UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 19-1689
_____

UNITED STATES,
Appellee,

v.

JEAN LEONARD TEGANYA,
Defendant-Appellant.
_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
_____

JOINT APPENDIX
VOLUME I
_____


Christine DeMaso                          Alexia DeVincentis
Assistant Federal Public Defender         Assistant U.S. Attorney
Federal Public Defender Office            U.S. Attorney's Office
51 Sleeper Street, 5th Floor              1 Courthouse Way, Ste 9200
Boston, MA 02210                          Boston, MA 02210
617-223-8061                              617-748-3394


For Jean Leonard Teganya                  For the United States

# TABLE OF CONTENTS

## **VOLUME I**

District Court Docket Sheet ............................................................. J.A. 1

Indictment ..................................................................................... J.A. 23

Pretrial Conference Transcript (3/5/19) .................................... J.A. 38

Trial Transcript Day 2 (3/11/19) ................................................ J.A. 76

Trial Transcript Day 3 (3/12/19) .............................................. J.A. 199

Trial Transcript Day 4 (3/13/19) .............................................. J.A. 375

Trial Transcript Day 5 (3/14/19) .............................................. J.A. 479

Trial Transcript Day 6 (3/15/19) .............................................. J.A. 595

## **VOLUME II**

Trial Transcript Day 7 (3/18/19) .............................................. J.A. 689

Trial Transcript Day 8 (3/19/19) .............................................. J.A. 818

Trial Transcript Day 9 (3/20/19) .............................................. J.A. 920

Hearing Transcript (3/21/19) .................................................. J.A. 1015

Trial Transcript Day 10 (3/22/19) ........................................... J.A. 1042

Trial Transcript Day 11 (3/25/19) ........................................... J.A. 1142

Trial Transcript Day 12 (3/26/19) ........................................... J.A. 1250

Trial Transcript Day 13 (3/27/19) ........................................... J.A. 1348

# **VOLUME III**

Telephone Conference (3/29/19) ............................................................. J.A. 1428

Trial Transcript Day 14 (4/1/19) ............................................................. J.A. 1454

Trial Transcript Day 15 (4/2/19) ............................................................. J.A. 1597

Trial Transcript Day 16 (4/3/19) ............................................................. J.A. 1663

Trial Transcript Day 17 (4/4/19) ............................................................. J.A. 1795

Trial Transcript Day 18 (4/5/19) ............................................................. J.A. 1947

Trial Exhibit 1 ............................................................................................. J.A. 2065

Trial Exhibit 3 ............................................................................................. J.A. 2076

Trial Exhibit 65 ........................................................................................... J.A. 2091

Trial Exhibit 75 ........................................................................................... J.A. 2092

Trial Exhibit 76 ........................................................................................... J.A. 2093

Trial Exhibit 81 ........................................................................................... J.A. 2094

Notice of Appeal (D.E. 75) ....................................................................... J.A. 2095

# United States District Court
## District of Massachusetts (Boston)
## CRIMINAL DOCKET FOR CASE #: 1:17-cr-10292-FDS-1

Case title: USA v. Teganya      Date Filed: 09/27/2017
Magistrate judge case number: 1:17-mj-02236-MBB      Date Terminated: 07/02/2019

---

Assigned to: Chief Judge F. Dennis Saylor, IV

Appeals court case number: 19-1689 USCA - First Circuit

**Defendant (1)**

**Jean Leonard Teganya**      represented by   **Scott Lauer**
*TERMINATED: 07/02/2019*        Federal Public Defender Office
         District of Massachusetts
         51 Sleeper Street
         5th Floor
         Boston, MA 02210
         (617) 223-8061
         Email: Scott_Lauer@fd.org
         *LEAD ATTORNEY*
         *ATTORNEY TO BE NOTICED*
         *Designation: Public Defender or*
         *Community Defender Appointment*

         **Timothy G. Watkins**
         Federal Public Defender Office
         51 Sleeper Street
         5th Floor
         Boston, MA 02210
         617-223-8061
         Fax: 617-223-8080
         Email: Timothy_Watkins@fd.org
         *ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1546(a) FRAUD AND MISUSE OF VISAS, PERMITS AND OTHER DOCUMENTS (1) | 97 months imprisonment, no term of supervised release, $100 special assessment |
| 18:1621(2) PERJURY (2) | 60 months imprisonment, no term of supervised release, $100 special assessment |
| 18:1546(a) FRAUD AND MISUSE OF VISAS, PERMITS AND OTHER | 97 months imprisonment, no term of supervised release, $100 special assessment |

**J.A. 1**

DOCUMENTS
(3)

| 18:1621(2) PERJURY (4) | 60 months imprisonment, no term of supervised release, $100 special assessment |
| 18:1621(1) PERJURY (5) | 60 months imprisonment, no term of supervised release, $100 special assessment |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| 18:1546 - IMMIGRATION FRAUD; 18:1621(2) - PERJURY | |

---

| **Plaintiff** | | |
| **USA** | represented by | **George P. Varghese** United States Attorney's Office John Joseph Moakley Federal Courthouse 1 Courthouse Way Suite 9200 Boston, MA 02210 617-748-3237 Email: george.varghese@usdoj.gov *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* *Designation: Assistant US Attorney* |
| | | **John A. Capin** United States Attorney's Office John Joseph Moakley Federal Courthouse 1 Courthouse Way Suite 9200 Boston, MA 02210 617-748-3264 Fax: 617-748-3951 Email: john.capin@usdoj.gov *TERMINATED: 11/30/2017* *LEAD ATTORNEY* *Designation: Assistant US Attorney* |
| | | **Scott Garland** United States Attorney's Office |

J.A. 2

John J. Moakley U.S. Courthouse
Suite 9200
Boston, MA 02210
617-748-3290
Fax: 617-748-3664
Email: scott.garland@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/03/2017 | 1 | MOTION to Seal as to Jean Leonard Teganya by USA. (Catino3, Theresa) [1:17-mj-02236-MBB] (Entered: 08/04/2017) |
| 08/03/2017 | 2 | Magistrate Judge Marianne B. Bowler: ENDORSED ORDER entered granting 1 Motion to Seal as to Jean Leonard Teganya (1)Allowed... (Catino3, Theresa) [1:17-mj-02236-MBB] (Entered: 08/04/2017) |
| 08/03/2017 | 3 | SEALED COMPLAINT as to Jean Leonard Teganya (1). (Attachments: # 1 Affidavit of Kevin J Cronin, # 2 JS45)(Catino3, Theresa) [1:17-mj-02236-MBB] (Entered: 08/04/2017) |
| 08/03/2017 | 4 | Arrest Warrant Issued by Magistrate Judge Marianne B. Bowler as to Jean Leonard Teganya. (Catino3, Theresa) (Main Document 4 replaced on 8/4/2017) (Catino3, Theresa). [1:17-mj-02236-MBB] (Entered: 08/04/2017) |
| 08/04/2017 | 5 | ELECTRONIC NOTICE of Case Assignment as to Jean Leonard Teganya; Magistrate Judge Marianne B. Bowler assigned to case. (Alves-Baptista, Antonia) [1:17-mj-02236-MBB] (Entered: 08/04/2017) |
| 08/04/2017 | 6 | Arrest Warrant Returned Executed on 8/4/2017 as to Jean Leonard Teganya. (Catino3, Theresa) [1:17-mj-02236-MBB] (Entered: 08/04/2017) |
| 08/04/2017 | 7 | MOTION to Unseal Case as to Jean Leonard Teganya by USA. (Alves-Baptista, Antonia) [1:17-mj-02236-MBB] (Entered: 08/04/2017) |
| 08/04/2017 | 8 | Magistrate Judge Marianne B. Bowler: ORDER entered granting 7 Motion to Unseal Case as to Jean Leonard Teganya (1) (Alves-Baptista, Antonia) [1:17-mj-02236-MBB] (Entered: 08/04/2017) |
| 08/04/2017 | 9 | ELECTRONIC NOTICE OF HEARING as to Jean Leonard Teganya Initial Appearance set for 8/4/2017 02:30 PM in Courtroom 25 before Magistrate Judge Marianne B. Bowler. (Putnam, Harold) [1:17-mj-02236-MBB] (Entered: 08/04/2017) |
| 08/04/2017 | 10 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Marianne B. Bowler: Initial Appearance as to Jean Leonard Teganya held on 8/4/2017. Court informs defendant of his rights and charges against him. Government states maximum penalties. Defendant submits financial affidavit, appoints counsel. Defendant sworn, answers bail questions. Government moves for detention, hearing set. Defendant remanded to the custody of agents present, to USMS. (Detention Hearing set for 8/9/2017 02:30 PM in Courtroom 25 before Magistrate Judge Marianne B. Bowler.) (Attorneys present: Chakravarty, Lauer. )Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to http://www.mad.uscourts.gov/attorneys/Magistrate-Audio.htm . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Putnam, Harold) [1:17-mj-02236-MBB] (Entered: 08/04/2017) |

J.A. 3

| 08/09/2017 | 12 | MOTION for Release with Conditions as to Jean Leonard Teganya. (Attachments: # 1 Affidavit of Basile Bazina, # 2 Memorandum Concerning the September 16, 2014 Decision of the Immigration Court, # 3 Affidavit of Gregory Meyer, # 4 Letter of Eric Nshimiye, # 5 Letter of Marcel Munyanziza, # 6 Letter of Aimable Rwabukumba, # 7 Letter of Leonard Uwiringiylmana, # 8 Affidavit of Professor Timothy Longman, # 9 "Reasons for Order and Order", # 10 Letter of Rev. Jorge Daniel Lazo, # 11 Letter of John J. Verrengia)(Lauer, Scott) [1:17-mj-02236-MBB] (Entered: 08/09/2017) |
|---|---|---|
| 08/09/2017 | 13 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Marianne B. Bowler: Detention Hearing as to Jean Leonard Teganya held on 8/9/2017. Government calls Special Agent Kevin Cronin, Homeland Security; witness examined directly, cross, re-directly, re-cross. Exhibits submitted. Both parties waive probable cause hearing; Court finds probable cause. Defendant argues against detention; defendant's motion (doc. 12) taken under advisement, government may oppose motion. Defendant remanded to the custody of the USMS. (Attorneys present: Chakravarty, Capin, Lauer.) Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to http://www.mad.uscourts.gov/attorneys/Magistrate-Audio.htm . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Putnam, Harold)[1:17-mj-02236-MBB] (Entered: 08/14/2017) |
| 08/09/2017 | 14 | EXHIBIT/WITNESS LIST re: Jean Leonard Teganya. (Putnam, Harold) [1:17-mj-02236-MBB] (Entered: 08/14/2017) |
| 08/21/2017 | 15 | Memorandum regarding Pretrial Detention as to Jean Leonard Teganya (Capin, John) [1:17-mj-02236-MBB] (Entered: 08/21/2017) |
| 08/21/2017 | 16 | NOTICE OF ATTORNEY APPEARANCE John A. Capin appearing for USA. (Capin, John) [1:17-mj-02236-MBB] (Entered: 08/21/2017) |
| 09/27/2017 | 17 | INDICTMENT as to Jean Leonard Teganya (1) count(s) 1, 2, 3, 4, 5. (Attachments: # 1 JS45)(Danieli, Chris) (Entered: 09/27/2017) |
| 09/27/2017 | 18 | ELECTRONIC NOTICE of Case Assignment as to Jean Leonard Teganya; Judge F. Dennis Saylor, IV assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Marianne B. Bowler. (Danieli, Chris) (Entered: 09/27/2017) |
| 09/27/2017 | 19 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge Marianne B. Bowler Reason for referral: full pretrial proceedings as to Jean Leonard Teganya (Danieli, Chris) (Entered: 09/27/2017) |
| 09/28/2017 | 20 | ELECTRONIC NOTICE OF HEARING as to Jean Leonard Teganya Arraignment set for 10/6/2017 02:15 PM in Courtroom 25 before Magistrate Judge Marianne B. Bowler. (Putnam, Harold) (Entered: 09/28/2017) |
| 10/06/2017 | 21 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Marianne B. Bowler: Arraignment as to Jean Leonard Teganya (1) Counts 1,2,3,4,5 held on 10/6/2017. Government states maximum penalties. Not Guilty Plea entered by Jean Leonard Teganya: Not Guilty on All Counts. The government anticipates a trial lasting two to three weeks and anticipates calling 10 to 15 witnesses. Defense to arrange meeting between potential surety and Pretrial Services. Counsel to confer about the possibility of case being deemed a complex matter. Government to exclude the time from this date until 12/7/2017. Defendant remanded to the custody of the USMS. (Status Conference set for 12/7/2017 02:30 PM in Courtroom 25 before Magistrate Judge Marianne B. Bowler.) (Attorneys present: Capin, Garland, Lauer.) Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, |

| | | |
|---|---|---|
| | | please go to http://www.mad.uscourts.gov/attorneys/Magistrate-Audio.htm . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Putnam, Harold) (Entered: 10/06/2017) |
| 10/16/2017 | 22 | Transcript of Detention Hearing as to Jean Leonard Teganya held on August 9, 2017, before Magistrate Judge Marianne B. Bowler. Court Reporter: No Reporter Used. Digital Recording transcribed by Karen Aveyard. The Transcript may be purchased through Karen Aveyard at k.aveyard@comcast.net, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/6/2017. Redacted Transcript Deadline set for 11/16/2017. Release of Transcript Restriction set for 1/16/2018. (Scalfani, Deborah) (Entered: 10/16/2017) |
| 10/16/2017 | 23 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 10/16/2017) |
| 10/26/2017 | 24 | Assented to MOTION for Excludable Delay from October 6, 2017 to December 7, 2017 as to Jean Leonard Teganya by USA. (Attachments: # 1 Text of Proposed Order)(Capin, John) (Entered: 10/26/2017) |
| 10/27/2017 | 25 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 24 Motion to Exclude as to Jean Leonard Teganya (1). (Putnam, Harold) (Entered: 10/30/2017) |
| 10/27/2017 | 26 | Magistrate Judge Marianne B. Bowler: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Jean Leonard Teganya. Time excluded from 10/6/2017 until 12/7/2017. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Putnam, Harold) (Entered: 10/30/2017) |
| 11/30/2017 | 27 | NOTICE OF ATTORNEY APPEARANCE George P. Varghese appearing for USA. *substituting for John A. Capin* (Varghese, George) (Entered: 11/30/2017) |
| 12/06/2017 | 28 | Transcript of Arraignment as to Jean Leonard Teganya held on October 6, 2017, before Magistrate Judge Marianne B. Bowler. No Reporter Used. Digital Recording transcribed by Karen Aveyard. The Transcript may be purchased through Karen Aveyard at k.aveyard@comcast.net, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 12/27/2017. Redacted Transcript Deadline set for 1/8/2018. Release of Transcript Restriction set for 3/6/2018. (Scalfani, Deborah) (Entered: 12/06/2017) |
| 12/06/2017 | 29 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 12/06/2017) |
| 12/07/2017 | 30 | MOTION for Ruling as to Detention re 12 MOTION for Release with Conditions as to Jean Leonard Teganya. (Lauer, Scott) (Entered: 12/07/2017) |
| 12/07/2017 | 31 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Marianne B. Bowler: Status Conference as to Jean Leonard Teganya held on 12/7/2017. Government reports that bulk of discovery has been provided. Defense agrees, though notes the complex, international nature of case investigation. Court orders defendant's continued detainment, finding him to be a risk of flight pursuant to 18 U.S.C. 3142(f)(2)(a). Written opinion to issue. Accordingly, 30 and 12 Motions as to Jean Leonard Teganya (1) denied as moot. Government to file assented to motion to exclude the time from this date until |

| | | |
|---|---|---|
| | | 2/7/2018. (Status Conference set for 2/7/2018 02:30 PM in Courtroom 25 before Magistrate Judge Marianne B. Bowler.) (Attorneys present: Varghese, Lauer.) Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to http://www.mad.uscourts.gov/attorneys/Magistrate-Audio.htm . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Putnam, Harold) (Entered: 12/07/2017) |
| 12/18/2017 | 32 | Joint MOTION for Excludable Delay from December 7, 2017 to February 7, 2018 as to Jean Leonard Teganya by USA. (Varghese, George) (Entered: 12/18/2017) |
| 12/29/2017 | 33 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 32 Motion to Exclude as to Jean Leonard Teganya (1) (Putnam, Harold) (Entered: 12/29/2017) |
| 12/29/2017 | 34 | ORDER ON EXCLUDABLE DELAY as to Jean Leonard Teganya. Time excluded from 12/7/2017 until 2/7/2018. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Putnam, Harold) (Entered: 12/29/2017) |
| 02/05/2018 | 35 | Assented to MOTION to Continue to March 1, 2, 5, or 6, 2018 to Status Conference as to Jean Leonard Teganya by USA. (Garland, Scott) (Entered: 02/05/2018) |
| 02/06/2018 | 36 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 35 Motion to Continue as to Jean Leonard Teganya (1). Status Conference set for 3/2/2018 02:30 PM in Courtroom 25 before Magistrate Judge Marianne B. Bowler. (Putnam, Harold) (Entered: 02/06/2018) |
| 02/12/2018 | 37 | ORDER ON EXCLUDABLE DELAY as to Jean Leonard Teganya. Time excluded from 2/7/2018 until 3/2/2018. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Putnam, Harold) (Entered: 02/13/2018) |
| 03/01/2018 | 38 | Assented to MOTION to Continue as to Jean Leonard Teganya. (Lauer, Scott) (Entered: 03/01/2018) |
| 03/01/2018 | 39 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 38 Motion to Continue as to Jean Leonard Teganya (1). Status Conference RESET for 3/8/2018 02:15 PM in Courtroom 25 before Magistrate Judge Marianne B. Bowler. (Putnam, Harold) (Entered: 03/01/2018) |
| 03/08/2018 | 40 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Marianne B. Bowler: Status Conference as to Jean Leonard Teganya held on 3/8/2018. Counsel discuss logistics of proper and effective service upon potential international witnesses. Counsel confer, request further date, and agree to the exclusion of time from this date until 5/17/2018. Government to file assented to motion to exclude time. (Status Conference set for 5/17/2018 02:30 PM in Courtroom 25 before Magistrate Judge Marianne B. Bowler.) (Attorneys present: Varghese, Garland, Lauer.) Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to http://www.mad.uscourts.gov/attorneys/Magistrate-Audio.htm . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Putnam, Harold) (Entered: 03/08/2018) |
| 04/05/2018 | 41 | Transcript of Status Conference as to Jean Leonard Teganya held on December 7, 2017, before Magistrate Judge Marianne B. Bowler. Court Reporter Name and Contact Information: No Reporter Used. Digital Recording transcribed by Karen Aveyard. The Transcript may be purchased through Karen Aveyard at k.aveyard@comcast.net, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/26/2018. Redacted Transcript Deadline set for 5/7/2018. Release of Transcript Restriction set for 7/5/2018. (Scalfani, Deborah) (Entered: 04/05/2018) |

| 04/05/2018 | 42 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 04/05/2018) |
| 05/16/2018 | 43 | Assented to MOTION to Continue to the May 17, 2018 Status Conference and to Exclude Time under the Speedy Trial Act as to Jean Leonard Teganya by USA. (Varghese, George) (Entered: 05/16/2018) |
| 05/17/2018 | | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 43 Motion to Continue as to Jean Leonard Teganya (1). The Deputy Clerk will assign a new date. (Bowler, Marianne) (Entered: 05/17/2018) |
| 05/17/2018 | 44 | ELECTRONIC NOTICE OF RESCHEDULING as to Jean Leonard Teganya. Status Conference set for 5/18/2018 02:00 PM in Courtroom 25 before Magistrate Judge Marianne B. Bowler. (Putnam, Harold) (Entered: 05/17/2018) |
| 05/18/2018 | 45 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Marianne B. Bowler: Status Conference as to Jean Leonard Teganya held on 5/18/2018. Counsel report on progress of discovery, request that matter be returned to the district judge, and that a scheduling conference be set at the court's earliest convenience. Government to exclude the time from 5/18/2018 until first appearance before the district judge. (Attorneys present: Varghese, Lauer.) Court Reporter Name and Contact or digital recording information: Digital Recording. To order a copy of this Digital Recording, please go to http://www.mad.uscourts.gov/attorneys/Magistrate-Audio.htm . For a transcript of this proceeding, contact Deborah Scalfani by email at deborah_scalfani@mad.uscourts.gov. (Putnam, Harold) (Entered: 05/21/2018) |
| 05/21/2018 | 46 | Magistrate Judge Marianne B. Bowler: ORDER entered. REPORT AND ORDER on Final Status Conference as to Jean Leonard Teganya (Putnam, Harold) (Entered: 05/21/2018) |
| 05/21/2018 | 47 | Case as to Jean Leonard Teganya no longer referred to Magistrate Judge Marianne B. Bowler. (Putnam, Harold) (Entered: 05/21/2018) |
| 05/22/2018 | 48 | Joint MOTION for Protective Order as to Jean Leonard Teganya by USA. (Attachments: # 1 Text of Proposed Order Proposed Order)(Varghese, George) (Entered: 05/22/2018) |
| 05/22/2018 | 49 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered acknowledging 46 Report and Order on Final Status Conference by Magistrate Judge as to Jean Leonard Teganya (1) Status Conference set for 5/30/2018 10:00 AM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 05/22/2018) |
| 05/23/2018 | 50 | Assented to MOTION for Excludable Delay from May 18, 2018 to May 30, 2018 *under the Speedy Trial Act* as to Jean Leonard Teganya by USA. (Varghese, George) (Entered: 05/23/2018) |
| 05/25/2018 | 51 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 48 Joint Motion for Protective Order as to Jean Leonard Teganya (1) (Pezzarossi, Lisa) (Entered: 05/25/2018) |
| 05/25/2018 | 52 | Judge F. Dennis Saylor, IV: ORDER entered. PROTECTIVE ORDER as to Jean Leonard Teganya (Pezzarossi, Lisa) (Entered: 05/25/2018) |
| 05/29/2018 | 53 | Judge F. Dennis Saylor, IV: ORDER entered granting 50 Motion to Exclude as to Jean Leonard Teganya (1). Time excluded through 5/30/2018. (Pezzarossi, Lisa) (Entered: 05/29/2018) |
| 05/30/2018 | 54 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Status |

J.A. 7

| | | |
|---|---|---|
| | | Conference as to Jean Leonard Teganya held on 5/30/2018. Case called. Counsel and dft appeared. Colloquy re: trial. Parties anticipate a 3 week trial and request the March 2019 time frame. Court set further status conference for 7/12 at 3:20 p.m. to select trial date. No objection to exclusion of the time. (Attorneys present: Lauer, Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 05/30/2018) |
| 05/30/2018 | 55 | ELECTRONIC NOTICE OF HEARING as to Jean Leonard Teganya Interim Status Conference set for 7/12/2018 03:30 PM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 05/30/2018) |
| 05/30/2018 | 56 | Judge F. Dennis Saylor, IV: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Jean Leonard Teganya. Time excluded from 5/30/2018 until 7/12/2018. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (FDS, law2) (Entered: 05/30/2018) |
| 07/12/2018 | 57 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Status Conference as to Jean Leonard Teganya held on 7/12/2018. Counsel and dft appeared. Court set following dates and deadlines: Trial to begin on 3/11/2019 (parties anticipate 3-4 weeks). Final Pretrial Conference set for 3/5/2019 at 2:00 PM. Pretrial filings (proposed voir dire, jury instructions, exhibit and witness list, and motions in limine) due by 2/19/2019. Status Conferences set for 9/11/2018 at 12:10 PM and 11/5/2018 at 3:20 PM. (Attorneys present: S. Lauer, S. Garland, G. Varghese. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 07/12/2018) |
| 07/12/2018 | 58 | ELECTRONIC NOTICE OF HEARING as to Jean Leonard Teganya: Interim Status Conference set for 9/11/2018 12:10 PM in Courtroom 2 before Judge F. Dennis Saylor IV. Final Status Conference set for 11/5/2018 03:20 PM in Courtroom 2 before Judge F. Dennis Saylor IV. Final Pretrial Conference set for 3/5/2019 02:00 PM before Judge F. Dennis Saylor IV. Jury Trial set for 3/11/2019 09:00 AM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 07/12/2018) |
| 07/12/2018 | 59 | Judge F. Dennis Saylor, IV: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Jean Leonard Teganya. Time excluded from 7/12/2018 until 3/11/2019. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (FDS, law2) (Entered: 07/12/2018) |
| 09/11/2018 | 60 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Status Conference as to Jean Leonard Teganya held on 9/11/2018. Case called. Counsel reported issues with investigator and scheduling. Court will set further status conference for 9/26/2018 at 3:30 p.m. (Attorneys present: G. Varghese, S. Lauer. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 09/11/2018) |
| 09/11/2018 | 61 | ELECTRONIC NOTICE OF HEARING as to Jean Leonard Teganya Interim Status Conference set for 9/26/2018 03:30 PM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 09/11/2018) |
| 09/25/2018 | 62 | ELECTRONIC NOTICE CANCELING 9/26/2018 STATUS CONFERENCE as to Jean Leonard Teganya. All other scheduled hearings remain on the Court's calendar. (Pezzarossi, Lisa) (Entered: 09/25/2018) |

| 11/05/2018 | 63 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Status Conference as to Jean Leonard Teganya held on 11/5/2018. Dft report that motion regarding bail to be filed. Colloquy re: length of trial and witness logistics. Court set further status conference to revisit length of trial.<br><br>NOTICE OF HEARING: Status Conference set for 12/13/2018 03:30 PM in Courtroom 2 before Judge F. Dennis Saylor IV. (Attorneys present: S. Lauer, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 11/05/2018) |
| 11/26/2018 | 64 | MOTION for Review of Detention Order by District Court Judge as to Jean Leonard Teganya. (Lauer, Scott) (Entered: 11/26/2018) |
| 12/10/2018 | 68 | MEMORANDUM in Opposition by USA as to Jean Leonard Teganya re 64 MOTION for Review of Detention Order by District Court Judge (Attachments: # 1 Exhibit Gov't's Ex. 1 - Detention Hearing, # 2 Exhibit Gov't's Ex. 2 - Detention Hearing, # 3 Exhibit Gov't's Ex. 3 - Detention Hearing, # 4 Exhibit Gov't's Ex. 4 - Detention Hearing, # 5 Exhibit Gov't's Ex. 5 - Detention Hearing, # 6 Exhibit Gov't's Ex. 6 - Detention Hearing, # 7 Exhibit Gov't's Ex. 7 - Detention Hearing, # 8 Exhibit Gov't's Ex. 8 - Detention Hearing, # 9 Exhibit Transcript - Detention Hearing, # 10 Exhibit Ex. 10 - Report of Investigation (June 4, 2018))(Garland, Scott) (Entered: 12/10/2018) |
| 12/13/2018 | 69 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Status Conference as to Jean Leonard Teganya held on 12/13/2018. Counsel and defendant appeared. Colloquy re: logistics and length of trial (5 weeks anticipated). Court heard argument on 64 Motion for Review of Detention Order. Court will take motion under advisement. Colloquy re: Motion for Order. Motion remains pending further consideration. Court will set further status on 1/11/2019 at 3:10 p.m. (Attorneys present: S. Garland, S. Lauer. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 12/13/2018) |
| 12/13/2018 | 70 | ELECTRONIC NOTICE OF HEARING as to Jean Leonard Teganya Status Conference set for 1/11/2019 03:10 PM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 12/13/2018) |
| 01/11/2019 | 71 | NOTICE RESETTING HEARING as to Jean Leonard Teganya -- TIME CHANGE ONLY -- -Status Conference reset for 1/11/2019 02:15 PM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 01/11/2019) |
| 01/11/2019 | 72 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Status Conference as to Jean Leonard Teganya held on 1/11/2019. Colloquy re: pending motions and trial length and logistics. Court GRANTED motion for Order. Court directed counsel to hold March 8th open for impanelment. Court set further status on 1/30/2019 at 10:00 a.m. (Attorneys present: G. Varghese, S. Garland, S. Lauer. )Court Reporter Name and Contact or digital recording information: Lee Marzilli at leemarz@aol.com. (Pezzarossi, Lisa) (Entered: 01/11/2019) |
| 01/14/2019 | 73 | ELECTRONIC NOTICE OF HEARING as to Jean Leonard Teganya Jury Selection set for 3/8/2019 09:00 AM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 01/14/2019) |
| 01/17/2019 | 75 | Joint MOTION for Order *Regarding Pretrial Schedule* as to Jean Leonard Teganya by USA. (Varghese, George) (Entered: 01/17/2019) |
| 01/18/2019 | 76 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered. Pursuant to 18 U.S.C. sec. 3145(b), Defendant's Motion for Review of Detention Order (Docket No. 64) is DENIED. The government has met its burden of establishing that no condition or |

76459    In re: USDC Massachusetts    Internal use    07/16/2020

| | | combination of conditions will reasonably assure the defendant's presence at trial. According to the record before the Court, and as set forth in the materials submitted by the government, defendant presents a serious risk of flight. Among other things, he is a citizen of Rwanda; he entered the United States illegally; he has fled or otherwise departed from Canada and other jurisdictions where he did not have legal status; and he is charged with a serious crime that (among other things) allegedly involved participation in genocide, and that carries significant potential penalties. Under the circumstances, the proposed conditions of release are not sufficient to reasonably assure his appearance. (Pezzarossi, Lisa) (Entered: 01/18/2019) |
|---|---|---|
| 01/18/2019 | 77 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 75 Motion for Scheduling Order as to Jean Leonard Teganya (1). (Pezzarossi, Lisa) (Entered: 01/18/2019) |
| 01/22/2019 | 78 | Judge F. Dennis Saylor, IV: ORDER entered. INITIAL ORDER CONCERNING PROCEDURES FOR TRIAL as to Jean Leonard Teganya (Pezzarossi, Lisa) (Entered: 01/22/2019) |
| 02/06/2019 | 88 | EXHIBIT/WITNESS LIST by Jean Leonard Teganya (Lauer, Scott) (Entered: 02/06/2019) |
| 02/06/2019 | 89 | EXHIBIT/WITNESS LIST by USA as to Jean Leonard Teganya (Varghese, George) (Entered: 02/06/2019) |
| 02/07/2019 | 90 | Proposed Voir Dire by USA as to Jean Leonard Teganya (Garland, Scott) (Entered: 02/07/2019) |
| 02/18/2019 | 91 | MOTION in Limine *to Limit Testimony of Defense Expert Noel Twagiramungu* as to Jean Leonard Teganya by USA. (Varghese, George) (Entered: 02/18/2019) |
| 02/19/2019 | 92 | Proposed Jury Instructions by USA as to Jean Leonard Teganya (Varghese, George) (Entered: 02/19/2019) |
| 02/19/2019 | 93 | EXHIBIT/WITNESS LIST by USA as to Jean Leonard Teganya (Varghese, George) (Entered: 02/19/2019) |
| 02/20/2019 | 94 | ELECTRONIC NOTICE OF HEARING as to Jean Leonard Teganya Final Status Conference set for 2/25/2019 03:15 PM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 02/20/2019) |
| 02/25/2019 | 95 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Final Status Conference as to Jean Leonard Teganya held on 2/25/2019; scheduling addressed; restrictions re witness appearance addressed; trial expected to conclude the middle of April 2019; if not sooner, 91 Motion in Limine to be heard at the 3/5/19 Final Pretrial Conference; deft remanded to custody. (Attorneys present: AUSAs Garland and varghese for the Gov't; Lauer for the deft. )Court Reporter Name and Contact or digital recording information: Valerie O'Hara at vaohara@gmail.com. (Lovett, Jarrett) (Entered: 02/25/2019) |
| 02/28/2019 | 96 | NOTICE OF ATTORNEY APPEARANCE: Timothy G. Watkins appearing for Jean Leonard Teganya. Type of Appearance: Federal Defender Office. (Watkins, Timothy) (Entered: 02/28/2019) |
| 03/04/2019 | 97 | MOTION in Limine *to Exclude Evidence Regarding Legal Determinations Made in Canada* as to Jean Leonard Teganya. (Attachments: # 1 Exhibit 2005 Canadian Refugee Decision, # 2 Exhibit 2006 Canadian Court Decision, # 3 Exhibit 2012 Canadian Court Decision)(Lauer, Scott) (Entered: 03/04/2019) |
| 03/04/2019 | 98 | RESPONSE to Motion by Jean Leonard Teganya re 91 MOTION in Limine *to Limit* |

J.A. 10

| | | *Testimony of Defense Expert Noel Twagiramungu* (Lauer, Scott) (Entered: 03/04/2019) |
|---|---|---|
| 03/04/2019 | 99 | Proposed Voir Dire by Jean Leonard Teganya (Lauer, Scott) (Entered: 03/04/2019) |
| 03/05/2019 | 100 | Opposition by USA as to Jean Leonard Teganya re 97 MOTION in Limine *to Exclude Evidence Regarding Legal Determinations Made in Canada* (Varghese, George) (Entered: 03/05/2019) |
| 03/05/2019 | 105 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Final Pretrial Conference as to Jean Leonard Teganya held on 3/5/2019. Colloquy re: trial logistics and pending motions. For the reasons stated on the record the Court granted in part 97 MOTION in Limine to Exclude Evidence Regarding Legal Determinations Made in Canada. The Court will leave pending the 91 Motion to Limit Testimony. Court will permit counsel to file offer of proof. (Attorneys present: Lauer, Watkins, Garland, Varghese. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 03/08/2019) |
| 03/06/2019 | 101 | TRIAL BRIEF by USA as to Jean Leonard Teganya (Varghese, George) (Entered: 03/06/2019) |
| 03/07/2019 | 102 | EXHIBIT/WITNESS LIST by USA as to Jean Leonard Teganya (Varghese, George) (Entered: 03/07/2019) |
| 03/07/2019 | 103 | EXHIBIT/WITNESS LIST by USA as to Jean Leonard Teganya (Varghese, George) (Entered: 03/07/2019) |
| 03/07/2019 | 104 | MOTION in Limine *to Exclude Prejudicial Photographs and Limit Scope of Testimony from Dr. Rony Zachariah* as to Jean Leonard Teganya. (Lauer, Scott) (Entered: 03/07/2019) |
| 03/08/2019 | 106 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial (DAY 1) as to Jean Leonard Teganya held on 3/8/2019. Conference without jury present. Jurors brought in. Jury Selection process began. 16 jurors impaneled. Jurors sworn. Trial to resume on 3/11/2019 at 8:45 a.m. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) Modified on 3/18/2019 (Pezzarossi, Lisa). (Entered: 03/11/2019) |
| 03/11/2019 | 107 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial (DAY 2) as to Jean Leonard Teganya held on 3/11/2019. Case called. Conference with counsel and dft re: Juror seat 4. Juror in seat 4 discharged. Jury brought in. Opening statements. Govt called Dr. Phil Clark. Direct examination to continue on 3/12/2019. Court will resume at 8:30 a.m. for conference. EXHIBITS ADMITTED: 18 AND 19. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) Modified on 3/18/2019 (Pezzarossi, Lisa). (Entered: 03/11/2019) |
| 03/12/2019 | 110 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial (DAY 3) as to Jean Leonard Teganya held on 3/12/2019. Conference without jurors present. Jury brought in. Direct exam of P. Clark continued w/cross and redirect. Govt called Dr. Rony Zachariah (Direct, cross and redirect). Govt called I. Mukankusi. Direct exam will resume on 3/13/2019. Counsel to meet at 8:30 a.m. on 3/13/2019. EXHIBITS ADMITTED: 24, 23, 53, 52. (Attorneys present: Lauer, Watkins, Garland, Varghese. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) Modified on 3/18/2019 (Pezzarossi, Lisa). (Entered: 03/12/2019) |

| | | |
|---|---|---|
| 03/13/2019 | 114 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial (DAY 4) as to Jean Leonard Teganya held on 3/13/2019. Case called. Conference w/out jury present. Jurors brought in. Direct exam of I. Mukankasi resumed; cross, redirect and recross). Govt called J. P. Gasasira. Direct exam of Gasasira to resume on 3/14/2019.<br><br>EXHIBITS ADMITTED: 26, 28, 58, 60, 29. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) Modified on 3/18/2019 (Pezzarossi, Lisa). (Entered: 03/13/2019) |
| 03/14/2019 | 115 | Transcript of Pretrial Conference as to Jean Leonard Teganya held on March 5, 2019, before Judge F. Dennis Saylor IV. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/4/2019. Redacted Transcript Deadline set for 4/15/2019. Release of Transcript Restriction set for 6/12/2019. (Scalfani, Deborah) (Entered: 03/14/2019) |
| 03/14/2019 | 116 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 03/14/2019) |
| 03/14/2019 | 117 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial (DAY 5) as to Jean Leonard Teganya held on 3/14/2019. Case called. Brief conference with counsel w/out jury present. Jurors brought in. J. Gasasira resumes stand - testimony completed. Govt called R. Radatz (direct exam only). Govt called A. Nzabonimpa testimony to resume on 3/15/2019. Conference on 3/15/2019 at 8:30 a.m.<br><br>EXHIBITS ADMITTED: 61, 59, 43, 56, 57, 21, 9, 12, and 15 (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Kathleen Silva at kathysilva@verizon.net. (Pezzarossi, Lisa) Modified on 3/18/2019 (Pezzarossi, Lisa). (Entered: 03/14/2019) |
| 03/15/2019 | 118 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial (DAY 6) as to Jean Leonard Teganya held on 3/15/2019. Conference w/out Jury present. Jurors brought in. Cross of A. Nzabonimba. Govt called: B. Kalimba (direct/cross/redirect). Govt called J. Arusha (direct/cross/redirect). Govt called A. Numukobwa (direct/cross). Trial to resume on 3/18/2019 at 8:30 a.m. (Attorneys present: S. lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) Modified on 3/18/2019 (Pezzarossi, Lisa). (Entered: 03/15/2019) |
| 03/18/2019 | 119 | Transcript of Jury Trial Day Two as to Jean Leonard Teganya held on March 11, 2019, before Judge F. Dennis Saylor IV. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 4/8/2019. Redacted Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Scalfani, Deborah) (Entered: 03/18/2019) |
| 03/18/2019 | 120 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at |

J.A. 12

http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 03/18/2019)

| 03/18/2019 | 121 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 3/18/2019 (DAY 7). Conference w/out Jury present. Colloquy re: issue with exhibits/affidavit. Jurors brought in. Govt called witnesses: M. Boyle and I. Habimana- Testimony completed. EXHIBITS ADMITTED: 1, 3, 4, 29, 30, 17, 27, 32, 34. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 03/19/2019) |
| 03/19/2019 | 125 | RESPONSE TO COURT ORDER by Jean Leonard Teganya (Watkins, Timothy) (Entered: 03/19/2019) |
| 03/19/2019 | 126 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 3/19/2019 (DAY 8). Conference w/out jury present. Colloquy re: exhibits. Jury brought in. Govt called C. Mukeshimana (direct/cross/re-direct/re-cross). Govt called E. Mukamurenzi (direct/cross/re-direct/re-cross). EXHIBITS ADMITTED: 35, 36, 64, 37. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 03/20/2019) |
| 03/20/2019 | 127 | MOTION for Acquittal as to Jean Leonard Teganya. (Lauer, Scott) (Entered: 03/20/2019) |
| 03/20/2019 | 131 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 3/20/2019 (DAY 9). Conference w/out jury present. Colloquy re: proffer. Jurors brought in. Govt called B. Anderson (direct, cross, redirect). Govt rested. Jurors excused for the day. Jurors directed to return on 3/22/2019. Court will hold hearing on proffer on 3/21/2019 at 9:00 a.m. Dft waived presence at 3/21/2019 hearing. Jury trial to resume on 3/22/2019. EXHIBITS ADMITTED: 62, 63, 51. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. Modified on 3/22/2019 (Pezzarossi, Lisa). (Entered: 03/20/2019) |
| 03/20/2019 | 132 | ELECTRONIC NOTICE OF HEARING as to Jean Leonard Teganya Hearing set for 3/21/2019 09:00 AM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Entered: 03/20/2019) |
| 03/21/2019 | 133 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Hearing as to Jean Leonard Teganya held on 3/21/2019. Colloquy re: defendant's expert. Court will hold vior dire of expert on 3/22/2019. Court will direct jurors to report by 10:00 a.m. on 3/22/2019. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 03/21/2019) |
| 03/22/2019 | 134 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 3/22/2019 (DAY 10). Colloquy re: voir dire of N. Twagiramungu. Twagiramungu sworn. Voir dire held. Court heard argument. Jurors brought in. Defense calls N. Twagiramungu(direct/cross/redirect/recross). Jurors excused for the day. Trial resumes Monday, March 25, 2019 at 8:30 AM. (Attorneys present: S. |

J.A. 13

Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 03/22/2019)

| 03/25/2019 | 135 | [ERROR] Electronic Notice of Hearing as to Jean Leonard Teganya Hearing set for 4/8/2019 09:00 AM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) Modified on 3/25/2019 (Pezzarossi, Lisa). (Entered: 03/25/2019) |
|---|---|---|
| 03/25/2019 | 136 | Notice of correction to docket made by Court staff as to Jean Leonard Teganya. Docket Entry 135 ELECTRONIC NOTICE OF HEARING as to Jean Leonard Teganya Hearing set for 4/8/2019 09:00 AM was issued in error on this matter. Hearing was for another matter 17-cr-10291. The clerk has canceled the 4/8/2019 in this matter hearing and noted the docket. (Pezzarossi, Lisa) (Entered: 03/25/2019) (Pezzarossi, Lisa) (Entered: 03/25/2019) |
| 03/25/2019 | 137 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 3/25/2019 (DAY 11). Case called. Conference w/out jury present. Jurors brought in. Interpreter J. Bizimana sworn in. Defense called: D. Nsengumuremyi, S. Seminega, J. P. Munyentwari, and F. Barinda (testimony completed). Trial to resume on 3/26/2019. (Attorneys present: Lauer, Watkins, Garland, Varghese. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 03/26/2019) |
| 03/26/2019 | 138 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 3/26/2019 (DAY 12). Conference w/out jury present. Jurors brought in. Defense called: J. P. Baligira, A. Rwabukunba (testimony completed. Direct exam of E. Muvunarinda began. Trial to resume with direct exam of Muvunardinda on 3/27/2019. Colloquy re: full days on April 1, 2019. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) Modified on 3/26/2019 (Pezzarossi, Lisa). (Entered: 03/26/2019) |
| 03/27/2019 | 139 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 3/27/2019 (DAY 13). Conference without jury present. Colloquy re: jury instructions and witness travel issues. Jury brought in. Continued direct exam of E. Muvunaninda - testimony concluded. Defense called J. Baptiste Bizimana and M. C. Musilikare - testimony concluded. (No trial on 3/28/2019 or 3/29/2019). Trial to resume on Monday, April 1, 2019 at 8:30 a.m. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 03/27/2019) |
| 03/28/2019 | 140 | MOTION to Present Testimony via Videoconferencing as to Jean Leonard Teganya. (Watkins, Timothy) (Entered: 03/28/2019) |
| 03/29/2019 | 141 | Emergency MOTION for Order *Directing the Government and Its Agents to Provide Voluntariness Information to Defense Witnesses* as to Jean Leonard Teganya. (Attachments: # 1 Text of Proposed Order)(Watkins, Timothy) (Entered: 03/29/2019) |
| 03/29/2019 | 142 | NOTICE of Telephone Conference. Conference set for 03/29/2019 at 3:30pm. Call in information: 1-888-675-2535 Access Code: 7629998 (Halley, Taylor) (Entered: 03/29/2019) |
| 03/29/2019 | 143 | MOTION to Delay Testimony of Certain Wtinesses as to Jean Leonard Teganya by USA. (Garland, Scott) (Entered: 03/29/2019) |
| 03/29/2019 | 151 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: granting 140 MOTION to Present Testimony via Videoconferencing as to Jean Leonard Teganya. |

J.A. 14

| | | |
|---|---|---|
| | | (1); Motion Hearing as to Jean Leonard Teganya held on 3/29/2019 re 140 MOTION to Present Testimony via Videoconferencing filed by Jean Leonard Teganya (Attorneys present: Scott Lauer and Timothy G. Watins by telephone for the Defendant; George P. Varghese and Scott Garland by telephone for the gov't. )Court Reporter Name and Contact or digital recording information: Cheryl Dahlstrom at cheryldahlstrom@yahoo.com. (Halley, Taylor) (Entered: 04/03/2019) |
| 04/01/2019 | 149 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 4/1/2019 (DAY 14). Case called. Conference w/out jury present re: witness issues and motions. Jury brought in. Defense called. J. P. Mihigo, I. Rukeribuga, A. Minani, T. M. Nahimana, J.F. Habimana, J.P. Rukebesha -- Testimony completed. Trial to resume on 4/2/2019 at 8:30 a.m.<br><br>EXHIBITS ADMITTED: 72. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) Modified on 4/2/2019 (Pezzarossi, Lisa). (Entered: 04/02/2019) |
| 04/02/2019 | 147 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered finding as moot 143 MOTION to Delay Testimony of Certain Witnesses. (Pezzarossi, Lisa) (Entered: 04/02/2019) |
| 04/02/2019 | 148 | Proposed Jury Instructions by Jean Leonard Teganya (Watkins, Timothy) (Entered: 04/02/2019) |
| 04/02/2019 | 150 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 4/2/2019 (DAY 15). Case called. Conference w/out jury present. Colloquy re: jury instructions/witnesses. Jury brought in. Defense called: S. Kuazikubone and E. Nshimiye - testimony concluded. Jury excused for the day. Continued colloquy re: jury instructions. Trial to resume on 4/3/2019 at 8:30 a.m. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) Modified on 4/2/2019 (Pezzarossi, Lisa). (Entered: 04/02/2019) |
| 04/03/2019 | 152 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 4/3/2019 (DAY 16). Case called. Conference without jury present. Jurors brought in. Defense called J. C. Kabagemi - testimony concluded. Defense called J. Leonard Teganya (direct/cross). Cross examination of Teganya to resume on 4/4/2019 at 9:00 a.m. Court will conduct conference with counsel on 4/4/2019 at 8:15 a.m.<br><br>EXHIBITS ADMITTED: 73, 74, 75, 76, 77, 23A, 78, 79, 80. (Attorneys present: Lauer, Watkins, Garland, Varghese. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) Modified on 4/3/2019 (Pezzarossi, Lisa). (Entered: 04/03/2019) |
| 04/04/2019 | 153 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 4/4/2019 (DAY 17). Case called. Conference w/out jury present re: jury instructions. Jurors brought in. Cross exam of Defendant resumed, redirect. Defense rested. Jurors excused. Conference without jury re: jury instructions, verdict form, indictment. Trial to resume on 4/5/2019 at 8:30 a.m. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 04/04/2019) |
| 04/05/2019 | 154 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Jury Trial as to Jean Leonard Teganya held on 4/5/2019. Case called. Conference without jury |

| | | present. Colloquy re: jury instructions. Jurors brought in. Closing Arguments. Jury charged and sent to deliberate. Verdict returned. Defendant guilty as to Counts 1-5. Court set sentencing for 7/1/2019 at 2:00 p.m. (Attorneys present: S. Lauer, T. Watkins, G. Varghese, S. Garland. )Court Reporter Name and Contact or digital recording information: Valerie OHara at vaohara@gmail.com. (Pezzarossi, Lisa) (Entered: 04/05/2019) |
|---|---|---|
| 04/05/2019 | 155 | JURY VERDICT as to Jean Leonard Teganya (1) Guilty on Count 1,2,3,4,5. (Pezzarossi, Lisa) (Entered: 04/05/2019) |
| 04/05/2019 | 156 | Judge F. Dennis Saylor, IV: ORDER entered. PROCEDURAL ORDER re sentencing hearing as to Jean Leonard Teganya Sentencing set for 7/1/2019 at 2:00 PM in Courtroom 2 before Judge F. Dennis Saylor IV. (Pezzarossi, Lisa) (Main Document 156 replaced on 4/8/2019) (Pezzarossi, Lisa). (Entered: 04/05/2019) |
| 04/16/2019 | 157 | TRIAL EXHIBIT AND WITNESS LIST (Pezzarossi, Lisa). (Entered: 04/16/2019) |
| 06/25/2019 | 158 | Letter from Fr. Edward Tetteh, SVD -- Miramar Retreat Center on behalf of Jean Leonard Teganya dated 6/24/2019. (Pezzarossi, Lisa) (Entered: 06/25/2019) |
| 06/26/2019 | 159 | MOTION for Leave to File Excess Pages *in Government's Sentencing Memorandum* as to Jean Leonard Teganya by USA. (Attachments: # 1 Sentencing Memorandum with Excess Pages)(Garland, Scott) (Entered: 06/26/2019) |
| 06/27/2019 | 160 | Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 159 Motion for Leave to File Excess Pages. (FDS, law1) (Entered: 06/27/2019) |
| 06/27/2019 | 161 | SENTENCING MEMORANDUM by USA as to Jean Leonard Teganya (Attachments: # 1 Appendix Jabbateh - Court's Sentencing Memo, # 2 Appendix Jordan - Sentencing Transcript, # 3 Appendix Boskic - Sentencing Transcript Excerpts)(Garland, Scott) (Entered: 06/27/2019) |
| 06/28/2019 | 162 | SENTENCING MEMORANDUM by Jean Leonard Teganya (Attachments: # 1 Edward Tetteh Letter, # 2 Jack Vercollone Letter, # 3 Nicole Gahamanyi Letter, # 4 Greg Meyer Letter)(Lauer, Scott) (Entered: 06/28/2019) |
| 07/01/2019 | 163 | Electronic Clerk's Notes for proceedings held before Judge F. Dennis Saylor, IV: Sentencing held on 7/1/2019 for Jean Leonard Teganya (1). Parties made aware of the materials/submissions being relied upon by the Court for purposes of the hearing; objections to PSR addressed; applicable sentence-guideline range calculated; sentence recommendations heard; defendant committed to the custody of the BOP to be imprisoned for a total term of 97 months. This sentence consists of terms of 97 months on Counts 1 & 3, and terms of 60 months on Counts 2, 4, and 5, all to be served concurrently; no term of supervised release to follow; $500 special assessment; defendant advised of right to appeal. Defendant remanded to the custody of the USMS. (Attorneys present: Garland, Varghese, Lauer. Probation: D'Addieco.) Court Reporter Name and Contact or digital recording information: Kathleen Silva at kathysilva@verizon.net. (Bono, Christine) (Entered: 07/01/2019) |
| 07/02/2019 | 164 | Judge F. Dennis Saylor, IV: ORDER entered. JUDGMENT as to Jean Leonard Teganya (1), Count(s) 1, 3, 97 months imprisonment, Count(s) 2, 4, 5, 60 months imprisonment, all to be served concurrently; no term of supervised release; $500 special assessment. (Bono, Christine) (Entered: 07/02/2019) |
| 07/02/2019 | 165 | Judge F. Dennis Saylor, IV: ORDER entered. STATEMENT OF REASONS as to Jean Leonard Teganya. (Bono, Christine) (Entered: 07/02/2019) |
| 07/08/2019 | 166 | NOTICE OF APPEAL by Jean Leonard Teganya re 164 Judgment, (Fee Status: IFP granted) NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be |

| | | downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 7/29/2019. (Lauer, Scott) (Entered: 07/08/2019)** |
|---|---|---|
| 07/08/2019 | 167 | Certified and Transmitted Abbreviated Electronic Record on Appeal as to Jean Leonard Teganya to US Court of Appeals re 166 Notice of Appeal - Final Judgment. (Paine, Matthew) (Entered: 07/08/2019) |
| 07/09/2019 | 168 | USCA Case Number as to Jean Leonard Teganya 19-1689 for 166 Notice of Appeal - Final Judgment. (Paine, Matthew) (Entered: 07/09/2019) |
| 07/24/2019 | 169 | NOTICE TRANSCRIPT ORDER ACKNOWLEDGMENT FORM received from USCA and addressed to Valerie O'Hara as to Jean Leonard Teganya' Transcript order form filed in USCA on July 24, 2019. Transcripts ordered: 03/08/2019, 03/12 - 03/15/19, 03/18 - 03/20/19, 03/22/19, 03/25 - 03/27/19, 04/01 - 04/04/19, 04/05/2019, Hearing on 03/21/2019; Verdict on 04/05/2019. Transcripts due: 9/23/2019.(Scalfani, Deborah) (Entered: 07/24/2019) |
| 09/11/2019 | 170 | NOTICE TRANSCRIPT ORDER ACKNOWLEDGMENT FORM received from USCA and addressed to Valerie O'Hara as to Jean Leonard Teganya' Transcript order form filed in USCA on September 11, 2019. Transcripts Ordered: 5/30/18, 7/12/18, 9/11/18, 11/5/18, 12/13/18 and 2/25/19. Transcripts due by 11/12/2019. (Scalfani, Deborah) (Entered: 09/11/2019) |
| 09/11/2019 | 171 | NOTICE TRANSCRIPT ORDER ACKNOWLEDGMENT FORM received from USCA and addressed to Lee Marzilli as to Jean Leonard Teganya' Transcript order form filed in USCA on September 11, 2019. Transcript ordered: 1/11/19 Status Conference. Transcript due by 11/12/2019. (Scalfani, Deborah) (Entered: 09/11/2019) |
| 09/11/2019 | 172 | NOTICE TRANSCRIPT ORDER ACKNOWLEDGMENT FORM received from USCA and addressed to Cheryl Dahlstrom as to Jean Leonard Teganya' Transcript order form filed in USCA on September 11,2019. Transcript ordered: 3/29/19 Motion Hearing. Transcript due by 11/12/2019. (Scalfani, Deborah) (Entered: 09/11/2019) |
| 09/11/2019 | 173 | NOTICE TRANSCRIPT ORDER ACKNOWLEDGMENT FORM received from USCA and addressed to FTR - Linda Walsh as to Jean Leonard Teganya' Transcript order form filed in USCA on September 11, 2019. Transcripts ordered: 8/4/17, 3/8/18 and 5/18/18. Transcripts due by 11/12/2019. (Scalfani, Deborah) (Entered: 09/11/2019) |
| 09/20/2019 | 174 | Transcript of Sentencing Hearing as to Jean Leonard Teganya held on July 1, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Kathleen Silva at kathysilva@verizon.net The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/11/2019. Redacted Transcript Deadline set for 10/21/2019. Release of Transcript Restriction set for 12/19/2019. (Scalfani, Deborah) (Entered: 09/20/2019) |
| 09/20/2019 | 175 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 09/20/2019) |
| 09/23/2019 | 176 | Transcript of Jury Trial Day One (Jury Impanelment) as to Jean Leonard Teganya held on |

## J.A. 17

| | | |
|---|---|---|
| | | March 8, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/24/2019. Release of Transcript Restriction set for 12/23/2019. (Scalfani, Deborah) (Entered: 09/23/2019) |
| 09/23/2019 | [177](#) | Transcript of Jury Trial Day Three as to Jean Leonard Teganya held on March 12, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/24/2019. Release of Transcript Restriction set for 12/23/2019. (Scalfani, Deborah) (Entered: 09/23/2019) |
| 09/23/2019 | [178](#) | Transcript of Jury Trial Day Five as to Jean Leonard Teganya held on March 14, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/24/2019. Release of Transcript Restriction set for 12/23/2019. (Scalfani, Deborah) (Entered: 09/23/2019) |
| 09/23/2019 | [179](#) | Transcript of Hearing as to Jean Leonard Teganya held on March 21, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/24/2019. Release of Transcript Restriction set for 12/23/2019. (Scalfani, Deborah) (Entered: 09/23/2019) |
| 09/23/2019 | [180](#) | Transcript of Jury Trial Day Fourteen as to Jean Leonard Teganya held on April 1,2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/24/2019. Release of Transcript Restriction set for 12/23/2019. (Scalfani, Deborah) (Entered: 09/23/2019) |
| 09/23/2019 | [181](#) | Transcript of Jury Trial Day Fifteen as to Jean Leonard Teganya held on April 2,2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/24/2019. Release of Transcript Restriction set for 12/23/2019. (Scalfani, Deborah) (Entered: 09/23/2019) |
| 09/23/2019 | [182](#) | Transcript of Jury Trial Day Sixteen as to Jean Leonard Teganya held on April 3, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/24/2019. Release of Transcript Restriction set for 12/23/2019. (Scalfani, Deborah) (Entered: 09/23/2019) |
| 09/23/2019 | [183](#) | Transcript of Jury Trial Day Seventeen as to Jean Leonard Teganya held on April 4,2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and |

| | | |
|---|---|---|
| | | Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/24/2019. Release of Transcript Restriction set for 12/23/2019. (Scalfani, Deborah) (Entered: 09/23/2019) |
| 09/23/2019 | 184 | Transcript of Jury Trial Day Eighteen as to Jean Leonard Teganya held on April 5, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/15/2019. Redacted Transcript Deadline set for 10/24/2019. Release of Transcript Restriction set for 12/23/2019. (Scalfani, Deborah) (Entered: 09/23/2019) |
| 09/23/2019 | 185 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 09/23/2019) |
| 09/27/2019 | 186 | Transcript of Initial Appearance as to Jean Leonard Teganya held on August 4, 2017, before Magistrate Judge Marianne B. Bowler. COA Case No. 19-1689. No Reporter Used. Digital Recording transcribed by Linda Walsh. The Transcript may be purchased through Linda Walsh at lwalshsteno@gmail.com, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/18/2019. Redacted Transcript Deadline set for 10/28/2019. Release of Transcript Restriction set for 12/26/2019. (Scalfani, Deborah) (Entered: 09/27/2019) |
| 09/27/2019 | 187 | Transcript of Status Conference as to Jean Leonard Teganya held on March 8, 2018, before Magistrate Judge Marianne B. Bowler. COA Case No. 19-1689. No Reporter Used. Digital Recording transcribed by Linda Walsh. The Transcript may be purchased through Linda Walsh at lwalshsteno@gmail.com, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/18/2019. Redacted Transcript Deadline set for 10/28/2019. Release of Transcript Restriction set for 12/26/2019. (Scalfani, Deborah) (Entered: 09/27/2019) |
| 09/27/2019 | 188 | Transcript of Status Conference as to Jean Leonard Teganya held on May 18, 2018, before Magistrate Judge Marianne B. Bowler. COA Case No. 19-1689. No Reporter Used. Digital Recording transcribed by Linda Walsh. The Transcript may be purchased through Linda Walsh at lwalshsteno@gmail.com, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/18/2019. Redacted Transcript Deadline set for 10/28/2019. Release of Transcript Restriction set for 12/26/2019. (Scalfani, Deborah) (Entered: 09/27/2019) |
| 09/27/2019 | 189 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 09/27/2019) |
| 09/30/2019 | 190 | Transcript of Status Conference as to Jean Leonard Teganya held on January 11,2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Lee Marzilli at leemarz@aol.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/21/2019. Redacted Transcript Deadline set for 10/31/2019. Release of Transcript Restriction set for 12/30/2019. (Scalfani, Deborah) (Entered: 09/30/2019) |

J.A. 19

| 09/30/2019 | 191 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 09/30/2019) |
|---|---|---|
| 10/04/2019 | 192 | Judgment Returned Executed as to Jean Leonard Teganya on 8/16/19. (Lara, Miguel) (Entered: 10/07/2019) |
| 10/09/2019 | 193 | Transcript of Status Conference as to Jean Leonard Teganya held on May 30, 2018, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/30/2019. Redacted Transcript Deadline set for 11/12/2019. Release of Transcript Restriction set for 1/7/2020. (Scalfani, Deborah) (Entered: 10/09/2019) |
| 10/09/2019 | 194 | Transcript of Status Conference as to Jean Leonard Teganya held on July 12, 2018, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/30/2019. Redacted Transcript Deadline set for 11/12/2019. Release of Transcript Restriction set for 1/7/2020. (Scalfani, Deborah) (Entered: 10/09/2019) |
| 10/09/2019 | 195 | Transcript of Status Conference as to Jean Leonard Teganya held on September 11, 2018, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/30/2019. Redacted Transcript Deadline set for 11/12/2019. Release of Transcript Restriction set for 1/7/2020. (Scalfani, Deborah) (Entered: 10/09/2019) |
| 10/09/2019 | 196 | Transcript of Status Conference as to Jean Leonard Teganya held on November 5, 2018, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/30/2019. Redacted Transcript Deadline set for 11/12/2019. Release of Transcript Restriction set for 1/7/2020. (Scalfani, Deborah) (Entered: 10/09/2019) |
| 10/09/2019 | 197 | Transcript of Status Conference as to Jean Leonard Teganya held on December 13, 2018, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/30/2019. Redacted Transcript Deadline set for 11/12/2019. Release of Transcript Restriction set for 1/7/2020. (Scalfani, Deborah) (Entered: 10/09/2019) |
| 10/09/2019 | 198 | Transcript of Status Conference as to Jean Leonard Teganya held on February 25, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/30/2019. Redacted Transcript Deadline set for 11/12/2019. Release of Transcript Restriction set for 1/7/2020. (Scalfani, Deborah) (Entered: 10/09/2019) |

J.A. 20

| 10/09/2019 | 199 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 10/09/2019) |
| --- | --- | --- |
| 10/09/2019 | 200 | Transcript of Telephone Conference as to Jean Leonard Teganya held on March 29, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Cheryl Dahlstrom at cheryldahlstrom@yahoo.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 10/30/2019. Redacted Transcript Deadline set for 11/12/2019. Release of Transcript Restriction set for 1/7/2020. (Scalfani, Deborah) (Entered: 10/09/2019) |
| 10/09/2019 | 201 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 10/09/2019) |
| 11/04/2019 | 202 | Transcript of Jury Trial Day Eight as to Jean Leonard Teganya held on March 19, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/25/2019. Redacted Transcript Deadline set for 12/5/2019. Release of Transcript Restriction set for 2/3/2020. (Scalfani, Deborah) (Entered: 11/04/2019) |
| 11/04/2019 | 203 | Transcript of Jury Trial Day Nine as to Jean Leonard Teganya held on March 20, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/25/2019. Redacted Transcript Deadline set for 12/5/2019. Release of Transcript Restriction set for 2/3/2020. (Scalfani, Deborah) (Entered: 11/04/2019) |
| 11/04/2019 | 204 | Transcript of Jury Trial Day Ten as to Jean Leonard Teganya held on March 22, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/25/2019. Redacted Transcript Deadline set for 12/5/2019. Release of Transcript Restriction set for 2/3/2020. (Scalfani, Deborah) (Entered: 11/04/2019) |
| 11/04/2019 | 205 | Transcript of Jury Trial Day Eleven as to Jean Leonard Teganya held on March 25, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/25/2019. Redacted Transcript Deadline set for 12/5/2019. Release of Transcript Restriction set for 2/3/2020. (Scalfani, Deborah) (Entered: 11/04/2019) |
| 11/04/2019 | 206 | Transcript of Jury Trial Day Twelve as to Jean Leonard Teganya held on March 26, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/25/2019. Redacted Transcript |

| | | Deadline set for 12/5/2019. Release of Transcript Restriction set for 2/3/2020. (Scalfani, Deborah) (Entered: 11/04/2019) |
|---|---|---|
| 11/04/2019 | 207 | Transcript of Jury Trial Day Thirteen as to Jean Leonard Teganya held on March 27, 2019, before Judge F. Dennis Saylor IV. COA Case No. 19-1689. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/25/2019. Redacted Transcript Deadline set for 12/5/2019. Release of Transcript Restriction set for 2/3/2020. (Scalfani, Deborah) (Entered: 11/04/2019) |
| 11/04/2019 | 208 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general-info.htm (Scalfani, Deborah) (Entered: 11/04/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/08/2020 10:28:54 | | |
| **PACER Login:** | fd042751:2548165:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:17-cr-10292-FDS |
| **Billable Pages:** | 20 | **Cost:** | 2.00 |

J.A. 22

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Cr. No. 17- *10292* |
| | ) | |
| V. | ) | Violations: |
| | ) | 18 U.S.C. § 1546(a) |
| JEAN LEONARD TEGANYA | ) | Fraud and Misuse of Visas, |
| | ) | Permits and Other Documents |
| | ) | |
| | ) | 18 U.S.C. § 1621(1) |
| | ) | Perjury |
| | ) | |
| | ) | 18 U.S.C. § 1621(2) |
| | ) | Perjury |

## **INDICTMENT**

The Grand Jury charges that:

At all times relevant to this Indictment,

### I.    **The Rwandan Genocide**

1.    Rwanda is one of the smallest countries in Central Africa, with approximately seven million people, and is peopled by two main ethnic groups, the Hutu and the Tutsi.   The Hutus account for 90 percent of the population.   Following Rwanda's independence from Belgium in 1962, the Hutu majority gained control of the government, and engaged in acts, including discrimination and acts of violence, against Tutsis.   As a result, numerous Tutsis fled Rwanda and some formed a rebel guerilla army, known as the Rwandan Patriotic Front ("RPF").

2.    In or about the early 1990s, the RPF invaded Rwanda; thereafter, Hutu President Juvenal Habyarimana executed agreements that mandated that the Hutus and Tutsis would share power.   These agreements, which were negotiated between July 1992 and June 1993, were

1

**J.A. 23**

signed in Arusha, Tanzania, and came to be known as the Arusha Accords.   Pursuant to the

Accords, Habyarimana's party, the Mouvement Revolutionaire National pour le Developpement

("MRND"), shared power with several other parties, as well as those that represented the RPF.

3.      On or about April 6, 1994, the Rwandan president's plane, which was carrying

President Habyarimana and Burundi's new President, was shot down by ground-fired missiles as

it approached Rwanda's airport at Kigali.   This assassination precipitated a period of political

violence in Rwanda.   In particular, Hutu extremists, with positions of power in an interim

government formed after Habyarimana's assassination, began targeting and killing prominent

opposition figures, including moderate Hutu politicians and Tutsi leaders.   Included among

those killed were government ministers opposed to the extremists.

4.      The killings spread throughout the countryside as Hutu soldiers, militia, including

the youth militia of the MRND, known as the Interahamwe, and civilians, armed with machetes,

clubs, guns and grenades, began killing Tutsi civilians.   All individuals in Rwanda carried

identification cards specifying their ethnic background, a practice left over from colonial days.

These identification cards, known as "cartes d'identite," or "identity cards," which included

information about the bearer, including ethnicity, now meant the difference between life and

death.   Roadblocks where identity cards were checked were set up all over the country and

Tutsis were attacked and killed wherever they congregated, including at hospitals, churches, and

schools.

5.      The Hutu extremists engaged in genocidal mania, clubbing and hacking to death

defenseless Tutsi families with machetes everywhere they were found.   A Rwandan radio

station, controlled by Hutu extremists, further encouraged the killings by broadcasting non-stop

2

**J.A. 24**

hate propaganda, and even pinpointed the locations of Tutsis in hiding.

6.      The killings only ended after armed Tutsi rebels of the RPF, invading from neighboring countries, managed to defeat the Hutu extremists and halt the genocide in July 1994. By then, over one-tenth of the population, an estimated 800,000 persons, had been killed.

7.      The prefecture of Butare, located in the south of Rwanda, was the intellectual and cultural center of Rwanda at the time of the genocide.   Butare had a high percentage of Tutsis as compared to the national average demographics and a strong moderate and multi-ethnic political presence. On or about April 19, 1994, the interim Rwandan government removed the Tutsi governor in Butare.   On or about April 20, 1994, the killings arrived in full force in Butare with the establishment of roadblocks and arrests by military patrols.   These measures resulted in several small-scale massacres and targeted killings.

8.      As the intellectual capital of Rwanda, Butare was the site of the national university to which the Butare University Hospital ("the Hospital") was attached.   Tutsi students were killed at the university in the early days of the genocide in Butare. The Hospital was itself the site of many atrocities.   Tutsi patients were removed from the Hospital upon verification of their ethnicity and then beaten or hacked to death behind the hospital.   Hospital nurses who were Tutsi were also killed.   Killings and other acts of violence at the Hospital aimed at Tutsis continued throughout the duration of the genocide.

**II.      The Defendant JEAN LEONARD TEGANYA**

9.      The Defendant JEAN LEONARD TEGANYA ("TEGANYA") is from Gisenyi, a prefecture (or state) in northern Rwanda.   Many of the Hutu elite, including the assassinated president, were from the northern prefectures.

3

**J.A. 25**

10.    TEGANYA was a medical student and medical trainee at the Hospital before and during most of the genocide. He lived in a dormitory on the Hospital grounds.

11.    Both before and during the genocide, TEGANYA was an active member of the MRND and its youth militia, the Interahamwe.

12.    While at the Hospital during the genocide, TEGANYA played an active role in the persecution of Tutsis.   For example, he assisted the Interahamwe and the military in the identification of Tutsis among Hospital patients and personnel; search for Tutsis hiding on the Hospital grounds; capture of Tutsis; and forcible removal of Tutsis from the Hospital and Hospital grounds.

### III.    TEGANYA's Arrival In The United States And Application For Asylum

13.    TEGANYA avoided border inspection and walked into the United States from Canada on or about August 3, 2014.   TEGANYA was encountered by Customs and Border Protection officials near Houlton, Maine and was arrested for administrative immigration removal for entering the United States without being inspected.

14.    TEGANYA applied for asylum on September 13, 2014, by submitting an Application for Asylum and Withholding of Removal, Form I-589 ("Asylum Application").   In response to the question on the Asylum Application, "Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group or the press or media," TEGANYA responded as follows:

> My father was the local President (formerly Kibilira District) of
> MRND from 1991 to 1994.   As a student, I belonged to the Red

4

**J.A. 26**

Cross Youth Section from 1986 to 1991. I was president of the
Red Cross Youth Section from 1989 to 1990. I will submit a
detailed declaration prior to my asylum hearing.

15.     In an affidavit he submitted in support of the Asylum Application, TEGANYA

discussed his father's activities as an MRND member, but provided no information concerning

his own affiliation with the MRND, the Interahamwe, or any other militia group.

16.     TEGANYA signed the Asylum Application under the following certification:

I certify, under the penalty of perjury under the laws of the United
States of America that this application and the evidence submitted
with it are all true and correct.

## IV.    TEGANYA'S Immigration Court Bond Hearing

17.     On September 16, 2014, TEGANYA testified under oath at a bond hearing

conducted by the Immigration Court.

18.     At that hearing, TEGANYA knowingly made false statements concerning his

MRND affiliation and what he observed during the Rwandan genocide.

5

**J.A. 27**

COUNT ONE
18 U.S.C. § 1546(a)
Fraud and Misuse of Visas,
Permits and Other Documents

The Grand Jury re-alleges and incorporates by reference paragraphs 1-18 of this Indictment

and further charges that, on or about September 13, 2014, in the District of Massachusetts and

elsewhere, the defendant,

JEAN LEONARD TEGANYA,

did knowingly make under oath, and did knowingly subscribe as true under penalty of perjury

under 28 U.S.C. § 1746, a false statement with respect to a material fact in an application and

document required by the immigration laws and regulations prescribed thereunder, and did

knowingly present such application and document, which contained a false statement and which

failed to contain any reasonable basis in law and fact.    Specifically the defendant did knowingly

prepare, sign, and present a Form I-589, Application for Asylum and for Withholding of

Removal, knowing it contained the false statements described below:

> In response to a question that asked "Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military.or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group or the press or media," the defendant responded by indicating "Yes," and when instructed to "describe for each person the level of participation, any leadership or other positions held and the length of time you or your family members were involved in each organization or activity," the defendant stated as follows:

>> My father was the local President (formerly Kibilira District) of MRND from 1991 to 1994.   As a student, I belonged to the Red Cross Youth Section from 1986 to 1991.   I was president of the Red Cross Youth Section from 1989 to 1990

As the defendant then and there well knew, that response set forth above was false, in that the

Defendant was himself a member of the MRND Party and the Interahamwe before and during the

6

**J.A. 28**

genocide in Rwanda, which began in April 1994.

All in violation of Title 18, United States Code, Section 1546(a).

.

.

**J.A. 29**

COUNT TWO
18 U.S.C. § 1621(2)
Perjury

The Grand Jury re-alleges and incorporates by reference paragraphs 1-18 of this Indictment and further charges that, on or about September 13, 2014, in the District of Massachusetts and elsewhere, the defendant,

JEAN LEONARD TEGANYA,

in a declaration, certificate, verification, and statement under the penalty of perjury as permitted under 28 U.S.C. § 1746, did knowingly and willfully subscribe as true material matters which he did not then and there believe to be true, that is to say:

At the time and on the date stated above, on a Form I-589, Application for Asylum and for Withholding of Removal, the defendant responded to the question set forth below with the statement set forth below, which statement the defendant then and there knew was false.

> In response to a question that asked "Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group or the press or media," the defendant responded by indicating "Yes," and when instructed to "describe for each person the level of participation, any leadership or other positions held and the length of time you or your family members were involved in each organization or activity, the defendant stated as follows:
>
> > My father was the local President (formerly Kibilira District) of MRND from 1991 to 1994.  As a student, I belonged to the Red Cross Youth Section from 1986 to 1991.   I was president of the Red Cross Youth Section from 1989 to 1990.

As the defendant then and there well knew, the response set forth above was false, in that the Defendant was himself a member of the MRND Party and the Interahamwe before and during the genocide in Rwanda, which began in April 1994.

8

**J.A. 30**

The Defendant signed said Form I-589 and certified under penalty of perjury under the laws of the United States of America that the answers he provided on said Form I-589 were true and correct.

All in violation of Title 18, United States Code, Section 1621(2).

9

**J.A. 31**

## COUNT THREE
Fraud and Misuse of Visas,
Permits and Other Documents
18 U.S.C. § 1546(a)

The Grand Jury re-alleges and incorporates by reference paragraphs 1-18 of this Indictment

and further charges that, on or about September 13, 2014, in the District of Massachusetts and

elsewhere, the defendant,

JEAN LEONARD TEGANYA,

did knowingly make under oath, and did knowingly subscribe as true under penalty of perjury

under 28 U.S.C. § 1746, a false statement with respect to a material fact in an application and

document required by the immigration laws and regulations prescribed thereunder, and did

knowingly present such application and document, which contained a false statement and which

failed to contain any reasonable basis in law or fact.    Specifically the defendant did knowingly

prepare, sign, and present a Form I-589, Application for Asylum and for Withholding of

Removal, knowing it contained the false statements described below:

> In response to a question that asked "Have you, your spouse or your child(ren) ever ordered,
> incited, assisted or otherwise participated in causing harm or suffering to any person
> because of his or her race, religion, nationality, membership in a particular social group or
> belief in a particular political opinion," the defendant responded by indicating "No."

As the defendant then and there well knew, that response was false because the defendant

personally ordered, incited, assisted and otherwise participated in causing harm and suffering to

persons because of their membership in a particular social group, to wit Tutsis, during the genocide

in Rwanda, which began in April 1994.

All in violation of Title 18, United States Code, Section 1546(a).

10

**J.A. 32**

COUNT FOUR
18 U.S.C. § 1621(2)
Perjury

The Grand Jury re-alleges and incorporates by reference paragraphs 1-18 of this Indictment and further charges that, on or about September 13, 2014, in the District of Massachusetts and elsewhere, the defendant,

JEAN LEONARD TEGANYA,

in a declaration, certificate, verification, and statement under the penalty of perjury as permitted under 28 U.S.C. § 1746, did knowingly and willfully subscribe as true material matters which he did not then and there believe to be true, that is to say:

At the time and on the date stated above, on a Form I-589, Application for Asylum and for Withholding of Removal, the defendant responded to the question set forth below with the statement set forth below, which statement the defendant then and there knew was false.

> In response to a question that asked "Have you, your spouse or your child(ren) ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion," the defendant responded by indicating "No."

As the defendant then and there well knew, that response was false because the defendant personally ordered, incited, assisted and otherwise participated in causing harm and suffering to persons because of their membership in a particular social group, to wit Tutsis, during the genocide in Rwanda, which began in April 1994.

The Defendant signed said Form I-589 and certified under penalty of perjury under the laws of the United States of America that the answers he provided on said Form I-589 were true and correct.

All in violation of Title 18, United States Code, Section 1621(2).

J.A. 33

COUNT FIVE
18 U.S.C. § 1621(1)
Perjury

The Grand Jury re-alleges and incorporates by reference paragraphs 1-18 of this Indictment and further charges that, on or about September 16, 2014, in the District of Massachusetts and elsewhere, the defendant,

JEAN LEONARD TEGANYA,

having duly taken an oath before a competent tribunal, officer and person, in a case in which a law of the United States authorizes an oath to be administered, that he would testify, declare, depose and certify truly, did willfully and contrary to such oath state a material matter that he then and there did not believe to be true, that is to say:

At the time and place stated above, before an Immigration Judge, in an Immigration Court of the United States, an oath was administered to the defendant TEGANYA, who was appearing as a witness, that he would testify truthfully, during removal proceedings to consider whether he should be removed from the United States or granted asylum, pursuant to the laws and regulations of the United States.

At the time and place alleged, the defendant TEGANYA, appearing as a witness under oath at a proceeding before the Immigration Judge, knowingly made the following declarations in response to questions with respect to material matters as follows:

Question:              And what happened to him [your father]?

Answer by TEGANYA:     My father was also a – was also the local head of – the local president of the MRND, which was the formal ruling party.

                    *        *        *

12

J.A. 34

| Question: | Why are you afraid to go back to Rwanda? |
|---|---|
| Answer by TEGANYA: | I'm afraid because of this political past of my father.   Even though I'm not attached to him politically, I was not interested in his political activity or I don't – I have no political ambition.   I was not living with him.   <u>I never belong [sic] to that political party</u>, but still in Rwanda, many times it's about family. |

The declaration of defendant TEGANYA that is underscored above, as defendant TEGANYA then and there well knew and believed, was false in that defendant TEGANYA was a member of the MRND before and during the Rwandan genocide.

| Question: | What did you see at the hospital with respect to the genocide? |
|---|---|
| Answer by TEGANYA: | At the hospital, mostly what I saw, it was just people who were left of dead.   Just coming to the hospital seeking for medical care. |

*      *      *

| Question: | So, what exactly did you see when you were an intern at Butare hospital? |
|---|---|
| Answer: | As I was telling the – his honor, I mostly – what I saw, I saw people coming, wounded people, victims of genocide coming to the hospital looking for medical care. |
| Question: | So, there is documentary evidence that actually shows that people who came to that particular hospital – and this is in Bond Exhibit . . . 5 that people were, actually being turned over to be slaughtered by the military that was waiting outside. Did you witness any of that? |
| Answer: | <u>No.</u> |
| Queston: | It talks about the horror that went on in this hospital where you were an intern for two months at the height of the genocide and you didn't see any of this; is that correct? |

13

<b>J.A. 35</b>

| Answer: | Only a lot of details – according to my opinion – which are not really accurate.  I'm not the first one to state that even there is a woman who participated in [unintelligible] this document.   He give me – she give me her testimony in Canada.   So, that just – all I can say is what I have seen.   What is written down, I – I cannot – cannot confirm that. |
| --- | --- |
| Question: | So, you never saw any atrocities occur? |
| Answer: | As it is written in the – the document, most of atrocity occurred at nighttime. |
| Question: | Did you see any atrocities occur? |
| Answer: | <u>No.</u> |

The declaration of defendant TEGANYA that is underscored above, as defendant TEGANYA then and there well knew and believed, were false in that defendant TEGANYA observed atrocities at the Hospital during the genocide, including Tutsis being turned over to the military to be killed.

All in violation of Title 18, United States Code, Section 1621(1).

14

J.A. 36

Case 1:17-cr-10292-FDS    Document 17    Filed 09/27/17    Page 15 of 15

**A TRUE BILL**

FOREPERSON OF THE GRAND JURY

JOHN A. CAPIN
ALOKE S. CHAKRAVARTY
ASSISTANT UNITED STATES ATTORNEYS

Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

DISTRICT OF MASSACHUSETTS
DATE AND TIME: 9/27/17 @ 11:42

15

**J.A. 37**

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,           )
                                         )
5    vs.                                 )  Criminal Action
                                         )
6    JEAN LEONARD TEGANYA,               )  No. 17-10292-FDS
                        Defendant        )
7                                        )
                                         )
8                                        )

9

10   BEFORE:   THE HONORABLE F. DENNIS SAYLOR, IV

11
                          PRETRIAL CONFERENCE
12

13

14
                John Joseph Moakley United States Courthouse
15                        Courtroom No. 2
                         One Courthouse Way
16                        Boston, MA 02210

17
                          March 5, 2019
18                         2:00 p.m.

19

20

21

22

23                    Valerie A. O'Hara
                     Official Court Reporter
24        John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                  E-mail: vaohara@gmail.com

Case: 19-1689   Document: 00117615536   Page: 42   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 115   Filed 05/14/19   Page 2 of 58

2

1    APPEARANCES:

2    For The United States:

3         United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;
5
     For the Defendant:
6
          Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    And TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
  1                            PROCEEDINGS
  2           THE CLERK:  All rise.  Thank you.  Court is now in
  3      session in the matter of United States vs. Jean Leonard
  4      Teganya, Criminal Action Number 17-10292.
  5           Would counsel please identify themselves for the
  6      record.
  7           MR. VARGHESE:  Good afternoon, your Honor,
  8      George Varghese for the United States.
  9           MR. GARLAND:  Good afternoon, your Honor,
02:03PM 10  Scott Garland on behalf of the United States.
 11           THE COURT:  Good afternoon.
 12           MR. LAUER:  Good afternoon, your Honor, Scott Lauer
 13      from the Federal Defender Office, and with me, as you can see,
 14      is Tim Watkins.
 15           THE COURT:  Does this mean you're back, Mr. Watkins?
 16           MR. WATKINS:  A cameo appearance just for this case.
 17           THE COURT:  For today or for the trial?
 18           MR. WATKINS:  For the trial, then they send me back to
 19      the swamp after that.
02:04PM 20        THE COURT:  Welcome back.
 21           MR. LAUER:  Thank you.
 22           THE COURT:  This is the final pretrial in this case.
 23      I have a couple motions in limine, which I think I will take up
 24      first in no particular order.  The defendant has moved to
 25      exclude evidence regarding the Canadian legal decision, which
```

J.A. 40

Case: 19-1689     Document: 00117615536     Page: 44     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 115   Filed 05/14/19   Page 4 of 58

4

1    is Number 97, and I guess let me ask counsel the following:

2            I mean, I think I'm viewing this framework, this is my

3    starting point anyway, so certain facts about what happened in

4    Canadian it seems to me are relevant and admissible, meaning

5    not excludable under Rule 403.  He files for refugee status in

6    1999.  His request to be admitted as a refugee is denied.  That

7    denial was based on Canadian law.

8            During those proceedings, he makes certain statements

9    or admits to certain facts, whatever happened.  That process

02:05PM 10    was not concluded until October, 2012, and after which

11    he -- well, I guess the likely result of that final denial is

12    that he would be deported or removed from Canada.

13            What I don't understand why it would be admissible

14    would be the reasoning of the Canadian authorities, including

15    specific findings of fact or conclusions, whether it's of an

16    immigration board or a court or whatever.

17            If that is relevant, it's not clear to me why under

18    Rule 403 it ought to come in, and then my understanding is he

19    crosses the border into U.S., he's arrested, he makes a

02:06PM 20    statement in some form or another concerning the Canadian

21    proceedings.  He makes other statements as well.  Maybe it's a

22    detention hearing.

23            It seems to me his complaints as to the Canadian

24    proceedings, you know, whether they're fair or not fair are not

25    relevant.  Now, to the extent he makes a statement in Canada or

J.A. 41

1    in the United States as to what happened in Rwanda, that may be

2    very much relevant, and so my instinct is that some of this can

3    come in, but, in particular, I would draw a distinction between

4    the result, that is, that he applied for refugee status and was

5    denied because I think that is irrelevant and the reasoning or

6    the fact finding, he was denied because they didn't believe him

7    or concluded he had participated in a genocide.

8         I don't see why that comes in, so I guess because it's

9    your motion, Mr. Lauer, let me start with you.  What's your

02:07PM 10    reaction to all of that?

11         MR. LAUER:  I don't have a lot to add to what you've

12    just outlined.  I think the recitation of facts regarding what

13    took place in Canada that you just went through is

14    uncontroversial, and we wouldn't object to evidence in that

15    form.  The concern clearly is the extent to which the

16    government seeks to introduce evidence as to matters of fact

17    that were heard by a different court or different courts.

18         THE COURT:  And if he makes a statement in that

19    proceeding, then it's a statement of a party opponent, and it

02:07PM 20    comes in presumably.

21         MR. LAUER:  Yes.  I don't think my motion was

22    attempting to deal with that.  What the motion attempts to do

23    is bring to the Court's attention that the government is

24    attempting to introduce evidence as to factual findings and

25    legal conclusions reached by courts in Canada who had before

# J.A. 42

1    them very different evidence and very different standards of

2    law than will be applied here in this proceeding.

3              THE COURT:  Frankly, if it's the same, I'm not sure it

4    matters because it suggests that there isn't anything for this

5    jury to do except rubber stamp the Canadian findings, so to

6    speak, which is the Rule 403 danger even if it's technically

7    relevant.

8              MR. LAUER:  I'm in complete agreement.

9              THE COURT:  Mr. Garland, what's wrong with that?

02:08PM 10          MR. GARLAND:  Mr. Varghese is going to address that.

11             THE COURT:  Mr. Varghese.

12             MR. VARGHESE:  Your Honor, I don't necessarily

13   disagree with anything the Court has said in terms of the way

14   that the evidence was laid out.  I think the concern is for the

15   government just that the admissions that the defendant made in

16   Canada should come in, and I think the Court said that.

17             THE COURT:  It would be, for instance, say the

18   defendant takes the stand in a detention hearing or sometimes

19   they even testify in the grand jury, whatever, you make a

02:09PM 20   statement, you don't necessarily say to the jury, oh, this was

21   in a detention hearing to find out whether we should lock him

22   up, you just say it's a prior proceeding.

23             MR. VARGHESE:  Exactly.

24             THE COURT:  It's under oath, and if he needs to be

25   confronted if he takes the stand with a prior inconsistent

**J.A. 43**

          1     statement or if it just comes in as a statement of a party

          2     opponent, the jury is just told it's a legal proceeding under

          3     oath.

          4          MR. VARGHESE:  The only concern, your Honor, would be

          5     the excuses that he gives in the United States about that

          6     Canadian proceeding.  We sort of view that as in a sense

          7     allowing him to put his defense on without the opportunity for

          8     the opportunity to rebut it, and it comes very early on, the

          9     very same day he walks across the border, he spins this yarn

02:09PM  10     about how the Canadian opinion really has nothing to do with

         11     him and that these Canadian immigration officers leapt to this

         12     conclusion, but when you actually parse the opinion, it's very

         13     clear, that's not what Canada did.

         14          THE COURT:  But, again, his opinion, whether it's fair

         15     or unfair, why does that come in?  In other words, if he says I

         16     was at the such-and-such hospital in Rwanda, that comes in, if

         17     he says the Canadian Judge was biased against me, why would

         18     that come in?

         19          MR. VARGHESE:  I don't believe it should come in.  I

02:10PM  20     agree with that, your Honor.  Thank you.

         21          THE COURT:  The devil often is in the details here,

         22     but I'm going to approach it with this framework in mind, and

         23     as with anything else, may change once we get in the heat of

         24     battle, but for now, I think that's the basic framework I'm

         25     going to use to decide this, and so we'll call that granted in

**J.A. 44**

Case 1:17-cr-10292-FDS   Document 115   Filed 05/14/19   Page 8 of 58

8

1    part and denied in part, Number 97, and we can revisit it as

2    necessary during the trial.

3         All right.  The government has also moved in limine to

4    limit the testimony of Noel Twagiramunga, if I'm pronouncing

5    that correctly, Number 91, who is the defendant's expert, who I

6    understand it at least in part intends to testify concerning

7    certain cultural or social or political issues in Rwanda that

8    may affect or are alleged to affect witness credibility.

9         Who wants to be heard on that?

02:11PM 10         MR. GARLAND:  Your Honor, that's me.  So there are

11   some things that Mr. Twagiramunga definitely is qualified to

12   testify about.  He is definitely qualified to testify as a

13   historian as to what happened in pre-genocide Rwanda.  That

14   much is absolutely clear.

15        It is also probably true that he is qualified to

16   testify about post-genocide Rwanda, that is, he has the

17   requisite familiarity with the academia, his own research, but

18   the real question is whether he can testify about what the

19   defense wants him to, which is to essentially say that our

02:12PM 20   witnesses will get up there and testify in a particular way

21   because they're going to feel some effects from the

22   authoritarian regime, and the other thing that I think he's

23   going to be testifying about is what sort of fate awaits

24   Mr. Teganya if he is returned back to Rwanda.

25        I'll take the second one first, which is that we've

# J.A. 45

1    cited, I think it was First Circuit opinion, which as the Court

2    is aware, the jury generally is not supposed to be concerned

3    with at all the consequences of what happens after this,

4    whether it's the sentence that you would impose, if any, or

5    what would happen with collateral consequences, and it feels

6    like that's a back door way of getting in that.

7        One of the things that the defense has suggested is,

8    well, that is really going to be relevant because the

9    government wants to show that the fact that Mr. Teganya was a

02:13PM 10   refugee or fugitive, I should say, in Canada is something we're

11   going to rely on to show his consciousness of guilt, which is

12   what he was really worried about was going back to Rwanda.

13       That's not a proposition we're intending to make.  The

14   proposition we intend to make is that he crossed the border

15   illegally.  Let me back up.  He made certain statements in

16   Canada.  Those statements during that process, as you just

17   talked about, can be relevant, and we're going to show how

18   they're inconsistent with other positions that he's taken and

19   inconsistent with the witnesses who will testify.

02:13PM 20       We're also going to show that he crossed the border

21   illegally and did not even go to the U.S. border patrol or Port

22   of Entry there because he understood his claim of asylum wasn't

23   a good one, and so he wanted to avoid even making that in the

24   first place.  He wanted to go elsewhere in the United States

25   without coming to border patrol awareness, and so what would

**J.A. 46**

Case: 19-1689   Document: 00117615536   Page: 50   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10252-FDS   Document 115   Filed 03/14/19   Page 10 of 38

10

1    have happened to him over in Rwanda if he were caught, that

2    seems to be very much a side issue.

3         Now, if you then go to the question why doesn't

4    Mr. Twagiramunga's expertise in post-Rwanda, why is that not

5    relevant, the answer is this:

6         Mr. Twagiramunga has a couple of points he's made in

7    his academic research.  One of them is that the current regime

8    in Rwanda, which has been around since about 1994, hasn't done

9    a good job of prosecuting the Tutsis, who basically were the

10   saviors who came in.  That has nothing to do with whether

11   Mr. Teganya committed genocide or didn't commit genocide before

12   the RPF came in.

13        The second thing that he said is that the Kagame

14   government has been repressing the civil and political rights

15   of people of its critics.  In this case, there's no evidence,

16   we're aware of no evidence that Mr. Teganya was a critic of the

17   Kagame regime, and, furthermore, there's no evidence that we're

18   aware of that Mr. Twagiramunga has any expertise whatsoever on

19   how to show that the Kagame regime in Rwanda goes and basically

02:15PM 20   puts its thumb on the scale of court proceedings.

21        In fact, exactly the opposite.  He's made statements

22   in various places that the legal system there works.  There is

23   a lot of evidence that there have been a lot of acquittals over

24   there.  Furthermore, as the defense is aware, a number of the

25   witnesses from Rwanda, actually all of the witnesses from

1          Rwanda, I believe, were paroled into the United States.

2               When they were paroled into the United States, they

3     needed to sign an affidavit in order to get parole status or to

4     be evaluated for it, and in those affidavits, they said that

5     they did not fear persecution or prosecution back in Rwanda on

6     the basis of the testimony that they were going to give here,

7     and, in fact, we're unaware of any case whatsoever in which

8     people have testified here and been subject to pressure back

9     there because of what they said.

02:16PM 10               In fact, even in the *Munyenyezi* case that was tried

11    here, there was a mistrial, there were Rwandan witnesses for

12    the defense, they went back to Rwanda, they came back from

13    Rwanda over here.  There's no allegation of that whatsoever.

14          THE COURT:  I can't exclude that piece of the

15    testimony on that basis.  I mean, that goes to the credibility

16    of the testimony or maybe cross-examination, but let me ask

17    this:

18               Putting aside for a moment evidence concerning

19    Teganya's fate if he's sent back to Rwanda and putting aside

02:17PM 20     the general proposition that post-1994 Rwanda events are

21    irrelevant, as I understand it, part of what is going on here

22    or what defendants propose is that the expert will testify as

23    to a cultural or social or political backdrop that could affect

24    the credibility of witnesses and that may be necessary to

25    assess the credibility.

# J.A. 48

1          You may think it's wrong, but what if, for example,

2     there are pressures on the witnesses, that they will feel

3     pressure to adhere to a certain story or to tell a certain

4     story, how would the jury know that without expert testimony?

5          MR. GARLAND:  I think there the argument would be,

6     your Honor, that Mr. Twagiramunga just doesn't have the basis

7     of experience to testify to that.

8          THE COURT:  Let me assume that away.  I may need to

9     have a voir dire or, you know, a mini Daubert hearing on that

02:18PM 10     very question.

11          MR. GARLAND:  I think even in that case, your Honor,

12     even in that case, that comes dangerously close to what the

13     Court, what the First Circuit was saying in the I think it was

14     the *Kantengwa* case, which was cited by the defense because

15     there, what the First Circuit notes is that the government

16     expert there, Timothy Longman, was talking about, well, how do

17     we look at what happened in the past, how do we look at the

18     credibility of various historical circumstances and sources

19     there, how do we weigh those, and this is what a historian

02:19PM 20     does, they look at various things that happened in the past and

21     act as a historian, and what they do then next is they say this

22     isn't a circumstance like in *Marvel Characters vs. Kirby*, and

23     they cite the opinion.

24          They basically say there is a difference between a

25     historian coming in and saying here's how you weigh historical

**J.A. 49**

 1    sources from what happened in the past versus opining basically

 2    on the credibility of witnesses.

 3            THE COURT:  Okay.  But this is a little different.

 4    Let me, I guess, set some markers.  No one expert or otherwise

 5    can opine on the credibility of a specific witness, okay.  You

 6    also can't offer expert testimony about stereotyping, you know,

 7    all Tutsi people tell the truth or all Tutsi lie or anything of

 8    that sort.

 9            You can't have expert testimony about what I'll call a

02:20PM 10    cultural defense, it is my culture to stand by while others

11    commit genocide, therefore, I'm innocent.  You can't have

12    testimony about that, but even in the United States, there are

13    cultural norms sometimes that make dissent from acceptable or

14    accepted narratives quite difficult.

15            Let me give you a hypothetical, which may or may not

16    work, but let me try it.  So, suppose you have awoken from a

17    Rip Van Winkle slumber, you've been asleep for 25 years, and

18    now you're called upon to sit in a campus sexual assault, and

19    you're weighing the credibility of the witnesses.

02:20PM 20            You might not know that there is a tremendous social

21    pressures on college campuses right now for people to have

22    certain kinds of opinions and not have other kinds of opinions,

23    which could affect a witness.  It could be a witness to a

24    sexual assault.  You might feel pressure to adhere to that

25    story even if it turns out there were doubts, you know, they

1    should have acknowledged doubts, or, conversely, someone coming

2    forward to dispute the sexual assault occurred in the current

3    campus environment might feel tremendous pressure not to do so

4    or to change their story, the point being that there are

5    cultural norms sometimes that would affect a witness's

6    testimony.

7         I don't know, obviously, whether such a cultural or

8    social or political norm exists in Rwanda, but the defense is

9    going to say there are such norms, and if he is qualified to so

02:21PM 10    opine, obviously, the jury would know nothing about those norms

11    as long as we're keeping it within bounds, that is, that

12    there's a foundation, that he has sufficient familiarity with

13    Rwanda and social/political/cultural norms that he can make

14    this opinion but also making clear maybe with a cautionary

15    instruction that he's not opining on anybody's credibility,

16    he's not stereotyping, he's simply describing this norm that

17    exists that may affect the testimony of these witnesses.

18         Why wouldn't that be helpful to the jury, and what's

19    wrong with it exactly?  Again, carefully limited perhaps with

02:22PM 20    some cautionary instructions to make sure we're not stepping

21    over any lines, but just these are the norms.  If you're

22    Russian, you know that you don't dissent from Vladimir Putin's

23    government.  That is a current, I assume it is, a current

24    cultural political fact in Russia, and so if that were somehow

25    relevant, somebody might testify that, yeah, this is the way it

J.A. 51

Case: 19-1689   Document: 00117615536   Page: 55   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10252-FDS   Document 115   Filed 03/14/19   Page 15 of 38

15

1    is, that people don't take the stand in Russian and criticize

2    the Putin government or the North Korean Government or

3    whatever, right, I mean, these things exist.

4         MR. GARLAND:  I think to answer the Court's

5    hypothetical, I think if there were an expert who actually were

6    qualified to testify to that, not just generally that there's

7    an authoritarian regime and, therefore, that authoritarian

8    regime must express itself through indirect pressure or that

9    the citizen must, therefore, assume that if they testify to

02:23PM 10   something over in America about another guy, if they could

11   actually show that there was real evidence that that's how the

12   government works, that's fine.

13        I think the danger without doing a pretty good voir

14   dire is that what Mr. Twagiramunga will say, I should say

15   Dr. Twagiramunga would say is that yes, he's an expert in the

16   fact that it is an authoritarian regime, and even if we were to

17   grant that point, that doesn't mean that what that government

18   does is to interfere into prosecutions.

19        Moreover, nor does it mean that Dr. Twagiramunga has

02:24PM 20   the done any academic research on that question of whether

21   that's the way it expresses itself, and what we would suggest

22   is that given an opportunity to examine Dr. Twagiramunga about

23   this, I believe that we would be able to identify that he

24   hasn't done any research in this, and, in fact, has made other

25   statements that are complimentary about the judicial system and

**J.A. 52**

Case: 19-1689    Document: 00117615536    Page: 56    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 115   Filed 03/14/19   Page 16 of 38

16

 1   the legal system over in Rwanda as well that there have been a

 2   number of other actual statistics that one could use to suggest

 3   that there has not been that sort of a cultural norm, the

 4   number of acquittals, for example, the appointment of who to

 5   judges at local courts, et cetera, et cetera, so all of that.

 6        I don't think that -- so what the government is

 7   suggesting is that just because you may be an expert on the

 8   current political system in Rwanda, that doesn't necessarily

 9   mean that you can then make speculative questions or

02:25PM 10   speculative judgments about how its citizens, who you may never

11   have interviewed on this particular point about, would feel.

12   That would be the argument.  Those are two different

13   expertises.

14        THE COURT:  Okay.  Mr. Lauer.

15        MR. LAUER:  To the extent that there's some question

16   about Dr. Twagiramunga's qualifications or basis for such an

17   opinion, certainly the Court is free to conduct a hearing, and,

18   you know, the government will have the right to put those

19   questions to him, but as a general matter here, I think the

02:26PM 20   Court has latched onto what the defense perceives to be the key

21   factor, which is this is a case where the witness credibility

22   will be at issue, and bias is extremely important, and the

23   defense should be able to probe biases that exist.

24        And in this particular case, witnesses are coming from

25   a country that many Americans, the jury is likely to be

1    unfamiliar with, they are likely to be unfamiliar with the

2    politics of Rwanda, as they exist now, cultural norms, and we

3    are not proposing to inquire of Dr. Twagiramunga if he believes

4    that other witnesses are lying.

5        We intend to ask him about his research, about the

6    research of other scholars, including scholars that the

7    government has relied on past cases that goes to this question,

8    so we believe that Dr. Twagiramunga does have the requisite

9    basis to testify to that, and for the reasons outlined in our

02:27PM 10    memo and expressed here today, we think the jury should hear

11    it, and we think it will be helpful to them in making

12    assessments of the case and witness credibility.

13        THE COURT:  Here's how I'm going to handle this.  I

14    think or my instinct is that if a proper foundation has been

15    laid such that he is qualified to render whatever the expert

16    testimony is, that this is probably fair game with some

17    important limitations and perhaps some cautionary instructions.

18        I think what I will want to do, and we have some time

19    to work with, obviously, is to do some kind of voir dire.  I

02:28PM 20    think probably what I would like from the defense is something

21    in the nature of an offer of proof as to his qualifications.

22    Did you do an expert disclosure of some kind?  I don't

23    remember.

24        MR. LAUER:  We provided the government with a letter

25    outlining the general terms.

**J.A. 54**

Case: 19-1689   Document: 00117615536   Page: 58   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10252-FDS   Document 115   Filed 03/14/19   Page 18 of 38

18

 1          THE COURT:  I may need more than that.

 2          MR. LAUER:  We can certainly expand upon that.

 3          THE COURT:  An offer of proof just to save time and to

 4    give both the government and me time to react to that.

 5          He's in the United States, correct?

 6          MR. LAUER:  He is presently residing in the

 7    Springfield area, so he's available relatively easily.

 8          THE COURT:  Okay.  So let's do that.  How about maybe

 9    within 14 days file an offer of proof.  I don't think -- it's a

02:29PM 10    part the government does not object to, I don't think we need

11    anything on that but just this one subset particularly, and I

12    guess the question in my mind is can he opine as to current

13    political, social or cultural norms, if that's the right word,

14    or the current political cultural and social environment in

15    Rwanda that may affect the credibility of witnesses or may be

16    necessary to understand to assess the credibility of witnesses.

17          And, again, as a general proposition, other than that,

18    I think post-1994 Rwanda events are irrelevant, and I would

19    certainly need to be convinced that any testimony one way or

02:30PM 20    the other of Mr. Teganya's fate if returns to Rwanda should be

21    excluded.

22          MR. LAUER:  Your Honor, if I could on that point?

23          THE COURT:  Yes.

24          MR. LAUER:  I did raise that in our response.  The

25    government has provided notice that they intend to present

1    evidence to the jury, and I would expect argument, to the

2    effect that Mr. Teganya's flight from Canada was motivated by

3    consciousness of guilt.

4         And, in fact, the response to that, and what we

5    believe the government is doing by eliciting that is opening

6    the door to an explanation of why he did so and what his

7    motivations were, so while it may not be admissible absent that

8    sort of door opening, I do want to signal to the Court that we

9    do expect the government to pursue that line of argument, and,

02:31PM 10    if so, we are going to make an argument that we should be

11    permitted to respond.

12         THE COURT:  Do you want to respond, Mr. Garland?  In

13    other words, let's say you make the argument he came through

14    the main woods because he knew he was guilty of genocide and

15    was trying to avoid further legal proceedings, and I'm not

16    quite sure how the government or how the defense would prove

17    this without Mr. Teganya taking the stand, but let's assume for

18    the moment that they want to put on evidence that he was

19    frightened of returning to Rwanda for fear that something

02:32PM 20    terrible will happen to him, imprisonment or worse, what's your

21    reaction to that?

22         MR. GARLAND:  Our reaction to that, he was coming over

23    here for the purpose of trying to get asylum somewhere.

24    Obviously, there's something in a claim of asylum that says I

25    don't want to go back to Rwanda.  We take that as given because

**J.A. 56**

1   that's what it means to say that you're a refugee.

2          THE COURT:  Because I would be persecuted if I go

3   back?

4          MR. GARLAND:  Right.  He's already going to be able to

5   say that.  Our proof at that point is that he's going to

6   be -- and part of the concern, of course, is that the jury will

7   now be thinking that, well, wait a minute, we're trying to

8   figure out the false statements within this asylum claim, do we

9   now have to figure out whether he should have been granted

02:33PM 10   asylum, which, as the Court is very aware, that's not what

11   they're going to be asked to decide at all, so part of what

12   Mr. Lauer is suggesting is going to be a wholesale confusion of

13   the issues since it's already going to be before the Court and

14   before the jury that Mr. Teganya in both places was saying I

15   was feared persecution back in Rwanda.

16          The second thing is that argument that we have is that

17   not that he was -- not just that he was fleeing Canada to come

18   over here because he thought his claim of asylum was unfounded,

19   but once he comes over the border, the way he comes in, the way

02:33PM 20   he comes in is not to skirt the border, go to the port of entry

21   of the U.S., knock on their door and say, hi there, I'd like to

22   claim asylum.  That's not what he's doing.

23          What he does, he goes six miles out of his way to

24   avoid that place and to come in, so that has, again, nothing to

25   do with what was going on back in Rwanda, what happened there

J.A. 57

1    but very much so that his own belief that what he was going to

2    be able to convince a government of was ill-founded.

3          The other thing is that once the Court opens that door

4    and does an examination of this other government and what it's

5    been doing post-Rwanda, it's hard to know where to stop at that

6    point because that takes on a whole other line in itself.

7          And part of the issue with putting that off to make

8    the defendant's case is the following:  We have an expert.  The

9    expert is going to be the first person who testifies.  After

02:34PM 10   that expert is done, he's going to go back to London, won't be

11   here again.

12         If we need to, we have the ability to, as I say, we

13   have evidence from Mr. Teganya's writings are inconsistent with

14   this position.  They want to have him talk about and other

15   things as well.

16         Part of what we're trying to figure out at this point

17   is how far to go with the expert to front this issue, and we

18   also don't want to be accused of having broached this issue

19   with our first witness opening the door to the other side

02:35PM 20   because that is a rabbit's hole that the jury could go down in

21   trying to figure out what to do with Mr. Teganya.  That's not

22   what they're supposed to be doing.

23         THE COURT:  All right.  It seems to me that at a

24   minimum, there's a clear distinction between his mental state

25   at the time he's crossing the border and what would actually

**J.A. 58**

1    happen to him.  In other words, it's all speculation.  You're

2    right, it's certainly true that inherent in this, in any asylum

3    application is a claim that you fear persecution returning to

4    your home country.

5          We can hardly avoid that, but it seems to me that

6    expert testimony about how people in his position have been

7    treated is perhaps out of bounds for a variety of reasons under

8    Rule 403, if nothing else, because it doesn't really go to his

9    intent.

02:36PM 10          Mr. Lauer, do you want to respond to that?

11          MR. LAUER:  Well, your Honor, it's hard to address

12   this in the abstract without the benefit of hearing what the

13   government's expert might be saying, and it sounds like there's

14   some question on the part of the government as to how far to go

15   with him, but what I would say is that to the extent that the

16   government is making a claim that the defendant's entrance into

17   the United States via the woods as opposed to a port of entry

18   was somehow a reflection of his consciousness of guilt, in

19   other words, a reflection of the fact that he had done

02:36PM 20   something wrong, participated in the genocide, then there is an

21   answer to that, and the answer to that relates directly to the

22   current political situation in Rwanda, how persons who are

23   similarly situated to him, persons with familial connections to

24   the prior regime, the sort of treatment that they can expect to

25   receive, and, you know, as I said, I don't quite know what to

Case: 19-1689     Document: 00117615536     Page: 63     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 115   Filed 03/14/19   Page 23 of 38

23

1    say not having heard, you know, the government's evidence in

2    the case, but I think that there should be an opportunity for

3    the defense to respond to that, and Dr. Twagiramunga, as the

4    government has noted, does have ample scholarship on

5    post-genocide Rwanda and could testify as to those matters.

6         Now there may be limitations on that.  This is not the

7    forum to litigate an asylum claim, but in some limited form, I

8    think a response would be reasonable.

9         THE COURT:  All right.  I'm not sure I'm prepared to

02:38PM 10   make a final or even a semifinal ruling on this question.  It

11   seems to me that the defendant's mental state is, of course, at

12   issue.  It always is.

13        It's not clear to me as a Rule 403 matter, if nothing

14   else, why we need expert testimony about current events in

15   Rwanda unless there is a direct tie to the defendant's mental

16   state, but maybe there is.

17        I'd have to hear the evidence, and that's always the

18   danger, whatever the evidence is, is that if you open a door,

19   the other side gets to paint a more complete picture, and I'm

02:38PM 20   not sure what else to say besides that, so let's take it a step

21   at a time.

22        In the meantime, I'm going to keep this motion pending

23   pending further developments, and, again, I'd ask the

24   defendants to produce an offer of proof of what I'll call the

25   political and social norms within 14 days or by March 19th,

# J.A. 60

```
 1    which should give us ample time to react and set up a voir

 2    dire, if necessary.

 3           Okay.  I think those are my only two motions.  Am I

 4    right on that?

 5           THE CLERK:  Yes.

 6           THE COURT:  Let's talk about impanelment.  It is

 7    expected to be a long trial.  We are going to bring in

 8    somewhere between 60 and 100 people.  We are still working with

 9    Mr. McAlear.  We may have others downstairs because there's

10    another trial where jurors are being brought in every day, so

11    we may have some backup, so to speak, whatever that number is,

12    but let's say that we bring 60 people in, we will put all 60

13    people under oath.

14           I will ask my voir dire questions, as I think you

15    know.  What I'll do is I'll ask a question.  If someone raises

16    their hand, I'll call them up to sidebar one-by-one to explore

17    with them whatever the issue is.

18           I do permit very limited, discrete, thoughtful

19    attorney voir dire at sidebar if you think I haven't explored

20    something fully enough, and then once we've gone through that

21    process, we will take the first 12 people on the list plus

22    alternates and put them in the box for the exercise of

23    peremptory challenges.

24           How many alternates do you think I ought to impanel?

25    I think I need at least two.  The question is should I go
```

The line timestamps: 02:39PM at line 10, 02:40PM at line 20.

**J.A. 61**

```
 1    farther than that?  What's the government's view?

 2          MR. VARGHESE:  Your Honor, I think we should do four

 3    just in case given the length of the trial.

 4          MR. LAUER:  I don't disagree.

 5          THE COURT:  That will make impanelment longer,

 6    obviously, but we will make it 16.  The last four people

 7    impaneled regardless of their juror seat will be the

 8    alternates.  They will not be told that they are the

 9    alternates.  You will know, but they won't know, and an order

10    of impanelment, they will be 1, 2, 3, 4, so if something

11    happens to one of the jurors, you'll know who replaces them,

12    and you'll also, of course, have this randomized list in front

13    of you, and as we cross out names, you'll know when we exercise

14    peremptories who the next person on the list will be, which

15    will help inform the exercise of your peremptory.

16          In terms of the voir dire questions, sort of as a

17    philosophical matter, it's as important for me sometimes to

18    make statements as well as to ask questions, that is, to

19    introduce questions so they don't come out of the blue so that

20    people are thinking about the issues, so, for example, I expect

21    to ask a question about views on immigration issues, but

22    introduce that by basically saying something to the effect that

23    this is, you know, very much in the news, a lot of people have

24    strong opinions on immigration, and, of course, this case has

25    nothing to do with any of that, it's a particular narrow,
```

02:41PM (line 10)
02:42PM (line 20)

**J.A. 62**

1    discrete issue.

2         It's not a referendum or a vote on American

3    immigration policy, but, nonetheless, there may be people

4    whose, you know, views are so strong one way or the other that

5    it would affect your ability to be a fair juror, something like

6    that, and then ask the question do any of you have a feeling

7    about or feelings about immigration issues or immigrants that

8    would affect your ability to be fair and impartial.

9         So I think there are a number of things.  I think I

02:43PM 10    need to ask that some question in some form or another

11    concerning genocide or make that statement to say that, you

12    know, there may be genocide survivors or people with friends or

13    family members affected by it, and, again, this is the only

14    real issue there from our standpoint is whether or not any of

15    that would affect their ability to be fair.

16         I always approach law enforcement questions that way,

17    that is, I try to explain what we're looking for in terms of

18    law enforcement bias, why it matters, whether you're pro law

19    enforcement or anti-law enforcement, so I think that's how I

02:44PM 20    need to approach these issues.

21         Again, I'm going to ask the questions, but I think I

22    need to make sure that the people understand what it is we're

23    talking about.  At the risk of grossly painting with a broad

24    brush, I think there are always people who want to get out of

25    jury duty no matter what, and they tend to get themselves out,

**J.A. 63**

Case: 19-1689 Document: 00117615536 Page: 67 Date Filed: 07/16/2020 Entry ID: 6352983
Case 1:17-cr-10292-FDS Document 115 Filed 03/14/19 Page 27 of 38

27

1    but the people who remain tend to be ordinary, decent people

2    that just sometimes, you know, need to be reminded of what's

3    important and why we're asking the questions the way we do and

4    making sure that they're examining their own feelings carefully

5    to make sure they can be fair and open-minded.

6           I'll have this in drug cases, for example, where a lot

7    of people have very strong views about drugs.  Sometimes, you

8    know, if your son died of a fentanyl overdose, it might be hard

9    for you to be, usually it is hard for you to be rational and

02:45PM 10   fair as a juror, but people might say, for example, they hate

11   drugs, and my response is, well, that's fine, most people hate

12   drugs.  That doesn't really the question whether this defendant

13   is guilty of these charges and try to tease it out that way, so

14   I do think I need to sort of introduce some of these questions.

15          Does the defense want me to ask any race-related

16   question, that is, sometimes with a Hispanic or Black

17   defendant, I will, again, do a short introduction and then ask

18   people questions?  Do you want me to do that here?

19          MR. LAUER:  We do not, your Honor.  We think that

02:45PM 20   probably your question about immigration will cover much of

21   that, but I did want to bring to your attention that this case

22   is going to involve at least some graphic testimony regarding

23   violence and sexual assault.

24          THE COURT:  Actually, yes, that's another one of the

25   things I'm going to do.  I think I need to tell people

# J.A. 64

          1    basically that one way or another the evidence is likely to be

          2    disturbing or unsettling, and I guess I don't quite know how to

          3    phrase it, but the thrust of it would be, we're not looking for

          4    people who are cold or insensitive, but we do need people who,

          5    you know, are going to take their duty seriously and keep their

          6    eye on the ball and pay attention to the facts and listen to my

          7    instructions and to sort through that.

          8            I notice the government had photographs.  Are there

          9    graphic photos that you expect to introduce, somewhat graphic

02:46PM  10    photos?

         11            MR. GARLAND:  There may be, your Honor.

         12            THE COURT:  Okay.

         13            MR. GARLAND:  More likely to be dead bodies, so there

         14    may be some, yes.

         15            THE COURT:  Okay.  I think I just need to front that.

         16    Okay.  I don't want to lose six jurors in the middle of the

         17    trial because they can't handle it, not simply asking the

         18    question but sort of trying to confront it directly, this is

         19    what the evidence is going to be, and we expect that normal

02:47PM  20    people may have, you know, uncomfortable reactions, but it's

         21    important that under any circumstances the jurors not decide

         22    the case based on their reactions to photographs or evidence

         23    but because they've listened to all of the evidence and are

         24    making a proper determination of whether the government has met

         25    its burden of proof.

```
  1                MR. LAUER:  If I could, your Honor.

  2                THE COURT:  Yes.

  3                MR. LAUER:  We would actually ask the Court to be a

  4     little bit more direct about it in the same way that someone

  5     who has a loved one who may have passed away due to a fentanyl

  6     overdose would have a hard time putting it aside, someone who

  7     has been sexually assaulted or someone whose loved one has been

  8     sexually assaulted is likely to have those same feelings.

  9                THE COURT:  Is that going to be part of this case,

02:48PM 10     sexual assault?

 11                MR. LAUER:  Yes, there will be direct testimony about

 12     sexual assault and rape.

 13                THE COURT:  Okay.  Then I will do that as well.  All

 14     right.  The defense had some other objections or issues with

 15     the voir dire questions.  I'll pull those up.

 16                I'm going to describe the case.  Let me talk about

 17     that.  In all these things, I hope, I'm certainly going to make

 18     every effort to be scrupulously neutral, but I think I want to

 19     say something that more or less goes like this, that the

02:49PM 20     defendant is from Rwanda, that it's a nation in East Central

 21     Africa, that for a short period of time in 1994, there were

 22     mass killings in Rwanda rooted largely although not entirely

 23     along tribal lines, those events have come to be known as the

 24     Rwandan genocide, this case involves false statements, perjury,

 25     et cetera, that bear on those issues, something like that so
```

J.A. 66

Case: 19-1689    Document: 00117615536    Page: 72    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 115   Filed 03/14/19   Page 30 of 38

30

 1    that they understand -- I'm doing this off the top of my head,

 2    and I'm going to pick my words very carefully, but I don't

 3    think I can say this is a bank robbery case, you know, the kind

 4    of things I normally say, I think I need to walk through

 5    Rwanda, events of 1994 and how it may bear on what the

 6    government says are the charges here.

 7            MR. VARGHESE:  Your Honor.

 8            THE COURT:  Yes.

 9            MR. VARGHESE:  Would you be amenable to having the

02:50PM 10    parties submit a statement of the case for the Court?

11            THE COURT:  That's fine.  You don't need to do it

12    jointly, you can give me suggestions or if you can agree on it,

13    that's fine.  The other thing is I could circulate a proposed

14    statement as well so you can have something to shoot at.  The

15    trick, as always, from my standpoint is making sure I'm not

16    putting a thumb on the scale, so I have to really walk

17    carefully through that.

18            Oh, I am going to ask, I think I need to, it's a

19    standard question, have they heard anything about the case, any

02:51PM 20    publicity?  I don't know if there's going to be an NPR story

21    the morning of the trial.  I need to ask that question.  I just

22    don't see any way around that.

23            I'm routinely shocked in high profile cases how few

24    jurors have had any exposure at all, and it seems to be getting

25    worse and worse as no one reads newspapers anymore.  You know,

J.A. 67

1    you can ask people, the story has be on the front page of the

2    paper every day for three weeks.  Have you read it?  Nope.  Are

3    you related to a cop?  100 hands go up.  But, anyway, I need to

4    ask the question.

5         All right.  So I am hoping that we will get a jury by

6    the end of Friday.  Obviously, if we don't, we will spill over

7    to Monday.  I am going to try to make that as brisk as I can

8    consistent with fairness.  I think we are the only jury,

9    obviously, being impaneled that day.  They need to show up and

02:52PM 10  watch a video.  Do you know when they're going to be ready,

11   Lisa?

12         THE CLERK:  I think between 9:40 and 9:45.

13         THE COURT:  Why don't I see counsel at nine to wrap up

14   whatever we need to wrap up, otherwise the default is going to

15   be I want to see you every morning at 8:30 unless I say it's

16   earlier, like 8:00.

17         Before I leave voir dire, so if we have four

18   alternates, that's, what, eight peremptories for the

19   government -- hold on.  It's ordinarily six plus ten with four

02:52PM 20  alternates.  Does each side get two extra ones; is that right?

21         MR. VARGHESE:  I believe that's right, your Honor.

22         THE COURT:  So it will be eight and twelve.

23   Peremptories will be exercised one-by-one at sidebar in

24   alternating rounds, so the government will go first in the

25   first round, so let's say we put 16 people in the box.  The

Case: 19-1689    Document: 00117615536    Page: 72    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 115   Filed 03/14/19   Page 32 of 38

32

1    government at sidebar says we strike Juror Number 1, defense

2    says Juror Number 2, the government says Juror Number 3,

3    government says Number 4, defense 5, government 6, and then

4    people are satisfied, we will strike those six jurors, replace

5    them with Jurors 15, 16, 17, 18, 19 and 20.

6           In the next round, defense will go first, but there

7    will be no backstrikes, that is, you have only one chance to

8    exercise a peremptory on a juror, so in keeping with my

9    hypothetical, if we put 14 people in the box and six are

02:54PM 10   struck, the remaining eight will be on the jury, and, again,

11   the last four people picked will be the alternates regardless

12   of where they are sitting in the jury.

13          Any questions or anything else about voir dire?  We

14   can revisit this again Friday morning, okay.

15          All right.  Trial mechanics, let me just touch on some

16   things quickly.  My standard trial day will be 9 to 1.  I have

17   cleared the afternoon of March 12th.  March 11th has proved

18   more difficult.  I have some safety valve availability on

19   March 13th, which is Wednesday.  I normally teach on Wednesday

02:54PM 20   afternoon, but it's spring break.  I have a sentencing and a

21   hearing, but there may be things we can do with that, but

22   unless you think differently, I think I will tell the jury

23   something like this, that our normal trial day will be 9 to 1.

24   I'll tell them what days we're not sitting.  I'll tell them

25   we're going to probably sit occasional afternoons to stay on

**J.A. 69**

Case: 19-1689    Document: 00117615536    Page: 73    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 115   Filed 03/14/19   Page 33 of 38

33

1    track, and the first such afternoon will be March the 12th,

2    where we'll go after 2:00.  I don't like keeping them past 4:30

3    so they can get a head start getting out of town.  They tend to

4    be unhappy, but, again, we'll see how that goes.

5          We don't provide them lunch, so we need to send them

6    away for lunch and get them all back by two.  We pay for lunch

7    when they're deliberating but not when we're in session.

8          My normal break schedule is 10:30 and 12:00.  With 16

9    people, the breaks tend to be a lot longer in terms of people

02:55PM 10    going to the bathroom.  I may do a one break system.  I'll feel

11    my way forward.  We'll have one break at eleven.  Obviously, if

12    somebody raises their hand, we can take a break, but I'm

13    concerned about losing the time.  It's just hard to get 16

14    people, you know, in and out, into the bathrooms and back into

15    the courtroom, so it will be one or the other, either

16    we'll break at 10:30 or noon or we'll break at eleven.

17          I'm not sure.  I guess, let me ask you, do you have

18    any questions about my trial practices, preferences?  We have a

19    document camera, obviously, that you can use.  I won't chain

02:56PM 20    you to the podium, but it certainly ought to be the default

21    position from which you testify.  I do use this witness stand.

22    I experimented with mock trials in my class and found that 100

23    percent of the jurors prefer this stand to that one.

24          There was a single mock juror that preferred the one

25    across the way, so I use this one.  It means my clerks can't

**J.A. 70**

1    see what's going on, so they may have to move around, but

2    that's the one we'll use.

3         Objections should be either the word "objection" or

4    something simple like "objection, hearsay," all argument to be

5    at sidebar, and one of the reasons that I want to see you every

6    morning is I want to try to anticipate objections.  Really

7    while the jury is in the box, I would like the case to move

8    briskly.  I can spend all kinds of time before trial, after

9    trial every day, but I don't want to waste their time.  I

02:57PM 10   really want it to move.

11        And at the risk of stating the obvious, one of the

12   reasons 9 to 1 works and the all day schedule does not is

13   people's, you know, ability to concentrate and interest lags as

14   we tend to go all day, but, you know, I'm convinced that we

15   need to do it at least sometimes.

16        Anything else anybody it occurs to you that you want

17   to take up?  Mr. Varghese.

18        MR. VARGHESE:  Two things, your Honor.  For many of

19   the witnesses, we're going to need an interpreter.

02:58PM 20        THE COURT:  Yes.

21        MR. VARGHESE:  And so just to make sure it was okay

22   with the Court, if we have --

23        THE COURT:  Usually the way it works, the interpreter

24   will be right here, in other words, that's the interpreter for

25   the entire proceeding, so, for example, in my MS-13 trials, if

J.A. 71

```
  1    we had a witness who spoke only Spanish, the interpreter would

  2    be there.  Now, the defendants also spoke only Spanish, and

  3    they had a different interpreter who was doing the headphones,

  4    and I assume Mr. Teganya's English is good enough that he

  5    doesn't need an interpreter?

  6              MR. LAUER:  No interpreter required.

  7              MR. VARGHESE:  There is -- we would request having an

  8    interpreter at our table, your Honor, to help us.

  9              THE COURT:  That's up to you.  In other words, just to

 10    privately consult with you?

 11              MR. GARLAND:  Just to make sure the interpretation is

 12    correct.  We found in prior trials that there was a discrepancy

 13    between what the witness was saying and what was being

 14    interpreted.

 15              THE COURT:  Okay.  This is, we're going to have some

 16    English, some French and some African languages?

 17              MR. GARLAND:  Primarily, it's going to be

 18    Kinyarwandan, which is the language spoken in Rwanda.  The

 19    government will have no French-speaking witnesses.

 20              THE COURT:  Okay.  Defense, same?

 21              MR. LAUER:  Largely Kinyarwandan, probably a handful

 22    of French.

 23              THE COURT:  How much interpreters do we have, in other

 24    words, if the interpreter takes ill or is stuck in traffic, do

 25    we just have one?
```

J.A. 72

1          MR. GARLAND:  We have two court-certified interpreters

2     that the government has.

3          THE COURT:  Okay.

4          MR. GARLAND:  I don't know what the defense.

5          THE COURT:  The reason I'm asking, I had a trial

6     involving a lot of Laotian defendants, and we had one

7     interpreter, and everything depended on his health, how tired

8     he was.  I mean, you know, he was running the show by the end

9     of the trial.

02:59PM 10          MR. GARLAND:  Did he have the robe on, too?

11          THE COURT:  It's just the way it is, right, so just

12     keep that in mind.

13          MR. GARLAND:  We have four other interpreters that are

14     helping us in terms of logistics and moving things around, but

15     in terms of court-certified, we have two.

16          THE COURT:  If something happens with a Spanish

17     interpreter, you know, we can find one in 15 minutes, but I

18     think this is likely to be more difficult?

19          Anything else, Mr. Lauer?

03:00PM 20          MR. LAUER:  No, your Honor.

21          THE COURT:  Okay.  Who is going to open for the

22     government?

23          MR. GARLAND:  I am, your Honor.

24          THE COURT:  How long do you expect that to take?

25          MR. GARLAND:  Thirty minutes.

```
 1              THE COURT:  Mr. Lauer.

 2              MR. LAUER:  Shorter, 15 to 20.

 3              THE COURT:  You expect to open at the beginning of the

 4     case?

 5              MR. LAUER:  Yes.

 6              THE COURT:  All right.  That's fine.  I probably told

 7     you this, you're presumed innocent.  Time management is

 8     important in every trial, but I think particularly important in

 9     this one.  You know, if you tell me half an hour and you take

10     45 minutes, I'm not going to cut you off, but I will also make

11     a mental note that you're not good at estimating your time, so

12     just remember time is an issue, that's all.

13              And if it looks like we are falling behind, I will

14     start to tighten the screws, you know, again, I can't unfairly

15     affect the defense, but I will keep an eye on time.  Obviously,

16     it applies to the defense even though you have a right to put

17     on a defense.  I'm not going to give you complete carte blanche

18     either, so we'll see how that goes.

19              All right.  So I will see you at 9:00 Friday.  If

20     there's anything anybody wants to raise, I am happy to have a

21     conference on short notice even by telephone, if necessary.

22     You know, I'd rather deal with it sooner rather than later.  I

23     invite the parties to submit anything, a statement of the case

24     or further refinements on voir dire questions in response to

25     this colloquy, and I've been drafting something, and I will
```

03:00PM at line 10

03:01PM at line 20

```
1    circulate my own, I guess, proposal for the statement of the
2    case, I'll call it, the thing I tell the jury at the beginning
3    of the case what it is all about.  Okay.  Thank you.
4              THE CLERK:  All rise.
5              (Whereupon, the hearing was adjourned at 3:01 p.m.)
6
7                     C E R T I F I C A T E
8    UNITED STATES DISTRICT COURT )
9    DISTRICT OF MASSACHUSETTS ) ss.
10   CITY OF BOSTON )
11             I do hereby certify that the foregoing transcript,
12   Pages 1 through 38 inclusive, was recorded by me
13   stenographically at the time and place aforesaid in Criminal
14   Action No. 17-10292-FDS, UNITED STATES OF AMERICA vs.
15   JEAN LEONARD TEGANYA and thereafter by me reduced to
16   typewriting and is a true and accurate record of the
17   proceedings.
18             Dated March 14, 2019.
19
20                     s/s Valerie A. O'Hara
21             _____
22               VALERIE A. O'HARA
23               OFFICIAL COURT REPORTER
24
25
```

2-1

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,          )
                                        )
5    vs.                                )  Criminal Action
                                        )
6    JEAN LEONARD TEGANYA,              )  No. 17-10292-FDS
                    Defendant           )
7                                       )
                                        )
8                                       )

9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11

                          JURY TRIAL DAY 2
12

13

14

                John Joseph Moakley United States Courthouse
15                        Courtroom No. 2
                         One Courthouse Way
16                       Boston, MA 02210

17

                           March 11, 2019
18                          9:01 a.m.

19

20

21

22

23                       Valerie A. O'Hara
                       Official Court Reporter
24        John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                      Boston, MA 02210
                  E-mail: vaohara@gmail.com

J.A. 76

Case: 19-1689   Document: 00117615536   Page: 80   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 2 of 123

2-2

```
1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;
5
     For the Defendant:
6
             Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

J.A. 77

<u>PROCEEDINGS</u>

1

2       THE CLERK:  All rise.  Thank you.  Please be seated.

3  Court is now in session in the matter of United States vs. Jean

4  Leonard Teganya, Criminal Action Number 17-10292.

5       Would counsel please identify themselves for the

6  record.

7       THE COURT:  All right.  Good morning.  I understand

8  Mr. Teganya has not yet arrived in the courtroom, and I think

9  we're all running at least a few minutes late, but I wanted to

09:01AM 10  flag something.  Apparently at the end of the day on Friday or

11  as we broke up on Friday, Juror Number 8, Fernando Dinis,

12  D-i-n-i-s, approached the clerk and said that he didn't speak

13  English well.

14       Of course, he said that in perfect English, but he

15  apparently said that he doesn't understand big words, and so I

16  think I need to do a voir dire at him at sidebar before we go

17  any further and kind of see where we are, and apparently we're

18  missing a juror or at least we were a couple minutes ago, so we

19  need to wait on her.

09:01AM 20       Do you want to wait for Mr. Teganya to do the voir

21  dire?  In other words, do you want him in the courtroom?  I

22  think I just heard him here.

23       MR. LAUER:  I think he may be very close.

24       THE COURT:  I'll instruct Ms. Pezzarossi to go

25  upstairs, check on the number of jurors and to bring this juror

Case: 19-1689    Document: 00117615536    Page: 82    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 119    Filed 03/18/19    Page 4 of 123

2-4

```
 1   down.
 2            THE CLERK:  All rise for the juror.
 3            (THE FOLLOWING OCCURRED AT SIDEBAR:)
 4            MR. WATKINS:  Is it by seat number, what seat number
 5   is he?
 6            MR. LAUER:  Seat 4.
 7            THE COURT:  Seat 4.  Juror Number 8, seat 4,
 8   Mr. Fernando Dinis, I understand that you approached the clerk
 9   on Friday after we had impaneled and said that you had trouble
10   with English; is that correct?
11            THE JUROR:  Yes.
12            THE COURT:  Can you tell me about that?
13            THE JUROR:  I have a lot of problems to understand,
14   and my English, basic English, I don't understand much talking
15   about.
16            THE COURT:  Were you able to understand what we did on
17   Friday?  Were you able to understand?
18            THE JUROR:  I don't understand what the case is all
19   about.
20            THE COURT:  Okay.
21            THE JUROR:  I know it's something Africa, but I don't
22   understand what was going on.
23            THE COURT:  Okay.  Can I get you to stand aside for a
24   moment.  I'm not sure whether this is real or not, but I'm not
25   sure I have much choice.  Does anyone disagree?  I think I may
```

09:04AM 10
09:05AM 20

J.A. 79

| | |
|---|---|
| 1 | need to let him go. |
| 2 | MR. GARLAND:  No. |
| 3 | MR. LAUER:  I don't disagree. |
| 4 | THE COURT:  Mr. Dinis, I'm going to discharge you. |
| 5 | I'm going to let you off the jury. |
| 6 | THE JUROR:  Thank you very much. |
| 7 | THE COURT:  Thank you. |
| 8 | So that means we're down to three alternates and he'll |
| 9 | be replaced, I have to look at my chart but whoever the last |
| 09:05AM 10 | person seated.  Do you have the order for impanelment?  I think |
| 11 | the person in seat 16 was the first alternate, so I discharged |
| 12 | him, we're down to three alternates, and I guess we'll just |
| 13 | leave people in the seats they're in.  Is everybody here? |
| 14 | All right.  We'll guess we'll stand in recess.  I |
| 15 | don't know what else to do. |
| 16 | THE CLERK:  All rise.  Thank you.  You may be seated. |
| 17 | THE COURT:  All right.  We are still missing a juror. |
| 18 | Ms. Awah, who's in seat 13, who's an alternate.  Her cell phone |
| 19 | is going to voice mail.  She hasn't called.  I guess what I |
| 09:17AM 20 | propose is we give it one more round of try and we have to move |
| 21 | forward at some point.  Does anyone have a different view? |
| 22 | It's 9:17.  I don't want this to go too long.  Does the |
| 23 | government have a different view? |
| 24 | MR. VARGHESE:  No, your Honor, that's fine. |
| 25 | THE COURT:  Mr. Lauer. |

```
 1              MR. LAUER:  I defer to the Court.

 2              THE COURT:  So we'll give her one more last chance, as

 3     the country song goes, and, if not, we'll discharge her, too.

 4     I should ask, is there anything else we need to talk about?

 5              MR. VARGHESE:  Your Honor, there's one just scheduling

 6     issue.  We had asked the Court whether or not it was available

 7     to sit for the full day on Wednesday.

 8              THE COURT:  Yes.

 9              MR. VARGHESE:  I actually don't think we need that

09:18AM 10     full day.  I think we'll be okay with just the usual one

11     o'clock break.

12              THE COURT:  Okay.  Mr. Lauer.

13              MR. LAUER:  It makes no difference to us.

14              THE COURT:  Okay.  She just arrived, so we'll give her

15     a few minutes.

16              THE CLERK:  All rise for the jury.

17              (JURORS ENTERED THE COURTROOM.)

18              THE COURT:  All right.  Good morning, everyone.  I

19     hope you had a good weekend.  I think we are ready to get

09:24AM 20     started.  Just as a reminder, if any of you are running late

21     for some reason, you need to call, okay, because things happen,

22     but we need to know where you are.  So, with that is the

23     government ready to open?

24              MR. GARLAND:  The government is, your Honor.

25              THE COURT:  Okay.
```

J.A. 81

1                    OPENING STATEMENT

2          MR. GARLAND:  May it please the Court, this case

3     involves two sets of important events.  What happened 25 years

4     ago in Rwanda during the Hutu genocide of Tutsis and what

5     happened five years in the United States when Mr. Teganya, the

6     defendant, applied for asylum and lied about his part during

7     that genocide.

8          The evidence will show the following:  Twenty-five

9     years ago, extremists from Rwanda's majority ethnic group, the

09:25AM 10    Hutus, sought to exterminate Rwanda's minority's ethnic group,

11    the Tutsis.  What resulted was the worst genocide since the

12    Holocaust and World War II.  500,000 to 800,000 Tutsis laid

13    dead at Hutu hands within 100 short days.  It stopped only when

14    the Hutus were stopped.

15         The defendant, Mr. Teganya, is a Hutu.  He grew up in

16    Rwanda, and he lived there through the genocide.  When the

17    Hutus were stopped, he fled Rwanda, and he went from country to

18    country to country until he landed in Canada, and he stayed

19    there for about 15 years.

09:26AM 20         Five years ago, Mr. Teganya entered the U.S.

21    unlawfully, and when he arrived and was arrested, he claimed

22    asylum asking that the United States not send him back to

23    Rwanda, but Mr. Teganya had a problem, and that problem was

24    that U.S. law made asylum unlawful if he had assisted genocide

25    as during the Rwandan genocide, which he had.

Case: 19-1689     Document: 00117615536     Page: 86     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 8 of 123

2-8

         1              During the genocide, the evidence will be that
         2    Mr. Teganya had led soldiers to Hutus who were seeking out
         3    Tutsis to kill.  He had beaten Tutsis, he had raped at least
         4    one Tutsi woman and killed other Tutsis.
         5              He swore to tell the truth during the asylum
         6    proceedings, and then he lied about the genocide and his part
         7    in it.  Those lies were charged in an indictment charging
         8    immigration fraud and perjury, and that's why you and all of us
         9    are here today.
09:27AM 10              In a few minutes, I will tell you about the asylum
        11    process and the lies that Mr. Teganya told during that process.
        12    In order to explain them to you, I'm first going to explain
        13    what happened during the genocide so that you'll understand
        14    Mr. Tavares's part during it.
        15              The evidence on that will show the following:  Rwanda
        16    is a small country in the center of East Africa.  It has two
        17    major ethnic groups, Hutus, the majority, and Tutsis, a much
        18    smaller minority.
        19              In 1994 Rwanda, it mattered whether you were a Hutu or
09:28AM 20    a Tutsi.  It mattered a lot.  As a political and economic rival
        21    since at least the early 1900's, the country was run by one
        22    group or the other, and the group that was out of power could
        23    suffer.
        24              Rwandan's ethnic group could determine the school, his
        25    grades, and his job.  In fact, every Rwandan had to carry an

# J.A. 83

          1    ethnic identity card that listed whether Hutu or Tutsi.  In the
          2    30 years leading up to the 1994 genocide, the Hutus had been in
          3    power.  They had been in power, and they ruled through their
          4    political party, the MRND.
          5         As 1994 loomed closer, the MRND and extremist Hutus
          6    made Tutsis suffer.  Extremist Hutus dehumanized Tutsis calling
          7    them cockroaches, worse, extremist Hutus went further meaning
          8    mass killings of Tutsis.  Yet those earlier mass killings of
          9    Tutsis paled in comparison to what happened and what started on
09:29AM  10    April 6, 1994.
         11         That day the genocide started when a plane was
         12    carrying the Rwandan president, a Hutu, was shot, crashed down,
         13    killing the Rwandan president.  Within a half hour, armed Hutu
         14    checkpoints and roadblocks sprung up across the country looking
         15    for Tutsis.  As people walked or drove up to those checkpoints
         16    or roadblocks, soldiers or paramilitary groups demanded to see
         17    those ethnic identity cards, and the Tutsi identity card could
         18    mean being beaten, raped or killed.
         19         Sometimes it would happen right there by the side of
09:30AM  20    the road, sometimes further off.  One witness will testify that
         21    as he drove through the countryside surrounding Butare, he saw
         22    multiple checkpoints and roadblocks, and he saw numerous piles
         23    of dead bodies, not just a few piles of dead bodies, dozens.
         24         The genocide didn't stop at the roads, it invaded the
         25    Tutsis own homes.  Tutsis were dragged from their homes,

Case: 19-1689    Document: 00117615536    Page: 88    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 119    Filed 05/16/19    Page 10 of 123

2-10

1    sometimes by Hutu soldiers, sometimes by paramilitary groups,

2    sometimes by extremist Hutu neighbors.

3         A Tutsi who was lucky to survive and returned back to

4    that home, might find his or her belongings all smashed, that

5    is, if their home still existed and hadn't been burned down in

6    the interim.

7         With roads and homes unsafe, Tutsis hid wherever they

8    could.  Now, in past episodes of Hutu violence, Tutsis had

9    sought revenge at such places as churches and hospitals, but

09:31AM 10    now even those refugees became unsafe, and that's because Hutus

11    lured Tutsis to places like churches, and when the Tutsis

12    gathered there for shelter, they were mowed down with bullets.

13         Nor were Tutsis safe at a place of healing, like a

14    hospital, especially this hospital, the University Hospital in

15    Butare, where Mr. Teganya was during the genocide.

16         Even at a hospital, this hospital, Tutsis were raped,

17    they were rounded up, and either bussed away to be killed or

18    killed near a pit near the hospital grounds.  The perpetrators

19    again were soldiers, they were paramilitary soldiers, they were

09:32AM 20    even university students, even medical students like

21    Mr. Teganya, so who is the defendant, and how did he get to the

22    University Hospital, and what did he do during the genocide?

23         The defendant is a Hutu.  He grew up in the northern

24    region of Rwanda in a place called Gisenyi.  Now, Gisenyi was a

25    stronghold of extremist Hutus.  Many of them supported the

J.A. 85

1    MRND.  In Gisenyi, the local president of the MRND was the

2    defendant's father.

3         The MRND and how Mr. Teganya belonged to it and

4    participated in it, that will be a major focus of this case.

5    The evidence will be that the defendant belonged to and

6    participated with the MRND when he was growing up in Gisenyi

7    and then he continued to do so when he moved south to Butare so

8    he could attend medical school.

9         You will hear testimony that in both Gisenyi and

09:33AM 10   Butare, he attended MRND political rallies, MRND political

11   meetings, that he wore MRND clothing, like the hat and scarf

12   that you'll see on your monitors and that he also took the MRND

13   party line of opposing Tutsis.

14        One of the eyewitnesses you'll hear from will be a

15   former medical school who lived down the hall from the

16   defendant.  Another of those witnesses will be a former medical

17   student who was his own roommate.

18        You'll also hear that Mr. Teganya was not just an MRND

19   member, he also led a team.  He led a team of an MRND

09:34AM 20   paramilitary group called the Interahamwe.  The Interahamwe's

21   purpose was initially to physically force people who didn't

22   want to join the MRND to join the MRND against their will.

23        But once the genocide started, the Interahamwe's

24   purpose became to kill Tutsis wherever they were, so the

25   Interahamwe trained in combat in two locations, at least.  One

J.A. 86

     1    of those locations was for training the unarmed combat like

     2    karate' or Kung Fu, the other was a location, and that location

     3    was hidden in the woods.  That location was for training and

     4    armed combat.  Armed combat with what Rwandans called local

     5    weapons.  Local weapons were machetes and things like this

     6    heavy club.

     7         The eyewitness to this combat training was an

     8    Interahamwe advisor who you will hear testify in court.  He

     9    served many years, long years in prison for his part in killing

09:35AM 10    Tutsis during genocide, and he will testify that the defendant

    11    attended training in both locations and that he wore the MRND

    12    clothing and that that clothing identified him as a leader and

    13    that the defendant acted as an MRND and Interahamwe leader.

    14         Now, during the genocide, the defendant was an intern,

    15    a medical intern at the Butare University Hospital.  Here's

    16    what the hospital looks like from overhead.  It's different

    17    from the hospitals that you are probably used to.  Our

    18    hospitals are generally big buildings with multi-stories.  The

    19    buildings are close together, and they're connected by internal

09:36AM 20    hallways and elevator banks as well.  This.

    21         Hospital, however, the University Hospital consists of

    22    multiple buildings of only one, two or three stories.  They're

    23    connected by what looks like from overhead enclosed hallways,

    24    but what you're seeing are really just roofs over walkways that

    25    have no walls, just sidewalks.

Case: 19-1689   Document: 00117615536   Page: 91   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 05/16/19   Page 13 of 123

2-13

1          Because those walkways have no walls, you can stand in

2     one area and you can see across the hospital grounds to see

3     what's happening in another.

4          You can also hear screams from other parts of that

5     hospital grounds.  Here is the dermatology ward, which you'll

6     hear about, here is the maternity ward, which you will hear

7     about, and here is a dormitory that the defendant lived in.

8          This hospital is where many Tutsis flocked during the

9     genocide when it reached Butare.  Some of them came to the

09:37AM 10    hospital for treatment of the injuries that they received from

11    Hutus.  Some merely sought shelter and refuge hoping that this

12    building of care would somehow keep them safe.  It didn't

13    because soon that hospital was taken over.

14          It was taken over by Hutu soldiers and extremists.

15    Civilian Tutsis were then taken out of hospital beds, out of

16    hospital buildings, out of relief tents that were on the

17    hospital grounds.

18          You'll hear eyewitness testimony from a doctor who

19    witnessed one patient grabbed, his I.V. ripped out of him, and

09:37AM 20    he was beaten to death right there in front of others.

21          Also killed were Tutsi nurses.  One Hutu nurse was

22    killed.  She was killed even though she was a Hutu because she

23    was pregnant, and she was carrying a baby, and that baby had a

24    Tutsi father, and so that baby was a Tutsi, and that led to her

25    death.

```
 1              The hospital became so dangerous that there was a
 2      group of medical doctors there who specialized in wartime
 3      medical care.  It became so dangerous for them that they packed
 4      up and they left, a group who's very job was to brave war
 5      zones, packed up and left the hospital, left the country
 6      because it was too dangerous, and you'll testimony that that
 7      was the first time in that group's history that it had left a
 8      war zone for that reason.
 9              After those doctors left, the killings continued.
09:38AM 10   Now, what was the defendant's part in all of this?  He
11      participated in the genocide in a way that would later make
12      U.S. asylum unlawful.  You'll hear testimony that he led Hutu
13      soldiers around the hospital while they were looking for Tutsis
14      to kill.  He pointed Tutsis out to the soldiers so that they
15      could take them.  Sometimes he beat Tutsis or struck them with
16      weapons.  He led soldiers to women and girls so that those
17      girls, women could be raped.
18              One woman will testify that she knew Mr. Teganya
19      before the genocide started, and she knew him during the
09:39AM 20   genocide as well, and during that time, things changed.  He
21      raped her at the hospital twice.
22              The Interahamwe witness, the paramilitary who attended
23      combat training with the defendant, he'll testify that he saw
24      the defendant and some others take four Tutsi students out of
25      that dormitory we indicated before and then killed two of them
```

J.A. 89

```
 1    with others near a pit.  That pit will be a place that you'll

 2    hear about a lot during the trial.

 3          This is the pit with the Interahamwe witness pointing

 4    to it.  Here is the same pit with a woman pointing at it

 5    because she had been taken to that pit to be killed.  She

 6    doesn't know who took her there, only to be saved by a

 7    compassionate Hutu soldier because there were some

 8    compassionate Hutus in Rwanda.  Today that woman, who will

 9    testify, works as a nurse at that hospital that almost cost her

10    her life.

11          Now, the building that you see behind both of the

12    witnesses, that is the maternity ward, a place of life so close

13    to a place of death.  Notice how close it is as well to the

14    dormitory.

15          The genocide eventually ended after 100 days of terror

16    and at least 500,000 to 800,000 deaths later, the genocide

17    ended and the Hutus were stopped.

18          What happened then?  You can imagine many Hutus fled

19    to other countries, so did the defendant, Mr. Teganya.  He fled

20    to Congo then Kenya and then India, and he finally reached

21    Canada, where he married, had kids, and he settled down for

22    about 15 years.  He claimed asylum in Canada asking Canada not

23    to send him back to Rwanda.  Canada refused.

24          In 2014, some time after Canada had refused him

25    asylum, the defendant left his home in Montreal, and he crossed
```

# J.A. 90

Case: 19-1689    Document: 00117615536    Page: 94    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 05/16/19   Page 16 of 123

2-16

1    into the United States.  Now, instead of crossing into the

2    United States from Montreal via major hallways due south into

3    say New York or Vermont or New Hampshire, the defendant instead

4    skirted the far Northeastern corner of the United States and

5    crossed over into the U.S. in a remote corner of Maine.

6          He didn't cross over at the U.S. border patrol station

7    that was off of a major road there, rather what he did was walk

8    through a woods where the border was going through unlawfully

9    and just crossed over there.  He was spotted miles away from

09:42AM 10    the lawful border crossing station, and then he was arrested.

11          At that point, he claimed asylum.  He claimed asylum

12    in the United States.  Why?  Because asylum allows a person to

13    stay in the United States and maybe even become a U.S. citizen.

14          But as I mentioned before, the defendant had a

15    problem, and that problem was that his application for asylum

16    would be denied if the U.S. found out what he had done over in

17    Rwanda because persecutors cannot claim asylum.  His asylum

18    application is what brings us all here today.

19          Now, the indictment won't ask you to decide whether

09:43AM 20    the defendant deserved asylum or whether he didn't deserve

21    asylum, instead it will ask you to decide whether he lied

22    during the application process and whether those lies mattered.

23          To apply for asylum, the defendant had to fill out a

24    form.  Here's the first page of that form.  You can tell that

25    it is his form because it has his name at the front.  It also

```
 1    has his signature at the back, and with his signature, the

 2    defendant swore to tell the truth and that his answers would be

 3    true and correct.  True and correct, they were not.

 4           Counts 1 and 2 charge the defendant with immigration

 5    fraud and perjury for answering falsely on this form, answering

 6    falsely about his political party.  The question asked whether

 7    the defendant had ever belonged to a political party or

 8    military or ethnic group, and, if so, how much had he

 9    participated?

10    What did he answer, he answered that his father had

11    been president of the local MRND back in Gisenyi and that he

12    himself belonged to a group of the Red Cross, but the defendant

13    left out and thus concealed his own membership in the MRND and

14    his own leadership within that group.

15           The evidence will be that when the defendant concealed

16    his work with the MRND, it mattered.  It mattered because the

17    MRND started the genocide, and a true answer would have linked

18    to it.  It could have prompted questions and inquiry into his

19    actions during the genocide.  It could have made his other

20    answers more suspect, and it could have led to his crimes over

21    there being more likely to be uncovered.  And a false answer, a

22    false answer would not.

23           Counts 3 and 4 charge the defendant with immigration

24    fraud and perjury for answering falsely on this form, again,

25    this time about his prior violations.  The question asked
```

09:44AM (line 10)
09:44AM (line 20)

# J.A. 92

1   whether he had ever participated in causing harm or suffering

2   to anyone because of their race, their social group or

3   political opinion.  He answered no.

4        This mattered because a true answer would have

5   disqualified him completely from receiving asylum, and a false

6   answer, false answer would not.

7        After the defendant filled out and submitted this

8   form, he testified at an immigration custody hearing.  He had

9   been held in custody since his arrest, and he wanted the

09:45AM 10   government to let him out while his application for asylum was

11   being considered under review.  Should the government keep him

12   in custody or release him on bail and if on bail for how much?

13        Before testifying, the defendant swore an oath to tell

14   the truth.  Count 5 charges him with perjury for breaking that

15   oath during his testimony.  When asked why he was afraid to

16   return to Rwanda, the defendant again cited his father's

17   political past, but this time he affirmatively denied that he

18   had ever belonged to the MRND.

19        When asked whether he had ever seen anybody at the

09:46AM 20   hospital turned over to the military for them to slaughter, he

21   answered no.  When the defendant was asked whether he had ever

22   seen any atrocities at the hospital, he again answered no, and

23   he did that even though some of the atrocities occurred at that

24   hospital were at his own hands.

25        Those are the five counts that you will have to

```
 1    decide.  You should know a few things about the trial and the
 2    evidence.  This trial will not be like the movies or the TV.
 3    The story might sometimes come out of order as we try to
 4    accommodate the schedule of witnesses who have come from some
 5    in the United States, some from France, some from England, some
 6    all the way from Rwanda.
 7          You also won't have explanations where the defendant
 8    was 24-7 back in 1994 in Rwanda.  There weren't surveillance
 9    cameras everywhere, there won't be fingerprint evidence, and
10    there won't be autopsy reports either, what you will have will
11    be the defendant's own conflicting words on immigration
12    documents and immigration hearings, and you will have
13    eyewitness testimony from people who knew the defendant in high
14    school, knew the defendant in medical school, knew the
15    defendant during the genocide and saw what he did and who he
16    was.
17          Some were Tutsis who survived the genocide and lived
18    to tell their stories to you in this courtroom.  One was a Hutu
19    who killed multiple Tutsis, who I told you about before,
20    attended combat training with the defendant and served a long
21    prison sentence for doing so.
22          His stories, many of the stories may make you
23    uncomfortable, but the evidence will be that during the
24    genocide, Interahamwe witness and his patriots are exactly the
25    type of people that the defendant helped because he was one of
```

09:47AM (line 10)
09:48AM (line 20)

**J.A. 94**

1    them, and he shared their goals.

2         Now, because of the passage of time, some of the

3    witnesses' details may be fuzzy, but what will not be fuzzy

4    will be that the defendant belonged to the MRND, that he saw

5    atrocities during the genocide, and that he participated

6    himself.

7         As I said, the charges that you'll decide concerning

8    whether Mr. Teganya lied during the asylum process, not whether

9    he was entitled to asylum, so focus on his words and whether

09:49AM 10    his words were true.

11         At the end of this case, we will come back and ask you

12    to weigh all the evidence, use your common sense and to return

13    the verdict that fits the evidence, guilty on all charges.

14         THE COURT:  All right.  Thank you.

15         Mr. Lauer.

16                    OPENING STATEMENT

17         MR. LAUER:  This is a challenging case.  It's a

18    challenging case in a few different ways.  First of all, it's a

19    case about things that happened in Rwanda a long, long time

09:50AM 20    ago.  Rwanda is a very different place than the United States.

21         Most of the witnesses that you'll hear from are

22    testifying through interpreters speaking a different language

23    that you won't understand.

24         You won't have a frame of reference for the people,

25    the culture, the places.  It's not the same as if it happened

J.A. 95

         1    here in Boston or elsewhere in Massachusetts, and if your head
         2    is already spinning a little bit from all of the names and all
         3    of the places and all of this evidence about the genocide,
         4    you're not alone.
         5         Now, this is a case about the genocide.  It's a case
         6    about mass killings, it's a case about terrible, terrible
         7    things, and no one is denying that the genocide took place and
         8    that there were terrible, terrible things that impacted a human
         9    cost, but this is a case about one man.  It's not a case about
09:50AM  10    a genocide, who was responsible, which ethnic group perpetrated
        11    what, it's a case about Jean Leonard Teganya.
        12         Now I want to use my time this morning to tell you his
        13    story.  Mr. Teganya is a good man who's only crime was being a
        14    Hutu at the time of this genocide.
        15         Now, in Rwanda, his name would not be Jean Leonard
        16    Teganya, Rwandan culture, the naming convention is a little bit
        17    unique.  In Rwanda, he would be at the Teganya, Jean Leonard.
        18    In Rwanda, there's one Rwandan name, and it's not a family
        19    name, it's not a surname that follows from father to son or
09:51AM  20    father to daughter, it's one Rwandan name.
        21         And, in fact, the vast of Rwandans do not bear their
        22    family name, they do not inherit a name from their parent, but
        23    Mr. Teganya is an exception.  Mr. Teganya is a Teganya, and
        24    that's something that differentiates him from his siblings and
        25    that's something that means something in Rwanda both then and

**J.A. 96**

1    now.

2            You've heard a little bit about Mr. Teganya's father.

3    He was a mining.  He was in the mining industry, he worked for

4    a mining company for many, many years.  In the mid-'80s, that

5    mining company was taken over by the government, the MRND that

6    you've head a lot about, and Mr. Teganya's father became an

7    MRND member.

8            And by the time of the genocide in 1994, he was an

9    MRND official, and as you heard, you saw the document on the

09:52AM 10    screens, Mr. Teganya was upfront about that, he said my father

11    was an MRND official.  He did not try to hide it.

12            You've heard a little bit about the region that he

13    hailed from, how it was a stronghold of the MRND, and that's

14    really not disputed either.  It was, but, again, this is a case

15    about an individual, an individual who happens to be Hutu, an

16    individual who is from that region, but when you assess this

17    case and what he did and who he is, you have to consider him as

18    an individual.

19            When you do that, you'll learn some things about him

09:53AM 20    that maybe you didn't know.  His mother, for instance, his

21    mother is Tutsi.  The woman who brought him into the world, the

22    woman who raised him, Tutsi.  The idea that he was raised to

23    hate Tutsis is false.  What was valued, the values of the

24    Teganya family was education.

25            Mr. Teganya, Jean Leonard was sent away for a seminary

J.A. 97

Case: 19-1689    Document: 00117615536    Page: 101    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 23 of 123

2-23

1    education at a very young age.  He wasn't in his father's

2    house, he wasn't with his father at whatever MRND meetings were

3    going on, he was in school, he was in school at a catholic

4    seminary.

5            It was a long name, and I'm not going to try to

6    pronounce it, it was in a place called Nyundo, and you'll hear

7    from other people who attended that school, people who know him

8    from that time period.

9            Did they recall him being an MRND extremist?  Did they

09:54AM 10   recall him having extremist views?  The answer is no.  No, they

11   don't.  In fact, what they remember about him is that he had a

12   position, a position of some importance to the student body and

13   within the school.

14           He was what's called a vice dean, and that's a

15   position that the students themselves elect, and there were

16   Tutsi students, and there were Tutsi faculty members, and

17   you'll hear from the students, to be dean or vice dean, it was

18   a sign of respect, a sign you were someone who was taken

19   seriously, who got along with everyone.

09:55AM 20           He moved onto the university.  He graduated with

21   distinction from Nyundo, he moved onto the university, and

22   that's in the Town of Butare, where this hospital is.  Now,

23   Mr. Teganya was a medical student.  He was focusing on

24   medicine.  He was at what's called the pre-clinic stage of his

25   studies.  He was not a doctor.  He was not even an intern in

J.A. 98

Case: 19-1689    Document: 00117615536    Page: 102    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 24 of 123

2-24

1    the sense we understand it.  Here, we go to a hospital.  There

2    are interns who can practice medicine, who examine you,

3    prescribe medications.  That was not the sort of status that he

4    had at that time.

5         He was a very junior medical student, and, in fact, he

6    was in a classroom setting all year long until the time of the

7    genocide.  There was an observational period that required him

8    to go to the hospital and to be there to observe the doctors.

9    That's what he was doing there.

09:55AM 10         And what you'll hear about that time period during the

11    time of the genocide and when Mr. Teganya was at this hospital

12    is that Butare, the city, and the hospital were different, a

13    little different than the country all around it.

14         You heard that there was a plane crash, the president

15    was assassinated.  Within 30 minutes, checkpoints springing up

16    all through the country.  Not the case in Butare.  Butare was

17    the university town, the only university town in the entire

18    country, and it was a completely different vibe.

19         Butare was progressive, Butare was a place where there

09:56AM 20    was more Tutsis than elsewhere in the country, and Butare was

21    calm.

22         So what you'll hear is that for the first two weeks of

23    the genocide, from roughly April 6th to April 19th, Butare was

24    calm, no violence, and, in fact, the violence in the hills, the

25    massacres, the bodies that some of the government witnesses are

**J.A. 99**

      1      going to testify about in the countryside, that was not

      2      happening in Butare.

      3            What was happening was people from the countryside

      4      coming to Butare seeking refuge, seeking shelter.  The hospital

      5      was essentially a haven.  It was a place that was safe because

      6      there were doctors and because there was medicine and where

      7      people could go to be safe.

      8            Now, that did change.  Things did change at the

      9      hospital, and no one is disputing that either.  They changed

09:57AM 10      later in the month.  There was a speech that was given.  You'll

     11      hear witnesses refer to this speech in Butare.  The interim

     12      president of the country came to Butare and asked people to

     13      work, meaning that they should commit acts of violence, and

     14      that's when Butare itself became under siege.

     15            What you'll hear about specific to the hospital is

     16      this.  It was a hospital.  People go there needing treatment,

     17      and that includes soldiers from the front.

     18            Now, you didn't hear about this from the government,

     19      but all of this genocide takes place in the context of what

09:58AM 20      amounts to a civil war.  Several years earlier, there had been

     21      an invasion.  Tutsis from Uganda had invaded the north of the

     22      country.  There's hostilities in the entire northern region, so

     23      there's a war going on that precipitated this genocide, and

     24      what happens in Butare a couple weeks in is that soldiers from

     25      the front come into town, and there are people who have seen

**J.A. 100**

Case: 19-1689    Document: 00117615536    Page: 104    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 20 of 123

2-26

1    their friends killed, who have been injured themselves, and

2    where do they go?  They go to the hospital.  And who's at the

3    hospital, Tutsis seeking refuge, and what happens?  Killings.

4         Mr. Teganya doesn't deny any of that.  He didn't in

5    his asylum application.  There was violence at the hospital,

6    but the question, and, again, this is a case about an

7    individual, the question is what is his role?  What did he do?

8         Now, you've heard from the government there's

9    witnesses who were classmates, say he wore this clothing, and

09:59AM 10   you saw pictures of the clothes.  He attended these meetings.

11   The witnesses you'll hear from the government are not the only

12   classmates that he had.

13        You'll hear from others.  What did they remember about

14   Jean Leonard Teganya?  He was studious, he was someone who got

15   along with people, he was not political, he was mainly known

16   for studying, and, in fact, there was a term that many people

17   used, students at that time.  You know, some university

18   students are the type to go out in Rwanda, as in America, it's

19   a university town, and there's bars.

09:59AM 20        The students who go to the bars, "Canards."  That's

21   the term.  For students who take their studies seriously are

22   "Gents."  You'll hear from witnesses that describe Mr. Teganya

23   as a Gent.  He was not someone who had problems with Tutsis, he

24   was not someone who was an extremist, he was not someone who

25   attended meetings, but he was there.

J.A. 101

         1            He was there, and in the midst of all this, killings.

         2     What is he to do?  You heard there's checkpoints throughout the

         3     country.  Travel is very, very difficult.  There's soldiers

         4     with guns all over the place or other weapons.

         5            What did he do?  He remained there treating people,

         6     helping people.  This was a crisis situation, and the idea or

         7     the implication that you may here by remaining there, he did

         8     something wrong, is not consistent with other evidence.

         9            The country fractured, fractured several months into

10:00AM 10     this.  You heard it was about 100 days.  In the summertime, a

        11     few months after the violence broke out in April, what happens

        12     is the Tutsi Army that I referred to before, it's called the

        13     RPF.

        14            The Tutsi Army sweeps in and takes over the country,

        15     and what happens, there's a mass exodus of Hutu.  A million,

        16     maybe up to two million people flee the country.  Now, were

        17     some of those people responsible for what happened?  Sure.

        18     Were all of them?  No.

        19            So, Mr. Teganya, like millions of others flees.  He

10:01AM 20     flees to the Congo.  He lives in refugee camps for two years.

        21     That was difficult because the conditions were challenging, not

        22     sanitary.  There was violence.  He gets a job working for an

        23     NGO as a medical assistant.  After getting that job, he is able

        24     to get to Kenya to get out.

        25            Within Kenya, he applies to further his education in

**J.A. 102**

Case: 19-1689     Document: 00117645536     Page: 106     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 28 of 123

2-28

          1    India.  Now, you heard he's traveling all over the world.  He

          2    went to India and got a master's degree, economics.  That's

          3    Jean Leonard Teganya, but after he gets that degree in India,

          4    he can't go back to Rwanda.

          5         By this time, his father has been brought back

          6    forcibly, jailed without a trial, as was the experience for

          7    many, many Hutu in Rwanda.

          8         You'll hear testimony about that, how people returning

          9    to Rwanda in the aftermath of this were jailed for years, five

10:02AM   10    years, ten years, no trial, no evidence.  You'll hear from

         11    people who had that experience, so there was no question, he

         12    could not go back to Rwanda, so he goes to Canada.  He speaks

         13    French.  French is a language that many in Rwanda speak at that

         14    time.

         15         He goes to France.  He carves out a life for himself.

         16    He applies for refugee status.  He marries.  He has two kids.

         17    He has a career.  He doesn't get his refugee status, so what's

         18    he going to do?  Returning to Rwanda is not an option, and the

         19    United States is right next door.

10:03AM   20         Now, the United States has asylum laws, too, and

         21    you'll be learning about that.  Asylum laws exist for a reason.

         22    They exist because people in other areas of the world are

         23    subject to discrimination, repression and need safety, so he

         24    crossed the border with little more than a backpack and the

         25    clothes on his back, and he went into Maine, encountered a

**J.A. 103**

Case: 19-1689   Document: 00117615536   Page: 107   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 29 of 123

2-29

 1    border patrol agent very quickly, identified himself, gave a

 2    statement, explained what he was doing, where he had come from.

 3    He eventually submits a very detailed affidavit that you'll

 4    eventually have the benefit of reading, and he explains exactly

 5    what his background is in great detail.

 6          So the thing about this case is that it's two very

 7    different versions of Jean Leonard Teganya.  There's one

 8    version that you'll hear for the next couple weeks as the

 9    government is calling their witnesses, and that Jean Leonard

10:04AM 10  Teganya was an extremist, someone who attended rallies and wore

11    clothing and put those beliefs into action during the genocide.

12          Now, as you're listening to that, remember your role.

13    As a jury, you are hear to evaluate the credibility of

14    witnesses, to listen to someone, think critically about what

15    they're saying.

16          Were they in a position to see or hear the things that

17    they claim?  Does their story make sense?  Did they have a

18    motive to fabricate or distort?  Are they credible?  That is

19    your role to decide who is credible in this case.

10:05AM 20        So you'll have one set of witnesses from the

21    government, and then in a few weeks, they'll be another set of

22    witnesses that we will be calling, and you will hear a very,

23    very different version of Jean Leonard Teganya from the

24    defense, someone who was not an extremist, someone who was

25    apolitical, someone who got along, someone who is the vice dean

**J.A. 104**

Case: 19-1689   Document: 00117615536   Page: 108   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 115   Filed 03/18/19   Page 30 of 123

2-30

1    at his high school, his catholic seminary, where conduct was a

2    major part of what he was graded on, someone who in medical

3    school got good grades, was advancing, was known as a Gent and

4    other people at the hospital, who were there either working in

5    similar circumstances to Mr. Teganya, whose experiences are

6    very similar to his, and the reasons is because he didn't lie.

7          What he wrote was the truth, and at the end of the

8    trial, it's going to be your job to reconcile those two

9    versions of Jean Leonard Teganya, and when you do, when you

10   evaluate what witness is being credible and what witnesses are

11   not, you will see the charges are not true, and Jean Leonard

12   Teganya is not guilty.

13         THE COURT:  Thank you, Mr. Lauer.

14         All right.  Mr. Varghese.

15         MR. VARGHESE:  Your Honor, the United States calls

16   Dr. Phil Clark.

17         THE COURT:  Can I see counsel quickly at sidebar while

18   we're getting set up.

19         (THE FOLLOWING OCCURRED AT SIDEBAR:)

20         THE COURT:  I don't recall whether anyone asked for

21   sequestration of witnesses.

22         MR. LAUER:  We would so move, although the parties

23   have come to an agreement about certain witnesses remaining.

24         THE COURT:  I will so order subject to your agreement.

25   If I need to put that on the record, we can at some other

J.A. 105

 1    point, and, obviously, I can't monitor it in the sense I don't

 2    know who these people are, so I'll ask you to make sure if

 3    someone comes in the courtroom and they're not supposed to be

 4    here that they could step outside.

 5              (SIDEBAR CONFERENCE WAS CONCLUDED)

 6              PHIL CLARK, having been duly sworn by the Clerk,

 7    testified as follows:

 8                            DIRECT EXAMINATION

 9    BY MR. VARGHESE:

10:08AM 10   Q.   Good morning.

11    A.   Good morning.

12    Q.   Sir, in a loud, clear voice, can you please introduce

13    yourself to the jury?  What's your name?

14    A.   Yes, my name is Phil Clark.

15    Q.   Dr. Clark, where are you joining us from today?

16    A.   I'm joining you from London.  I'm based at the School of

17    Oriental and African Studies at the University of London.

18    Q.   Before we talk about your current position, let's talk a

19    little bit about your background.  Where did you go to school?

10:08AM 20   A.   I did my undergraduate studies at Flinders University in

21    South Australia.  I then gained road scholarship to do my Ph.D.

22    at the University of Oxford.

23    Q.   And what was your Ph.D. in, what subject matter?

24    A.   My Ph.D. was in the Department of Politics, and it looked

25    specifically at issues around justice and reconciliation after

Case: 19-1689    Document: 00117615536    Page: 110    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 32 of 123

2-32

 1    the genocide in Rwanda.

 2    Q.    What was your thesis on?

 3    A.    Specifically my Ph.D. thesis was on the workings and the

 4    impact of the Gacaca community courts in Rwanda, a process that

 5    I followed for around ten years.

 6    Q.    And, just briefly, can you explain to the jury what are

 7    the Gacaca Courts in post-genocide Rwanda?

 8    A.    The Gacaca Courts were a process of around 12,000

 9    village-based courts that were set up in Rwanda between 2002

10:09AM 10    and 2012.  The idea of Gacaca was to prosecute genocide cases

11    in the very same communities where crimes were alleged to have

12    taken place.

13          Over that decade, Gacaca prosecuted around 400,000

14    genocide suspects.  The Gacaca jurisdictions were overseen by

15    lay judges, every day members of the community who were elected

16    to the position of judge because of their standing in the

17    community, so this was very much a community-based process of

18    post-genocide justice.

19    Q.    And we'll be talking about that in a bit.  Why don't you

10:10AM 20    finish your background.  Follow your Ph.D. at Oxford, did you

21    do any post-doc. work in the same subject area?

22    A.    I did.  Following my Ph.D. at Oxford, I held two

23    postdoctoral research positions, and during those jobs, I

24    continued my research specifically into Gacaca and issues

25    around justice and reconciliation in Rwanda.  This then led to

Case: 19-1689    Document: 00117615536    Page: 114    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 39 of 123

2-33

1    a book that I published five years after my Ph.D. on the impact

2    of the Gacaca Courts, particularly at the community level in

3    Rwanda.

4    Q.   And I think you started by saying you're with the

5    University of London.  Can you tell the jury what is your

6    current position and focus?

7    A.   So I'm currently what in the British system is known as a

8    reader in comparative and international politics, I think the

9    equivalent here in the United States is an assistant professor,

10   so one rung below professor.  It's a permanent tenured academic

11   position which I've held in London since 2010.

12   Q.   And you said it was in comparative and international

13   politics; is that right?

14   A.   Yes, that's right.

15   Q.   Do you hold any other positions at the school?

16   A.   I do.  I'm also the codirector of the Center on Conflict

17   Rights and Justice, which is one of the largest research

18   centers in the university.

19   Q.   What's your focus of your academic research in teaching?

20   A.   The focus of my research and teaching is very much on

21   causes of mass conflict, specifically in Africa, and responses

22   to mass conflict, so my work focuses on things like justice,

23   reconciliation, peace building, geographically my research

24   focuses particularly on the African Great Lakes, so I'm a

25   specialist on the history, the politics of Rwanda, Uganda and

1    the Democratic Republic of Congo, in particular.

2    Q.    Have you ever traveled to Rwanda?

3    A.    I have.  Since 2003, I've made more than 40 field trips to

4    Rwanda.  Those trips are typically between two weeks to nine

5    months.  I've been to Rwanda every year since 2003, and I often

6    make multiple trips during the same year to the country.

7    Q.    What's the purpose of all of these travel, all these trips

8    to Rwanda?

9    A.    There are really two main reasons why I go back to Rwanda

10:12AM 10   so regularly.  The first one is clearly because of my own

11   research.  I'm constantly conducting field work in various

12   parts of the country, particularly on issues around justice and

13   reconciliation after the genocide.

14          More recently, I've also been going back to Rwanda

15   regularly as part of a training program that I set up in Kigali

16   to train Rwandan researchers to do research on some of these

17   same issues but to really get more Rwandan voices into

18   international debates rather than the non-Rwandans exclusively.

19   Q.    And in terms of that program, are you focusing Rwandan

10:13AM 20   academics on a specific subject matter area?

21   A.    No, it's quite a broad research agenda.  The focus of that

22   training program, which is run through an organization called

23   the Aegis Trust, and it's been funded by the British and the

24   Swedish governments.  It's focused really on the full range of

25   issues around Rwanda's post-genocide recovery, so it's a

```
 1   program that works with Rwandan academics and Rwandan
 2   researchers to look at a range of political, social, cultural
 3   and economic issues that relate to how Rwanda has responded to
 4   the 1994 genocide.
 5   Q.   When you traveled to Rwanda those 40 trips you talk about,
 6   do you particularly stay in Kigali, the capital, or do you
 7   travel the other parts of the country as well?
 8   A.   The vast majority of my field work is in rural areas, so I
 9   spend some time in Kigali.  I have a couple of field sites in
10   the city, but the vast majority of my work is in 10 other field
11   sites, which are scattered around the different provinces of
12   the country, so the bulk of my field work is spent in the
13   Rwandan countryside.
14   Q.   Approximately how many individuals have you interviewed
15   during your field work in Rwanda regarding the genocide and its
16   aftermath?
17   A.   Over the last 16 years, I would estimate I've now
18   interviewed more than 1200 individuals who all have different
19   relations to the genocide.  These are interviews with
20   perpetrators, with survivors, with government officials, with
21   bystanders to the violence.  The vast majority of those 1200
22   interviews have been with everyday people at the community
23   level.
24   Q.   Does that also include different ethnic groups as well?
25   A.   Indeed, a key part of my research is to interview a real
```

J.A. 110

1    diversity of people across all sorts of categories in Rwandan

2    society, so it's a very important feature of my research that I

3    speak to people who are right across the ethnic divide, which

4    in Rwanda means Hutu, Tutsi, and Twa, and the Twa often get

5    left out of this picture, but also a diversity of people in

6    terms of gender, in terms of educational attainment, in terms

7    of their geographical location, in terms of their age and

8    various other criteria.  Interviewing people across a real

9    spectrum of society is a key focus of my work.

10:16AM 10    Q.    I want to ask you, you mentioned that your thesis was

11    published.  Have you published any other books on the topic of

12    Rwanda and genocide?

13    A.    I have.  I coedited a book in 2008 called *After Genocide*.

14    It was co-edited with an American scholar called.

15    Zachary Kaufman.  This, again, was a collection of essays by

16    about 25 contributors looking at a very wide range of issues

17    relating to Rwanda's recovery from the genocide, again,

18    particularly with an interest in justice and reconciliation.

19    Q.    Have you authored any opinion pieces about the politics of

10:16AM 20    Rwanda and the aftermath of the genocide?

21    A.    I have.  In the last 15 years or so, I think I've

22    published something like that 25 or 30 opinion pieces in

23    outlets like the *New York Times*, *The Washington Post*, CNN and

24    BBC websites, *The Guardian Newspaper* in the U.K.

25          Again, these are all that deal with the current

**J.A. 111**

```
 1    political situation in Rwanda as well as bigger issues around

 2    accountability for genocide crimes and issues around

 3    reconciliation at the community level.

 4    Q.   Have you given any talks or lectures about Rwanda, the

 5    genocide and its aftermath?

 6    A.   Yes, in that period, I've given I would say hundreds of

 7    presentations in a wide range of fora.  In fact, even on this

 8    same trip to the U.S., I've given presentations at Boston

 9    University and at Yale, and I'll be at NYU in New York later in
10    the week.

11         In that period, I've lectured extensively in North

12    America, in Western Europe, in various African states and also

13    in my home country of Australia.

14    Q.   Have you ever testified as an expert witness with respect

15    to the Rwanda genocide and its aftermath?

16    A.   Yes, I've testified in three Rwandan genocide-related

17    cases in Sweden, one case in the U.K., and this is the third

18    occasion that I've testified in a Rwanda case here in the U.S.

19    Q.   Have you always testified for the prosecution?

20    A.   In the majority of those cases, I've testified for the

21    prosecution, but I also testified for the defense in a case at

22    the International Criminal Court.

23         It was the case of Callixte Mbarushimana, who was an

24    alleged leader of the Hutu-dominated rebel group, the FDLR.  On

25    that occasion, I gave expert witness testimony for the defense
```

10:17AM (line 10)

10:18AM (line 20)

J.A. 112

2-38

           1    in the Mbarushimana case.

           2    Q.   Dr. Clark, with that understanding of your background, I

           3    want to turn and talk about Rwanda itself.  Could you explain

           4    to the jury where is the country of Rwanda?

           5    A.   Rwanda really is smack bang in the middle of Africa.  It's

           6    very much the heart of the continent, a very small country.  If

           7    you blink, you may miss it, but it's located right in the

           8    center of the continent.

           9         MR. VARGHESE:  By agreement of the parties,

10:19AM   10    Exhibit 18.  Your Honor, we'd ask Exhibit 18 may be admitted.

          11         MR. LAUER:  No objection.

          12         THE COURT:  All right.  It's admitted, Exhibit 18.

          13         (Exhibit No. 18 received into evidence.)

          14    Q.   Dr. Clark, do you see what's on the screen in front of

          15    you?

          16    A.   Indeed.

          17    Q.   And if I just highlight this one area here, do you see

          18    what I blew up in that fuzzy white?

          19    A.   Yes.

10:19AM   20    Q.   And is that Rwanda?

          21    A.   That is Rwanda.

          22    Q.   So, centrally located in Africa?

          23    A.   Yes, that's right.

          24    Q.   Approximately how many people live in Rwanda?

          25    A.   The current population of Rwanda is approximately 12

J.A. 113

Case: 19-1689   Document: 00117615536   Page: 113   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 39 of 123

2-39

  1    million people.

  2    Q.   Can you tell the jury a little bit about the population?

  3    Is it dense?

  4    A.   Yes, Rwanda is the most densely populated country in

  5    Africa.  It's the second most densely populated in the world

  6    after Bangladesh.  People lived in a very crammed fashion on

  7    the very hilly terrain of the country, so a small country but

  8    with an enormous population.

  9    Q.   Can you tell us about the economy of Rwanda?  What's the

10:20AM 10  economy like?

 11    A.   The economy of Rwanda today is still predominantly

 12    agriculture-based.  The country's main exports are coffee and

 13    tea, so the bulk of the rural population is engaged either in

 14    subsistence agriculture or in export agriculture around the

 15    coffee and tea industries.

 16         There is an increasing emphasis in the country on

 17    tourism.  About 20 percent of the country's GDP now comes from

 18    tourism, and the country still relies to the tune of about 15

 19    percent of its national GDP on foreign aid, so there's still a

10:21AM 20  certain amount of economic reliance on international support.

 21         MR. VARGHESE:  We also have a map of Rwanda.  By

 22    agreement of the parties, Exhibit 19.

 23         THE COURT:  All right.  It's admitted.

 24         (Exhibit No. 19 received into evidence.)

 25    Q.   Dr. Clark, do you see what's on the screen in front of you

**J.A. 114**

1    there?

2    A.    I indeed.

3    Q.    Do you recognize what's in Exhibit 19?

4    A.    Yes, this is a map of Rwanda with a fairly detailed

5    breakdown of its provinces.

6    Q.    What languages are spoken in Rwanda?

7    A.    The dominant national language is Kinyarwandan, but Rwanda

8    also in recent years has elevated English to its second

9    national language, and French is also widely spoken.  It used

10:22AM 10   to be also one of the national languages, but that has been

11   diminished in status over the last five or six years.

12   Q.    Is the country more rural or urban?

13   A.    The overwhelming majority of Rwandans live in rural areas.

14   About 70 percent of the population lives in the countryside,

15   and within that 70 percent of the population, the vast majority

16   of people are engaged in subsistence agriculture, simply

17   growing enough to survive typically with no export or

18   necessarily monetary element to the produce that they grow.

19   Q.    What's the capital of Rwanda?

10:22AM 20   A.    The capital is Kigali, and about 20, 25 percent of the

21   national population today lives in the capital.

22   Q.    And can you tell us what Kigali is like as a city?

23   A.    Kigali is growing rapidly.  Even in the time that I've

24   been in Rwanda since 2003, I've seen the city change quite

25   drastically.  It's gone from a fairly rundown sort of town to

**J.A. 115**

 1    an increasingly modernized city with skyscrapers and a very

 2    effective public transport system, and also it's a place where

 3    the local population has grown quite substantially.

 4            Many Rwandans who had been living abroad over the last

 5    20 or 30 years have come back to Kigali, and many people living

 6    in the countryside have also flocked to the city usually hoping

 7    to gain employment there.

 8    Q.    I want to ask you about the region towards the south,

 9    Butare.  Can you tell the jury a little bit about Butare.

10:23AM 10    What's Butare like?

11    A.    Yes, Butare is a province that I know quite well.  I've

12    been conducting research there since 2003.  Butare really is

13    quite different from the rest of Rwanda, and people who live in

14    this part of Rwanda often see themselves as very different in

15    the sense that this historically has been the site of the

16    national university, so it's a part of the country that sees

17    itself as the intellectual capital.  It sees itself as more

18    liberal, as more tolerant than other parts of Rwanda.

19            Historically, it's also been the part of the country

10:24AM 20    where one of the largest percentages of the Tutsi minority have

21    lived, so for lots of reasons, Butare is quite separate from

22    the rest of the country historically and even today.

23    Q.    Since you mentioned the Tutsis, let's talk about that.

24    Can you describe the demographics of Rwanda?

25    A.    Yes, the Rwandan population is essentially broken down

1    into three major ethnic groups.  The majority group is the

2    Hutu, who represent roughly 84 or 85 percent of the national

3    population.  The second largest ethnic group is the Tutsi,

4    which represents 13 or 14 percent of the population, and the

5    third group, the Twa represent the remaining one percent.

6    Q.    Are they actually different ethnic groups?

7    A.    There's some conjecture over this because historically,

8    particularly in the pre-colonial period in Rwanda, this

9    division between three groups was really a socioeconomic or a

10:25AM 10    class distinction.  Even in the national language,

11    Kinyarwandan, these words, "Hutu," "Tutsi" and "Twa" really

12    mean socioeconomic divisions rather than ethnic labels.

13         Historically, Tutsi was seen as cultivators.  They

14    were seen as the working class.  The Tutsi was seen as the land

15    owners, they were the aristocrats.  And the Twa were very much

16    the lower class.  They were seen as heavily marginalized and

17    really could not penetrate the other two categories.

18         So if you go back, particularly to the end of the 19th

19    century, these were class categories, and people could move

10:26AM 20    between these categories depending on their wealth and

21    depending on their status.  So, for example, a Hutu who gained

22    wealth, especially in terms of head of cattle or a certain

23    prestige in the community could be elevated to the category of

24    Tutsi and vice versa, a Tutsi who fell out of favor in

25    socioeconomic terms could find themselves falling into the

**J.A. 117**

1    category of Hutu, so historically these have been class labels

2    more than ethnic labels.

3    Q.    So how is it that these class distinctions became sort of

4    codified as these ethnic identities?

5    A.    The key factor here is the impact of Belgium colonialism

6    in Rwanda, and it's really difficult, I think, to exaggerate

7    just how important the period of Belgium colonization was.

8         When the Belgiums arrived in Rwanda, they found this

9    very well-ordered society, very hierarchical with the Tutsi at

10:27AM 10    the top, the Hutu, the majority sort of in the middle and

11    towards the bottom and very much the Twa at the bottom of all

12    of this, and so what the Belgiums did in 1933 was to issue

13    identity cards explicitly on the basis of people's ethnicity,

14    so what the Belgiums did in 1933 was they took the

15    socioeconomic categories, which had been very fluid, and they

16    fixed them so that in 1933 if you, for example, had 10 head of

17    cattle or more, you were considered a Tutsi, and you were given

18    an identity card with your name on it that said you were a

19    Tutsi.

10:27AM 20         If you had fewer than 10 head of cattle, you were put

21    in the ethnic category of Hutu, and if you were someone who was

22    of very short stature and who engaged in hunted gathering in

23    the forests or if you engaged in pottery, you were considered a

24    Twa, and that was put on your ethnic identity card, and it was

25    fixed for all time.

J.A. 118

1           So the big change under the Belgiums is to take the

2    socioeconomic categories, which had always been very fluid and

3    to make them rigid, and so after 1933, up until the genocide in

4    1994, all Rwandans inherited their ethnic identity through

5    their father's line, so identity cards were passed down through

6    the family along those lines.

7           The other thing that the Belgiums did was not only to

8    fix these ethnic identities but also to systematically favor

9    the Tutsi.  The Belgium idea, and it was in many ways a deeply

10:29AM 10    racist idea, was that there was a hierarchy of people, and they

11    saw the Tutsi basically as more like them.  They saw them as

12    more European.

13           They saw them as people that they could cooperate with

14    and engage with, and so the Belgiums also favored the Tutsi in

15    all aspects of social and political life, so the Belgium period

16    of colonization is absolutely fundamental to try to understand

17    ethnic divisions in the country.

18    Q.   You mentioned that there were socioeconomic groups to

19    start were, but were there biological or racial differences

10:29AM 20    between the groups that could account for what the Belgiums

21    were doing?

22    A.   There are some subtle physical differences between the

23    groups, and, again, these had been very fluid categories until

24    the period of Belgium colonization, but the Belgiums sort of

25    pushed this idea that the Tutsi physically were very tall, very

**J.A. 119**

Case: 19-1689    Document: 00117615536    Page: 123    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 119    Filed 03/18/19    Page 45 of 123

2-45

1    slender, had very elegant facial features, and in the Belgium

2    imagination, that meant that Tutsi were more European.

3         Again, they were more like them, and so when these

4    identity cards were issued in 1933, they weren't only issued on

5    the basis of socioeconomic categories, there was also a certain

6    amount of physical features that were built into this

7    calculation.

8         The Hutu was seen as shorter and stockier.  That also

9    factored into what identity cards people received in 1933, and

10:30AM 10    the Twa, again, was seen as shorter than everybody else and had

11    even stockier features than the Hutu, and partly on these

12    physical characteristics, identity cards were also given to the

13    Twa.

14    Q.   You mentioned this before, but I just wanted to make sure

15    I was clear about it.  How was ethnic identity passed through

16    the generations?

17    A.   Ethnic identity after 1933 was passed down through the

18    father's line, so until the genocide in 1994, every Rwandan

19    citizen inherited their ethnic identity through the father's

10:31AM 20    side of the family.

21    Q.   Regardless of whether or not the mother was a Tutsi or a

22    Twa?

23    A.   Indeed.  And so one of the features of Rwandan life for

24    centuries has been a high degree of intermarriage, particularly

25    between a Hutu and Tutsi, but the key there is that even if one

J.A. 120

1   had a Tutsi mother, an individual's ethnic identity would be

2   determined by the identity of their father.

3   Q.   You mentioned that the Belgiums favored the Tutsis.   In

4   what ways would that preface manifest itself?

5   A.   The Belgium favoring of the Tutsi really was

6   comprehensive.   Primarily, it showed in the extent to which

7   Tutsi were preserved in the running of the state, so most of

8   the plum political positions, high-ranking positions in the

9   military were given to the Tutsi, but also in social and

10:32AM 10   economic terms, the Tutsi were very much favored.

11        Tutsi business people gained access to government

12   contracts and were typically preserved in the economic realm.

13   Tutsi were also given most of the scholarships at the

14   university and the secondary school level, so there was a

15   complete skewing of the educational system towards the Tutsi.

16        In the minds of many Hutu in the colonial era, there

17   was almost no distinction between the Belgiums and the Tutsi.

18   When many Hutu, especially in rural areas, thought about

19   Belgium and colonial policy, they also thought about how much

10:32AM 20   this benefited the Tutsi population and how much it relied on

21   the Tutsi leadership that was also being prefaced under the

22   Belgiums.

23   Q.   So did that lead to resentment among the Hutu population?

24   A.   Indeed.   This structure of Belgium rule created an

25   enormous amount of resentment and anger amongst the majority

**J.A. 121**

Case: 19-1689    Document: 00117615536    Page: 125    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 119    Filed 03/18/19    Page 47 of 123

2-47

```
 1    Hutu in the population.  There was a real sense of burning
 2    grievance and injustice because most Hutu and Tutsi, especially
 3    in rural areas, were living side-by-side on the same hills, and
 4    so Hutu could see how the Tutsi neighbors, even in the same
 5    communities, were receiving all sorts of government benefits
 6    that they simply were not, and so this process extended over
 7    several decades meant that a real burning sense of anger and
 8    grievance went very deep in the Hutu community.
 9    Q.    Did that eventually lead to violence?
10    A.    It did.  The key turning point in Rwandan history in terms
11    of outbreaks and violence is 1959.  Up until 1959, there had
12    always been tensions between Hutu and Tutsi, but it had never
13    manifest in violence.  That changes in 1959.
14          What's happening by the end of the 1950's and the
15    early 1960's is that Belgium is trying to get out of Rwanda,
16    it's trying to extricate itself from its colonies, and Belgium
17    also is under pressure to start to institute a more democratic
18    system in Rwanda, which turns the tables towards the ethnic
19    majority of the Hutu.
20          So this creates an environment at the end of the
21    1950's and the beginning of the 1960's which is increasingly
22    tilted towards the Hutu population.  As part of that process,
23    we also see the growth of the very first organized Hutu
24    political parties, and one of the things that those parties do,
25    especially beginning in 1959, is to exact violent revenge
```

1    against Tutsi political and military leadership but also

2    against every day Tutsi civilians, and so this is a period of

3    enormous political and social change in Rwanda, but one of the

4    key facets of it is the first real recorded outbreak of

5    ethnically-driven violence, specifically against the Tutsi.

6    Q.    What was the result of that violence against the Tutsis?

7    A.    In the period between 1959 and when Rwanda gained its

8    independence in 1962, we see the killing of tens of thousands

9    of every day Tutsi, and one of the key outcomes of that

10:35AM 10    violence is to produce an enormous refugee exodus of the Tutsi

11    population from Rwanda.

12         The vast majority of those Tutsi exiles end up living

13    in refugee camps in the wider region, in Uganda, in Burundi, in

14    what was then Eastern Zaire, in Tanzania, even as far afield as

15    Kenya, and so not only does the Tutsi population experience

16    mass violence and mass killing, it also experiences the massive

17    fragmentation of that community as it's pushed outside of

18    Rwanda's borders and is scattered into these refugee camps

19    right across the region.

10:36AM 20    Q.    You mentioned that Rwanda gained its independence from

21    Belgium in 1962.  Can you explain how that came about?

22    A.    Yes.  By the early 1960's, it was becoming very unpopular

23    for European countries to hang onto their colonies, and so this

24    was a period of massive decolonization across Africa, and many

25    European states were trying to get out of the continent.

**J.A. 123**

Case: 19-1689    Document: 00117615536    Page: 127    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 49 of 123

2-49

1          Belgium was no different in that respect, and so what

2     Belgium had been doing, particularly from 1961, leading into

3     1962, was to try to find ways to tilt the ethnic balance and to

4     begin to favor the Hutu.

5          This first manifest in the country's very first

6     elections at the local level in 1961, which a couple of Hutu

7     political parties won overwhelming, and so the Belgiums left in

8     1962.  There was a very strong sense by then that this was now

9     a Hutu-dominated state, that the Belgiums felt we've put this

10:37AM 10    country back in the hands of the ethnic majority contrary to

11    how we have ruled the country for the preceding decades.

12          We can now get out, and this country will move forward

13    with an ethically-dominated democratic system, and so what we

14    see upon independence in 1962 is the country ruled by a Hutu

15    president, Kyabunda, who then institutes a political and social

16    system, which very strongly favors the Hutu.

17    Q.   When the Hutus came to power in 1962, did that identity

18    card law that the Belgiums imposed back in 1933, was that still

19    in place?

10:38AM 20    A.   Yes.  The Kyabunda government inherited the I.D. system

21    from the colonials, and it was then used to restructure the

22    entire society, so Kyabunda, as I said, prefaced the Hutu

23    population, and the easiest way to determine who would benefit

24    from this new system was to look at their identity cards and to

25    see who was identified explicitly as a Hutu.

J.A. 124

Case: 19-1689    Document: 00117615536    Page: 128    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 50 of 123

2-50

1   Q.   And in what ways did the Hutu government benefit the Hutu

2   population?

3   A.   In many ways, Kyabunda's government did exactly what the

4   Belgiums had done except with a different ethnic group being

5   preferred, so we then saw a Kyabunda kill or force into exile

6   the entire Tutsi political and military leadership that had

7   been in place under the Belgium colonials, and, instead, Hutu

8   leaders were elevated to those key positions.

9        We also saw Kyabunda's government preface the Hutu

10:39AM 10   economically in terms of government welfare in the countryside

11   or preferential treatment in terms of government contracts,

12   and, again, education was used as a key tool of ethnic

13   dominance.

14        Kyabunda also prefaced Hutu very strongly in terms of

15   university and secondary school scholarship, so we basically

16   see the same political structure, but it's totally turned on

17   its head with the Hutu now being preferred, whereas in the

18   past it had been the Tutsi.

19   Q.   Were there reprisals against the Tutsis once the Hutus

10:39AM 20   came to power?

21   A.   There were.  So the emergence of Kyabunda's regime in 1962

22   is accompanied by continued mass violence, especially against

23   Tutsi civilians.  This really extends from 1962 into the latter

24   part of 1963.  It's about an 18-month period of quite extreme

25   violence.  Some of this violence is carried out by the national

**J.A. 125**

1    forces, by the National Army, and by the police, but some of

2    these killings of Tutsi are also carried out by every day Hutu,

3    and the view of most historians is that much of this was driven

4    by this anger and this grievance that the Hutu community had

5    carried against the Tutsi for so long, and now with the change

6    in political regime, this was the moment for many every day

7    Hutu to begin carrying out revenge for the policies of the

8    past.

9    Q.   So even after the Hutus gained power, they were still

10:40AM 10    seeking retribution against the Tutsis?

11    A.   Indeed.  There was quite a widespread process of local

12    level killing of Tutsis.  One of the dynamics that then

13    extended into the 1960's was that some Tutsi groups in the

14    wider region began to mobilize militarily to try to come back

15    to Rwanda to capture control of the country, and so one thing

16    that Kyabunda did was to tell the general Hutu population that

17    the Tutsi are on the doorstep, the Tutsi are looking to come

18    back.

19         You can see these Tutsi rebel groups mobilizing in the

10:41AM 20    wider region, so we need to stop the Tutsi threat wherever it

21    shows itself, and part of Kyabunda's rhetoric in the early to

22    mid-1960's was to tell the Hutu population that every day Tutsi

23    inside the country were connected to these Tutsi rebels

24    outside, and so in trying to thwart the Tutsi rebel threat, you

25    also had to thwart the Tutsi civilian threat inside the

Case: 19-1689    Document: 00117615536    Page: 130    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 52 of 123

2-52

1    country, and that was one of the ways in which violence against

2    every day Tutsi was incited by the state.

3    Q.    At some point, did the government change again?

4    A.    Yes.  The regime in Rwanda changed again in 1973.  Another

5    Hutu president, Juvenal Habyarimana, came to power through a

6    coup in 1973.  Habyarimana had been a general in Kyabunda's

7    Army.

8          The key thing in understanding why the coup took place

9    in 1973 is that this is really about a conflict between

10:42AM 10    different Hutu regional groups within Rwanda.  Kyabunda over

11    time was increasingly seen as representing Southern Hutu, so

12    Hutu from the south of the country.

13          Habyarimana, in contrast, had his stronghold very much

14    in the north, and the view of Habyarimana and his support base

15    was that Kyabunda was keeping the wealth and the prestige of

16    the regime amongst his own Hutu base in the south, and so this

17    is what sparks Habyarimana to mount this coup in 1973.

18    Kyabunda is killed, and Habyarimana comes to power, and he is

19    the president from 1973 until 1994.

10:43AM 20    Q.    And can you tell the jury a little bit about what his

21    reign is like from '73 to 1994?

22    A.    The best way to understand the period of Habyarimana's

23    presidency is really to divide it into two periods.  There's

24    the period of 1973 to 1986, then there's the period from 1986

25    until 1994.

Case: 19-1689    Document: 00117615536    Page: 131    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 53 of 123

2-53

             In that first period, Habyarimana makes some initial

 2   moves to try to bring Tutsi more into political life, into

 3   socioeconomic life, but this really only lasts the first year

 4   or two of his regime, and what we see really up until 1996 is,

 5   again, an ethically-dominated system in which Habyarimana

 6   preferenced the Hutu in exactly the same way as Kyabunda had,

 7   so Hutu, again, in all of the key political, military, economic

 8   and educational positions.

 9             But 1986 brings a bit of a change because what is

10   happening at that time is, firstly, the Tutsi are getting

11   organized in the refugee camps in the wider region, and so

12   Habyarimana believes that there is a chance that the Tutsi,

13   especially Tutsi who had gone into exile in Uganda, could one

14   day threaten his power, and they could link up with Tutsi

15   inside the country and build a much wider rebel force against

16   him.

17             In response to that, Habyarimana began to make some

18   concessions to the Tutsi population, especially in the

19   socioeconomic realm, so after 1986, we do begin to see

20   Habyarimana extending welfare programs to Tutsi in the

21   countryside, whereas previously they had almost exclusively

22   been the domain of the Hutu.

23             We see some Tutsi being given very minor positions in

24   the political structure, so the period from 1986 onwards marks

25   a little bit of a shift in the way that Habyarimana dealt with

**J.A. 128**

1    ethnic development issues, in particular.

2    Q.    How were those moves received by the Hutu population, the

3    almost liberalization of the policies or the acceptance of

4    Tutsis?

5    A.    This created an enormous amount of anger and grievance

6    amongst many of Habyarimana's own leadership, who saw this

7    really as selling out the Hutu cause to the Tutsi, but it was

8    also received very negatively by many every day Hutu living on

9    the hills.

10:45AM 10          As the 1980's go on, this also becomes a period of

11   enormous economic pressure in the Rwandan countryside.  In

12   1989, for example, the coffee price internationally completely

13   collapsed, which affected Rwanda because coffee was the

14   dominant export crop, and that had a huge effect on the rural

15   population, so every day Hutu in Rwanda were doing it tough

16   because of what was happening in the coffee industry, and there

17   were enormous food shortages, for example, and at the same

18   time, they were witnessing their own government beginning to

19   increasingly preference the Tutsi in welfare programs, so it's

10:46AM 20   that double whammy.

21          It's that jewel dynamic that starts to really build a

22   sense of tension and a sense of grievance amongst Hutu

23   beginning to be directed against Habyarimana.

24   Q.    So, was the view that Habyarimana wasn't extreme enough

25   for the Hutus?

# J.A. 129

Case: 19-1689     Document: 00117615536     Page: 133     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 55 of 123

2-55

1    A.    Indeed.  This was a growing sentiment, even from 1986

2    onward within Habyarimana's own political party, within the

3    military, but also amongst some every day Hutu.

4    Q.    At some point, did violence again break out between the

5    Hutus and the Tutsis?

6    A.    Yes.  The next key moment of violence is at the end of

7    1990, when a Tutsi-dominated rebel group called the Rwandan

8    Patriotic Front, the RPF, invaded Rwanda from bases in Uganda.

9    Q.    Let me stop you for one second.  If we're looking at

10:47AM 10   Government Exhibits 19, can you point kind of where Uganda is

11   and where the attacks were coming from?

12   A.    Yes.  So this will test my technological skills here.

13   Uganda is directly to the north.  It's here, and so the RPF

14   invasion took place on the sort of fronts there at the end of

15   1990.

16   Q.    Sorry, then what was the -- can you explain what happened

17   when the RPF attacked?

18   A.    Yes.  So when the RPF attacked at the end of 1990, this

19   sparked a civil war between this Tutsi-dominated rebel front

10:48AM 20   and the Hutu-dominated government of Habyarimana, and so at the

21   end of 1990 and the beginning of 1991, we see pitched battles

22   between the rebels and the government forces, particularly in

23   the north of the country, and this leads to a very significant

24   civilian death toll, and already in that period, there's an

25   enormous amount of ethnic propaganda that is being spewed,

**J.A. 130**

 1    particularly by Habyarimana's government.

 2         And so the way this is interpreted by the local

 3    population is that this is very much an ethnic-based civil war,

 4    once again, pitting Hutu against Tutsi in the ways that we had

 5    seen at the end of the 1950's and the beginning of the 1960's.

 6    Q.   Who was leading the RPF attacks from Uganda?

 7    A.   So the initial attack by the RPF was led by an individual

 8    called Fred Rwigyema, who had become very senior in the Uganda

 9    military.

10:49AM 10         One of the things that the Rwandan exiles, the Tutsi

11    exiles did, especially those living in Uganda, was to curry

12    favor with the regime in Uganda, and in some cases to rise

13    through the ranks to positions of some prominence, and Rwigyema

14    fits very much within that category.

15         In fact, he had been the chief of the armed forces at

16    one point.  Rwigyema was killed very early on in the RPF

17    invasion the second or third day of the invasion.

18         The RPF then parachuted in Paul Kagame who in fact had

19    been in the U.S. undertaking military training at the time.  He

10:50AM 20    was parachuted onto the front lines, and he then led the RPF

21    throughout the civil war, which lasted from the end of 1990

22    until the end of the genocide in the middle of 1994.

23    Q.   And Paul Kagame, is he the current president of Rwanda?

24    A.   Indeed, Kagame is the president of Rwanda today.

25    Q.   When the civil war started in 1990, generally what was the

Case: 19-1689    Document: 00117615536    Page: 135    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 119    Filed 03/18/19    Page 57 of 123

2-57

1   government's response?  First of all, generally, what was the

2   government's response?

3   A.    The government's initial response was to frame this really

4   in terms of the armed return of the Tutsi refugees.  One of the

5   key factors in the background to the civil war was that at key

6   moments in the 1980's, Habyarimana had said that there would be

7   no peaceful return for the Tutsi refugees from the wider

8   region.

9         As the RPF was mobilizing as a force, especially in

10:51AM 10   Uganda, they had been lobbying Habyarimana to allow the

11   refugees to come home, and when Habyarimana refused, the RPF

12   sought no recourse other than an armed invasion.

13         In response to that invasion, the message, the

14   propaganda from Habyarimana's government was this was the Tutsi

15   threat returned.

16         This was an attempt by the Tutsi to regain control of

17   Rwanda in the way that they had in the colonial period, and

18   there was very explicit propaganda being used by Habyarimana's

19   government really from the beginning of the civil war onwards,

10:51AM 20   and so in the minds of many every day Hutu, the RPF was

21   synonymous with the return of the Tutsi to marginalize and to

22   alienate the Hutu in the way that they had been in history.

23         And so in the minds of many Hutu, the RPF was seen

24   potentially as a return to colonial war, and what was likely to

25   happen if the RPF won the war was that Hutu once again would

Case: 19-1689    Document: 00117615536    Page: 136    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 58 of 123

2-58

```
 1   find themselves completely on the margins of society, and that
 2   they would be struggling in the ways that they had at the
 3   beginning of the 20th Century.
 4   Q.   Did this lead to consequences for Tutsis who were living
 5   within the country?
 6   A.   It did.  So, increasingly, as the civil war progressed,
 7   the propaganda from Habyarimana's regime was that there was no
 8   difference between the Tutsi-dominated rebels and every day
 9   Tutsi civilians living inside the country, and in many ways,
10   this is an echo of the propaganda that Kyabunda's regime had
11   used directly after independence.
12        Habyarimana doesn't resort to this kind of propaganda
13   immediately when the civil war takes place, but as it becomes
14   clear that the government is losing the battle to the RPF, this
15   propaganda increases, and the key thing here is that that
16   propaganda basically says that there is no distinction between
17   Tutsi rebel and Tutsi civilian, it's Tutsi at large who are the
18   threat, and so increasingly the message then becomes to the
19   Hutu majority population, in order to thwart the
20   Tutsi-dominated rebels, you must also militarily and violently
21   start to target Tutsi living inside the country.
22   Q.   I want to talk to you a little bit about the propaganda.
23   How was the government, the Hutu-dominated government, putting
24   out this propaganda?
25   A.   The most effective means of propaganda in Rwanda has
```

J.A. 133

1   always been the radio, especially in rural areas where literacy

2   is quite low, the radio has enormous penetration into daily

3   life, and so Habyarimana's government used the national radio

4   station called RTLM to express this propaganda, particularly

5   into the countryside.

6          Within the wider government, there were also actors

7   who were publishing pamphlets, newspapers, often extremely

8   inflammatory reading material targeted at the Hutu upper class,

9   at the intelligentsia, also trying to convince them that a new

10  type of strategy was needed to target the Tutsi threat.

11         The most famous example of this kind of propaganda

12  newspaper was a publication called *Kangura*, which was published

13  by some Hutu extremists within the wider government.  This was

14  published right through the period of the civil war, and it

15  constantly contained cartoons and articles that demonized the

16  Tutsi, and it was an attempt to rally support, especially

17  amongst the Hutu elite against the Tutsi population.

18  Q.   When you talk about the messages, can you explain to the

19  jury what were the messages contained in the propaganda?  What

20  were the messages contained in the propaganda that was being

21  put out by the government with respect to the Tutsi population?

22  A.   There were two key messages that were being put out both

23  on RTLM and in publications like *Kangura*.  The first was

24  something I've already stated, which is that there is really no

25  distinction between Tutsi rebel and Tutsi civilian, completely

**J.A. 134**

Case: 19-1689    Document: 00117615536    Page: 138    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 115   Filed 03/18/19   Page 60 of 123

2-60

1    collapsing these categories, and that is a key message

2    generated to try to mobilize violence against the Tutsi

3    civilian population:

4          You need to target your Tutsi neighbors because they

5    are likely to support the RPA.  If we can kill Tutsi inside the

6    country, we can thwart the rebel threat.

7          The second message that goes along with the first was

8    an attempt to thoroughly dehumanize the Tutsi population, so,

9    for example, in *Kangura*, there were often pictures of the Tutsi

10:56AM 10   as cockroaches, as vermin.

11          This was an attempt to portray the Tutsi as subhuman,

12    to try to say not only are we about to be invaded, but we're

13    about to be invaded by this demonic, this subhuman force, and

14    this was also a message that was being reinforced constantly

15    over the radio, constant references to the Tutsi as

16    cockroaches, as rats, who invade by night, who penetrate our

17    society by stealth, and so this dehumanization campaign was a

18    very key part of the overall propaganda message.

19    Q.   Dr. Clark, you used the term "cockroach."  Can you explain

10:57AM 20   to the jury that term and its significance with respect to the

21    propaganda campaign?

22    A.    Indeed.  The relevant word in Kinyarwandan, which was used

23    constantly in the propaganda was "Inyenzi," which basically

24    translates as "cockroach" or as other forms of vermin.  There's

25    some ambiguity about the word, but what's key about that word

**J.A. 135**

Case: 19-1689    Document: 00117615536    Page: 139    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 61 of 123

2-61

1    is that the propaganda was taking a term that the RPF

2    themselves had used to describe what they were doing.

3              The RPF in some of its own communicas referred to

4    themselves as "Inyenzi" because the word in Kinyarwandan has

5    another connotation, which is a party that moves with stealth,

6    that moves undetected, so the RPF were using this word to mean

7    one thing, but the Hutu propaganda was turning this on its head

8    and using it to mean something totally different with an

9    emphasis on vermin, on cockroach as a subhuman category.

10:58AM 10   Q.    Is that the word, Doctor?

11   A.    That is the word, yes.

12   Q.    So the idea of this as a cockroach, it started out as a

13   point of pride for the paramilitary?

14   A.    Indeed.  This was very much an image of itself that the

15   RPF wanted to portray.  It had a connotation of being crafty,

16   of being highly strategic, to be able to catch the government

17   unaware.

18             The moment for the RPF where this word, "Inyenzi" took

19   on this particular meaning was when the RPF captured really

10:59AM 20   with great surprise, the Town of Ruhengeri in the north of

21   Rwanda in 1991.  It totally caught Habyarimana's government off

22   guard.

23             By that stage, Habyarimana's government seemed to

24   believe that they were winning the war.  The capturing of

25   Ruhengeri town and the capturing of Ruhengeri prison and the

**J.A. 136**

Case: 19-1689    Document: 00117615536    Page: 140    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 62 of 123

2-62

1    releasing of many political prisoners was a huge early victory

2    for the RPF, and in many of the RPF's communicas around that

3    time, you see this word, "Inyenzi," being used time and again

4    as a real point of pride.

5    Q.   And, as contrast, the Hutus adopted this word as a

6    dehumanization tactic, right?

7    A.   Indeed.  So particularly after 1991, if we look at

8    government, propaganda either on the radio or in the

9    newspapers, there's a completely different use of this word,

11:00AM 10   you know, trying to manipulate something that's very common in

11   Kinyarwandan, which is words that have double meanings, and

12   this would have been very clear in the minds of the bulk of

13   Rwandan listeners, that the RPF are using this word for one

14   particular purpose, but the government is explicitly using it

15   to dehumanize the Tutsi and frame them as cockroaches, which

16   should be crushed, so there was a very direct government

17   message in the use of "inyenzi."

18        THE COURT:  Is this a good place to break,

19   Mr. Varghese?

11:00AM 20        MR. VARGHESE:  Yes.

21        THE COURT:  Ladies and gentlemen, we're going to take

22   a break every morning.  There's 15 of you.  I want to make sure

23   you all have a chance to use the facilities.  On the other

24   hand, the faster we get this done, the faster the trial will

25   move, so let's make this as quick and orderly as you can and

**J.A. 137**

```
        1    keep the trial moving.

        2              (A recess was taken.)

        3              THE CLERK:  All rise for the jury.

        4              (JURORS ENTERED THE COURTROOM.)

        5    Q.   Good morning again, Dr. Clark.

        6    A.   Good morning.

        7    Q.   I want to pick up where we left off talking about some of

        8    the propaganda that was going on in this time period.  Was the

        9    propaganda fairly static or did it increase over the years?

11:21AM 10    A.   The propaganda very much increased the longer the civil

       11    war went on, particularly as the RPF began to make inroads

       12    during the civil war, there was a strong sense within the

       13    government of needing to ramp up especially the ethnic

       14    propaganda, so by the time we get to 1992 and 1993, RTLM, in

       15    particular, is very much in full voice.

       16              THE COURT:  That's the radio station?

       17              THE WITNESS:  That is the radio station, the

       18    government-owned radio station at the time.

       19    A.   And so really by the time we get to 1993, we are seeing

11:22AM 20    this full depiction of the Tutsi as being a threat, both

       21    internally within Rwanda and also the rebels who are

       22    encroaching and this process of dehumanization, of framing the

       23    Tutsi is very much subhuman, yes, that increased over time.

       24    Q.   You mentioned RTLM, and I'll ask you about that.  How

       25    often was RTLM broadcasting these propaganda messages?
```

J.A. 138

Case: 19-1689    Document: 00117615536    Page: 143    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 64 of 123

2-64

1    A.    RTLM was broadcasting daily.  In the period of civil war

2    leading into the genocide in 1994, almost all RTLM programs

3    24 hours a day were talking about the conflict, were talking

4    about the Tutsi threat, were talking about the responsibility

5    of every day Hutu to counter that Tutsi threat, and because

6    this was the dominant radio station in the country and the vast

7    majority of the Rwandan population would have had either a

8    radio or access to a radio, people were listening to this

9    propaganda in an absolutely saturated fashion.

11:23AM 10    Q.    In addition to the propaganda, were there other steps that

11    the government was taking to prepare the population?

12    A.    Yes, they were.  What is also key, as the civil war goes

13    on and as the government's propaganda is increasing, we also

14    see the increased militarization of the population, in

15    particular, what we see especially from 1992 onwards is the

16    government forming and training youth militias with the

17    specific objective of targeting the Tutsi population.

18          The most widespread and the most powerful of these

19    militias was called the Interahamwe, which was a Hutu militia

11:24AM 20    mobilized right across the country, given systematic training,

21    given weapons, particularly machetes and then fanned out across

22    the country to target particularly Tutsi civilians.

23          The role of the Interahamwe was really not to take on

24    the RPF rebel because that was something left to the national

25    Army, but the role of the Interahamwe was to target Tutsi

```
 1    civilians who were living inside Rwanda at the time.
 2    Q.    How did the Interahamwe get set up and trained?  Was
 3    that -- who was responsible for that?
 4    A.    So the Interahamwe very much grew out of Habyarimana's
 5    government.  This was a government initiative.  One of the ways
 6    in which the government mobilized individuals, particularly
 7    young, abled-body men to join the Interahamwe was to look at a
 8    Hutu social movement, which was developing through the period
 9    of the civil war, a social movement that we typically think of
10    as called Hutu power.
11          This was a social movement of Hutu right across the
12    country who were increasingly concerned about the Tutsi threat
13    and increasingly saw violence against Tutsi civilians as the
14    way to thwart that threat.
15          Hutu power was a very widespread movement across the
16    country in the period of the civil war that brought together
17    many people from multiple Hutu political parties, so they
18    weren't only from the ruling party, they were from a range of
19    other Hutu political parties, who were in play at the time, and
20    it was out of Hutu power in particular that the government was
21    able to mobilize some of the most extreme, some of the most
22    able body especially men to join the Interahamwe and to
23    mobilize these youth militias in that way.
24    Q.    So the individuals who were joining the Interahamwe, were
25    they soldiers or civilians?
```

J.A. 140

Case: 19-1689    Document: 00117615536    Page: 144    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 60 of 123

2-66

         1    A.   Almost exclusively, they were civilians.  These were

         2    typically every day Hutu, particularly young men, and they

         3    joined the Interahamwe largely because of the Hutu power

         4    ideology, which was very widespread at the time.  This idea

         5    that Hutu needed to rise up and use force to thwart the Tutsi

         6    threat, and also part of that ideology was again to see no

         7    distinction between Tutsi civilians and the Tutsi rebels, but

         8    the Interahamwe really was made up of every day Hutu men, the

         9    vast majority of whom had no previous military experience.

11:26AM  10    Q.   And so what were they practicing for?

        11    A.   What the Interahamwe were training for was to carry out

        12    the systematic killing of Tutsi civilians, and this was seen as

        13    part and parcel of the government's attempt to thwart the RPF

        14    threat.  It's almost as though the National Army was in charge

        15    of taking on the rebels and defeating them militarily.

        16         It was largely the job of the Interahamwe to target

        17    Tutsi civilians wherever they were living across the country.

        18    The Interahamwe was also very well organized.  It was

        19    structured with cells right across Rwanda, and so they were

11:27AM  20    able to mobilize and able to carry out attacks against Tutsi

        21    often very quickly and really right across the country, and

        22    this was happening in 1992 and in 1993, so even before we get

        23    to the genocide in 1994, the Interahamwe were already a very

        24    powerful force.

        25    Q.   Actually one point of clarification I just wanted to ask

# J.A. 141

Case: 19-1689    Document: 00117615536    Page: 145    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 119    Filed 03/18/19    Page 67 of 123

2-67

1    you, on the break, prior to the break, you were testifying

2    about how Habyarimana's government being split up into sort of

3    two sort of time periods, and I want to be clear, there was

4    some confusion what those dates were.  Could you just repeat

5    that?

6    A.   Yes, so the first period of Habyarimana's rule was 1973 to

7    1986, and then there is a change in his policy from 1986 until

8    he is killed in 1994.

9    Q.   Let's talk a little bit since you mentioned Hutu power,

11:28AM 10    let me ask you about the political parties, what was the

11    political party of the government in power in Rwanda in this

12    time period?

13    A.   So Habyarimana's party during the civil war and during the

14    genocide was the MRND, and this was the party that Habyarimana

15    formed very early in the years of his presidency and that

16    continued as the ruling party right up until 1994.

17    Q.   So how long was MRND in power?

18    A.   So MRND was in power for 19 years.  It was formed in 1975,

19    and it ruled until the RPF captured control of the state in the

11:29AM 20    middle of 1994.

21    Q.   So who all were members of MRND?

22    A.   So up until the early 1990's, all Rwandan adult citizens

23    were automatically members of the MRND party.  This was one of

24    the stipulations of Habyarimana's one-party state that

25    according to the Rwandan Constitution, as soon as you were

1    acknowledged as a citizen of the country, you were by default a

2    member of the MRND party, but that policy changed in 1991

3    because what happened in 1991 was that Rwanda shifted towards a

4    multi-party system.

5        It went from a one-party state to now having a very

6    wide range of political parties, and that included a wide

7    range of parties that self-identified as dominated by Hutu, and

8    so what that meant was from 1991 onwards, it was not automatic

9    for a citizen to be a member of MRND.

11:30AM 10        If you were a member of MRND after 1991, you had to

11    actively sign up to the party, you had to actively choose to

12    become a member, or, by the same token, you could choose to

13    become a member of any of these other political parties that

14    had also emerged at that time, so 1991 is a real turning point

15    in terms of who is a member of the MRND party.

16    Q.    And what brought about the multi-party system in 1991?

17    A.    What happened in Rwanda in 1991 was is similar in what was

18    happening in many African states at that time.  The entire

19    continent of Africa had been dominated by these one-party

11:31AM 20    systems since independence, but in the early 1990's, there was

21    a real international shift to try to put pressure on African

22    states to open up their political systems to a multitude of

23    political parties.

24        In the Rwandan case, the most influential

25    international backer was France.  France had provided an

**J.A. 143**

        1    enormous amount of foreign aid to Rwanda.  There was a very

        2    close personal relationship between President Habyarimana in

        3    Rwanda and President Mitterrand in France, and in effect France

        4    lost patience with Rwanda, lost patience with this one-party

        5    rule, and so France in particular put big pressure on Rwanda at

        6    the beginning of the 1990's to move towards this multi-party

        7    period, and so in 1991, a new constitution comes into force,

        8    and almost overnight we see the growth of six or seven quite

        9    substantial political parties, many of which are directly

11:32AM 10    contesting the MRND, which has enjoyed its status as the

       11    one-party ruler for the last 20 years almost.

       12    Q.   Despite the emergence of these new parties, which party

       13    remained in control of the government?

       14    A.   The MRND very much was in control at that time, and, in

       15    particular, they held the presidency because Habyarimana was

       16    still in charge, because he had built an executive around

       17    himself of actors from the MRND, the MRND was very much still

       18    calling the shot at the nationals level, really up until the

       19    end of the genocide in 1994.

11:32AM 20    Q.   And what parts of the country was MRND the strongest?

       21    A.   The MRND was strongest in the north of the country.  The

       22    real party stronghold was in places like Ruhengeri and Byumba

       23    in the north right up on the Ugandan border, and the reason

       24    for this was this was Habyarimana's homeland.

       25         This was where his clan had always lived.  This is

**J.A. 144**

Case: 19-1689     Document: 00117615536     Page: 148     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 70 of 123

2-70

1    where he had mobilized much of his own personal support over

2    decades.

3           If you looked at the top brass politically and

4    militarily of the MRND when Habyarimana was president, most of

5    the plum positions were given to Hutu from the north of the

6    country, so that was very much their stronghold.

7    Q.   Doctor, do you see what's on the screen in front of you?

8    A.   Yes, indeed.

9    Q.   And I've highlighted the states in the north of Rwanda.

11:34AM 10   Is that where MRND, where you were talking about?

11   A.   Yes, that's right.  So Habyarimana's own homeland is

12   really -- it straddles these two provinces.  In fact, sorry,

13   these are prefectures at the time of Byumba and Ruhengeri, so

14   MRND was particularly strong here, but over time MRND's real

15   power base also extended into Gisenyi, so really it's this

16   entire arc of power across the north and the northwest of the

17   country.

18   Q.   When you say it was MRND's power base, what did that mean

19   in terms of the politics of this region?

11:34AM 20   A.   What that meant was in these places, the support for MRND

21   and its policies was stronger than anywhere else in the

22   country, so Habyarimana could rely upon the active support of

23   the population in these particular prefectures.  This was

24   especially important for Habyarimana after the period of

25   multi-partyism because even within the Hutu population itself,

**J.A. 145**

Case: 19-1689    Document: 00117615536    Page: 148    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 71 of 123

2-71

1    the MRND was beginning to be challenged, especially there were

2    two other Hutu political parties that arose after 1991, the MDR

3    and the CDR.  These were explicitly Hutu parties that were

4    challenging the MRND on their own terms and were saying that

5    MRND no longer fully represents the interest of the Hutu, we

6    are the true Hutu parties.

7              In that time, Habyarimana fell under threat, even from

8    within the Hutu population itself, but the places that he could

9    always rely on and where he traveled back to and often held

11:36AM 10    very large rallies were in these places, in Byumba, in

11    Ruhengeri and in Gisenyi.

12    Q.   Had there been violence against the Tutsis in these areas

13    leading up to the genocide?

14    A.   There had been, so one of the key facets of violence in

15    Rwanda in the civil war period was that there were systematic

16    massacres of the Tutsi population even before we get to the

17    genocide in 1994.

18              Some commentators talk about these as rehearsal

19    massacres, that there was a period of the Hutu government of

11:36AM 20    the day wanting to see what they could get away with in terms

21    of the systematic killing of Tutsi civilians, and so in late

22    1990, in early 1991, and into 1992, we see the large scale

23    killings of Tutsi in these three prefectures, in Byumba, in

24    Ruhengeri and in Gisenyi and also in the far south and

25    southeast of the country in an area known as the Bugesera.

J.A. 146

1              To a large extent those massacres went without any

2     international condemnation.  They happened really without any

3     significant attention, and so it seems that as a result the

4     government believed that it could continue killing Tutsi

5     civilians in very large numbers with no accountability, but a

6     lot of that started in the far north of the country in

7     Habyarimana stronghold.

8     Q.   I wanted to ask you, you used the phrase, "wanted to get

9     away with," and I just wanted to clarify that, "get away with,"

11:37AM 10   what do you mean by that?

11    A.   What I mean by that is without any real accountability for

12    those crimes.  There was a real sense that these massacres

13    happened without anybody being brought to justice for them, but

14    because this was a one-party state, it was a state that could

15    control the media, it could control the spread of information,

16    and also most of the international community at least at that

17    time didn't know very much and didn't care very much about

18    Rwanda.

19             There was very little international interest in this

11:38AM 20   tiny country in the heart of Africa, and so these massacres

21    against the Tutsi population in the early 1990's happened with

22    almost no international media reporting and certainly no

23    justice for the perpetrators.

24    Q.   By contrast, what was the political atmosphere in Butare

25    in the south?

J.A. 147

Case: 19-1689    Document: 00117615536    Page: 151    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 119    Filed 03/18/19    Page 79 of 123

2-73

1    A.   The atmosphere in Butare was completely different.  It

2    bore almost no resemblance to what was taking place in the far

3    north and in the southeast.  Even through the period of the

4    civil war, which was extremely ethically tense across Rwanda,

5    Butare remained credibly peaceful and extremely tolerant in

6    ethnic terms.

7          Butare was also unusual in the rest of the country

8    because it was the only prefecture that had a Tutsi prefect,

9    and a prefect was essentially a governor of the province.  This

11:39AM 10  was a very powerful individual, who had an enormous clout in

11   the way that that prefecture was administered.

12          This was the only place where a Tutsi prefect was in

13   charge, an individual called Jean Baptiste Habyarimana, not to

14   be mistaken with Juvenal Habyarimana, the president, and it was

15   at least partly because of Prefect Habyarimana's influence that

16   Butare was able to build a much more ethically tolerant

17   environment so it really stands out in that sense in the

18   national terrain at that time.

19   Q.   Did MRND have strength in this region?

11:40AM 20  A.   MRND was historically incredibly weak in Butare.  One of

21   the other key features of this part of Rwanda is that it also

22   has one of the largest Tutsi populations of any part of the

23   country, so it is not only a university town, it's not only a

24   sort of a more intellectual province, if you like, where there

25   is, you know, a sort of a more liberal atmosphere, its

J.A. 148

1    demographics are also very different.

2          This is where we see a much larger Tutsi population

3    than almost any other prefecture in the country, and so for

4    these reasons, MRND was never able really to get a foothold in

5    Butare, and also this goes back to something I mentioned

6    earlier, which is that MRND not only is a Hutu-dominated party,

7    but it is typically attached to the northern Hutu of the

8    country, so Butare is in the far south, but MRND's real power

9    base is in the north, so that was another reason why MRND was

11:41AM 10    never really able to get much of a power base here in Butare.

11    Q.   I want to just ask you about the distinction between

12    Butare, the region, and then the university specifically.  Did

13    the university reflect its political environment in the state

14    or was it different than the university?

15    A.   Broadly, what we see in Butare Town is quite similar to

16    what we see in the rest of the prefecture, but that begins to

17    change as we get into 1994.

18          So leading into early 1994, this atmosphere of

19    tolerance, of peace, which we see around the university in the

11:41AM 20    town, is mirrored in the rest of the prefecture, so you could

21    go out into the rural areas, and you would see broadly

22    harmonious relations between Tutsi and Hutu.

23          There was some minor violence in Butare Prefecture in

24    1992 and 1993, but the key here is that that was violence

25    between Hutu themselves because one of the things that was

Case: 19-1689    Document: 00117615536    Page: 153    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 75 of 123

2-75

1    happening in Butare in the context of the civil war was a

2    conflict between the MRND, the ruling party and one of these

3    new Hutu political parties which had emerged, the MDR.

4        The real Hutu representation, the real Hutu political

5    representation in Butare at that time was through the MDR

6    rather than the MRND, and so the MRND was trying to get more

7    control in Butare, and that did lead to some violence,

8    especially in the southern part of the prefecture, but that was

9    particularly not targeting the Hutu population, it was between

11:43AM 10    Hutu themselves, so for all intense and purposes, relations

11    between Hutu and Tutsi in the wider prefecture really up until

12    1994 are, in fact, quite harmonious.

13    Q.   What was the effect of these new parties, CDR and MRD,

14    what were their effect on MRND in terms of its views and

15    particularly with respect to the Tutsis?

16    A.   Broadly, the effect was to make the MRND much more

17    extremist.  One of the messages that both the MDR and the CDR

18    was expressing was that we are the true Hutu parties, and the

19    MRND is selling out the Hutu population to the Tutsi and to the

11:43AM 20    Tutsi rebels, in particular, and so the effect within the MRND

21    itself was to ramp up both its propaganda and its military

22    strategy to try to be seen as the main Hutu voice, that it was

23    going to represent Hutu interests far and above what the MDR

24    and the CDR were promising at the time.

25        And so we can track through the early 1990's the

**J.A. 150**

```
         1    increase in MRND's propaganda and its use of youth militias and

         2    the rise of these other Hutu parties, the two things are

         3    happening at exactly the same time.

         4    Q.   What did it mean to be a party member, to be a member of

         5    MRND?

         6    A.   What it meant after 1991 was that you had to make the

         7    active choice to be a party member.  You were no longer

         8    automatically registered to the party, you had to actively sign

         9    up, and we also have to recall that post-1991, this is the

11:44AM  10    period of the civil war, so the country is going through two

        11    major events simultaneously.

        12         It's going through the move towards multi-party

        13    democracy, which is extremely disruptive to national politics,

        14    and the country's also going through a civil war between the

        15    government and the Tutsi rebels, and so what this also means is

        16    that anybody who joined MRND after 1991 not only had to make

        17    the active choice to do so, they also had to display an

        18    absolute adherence to the policies of the ruling party, and in

        19    that context, what that meant was an adherence to the kind of

11:45AM  20    propaganda and the kind of violent campaign against the Tutsi

        21    civilian population that the MRND was advocating at that time,

        22    so to be an MRND member carried with it explicitly this

        23    anti-Tutsi philosophy and in some cases also anti-Tutsi action

        24    because many members of MRND also swelled the ranks of the

        25    Interahamwe and carried out violent attacks against the Tutsi
```

1    population even before the genocide in 1994.

2    Q.    How did party members display their identification with

3    their parties?

4    A.    There were multiple ways in which individuals might

5    display their credentials.  Most of the political parties at

6    the time had regalia that people would wear, shirts, caps,

7    scarves, this kind of thing to display very prominently that

8    they were a member of a particular party, so we would see this

9    with the MRND, we would see this MDR, CDR, and other political

11:46AM 10   parties at the time, but also this could happen through

11   attendance at public rallies.

12        One of the big political processes, especially after

13   1991, is the constant holding of political rallies across the

14   country because new parties have to gain support, they have to

15   mobilize supporters because they are befresh to the political

16   terrain, so they were holding large rallies to try to get

17   people to join their cause.

18        In response, the MRND was also holding the largest

19   rallies it had held for 10 or 15 years because it was trying to

11:47AM 20   counter the threat especially of these other Hutu parties, and

21   so one way that you could display your allegiance to a

22   particular party was to be publicly visible at these events,

23   and it was very important for many people to be publicly

24   visible because you were identifying yourself with a particular

25   party, and by the same token, you were also saying I am not a

J.A. 152

```
 1     member of these other parties, you know I'm a member of MRND,

 2     I'm not a member of MDR or CDR, for example.

 3            And so people's political identification came through

 4     their dress, but it also came through how they acted and the

 5     kinds of events they attended.

 6     Q.   Would somebody, would a Rwandan in this time period wear

 7     clothing if they were not part of that party?  Would they wear

 8     party clothing if they were not affiliated with that party or

 9     would they go to rallies if they were not affiliated with that
11:48AM 10  party?

11     A.   It would have been extremely unusual for an individual to

12     do so because this was a very politically charged time.  You

13     know, it was a new thing for Rwanda to have multiple political

14     parties, and so this was also a time when people were having to

15     nail their colors to the mast to say this is who is am, this is

16     who I belong to, and on top of that, you've got the civil war

17     context, so it's particularly important to show that you are a

18     real Hutu and that you belong to this political party.

19            And so it would be very peculiar for someone to wear
11:48AM 20  clothing or to attend a rally if they were not already a signed

21     up member to that particular party.

22     Q.   You've talked about the civil war.  I wanted to ask you,

23     was there an effort of peace to try to reconcile the war

24     infractions in the civil war?

25     A.   Yes.  There was a peace process that began at the end of
```

J.A. 153

Case: 19-1689   Document: 00117615536   Page: 153   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 79 of 123

2-79

1    1992 and led to a peace accord being signed in August of 1993.

2    It's known as the Arusha Accord.  This was an attempt to bring

3    peace to the country, to end the civil war between

4    Habyarimana's government and the RPR.

5    Q.   Let me stop you for one second.  You said it's known as

6    the Arusha Peace Accords.  What is Arusha?

7    A.   Indeed.  Arusha is a very large town in neighboring

8    Tanzania.  It's a town that over the last 30 or 40 years has

9    held many of Africa's big peace negotiations, so Rwanda wasn't

11:49AM 10   the only country to have its peace process held there.

11         It was also the place that later became the site of

12    the UN International Criminal Tribunal for Rwanda.  It also set

13    up shop in Arusha largely because of this connection back to

14    the peace process back in 1993.

15    Q.   And I apologize, let me go back to the question then.  Can

16    you explain to the jury what was that peace process that

17    started in Arusha in 1992 culminating in August, '93?

18    A.   So the nature of that process was to bring together

19    particularly the two sides of the civil war, so Habyarimana's

11:50AM 20   government and the ruling MRND and the RPF rebels, but there

21    was also a seat at the table for the other political parties

22    that had mobilized at that time, so MDR had a representative,

23    CDR had a representative, and a couple of other much smaller

24    political parties all had a seat at the table in Arusha, and

25    this was an attempt to find a peaceful solution to the

J.A. 154

1    conflict.

2            When the accord was signed in August of 1993, one of

3    the key things that it did was to establish a power sharing

4    government between all of these parties, and so Habyarimana and

5    the MRND kept control of the presidency, but key ministries

6    would then divide it out amongst the RPF as the rebels and the

7    other key political parties, but before, during and after the

8    accord was signed, the civil war basically raged, that

9    especially the government and the RPF basically continued

11:51AM 10    battling one another through the whole period of this peace

11    process, and so to a certain extent, it was no great surprise

12    that soon after the accord was signed in August of 1993, the

13    peace deal completely collapsed, and the civil war proceeded.

14    Q.    Did this attempt at peace affect the contentions within

15    Rwanda between the Hutus and the Tutsis?

16    A.    It did not.  And the reason that the Arusha process didn't

17    dampen down inter-ethnic tensions is that for all intents and

18    purposes, the civil war just continued, and through that whole

19    period of peace negotiations, the government was repeatedly

11:52AM 20    using the same anti-Tutsi propaganda and as it had been using

21    before, so the Arusha process brought no end to that

22    propaganda, and the government and the RPF constantly blamed

23    each other for breaking the cease fire.

24            There was an accusation on both sides that neither

25    party was really respecting the Arusha process, so on the

Case: 19-1689    Document: 00117615536    Page: 159    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 81 of 123

2-81

```
 1   ground in Rwanda, the same violence, same tensions were going
 2   on as though Arusha was making no impact whatsoever.
 3   Q.   Did the attempt at peace affect the president standing
 4   among the Hutu population within Rwanda?
 5   A.   It did.  The Arusha process had a profound effect both
 6   within the Hutu majority population itself but also within the
 7   MRND as a party.  There was a very strong sense, especially
 8   within MRND, that Habyarimana was giving away too much in the
 9   peace process, that he was making too many concessions to the
11:53AM 10   RPF, that he was willing to give the RPF some plum positions in
11   the national government and that this was too much.
12        And so one of the consequences of the Arusha process
13   for Habyarimana personally was that he started to lose even
14   more support within the Hutu population itself, and essentially
15   after August of 1993, the MRND ruling party splits in two.
16        You've got a facture that is aligned still with
17   Habyarimana, but you've got another faction which is calling
18   for a much stronger stance against the RPF and that sees that
19   Habyarimana is going soft, that he no longer represents Hutu
11:54AM 20   interests, so that's one of the big effects of the Arusha
21   process is to split the ruling party in two.
22   Q.   I want to turn now and talk about the genocide and how it
23   began, but I think it's probably -- before we do that, let's
24   define some terms.  What is a genocide?  How do you define
25   genocide?
```

J.A. 156

1    A.    So the most common definition of genocide is the one

2    that's used in the United Nations Genocide Convention.  It was

3    signed in 1948.  The definition is that a genocide is the

4    attempt to destroy in part or in whole a group of people on the

5    basis of their national, their ethnic, their racial, or their

6    religious identity.

7    Q.    What is a genocidaire?

8    A.    A genocidaire is someone who commits genocide, who takes

9    part in exactly those acts, to eradicate in part or in whole

11:55AM 10    these groups that are identified in those four particular

11    categories.

12    Q.    And if you had to provide an example of a genocide, what

13    would be an example?

14    A.    So we have examples of multiple genocides, especially in

15    the second half of the 20th Century, the holocaust of the Jews

16    clearly is a genocide because there was an attempt to eradicate

17    the Jewish population in Europe.

18          We could also talk about the Cambodian genocide at the

19    end of 1970s carried out by the Khmer Rouge, so, unfortunately,

11:55AM 20    we have several examples of genocides, especially at the end of

21    the 20th Century.

22    Q.    How is the genocide different than the civil war that you

23    have been testifying about?

24    A.    It's very important to separate these two things out

25    because the genocides against the Tutsi population in Rwanda in

```
 1    1994 happens during the civil war, so the best way to

 2    understand how we then see 800,000 approximately Tutsi killed

 3    in 100 days in 1994 is we have to understand that this happens

 4    in the wider context of this fight between Habyarimana's

 5    government and the RPF rebels, that it's because Habyarimana

 6    and his ruling party feel that they are losing control of the

 7    country, they are losing the civil war that they then see the

 8    need to target the Tutsi population inside Rwanda where the

 9    idea was we are losing the civil war, Tutsi civilians are part

10    of the RPF, they are swelling the rebels' ranks, and so in

11    order to defeat the rebels, we also have to defeat, we have to

12    eradicate Tutsi civilians, so the genocide happens during the

13    civil war and could not have happened had we not had a

14    preceding civil war.

15           One way to understand this, I guess, is if we go back

16    to the example of the Holocaust, the Holocaust happened in the

17    context of the second world war.  We talk about these things as

18    two events that happened simultaneously.  It's because of what

19    was happening in Germany at the time of the second world war,

20    it's what was happening to Hitler and the Nazi party and the

21    threat that they felt by all sorts of other actors during the

22    Second World War that they then saw it as necessary to destroy

23    the Jewish population.

24           You don't get to the Holocaust without having the

25    Second World War.  Rwanda is the same, you don't get to the
```

**J.A. 158**

Case: 19-1689    Document: 00117615536    Page: 163    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 84 of 123

2-84

1    genocide without having the preceding civil war, but these are

2    two different events, and I think we have to understand them in

3    that way.

4    Q.   Why is it important to distinguish between the genocide

5    and the war, why not classify it all as part of the war?

6    A.   What we lose if we only talk about this as a civil war is

7    we lose that deliberate and systematic attempt to eradicate the

8    Tutsi population because of their identity because if we don't

9    talk about that, then this just looks like any other civil war

11:58AM 10   between two sides in which there happens to be an accidental

11   civilian death toll.

12        The genocide in Rwanda is different.  It's about the

13   deliberate, the orchestrated, the planned attempt to completely

14   eradicate the Tutsi civilian population, so unless we use the

15   word "genocide," we can't fully describe exactly what was going

16   on there.

17   Q.   When did the genocide begin in Rwanda?

18   A.   Historians and commentators typically talk about the

19   genocide beginning on the night of the 6th of April in 1994.

11:59AM 20   This was the night that President Habyarimana was flying back

21   to Rwanda from Arusha.

22        There had been a new wave of negotiations attempted in

23   1994.  Habyarimana 's plane was shot down.  It crashed

24   ironically, tragically into the president's own palace killing

25   him, the president of Burundi and all on board, and within a

# J.A. 159

1    matter of about a half an hour, the Rwandan Presidential Guard

2    had set up roadblocks around Kigali, and people were being

3    pulled out of vehicles, their identity cards were checked, and

4    if people were found to be Tutsi, they were being killed right

5    there on the spot.

6          So we talk about the genocide really as beginning in

7    the direct aftermath of the shooting down of Habyarimana's

8    plane on the night of the 6th of April of 1994.

9    Q.    Who shot down that plane?

11:59AM 10   A.    There is much conjecture about this issue, an enormous

11   amount of accusation and counter-accusation, and I'm personally

12   not sure that we will ever fully get to the bottom of this.

13         There are basically two schools of thought as to who

14   shot the plane down.  One view is that it was the RPF rebels

15   themselves, that as part of the civil war, they wanted to

16   eliminate the head of state, they wanted to eliminate the head

17   of the government that they were targeting, and so it was the

18   RPF rebels who shot the plane down.

19         The second school of thought is that it was extremists

12:00PM 20   within Habyarimana's own party who believed, again, that he was

21   making too many concessions to the Tutsi, that because of what

22   had happened at the Arusha talks, there was a strong sense

23   within the MRND in that more extremist faction than I described

24   before that was losing patience with Habyarimana, that wanted a

25   completely different approach, that wanted to ramp up violence

## J.A. 160

```
 1    against the Tutsi and wanted to defeat the RPF militarily
 2    rather than negotiate with them, so that school of thought
 3    emphasizes Hutu actors within Habyarimana's own party, within
 4    his own military that shot down the plane because they wanted
 5    to get rid of Habyarimana, and they themselves wanted to get
 6    control of the state.
 7            These are two dominant arguments.  Lots of evidence
 8    has been brought to bear on both sides over the years.  My
 9    personal guess is that we'll be back here in 30 years' time
10    having the same argument.  I think there's an enormous amount
11    of unclarity about this particular event.
12    Q.   So you mentioned the roadblocks.  How soon after the plane
13    going down were roadblocks set up?
14    A.   This is one of the historical facts that points to the
15    likelihood that it was extremists within Habyarimana's own
16    party who shot the plane down because within half an hour of
17    the plane crashing and it becoming clear that Habyarimana was
18    dead, the Rwandan Presidential Guard, and these were the most
19    experienced armed actors within the national armed forces,
20    directed from central command were setting up roadblocks around
21    Kigali.
22            So this happened very, very will quickly, and this
23    lends itself to the historical idea that there must have been a
24    high degree of planning of the killing of Tutsi, that it wasn't
25    just spontaneous reaction to the crash of Habyarimana's plane
```

12:01PM  (line 10)
12:02PM  (line 20)

# J.A. 161

Case: 19-1689    Document: 00117645536    Page: 165    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 119    Filed 03/18/19    Page 87 of 123

2-87

1    that we then saw the killing of Tutsi thereafter, the fact that

2    roadblocks were set up and Tutsi being killed immediately after

3    the plane had crashed lends itself to an understanding that

4    there was something very orchestrated, very deliberate, very

5    planned about all this.

6    Q.    Were these specific Tutsi individuals being targeted or

7    was it random Tutsis being stopped and killed?

8    A.    It was to begin with quite random, it was quite

9    indiscriminate, so the first wave of killings on the night of

12:03PM 10    the 6th of April involves every day Tutsi civilians who are

11    being stopped at these checkpoints, at these barriers and

12    having their identity cards checked and then are being killed

13    right there and then as a result.

14         What we see later into the night of the 6th of

15    April and into the morning of the 7th of April is the

16    deliberate killing of Tutsi political and social leaders, very

17    prominent Tutsi in the community and very prominent Hutu

18    political leaders who were considered to be too sympathetic to

19    the Tutsi, for example, on the morning of the 7th of April, the

12:03PM 20    then prime minister of Rwanda, Agathe Uwilingiyimana, herself a

21    Hutu but who displayed a willingness to negotiate with the RPF

22    in Arusha was systematically killed on the morning of the 7th.

23         And so that shows a certain degree of deliberate

24    intent very quickly to eliminate Tutsi leadership but also

25    moderate Hutu leadership which may be sympathetic to the RPF

# J.A. 162

Case: 19-1689    Document: 00117615536    Page: 166    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 80 of 123

2-88

```
      1    and to the Tutsi cause.

      2    Q.   How did the genocide progress throughout Kigali?

      3    A.   So over the rest of that week, we then see the violence

      4    against Tutsi spread very, very quickly, and it goes beyond the

      5    checking of vehicles at barriers.  It now extends into public

      6    institutions, and it extends into people's home, and this is

      7    particularly where we see the Interahamwe and other militia

      8    groups start to play a very prominent role going house to house

      9    and building to building looking for Tutsi and killing them

12:05PM 10    where they are found.

     11         And as the weeks progressed, that violence then spread

     12    very quickly out of Kigali, the capital in the center of the

     13    country, out into the countryside where the same pattern of

     14    violence then emerged.

     15    Q.   You touched on this already, but I just want to make sure

     16    this is clear.  So what is the evidence that this was not a

     17    spontaneous reaction to the death of the president?

     18    A.   There are various forms of evidence that are marshaled to

     19    try to show that this wasn't just random, that this wasn't just

12:05PM 20    spontaneous.  The first piece of evidence is one that I've

     21    already pointed to, the systematic killing of both Tutsi

     22    civilians and political leaders who were either Tutsi or

     23    sympathetic to Tutsi very soon after the plane had crashed.

     24         That suggested some degree of planning, the fact that

     25    these attacks were being carried out by the Rwandan armed
```

# J.A. 163

```
 1    forces, it seemed very quickly that there was a strategy, there
 2    was a deliberate strategy that was already in place, but what
 3    we also see at this same time really from the 7th of
 4    April onwards is the very deliberate use of the Interahamwe and
 5    other militias to also carry out killings, that there was a
 6    tense of order, there was a sense of purpose to what these
 7    militias were doing.
 8          They weren't just going willy nilly place to place
 9    killing Tutsi, they were moving systematically through the
10    neighborhoods of Kigali and then were fanning out into the
11    countryside to begin killing Tutsi in rural areas, all the
12    while, the government was using RTLM and other propaganda
13    sources to control the killings, so one of the things that the
14    government was doing especially through RTLM was to read out
15    lists of Tutsi targets who were known to be alive in particular
16    parts of the country giving directives to the Interahamwe, to
17    Hutu civilians that they needed to go and look for these
18    particular individuals to kill them wherever they were found.
19          These are the sorts of things that point to a certain
20    amount of planning, of orchestration rather than this just
21    being a random reaction to the shooting down of Habyarimana's
22    plane.
23    Q.   Was it just Tutsi men that were being targeted?
24    A.   It was not.  There was an attempt to target Tutsi
25    civilians across the gender divide and across the age spectrum,
```

The timestamps in the left margin read "12:06PM" at line 10 and "12:07PM" at line 20.

| | |
|---|---|
| 1 | so very quickly Hutu were also killing Tutsi women.  There was |
| 2 | a high usage of rape and other forms of sexual violence. |
| 3 | Children, infants were being killed.  There were many recorded |
| 4 | instances of pregnant Tutsi women being killed and their unborn |
| 5 | babies being quashed right there and then, so this really was |
| 6 | wholesale, this was comprehensive in targeting the Tutsi |
| 7 | civilian population. |
| 8 | Q.   How is it that Hutu every day Hutu civilians were |
| 9 | motivated to kill Tutsi neighbors that they had grown up with |
| 12:08PM 10 | or lived with their whole lives? |
| 11 | A.   This is an issue that has generated an enormous amount of |
| 12 | academic study in the last 20 years or so, and some of my own |
| 13 | personal research has been into exactly this question, trying |
| 14 | to understand what motivated a genocidaire to commit these acts |
| 15 | in 1994, and there are several key motivations that I think |
| 16 | have become apparent over time, and this includes off the back |
| 17 | of interviews with perpetrators themselves. |
| 18 |         One key motivation is a real sense of coercion and |
| 19 | pressure being applied by the central government in Kigali, and |
| 12:09PM 20 | that includes people being susceptible to this government |
| 21 | propaganda that in order to thwart the Tutsi threat, in order |
| 22 | to ensure that this country does not go back to the kind of |
| 23 | Tutsi dominance that we saw in colonialism, you must go out and |
| 24 | kill a Tutsi.  That message was very powerful in many Hutu |
| 25 | communities, so government propaganda, government planning was |

J.A. 165

Case: 19-1689    Document: 00117615536    Page: 168    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 91 of 123

2-91

1    one key motivation.

2         But what we've also I think uncovered the more the

3    research on Rwanda has unfolded is that there was a large

4    amount of killing that took place in rural areas that didn't

5    necessarily mean having to follow the orders of elites in

6    Kigali.

7         What was happening in the countryside in many parts of

8    Rwanda was that local political actors who had a lot of

9    influence were also mobilizing militias and were also coercing

12:10PM 10    every day Hutu to commit these crimes, and so that was

11    happening at the local level at the same time as the

12    government's propaganda was being spewed out on the radio from

13    Kigali, and so a lot of the killing is about people feeling

14    that they are being forced by local government officials, local

15    clan elders, people of significant influence at the local

16    level.

17         There's a power dynamic there that also I think

18    explains why many people join the killing spree, and then I

19    would argue that there's a third general motivation for why

12:10PM 20    genocidaire committed these acts, and that is a material one,

21    an economic motivation that the longer the genocide went on,

22    many Hutu peasants who were extremely poor, and, again, you'll

23    recall I said that there was time of a real economic pressure,

24    especially in rural areas.

25         Many Hutu peasants saw the genocide as an opportunity

1    to enrich themselves.  If I kill my Tutsi neighbor, I will be

2    able to capture his or her head of cattle, I'll be able to

3    capture their property, I'll be able to possibly even capture

4    their land.

5          And for many communities that were economically

6    desperate at the time, taking part in the genocide provided a

7    real economic opportunity, and so my research and the research

8    of various other scholars shows that many perpetrators joined

9    the killing spree because they were motivated economically.

12:11PM 10   Q.   Throughout your research, have you uncovered instances

11   where Hutus would protect some Tutsis but kill others?

12   A.   Yes.  In my research and in the research of various other

13   commentators, this is in fact quite a common phenomenon during

14   the genocide that many Hutu perpetrators would also at some

15   stage during the genocide have harbored or protected Tutsi

16   friends, Tutsi neighbors, Tutsi family members.

17         And the reason that this takes place, the reason that

18   you have individuals who are both protectors and perpetrators

19   during the genocide is that these individuals had very complex

12:12PM 20   relations at the local level in 1994, so, for example, I have

21   interviews with numerous perpetrators who will say I

22   protected --

23         MR. LAUER:  Objection.

24         THE COURT:  I'm going to allow it.  Again, this is

25   background information, ladies and gentlemen, and I will permit

# J.A. 167

1    it to help you understand the context of what you're going to

2    hear, the direct evidence.  Obviously, all of this is at a high

3    level of abstract, and it doesn't say anything about what the

4    defendant did or did not do or what any particular witness did

5    or did not do, but I'll overrule the objection.  Go ahead.

6    A.   Thank you.  I have interviews with numerous genocide

7    perpetrators who tell a very similar story, which is that

8    during the genocide, I protected a certain number of Tutsi,

9    sometimes it was a close family member, sometimes it was a

12:13PM 10   close friend, but in order to thwart any suspicion about me as

11   a Hutu protecting these Tutsi, I then needed to be seen to be

12   actively joining the killings in my community, and these two

13   things were sometimes happening simultaneously.

14         The same individuals harboring Tutsis in their own

15   homes but going out by day and very actively participating in

16   the community to show to their community that they were being a

17   realty Hutu, that they were as dedicated to the eradication of

18   the Tutsi as anybody else, and so in some instances, you get

19   these two things happening simultaneously.

12:14PM 20         Especially in my research on the Gacaca Courts, it was

21   a common defense of many accused to say I could not have

22   committed these genocide crimes of which I am accused because I

23   was known to be protecting these Tutsi, but, in fact, sometimes

24   it was also possible that they were committing crimes even

25   though they were protecting Tutsi.  These two things could be

Case: 19-1689    Document: 00117615536    Page: 173    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 119    Filed 03/18/19    Page 94 of 123

2-94

1    happening simultaneously.

2    Q.    Can you explain how the genocide progressed out from

3    Kigali and throughout the rest of the country?

4    A.    What we see after the 7th of April is the quite rapid

5    spread of the genocide from the capital city to such an extent

6    that if we think of the total death toll of Tutsi and the

7    genocide as approximately 800,000 people, about three-quarters

8    of that death toll was carried out in the first two weeks of

9    the genocide, so the vast majority of Tutsi victims of the

12:15PM 10    genocide were killed between the 7th of April and roughly the

11    21st, 22nd.

12         So this shows just how quickly the killings spread out

13    into the rural areas, and there are good reasons, I think, to

14    understand why the killing was able to spread so quickly.

15    Partly it was because, as I said before, some communities had

16    already witnessed the massacre of Tutsis as early as 1992 and

17    1993.

18         Many communities, of course, had also been listening

19    to the government propaganda for years, and furthermore, you

12:15PM 20    had the mobilization of the Interahamwe, this well-organized,

21    well-armed, absolutely dedicated militia that was also very

22    mobile across the country, and so those factors meant that

23    while the violence started in the capital, it spread with great

24    speed and great ferocity out into rural areas.

25    Q.    And you touched on this, but who all was doing the

# J.A. 169

Case: 19-1689    Document: 00117645536    Page: 173    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 95 of 123

2-95

1    killing?

2    A.   The killings were being carried out by a very wide range

3    of actors.   This is one of the key things, I think, to

4    understand about the Rwanda genocide was there were some

5    killings that were being carried out by government actors, by

6    the National Army, including the Presidential Guard, by the

7    police and the security services.

8         There was also perpetration by the Interahamwe, an

9    organized militia, Hutu militias, but the vast majority of

12:16PM 10   killings during the genocide were carried out by every day

11   Hutu, every day civilians who were no part of the government,

12   per se, were not necessarily members of the Interahamwe but

13   were part of the great mass of the Hutu majority population

14   that for all of these reasons I've already mentioned picked up

15   machetes and other basic implements and joined the killing, so

16   when we think about the genocide, we also have to think about

17   the different levels of Rwandan society that were involved in

18   carried out the killing.

19   Q.   And that led to my next question, which is how were folks

12:17PM 20   being killed, how were the Tutsis being killed?

21   A.   The vast majority of killings during the genocide were

22   carried out with very basic implements, the kind of implements

23   that people would have easily had to hand, especially on the

24   farms, so the majority of killings were carried out with

25   machetes, spiked clubs, hose, gardening implements, and what

Case: 19-1689    Document: 00117615536    Page: 174    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 90 of 123

2-96

1    that meant was the violence was incredibly intimate.  The

2    violence was hand-to-hand combat.  It was a single individual

3    in many cases wielding a machete often against an individual

4    that they knew extremely well, and so this really separates out

5    the Rwandan genocide from all of those other genocides that I

6    mentioned earlier.

7            This is not highly sophisticated, highly bureaucratic

8    or mechanized killing, as we saw with the gas chambers in the

9    Holocaust, this is not the use of light weaponry to shoot tens

12:18PM 10   of thousands, hundreds of thousands of individuals as we saw in

11   the case of the Cambodian genocide.

12           What really marks the Rwandan genocide out is the

13   scale of the killing, the speed of the killing, and the fact

14   that it was carried out with such basic weapons, which people

15   would have probably had lying around the house anyway.

16   Q.    Where do the Tutsis go for refuge?

17   A.    Tutsi, if they were fortunate to escape the first attempt

18   to kill them would typically do one of two things.  If they

19   lived in the border lands, they would try to flee into

12:19PM 20   neighboring countries, but that wasn't always possible because

21   the Army, the Interahamwe, and even local community members

22   would often try to block border crossings, so many Tutsi also

23   sought refuge in places that they trusted.

24           They sought refuge in places like churches, schools,

25   hospitals, clinics, in places that they associated with

**J.A. 171**

Case: 19-1689   Document: 00117615536   Page: 175   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 97 of 123

2-97

1    worship, with health, with care, they had good reason to think

2    that these were places where they would find protection, so

3    that was a very common strategy by many Tutsi.

4    Q.   Can you talk about Butare now.  When did the genocide come

5    to Butare?

6    A.   The genocide came relatively late to Butare.  You'll

7    recall that I said Butare is a very unusual place in Rwanda.

8    There's a different set of political and social dynamics there,

9    and so what that meant was while the genocide was spreading

12:20PM 10  very quickly across the country after the 7th of April, the

11   violations had not yet reached Butare.

12        Butare was one of the few prefectures in the country

13   that initially did not take part in the genocide on a large

14   scale, and a big reason for that, again, was that you had this

15   individual, Jean Baptiste Habyarimana, the prefect of Butare,

16   who was very influential when he saw what was happening

17   elsewhere around the country, when he heard the government

18   propaganda, he was very mobile within the prefecture, visiting

19   villages, going place to place, holding meetings, holding

12:21PM 20  rallies trying to diffuse the tension, and that succeeded for

21   the first few days of the genocide, so while the violence was

22   raging everyone else, Butare largely was quite peaceful.

23        But things changed from the 11th of April onwards in

24   Butare because the MRND in Kigali could not tolerate the fact

25   that the genocide had not spread to Butare and could not

J.A. 172

```
 1  tolerate the actions of Jean Baptiste Habyarimana, and so on
 2  the 11th of April, he was removed from his position as prefect,
 3  and he was replaced by an individual who was much more
 4  sympathetic to MRND and to the genocidal cause, and so what we
 5  then see moving into especially the end of April is the
 6  violence beginning to spread through the prefecture of Butare,
 7  but, importantly, even in the month of May, there is a high
 8  degree of resistance to the killing.
 9          It's very well documented that communities, especially
10  in the far north of Butare Prefecture, the closer you get
11  towards -- on the road to Kigali, these prefectures held out as
12  long as they could, and it was only really in May and into
13  June that we begin to see the killing of Tutsi in that part of
14  the prefecture, so, in short, the genocide arrives very late in
15  this part of the country.
16  Q.   Did there come a point where the central government in
17  Kigali visited Butare and encouraged the population to begin
18  the genocide?
19  A.   Yes.  There are various instances at which the central
20  government in Kigali sent very high-ranking officials to Butare
21  to directly mobilize the Hutu population to kill Tutsi, and
22  this was because of the frustration of the government.
23          You know, the violence is happening everywhere.  Tutsi
24  are being killed everywhere.  What's wrong with Butare?  This
25  was the government's attitude.  There was a very famous speech
```

12:22PM (line 10)
12:22PM (line 20)

J.A. 173

1    on the 11th of April.  At the ceremony, when Jean Baptiste

2    Habyarimana was deposed from his position as prefect, the then

3    interim prime minister of the country, Sindikubwabo gave a

4    speech, a very powerful speech to a very large gathering of

5    many of the inhabitants of the prefecture accusing the Hutu of

6    Butare of not being dedicated to the anti-Tutsi cause.

7         The language that he used was the Hutu in Butare are

8    lazy because the Hutu everywhere else in the country are going

9    to work, and in the language of the day, going to work meant

12:23PM 10   killing Tutsi because it was hard work, hand-to-hand combat,

11   often with machetes.

12        It was considered work to be killing Tutsi, and the

13   Interahamwe famously would sing songs and would chant that they

14   were going to work, that they were going to kill Sindikubwabo

15   on the 11th of April said to the massive rally in Butare Town

16   that it's time for the Hutu here to go to work in the way that

17   their ethnic family and friends elsewhere in the country are

18   currently doing so.

19        We then see the first killings of Tutsi in Butare Town

12:24PM 20   and outwards into the prefecture.  Sindikubwabo's speech on the

21   11th of April had a profound effect, but there is still

22   resistance.  We're still not seeing the killing of Tutsis in

23   Butare to the same extent as is taking place around the

24   country, so the government has to keep sending key ministers

25   and key officials all the way through the month of April and

Case: 19-1689    Document: 00117615536    Page: 178    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 100 of 123

2-100

1   even into the month of May because Butare is different, and

2   there's a sense that the government needed to actively coerce

3   the killings there because of what was happening in that part

4   of the country.

5   Q.   When the violence started in Butare, how was it compared

6   to the rest of the country?

7   A.   The violence initially after the 11th of April was

8   relatively minimal.  It was on a much smaller scale than what

9   had been seen elsewhere.  It was individual Tutsi in some

12:25PM 10   homes, it was much more scattered than it had been elsewhere,

11   but within a week or so of Sindikubwabo's speech, the situation

12   changes quite drastically, and then we start to see increasing

13   massacres in very, very large numbers, sometimes tens,

14   sometimes hundreds of Tutsi being killed in Butare Town and

15   outwards into the prefecture.

16   Q.   You mentioned that Tutsis sought refuge in places of care,

17   like churches or hospitals, clinics.  What happened when they

18   were found in those locations?

19   A.   When Tutsi were discovered in those places of refuge, and

12:26PM 20   it should be said that in many, many cases, Tutsi were found in

21   those places of refuge, one of two things happened:  Either

22   they were killed where they were found, so some of the largest

23   massacres during the genocide took place inside churches,

24   inside hospitals, inside schools.

25           Sometimes this would involve the Interahamwe or other

**J.A. 175**

Case: 19-1689    Document: 00117615536    Page: 179    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 101 of 123

2-101

| | |
|---|---|
| 1 | actors throwing grenades into the buildings, and the death toll |
| 2 | was enormous, or the Interahamwe would go into the places of |
| 3 | refuge and drag Tutsi out and then kill them elsewhere, but in |
| 4 | the vast majority of recorded cases during the genocide when |
| 5 | Tutsi tried to seek refuge in these safe spaces, more often |
| 6 | than not, they were killed. |
| 7 | Q.   During the course of your research, did you become |
| 8 | familiar with the events that occurred at the hospital in |
| 9 | Butare? |
| 12:26PM 10 | A.   Yes.  During my field work both in Butare Town and in some |
| 11 | rural areas in the wider prefecture, various events at Butare |
| 12 | Hospital were extremely well known.  One particular event that |
| 13 | came up often in my field research -- |
| 14 | MR. LAUER:  Objection. |
| 15 | THE COURT:  Let me see counsel at sidebar. |
| 16 | (THE FOLLOWING OCCURRED AT SIDEBAR:) |
| 17 | THE COURT:  What do you expect the answer to be? |
| 18 | MR. VARGHESE:  He's talking about the hospital being a |
| 19 | well-known genocide location. |
| 12:27PM 20 | THE COURT:  Well known now or well known then?  Why |
| 21 | does it come in?  This is where he's alleged to have |
| 22 | participated in things? |
| 23 | MR. VARGHESE:  It goes directly to the point that |
| 24 | Mr. Teganya was unaware that there was genocide going on at the |
| 25 | hospital, it's well known.  This is like there were a lot of |

**J.A. 176**

```
 1    genocide killings in the hospital.

 2             THE COURT:  When was it well known?  I mean, we have

 3    things unfolding after April 11th or whatever, and, of course,

 4    we know now what we know, for example, to use --

 5             (SIDEBAR CONFERENCE WAS CONCLUDED.)

 6             THE COURT:  If anyone wants to stand up and stretch

 7    while we're doing this, feel free to do that.

 8             (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

 9             THE COURT:  You know, the Holocaust is best known now

12:28PM 10    than it was in 1943, for example, at least to the world at

11    large, so, again, how do we -- the fact that this was known or

12    is known now, how does that either set a context for him or to

13    tend to prove the charges?

14             MR. VARGHESE:  I think the fact that it is known that

15    it is a sort of notorious place is relevant, the fact that

16    Dr. Clark is hearing about it through his research is relevant

17    because I think this was not a small scale killing at a house,

18    this was more of a large-scale known genocide site.

19             THE COURT:  But most of your witnesses are going to

12:29PM 20    testify about this, right, what happens in the hospital?

21             MR. VARGHESE:  Yes, sir.

22             THE COURT:  Do you want to add anything?

23             MR. LAUER:  It strikes me that it's such a form of

24    bolstering and anticipated witness testimony.  I mean, the

25    ultimate issue in this case is what took place at the hospital.
```

J.A. 177

1        THE COURT:  Yes, I think the prudent thing to do is

2     keep it out.  I'm going to sustain the objection.

3        (SIDEBAR CONFERENCE WAS CONCLUDED)

4        THE COURT:  All right.  I'm going to sustain the

5     objection.  I think we're going to hear testimony from

6     eyewitnesses concerning the hospital, so put another question

7     to the witness.

8     Q.   How were bodies disposed of?

9     A.   Bodies were often thrown into mass graves or they were

12:30PM 10   thrown into pit latrines, into toilet blocks.  Sometimes they

11    were even thrown into rivers and lakes.  They were often

12    disposed of in an extremely ad hoc fashion.

13        The issue of mass graves is a very important one in

14    Rwanda today because people are still uncovering graves where

15    sometimes tens, if not hundreds of bodies are buried, but that

16    was a symptom of the speed of the genocide, that people were

17    being killed, and the Interahamwe and other assailants were

18    often moving on very quickly.  They didn't spend an enormous

19    amount of time disposing of these bodies, they were often

12:31PM 20   disposed either exactly where people were killed or very close

21    by.

22    Q.   You touched on this, but I just want to ask, were killings

23    uniform throughout the genocide period?

24    A.   Killings were not uniform in the sense that there was

25    geographical variation in the genocide.  I've already mentioned

1    that Butare was quite unusual in the sense that the genocide
2    arrived there quite late.  There were other pockets of
3    resistance to the killings.  There were some communities in the
4    west of Rwanda, there were some communities in the east of
5    Rwanda where communities actively stood up to the Interahamwe
6    and ensured that either no or very few Tutsis were killed in
7    those particular places.
8         The death toll was also very different in some parts
9    of the country.  The reason for that is that some parts of
12:31PM 10  Rwanda before the genocide had more Tutsi living there than
11   others, so, of course, in places where there was previously a
12   very high Tutsi population, you would justifiably expect there
13   to be a much larger Tutsi death toll, and so while we talk
14   about the Rwandan genocide as this 100 days of the killing of
15   the Tutsi population, in fact, within that there was a huge
16   amount of variation in different parts of the country.
17   Q.    In addition to the killings, was there other types of
18   violence associated with the genocide?
19   A.    Yes.  So as the genocide unfolded, the violence was not
12:32PM 20  only about murder.  I've already mentioned the extent to which
21   sexual violations was carried out.  There was mass rape that
22   was committed at various stages and in various places during
23   the genocide, and there have been numerous court cases, not
24   least at the UN tribunal for Rwanda that dealt explicitly with
25   the use of sexual violence during the Rwandan genocide.

J.A. 179

1          There was also a large amount of very deliberate

2     injury to individuals.  Sometimes the objective of an attack

3     upon a victim was not necessarily to kill them, it may be to

4     mame them, it may be to incapacitate them, or the attempt may

5     have been to kill an individual but the attempt was

6     unsuccessful, and instead this person was left with horrific

7     injuries, and we also saw an enormous amount of looting and

8     property-related violence in the genocide.  All of this was

9     taking place at the same time.

12:33PM 10    Q.    How long did the genocide last?

11    A.    The genocide lasted 100 days from the night of the 6th of

12    April through and until the middle of July when the RPF

13    captured control of the country, became the ruling party and in

14    effect brought the genocide to an end.

15    Q.    Do you know when the RPF arrived to Butare?

16    A.    The RPF arrived to Butare again very late in the piece.

17    The RPF didn't arrive in this part of the country until really

18    the beginning of June or the middle of June, and the reason for

19    this is due to the basic geography of the country that Butare

12:34PM 20    is in the deep south of Rwanda, the RPF had invaded from the

21    north and was trying to make its way systematically through the

22    countryside, and so the RPF had quite quickly captured control

23    of Northern Rwanda.  It took a long time to get to the east of

24    the country.

25          The RPF also took some time to capture control of

**J.A. 180**

Case: 19-1689   Document: 00117615536   Page: 184   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 106 of 123

2-106

1    Kigali and the west of the country, and in many respects Butare

2    was one of the last places the RPF managed to reach in June, so

3    quite late in terms of the genocide.

4    Q.   What happened when the RPF came through and took over the

5    country?

6    A.   What happened as the RPF moved through the country was

7    firstly that it was finding these completely destroyed

8    communities of Tutsi victims, and for the Tutsi members of the

9    RPF, this was quite a horrific discovery, and what it also

12:35PM 10    meant was that some members of the RPF as they moved through

11    the country were finding their own loved ones killed.  They

12    were finding family members, friends killed in their home

13    communities, and so what we also saw during the period of the

14    genocide were RPF revenge attacks, so there were some revenge

15    attacks carried out by the RPF against unarmed Hutu civilians.

16    They're on a significantly smaller scale than the crimes

17    committed against Tutsi civilians, but they certainly did take

18    place.

19          And so as the RPF was moving through the country, it

12:36PM 20    was finding these devastated communities, and then the attempt

21    by the RPF in the middle of July was to shift from being a

22    fighting rebel force to then establishing a government very,

23    very quickly in the capital city, Kigali.

24    Q.   How did the Hutu population react as the RPF came through

25    the country?

1    A.    The broad response of the Hutu population, especially

2    towards the end of June and the beginning of July, 1994, was to

3    flee the RPF advance.  What we see especially from July of 1994

4    through the remainder of that year is the mass exodus of around

5    2 million Hutu civilians out of Rwanda into what was then

6    eastern Zaire and became the democratic Republic of Congo.

7    Q.    Looking at Exhibit 19, can you just point out where that

8    is?

9    A.    Yes.  So this the DRC here, so the Hutu exodus occurred at

12:37PM 10    almost all possible border crossings.

11    Q.    Did that exodus include individuals who were involved in

12    the genocide?

13    A.    Yes.  In that 2 million strong crowd, there were many of

14    the perpetrators of the genocide, including many senior actors

15    within the MRND and other political parties but also very large

16    numbers of every day Hutu civilians who had also participated

17    in the killing.

18        There were also many innocent Hutus in that population

19    that were fleeing the RPF advance.  They believed that it was

12:37PM 20    no longer possible for them to live in a Rwanda that was

21    dominated by the Tutsi, and so many innocent Hutu civilians

22    also fled across the western border into refugee camps in

23    eastern Zaire.

24    Q.    Generally, did the Tutsi population flee from the advance?

25    A.    No, they did not.  The vast majority of Tutsi remained

**J.A. 182**

1    because the Tutsi felt a real commonality with the RPF, and

2    certainly in the minds of many Tutsi who survived the genocide,

3    they considered the RPF the liberators.  The view of many Tutsi

4    survivors is that had it not been for the RPF's advance, the

5    genocide perhaps would have gone even further and many more

6    Tutsi would have been killed.

7    Q.    Dr. Clark, I want to turn now and ask you a little bit

8    about how you go about conducting your research in Rwanda.  You

9    mentioned that you do field work.  Can you explain how you go

12:38PM 10   about conducting your field work in Rwanda?

11   A.    Most of my field work in Rwanda is based on interviews at

12   multiple levels of Rwandan society.  The majority of my

13   interviews are carried out with every day people, especially in

14   rural areas, so I do a lot of interviews with people who would

15   say that they were simply Rwandan farmers, but I also conduct

16   interviews with government officials, with members of political

17   society groups, and as I mentioned earlier, a key feature of my

18   field work is the need to speak to a very wide spectrum of

19   people that there is a real danger when you are conducting

12:39PM 20   field work that if, for example, you only interview genocide

21   survivors, you're only going to get one particular story.

22          And so if you want to understand the issues that I'm

23   interested in in my research, which is things like the current

24   state of Rwandan politics or issues of justice and

25   reconciliation, you have to see these issues from multiple

**J.A. 183**

1    sides, and so as I've already mentioned, a key part of my

2    research is ensuring that I'm speaking to a diversity of actor,

3    genocide perpetrator, as well as genocide survivor, genocide

4    bystander as well, people in positions of influence, and people

5    with much less influence across the gender divide, across the

6    age divide, across the socioeconomic divide.  It's very, very

7    important to have a diversity of respondent.  That's a key part

8    of my field work.

9    Q.    Does that also include geographic diversity?

12:40PM 10    A.    Indeed.  So since I began my field work in Rwanda in 2003,

11    I've always had 12 major field sites which are scattered across

12    the country, two in Kigali and then the remaining 10 in various

13    rural areas, and that is also a key part of the diversity of

14    field work that different issues experience differently in

15    different parts of the country.

16          As I've already alluded to, even the genocide itself

17    was different in different parts of the country, and so if you

18    are trying to understand how the genocide happened, the impact

19    that it had on Rwanda, you need to get around and see that

12:41PM 20    effect in different geographical spaces, and so that's why I've

21    maintained a very wide range of field sites over the last 16

22    years.

23    Q.    Do you have any field sites in the Butare region?

24    A.    I do.  I have two main fields sites in Butare.  I have a

25    set of field interviews that I've been conducting since 2003 in

J.A. 184

1    Butare Town, and then another field site in a rural area to the

2    east of the town in a place called Ngoma, which is a sort of a

3    small village.  There's various communities around there where

4    I do my field work.

5    Q.   As part of your research, have you actually visited the

6    hospital in Butare?

7    A.   I have visited the hospital in Butare.  I visited it on

8    several occasions.  I've spoken to some staff who work there.

9    I've also attended a genocide memorial service that was held in

12:42PM 10    the Butare Hospital.

11    Q.   What steps do you take to make sure that you are getting

12    accurate information during the course of your interviews?

13    A.   This is a very important feature of field work in a

14    post-conflict environment like Rwanda that as a researcher, you

15    need to spend a lot of time ensuring that the information that

16    you're gathering is as accurate as possible.  There are many

17    individuals who either have fuzzy recollections of the past or

18    may have reasons to not necessarily tell the truth, and so I

19    have various protocols in place for my field work to try to

12:42PM 20    ensure that the information is as accurate as possible.

21         This includes beginning every interview with an

22    individual by saying that I am an independent academic

23    researcher, so I'm not working for any government, I'm not a

24    journalist, and that I don't already have an idea of what I'm

25    looking for in this interview.

 1              It's very important in my work to emphasize to my
 2     interviewees that they need to be as free and open as possible
 3     and that I'm not expecting them to tell me anything in
 4     particular.
 5              One of the other key features of my field work is that
 6     I've been able to go back to the same locations and often to
 7     interview the same individuals over this 16-year period, and so
 8     what I've discovered in my field work is that this enabled me
 9     to build a certain amount of trust and a certain rapport with
10     my interviewees, and what I find as a result is that many of my
11     interviewees will only tell me particularly sensitive things
12     after the third or the fourth or the fifth interview, sometimes
13     four or five years later, and I think that's understandable
14     that I'm a foreigner coming into Rwanda.  These individuals
15     have never met me before.  It's unlikely that they are going to
16     tell me extremely sensitive or contentious things on the first
17     meeting.
18              It's going to take a lengthy period of building trust
19     before people feel open enough to be able to speak especially
20     about the genocide and its impact, and so that's one of the key
21     reasons why a lot of my field work is based upon repeat visits
22     and follow-up interviews.  That's a key part of what I do.
23     Q.   Are there details about survivor stories that are
24     especially sensitive that take time to develop with the
25     witness?

 1    A.    Yes.    Survivors, genocide survivors in Rwanda are a

 2    particularly complex category of people to conduct interviews

 3    with.    They are often traumatized by what they lived through.

 4          Many of my survivor interviewees say that they

 5    experience some degree of post-traumatic stress disorder, and

 6    so talking about the events of the past can be very triggering

 7    for them in many ways, and so I find particularly with

 8    survivors that it's only after multiple interviews that certain

 9    issues start to come out.

12:45PM 10          Now, those issues are various.    It can be things like

 11    even identifying the perpetrator of crimes against their

 12    family.    Many survivors simply don't want to talk about the

 13    past because it dredges up these very, very difficulty

 14    memories.    I've done many interviews with victims of sexual

 15    violence, including with female victims of sexual violence.

 16          Now, it is highly unlikely that a foreign man can come

 17    into a Rwandan community and have an interviewee give a full

 18    and frank interview about sexual violence at the first attempt.

 19    That's the kind of thing that often takes many, many years of

12:45PM 20    building trust, so there's a real sensitivity around that.

 21          And one of the other issues that has come up in some

 22    of my survivor testimony is also about their own relatives who

 23    were involved in killings.

 24          There is often a sensitivity about pointing the finger

 25    at Hutu loved ones who also perpetrated the genocide.    You have

       1    to recall that a lot of my early field work was taking place

       2    when the Gacaca Courts were underway between 2002 and 2012, so

       3    what this meant was I was also conducting research in an

       4    environment when there was a legal process underway, and so

       5    many of my interviewees quite rightly wanted to know if they

       6    told me certain things about the past, would that information

       7    be used in Gacaca legal proceedings, and so people were

       8    sometimes very reluctant to speak openly at the first attempt

       9    because they were worried about the legal ramifications of

12:46PM 10    giving this testimony, and so, again, it often took multiple

      11    interviews to allay their concerns, to bill rapport and to have

      12    a much deeper interview than was possible at the first attempt,

      13    so there are lots and lots of areas of sensitivity especially

      14    in survivor interviews.

      15    Q.   Do you speak Kinyarwandan?

      16    A.   I do not speak it fluently, so I speak enough Kinyarwandan

      17    to be able to converse on day-to-day issues, but when it comes

      18    to dealing with more sensitive and more complex issues, I rely

      19    entirely on Rwandan interpreters.

12:47PM 20    Q.   When you go to conduct your field work, do you coordinate

      21    with the Rwandan government in any way?

      22    A.   No, I don't coordinate with the government.  The only

      23    formal interaction that I have with state officials is it's now

      24    stipulated that all foreign researchers in Rwanda must have a

      25    research permit, so you have to go through a process of

# J.A. 188

Case: 19-1689   Document: 00117615536   Page: 192   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 115   Filed 03/18/19   Page 114 of 123

2-114

1    applying for this permit, so I have to engage with the state in

2    that regard.

3           But I also interviewed government officials for the

4    purposes of my research.  It's important to also get the

5    perspective of state officials and sometimes to compare that

6    with what local people are saying at the community level.

7           For example, when I was doing my research into the

8    Gacaca Courts, it was important for me both to have a sense of

9    what the government thought it was doing when it established

12:48PM 10   these village courts but also to understand how every day

11   people who were participating in Gacaca were experiencing the

12   process and then to compare and contrast these different levels

13   of perspective, so that's the other way in which I often engage

14   with government actors.

15   Q.   With respect to your research, is any of your

16   money -- where do you receive your money for your research

17   project?

18   A.   Almost all of my research funding comes either from my

19   host universities, so I've moved around in the U.K. to various

12:49PM 20   universities.  I'm currently at the University of London.

21   That's where most of the funding comes from.

22          In some instances, I've done consulting work for

23   various UN bodies or for international NGOs, civil society

24   groups that enables me sometimes to produce a report for those

25   bodies but then piggybacking on that to stay in Rwanda and do

J.A. 189

Case: 19-1689    Document: 00117615536    Page: 193    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 115    Filed 03/18/19    Page 115 of 123

2-115

 1    my own research, but that's where my funding comes from.

 2    Q.    You talked about the research permit that you have to get

 3    from the Rwandan government.  Your ability to get the research

 4    permit, does that affect your interviews in any way or the

 5    articles that you have written in any way?

 6    A.    No.  What I found is that going through the process of

 7    getting a research permit really involves describing in very

 8    broad terms the research that I want to do, and it never

 9    involves having to divulge to the state specifically where I

12:50PM 10    will be doing my research or who I will be speaking to, and

11    then what I found is that that permit is then no impediment to

12    doing the kind of work that I need to do, and so I've been able

13    to do my work very freely in Rwanda for 16 years now.

14    Q.    In terms of the articles or the papers or the opinion

15    pieces you've written, have you always tried to write in favor

16    of the current Rwandan Government?

17    A.    No, not always.  Many of my publications have been very

18    critical of various Rwandan Government policies.  As an

19    academic, I feel it's important to be as even handed as

12:50PM 20    possible to try to point out when things are going well and

21    some government policies to my view have worked well but

22    equally to point out where there are problems and flaws with

23    government ideology or government policies, and so both in my

24    academic writing and in opinion pieces that I've written in the

25    international press, I'm often doing both of these things.

# J.A. 190

1          There are times when I felt that it's been important

2     to emphasize positive aspects of what's been happening in

3     Rwanda, and at other times, it's been important to emphasize

4     more negative aspects.

5     Q.   Have you faced any reprisals from the government for

6     anything that you've written?

7     A.   No.  I've never faced any reprisals from the Rwandan

8     State.  Sometimes when I interview government officials for my

9     research, if I've recently published something very critical of

12:51PM 10    the country, those officials will sometimes raise questions

11    about that.  We'll often have a conversation about that.  They

12    will express their criticism of what I've written, but that's

13    as far as it goes.  It's never in any way blocked the kind of

14    research that I've wanted to do.

15    Q.   The last section that I want to talk to you about is the

16    Gacaca process that you talked about.  Can you explain to the

17    jury the Gacaca Courts and why they were formed?

18    A.   Yes.  Gacaca, as I've already alluded to, is quite an

19    unusual justice process.  There's really no other country on

12:52PM 20    earth that has decided to deliver justice for genocide crimes

21    at the community level and to try to prosecute so many

22    suspects.  Gacaca ended up prosecuting about 400,000

23    individuals.

24          The way that Gacaca came about was really through

25    experimentation.  At the end of the genocide, when the RPF took

**J.A. 191**

1    control of Rwanda, the government basically drove trucks around

2    the Rwandan countryside and rounded up in a very ad hoc fashion

3    anybody who was suspected of being a genocide perpetrator.

4         What that basically meant was most able-bodied Hutu

5    men who were still inside Rwanda at that time were rounded up

6    and taken to jail where they then stayed from the end of 1994

7    until the Gacaca process began in 2002.

8         The reason Gacaca was put in place was the Rwandan

9    government was struggling to deal with this massive backlog of

12:53PM 10    genocide suspects in prison.  The estimate by 2002 was that

11    about 130,000 detainees were imprisoned as genocide suspects.

12         Initially, the Rwandan government tried to prosecute

13    some of these suspects through the National Courts, the

14    conventional court system, but the government was finding that

15    that kind of justice was by nature slow, laborious, and there

16    was no way that that system would be able to deal with 130,000

17    suspects, and so the government pondered numerous options over

18    many years about what to do and eventually decided in the early

19    2000's to use this localized justice process that was based on

12:54PM 20    lay judges, every day people elected by their local

21    communities, open air hearings that were conducted in the same

22    locations where crimes were alleged to have taken place.

23         Gacaca hearings happened one day per week for ten

24    years, and large numbers of every day community members

25    actively participated and gave eyewitness testimony in Gacaca

**J.A. 192**

1    hearings, and it's fair to say that most every day Rwandans

2    were absolutely exhausted by the Gacaca process by the time it

3    closed in 2012.

4         People had just had enough and were tired and quite

5    traumatized in many respects from having to constantly give

6    this testimony about what had taken place during the genocide.

7    Q.   You mentioned the judges were elected; is that right?

8    A.   Indeed.

9    Q.   Sorry.  Were they mostly Hutus or Tutsis or a mixture?

12:55PM 10   A.   One of the key features of the Gacaca process was that

11   because judges were elected by their local communities in a

12   country where 84 or 85 percent of the population is Hutu, most

13   communities elected Hutu judges, so one of the I think

14   unexpected features of Gacaca was that this was basically a

15   process of Hutu judging Hutu about the crimes that had been

16   committed in the past, and these judges were elected because

17   they were considered upstanding members of the community, they

18   had some moral status amongst their peers.

19        The Gacaca law stipulated that if an elected judge had

12:55PM 20   at all been accused of being a genocide perpetrator, they had

21   to be removed from the process, so that what you then ended up

22   were with Gacaca Judge's panels where there was no taint of the

23   genocide, there was no suspicion that any of these Judges had

24   taken part in the killings in 1994.

25        It should also be said that many Tutsi also were

**J.A. 193**

1     elected as Gacaca Judges, but the overwhelming majority were

2     Hutu.

3     Q.   How many suspects were eventually tried through the Gacaca

4     process?

5     A.   My estimate, which I detail in my book on Gacaca is that

6     around 400,000 genocide suspects were prosecuted through

7     Gacaca, and they were prosecuted in around 1 million individual

8     cases because what often happened at Gacaca was that

9     individuals would be accused of multiple genocide crimes, and

12:56PM 10     so Gacaca counted each of these charges as a separate trial.

11          The same individual would typically not be prosecuted

12     for multiple crimes at the same trial, they would be prosecuted

13     for one particular crime, that trial would end, and if they

14     were accused of multiple crimes, they would come back again and

15     go through a separate trial, so that's why you get 400,000

16     suspects and a million separate cases.

17     Q.   Did you have the opportunity to observe any of those

18     trials?

19     A.   I did.  Over the life span of Gacaca, I witnessed hundreds

12:57PM 20     of Gacaca hearings in these 12 field sites, so a lot of my

21     field work was moving around these different places to see how

22     Gacaca was taking place because it operated quite differently

23     in different parts of the country, and so, for example, like a

24     Gacaca in Butare would look very, very different from a Gacaca

25     in the north of the country for all sorts of reasons.

2-120

 1    Q.    Did you undercover any efforts in your research by the

 2    Rwandan government to force or coerce witnesses to provide

 3    testimony against suspected genocidaires?

 4    A.    No.   In my research, I found no evidence of government

 5    coercion, either of prosecution or defense witnesses, and this

 6    was something that I wrote about in my book on Gacaca and also

 7    in some subsequent reports that having looked at Gacaca

 8    operating in these 12 field sites over a very lengthy period,

 9    this kind of thing did not manifest.

12:58PM 10    Q.    In fact, did you do any specific consulting work with

11    respect to this issue of government coercion of witnesses?

12    A.    I did, along with my wife, who is also a Rwanda

13    specialist, her name is Nicola Palmer, we did a joint project

14    four or five years ago for an NGO based in London called

15    Redress.   It's an organization that works with victims of mass

16    atrocities around the world.

17          We did a specific research report on prosecution and

18    defense witnesses in Rwanda, who were testifying in multiple

19    jurisdictions, so we interviewed prosecution and defense

12:59PM 20    witnesses who had given testimony at Gacaca and/or testimony in

21    the Rwandan National Courts or at the UN Tribunal or in foreign

22    jurisdictions, such as this one, because, obviously, many

23    Rwandan witnesses are traveling backwards and forwards to

24    testify in foreign places such as the U.S., and one of the key

25    things that we found in that report was that none of our

# J.A. 195

Case: 19-1689    Document: 00117615536    Page: 199    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 119   Filed 03/18/19   Page 121 of 123

2-121

1    witnesses stated that they had been coerced by the Rwandan

2    government about what they were supposed to say in these

3    different jurisdictions.

4            Some individuals claimed that they had experienced the

5    coercion or the backlash of their neighbors for things that

6    they had said or even the mere fact that they had traveled was

7    sometimes a reason for backlash, but this had never been on the

8    responsibility of the Rwandan government.

9            THE COURT:  Anything else, Mr. Varghese?

01:00PM 10           MR. VARGHESE:  Just would you like me to stop, your

11   Honor?

12           THE COURT:  Well, how much more do you have?

13           MR. VARGHESE:  I only have a few minutes.  I'm

14   cognizant of the time.

15           THE COURT:  A few minutes meaning?

16           MR. VARGHESE:  Probably closer to 10 minutes.

17           THE COURT:  All right.  Why don't we break.  Let me

18   see the lawyers at sidebar about the schedule.

19           (THE FOLLOWING OCCURRED AT SIDEBAR:)

01:00PM 20           THE COURT:  All right.  With ten minutes tomorrow, how

21   long do you expect to take?  Is this the one we need the

22   tomorrow afternoon session for?

23           MR. VARGHESE:  No, it's the next witness.

24           THE COURT:  What time -- what should I tell them to

25   expect for tomorrow afternoon?  I would prefer to get them out

1    of here at 4:00 or 4:30 or some reasonably civilized hour.

2    Does that sound right?

3        MR. GARLAND:  Yes, that will work, depending on

4    cross-examination.

5        MR. LAUER:  The witness that is the concern here, I

6    don't think he's going to last to the end of the day.

7        (SIDEBAR CONFERENCE WAS CONCLUDED.)

8        THE COURT:  Okay.  Ladies and gentlemen, we're going

9    to break for the day.  Tomorrow, as I told you when we were

01:01PM 10    impaneling, because of some witness scheduling, we're going to

11    have an afternoon session.  The lawyers assure me that despite

12    that you'll get out of here at a reasonably civilized hour,

13    meaning on the order of four o'clock as opposed to five, and

14    hopefully you can beat the traffic, maybe even earlier.

15        There will be an afternoon session tomorrow.  That

16    means we will break from 1 to 2.  I'm sorry to report that I'm

17    not allowed to pay for your lunch.  There's a cafeteria here,

18    and there's other things in the neighborhood, but I'm afraid

19    you are on your own for it.

01:02PM 20        When you deliberate, we can buy you lunch, and we buy

21    you breakfast every morning, as you may have figured out, but I

22    can't buy you lunch.  Thank you for your patience.  I would

23    again very much like to start promptly at 9:00 tomorrow.

24        If you have a problem of some kind, please call us so

25    we know where you are and what's going on.  Please remember my

```
 1    instructions not to discuss the case with anyone else or among
 2    yourselves, and we'll see you tomorrow morning hopefully at
 3    nine o'clock.  Thank you.
 4              THE CLERK:  All rise.
 5              (JURORS EXITED THE COURTROOM.)
 6              THE COURT:  8:30 tomorrow.
 7              MR. GARLAND:  Yes, your Honor.
 8              MR. LAUER:  Very good.
 9              (Whereupon, the hearing was adjourned at 1:02 p.m.)
10                    C E R T I F I C A T E
11    UNITED STATES DISTRICT COURT )
12    DISTRICT OF MASSACHUSETTS ) ss.
13    CITY OF BOSTON )
14              I do hereby certify that the foregoing transcript,
15    Pages 1 through 123 inclusive, was recorded by me
16    stenographically at the time and place aforesaid in Criminal
17    Action No. 17-12092-FDS, UNITED STATES OF AMERICA vs.
18    JEAN LEONARD TEGANYA and thereafter by me reduced to
19    typewriting and is a true and accurate record of the
20    proceedings.
21              Dated March 18, 2019.
22                        s/s Valerie A. O'Hara
23              _____
24                   VALERIE A. O'HARA
25                   OFFICIAL COURT REPORTER
```

J.A. 198

```
1                      UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3

4      UNITED STATES OF AMERICA,        )
                                        )
5      vs.                              )  Criminal Action
                                        )
6      JEAN LEONARD TEGANYA,            )  No. 17-10292-FDS
                        Defendant       )
7                                       )
                                        )
8                                       )

9

10     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                          JURY TRIAL DAY 3

12

13

14

                 John Joseph Moakley United States Courthouse
15                         Courtroom No. 2
                          One Courthouse Way
16                        Boston, MA 02210

17

                           March 12, 2019
18                          8:30 a.m.

19

20

21

22

23                       Valerie A. O'Hara
                       Official Court Reporter
24     John Joseph Moakley United States Courthouse
                   1 Courthouse Way, Room 3204
25                      Boston, MA 02210
                  E-mail: vaohara@gmail.com
```

J.A. 199

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;

5
     For the Defendant:
6
             Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2    WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

3    PHIL CLARK                    5              43
        By Mr. Varghese                  12                 51
4       By Mr. Lauer

5    RONY ZACHARIAH, M.D.
        By Mr. Garland             53            160
6       By Mr. Lauer                     139
     ISABELLE MUKANKUSI
7       By Mr. Varghese          161

8    EXHIBITS                          FOR I.D.   IN EVIDENCE

9       24                                             63
10      23                                             67
        53                                            102
11      52                                            103

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**J.A. 201**

```
 1                        PROCEEDINGS
 2              THE CLERK:  All rise.  Thank you.  Please be seated.
 3      Court is now in session in the matter of United States vs.
 4      Jean Leonard Teganya.  Court is now back in session.
 5              THE COURT:  Good morning, everyone.  We did some sort
 6      of network upgrade something or others with computers, so I
 7      assume they're not going to work the rest of the trial, but let
 8      me know if you have any problem.
 9              What, if anything, do we have to talk about,
10      Mr. Garland?
11              MR. GARLAND:  Nothing for the government.
12              THE COURT:  Mr. Lauer.
13              MR. LAUER:  No, nothing at this point.
14              THE COURT:  I did see there's a story both in The
15      Globe and The Herald.  I propose not to draw the jury's
16      attention to it, but if you want me to do something either
17      today or any other day, let me know.
18              What's the current thinking about the timing of all
19      this?  I assume we're going to go in the afternoon, but, again,
20      still thinking it won't go too late in the afternoon?
21              MR. GARLAND:  That's correct, your Honor.  We're not
22      certain we're going to need the entire afternoon, but we will
23      go into the afternoon.
24              THE COURT:  Like I said, my live feed isn't working.
25      Any time we touch the computers, we have problems, so let me
```

08:38AM (line 10)
08:38AM (line 20)

J.A. 202

1    know, and we'll try to deal with it as best we can.  All right.

2    Thanks.

3              ( A recess was taken.)

4              THE CLERK:  All rise for the jury.

5              (JURORS ENTERED THE COURTROOM.)

6              THE COURT:  All right.  Good morning, everyone.

7    Dr. Clark, you understand that you're still under oath?

8              THE WITNESS:  I do, yes.

9              THE COURT:  All right.  Mr. Varghese.

10                   PHIL CLARK, RESUMED

11               DIRECT EXAMINATION, CONTINUED

12    Q.   Good morning.

13    A.   Good morning.

14    Q.   Dr. Clark, I just want to finish off where we left off

15    yesterday.  We were talking about the Gacaca process.  Do you

16    recall that?

17    A.   Yes.

18    Q.   I want to pick up, and I just want to ask you you

19    testified yesterday that there was about 400,000 folks who were

09:02AM 20    put through the Gacaca process?

21    A.   Yes, that's correct.

22    Q.   Can you explain to the jury how did the number grow from

23    the original 135,000 that were originally arrested to the

24    400,000?

25    A.   So when Gacaca began, it was prosecuting this caseload of

**J.A. 203**

1    around 130,000 genocide suspects who had already been in jail

2    since 1994, but what happened as Gacaca progressed was that

3    more and more suspects were being identified by their local

4    communities, so that by the end of Gacaca in 2012, around

5    400,000 individuals had been prosecuted.

6         What this means is that an additional 270,000

7    individuals who had not been previously been in jail were

8    identified as the process went on, so Gacaca ended up dealing

9    with a much larger caseload than what it began with.

09:02AM 10    Q.    And what was the -- had your research informed you about

11    what the conviction rate was through the Gacaca process and

12    what the significance was?

13    A.    Yes.  One of the key findings in my book on Gacaca was

14    that the conviction rate was around 72, 75 percent.  What that

15    means is that Gacaca had an acquittal rate of about 25 to 30

16    percent.

17         One of my key findings in the book on the back of

18    those statistics is that Gacaca was very effective in finding

19    individuals who had been falsely accused of genocide crimes,

09:03AM 20    and it was effective in acquitting innocent individuals who had

21    been charged with the crime of genocide, and this, I think, was

22    something that many commentators on Gacaca did not expect at

23    the beginning of the process, very few people expected the

24    acquittal rate to be so high, but, in fact, it was very high by

25    the end of Gacaca in 2012.

# J.A. 204

1    Q.    Were there any efforts, did you undercover efforts that

2    witnesses were coerced to testify about suspected genocideers?

3    A.    No, in my 10 years of looking at the Gacaca process, I

4    found no evidence of witnesses either for the prosecution or

5    for the defense being coerced to give particular forms of

6    testimony.

7    Q.    With respect to Gacaca -- I'm sorry, with respect to the

8    other forms of trial, of genocideer suspects, did you find

9    anything as well in addition to Gacaca such as the ICTR or the

09:04AM 10    Rwandan criminal courts?

11    A.    As I mentioned in my testimony yesterday, my wife and I

12    conducted a research report for the organization redress five

13    or six years ago looking at exactly this issue of witnesses

14    either for the prosecution or for the defense who were giving

15    testimony in a wide range of jurisdictions.  That included

16    Gacaca but also the ICTR, the UN tribunal based in Tanzania,

17    the Rwandan national courts and proceedings held in foreign

18    jurisdictions, such as this one.

19              One of the key findings of that report was that there

09:05AM 20    was no direct coercion of any prosecution or defense witnesses

21    by the Rwandan government.  There was some instances of

22    pressure being brought to bear on witnesses by members of their

23    own community, sometimes even by the direct family members of

24    witnesses, especially if witnesses testified against their own

25    family members, there would be some pushback by those family

```
 1   members and members of the local communities, but we found no
 2   evidence of coercion of witnesses conducted by the Rwandan
 3   government.
 4   Q.   Dr. Clark, my last set of comments I want to ask you about
 5   common defense argument that was made during the process.  Are
 6   you familiar with the theory of genocide denial?
 7   A.   Yes, I'm very familiar with this idea.
 8            MR. LAUER:  Objection, your Honor.
 9            THE COURT:  Let me see you at sidebar.
10            (THE FOLLOWING OCCURRED AT SIDEBAR:)
11            MR. LAUER:  The question seems for him to opine on
12   defense strategies.
13            THE COURT:  I'm not saying I did not like the
14   introduction to that question, which did sound like it's
15   attacking a defense.  I mean, you perhaps didn't intend it, but
16   it certainly sounded that way, the kinds of things defense
17   lawyers raise, so I'm going to sustain the objection, strike
18   the question.  Why don't you rephrase it.  You can ask just are
19   you familiar with something called genocide denial.
20            MR. VARGHESE:  That's fine, your Honor, I apologize.
21            (SIDEBAR CONFERENCE WAS CONCLUDED)
22            THE COURT:  I'm going to sustain the objection and
23   strike the question.  Let's rephrase, Mr. Varghese.
24   Q.   Dr. Clark, are you familiar with a term called "genocide
25   denial"?
```

1    A.    Yes, I'm familiar with the term, yes.

2    Q.    What is genocide denial?

3    A.    Genocide denial is in essence the idea that an individual

4    or a group would claim that a genocide that is historically

5    known to have occurred did not occur.  This is a phenomenon

6    that we've seen not just in the Rwandan context but in the

7    context of all of the other genocides that I mentioned

8    yesterday, including the holocaust.

9          There's a very well-known phenomenon of holocaust

09:07AM 10    denial.  Many individuals, many groups for various reasons

11    continue to claim that the holocaust did not occur, and

12    sometimes it is because those individuals are, in fact,

13    holocaust perpetrators, and so they prefer to try to claim that

14    the holocaust is simply a myth.

15          We've something very similar in the Rwandan context.

16    Many individuals and many groups are continuing to claim that,

17    in fact, the genocide in 1994 did not take place.

18    Q.    Is there any evidence to support that?

19    A.    There is no evidence to support that, and, in fact, as I

09:08AM 20    outlined yesterday, there is an enormous amount of evidence to

21    support the fact that the genocide did occur in Rwanda in 1994.

22          If we go back to the definition of genocide and the

23    genocide convention, we are looking at the systematic attempts

24    to eliminate in whole or in part the Tutsi minority group in

25    Rwanda in 1994.  We have an enormous amount of evidence to

```
 1   support the fact that that, in fact, exactly did take place.
 2   Q.   Dr. Clark, are you familiar with the theory of the dual
 3   genocide or the dual genocide theory?
 4   A.   Yes, this is a very common phenomenon in many Rwandan
 5   circles.  The idea behind the jewel or the double genocide
 6   thesis is that there was, in essence, two genocides in 1994, a
 7   view that I personally consider to be false.
 8        The idea is that there was firstly the genocide of the
 9   Tutsi carried out by the range of actors that I discussed
10   yesterday, but that during and directly after that genocide,
11   there was a second genocide of the Hutu carried out by the
12   Rwandan Patriotic Front, the Tutsi dominated rebel group, and
13   its supporters.
14        This is what the double genocide thesis, in essence,
15   says, that at first there was a genocide of the Tutsi, and this
16   was followed by a genocide of the Hutu.
17        I'm of the view that while there were killings of Hutu
18   by the RPF and by other actors that there was not the degree of
19   orchestration and systematicity that we saw in the genocide of
20   the Tutsi, and, so, therefore, as egregious as those crimes
21   against Hutu are, we should not describe those as a second
22   genocide.
23   Q.   Dr. Clark, are you familiar with the theory that
24   genocideers or individuals could not be genocideers if they
25   came from --
```

J.A. 208

```
 1              MR. LAUER:  Objection.

 2              THE COURT:  Let me hear the question.

 3    Q.   Are you familiar with the theory that individuals could

 4    not be genocideers if they came from mixed ethnicities?

 5              THE COURT:  Overruled.

 6    A.   Yes.  This was a very common line of defense for genocide

 7    suspects, not only at Gacaca but in some of the other

 8    jurisdictions that dealt with Rwandan genocide crimes.  The

 9    argument was often that an individual would claim they could

10    not have perpetrated genocide crimes because even though they

11    were a Hutu, they had a Tutsi spouse, or they had other close

12    Tutsi relatives.  This was a very common defense.

13    Q.   And was there evidence to support that?

14    A.   In the cases that I observed at Gacaca, when that kind of

15    defense was brought forward, more often than not, it had no

16    evidentiary basis, that, in fact, it was very common across

17    Rwanda for Hutu perpetrators of genocide crimes to also in many

18    cases have a Tutsi spouse or very close Tutsi relatives.

19              This is because of the nature of these very

20    intertwined communities, especially in rural areas in Rwanda.

21    There had been an enormous amount of intermarriage between Hutu

22    and Tutsi for generations, but when it came to 1994, one of the

23    striking features of the Rwandan genocide was that those Hutu

24    who identified very strongly with the Hutu power message and

25    wanted to eliminate Tutsi chose to do so even though they may
```

**J.A. 209**

1    have had a Tutsi spouse or close Tutsi relatives, so this was a

2    very widespread phenomenon right across the country during the

3    genocide.

4            THE COURT:  Let me remind the jury, this is all

5    context and background, kind of viewing things at a high level.

6    None of this explains how any particular individual acted,

7    whether that's the defendant or any witness, in other words,

8    this is a broad-spread set of generalizations to help you

9    understand things.  It doesn't answer how a specific person

09:12AM 10   acted or felt or what that person's motives were.

11           Mr. Varghese.

12           MR. VARGHESE:  Thank you, your Honor, I have no

13    further questions.

14           THE COURT:  All right.  Cross.

15                        CROSS-EXAMINATION

16    BY MR. LAUER:

17    Q.    Good morning.

18    A.    Good morning.

19    Q.    So you described yesterday the concept of regionalism and

09:13AM 20   how regionalism played into the political realm during the time

21    of the genocide.  You recall that?

22    A.    Indeed.

23    Q.    And specifically you described how the MRND was strongest

24    in the north, correct?

25    A.    That's right.

**J.A. 210**

```
 1    Q.    That was where the president's political base was?
 2    A.    Yes, that's right.
 3    Q.    And, therefore, as a general matter, northerners were
 4    known to be supporters of the MRND; is that a fair statement?
 5    A.    Yes, broadly speaking, that's right.
 6    Q.    And as you just said, that's broadly speaking.  That would
 7    not tell you anything about any individual person, would it?
 8    A.    No, not necessarily, no, it would not be enough to know
 9    that someone was a northerner to then assume that they were a
10    member of MRND, no.
11    Q.    In fact, it could be something of a stereotype, couldn't
12    it?
13    A.    It was a very broad view in Rwanda at the time that many
14    northerners by default were members of the MRND, yes, this was
15    a very widespread perspective.
16    Q.    Stereotype?
17    A.    I perhaps wouldn't go as strong as saying it's a
18    stereotype.  Northerners typically were not denigrated or
19    criticized for being a member of the MRND, but it was a
20    widespread view.
21    Q.    Now, when you go to Rwanda and you interview people, you
22    want to hear about their individual experience, right?
23    A.    Yes, that's a very important part of my field work, yes.
24    Q.    You don't just assume that because you know someone's
25    region you know what their experiences are, do you?
```

09:14AM (line 10)
09:14AM (line 20)

J.A. 211

         1    A.    No, not at all.  As much as regional variation comes into

         2    my field work, it's more important for me to probe the very

         3    direct experiences of that particular individual.

         4    Q.   So I want to move onto the topic of how your research is

         5    conducted in Rwanda.  You mentioned yesterday that you had not

         6    been pressured by the Rwandan government in conducting your

         7    research at all?

         8    A.   Yes, that's correct.

         9    Q.   But you did mention having to acquire a permit?

09:15AM 10    A.   Yes.

        11    Q.   Is that unusual in your experience to have to acquire a

        12    permit to do academic research?

        13    A.    It's not unusual in this part of Africa.  Most of Rwanda's

        14    neighboring countries for a long time had a research permit

        15    process, so, for example, if you wanted to do research in

        16    Uganda or Kenya or Tanzania, you need to get a permit from the

        17    government before you can undertake research.

        18           In fact, Rwanda was relatively late to this process.

        19    It was one of the last countries in the region to institute

09:16AM 20    this permit process.

        21    Q.   What information do you have to supply in order to get

        22    that permit?  Do you have to tell the government how long

        23    you'll be there, where you'll be?

        24    A.   Yes.  On the permit form, you have to firstly sketch in a

        25    very broad sense the nature of the research project, so, what

1   is the theme, what is the topic.  You have to then identify the

2   provinces broadly where you will be conducting your field work,

3   and you have to give a broad time frame, what is the duration

4   of the project as a whole.

5   Q.   It's fair to say that many other researchers resent having

6   to provide that sort of information?

7   A.   Yes.  This is a point of discussion amongst academics

8   working on Rwanda that some claim that it's very arduous to go

9   through this permit process.

09:16AM 10   Q.   Well, it's actually kind of a point of controversy being

11   able to get into Rwanda to do research in the academic

12   community, that's a point of controversy, is it not?

13   A.   It is a point of controversy.  This relates not so much to

14   the permit process itself but the perception of some academics

15   and other researchers that if they are working on very

16   contentious themes, some commentators claim that they simply

17   cannot now get access to Rwanda, they claim that it's become

18   impossible for them to conduct their research.

19   Q.   In fact, they claim they don't feel safe?

09:17AM 20   A.   This is also a common claim amongst some academics who no

21   longer go back to the country.

22   Q.   And some academics also feel that their research subjects

23   can't be safe?

24   A.   That is a lesser claim made by some commentators.  It

25   should be said that the academics who make these claims, either

```
 1    they themselves do not feel safe or that their research

 2    respondents may not feel safe, have not been able to show, in

 3    fact, that they personally or their respondents have ever been

 4    intimidated, so one of the points of discussion in academics

 5    circle about this issue is how much this is a perception as

 6    opposed to the reality.

 7    Q.   Well, I'd like to just ask you about a few other scholars

 8    in your field.  One of them is actually local.  Are you

 9    familiar with Timothy Longman?

10    A.   Indeed, I'm very familiar with Timothy.

11    Q.   He's the director of the African Study Center at Boston

12    University?

13    A.   He was previously the director of that center, yes.

14    Q.   Been studying Rwanda for many years?

15    A.   Oh, many years, going back to even before the genocide.

16    Q.   You did some sort of panel discussion with him just last

17    week, in fact, while you were in town?

18    A.   Indeed, at Boston University, yes.

19    Q.   He is one of the people who claims he can't be safe in

20    Rwanda?

21    A.   That is true.

22    Q.   And there's also another leading scholar by the name of

23    Filip Reyntjens out of the University of Antwerp that's been

24    studying Rwanda for decades.  He doesn't feel like he's safe in

25    Rwanda?
```

**J.A. 214**

```
 1    A.    Yes, that's correct.

 2    Q.    Rene' Lemarchand, another professor in the United States,

 3    he has claimed that he's not safe in Rwanda?

 4    A.    He has also made that claim.

 5    Q.    Gerard Prunier, another professor not safe in Rwanda?

 6    A.    He has also made that claim, yes.

 7    Q.    And there are others, right?

 8    A.    There are certain others, yes.

 9    Q.    These, just to be clear, these are tenured professors with

10    decades of experience studying Rwanda, correct?

11    A.    Yes, but they are also --

12    Q.    These are well-respected authorities in the field?

13    A.    They are respected but also contested.  Like many

14    commentators working on Rwanda, there is enormous disagreement

15    about the country.

16    Q.    You're familiar with Alison Des Forges?

17    A.    Yes.

18    Q.    She was something of a giant, a legend in the field before

19    her untimely passing?

20    A.    She was a very prominent human rights activist and an

21    academic commentator, yes.

22    Q.    And she published a book called, *Leave None To Tell The

23    Tale*, which was considered to be one of the foundational

24    accounts of the genocide?

25    A.    Yes, that's right, co-authored with Timothy Longman, *Leave*
```

J.A. 215

1   *None To Tell The Story*, yes.

2   Q.   Shortly before her death, she was unable to enter Rwanda,

3   she was turned away?

4   A.   Yes, she was blocked entry at the Rwandan border traveling

5   from Bujumbura in Burundi, that's correct.

6   Q.   And, in fact, shortly prior to that, she had been highly

7   critical of the Rwandan government, had she not?

8   A.   She had been.  She had been highly critical of the RPF-ed

9   government really from the late 1990s onwards.

09:20AM 10   Q.   And, in fact, she was accused of being a genocide

11   sympathizer?

12   A.   Yes, at one key meeting in Kigali, I believe, a couple of

13   years before she was blocked entry to the country, one

14   particular government official accused her of being a

15   genocideer sympathizer, yes.

16   Q.   So, if I understand it correctly, this woman who authored

17   one of the primary texts of the genocide who came to be

18   critical of the Rwandan government was accused of being a

19   genocide sympathizer?

09:21AM 20   A.   Yes, that's correct.

21   Q.   And then she was turned away at the border?

22   A.   In a very heated public meeting where at the time she was

23   leading the Human Rights Watch Delegation to Rwanda, there was

24   a lot of contention from the government side about the findings

25   of that particular report, and in that moment, this epithet was

J.A. 216

1    used against her by a government official, yes.

2    Q.    And you're aware that that's not unique to Ms. Des Forges,

3    that other academics have been described by various government

4    officials as either genocide deniers or enemies of Rwanda?

5    A.    Yes, that is sometimes the language that is used against

6    academics who have been very vocally critical of the current

7    government, yes.

8    Q.    Would you agree that Rwanda is an authoritarian state?

9    A.    Yes, I think in many key respects, this is an autocratic

09:22AM 10    regime, and this is something that I've written about quite

11    extensively that I believe this is a state that has a high

12    degree of government control over the territory and the

13    population, but that control is not as extensive as some of

14    Rwanda's critics claim, and that there is still a high degree

15    of liberty for citizens to maneuver even within the overarching

16    authoritarian state.

17    Q.    So let's just sort of talk about some factual information

18    about the Rwandan government here.   The president is

19    Paul Kagame?

09:22AM 20    A.    That's correct.

21    Q.    And you testified yesterday that he was, in fact, the

22    leader of the Rwandan Patriotic Army, the Rwandan Patriotic

23    Front, the Tutsi Army that came in and ended the genocide?

24    A.    That's right.

25    Q.    So, in a practical sense, he's been leading the country

J.A. 217

1    since 1994?

2    A.   Yes, even from the period of 1994, when the genocide ended

3    onwards, Kagame was vice-president, but it was very clear that

4    he was calling the shots, and he became president in 2000.

5    Q.   So he's elected in 2000, correct?

6    A.   He was appointed by the party in 2000.  Elections were not

7    held until 2003.

8    Q.   So, he's appointed by the party, he's then elected in

9    2003, and he's been re-elected several times, correct?

09:23AM 10    A.   Yes, that's correct.  He's been re-elected twice, in 2010,

11    and most recently in 2017.

12    Q.   And when he was re-elected in 2017, the Constitution had

13    been to be amended to permit that; is that correct?

14    A.   Yes, that's correct.  The Constitution was changed to

15    enable Kagame to run for a third term, something that had been

16    prohibited in the Constitution up until that point.

17    Q.   So, there was some sort of a referendum to amend the

18    Constitution?

19    A.   In fact, yes, there was an outright referendum just prior

09:23AM 20    to that election.  The overwhelming majority of Rwandans voted

21    for that constitutional change.

22    Q.   And how many percentage-wise is the overwhelming majority?

23    A.   That referendum, the majority was I think in the low 90s,

24    92, 93 percent of the population voted for that constitutional

25    change.

J.A. 218

```
 1   Q.   And, in fact, that sort of number is 90 plus percent of
 2   the population voting for the president, that's always been the
 3   case when Kagame has run, is it not?
 4   A.   Indeed.  In fact, that's been the trend in Rwandan
 5   elections right back to independence.  The incumbent typically
 6   has won all elections by 90 percent plus.
 7   Q.   In Western democracy, it would be highly unusually to have
 8   an election where 90 percent of the population votes for one
 9   candidate or another; would you agree?
10   A.   Yes, this would be very unusual in this context.
11   Q.   In fact, there are reasons why he's able to get 90 plus
12   percent of the vote; are there not?
13   A.   Yes.  And this is the kind of phenomenon that we've seen
14   in many states in this region over the last 20 years.
15   Q.   The elections, just to speak about those reasons, the
16   elections are pretty tightly controlled, aren't they?
17   A.   The elections are very tightly controlled, not just in
18   Rwanda but in the rest of the region as well, yes.
19   Q.   And when we say the elections are tightly controlled, what
20   we mean is the executive branch, the Presidency, makes sure
21   that people vote RPF?
22   A.   Yes.  There is an enormous amount of pressure on the
23   population to vote for the ruling party, yes.
24   Q.   And also to make sure that there's not a viable
25   opposition?
```

09:24AM (line 10)
09:25AM (line 20)

1    A.    Yes, that has also been a feature of Rwandan governance

2    really since the early 1990s for the ruling party to try to

3    systematically undermine opposition groups.  The RPF has also

4    done that in the Rwandan case.

5    Q.    And the demographics of the country, there's still about I

6    think you said about 84, 85 percent Hutu, and, you know, close

7    to 13, 14 percent Tutsi, correct?

8    A.    That's correct.

9    Q.    And yet the RPF as a political party at the highest levels

09:26AM 10    is still dominated by Tutsis?

11    A.    Yes, at the level of the executive, the party is dominated

12    by Tutsi, but to a lesser extent in the military and some key

13    government ministries.  It's also, I think, not as clear-cut is

14    to say that this is a Tutsi-dominated government that can only

15    gather support amongst every day Hutu through control.

16          There are many, many reasons why every day Hutu also

17    will vote for the RPF, but it is also true that there is a high

18    degree of government pressure.

19    Q.    So let's talk about some of the past presidential

09:26AM 20    campaigns.  In 2010, there was an opposition candidate briefly

21    named Victoire Ingabire?

22    A.    Yes, that's correct.

23    Q.    That was a Rwandan who had lived abroad?

24    A.    Yes, she lived in the Netherlands for many years.

25    Q.    She returned to Rwanda to run for office?

**J.A. 220**

```
 1    A.    Yes, that's correct.

 2    Q.    And within a few months, she was jailed?

 3    A.    That's correct, she was jailed on the charge of minimizing

 4    the genocide.  She gave a --

 5    Q.    A form of genocide denial?

 6    A.    In the Rwandan law, it's in a slightly different category,

 7    but the two things are related, so rather than being an

 8    outright of the genocide, Ingabire was charged and convicted

 9    with minimizing the genocide, which, in essence, in her speech

09:27AM 10    was to draw an equivalence between the genocide of the Tutsi

11    and the killings of Hutu that took place afterwards.

12          In essence, she propagated the double genocide thesis,

13    which in Rwanda is a prosecutable offense if it is stated by a

14    political leader, such as she was.

15    Q.    Now, Ms. Ingabire, she had an American lawyer, did she

16    not?

17    A.    She did, she had an American lawyer called Peter Erlinder.

18    Q.    Tell the jury what happened with Peter Erlinder when he

19    showed up in Rwanda to represent her?

09:28AM 20    A.    So, Mr. Erlinder arrived in Rwanda to defend

21    Mrs. Ingabire, and he also engaged in a very inflammatory

22    speech-making while he was in the country along the very

23    similar lines to what Mrs. Ingabire herself had also done, and

24    on that basis he, too, was charged and imprisoned for some

25    months.
```

J.A. 221

```
 1    Q.    Now, Ms. Ingabire, you mentioned she was convicted,
 2    sentenced to eight years?
 3    A.    Yes, I believe that's right.
 4    Q.    And she was actually just released from prison; is that
 5    right?
 6    A.    Yes, she was, she was pardoned about nine months ago.
 7    Q.    Are you aware that just within the past few days, one of
 8    her political aides was murdered?
 9    A.    Yes, I've seen the media reports around that that a member
10    of her party has been found killed.  It's not yet clear exactly
11    what happened in that case.
12    Q.    I want to move on to the most recent election, which is
13    2017.  There was an opposition candidate by the name of
14    Diane Rwigara?
15    A.    Yes, that's right.
16          MR. VARGHESE:  Objection, your Honor.
17          THE COURT:  Let me see counsel.
18          (THE FOLLOWING OCCURRED AT SIDEBAR:)
19          THE COURT:  What's the objection?
20          MR. VARGHESE:  I'm not sure going through these
21    elections is relevant at all.  We're talking about political
22    retribution.  It has nothing to do with his academic work, and
23    it has nothing to do with the genocide.
24          THE COURT:  We had a current themes in Rwanda and how
25    people, you know, genocide denial, and I think this is all fair
```

J.A. 222

1    game in light of the direct.  Overruled.

2            (SIDEBAR CONFERENCE WAS CONCLUDED)

3            THE COURT:  All right.  The objection is overruled.

4    Q.   I was asking you about Diane Rwigara.  You're familiar

5    with Ms. Rwigara?

6    A.   Yes, indeed.

7    Q.   She came from a wealthy family?

8    A.   Yes, that's right.

9    Q.   Had a successful business?

09:30AM 10    A.   Yes, that's right, a Tutsi business family.

11    Q.   And after she announced candidacy, she was jailed?

12    A.   Yes, she was jailed on different charges.  She has charged

13    and convicted with a range of crimes relating to electoral

14    fraud, and also she was accused of collaborating with various

15    enemies of the state, various armed groups outside the country

16    that have been threatening the current government in Kigali.

17    Q.   And after she was charged, her family business or her

18    property was seized?

19    A.   Yes.

09:30AM 20    Q.   And a number of family members were imprisoned, too, were

21    they not?

22    A.   Yes, her mother specifically, Adeline, was also charged as

23    being part of a conspiracy to commit the same crimes allegedly

24    as her daughter, so Diane Rwigara's mother was also convicted

25    and imprisoned for the same period.

J.A. 223

```
        1    Q.   Are you aware her sister was also charged?

        2    A.   Yes, her sister was also charged, but my understanding in

        3    her case was she was released quite soon after.

        4    Q.   So you would agree that within Rwanda, there's a very

        5    strong clampdown from the government on opposition parties?

        6    A.   Yes, and this is something that I've written about myself,

        7    a very strong trend over many years now for the current

        8    government to systematically undermine opposition political

        9    parties, yes.

09:31AM 10   Q.   We're not just talking about people being jailed either,

       11    there have been disappearances and killings?

       12    A.   Yes, there have been some very troubling, in many cases,

       13    mysterious killings, assassinations of leading opposition

       14    figures.  Most of those cases remain uninvestigated and

       15    unresolved.

       16    Q.   Most of those cases involve people who were members of the

       17    Kigali government who left and went abroad, correct?

       18    A.   Yes, more recently that has been the trend in Rwanda for

       19    the government to target former members of the RPF itself.

09:32AM 20   Historically, the trend had been for the government to target

       21    Hutu opposition leaders.  More recently, the trend has been to

       22    target individuals who are seen to have betrayed the party, and

       23    they have been subject to assassination attempts and to various

       24    other forms of targeting.

       25    Q.   I want to move onto the subject of the Gacaca courts,
```

J.A. 224

```
 1   which you have testified about.  That's your research focus; is
 2   it not?
 3   A.   It has been one of the key focus points of my research in
 4   the last 10 or 15 years, yes.
 5   Q.   And it's fair to say that your findings on the Gacaca
 6   process are that it did a number of positive things, a number
 7   of good things for the reconciliation process?
 8   A.   Yes, broadly, that is my argument.  I point out various
 9   problems and flaws in the Gacaca system, but, on balance, I
10   argue that this was a positive approach to delivering
11   accountability for genocide crimes and also laying a foundation
12   for long-term reconciliation in the country.
13   Q.   Would you agree that there's a spectrum of academic
14   thought on the efficacy of the Gacaca courts?
15   A.   Indeed.  As is the case with almost any issue related to
16   Rwanda, there's enormous contestation, you would struggle to
17   find two academics who work on Rwanda who agree on everything.
18   Q.   Well, on that spectrum, would you agree that your view of
19   Gacaca is more positive than most?
20   A.   Yes.  I would say I'm certainly at the positive end of the
21   spectrum, but I'm certainly not alone in that regard.  There
22   are numerous other commentators who have a view of Gacaca that
23   is broadly similar to mine.  I should emphasize, too, that is
24   Rwandan as well as non-Rwandan academics, but there are, of
25   course, commentators who fundamentally disagree with my
```

J.A. 225

1    depiction and are much more critical and in some cases even

2    scathing of the way that Gacaca went about its work.

3    Q.   I want to turn to that.  Now, the book that you wrote on

4    Gacaca, you describe your view, and you actually differentiate

5    your view from the "dominant view," correct?

6    A.   Yes, that's correct.

7    Q.   And the dominant view is highly critical of the quality of

8    justice that was achieved in Gacaca, is it not?

9    A.   Yes, that's correct.  At the time that I published that

09:34AM 10    book in 2010, there were two particular strands of argument

11    that were really dominating these debates.  One was that Gacaca

12    would not deliver fair trials, and the other argument was that

13    Gacaca was simply being used as a tool of control by the

14    government.

15         I should say I think those debates have shifted

16    somewhat since that book was published in 2010, and there's now

17    a range of commentators whose views are more in line with my

18    own.

19    Q.   Okay.  Now, these other view points criticizing the

09:35AM 20    quality of justice, you refer to them as the human rights

21    critique or the human rights standpoint?

22    A.   Yes, that's the first major criticism.  There's the second

23    criticism, which is what I call the state control critique.

24    Q.   Okay.  And the academics or the, you know, NGOs that are

25    lodging these criticisms are organizations like Human Rights

**J.A. 226**

1    Watch?

2    A.    Yes, that's right.

3    Q.    Amnesty International?

4    A.    The human rights critique is strongest in the NGO as

5    opposed to the academic community, and two of the loudest

6    voices in that domain are Human Rights and Amnesty

7    International.

8    Q.    And those are well-respected organizations, obviously,

9    throughout the world?

09:36AM 10    A.    Yes, well-respected but not without criticism it should be

11    said.

12    Q.    No one is immuned from criticism, right?

13    A.    Indeed.

14    Q.    So that would be one critique would be the human rights

15    critique, and what's emphasized by those NGOs are some of the

16    structural flaws in Gacaca?

17    A.    Yes, the view of Human Rights Watch and Amnesty

18    International from the very beginning of Gacaca was that this

19    was a system of justice that did not conform to international

09:36AM 20    standards of justice.  In essence that this would not be a

21    conventional court system, that it would be impossible to

22    prosecute so many genocide cases in village courtyards with

23    locally elected judges.

24    Q.    Well, there was also critiques because people were being

25    jailed for many years with no trials, right?

J.A. 227

1    A.   That was before Gacaca, so that was not something that was

2    taking place once the Gacaca process began, so these

3    organizations had been very critical of the Rwandan system in

4    jailing that initial 130,000 detainees, but in many ways,

5    Gacaca was part of the response to that problem, so those

6    groups didn't criticize Gacaca on those grounds, it was what

7    came before.

8    Q.   And the Gacaca trials themselves had what these human

9    rights organizations perceived as structural defects, like a

09:37AM 10   lack of lawyers, judges that were elected, there were major

11   concerns about the quality of justice through the Gacaca

12   process?

13   A.    Indeed.  These were the main human rights criticisms

14   raised by these organizations, but I think what those

15   criticisms did not deal with was how could you provide trained

16   lawyers and trained judges to deal with such an enormous

17   caseload in a country coming out of genocide in a place where

18   the judicial system had been almost completely destroyed, so my

19   response to the human rights critique was that it was setting

09:38AM 20   up an ideal of justice that simply was not realistic in the

21   Rwandan case.

22   Q.   And so what was realistic was arresting 130,000 people

23   en masse, detaining them for years and years and years, not

24   giving them lawyers, or if they weren't present, trying them in

25   essensia?

1    A.    I don't think anybody doubts that that rounding up of

2    genocide suspects between 1994 and 2002 was egregious.  As I

3    said in my testimony yesterday, that rounding up was done in a

4    very ad hoc fashion, and, undoubtedly, in that process, many

5    innocent people were also rounded up and imprisoned on

6    completely false charges, but Gacaca I think was a very

7    effective response to then prosecuting that caseload and in

8    many cases acquitting those who had been falsely accused.

9    Q.    I'd like to turn, you mentioned that there's sort of two

09:39AM 10    critiques, one being the human rights critique and then another

11    critique about the Gacaca courts being an instrument of control

12    by the government.  That's more the academic line of thought,

13    is it not?

14    A.    Yes, indeed.

15    Q.    And there's a number of proponents of that theory or that

16    had hypothesis, are there not?

17    A.    Yes, that's right.

18    Q.    One of whom is Timothy Longman?

19    A.    Yes, that's right.  Timothy's view on Gacaca is quite

09:39AM 20    nuanced and has changed over time, but his view of Gacaca now

21    is more in that camp of seeing Gacaca as a tool of state

22    control.

23    Q.    And his view which he expressed in a very lengthy book is

24    that the Gacaca proceedings were a way to collectivize the

25    guilt of the Hutu and essentially keep them in line; is it not?

**J.A. 229**

1    A.    Yes.   That is the crux of Longman's critique of Gacaca

2    that he sees this very much as a tool of the collectivization

3    of guilt of the Hutu population.   It should also be said, as

4    Longman points out in that book, that his view of how Gacaca

5    developed at the end of the process was not based on field work

6    because he stopped doing field work in Rwanda in the very early

7    stages of Gacaca, so by his own admission in that book, much of

8    his analysis of the process is not based on firsthand

9    interviews with people in the field or firsthand observations

09:40AM 10    of the process itself.

11    Q.    And what was the reason why he stopped his field work?

12    A.    As was raised in my earlier testimony, he believed that

13    either he or his field respondents would not be safe.   Again

14    though, as he also mentions in the book and as he has stated

15    publicly numerous times, he has not personally been harassed or

16    intimidated, and neither have any of his respondents.

17          This is something that he believes could happen, but

18    it has not to this date happened yet.

19    Q.    So Professor Longman writes, "Nearly every Hutu I have

09:41AM 20    ever worked with in Rwanda, human rights activists, university

21    professors, civil society organizers, church workers, students,

22    most of the moderate people supportive of democracy and opposed

23    to the current regime, having been critiques of the

24    pre-genocide government, was charged in Gacaca courts for

25    participating in the genocide.   Most now live in exile having

```
 1    been harassed and threatened by the current regime."
 2              MR. VARGHESE:  Objection, your Honor.
 3              THE COURT:  Overruled.  Is this from his book?
 4              MR. LAUER:  This is a direct quote from his book.
 5    Q.   Are you familiar with his book?
 6    A.   Indeed, it's a section where he talks about the extent of
 7    the Hutu population that was charged with genocide crimes and
 8    was prosecuted through Gacaca, and it is true that an enormous
 9    percentage of the Hutu population was prosecuted through
10    Gacaca, but that perhaps is not surprising when we consider the
11    number of individuals who were actively involved in the
12    killings in 1994, a very significant percentage of the every
13    day Hutu population did, in fact, participate in the genocide
14    in some way, so Gacaca and its approach is not surprising in
15    that sense.
16    Q.   He also cites your work in his book, Professor Longman
17    does?
18    A.   Yes, we have a longstanding debate over Gacaca and other
19    things.
20    Q.   And he cites your book, in fact, he cites a forward to
21    your book as an example of the Rwandan government imposing a
22    narrative of the genocide that Rwandans are expected to conform
23    to; does he not?
24    A.   This relates to a different book.  This relates to not my
25    Gacaca book but an edited collection, which I mentioned
```

J.A. 231

1   yesterday, a book called *After Genocide*.

2   Q.   And in that book, who wrote the forward?

3   A.   Yes, the forward was provided by President Paul Kagame,

4   and there had been some negotiation about where Kagame's piece

5   would be placed in the book.  What we wanted to do initially

6   was for Kagame to author a chapter that would be alongside

7   opposing views, and it was only at the last minute that the

8   government insisted that that piece be a forward, so it becomes

9   the first thing that you read in the book.

09:43AM 10        But what we then made sure that we did in the book was

11   to give other contributors much space to debate directly with

12   Kagame and the ideas that he expresses in that piece.

13   Q.   So Professor Longman --

14   A.   What you did in the book is a debate --

15        THE COURT:  Hold on, we're a little far away from the

16   question.

17   Q.   Professor Longman cited that forward by President Kagame

18   as an example of exactly how the government of Rwanda has a

19   conventional narrative about the genocide and enforces it?

09:44AM 20   A.   Yes, that's correct, but what is key, I think, in the book

21   is that --

22        THE COURT:  Again, let's stick to the questions that

23   are being asked here.  Go ahead.

24   Q.   Now, you've been asked a variety of questions from the

25   government about coercion being directed at witnesses who have

J.A. 232

1    participated in various genocide-related proceedings.  You were

2    asked yesterday, you were asked this morning, right?

3    A.   That's correct.

4    Q.   And you mentioned a report that you authored about the

5    experiences of witnesses who had participated in genocide cases

6    both locally and internationally?

7    A.   Yes, that's correct.

8    Q.   Would you agree that coercion can be subtle?

9    A.   Coercion can be subtle, yes.

09:44AM 10   Q.   No one needs to put a gun to someone's head in an

11   authoritarian state, do they?

12   A.   No, I think in any state, coercion can take very subtle

13   forms, that's correct.

14   Q.   Your report about the experience of witnesses in Rwanda

15   does mention that there are some sources of contention that

16   witnesses experience or some difficulties that witnesses

17   experience when they return to Rwanda after testifying abroad?

18   A.   Yes, that's correct, but the key is that those forms of

19   pushback or concern are raised predominantly by community

09:45AM 20   members rather than operatives of the state.

21   Q.   Well, one of the phenomenon that you refer to has to do

22   with compensation, correct?

23   A.   Yes, that's correct, the per diems that are paid to,

24   witnesses, particularly if they testify in foreign

25   jurisdictions.

J.A. 233

| | |
|---|---|
| 1 | Q.    So I just want to go through that a little bit.  Rwanda, |
| 2 | as you've testified yesterday, is an extremely poor country? |
| 3 | A.    Yes, particularly in rural areas, yes. |
| 4 | Q.    What is the average yearly income of an average Rwandan |
| 5 | peasant? |
| 6 | A.    In the vast majority of cases, you, in fact, couldn't put |
| 7 | a monetary value on people's income because most Rwandans |
| 8 | living in rural areas engage in subsistence agriculture, so |
| 9 | they simply grow enough to feed themselves and their families. |
| 09:46AM 10 | Many everyday Rwandans are, in fact, outside of the cash |
| 11 | economy. |
| 12 | Q.    And when witnesses travel abroad to the ICTR, to other |
| 13 | international jurisdictions, they receive witness appearance |
| 14 | fees or per diems, correct? |
| 15 | A.    Yes, that's correct, to cover their costs while they're |
| 16 | staying abroad, yes. |
| 17 | Q.    And what might seem like a small amount of money or a |
| 18 | pittance to someone in the United States or Europe is, in fact, |
| 19 | a very large amount of money for someone in Rwanda, is it not? |
| 09:46AM 20 | A.    Yes, that's correct, and this is something we discuss in |
| 21 | that particular report, yes. |
| 22 | Q.    And what you found when you interviewed people was that |
| 23 | those per diems and that income was something that was noticed |
| 24 | by others when witnesses returned home? |
| 25 | A.    Yes.  This was a very common phenomenon and something that |

**J.A. 234**

1    our report respondents discussed at length was they would come

2    back from abroad, they would often be wearing nicer clothes

3    than when they had left.  People in the local community would

4    know that they had been away and that they had acquired a

5    certain amount of money in that process, and so people would

6    notice that, and questions would be asked.

7    Q.    There were also questions asked regarding discrepancies in

8    what someone said in Gacaca versus what someone may have said

9    in an international forum, correct?

09:47AM 10    A.    Yes, that's correct.  This has been one of the important

11    features of the justice domain in Rwanda is that witnesses are

12    often giving testimony in different contexts.  The same

13    individuals may be giving testimony in Gacaca and also

14    traveling to Tanzania to testify at the ICTR, and for all sorts

15    of reasons what witnesses say in one place may differ subtly or

16    sometimes quite substantially depending on where they are

17    giving that evidence.

18    Q.    And, in fact, you quoted one person in your redress report

19    who said, "When it comes to a trial outside of Rwanda,

09:48AM 20    sometimes people give testimony that they would not give

21    inside.  They go outside, and they tell one story, and then

22    they come here and tell a different story."

23    A.    Yes, that's right, but as we also say in the report, what

24    that doesn't inherently suggest is that these individuals are

25    lying in Rwanda but telling the truth outside.  In fact, the

**J.A. 235**

 1    picture can be very mixed.  Some respondents found it easier to

 2    testify in front of Gacaca because it was a context that they

 3    knew and they were very comfortable with.  Sometimes when they

 4    went abroad, they could find the overall environment quite

 5    intimidating, but on the flip side, many respondents describe

 6    the complete opposite that, in fact, it was easier for them to

 7    go to foreign jurisdictions where no one knew who they were,

 8    they could testify fully, whereas when they were inside the

 9    community because of community pressure, they sometimes had to

09:49AM 10  be very careful about what they said, so the picture was very

11    mixed in that regard.

12    Q.   Also documented in your report was a case in which

13    survivors, victims, who had testified for the defense at the

14    international court were ostracized from their community and

15    excluded from a survivors' organization in charge of

16    distributing government assistance?

17    A.   Yes, that's correct.  That's something that we discuss at

18    length in the report is the difficulty that survivors who

19    testify for the defense sometimes face when they come back to

09:50AM 20  their home communities, and, again, this doesn't happen in

21    every single case, but we did discover a handful of cases in

22    which survivors felt that pressure from their own family and

23    from other survivors when they came back to Rwanda was quite

24    acute.

25    Q.   What are the survivors' organizations in Rwanda?

J.A. 236

```
 1    A.    There are a very wide range of survivor organizations, but

 2    there are two that are most prominent.  There's an organization

 3    called Ibuka, which for many years now has seen itself as the

 4    umbrella survivor organization, and there's a second group

 5    called EVGA, which comprises particularly widows of the

 6    genocide, and they have a very strong gender dimension to their

 7    work in the survivor community.  These are the two main groups.

 8    Q.    Belonging to a group such as that, does that make one

 9    eligible for certain survivor benefits?

10    A.    Not automatically, so, no.  The Rwandan government for

11    many years now has had a survivor compensation fund called

12    FARG, F-A-R-G.  In order to apply to FARG for various benefits,

13    an individual simply needs to show that they were a survivor of

14    the genocide.

15          It's not relevant at all, but they are necessarily a

16    member of one of these survivor organizations.  What counts is

17    that they can show that they were a survivor.

18    Q.    But what was reported to you in the redress report was

19    that survivors who had gone abroad and testified for the

20    accused then found themselves with their benefits cut off?

21    A.    No.  What we found in that report, it was there may be

22    members of survivors' families or their local communities that

23    would agitate to try to block them gaining survivor benefits.

24    We did not find any categorical cases where individuals

25    benefits were, in fact, cut off.
```

J.A. 237

```
 1              This is more about the kind of pressure that survivors

 2    face in their own communities as opposed to their relationship

 3    with the government, which oversees that survivor fund.

 4              THE COURT:  Just to, I guess, maybe repeat my earlier

 5    admonition, ladies and gentlemen, this is all offered for

 6    context.  If this case involved events that totally took place

 7    in the United States, you probably would understand what kinds

 8    of pressures were or were not placed on witnesses, and you've

 9    obviously grown up in this country.

09:52AM 10              This involves a foreign country that went through an

10    extraordinarily difficult period, and I'm allowing all of this

11    just so that you understand some context, but it doesn't really

12    tell you, it doesn't tell you anything about whether a

13    particular individual is or is not telling the truth or what

14    pressures might be put on that witness.  It's all context for

15    you to understand.

16              MR. LAUER:  Can I have the Court's permission to

17    approach, your Honor?

18              THE COURT:  Yes, go ahead.

09:53AM 20  Q.   Sir, I'm showing you a document.  Do you recognize this to

20    be a copy of your redress report?

21    A.   Indeed.

22    Q.   I'm going to direct your attention to this paragraph right

23    here, and I'm going to read it.  "In another case examined by

24    redress, survivors who had testified for the defense at the
```

J.A. 238

1    ICTR were subsequently ostracized by their local community and

2    excluded from a survivors' organization in charge of

3    distributing government assistance for the most vulnerable

4    survivors and in turn could no longer benefit from such

5    assistance."  That's what your report says?

6    A.   Yes, indeed.  What is --

7         THE COURT:  That was just a question that is what your

8    report says.

9         THE WITNESS:  Sorry, your Honor.

09:54AM 10    Q.   Now, through your studies, through your work, you've had a

11    variety of interviews with both people in the countryside as

12    well as a number of high-ranking government officials, correct?

13    A.   Yes, that's correct.

14    Q.   And, in fact, you've interviewed the minister of justice?

15    A.   Yes, several ministers of justice over the years, yes.

16    Q.   And when you interviewed, I believe he's the present

17    minister of justice, Busingye, he acknowledged to you that

18    executive interference is still occurring at trials?

19    A.   This was an interview that he gave about 10 years ago, and

09:55AM 20    his precise quote was that in his experience there had been

21    attempts in 2005, 2006 to try to influence the judiciary but

22    that he believed the judicial system had mechanisms in place to

23    block that.

24    Q.   Now, you've been very clear that you have not felt any

25    pressure or coercion from the Rwandan government?

J.A. 239

```
          1   A.    Yes, that's correct.

          2   Q.    You travel there frequently, several times a year?

          3   A.    Yes, that's correct.

          4   Q.    You have many contacts there?

          5   A.    Yes, indeed.

          6   Q.    You've interviewed the minister of justice?

          7   A.    Yes, several times.

          8   Q.    Many other high-ranking officials?

          9   A.    Yes, indeed.

09:56AM  10   Q.    President Kagame himself?

         11   A.    Yes.

         12   Q.    Who then was generous enough to give you a two-hour

         13   interview?

         14   A.    Yes, that's right.

         15   Q.    Generous enough to give your book a forward?

         16   A.    Yes, that's right.

         17   Q.    Within the past two to three years, you were retained to

         18   testify on behalf of the government of Rwanda or the British

         19   Crown, who was representing the interests of the government of

09:56AM  20   Rwanda, correct?

         21   A.    Yes, that's correct.  I was called by the Crown

         22   Prosecution Service in the U.K., an extradition case concerning

         23   five Rwandan genocide suspects.

         24   Q.    And the issue was whether they could be returned there to

         25   get a fair trial?
```

**J.A. 240**

```
 1    A.    Yes, that's correct.

 2    Q.    And you testified they could?

 3    A.    I did.

 4    Q.    And that was rejected?

 5    A.    Yes, it was.

 6    Q.    The Court held they could not get a fair trial?

 7    A.    Yes.

 8          MR. LAUER:  I don't have any further questions,

 9    thank you.

10          THE COURT:  Any redirect?

11          MR. VARGHESE:  Yes, your Honor.

12                    REDIRECT EXAMINATION

13    BY MR. VARGHESE:

14    Q.    Good morning again, Dr. Clark.

15    A.    Good morning.

16    Q.    Let's pick up where Mr. Lauer left off.  Can you explain

17    to the jury the issue that the British court had with respect

18    to that extradition case?

19    A.    Yes.  What that case hinged on was the question of whether

20    Rwandan suspects being extradited back to Rwanda would, in

21    fact, receive a fair trial in the Rwandan court system, and

22    ultimately the British courts decided that they believed there

23    was some doubt of whether these individuals would get a fair

24    trial back in Rwanda, and so that extradition was ultimately

25    refused.
```

J.A. 241

```
 1    Q.   Does that have anything to do with your testimony here

 2    today with respect to the testimony you provided about the

 3    history of the genocide and the issues that were raised?

 4    A.   No.  I believe these are two quite different cases, and my

 5    role within these cases is quite different.  In the British

 6    case, my role as an expert witness was to provide both a

 7    written report and oral testimony about the function of the

 8    Rwandan justice system and in particular how it relates to the

 9    overarching political environment in Rwanda.  Clearly, my role

10    in this case is quite different from that.

11    Q.   You mentioned the political environment, and Mr. Lauer

12    asked you a number of questions about the political

13    environment.  In fact, he asked you some questions about

14    political elections.  Do you remember those questions?

15    A.   Yes, indeed.

16    Q.   Does the coercion that the Rwandan government puts on

17    political elections, does that have anything to do with the

18    genocide suspects that are being tried through Gacaca courts

19    and other mechanisms?

20    A.   No, this is an issue I've written about quite extensively

21    that this is undoubtedly a very repressive state which controls

22    elections in many, many ways but that this does not inherently

23    mean that the state is coercing either prosecution or defense

24    witnesses at Gacaca or in foreign jurisdictions to testify in a

25    particular way.
```

**J.A. 242**

1          And there has sometimes, I think, been a tendency in

2     the academic literature to think that one equals the other, and

3     my argument is that there is no evidence of the latter, that I

4     do not see this coercion of witnesses taking place at any level

5     of justice process that concerns genocide crimes.

6     Q.    In your research, have you found any evidence of the

7     executive interfering with the judicial process in Rwanda?

8     A.    No, I have not, and particularly in the context of the

9     British extradition case, this was a matter that had to be

10:00AM 10   looked at very closely, and I did not find any evidence of

11    executive interference in the workings of the judiciary.

12    Q.    Mr. Lauer asked you some questions about the change in the

13    Constitution of Rwanda to allow President Kagame to continue on

14    as president.  Do you remember those questions?

15    A.    Yes, that's right.

16    Q.    What was your response to that issue, the change in the

17    Constitution?

18          MR. LAUER:  Objection.

19          THE COURT:  Sustained.

10:00AM 20   Q.    Did you write an article about that?

21    A.    I did.

22          MR. LAUER:  Objection.

23          MR. VARGHESE:  Your Honor, he opened the door.

24          THE COURT:  All right.  I'll allow it.

25    Q.    Did you write an article about that change in the

**J.A. 243**

1    Constitution?

2    A.    Yes, I did.  At the time I wrote several pieces around the

3    referendum concerning the third presidential term.

4    Q.    And what was your view with respect to the change in the

5    Constitution?

6    A.    My view was that I believed that the referendum in many

7    ways was problematic, that it was unfortunate, and that I

8    thought that there were good reasons why a change of leadership

9    at the top, in fact, would be a good thing but also I pointed

10:01AM 10    out that referenda were a democratic way to determine this kind

11    of issue and that Rwanda had at least gone through a methodical

12    process to enable Kagame to contest the vote again in contrast

13    to most of Rwanda's neighbors with that kind of change was just

14    made through executive order, so Rwanda had a much more

15    methodical and a much more legal process in that regard, even

16    though ultimately I didn't think that the final decision was

17    perhaps in Rwanda's long-term interests.

18    Q.    What was the Rwandan government's response to your call

19    for a change in leadership?

10:02AM 20    A.    There was some comment about this issue when I interviewed

21    government officials after I had published those pieces.  We

22    had a debate about why I held that particular view, and then

23    the interviews proceeded very amicably after that.  There was

24    no further pushback.

25    Q.    Was there anything about the Rwandan government's response

**J.A. 244**

```
 1    that changed your view or changed your research?

 2    A.    No, there was not, and I still hold the view that I think

 3    ultimately a fresh perspective at the level of the presidency

 4    would, in fact, be a very healthy thing for the Rwandan state.

 5    Q.    Has that inhibited your ability to do research in Rwanda?

 6    A.    It has not.  I've made several trips back to the country

 7    since I published those things and since I had those interviews

 8    with government officials.  For all intense and purposes, my

 9    research in Rwanda continues, as it was happening in the past.

10    Q.    Mr. Lauer asked you a number of questions about academics

11    who say they can't go back to Rwanda because of things that

12    they have written or said.  Do you remember those questions?

13    A.    Yes, indeed.

14    Q.    Specifically he asked you some questions about

15    Mr. Longman, Professor Longman.  Do you remember that?

16    A.    Yes.

17    Q.    In fact, you met with Professor Longman during your stay

18    here in the United States?

19    A.    Yes, that's right, I've seen him twice on this visit, yes.

20    Q.    And you've had discussions about this claim that he can't

21    go back?

22    A.    Yes, over many years now, yes.

23    Q.    What's your view with respect to Mr. Longman's claim he

24    can't go back?

25    A.    As Professor Longman has stated himself, this view that he
```

1    can't --

2              MR. LAUER:  Objection.

3              THE COURT:  Well, it's a little bit untimely.  You

4    asked him to --

5              MR. LAUER:  He was asked his view.

6              THE COURT:  All right.  Fair enough.  Sustained.

7    Q.    What's your view about whether or not Professor Longman's

8    claim is legitimate?

9    A.    I think we even have to look at the way that

10:04AM 10   Professor Longman has couched this claim himself.  He has

11   couched it very much as a belief that he cannot go back without

12   reprisal either to himself or to his field respondents.  He's

13   not claiming that this has, in fact, happened, that this is

14   something that he believes may happen if he were to go back,

15   and in my very public debate with him and others on this exact

16   issue, one thing that I often point out is that many other

17   critical scholars in many more ways who are more critical of

18   the Rwandan regime, even than Professor Longman, do continue to

19   go back and do continue to conduct field work.

10:04AM 20             And so I have often used that as an argument to say to

21   Professor Longman and others, I think you could go back without

22   facing any reprisal.

23   Q.    This issue of whether or not academics can go back to

24   Rwanda, it came up within the context of your thesis to

25   understand Rwanda, you have to go to Rwanda; is that right?

1    A.    Yes, indeed.  This, I think, is a very strong part of my

2    field work that in order to really understand in depth what's

3    happening in the country, you need to be there firsthand, you

4    need to interview people firsthand, you need to go back

5    multiple times to build that kind of trust and rapport with

6    interviewees, which I discussed yesterday, and also to observe

7    the political environment firsthand.  I think there's a problem

8    if we are trying to do these things fundamentally from a

9    distance.

10:05AM 10    Q.    And so when Professor Longman is criticizing Gacaca, is he

11    doing that through interviews with folks on the ground?

12            THE COURT:  Let me see counsel at sidebar.

13            (THE FOLLOWING OCCURRED AT SIDEBAR:)

14            THE COURT:  All right.  This isn't drawing an

15    objection, but I'm having trouble with it.  First off,

16    100 percent of your questions on redirect have been leading,

17    100 percent, which is commonplace.  Most redirect is grossly

18    leading, but it's also grossly argumentative, and it's making

19    me squirm up here.

10:06AM 20            This is a criminal case.  I don't know why you're not

21    objecting to the form of the questions.  They are leading and

22    argumentative.  We're way afield from the issues in this case.

23            You did open the door with Professor Longman, but, you

24    know, we're asking his views about Longman's views about

25    something else, but, anyway, the point of this sidebar is you

**J.A. 247**

1    can ask a leading question like you were asked about X, right,

2    but then your next question doesn't get to be grossly leading

3    or argumentative, right.  Let's try to keep this under control.

4         The witness is going way beyond the question.  Your

5    questions are improper.  I feel that I'm losing a little bit of

6    control here, and it's not drawing an objection, so I want this

7    to get under control.

8         (SIDEBAR CONFERENCE WAS CONCLUDED)

9         THE COURT:  Put another question to the witness,

10:07AM 10   Mr. Varghese.

11   Q.   Was Professor Longman's work on Gacaca based on interviews

12   he conducted in the country?

13   A.   His lighter work on Gacaca, including in the book that was

14   earlier presented, is based firstly on distant communication

15   with interviewees in Rwanda, e-mails, telephone calls in

16   particular, and then looking at other academics' work and human

17   rights reports that were coming out at the time, so this is a

18   very different method of gathering information from a distance.

19   Q.   Mr. Lauer asked you some questions about witnesses

10:08AM 20   receiving per diems.  Do you recall those questions?

21   A.   Yes.

22   Q.   Have you found any evidence that referring per diems

23   affects witness testimony?

24   A.   No, I have seen no evidence in any foreign jurisdiction

25   that giving per diems at all affects the testimony that

**J.A. 248**

```
 1   individuals provide.

 2   Q.   Is that for both witnesses for the prosecution as well as

 3   witnesses for the defense?

 4   A.   Indeed, right across the board, both prosecution and

 5   defense witnesses.

 6        MR. VARGHESE:  Thank you, Doctor, I don't have any

 7   further questions.

 8        THE COURT:  Recross.

 9        MR. LAUER:  Very briefly.

10              RECROSS-EXAMINATION

11   BY MR. LAUER:

12   Q.   You were just asked on redirect examination whether you

13   had found any evidence of executive interference in the Rwandan

14   justice system, correct?

15   A.   Yes, that's correct.  I had not.

16   Q.   You said no?

17   A.   Yes, that's correct.

18   Q.   You saw no evidence?

19   A.   No evidence.

20   Q.   Didn't I ask you about ten minutes ago about talking to

21   the minister of justice and the minister of justice telling you

22   that there was sometimes executive interference?

23   A.   Specifically what he said was that there were attempts

24   many years ago of the executive to interfere in the judicial

25   process but that that was blocked, and the point that he was
```

10:08AM (line 10)
10:09AM (line 20)

**J.A. 249**

1    making in that interview, which I've cited in several

2    publications, is that the judicial system had a system in place

3    to be able to thwart that kind of attempt, and he was also

4    emphasizing that these things happened a long time ago but did

5    not happen since a range of judicial reforms.

6    Q.    So let me just see if I understand.  He tells you there

7    used to be executive interference, but it's gone now, it's all

8    under control, everything is good.  Is that the sum and

9    substance of it, sir?

10:10AM 10    A.    The crux of it is that there were attempts to put pressure

11    on judges but that these did not manifest in the way that

12    decisions were made.  There was a system in place within the

13    judiciary to be able to deal with that so that the interference

14    did not take place.

15    Q.    Judges in Rwanda are subject to being terminated, are they

16    not?

17          MR. VARGHESE:  Objection, your Honor, beyond the

18    scope.

19          THE COURT:  Overruled.

10:10AM 20    Q.    Judges are subject to being terminated, are they not,

21    summarily dismissed?

22    A.    Yes.

23    Q.    And many Judges in Rwanda have recently been dismissed?

24    A.    Some Judges have recently been dismissed.

25    Q.    Would you agree that one way an executive might be able to

J.A. 250

1    control a decision is to summarily dismiss a Judge?

2    A.    In many respects, that's not how the system happens in

3    Rwanda.  The dismissal of Judges is not within the purview of

4    the cabinet.  This is a decision that is made by the upper

5    echelons of the guiding counsel of the judiciary, so under

6    Rwandan law, it is not within the power of the executive to

7    either appoint or to dismiss Judges.

8    Q.    The minister of justice told you that phone calls are made

9    from the executive branch to Judges about pending cases, did he

10:11AM 10    not?

11    A.    Again, yes, he said that there had been attempts to do

12    this, but, again, many years prior and before a set of

13    important reforms had taken place within the Rwandan judiciary.

14          MR. LAUER:  I have no further questions.  Thank you.

15          THE COURT:  Thank you, Dr. Clark, you may step down.

16          Mr. Garland.

17          MR. GARLAND:  Yes, your Honor, the government calls

18    Dr. Rony Zachariah to the stand.

19          RONY ZACHARIAH, M.D., having been duly sworn by the

10:13AM 20    Clerk, testified as follows:

21                        <u>DIRECT EXAMINATION</u>

22    BY MR. GARLAND:

23    Q.    Good morning.  Could you state your name and spell it for

24    the record court reporter, please.

25    A.    Good morning.  My name is Rony Zachariah.  Rony is my

```
 1   first name, R-o-n-y, Zachariah is Z-a-c-h-a-r-i-a-h.
 2           THE COURT:  Dr. Zachariah, can I get you to move that
 3   microphone an inch closer.
 4   Q.   Where do you live now?
 5   A.   I live in Geneva, Switzerland.
 6   Q.   What's your profession?
 7   A.   I'm a medical doctor by training.
 8   Q.   Do you have any specializations?
 9   A.   I do.  I graduated in medicine in Nigeria in 1986 and then
10   went on to do tropical medicine and public health in London,
11   and then pediatrics in the University of Ireland, and then
12   subsequently a doctorate in operations research at the
13   University of Amsterdam, Holland.
14   Q.   From your education, are there any particular areas of
15   medicine that you specialize in?
16   A.   I specialize in pediatrics and general medicine, which
17   I've also had a lot of experience in emergency medicine.
18   Q.   How long have you been a doctor?
19   A.   Since 1986.
20   Q.   Where do you work at currently?
21   A.   Sorry.
22   Q.   Where do you work at currently?
23   A.   I currently work with the Work Health Organization in
24   Geneva.
25   Q.   And what does the World Health Organization do?
```

J.A. 252

```
 1    A.   Well, as it implies, the World Health Organization tries

 2    to improve healthcare for people all around the globe.  More

 3    specifically, it's standards of healthcare and particularly

 4    offers support to all its member states.

 5    Q.   What's your position there?

 6    A.   I'm currently a scientist.

 7    Q.   And what do you study as a scientist at the World Health

 8    Organization?

 9    A.   Well, I help the improvement of health systems in

10:15AM 10    different countries around the world because my field is

11    operations research, which tries to look at the performance,

12    the yield of health systems, and I'm a scientist in that

13    domain, so basically focused on infectious diseases of poverty

14    in low and middle income countries.

15    Q.   When did you join the World Health Organization?

16    A.   I joined in September, 2017.

17    Q.   Where did you work before you joined that organization?

18    A.   I worked before with Doctors Without Borders, as it's

19    commonly called here, otherwise in french, Médecins Sans

10:16AM 20    Frontières.

21    Q.   When did you start there working at Doctors Without

22    Borders?

23    A.   I started in 1992.

24    Q.   Where is it located, I guess, headquartered?

25    A.   That's a bit of a difficult question because it has five
```

J.A. 253

1    operational hubs or headquarters.  Those are Brussels, Geneva

2    in Switzerland; Barcelona in Spain; Paris in France; and

3    there's one more, and Amsterdam in Holland.  So we have five

4    operational centers.

5         I was working for the Belgium operational centers.  In

6    addition to those operational centers, we have many hubs, for

7    instance, we have a hub here in the U.S.A. that is linked to

8    our Paris section, we have one in Canada linked to the Dutch

9    section, so we have also branches in Holland, in Japan, in

10:17AM 10   Africa and Asia.

11   Q.    What does Doctors Without Borders do?

12   A.    Well, Doctors Without Borders is a humanitarian,

13   international humanitarian organization, and basically we

14   provide medical care to victims, to populations in distress and

15   to victims of human and manmade disasters, including victims of

16   conflict.

17         Maybe I should give you a little bit more of the

18   organization.  Basically we are doctors, nurses, logisticians,

19   administrators, and we try to perform our actions according to

10:18AM 20   medical ethics, and the organization is strictly bound to

21   impartiality, independence and neutrality, neutrality in terms

22   of trying to be independent from all racial creed, religion or

23   economic influences.

24   Q.    You mentioned conflict before.  What do you mean by

25   conflict?

1    A.    I meant war situations, situations where there is civilian

2    conflict.

3    Q.    How is Doctors Without Borders funded?

4    A.    Doctors Without Borders is funded, a great part of our

5    funding is private funding.  We have 95 percent of our funding

6    now that comes from individuals, so people in this room give,

7    you know, three U.S. dollars, five dollars, a hundred dollars,

8    and that's what we've been trying to achieve, and today over

9    the many years we have 95 percent of our funding from private,

10:19AM 10    and the reason for that is to allow us to be independent in

11    terms of actions and our choices of where we go.

12    Q.    When you say independent, how do you mean independent,

13    independent of what?

14    A.    Independent of our donors.  That is one of the financial

15    independence because if we don't have the means, we wouldn't be

16    able to go to many countries.  For instance, in the Congo, for

17    five years, we don't agree with the position of the Belgium

18    government, and we felt that they were not neutral, and we

19    funded the whole medical programs and a great part of the Congo

10:19AM 20    through our private funding.

21         The same in Yugoslavia, NATO was involved.  We refused

22    funding from all EuroCan states, including the U.S.  In

23    Afghanistan, we did not take money from the United States or

24    any of the NATO partners for the same reasons that we wanted to

25    be perceived as neutral in all senses by our beneficiaries and

**J.A. 255**

```
 1   by the political authorities and administrative authorities of

 2   the state.  That is what we try.  It may not always be

 3   perceived the same way.

 4   Q.   What positions did you hold while you were with Doctors

 5   Without Borders?

 6   A.   I started off as a medical doctor, then I became the head

 7   of hospital management, then I became field coordinator of

 8   operations, then I became general coordinator of operations,

 9   finally, head of mission and general coordinator.

10   Q.   Can you explain to the jury what each of those positions

11   other than medical doctor entailed?

12   A.   Well, in theory, as I've explained, I have listed, it's

13   greater levels of responsibility.  When you start as a medical

14   doctor, you basically have clinical functions on the bedside,

15   and you have your own supervisors.  You become head of the

16   hospital, as I was in Somalia, for instance, then you are

17   responsible for the overall management of the medical

18   administrative teams ensuring also the smooth running of all

19   their logistics and maintenance of the hospitals, including

20   shifts and so on and so forth.  Basically you head the team.

21          When you become field coordinator of the operations,

22   then you are responsible for multiple medical facilities.  You

23   might have hospitals, you might have health points, health

24   centers.  I don't know what they're called in the U.S., but

25   there are the tertiary hospitals, the district hospitals, the
```

10:20AM 10

10:21AM 20

**J.A. 256**

```
 1    community hospitals and then the community health centers, so

 2    you might have different levels of those facilities, and you're

 3    responsible for those.

 4          You're also responsible for security, you're

 5    responsible for representation with the administrative

 6    authorities where you go, and you're responsible for the

 7    strategy choices you make in the organization.

 8    Q.   Can you tell the jury where you traveled to as part of

 9    your work with Doctors Without Borders?

10    A.   I started in Lebanon in the early '90s, and after that I

11    joined Doctors Without Borders.  I went from there to Somalia

12    during the war, and from Somalia, I went to Afghanistan,

13    Afghanistan to Tajikistan, Kenya, and I've been in several

14    other countries, including Rwanda, I've been in Liberia, Chad,

15    Guinea, Sri Lanka also during the war, and the list goes on.

16    Maybe I can stop there.

17    Q.   When did you go to Rwanda?

18    A.   I went to Rwanda in 1994.

19    Q.   And for what purpose?

20    A.   I went, in fact, to support the teams as a field

21    coordinator.  We had about 80,000 to 100,000 refugees on the

22    border region of Butare and other areas in the south of Rwanda,

23    so I went as a general field coordinator of operations mainly

24    to manage the refugee program for Burundis, refugees.

25    Q.   What month did you arrive and the date, if you remember?
```

J.A. 257

1    A.   I arrived on the 20th of February, 1994.

2         MR. GARLAND:  If we could have Exhibit 19, please,

3    which I believe has been previously admitted into evidence.

4    Q.   When you first arrived in Rwanda in February, where did

5    you go?

6    A.   Well, the usual practice is we arrive at the capital,

7    which was Kigali because I received briefings for two to three

8    days from my head of mission at the time.

9    Q.   After the briefing, where did you go?

10:24AM 10   A.   I took the road to Butare in the south, which was my

11   station.

12   Q.   Can you identify where that is on the map?

13   A.   This is Kigali, and I took the road all the way down.  Can

14   you see that as I draw that through?

15   Q.   I believe if you touch one of the icons at the top, it

16   will allow you to draw.

17   A.   Oh, yes, I see.  It doesn't seem to work.  Is that the

18   arrow?

19        THE COURT:  Let's just describe it with words.  We can

10:25AM 20   follow along.

21   A.   Okay.  I think everyone can see Kigali on the map.  I took

22   the road, one road that's shown on this map.  I went Gitarama,

23   which is the main road, and from Gitarama down further south to

24   Butare Town.

25   Q.   When you got there, where were the Burundi refugees being

1    attended to?

2    A.    The Burundi refugees were all on the border.  In fact,

3    they were -- it looks like it's -- okay, on the border between

4    Burundi and the southern part of Rwanda, in fact, along the

5    border of Butare but also further down to the west.  They were

6    mostly confined in the border areas.

7    Q.    So if you were to draw a circle around the Butare Town at

8    the bottom of that map, that would be maybe from three o'clock

9    to six o'clock on the circle at that border?

10:26AM 10    A.    Yes, three o'clock to probably about six to seven o'clock,

11    yeah.

12    Q.    All right.  And do you recall about how far away that was

13    from Butare Town?

14    A.    It was about 25 to 30 kilometers, I would say.

15         THE COURT:  I'm sorry, were these refugees from

16    Burundi who had fled to Rwanda, or were they Rwandan refugees?

17         THE WITNESS:  No, they were actually Burundi refugees

18    who had fled Burundi due to the political upheaval there, and

19    they were Hutu refugees.

10:27AM 20         THE COURT:  Okay.

21    Q.    Thank you.  So when you went down from Kigali to Butare,

22    why were you going to Butare?

23    A.    Because I was to be the head of field operations and the

24    general coordinator for the Butare operations of Belgium and

25    basically to take care and ensure the medical care in the broad

J.A. 259

1    sense of 80,000 to 100,000 of refugees.

2    Q.    Is there a reason you were stationed in Butare rather than

3    stationed at the border where the refugees were?

4    A.    Yes.  As an organization, we were stationed at both sites.

5    We had our own field staff living very close to the refugee

6    camps, medical, administrative logistics, and we had the

7    coordination staff that were based in Butare, and the reason

8    being that Butare was the hub for supplies, it was the hub for

9    meetings.

10:28AM 10         It was where all the contacts and representation with

11    authorities took place, and that's where all the coordination

12    meetings took place as well, and it was also the site of the

13    United Nations High Commission for refugees for the southern

14    region, so clearly the point where coordination activity would

15    happen.  It was quite close to the border, so we were able to

16    make trips up and down.

17    Q.    How long would it take?  How far was it from Butare Town

18    to the border?

19    A.    To the border where the refugee camps were?

10:28AM 20    Q.    Yes.

21    A.    25, 30 minutes, maybe a bit more depending -- it's all

22    dirt roads, so it depends on the weather.

23    Q.    When you were in Butare, did you become familiar with the

24    area and what was contained in the town?

25    A.    Sorry, I didn't get that.

J.A. 260

1    Q.   When you were in Butare, did you become familiar with the

2    town?

3    A.   Yes, it's a small town, and, yes, I did become familiar

4    with it, yes.

5         MR. GARLAND:  If we could show Exhibit Number 25 to

6    the witness, please.  24, please.

7    Q.   Do you see what's on your screen, Exhibit 24?

8    A.   Yes, I do.

9    Q.   And are you familiar with it?

10:29AM 10   A.   I'm sort of familiar with this.  I've seen it as well in

11   the office.

12   Q.   What is it?

13   A.   So this is a map of Butare.  It shows the main road, it

14   shows the Butare Hospital, it shows the ETSO quarters, and I

15   think some part of the, yeah, I think those are the main areas

16   I can recognize here.

17   Q.   Is this a fair and accurate representation of what you

18   recall Butare looking like at the time?

19   A.   Yes, it's at a distance, but I can recognize a good deal

10:30AM 20   of the structures.

21         MR. GARLAND:  Your Honor, the government moves

22   Exhibit 24 into evidence.

23         MR. LAUER:  No objection.

24         THE COURT:  It's admitted, 24.

25         (Exhibit No. 24 received into evidence.)

J.A. 261

```
 1    Q.    Can you identify on this map where you were staying when
 2    you were in Butare?
 3    A.    I think it's not on this map, but it was in the Rabuvu
 4    area, so if you look down where the zero 24, the yellow is, it
 5    would be at 9:00 but further down.  It would be 9:00 but
 6    further downwards.
 7    Q.    And how long would it take you approximately to get from
 8    where you were to the hospital if you went there?
 9    A.    About 8 to 10 minutes.
10    Q.    Did you have occasion to go to the hospital?
11    A.    Yes, indeed.
12    Q.    And I'm going to ask you some more questions about that in
13    a minute, but how big was the Doctors Without Borders staff
14    when you arrived?
15    A.    We had about 50 international staff and 200, more or less
16    200 national Rwandan staff.
17    Q.    When you said national staff, you were referring to staff
18    who were from Rwanda and lived in Rwanda?
19    A.    Exactly.
20    Q.    And your responsibility with respect to that staff, how
21    would you describe it?
22    A.    They were the same as with any of the they were part of
23    the field operations and the teams of Médecins Sans Frontières,
24    of Doctors Without Borders, sorry.
25    Q.    And what was your authority over the staff and your
```

```
 1    responsibilities with respect to the staff?

 2    A.   The same responsibilities.

 3    Q.   So when you got to Butare, what did you do when you first

 4    arrived?

 5    A.   When I first arrived, generally what you do as field

 6    coordinator is try to visit all your sites, meet all the

 7    authorities, and get a good grasp of the different areas of

 8    operations, so, yes, I visited the different refugee camps,

 9    discussions with medical teams, the logistic teams because at

10    the time, we were providing not just medical care but also

11    shelter, water and sanitation facilities, and we were also

12    involved with much of the camping.

13    Q.   And did you have to coordinate with anybody within Rwanda

14    to set this up?

15    A.   Yes, the communal authorities, of course, in the refugee

16    camp areas.  That was for the areas around the camp, and, of

17    course, in Butare with the general authorities, the hospital

18    authorities because the hospital at the time was our main

19    medical center, although we had our own medical doctors and our

20    outpatient and clinical services on the border areas for the

21    refugees, any patient that could not be managed by our doctors

22    because they needed more sophisticated diagnostic

23    investigations or they needed more specialized care were sent

24    to the Butare University Hospital.

25         In addition, this was particularly important for
```

10:32AM (line 10)
10:33AM (line 20)

J.A. 263

1    children who were malnourished, so we had a program of

2    nutritional rehabilitation that was based in the Butare

3    Hospital.

4    Q.   Can you describe for the jury what was Butare like in very

5    general terms when you arrived at the end of February, 1994?

6    A.   Beautiful, pleasant, quiet country.  In fact, I had come

7    after all my experiences in other countries, which I've

8    mentioned to you, it was just a lovely place to be in.  People

9    were very friendly, and it was great.  The weather was

10:34AM 10    beautiful, it's a land of 1,000 hills, they say.  It was great.

11    Q.   And in Butare at that time, did you observe any war or

12    casualties from war?

13    A.   No, there was nothing at the time.

14    Q.   You've mentioned a couple of times a hospital at the

15    university.  On Exhibit 24, can you describe with words where

16    it is on your monitor if it is there?

17    A.   I'll see if this still works.  No, it doesn't.

18         THE COURT:  We'll try to see if we can't fix it at the

19    break.

10:34AM 20         MR. GARLAND:  Yes, thank you.

21    A.   So it's right in the middle of the screen.  You can see

22    the white structures and a little bit of black.  That is

23    actually the Butare University Hospital right in the middle of

24    the screen.

25         MR. GARLAND:  I'm going to ask that the witness be

**J.A. 264**

1    shown Exhibit Number 24.  I'm sorry, Exhibit Number 23, your

2    Honor.

3    Q.   Have you seen this before?

4    A.   Yes, I have.

5    Q.   What is it?

6    A.   This is zoom-in of the Butare University Hospital.

7    Q.   Is it a fair and accurate representation of the hospital

8    as it looked like when you were there from overhead?

9    A.   Yes, it does.

10:35AM 10        MR. GARLAND:  Your Honor, the government moves

11    Exhibit 23 in evidence I believe without objection.

12        MR. LAUER:  No objection.

13        THE COURT:  It is in, Exhibit 23.

14        (Exhibit No. 23 received into evidence.)

15    Q.   Can you point out a couple of buildings that you were

16    familiar with when you were there?  Since the monitor -- maybe

17    describe them with words a little bit.

18    A.   Okay.  The arrow is not working.  Okay.  Let me try that.

19    On the right side, you can see two roads.  You can see a road

10:36AM 20    coming in, and that is one of the main entrance roads.  Maybe

21    let me describe it a bit better.  You can see the white

22    structure right in the middle.

23        MR. GARLAND:  I think we may have a solution to this.

24    We have that in a blow-up with the Court's permission I'll set

25    up.

J.A. 265

1          THE COURT:  Sure.

2          MR. GARLAND:  Thank you.

3    Q.   So I will put the question to you again.  Can you just

4    identify a couple of the buildings that you're familiar with

5    there?

6    A.   Okay.  Maybe I'll just describe, first of all, this is one

7    of the main roads coming into the hospital, this is the main

8    parking area, this is actually the flag pole at the entrance,

9    and then we have here the main administration archives

10:38AM 10   reception.

11          This building is where the hospital director is.  In

12   fact, it's a double-story building, hospital direction, and I

13   believe also some of the medical storage rooms where we stock

14   the medicines.  This is the surgical emergency, you have the

15   casualty, is that the casualty, the first?

16   Q.   I can't give the answers, I can only give the questions.

17   A.   The surgical theater so that's where surgical operations

18   happen, and then you have these are actually corridors that are

19   covered for patients to be rolled through and including stuff

10:38AM 20   to move around.  Particularly Butare has a lot of rain.

21          So these are, I believe, the pediatric, maternity.

22   This side you have the laundry, the wards, and the morgue, I

23   can't recollect right is one of these two, and this is an area

24   that we were in and working, and I believe these are still the

25   tents that we put in at the time to add capacity to the

J.A. 266

1    hospital because this is about the 6th of May.

2    Q.    And I'll ask you a few more questions about that, but what

3    I want to ask is a couple basic questions.  About how many

4    stories were each of those buildings?

5    A.    Sorry.

6    Q.    How many stories or levels was each of those buildings?

7    A.    Well, they were all single stories except I believe the

8    administrative and hospital direction, two stories.

9    Q.    And you identified the core doctors on there.  Did those

10:39AM 10   corridors have walls?

11   A.    No, they did not.

12   Q.    So were they then open to the air?

13   A.    Yes.

14   Q.    Can you explain the tents that you mentioned?

15   A.    So these are right here open space, these white

16   structures.  We put them in, and that's part of whatever we do

17   when we have an emergency mode, if we think we're going to

18   receive a lot of casualties, then what we do is put additional

19   structures if there aren't enough in the hospital to allow a

10:40AM 20   triage process, so when patients come in, you look at somebody,

21   assess the patient, decides if he's mildly injured or receives

22   urgent surgical care, and that we call the triage system, so

23   these were set up so that patients come in and you triage and

24   quickly funnel them into the different hospital services to be

25   able to offer efficient care and not leave patients waiting,

 1    particularly those who are bleeding and so in situations of

 2    conflict.

 3    Q.   Can you explain to the jury whether the Doctors Without

 4    Borders was integrated with the hospital staff that was already

 5    there or whether it was running side by side?

 6    A.   It was completely integrated because we provided

 7    additional staff at the time to support the hospital staff so

 8    they were integrated working within the wards, working within

 9    pediatrics, also happened with nutrition, and they would report

10:41AM 10   directly to us.

11    Q.   Okay.  And what sort of equipment did Doctors Without

12    Borders bring with them when they got there?

13         MR. LAUER:  Can I interrupt?  Are we done with the

14    map?

15         MR. GARLAND:  I think a lot of testimony in a while

16    we'll get back to this map, but we can take it down.

17         THE COURT:  Why don't we take it down and have him

18    resume the stand.

19    Q.   How big was the university medical staff as compared to

10:42AM 20   the Doctors Without Border staff?

21    A.   Well, they were the majority.  We were supplementary staff

22    that were complimenting the staffing needs of the hospital.

23    Q.   So the areas that you were pointing out before, is that

24    where Burundi refugees would come and be treated at various

25    times?

**J.A. 268**

```
 1    A.   Yes, depending on their conditions and medical needs, they
 2    would go to the respected areas of the hospital.
 3    Q.   And during February and March of 1994, did you then also
 4    get outside of Butare in order to treat Burundi refugees?
 5    A.   Yes, indeed, I used to go twice, three times a week at
 6    least to our different camp sites and once or twice to the
 7    hospital because the hospital had its own doctors from our side
 8    that were working there and taking care of the operations.
 9    Q.   And when you would travel out to treat the Burundi
10    refugees outside of Butare, would you go back to the same area
11    that you previously indicated on the map of Rwanda?
12    A.   Yes, indeed.
13    Q.   When you did that in February and March of 1994, can you
14    describe what the security situation was?
15    A.   Nothing spectacular.  We didn't have any sort of hurdles.
16    We had open access to all these areas.  We had excellent
17    collaboration with the communal authorities.
18    Q.   And did you have any troubles performing those operations
19    and those services in February and March of 1994?
20    A.   No, we did not.
21    Q.   In February and March of '94, were there military
22    checkpoints in Butare?
23    A.   Yes, there were two.
24    Q.   Can you describe them and how they operated?
25    A.   One was -- these were what you call city limit
```

**J.A. 269**

1    checkpoints.  You had one at the entry of Butare Town and one

2    at the exit of Butare Town, so the entry coming in from Kigali,

3    from the Gitarama area, and the exit was on the way south to

4    the Burundi border.  Those were the only two.  They were manned

5    by military personnel.  You would stop and they would ask you

6    where you were going, but we were already well-known, so it was

7    a formality, these checkpoints.

8    Q.    Okay.  And at that point, did you ever in February and

9    March of 1994, did you ever feel threatened?

10:44AM 10    A.    No, not at all.

11    Q.    Was the security situation in Rwanda or where you were the

12    same in April, 1994 as in the presiding months?

13    A.    No, not at all.

14    Q.    What was the first event that triggered security concerns?

15    A.    Well, the first event was not actually in Butare, it was

16    Kigali.  It was the 6th of April when the plane of the then

17    President Habyarimana was shot down.  On the 7th, we got

18    information from our head office saying that the security

19    situation in Kigali has deteriorated considerably, a number of

10:45AM 20    top government officials have been killed or assassinated, and

21    there is a considerable amount of shooting and insecurity in

22    Kigali, and we were told to prepare and move to emergency mode.

23    Q.    One question when I asked you before, when you were in

24    Rwanda, what language did you speak to communicate with people?

25    A.    Well, at the coordination -- meetings were generally held

J.A. 270

1    in French, but if it was with UN personnel, NGO personnel, it

2    depended, you could also speak in English, but with the

3    communities, in French.

4    Q.   If people were speaking Kinyarwandan, did you have a way

5    of talking with them?

6    A.   We had translators, if needed.

7    Q.   And you yourself speak french?

8    A.   Yes, I do.

9    Q.   All right.  So how did you and Doctors Without Borders

10:46AM 10   react to the news about the plane going down?

11   A.   Well, we informed all our staff because we have HF, we

12   have radio communication systems at the time, and my immediate

13   reaction was to discuss with the hospital management and to put

14   in -- in fact, take emergency precautions and ensure that we

15   had the resources and the emergency preparedness, measures put

16   in place, and one of those sites were the University Hospital.

17   Q.   And when you say emergency preparations, how did that

18   differ from the sort of care you had been giving the Burundian

19   refugees?

10:47AM 20   A.   Well, here we were thinking in case, conflictual situation

21   does arise and conflict and insecurity moves to Butare, we

22   would have injured, we might have injured, we might have people

23   coming in for conflict, so basically what we do is we

24   decentralize, first of all, stocks, which means, we had foot

25   stocks, we had medical supplies, and the way Doctors Without

J.A. 271

1    Borders works is in these circumstances, we have pre-made kits,

2    so we have kits, which is basically a package of boxes that has

3    everything arranged in operational hubs, enough medical

4    supplies for 10,000 consultations, for instance, so that is a

5    kit 10,000.

6         We have for 1,000 consultations, there's a kit, 1,000,

7    then you have kit surgical operations, we have a kit for 150

8    surgical operations, we have a kit for 300 surgical operations,

9    so these have everything from the accoutrements, the

10:48AM 10   anesthesia, the drugs, the consumables, you just put those

11   boxes, so basically we had a big storehouse close to the Huye

12   Stadium, and this was a UNHCR, I believe, warehouse.

13        So we took those, and we decentralized them.  That

14   means we basically put them in all residential buildings, we

15   put them in the hospital.  In addition to that, at the hospital

16   we put in emergency independent generator supplies.  We brought

17   in fuel.

18        We put in the bladder tank of 15,000 liters to allow

19   for surgical operations in case the bowl hole in the central

10:49AM 20   system broke down for water supply.  We put in the tents that

21   you've seen, and then we also had a conservative amount of fuel

22   stocks within our own office premises, so that's sort of the

23   idea.

24        The idea to do that is basically to ensure that your

25   access to the medical supplies is not cut off in case

1    insecurity comes to one sector or the other.

2    Q.   And were you meeting with government authorities at that

3    point as well?

4    A.   We did meet with the government authorities, in fact, as

5    early as the 8th or the 9th, I asked for a meeting because we

6    can't just set up those tents in a hospital.  This hospital

7    doesn't belong to us, it belonged to the Rwandan authorities,

8    so we met with the board of the university, and we told them we

9    would like to prepare and support them in case there's going to

10:50AM 10    be a conflict.

11         The only hesitation of the government was to say that

12    you are MSF Belgium, and if you have Belgiums, they're not

13    welcome, and the strategy I took at the time was to say we're

14    no longer Belgiums because we decided at that time, and the

15    Belgiums decided also not to stay for security reasons.  They

16    had their choice.  They evacuated, and we shifted a mode to MFS

17    International.

18         The face of the people in my team were French,

19    Canadian, Swiss, Luxemburg, so it worked, and they said we're

10:50AM 20    happy to have you at the time.

21    Q.   And just to be clear about one thing, when you refer to

22    MSF, are those the initials of the organization in french?

23    A.   Yes, it's Doctors Without Borders, yes.

24    Q.   Did you talk to the government at all about where you

25    might be permitted to travel or not travel at that point?

J.A. 273

```
 1    A.   Well, on the 9th, I think on the 9th we were told by the
 2    sous-prefet of Butare, all nongovernmental organizations and
 3    relief organizations working in the Butare region would now
 4    have to get authorization to move, so this in french is called
 5    laissez passe', so basically you had to go to the brigade
 6    commander, who was then Colonel Tassas Morwani, who was the
 7    military commander for the Butare region, so I went on the 8th,
 8    and I was advised to actually type the letter with the names of
 9    people on it, so I met Colonel Morwani.  He stamped the pass,
10    and that was the first time we were actually since
11    February required to have formal authorization from the
12    military to move around.
13               MR. GARLAND:  If we can have Exhibit 19 back up on the
14    screen.
15    Q.   Where did the travel authorization allow you to travel to?
16    A.   Well, it allowed me to travel in the entire prefecture of
17    Butare and Gikongoro, so this is the position 5:00 on the
18    screen, and the position from 6 to roughly 11:00 looking from
19    the Butare side.
20    Q.   You used a word earlier I want to ask you about.  You said
21    you went and talked to the sous-prefet.  Can you very briefly
22    tell the jury what a sous-prefet was?
23    A.   The sui prefect is I guess in the English system the vice
24    governor, and the prefet becomes sort of the governor.
25    Q.   What was the -- when was the first time that you had any
```

J.A. 274

        1    sign of injuries or casualties from war that you saw within

        2    Rwanda?

        3    A.    I don't know if they were from war, but the first time we

        4    actually saw casualties was on the 11th of April when while I

        5    was in the hospital, I was summoned to say that there was a

        6    vehicle, which has come from one of the communal areas, which

        7    means the local authorities in Butare, and they have brought in

        8    between 7 and 11, I can't remember now, between 7 and 11

        9    bodies, so I quickly go back to the area where it was, it was

10:54AM 10    in the morgue, and these individuals were all civilians.  They

       11    were tied, their hands, some of their hands and feet were tied,

       12    and they were shot.

       13    Q.    Were their hands tied in the front or in the back?

       14    A.    In the back.

       15    Q.    Do you recall their ages or genders?

       16    A.    They were men and women, all civilians.  I can't recollect

       17    seeing any children.

       18    Q.    Was there any care that could be given at that time?

       19    A.    No, they were confirmed dead.

10:54AM 20    Q.    And how could you tell that they had been shot?

       21    A.    Well, they had clear bullet wounds.

       22         MR. GARLAND:  Your Honor, I am going to enter into a

       23    line of questioning that's going to go for a little while.  I

       24    don't know if you want me to continue.

       25         THE COURT:  We'll take our break now.  We'll take our

J.A. 275

1    mid-morning break.  Again, let's see if we can't get that

2    closer to 15 than 20 minutes.  Again, I know there's a lot of

3    you, and I know there's only so much rushing we can do, but,

4    again, I would like the case to move as briskly as we can.

5                THE CLERK:  All rise.

6                (A recess was taken.)

7                (Resumed, 11:16 a.m.)

8                (Jury enters the courtroom.)

9                THE CLERK:  Thank you.  You may be seated.  Court is

11:17AM 10    now back in session.

11    BY MR. GARLAND:

12    Q.   Dr. Zachariah, I just want to ask you one or two questions

13    about the events you just related, which I believe -- you tell

14    me -- was about bodies at the morgue with their hands tied

15    behind their back.  Where was that morgue located?

16    A.   It was located in the back of the hospital.

17    Q.   That was the hospital in Butare, correct?

18    A.   Yes.

19    Q.   And I'm going to start asking you a bunch of questions

11:17AM 20    about what you were doing between April 3 and about April 24.

21    During that period, where did you go to sleep each night?

22    Where were you based?

23    A.   We were based in the Rubavu area of Butare, which is the

24    residential area that I mentioned earlier on.

25    Q.   All right.  So you talked before about getting

1    authorization to travel.  On April 13, did you travel outside

2    of Butare?

3    A.    Yes, I did.

4    Q.    Where did you try to travel to?

5    A.    I traveled to Gitarama Town.

6    Q.    And if we can have Exhibit 19 up again.  And why were you

7    trying to travel to Gitarama Town?

8    A.    So I received information from headquarters that a request

9    for assistance was made by the hospital surgical director, who

11:18AM 10   was Belgian at the time, and they relayed that appeal to us in

11   Butare; and basically that there were about 40 civilian wounded

12   with lacerations and so on, and they had ran out of surgical

13   supplies, and they needed our assistance.  So my objective was

14   to take medical supplies, additional food to support the

15   hospital in Gitarama.

16   Q.    How did you travel there?

17   A.    We traveled, if I remember right, with two vehicles that

18   were well loaded.  So there was myself, my driver, and a second

19   colleague, and we didn't have any additional passengers, as we

11:19AM 20   loaded the vehicles with medical and food supplies.

21   Q.    Do you have an estimate of how far it is from Butare to

22   Gitarama Town, the place where you were trying to go?

23   A.    I think it's about 60, 60 to 70 kilometers, but I can't

24   recollect perfectly how many kilometers it might be.

25   Q.    Did you see anything significant as you were traveling up

**J.A. 277**

```
 1   there?
 2   A.    Yes, we did.  We saw civilians, men, women, children,
 3   walking towards Butare.
 4   Q.    Do you have an estimate of how many?
 5   A.    On the road, if I put all of them together, there were
 6   hundreds, probably thousands walking.
 7   Q.    Were they walking all together or not?
 8   A.    Small groups, threes, fives, sometimes in singles.
 9   Q.    How could you tell that they were civilians?
10   A.    Well, they were dressed in civilian clothes.
11   Q.    And can you describe what they looked like as they walked.
12   A.    They looked very -- this is very unusual, so I stopped and
13   asked, "Where are you coming from?  Where are you going?"  And
14   they said, "Well, we're fleeing conflict."
15   Q.    Let me hold you there.  If you can describe how they
16   looked.
17   A.    They looked very tired, worn out.  Many looked, yeah,
18   basically fatigued, dusted, and clearly they had been walking
19   for hours, if not days.
20   Q.    Were they carrying anything with them?
21   A.    Some were carrying some very minor belongings, but most of
22   them had nothing at all.
23   Q.    And can you estimate the genders, the ages of the people
24   you saw?
25   A.    Well, they were women; they were men and children.
```

11:20AM (line 10)
11:21AM (line 20)

**J.A. 278**

1    Q.    And had you ever seen a group like this, a group of people

2    like this walking in Rwanda before?

3    A.    In the border areas, yes, but not inside Rwanda.

4    Q.    And can you again say which direction they were going

5    toward?

6    A.    They were going towards Butare.

7    Q.    Did you learn what they were doing or why they were

8    walking?

9    A.    They felt -- yes, I did because I stopped to ask, which is

11:21AM 10    part of the usual procedure in any case.  And they said they

11    felt they would be safe in Butare, and therefore they were

12    trying to leave other areas, particularly the Gitarama and

13    Kigali areas, and they were trying to seek refuge in the Butare

14    prefecture.

15    Q.    Were you able to make it to Gitarama Town?

16    A.    Yes, I was.

17    Q.    What happened along the way?

18    A.    Well, the scene until I got to Gitarama was the same,

19    people walking towards Butare.  So right at the border of

11:22AM 20    Gitarama Town there was a checkpoint.  In fact, that was a very

21    heavy checkpoint, if I can put it that way, and --

22    Q.    Can you describe it in detail.

23    A.    Yes.  There were barrels on the road.  There were planks

24    with nails on it.  It was a military checkpoint with several

25    soldiers armed with machine guns.  And on the distance on the

J.A. 279

1    hillside, there was also a heavy machine gun, a Browning 25.

2    This is the kind of machine guns that you can fix onto big

3    vehicles that are used in Yemen, for instance, and Somalia, so

4    it's basically a high-power cannon machine gun.  So clearly

5    it's one of those that you could take off cars or whatever.  So

6    it was quite significant because this is the first time we were

7    seeing a heavy checkpoint, which is very unusual from what we

8    used to see before.

9    Q.   How many people were manning the checkpoint?

11:23AM 10   A.   Maybe about five, six.

11   Q.   And were they military or civilian?

12   A.   They were all military.

13   Q.   And how could you tell that they were military?

14   A.   They had military uniforms, the usual green khaki that

15   they have in Rwanda.

16   Q.   When you were in the car, which seat did you have?

17   A.   I was in the right seat.

18   Q.   And was that the passenger or --

19   A.   It was the passenger seat because I had a driver who was

11:24AM 20   on the left.

21   Q.   What happened at the barricade?

22   A.   So one of the soldiers comes up to the car.  He comes to

23   the driver's side, and he speaks in Kinyarwandan, which I

24   didn't understand.  And then the driver takes out his ID card,

25   and the soldier looks at it, and then he shouts three times

**J.A. 280**

1    "ba-Tutsi, ba-Tutsi."  He opens the door and slams it back,

2    again, very unusual.  We've never been treated in that way.  So

3    I intervene and I say, "Well, we are going to the Gitarama

4    Hospital, and we are carrying medical supplies because there

5    are many civilian wounded."  And he basically says, "Okay, go

6    on."

7                There was also some sort of conversation that

8    went on between the driver and the soldier before in fact I --

9    he decided to release us.  And as we crossed the barrier, I

11:25AM 10    asked my driver, "Well, what happened there?  Why was he so

11    aggressive?"  And the driver said, "Well, he has accused me and

12    us of actually supporting the rebels."

13    Q.   Did you make it through to the hospital that you were

14    going toward?

15    A.   Yes, we did.

16    Q.   What happened when you were there?

17    A.   So I met the surgical team, and we went to the wards to

18    see the kind of casualties that were there, and they were all

19    civilians.  We had women, children, each one with lacerations

11:25AM 20    that ranged between 5 and 15 centimeters.

21    Q.   Can I ask you to explain for the jury in a nonmedical term

22    what a laceration is.

23    A.   A laceration is basically a cut.  If you have a knife and

24    you slash your hands, what you get -- or any part of your body,

25    the split of the skin and the tissues that show, that's a

J.A. 281

1    laceration.

2    Q.    How severe were those lacerations?

3    A.    Well, they were between 5 and 15 centimeters, so some were

4    small, some were big.  And what was very unusual was, they were

5    all on the upper body, so they had wounds on the scalp, on the

6    shoulder, on the back.  Most of the wounds were on the upper

7    body.

8    Q.    What was unusual about that being on the upper body?

9    A.    Well, if you see predominantly lacerations -- and so we

11:26AM 10    spoke to them, and they said they were actually attacked by

11    soldiers and civilians with machetes.  And if, of course, you

12    see them on the upper body, these are the most, how do you say,

13    the most sensitive, or these are the parts of the body that can

14    disable you and also kill you most easily.  And the impression

15    I had was, it looked like these people were actually

16    deliberately -- the attackers or whoever was perpetrating this

17    was aiming at the most prone parts of the body that can maim or

18    permanently injure or even kill the individual.

19    Q.    Approximately how many of those patients were there?

11:27AM 20    A.    There was about 40, if I remember right.

21    Q.    What did you do then after seeing them?

22    A.    So I asked the surgical team in the hospital if they

23    needed any additional assistance, and they said, "No.  We have

24    the means to manage this.  We just need the supplies."  So we

25    made a donation of surgical material as well as additional food

J.A. 282

```
 1   supplies to the hospital, and then we left back.
 2   Q.   When you did this and you saw these people, was that
 3   during the day or the night?
 4   A.   It was during the day.
 5   Q.   And let me ask you the question I should have asked
 6   before.  When you saw those patients back at the morgue with
 7   their hands tied behind their back, was that during the day or
 8   during the night?
 9   A.   It was during the day.
10   Q.   Did this incident of going through the barricade affect
11   your security posture going forward?
12   A.   Yes.
13   Q.   How so?
14   A.   Because I realized that access is a major issue if you had
15   a Tutsi driver.  So we went back, and on the 14th I called a
16   meeting of all our eight remaining Rwandese drivers along with
17   the coordination team, and I basically asked them what their
18   ethnic group was, and seven of the eight were actually Tutsis.
19   And I was very open with them, and I said, "Well, you saw
20   what's happened yesterday.  Do you really want to?  I feel
21   there's a risk to your security from what we have --"  And they
22   greatly agreed, and they said, "Well, we don't feel anymore
23   comfortable, and we prefer not to be driving."
24          So four of the eight drivers had their homes in
25   Kigali, and it was not possible to go back.  We put them in one
```

J.A. 283

```
 1    of our residential houses where we had evacuated expatriates,
 2    provided an adequate amount of food and other provisions; and
 3    the other four basically were able to go back to their
 4    residences in Butare.  So we basically decided to stop driving
 5    ourselves.
 6    Q.   I want to move you now forward to April 16.  Did you go
 7    outside of Butare on April 16?
 8    A.   Yes, I did.
 9    Q.   Where did you try to go to?
10    A.   So I went to the Gikongoro Town.
11    Q.   For what purpose?
12    A.   I was told -- in fact, I had a delegation of colleagues
13    from Caritas, which is the charity wing of the Catholic Church.
14    They had come to our offices and told us that there are about
15    400 injured civilians or more in the Kibeho Church, and they
16    needed surgical attention, there are no means of transport, and
17    whether we would be able to evacuate them to Butare Hospital.
18    Q.   Can you point out where your destination was, roughly, on
19    the map of Exhibit 19.
20         (Witness complies.)
21    A.   So this is Butare, and this is Gikongoro here.
22    Q.   How many vehicles did you take to go there?
23    A.   So we took three vehicles.
24    Q.   And how were the vehicles configured when you went up?
25    A.   Well, these are three Toyota Land Cruisers, which is the
```

11:30AM (line 10)
11:31AM (line 20)

1   classic vehicles we use at Doctors Without Borders because they

2   are reinforced; they can be easily adapted.  We took off all

3   the seats, the rear seats.  And there was one expatriate

4   driver, there was myself, there was a colleague from Luxemburg,

5   and there was a colleague from Holland.  So we basically

6   thought we would do this a number of times and bring patients

7   back, so the idea was to serve as an ambulance to bring

8   patients back.

9   Q.   Did you see anything significant on the way up to Kibeho

11:32AM 10   Church?

11   A.   Yes.  Unusually, there were many checkpoints on the way to

12   Kibe ho Church, maybe about eight to ten.

13   Q.   Had you been that way before?

14   A.   Not to my recollection.

15   Q.   And how did those checkpoints compare to the one that you

16   had seen, the one that you had just described from the other

17   day?

18   A.   Well, this one had a mix of civilians and military.  The

19   checkpoints that were closer to Butare had military personnel.

11:32AM 20   Some of them had civilians with them.  And as we went on, there

21   were civilians with machetes, clubs.  Some had revolvers.  And

22   as we went closer towards Kibeho, there were soldiers on the

23   hillsides, and we had a mix of soldiers, armed soldiers, and

24   civilians.

25   Q.   Were you able to get through the barricades?

```
 1    A.   I was able to get through the barricades with my team.

 2    Q.   What was your experience in going through those

 3    barricades?

 4    A.   We told them what we were going to do.  And I also had a

 5    letter from Colonel Muvunyi, the authorization which gave me

 6    actually the authorization to circulate, and for all military

 7    and civilian personnel to provide us with the necessary,

 8    whatever is needed to accomplish our mission, and it covered

 9    Gikongoro.  So I showed it to the military personnel at the

11:33AM 10  time, and they let us through.  And we told them basically, "We

11    are from the Butare Hospital, and we are here to evacuate

12    civilian wounded."

13              THE COURT:  Were you speaking to them in French?

14              THE WITNESS:  Yes, sir.

15              THE COURT:  Thank you.

16    Q.   Were you able to make it to Kibeho Church?

17    A.   Unfortunately not.

18    Q.   Can you describe the scene that you saw when you got to

19    the closest point to the church.

11:34AM 20  A.   So we got to about 500 meters from -- maybe 500, 700

21    meters to the Kibeho Church.  We could see the church in the

22    distance.  And as you come into Kibeho, it's a hilly area, it's

23    a dirt road, and you have just enough space for one vehicle to

24    go at a time.  And there's a cliff on the right side, a

25    hillside on the left, a hill on the left; and as we come,
```

J.A. 286

 1    there's a pickup van that horns behind us and tries to

 2    negotiate.  So we pull -- I pulled to the left, and the person

 3    overtakes; he slams the brake in front of us.  And there's no

 4    way you can negotiate stops.  And there are two communal

 5    policemen on the back of the pickup.  They jump off with

 6    automatic weapons and come towards us.  And behind them is a

 7    civilian with at the time a yellow scarf on his neck, which was

 8    quite odd to me.

 9              Anyway, he comes.  He seems to be in authority.

11:35AM 10    He asks me, "What are you doing here?"  So I tell him, "I am

11    here to evacuate injured from the Kibeho Church.  I heard

12    there's about 300 to 400 injured, and we've been informed of

13    this.  We have the facilities in Butare Hospital."  And before

14    he could say anything, I took out the authorization I had from

15    the military commander, and I gave it to him, and I said, "And

16    we actually have authorization from Colonel Tharcisse Muvunyi

17    to access Gikongoro."

18    Q.    Did he allow you to go forward?

19    A.    Well, he looks at the authorization carefully, and then he

11:36AM 20    looks at me and he says, "You have no authorization

21    whatsoever."  And then he turns around, and what happens is,

22    the communal policeman takes off the safety catch of his

23    automatic weapon and points it at me, and I say, "It's okay.

24    It's okay.  We won't go further."

25              And another, the second policeman goes to the car

**J.A. 287**

1    of my colleague and takes off the HF radio.  We were

2    communicating with HF, so we didn't have walkie-talkies.  We

3    didn't have cellphones at the time.

4    Q.    Can you explain, what does HF stand for?

5    A.    It's a high-frequency radio.  So most of the security

6    people have that.  You can speak for 1 to 2 kilometers,

7    3 kilometers, so that's the way we were communicating between

8    our cars.

9    Q.    What happened next?

11:37AM 10    A.    So in fact basically I had my HF on the base of my seat.

11    I pressed it and I said "Abort," you know, "We have to turn

12    back."

13            And so the person actually had the radio in

14    front, and the communal policeman tried to take it because he

15    heard the noise, of course.  It was a silly thing for me to do,

16    but I -- and then the second policeman who was with me, he went

17    to the second car and then tried to take off the lady who was

18    with me from Europe, "Can I have your passport.  Are you

19    Belgian?"  And the passport is taken away, and, of course, this

11:37AM 20    is a major issue for us.  So I tried to call and say, "No, no,

21    no, it's okay.  We're leaving.  Can you please give the lady

22    back her passport."  And the person who seemed to have been in

23    command at the time turns around and says, "Give the passport

24    back."  Clearly then we turn around.

25    Q.    And before you relate that, before you had been cut off,

**J.A. 288**

1    did you get a view of the scene between you and Kibeho Church?

2    A.    We could see the Kibeho Church, and we could see crowds of

3    people.

4    Q.    Can you estimate how many people at all?

5    A.    Maybe 500, 800.  It's difficult to say.  These were people

6    staying outside, so there might have been people inside.

7    Q.    So then what happened next?

8    A.    We turned back and started to drive away, and as we were

9    driving away, we could hear repeated automatic weapons,

11:38AM 10    dat-dat-dat-dat-dat-dat.  I've heard that several times before

11    in Lebanon and Somalia.  And it didn't stop, and with that, you

12    could hear the screams of people.  And that was what we heard

13    until we were completely out of distance, I think, from the

14    Kibeho area.

15    Q.    Can you estimate how long it was until you stopped

16    hearing, 10 seconds, 30 seconds, more?

17    A.    Maybe 30 seconds.  These are dirt roads, so you go pretty

18    slowly.  Maybe 30 seconds to a minute, far enough.

19    Q.    Did this happen during the day or the night?

11:39AM 20    A.    It happened during the day.

21    Q.    Do you recall what time of day?

22    A.    Somewhere midday, I would say.  Probably later -- no, it's

23    probably around 1:00 o'clock or 2:00 o'clock, somewhere around

24    there, because we -- the reason being that we got back finally

25    to Butare, and I tried to renegotiate with my team.  About two

**J.A. 289**

```
 1    to three hours after, after we discussed this, I said, "Well,
 2    we should try to go back."  And that was already -- it was
 3    already starting to get dark, so it must have been towards the
 4    late afternoon, I would think.
 5    Q.   And so I was going to ask you, what did you do after once
 6    you returned to Butare?
 7    A.   We decided that we would try to renegotiate and go back in
 8    fact with our vehicles to Gikongoro.
 9    Q.   At the same time in the events that we have been talking
11:40AM 10    about, are you also going to the hospital at various times?
11    A.   On this specific day, we didn't go back to the hospital.
12    We came back.  We discussed, and we said, "Maybe let's give it
13    an hour, two hours, and let us try to go back and see what we
14    can find is happening in Gikongoro."
15    Q.   Did you ever go back to Kibeho Church or try to?
16    A.   We tried to indeed, but at this time we see hundreds of
17    people, civilians, coming towards Butare, and we learned that
18    close to 2,000 civilians were actually gunned down in the
19    Kibeho Church.
11:41AM 20    Q.   Did you complete the journey to Kibeho Church then?
21    A.   We did not because we were told and we learned that it is
22    extremely unsafe, and that most of the civilians are fleeing
23    anyway towards Butare.
24    Q.   Was the University Hospital and Doctors Without Borders at
25    that point treating civilians at the hospital?
```

J.A. 290

```
 1    A.   Yes, we were.
 2    Q.   And were the only civilians at the hospital wounded, or
 3    were there civilians who were not wounded there?
 4    A.   Both.  This is the 16th.  No, there were mainly -- the
 5    16th, there were mainly -- no, there were probably a few
 6    wounded, but most of them were not wounded patients.
 7    Q.   Do you know what they were doing at the hospital if they
 8    were not wounded?
 9    A.   Well, they all had medical conditions that needed care.
10    That was one of them, and we also had -- we began to see other
11    civilians come in because they sought refuge, mainly children.
12    And the position we had at the time was to let anyone in
13    because the hospitals have special protection under the Geneva
14    Conventions, and they're supposed to be neutral sites that
15    should be respected.  So we had already made provisions there
16    to say that any civilian coming in, admit them, put them in the
17    tents; if needed, put in additional tents, but provide them
18    with the refuge.
19    Q.   When you said that you understood that a hospital would be
20    respected, what do you mean by respected?
21    A.   The right to care, to medical care, irrespective of race,
22    irrespective of ethnicity; and, of course, whether you are
23    civilian or military, everyone should have had the access to
24    the hospital services.
25    Q.   I want to move forward now to April 17.  Were you in
```

J.A. 291

1    Butare that day of April 17?

2    A.    Yes, I was.

3    Q.    What was the security situation in Butare at that point?

4    A.    So in fact the 17th, after what happened in Kibeho the day

5    before, we had again met with our colleagues from the Catholic

6    Church, and also with the vice-governor, the sous-prefet, and

7    we suggested that the aid community should have daily security

8    meetings in order to have a good handle on the situation and

9    how it's evolving in Butare and Gikongoro, and this was agreed

11:44AM 10    upon.  So we were staying outside the auditorium where --

11    Q.    And before you get to that, if we could have up

12    Exhibit 24, please.  Do you see the auditorium on this?  And it

13    may not be on this.

14    A.    I can't recollect where -- I think it is -- no, I can't

15    recollect, but it's closer towards the Rubavu area.  If I may

16    say, it's very close to the prefecture, close to the Hotel

17    Ibis, which is on the main road close to the -- next to the

18    cathedral.

19    Q.    So what happened?

11:44AM 20    A.    So there was a meeting going on inside.  So I was staying

21    with a few colleagues and the sous-prefet outside waiting for

22    the meeting to finish.  And what was again unusual in Butare

23    were, there were additional checkpoints that had cropped up,

24    and one of them was just in front of us close to the

25    prefecture, and they were checking your authorization passes.

1    But while standing there, we see a car coming, a blue Nissan

2    vehicle, if I remember right.  It had a Burundese number plate.

3    It was distinctly different from the Rwandese numbers.  And

4    some sort of loud discussion happens with the driver and the

5    soldiers that are manning this checkpoint.  And he's -- he

6    gives out some papers.  I don't know whether they're car

7    papers, identity cards, whatever.  And then an aggressive

8    behavior ensues.  They open the door.  They pull this person

9    out of the car and then start hitting him with their gun butts.

11:46AM 10    In fact, they were hitting him on the head.  He started to

11    bleed.  And he tries to appeal while he's on floor, and they

12    keep hitting him until he becomes limp, and I believe actually

13    died.  He's pulled to the side into the ditch, and the car is

14    left there.

15    Q.   Who beat him?

16    A.   Soldiers at the checkpoint.

17    Q.   Did you say before whether there were any government

18    officials with you at that time?

19    A.   Yes.  The vice-governor was with me.

11:46AM 20    Q.   Did the government officials intervene at all or attempt

21    to intervene?

22    A.   No, they did not, not the vice-governor.  In fact, I asked

23    him, "Why is this happening?"  and his response was, "I believe

24    he is probably Tutsi or they think he's Tutsi, and that's why

25    he's been beaten up."

J.A. 293

```
 1    Q.   Were there other spectators there as well?

 2    A.   There were a few others, yes.

 3    Q.   Did you see any reactions by them?

 4    A.   Well, we were -- we were basically shocked.

 5    Q.   Were there any civilians involved with this as well?

 6    A.   At the time, there was nobody at that checkpoint, but what

 7    struck me was, as this happened and just after that, there was

 8    a pickup truck with about ten to fifteen people on the back

 9    very jubilant.  They were stamping their feet on the rear of
10    the pickup.  They had banana leaves.  They had clubs, machetes.

11    Again people with yellow scarfs I saw on this truck, and they

12    were blaring the horns.  And the first time I saw that I

13    thought it was, gosh, there's been a -- somebody's won a

14    football match.  So I asked in fact naively the vice-governor,

15    "Has there been a football match?"  And as I'm asking him, the

16    driver blares the horn, the checkpoint opens; no identity

17    cards, nothing checked.  The car just drives through without

18    even -- even slowing down.  So this was extremely unusual

19    because we needed passes as an aid group of doctors.  Somebody

20    has just been beaten to death in front of this checkpoint, but

21    a group of civilians have easy access.  So I asked the

22    vice-governor, "What is happening?" and he says, "These are the

23    Interahamwe," my first time I hear the Interahamwe in Butare.

24    Q.   I believe you testified before that there were more

25    security checkpoints around Butare.  How did they compare to
```

J.A. 294

1    the ones that you noticed when you first got there?

2    A.   Oh, the ones -- sorry.  From when I first got there?

3    Q.   Yes, when you first got to Butare back in February.

4    A.   Oh, the checkpoints were, they asked you for your

5    authorization letter.  They were very hesitant sometimes to let

6    you through.  You each time had to negotiate.  And instead of

7    two, between I think the -- on the 17th we probably had five or

8    six checkpoints, or maybe even more.

9    Q.   The incident with this person being beaten to death in

11:49AM 10   front of you, did that happen during the day or during the

11   night?

12   A.   During the day.  In fact, it was in the morning.

13   Q.   At this point, is the hospital at the university still

14   operating normally, or had its operations changed at all with

15   the addition of the civilians there?

16   A.   I'm sorry.  If you could ask that question again.

17   Q.   The question was, how was the hospital operating at that

18   point compared to when you had been working there in February

19   and March?

11:50AM 20   A.   Well, the hospital was still functioning with its -- but

21   my focus was basically on insuring protection and trying to

22   insure that we were offering surgical care.  We had additional

23   surgical teams that had come in, anesthetic teams, because the

24   general clinical care, medical care can be provided by the

25   staff; and due to the load of patients we had that needed

**J.A. 295**

1    surgical attention, most of our emphasis was to bring in

2    surgical teams that were helping the hospital to cope with the

3    wounded.

4    Q.   I want to move now to April 19.  Were you able to travel

5    on April 19?

6    A.   Yes, I was.

7    Q.   Where did you try to go?

8    A.    I decided to go to the border, the Burundi border, because

9    some of my colleagues at the time felt they wanted to leave.

11:51AM 10    The situation was -- it's their choice, and we respect that.

11    And we also decided to bring in, because communications was a

12    problem, we decided or wanted to bring in new satellite

13    equipment for communications with headquarters, and this was

14    the purpose of going to the border.

15    Q.   How many cars went and what did they carry?

16    A.   I think we had three cars, if I remember right, maybe

17    four.  We had a contingent of our staff that we were

18    evacuating, including an African contingent from Benin of

19    doctors who decided they would leave from the hospital, that it

11:51AM 20    was rather unsafe.  And then we had some medical supplies which

21    we thought on the way we would give to help facilities, if

22    needed, to support wounded and other forms of medical care.

23    Q.   Did this trip to the border go the same way that your

24    other trips to the border had gone?

25    A.    No, not at all, if I can say "hell on earth."

**J.A. 296**

```
  1   Q.    Why do you say that?
  2   A.    Well, this trip used to take us about maybe two hours,
  3   roughly.  It took us six hours that day, and there were about
  4   twenty-five checkpoints on the way to the Burundi border.
  5   Q.    Were the checkpoints manned by military, civilians, or a
  6   mix?
  7   A.    A mixed combination was the general picture along the way.
  8   You had some checkpoints which you basically had civilians but
  9   you had one or two soldiers.  There were some where -- but it
 10   was basically a mixed group of individuals, soldiers and
 11   civilians.
 12   Q.    And what was the experience of getting through those
 13   checkpoints for you and your staff?
 14   A.    It was difficult.  It was difficult.  At each of the
 15   checkpoints, the African contingent of my team were asked for
 16   ID cards, not expatriates, including myself or any fair-skinned
 17   individual.  And they openly asked us, "Are you carrying
 18   Tutsis?"  Some even jumped in the back of the vehicles, opened
 19   the basic kits, which I explained to you earlier on are big
 20   cases of medical supplies.  They opened it, and they asked us,
 21   "If you're carrying Tutsis, we want to check."
 22   Q.    Were the checkpoints, were they basically the same as you
 23   went along the road, or were there differences between them?
 24   A.    There were differences between them, and I think somewhere
 25   towards the middle, maybe the fifth, sixth checkpoint -- and
```

J.A. 297

1    this is an area where there's quite a lot of population -- I

2    think several villages were there -- this checkpoint was

3    heavily, how do you say, constructed, barrels again, planks of

4    wood with nails on it, trees, logs.  You just couldn't go

5    through it.  I mean, there's no way, including the right and

6    left sides.  I mean, the kind of vehicle we have, we could

7    actually run through the gutters and so on without a problem,

8    but there were logs even on the side.  There was no way you

9    could get through.

11:54AM 10    Q.    You testified before, I believe, that it was hell on

11    earth.  Was that just because of the checkpoints and the

12    barricades?

13    A.    No.  It was because of what we saw was happening on that

14    road.

15    Q.    What was it that you saw?

16    A.    So the entire landscape was basically becoming dotted with

17    human bodies.  In fact, we could see piles.  And if you drive

18    down from Butare to Bugarama, there were hillsides, there are

19    valleys, and you can see the villages, and in the distance you

11:55AM 20    could see bodies.  And in addition, as we went through the

21    villages, most of these are mud huts with grass roofs; they

22    were burning.  You would see three to four militia.  I call

23    them militia because they are civilians with machetes or clubs

24    or big canes.  They would have one or two civilians sitting

25    down, and somebody would be holding a machete, and this was the

J.A. 298

1    scene.  And you would see also dead bodies beside on the side

2    of the checkpoints, and as you went through villages, you would

3    see piles of bodies.

4    Q.    Can you estimate approximately how many piles of bodies

5    you would see?

6    A.    I think we must have seen -- this was the scene all the

7    way wherever there were villages, all the way to Burundi

8    border.

9    Q.    On your way down there, did you record any images of what

11:56AM 10    you were seeing?

11    A.    I did take a few pictures of what I saw.

12    Q.    Before you get to that --

13                MR. GARLAND:  I'm going to ask that the witness

14    be shown Exhibit 53, which is not going to be admitted by

15    mutual agreement, I believe.

16    Q.    Do you see what's on 53?

17    A.    Yes, I do.

18    Q.    And without describing the contents of that, are you

19    familiar with this?

11:56AM 20    A.    Yes, I am.  I took this picture.

21    Q.    Was that on the way down or on the way back?

22    A.    On the way down.

23    Q.    Is it a fair and accurate representation of what you saw?

24    A.    Indeed.

25                MR. GARLAND:  Your Honor, the government moves in

**J.A. 299**

```
 1   Exhibit 53 into evidence.

 2          THE COURT:  All right, it's admitted, Exhibit 53.

 3          MR. LAUER:  Your Honor, subject to my motion.

 4          THE COURT:  I'll give you a standing objection

 5   concerning the pretrial motion.

 6          MR. LAUER:  Will you issue a limiting instruction?

 7          THE COURT:  Well, I guess I'll caution the jury.

 8   These, first off, are photographs obviously that are

 9   disturbing, and, again, as I asked you during the impanelment

10   process, there is going to be disturbing evidence; and you have

11   to keep your focus here on what the case is all about, whether

12   Mr. Teganya is guilty of the charges in question.  And I don't

13   think there will be any evidence that he ever viewed what is

14   shown in these images, but I am going to admit them.  So

15   Exhibit 53 is admitted.

16          MR. GARLAND:  Thank you.

17          (Exhibit 53 received in evidence.)

18   Q.   First of all, how did you take this photograph?

19   A.   Well, I had a 120-millimeter zoom camera, and I took it

20   from sitting in the car.  As I was negotiating a curve and I

21   saw there was nobody would see me, so I slowed down, I used my

22   zoom, and I took these pictures.

23   Q.   Can you describe for the jury what it is that you were

24   taking a picture of.

25   A.   Okay, so this picture doesn't show everything, but on the
```

11:57AM 10

11:58AM 20

**J.A. 300**

         1   right and the left side there are villages, or you could see --

         2   yeah, there are small-scale constructions.  And what you see on

         3   top, the dotted red and white are probably a collection of

         4   about 80 civilian bodies, and further down what you see is

         5   probably another 15 to 20, and this is the scene that we

         6   basically were seeing along the way.

         7           MR. GARLAND:  Your Honor, I would ask that the witness

         8   be shown but not the jury at this time Exhibit 52.

         9   Q.   Do you see Exhibit 52?

11:59AM 10   A.   Yes, I do.

        11   Q.   Are you familiar with it?

        12   A.   Yes, I am.

        13   Q.   What is it, without describing its content?

        14   A.   This is in fact a zoom of the lower -- there were two

        15   collections of bodies.  In the first image, this is the lower

        16   one which I took coming in a bit closer, a bit more further

        17   with my car, and then I zoomed it in.

        18           MR. GARLAND:  Your Honor, the government moves

        19   Exhibit 52 into evidence.

11:59AM 20           THE COURT:  It's admitted, 52.

        21           (Exhibit 52 received in evidence.)

        22   Q.   Did you make it to the Burundi border?

        23   A.   Yes, I did.

        24   Q.   What did you see as you approached?

        25   A.   So about 700 meters from the border, I see a group of

1    civilians, perhaps about 70, 50 to 70 civilians, women,

2    children, elderly.  They were running, and they came out of --

3    Q.    Which direction were they running?

4    A.    They were running towards the Burundi border.  And they

5    had come out from -- as we took a curve, and the road was quite

6    narrow, they came out; they were rushing from an area between

7    the road and the left side.  So it seemed like it was a

8    pathway, but, you know, people were running into the road and

9    overtook, so I slowed down.  They overtook the vehicle, and

12:00PM 10    behind them were a group of ten militia, again civilians with

11    machetes.  An elderly man, who I believe just couldn't keep the

12    pace, was quickly overtaken by one of the militia.  He took his

13    machete, hit the man on his neck.  That's a very -- it's an

14    area where you have the carotid arteries.  Blood started

15    flowing out. He fell.  The person didn't stop.  He just

16    continued chasing these women and children.  They tried to open

17    our doors, but they were locked.  We didn't have an idea of

18    what was happening until these people reached the border with

19    the ten militia following them, and at the border, there was

12:01PM 20    another group of militia waiting for them.

21    Q.    And what happened there?

22    A.    The 60 to 70, all these civilians were basically hacked to

23    death, and there was probably about six or seven that survived

24    and crossed the bridge across into the Burundi side.

25    Q.    Did you see anything being done to dispose of bodies?

1   A.   Yes.  They were all being thrown into the Akanyaru River.

2   Q.   Before that happened, while the people were in the

3   stampede and running into another militia, could you hear what

4   was going on?

5   A.   Well, they were all screaming.  In fact, some of them were

6   asking me -- there was women with children in their arms

7   running.  You could see they were desperate.  You could see in

8   their eyes the desperate nature for life.  In fact, they were

9   pleading, "Open the door, open the door."  But we were all so

12:02PM 10   just shocked, and we didn't know what the security situation

11   would be, and, well, we were numbed.  We just kept driving

12   slowly.

13   Q.   What happened to your staff that you were trying to help

14   evacuate?

15   A.   We evacuated them.  There was no problem with them.  They

16   got their stamps and the rest of it, and they evacuated.  We

17   got our satellite equipment as well.

18   Q.   Did this event happen during the day or the night?

19   A.   It happened during the day.

12:03PM 20   Q.   Were you able to return back to Butare after that?

21   A.   Yes.  With a restrictive team, we went back to Butare.

22   Q.   How did that return trip compare to the trip that you took

23   down?

24   A.   Well, we had no more African colleagues in our vehicles.

25   We were only expatriates that were from Europe or people like

# J.A. 303

```
 1   myself, and it was easier to go back.  It took us far less
 2   time.  In fact, it took us the usual, maybe two and a half,
 3   three hours but not more.
 4              THE COURT:  Is that because the doctors from Benin had
 5   been dropped off at the border?
 6              THE WITNESS:  Yes, along with some other national
 7   staff.  In fact, we had a few Rwandese staff that we took out
 8   as well that day.
 9   Q.   So going back, it was only expatriates?
10   A.   Yes.
11   Q.   Having gone through this, what was your emotional state at
12   that time?
13   A.   Oh, it was -- in what terms, if I may ask?
14   Q.   If you can just describe what emotions were going through
15   you as you were going back having witnessed this.
16   A.   Well, I -- I -- I called my -- as I went back towards --
17   was driving back towards Butare, I called up my colleagues on
18   the radio, the car radio, and I said, "Hell has broken loose.
19   The situation has completely changed, and this place is
20   becoming impossible, what we've seen today."  And it's one of
21   the reasons why I took those pictures because it was difficult
22   to describe to people that this sort of killing was happening.
23   And I think this was towards already the evening, and one of my
24   colleagues who was there, who also is very experienced in this
25   sort of situation, said that there was a very inflammatory
```

J.A. 304

1    speech that happened on that day by the then interim president,

2    Theodore Sindikubwabo, who was in Butare; and I in fact saw him

3    several times on the road.  And there was the inauguration of

4    the new sous-prefet, the vice-governor -- no, the new governor

5    of Butare.  The old governor was taken off and this person was

6    put in, and at that gathering, there were announcements made to

7    say that the work needs to be done.  I would assume that was

8    what we were seeing, and clearly there was a distinct change in

9    that road in anything we had seen until now.

12:06PM 10    Q.    Let's move forward to the next day, to April 20.  On

11    April 20, what did you do?  Did you stay at the hospital or go

12    away from the hospital?

13    A.    In fact on April 20, as usual, I went again to the

14    security meeting at the auditorium.  And as we were in the

15    meeting, one of the Belgian pastors from one of the refugee

16    camps in the Kibuye commune -- and these camps were nicknamed

17    by us as Saga 1 and Saga 2, and we had about 40 MSF staff

18    there -- so this pastor had actually walked the 20 or so

19    kilometers.  And he comes in, and he calls me out and a few of

12:07PM 20    my colleagues and says, "Your staff are in serious danger.

21    They are selectively looking for Tutsis, and the communes

22    actually are collaborating, so there is no security for your

23    staff.  Go and get them out."

24    Q.    How far away were these camps from the University

25    Hospital?

**J.A. 305**

```
 1    A.    About 20 kilometers.

 2    Q.    So what did you do?

 3    A.    So I decided to leave.  Myself and a colleague from -- I

 4    think she was French -- we went with two cars.  She was in

 5    front and I was behind, and we drive towards Saga 1 and Saga 2.

 6    Q.    And what did you hope to accomplish?

 7    A.    I was basically going to try and see if I could get anyone

 8    who was there out.  We only had two vehicles that were there,

 9    and the plan was to go quickly, see what's happening, evacuate,
12:08PM 10    call for more vehicles to come in to take the rest of the

11    personnel.

12    Q.    Did you encounter any checkpoints or roadblocks on the way

13    there?

14    A.    Yes.  There was maybe five, five to seven checkpoints.  I

15    can't remember.  I managed to negotiate my way through those

16    ones.

17    Q.    And were you able to reach Saga 1 and Saga 2?

18    A.    Unfortunately not.  On the last checkpoint on the entry

19    towards Saga 1 and Saga 2 and where the residences or the
12:08PM 20    dormitories of our staff were -- now, we had about 40 of them.

21    We had staff that were Rwandese, staff from the Congo, and then

22    we had expatriate staff, but the expatriate ones were

23    evacuated, and the remaining staff were mainly Hutus, Tutsis,

24    and Zaire staff.  As we were coming in, I could see in the

25    distance the area where the MSF houses were; they were burning.
```

**J.A. 306**

1    Q.    Can you describe what those houses were and what they

2    looked like before they were burning.

3    A.    Well, they were sort of dormitories.  These are long

4    structures where -- like halls where you have multiple

5    bedrooms, and you can have two in a room.  And so I guess it's

6    a bit like a hostel, a sit-in hostel, whatever.  So we had

7    enough residences to cater for about 30 to 40 staff of Doctors

8    Without Borders.

9    Q.    How many houses were there or dormitories were there?

12:09PM 10    A.    There were four, I believe, yeah.

11    Q.    How many of those were burning?

12    A.    Oh, I wouldn't be able to say.  I could only see from the

13    distance where they were.

14    Q.    What happened as you approached?

15    A.    As I approached the last checkpoint -- maybe there might

16    have been some before, but at least in this checkpoint what

17    happened is, it was like a festivity.  There were people with

18    spears.  There were people with masks.  They were dancing.

19    They were whistling.  Some had clubs, machetes, banana leaves.

12:10PM 20    And as we approached, somebody who seems to be an authority

21    comes to the first car and asked certain questions.  And the

22    lady who was driving, my colleague, says, "Well, the lead

23    coordinator is behind.  Why don't you go and speak to him."

24              So the person comes up to me, and I tell him,

25    "Well, I'm here to see my staff and to take them out."  And

**J.A. 307**

1    basically what happens at that time is, one of those with -- he

2    is accompanied by two or three others -- the headlights of my

3    cars are smashed with the baton.  And he comes up and he tells

4    me, "If you're here to evacuate Tutsis, we will kill them

5    anyway, and we will kill you as well."  So the position we had

6    was clear; we had to return back to Butare.

7    Q.    Were you able to evacuate your staff from those buildings?

8    A.    Unfortunately not.

9    Q.    Did you ever see any of them again?

12:11PM 10    A.    I didn't see any of them anymore again, but I learned

11    what -- I did see some of my staff from Zaire.  They actually

12    walked down, and I met them the next day morning.  They came,

13    and I learned what happened.

14    Q.    What did you learn happened to the staff that you didn't

15    see again?

16    A.    Well, all the MSF staff, who actually had -- were asked to

17    keep clear identification.  They had MSF white T-shirts with

18    the red logo.  They had the MSF identification cards.  All of

19    them were rounded up by militia and by soldiers.  The MSF Tutsi

12:12PM 20    staff, after verification of their identity cards, were put on

21    one side.  The MSF Hutu staff were put on the other.  The Zaire

22    staff were kept also on one side.  The MSF Hutu staff were then

23    given guns and machetes, and they were asked...

24            (Witness pausing.)

25    Q.    Do you need to take a moment?

**J.A. 308**

1   A.   They were asked to kill their Tutsi colleagues.  We

2   believe about 40 of our staff were killed that day.

3   Q.   I'm sorry.  What did you do after that?

4   A.   So after that, I went to try to meet the new prefet.

5   Q.   Where was that?

6   A.   This was in Butare, the new governor, Sylvain Nsabimana.

7   That was his name, yeah.  And I went to see him with the head

8   of the International Committee of the Red Cross, who were

9   extremely active and who liked Doctors Without Borders, very

12:13PM 10   specialized in war and conflict situations.  And so I did have

11   an audience with him, and I explained to him the growing

12   humanitarian crisis in the prefecture in which he is fully

13   responsible.  I appealed to him to try to ensure the protection

14   of civilians and of humanitarian aid workers, saying what

15   happened, and I told him the places, "Butare has become an

16   anarchic situation."  And basically he was very uncollaborative

17   with us, and in fact extremely arrogant, if I may put it that

18   way.

19          As we were describing these events to him, he was

12:14PM 20   looking elsewhere, looking at papers, and at a certain moment

21   he turned to us and said, "If you think that's the situation,

22   so be it."  And that was -- I felt really helpless, I must say,

23   in terms of collaboration of authority.  It was a complete

24   change from what happened with the former governor, and clearly

25   the situation had changed considerably.

J.A. 309

1    Q.    Did you know whether the new official that you were

2    meeting with was Hutu or Tutsi?

3    A.    He was Hutu.

4    Q.    What happened back the at Saga 1 and Saga 2?  Was that

5    during the day or during the night?

6    A.    It was during the day.

7    Q.    Back in Butare that night of April 20, did anything

8    unusual happen?

9    A.    Yes, it did.

12:15PM 10    Q.    What was that?

11    A.    In fact, I went back to the hospital indeed towards

12    4:00 o'clock, around-abouts, and I meet the hospital director,

13    who I know very well since we've been working with him,

14    Dr. Jolton, and he tells me -- he looks for me quickly as he

15    sees me, and he says, "Well, this hospital has been designated

16    a military hospital, and from now onwards, we're going to be

17    receiving military wounded from the frontline."  I say, "That's

18    fine.  We can accommodate that."

19              And I quickly discuss also with my teams to say

12:15PM 20    we should evacuate one of the wards, the orthopedic ward of

21    civilians, put them in the tents.  And I think that ward has

22    maybe about 40 beds, but you could accommodate more.  That

23    would be the site where the soldiers would be.  It's also very

24    close, I believe, if I remember right, to the surgical

25    operations theater, so it would be easier access.  And --

J.A. 310

```
 1    Q.   Before you go on, to make this a little easier, can we

 2    have Exhibit 23 up on the screen, please.  Can you point to the

 3    place where you had ordered the evacuation so the soldiers

 4    could be housed there.

 5    A.   Sorry.

 6    Q.   Could you point to the place that you had asked to be

 7    evacuated for the soldiers' treatment?

 8    A.   I can't remember completely, but I believe it was one of

 9    these blocks here because the surgical theater is just here,

10    the surgical operations facility.

11    Q.   And did soldiers come in that night?

12    A.   Yes, they did.  In fact, there were a number of helicopter

13    trips.  The first one was there, I witnessed it myself, and it

14    brought about 40 soldiers.  They landed exactly here in this

15    space in the front.  And they were all apparently soldiers of

16    the Presidential Guard.  They had bullet wounds, and the first

17    three had about 35 to 40 soldiers.

18    Q.   Did Doctors Without Borders treat those wounded soldiers?

19    A.   Yes, indeed, we did.

20    Q.   Was there any concern about having soldiers being treated

21    at a hospital where civilians were also being treated?

22    A.   In general terms, we do not have a problem with that, but

23    considering what was happening in the environment of Butare, I

24    was very worried that there may be repercussions on the

25    civilians, and mostly those who were fleeing conflict and
```

**J.A. 311**

1    taking refugees, mostly Tutsis at the time, on their safety.

2    That was my concern.

3    Q.    I want to ask you to step back from some of the more

4    emotional events at this time and ask you a little bit more

5    about the staffing.  The staff who were at the hospital at that

6    point, you said that there was university staff and Doctors

7    Without Borders staff as well; is that right?

8    A.    Yes.

9    Q.    And did the university staff treat the soldiers as well?

12:18PM 10    A.    Yes, they did.

11    Q.    Did you have any authority over medical students or

12    medical interns?

13    A.    Medical students and interns were not part of my mandate,

14    and we were there to support and complement the hospital

15    services; but teaching and training was not, so I did not have

16    any direct mandate for medical students.

17    Q.    Were you aware of any medical students being there for the

18    care of either civilians or soldiers at this point?

19    A.    Well, Butare was a university hospital, so with a

12:19PM 20    university hospital, clinical attachments of medical students

21    from the third year to the fifth year happens in these

22    hospitals.  So they participate in ward rounds.  They practice

23    their clinical skills on patients, and eventually their exams

24    are conducted in these hospital settings.

25    Q.    Did you ever observe medical students treating either

1   soldiers or civilians at the hospital during this period?

2   A.   Yes, around about the 20th to the 22nd.

3   Q.   All right.  And what did you see when you noticed that?

4   A.   Well, I noticed medical students in the casualty, in the

5   surgical area.  One of the days -- and that is an area I used

6   to visit quite frequently because our surgical teams were

7   there, and supplies monitoring was one of the issues, and much

8   of the suturing was done in the casualty.  But one of the days

9   I came in, the place was flooded with medical students, and

12:20PM 10   they were all suturing, and what --

11   Q.   What were they suturing?

12   A.   They were suturing civilian patients with lacerations,

13   children, women, elderly.

14   Q.   And what did you observe?

15   A.   In fact many of them were screaming, so I tried to see,

16   and several of the medical students were actually suturing

17   these patients without anesthesia.  Now, we had provided --

18   what struck me was, we had provided adequate quantities of

19   lignocaine, which is what you use.  If you have a laceration,

12:21PM 20   you first infiltrate or use a needle and you infiltrate the

21   areas around the wound, and then you suture so the pain is

22   relieved, and many of those bottles were still on the trolley

23   at the base.  So I reprimanded some of the students to say that

24   "You need to use the lignocaine, and this is how you use it.

25   You infiltrate, and then you suture."  That was one of the

J.A. 313

1    occasions where I had a direct contact with medical students.

2    Q.    This may be an obvious question to a doctor, but what's

3    the reason for using an anesthesia before doing sutures on a

4    laceration?

5    A.    Reduce the pain and suffering.

6    Q.    Is there a medical reason to withhold local anesthesia

7    before suturing somebody up?

8    A.    Generally not.  There isn't.

9    Q.    Was there a medical reason in this particular situation to

12:22PM 10    avoid using anesthesia that you could see?

11    A.    Surely not.  I mean, you could -- the only reason that one

12    would perhaps speculate on is, there were loads of soldiers.

13    There were lots of -- we were the only supply chain and the

14    only facility that existed.  Whether there were instructions to

15    say, "Keep the lignocaine because we might need it for more

16    serious lacerations."  But still, if that was a logistic

17    consideration, you could still use lower doses of lignocaine.

18    And we had made it very clear that we have massive amounts of

19    these drugs, and they were available in the stores, so that was

12:23PM 20    odd.  So under the circumstances, the supplies were there.

21    They were available.  There isn't a medical justification or a

22    logistics justification for not using lignocaine.

23    Q.    Since I'm asking you about medical students, let me ask,

24    to your knowledge, did you ever encounter a medical student who

25    was named Jean Leonard Teganya?

**J.A. 314**

1    A.    No.  In fact, I wouldn't know the names of the medical

2    students, and I didn't have any direct, as I said, link with

3    them, so the name doesn't mean anything to me.

4    Q.    I asked you before about whether you had any concern about

5    having soldiers being treated where there were also civilians

6    being treated.  Were there any acts of violence against

7    civilians that you learned of while you were there?

8    A.    This is while I was in the hospital?

9    Q.    Or before getting to the hospital but at the hospital on

12:24PM 10    the 20th or the 21st or 22nd or going forward.

11          THE COURT:  Wait.  I'm confused now.  Why don't you

12    rephrase that.

13          MR. GARLAND:  Okay, I will, your Honor.

14    Q.    On the 20th -- let's just be at the 20th -- at the 20th,

15    had you seen any intentional violence done to any of the

16    civilians at the hospital?

17    A.    Not to my recollection, no.

18    Q.    Did there come a point where you did learn about violence

19    that had been done to civilians at the hospital?

12:24PM 20    A.    Well, on the 21st morning, the hospital is now quite

21    congested because we have soldiers, and the head count was

22    close to 140.  Our head count of civilian patients was probably

23    between 120 and 150, so the hospital is at capacity.  I come in

24    the morning, and generally what we do is, we do a head count,

25    see what the numbers of patients because that determines our

1    needs.  And I was told that about 40 children, and I was told

2    by the director at this time of the hospital, that 40 children

3    have been shifted from the hospital to the prefecture, which is

4    the governor's office, because there's a concern about hygiene

5    in the hospital.

6    Q.    Did you look for those children in the hospital?

7    A.    In fact, yes, I did.  It was my pediatric night staff that

8    told us, and they said, well, 40.  And I was very concerned,

9    and I discussed with the director of the hospital saying that

12:25PM 10    "You know the situation here.  You know what's happening

11    outside.  There is no reason for us to -- and we can put in

12    additional facilities if needed, but we do not want these

13    patients outside the hospital.  This is also a place for refuge

14    for civilians."  So I actually -- he tells me, "This is

15    unnegotiable.  The decision that's been taken is beyond me."

16         So I decide that I will try to go and find out where

17    have they gone.  They said, "Well, they have been taken to the

18    prefecture."  So I went to the prefecture, and I see six or

19    seven of the kids.  Now, the way I could identify them was

12:26PM 20    through our bandages.  The bandages we used were the only ones

21    available at the time, and they came from Holland from the

22    International Dispensing Association.  And the kind of plaster

23    we were using as well was not the same as the one the hospital

24    had.  So there were six or seven of them.  So I asked them in

25    the prefecture, "Where are the rest of the kids?"  And they

 1    said, "Oh, they've been taken to the Kabutare Hospital."

 2              So I then drive to the Kabutare Hospital, and

 3    they said, "We never received any kids from the Butare

 4    Hospital, neither from the prefecture." So I never saw those

 5    kids anymore. So this was one of the -- this was an extremely

 6    worrying situation for me because clearly we didn't know what

 7    was happening; some of our civilian children were taken out,

 8    and they were unaccounted for.

 9    Q.   Let's move forward to April 22. What did you do during

12:27PM 10    the day of April 22?

11    A.   Now, on the 20th actually, just to give you some

12    background into this, after the change of the governor of

13    Butare, we were told again in the security meeting that you

14    need new passes now; and this time on the pass you would need

15    the names, you would need the passport numbers, you would need

16    the nationalities, and you will need the car registration

17    numbers. And I had copies of those. And on each, whoever is

18    on the car has to be on the car that is allocated to them. It

19    was a major change in terms of clamping down on the

12:28PM 20    authorization.

21              So while we did that, we saw Colonel Muvunyi.

22    And clearly there was a problem of fuel supplies. And the

23    sous-prefet, the vice-governor, told me that "I have no more

24    access to fuel, and I do not have an authorization. My car is

25    stranded. Can you come and pick me up --" he was living very

**J.A. 317**

1    close to where we were staying -- "the next morning to go to

2    the security meeting?"  And I said, "Sure.  I'll pick you up

3    about 8:00 o'clock."

4              So this was the 22nd morning.  I drive up with a

5    colleague to his house.  And what I see outside as I approach

6    Dr. Zephanie's house is about fifteen bodies lying scattered

7    outside his compound.

8    Q.    This is the vice-governor's compound?

9    A.    Yes.

12:29PM 10    Q.    Please continue.

11    A.    So I stopped the car.  I get off with my colleague, and I

12    see the kind of bodies.  There was a mother who was

13    breast-feeding her child.  The child was shot in the back of

14    the head lying there.  And then there was a young girl, maybe

15    16, 17 years of age, who rushes to me.  And they know our car.

16    They know we're medical people.  She quickly opens her breast

17    and tells me, "I'm injured, and I was shot yesterday, and

18    soldiers came.  They attacked my dad and whole family.  They

19    accused him of being from the PSD party," which was a Hutu

12:30PM 20    moderate party that actually was in control of Butare.  "And

21    they basically killed all the family, and I managed to escape

22    but I got a bullet."  And it was surely at close range because

23    her breast was split, but there was no bleeding.  Clearly the

24    bullet, if it is very close at such a high velocity, the heat

25    closes the blood vessels.

```
 1              Anyway, I told her, "Get onto the car.  We'll
 2      take you to the hospital."  And as I was taking her into the
 3      back, I hear a groan from the gutter on the side, and it was a
 4      young boy of maybe 13, 14 years of age.  I quickly go to him.
 5      I check his pulse.  He has a very weak pulse, and I see he's
 6      been shot in the thigh.  And if you're shot in the thigh, the
 7      muscles can hold two to three liters.  And clearly he was in
 8      shock, and probably they thought he was dead.  And he was
 9      groaning, weak, lost a lot of blood.  So I said, "We'll have to
10      take him."  So I with my partner tried to carry him.  We drag
11      him into the back of the vehicle, and as we're doing so, two
12      soldiers come quickly, and they say, "You can't take these."  I
13      don't know where they came from.  "You can't take these
14      patients."  And they actually tried to pull the boy off the
15      rear of the Toyota Land Cruiser by pulling his leg.
16              And I tried to negotiate with him, and I tell
17      him -- what made me get away with him is, I told him, "You
18      know, we are treating 140 of your own colleagues in the Butare
19      Hospital, and you know the situation here.  You might get
20      injured, but if you come, I assure you I will treat you as
21      well.  So, please, these are injured; let me take them to the
22      hospital."  And I think that worked because he let me go.
23              So we take the two patients.  We pass again
24      through the Butare -- and this is at the Rubavu quartiere,
25      which is right at the entry of Butare.  I pass through the main
```

```
 1    road.  At almost all the checkpoints they ask for ID cards;

 2    they want to know whether they were Tutsis.  They didn't have

 3    any ID cards, obviously, and I managed to get them to the

 4    hospital.

 5    Q.   How far away was the location where you picked up those

 6    patients from the hospital?

 7    A.   It was about 2 kilometers.  It's the same Rubavu area

 8    where we had our residences.

 9    Q.   And were you around the hospital that evening?

10    A.   Of the?

11    Q.   The 22nd.

12    A.   In fact, I made several trips to the hospital that day.

13    Q.   What were you doing on those trips?

14    A.   Monitoring the situation, trying to see what needs are

15    there, how my team is working.

16    Q.   Were there checkpoints and roadblocks at that point?

17    A.   There were probably eight, ten, maybe more checkpoints,

18    and what was particularly concerning was, the soldiers had

19    changed.

20    Q.   How so?

21    A.   Their uniforms had changed.  And I knew on the 20th that

22    there were two Hercules C-130 aircraft that landed and

23    apparently brought in new soldiers of Presidential Guard and

24    the power commanders, and clearly that was seen in the

25    checkpoints.  They were much more unfriendly.  In fact, at one
```

12:33PM appears at lines 10 and 20.

**J.A. 320**

         1    of the checkpoints coming back from the hospital, in front of

         2    the Hotel Falcone, which is very close to where we are, there

         3    were 30 civilians, 15 children, and they were being

         4    aggressively pushed by the soldiers.  And some of them were

         5    being hit with gun butts, the children, on their head.  We

         6    couldn't stop because we were asked to go on.  And as we came

         7    back, maybe about 30 minutes later, there were just piles of

         8    bodies there.  All those kids and civilians were killed.  The

         9    checkpoint was full of blood, including the tar roads, and we

12:34PM  10    could see the soldiers taking the bodies and throwing them

        11    behind the area around Hotel Falcone.  So clearly the

        12    checkpoints had changed, and the soldiers manning these

        13    checkpoints had also changed, so clearly there was a clampdown

        14    is what we had seen in Butare.

        15    Q.   Did you see those bodies after they had been put where

        16    they were?

        17    A.   No.  They were put behind, and there's a small cliff

        18    behind those hotels, so I believe they were probably being

        19    dumped behind there.  And clearly there was no way I could risk

12:35PM  20    my security to go and look at that time.

        21    Q.   On April 23, did you go to the hospital?

        22    A.   Yes.  As is usual, I arrived at 8:00 o'clock in the

        23    morning.

        24    Q.   Can you indicate on the map where it is that you went.

        25    A.   Generally, I used to take this road, or I could -- oops,

```
 1   sorry.  I would take this way, or I would take this way.  These
 2   are both access routes.  And then I would come up here, and I'd
 3   park my vehicle here, because this area here is where most of
 4   the MSF activity was.
 5   Q.   What time did you get there?
 6   A.   I got there between 8:00 and 8:30 in the morning.
 7   Q.   What did you see when you got there?
 8   A.   So when I got there, we had a 24-hour shift of our staff,
 9   so our staff come quickly to me and tell me 40 civilian Tutsi
10   patients, their ID cards were verified, and they were taken
11   away by soldiers and civilians, and they were either killed or
12   hacked; they were either clubbed or hacked to death behind the
13   hospital.
14   Q.   Did you investigate that?
15   A.   Well, while I was there, they were actually -- I could see
16   them carrying the bodies.  And in fact my staff said, well,
17   those are the bodies that they're actually taking on the --
18   there were three dump trucks parked on the side, and in fact
19   they were parked...  So these dump trucks were parked over
20   here.  There were three of them, if I remember right, so I
21   could see them very clearly from here, and bodies of civilian
22   patients, women and adults were basically, men, were being
23   loaded on these dump trucks.
24   Q.   You said that they were being carried.  Who were they
25   being carried by?
```

12:36PM 10

12:37PM 20

**J.A. 322**

1    A.    They were being carried by prisoners, Rwandese prisoners.

2    Q.    How could you tell that they were prisoners?

3    A.    Well, in Rwanda they had a very distinct uniform which is

4    pink, bright pink, and prisoners were often used for labor as

5    part of their -- I guess part of what they had to do while they

6    were in custody.  And they used to do different kinds of work,

7    and here, I guess they were called in to carry the bodies away

8    from the hospital onto the dump trucks, and our knowledge on

9    that is that they would be dumped somewhere.

12:38PM 10    Q.    Did the number of bodies you saw carried, was it

11    consistent with the reports you had heard?

12    A.    I didn't do any body count, but with three trucks, I

13    assumed that what I learned from my staff of about 40 people

14    seemed very plausible.  You wouldn't need three otherwise.

15    There might have been more.

16    Q.    At this point, did you know from checks that you had done

17    approximately how many patients were at the hospital all told?

18    A.    Yeah.  There were about between 140 and 150 patients.

19    Q.    And approximately how many of those were military and how

12:39PM 20    many of those were civilian?

21    A.    It was about 140 military personnel and between 130 and

22    150 civilians.

23    Q.    Did you keep track of how many patients there were on a

24    daily basis?

25    A.    Yes, we generally did, so if there was any serious

J.A. 323

1    increase, then my staff would let me know, but that is part of

2    the routine procedure.

3    Q.    And were all of the patients, the civilian patients,

4    accounted for at that point?

5    A.    Well, 40 were not.

6    Q.    Did you talk to any government personnel about the safety

7    of civilians at that point?

8    A.    Yes.  In fact, this was a very concerning and a turning

9    point because the 21st we had 40 civilian children unaccounted

12:40PM 10    for, taken away, and now we had 40 others, and this time killed

11    within the premises of the hospital with, the evidence that we

12    had seen, so an unacceptable situation was what my team and

13    myself felt.

14          So I asked for a meeting with the hospital

15    direction.  And along with the military patients that were in

16    the hospital, there was a person responsible.  He was a medical

17    captain, and he was designated as responsible for all the

18    affairs of the soldiers, and in fact he seemed to have been in

19    full command of the hospital at this time.  So I asked for a

12:40PM 20    meeting with the International Committee of the Red Cross Head

21    of Mission, who made himself available, Dr. Jolton, myself and

22    the military captain responsible for the affairs of the

23    Presidential Guard and the soldiers in the hospital.

24    Q.    Where did this conversation occur?

25    A.    It occurred in the director's office.

J.A. 324

1   Q.   Where is that on the map there?

2   A.   So it's here.  Can you see that arrow?

3   Q.   Yes.

4   A.   Okay, yeah, that's the building.  It's in fact the

5   upper-story building, the second story of that building.

6   Q.   So did the conversation occur?

7   A.   It did.  I explained the situation, and I made it clear in

8   the strongest possible terms the ethical and human rights

9   considerations around what has happened, and also the

12:42PM 10   obligations of the military forces in terms of respecting the

11   Geneva Convention, and the right for woundeds, irrespective of

12   their ethnic, religious, or other backgrounds.

13          I also told him that "We are not Tutsis.  We're

14   not Hutus.  We're not Rwandans.  We are here to treat everyone.

15   We will treat all your soldiers.  We will treat all civilians,

16   irrespective of who they are.  But the conditions for us to

17   work is that you respect those conditions.  Everyone has the

18   right to be treated."  And I was hoping, because we were then

19   the last functioning medical facility in the south of Rwanda,

12:42PM 20   that where we had 140 soldiers and we had surgical teams, that

21   he would think, "Oh, we'd better keep these guys because we

22   need them for our soldiers."  But my attempt at negotiation was

23   that this way I would -- I would also ensure the protection and

24   the refuge of the civilians that I was trying to protect.

25          Well, for the first time I realized that Dr. Jolton,

J.A. 325

1    who was the hospital director, and several times I looked at

2    his face, but he was mum silent; he was no longer in control.

3    The military captain was, but he was -- he hardly said

4    anything.  In fact he -- it was me and my colleague who was

5    speaking, and he just said at a certain moment, "We will do

6    what we can."  And that was the end of the meeting.  So it

7    didn't last too long, maybe 25 minutes, 30 minutes.

8    Q.   What did you do after that conversation?

9    A.   So we came down.  He was in front, followed him.  We come

12:44PM 10    down the steps into the corridor just around where the MSF

11    tents are, and a few other soldiers come towards him, and he

12    says in French -- and we had heard this already before, two

13    days before, and I learned of this from my staff -- he says,

14    "This hospital stinks with Tutsis.  Clean up."

15    Q.   What happened next?

16    A.   So in one of the tents that was close by, a soldier or

17    maybe two, two soldiers go in.  They open the tent.  There is a

18    patient who was on a table being sutured.  In fact he had a

19    laceration, had an I.V. line, which is a drip.  They pull off

12:44PM 20    the I.V. line, and they drag the patient off the table as he

21    was being sutured.  And when you suture, you actually have a

22    needle holder, and you hold the needle and then -- so as the

23    person was dragged off, the line and the suture gets ripped

24    off, and he's taken away.

25    Q.   Who else was there to witness that?

**J.A. 326**

1     A.    In addition to that, well, my other staff were there, and

2     there was quite a lot of commotion going on now.  And then

3     other soldiers with civilians come and they take -- we had

4     five -- at this moment we had just five MSF Rwandese staff

5     there.

6     Q.    Before we get to that, you said other soldiers came with

7     civilians.  Do you mean civilian patients or other civilians?

8     A.    Other civilians, yes.

9     Q.    What types of civilians were they?

12:45PM 10     A.    Dressed in ordinary uniform.  Some had machetes.

11     Q.    So you were talking about nurses, and that's where I

12     wanted to turn next.  How many nurses did MSF or Doctors

13     Without Borders have at that point?

14     A.    At that moment, if I remember right, we just had five.

15     Q.    Do you recall their names?

16     A.    Yes, I do.

17     Q.    What were they?

18     A.    I recall their first names because their second names are

19     extremely difficult in Kinyarwandan.  So it was Sabine, Nadine,

12:46PM 20     Rose, Alex, and Jean Marie.

21     Q.    Where were they from?

22     A.    They were all Rwandans.

23     Q.    Do you know what their ethnic group was?

24     A.    Yes, I did because obviously I needed to find out.  So all

25     of them, Nadine, Rose, Alex, and Jean Marie, were Tutsi, and

J.A. 327

```
 1    Sabine was Hutu.  In fact, I had asked them already, "Do you
 2    want to stay in this hospital?  You know what's happening.  You
 3    know the situation."  Especially the Tutsi staff who were
 4    employed by us, I told them, "Look, if you want to go
 5    somewhere, we can do whatever."  They felt the hospital was
 6    probably the safest place to stay and be, and they continued to
 7    render their services.
 8    Q.   So, first of all, can you show on the map where it was
 9    that you saw that soldier's I.V. line ripped out and taken
10    away.
11              (Witness indicating.)
12    Q.   In what direction was he taken to?
13    A.   Oh, he was taken in this direction.
14              (Witness indicating.)
15    A.   So they were being taken this way.
16    Q.   So you had started to talk about nurses because I was
17    asking about what happened after that.  So what did happen
18    after that patient was taken away?
19    A.   So, I mean, this area has quite a lot of civilians.  They
20    had -- our staff had patients, but then two other soldiers
21    came, and they took Nadine and Rose.
22    Q.   Where did they take Nadine and Rose from?
23    A.   They were actually working in one of the other tents, so
24    in one of these tents, in that tent.  And so they were taken.
25    So I --
```

(Time markers: 12:47PM at line 10, 12:48PM at line 20)

**J.A. 328**

```
 1    Q.   Before you get to that, how long was it between when that

 2    patient had been taken away and when the first nurse was taken

 3    away?

 4    A.   Minutes.  It was all happening at the same time, following

 5    the order that was given.

 6    Q.   Who were they taken away by?

 7    A.   Soldiers.

 8    Q.   And where were they taken to?

 9    A.   Taken in the same direction.

12:48PM 10  Q.   Did you get a look at their faces as that happened?

11    A.   At Nadine and --

12    Q.   At Nadine and Rose's faces?

13    A.   Yes, and in fact I tried to appeal to the soldiers.

14    Q.   What did you say?

15    A.   I told them, "These are my staff.  They've been working."

16    In fact they basically said, "They are on a list.  There's

17    nothing you can do."

18    Q.   Did they show you a list?

19    A.   No.  I didn't see a list at this time.

12:49PM 20  Q.   Were Nadine and Rose taken at the same time, or was there

21    a little bit of delay?

22    A.   No.  They were taken at the same time.  They were taken

23    together.

24    Q.   You mentioned civilians being around at that point.  Were

25    they also civilians who were armed?
```

J.A. 329

1   A.    No.  They were patients because this area had quite a lot

2   of patients hanging around.

3   Q.    Okay.  Did you ever see Nadine again?

4   A.    Sorry?

5   Q.    Did you ever see Nadine again?

6   A.    No.  I haven't seen Nadine or Rose ever again.  And our

7   mission has tried after to search for them, and they have not

8   been seen, and I learned much later that they had been killed.

9   Q.    I think that you mentioned before that Sabine was a -- let

12:50PM 10   me ask you before I get to Sabine, you talked about Nadine and

11   Rose.  Alex and Jean Marie, what happened to them?

12   A.    Well, just after this, another soldier comes and takes

13   Sabine.  She's pulled.  She's also working in the same area.

14   So I see the commotion, and I come out and I see the soldier

15   dragging Sabine.  Now, Sabine was Hutu.  She was seven months

16   pregnant.  And Sabine was a friend.  So when they came to take

17   Sabine, I intervened.  I intervened physically.  I got between

18   the soldier and I got between Sabine, and I told the soldier,

19   "There's a mistake.  There's a mistake.  Sabine is not Tutsi.

12:50PM 20   She is Hutu."  And I could see the military captain who was

21   close by.  I turned to him because obviously he was in command.

22   And I said, "Captain, there is a mistake.  Sabine is Hutu.  She

23   is not Tutsi.  And she has been taking care of your soldiers.

24   And I located her to the orthopedic ward.  You've seen how

25   she's been working."

**J.A. 330**

```
        1            So he doesn't say anything, and then he comes

        2    towards me, and I look into his eyes for hope.  Well, he simply

        3    opens his rear pocket, and he takes out a paper in which there

        4    is a typed list or typed names, and, in addition, there was

        5    handwritten notes on it.  He looks at it very carefully, and

        6    then he looks straight into my eyes and he says, "Doctor, you

        7    are right.  You are right.  Sabine is Hutu, but this child that

        8    she's going to have is going to be Tutsi."  It was the first

        9    time in Rwanda that I realized that the child follows the

12:52PM 10    paternal line.  Sabine was taken away in the same way as

       11    Alex and -- sorry, as Nadine and Rose.

       12    Q.    When Nadine was taken away, was it day or night?

       13    A.    It was in the day.

       14    Q.    When Rose was taken away, was it day or night?

       15    A.    All of them was during the day.

       16    Q.    Did you ever see Sabine again?

       17    A.    No.

       18    Q.    What about the other two nurses, Alex and Jean Marie?

       19    A.    Well, so after what happened to Sabine, I felt I needed to

12:52PM 20    go to higher authority to try to see if we can make a change.

       21    So I called on my staff, and I tried to see if I could meet

       22    then the military liaison officer, who was then the

       23    Captain Nzyemana, Delphonse Nzyemana, who was then the liaison

       24    officer for us.  And I was even trying to go and see Tharcisse

       25    Muvunyi, the brigade commander, to say this is completely
```

J.A. 331

1    unacceptable.  And I knew both of them well.  So I managed to

2    get a meeting with Captain Nzyemana, and I explained what has

3    happened, and I said, "Well, three of their staff have also

4    just been taken by your soldiers, by these soldiers," and that

5    "You need to try to do something."

6              And I was hoping that -- well, what he told me

7    was that he would look into it and he will investigate and get

8    back.  Obviously he had radio communications.  I was hoping

9    that he would call back the hospital authorities and put some

12:54PM 10    order.  I left.  Ideally I would have expected him to have

11    followed me and done something, but, well, at least I felt at

12    the time that maybe there might be a change.

13              I come back to the hospital, and I'm told by my

14    other expatriate staff that Alex and Jean Marie have also now

15    been taken.  And as I am back, I can see civilians, and they

16    say, "Well, it's been happening since you left that civilians

17    are being taken out in ones and twos."  And you could see that

18    happening by soldiers and civilians, militia, and being dragged

19    away.  Of course, there were screams.  They were trying to

12:54PM 20    resist, but that was the general scene that was happening at

21    this time.

22    Q.   And was that during the day or during the night?

23    A.   This was in the day.  It was towards 4:00 o'clock in the

24    evening.

25    Q.   Were you able ever to determine how many patients,

1    civilian patients had been killed on the 22nd and the 23rd?

2    A.   We estimate about 150.  I mean, we haven't done a head

3    count for obvious reasons, but we had lost 40 patients clearly,

4    children on the 21st, 40 on the 22nd for which we had a head

5    count; and then, from what was happening, there was 60 -- I

6    mean, there was probably about 60 to 70 patients left there.

7    It might actually be an underestimate, but that was sort of the

8    estimate we assumed that happened during the 22nd, 23rd, or

9    21st to 23rd.

12:55PM 10    Q.   As a result of all of this, what did you decide to do?

11    A.   At that moment in the hospital, I decided that the

12    conditions for Doctors Without Borders to work had been -- I

13    think the situation was just unacceptable.  We had lost

14    neutrality.  We had no more patients, and in a certain way, we

15    had no more staff.  I considered my Rwandese staff that were

16    working in the hospital part of our staff, and this situation

17    was completely unacceptable.  I told my staff at the hospital

18    that "I've taken the decision to evacuate," and they fully

19    endorsed that decision.

12:56PM 20    Q.   Did you evacuate that night?

21    A.   No, we didn't because we knew the border closes about 6:00

22    o'clock and that we might be stuck on the border, and we felt

23    perhaps trying to leave at night might be even more dangerous.

24    So we decide to spend the night in our own residences and leave

25    the next morning.  And I had actually told -- and I very much

J.A. 333

```
 1   felt also that we should see the authorities again before we

 2   leave.  So I spent the night actually in Butare with my team.

 3   Q.   What happened next?

 4   A.   Well, in the morning I went -- we decided we'll evacuate,

 5   so with my team and the team from Holland and the other MSF

 6   delegations, we -- I went to see Captain Nzyemana again at the

 7   same auditorium.  He was there in another meeting, and he

 8   basically confirmed that what has happened in the hospital.

 9   And he said, "The situation is well out of my control.  I can

10   do nothing."  And we actually left that day on the 24th of

11   April, 1994.

12   Q.   Did you ever go back to the hospital?

13   A.   Unfortunately not.  I felt there was no more reason to go

14   back.

15   Q.   Did you go to the border where the Burundi refugees were

16   located?  Where did you evacuate to?

17   A.   We evacuated in fact out of Rwanda to the Bugarama side,

18   Burundi border, with a plan to evacuate to Bugarama.  In fact,

19   I was pulling my mission out.

20   Q.   How long did it take to get there?

21   A.   It took me about two and a half, three hours.  There were

22   still checkpoints, but it was much easier.  But then there were

23   no more villages.  They were all empty.  I think most of the

24   killing was already done.  We didn't see any more bodies on the

25   side.  Most people were festive.  We still had the checkpoints,
```

12:57PM appears at line 10.
12:58PM appears at line 20.

J.A. 334

```
 1    but this time it was easier because we didn't also have any

 2    African delegation in our team, and ID cards were not even

 3    asked for.

 4    Q.   And what did you see as you got to the border?

 5    A.   I got to the border.  Now, all along the way the Akanyaru

 6    River, which flows out from Rwanda across the border into the

 7    Burundi side, there were bodies, civilian bodies floating.  In

 8    fact, I stood on that bridge for over 30 minutes, probably an

 9    hour just counting.  There was one -- there was like six bodies
10    every minute on the average.

11    Q.   Why did you do that?

12    A.   I was, well, probably in reflection just thinking what --

13    you know, I can't explain it, but that's what I was doing.  It

14    was a failure for us.

15    Q.   What ages and genders were the bodies, as best you could

16    tell?

17    A.   They were women, children, elderly, all kinds of

18    civilians.

19    Q.   Was that river and the bodies, were they flowing into or

20    out of Rwanda?

21    A.   Out of Rwanda.

22    Q.   Dr. Zachariah, why did you stay so long in Butare?

23    A.   A passion to try to help, a passion to save lives.  I

24    think that's what Doctors Without Borders was created for, and

25    I think myself and my team, we were trying to stand by that.
```

J.A. 335

1 Q. Had Doctors Without Borders ever left a war zone under

2 similar circumstances at that point?

3 A. No, not under these circumstances.  We had never had our

4 hospital patients massacred.  We had never had our civilian

5 patients killed because of their ethnicity, so this was an

6 unprecedented moment in our history.

7    THE COURT:  Is this a good place to break, or are you

8 done?

9    MR. GARLAND:  If I can just consult with counsel for

01:00PM 10 one second.

11    (Discussion between government counsel.)

12    MR. GARLAND:  Your Honor, no more questions for

13 Dr. Zachariah from the government.

14    THE COURT:  All right, we will break and resume at

15 2:00 o'clock with cross-examination.

16    THE CLERK:  All rise.

17    (Jury excused.)

18    (Noon Recess, 1:01 p.m.)

19    THE CLERK:  All rise for the jury.

02:02PM 20    (JURORS ENTERED THE COURTROOM.)

21    THE CLERK:  Thank you.  You may be seated.  Court is

22 now back in session.

23    THE COURT:  Mr. Lauer.

24

25

**J.A. 336**

<pre>
 1                        CROSS-EXAMINATION

 2   BY MR. LAUER:

 3   Q.   Good afternoon, Doctor.

 4   A.   Good afternoon.

 5   Q.   Again, MSF refers to Doctors Without Borders, so I'm going

 6   to use that term.  The MSF headquarters was located in the Town

 7   of Butare?

 8   A.   That's right.

 9   Q.   And that was your home base?

10   A.   Yes.

11   Q.   The facilities you had in the hospital were specifically

12   installed to deal with the anticipated conflict situation?

13   A.   That's right.

14   Q.   I want to talk to you a little bit about Butare in the

15   early days of April.  You made reference to the plane crash on

16   April 6th, you recall that event?

17   A.   Yes, I do.

18   Q.   And you recall in the days immediately thereafter, the

19   Town of Butare remained calm?

20   A.   Yes.

21   Q.   And it was due to the information you were getting about

22   the situation in Kigali that you started to make these

23   arrangements for what might be an escalating conflict

24   situation?

25   A.   Yes, that's right.
</pre>

J.A. 337

```
 1   Q.   So you testified you obtained a letter from the colonel
 2   that permitted you to travel about?
 3   A.   In fact, we were obliged to get a letter from the colonel
 4   on three occasions.
 5   Q.   And you were able to travel about in the City of Butare in
 6   the few days after the plane crash?
 7   A.   Yes, we were.
 8   Q.   You didn't see on April 7th, April 8th, 9th, April 10th,
 9   violence?
10   A.   That's correct.
11   Q.   Life in Butare at least was relatively normal?
12   A.   For us, yes.
13   Q.   In terms of the hospital, this was a point in time when
14   you were starting to set up your tents?
15   A.   Yes, I think around the 9th.
16   Q.   And the hospital at that point in time was business as
17   usual?
18   A.   Yes, except for the emergency movement that we were
19   involved with, yeah.
20   Q.   And you made reference on direct examination, you were
21   working closely with the hospital authorities?
22   A.   That's right.
23   Q.   You were having regular meetings to try and prepare as
24   best you could for this situation?
25   A.   Mainly with the hospital director, who was my reference
```

J.A. 338

```
 1   point.

 2   Q.   That was Dr. Jotham?

 3   A.   That's right.

 4   Q.   And he was cooperative with you, was he not?

 5   A.   He was.

 6   Q.   And he was the guy in charge at that time?

 7   A.   There was a hospital board, who I had met earlier on, I

 8   mentioned, I think that must be the 9th or the 10th, but once

 9   they were okay with it, Jotham was my reference point.

02:05PM 10   Q.   And you worked well together?

11   A.   Yes.

12   Q.   Now, you did testify about a number of excursions you made

13   outside of Butare starting on or about April 13th?

14   A.   That's right.

15   Q.   Is that accurate?

16   A.   Yes.

17   Q.   You testified about travel to Gitarama on April 13th?

18   A.   That is right.

19   Q.   And it was only once you got outside of Butare closer to

02:05PM 20   Gitarama that you encountered this large group of people,

21   civilians walking toward Butare, right?

22   A.   That is correct.

23   Q.   And you came to understand that what they were doing was

24   fleeing from an area of conflict and going to Butare?

25   A.   That is correct.
```

J.A. 339

```
 1    Q.    You described venturing outside of Butare on a few other

 2    occasions to Kibuye?

 3    A.    Yes.

 4    Q.    And that was the church where you heard that gunfire?

 5    A.    Indeed.

 6    Q.    And you described venturing to the camps on the Burundian

 7    border which you described as hell on earth?

 8    A.    Yes.

 9    Q.    That sort of violence during the period of time was not

10    taking place inside of Butare?

11    A.    Well, the 19th, it was already happening to the first;

12    checkpoint on the exit of Butare.

13    Q.    We'll get to the 19th, but I'm going to ask you to focus

14    on the period of let's say April 7th through April 18th.  That

15    period of time in Butare, you were not seeing that level of

16    conflict that you saw outside of the city; is that a fair

17    statement?

18    A.    Well, the security had changed on the 17th, as I had said

19    earlier on.

20    Q.    I'm not asking you about the security, I'm asking you

21    whether there were conflict, whether there were people being

22    murdered in front of your very eyes inside the City of Butare

23    as you saw elsewhere on the countryside?

24    A.    Well, on the 17th in front of the authorities, we saw one

25    person taken out of the car and being gun butted to death.
```

02:06PM (line 10)
02:07PM (line 20)

J.A. 340

1    This was on the 17th, and I mentioned it earlier on just in

2    front of the auditorium.

3    Q.   Obviously that's an instance of violence?

4    A.   Yes.

5    Q.   What you described when you ventured outside the city was

6    eventually being surrounded by it; is that a fair statement?

7    A.   I don't think I got that question right, excuse me, if you

8    would be so kind as to repeat it.

9    Q.   Well, you testified about April 13th traveling to

02:08PM 10   Gitarama?

11   A.   Yes.

12   Q.   And seeing people fleeing and hearing gunfire, right?

13   A.   Right.

14   Q.   And you came to understand there was, in fact, a massacre

15   of many hundreds of people, perhaps thousands of people at that

16   location, correct?

17   A.   That is exact, yeah.

18   Q.   Okay.  Then you testified about going to Kibuye to these

19   camps where you saw large groups of people fleeing, being

02:08PM 20   chased, so that level of violence?

21   A.   That was on the 19th going to the Burundian border, not to

22   Kibuye and not to camps, it was going to the Burundian border

23   on the 19th.

24   Q.   Right.  Okay.  Maybe I'm not making myself clear with my

25   question.  What I'm asking you --

```
 1    A.    Right.

 2    Q.    -- is about life on the street in Butare Town, the city,

 3    between let's say April 7th and April 19th, when there was this

 4    speech.  Is it fair to say that relative to what you saw

 5    outside of Butare, Butare was calm?

 6    A.    I think that is fair, yes.

 7    Q.    Now, during that time period, and I'll qualify this again

 8    before April 19th, you were going to the hospital on a daily

 9    basis, correct?

10    A.    Yes.

11    Q.    And the hospital was functioning?

12    A.    It was.

13    Q.    You saw the doctors and staff there were treating

14    patients?

15    A.    Yes.

16    Q.    And you were working closely with the staff there to do

17    that?

18    A.    Not in the patient wards, mainly on the emergency side,

19    but that was mainly run by MSF, and most of my work was related

20    to the surgical side, and I had my team, so I didn't

21    necessarily always have to see the hospital staff.  If there

22    was a need, I did, but I had people in the hospital who were

23    working.

24    Q.    So you had a management role and an oversight role,

25    correct?
```

```
 1    A.    That's right.

 2    Q.    And in that role, it was not brought to your attention

 3    that there was any disruption in the provision of medical

 4    service?

 5    A.    Until that time, no.

 6    Q.    Now, you did mention on April 19th, that was a date that

 7    things changed pretty drastically, correct?

 8    A.    Yes.

 9    Q.    You mentioned that there had been a speech that day?

10    A.    That's right.

11    Q.    And that was by the interim president, Sindikubwabo?

12    A.    That's right.

13    Q.    And it had really sort of ushered in a wave of violence?

14    A.    That was the perception, yeah, that was the understanding.

15    Q.    And on April 19th, you actually spoke to the outgoing

16    prefet, right, the governor?

17    A.    I spoke to him on the 18th.

18    Q.    And that was basically shortly before he was replaced?

19    A.    In fact, when I met him, he had already been taken off, he

20    was just cleaning his office, so I believe he was taken off on

21    the 17th.  He told us when we went to see him I was being taken

22    off of my duties as of yesterday, you have to meet the new

23    prefet, and I have no control over the situation anymore.

24    Q.    So the person who had been in charge of that prefecture,

25    that particular area, he was replaced, and someone else was
```

02:10PM (line 10)
02:11PM (line 20)

**J.A. 343**

```
 1    brought in?

 2    A.   That is correct.

 3    Q.   And you actually had a meeting with that new prefet or

 4    governor who was really not interested in hearing you out,

 5    correct?

 6    A.   That is correct, yeah.

 7    Q.   And then on April 20th, you testified that you were

 8    actually at the hospital when some military helicopters landed?

 9    A.   Yes, that's right.

10    Q.   And they brought about 40 wounded soldiers?

11    A.   That is right, on the first helicopter that landed.

12    Q.   And there were other helicopters that landed?

13    A.   Yes.

14    Q.   Bringing more wounded soldiers?

15    A.   Indeed.

16    Q.   And those wounded soldiers, they were accompanied by other

17    soldiers who were not wounded?

18    A.   Yeah, there were a few, I guess on the first one, I was

19    not there for the second and third, I was told three

20    helicopters came.  On the first one, yes.

21    Q.   And you were told at that point in time that the hospital

22    was now being designated a military hospital?

23    A.   That is right.

24    Q.   And starting on April, the evening of April 19th, there

25    were a lot of soldiers at the hospital, patients as well as a
```

**J.A. 344**

```
 1    few who were not patients?
 2    A.    April the 20th.
 3    Q.    April the 20th; is that correct?
 4    A.    That is correct, not the 19th.
 5    Q.    And at that point in time, April 20th -- no, excuse me,
 6    April 21st, okay, so moving to April 21st, you said you showed
 7    up at the hospital about 8:00 in the morning, right?
 8    A.    That's correct.
 9    Q.    And that is relatively common for new staff or day staff
10    to come at that particular time, correct?
11    A.    Sorry, I didn't get that question.
12    Q.    Well, you mentioned that there was a nighttime staff,
13    correct?
14    A.    Right.
15    Q.    A much smaller amount of staff members who were present
16    during the overnight?
17    A.    Right.
18    Q.    You were not part of that overnight staffing?
19    A.    No, I was not.
20    Q.    You came in on April 21st at about 8 a.m.?
21    A.    That's right.
22    Q.    Is that about the same time period, 8 a.m., where the day
23    staff arrived?
24    A.    No, I think they had different timings.
25    Q.    Are you aware of the particular timings of the various
```

02:13PM (line 10)
02:14PM (line 20)

**J.A. 345**

1  staff members?

2  A.   I can't remember the exact, they followed the hospital

3  timings.

4  Q.   As a general matter, was there a night staff and a day

5  staff?

6  A.   Is this hospital staff or MSF staff?

7  Q.   I'm specifically asking you about hospital staff and not

8  MSF staff.

9  A.   I do not know, I'm afraid, but I would tend to believe

02:14PM 10  that most hospitals and the university hospital would be no

11  different, you work in shifts.

12  Q.   Now, that morning of April 21st, you arrive at 8 a.m. and

13  you learn that 40 children had been relocated?

14  A.   That is correct.

15  Q.   You hadn't actually seen that with your own eyes?

16  A.   No, I had not.

17  Q.   It was brought to your attention because you were again in

18  an oversight sort of role?

19  A.   My staff actually told me about this in the morning from

02:15PM 20  the pediatric ward.

21  Q.   Okay.  Then similarly on the morning of the 23rd, you

22  arrive at the hospital about 8 a.m., correct?

23  A.   That's right.

24  Q.   And you explained on direct examination that you spoke to

25  your staff and learned that there had been more patients

**J.A. 346**

        1   removed that previous evening?

        2   A.    That is correct.

        3   Q.    And you yourself upon hearing that were able to see that

        4   there were dump trucks and that there were bodies being loaded

        5   into those dump trucks?

        6   A.    Yes.

        7   Q.    And you identified that as having taken place.  If we

        8   could have Number 23, could you once again point to the area

        9   where you saw the dump trucks.

02:16PM 10   A.    It would be here.  (Indicating)

       11   Q.    Okay.  Were you able to see that from the area where your

       12   tents were installed or did you have to walk around?

       13   A.    I had to walk down.  In fact, my car was parked there, and

       14   my staff actually called my attention to say, well, they're

       15   taking the bodies now.

       16   Q.    Okay.  So they told you they're taking the bodies, and you

       17   walked there to see?

       18   A.    Yes.

       19   Q.    Now, you explained that there were certain patients that

02:17PM 20   were MSF patients, and there were certain patients that were

       21   just general hospital patients.  Was there a distinction

       22   between the two?

       23   A.    In terms of -- there wasn't.  I mean, how would there be?

       24   We were interested very much in all of the patients, but, of

       25   course, the injured and those taken refugee, seeking refuge in

J.A. 347

1    the hospital, we were particularly interested with them, but

2    there was no demarkation between say MSF patients and this is a

3    University Hospital that does not belong to us.  The primary

4    responsibility lies still with the hospital, and we were

5    complimenting the services there.  That was our role.

6    Q.   Okay.  So patients didn't belong to MSF or patients didn't

7    belong to the hospital, both MSF and the hospital were working

8    jointly to provide care?

9    A.   Yes.

10   Q.   Is that accurate?

11   A.   Yes.

12   Q.   You mentioned that the hospital had become very congested.

13   Is that true?

14   A.   Yes, after the 20th, I would say, I mean, the bed

15   occupancy rate had gone up because we basically had civilians.

16   We kept patients who could be discharged.  They preferred to

17   stay in the hospital, and then, of course, there was the influx

18   of military soldiers who were wounded.

19   Q.   So when we're looking at Exhibit 23 here, there's any

20   number of buildings, there's the courtyard area with the MSF

21   tents.  How much bed space was there at the hospital?

22   A.   I believe if my recollection is right, there was roughly

23   about 400.

24   Q.   Okay.

25   A.   Maybe 350 to 400.

**J.A. 348**

```
 1    Q.   And was the hospital at capacity by April 20th?

 2    A.   I believe after the 20th, it was probably at full

 3    capacity, yeah.

 4    Q.   And --

 5    A.   Or more.

 6    Q.   And in terms of more, there were people in the courtyards,

 7    correct?

 8    A.   Sorry, there were people --

 9    Q.   There were people, excuse me, in the corridors and outside
```
02:19PM 10    the rooms?
```
11    A.   The people in the tents, and in most hospitals in Africa,

12    I mean, bed occupancy is relative.  You can have -- I've seen

13    hospitals with 300 percent bed occupancy.  It basically means

14    you will have patients lying on the floor between the beds, but

15    space is something you make the best use of in those

16    circumstances.

17    Q.   Okay.  So if I understand you correctly, your best

18    estimate would be that there's about 400 beds in total at the

19    Butare University Hospital?
```
02:19PM 20    A.   If I remember right, that would be more or less what it
```
21    was, yeah.

22    Q.   And this being in a period that the hospital was at

23    capacity and extremely congested, there may well have been many

24    hundreds more either on the floors or in the corridors or

25    wherever they could be fit?
```

**J.A. 349**

```
 1    A.    Right, they could be.

 2    Q.    Okay.

 3    A.    There weren't patients in my recollection on the

 4    corridors.

 5    Q.    Do you recall there being people who were not even

 6    wounded, people who had just come seeking refuge who were just

 7    there?

 8    A.    Yes, they might well have been, but I have no head counts

 9    on those, and, in fact, in most African hospitals, family
02:20PM 10    members also accompany patients as part of help.

11    Q.    And is that -- do I understand it correctly that the

12    reason why family members might accompany a patient is to make

13    sure that the patient is fed and taken care of while they're

14    there?

15    A.    Yes.

16    Q.    We're not just dealing with 400 plus patients, we're

17    dealing with 400 plus patients, family members, other people

18    seeking refuge?

19    A.    Yes.
02:21PM 20    Q.    Throughout this --

21    A.    That would be right, yeah.

22    Q.    -- large campus with several dozen buildings?

23    A.    That is possible, yeah.

24    Q.    You mentioned that you saw at one point I believe on

25    April 23rd, you saw medical students providing care or
```

J.A. 350

```
 1    suturing, something to that effect?

 2    A.   On or around between the 20th and the 22nd.  I can't point

 3    a pin on the date.

 4    Q.   Okay.  But you do have a recollection of medical

 5    students --

 6    A.   Yes.

 7    Q.   -- providing essentially suturing?

 8    A.   That is right, yeah.

 9    Q.   Okay.  And can you identify where that was being done on

10    the map?

11    A.   So that would be here.  (Indicating)

12    Q.   Okay.

13    A.   If I remember right, yeah.

14    Q.   So that would be just sort of directly behind the

15    administration building?

16    A.   It's actually the surgical and emergency facility.  It's

17    where the surgical theater is.

18    Q.   Okay.

19    A.   And what you call the casualty, it's where patients first

20    come in.

21    Q.   Where patients are coming in, being assessed?

22    A.   Oh, No, that happened in our triage tents, but before you

23    get into the theater, people prepare you or you take patients

24    from the ward and you want to do suturing, you would bring them

25    there, roll them back out.  So, it's sort of, you know, you
```

02:21PM  10

02:22PM  20

**J.A. 351**

```
 1    could do sutures, you could do first aid.  It's a sort of
 2    first -- most surgical theaters and causalities have that space
 3    to allow you to prepare patients or to do more simple
 4    procedures.
 5    Q.   Okay.
 6    A.   Lacerations mainly.
 7    Q.   And that theater and what you circled there on the map,
 8    that's a building, correct?
 9    A.   It is, yeah.
10    Q.   It's not a tent?
11    A.   No, it isn't.
12    Q.   It has walls?
13    A.   Yes.
14    Q.   Do you recall whether or not there were windows?
15    A.   I can't remember, but I believe there must be.  I don't
16    know.  I don't know.
17    Q.   Do you have a specific memory as to that?
18    A.   No, I don't.
19    Q.   It's okay if you don't.  How big of a room is that?
20    A.   It's probably from where I am to maybe the third row of
21    the jury and then probably to here.
22    Q.   Okay.  And in that space, were the patients being attended
23    to by individual medical students or by teams?
24    A.   There were several medical students.  It was quite
25    congested.
```

02:23PM 10

02:23PM 20

```
 1    Q.    It was quite congested in that room?
 2    A.    It was, yeah.
 3    Q.    This was a time period where many people had been hurt?
 4    A.    Yes, or many were in there, yes, that's right.
 5    Q.    Many people needed suturing?
 6    A.    Yes.
 7    Q.    Many people needed first aid?
 8    A.    Yes.
 9    Q.    So it was a congested busy place?
10    A.    It was.
11    Q.    You mentioned that you had noticed that lidocaine was not
12    being used to provide anesthesia for some people receiving
13    sutures?
14    A.    That is correct.
15    Q.    When you noticed that, and I believe you said you
16    reprimanded the student or student involved, what resulted?
17    A.    They were not very attentive is the impression I had.
18    Q.    Was there a doctor on scene?
19    A.    I don't know, not that I remember, but they knew -- I
20    mean, I told them who I was and that this is not the way, you
21    know, and I knew they were medical students, and I told them
22    this is what they were supposed to do, but they were not
23    cooperative.
24    Q.    Was it your impression that they were more senior or more
25    junior?
```

1    A.    They were more -- it's difficult to say, more senior, more

2    junior in terms of the years of clinical service.

3    Q.    Well, let me actually take a step back.  The provision of

4    medical care in a hospital like this, a teaching hospital, do

5    you know whether junior medical students very, very, at the

6    beginning of their medical school, would they be permitted to

7    care directly for a patient?

8    A.    Generally not.  They should be under supervision of senior

9    doctors, and, ideally, a third-year medical student, it's a bit

02:25PM 10    too early to be doing that, you should be involved with

11    clinical skills, but practice can change in different

12    countries, but clearly they should have been under supervision

13    of senior doctors.

14    Q.    In the sorts of things or the role that let's a third-year

15    student as opposed to a fifth-year student might play are

16    handling instruments, medical instruments, scalpels, that sort

17    of thing?

18    A.    You mean the third year or the fifth year?

19    Q.    The third year.

02:26PM 20    A.    The third year, it's still early, I think, but, I mean,

21    the practice -- you are not yet a trained physician in Rwanda

22    or in any of the countries when you are a third to the fifth

23    year.  You must be doing that under supervision, but it's too

24    early in the third year to be doing that, that would be my

25    perception of things because you haven't yet had the clinical

**J.A. 354**

1      training to be doing that.

2            Ideally, you should be finishing your fifth year, you

3      should be doing your internship, and then during your

4      internship, you should be doing that because don't yet know the

5      anatomy and some of the clinical skills.  You should be doing

6      that under supervision under ideal circumstances.

7      Q.   And I believe you mentioned on direct examination that you

8      were familiar with Butare Hospital and the fact that there were

9      medical students who would observe the care that was being

02:27PM 10     provided?

11     A.   Yes.

12     Q.   It was not unusual to have medical students shadowing a

13     doctor in surgical?

14     A.   Not at all, that's the role of a university.

15     Q.   That's the whole point of a teaching hospital?

16     A.   Exactly, yeah.

17     Q.   The observations you made at the hospital where people

18     were being taken in front of your very eyes, that was taking

19     place in the tents?

02:27PM 20     A.   That was taking place, in fact, all around the area that I

21     showed you.

22     Q.   Can you just identify again where that was taking place?

23     A.   So these are the civilian patients outside those that I've

24     described, so these ones were being taken this way.

25     Q.   Okay.  And what was happening was soldiers were showing up

J.A. 355

```
 1    and taking the people, correct?

 2    A.   Well, I was not in the wards, I was in the area around the

 3    tents here, so my view of what was happening, you know, in the

 4    wards, I was not there but what you would see is a mix of

 5    soldiers and civilians.

 6    Q.   And I'm sorry to have to put it like this, but what you

 7    were seeing was not the person being murdered in front of you,

 8    what you were seeing was people being taken away to be

 9    murdered?

10    A.   Aggressively taken away, yes, that's right.

11    Q.   And you described them sort of walking upward on the map

12    away, is that your understanding of where they were going?

13    A.   Yes, that is where they were being taken.

14    Q.   Did you see any doctors pulling those patients in that

15    direction?

16    A.   Not to my recollection, no.

17    Q.   Did you see any medical staff pulling patients out of

18    their beds?

19    A.   I wouldn't know, but I didn't see anyone with white coats

20    doing that.

21    Q.   Did the medical students wear white coats?

22    A.   Yes, they did.

23    Q.   As best you could see from your own eyewitness

24    observations, did the doctors at the hospital appear to be

25    caring for their patients?  Were they treating them?
```

J.A. 356

```
         1   A.   It depends.  Yes, those who were there, you mean, were
         2   they taking care of their patients?  I had not been very much
         3   in the wards like the different wards so I don't know what's
         4   happening, but I would be inclined to think that the care was
         5   going on.
         6   Q.   And the reason you're qualifying that is because you
         7   weren't in the other wards?
         8   A.   Yes, I was in the other wards between -- and my presence
         9   was intermittent.
02:30PM 10   Q.   You were in a totally different location on this large
        11   hospital campus?
        12   A.   Predominantly my work was in the areas I've spoken to you
        13   about.
        14   Q.   And just because you were in one area doesn't mean you
        15   would have any knowledge of what was happening in a different
        16   building on the other side of the campus?
        17   A.   Except if I got information from my staff who was there.
        18   Q.   Right.  But in terms of your own observations, you can't
        19   say what was happening in a building where you weren't present?
02:30PM 20   A.   That is correct, yes.
        21        MR. LAUER:  I have no further questions, thank you.
        22        THE COURT:  Redirect.
        23        MR. GARLAND:  Very briefly, your Honor.
        24
        25
```

J.A. 357

```
 1                    REDIRECT EXAMINATION

 2   BY MR. GARLAND:

 3   Q.   Dr. Zachariah, when patients were being taken away by

 4   soldiers and by civilians on April 23rd, were you indoors or

 5   were you outside?

 6   A.   I was outside.

 7   Q.   Could you hear any noises in the distance?

 8   A.   I could hear them screaming and pleaing.

 9        MR. GARLAND:  No further questions.

10        THE COURT:  Any recross?

11        MR. LAUER:  No.

12        THE COURT:  Thank you, Dr. Zachariah.  Do we have

13   another witness for today?

14        MR. VARGHESE:  Your Honor, may we approach?

15        THE COURT:  Yes.

16        (THE FOLLOWING OCCURRED AT SIDEBAR:)

17        MR. VARGHESE:  Your Honor, we have a witness

18   available, but this is the witness we wanted to get done with

19   today, so if you would prefer, we're happy to stop for today

20   and pick up tomorrow morning.

21        THE COURT:  Why don't we do this.  How do you feel

22   about doing a half an hour of the witness and we'll break at

23   three?

24        MR. VARGHESE:  That's fine, your Honor.

25        THE COURT:  Do you want to do that?
```

02:31PM (line 10)
02:32PM (line 20)

J.A. 358

```
 1            MR. VARGHESE:  Absolutely, we're ready to do it.
 2   She's our first witness, and so it's going to take a little
 3   while with the translation.
 4            THE COURT:  You might not get very far, all the reason
 5   to make headway as long as we're here.  Why don't we do that.
 6            (SIDEBAR CONFERENCE WAS CONCLUDED)
 7            THE COURT:  All right.  What we're going to do since
 8   everyone is here, on the one hand, we're breaking early, but I
 9   think it would make sense to do half an hour and let you out at
10   three o'clock to make as much use of the time as we can, make
11   sure you're not caught at rush hour.
12            Mr. Varghese.
13            MR. VARGHESE:  Your Honor, the United States calls
14   Isabelle Mukankusi.  Your Honor, with this witness we have a
15   translator as well.
16            THE COURT:  Okay.
17            (The interpreter was sworn.)
18            THE CLERK:  Could you state your name for the record.
19            THE INTERPRETER:  Augustin Mutemberezi.
20            ISABELLE MUKANKUSI, having been duly sworn by the
21   Clerk, testified through the Interpreter, as follows:
22                        DIRECT EXAMINATION
23   BY MR. VARGHESE:
24   Q.   Good afternoon.
25   A.   Good afternoon.
```

```
 1    Q.   Can you please introduce yourself to the jury.  What is
 2    your name?
 3    A.   My name is Isabelle Mukankusi.
 4    Q.   And, Ms. Mukankusi, where are you from currently?
 5    A.   Butare.
 6    Q.   In Rwanda?
 7    A.   Yes.
 8    Q.   Back in 1994, how old were you?
 9    A.   I was 14.  I was born 1980.
10    Q.   Were you in school?
11    A.   Yes.
12    Q.   What grade were you in?
13    A.   Secondary school.
14    Q.   Ms. Mukankusi, what ethnic group did you belong to?
15    A.   I'm a Tutsi.
16    Q.   Back in 1994, where did you live?
17    A.   I was living in Butare.
18    Q.   Were you in Butare Town?
19    A.   No, I wasn't living in the entire town but in nearby
20    village.
21    Q.   How far was your house from the hospital?
22    A.   Driving was about 15 minutes.
23    Q.   Who did you live with?
24    A.   I was living with my grandmother and grandfather.
25    Q.   Where were your parents?
```

J.A. 360

```
 1    A.    They were living in Congo.

 2    Q.    Why were they in Congo?

 3    A.    They had taken a lift to Congo in 1990, when they were

 4    hunting them.

 5    Q.    Sorry, could you repeat the answer?  I didn't quite hear

 6    it.

 7    A.    They had taken a lift to Congo because they were hunting

 8    them in 1990 as suspect, cooperator.

 9    Q.    Were you living with anyone else other than your

02:37PM 10    grandparents?

11    A.    We had some domestic workers at home.

12    Q.    How many domestic workers were living with you and your

13    grandparents?

14    A.    There were two.

15    Q.    Did they help out with the house, help out cleaning and

16    cooking in the house?

17    A.    Yes.

18    Q.    Did you have any sisters and brothers?

19    A.    Yes.

02:38PM 20    Q.    Were they living with you?

21    A.    No, they had left with my parents to Congo.

22    Q.    How old were your grandparents in 1994?

23    A.    My grandfather was 105, and my grandmother was 92.

24    Q.    Prior to the genocide, were you aware of the contentions

25    between the Hutus and the Tutsis?
```

J.A. 361

```
 1    A.   I wasn't aware because I was young, but they were trying
 2    to tell us about it.
 3    Q.   I'm sorry.
 4    A.   I wasn't aware of it because I was young, but they were
 5    trying to inform us about it.
 6    Q.   When you were in primary school, were you ever -- was
 7    there ever an incident involving -- that you were involved in
 8    because you were a Tutsi?
 9              MR. LAUER:  Objection.
10              THE COURT:  Overruled.  Go ahead.
11    A.   Yes, it happened.
12    Q.   I'm sorry?
13    A.   Yes, it happened.
14    Q.   What happened?
15    A.   I was seven years old.  The teacher came into class and
16    asked the Tutsis to stand up.  I didn't know what I was.  I
17    kept sitting.  He came and he started knocking on my head
18    saying that I'm a Tutsi, I should stand up.
19    Q.   You didn't stand up?
20    A.   I stood up crying.
21    Q.   Why didn't you stand up when the teacher initially told
22    you to stand up?
23    A.   I didn't know if I was a Tutsi.
24    Q.   What did the teacher do to you to get you to stand up?
25    A.   He came and started knocking on my head saying that I
```

J.A. 362

```
 1    should be standing up because I'm a Tutsi.
 2    Q.   Why did the teacher want you to stand up?
 3             MR. LAUER:  Objection.
 4             THE COURT:  Sustained.  There's no question.
 5    Q.   And you were seven years old when this happened?
 6    A.   Yes.
 7    Q.   When you were growing up, were you ever called names
 8    because you were a Tutsi?
 9    A.   Ever since then nobody called me by the name.
10    Q.   I'm sorry, can you repeat that?
11    A.   Since that time nobody called by the name, by my name.
12    Q.   Since the time when you were forced to stand up?
13    A.   Yes.
14    Q.   What did they call you after that time?
15    A.   They would call me the girl from Bugesera.
16    Q.   Is Bugesera a part of Rwanda?
17    A.   Yes.
18    Q.   Are there a lot of Tutsis in that area?
19    A.   I did not know at that time, I don't know why they were
20    calling me that way.
21    Q.   Had you ever heard the term "Inyenzi"?
22    A.   Yes.
23    Q.   Had you ever heard it directed towards you?
24    A.   Yes, they used to call me that.
25    Q.   When did that happen?
```

02:41PM (line 10)
02:42PM (line 20)

**J.A. 363**

```
 1   A.   Yes, always the neighbors used to call us "Inyenzi" or
 2   snakes, cockroaches or snakes.
 3   Q.   Did that scare you?
 4   A.   Initially it was scaring me, but whenever they say they
 5   are assaulting you, you would be scared.
 6   Q.   What were the circumstances in which people would call you
 7   Inyenzi?
 8   A.   Just because being a Tutsi, that was enough reason.
 9   Q.   When did the genocide start in Butare that you recall?
10   A.   After the plane that was carrying the president crashed,
11   it started after two weeks.
12   Q.   What was the first act of violence that you observed in
13   Butare?
14   A.   They burned our house.
15   Q.   Before they burned your house, did you observe anything
16   else, others?
17   A.   We started seeing neighboring villages and the house when
18   the house was burning, and we could see the smoke going up.
19   Q.   At that time did you know why those houses were being
20   burned?
21   A.   No, at that time I wasn't aware.
22   Q.   At some point did you learn?
23   A.   Yes.
24   Q.   How did you learn about those houses being burned?
25   A.   I had a friend who it was the same class in the first year
```

**J.A. 364**

```
 1    of the secondary school, Angeliq.

 2    Q.   What did Angeliq -- where did Angeliq live?

 3    A.   It was living in a neighboring hill.

 4    Q.   Was her house one of the houses you saw?

 5    A.   I couldn't tell.  I'm not sure.

 6    Q.   At some point, did you see Angeliq after the houses were

 7    on fire?

 8    A.   Yes, I saw the house burning.  After that, I saw Angeliq

 9    with kids and carrying a suitcase.
```
02:46PM 10    Q.   Where did you see Angeliq?
```
11    A.   Close to our house, there was a main road, that's where I

12    say her with her sister, older sister, and three kids with the

13    suitcases.

14    Q.   What were they doing?

15    A.   I went to check on her, and I found she was sobbing, and

16    when I asked her, she told me --

17              MR. LAUER:  Objection.

18    A.   She told me her husband --

19              THE COURT:  Hold on.  Let me see counsel at sidebar.
```
02:47PM 20              (THE FOLLOWING OCCURRED AT SIDEBAR:)
```
21              THE COURT:  What do you expect the answer to be?

22              MR. VARGHESE:  She's going to say that she was told

23    that the house burned down and she ends up taking Angeliq into

24    her house.

25              THE COURT:  Okay.  It comes in, in other words, what
```

J.A. 365

1    Angeliq told her because?

2        MR. VARGHESE:  It's for the truth, it's to explain

3    actions.

4        THE COURT:  Okay.

5        MR. LAUER:  I'm still failing to perceive the

6    relevance.

7        THE COURT:  I don't know where any of this is going,

8    but I'll have to see, but in terms of the hearsay objection,

9    I'll let it in.  Do you think we need a limiting instruction on

02:48PM 10    something like this?

11        MR. LAUER:  This the first time they've encountered

12    that, so, yes.

13        THE COURT:  Okay.  All right.

14        (SIDEBAR CONFERENCE WAS CONCLUDED)

15        THE COURT:  All right.  Ladies and gentlemen, let me

16    explain something to you.  Sometimes when people tell us

17    things, we can take it for the truth, and sometimes it matters

18    only that we were told something, so, for example, if I told

19    you my birthday and you were filling out a form, you know,

02:49PM 20    you're the receptionist at the doctor's office, you're taking

21    that for the truth, that's actually my birthday.  Sometimes it

22    just matters what you're told, you did something because you

23    were told something.

24        If somebody told you the building was on fire and you

25    evacuated, you may not have any idea whether the building was

**J.A. 366**

1    on fire, but you left because you were told, and it's just the

2    fact of telling someone that matters.

3            So, in this case or this conversation what matters is

4    not whether what Angeliq told the witness is true but the fact

5    that the witness was told that fact is what matters because

6    then the witness did something in response, so I'm going to

7    instruct you may consider it for that limited purpose.

8            This is what we call hearsay in the law.  Sometimes

9    there's exceptions.  It's a complicated rule, but basically,

02:49PM 10    again, you can consider it for the fact that it was said to her

11    but not for whether it was actually true.  It doesn't matter

12    whether it was true or not.

13            Okay.  With that, Mr. Varghese.

14    Q.   What did Angeliq tell you happened that led to her walking

15    down the street with her sister?

16    A.   She told me that all the houses that are being burned are

17    Tutsis homes and her father and mother have been burnt in their

18    house.

19    Q.   What did you do after Angeliq told you that?

02:50PM 20    A.   They asked me where one of the Hutus teachers was teaching

21    us in school, where he lives, and I guided her there so that we

22    can hide from there.

23    Q.   Was she and her sister and the kids, were they scared that

24    people were following them?

25    A.   Yes.

**J.A. 367**

```
 1    Q.   What happened at that house of the Hutu teacher?
 2    A.   When we got there, we found there was a meeting going on,
 3    and he said I don't want any Tutsi in my home.
 4    Q.   So where did you go?
 5    A.   They came to our house.
 6    Q.   You mentioned it was Angeliq, her sister and kids as well,
 7    children as well.  How many children were there?
 8    A.   There were three kids.
 9    Q.   When you got to your house, what happened next?
02:52PM 10    A.   They stayed there for a week.
11    Q.   At some point, did you start hearing, receiving threats at
12    your house?
13    A.   After one week, they moved to another place, which was a
14    neighbor, a good neighbor.
15    Q.   Did you start receiving threats at your house?
16    A.   Yes, one day when I woke up in the morning and opened the
17    door, I found there was a letter saying that your granddaughter
18    is the one we are going to start with to kill.
19         MR. VARGHESE:  I'm sorry, can you repeat that again,
02:53PM 20    Augustin.
21    A.   One day when I woke up and opened the door, I found a
22    letter by the door saying that we are going to start killing
23    with your granddaughter.
24    Q.   Did the letter say why they were coming to kill you?
25    A.   It say that we're going to start with her because her
```

**J.A. 368**

```
 1    father went to RPF.
 2    Q.   Went to where?
 3    A.   Joined the RPF.
 4    Q.   What did you do after receiving that note?
 5    A.   I was scared fearing I may be killed.
 6    Q.   So what did you do?
 7    A.   I stayed there with my good friend.
 8    Q.   At some point did you flee the house?
 9    A.   Yes.
02:54PM 10    Q.   Where did you go?
11    A.   I went in the bushes and some places where there was
12    grass.
13    Q.   Who went with you?
14    A.   One female domestic worker, we hide.
15    Q.   Did your grandparents go with you?
16    A.   No, they were too old, they couldn't move out of the
17    house.
18    Q.   From where you were hiding, could you still see your
19    grandparents' house?
02:55PM 20    A.   No, I couldn't see because I was hiding in the grass.
21    Q.   At some point, did you see what happened to your
22    grandparents' house?
23    A.   After some time, we heard people saying when I was hiding
24    in the bushes with the other domestic worker, they were saying
25    they had killed the old people and burned their houses.  At
```

**J.A. 369**

         1   that time I thought of getting out so that they can kill me

         2   also.

         3   Q.   So what did you do next?

         4   A.   They grabbed me and was stopping me from making noise, so

         5   around six when the Interahamwe had rested, all gone.

         6   Q.   I'm sorry, can you repeat that one more time.

         7   A.   The worker tried to grab me and stopping me from making

         8   noise and around six, when the Interahamwe had gone.

         9   Q.   Why were you making noise?

02:56PM  10   A.   Because I was sad, and I just wanted to be killed with

        11   them.

        12   Q.   Because you thought the house was burning?

        13   A.   No, it was because I was so sad, my grandparents had been

        14   killed and burning the house.

        15   Q.   So did you go back to the house to look for them?

        16   A.   Around 6:30 we went, me and the other worker.

        17   Q.   Where did you go?

        18   A.   We went at home, my grandparents' home.

        19   Q.   And what did it look like?

02:57PM  20   A.   There were a lot of books at home of my father and his

        21   older brother, so the whole compound was full of books.

        22   Q.   What else?

        23   A.   They had broken the house, shuttered windows and

        24   everything looted.

        25   Q.   Did you find your grandparents?

**J.A. 370**

```
 1    A.    Yes, I found them there.  They had not been killed.

 2    Q.    Where were they?

 3    A.    My grandfather was in the house and my grandmother was

 4    lying on the floor.

 5    Q.    Did the attackers -- were the attackers gone?

 6    A.    Yes, they had left but had warned them they were coming

 7    the next day to kill them.

 8    Q.    What happened next?

 9    A.    After that, we had a domestic worker who had a house he

10    had not lived in yet, so he took me and the other female worker

11    and went and hid us there.

12    Q.    Did your grandparents go with you?

13    A.    No, they didn't.

14    Q.    Did they stay in the house?

15    A.    Yes, they stayed in the house.

16    Q.    How long were you at the other domestic worker's house?

17    A.    We got there around 8 p.m., but around 3 a.m. he came and

18    told us you need to leave here because they are coming to kill

19    you.

20    Q.    After learning that the Interahamwe were coming, where did

21    you go?

22    A.    We got out and went to hid at one gentleman who my

23    grandfather had given them the land.

24    Q.    And what happened next?

25    A.    The next day, he went and informed the Interahamwe that we
```

**J.A. 371**

1    are staying there.

2    Q.    So where did you go from there?

3    A.    So he kicked us out and we went back to the house.

4    Q.    And when you got back to your grandparents' house, what

5    was going on at your grandparents' house?

6    A.    We found out that the neighbors gathered there.  My

7    grandmother was still lying on the shattered glass scared, and

8    my grandfather was sitting on the veranda.

9    Q.    What were the Hutu neighbors doing?

03:02PM 10    A.    They were just getting whatever was there, cups, table.

11    Q.    Were they stealing your grandparents' stuff?

12    A.    Yes, they were taking them out.

13    Q.    Did you flee again?

14    A.    No.

15    Q.    Why not?

16    A.    The other female worker told me to hide in the store

17    because there was a big bay which was there which they had not

18    moved.

19    Q.    Is that what you did?

03:03PM 20    A.    Yes, but my grandfather was saying that you should stay

21    with us and let them kill us together.

22    Q.    At some point, did the Interahamwe return to your

23    grandparents' house?

24    A.    At that time, we heard a noise and we saw a big bone, and

25    the Interahamwe were coming wearing big knives.

J.A. 372

```
 1    Q.   Were they saying anything?
 2         THE INTERPRETER:  I want to ask, may you repeat?
 3    Q.   Sorry.  She said did you hear -- what did you hear?
 4    A.   They were saying that we have to kill all the Tutsis and
 5    getting them completely they are next, and we need to kill
 6    them.
 7    Q.   What happened next?
 8    A.   Where my grandfather was, I would see him from where he
 9    was under the bed.
10    Q.   To be clear, where were you?
11    A.   I was under the bed in the storage.
12    Q.   Storage, okay.  Where was your grandfather?
13    A.   He was by the front door.
14    Q.   What happened?
15    A.   I saw the Interahamwe blowing whistles and also wearing
16    big knives, and when they got there, they moved his sunglasses
17    and throw them on the floor.
18    Q.   His --
19    A.   Eyeglasses.
20    Q.   Eyeglasses and threw them on the floor.  What happened
21    next?
22    A.   They started cutting him with machete.
23    Q.   Did you see what happened next?
24    A.   There was a woman who saw me where I was hiding and said
25    there's another snake under the bed.
```

J.A. 373

```
 1    Q.   And did they come for you?

 2    A.   They came and pulled off the bed and saw me.

 3    Q.   And what happened to you?

 4    A.   Other than seeing them with the machetes and also the

 5    clubs, after that, I did not know anything.

 6    Q.   Did you lose consciousness?

 7    A.   Yes.

 8    Q.   Did you ever see your grandmother and grandfather again?

 9    A.   No.

10    Q.   At some point, did you wake up?

11    A.   Yes, I woke up.

12    Q.   Where were you?

13    A.   I was in a hospital.

14         THE COURT:  All right.  Why don't we pause there for

15    the day.  All right.  Ladies and gentlemen, thank you for your

16    cooperation and patience.  We will resume tomorrow at nine

17    o'clock.  I think we do not need an afternoon session tomorrow.

18         MR. VARGHESE:  That's correct.

19         THE COURT:  Please remember my caution not to read

20    anything about the case or to talk among yourselves or to talk

21    to anyone else, and we'll see you tomorrow morning at nine.

22         THE CLERK:  All rise.

23         (Whereupon, the hearing was adjourned at 3:06 p.m.)

24

25
```

03:06PM (line 10)
03:07PM (line 20)

**J.A. 374**

4-1

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

4      UNITED STATES OF AMERICA,          )
                                          )
5      vs.                                )  Criminal Action
                                          )
6      JEAN LEONARD TEGANYA,              )  No. 17-10292-FDS
                          Defendant       )
7                                         )
                                          )
8                                         )

9

10     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                        JURY TRIAL DAY 4

12

13

14
                John Joseph Moakley United States Courthouse
15                        Courtroom No. 2
                         One Courthouse Way
16                        Boston, MA 02210

17
                          March 13, 2019
18                          8:30 a.m.

19

20

21

22

23                      Valerie A. O'Hara
                       Official Court Reporter
24     John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                     Boston, MA 02210
                 E-mail: vaohara@gmail.com

J.A. 375

1    APPEARANCES:

2    For The United States:

3         United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;

5
     For the Defendant:
6
             Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.

8
     ALSO PRESENT:
9
     Augustin Mutemberezi, Interpreter
10   Moses B. Rndasunikwa, Interpreter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2   WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

3    ISABELLE MUKANKUSI
      By Mr. Varghese              8
4     By Mr. Lauer                       29
      By Mr. Varghese                            46
5     By Mr. Lauer                                         49
      By Mr. Varghese                            51
6
    JEAN PIERRE GASASIRA
7     By Mr. Garland              52

8

9   EXHIBITS                            FOR I.D.   IN EVIDENCE

10    26                                               9
      28                                              19
11    39                                             101
      58                                              69
12    60                                              78

13

14

15

16

17

18

19

20

21

22

23

24

25

J.A. 377

```
 1                          PROCEEDINGS
 2              THE CLERK:  All rise.  Thank you.  You may be seated.
 3      Court is now back in session.
 4              THE COURT:  All right.  Good morning, everyone.  What,
 5      if anything, do we have to talk about?  Mr. Garland.
 6              MR. GARLAND:  Nothing for the government, your Honor.
 7              THE COURT:  Mr. Lauer.
 8              MR. LAUER:  A housekeeping matter.
 9              THE COURT:  Yes.
10              MR. LAUER:  There's a member of the defense team who
11      is a court-certified interpreter in Kinyarwandan.  We'd like to
12      have him present to listen to the translation, and if there is
13      any issue bring it to the Court's attention.
14              THE COURT:  Any problem with that?
15              MR. GARLAND:  No objection, your Honor.
16              THE COURT:  All right.  That's fine.
17              MR. LAUER:  And this isn't necessarily salient for
18      this witness, but later today there is a witness the government
19      provided some additional exhibits that they would be proposing
20      to admit.  They're essentially photos or what seem to be
21      perhaps memorial photos of the victims, and there would be an
22      objection to that, and I would like to be heard on it.
23              THE COURT:  Okay.
24              MR. LAUER:  Outside the presence of the jury.
25              THE COURT:  Is that something I can take up now?
```

08:39AM appears at lines 10 and 20.

J.A. 378

1           MR. GARLAND:  No reason not to, your Honor.

2           THE COURT:  Do you have the photos?

3           MR. LAUER:  So, last night, the government sent us a

4    series of photographs.  I have some for the Court right now.

5    The second witness will be testifying today is Mr. Gasasira.

6    Mr. Gasasira, I suspect, will testify that each of these

7    individuals was killed.

8           This case is complex enough and has many names and

9    faces already.  If we're getting into the business of putting

08:40AM 10   in photographs of every single victim, it's going to be

11   unnecessarily confusing, and, quite frankly, prejudicial,

12   introducing a memorial photograph of the victims.

13          You know, we have to draw the line somewhere, and I

14   would suggest that admitting photographs of each and every

15   victim who may be testified about is unnecessary.

16          THE COURT:  Counsel.

17          MR. GARLAND:  Your Honor, a couple things.  First,

18   visual aids engage a jury.  They help keep things real for

19   them.  These are real people.  I don't think that there's any

08:41AM 20   argument that I've heard that the witness won't be able to

21   identify these people, and, moreover, the testimony seems to be

22   heading towards that this is a put-up job by the Rwandan

23   government, that the witnesses have either been forced, whether

24   indirectly or directly, into saying things, and at that point

25   the details that we can give the jury of the document what

# J.A. 379

1    happened is important.

2         Moreover, three of the people whose photographs you

3    have up there, the allegation will be that Mr. Teganya was the

4    person who participated in killing them.  That's certainly

5    relevant, it's not like there will be photographs of every

6    person.

7         THE COURT:  I'm not going to exclude the photographs.

8    I don't think they're inflammatory.  There's four of them, so I

9    don't think they're unnecessary in the sense of being

08:42AM 10    cumulative, and I guess I don't see they're relevant under 401,

11    and I don't see a 403 problem, so I'm going to permit them to

12    be admitted.

13         That reminds me, the defense filed a motion in limine

14    I think yesterday, which how quickly will I need to address

15    that?  In other words, how quickly is that issue coming up?

16         MR. GARLAND:  Your Honor, at this point I think it's

17    incredible unlikely that we're going to call that witness in

18    our case in chief, however, we are strongly thinking about

19    whether to call that person in rebuttal, if necessary,

08:42AM 20    depending on what witness --

21         THE COURT:  I just want you to know, I want to have it

22    sufficiently in advance so I can tee it up without the jury

23    sitting there and resolve it that way, so if you can just keep

24    everyone informed, including me, if it's your plan to call that

25    witness.

J.A. 380

```
 1            MR. GARLAND:  We will definitely do that, your Honor.
 2            THE COURT:  I may not have ordered this before, I
 3     can't remember, hopefully you're doing it anyway, but as a
 4     matter of professional courtesy, I certainly want you to tell
 5     each other who the next day's lineup is and the anticipated
 6     lineup for the day after that, and that applies to both
 7     prosecution and defense.
 8            MR. GARLAND:  We've definitely been doing that, your
 9     Honor.
08:43AM 10     THE COURT:  Obviously, things change but just so you
11     know, you know, who's coming.
12            All right.  I understand we have two interpreters and
13     may need to switch one out at some point; is that right?
14            MR. GARLAND:  I think that's right, just in case one
15     of them gets tired.  The other thing is to the extent they may
16     hear a word and might need consultation, they may want to bring
17     that to the Court's attention and ask permission to consult.
18            THE COURT:  One disadvantage is the space is a little
19     more cramped, but, and, obviously, the jury and everyone needs
08:44AM 20     to hear both the witness and the interpreter.  It was working
21     all right yesterday, but we'll just get by as best we can, I
22     guess.
23            Okay.  Anything else?
24            MR. GARLAND:  Nothing for the government.
25            MR. LAUER:  No, your Honor.
```

## J.A. 381

```
 1              THE COURT:  All right.  So we'll get started at 9:00,
 2    assuming we have all of our jurors.
 3              THE CLERK:  All rise.
 4              (A recess was taken.)
 5              MR. VARGHESE:  All rise for the jury.
 6              (JURORS ENTERED THE COURTROOM.)
 7              THE COURT:  Good morning, everyone.  All right.
 8    Ms. Mukankusi, do you understand you are still under oath?  You
 9    don't have to do it again.  Do you understand that you are
10    still under oath?
11              THE WITNESS:  Yes.
12              THE COURT:  Thank you.  Please be seated.
13    Mr. Varghese.
14              MR. VARGHESE:  Thank you, your Honor.
15                    ISABELLE MUKANKUSI, RESUMED
16                    DIRECT EXAMINATION, CONTINUED
17    BY MR. VARGHESE:
18    Q.   Good morning.
19    A.   Good morning.
20    Q.   I want to pick up from where we left off yesterday.
21    A.   Yes.
22    Q.   We were discussing the fact that you had woken up in the
23    hospital.  Do you remember that?
24    A.   Yes.
25    Q.   Which hospital?
```

09:00AM 10
09:01AM 20

```
 1    A.    The University Hospital.

 2    Q.    In Butare Town?

 3    A.    Yes, in Butare.

 4    Q.    Do you remember how you got there?

 5    A.    No, I don't.

 6    Q.    Did you learn how long you had been there?

 7    A.    I know how long I was there.

 8    Q.    When you first woke up, how long had you been there?

 9    A.    I had been there for about two and a half months.

10    Q.    What building at the hospital were you in?

11    A.    I was in the maternity ward.

12          MR. VARGHESE:  Can we have for the witness and the

13    parties Exhibit 26, please.

14    Q.    Ms. Mukankusi, do you see what's on the screen in front of

15    you?

16    A.    Yes, I see.

17    Q.    Do you recognize it?

18    A.    Yes.

19    Q.    Is it a fair and accurate picture of the ward that you

20    were in?

21    A.    Yes, that's it in the picture.

22          MR. VARGHESE:  Your Honor, we ask that Exhibit 26 be

23    admitted into evidence.

24          THE COURT:  All right.  It's admitted, Exhibit 26.

25          (Exhibit No. 26 received into evidence.)
```

09:02AM (line 10)
09:03AM (line 20)

J.A. 383

```
 1   Q.   Can you please explain what's in the picture?
 2   A.   This is the hall, the maternity hall in the ward I was in.
 3   There were two rooms in it, one for the people with the skin
 4   diseases.  Another part of the room had a lot of Tutsi people
 5   had been injured.  The people with the skin diseases were in
 6   the room behind, which was attached to it.  The first hall is
 7   the one we were in, all the Tutsis that had been injured.
 8   Q.   I want to ask you about the first hall where the Tutsis
 9   were injured.  Was it crowded?
10   A.   It wasn't full, but there were a lot of people.
11   Q.   What injuries had you suffered?
12   A.   I had been cut for ten times on my head, and the 15
13   machete which had cut my ear into two halves.
14   Q.   Do you still have scars from where you were struck?
15   A.   Yes, I have them, but after the genocide, I was treated, I
16   did surgery and they repaired my ear.
17   Q.   Can you show to the jury where you were cut in the attack
18   at your grandparents' house?
19   A.   Yes.
20   Q.   And maybe can you stand up and show them.
21   A.   One was around here, but they did some plastic surgery,
22   and they made it smaller.  Another was there, but they repaired
23   it also.  It used to be big.  Another one was cut around my ear
24   and was cut, but they also repaired it.  Another one was around
25   there where you can see.  Another one is here.  Another one was
```

09:04AM (line 10)
09:06AM (line 20)

# J.A. 384

           1    behind but unless one comes close and look, but there's so

           2    many.

           3    Q.   You can have a seat.  And you said these were machete

           4    cuts?

           5    A.   Yes.

           6    Q.   Others in the hospital, what injuries did they have, the

           7    other people who were in the room with you?

           8    A.   One, his leg was cut off.  Another one was hit by a club

           9    and the brain was visible.  One, arms were cut off.  All the

09:07AM 10    people who were there, they all had some injuries, and there

          11    were others which their muscles were coming out of their body.

          12    Q.   Were the people in the room Hutus or Tutsis or both?

          13    A.   There were all Tutsis.

          14    Q.   Were patients being treated for their injuries?

          15    A.   Yes, they were being treated.

          16    Q.   Did you observe patients who were not receiving proper

          17    medical treatment?

          18            MR. LAUER:  Objection.

          19            THE COURT:  I'll sustain it in that form.

09:08AM 20    Q.   What was the extent of the treatment?

          21    A.   They would come to treat us today, and tomorrow they won't

          22    show up to cover their wounds.

          23    Q.   Did you observe any wounds that were not being treated

          24    well?

          25    A.   Yes, because there were people who were dying because they

```
 1   were not being treated.
 2   Q.   Did you see any bugs or insects inside --
 3            MR. LAUER:  Objection.
 4            THE COURT:  Overruled.
 5   Q.   Did you see any bugs or insects inside the wounds?
 6   A.   Yes, I could see the maggots.
 7   Q.   Where did you see them?
 8   A.   There was a woman who was lying down, I don't know why
 9   they had cut a width in the back, and the maggots were coming
10   out of her back.
11   Q.   During your time at the hospital, did you see soldiers?
12   A.   Yes, I saw them.
13   Q.   What did you observe?
14   A.   During the day, they would come in the ward, in the
15   maternity ward and start taunting us with words.
16   Q.   What kinds of things would they say?
17   A.   They would tell me why did you become a Tutsi and say you
18   always proud but your time is over.
19   Q.   I'm sorry, Augustin, can you repeat that last part?
20   A.   Yes.  They would tell me why did you become a Tutsi, you,
21   too, are so proud, but your time is over.
22   Q.   How often would they come in and say those things?
23   A.   Almost every day.  It wouldn't be a day that goes without
24   the soldiers coming in.
25   Q.   Was it just soldiers who came in taunting or insulting
```

J.A. 386

1    you?

2    A.    During the day, soldiers would come in, but in the

3    evening, even the civilian, in civilian clothes would come up.

4    Q.    And what would they say in the evening?

5    A.    During the day?

6    Q.    In the evenings.

7    A.    In the evening, they would come to pick people to be

8    killed.

9    Q.    Did you observe people being taken out of the dermatology

09:12AM 10    ward to be killed?

11    A.    Yes, I would see them every day.

12    Q.    Can you explain to the jury what would happen?

13    A.    The soldiers would get in with other people in civilian

14    clothing.  In the hall, there would be like 30 or 40 people.

15    They would call, "Stand up, stand up, stand by the door."  When

16    they get five or six people, they would take them to kill them.

17    Q.    How do you know that they were being taken to be killed?

18    A.    Yeah, we knew because nobody would come back.

19    Q.    Did you ever see medical staff participating in this

09:13AM 20    during the evenings?

21    A.    Yes, I saw them.

22    Q.    What did you see?

23    A.    The day they took me, two or three soldiers and others,

24    they took me out behind the maternity ward.

25    Q.    Let me stop you for one second.  We'll get to that, but

J.A. 387

1    before we get that, let me ask you a couple of other questions.

2    Before they took you, were you ever harmed at the hospital?

3    A.    Yes.

4    Q.    What happened to you?

5    A.    The day they would come to take me, but on that, they say

6    they won't take me that day, but every day they will be hitting

7    you with 80 crutches.

8    Q.    Let me ask who hit you?

9    A.    Soldiers.

09:15AM 10    Q.    And what were they hitting you with?

11    A.    Crutches.

12    Q.    You say they came to get you.  What happened when they

13    came to get you?

14    A.    They came and told me to stand up.  They also called a

15    pastor.

16    Q.    I'm sorry, let me just go back to being hit.  You said

17    that when they told you that they were not going to take you

18    but hit you?

19    A.    Yes.

09:16AM 20    Q.    Can you explain that?

21    A.    Yes.

22    Q.    What happened?

23    A.    There was a soldier who was getting pushed in a

24    wheelchair.  He had the crutches.  He would start hitting me,

25    but I would cover my head and he would hit other parts.  The

4-15

```
      1   next -- before they would come with another soldier, all the
      2   soldiers were walking on crutches, they were also injured, and
      3   they would start hitting me.  Whoever got me with crutches
      4   would hit me eight times because they knew.
      5   Q.   Where were you when you were being hit?
      6   A.   I would be lying down in the bed.
      7   Q.   Where were they hitting?
      8   A.   They would hit me everywhere, but I tried to cover my
      9   head.
09:17AM 10   Q.   Were they saying anything when they were hitting you?
     11   A.   No, I knew what they told me.  I would just keep quiet.
     12   Q.   You said it was eight times they would hit you.  How do
     13   you know it was eight times?
     14   A.   They would tell me to count.
     15   Q.   How often did this happen?
     16   A.   I wouldn't know because whenever a soldier got there with
     17   crutches would do it.
     18   Q.   Was this during the daytime or the nighttime?
     19   A.   This would happen during the day or at night.
09:18AM 20   Q.   Did anyone try to stop?
     21   A.   No.
     22   Q.   You mentioned that you saw patients being taken away to be
     23   killed.  Did you also see any women taken away to be raped?
     24   A.   There was one gal, we were together, she would tell us
     25   things, a soldier that always raped her.
```

**J.A. 389**

```
 1   Q.   How often did that happen?

 2   A.   I don't know.

 3   Q.   Did you see her being taken to be raped?

 4   A.   The soldier would be getting in the room and take her

 5   away, and according to what she told us, that's what we knew

 6   what happened.

 7   Q.   And she came back?

 8   A.   Yes, she come back.

 9   Q.   At some point, did they come to take you to be killed?

10   A.   Yes.

11   Q.   What happened?

12   A.   On that day they came, there were people in uniforms and

13   others in the civilian clothing.  They told me to stand up.

14   Q.   Let me stop you for one second.  How many people were

15   there?

16   A.   I can't be precise, but there were about five people.

17   Q.   Were they armed?

18   A.   Yes, the soldiers had guns.

19   Q.   What about the civilians?

20   A.   They didn't have anything.

21   Q.   What happened?

22   A.   After they told me to stand up, they also told the pastor

23   to stand up and also the pastor's wife and young brother and

24   me.

25   Q.   Let me stop you for one second.  Were all of those people
```

09:20AM (line 10)
09:20AM (line 20)

J.A. 390

```
 1    in the dermatology ward with you?
 2    A.    Yes, they were all there.
 3    Q.    And they were all told to get up and come with you?
 4    A.    Yes.
 5    Q.    And you said it was the pastor, the pastor's wife, two
 6    kids and a brother?
 7    A.    Yes.
 8    Q.    How old were the kids?
 9    A.    One was about seven years old, another one was about three
10    years old.
11    Q.    Were they all Tutsis?
12    A.    Yes, they were all Tutsis.
13    Q.    Where did they take you?
14    A.    We moved in front of the maternity ward.  We went down
15    behind the maternity ward, and we went behind the maternity
16    ward.
17    Q.    Was it daytime or nighttime when this happened?
18    A.    It was at night.
19    Q.    Did you try to run or escape?
20    A.    No, I did not.
21    Q.    Why not?
22    A.    I didn't have anywhere to run to, to escape to.
23    Q.    Where did they take you?
24    A.    They took me behind the maternity ward.
25    Q.    What was there?
```

09:22AM 10

09:23AM 20

```
 1    A.    When I got there, we found people had just been killed and

 2    were dying.   There was something, a plastic tent, which was on

 3    the floor.

 4    Q.    Sorry, there was a plastic?

 5    A.    Sheeting.

 6    Q.    On the floor?

 7    A.    On the floor.

 8    Q.    The people that were dying, where were the people that

 9    were dying?

09:24AM 10  A.    They were lying down on the floor dying.

11    Q.    Were they on the sheet, the plastic sheet?

12    A.    Yes.

13    Q.    How many people could you see lying on the plastic sheet?

14    A.    I can't know the number.

15    Q.    More than one?

16    A.    Yes.

17    Q.    You said that they were dying.   How do you know they were

18    dying?

19    A.    It's hard not to know a person is dying.   It was visible.

09:25AM 20  That's where we were going and what we expected.

21    Q.    Were they making any sounds?

22    A.    Yeah, people were having a groaning sound.

23          MR. VARGHESE:   Can we have for the witness and the

24    party Exhibit 28, please.

25    Q.    Ms. Mukankusi, do you see what's on the screen in front of
```

J.A. 392

```
  1   you?

  2   A.   Yes, I do.

  3   Q.   Do you recognize it?

  4   A.   Yes.

  5   Q.   And is it a fair and accurate representation of where you

  6   were taken?

  7   A.   Yes.

  8        MR. VARGHESE:  Your Honor, we'd ask Exhibit 28 be

  9   admitted.

 10        THE COURT:  All right.  It's admitted, Exhibit 28.

 11        (Exhibit No. 28 received into evidence.)

 12   Q.   Can you explain to the jury what are we looking at in this

 13   picture?

 14   A.   The house you see is the maternity ward.  In front of it,

 15   that's where that building is.  They brought us from the

 16   maternity ward, and they brought us behind the maternity

 17   building.  That's where we met people who were coming up.  We

 18   suspected they were the people who had just killed, and the

 19   other people found.  When we got there, that's when we find

 20   people were dying and making groaning noise.

 21        One of the soldiers, that's when they started stabbing

 22   us with knives.

 23   Q.   Let me stop you for one second, and we'll get there.

 24   Let's just situate ourselves.  So in this picture, are you in

 25   this picture?
```

09:26AM 10

09:27AM 20

1    A.    Yes.

2    Q.    And is this you here?

3    A.    Yes, that's me.

4    Q.    And what are you pointing to in this picture?

5    A.    I'm pointing to a place where they were taking us to be

6    killed.

7    Q.    Is this area over here, was that where you were talking

8    about people were dying?

9    A.    Yes, that's the place I'm talking about.

09:28AM 10    Q.    What is this building in the background?

11    A.    That's the maternity building.

12    Q.    There appears to be a wall in the picture.  Was that there

13    back in 1994?

14    A.    No, it wasn't there.

15    Q.    You mentioned the dermatology building.  Can you see the

16    dermatology building in this photograph?

17    A.    No, it's not visible.

18    Q.    Is the dermatology building on the other side of the

19    maternity building?

09:29AM 20    A.    Yes, if you stood in front of the maternity building, you

21    would see the maternity, but you can't see it from the back.

22    Q.    You talked about I think -- when you walked down from

23    dermatology to this location, did you see anybody else?

24    A.    No, when I got where the people was, that's when you saw

25    people coming from there.

**J.A. 394**

```
 1    Q.    Who did you see coming from there?

 2    A.    There were soldiers.

 3    Q.    Was it just soldiers or were there also civilians?

 4    A.    There were soldiers and other people in civilian clothing.

 5    Q.    And which way were they going?

 6    A.    They were going on the other side of maternity ward.

 7    Q.    When you got down there, who all were with you?

 8    A.    We were all together as we came out of the maternity.

 9    Q.    So how many soldiers and civilians were with the group?

10    A.    There were two soldiers, the rest were civilian.

11    Q.    And how many total?

12    A.    There were about five.

13    Q.    And how many patients were there?

14    A.    It was me, two kids, three, the pastor, his wife and his

15    brother were six people.

16    Q.    What happened next?

17    A.    A soldier pulled a bayonet from his pant and stabbing one

18    of the children.  The civilian had machetes, I don't know where

19    they got them because when they entered the maternity ward, I

20    didn't see the machete.

21    Q.    What did they do with the machete?

22    A.    They started cutting everyone.

23    Q.    What happened to the two kids?

24    A.    They started crying, and the mom was asking, "Please at

25    least leave me with one child."
```

J.A. 395

```
          1    Q.   What happened next?

          2    A.   They were all killed.

          3    Q.   Did you see them killed?

          4    A.   Yes.

          5    Q.   What happened to the pastor and his brother?

          6    A.   All of them, they were hitting them.

          7    Q.   Striking them with the bayonet and the machetes?

          8    A.   No, they were not using clubs.

          9    Q.   What were they using?

09:33AM  10    A.   Knives, big sticks, machetes.  That's what I saw.

         11    Q.   What happened to you?

         12    A.   One soldier came and said this is a too smart woman.

         13    Q.   I'm sorry, can you say that again.

         14    A.   This is a crazy smart woman, don't kill her, we need at

         15    least a crazy Tutsi to see.

         16    Q.   I'm sorry, can you say that again?

         17    A.   We need a crazy Tutsi at least to -- around.

         18    Q.   Who was he saying that to?

         19    A.   It was another soldier who had joined them and was telling

09:34AM  20    the soldiers who had brought us down.

         21    Q.   So what happened?

         22    A.   She took me back to the maternity ward.

         23    Q.   You said she, I think?

         24    A.   I think that was my mistake.  I stand corrected, your

         25    Honor.  He took me back to the maternity.
```

```
 1    Q.   When he was taking you back to dermatology, did he say
 2    anything to you?
 3    A.   He told me that I'm also Tutsi.
 4    Q.   Did you say anything to him on the walk back?
 5    A.   No.
 6    Q.   Did you go back to dermatology?
 7    A.   Yes, that's where I went back.
 8    Q.   What happened -- what happened next?
 9    A.   So when I go back, everybody was asking, "But we thought
10    you were dead, what happened?"  And I told them exactly what I
11    just said now.
12    Q.   Did you recognize any of the civilians that took you to
13    this location here?
14    A.   Yes, in the morning, we would go to get some food, and
15    when we were going, I saw one among the people who had took me,
16    and he was wearing a lab coat, and I had to run back because I
17    was scared he may kill me.
18    Q.   Was this the next morning?
19    A.   Yes.
20    Q.   And where were you going?
21    A.   There was a nun who used to give us some food.  That's
22    where I was going.
23    Q.   And where did you see the man?
24    A.   I saw him in a corridor.  He was going down, and I was
25    going up.
```

J.A. 397

```
  1   Q.   And did you recognize him immediately?

  2   A.   Yes, I think I remember how he looked.

  3   Q.   And how was he dressed?

  4   A.   He was a doctor and wearing a lab coat.

  5   Q.   What did you do when you saw him?

  6   A.   I went, I turned back and took another road because I

  7   thought he was going to kill me.

  8   Q.   Did you see him again?

  9   A.   No, I did not see him, but I saw another person.

 10   Q.   Who is the next person you saw?

 11   A.   He was a man that people had took us down, but I used to

 12   see him around in the hospital.

 13   Q.   And was he also part of the medical staff?

 14   A.   Yes, they had lab coats on, I think.  He was a member of

 15   the medical staff.

 16   Q.   Where did you see the second person?

 17   A.   I used to see him often around.

 18   Q.   After you had returned to the dermatology ward, did you

 19   continue to be terrorized and beaten by soldiers with crutches?

 20   A.   Yes, they continued, but it didn't last long.

 21   Q.   Why?  What happened?

 22   A.   Because the Interahamwe was approaching, and they were

 23   kind of scared.

 24   Q.   Can you explain what you mean when you say the Inkatoni?

 25   A.   It was the RPF.
```

09:38AM (line 10)

09:39AM (line 20)

# J.A. 398

```
 1    Q.    How did you know that the RPF were approaching?

 2    A.    The soldiers would tell us that the RPFs are about to

 3    come.

 4    Q.    During this trial, did anyone ever take you again?

 5    A.    Taking me to the pit?

 6    Q.    Not to the pit, but did anyone ever take you again, not to

 7    the pit?

 8    A.    No.

 9    Q.    Did anyone ever try to rape you?

 10   A.    Yes.

 11   Q.    What happened?

 12   A.    At that time, they told us the RPF were approaching, and

 13   we would also hear the brigs. and gunshot.  All the people who

 14   were in the hospital they moved to the reception area, and even

 15   the patients that were on the beds, they were being pushed to

 16   the reception area, so us in the dermatology, we went to stay

 17   there by ourselves, so we also moved to the reception area.

 18   Q.    And what happened when you got to the reception area?

 19   A.    When we got there, there's a lady who I was with in the

 20   maternity, and she asked me to go and pick up her container.

 21   Q.    What?

 22   A.    A container.

 23   Q.    And what happened?

 24   A.    I went back by myself in the hospital.  A soldier grabbed

 25   me by my hand, and I was pleading to him please don't harm me,
```

09:41AM 10

09:42AM 20

**J.A. 399**

1    you got to take my brother because I thought he was going to

2    kill me.

3    Q.    And where did he take you?

4    A.    I did not know.  He kept going down.  When I got to the

5    tertiary area of the surgery department, there's kind of a

6    corridor, a corner.  He slide down and started moving his butt,

7    and I was pleading to him, "Please forgive me, I'm your

8    sister."

9              I knew he was going to rape me.  I was covered with

09:44AM 10   bed sheets, then he was trying to remove them from me.  In

11    front of vase I had something hidden, which was like a bomb

12    blast.  He got scared and picked his gun, and I also learned.

13    It was my first time having that kind of experience.  I passed

14    in front of the dermatology and went into the maternity ward.

15    Q.    Did you take that opportunity to run away?

16    A.    Yes.

17    Q.    Was he following you?

18    A.    Yes, he was telling me I'm going to shoot you.  I said,

19    "It's okay."

09:45AM 20   Q.    Where did you go?

21    A.    I escaped.  I didn't know where he turned, and I went in

22    the surgery ward.

23              THE COURT:  The surgery ward?

24              THE WITNESS:  Surgery ward, yes.

25    Q.    What happened when you got to the surgery ward?

J.A. 400

1    A.    I found a lady with her daughter on the bed.  She put me

2    on the bed and covered me with a mattress and she leaned on me.

3    Q.    And she what?

4    A.    She lied on it.

5    Q.    What happened next?

6    A.    The soldier came and asked, "Anybody entered in here?"

7    No, she told him she went behind the maternity ward.  He went

8    that way as if he was following me, and then I went back to the

9    reception area, that's where I found everybody there.

09:46AM 10    Q.    Were you at the hospital until the RPF came to Butare?

11    A.    Yes, I was there.

12    Q.    When the RPF arrived, where did the soldiers who were at

13    the hospital go?

14    A.    Some left on the buses, others stayed there.

15    Q.    I'm sorry, what was that?

16    A.    Some went with the bus and the others stayed there.

17    Q.    Stayed there.  What about the medical staff?

18    A.    Nobody was there.

19    Q.    They fled?

09:47AM 20    A.    Yes, they all fled.

21    Q.    Ms. Mukankusi, has anyone forced or coerced you to testify

22    here today?

23    A.    No.

24    Q.    Has anyone pressured you in any way regarding your

25    testimony today?

```
         1    A.    No.
         2    Q.    Has the government of Rwanda spoken to you about your
         3    testimony or what to say in this proceeding?
         4    A.    No, no, no.
         5    Q.    Has anyone offered you anything for your testimony here
         6    today?
         7    A.    No.
         8    Q.    From either the United States Government or the Rwandan
         9    Government?
09:48AM  10   A.    No.
        11    Q.    Are you receiving money for food during your stay hear in
        12    the United States?
        13    A.    Now?
        14    Q.    Yes.
        15    A.    Yes, I get food.
        16    Q.    And did the United States pay for your travel and hotel
        17    accommodations to be a witness here today?
        18    A.    Yes.
        19    Q.    Is there anything about receiving any of that money that
09:49AM  20   affects your testimony here today?
        21    A.    She's asking me to repeat.  No, I'm giving my testimony
        22    because this is my story, and I have to say it.  It's not
        23    because of any benefit.
        24    Q.    Are you currently employed?
        25    A.    Yes, I do.
```

J.A. 402

```
 1    Q.    Where do you work?

 2    A.    I work in the pharmacy.

 3          THE INTERPRETER:  I was asking for clarification

 4    because she used a shorthand, which I don't know.

 5    A.    I work in the pharmacy at the University Hospital.

 6    Q.    The same hospital that we've been talking about today?

 7    A.    Yes.

 8    Q.    What's your position at that hospital?

 9    A.    I am a nurse.

09:50AM 10          MR. VARGHESE:  Thank you.  I have no further

11    questions.

12          THE COURT:  All right.  Cross-examination.

13                      CROSS-EXAMINATION

14    BY MR. LAUER:

15    Q.    Good morning.

16    A.    Good morning.

17    Q.    Are you married?

18    A.    No.

19    Q.    Are your parents still alive?

09:51AM 20    A.    One is dead.  My father is alive.

21    Q.    And where does your father live?

22    A.    He lives in Butare.

23    Q.    And what does your father do for a living?

24    A.    He's retired.

25    Q.    You mentioned that your parents had fled the country
```

J.A. 403

```
 1    yesterday.  Is that true?
 2    A.   That's true.
 3    Q.   And you mentioned you remained in Rwanda living with your
 4    grandparents?
 5    A.   Yes.
 6    Q.   You have siblings?
 7    A.   Yes, I do.
 8    Q.   How many siblings do you have?
 9    A.   Two.
10    Q.   Are they older or younger than you?
11    A.   They are younger than me.
12    Q.   And I think you mentioned yesterday that your siblings
13    fled with your parents, and you were the only child remaining
14    in Rwanda with your grandparents.  Is that true?
15    A.   Yes.
16    Q.   Was there a particular reason why you remained with your
17    grandparents and your parents and siblings fled?
18    A.   I was born and raised at my grandparents' house.
19    Q.   Where were your siblings born?
20    A.   They were in Kigali with my mom and my father.
21    Q.   I'm a little bit confused.  You were born and raised with
22    your grandparents in Butare.  Is that true?
23    A.   Yes.
24    Q.   Your siblings were born and raised with your parents in
25    Kigali?
```

J.A. 404

```
 1    A.   Yes.

 2    Q.   Did you ever live with your parents and siblings?

 3    A.   Yes, I did.

 4    Q.   Can you explain how it came to be that you remained with

 5    your grandparents in Butare while your parents and siblings

 6    fled the country?

 7    A.   My father had one sibling, there were two people.  My

 8    father used to be a priest, a catholic priest, and his older

 9    brother had no children.  He asked the permission from the Pope

10    to have children because his parents always asked him to have

11    children so there was a family lineage surviving, so when they

12    had me, they gave me out to the grandparents.

13    Q.   Okay.  And when were you given to your grandparents?

14    A.   When?

15    Q.   Yes.  If you can remember.

16         THE INTERPRETER:  I think she didn't understand the

17    question.  May I repeat?

18    A.   I lived with them as soon as I started school.

19    Q.   And when did you start school?

20    A.   I started school when I was seven.

21    Q.   Okay.  And what year were you born?

22    A.   1980.

23    Q.   So that would mean you started in about 1987?

24    A.   I'm not so sure, but it's around that time.

25    Q.   And if I understand you correctly, you went to live in
```

09:54AM 10

09:55AM 20

J.A. 405

```
 1    Butare with your grandparents but your parents and brothers and
 2    sisters stayed in Kigali?
 3    A.   Yes.
 4    Q.   So from the age of seven onward, you lived in Butare?
 5    A.   Yes.
 6    Q.   And when did your parents and siblings flee the country,
 7    what year was that?
 8    A.   1989.
 9    Q.   And that was because they perceived some sort of threat to
10    them and their safety?
11    A.   Yes, because they always wanted to kill them suspecting
12    them they were Hutu sympathizing.
13    Q.   And at that point in time, what was your father's
14    employment?
15    A.   He was working with the BNAP.
16    Q.   Excuse me, can you repeat that?
17    A.   He was working with the BNAP.
18         THE INTERPRETER:  It's a short form for something.
19    Q.   Can you explain what that is?
20    A.   That's the story he told me.  I don't know what BNAP was
21    or it is now.
22    Q.   Can you tell us was he a farmer or an office person or a
23    professional?
24    A.   Oh, he was working in an office.
25    Q.   Okay.  You don't know what kind of business that was or if
```

09:56AM (line 10)
09:57AM (line 20)

**J.A. 406**

```
 1   it was a government office?
 2   A.   I suspect it was a government office maybe.
 3   Q.   Did your father eventually return to Rwanda after the
 4   genocide?
 5   A.   Yes, he came back.
 6   Q.   And when he came back, what did he do for work at that
 7   point in time?
 8   A.   He worked at IRST in Butare.
 9   Q.   And can you explain what that is?
10   A.   It was a scientific site at the university.
11   Q.   Was your father a scientist?
12   A.   No, he had studied literature, but I don't know what he
13   did in the university.
14   Q.   Was that a position that he was appointed to?
15   A.   Yes.
16   Q.   You mentioned that you started school at the age of seven.
17   Was that a school in the area of your grandparents' home?
18   A.   Yes.
19   Q.   What was the name of the primary school?
20   A.   It had no name.
21   Q.   Did you eventually move onto a secondary school?
22   A.   Yes.
23   Q.   Was that also in the area around your grandparents' home?
24   A.   No.
25   Q.   Where was the secondary school?
```

J.A. 407

```
 1   A.   It was in Nyanza in a school called ETF.  ETF is a
 2   technical school for women.
 3   Q.   Okay.  And Nyanza is a totally separate city some distance
 4   from Butare, correct?
 5   A.   Yes.
 6   Q.   And so I would imagine it was a boarding school?
 7   A.   Yes.
 8   Q.   Meaning that you lived on the campus in the City of Nyanza
 9   and not in your grandparents' home?
10   A.   I would go back during the holidays.
11   Q.   But when the school was in session, you lived in Nyanza?
12   A.   Yes.
13   Q.   I think yesterday you said your grandparents' home was
14   about 15 minutes outside of Butare?
15   A.   Yes.
16   Q.   In Rwanda, there's different geographical units of
17   cellule, sector and commune; are you familiar with those terms?
18   A.   Yes.
19   Q.   And what cellule, sector and commune was your
20   grandparents' house?
21   A.   We lived in the commune of Ruhashya.
22   Q.   Can you spell that?
23   A.   Yes, R-o-u-h-a-s-y -- no s-h-y-a.
24   Q.   Forgive me, but I just want to repeat back to you to make
25   sure it's correct, R-u-h-a-s-h-y-a?
```

10:01AM (line 10)
10:02AM (line 20)

```
 1    A.   Yes.

 2    Q.   Do you remember meeting with investigators from the

 3    United States several years ago?

 4    A.   Yes, I do.

 5    Q.   It was the year of 2016?

 6    A.   Yes.

 7    Q.   In fact, two of the investigators are seated here in the

 8    court right now.  Do you recognize them?

 9    A.   Yes.

10:03AM 10    Q.   And they asked you where you were living at that time?

11    A.   Yes, they did ask me.

12    Q.   And you told them you were living in ISSA, which is

13    spelled I-S-S-A?

14    A.   Yes, this is an agricultural center called ISSA, and it's

15    close to where we live.  If you were to give a person a

16    direction, that's the significant location I would tell them.

17    Q.   I'm sorry, can you repeat, what is ISSA?

18    A.    It is ISSA, it's the institute --

19         THE INTERPRETER:  I'm trying -- it's a french acronym,

10:04AM 20    so I'm trying to put it in English.

21    A.    It's the agricultural institute, an institute for

22    agriculture in Rwanda.

23    Q.   So ISSA is an acronym?

24    A.   Yes, a French acronym.

25    Q.   And it stands for what?
```

J.A. 409

```
         1    A.    Institute for Research of Agriculture for Rwanda,

         2    something like that.

         3    Q.    Okay.  And what is the relation of ISSA to Ruhashya?

         4    A.    ISSA is in Ruhashya.

         5    Q.    So what is the name of your village?

         6    A.    Musasu.

         7    Q.    So, and forgive my ignorance again, your testimony is that

         8    ISSA is in Ruhashya?

         9    A.    Yes.

10:06AM  10    Q.    You yesterday -- yesterday you talked about being at your

        11    grandparents' house at the time the violence started in the

        12    genocide?

        13    A.    Yes.

        14    Q.    And I believe you testified that your house was burned?

        15    A.    Yes.  We had two houses.  One was destroyed and another

        16    one was burned.

        17    Q.    Okay.  Were the two houses adjacent to each other?

        18    A.    Yes.

        19    Q.    So the same property but two houses?

10:07AM  20    A.    Yes, there was one outside which was also like a kitchen

        21    and another one, the main house.

        22    Q.    Okay.  Which house was it that burned?

        23    A.    The kitchen.

        24    Q.    Because yesterday you told us about your house burning.

        25    Do you recall that?
```

J.A. 410

```
 1   A.   Yes.
 2   Q.   And then you told us that a later point you were inside
 3   the house when people came and attacked you.  Do you remember
 4   that?
 5   A.   Yes.
 6   Q.   And you had testified that glass had been broken and that
 7   your grandparents were there inside the house?
 8   A.   Yes.
 9   Q.   And yesterday you didn't tell us anything about there
10   being two houses, did you?
11   A.   I didn't say it.
12   Q.   You don't have any recollection of what happened between
13   the time that you were attacked and the time you woke up in the
14   hospital; is that correct?
15        THE INTERPRETER:  She's asking me to repeat.
16   A.   Yes, I don't recall anything.
17   Q.   One minute you're being attacked in your grandparents'
18   house, the next minute you wake up in the hospital?
19   A.   Yes.
20   Q.   And you told us today you learned when you woke up that
21   you had been there two and a half months?
22   A.   Yes, approximately two and a half months.
23   Q.   And during that two and a half months, you have no idea
24   who was feeding you?
25   A.   When I was in the hospital?
```

10:08AM 10

10:09AM 20

**J.A. 411**

```
      1   Q.   Yes.  When you were in the hospital apparently
      2   unconscious?
      3   A.   No, I don't know it.
      4   Q.   And you told us that you had severe wounds?
      5   A.   Yes.
      6   Q.   Head injuries?
      7   A.   Yes.
      8   Q.   You don't know who bandaged those?
      9   A.   I remember one person.
10:11AM 10  Q.   Well, you would agree with me that two and a half months
     11   is a long time to be unconscious?
     12   A.   Yes.
     13   Q.   And for someone who has been hurt, two and a half months
     14   would require that someone be caring for that person; would you
     15   agree with that?
     16   A.   Yes, but I don't know what was going on at that time.
     17   Q.   No, I understand you were apparently in a coma; is that
     18   right?  Is your memory from this period of time very strong?
     19   A.   Yes, I'm okay.
10:12AM 20  Q.   When you were interviewed by these investigators about two
     21   and a half years ago, do you recall telling them that you were
     22   in a coma for one month?
     23   A.   Yes.
     24   Q.   So, as you sit here right now, are you sure whether you
     25   were in a coma for one month or two and a half months?
```

J.A. 412

```
         1  A.   The two and a half months has to pass.  There's a time I
         2  was unconscious in a coma, and there's a time when I was kind
         3  of traumatized.  They were telling me that I used to be
         4  carrying the mattress around.  All that time I was unconscious.
         5  Q.   So, you testified a few moments ago that you have a strong
         6  memory of this period of time?
         7  A.   Yes.
         8  Q.   Is that what you feel?
         9  A.   Yes, I remember what happened.
10:14AM 10  Q.   When you were interviewed in 2016, you disclosed that
        11  during that period of time, you were doing things that you
        12  don't remember; isn't that what you told the investigators in
        13  2016?
        14  A.   What I don't recall is what happened within those two and
        15  a half months, but what happens after I do remember.
        16  Q.   Okay.  But what you told the investigators in 2016 was
        17  that you had been told by other Tutsis that during this period,
        18  you did things that you did not remember, that's what you said
        19  in 2016?
10:15AM 20  A.   The things I was doing?
        21  Q.   My question is this.  Would you agree with me that in
        22  2016, you told the investigators who were interviewing you that
        23  "You were told by other Tutsis that during this period, you did
        24  things that you did not remember"?
        25  A.   Yes.
```

**J.A. 413**

```
 1    Q.    You had very serious injuries?

 2    A.    Yes.

 3    Q.    Do you have any complications or lasting effects of those

 4    injuries?

 5    A.    No, except where they used to hit me at the back, that's

 6    where I still feel pain sometimes.

 7    Q.    Is your hearing at all affected by the injuries you

 8    sustained to your ears?

 9    A.    No, I don't have any problem.

10:17AM 10    Q.    In 2016, when you were interviewed, you said that a large

11    portion of your ears had been cut off.  Do you recall saying

12    that?

13    A.    Yes.

14    Q.    How was it that you came to have plastic surgery to

15    reattach that?

16    A.    The one part got off but it didn't detach completely, it

17    went at the back.

18    Q.    Okay.  So when you told the investigators in 2016 that a

19    large portion of them was cut off, that it was not, in fact,

10:18AM 20    cut off and detached; is that your explanation?

21    A.    Yes, it wasn't completely detached.

22    Q.    If I could just refer you back to that interview you did

23    in 2016 with the U.S. investigators?

24    A.    Yes.

25    Q.    You recall that interview?
```

J.A. 414

```
        1    A.   Yes.

        2    Q.   It was in Butare at the Hotel Ibis?

        3    A.   Yes.

        4    Q.   How did that interview come about?

        5    A.   They called me to come and testify about how I survived at

        6    the hospital, the Butare Hospital.

        7    Q.   You say they called you.  Do you mean the investigators

        8    here, the American investigator?

        9    A.   Yes.

10:19AM 10    Q.   Do you speak English?

       11    A.   No.

       12    Q.   So how was it that they called you?

       13    A.   They told somebody to call me.

       14    Q.   Who was the actual person you spoke to to arrange this

       15    interview?

       16    A.   The person called me and told me there are people who want

       17    the testimony of what happened at the University Hospital, and

       18    I asked him who are you.  He told me the name, but I could not

       19    recognize the name, but I answered the call, I went there.

10:20AM 20    Q.   So, you got a phone call from someone you didn't know?

       21    A.   Yes, I got a phone call from somebody I did not know, but

       22    he told me who it was.

       23    Q.   He identified himself in some way, I imagine?

       24    A.   Yes.

       25    Q.   Did he identify where he worked?
```

J.A. 415

1    A.    I don't remember where he worked, but when I got at the

2    Ibis Hospital, I found him there, and he told me where he

3    lived, and it was in the neighborhood of where I lived.

4    Q.    First I want to stick to this phone call.  You got a phone

5    call from someone you did not know and had never spoken to

6    before; is that correct?

7    A.    Yes.

8    Q.    And that person gave you a name, and he identified where

9    he worked, but as you sit here today, you don't remember those

10:22AM 10   things?

11   A.    He told me his name, and I joined him at the Ibis.

12   Q.    Did he represent that he worked for the government or the

13   prosecution service in Rwanda in some way?

14   A.    No, he didn't tell me.

15   Q.    So you remember that he didn't tell you that, but you

16   don't remember his name or where he did work; is that correct?

17   A.    Now I know him very well.

18   Q.    So what's his name?

19   A.    I don't remember his name, but I could recall the name.

10:23AM 20   Q.    You said you know him very well.  How old is he?

21   A.    She's pointing to me that he may be my age.

22   Q.    Where does he live?

23   A.    He lives in a place called Butamwa in Butare.

24   Q.    Do you know his family?

25   A.    No, I don't know.

**J.A. 416**

```
 1    Q.   How do you know him very well?

 2    A.   When I met him, he introduced himself to me.

 3    Q.   And because he introduced himself to you, you consider you

 4    know him very well?

 5    A.   Yes.

 6    Q.   So you get this phone call from a man who wants to have a

 7    meeting with you, is that what the phone call was all about?

 8    A.   Yes.  No, he told me that there are people who needs to be

 9    given testimony about the hospital where you survived from.

10:24AM 10   Q.   And despite not knowing this man, you agreed to a meeting?

11    A.   Yes.

12    Q.   And the meeting took place at the Hotel Ibis in Butare?

13    A.   Yes.

14    Q.   And this man, when you arrived, he was there?

15    A.   Yes.

16    Q.   Was he, in fact, with the U.S. investigators?

17    A.   Yes, they were together.

18    Q.   And you said he introduced himself to you at that point?

19    A.   Yes.

10:25AM 20   Q.   But, again, you can't remember his name here today?

21    A.   Yeah, I can't remember the name right now, but I think if

22    I come back, I will remember his name.

23    Q.   You could call who?

24    A.   If I remember after some time, I may remember his name.

25    Q.   Did you have contact with this man after that meeting?
```

J.A. 417

4-44

1    A.    Yeah, we meet and chat some time at a funeral and some

2    other gatherings.

3    Q.    So you've met him on other occasions after this meeting at

4    the Hotel Ibis?

5    A.    Yes.

6    Q.    And you've chatted?

7    A.    No, we greet each other, that's all.

8    Q.    Have you talked further with him about your testimony here

9    today?

10:27AM 10    A.    No, never talked about it again.

11    Q.    Have you been to this man's house?

12    A.    No.

13    Q.    Has he visited yours?

14    A.    No.

15    Q.    Was there anything else that took place in that initial

16    phone call other than him saying that he wanted you to appear

17    for a meeting?

18    A.    Like what?

19    Q.    Well, did you ask him:  How did you get my name?  How did

10:28AM 20    you get my phone number?  Why do you know that I was at the

21    hospital in Butare?  Did you ask him any of those questions?

22    A.    After I met him and I recognized there were some people

23    that wanted my testimony, I didn't ask any of those questions.

24    Q.    But in the phone call at the time of the phone call, you

25    didn't know who he was; is that accurate?

**J.A. 418**

```
 1    A.    I did not know him.

 2    Q.    And he represented that he was working on behalf of some

 3    investigators?

 4    A.    Yeah, when he called me, he said, Isabelle, how are you,

 5    my name is so-and-so, there are people who want to give a

 6    testimony about where you survived, that's the only thing he

 7    said.

 8    Q.    And you didn't ask any questions, you just agreed?

 9    A.    Yes, when I left and when I got there, he showed me the

10    people who are waiting for me in the room, and those are the

11    people who want your testimony and I gave my testimony.  After

12    that, I left.

13    Q.    And who were the people in that room?

14    A.    There's a gentleman I can recognize here and the

15    interpreter, a lady interpreter.

16    Q.    And this man that you met at that time, he was there, too?

17    A.    You mean in the room?

18    Q.    My question is when you appeared at the Hotel Ibis for

19    this meeting, you met the man who had called you, correct?

20    A.    Yes.

21    Q.    And, in fact, he introduced you to these investigators?

22    A.    Yes.

23    Q.    And how did you get to that meeting?

24    A.    When I got to Ibis, we were talking on the phone, and

25    because I was there, and they was waiting for me, so I said
```

J.A. 419

```
          1    this is me, and that's how I got to know him.

          2    Q.   Did you drive yourself to Butare for this meeting?

          3    A.   No, we live close by.  I walked there.

          4    Q.   And did you walk home?

          5    A.   Yes.

          6         MR. LAUER:  If I could have one moment, your Honor.

          7    Q.   What is your father's full name?

          8    A.   Hodili Stanislos.

          9    Q.   Can you spell that?

10:33AM  10    A.   Yes, H-o-d-i-l-i.  Stanislos is S-t-a-n-i-s-l-o-s.

         11    Q.   Thank you very much.  I have no further questions.

         12         THE COURT:  Any redirect?

         13         MR. VARGHESE:  Just briefly, your Honor.

         14                   REDIRECT EXAMINATION

         15    BY MR. VARGHESE:

         16    Q.   Just one second, your Honor.  I want to ask you some

         17    questions about some things that Mr. Lauer asked you about.

         18    A.   Yes.

         19    Q.   Mr. Lauer asked you some questions about why you were

10:34AM  20    living with your grandparents.  Do you remember those

         21    questions?

         22    A.   Yes.

         23    Q.   Can you explain to the jury why you were living with your

         24    grandparents?

         25    A.   What I say that my father had only one brother.  He had an
```

J.A. 420

```
 1    older brother who was a doctor and had no children, and my

 2    father was a priest.  The family asked him to ask permission to

 3    leave priesthood.  He was granted the permission by the Pope.

 4    He still have that up to now, and that's when they had me, and

 5    I went to live with my grandparents.

 6    Q.    You were the oldest child?

 7    A.    Yes, I'm the oldest.

 8    Q.    And were you taking care of your grandparents?

 9    A.    Yes, I'd help them with some things, chores I would do for

10    them.

11    Q.    Mr. Lauer asked you some questions about your

12    grandparents' house.  How many -- where was the kitchen

13    located?

14    A.    Yes, sometimes when you hear, you answer things they ask

15    you, but we had the main house, and on the side, there was a

16    kitchen.

17    Q.    And that kitchen was for cooking for the main house?

18    A.    Yes.

19    Q.    You testified that there were two periods while you were

20    in the hospital that you can't remember.  Is that right?

21    A.    Yes.

22    Q.    And one period was when you were unconscious?

23    A.    Yes, one period, that's when I was unconscious.

24    Q.    When was the second period?

25    A.    At that time I was traumatized, I didn't know what I was
```

```
 1    doing.  They were telling me I used to carry the mattress
 2    around the hospital.  All that time I don't remember what I was
 3    doing, what was happening.
 4    Q.   But you were conscious?
 5    A.   I don't know how to explain it, but I don't remember what
 6    I was doing at that time, but that's what they tell me.
 7    Q.   Mr. Lauer asked you some questions about providing your
 8    testimony about what happened in Butare Hospital.  Do you
 9    remember that?
10    A.   Yes.
11    Q.   Have you provided your testimony about what happened in
12    Butare Hospital before?
13    A.   Yes, I have.
14    Q.   Have you ever provided it publicly?
15    A.   Yes, I have.
16    Q.   Have you ever provided it at the hospital itself?
17    A.   That's where I give my testimony for the first time.
18    Q.   What was the circumstances that you gave your testimony
19    publicly at the hospital?
20    A.   At the hospital, we have a day for commemorating people
21    who died there.
22    Q.   And as part of that commemoration ceremony, is that when
23    you gave your testimony?
24    A.   Yes, when they were commemorating, that's when I gave my
25    testimony.
```

10:38AM (line 10)
10:39AM (line 20)

J.A. 422

```
 1              MR. VARGHESE:  Thank you.  Nothing further.

 2              THE COURT:  Any recross?

 3              MR. LAUER:  Just briefly, your Honor.

 4                         RECROSS-EXAMINATION

 5   BY MR. LAUER:

 6   Q.    So you provided testimony about the hospital?

 7   A.    Yes.

 8   Q.    One time, more than one time?

 9   A.    I gave it on the commemoration day, and I gave it during

10   the discussions that were taking place.

11   Q.    What discussion was that?

12   A.    Before we get to commemoration day, we always have the

13   night before, we have a remembrance moment where we light the

14   candles and remember it.

15   Q.    How long have you been in the United States?

16   A.    Less than two weeks.

17   Q.    Longer than one week?

18   A.    Yes.

19   Q.    And since you've been in the United States, you were asked

20   if you would be willing to speak with the defense about your

21   memories?

22              THE INTERPRETER:  She's asking me to repeat.

23   A.    No, they told me to come and give my testimony.

24   Q.    Were you ever asked if you were willing to sit down and

25   speak with me, the defense?
```

```
 1    A.    Yes.

 2    Q.    And you declined?

 3    A.    No, I did not.

 4    Q.    You agreed to meet with me; is that what you're telling me

 5    now?

 6    A.    No, they told me to come give my testimony.  I did not

 7    know who I was meeting or who I was supposed to meet.

 8    Q.    Were you ever informed by either Mr. Garland,

 9    Mr. Varghese, the investigators you've met with, that the

10:43AM 10  defense, myself, had made a request to speak to you?

11    A.    No.  What they told me that I will come and give my

12    testimony and there will be an interpreter.

13    Q.    But you have no memory of ever being informed that the

14    defense would like an opportunity to hear from you?

15    A.    No.

16               MR. LAUER:  No further questions, thank you.

17               THE COURT:  Let me see you at sidebar.

18               (THE FOLLOWING OCCURRED AT SIDEBAR:)

19               THE COURT:  You didn't object that this is was outside

10:44AM 20  the scope of redirect, which it clearly was, okay, and I want

21    to be strict about that because the trial is never going to end

22    if redirect and recross, people come up with new ideas that

23    they had plenty of time to think about beforehand, including

24    refusal to meet with the witness, so I'm going to let you

25    re-redirect, it may require re=recross, but this is it.
```

**J.A. 424**

```
 1            In the future, if you don't object, I'm going to cut

 2     it off myself because cross does not have to be in the scope of

 3     direct, but redirect needs to be within the recross or we will

 4     never complete this trial, so let's do this quickly.

 5            MR. VARGHESE:  Yes, your Honor.

 6            (SIDEBAR CONFERENCE WAS CONCLUDED)

 7            THE COURT:  Very quickly, Mr. Varghese.

 8            MR. VARGHESE:  Yes, your Honor.

 9                       REDIRECT EXAMINATION

10     BY MR. VARGHESE:

11     Q.   Do you remember we came to this courtroom before today?

12     A.   Yes, I remember.

13     Q.   And you were sitting in the benches over here?

14     A.   Yes.

15     Q.   And do you remember I told you that Mr. Teganya's lawyers

16     has asked to meet with you?

17     A.   Yes, I remember.

18     Q.   And do you remember I told you you don't have to meet with

19     them if you don't want to?

20     A.   Yes.

21            MR. VARGHESE:  Nothing further, your Honor.

22            MR. LAUER:  Nothing, thank you.

23            THE COURT:  Thank you.  You may step down.  You're

24     free to leave now.  Let's start the next.

25            MR. GARLAND:  Your Honor, the government calls
```

10:45AM (line 20)

**J.A. 425**

```
 1    Jean Pierre Gasasira to the stand.
 2            THE COURT:  We'll take our usual break at eleven.
 3    We'll swear the interpreter, the new interpreter first.
 4            (The interpreter was sworn.)
 5            THE CLERK:  Would you please state your name for the
 6    record.
 7            THE INTERPRETER:  Moses Rndasunikwa.
 8            THE CLERK:  I will swear in the witness.
 9            JEAN PIERRE GASASIRA, having been duly sworn by the
10    Clerk, testified through the Interpreter, as follows:
11                        DIRECT EXAMINATION
12    BY MR. GARLAND:
13    Q.   Good morning, Mr. Gasasira.
14    A.   Good morning.
15    Q.   What country are you from?
16    A.   Rwanda.
17    Q.   What town do you live in?
18    A.   Huye.
19    Q.   Did you grow up there?
20    A.   Yes.
21    Q.   How long would it take to walk from your town to the
22    National University in Butare?
23    A.   Forty minutes.
24    Q.   And how long would it take to drive there?
25    A.   Five minutes.
```
10:48AM (line 20)

**J.A. 426**

```
 1   Q.   And is Huye another name for Butare?

 2   A.   Yes.

 3   Q.   How old are you?

 4   A.   Forty-two.

 5   Q.   What do you do for a living?

 6   A.   I'm self-employed.

 7   Q.   And what do you do in your business?

 8   A.   I'm a businessman.

 9   Q.   What type of business, if you could be more specific?

10   A.   I go to the local markets, and then whatever I buy from

11   the local markets, I sell them in the city.

12   Q.   And if you could keep your voice up as well, that would be

13   helpful.  What's your highest level of education?

14   A.   High school, the last grade in high school.

15   Q.   Did your parents have national identity cards back in the

16   1990's?

17   A.   Yes.

18   Q.   What ethnic groups did they list?

19   A.   Tutsi.

20   Q.   What did your parents do for a living?

21   A.   My dad was a laboratory technician.

22   Q.   Continue, please.

23   A.   At the University Hospital.

24   Q.   Was that the University Hospital in Butare?

25   A.   Yes.
```

J.A. 427

```
     1   Q.   And did your mother work as well?

     2   A.   Just my dad.

     3   Q.   Okay.  Did you ever visit your father at the University

     4   Hospital?

     5   A.   Yes.

     6   Q.   What did you do when you visited him there?

     7   A.   I would take him food for lunch.

     8   Q.   Why would you bring lunch to your father there?

     9   A.   He would have a short pause during noon, so he didn't have

10:51AM 10   time to rest.

    11   Q.   Did you go to school nearby?

    12   A.   Yes.

    13   Q.   At the time of the genocide, how old were you?

    14   A.   Seventeen.

    15   Q.   Did you hear about President Habyarimana's plane being

    16   shot down?

    17   A.   Yes.

    18   Q.   Where were you when you heard about that?

    19   A.   At home.

10:51AM 20   Q.   And how did you learn about it?

    21   A.   On the radio.

    22   Q.   Who else lived with you at home at that time?

    23   A.   My parents, my oldest siblings and my relatives.

    24   Q.   How many older siblings did you have?

    25   A.   Four.
```

```
 1    Q.   And were they brothers, sisters, both?

 2    A.   Three boys and one girl.

 3    Q.   And were there other relatives who lived there with you?

 4    A.   My sister's little kid and our maid or houseworker.

 5    Q.   After you learned that the president's plane was shot

 6    down, that day what did your family do?

 7    A.   We stayed inside the house.

 8    Q.   Why did you stay inside the house?

 9    A.   Just to hear that the president is dead and that his plane

10    was shot at was a big thing.

11    Q.   When was the next time that you went out of your house?

12    A.   After one day, we went out to see what we could do.

13    Q.   And what happened when you went outside?

14    A.   We went to find something to eat.

15         MR. LAUER:  We're having trouble hearing.

16         THE COURT:  Maybe move the mic.  it's important for

17    Mr. Gasasira to speak, so we need to hear both of you.

18    A.   We went outside the house, and we went to check on our

19    neighbors to see how they are doing.

20    Q.   And what happened next?

21    A.   We started listening to the local leaders.

22    Q.   What did the local leaders tell you?

23    A.   They told us not to get out of our houses and go to the

24    center, so we should stay inside.

25    Q.   I'm going to suggest that perhaps the microphone be moved
```

10:53AM (line 10)
10:54AM (line 20)

**J.A. 429**

```
 1    a little bit closer to, I'm sorry, to Mr. Gasasira just because
 2    I'm having difficulty hearing as well.  The local leaders you
 3    heard from, were they Hutu or Tutsi?
 4    A.    They were Hutus.
 5    Q.    So they told you to stay inside their house.  Did they
 6    tell you why you should stay inside your house?
 7    A.    They told us.
 8    Q.    What was the reason for you to stay inside your house?
 9    A.    That Habyarimana is dead.
10    Q.    Did they say what would happen if you went outside of your
11    house?
12    A.    Yes.
13    Q.    What did they say would happen if you went outside your
14    house?
15    A.    They told us to stay inside the house so they can get some
16    directives from the other leaders above.
17    Q.    Did anybody else tell you to stay inside the house?
18    A.    Yes.
19    Q.    Who were they?
20    A.    All my Hutu neighbors.
21    Q.    Could you repeat the answer, please.
22    A.    All my Hutu neighbors.
23    Q.    All your Hutu neighbors, okay.  How long was it before you
24    -- did you go back to the house then?
25    A.    Repeat the question, counselor.
```

J.A. 430

```
         1    Q.   Did you go back to your house then?

         2    A.   Yes, we went back to the house.

         3    Q.   How long was it before you left the house again?

         4    A.   It took some days.

         5    Q.   When you stayed inside the house, what did you and your

         6    family do for those days?

         7    A.   We just scared of getting out.

         8    Q.   Did you listen to the radio at all during those days?

         9    A.   Yes.

10:57AM 10    Q.   Did you hear any talk about Hutus or Tutsis?

        11    A.   Yes.

        12    Q.   What did you hear about Hutus and Tutsis during that time?

        13    A.   They were saying that Habyarimana is killed by the Tutsis.

        14    Q.   Did you hear anything else about Tutsis during that time?

        15    A.   They were saying Tutsis are bad people, they killed the

        16    parent of the nation, and they need to do something for

        17    revenge.

        18         MR. LAUER:  Your Honor, my next set of questions are

        19    going to go into a lengthy event.

10:58AM 20         THE COURT:  Okay.  Why don't we take our mid-morning

        21    break.

        22         THE CLERK:  All rise.

        23         (A recess was taken.)

        24         THE CLERK:  All rise for the jury.

        25         (JURORS ENTERED THE COURTROOM.)
```

**J.A. 431**

```
 1    Q.   Mr. Gasasira, before the break you were saying you and

 2    your family were in your house for a number of days; is that

 3    right?

 4    A.   Yes.

 5    Q.   How did you know it was time to leave your house?

 6    A.   The hills across from us were burning.

 7    Q.   What could you see what particularly was burning?

 8    A.   The houses of Tutsi.

 9    Q.   What else did you see when you looked out?

11:19AM 10    A.   The Tutsis were fleeing from one part of the village to

11    another.

12    Q.   Could you tell what they were fleeing from?

13    A.   Yes.

14    Q.   What were they fleeing from?

15    A.   They were fleeing from Nguru.

16    Q.   Anything else?

17    A.   They were going, and when they reached like there was a

18    field, they will have a stop.

19    Q.   And what would then happen?

11:20AM 20    A.   They would gather together.  They would stay there for a

21    day or two.

22    Q.   I'm going to stop you right there because I want to stick

23    with the people fleeing while the houses were burning.  How did

24    you know that the people that the Tutsi were fleeing from were

25    Hutu?
```

**J.A. 432**

```
 1    A.   Their houses were being burnt by the Hutus.

 2    Q.   Did you see Hutus chasing the Tutsis?

 3    A.   Yes.

 4    Q.   How could you tell the people that were chasing the Tutsis

 5    were Hutu?

 6    A.   The words they were using.

 7    Q.   Were you outside at that point so you could hear the

 8    words?

 9    A.   Yes.

11:21AM 10    Q.   What words did you hear them say?

11    A.   They were saying that they want to kill inyenzi.

12    Q.   And what did you understand inyenzi to mean?

13    A.   Tutsi.

14    Q.   Was inyenzi a nice name for Tutsis?

15    A.   No.

16    Q.   Were the people who were chasing them wearing any uniforms

17    at all?

18    A.   Yes.

19    Q.   What type of uniforms?

11:22AM 20    A.   Most of them were the commune police, the Gendarmerie, and

21    the Hutus were dressed in the clothes of MRND.

22    Q.   Okay.  Were any of them armed?

23    A.   Yes.

24    Q.   What types of weapons did they have?

25    A.   Police and Gendarmerie, they had guns, grenades, and the
```

```
 1   civilian Interahamwe, they had axes and machetes and dogs.
 2   Q.   Did you see as the Tutsis were fleeing, did you see any
 3   violence occurring?
 4   A.   Yes.
 5   Q.   What did you see?
 6   A.   They were killing them.  The police and the Gendarmerie,
 7   they were gathering them together to stop them from fleeing and
 8   shoot them, and whoever tried to go, they would throw grenades
 9   at them, and the Hutus would follow them with machetes and kill
10   them with machetes and clubs.  That's what I saw.
11   Q.   Once you saw that, what did you and your family do?
12   A.   We didn't have anything to do.  We stayed in one place.
13   Q.   Did you ever wind up leaving your house and moving to
14   another area?
15   A.   Yes.
16   Q.   When did you move to another area?
17   A.   On the 21st of April.
18   Q.   Where did your family go?
19   A.   I went with my dad.  I didn't know where they went.
20   Q.   Why didn't you know where the others went?
21   A.   After they came back home, my mom went back home and my
22   older brother and others were killed.  I didn't know where they
23   killed them, but the place where we had fled, it was just me
24   and my dad.
25   Q.   When you left your house with your father, did you two
```

J.A. 434

```
  1    take any possessions with you?

  2    A.   Nothing at all.

  3    Q.   When you and your dad left your house, where did you go?

  4    A.   We went to the soccer field.

  5    Q.   Why did you go to the soccer field?

  6    A.   Because all the Tutsis had fled there.

  7    Q.   When you got to the soccer field, what happened?  Actually

  8    strike that question.  When you got to the soccer field, what

  9    did you see?

11:26AM 10  A.   I saw they had Hutus killing Tutsis.

 11    Q.   And were there Tutsis there as well?

 12    A.   Yes.

 13    Q.   Can you describe was it crowded or deserted or somewhere

 14    in between?

 15    A.   There were so many people, there were so many Tutsi

 16    people.  Interahamwe, Gendarmerie and police, and they had

 17    gathered around them, and they were trying to make sure nobody

 18    escapes.  They killed the people the whole night, that's what

 19    they did.

11:27AM 20  Q.   And was the -- were people on the soccer field the Tutsis?

 21    A.   Yes.

 22    Q.   And was the soccer field enclosed by a stadium as well?

 23    A.   No.  They were just primary schools and the soccer field.

 24    Q.   And where were the Hutus and the Interahamwe positioned

 25    relative to the Tutsis?
```

J.A. 435

```
 1   A.   They would come to our houses with the machetes and axes

 2   and whistles.

 3   Q.   I want to concentrate right on what was happening at that

 4   soccer field.  Where were the Interahamwe and the Hutus, among

 5   the Tutsis, or were they on the outside?

 6   A.   The police and the Interahamwe and Gendarmerie, they

 7   surrounded them.

 8   Q.   Were those people armed with weapons?

 9   A.   Yes.

10   Q.   What weapons did they have?

11   A.   The Gendarmerie had military weapons, guns and hand

12   grenades.  The Hutu civilians, they had traditional weapons,

13   axes, hammer, clubs, something like that.

14   Q.   How did you know to go to the soccer field in the first

15   place?

16   A.   We don't want to stay in our houses because we're scared

17   to die there alone, so you would try to go where the other

18   people are so thinking that that's where we would be able to

19   survive.

20   Q.   On the way there, did you talk to any government

21   officials?

22   A.   Yes.

23   Q.   What type of official?

24   A.   The local officials, they're local officials.

25   Q.   And what was the conversation with the local officials?
```

11:28AM (line 10)
11:30AM (line 20)

 1   A.   They were telling us all the Tutsis should go to the

 2   soccer field, that's where we're going to protect them, but we

 3   learned that it was just pretty much to get us so they can kill

 4   us.

 5   Q.   So when you were at the soccer field, what happened?

 6   A.   When we got there, they started killing us around the

 7   evening, I would say from three or from four the whole night.

 8   Q.   Three in the afternoon or three in the morning?

 9   A.   Three in the afternoon.

11:31AM 10   Q.   And were you and your -- at this point, was it just you

11   and your father, or was anybody else from your family there?

12   A.   It was me and my father.  Others had gone in another place

13   I didn't know.

14   Q.   Were you and your father safe at the soccer field?

15        THE INTERPRETER:  Repeat that question, counselor?

16   Q.   Were you and your father safe at the soccer field?

17   A.   No, even my dad was hurt on his leg.

18   Q.   Did you see that happen?

19   A.   Yes.

11:32AM 20   Q.   Can you describe it for the jury.

21   A.   As they were pushing us together, they had Interahamwe

22   solders.  They were throwing in hand grenades, and they were

23   shooting, and those that were injured, they would fall down.

24   The Hutu and Interahamwe, they would just finish them or kill

25   them using their traditional weapons they had.  The next

1    morning that's when I saw my dad, I thought he was really dead,

2    but I found out he was injured on his leg.

3    Q.   Did you learn how he had gotten injured?

4    A.   No, but when I saw him, he was injured, and he tell me he

5    was dead, they beat him with a club, and he was bleeding.

6    Q.   Where was he bleeding from?

7    A.   On his leg.

8    Q.   What did you and your father do next?

9    A.   My dad said that we go to the hospital, and I said okay,

11:33AM 10    I'll accompany you there.  We went together.  We reached the

11    hospital.

12    Q.   I'm going to stop you there.  I want to ask you some

13    questions about getting to the hospital.

14    A.   Yes.

15    Q.   Did you, when you went to the hospital, did you and your

16    dad take a road, or did you go through the forest?

17    A.   We took the road.

18    Q.   Did you take a car or did you go on foot?

19    A.   We went on foot.

11:34AM 20    Q.   What was it like this time on the road to Butare Hospital?

21    A.   It was very scary.

22    Q.   What was scary about it?

23    A.   There are roadblocks.  Interahamwe killed the people the

24    whole night.  You could see machetes and clubs full of blood.

25    Most of them, they knew my dad, and they knew he was a Tutsi,

```
 1    and they would tell him, you two, just in a moment, we'll kill
 2    you wherever you go.
 3    Q.   Did you see bodies on the road as well?
 4    A.   Yes.
 5    Q.   How were you able to get through the roadblocks?
 6    A.   Because they knew my dad, they would say we're preserving
 7    you for us, this is the time for the Tutsi, you killed
 8    Habyarimana, and we want to kill you all over the country.
 9    Q.   Had you walked from your town to the hospital before?
10    A.   Yes.
11    Q.   When you were walking with your dad this time, did it take
12    longer or less time?
13    A.   Yes.
14    Q.   Did you ultimately get to the hospital with your dad?
15    A.   Yes.
16    Q.   Was it the same day or a different day as you left?
17    A.   The same day.
18    Q.   When you got to the hospital, what was it like there?
19    A.   In the hospital, it was calm.  You could see the Red Cross
20    cars.  They were bringing people very sick, young ladies or
21    young girls, kids, small children, they were all injured, and
22    they would put them in the hospital.  And the Red Cross
23    employees, they will say that they found them in pit, and they
24    picked those who are still breathing, and then they bring them
25    to the hospital so they can get help, that's what I saw.
```

11:35AM at line 10

11:36AM at line 20

J.A. 439

```
  1    Q.   Did you see soldiers there at the hospital?

  2    A.   No.

  3    Q.   Did you see any Interahamwe when you first got there?

  4    A.   No.

  5    Q.   And did you see any violence when you first got there?

  6    A.   It was calm.  It was the beginning.  It was the second day

  7    when the genocide started.

  8    Q.   Did your father get any treatment at the hospital?

  9    A.   Yes.

11:38AM 10    Q.   Where was he treated?

 11    A.   Counselor.

 12    Q.   Where was he treated at the hospital, in which area?

 13    A.   In the hallway.

 14    Q.   At which part of the hospital was he treated at?

 15    A.   In the hallway.  They were just giving him first aid or

 16    helping him.

 17    Q.   And what did they do for his injuries?

 18    A.   They put a Band-Aid on it.  It was a young medical staff

 19    was helping him, and he knew him.  He didn't put any on his

11:39AM 20    wound, he just put a Band-Aid just to protect him from

 21    bleeding.

 22    Q.   Do you know the person who gave your father treatment at

 23    that time?

 24    A.   Yes.

 25    Q.   What was his name?
```

# J.A. 440

|     |                                                                      |
|-----|----------------------------------------------------------------------|
| 1   | A.    Karekezi Jean Claude.                                          |
| 2   | Q.    Had you met Karekezi before?                                   |
| 3   | A.    Yes, I knew him.                                                |
| 4   | Q.    How did you know him?                                           |
| 5   | A.    Yeah, I knew him.  He had -- he was Number 1 when they did      |
| 6   | a cycling competition in our village Huye, in our town, and he        |
| 7   | was Number 1 among the cycling team, and I knew his home              |
| 8   | because they had a shop.                                              |
| 9   |      When I would come from school during the primary                |
| 11:40AM 10 | school, and if I didn't get a chance to go home, I would go to |
| 11  | his mom's shop to buy milk.  And when he's coming from school,        |
| 12  | sometimes we would meet, and they would tell us Karekezi lives        |
| 13  | here.                                                                 |
| 14  | Q.    Was Karekezi a Hutu or a Tutsi?                                 |
| 15  | A.    He was a Tutsi.                                                 |
| 16  | Q.    And what job did Karekezi have at the hospital?                |
| 17  | A.    The job he had was treating people.                            |
| 18  | Q.    After your dad got treatment at the hospital, did you and      |
| 19  | he stay there?                                                        |
| 11:41AM 20 | A.    No.                                                     |
| 21  | Q.    Where did you go next?                                         |
| 22  | A.    We went home.                                                  |
| 23  | Q.    Did you try to go back the same route that you had come?       |
| 24  | A.    Yes.                                                           |
| 25  | Q.    Were you able to go back?                                      |

**J.A. 441**

```
 1    A.    No.

 2    Q.    What happened?

 3    A.    We went down, we left the hospital, and we get to the town

 4    road, we passed by the National University, and we arrived in a

 5    place called Mucuni.  There was a very big red brook, and it

 6    was manned by the president.  When we reached that roadblock,

 7    my dad told me to go back, and he said that it looks it's going

 8    to be very tough, it's not easy, instead of us dying together,

 9    you are still young, you know where the city is, you went to
10    primary school there, let me just go, you go back.

11    Q.    Did your father go on?

12    A.    Yes.

13    Q.    Did you go on with him?

14    A.    With my dad?

15    Q.    Did you go back home with your dad?

16    A.    No.  I went back to the city, and my dad continued to go

17    home.

18    Q.    Let me ask you, what your father's name?

19    A.    Bitira James.

20    Q.    Can we have Exhibit 58 for the witness and for the

21    parties, please.  Do you see something on your screen,

22    Mr. Gasasira?

23    A.    I saw it.

24    Q.    Are you familiar with it?

25    A.    Yes.
```

```
 1   Q.   What is it?

 2   A.   My dad.

 3             MR. GARLAND:  Your Honor, the government moves

 4   Exhibit 58 into evidence.

 5             MR. LAUER:  Subject to my earlier objection, your

 6   Honor.

 7             THE COURT:  All right.  It's admitted,

 8   Exhibit Number 58.

 9             (Exhibit No. 58 received into evidence.)

11:44AM 10   Q.   So is this a picture of your father then?

11   A.   Yes.

12   Q.   Have you seen your father since your father went onto your

13   house and you did not?

14   A.   No.

15   Q.   After you separated from your father, where is the place

16   that you went?

17   A.   I went back to the primary school where I used to go.  I

18   found some few Tutsis who had fled there.  That's where I

19   stayed first and stayed with them.  After a few days, they

11:45AM 20   chased us out.

21   Q.   I'm going to stop you there.  Who chased you out?

22   A.   The Hutu and Interahamwe.

23   Q.   And were they armed when they chased you?

24   A.   Yes.

25   Q.   Where did you flee to?
```

**J.A. 443**

1    A.    We left, and we were thinking to go to the diocese, but

2    that diocese is called Caritas, but the older folks were among

3    us.  They were saying that going to really just compound is not

4    right.  They said let's go to the prefecture if they're going

5    to kill us, let them kill us, and that's where we went to the

6    field at the prefecture, and we went there to be killed.

7    Q.    Can you describe for the jury what the prefecture looked

8    like.

9    A.    Yes.

11:46AM 10    Q.    Please describe it.

11    A.    Prefecture is like a district, and they have commune or

12    the counties, they have more than five counties.  It depends on

13    how big the district is, and they have the local sector, which

14    is below the county, all at the local level.  All big decisions

15    will be made at the prefecture of the district, so that's where

16    we decided to go.  We thought there would be mass food to keep

17    us alive.  We lived there.

18    Q.    I want to ask you, so was there a building there that you

19    went to?

11:47AM 20    A.    Yes, there was a building of the prefecture, district

21    leader and other houses that had different subs but outside

22    where people used to park in the parking lot and the garden of

23    the prefecture, that's where all the older folks were together.

24    That's where we spent the night.  When it rained, it would rain

25    on us there.  We didn't have food, we didn't have anything to

J.A. 444

1    drink, and the Interahamwes would come at night, and they would

2    take the young men and young women to go, and they would take

3    them to be killed.

4         That's the life we lived in when we had the

5    prefecture, and the leader, he always saw us there, and he

6    never say anything, and we were just waiting for our death.

7    That's how it was there.

8    Q.   Do you remember how long you were at that place,

9    approximately?

11:49AM 10   A.   Approximately three weeks.

11   Q.   And did you eventually leave that area?

12   A.   Yes.

13   Q.   What happened when you left?

14   A.   The prefect, and one very important businessman in Butare,

15   it was in the morning, and they are standing in the garden at

16   that big field that I had mentioned, and the prefect came out

17   of his office.  He came to see that businessman called

18   Manichejci, and he told him why don't you take these people

19   from here, and he said the white people and other foreigners,

11:50AM 20   they're going to come here and take pictures of them, and they

21   will know what we are doing.  And that gentleman agreed right

22   away, and they went in the office for a few minutes.  After a

23   few minutes they came out.  They didn't tell us anything.

24         In the evening around 3:00, they brought buses from

25   the company called Naijacom, and they told us they're going to

**J.A. 445**

```
 1    take us deep in the village where the white people never see
 2    us.
 3    Q.    Did you go on those buses?
 4    A.    No.
 5    Q.    Did the other people who were with you go on the buses?
 6    A.    Yes.
 7    Q.    And the people who went on the buses, did you know some of
 8    those people?
 9    A.    I had got to know them.
10    Q.    And were they Hutu or Tutsi?
11    A.    They were Tutsis.
12    Q.    When the people got on the buses, what did the buses do?
13    Did the buses drive away?
14    A.    Yes.
15    Q.    Did you see -- ever see any of the people that went on
16    those buses again?
17    A.    No.
18    Q.    So if you didn't go on the bus, why didn't you go on the
19    bus?
20    A.    I can explain that.  Those buses from Naijacom, they were
21    taking us in the village called Nyanza, and on the way there,
22    they were going to pass the road from where I came from, and
23    they knew the bus would never pass the roadblock without being
24    chased.  And they knew before they get to the roadblock, they
25    have people there.  It was supposed to be that they're going to
```

11:51AM 10

11:52AM 20

**J.A. 446**

```
 1   take me out of the bus because so many people are on there,

 2   they knew my family and they knew my dad, so I knew for the

 3   bus, which is in my area they would take me out, and they would

 4   kill me, that's why I decided not to the go on that bus.

 5   Q.   So where did you go?

 6   A.   At that moment, I was a little bit lucky.  There was a

 7   surgeon who was injured during the war, and he was in the

 8   wheelchair, and I asked him if I can help him or take care of

 9   him, and he asked me are you not a Tutsi, and I told him no.  I

10   told him I'm a homeless kid here in the town.  I came here a

11   long time ago.  My parents are separated.  I approached him

12   like that so he can allow me, so I can pretend that I'm helping

13   him because I knew there's not any other place I can go.

14   Q.   Was this right there at the place where the buses had

15   taken away the Tutsis or was that at a different location?

16   A.   No, it was not in that location where the buses were.

17   They left that place, the district with the prefecture.  I went

18   to the main road close to the shops, close to the city.  That's

19   where I met that surgeon.

20   Q.   What were the soldier's injuries?

21   A.   His legs were shot, and he was in a wheelchair that had

22   two wheels, but he needed someone to push him from behind.

23   Q.   And did the soldier agree to have you help him out?

24   A.   Yes, he agreed because he was really sick.

25   Q.   Do you sitting here right now remember the soldier's name?
```

J.A. 447

```
 1    A.    No.  I knew his name then, but because I never got to know
 2    him well, I forgot about his name.
 3    Q.    And what did the soldier call you?
 4    A.    He called me the homeless kid, and I called him my boss,
 5    the one I serve.
 6    Q.    At that time in Butare, were most of the -- were the
 7    homeless children there, were they most likely Hutu, Tutsi or a
 8    mix?
 9    A.    They were young people like me.  Most of them were Hutus,
11:57AM 10   and sometimes it was hard to identify each individual because
11    we didn't know where they came from or their home village.  It
12    was hard to tell.
13    Q.    Did you learn where the soldier was staying at night?
14    A.    Yes.
15    Q.    Where was that?
16    A.    We continued together and we went to the hospital.
17    Q.    Were you pushing him from behind?
18    A.    Yes.
19    Q.    And is that where the soldier was staying?
11:57AM 20   A.    Yes.
21    Q.    At any point, did you learn what the soldier thought about
22    Tutsis?
23    A.    Yes.
24    Q.    How did you learn that?
25    A.    He would say it.
```

```
 1   Q.   And what would he say?

 2   A.   He will say that the Tutsis are the one who shot him

 3   during the war.

 4   Q.   Where did the soldier stay at the hospital?

 5   A.   He was in the hall with others.

 6   Q.   So he didn't have a private room then?

 7   A.   No.

 8   Q.   Who were the other patients in that hall?

 9   A.   His fellow soldiers.  All of them were shot at the front

11:58AM 10   line and other soldiers were treating them.

11   Q.   Were those soldiers then Hutu as well?

12   A.   Yes.

13   Q.   Where did you stay?

14   A.   I stayed with him.

15   Q.   Did you have a bed?

16   A.   Yes, but it will change depending on the number of the

17   patients they have if they have more or less.

18   Q.   Did they ever run out of beds?

19   A.   No.

11:59AM 20   Q.   How did it feel being a Tutsi in that room with a bunch of

21   soldiers who were Hutu who you had known had been in the war?

22   A.   Because I had told them that I'm not a Tutsi, and I had

23   told them that I'm homeless, I came a long time ago in the

24   city, they didn't find me, and the individual that I was

25   helping, he was very happy with my service.
```

## J.A. 449

```
 1   Q.   Were you concerned about what would happen if you were
 2   found out to be Tutsi?
 3   A.   Yes.
 4   Q.   What sorts of things did you have to do to help out the
 5   soldier?
 6   A.   I go everywhere that he will not be able to reach.  When
 7   he needed breakfast, when he needed to move, to go outside for
 8   the sun, I would go with him.
 9   Q.   And did you have time apart from him as well?
10   A.   Yes.
11   Q.   Until the end of the genocide, where did you stay?
12   A.   There.
13   Q.   Were you allowed to walk throughout the hospital or were
14   you restricted to any particular areas?
15   A.   I would walk.
16   Q.   And during the time that you stayed there, did you see
17   doctors?
18   A.   Very few.
19   Q.   Did you see any civilian patients?
20   A.   Yes.
21   Q.   Did you see medical students?
22   A.   I would see medical staff.  I was not differentiating
23   between the staff and between the doctors and the interns, but
24   they all did the same job, they were helping the patient.
25   Q.   So I want to ask you that, put that question to you a
```

J.A. 450

```
 1    different way.  Were you able to distinguish between a doctor,

 2    a medical student helping a doctor or any other medical staff?

 3    A.   It was hard because that was not my job.  I had no

 4    knowledge of it, but, yes, doctors that we knew, they are

 5    doctors like a doctor who treated you.  Those ones, I knew

 6    them.

 7    Q.   And while you were there, did you ever see Interahamwe?

 8    A.   Yes.

 9    Q.   While you were there, could you tell who was running the

12:03PM 10    medical care at the building, whether it was civilian doctors

11    or soldiers or Interahamwe or others?

12    A.   It was hard.

13    Q.   I want to turn now back to Karekezi.  Was Karekezi the man

14    that you said before had helped your father?

15    A.   Yes.

16    Q.   And did you testify that he was Tutsi?

17    A.   Yes.

18         MR. GARLAND:  Can we show the witness and the parties

19    only Exhibit Number 60, please.

12:04PM 20    Q.   Do you see something on your screen?

21    A.   Yes.

22    Q.   Do you recognize this?

23    A.   Yes.

24    Q.   Do you recognize who the person is?

25    A.   I know him.
```

J.A. 451

```
 1              MR. GARLAND:  Your Honor, we move Exhibit 60 into
 2      evidence.
 3              MR. LAUER:  Subject to my objection.
 4              THE COURT:  Yes, it's admitted, Exhibit 60.
 5              (Exhibit No. 60 received into evidence.)
 6      Q.   Who is this a picture of?
 7      A.   Karekezi Jean Claude.
 8      Q.   Is that the Karekezi you were referring to before?
 9      A.   Yes.
12:05PM 10      Q.   Do you know whether Karekezi continued to work at the
11      hospital once you were staying there?
12      A.   Yes.
13      Q.   How did you learn that?
14      A.   Sometimes I met him.
15      Q.   Sometimes?  I couldn't hear.
16      A.   Sometimes I met him.  And there is some information I know
17      about him.
18      Q.   And let me put a question to you about that.  Did you ever
19      learn about whether Karekezi was afraid for his safety?
12:05PM 20              MR. LAUER:  Objection, your Honor.  I'd like to be
21      heard at sidebar.
22              THE COURT:  Okay.
23              (THE FOLLOWING OCCURRED AT SIDEBAR:)
24              THE COURT:  What do you expect the evidence to be, how
25      this line of questioning will play out?
```

**J.A. 452**

```
 1            MR. GARLAND:  So it will play out, he saw Karekezi
 2    talking to another doctor there, that he saw Karekezi's face
 3    and Karekezi looked like he was run down, tired, afraid, and
 4    that he had a conversation with the other person in which he
 5    related that he was afraid, or that would be the sum and
 6    substance.
 7            THE COURT:  Karekezi told --
 8            MR. GARLAND:  The other doctor.
 9            THE COURT:  The other doctor.
10            MR. GARLAND:  Within Mr. Gasasira's hearing that he
11    was afraid.  The specific words that he said were along the
12    lines that Teganya was coming after me.  I understand the
13    objection I assume of hearsay.
14            THE COURT:  Let me hear the objection.
15            MR. LAUER:  The objection is hearsay.
16            THE COURT:  Just making sure.
17            MR. GARLAND:  It's true I shouldn't create an
18    objection that's going to be made.  I think it's not hearsay,
19    that the point is -- first of all, it's present state of mind,
20    and it's offered for the truth of it.
21            It shows why it is that he's scared from certain
22    events that happened afterwards will bear that out, and it
23    shows his emotional state at that time as well.
24            MR. LAUER:  Saying he's scared or he appeared scared
25    is one thing.  Saying that words to the effect "Teganya is
```

**J.A. 453**

4-80

1    after me" is another, so he can testify about his feeling, or,

2    you know, whatever his sense impression may be, but saying

3    "Teganya is after me" is conclusory, it's not a present sense

4    impression, and it's hearsay.

5         THE COURT:  Well, let me break this down.  First off,

6    I think he can testify as to what he observed, and if he

7    observed that he looked run down or frightened or whatever, you

8    know, I think that's permissible.  That's certainly grounds for

9    cross-examination as to whether you can tell someone is afraid

12:08PM 10   by the way they look, but I'm going to allow that.

11        I think the statement if he hears him say "I'm

12   scared," that's obviously a present mental condition that would

13   be within the hearsay exception.

14        If he says "I'm scared because there's a lion in the

15   rafters that I'm afraid is going to jump on me," it's kind of

16   fleshing out why he's scared, right, what he's afraid of as

17   opposed to this, or, you know, I am sad because my grandfather

18   died, I am scared because someone threatened to kill me, it

19   seems to me it's all within the same statement, so to speak,

12:09PM 20   and I think I'm going to allow it within the hearsay exception

21   for revealing his then present state of mind.

22        MR. WATKINS:  Your Honor, may I just consult?

23        THE COURT:  Yes.

24        MR. LAUER:  I don't the limiting instruction that you

25   could possibly give that's going to make sure that this used

**J.A. 454**

```
 1    only for the purposes that it is being brought for.

 2            If it's being brought for the purpose of explaining

 3    why he's scared, it's not mutually evidence that Teganya was,

 4    in fact, after him.  I think that should be explained to the

 5    jury.

 6            MR. GARLAND:  I think the Court's already given that

 7    instruction.

 8            MR. LAUER:  I think there should be clarity for the

 9    jury about the purpose this particular evidence is being

12:10PM 10   offered.  It's not direct evidence that Teganya was after him,

11    it's evidence of his then state of mind.

12            THE COURT:  I think I'll give a cautionary

13    instruction.  I don't think I'll limit it, I think I'll caution

14    them as to what kind of evidence it is just to make sure -- you

15    don't expect there to be any other evidence on this point?

16            MR. GARLAND:  I don't think so.  I want to be clear

17    for the Judge because -- go on.

18            MR. VARGHESE:  There is going to be evidence about a

19    later time with Karekezi.

12:10PM 20   THE COURT:  By Teganya.  I'll just take the statement

21    then.  I'm just going to caution them that I'm permitting this

22    because whatever weight they choose to give this evidence is

23    then existing state of mind.  I'm going to leave it at that.

24            MR. WATKINS:  Your Honor.

25            THE COURT:  Yes.
```

**J.A. 455**

```
 1              MR. WATKINS:  Just because the government has used two
 2      lawyers to argue, may I argue here for just a moment?
 3              THE COURT:  Yes.
 4              MR. WATKINS:  In our view, there is no cautionary
 5      instruction that is going to be able to properly put this
 6      before the jury.  Let's understand what he's talking about is
 7      implicating the defendant, right?  There's no two ways about
 8      that.  It is impossible in my mind to figure out how the jury
 9      is going to compartmentalize that.
12:11PM 10              THE COURT:  I'm not limiting, in other words, I'm not
11      limiting it.  In other words, I'm not saying they may only
12      consider it for state of mind but just to make sure they
13      understand what it means.
14              In other words, if I say I'm sad because my
15      grandfather died, why would that have any limitation on it?
16              MR. WATKINS:  Number 1, because the grandfather is not
17      accused of dying, that's not a criminal offense.
18              THE COURT:  Okay.
19              MR. WATKINS:  In your analogy, what the government
12:11PM 20      could do is he was afraid because someone was after him.  That
21      I understand would be proper to set the stage for it.  There is
22      simply no reason why the defendant's name has to be a part of
23      that statement.
24              MR. GARLAND:  One thing I wanted to say, your Honor,
25      is that to be very clear, I do not necessarily to say
```

J.A. 456

1    Mr. Gasasira to say, and he's going to say that Mr. Karekezi

2    said I am scared, here's why.  It's not parsed out that way.

3    His whole manner is being scared, he's talking to the other

4    doctor.  It's a conversation, and he says "Teganya was after

5    me, I think Teganya is after me, by itself."  I'm not backing

6    it up, but I want the Court to be clear as to what the --

7            MR. LAUER:  If there's not even a foundation that he

8    said he was scared, if it's just based on the appearance of

9    being scared, I think foundation, you can't even get to a

12:12PM 10  present sense impression.

11           THE COURT:  It's not a present sense impression, it's

12   a statement of then existing or mental condition or emotional

13   condition, including the reason for that condition.

14           MR. LAUER:  That's an inference, the reason for that

15   condition.  If he's not prepared to say that he was scared

16   and --

17           MR. GARLAND:  I'm sorry, I don't think that is clear.

18   I think that he was prepared to testify to outward appearances

19   that the person is scared.  What I was saying was that I don't

12:13PM 20  think that he's going to testify that Karekezi said "I am

21   scared," period, "Teganya is after me," it was a linguistic

22   formulation.

23           MR. LAUER:  If it's just "Teganya is after me," and

24   this witness's opinion is that he looked scared, that's a

25   different thing.  That is a different thing.

**J.A. 457**

1          THE COURT:  All right.  I'm going to allow the

2     testimony.  I don't know that I'm going to limit it.  Let me

3     think clearly here.  I could, I suppose, say you may only

4     consider this as evidence of his then existing state of mind

5     and not his actual proof that Teganya is after him, right, and

6     you say that that doesn't work because the jury won't be able

7     to keep that separate.

8          Assuming I'm admitting the statement, do you want the

9     instruction nonetheless or were you objecting?

12:14PM 10          MR. LAUER:  I suppose, yes, I do want the instruction

11     if the Court's prepared to admit that, but without this witness

12     saying that the third-party declarant said I am scared, I think

13     it's a very thin foundation on which to say it was --

14          THE COURT:  All right.  Part of this, as I understand

15     it, there will be later testimony that Teganya does, in fact,

16     attack this, not this witness but this fellow, Karekezi?

17          MR. GARLAND:  That's correct.

18          THE COURT:  All right.  I'm going to handle it that

19     way.  The objection is overruled.

12:14PM 20          (SIDEBAR CONFERENCE WAS CONCLUDED)

21          THE COURT:  Thank you for your patience.  Why don't we

22     back up and ask the question again.

23     Q.   So the question that I asked was a yes or no question.

24     Did you ever learn whether Karekezi was concerned for his

25     safety?

**J.A. 458**

```
 1    A.    Yes.

 2    Q.    Where were you when you learned that?

 3    A.    We met in the hallway.  He was just coming from the

 4    surgery department where he used to work, and it was in the

 5    morning, and I was going to buy food for that soldier that I

 6    was taking care of.

 7    Q.    I'm going to stop you right there.  Did you talk to him at

 8    that point?

 9    A.    No.

10    Q.    Were you passing him in a room or a hallway?

11    A.    It wasn't me that passed him.  He met another doctor that

12    I knew very well, a medical staff.

13    Q.    And before you go on, were you able to observe -- were you

14    able to see Dr. Karekezi at that point?

15    A.    Yes.

16    Q.    Were you able to see his face?

17    A.    Yes.

18    Q.    How did he appear at that point?

19    A.    He was scared, and he had lost weight, and he just looked

20    like he looked scared of civilians, soldiers, even his fellow

21    doctors.

22    Q.    How could you tell from his face that he was scared?

23    A.    I knew him.  He was always a guy who would be smiling, he

24    would say hi to everybody, but when we met this time, he looked

25    scared, scared of you.
```

12:16PM (line 10)
12:17PM (line 20)

**J.A. 459**

1    Q.    And so I'm going to ask you what happened next?

2    A.    When he met Mbarutso.

3    Q.    Can you explain to the jury who that person was?

4    A.    Mbarutso was a grownup doctor.  He was a gynecologist, and

5    my history, my mom told me he's the one who delivered me when I

6    was born.

7    Q.    I'm sorry, could you repeat the last?

8    A.    My mother told me he's the one who delivered me when I was

9    being born.  He was a good doctor, and in genocide, nobody was

12:18PM 10    looking for him.  That's the doctor that met Karekezi.

11    Q.    And what happened next?

12    A.    We met in the hallway.  I was going up, and he was going

13    down to the maternity department or maternity ward, and he saw

14    Karekezi from the surgery department, and he say hi, he say hi

15    to him, Mbarutso say hi to him.

16          THE COURT:  I'm sorry, who said hi to whom?

17          THE WITNESS:  Mbarutso say hi to Karekezi.

18    Q.    And did Karekezi answer him?

19    A.    He answered him.  He said hi, and he told him to Mbarutso,

12:19PM 20    "Things are not well, I have a fellow doctor who's hunting me

21    down," and he asked him, "Who's that?"  And he told him,

22    "Dr. Teganya."  And Mbarutso just looked up, and he replied to

23    him, and he said, "All of the medical staff here or the doctors

24    here, there are some interns and Teganya, with Teganya, they

25    are killing people.  They are not listening to me anymore."

1    Q.    I'm going to move you on from there.

2          THE COURT:  Let me stop there.  Ladies and gentlemen,

3    I'm allowing this conversation into evidence as evidence as to

4    what Jean Claude Karekezi said at the time concerning his

5    emotions or state of mind or mental condition similar to if

6    someone said I'm sad because my grandfather died or I'm tired

7    because I didn't get a good night sleep, they're explaining the

8    reason for what they report as their distress, and I'm

9    permitting you to consider it at this stage for that purpose

12:21PM 10   only.

11         All right.  Mr. Garland.

12         MR. GARLAND:  Thank you.

13   Q.    Mr. Gasasira, when you were at the hospital, were you

14   familiar with someone named Jean Leonard Teganya?

15   A.    Yes.

16   Q.    Where had you seen him?

17   A.    He will come to the hallway where the soldiers were, where

18   they were living.  That's when I knew him.

19   Q.    I'm sorry, go ahead.

12:21PM 20   A.    All the time the soldiers would come in, and he look like

21   he was the one taking care of them.

22   Q.    I'm sorry, could you repeat the last?

23   A.    He looked like he's the one who is taking care of him.

24   That's how I knew him.

25   Q.    And how did you know that his name was Teganya?

# J.A. 461

```
 1    A.    The soldiers would call him.

 2    Q.    What would they call him?

 3    A.    They will call him "Teganya Jean Leonard."

 4    Q.    And did you see him respond to the soldiers when they call

 5    him "Teganya"?

 6    A.    Yes.

 7    Q.    Can you describe what he looked like?

 8    A.    Yes.

 9    Q.    Please describe him.

12:22PM 10    A.    He had big eyes, well clear eyes, he was a little bit

11    chubby in his cheeks, his upper tooth, he had a gup, and he had

12    little big lips, and on top of his head, he was trying to get

13    bald, but he had hair in the back, but here, you can look, the

14    hair is fading away, he's going to be bald, but he was a strong

15    young man.  That's how I knew him.

16    Q.    Do you recognize anybody here in the court today?

17    A.    Repeat that question, counselor.

18    Q.    Do you recognize anybody here in court today?

19    A.    I saw somebody.

12:23PM 20    Q.    And could you describe the person that you saw?

21    A.    Yes.

22    Q.    Please describe that person.

23    A.    That guy who's wearing glasses.  He had black glasses.  He

24    has brown lips, and he has hair right here, and he's bald.

25    That's Teganya.
```

J.A. 462

```
 1    Q.   Can you describe what he's wearing?

 2    A.   Unless if I stand up, I would be able to tell.

 3         MR. GARLAND:  Your Honor, may the witness stand up?

 4         THE COURT:  Yes.

 5    A.   I see him.  He has glasses.  He has a black jacket or

 6    black coat with some cuffs and a white shirt, and his tie has

 7    some color on it, and he's looking at me.

 8         MR. GARLAND:  Your Honor, I ask that the record

 9    reflect that Mr. Gasasira has identified the defendant.

10         THE COURT:  Yes.

11         MR. GARLAND:  Thank you.  You may be seated.

12         MR. LAUER:  Objection, your Honor, can we be heard?

13         THE COURT:  All right.

14         (THE FOLLOWING OCCURRED AT SIDEBAR:)

15         THE COURT:  What's your objection?

16         MR. WATKINS:  Judge, may I argue?

17         THE COURT:  Yes, go ahead.

18         MR. WATKINS:  Judge, I just want to point out what

19    just happened because what we heard was a statement for a

20    limited purpose that the government then bolstered through this

21    witness, who spent a period of time explaining who this person

22    is to give gravity to the fact that it was this person.

23         THE COURT:  Well, we're going to have direct evidence

24    apparently that Teganya attacked this guy, so that's even

25    bolstering further.  I mean, they can juxtapose the evidence
```

12:24PM (line 10)
12:25PM (line 20)

**J.A. 463**

```
 1    any way they want.  There's nothing improper about that
 2    courtroom identification that I can see, so overruled.
 3              (SIDEBAR CONFERENCE WAS CONCLUDED)
 4              THE COURT:  Overruled.
 5              MR. GARLAND:  Thank you, your Honor.
 6    Q.   When you were at the hospital, what did you understand
 7    Mr. Teganya's position to be there?
 8    A.   Yes.
 9    Q.   What did you understand his position to be at the
10    hospital?
11    A.   He would come to see those soldiers, and he would address
12    their wounds, and he would help them as a doctor, and whoever
13    needed something else, he'll bring them the medication.  That's
14    how I saw him.
15    Q.   Did you know whether he was a doctor or a medical student
16    or even some other position?
17    A.   I didn't know if he was an intern or a doctor.  I saw him
18    as a regular doctor because he was always treating the
19    soldiers.  At the hospital, there are very few doctors.  Some
20    of them were being hunted down and others had been killed, and
21    others left.  The Interahamwe, they were running around killing
22    people of different religions.  That means at the hospital
23    stayed very few doctors.
24    Q.   Did you know anybody else at that hospital with the last
25    name of "Teganya" or the family name of "Teganya"?
```

J.A. 464

```
 1    A.    No.

 2    Q.    How frequently would you see Mr. Teganya around the

 3    hospital?

 4    A.    Very different time.  I saw him more than one time.

 5    Q.    Would you see him -- how often would he come to the

 6    soldier's ward?

 7    A.    Sometimes he would come three times, and sometimes he

 8    would not come at all, and sometimes he will come to treat, and

 9    sometimes he just come to have a conversation with him.

12:28PM 10    Q.    Did you see him outside of the soldier's ward as well?

11    A.    Yes, I saw him.

12    Q.    Did you ever hear Mr. Teganya talk about Hutus or Tutsis?

13    A.    Yes.

14    Q.    What would you hear him say?

15    A.    He would say that Tutsis are very bad people and that they

16    are the one that killed Habyarimana, they are fighting us, and

17    he said those young men who are leading the war of RPF and that

18    is afraid of Juvenal who were able to kill him, and Kagame is

19    left, and he's now the one who is leading the fight of the war.

12:29PM 20    Look what he did to you, so we're going to kill all the Tutsis,

21    that's what's next.

22    Q.    Did you see how the other people treated Mr. Teganya at

23    the hospital?

24    A.    Yes.

25    Q.    How did they treat him at the hospital?
```

**J.A. 465**

```
 1    A.    Those soldiers?

 2    Q.    Yes.

 3    A.    They were very happy.  I had something, and they were

 4    saying that he's from the same, and most of those soldiers also

 5    came from the same Ruhengeri, so they will see him as one of

 6    their own.

 7    Q.    Okay.

 8    A.    They knew him very well.

 9    Q.    How did you feel about Mr. Teganya?

10    A.    Me?

11    Q.    Yes.

12    A.    He was very scary.  He had very bad words.  He was telling

13    the soldiers to do bad things, and you could tell that they

14    knew each other, as they always say.

15    Q.    Were you scared of him personally?

16    A.    Very much so.

17    Q.    Do you recall ever having a conversation with Mr. Teganya?

18    A.    No.

19    Q.    Did you want to be around him when you were there?

20    A.    No.

21    Q.    If Mr. Teganya came into a room and you were there, what

22    would you do?

23    A.    I will find something to do, and I'll try to see something

24    that I can take out of the way.  I'll try to find something to

25    do outside.  I didn't want to look him in the eyes.  I didn't
```

12:30PM 10

12:31PM 20

**J.A. 466**

1    want him to know who I am because whatever he would say would

2    be done.

3    Q.    I want to talk now again about Karekezi.  Did you see

4    Dr. Karekezi again after the conversation you talked about

5    before?

6    A.    Yes.

7    Q.    Where was he when you saw him?

8    A.    When he was going to treat another soldier?

9    Q.    I'm sorry.

12:32PM 10    A.    When he was going to treat another soldier in the room.

11    Q.    And where was this?  Was this indoors or outdoors?

12    A.    He walked in the surgery.  One surgeon went up in his

13    wheelchair, and he was with another fellow surgeon because at

14    the surgery, they will have to wait, so they wait for a doctor

15    to come up, and at that time Karekezi came out, but the other

16    surgeon who was wheeling his friend in the wheelchair, he

17    wasn't there.  Karekezi came wearing the lab coat.

18    Q.    Let me ask you a question about that.  What was Karekezi

19    dressed in, just a lab coat or what else?

12:33PM 20    A.    He was wearing a lab coat, and he had the mask that you

21    put around your face.

22    Q.    Is that like a surgical mask?

23    A.    Yes, it was like surgical clothes that you wear that

24    covers your mouth and your nose, and it goes around and you

25    could see only his eyes.

```
 1    Q.    What happened next?
 2    A.    And he had gloves, and he told the gentleman to raise up
 3    his legs, and he stretched his legs, and Karekezi Jean Claude,
 4    and the clothes he had on him fall down on the other surgeon's
 5    legs, and when that surgeon looked him in the face, and he
 6    said, "Oh, in the hospital also there are Tutsis?  And he said
 7    even we still have Tutsi doctors here?"  That surgeon didn't
 8    know Karekezi, and Karekezi ran back into the surgery
 9    department.
12:35PM 10   Q.    Did he run out of that room or did he stay in the room?
11    A.    No.
12    Q.    Where did Karekezi go?
13    A.    He went in the surgery, and that surgeon went back to the
14    hall without being dressed, and he said I saw Tutsi.
15    Q.    I'm losing who said that.  Who was it who said that?
16    A.    That soldier.
17    Q.    The soldier.  And what did the soldier do next?
18    A.    That his fellow surgeon, who was wheeling him in the
19    wheelchair, he went to find Teganya, and he said Teganya is the
12:35PM 20   one who knows his fellow doctors.
21    Q.    And how was the soldier in the wheelchair able to do that?
22    A.    Repeat the question, counselor.
23    Q.    Yes.  How did the soldier who was in the wheelchair, did
24    he wheel himself, walk, crutches?
25    A.    When you are leaving the hall, they were pushing -- when
```

J.A. 468

1    they were leaving the hall, they were pushing him, but when

2    you're going down in the hallway, it was a little hill, it was

3    a little down, and then he was able to wheel himself, everybody

4    would be able to wheel himself.

5    Q.    When Karekezi's mask dropped and he ran away, who else was

6    there other than the soldier that you were referring to and

7    yourself?

8    A.    At the hospital at that time, there were very few people.

9    Most of them were already killed.  The hospital was full of

12:37PM 10    surgeons and Interahamwe.  There were not that many sick people

11    because everybody knew there was a genocide taking place there.

12    Q.    Okay.

13    A.    Some people are being killed, and those that didn't die

14    were leading a bad life, that's how I see the hospital.

15    Q.    So Karekezi runs away, you say soldiers go out of the

16    room.  What happened next?

17    A.    He came saying that he saw Tutsi and inyenzi, and he was

18    telling his fellow surgeons.

19    Q.    Who is he, who is saying this?

12:38PM 20    A.    That surgeon who was in the wheelchair, and his fellow

21    friend who was wheeling him, he went to find Dr. Teganya.

22    Q.    How did you know he went to find Teganya?

23    A.    He's the one who came.

24    Q.    And when Mr. Teganya came, was he accompanied by anybody

25    or was he alone?

```
 1    A.   He came back with that surgeon who went to call him.

 2    Q.   Did anybody else come with him?

 3    A.   No, he found the others in the hall.

 4    Q.   And others, can you describe who the others were?

 5    A.   The soldiers, those who were taking care of the other

 6    injured soldiers.

 7    Q.   And what happened?  Did Mr. Teganya say anything when he

 8    arrived?

 9    A.   Yes.

10    Q.   What did he say?

11    A.   He asked that surgeon, "How did you see him?  How did he

12    look like?"  And the surgeon say he's a tall guy, he's a young

13    man, and he looked like Kagame because everybody knew Kagame at

14    that time because they knew him because he was the leader of

15    the world, and they say he's a handsome guy with a very nice

16    nose, and he has hair.  And Teganya himself said that is

17    Karekezi, and he's the one who I know who lives here in this

18    hospital.

19    Q.   Who just said that?

20    A.   Teganya.

21    Q.   Okay.  Did Teganya say anything else at that point?

22    A.   He went out.

23    Q.   And what happened next?

24    A.   He went out with a few soldiers.  They went behind the

25    hospital.  There was Interahamwe roadblock there.
```

J.A. 470

```
 1    Q.    And how did you know that they went around behind?

 2    A.    I also went out through the corridor.  During the

 3    genocide, if you noticed that people are gathering together,

 4    they are kind of having a meeting, you will think like, oh,

 5    maybe I'm the next one to be killed.  That's how I saw it.

 6    Q.    And so when you went, were you pushing your soldier

 7    wheelchair at that point?

 8    A.    I walked out of that hall, and in the hallway, you could

 9    see people ahead of you.

10    Q.    Let me -- I want to get the answer to this question.  When

11    you walked out, were you pushing the soldier that you were

12    taking care of in the wheelchair?

13    A.    No, I went out alone.

14    Q.    Okay.  And so you went out, what did you see?

15    A.    I saw Teganya with the soldiers.  They were having a

16    conversation, but I didn't know what they were talking about.

17    But if you see people together or gathered together, and, plus,

18    there were soldiers, and you will think like maybe they're

19    organizing in the hall, but I went back in the hall.

20          The soldier that I was wheeling the wheelchair, he say

21    that Teganya is the one who has the most keys, the keys for all

22    the rooms.  That guy who run away is going to find him.

23    Q.    So what did you do next?

24    A.    It was coming towards the morning.  It became 10:00, noon,

25    2:00, and that's when I saw Karekezi being taken from the
```

12:41PM (line 10)
12:42PM (line 20)

J.A. 471

1    surgery department, and they came to us, the place where I was

2    washing clothes is for that surgeon.

3    Q.    Let me ask you about that.  You say they.  Who was taking

4    Karekezi at that point?

5    A.    The Interahamwe and the soldiers, and Teganya was among

6    them.

7    Q.    And was this inside or was this outside?

8    A.    It was outside in the hall going towards the hospital.

9    Q.    Were you at a place where you could see this happening?

12:44PM 10    A.    Yes.

11    Q.    And when you say that they were taking Karekezi, what do

12    you mean?  What do you mean by they were taking him?

13    A.    At that place where they got him.  Teganya told him that

14    is Karekezi, we work together here in the hospital, he's a

15    Tutsi, I know him very well, and he has his relatives in

16    Inkotanyi, I know him very well, so he should not lie to you,

17    and they grabbed him by the pants, and they pushed him going

18    forward, and Teganya was kicking him, and they took him down.

19    Q.    I want to get a couple more observations while this is

12:45PM 20    happening.  Was Karekezi going along willingly or unwillingly?

21    A.    He was begging for mercy, and he was saying that I don't

22    know Teganya, and he was saying I don't know Kagame, and he was

23    saying I just work as a doctor, I help those who are in need,

24    and Teganya was telling him, but you're a Tutsi, and Teganya

25    had an axe, it was a small axe, and he took him down.

J.A. 472

```
 1    Q.   Can you show the jury how long the axe was or how short it
 2    was using your hands?
 3    A.   Yes.
 4    Q.   Can you show them how big with your hands?
 5    A.   They were small axes.  They were using them in the
 6    genocide to kill people, and they had made those axes manually,
 7    and they made those axes before the genocide.  It was a small
 8    axe.
 9            MR. LAUER:  I'm going to object, your Honor.  This is
12:47PM 10    well beyond the scope.
11            THE COURT:  Hold on.  Hold on.  All right.  Let's stop
12    there and put another question to him.
13            MR. GARLAND:  I can put another question to him.
14    Q.   Were the other people who were holding onto Dr. Karekezi
15    also armed?
16    A.   Yes.
17    Q.   Can you tell the jury the names of the weapons they
18    carried?
19    A.   Yes.
12:47PM 20    Q.   What were those names?
21    A.   The soldiers had guns and hand grenades and Interahamwe,
22    they had machetes.
23    Q.   So, as they're walking with him, are there other people
24    around not participating but onlookers?
25    A.   The few that I was able to identify, they were intern
```

```
 1    doctors were Hutu.

 2    Q.   Did they go along?

 3    A.   No.

 4    Q.   So what happened next?

 5    A.   They took him all the way down, and Teganya's is the one

 6    who was kicking him, and the soldiers were pushing him, and

 7    Teganya' is the one who killed him with the axe that I told you

 8    about.

 9    Q.   Where did they take him to?

10    A.   They took him just below the mortuary close to the

11    maternity ward, the maternity building.

12    Q.   Can you describe what that area looks like?

13    A.   Yes.

14    Q.   Please describe for the jury.

15    A.   That place is a little behind the mortuary, and close by

16    there's a maternity building.  It was a very visible place.  It

17    had a very bad odor, and during those days, Red Cross had taken

18    all the dead bodies of Tutsis, and they take them to bury them

19    somewhere.  There was some other people who died there.  That's

20    how the place look like.

21    Q.   And was this outside or inside then?

22    A.   It was outside.

23    Q.   And when they brought him to -- when they stopped, what

24    happened at that point?

25    A.   The soldiers pushed Karekezi, and they give him to
```

12:48PM (line 10)

12:49PM (line 20)

**J.A. 474**

```
 1   Teganya, and they kill him.  What Teganya did, he stood his
 2   ground and hit him with the axe, that's what I saw.
 3   Q.   Did you see Karekezi get up from that?
 4   A.   No.
 5   Q.   Did you ever see Karekezi alive after that?
 6   A.   No.  They already buried him.  We always have a
 7   commemoration for him.
 8   Q.   After he dropped to the ground and was killed, did you see
 9   anybody do anything with the body?
10   A.   No.
11   Q.   Can you recall the spot where Karekezi was killed?
12   A.   Yes.
13            MR. GARLAND:  Your Honor, I'd like Exhibit 39 to be
14   shown to Mr. Gasasira and the parties only.
15   Q.   Mr. Gasasira, do you see something on your screen?
16   A.   Yes.
17   Q.   And do you recognize what this is?
18   A.   Yes.
19   Q.   Is this near where Dr. Karekezi was killed?
20   A.   Yes.
21            MR. GARLAND:  Your Honor, we move Exhibit 39 into
22   evidence.
23            THE COURT:  All right.  It's admitted, Exhibit 39.
24            (Exhibit No. 39 received into evidence.)
25            MR. GARLAND:  We can show that to the jury, please.
```

12:50PM (line 10)
12:51PM (line 20)

J.A. 475

1    Q.    Was Dr. Karekezi killed -- first of all, the person who's

2    in the front of the picture, who is that?

3    A.    That's me.

4    Q.    And when was the picture taken?

5    A.    In June.

6    Q.    Of last year?

7    A.    Yes, June 15th last year.

8    Q.    Where is the spot that Dr. Karekezi was killed in relation

9    to where you are?

12:52PM 10    A.    Right here in my front, in front of me.

11    Q.    If you select one of those icons, you may be able to point

12    it out with an arrow.

13    A.    Which icon?  Right there.

14    Q.    Thank you.  Were you -- did you go into this area around

15    the time that Dr. Karekezi was killed?

16    A.    Yes.

17    Q.    What was it like in that area?

18    A.    It had a very bad odor, a lot of flies, people are now

19    going there.  It was very sad.

12:54PM 20    Q.    What did Mr. Teganya do after Dr. Karekezi was killed?

21    A.    He always come back in that hole, and he will say

22    thank you for finding Karekezi for me, we still have a few

23    Tutsis here in the hospital.  If I ever find one, always help

24    me, we'll have to kill the Tutsis.

25              MR. GARLAND:  Your Honor, at this point I'm going to

J.A. 476

```
 1      move on from this, but it's to a whole new direction, so I'm
 2      happy to do that.  I'm not asking to stop, but if the Court
 3      thinks this is a good time, I'm happy to do that as well.
 4              THE COURT:  Are we on schedule?  Let me ask that,
 5      Mr. Garland.
 6              MR. GARLAND:  We are a little bit behind where we
 7      expected to be today, but, generally, yes, we are, I think,
 8      ahead of schedule.
 9              THE COURT:  Why don't we use the five minutes to at
10      least get started.
11              MR. GARLAND:  Yes.
12      Q.   Mr. Gasasira --
13              THE INTERPRETER:  Your Honor, the witness is asking if
14      we can use the bathroom.
15              THE COURT:  In that case, we might as well break.  All
16      right.  Ladies and gentlemen, remember my caution not to
17      discuss the case among yourselves or with anyone else, and I
18      will see you tomorrow morning at 9:00.
19              THE CLERK:  All rise.
20              (JURORS EXITED THE COURTROOM.)
21              THE COURT:  Just so counsel is aware, Juror in seat
22      Number 12, who is Ms. McGilvray-Rivet, if I'm pronouncing that
23      correctly, has advised us that she has an adult daughter with a
24      very young child who's very ill, like life-threatening
25      situation.  She has been calling on the breaks.
```

12:55PM 10

12:56PM 20

**J.A. 477**

1          I basically told her do what you need to do, and if

2     you need to go, we'll discharge you, and so far she hasn't

3     asked to do that, but just as a heads-up, let's see how that

4     goes.  She's an alternate, so if she needs to be discharged,

5     I'll discharge her.

6          Anything else before tomorrow morning?  Mr. Garland.

7          MR. GARLAND:  Not for the government, your Honor.

8          THE COURT:  Mr. Lauer.

9          MR. LAUER:  No, your Honor.

12:57PM 10     THE COURT:  Okay.  Thank you.  We'll stand in recess.

11          (Whereupon, the hearing was adjourned at 12:57 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,         )
                                       )
5    vs.                               ) Criminal Action
                                       )
6    JEAN LEONARD TEGANYA,             ) No. 17-10292-FDS
                        Defendant      )
7

8

9

     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11                    JURY TRIAL DAY 5

12

13

14

15           John Joseph Moakley United States Courthouse
                        Courtroom No. 2
16                     One Courthouse Way
                       Boston, MA 02210
17

18                      March 14, 2019
                         8:30 a.m.
19

20

21

22                    Kathleen Mullen Silva
23                   Official Court Reporter
             John Joseph Moakley United States Courthouse
24             1 Courthouse Way, Room 3204
                       Boston, MA 02210
25             E-mail: kathysilva@verizon.net

1

2    APPEARANCES:

3    For the United States:

4         United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
5    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;

6

7
     For the Defendant:
8
             Federal Public Defender Office, by SCOTT LAUER, ESQ.,
9    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>INDEX</u>

2
     <u>WITNESS</u>                                              <u>PAGE</u>
3

4    JEAN PIERRE GASASIRA

5        Examination By Mr. Garland (Continued)              6
         Cross-Examination By Mr. Lauer                      23
6        Redirect Examination By Mr. Garland                 75

7    RUSSELL D. RADATZ, III

8        Direct Examination By Mr. Varghese                  80
         Cross-Examination By Mr. Lauer                      96
9
     ANICET NZABONIMPA
10
         Direct Examination By Mr. Varghese                  97
11       Cross-Examination By Mr. Lauer                      112

12

13                      E X H I B I T S

14
     <u>Defendant</u>               <u>Description</u>                <u>Received</u>
15   <u>Exhibit No</u>.

16       61           Received in evidence..................    7

17       59           Received in evidence..................   13

18       43           Received in evidence..................   16

19       56           Received in evidence..................   82

20       57           Received in evidence..................   87

21       21           Received in evidence..................   95

22        9           Received in evidence..................  105

23       12           Received in evidence..................  107

24       15           Received in evidence..................  107

25


**J.A. 481**

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  All rise.

 3   (Court enters.)

 4            THE COURT:  Good morning.  May I see counsel at

 5   sidebar.

 6   SIDEBAR COUNSEL AS FOLLOWS:

 7            THE COURT:  So, the juror in seat 12, McGilvary-Rivet,

 8   has had this ongoing family medical issue.  I don't know all

 9   the details, but I guess it's her daughter has a young child,

10   maybe an infant.

11            THE CLERK:  Age two.

12            THE COURT:  Two, who has brain cancer, and it's --

13   anyway, it's gotten to the point where even though she very

14   much wanted to be here, I basically told her do what you need

15   to do, and she has decided to stay on with her family.  So I

16   discharged her.  I didn't really feel I had a realistic choice.

17   So she's gone.  She was an alternate, but it means we're down

18   to two alternates.  And I'll just tell the jury -- I mean, they

19   may know the details, but I'll just tell them that I let her go

20   because of a family medical emergency.  So that's where we are.

21            MR. GARLAND:  Thank you, your Honor.

22            MR. LAUER:  Thank you.

23   END OF SIDEBAR CONFERENCE.

24            THE COURT:  All right.  Anything we need to talk

25   about?
```

J.A. 482

```
 1            MR. GARLAND:  Not for the government, your Honor.

 2            MR. LAUER:  No, your Honor.

 3            THE COURT:  Okay.  As soon as we have all now 14

 4   jurors, we'll get started.

 5            THE CLERK:  All rise.

 6   (Court exits.)

 7            THE CLERK:  All rise.

 8   (Court enters.)

 9   (Jury enters.)

10            THE CLERK:  Thank you.  You may be seated.  Court is

11   now back in session.

12            THE COURT:  All right.  Good morning, ladies and

13   gentlemen.  Just to let you know, I had to discharge the juror

14   in seat 12, Ms. McGilvary.  I don't know if she talked to you

15   about it, but she had a terrible family medical situation

16   that's been kind of hanging over her that's eventually required

17   her to be absent.

18            So we're down to 14.  So I want everybody to stay

19   healthy and take care of yourself so that we don't lose anybody

20   else.  Anyway, it's a terrible situation, but that's the way it

21   is.  That's why we have alternates.  Are we ready to go?

22            MR. GARLAND:  The government is, your Honor.

23            THE COURT:  And Mr. Gasasira, do you understand that

24   you are still under oath?

25            THE DEFENDANT:  Yes.
```

**J.A. 483**

```
 1              THE COURT:  Okay.

 2              MR. GARLAND:  Thank you, your Honor.

 3                  JEAN PIERRE GASASIRA, Previously sworn.

 4                      DIRECT EXAMINATION

 5   BY MR. GARLAND (Continued):

 6   Q.   Mr. Gasasira, good morning.

 7   A.   Good morning.

 8   Q.   I believe that -- did you testify yesterday that you knew

 9   Dr. Karekezi before you got to the hospital?

10   A.   Yes.

11   Q.   Well, when you were at the hospital during the genocide

12   did you see anybody else that you had known from before?

13   A.   No.

14   Q.   Did you see Mr. Teganya at any point engage in any other

15   violent act?

16   A.   Yes.

17   Q.   Can you describe the first one?

18   A.   Yes.

19   Q.   Who was the victim of that?

20   A.   Karekezi Jean Claude.

21   Q.   And the next, was there somebody other than Jean Claude

22   Karekezi?

23   A.   Nyangezi Prota.

24   Q.   Who was Nyangezi Prota?

25   A.   Nyangezi Prota was medical staff at the National
```

1    University Hospital in the laboratory.

2    Q.   And how did you meet him?

3    A.   I knew him because he worked with my dad.

4    Q.   Do you know whether he was Hutu or Tutsi?

5    A.   He was a Tutsi.

6         MR. GARLAND:   Your Honor, I'd ask that we show

7    Mr. Gasasira and the parties Exhibit 61.

8    Q.   Mr. Gasasira, do you see something on your screen?

9    A.   Yes.

10   Q.   Do you recognize this?

11   A.   Yes.

12   Q.   Do you recognize the person on the screen?

13   A.   Yes, I know him.

14        MR. GARLAND:   Your Honor, we move Exhibit 61 into

15   evidence.

16        THE COURT:   All right.   It's admitted.

17        MR. LAUER:   Subject to my earlier objection.

18        THE COURT:   Yes.   Overruled.   It's admitted.   61.

19        (Exhibit No. 61 received in evidence.)

20   Q.   Mr. Gasasira, who's the picture of on the screen?

21   A.   Nyangezi Prota.

22   Q.   And when did you see him at the hospital?

23   A.   I saw him when they were taking him to be killed.

24   Q.   Who is "they"?

25   A.   Soldiers, Interahamwe, and other hospital workers, and

1    Teganya was among them.

2    Q.    Do you recall where they took him from?

3    A.    Yes.

4    Q.    Where was that?

5    A.    Where he was hiding in the room, which they say that was

6    his office.

7    Q.    Where were you when you saw this?

8    A.    I was behind the hall.  I was washing clothes of the other

9    soldier's -- the soldier that I was taking care of, he had told

10   me to wash his clothes.  That's where we go to do laundry and

11   wash dishes and cups.  And at that time I saw Nyangezi Prota.

12   I knew him.  And they were pushing him by Interahamwe and

13   Teganya and the soldiers and the other hospital workers.

14          They all knew him, because he was an employee at the

15   hospital.  And they were pushing him, and they were verbally

16   abusing him.  Teganya was pushing him.  They took him down, and

17   he was telling the soldiers that, "I know him," that "He works

18   for the laboratory.  I know where he resides."

19   Q.    If I can ask, who was saying this?

20   A.    Teganya.

21   Q.    And was Mr. Teganya armed at the time?

22   A.    Yes.

23   Q.    Did Mr. Teganya say anything else as they were bringing

24   Nyangezi?

25   A.    He said something.

J.A. 486

1    Q.    I'm sorry.  Could you repeat?

2    A.    He said something.

3    Q.    What was that?

4    A.    He was pleading with him.  And he was telling him, "Young

5    man, you see I'm an old man.  I'm not a Tutsi.  I don't know

6    about inyenzi.  I have lived my life self-employed working for

7    the government.  I never prospered in politics.  I have a

8    family and kids.  Please let me live."

9    Q.    Can I ask who was saying this at this point?

10   A.    Prota.

11   Q.    Okay.  Did Mr. Teganya say anything after that?

12   A.    Yes.

13   Q.    What did he say?

14   A.    He said, "So long as you're Tutsi."

15   Q.    Do you recall whether this was day or night?

16   A.    It was during the day.

17   Q.    So where did they take Nyangezi?

18   A.    They took him down, and they was watching in the hallway,

19   and they reached in front of the mortuary, and they were

20   pushing him.  Because he was an old man, he was a little bit

21   weak, and his pants were falling down, and he was trying to

22   pull his pants up.  And he was pleading with them.  And he was

23   saying, "Please forgive me, young man.  If I survive, God will

24   help you."

25            And Teganya, with the soldiers, they were telling him

**J.A. 487**

1    that Tutsis should die.  They went down, and I was watching

2    them, and they went a little further from my side.  I told you

3    about the place where Karekezi was killed.  That's where they

4    killed him too.  Because I knew Prota, he was close to my

5    family.  My dad had told me that he met him at work.  He

6    treated him as his son.  He respected my dad.  I knew him well.

7    He was --

8              MR. GARLAND:  Your Honor, can I ask for a question to

9    be asked.

10             THE COURT:  I think the interpreter is consulting

11   about how to translate a word, consulting with the other

12   interpreter, which I think is fine.

13   A.   He christened my brother in the church.  Like Catholic,

14   you get baptized and someone stands.

15             THE COURT:  Why don't we...

16   A.   He was like a godfather.

17             THE COURT:  Like a good father?

18             THE INTERPRETER:  Godfather.

19             THE COURT:  Godfather.  Okay.

20   Q.   So let me ask, this was down by the mortuary, you said,

21   that they ended up?

22   A.   No.

23   Q.   Did I hear correctly you say that it was near where you

24   had talked about Karekezi being killed yesterday?

25   A.   It was the same place.

```
 1              MR. GARLAND:  If we could bring up Exhibit 39, which
 2   I believe has already been admitted into evidence.
 3              THE COURT:  39.  This is in.
 4   Q.  Was the location where they brought Mr. Nyangezi in the
 5   area that you see on your screen right now?
 6   A.  Yes.
 7   Q.  Can you point to where that is?
 8   A.  Yes.
 9   Q.  Please do so.
10   A.  Around there.  (Indicating.)
11              MR. GARLAND:  Your Honor, if the government hasn't
12   moved Exhibit 39 --
13              THE COURT:  It's in.
14              MR. GARLAND:  Okay.  Thank you.
15              THE COURT:  It was admitted yesterday.
16   Q.  That photo that we saw on the screen a moment ago, when
17   Mr. Nyangezi was killed, was he the same age as he was in the
18   photo we just saw of him?
19   A.  No.
20   Q.  What happened next when they got to that area that you
21   just identified in Exhibit 39?
22   A.  They killed him.
23   Q.  Did you watch that, him being killed?
24   A.  Because Nyangezi, I told you the relationship we had, I
25   was scared just to watch that.  But I saw them beating him with
```

J.A. 489

```
 1   clubs, with machetes, with axes.  But when they passed me,
 2   those hospital workers with Teganya, the ax that he carried
 3   around that I told you about, he was wiping blood from that ax.
 4   That's what I saw.
 5   Q.   When you saw the blood on the ax, was that before or after
 6   they had taken Nyangezi to that area?
 7   A.   It was after they killed him.
 8   Q.   Did you see Mr. Nyangezi alive after that?
 9   A.   No.  But after I was a little bit curious to see Nyangezi.
10   I went down there.  I found that they tied him up.  He was
11   bleeding on his head and his clothes were full of blood.  And I
12   grabbed a plastic bag.  He was dead, and I covered him, but it
13   was very scary.
14   Q.   Okay.  Did you see Mr. Teganya engage in any similar acts
15   with anybody else at the hospital?
16   A.   Yes.
17   Q.   Did you know the name of the next victim?
18   A.   Yes.
19   Q.   Who was that?
20   A.   Gasarabwe Mathias.
21   Q.   How did you know Gasarabwe Mathias?
22   A.   I knew him.
23   Q.   And who was he?
24   A.   I knew his family.
25   Q.   Was this from before the genocide?
```

## J.A. 490

```
 1    A.    Yes.

 2    Q.    Was he your age, older, younger?

 3    A.    He was older than me.  He had a wife and kids.

 4    Q.    And do you recall what -- do you know whether he was Hutu

 5    or Tutsi?

 6    A.    He was a Tutsi.

 7          MR. GARLAND:  I'd ask that Exhibit 59 be shown to

 8    Mr. Gasasira and the parties.

 9    Q.    Do you see Exhibit 59 on your screen?

10    A.    Yes.

11    Q.    Do you recognize this?

12    A.    Yes.

13    Q.    And is that a picture of a person that you know?

14    A.    Yes.

15          MR. GARLAND:  Your Honor, I move that Exhibit 59 be

16    admitted into evidence.

17          MR. LAUER:  Subject to my earlier objection.

18          THE COURT:  Yes.  It's admitted.  59.

19          (Exhibit No. 59 received in evidence.)

20    Q.    Mr. Gasasira, who is the person in this photo?

21    A.    That's Gasarabwe Mathias.

22    Q.    Is that a fair and accurate representation of him?

23    A.    Yes.

24    Q.    And when did you see him at the hospital?

25    A.    He was a patient in the hospital.  He was not a hospital
```

```
 1   employee.
 2   Q.   I'm sorry.  Could you --
 3   A.   He was a patient at the hospital.  He was not a hospital
 4   employee.
 5   Q.   Okay.  And was he a soldier, military patient, or a
 6   civilian patient?
 7   A.   He was a civilian patient.
 8   Q.   And what did you see happen?
 9        THE INTERPRETER:  Can you repeat the question,
10   counsel.
11   Q.   What did you see happen to him?
12   A.   They killed him in front of my eyes.
13   Q.   And who is "they"?
14   A.   Including Teganya, and the hospital workers that I didn't
15   know their names.
16   Q.   And were there soldiers or Interahamwe there as well or
17   not?
18   A.   There were Interahamwe civilians.  The soldiers were not
19   there.
20   Q.   The people who were there, were they armed or not?
21   A.   Yes.
22   Q.   Can you say from -- what did you see of him being killed?
23   What happened?
24   A.   I saw them taking him.
25   Q.   Where did they take him from?
```

```
1   A.   From the hall where he was as a patient.

2   Q.   And where did they take him to?

3   A.   They took him around the hospital.  And they passed in

4   front of us, where I could see him well.  Because I knew him, I

5   knew him as a patient, he didn't have anybody taking care of

6   him.  I hide from his sight so he doesn't see me, because he

7   was screaming and he was asking for help.

8   Q.   Did anybody give him any help?

9   A.   No.

10  Q.   Was he going along willingly or unwillingly?

11  A.   Because he was sick and he was very weak, and he was

12  saying that, "I'm not a Tutsi."  And they were asking him for

13  identification.  He didn't have any identification.  And they

14  were saying, "If you're not a Tutsi, show us your

15  identification."  And they were pushing him, and they were

16  kicking him.  They killed him in front of my eyes.

17  Q.   What did you see Mr. Teganya do along the way?

18  A.   He's the one who killed him.

19  Q.   And how did he do that?

20  A.   Like I told you, Teganya always carried his ax and he hit

21  him on his head with that ax, and he didn't take long.  He died

22  right away.

23  Q.   Did you see where they took him to?

24  A.   Yes.

25          MR. GARLAND:  Your Honor, I'd ask that we show
```

J.A. 493

```
 1   Mr. Gasasira and the parties Exhibit 43.

 2   Q.   Mr. Gasasira, do you see Exhibit 43 on your monitor?

 3   A.   Yes.

 4   Q.   Do you recognize what that is?

 5   A.   Yes.

 6        MR. GARLAND:  Your Honor, we move Exhibit 43 into

 7   evidence.

 8        THE COURT:  All right.  It's admitted.

 9        (Exhibit No. 43 received in evidence.)

10   Q.   First, have you seen this photo before?

11   A.   Yes.

12   Q.   What's it a picture of?

13   A.   There is my picture there.

14   Q.   And which one are you in the picture?

15   A.   I'm right there.  (Indicating.)

16   Q.   And when was that photo taken?

17   A.   In June last year.

18   Q.   And why were you standing --

19   A.   On the 15th.

20   Q.   I'm sorry.  Could you repeat?

21   A.   On the 15th.

22   Q.   Okay.  And why were you standing right there?

23   A.   I wanted to show them where the action took to kill him.

24   Q.   To kill.  That was to kill Mr. Gasarabwe?

25   A.   Yes.
```

**J.A. 494**

```
 1    Q.   Did the place that we're looking at right now, did it look

 2    the same back in 1994, when he was killed?

 3    A.   No.

 4    Q.   What was the difference?

 5    A.   If you look close, there is a building in front of me.

 6    Now it's the new maternity building.  It just got built.  It's

 7    a huge building.  Before genocide nothing was there.  It was

 8    just grass, and there was a dust bin, and that's where they put

 9    all the waste from the surgery room, the surgery department and

10    a place where the kids were staying, and they bring all the

11    waste and put all the waste there.  That's where they killed

12    him.  Now there's a building there.  So you can't see it

13    clearly.

14    Q.   Can you point to which of the buildings that are on the

15    screen is the one you just referred to?

16    A.   Yes.

17    Q.   Please go ahead and indicate.

18    A.   (Indicating.)  Right there.

19    Q.   Okay.  Thank you.

20         Did you ever hear Mr. Teganya talk about women or

21    girls?

22    A.   Yes.

23    Q.   Who was he talking with?

24    A.   Soldiers.

25    Q.   And can you tell the jury what that discussion was?
```

```
 1   A.   Yes.

 2   Q.   What did they say?

 3   A.   Like I told you, he used to come in the hall where the

 4   soldier patients were, and I was there.  Sometimes he'd come

 5   three times a day and evening, like 3:00.  Sometimes like

 6   7:00 a.m., like when he arrives at work.  Sometimes he'll come

 7   at 3:00 or 5:00.  And he will ask them like, "You know you came

 8   from the battlefield.  Have you had women since then?"  And

 9   they would say no.  And he would tell them, "I'm going to open

10   for you -- I'm going to open different rooms for you.  There's

11   some girls there, and those girls were brought here from Red

12   Cross and some other people brought them here.  They are in the

13   rooms.  Come.  I will show you where they are, and help

14   yourself."

15   Q.   Did the soldiers respond at all?

16   A.   Yes.

17   Q.   What did they say?

18   A.   Some accepted the offer, those who were strong, those who

19   are taking care of the others who were sick, and Teganya will

20   take them there.

21   Q.   Did you ever see Teganya taking the soldiers to someplace

22   after one of these conversations?

23   A.   Yes.

24   Q.   And do you remember -- on that occasion, do you remember

25   the specific conversation that they had?
```

J.A. 496

1    A.    Yes.

2    Q.    If you can relate that specific conversation to the jury.

3    A.    Yes.

4    Q.    Please tell the jury what was said on that occasion.

5    A.    He would tell them that Tutsis, they are very bad people.

6    You can come, and I will show you where they are and have them

7    for yourselves, marry them or rape them.

8          I remember there was a soldier that he had a gunshot

9    on his legs, and his legs were hanged up on the bed, and he

10   told him that, man, why did you tell us to go and have those

11   ladies or rape those ladies, but we see you are a young man,

12   why don't you go and have them too.  And he told him that, "I

13   started that when genocide started.  I have raped them and had

14   them enough," and he was very proud to say that.

15   Q.    Who is the "he" who was saying that, so the jury

16   understands?  Who was the "he" who said that?

17   A.    Teganya.

18   Q.    And did he say anything else at that time?

19   A.    All he would say was to mobilize the soldiers so they can

20   come with him and he will tell them, "I have the keys," and he

21   will tell them, "Even if I don't have the keys, we'll break the

22   door, and I'll give you the women as you wish.  And if you

23   don't want to -- if those women will not accept to be raped,

24   we'll kill them."  That's what I saw.

25   Q.    After that conversation with the soldier you just told us,

```
 1    did anything happen after that?

 2    A.    Yes.

 3    Q.    What did you see happen after that?

 4    A.    You know very well at the hospital when it's in the

 5    evening, it's always calm.  When we pass through the hallways,

 6    we'll hear a female screaming, crying.  Some of them would come

 7    outside, and they will try to get outside, and they would not

 8    allow them.  We would hear that, but we wouldn't have anything

 9    to do.  It was very sad.

10    Q.    And after the conversation that Mr. Teganya had with that

11    soldier, did Mr. Teganya do anything or the soldier do

12    anything?

13    A.    They would do it.  You will hear the scream.  It was

14    painful, and you could hear it outside.  Because everybody was

15    there.  There were soldiers and Interahamwe and medical staff,

16    and the hospital workers.  They were all killing people.

17    Nobody was supporting -- nobody was paying attention or helping

18    the cries and the agony of those ladies.  The way we knew that

19    in that hall, they would come back and they would discuss what

20    happened.  Some would come and go to bed and they looked happy.

21    It was very sad and very horrible.

22          It's not easy for anybody just to recall or to say

23    what happened.

24    Q.    Thank you.

25          You mentioned before meeting with Americans in 2018.
```

**J.A. 498**

```
 1    Do you recall talking about that?
 2    A.   Yes.
 3    Q.   Did anybody from the U.S. government offer you money to
 4    testify in the United States at that point?
 5    A.   No.
 6    Q.   When did you learn -- did the United States government pay
 7    your travel costs to come over here?
 8    A.   Yes.
 9    Q.   And did the government -- is the government giving you
10    money for food and hotel as well?
11    A.   Yes.
12    Q.   When did you learn that the United States would pay for
13    your travel and for your food and for your hotel?
14    A.    I didn't know that before.  I knew that when I was coming.
15    Q.   Did other people in Rwanda or elsewhere tell you
16    beforehand that you would be -- that your travel expenses and
17    your hotel and food would be paid if you came over here?
18    A.   No.
19    Q.   When you met with Americans in 2018, were there any
20    officials of the Rwandan government at that meeting?
21    A.   No.
22    Q.   And did any officials from the Rwandan government tell you
23    to go to that meeting with Americans in 2018?
24    A.   No.
25    Q.   Did anybody from the government of Rwanda tell you what to
```

J.A. 499

```
 1    say at this trial?
 2    A.    No.
 3    Q.    Did anybody from the government of Rwanda tell you what
 4    not to say at this trial?
 5    A.    No.
 6    Q.    Did anybody from your friends or family tell you what to
 7    say or what not to say at this trial?
 8    A.    No.
 9    Q.    Why did you come here?
10          THE INTERPRETER:  Repeat that, counsel.
11    Q.    Why did you come here?
12    A.    I can explain.
13    Q.    Why did you come here?
14    A.    There is a lady.  Her name is Sheila Mugisha.  We came
15    together here.  She called me and she told me that somebody
16    told her that I know some information, that I know the
17    information about genocide that took place in Butare, but
18    specifically, "You know what happened at the hospital."  That's
19    how I came to know her.
20    Q.    Did you come to court today because you'd have your
21    travel, hotel and food expenses paid for you?
22    A.    I don't understand your question.
23    Q.    Did you agree to come over to the United States and
24    testify because of money?
25    A.    No.
```

```
 1          MR. GARLAND:  Your Honor, may I take a moment to
 2    confer with counsel.  (Pause.)
 3    Q.   Can you tell the jury who Sheila is, the woman that you
 4    just mentioned?
 5    A.   Yes.
 6    Q.   Please tell them.
 7    A.   Sheila works with -- she works with you who are asking me.
 8    That's how I know her.
 9    Q.   And do you know who she works for?
10    A.   Yes.
11    Q.   Who does she work for?
12    A.   She works with Americans.
13          MR. GARLAND:  No further questions, your Honor.
14          THE COURT:  All right.
15                    CROSS-EXAMINATION
16    BY MR. LAUER:
17    Q.   Are you married?
18    A.   No.
19    Q.   Do you have children?
20    A.   No.
21    Q.   You said yesterday that you're self-employed; is that
22    correct?
23    A.   Yes.
24    Q.   And you described yourself as a businessman?
25    A.   Yes.
```

J.A. 501

```
 1    Q.    Do you have any employees?

 2    A.    Yes.

 3    Q.    How many employees do you have?

 4    A.    Two.  Myself, we are three.

 5    Q.    And what is your business?

 6    A.    My business is a small business.  I go to the local

 7    markets, and I buy eggs, chicken, vegetables, and I sell them

 8    to the restaurants, and I make a profit.  That's what I do.

 9    Q.    And a good day of profit, how much money do you earn?

10    A.    It depends on what I get.  It depends on the price I paid

11    from the local market.  That's how I get my profit.

12    Q.    So as I understand it, there might be days where you make

13    only a little profit, and there might be days when you make a

14    larger profit.  Is that a fair statement?

15    A.    Yes.

16    Q.    When you conduct your business, is it in U.S. dollars or

17    Rwandan francs?

18    A.    Rwandan francs.

19    Q.    Would you agree with me that the exchange rate -- well,

20    let me back up.

21            U.S. dollars are sometimes used in Rwanda, correct?

22    A.    Yes.

23    Q.    And the exchange rate of U.S. dollars to Rwandan francs,

24    one U.S. dollar is roughly 900 Rwandan francs.  Is that about

25    right?
```

# J.A. 502

```
 1   A.    I don't know that.  It's not part of what I do.
 2   Q.    Well, let me just ask you this:  On a very, very good day
 3   when you've felt like you've been extremely successful selling
 4   your produce, how many Rwandan francs do you come home with?
 5   A.    It's hard to explain.
 6   Q.    Well, please try.
 7   A.    That's my personal secret for my business.  That's like
 8   telling you my whole life.
 9   Q.    Well, sir, the way this works is you're required to answer
10   my questions under the pains and penalties of perjury.  That's
11   been explained to you, right?
12   A.    Yes.
13   Q.    So I'll ask you again on a very, very good day, where you
14   have been successful selling your produce, how many Rwandan
15   francs do you come home with?
16   A.    I can answer that.  But you didn't ask me my capital.
17   It's hard to tell my profit when you don't know what was my
18   capital.  I think that's my right.
19   Q.    Sir, it's a simple question.  You start out at the
20   beginning of the day buying produce from the market.  You sell
21   it to the restaurants, and you come home with a certain amount
22   of money.  What's a good day?
23   A.    I can help on that.  If you buy a chicken like a rooster,
24   like 3,000 Rwandan francs, you make 500 as a profit.  That's
25   when I'm happy.  That's on a good day.  That's where I can
```

J.A. 503

1    help.  That's an example.

2    Q.   Okay.  Let me just stop you there.  You sell one chicken,

3    and maybe you make a 500 Rwandan franc profit.  That's the

4    example you just gave, right?

5    A.   Yes.

6    Q.   And how many chickens would you sell in a day?

7    A.   I can answer that in another way.

8    Q.   Instead of just telling me you can answer it, can you just

9    give me the answer?

10        MR. GARLAND:  Your Honor, objection.

11        THE COURT:  Yes.  Just -- Mr. Lauer, put --

12   A.   Repeat the question.

13   Q.   How many chickens do you sell in an average day?

14   A.   You're asking me how many chickens I sold a day, but you

15   didn't ask me what was my capital.  Ask me how much did I

16   invest.

17   Q.   Sir, sir, the way this works is I get to ask the

18   questions, and you have to answer them.  Those are the rules.

19   Do we understand each other?

20        THE COURT:  All right.

21        MR. GARLAND:  Your Honor.

22        THE COURT:  Hold on.  And also your questions are

23   confusing.  Are you asking him -- you've mixed profit with

24   gross revenues.  You know, who knows about paying his

25   employees.  Let's try to get through this.  Just put another

1    question to him.

2    Q.   When you come home at the end of the day with money in

3    your pocket, what is a good day?

4    A.   I will answer that.  If I go back to that example.  I told

5    you that if I buy a rooster for 3,000, I'll make a profit of

6    500.  Those 3,000, I keep that, and I will take the 500 profit.

7    That's the money that makes me happy because I made a profit.

8    That's how I can explain it.

9    Q.   I'd like to get a sense for how big a business you have.

10   Do you sell chickens one at a time or do you sell them in bulk?

11   A.   Yes.  But when you asked about my business, I told you

12   it's a small business.  It's small.  It all depends on what I

13   invested.

14   Q.   Can you estimate your income in Rwandan francs on a yearly

15   basis?

16   A.   Yes.

17   Q.   Please do.

18   A.   Yes.

19   Q.   Can you tell me about how much money in Rwandan francs you

20   make in a year?

21   A.   I cannot tell you, but I can try to explain.  I cannot

22   tell, but I can try to explain.

23   Q.   Please try to explain.

24   A.   As you can see, a businessman, when you are not with the

25   government, sometimes you have good days, sometimes you have

J.A. 505

```
 1   bad days.  Sometimes when I do my book balance, I'm happy, but
 2   the way I am now, I'm still a small guy.  To be able to tell
 3   what I make in a year, if you become my expert, it would be
 4   hard to do.
 5   Q.   Okay.  So you're a businessman who can't tell me how much
 6   money you make in a year?
 7   A.   It's hard.  I make profit.  It goes high -- it's hard for
 8   me.
 9   Q.   All right.  I'll move on.
10        You said yesterday you live in Huye?
11   A.   Yes.
12   Q.   And specifically is that Tumba?
13   A.   It's in Tumba Training Centre.
14   Q.   And you said yesterday, I believe, that Tumba is about a
15   40-minute walk to Butare Town?
16   A.   Yes.
17   Q.   And in 1994, your father worked in Butare Town near the
18   hospital?
19   A.   Yes.
20   Q.   He was a medical technician of some sort?
21   A.   Yes.
22   Q.   And had he worked at the hospital for a long time?
23   A.   Yes.
24   Q.   You said, in fact, that he was very well known at the
25   hospital?
```

**J.A. 506**

```
 1   A.   Yes.

 2   Q.   You said you were well known at the hospital because you

 3   had visited him?

 4   A.   Yes.

 5   Q.   Bringing him lunch?

 6   A.   Yes.

 7   Q.   Was the building that your father worked in the laboratory

 8   building?

 9   A.   Yes.

10        MR. LAUER:  Can I have Exhibit 23.

11   Q.   I'm showing you an aerial photograph that's been admitted

12   as Exhibit 23.  Do you see this photo?

13   A.   Yes.

14   Q.   And do you recognize generally that that depicts the

15   layout of the hospital campus?

16   A.   No.

17   Q.   Okay.  Would you agree with me that the hospital campus,

18   the main building near the parking area, has a campus spread

19   out behind it?

20   A.   I can answer that.  If I look at this picture, that's a

21   photograph taken by a plane.  I cannot -- I don't understand

22   the picture very well.

23   Q.   Let me clarify.  Put the picture aside.  The hospital

24   campus has a number of different buildings on it.  Would you

25   agree with that?
```

J.A. 507

```
 1   A.   Yes.
 2   Q.   Different wards, administration building, many buildings.
 3   A.   Yes.
 4   Q.   And the laboratory is actually not on the same campus as
 5   those patient wards, correct?
 6   A.   I can explain that.
 7   Q.   Is the laboratory on the same campus as the patient wards
 8   and the maternity building and all of that?
 9   A.   No.
10   Q.   No, it's down the road a little bit, right?
11   A.   Yes.
12   Q.   I want to direct your attention to the plane crash in
13   which Habyarimana was killed.
14   A.   Yes.
15   Q.   You testified about that yesterday and learning about it
16   from the radio.
17   A.   Yes.
18   Q.   On April 6, right?
19   A.   Yes.
20   Q.   You told us yesterday that after learning about that plane
21   crash, you stayed inside the house with your family.
22   A.   Yes.
23   Q.   And then after a day, you left the house to check on your
24   neighbors.
25   A.   Yes.
```

J.A. 508

```
 1    Q.   And then you went back to your home to stay inside because
 2    there had been some local leaders who said that that was the
 3    thing to do.
 4    A.   Yes.
 5    Q.   And you said yesterday that you stayed inside for a period
 6    of some days.
 7    A.   Yes.
 8    Q.   Until you saw houses in the hills burning.
 9    A.   Yes.
10    Q.   And you testified that you saw Tutsis being chased by
11    Interahamwe and soldiers at that time?
12    A.   Yes.
13    Q.   And you testified yesterday that it was at that point you
14    left your home on April 21st.
15    A.   No.
16    Q.   You did not testify yesterday that you left your home on
17    April 21st?
18    A.   Yes.
19    Q.   That is what you testified to yesterday?
20    A.   Yes.  Yesterday I said that's when we left the house
21    fleeing and we went to the soccer field at the primary school.
22    Q.   Yes, I'm --
23    A.   That's when the genocide started in Butare.
24    Q.   Yes.  I'm getting to that.
25              Yesterday you said that when you left your home, you
```

J.A. 509

```
 1   left with your father; is that right?
 2   A.   What I said yesterday, I said on the 21st that's when we
 3   left the house, all of us, my mom, my dad and my older
 4   brothers, and we were going to the soccer field.
 5   Q.   So if yesterday what you said was that you and your father
 6   left, that would have been inaccurate?
 7   A.   But I said I went with my dad, but the others went by
 8   themselves.
 9   Q.   Okay.  As you sit here right now, when you left your house
10   after the houses were burning and the violence started, did you
11   go with only your father, or did your entire family flee
12   together?
13   A.   My whole entire family left, and when there are so many
14   people, I stayed with my dad, and the others went by
15   themselves.
16   Q.   Okay.  So everyone fled, but --
17   A.   Yes.
18   Q.   -- you and your father stayed together?
19   A.   Yes.
20   Q.   How did it come to be that you were separated from your
21   other family members?
22   A.   We were not alone.  Some people were scared.  You can also
23   think like more than a thousand people talking different
24   things, and they were all coming to one point, and they knew
25   they were going to be killed.  And the people were coming from
```

1   different sides.

2   Q.   So if I could just --

3   A.   And not coming from one side.

4        MR. GARLAND:  Objection, your Honor.

5        THE COURT:  Let's stop there and put another question

6   to the witness.

7   Q.   So you told us yesterday that after fleeing Tumba, you and

8   your father fled to the soccer field?

9   A.   Yes.

10  Q.   And that soccer field was in Butare Town?

11  A.   No.

12  Q.   Where was the soccer field?

13  A.   The primary school in Rango Training Center.

14  Q.   And where is that relative to Tumba?

15  A.   It's in the training center.  Tumba is a sector, and there

16  is another sector between that place and -- there's the side of

17  Tumba, where we lived, and the side of Nkubi.  They are two

18  sectors or two counties.

19  Q.   You told us that when you arrived at the soccer field,

20  there were many, many Tutsis who had gathered there, right?

21  A.   Yes.

22  Q.   And after gathering there, there was an attack?

23  A.   Yes.

24  Q.   And you described the attack as coming from soldiers,

25  Interahamwe and gendarmes.

**J.A. 511**

```
 1    A.    I said there were civilians, the community police and
 2    gendarmes.  Those are the ones I saw.
 3    Q.    And you said there were hand grenades and shootings and
 4    many, many casualties.
 5    A.    Yes.
 6    Q.    You told us that your father sustained a leg wound.
 7    A.    Yes.
 8    Q.    And you managed to escape uninjured.
 9    A.    Yes.
10    Q.    I'd like to direct your attention back to June of this
11    past year.  You recall when the American investigators came to
12    speak to you?
13    A.    Yes.
14    Q.    And you met at a hotel in Butare?
15    A.    Yes.
16    Q.    The Lighthouse Hotel?
17              THE INTERPRETER:  Can you repeat, counsel.
18    Q.    The Lighthouse Hotel.
19    A.    Yes.
20    Q.    And they asked you about your experiences in fleeing
21    Tumba?
22    A.    Yes.
23    Q.    And at that time you didn't say anything about a soccer
24    field?
25    A.    I told them everything.  That's my story.  And I told them
```

# J.A. 512

1    what happened at the hospital, and I told them that night on

2    the 21st, I told them I went with my dad after he was injured

3    where we had been.

4    Q.   So just to be clear, your testimony is that you did tell

5    the American investigators that you were attacked at a soccer

6    field with your father?

7    A.   Yes.

8    Q.   Didn't you tell the investigators your father had been

9    attacked at Tumba?

10   A.   I can explain that.  When I met them, when I started to

11   tell them the story, I started to tell them from the day we

12   flee, that my dad was injured on the leg, and where we had

13   fled, and they are in Rango at the primary school at the soccer

14   field, and I accompanied him to the hospital.  That's what I

15   told them.

16   Q.   Let's talk about that walk to the hospital.  Your

17   testimony was that you and your father walked to the hospital

18   together after being attacked at the soccer field.

19   A.   Yes.

20   Q.   So that he could receive treatment for his wound?

21   A.   Yes.

22   Q.   And what is the distance from the soccer field to the

23   hospital?

24   A.   Walking?

25   Q.   Yes.  How long, how many minutes?

**J.A. 513**

```
 1   A.    Forty minutes.

 2   Q.    And this would have been sometime around April 22?

 3   A.    Yes.

 4   Q.    There were many checkpoints or roadblocks between the

 5   soccer field and the hospital?

 6   A.    Yes.

 7   Q.    Do you recall how many?

 8         THE INTERPRETER:  Repeat that, counsel.

 9   Q.    Do you recall how many roadblocks there were on that walk?

10   A.    I remember some.  That was the beginning of the genocide.

11   There were so many roadblocks.  They didn't know who was going

12   to pass there.  So they were taking people from their houses.

13   That's what I saw.

14   Q.    And what would happen at the roadblocks would be the

15   soldiers or the Interahamwe would check ID cards?

16   A.    Yes.

17   Q.    And attack Tutsis if they found them?

18   A.    Yes.

19   Q.    And you said yesterday that many Interahamwe in the area

20   knew you and your father?

21   A.    Yes.  They were our neighbors.

22   Q.    And yet you and your father made it through many

23   roadblocks on the way to the hospital?

24   A.    Yes.

25   Q.    Did you have an ID card at that time?
```

J.A. 514

```
 1   A.   No.

 2   Q.   Did your father?

 3   A.   No.

 4   Q.   Your father did have a sizable wound?

 5   A.   Yes.

 6   Q.   And the soldiers of the Interahamwe just waved you

 7   through?

 8   A.   Yes, because they knew any time that -- if you look them

 9   in the face on the 21st, they spend a whole night looting.

10   They killed a lot of people.  They know we're not going to make

11   a run at the night.

12   Q.   So my question is, how was it you were able to get through

13   these roadblocks without identity cards?

14   A.   I can tell you.  Like I said, that was the beginning of

15   genocide.  They had killed many people the night before.  They

16   had looted things the night before.  There was even a saying a

17   talk, but we didn't know where that was coming from, that there

18   was peace, but it was just a trick so that those who escaped so

19   they can come from their hiding so they can kill them.  That's

20   why we were able to go through the roadblocks.

21   Q.   So you were able to make it through the roadblocks somehow

22   or another, and you arrive at the hospital.

23   A.   Yes.

24   Q.   And this was after fleeing your homes on April 21st?

25   A.   Yes.
```

**J.A. 515**

```
 1   Q.   And after spending the night at the soccer field?

 2   A.   Yes.

 3   Q.   Which means you and your father were arriving at the

 4   hospital on April 22nd.

 5   A.   Yes, in the morning.

 6   Q.   And your testimony yesterday was that when you arrived,

 7   there were no soldiers?

 8   A.   It was in the morning.  You know very well when you reach

 9   a place in the morning and you don't find people there, but if

10   you look around in the parking lot of the hospital, there was a

11   roadblock.  There was blood.  We saw that something happened

12   there during the night.

13   Q.   Well, my question is about the hospital grounds.  You

14   testified yesterday that when you got there, there were no

15   soldiers on the hospital grounds.

16   A.   They were not there that morning.

17   Q.   And there were not Interahamwe on the hospital grounds

18   that morning.

19   A.   They were not there, because we arrived there -- we

20   arrived in just a small place just in front of the parking.

21   And when you enter the corridor, we didn't even walk more than

22   five meters.  That's when my dad's wound was addressed.  We

23   didn't look down or look the other side to know who was down

24   there, because the hospital is so big.  So I was where I

25   arrived at the beginning.
```

**J.A. 516**

```
 1   Q.   So as best you could see, no soldiers anywhere, no
 2   Interahamwe?
 3   A.   That morning if you see what happened, it seemed they were
 4   there, but I just want to tell you that we were just in a very
 5   small place.  My dad, who used to work there, he knew the
 6   place, and the luck he got, that he got someone to help him
 7   before he went deep into the hospital, that's what I saw.
 8   Q.   When you did arrive at the hospital for your father to be
 9   treated, you told us that it was this Dr. Karekezi who treated
10   him?
11   A.   Yes.
12   Q.   And you told us that you were familiar with him because he
13   had won a cycling race?
14   A.   Yes.
15   Q.   He was from the same area that you were in Tumba?
16   A.   No.
17   Q.   Did you tell us something about him buying from your
18   mother's store?
19   A.   No, I didn't explain that one.
20   Q.   Where was he from, if you know?
21   A.   In the town.  They used to sell milk.  His dad had died a
22   long time ago.  I knew his mom.  I knew his brother.  Those are
23   the ones that survived.  And I knew them before genocide.
24   Q.   So you knew him and he treated your dad?
25   A.   Yes.
```

# J.A. 517

```
 1    Q.   Now, you and your father were at the hospital because you
 2    had fled your home in Tumba?
 3    A.   Yes.
 4    Q.   And when your father was at the hospital being treated, by
 5    your account, the hospital was calm?
 6    A.   Yes.
 7    Q.   No soldiers, no Interahamwe, no violence?
 8    A.   I can explain that.  But I have said that several times.
 9    If you know the hospital, if you get a chance to go there, we
10    just stopped at the beginning, and it was very early in the
11    morning.  I told you the roadblock that was in front of the
12    hospital, there was blood.  I don't think it was an animal that
13    was killed there.  And you know very well in the morning when
14    you walked the whole night, you may go to take a rest.
15    Q.   So do I understand you correctly that after your father's
16    wounds were treated, you and he decided to walk back to Tumba?
17    A.   Yes.
18    Q.   To leave the hospital and go.
19         Back to the area where the houses were burning and
20    people were being attacked?
21    A.   I can explain that.  Yesterday I said that I went down
22    with my dad.  We reached a place called Ku Mukoni.  And when we
23    got there, there was a very strong roadblock.  There was
24    someone living there.  It was the home of the new president,
25    Sindikubwabo Théodore.  When my dad saw that, he told me, "This
```

```
 1   place we cannot go beyond.  Instead of going through, we'll go
 2   back to the city."
 3   Q.   And you told us that was the point at which you went to a
 4   school?
 5          THE INTERPRETER:  Repeat that, counsel.
 6   Q.   And that was the point at which you went to a school to
 7   hide?
 8   A.   Yes.
 9   Q.   And the school that you went to, was it your school, the
10   school you had attended?
11   A.   Yes, I said that.
12   Q.   And what school is that?
13   A.   I can explain that.  It's a primary school that was
14   financed by the protestant.  It's in the city, in the town.
15   Q.   It's in Butare Town?
16   A.   Yes, in the city of Butare.
17   Q.   And yesterday you described staying at this school for a
18   few days?
19   A.   Yes, I was with other people.  And when I was going there,
20   I found them there.  I was not there long.
21   Q.   You said yesterday you were there a few days.  Is that
22   about right?
23   A.   Yes.
24   Q.   Until there was another attack by Interahamwe?
25   A.   Yes.
```

# J.A. 519

```
 1   Q.   And, again, you managed not to be hurt in that attack and
 2   get away?
 3   A.   Yes.
 4   Q.   Now, directing your attention back to that interview with
 5   U.S. investigators in June, you didn't say a word about being
 6   attacked in the school.
 7   A.   I told you, even I said that yesterday, that attack,
 8   that's when we left and we walked, and we were going to the
 9   parish at Caritas in Butare, and the older folks among us, they
10   are the ones who said that if we go to the Catholic school or
11   the Caritas, they're going to kill us.  Because the Catholic
12   charities also there were people from Matayzo.  That's when we
13   went to the prefecture.
14   Q.   My question --
15   A.   That's how I explained it.
16   Q.   My question is, did you tell investigators that you spent
17   a few days at a school and were attacked by the Interahamwe at
18   the school?  Did you tell them that in June?
19   A.   Yes, that's what I told you.
20   Q.   You described after the attack at the school fleeing to
21   the prefecture?
22   A.   Yes.
23   Q.   And the prefecture was a government building where a
24   number of Tutsis had been camping?
25   A.   Yes, and there was a man there.
```

J.A. 520

```
 1   Q.   And you talked about staying there for about three weeks?
 2   A.   Yes.  I did not carry a calendar, but I just made an
 3   estimate.
 4   Q.   But you were there for a number of days, and you talked
 5   about being rained on outside and waiting to die.  It was a
 6   while that you were there?
 7   A.   Yes.
 8   Q.   And then you described a conversation that you happened to
 9   to overhear between the prefect and a local businessman.
10   A.   Yes.
11   Q.   And how that conversation that you happened to overhear
12   led to buses arriving to take the Tutsis away?
13   A.   Yes.
14   Q.   And you decided not to take -- not to get on the buses?
15   A.   Yes.
16   Q.   Because you knew that the buses would be going on a road
17   that was dangerous?
18   A.   Yes.
19   Q.   And you were afraid that you would be recognized because
20   you were someone who was known in Butare?
21   A.   I can explain that.
22   Q.   The floor is yours.
23   A.   I was scared of -- I was scared that if I got to the
24   roadblock, the Interahamwe, who knew my dad, that I'm his son,
25   I had my older brothers, they would take me out and kill me.  I
```

J.A. 521

1    was not famous, but what I can explain, my family was known.

2    Q.    So instead of getting on the buses, you described walking

3    on the road?

4    A.    Yes.

5    Q.    This was the main road in Butare?

6    A.    Yes.

7    Q.    Which, as we've talked about, had many roadblocks on it?

8    A.    No.  From the prefecture to the main road is like looking

9    outside, like when you come in here to the court.  That means

10    roadblocks were behind.  I didn't pass the roadblocks.

11    Q.    So you're walking on this main road, not in the area of a

12    roadblock, and you happen to encounter a soldier in a

13    wheelchair.

14    A.    That's the way it is.

15    Q.    And he had been wounded?

16    A.    Yes.

17    Q.    And he was all by himself?

18    A.    Yes.

19    Q.    He needed someone to help push him?

20    A.    Yes.

21    Q.    He didn't have another soldier with him?

22    A.    When I met him, he didn't have any other soldier with him.

23    But I could tell before he met me, that was the way he went to

24    the town.

25    Q.    So you didn't have any idea at that point why this soldier

**J.A. 522**

```
 1   in a wheelchair happened to be in the middle of the road?
 2   A.   Yes.
 3   Q.   You didn't know how he had managed to get himself outside
 4   of the hospital to the middle of this road?
 5   A.   I didn't know anything.  That was my first time to see
 6   him.
 7   Q.   But you managed to strike up a friendship with this
 8   soldier?
 9   A.   Yes.
10   Q.   By lying to him about your ethnicity?
11   A.   Yes.
12   Q.   And you told him you were homeless?
13   A.   Yes.
14   Q.   And he didn't ask to see an ID card?
15   A.   No.
16   Q.   Just took you at your word?
17   A.   Yes.
18   Q.   You assisted him by pushing him all the way back to the
19   hospital?
20   A.   Yes.
21   Q.   And to push him back to the hospital, you did have to pass
22   some roadblocks?
23   A.   Yes.
24   Q.   And you managed to get through those roadblocks without
25   any problems?
```

J.A. 523

```
 1    A.    Yes.

 2    Q.    Nobody checked your ID card?

 3    A.    He would talk on my behalf.

 4    Q.    And when you did get back to the hospital, you told us

 5    that you became a sort of caretaker to this soldier?

 6    A.    Yes.

 7    Q.    He was staying in a hall with other soldiers?

 8    A.    Yes.

 9    Q.    What building was that?

10    A.    He was in the hall.

11    Q.    Was it inside a building?

12    A.    If you know the old maternity ward, it's like a little bit

13    after that.

14    Q.    Was it inside the maternity ward building?

15    A.    No.

16    Q.    It was in a different building?

17    A.    Yes.

18    Q.    Near the maternity ward?

19    A.    Yes.

20    Q.    You don't remember what the building was called?

21    A.    I don't remember that, but that's the hall for the

22    soldiers, and there was not any other civilians, and they all

23    had the same injuries or the same illness, and they were all

24    Interahamwe.  There was not any civilians there.

25    Q.    I understand that there were soldiers there.
```

**J.A. 524**

```
 1              My question is, you're aware that some of the
 2   buildings had names, like the maternity ward or the dermatology
 3   ward or the administration building or the surgery ward.
 4   You're aware that the buildings had those kinds of names,
 5   right?
 6   A.    Some of them I know.  I can tell you.
 7   Q.    And can you tell which building the soldiers were in?
 8   A.    They just called it the soldiers hall.
 9   Q.    So, sir, this hospital grounds you've told us was a place
10   that you visited, where your father worked, and that you were
11   very familiar with it.  Isn't that true?
12   A.    Yes.
13   Q.    And this building where you lived with the soldiers for
14   some period of time, you don't remember what the name of it
15   was?
16   A.    What I can answer is -- all I can say is one or two
17   things.  It was in the front of the maternity.  The second
18   thing, if you have a chance to come to Rwanda, I can just show
19   you the building.
20   Q.    I want to ask you some questions about this period of time
21   when you were caring for the soldier.  You testified that the
22   hospital was mostly empty.  Is that true?
23   A.    What do you mean by saying "empty"?
24   Q.    Well, yesterday you were asked about whether the hospital
25   was full or empty, and you said that it was mostly empty.  Was
```

J.A. 525

1  that true?

2  A.   I can explain that.  During genocide in the hospital,

3  there were people.  There were some services in it like wound

4  dressing for those who were injured.  Even those soldiers were

5  seen or was physicals.  They were not taking care of the

6  civilians.  They were just treating the soldiers, so that those

7  who could get well, they could go back and fight.  So they

8  cared about them most.  It doesn't say that the hospital was

9  empty.  Those who were killed were Tutsis.  The Hutus were

10  alive.

11  Q.   So my question is yesterday when you told us that the

12  hospital was mostly empty and that there were few patients,

13  other than soldiers, was that true?

14  A.   But I explained soldiers were the most there.  But people

15  were spending the whole day killing people, and they were not

16  showing -- they would not be showing those that had been

17  killed.

18        What do you mean by staying empty?

19  Q.   Well, I'm asking you to clarify what you said yesterday

20  when you told us the hospital was mostly empty.

21  A.   It was not empty.  Soldiers are not people?  What about

22  the hospital staff?

23  Q.   I'll ask you a different question.  We've covered this.

24  A.   Even Teganya was there.  How would you say that it was

25  empty?

**J.A. 526**

```
 1   Q.    I'm going to ask you another question now.
 2   A.    If I can go back behind.
 3              THE COURT:  Wait, wait.  Wait for a question.
 4   Q.    You have just told us that there were lots of soldiers,
 5   and that the hospital was very dangerous because people were
 6   being killed all the time.  That's what you just said a few
 7   moments ago.
 8   A.    Yes.
 9   Q.    And you have previously told us that you were known, your
10   father was known on this campus as well.
11   A.    Yes.
12   Q.    And yesterday you were asked about whether you stayed with
13   the soldier at all times or whether there were times when you
14   would walk the grounds.
15   A.    Yes.
16   Q.    And you told us that you were not with the soldiers all
17   the time, that you would leave to walk to other areas of the
18   hospital?
19   A.    Yes.
20   Q.    And you managed to do that without yourself ever being
21   attacked?
22   A.    Yes.
23   Q.    Yesterday you told us that you were familiar with
24   Mr. Teganya during this time period you were staying at the
25   hospital.
```

```
 1   A.   Yes.
 2   Q.   You told us how he would come in the hall where the
 3   soldiers were staying to treat them?
 4   A.   Yes.
 5   Q.   And you would see him doing that; is that true?
 6   A.   Yes.
 7   Q.   And you described his features, big eyes?
 8            THE INTERPRETER:  Can you repeat that.
 9   Q.   You described him as having big eyes.
10   A.   Yes.
11   Q.   A gap in his front teeth?
12   A.   Small, not big.
13   Q.   And you described him as being a little bit chubby?
14   A.   Not very big.
15   Q.   You said he was starting to go bald?
16   A.   I can explain that.
17   Q.   Well, it's actually a pretty simple question.  Was he
18   starting to go bald, yes or no?
19   A.   Yes.
20   Q.   In the front?
21   A.   Like here.  (Indicating.)
22   Q.   On top of his head?
23   A.   Yeah, right here.
24   Q.   So was it receding back?
25   A.   Yes.
```

```
 1    Q.   Your testimony yesterday was that you heard Mr. Teganya
 2    talking to the soldiers often, and today you said he would
 3    sometimes come three times a day.
 4    A.   Yes.  He sometimes would not show up.
 5    Q.   And you made it clear that you never spoke to him yourself
 6    because you were scared of him?
 7    A.   Yes.
 8    Q.   But you came to know him through his treatment of these
 9    soldiers?
10    A.   Yes.
11    Q.   Directing your attention to the meeting you had with
12    investigators in June, you were asked about how you knew
13    Mr. Teganya.
14    A.   Yes.
15    Q.   And at that time the investigators showed you a list of
16    names, right?
17    A.   What do you mean by that?
18    Q.   Did the investigators go through a list of names with you?
19    A.   What names?  What names are you talking about?
20    Q.   Well, I'll just ask you about Mr. Teganya.  You were asked
21    about him and how you knew him.
22    A.   I can explain that.
23    Q.   No.  I'm going to ask you a specific question.
24         I'm going to ask you, did you tell the investigators
25    that you remember he was doing a medical internship at the
```

1  hospital prior to the genocide?

2  A.   I can answer that.

3  Q.   Did you tell them that in June, yes or no?

4  A.   When they came to ask me, they were asking me about

5  genocide and how I survived the genocide.

6  Q.   Sir, sir.  It's a very specific question, and I just need

7  a yes or no answer.

8        Did you --

9        THE COURT:  Let him translate that.

10       Go ahead.  Translate that part of it.

11       (Translation.)

12       THE COURT:  Now ask the question.

13 Q.   Did you tell the investigators in June that you remember

14 Mr. Teganya was doing a medical internship at the hospital

15 prior to the genocide?

16 A.   I told them that I knew him during the act of genocide.

17 Q.   Okay.  So your testimony here before this jury is what you

18 told the investigators was that you knew him from your time at

19 the hospital during the genocide?

20 A.   Yes.

21 Q.   You didn't tell them that you recognized him from a time

22 before the genocide?

23 A.   I didn't know him.

24 Q.   You didn't tell the investigators that you recognized him

25 from the time before the genocide when you would bring your

**J.A. 530**

1   father's lunch to the hospital?

2   A.    I didn't know him.

3   Q.    Did you tell the investigators that you did recognize him

4   from the time before the genocide, when you would bring your

5   father's lunch to the hospital?  Did you make that statement in

6   June?

7   A.    No, I didn't know him.

8   Q.    Did you tell the investigators you did?

9   A.    Yes.

10  Q.    And that wasn't true?

11  A.    I told him I knew him during genocide.

12  Q.    No.  My question is, did you tell the investigators in

13  June that you knew him before the genocide?

14  A.    No.

15  Q.    So if you did make that statement, it would have been

16  inaccurate?

17          MR. GARLAND:  Objection.

18          THE COURT:  I'll allow it.  I think we need to move

19  on, but I'll allow this.

20  Q.    If you had said that, it wouldn't have been true?

21          MR. GARLAND:  Objection.

22          THE COURT:  Overruled.

23  A.    Like I told you, I knew him during genocide when he would

24  come to the hospital to treat the soldiers and when they would

25  call him and he would answer.

**J.A. 531**

```
 1    Q.   I'm going to move on.
 2              Your testimony yesterday was that you saw
 3    Dr. Karekezi's death.
 4              THE INTERPRETER:  Repeat that, counsel.
 5    Q.   You told us yesterday that you saw Dr. Karekezi's death.
 6              THE INTERPRETER:  I didn't hear the last part.
 7    Q.   You saw his death, Dr. Karekezi's death.
 8    A.   Yes.
 9    Q.   But before that you told us about a conversation you again
10    happened to overhear --
11    A.   Yes.
12    Q.   -- between Dr. Karekezi and Dr. Mbarutso?
13    A.   Yes.
14    Q.   And that was a conversation with Dr. Karekezi where
15    Dr. Karekezi was apparently expressing his fear of Mr. Teganya?
16    A.   Yes.
17    Q.   Was he raising his voice at the time he said that?
18    A.   In a low voice, very scared, but the one he was telling,
19    they were so close.  That's how he was talking.
20    Q.   So they were close together?
21    A.   He was close to him, not to Teganya.
22    Q.   So Dr. Karekezi and Dr. Mbarutso are close together and
23    they're talking in a low voice?
24    A.   Yes.
25    Q.   And it just so happened you were close enough to them to
```

J.A. 532

```
 1    overhear this conversation?
 2    A.    Yes.  It was in the hallway.  It was like if you meet
 3    someone in the hallway and you pass them and you're just
 4    curious and you want to know what they are talking about.
 5    That's how I heard what they were talking about.
 6    Q.    You also testified that you at some point thereafter saw
 7    Dr. Karekezi come out of the surgical ward?
 8    A.    Yes.
 9    Q.    And you described he still had his mask on?
10    A.    It was a piece of clothes like the one you put on your
11    face when you're doing wound dressing.
12    Q.    And he was with a soldier?
13    A.    What do you mean?
14    Q.    At the time you saw Dr. Karekezi coming out of the
15    surgical ward, he was with a soldier?
16    A.    It is the way I explained it yesterday.  If you want, I
17    can repeat that.
18    Q.    Well, is it fair to say you saw Dr. Karekezi fleeing
19    because the soldier was calling him a Tutsi?
20    A.    Yes.  He went back to surgery running, because the soldier
21    could not run after him.  Yesterday I explained that the
22    soldier went back to the hall, and he told the other soldiers
23    and Teganya that he just saw a Tutsi make the stop.
24    Q.    Right.  You just happened to be in the right place at the
25    right time to see all that?
```

J.A. 533

1    A.    Yes.

2    Q.    And you happened to be there when Dr. Karekezi was found

3    as well?

4    A.    No.  Yesterday I explained that I saw him when he was

5    being carried away, when they were passing through the hallway,

6    and he was bleeding and everything that I explained yesterday.

7    Q.    So you described how Dr. Karekezi was found by Mr. Teganya

8    and some soldiers and Interahamwe, right?

9    A.    Yes.

10   Q.    You were in a position to see that with your own eyes?

11   A.    I can explain.

12   Q.    Well, it's a simple question, sir.  Did you see him when

13   he was found by Mr. Teganya and these soldiers, did you see

14   that?

15   A.    No.  I saw them when they were taking him.

16   Q.    Okay.  You saw them taking him, and you described him

17   being pushed to the location where he was ultimately killed,

18   right?

19   A.    Yes.

20   Q.    And as Mr. Teganya and the soldiers were doing this, they

21   actually moved him to a different area of the hospital, right?

22   A.    Yes.  The way I explained it, that's the way it is.

23   Q.    Yeah.  He was taken behind the maternity ward.  Is that

24   your testimony?

25   A.    Not behind.  On the side.  And I showed that on the

**J.A. 534**

```
 1    picture.
 2    Q.   Okay.  Can we have that picture.  It's 39, I believe.
 3            So you can see Exhibit 39 here.  This is what you've
 4    identified as the place where Dr. Karekezi was killed.
 5    A.   Yes.
 6    Q.   Were there trees there?
 7    A.   No.
 8    Q.   Do you remember being interviewed in June of 2018 and this
 9    topic of Dr. Karekezi's murder coming up?
10    A.   Yes.
11    Q.   In fact, didn't you tell the investigators that Karekezi
12    was taken to the trees behind the maternity building?
13    A.   No.
14    Q.   Never said that?
15    A.   I didn't say that.
16    Q.   Because it wouldn't have been true?
17    A.   I showed them where I'm touching.  (Indicating.)
18    Q.   And before all of us, before this jury, you're saying this
19    is where Dr. Karekezi was killed?
20            MR. GARLAND:  Objection.
21            THE COURT:  I'll allow it.  It's -- I'll allow it.
22    Overruled.
23    Q.   Where you're standing in this picture, within a few feet,
24    is where you said Karekezi was killed, right?
25    A.   That's where they killed him.
```

J.A. 535

```
 1   Q.   No trees, and it's not behind the maternity building?
 2           MR. GARLAND:  Objection, your Honor.
 3           THE COURT:  I'll allow it, but I think we've been over
 4   this several times.
 5           Go ahead.  You may answer.
 6   Q.   This location there's no trees?
 7   A.   There were no trees.
 8   Q.   And this is not behind the maternity building?
 9           THE COURT:  All right.  Mr. Lauer, you've made your
10   point.  Let's move on.
11           MR. LAUER:  I'll move on.
12   Q.   You had to follow the soldiers to this location to see the
13   actual death?
14   A.   I didn't follow them.  I was just close by in the
15   distance.  I could see what everybody was doing.
16   Q.   And you were asked yesterday whether you were with the
17   soldier in the wheelchair, and your answer was no.
18   A.   I answered that I was behind the hall.  If you're behind
19   that hallway, that's the hallway where they took Karekezi
20   through and the soldiers had remained inside the hospital in
21   the hall.  That's how it was.
22   Q.   So at the time of Dr. Karekezi's death, you were not with
23   the soldier you were providing care for?
24   A.   No.
25   Q.   In June of 2018 you told the investigators that you pushed
```

J.A. 536

1  the soldier in the wheelchair to the place where the killing

2  occurred; isn't that what you said in June?

3  A.   No, I didn't say that.  I told them that I was behind the

4  hall.  I was preparing, washing the plates that he used to eat,

5  and I was down or bending down.  That's when I saw them taking

6  Karekezi, but I stayed in the hall.

7  Q.   Did you tell the investigators that the killing was a sort

8  of ceremony, and the soldier for whom you were caring wanting

9  to witness it?

10 A.   The death of a Tutsi was a good thing at that time.

11 Q.   My question is, did you make the statement that the

12 killing was a sort of ceremony, and the soldier for whom you

13 were caring wanting to witness it?  Did you say those words to

14 the investigators in June?

15 A.   Can you explain that again?

16 Q.   Well, we've talked a lot about the interview you had with

17 the investigators in June.  You know what I mean by that,

18 right?

19 A.   Yes.

20 Q.   At The Lighthouse Hotel?

21 A.   Yes.

22 Q.   And you talked about seeing Dr. Karekezi's murder with the

23 investigators, right?

24 A.   Yes.

25 Q.   And in doing so did you describe the killing as a sort of

**J.A. 537**

```
 1    ceremony and the soldier for whom you were caring wanting to
 2    witness it?
 3    A.   I can explain that.  When Karekezi was killed --
 4    Q.   It's actually -- I'm not --
 5         MR. GARLAND:  Objection.
 6    Q.   -- asking you about how he was killed.  I'm asking whether
 7    you said that, whether you made that statement to the
 8    investigators.
 9         MR. GARLAND:  Objection, your Honor.
10         THE COURT:  Overruled.
11    Q.   So it's -- I'm just going to make it yes or no to keep it
12    simple and not waste everybody's time.
13         Did you describe Karekezi's killing as a sort of
14    ceremony, and the soldier for whom you were caring wanting to
15    witness it?  Yes or no.
16    A.   The soldier with me, he didn't -- he did not witness
17    Karekezi get killed.  He heard the men in the hall.  That's
18    what I said.
19    Q.   So that's what you told the investigators in June?
20    A.   That's what I told them.
21    Q.   You also told the jury about the killing of Mr. Gasarabwe?
22    A.   Yes.
23    Q.   And you described him as being a family friend.  And he
24    was receiving treatment at the hospital; is that right?
25    A.   He was a patient.
```

```
 1    Q.   Do you know what his condition was?

 2    A.   I knew he was sick.

 3    Q.   From what?

 4    A.   I don't know what he was sick from, but I know he was

 5    sick.

 6    Q.   He was your friend.  Did you visit him in the hospital

 7    when he was sick?

 8    A.   I didn't visit him.

 9    Q.   You did not?

10    A.   I didn't visit him.

11    Q.   I'm sorry.  I didn't --

12    A.   I did not visit him.

13    Q.   You did not visit him.

14         When you were interviewed in June, you told

15    investigators, in fact, that you had checked in on him at the

16    hospital.  Isn't that what you told the investigators?

17    A.   There's a way that I told them.  We meet to say hi to him

18    or greet him.  I saw him on the bed, and I saw him again when

19    they were taking him.  That's what I told you -- that's what I

20    told them.

21    Q.   So about two minutes ago, when I asked you if you had seen

22    him at the hospital, where he was sick and you said no, that

23    wasn't entirely accurate?

24         THE COURT:  I think your question was did you visit

25    him.
```

J.A. 539

```
 1              MR. LAUER:  Yes, excuse me, your Honor.
 2   Q.   When I asked you that question, your answer was not
 3   entirely accurate?
 4   A.   Can you repeat the question, counsel.
 5   Q.   I'm sorry.  I'm being confusing.  It's my fault.
 6              A few minutes ago I asked you whether or not you had
 7   visited Mr. Gasarabwe when he was sick in the hospital.  Do you
 8   recall that?
 9   A.   You asked me if I visited him?
10   Q.   Yes.
11   A.   I didn't visit him.  But I saw him on the bed.
12   Q.   Okay.  Putting that aside, you told this jury you were
13   there when he was killed?
14   A.   Yes.
15   Q.   You claim that you saw it happen in front of your eyes.
16   A.   Yes.
17   Q.   Those were your exact words, actually, "in front of my
18   eyes"?
19   A.   Yes.
20   Q.   And you claimed to have seen Mr. Teganya himself strike
21   the blow.
22   A.   Yes.
23   Q.   When you were interviewed in June, you told the
24   investigators you didn't see the actual killing.
25   A.   I saw that.
```

**J.A. 540**

```
 1   Q.   You met with the investigators in June.  I'm sorry to have
 2   to do this again, but...
 3             You met with them in June, right?
 4   A.   Yes.
 5   Q.   And you talked about Mr. Gasarabwe's killing?
 6   A.   Yes.
 7   Q.   And yes or no -- you don't have to explain, just yes or
 8   no -- did you tell them you did not see the actual killing?
 9   A.   I told them I saw it.
10   Q.   You told them you saw it with your own eyes?
11   A.   Yes.
12   Q.   You didn't tell them that you saw the body later?
13             THE INTERPRETER:  Repeat the question, counsel.
14   Q.   When you were interviewed by those investigators, you
15   didn't tell them you did not see the actual killing, you saw
16   the body later?
17   A.   I saw Gasarabwe was being killed, and I said before.  The
18   person that I said I've seen him being killed is Nyangezi
19   Prota.  So differentiate between Nyangezi Prota and Gasarabwe.
20   Q.   I'm going to move on to Mr. Nyangezi.
21             THE COURT:  Why don't we take our morning break then.
22             Let me see counsel quickly.
23             THE CLERK:  All rise.
24   (Jury exits.)
25   SIDEBAR CONFERENCE AS FOLLOWS:
```

J.A. 541

```
 1          THE COURT:  I didn't want to say this in front of
 2    everybody.
 3          I'm not telling anyone how to try the case and
 4    everyone has their own strategies, but there are an awful lot
 5    of very long tangled questions.  The nature of the beast is
 6    there's always more on cross, and, you know, it's -- the
 7    translators are stumbling.
 8          I'm going to make one small suggestion, which is
 9    you're using the following lawyer elocutions.  I've written
10    these all down.  "At the time of" rather than "when."  "How did
11    it come to be that" rather than "why."  "The point at which"
12    rather than "when."  And "the location at which" rather than
13    "where."  I know it's hard, but we've got these poor
14    translators.  They're not even European.  They're speaking an
15    African language.  And I think they're really struggling here.
16    So Hemingway rather than Faulkner.  Again, it may be a good
17    strategy to ask a longer question -- I don't want to tell you
18    how to do it -- but all things being equal, shorter, clearer
19    questions would help a lot here.
20          MR. LAUER:  Yes, your Honor.  Thank you.
21    END OF SIDEBAR CONFERENCE.
22    (Court exits.)
23    (A recess was taken.)
24          THE CLERK:  All rise.
25    (Court enters.)
```

```
 1    (Jury enters.)

 2    BY MR. LAUER:

 3    Q.   I'm going to ask you some questions about Prota Nyangezi.

 4    A.   Yes.

 5    Q.   You told us earlier this morning that you were there when

 6    he was killed?

 7    A.   Yes.

 8    Q.   And it would have been the same place where Dr. Karekezi

 9    was killed?

10    A.   Yes.

11    Q.   Exhibit 39, if we could.  So you can see on the screen the

12    photograph of yourself.  This is the area where Mr. Nyangezi

13    was killed?

14    A.   Yes.

15    Q.   And your testimony today is that you were there when that

16    happened?

17    A.   Yes.

18    Q.   You were asked whether you were there to see it in June as

19    well?

20    A.   Yes.

21    Q.   Did you tell the investigators that you did not actually

22    witness the killing?

23    A.   I told them I saw it, but, like I explained before,

24    because of the relationship I had with Prota Nyangezi, I

25    avoided to look when he was killed.  That said, I didn't look
```

**J.A. 543**

1    at it when he was being killed, when he was being cut with

2    machetes and clubs and --

3    Q.    Well, let me ask you this:  Did you tell the investigators

4    that when one of the soldiers returned, he told the others,

5    including you, that Mr. Nyangezi had been killed?

6    A.    What do you mean?

7    Q.    Didn't you tell the investigators that you weren't there

8    and that you learned of his death when one of the soldiers

9    returned and told you that he had been killed?

10   A.    That's not true.

11   Q.    Okay.  We've covered it.  I'll move on.

12         You have a sister, Mukandori Providence.

13   A.    Yes.

14   Q.    And she survived?

15   A.    Yes.

16   Q.    She survived the genocide?

17   A.    Yes.

18   Q.    At the time of the genocide she had a baby?

19   A.    Yes.

20   Q.    The baby also survived?

21   A.    Yes.  We survived, the three of us.

22   Q.    You know a man named Gashirabake Charles?

23   A.    I know him, yes.

24   Q.    He's from your area?

25   A.    He's my neighbor.

**J.A. 544**

```
 1    Q.   And he was friendly with your sister, Providence?

 2    A.   No.

 3    Q.   They were not friendly?

 4    A.   Friendly or friends?

 5              THE INTERPRETER:  Counsel, can you...

 6    Q.   Were they friends?

 7    A.   No.

 8    Q.   You just knew him as a neighbor?

 9    A.   Yes.

10    Q.   You're aware that he was convicted in Gacaca for the death

11    of your father and Mr. Gasarabwe?

12    A.   Yes, and including my mom.

13    Q.   You were present for the Gacaca proceedings?

14    A.   Yes.

15    Q.   And Mr. Gashirabake was convicted for your father's death?

16    A.   He didn't confess that.

17    Q.   He confessed to Mr. Gasarabwe's death?

18    A.   No.

19    Q.   Were you present for the Gacaca proceedings involving your

20    father and Mr. Gasarabwe?

21    A.   Yes, even my mom.

22    Q.   At the time of the genocide was there a local leader in

23    Tumba named Dominique?

24    A.   What's his other name?

25    Q.   Dominique Abakotwa?
```

**J.A. 545**

```
 1              THE INTERPRETER:  Can you try to say that again or
 2    spell it?
 3    Q.    Dominique, I'm doing my best, Abakotwa.  Do you know that
 4    name?
 5    A.    Unless if I read it.
 6              MR. LAUER:  Can I approach, your Honor?
 7              THE COURT:  Yes.
 8    Q.    I'm pointing to that name.  Do you recognize that name?
 9    A.    I don't know him.
10    Q.    You told us that you came in contact with the
11    investigators in this case through a third party named Sheila
12    Mugisha?
13    A.    Yes.
14    Q.    Was that the first person who contacted you about these
15    proceedings?
16    A.    Yes.
17    Q.    Did you ever have contact with anyone else?
18    A.    No.
19    Q.    And how were you contacted?
20    A.    I can explain that.
21    Q.    Please do.
22    A.    They are people who know my testimony.  They know my
23    parents in that area of Tumba, who knew that my parents worked
24    at the hospital.  When she got my number, she got my number
25    from the hospital because my dad -- because my dad has pictures
```

## J.A. 546

```
 1    among the people that they remember at the hospital, and his

 2    picture is among those pictures that are hanging in the

 3    hospital.  When we had the memorial event, the hospital called

 4    us, and we go there to commemorate our parents.

 5    Q.    Did you know Ms. Mugisha before she called you?  Did you

 6    know her before she called you?

 7    A.    No.

 8    Q.    But you accepted her call?

 9    A.    She called me and she introduced herself to me.  But I

10    didn't know what she was talking about.

11    Q.    Did she tell you that there was going to be a meeting at

12    the hotel?

13    A.    She called me, and I was curious to know her.  She didn't

14    know me either.  I answered the phone, and she asked me, "Are

15    you called Gasasira Jean Pierre?"  And, "You had your parent

16    working at the hospital?"  I said, "Yes.  It's me."

17    Q.    Did she tell you about the meeting?  How did you know

18    about the meeting at The Lighthouse Hotel?

19    A.    She's the one who called me.  And she told me she wants to

20    know my story of the genocide, and she wanted to know

21    specifically about the hospital.  That's how we met.

22    Q.    How did you get to The Lighthouse Hotel?

23    A.    I left my house and I walked there.

24    Q.    And did you walk home as well?

25    A.    Yes.
```

## J.A. 547

```
 1    Q.   How long have you been in the United States?

 2    A.   I came on the 28th, last month.

 3    Q.   The 28th of February?

 4    A.   Yes.

 5    Q.   Which means you've now been here for two weeks?

 6    A.   Yes.

 7    Q.   And it was explained to you at some point that for every

 8    day that you spent here, you would receive a certain per diem

 9    or a certain amount of compensation?

10    A.   No.

11    Q.   That came as a surprise to you?

12    A.   What do you mean?

13    Q.   Do you expect to be going home with some money?

14    A.   No.

15    Q.   So no one has told you that you are eligible to receive a

16    witness fee?

17    A.   No.

18    Q.   No one has told you that you would be able to get that fee

19    for every day that you're being here?

20    A.   No.

21    Q.   You've met with the investigators on the case, the

22    prosecutors on the case?

23    A.   No.

24    Q.   You see the two prosecutors that I'm gesturing to right

25    now?
```

J.A. 548

1    A.    Yes.

2    Q.    Have you met with these gentlemen?

3    A.    I met them yesterday when we started.  But Scott and

4    George, they came to Butare.

5    Q.    Yes.  So you met them in Butare in June, the prosecutors,

6    Scott and George?

7    A.    Yes.  I took a lot -- I had a lengthy conversation with

8    Scott.

9    Q.    You came to the United States in February?

10   A.    Yes.

11   Q.    Have you had meetings with either the prosecutors or other

12   investigators since being here on February 28?

13   A.    No.

14   Q.    What were you doing for the past two weeks?

15   A.    I'm living where I'm residing.

16   Q.    And you have not met with any investigators or any

17   prosecutors over that entire two weeks that you've been here?

18   A.    No.

19   Q.    Why was it that you came here on February 28?

20   A.    They called me, and they told me that I'm coming to

21   testify in Teganya's case.  And they told me that I should say

22   whatever I told them.  That's why I came.

23   Q.    And it was explained to you that you would not have to buy

24   your plane ticket?

25   A.    They bought it for me.

**J.A. 549**

1  Q.   And it was explained to you that you would not have to pay

2  for a hotel room?

3  A.   Yes.

4  Q.   But the topic of how you would eat, that never came up?

5  A.   They feed me.

6  Q.   And just so I understand, you're telling us all that no

7  one has ever told you a word about being eligible to receive

8  any form of compensation or appearance fee?

9  A.   No, they would not give me compensation.

10        MR. LAUER:  May I have a moment, your Honor?

11        THE COURT:  Yes.

12 Q.   You came here on February 28?

13 A.   Yes.

14 Q.   You've been staying in a hotel room now for two weeks?

15 A.   Yes.

16 Q.   Your testimony is that you have not been meeting with the

17 prosecutors, you have not been meeting with investigators

18 during that two-week time?

19 A.   You asked me if I don't meet Scott and George.  I don't

20 meet them.  But I do meet other people.  And we see each other.

21 I can tell you the names.

22 Q.   What are the names?

23 A.   Brian and Kevin.  They help us from the hotel to here, and

24 to know other people we are with.  And they come to check us,

25 asking if we are well, and they ask us if we have had a meal.

## J.A. 550

1    And I met others yesterday.  That's how we do meet.  That's

2    what I was trying to explain to you.

3    Q.    During those two weeks, when you were meeting with Kevin

4    and Brian, were you ever informed that I had requested to speak

5    to you?

6    A.    I don't understand what you're trying to say.

7    Q.    Did anyone ever tell you that the defense attorney for

8    Mr. Teganya had requested a meeting with you?

9    A.    No, they didn't tell me that.

10   Q.    I'm sorry to belabor this.

11         Over the two weeks that you've been here, you've told

12   us that you met with Kevin and Brian at the hotel, right?

13   A.    I can tell you they were with me.  As for now, as I am

14   sitting here, I am with others.  But I'm not going to tell you

15   who they are.  They come where we are.  They would come and say

16   hello to us and check on us.  There are some other people that

17   work with them that are protecting us.  They're for our

18   security if you have like a stomach ache or stomach problems,

19   because we're not used to the food here.  So they would check

20   on us.  They know how our nights were and how our days are

21   going.

22   Q.    So my question, sir, my question is during that two-week

23   period, how many meetings did you have with either George or

24   Scott?

25   A.    None at all.

# J.A. 551

1  Q.   You did not meet with Scott, Mr. Garland, to prepare your

2  testimony?

3  A.   No.  I saw him yesterday when he was standing where you

4  are standing right now.

5          MR. LAUER:  Thank you.  No further questions.

6          THE COURT:  All right.  Redirect?

7          MR. GARLAND:  Your Honor, may I approach, please?

8          THE COURT:  Yes.

9  **SIDEBAR CONFERENCE AS FOLLOWS:**

10          MR. GARLAND:  Your Honor, as you'd expect, of course

11  we met with him on other occasions.  I have no idea whether

12  it's an issue with him versus something else with the

13  translating.  Then as well as he was at the time when we came

14  to the courtroom and we had everybody there and told them

15  people wanted to talk to them.

16          So the question is -- I think I can get this out, but

17  I may need to lead a little bit in order to do that, and I

18  didn't want to risk the court's ire without telling the court

19  that, because I'd like to get the truth out.

20          THE COURT:  All right.  I think in light of the

21  language barriers, I'll permit some mild leading on some areas

22  and take it a question at a time.  There's certainly ambiguity

23  in the word "meet" which could be "I meet you for the first

24  time, therefore, I'm meeting you," and "meeting" as we would

25  colloquially say, "We have a meeting and we talk."  So let's

```
 1    see how it goes.  I'll let -- again, I'll allow some mild
 2    leading up to a point, but it's going to be on a question-by-
 3    question basis.
 4              MR. GARLAND:  Thank you, your Honor.
 5    END OF SIDEBAR CONFERENCE.
 6                    REDIRECT EXAMINATION
 7    BY MR. GARLAND:
 8    Q.   Mr. Gasasira, you mentioned that we had seen each other
 9    yesterday.  Do you recall testifying about that?
10    A.   Yes.
11    Q.   Did we see each other a couple of days before that?
12    A.   No.
13    Q.   Did you come to our office building?
14    A.   No.
15    Q.   Did you come to our office building over the weekend to
16    talk with us?
17    A.   No.
18    Q.   Did you talk with us last week as well?
19    A.   No.
20    Q.   Do you remember seeing me back in June of 2018?
21    A.   Yes.
22    Q.   When was the next time you saw me?
23    A.   Yesterday.
24    Q.   And have you seen me -- you saw me before that, didn't
25    you, in Boston?
```

J.A. 553

```
 1    A.    You mean here in the city?

 2    Q.    In the city.

 3    A.    We met.

 4    Q.    And we talked a couple days ago, right, you and I?

 5    A.    Yes.

 6    Q.    And we talked before in the city before that?

 7    A.    Yes.

 8    Q.    In fact, we've talked a few times since you've come to

 9    Boston, right?

10    A.    Yes, I think like two.

11    Q.    Did you visit this courtroom before the trial started?

12    A.    To visit the court?

13    Q.    Have you been -- were you in this room before the trial

14    started?

15    A.    No.

16    Q.    Were you brought here with a group of people to this

17    building before the trial started?

18    A.    You mean the people I'm with?

19    Q.    Yes.

20    A.    Yes.

21    Q.    That was before the trial started, right?

22    A.    Yes.

23    Q.    And can you point to -- did you come into this room?

24    A.    I cannot recall very well.  I think it was the other side.

25    Q.    Did you sit in an area like this with other people?
```

J.A. 554

```
 1    A.    Yeah.  I think like behind there.  (Indicating.)
 2    Q.    And did George speak to the group of you?
 3    A.    Yeah.  I remember that, because I had forgotten about that
 4    one.  I'm sorry about that.  They asked me too many questions.
 5    I remember I came with my colleagues, and George asked us
 6    questions.  And he also remembered the things that you asked
 7    us.  It's a very tough thing.  I'm sorry about that.
 8    Q.    Did George tell you that Mr. Teganya's lawyers wanted to
 9    talk to you and the other people from Rwanda?
10    A.    Telling me?
11    Q.    I'm asking.  When you were here, did George tell you that
12    Mr. Teganya wanted to meet with you and everybody else?
13    A.    I don't recall being told.
14    Q.    Did George -- did anybody -- one second, please.  I want
15    to just gather my thoughts for the question.
16          Do you recall anybody telling you that Mr. Teganya
17    had lawyers?
18    A.    Yes.
19    Q.    And do you remember being told that they wanted to talk to
20    the people from Rwanda?
21    A.    You mean Teganya's --
22    Q.    Teganya's lawyers wanted to talk to the people from
23    Rwanda.
24    A.    Yes.
25    Q.    And were you told that it was your choice whether to talk
```

**J.A. 555**

1    to them or not?

2    A.    Yes.

3            MR. GARLAND:  May I consult with counsel for one

4    second, your Honor?

5            THE COURT:  Yes.

6            MR. GARLAND:  Your Honor, no further questions.

7            THE COURT:  Recross?

8            MR. LAUER:  No, your Honor.

9            THE COURT:  All right.  Thank you.  You may step down.

10           MR. LAUER:  Your Honor, before we start with the next

11   witness, can we be heard at sidebar?

12           THE COURT:  Yes.

13   **SIDEBAR CONFERENCE AS FOLLOWS:**

14           MR. WATKINS:  Your Honor, may I argue?

15           THE COURT:  Yes.

16           MR. WATKINS:  It occurs to me that we're going to have

17   to call Mr. Garland or Mr. Varghese about what happened, their

18   interaction with this particular witness.  The question would

19   be whether we do that right now, which I would suggest that we

20   do, or whether we're forced to wait until our case in chief to

21   call them.

22           THE COURT:  You're not going to put on the defense

23   case now.  You're not going to call witnesses in the middle of

24   the prosecution's case, number one.

25           Number two, whether I permit extrinsic evidence of

**J.A. 556**

1   impeachment will be a decision I'll make down the road.  We'll

2   come to it when we do, but we're certainly not going to

3   interrupt the prosecution's case for you to put on a defense

4   witness.

5   **END OF SIDEBAR CONFERENCE.**

```
 1              MR. VARGHESE:  Your Honor, the United States calls

 2    Agent Radatz, Dan Radatz.

 3                    RUSSELL D. RADATZ, III, sworn

 4                        DIRECT EXAMINATION

 5    BY MR. VARGHESE:

 6    Q.   Good morning, sir.

 7    A.   Good morning, sir.

 8    Q.   Can you please introduce yourself to the jury.  What's

 9    your name?

10    A.   My name is Russell D. Radatz, III.

11    Q.   Sir, are you currently employed?

12    A.   Yes.

13    Q.   Where do you work?

14    A.   I work for the United States Border Patrol.

15    Q.   Can you explain to the jury what is the United States

16    Border Patrol?

17    A.   The mission of the United States Border Patrol is to

18    detect and prevent the entry of illegal aliens, terrorists and

19    terrorist weapons from entering the United States.

20              Also to prevent the illegal trafficking of persons

21    and contraband.

22    Q.   Where does the U.S. Border Patrol work?

23    A.   The U.S. Border Patrol works on the ground between the

24    ports of entry all along the borders, north and south.

25    Q.   How long have you worked for the United States Border
```

J.A. 558

1    Patrol?

2    A.    A little over 13 years, sir.

3    Q.    And where are you currently stationed?

4    A.    Currently I'm assigned to Del Rio, Texas Border Patrol

5    Station.

6    Q.    Back in 2014, Agent Radatz, where were you stationed?

7    A.    I was assigned to Houlton Station, Houlton Sector in

8    Houlton, Maine.

9    Q.    Where is Houlton Station located?

10   A.    Houlton Station is located along Route 1 in Houlton, Maine

11   at the north end of town, but I-95 -- just a little north of

12   I-95, which dead ends into the port of entry and Canada.

13   Q.    How long were you assigned to the Houlton Border Patrol

14   Station?

15   A.    Just over eight years, sir.

16   Q.    Is Houlton, Maine a designated border crossing into the

17   country of Canada?

18   A.    Yes.

19   Q.    What were your responsibilities as part of the Houlton,

20   Maine Border Patrol Station?

21   A.    To patrol the border and whatever area I was assigned that

22   day, and get out, work trails, answer sensors, look for

23   anything that may seem out of place along the way.

24   Q.    You mentioned that Houlton, Maine is a designated border

25   crossing.  Is there a port of entry there?

J.A. 559

```
 1    A.    Yes, there is, sir.  A rather large port of entry.
 2              MR. VARGHESE:  Can we have for the witness and the
 3    parties Exhibit No. 56, please.
 4    Q.    Can you see what is on the screen in front of you?
 5    A.    Yes, I can.
 6    Q.    Do you recognize what we're looking at here?
 7    A.    Yes, I do, sir.  It's a map of the Houlton and Woodstock
 8    areas.  Houlton being United States in Maine, and Woodstock on
 9    the right in Canada.
10    Q.    Is this a fair and accurate representation of that area of
11    the country?
12    A.    Yes.
13              MR. VARGHESE:  Your Honor, we'd ask that Exhibit 56 be
14    admitted into evidence.
15              THE COURT:  All right.  It's admitted.
16              (Exhibit No. 56 received in evidence.)
17    Q.    Agent Radatz, can you please explain to the jury which
18    side of the map that we're looking at is the United States?
19    A.    The left side, sir.
20    Q.    Can you just touch the screen so -- just designate that.
21              That would mean that the other side, the right side,
22    is that Canada?
23    A.    Yes.
24    Q.    And you mentioned that U.S. 95 ends -- Interstate 95 dead
25    ends in Houlton, Maine.  Can you show the jury where is that
```

1    exactly?

2    A.    Could you blow the map up a little bit, please.

3            So right here (indicating) is the port of entry,

4    roughly.

5    Q.    What's on the other side of the border?

6    A.    Canadian Border Services Agency.  They have a rather large

7    port of entry as well.  I think that's what they call it.

8    Q.    Can you tell the jury, how do you legally enter the United

9    States in this part of the country?

10   A.    So if you're driving, you'll drive through -- you'll pass

11   the CBSA buildings, Canadian Border Services Agency, you'll

12   pass that building.

13           THE COURT:  Can you back up the mic a little bit.

14   It's very sensitive.  Not too much.  Okay.  Thank you.

15   A.    You'll pass it, and when you come into the U.S. side

16   you'll present yourself for entry at one of the many booths,

17   whichever is open at the time.  Commercial trucks has their

18   side, and then you'll have passenger vehicles on one side.  And

19   if you're coming in by foot, you can present yourself in the

20   lobby for inspection.

21   Q.    Is it the U.S. Border Patrol area that mans the border

22   crossing there?

23   A.    No, sir.  It's the Office of Field Operations, which is

24   more commonly called Customs, U.S. Customs.

25   Q.    Customs and Border Control; is that right?

**J.A. 561**

```
 1   A.   Yes, sir.

 2   Q.   If an individual is coming into the country to claim

 3   asylum, can that be done at the port of entry?

 4   A.   Yes, sir, it can.

 5   Q.   Can you explain how?

 6   A.   You would present yourself for entry in the lobby, and one

 7   of the officers working inside the port of entry will take care

 8   of you from there.

 9   Q.   You mentioned that the Border Patrol patrols areas outside

10   of the designated border ports of entry; is that right?

11   A.   Yes, sir.

12   Q.   How large is the area patrolled by the Houlton Border

13   Patrol Station?

14   A.   So the Houlton Border Patrol Station north to south as the

15   crow files is roughly 98 miles.  And if you follow the border,

16   both land and lake borders, it's roughly 132 miles of

17   responsibility.

18   Q.   Can you describe what the area is like?

19   A.   The area is very wooded.  It's got giant hills.  Some

20   people call them mountains.  Regardless, it's very rural and

21   the border is porous.

22   Q.   When you say the border is porous, can you explain what

23   you mean?

24   A.   Permeable, penetrable.

25   Q.   Is there any kind of barriers or fencing along that
```

**J.A. 562**

1   border?

2   A.   Very limited.

3   Q.   Is it possible to walk freely between the United States

4   and Canada?

5   A.   Yes.

6   Q.   During your eight years there, in your experience, are

7   there a lot of illegal border crossings in that area?

8   A.   No, sir.  It's not to say that they don't happen, but it's

9   limited.

10  Q.   Agent Radatz, I want to direct your attention to the date

11  August 3, 2014.  Were you working on that day?

12  A.   Yes.

13  Q.   In the morning hours?

14  A.   Yes.

15  Q.   Where were you assigned?

16  A.   I was assigned duties, what we commonly called local or

17  short south.

18  Q.   Can you describe for the jury what is short south, what

19  does that mean, and where is that located?

20  A.   So I would generally in that particular area, I would

21  generally work from the interstate, I-95 or Military Street

22  south to approximately Amityville.

23  Q.   So looking at the picture here, Exhibit 56, can you

24  explain for the jury or show the jury based on the picture,

25  where was the area that you were --

**J.A. 563**

1    A.    This area here (indicating) south of the interstate

2    between Route 1 and the international border, from Route 1 down

3    to Amityville.

4    Q.    On that morning, August 3, 2014, where were you located?

5    A.    I was sitting on the Catalina Road, which is about five

6    miles south of the interstate, sitting in a farm field with a

7    hedgerow bordering my right side.

8        MR. VARGHESE:    Okay.    Your Honor, can we have for the

9    parties and the witness Exhibit No. 57.

10   A.    Actually, sir.    I'd like to correct one small error I

11   made.    I said Amityville.    It's actually Amity, Maine, not

12   Amityville.

13   Q.    Thank you, Agent Radatz.

14        Agent Radatz, do you see what's on the screen in

15   front of you marked as Exhibit 57?

16   A.    Yes, sir.    Can you pull this up just a little bit?

17   Q.    Yeah.

18   A.    Okay.    So roughly I was sitting right about --

19   Q.    Before you do that, let me ask you, first of all, do you

20   recognize what we're looking at in this picture?

21   A.    I do.

22   Q.    And what is it?

23   A.    This is a map of the Lincoln Road and White Settlement.

24   White Settlement is over here.    Then up into the north/south

25   road, and to the right is the international border.

J.A. 564

```
 1   Q.   Is it a fair and accurate representation of that area?
 2   A.   Yes.
 3        MR. VARGHESE:  Your Honor, we'd ask that Exhibit 57 be
 4   admitted into evidence.
 5        THE COURT:  All right.  It's admitted.
 6        (Exhibit No. 57 received in evidence.)
 7   Q.   Agent Radatz, can you explain to the jury what are we
 8   looking in Exhibit 57?
 9   A.   Along the right side we have the international border,
10   Canada being on the far right side.  The line designating what
11   we call -- generally agents call it the slash, and from the
12   left side over is the United States.  This is the Lincoln Road,
13   traveling from left to right, and you have a north/south road
14   here.  This is called White Settlement.  Once you cross White
15   Settlement, the road becomes known as the Catalina Road.  And
16   if you go further to the west, it takes you to U.S. Route 1,
17   which is also a north/south road.
18   Q.   So I think hopefully -- this should work better.  Let's
19   see.  I think if you can, can you -- if you touch your screen
20   and that arrow there, you should be able to pick an icon.  Can
21   you draw a line showing where the border is, the Canada/U.S.
22   border?
23   A.   Right here, sir.  From this point all the way down to this
24   point, that's the Canadian border.  I'm not sure that it's
25   marked.
```

J.A. 565

```
 1   Q.    Yeah.  I think we're having a little -- I'll tell you what
 2   I'll do.  Let me blow it up.
 3         So that line going down the middle of the screen,
 4   that's the border?
 5   A.    Yes, sir.
 6   Q.    Were you located in this area on August 3, 2014?
 7   A.    Yes, sir.
 8   Q.    Where were you located?
 9   A.    I was sitting in this farm field along the hedgerow
10   approximately -- can I mark it?  Oops.  Maybe a little bit up.
11   Along that hedgerow, along the left side of the hedgerow.
12   Q.    You mentioned you were in a vehicle.  Was that a marked
13   vehicle?
14   A.    Yes.
15   Q.    How far is that location from the lawful port of entry?
16   A.    Roughly five-eighths, three-quarters of a mile is my best
17   estimate, sir.
18   Q.    Why did you station yourself there?
19   A.    I was sitting there because the hedge row concealed my
20   position, so that anything coming in illegally from Canada
21   wouldn't see me until it had already passed me.
22   Q.    Actually, I want to go back.  I want to make sure I
23   understand.  My question before was how far is it from the
24   lawful port of entry?
25   A.    About five miles south.
```

1    Q.    Okay.  And I think the question -- how far is it from the
2    border that we see in this picture here?
3    A.    So I was about five miles south of the international -- as
4    you were -- about five miles south of the port of entry, the
5    Houlton port of entry, and about five-eighths, maybe three-
6    quarters of a mile west of the international border.
7    Q.    Why did you pick this location from which to patrol?
8    A.    Because the hedge row offered concealibility from
9    anything -- any incoming traffic that may come illegally from
10   Canada.  So if anything entered illegally, it wouldn't see me
11   until it had already passed me.
12   Q.    Did anything unusual occur on the morning of August 3,
13   2014?
14   A.    I received a call from Houlton Sector radio that a
15   suspicious-looking person was walking down the road in that
16   general area.
17   Q.    What did you do in response?
18   A.    So I pulled out of my parking spot, and I headed west on
19   the Lincoln Road.  As I approached White Settlement Road, I
20   slowed down, looked left, looked right.  I didn't see anything.
21   So I continued westerly on that road, which now becomes
22   Catalina Road.
23          At that point off to my right side, I noticed a
24   person walking with dark-colored dress clothes and a backpack
25   matching the description given.  And I pulled -- after I passed

**J.A. 567**

1    the person, well ahead of the person, I pulled over onto the

2    right shoulder.

3    Q.    Let me stop you for a second.  If you could, can you

4    please show the jury where on the map did you encounter the

5    individual?

6    A.    My rough -- my best estimate would be right around that

7    area (indicating) there, sir.

8    Q.    Approximately how far is that from the international

9    border?

10    A.    A mile and a quarter, sir, maybe a little bit more, but

11    roughly one and a quarter miles.

12    Q.    In which direction was the individual walking?

13    A.    Away from the international border.  It was a westerly

14    direction towards Route 1.

15    Q.    Was that towards or away from the lawful port of entry?

16    A.    Away, sir.

17    Q.    You mentioned that you pulled over.  What happened next?

18    A.    So I parked the vehicle.  I exited.  I got out of the

19    vehicle, and I identified myself as a United States Border

20    Patrol agent.

21    Q.    And can you describe the individual that you encountered?

22    A.    The individual was wearing dark colored dress clothes, a

23    suit, and his legs were wet from like the thighs down with

24    plant matter all over his pants.

25    Q.    When you say "plant matter," can you explain what you

**J.A. 568**

1    mean?

2    A.   Weeds, seeds, grass burs, the sort of things you'd finding

3    walking through the woods in the morning with dew on the grass,

4    weeds.

5    Q.   Anything unusual about his shoes?

6    A.   The shoes were wet, sir.  And they were like a dress shoe.

7    Q.   Was he carrying anything?

8    A.   He was carrying a backpack.

9    Q.   So when you exited the vehicle and approached him, what

10   did you say?

11   A.   So I identified myself as United States Border Patrol

12   agent and I asked him his name and citizenship.

13   Q.   And what was the response?

14   A.   I couldn't understand him, sir.

15   Q.   So what happened next?

16   A.   I asked him, "Where were you born?"

17   Q.   And what did he say?

18   A.   Rwanda.

19   Q.   What language was he speaking?

20   A.   He was speaking English, but there was a noticeable

21   accent.

22   Q.   When he said "Rwanda," what happened next?

23   A.   So I asked him, I said, "What is your current immigration

24   status?"

25   Q.   And what was the response?

# J.A. 569

1    A.    The person told me that he was a refugee.

2    Q.    When he said he was a refugee, what happened next?

3    A.    So I asked him if he had any immigration paperwork to

4    support such claim.

5    Q.    And did he?

6    A.    No.

7          So at that point I asked him, "Where did you enter

8    the United States?"

9    Q.    Why did you ask that question?

10   A.    Because in order to enter the United States legally, you

11   have to present yourself at a port of entry.

12   Q.    And when you asked that, what was his response?

13   A.    He told me that he crossed the border illegally.  I asked

14   him, "Which port of entry did you use," because I still

15   couldn't understand him.  He told me that he crossed illegally

16   from Canada.

17          Could I actually see the 213?

18   Q.    Sure.  Is there something that would refresh your

19   recollection?

20   A.    Yes, sir.

21   Q.    Is that your report that was written up?

22   A.    Yes, it was.

23          MR. VARGHESE:  Your Honor, may I approach?

24          THE COURT:  Yes.

25   Q.    (Handing document.)

```
 1    A.    Thank you.

 2    Q.    Mr. Radatz, when you're done reviewing it, just let me

 3    know, and I'll come get it.

 4    A.    Yes, sir.  (Pause.)

 5          Thank you.

 6    Q.    Does that refresh your recollection?

 7    A.    Yes, sir.

 8    Q.    So what did he say?

 9    A.    So I asked him which port of entry, and he told me that he

10    entered the United States illegally by crossing the

11    international border from Canada to the United States.

12    Q.    At some point did he provide his name?

13    A.    Yes, sir.

14    Q.    What was his name?

15    A.    Jean Leonard Teganya.  If I pronounced it wrong, I

16    apologize.

17    Q.    After he admitted to entering the country illegally, what

18    happened next?

19    A.    I informed him that I was placing him under arrest for

20    illegal entry into the United States.

21    Q.    Is it illegal to enter the United States without first

22    going through a designated lawful port of entry?

23    A.    Yes.

24    Q.    Was Mr. Teganya handcuffed?

25    A.    No.
```

**J.A. 571**

1    Q.    Was he searched as part of his arrest?

2    A.    Yes.

3    Q.    What, if anything, did he have on him?

4    A.    I remember that he had a large -- he had a large sum of

5    cash, and I don't remember if I searched him -- his backpack,

6    rather.  I searched him on scene, but I threw his backpack in

7    the back of the vehicle, and I don't remember if we searched

8    the backpack on the side of the road or at the station, but

9    regardless he had a large sum of cash.

10    Q.    How much cash?

11    A.    Approximately $2,500 U.S. cash, and I think maybe like

12    $800 U.S. -- $800 Canadian.

13    Q.    Did he make any statements during processing?

14    A.    He'd mentioned being to various countries, India, Kenya,

15    the Congo.

16    Q.    Did he provide an address for his current residence?

17    A.    I believe it was Laval, Quebec.

18            MR. VARGHESE:  Your Honor, for the witness and the

19    parties, can we bring up Exhibit 21.

20    Q.    Agent Radatz, do you see what's on the screen in front of

21    you?

22    A.    Yes.

23    Q.    Do you recognize it?

24    A.    Yes.

25    Q.    Is it a fair and accurate representation of a map of that

**J.A. 572**

1   area of the country?

2   A.   Yes.

3         MR. VARGHESE:  Your Honor, we'd ask that Exhibit 21 be

4   admitted into evidence.

5         THE COURT:  All right.  It's admitted.  21.

6         **(Exhibit No. 21 received in evidence.)**

7   Q.   Agent Radatz, can you explain to the jury what is on this

8   map?

9   A.   It's a map of the northeastern part of the United States

10  and southeastern part of Canada.

11  Q.   And is the area of Laval, Quebec highlighted in this map?

12  A.   It is, yes.

13  Q.   Is that where the red dot is?

14  A.   Yes, sir.

15  Q.   As well as Houlton, Maine?

16  A.   Yes.  Houlton is represented by the white dot.

17  Q.   To your knowledge, are there lawful ports of entry into

18  the United States that are closer in proximity to Laval,

19  Quebec?

20  A.   Yes, sir.  Many, sir.

21  Q.   Did Mr. Teganya provide any explanation to you about why

22  he had traveled from Laval all the way to Houlton?

23  A.   He may have, but I don't recall, sir.

24  Q.   Did he say anything about his situation during the course

25  of processing?

```
 1   A.   He mentioned that he was a medical student or a doctor or
 2   something to that effect, that he grew up with a life of
 3   privilege and people held it against him.
 4   Q.   Agent Radatz, the individual you arrested on August 3,
 5   2014, do you see him in the courtroom here today?
 6   A.   I do, sir.
 7   Q.   Can you please identify him by his location in the
 8   courtroom and an article of clothing he might be wearing.
 9   A.   The gentleman with the dark-colored suit and the glasses.
10   Q.   What color tie?
11   A.   The gentleman with his hand on his face.  I can't see the
12   tie color.
13   Q.   Very well.
14        MR. VARGHESE:  Your Honor, please let the record
15   reflect an in-court ID.
16        THE COURT:  Yes.
17        MR. VARGHESE:  We have no further questions for Agent
18   Radatz.
19        THE COURT:  Okay.
20                    CROSS-EXAMINATION
21   BY MR. LAUER:
22   Q.   Good afternoon, sir.
23   A.   Good afternoon, sir.
24   Q.   When you encountered Mr. Teganya on the road, you
25   identified yourself and your position?
```

J.A. 574

```
 1    A.    Yes.

 2    Q.    Did he make any attempt to flee?

 3    A.    No.

 4    Q.    When you approached him to talk to him, was he

 5    cooperative?

 6    A.    Yes.

 7    Q.    He answered your questions?

 8    A.    He did.

 9    Q.    You mentioned that he was arrested for illegally entering

10    the United States, correct?

11    A.    Yes.

12    Q.    And that would be a violation of 18 U.S.C. 1325(a)?

13    A.    8 U.S.C. 1325(a).

14    Q.    8 U.S.C. 1325(a)?

15    A.    Yes.

16    Q.    And for a first offense, that's a misdemeanor?

17    A.    Yes.

18              MR. LAUER:  Thank you.

19              THE COURT:  Redirect?

20              MR. GARLAND:  No, your Honor.

21              THE COURT:  Thank you.  You may step down.

22              MR. VARGHESE:  Your Honor, the United States calls

23    Anicet Nzabonimpa.

24                    **ANICET NZABONIMPA, sworn**

25                      DIRECT EXAMINATION
```

**J.A. 575**

```
 1    BY MR. VARGHESE:

 2    Q.    Good afternoon, sir.

 3    A.    Good afternoon.

 4    Q.    Can you please introduce yourself to the jury.  What is

 5    your name?

 6    A.    My name is Anicet Nzabonimpa.

 7    Q.    And where are you from?

 8    A.    I come from Rwanda.

 9    Q.    Where in Rwanda?

10    A.    In the western region, which is what we call the Cyangugu.

11    Q.    Where do you currently reside?

12    A.    Now I live in Kigali.

13    Q.    Are you currently employed?

14    A.    Yes.  I am a medical doctor who is in a private practice.

15    Q.    What kind of medicine do you practice?

16    A.    I am a medical doctor, but I also do public health.

17    Q.    How long have you been practicing medicine?

18    A.    Nineteen years.

19    Q.    Back before the genocide, did you carry an identity card?

20    A.    Yes, I had it.

21    Q.    What ethnic group was listed on your identity card?

22    A.    Hutu.

23    Q.    Where did you grow up?

24    A.    I grew up in Cyangugu, but after I went to school in the

25    seminary in Gisenyi.
```

J.A. 576

```
 1            MR. VARGHESE:  If we could, can we bring up Exhibit
 2   19, which has already been admitted into evidence.
 3   Q.   Sir, do you see Exhibit 19 on the screen in front of you?
 4   A.   Yes, I see it.
 5   Q.   Can you please point out where is Cyangugu, where you grew
 6   up?
 7   A.   Around here.  (Indicating.)
 8   Q.   Were you familiar with an individual named Jean Leonard
 9   Teganya?
10   A.   Yes, I know him.
11   Q.   How do you know him?
12   A.   I found him in a seminary when I went to school there.
13   Q.   So where did you go to secondary school?
14   A.   I went to the seminary Nyundo, which was in Gisenyi, in
15   1986.
16   Q.   Looking at Exhibit 19, can you please identify for the
17   jury where is Gisenyi, where the school is located?
18   A.   Gisenyi is located here.
19   Q.   Why did you attend a school in Gisenyi when you grew up in
20   Cyangugu?
21   A.   The whole western region during that time, it belonged to
22   one diocese, Catholic Diocese of Nyundo, and all the citizens
23   would go to the seminary there.
24   Q.   Was it a seminary that you studied to become a priest?
25   A.   Yes.  That was an option, but you also had an option to
```

1   get out of the seminary and do other things.

2   Q.   Were there different areas in the school that you could --

3   or different subjects in the school that you could focus on or

4   major in?

5   A.   That school had two types of specialty.  One section

6   was focused on sciences, and the other one was focused on

7   literature.  And me, I focused on sciences.

8   Q.   You mentioned that you started in 1986.  How old were you

9   in 1986?

10  A.   I was about 15 because I was born in 1971.

11  Q.   How many years is secondary school?

12  A.   At that time it was six years.

13  Q.   And how many students are in the school?

14  A.   The whole school had about 300 students.  For the lower

15  classes in the school, the classes would be comprised of about

16  40 students, but as it went higher, it would be like 10 or 15.

17  Q.   Was Mr. Teganya in your class, in your year?

18  A.   Teganya was ahead of me one class.

19  Q.   What was Mr. Teganya's focus, science or literature?

20  A.   He was studying sciences.

21  Q.   What was -- did you have the opportunity to interact with

22  him?

23  A.   Since we were in the same school and we were studying all

24  at the same science training, I would see him almost every day.

25  Q.   What was he like back in secondary school?

1    A.    I would say he was extremely smart, and he was also -- he

2    didn't speak much.

3    Q.    Did he have a lot of friends?

4    A.    I wouldn't say that he had many friends because people

5    used to hang around each other depending on where they were

6    originally from.

7    Q.    So who did Mr. Teganya hang out with?

8    A.    Because he was also a native of the Gisenyi sector, I

9    would say that he hanged out with most of the people from that

10   region, northern region.

11   Q.    Did he have any Tutsi friends that you observed?

12   A.    No, I don't -- I can't recall any.

13   Q.    Did you know where he was from?

14   A.    Yes.  When we were in the seminary, each individual knew

15   where -- which party everyone originates from, and they knew he

16   was coming from the Ngororero party.

17   Q.    And where is that located?

18   A.    It was around Ngororero, a place called Ngororero, which

19   is indicated on the map, in Gisenyi.

20   Q.    Did you know anything about his father?

21   A.    All I remember, his father was a well known businessman in

22   Ngororero.

23   Q.    How do you know that?

24   A.    I would hear the students talking about it because most of

25   the time we didn't -- when they were talking among themselves,

**J.A. 579**

1    they talked also about their parents.

2          And sometimes the parents would visit the students at

3    school, and his father also would be at times among the parents

4    who would come.

5    Q.    Did you ever see Mr. Teganya's father visit him at school?

6    A.    Yes, I saw him.

7    Q.    How would he come visit the school?

8    A.    There was no designated time for parents to visit, but he

9    would come like once in a trimester.

10    Q.    How would he get there?

11    A.    He would come driving in a car.

12    Q.    Is that unusual?

13    A.    Yes.  Around that time anybody who would be driving a car

14    would be considered a very powerful person.

15    Q.    Did your family own a car?

16    A.    No.

17    Q.    During secondary school, did you hear Mr. Teganya or his

18    group of friends saying things that were anti-Tutsi?

19    A.    I would say around 1990, right after the war had started,

20    there was mistrust between the Hutu students and Tutsi

21    students.  Initially people used to hang with each other

22    depending on the region they came from, but around that time

23    people started also hanging with their ethnicity.

24          I would say that Teganya used to hang around the Hutu

25    students because in the region where he comes from, the

**J.A. 580**

1    students who were from there were predominantly Hutu.  Among

2    them they would talk about the war, which was due to the RFP

3    invasion, and they would say the Tutsis invaded Rwanda.  Among

4    them was Teganya, because they would say that the Tutsis

5    invaded Rwanda, and because Rwanda was invaded, all the Tutsis

6    were cockroaches.

7    Q.   You mentioned that Mr. Teganya hung out with Hutus after

8    the war began.  Did he ever hang out with you since you were a

9    Hutu?

10    A.   No.  We wouldn't hang around each other because the Hutus

11    are from the north and south.  They wouldn't -- we would not

12    hang around together.

13    Q.   Why not?

14    A.   It was considered then that Hutus from the north, they

15    were the people in power.  And the Hutus from the south, they

16    were considered in the opposition party.

17    Q.   What year did you graduate from secondary school?

18    A.   I graduated in 1992.

19    Q.   What did you do following graduation?

20    A.   After I graduated I joined the university in Butare.

21    Q.   What were you studying at the university in Butare?

22    A.   When I joined Butare, I went to -- I started medicine

23    training.

24    Q.   Did you see Mr. Teganya at medical school?

25    A.   Yes.  When I got to Butare starting my first year,

1    Mr. Teganya was in the second year, and I would see him quite
2    often as our classes were close.
3    Q.    How often would you see him?
4    A.    Many times.  I would say every day.
5    Q.    What was he like in medical school?
6    A.    In medical school he was extremely smart.  He wouldn't be
7    talking too much.  So I would say he didn't -- he did not mix
8    with the other students.
9    Q.    Who did he hang out with?  Who were his friends?
10    A.    I would describe his friends in two groups.  At the
11    university at that time the political parties had started and
12    the students would hang around depending on which parties they
13    belonged to.
14    Q.    Which -- I'm sorry.  You can....
15    A.    And also, like it was before, people would hang around
16    each other depending on which ethnicity they are and where they
17    were originally from.
18    Q.    Which political party was Mr. Teganya a member of?
19    A.    Teganya belonged to the ruling party, MRND.
20    Q.    Was he an active member of the MRND party at the
21    university?
22    A.    Yes.
23    Q.    How do you know?
24    A.    I know it because I would see him with the other students
25    who were party members.  And I would also see him wearing the

```
 1    signs of the MRND party.

 2    Q.   What kind of signs of the MRND party was he wearing?

 3    A.   The main ones were, which I saw Teganya wearing, was a

 4    hat.  There would be also an emblem, which had Habyarimana's

 5    picture.  And sometimes he would wear a scarf.

 6              MR. VARGHESE:  Can we have for the witness and the

 7    parties Exhibit No. 9.

 8    Q.   Sir, do you see what's on the screen in front of you?

 9    A.   Yes.

10    Q.   Do you recognize it?

11    A.   Yes.

12    Q.   Is it a fair and accurate representation of what the pins

13    looked like?

14    A.   Yes.  That's exactly.

15              MR. VARGHESE:  Your Honor, we'd ask that Exhibit 9 be

16    admitted into evidence.

17              THE COURT:  All right.  It's admitted.  Exhibit 9.

18              **(Exhibit No. 9 received in evidence.)**

19    Q.   Sir, can you explain to the jury, what are we looking at

20    in this picture, Exhibit No. 9?

21    A.   This is a pin with different colors.  There's red, yellow

22    and green.  That was the colors of the ruling party, MRND,

23    which was in power at that time.  In the middle is a picture of

24    President Habyarimana, who was the president then.  And

25    President Habyarimana was the founding member of the MRND.
```

J.A. 583

```
 1    This was a very strong sign that a party member has to show

 2    that they really support the founder.

 3    Q.    Did you observe Mr. Teganya wearing these pins in medical

 4    school?

 5    A.    Yes, I saw him wearing it.  He wouldn't wear it to school,

 6    but he would put it on when they were going to the party

 7    meeting.

 8          MR. VARGHESE:  Your Honor, may I approach?

 9          THE COURT:  Yes.

10    Q.    Sir, do you see what I've handed you?

11    A.    Yes, I see.

12    Q.    Let's start with Exhibit No. 12.  Yup.  Do you recognize

13    what that is?

14    A.    Yes.

15    Q.    What is it?

16    A.    This is the hat which used to be worn by the MRND party

17    members.

18    Q.    And what is Exhibit No. 15?

19    A.    Yes, I see.

20    Q.    And what is it?

21    A.    This is the scarf.  It would be worn also by the party

22    members of MRND.

23          MR. VARGHESE:  Your Honor, we'd ask that Exhibits 12

24    and 15 be admitted into evidence.

25          THE COURT:  They're admitted, 12 and 15.  12 is the
```

```
 1   hat.  15 is the scarf.
 2             (Exhibit No. 12 received in evidence.)
 3             (Exhibit No. 15 received in evidence.)
 4   Q.   Let's start with Exhibit 12.  Can you please show it to
 5   the jury.
 6   A.   This is the hat which used to be worn by the party members
 7   of MRND.  This is the same colors that are on the pin.  The
 8   additional one was the black color.  And that's the color they
 9   added on after the political reforms, when they opened up the
10   party.
11   Q.   And did you see Mr. Teganya wearing a hat like that?
12   A.   Yes, I saw him.
13   Q.   Can you show the jury Exhibit No. 15, what that is?
14   A.   This is a scarf.  It has the same colors as the hat.  It
15   was to be worn by the party members of MRND.
16   Q.   Did you ever see Mr. Teganya wearing a scarf like that?
17   A.   Yes.
18   Q.   How often did you see Mr. Teganya wearing MRND clothing
19   like the hat, like the scarf, or like the pins?
20   A.   I wouldn't say he was wearing it every day.  He would only
21   wear those colors when they were going to the party meetings,
22   and I would say like once a month.
23   Q.   And was that true throughout your time at the medical
24   school there?
25   A.   Yes.  Because after the opening of party politics there
```

J.A. 585

1    was a lot of political activities at the university.

2    Q.    Would anyone ever wear MRND clothing if they were not a

3    party member?

4    A.    No.

5    Q.    Were you a member of a political party?

6    A.    No.  I did not belong to any party.

7    Q.    Why not?

8    A.    One of the reasons I would say is because people from

9    Cyangugu, we were considered foreigners, belonged to the other

10   side, the other country.  And although many people belonged to

11   the opposition party, I never felt a need to belong to any.

12   Q.    Did you observe -- you mentioned Mr. Teganya going to

13   meetings.  What kind of meetings would Mr. Teganya be

14   attending?

15   A.    This would be the meetings organized by the party leaders

16   who would come to universities, and these would be public

17   meetings, but sometimes they would also call individual

18   students.

19        MR. VARGHESE:  I'm sorry.  Can the translator say the

20   last --

21        THE INTERPRETER:  They would call some individual

22   students for the students who belonged to the party.

23        MR. VARGHESE:  I'm sorry.  What was that?

24        THE INTERPRETER:  For the students who belonged to the

25   party.

```
 1    BY MR. VARGHESE:
 2    Q.    They would call them?
 3    A.    Yes.  There would be specific meetings for the students.
 4    Q.    So there were larger meetings with party leaders, and then
 5    students only meetings?
 6    A.    Yes.  There would be some meetings, bigger meetings.  Some
 7    of them would be hosted outside, out of the campus, especially
 8    in the soccer fields.
 9    Q.    Were those like rallies?
10    A.    Yes.
11    Q.    Did you ever see Mr. Teganya hanging out with other MRND
12    members?
13    A.    Yes.
14    Q.    Was that a frequent occurrence?
15    A.    Yes.
16    Q.    Did you know what Mr. Teganya's role was within the MRND
17    party at the university?
18    A.    Since I didn't belong to some party, I can't know his
19    position.  But he was a very active member and by all
20    appearances was somebody who had a big role to play.
21    Q.    Did you ever hear him say any anti-Tutsi statements?
22    A.    From him, I never heard anything.  But as many people who
23    belong to political groups, they would say some hurting words
24    to people, who do you know belong to that party, to other
25    parties, especially words which were against the Tutsis.
```

J.A. 587

```
 1    Q.    What kinds of things would they say?
 2    A.    They would call them inyenzi, cockroaches.  Or they would
 3    call them RPF, who had invaded Rwanda.
 4    Q.    Did you ever see the MRND group on campus become violent?
 5    A.    Whenever they would come for the party meeting, they would
 6    start beating other students who did not belong to the party.
 7    Q.    Would they be saying things when they were beating up the
 8    other students?
 9    A.    If the student was a Tutsi, they would call him inyenzi.
10    And if they are Hutus who belonged to opposition parties, they
11    would call them sympathizers or a traitor.
12    Q.    What would you do when you saw MRND members coming back
13    from meetings or rallies?
14    A.    We would hide.
15    Q.    Why?
16    A.    Because we were feeling that if you come close to them,
17    they would do -- assault you or beat you.
18    Q.    Even though you were a Hutu?
19    A.    Yes.  Very much so.
20    Q.    Were you scared of them?
21    A.    Yes.
22    Q.    Why were you scared of Mr. Teganya?
23    A.    Because I did not belong to his political party, and we
24    didn't come from the same region.
25    Q.    Were you on campus when the genocide began in April of
```

J.A. 588

```
 1   1994?
 2   A.   When the genocide started, I had left the week before.  It
 3   was during the school break.  I never went back.
 4   Q.   So you weren't on campus for the entire genocide period?
 5   A.   No, I never stepped back during the genocide.
 6   Q.   Doctor, has anyone forced or coerced you to testify here
 7   today?
 8   A.   No.
 9   Q.   Has anyone pressured you in any way regarding your
10   testimony and what you said today?
11   A.   No.
12   Q.   Has the government of Rwanda spoken to you about your
13   testimony or what to say here today?
14   A.   No.
15   Q.   Has anyone offered you anything for your testimony here
16   today?
17   A.   No.
18   Q.   From either the United States government or the Rwandan
19   government?
20   A.   No.
21   Q.   You're receiving a per diem during your stay here in the
22   United States; is that right?
23   A.   No.
24   Q.   You're receiving money for food?
25   A.   Yes.
```

J.A. 589

```
 1    Q.    Is there anything about receiving that money that affects
 2    your testimony here today?
 3    A.    No.
 4    Q.    Are you losing money by being here in the United States,
 5    Doctor?
 6    A.    Yes, I'm losing because I'm not at my work.
 7              MR. VARGHESE:  Thank you, Doctor.  I have no further
 8    questions.
 9              THE COURT:  Cross.
10                          CROSS-EXAMINATION
11    BY MR. LAUER:
12    Q.    Good afternoon.
13    A.    Good afternoon.
14    Q.    You told us that you grew up in Cyangugu?
15    A.    Yes.
16    Q.    Is that where you also attended your primary school?
17    A.    Yes.
18    Q.    And when it came time for you to move on to secondary
19    school, you went to the seminary?
20    A.    Yes.
21    Q.    And that was Petit Seminaire Saint Pie in Nyundo?
22    A.    Saint Pie in Nyundo.
23    Q.    And you mentioned that that is a seminary school and that
24    students had the option to become priests?
25    A.    Yes.
```

1    Q.    Were there many, many students who did, in fact, do that

2    and continue on to become priests?

3    A.    Yes, but those were few.

4    Q.    And part of the schooling was religious study, was it not?

5    A.    Yes.  It was one of the direct subjects.

6    Q.    And the people who were teaching the classes were priests?

7    A.    Some were priests.  Some others were not.

8    Q.    The students were graded based on their academic

9    performance?

10   A.    Yes.

11   Q.    Students were also graded based on their conduct?

12   A.    Yes.

13   Q.    In fact, conduct was very important?

14   A.    Yes.

15   Q.    The teachers and the priests did not tolerate people who

16   had poor conduct?

17   A.    Yes.

18   Q.    If a student misbehaved, that student could expect to be

19   dismissed?

20   A.    Yes.

21   Q.    And students were, in fact, graded and received a score

22   for their conduct in the classroom setting?

23         MR. VARGHESE:  Objection, your Honor.

24         THE COURT:  I'll allow it.  Overruled.

25   Q.    Were students scored on their conduct on their report

**J.A. 591**

1    cards?

2    A.    Yes.

3    Q.    You came to the seminary at Nyundo in 1986?

4    A.    Yes.

5    Q.    And you were one year behind Mr. Teganya, correct?

6    A.    Yes.

7    Q.    You mentioned that Nyundo, the school, had people from

8    different provinces, correct?

9    A.    Yes, but in the same diocese.

10   Q.    You yourself were from Cyangugu.  There were other

11   students from other places?

12   A.    Yes.

13   Q.    And the way students socialized tended to be that students

14   from the same region socialized together?

15   A.    Yes.

16   Q.    So you might socialize with other students from the west

17   and students from the north would socialize together?

18   A.    Yes, that was common.

19   Q.    And you explained to us that you were not friends with

20   Mr. Teganya, correct?

21   A.    Yes.

22   Q.    Your friends were from the western region?

23   A.    Yes, and south.

24   Q.    And were there staff members or -- excuse me -- were there

25   faculty that were Tutsis?

J.A. 592

```
 1   A.   Yes.

 2   Q.   In fact, there was quite a few priests and faculty that

 3   were Tutsi.

 4   A.   Yes.   They were Tutsis and Hutus.

 5   Q.   And there were also a fair amount of Tutsi students?

 6   A.   Yes, there were.

 7   Q.   And when you came there in 1986, that was well before the

 8   RPF invaded the north in 1990, right?

 9   A.   Yes.

10   Q.   And relations between students, Hutu students and Tutsi

11   students, at least prior to 1990, were normal?

12   A.   Yes.

13   Q.   In other words, there was not conflict between Tutsi

14   students and Hutu students prior to 1990?

15   A.   Yes, before 1990, when the war started.

16   Q.   In fact, if there were students who were persecuting other

17   students, with the emphasis on discipline, those students would

18   be disciplined?

19   A.   Yes.

20        MR. LAUER:  This might be a good time to break, your

21   Honor.

22        THE COURT:  Okay.  We'll break for the day.  Ladies

23   and gentlemen, please remember my cautions not to discuss the

24   case among yourself or with anyone else.  Don't read anything

25   about the case.  We'll see you tomorrow morning at 9:00.
```

J.A. 593

1           THE CLERK:  All rise.

2    (Court exits.)

3    (Jury exits.)

4    (1:01 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,        )
                                      )
5    vs.                              )  Criminal Action
                                      )
6    JEAN LEONARD TEGANYA,            )  No. 17-10292-FDS
                        Defendant     )
7                                     )
                                      )
8                                     )

9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                          JURY TRIAL DAY 6

12

13

14

15             John Joseph Moakley United States Courthouse
                          Courtroom No. 2
                         One Courthouse Way
16                        Boston, MA 02210

17

                            March 15, 2019
18                           8:30 a.m.

19

20

21

22

23                        Valerie A. O'Hara
                           Lee A. Marzilli
                        Official Court Reporters
24          John Joseph Moakley United States Courthouse
                        1 Courthouse Way, Room 3204
25                        Boston, MA 02210
                      E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;
5
     For the Defendant:
6
            Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.
8
     ALSO PRESENT:
9
     Augustin Mutemberezi, Interpreter
10   Moses B. Rndasunikwa, Interpreter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2   WITNESS                    DIRECT   CROSS  REDIRECT  RECROSS

3   ANICET NZABONIMPA
      By Mr. Lauer                        6
4     By Mr. Varghese                                      18

5   BERNARD KALIMBA
      By Mr. Garland          20
6     By Mr. Lauer                       32

7   JEROME ARUSHA
      By Mr. Varghese         41
8     By Mr. Lauer                       52

9   ASSUMPTA NUMUKOBWA
      By Mr. Varghese         64
10    By Mr. Lauer                       89

11

12

13                  Exhibit - None marked.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            PROCEEDINGS
 2              THE CLERK:  All rise.  Thank you.  You may be seated.
 3      Court is now back in session.
 4              THE COURT:  All right.  Good morning.  Anything from
 5      counsel's perspective we need to talk about?
 6              MR. GARLAND:  Nothing from the government.
 7              MR. LAUER:  No, your Honor.
 8              THE COURT:  How are we doing on scheduling,
 9      Mr. Garland?
08:44AM 10              MR. GARLAND:  We anticipate ending on time, maybe a
11      little early.
12              THE COURT:  Meaning you think we are on track?
13              MR. GARLAND:  We think we are on track.
14              THE COURT:  Do you think we need an afternoon session?
15              MR. GARLAND:  No, I don't.
16              THE COURT:  Do you disagree with that, Mr. Lauer?
17              MR. LAUER:  No, I don't.
18              THE COURT:  Any scheduling accommodations for
19      witnesses we need to talk about?
08:45AM 20              MR. GARLAND:  No, our witnesses are here or either
21      local or here because they came from Rwanda, so we're good.
22              THE COURT:  Okay.
23              MR. LAUER:  Our witnesses are slated to begin arriving
24      not this weekend but the following weekend, so we'll be ready
25      with witnesses starting on the 25th.
```

J.A. 598

```
 1              THE COURT:  Okay.  And just for planning purposes, you
 2     expect to rest when, ballpark?
 3              MR. GARLAND:  I think beginning Thursday or Friday.
 4              THE COURT:  Thursday or Friday of this week?
 5              MR. GARLAND:  Of next week.
 6              THE COURT:  Next week, sorry.  You'll have somebody
 7     ready to go if they rest on Thursday, let's say you'll have
 8     someone?
 9              MR. LAUER:  No, your Honor, our witnesses are, every
10     single one of them are coming from out-of-state and flying here
11     and all of the travel to begin arriving on Friday.
12              THE COURT:  Okay.
13              MR. LAUER:  So we would not have a witness on Friday
14     as it stands now.
15              THE COURT:  All right.  Okay.  I mean, if we need to
16     deal with that, we'll just deal with that, I don't know what
17     else to say.  I'd rather be ahead of ourselves rather than
18     behind.
19              Okay.  If there isn't anything else, we'll start as
20     soon as we have all the jurors.
21              THE CLERK:  All rise.
22              (A recess was taken.)
23              THE CLERK:  All rise for the jury.
24              (JURORS ENTERED THE COURTROOM.)
25              THE COURT:  All right.  Are you ready?  Do you
```

J.A. 599

```
1    understand that you are still under oath?

2              THE WITNESS:  Yes.

3              THE COURT:  All right.  Mr. Lauer.

4              MR. LAUER:  Thank you, your Honor.

5                   ANICET NZABONIMPA, RESUMED

6                        CROSS-EXAMINATION

7    BY MR. LAUER:

8    Q.   Good morning, sir.  When we stopped yesterday, I was

9    asking you some questions about your secondary school at

09:01AM 10   Nyundo.  Do you recall that?

11   A.   Yes.

12   Q.   Okay.  I just have a few more questions about that.  At

13   Nyundo every year there was a senior student selected to be the

14   dean of students, correct?

15   A.   Yes.

16   Q.   And there was another student that would be selected to be

17   vice dean, correct?

18   A.   Yes.

19   Q.   And the dean and the vice dean together represented the

09:02AM 20   student body in faculty meetings?

21   A.   Yes.

22   Q.   In order to become the dean or the vice dean, a student

23   had to be elected by their fellow classmates, correct?

24   A.   Can I explain about that?

25   Q.   Yes, please do.
```

1    A.   At times, there would be dean and vice dean who are

2    elected by students, and sometimes there would be a dean and

3    vice dean who are appointed by the school administration.

4    Q.   So I understand it, the dean and the vice dean could be

5    elected by students or they could be selected by the faculty?

6    A.   Yes.

7         MR. WATKINS:  May we approach sidebar?

8         MR. VARGHESE:  Your Honor, may we approach?  I think

9    we figured it out.

09:03AM 10         MR. WATKINS:  We thought we didn't have all the

11   jurors.  It made me nervous when I saw an empty seat.

12         MR. LAUER:  Everybody is here.

13   Q.   So I was asking you about the positions of dean and vice

14   dean.  It was something of a distinction to be either the dean

15   or the vice dean, was it not?

16   A.   I would explain also that.

17   Q.   Okay.  What did it mean to be the dean or the vice dean?

18   A.   To be dean or vice dean, at times you would campaign for

19   it and then be elected for it.

09:05AM 20   Q.   Okay.  And that was because the student body had a role in

21   selecting the dean and the vice dean, correct?

22   A.   As I said, at times, the administration would be electing

23   the dean and vice dean, and sometimes they had no need.

24   Q.   Okay.  Do you recall Mr. Teganya being elected vice dean?

25   A.   Yes, I remember he was vice dean.

**J.A. 601**

```
 1    Q.    Do you recall that he was also involved in the Red Cross?

 2    A.    I'm not sure about that.

 3    Q.    Were you a member of the Red Cross at Nyundo?

 4    A.    Can you repeat the question?

 5    Q.    Was there a student organization at Nyundo called the

 6    Red Cross?

 7    A.    Yes.

 8    Q.    Were you involved in that organization?

 9    A.    No.

10    Q.    Do you know generally what that organization did?

11    A.    I wasn't a member of the Red Cross group, but I don't know

12    about the group who would be involved in some first aid and

13    also some helping, charity work.

14    Q.    Do you remember Mr. Teganya was actually the president of

15    the Red Cross?

16    A.    No, I can't recall where.

17    Q.    Now, you explained yesterday that after you graduated from

18    Nyundo, you went onto the university in Butare, correct?

19    A.    Yes.

20    Q.    And by the time you arrived in Butare, Mr. Teganya was a

21    year ahead of you in the university?

22    A.    Yes.

23    Q.    And you and he were not friends?

24    A.    No.

25    Q.    He was essentially a classmate?
```

J.A. 602

```
 1    A.    No, we're not classmates because he was ahead of me one
 2    year.  Our classes, we were close but never in the same class.
 3    Q.    Okay.  So you were never in the same classroom together?
 4    A.    No.
 5    Q.    And you didn't eat together or socialize?
 6    A.    No.
 7    Q.    How many students approximately were in the medical
 8    school?
 9    A.    In the first year, which I was, 130, in the second year,
10    we were 60, and it went reducing.
11    Q.    And the reason it reduced from year to year is because it
12    was a demanding academic institution?
13    A.    There were various reasons for that.  There were some who
14    joined the first year and then failed the exam, and there were
15    those who after realizing it wasn't for them, it was hard, they
16    would just drop out.  Pursuing medical school is very, very
17    hard, and you had to sacrifice and be highly motivated.
18    Q.    Where were you living when you arrived at the medical
19    school?
20    A.    When I started, I was staying off campus, but later I
21    went, started living on the campus.
22    Q.    And when you lived off campus, how long was that for?
23    A.    About three months.
24    Q.    And then you moved to a dormitory on the campus?
25    A.    Yes.
```

```
 1    Q.    What dormitory did you live in?
 2    A.    I was staying in a dormitory called Cambodge.
 3    Q.    The Cambodge dormitory, that is on the university campus
 4    itself, correct?
 5    A.    Yes.
 6    Q.    And the university campus in Butare is actually some
 7    distance away from the faculty of medicine across the road?
 8    A.    Yes.
 9    Q.    Do you know where Mr. Teganya was living when you were
 10   living in the Cambodge dormitory?
 11   A.    I don't remember where.
 12   Q.    Do you remember who he was living with?
 13   A.    No, I can't recall.
 14   Q.    You testified that when you came to the university, it was
 15   during a time when there were many political activities
 16   occurring?
 17   A.    Yes.
 18   Q.    And you talked a lot about the MRND party, and you were
 19   shown some clothing from the MRND party.  Do you recall that?
 20   A.    Yes.
 21   Q.    And there were other parties active in Butare and in the
 22   university as well?
 23   A.    Yes.
 24   Q.    In fact, there were opposition parties, correct?
 25   A.    Yes.
```

09:11AM 10

09:12AM 20

# J.A. 604

```
 1    Q.    Parties like PSD, MDR, PL?

 2    A.    Yes.

 3    Q.    You testified that you, yourself, are from Cyangugu,

 4    correct?

 5    A.    Yes.

 6    Q.    And that's in the south and the west of the country?

 7    A.    Yes.

 8    Q.    And many people from that region, the southern region,

 9    were either moderates or opposition?

10    A.    Yes.

11    Q.    And you told us that you, yourself, were not political,

12    right?

13    A.    Yes.

14    Q.    But you were known to be from Cyangugu?

15    A.    Yes.

16    Q.    People who knew you were from Cyangugu, would they often

17    ask you whether you were opposition?

18    A.    No, I never used to attend those kind of -- expecting

19    those kind of conversations.

20    Q.    No, I understood you were not political yourself.  Was it

21    ever assumed that because you were from Cyangugu, you must be

22    opposition?

23    A.    Yes, but I wanted to say something on that.  Since I was

24    in the secondary school, I had some guiding principles, that's

25    what was my personal belief.  When I was in the second school,
```

09:14AM (line 10)
09:14AM (line 20)

J.A. 605

1    I never joined any stress group, whether scouting or some

2    catholic organization, I never joined any, and I'm almost the

3    only one who went to seminary.  I never joined any of those

4    groups.  When I joined the university, that's what I kept,

5    that's why I never joined any political party.

6    Q.    In terms of the general relations at the university,

7    students from the south and students from the north, there was

8    some tension, correct?

9    A.    Yes.

09:16AM 10    Q.    Students from the south considered students from the north

11    to be MRND?

12    A.    I don't know something.

13    Q.    Well, as a general matter, was there a perception that the

14    students from the north were MRND generally?

15    A.    I want to explain better.  There were two confessions.

16    There were conflict between the northerners and the

17    southerners, and that never depended on the political party or

18    the ethnicity, and that was because the ruling government at

19    that time was from the north and repressed the ruling people

09:18AM 20    from the south.

21    Q.    And the people from the south didn't like to be repressed

22    and didn't like northerners; is that fair as a general

23    statement?

24    A.    I'm not finished what I was saying.

25    Q.    Well, can you just answer my question, and then I'll ask

J.A. 606

```
 1    you another one.  As a general matter, did students from the

 2    south resent students from the north because the north was in

 3    power?

 4    A.    Yes.

 5    Q.    Okay.  And you explained that you have personal

 6    principles, correct?

 7    A.    I want to elaborate more on what I was saying.

 8    Q.    Well, sir, let me just ask you this.  You told us that you

 9    made a concerted effort not to be political because of your

09:19AM 10  personal principles, correct?

11    A.    May I say something?

12    Q.    Well, after I'm done speaking, the prosecutors will have

13    an opportunity to ask you questions, and you can say whatever

14    you want at that time, but right now I'd like you to answer my

15    questions.

16          So my next question is this.  Would it frustrate you

17    when students assumed your politics not knowing your personal

18    principles?

19    A.    Can you repeat the question clearly?

09:20AM 20  Q.    I'll try and make it simpler, I'm sorry.  You told us that

21    you had certain moral beliefs, principles that made you want to

22    stay out of politics; is that correct?

23    A.    Yes.

24    Q.    And, nonetheless, because of the political situation at

25    the time, northerners assumed southerners were opposition, and
```

        1    southerners assumed northerners were MRND?

        2              MR. GARLAND:  Objection, your Honor.

        3              THE COURT:  Sustained.  We're really talking about

        4    stereotypes here.

        5              MR. LAUER:  I'll ask a new question.

        6    Q.   You testified that you -- that there were regular

        7    meetings, political meetings, taking place in Butare?

        8    A.   Yes.

        9    Q.   And you talked about the MRND meetings in particular and

09:21AM 10   seeing students attending those meetings?

       11    A.   Yes.

       12    Q.   Those were not on the campus, correct?

       13    A.   There were some which would take place outside the campus

       14    and some would be on the campus.

       15    Q.   The meetings outside the campus, those would take place at

       16    a soccer stadium?

       17    A.   They would take place on different venues.

       18    Q.   Okay.  Where in the university campus would they take

       19    place?

09:22AM 20   A.   It was taking place in different venues.

       21    Q.   Like what?

       22    A.   There would be different sports fields.  There was the

       23    soccer stadium.  There would also be the meeting halls at

       24    different faculties.

       25    Q.   And so these meetings, were they taking place during the

```
 1    school day?
 2    A.    No, after school.
 3    Q.    On the weekends?
 4    A.    Yes.
 5    Q.    Or in the evenings?
 6    A.    Yes, possibly.
 7    Q.    But not when school was going on?
 8    A.    Yes.
 9    Q.    And you described yesterday that there would be large
10    numbers of people in the streets going to these meetings
11    wearing the clothing?
12    A.    Yes.
13    Q.    And occasionally either during or after a meeting, there
14    could be acts of violence taking place in the street, correct?
15    A.    Yes.
16    Q.    And I believe you said that it actually scared you to see
17    that sort of thing, correct?
18    A.    Yes.
19    Q.    You would try and stay away?
20    A.    Yes.
21    Q.    You had a meeting with investigators from the
22    United States in June of this year?
23          THE WITNESS:  This year or next year?
24    Q.    Excuse me, June of 2018.
25    A.    Yes, we met, but I don't recall the exact month.
```

J.A. 609

```
 1    Q.    You remember it was last year?

 2    A.    Yes.

 3    Q.    At the Marriott Hotel in Kigali?

 4    A.    Yes.

 5    Q.    How did that meeting come about?

 6    A.    They called me and they wanted to meet.  When we met, they

 7    asked me about the genocide, it was the genocide.

 8    Q.    Can I just take you back a step.  You said they called

 9    you.  Who specifically called you?

09:26AM 10   A.    I think it was called by their interpreter.

11    Q.    Do you recall that person's name?

12    A.    Yes.

13    Q.    Who is that?

14    A.    Nira.

15    Q.    You eventually learned that this case would have a trial?

16    A.    Yeah, later.

17    Q.    And you were asked to travel here to testify?

18    A.    Yes.

19    Q.    When did you arrive here in Boston?

09:27AM 20   A.    Last Friday.

21    Q.    So you've been here for one week?

22    A.    Yes.

23    Q.    And you testified that by coming here, you are losing

24    money, correct?

25    A.    That's apparent.
```

# J.A. 610

```
 1    Q.   Because you are a doctor and you have a practice?

 2    A.   Yes.

 3    Q.   And I think yesterday you said that you're in private

 4    practice, as a matter of fact?

 5    A.   Yes.

 6              MR. LAUER:  May I approach the witness, your Honor?

 7              THE COURT:  Yes.

 8    Q.   Sir, I'm showing you a document.  I'm just asking you to

 9    look at it for a moment and then look up at me when you are

09:28AM 10   done.  You recognize this document?

11    A.   Yes, I know it.

12    Q.   This is a copy of your LinkedIn profile?

13    A.   Yes, but this is not an updated one.

14    Q.   Okay.  Your LinkedIn profile lists your current position

15    as working for the Ministry of Health, does it not?

16    A.   Until September last year.

17    Q.   So until September of last year, you worked for the

18    Ministry of Health?

19    A.   Yes.

09:29AM 20   Q.   Meaning that at the time you met with the investigators in

21    this case, you were working for the Ministry of Health?

22    A.   Yes.

23    Q.   How long did you work for the Ministry of Health?

24    A.   Since 2008.

25              MR. LAUER:  May I have a moment, your Honor?
```

**J.A. 611**

```
 1                THE COURT:  Yes.

 2                MR. LAUER:  I have no further questions.

 3                THE COURT:  Redirect.

 4                MR. VARGHESE:  Just briefly.

 5                        REDIRECT EXAMINATION

 6       BY MR. VARGHESE:

 7       Q.   Good morning.

 8       A.   Good morning.

 9       Q.   I'm going to start with where Mr. Lauer picked up.

09:31AM 10       A.   Yes.

11       Q.   Can you explain the work that you did for the Ministry of

12       Health?

13       A.   I was working at the Ministry of Health as a secondary

14       staff.  Initially, I was working but being paid with the

15       Project Jhpiego, but I was a candidate of the Ministry of

16       Health.  I was working with the family planning project.

17       Q.   What was the specific focus of the work that you were

18       doing?

19       A.   My title was a technical advisor, and I was providing

09:32AM 20       technical assistance to the employees of Ministry of Health.

21       Q.   On what issues?

22       A.   That was training the hospital employees and providing

23       membership to the medical staff on the family planning

24       programs.

25       Q.   Did that also include work done on H.I.V. treatment?
```

J.A. 612

```
         1    A.    Yes, I was also providing the technical assistance on

         2    H.I.V. programs and also gender-based virus and also about

         3    mental health.

         4    Q.    Did anything about that work on family reproduction or

         5    H.I.V. affect your decision to come meet with investigators at

         6    the Marriott Hotel in Kigali?

         7    A.    No.

         8    Q.    Did anybody at the Ministry of Health tell you to come

         9    meet with the U.S. investigators?

09:34AM 10    A.    No.

        11    Q.    Did anybody at the Ministry of Health discuss with you

        12    your testimony here today?

        13    A.    No, I didn't inform anyone about my being here today.

        14    Q.    Mr. Lauer asked you some questions about whether or not

        15    folks in the south resented folks in the north.  Do you

        16    remember that question?

        17    A.    Yes.

        18    Q.    Did you resent people in the north?

        19    A.    No, I didn't hate them really.

09:34AM 20    Q.    Did you resent Mr. Teganya?

        21    A.    No.

        22          MR. VARGHESE:  Thank you, nothing further, Doctor.

        23          THE COURT:  Recross.

        24          MR. LAUER:  No, your Honor.

        25          THE COURT:  All right.  Thank you.  You may step down.
```

J.A. 613

```
 1              MR. GARLAND:  Your Honor, the defendant calls

 2      Bernard Kalimba to the stand.

 3              BERNARD KALIMBA, having been duly sworn by the Clerk,

 4      testified as follows:

 5                          DIRECT EXAMINATION

 6      BY MR. GARLAND:

 7      Q.   Good morning.  Can you tell the jury your name?

 8      A.   Kalimba Bernard.

 9      Q.   And what country are you from?

09:36AM 10     A.   Rwanda.

11      Q.   What town do you live in in Rwanda?

12              THE COURT:  Do you have a spelling of his name?

13              MR. GARLAND:  We have it up on your screen, your

14      Honor.

15              THE COURT:  It's not on mine.  Okay.  Thank you.

16      Q.   What town do you live in in Rwanda?

17      A.   I live in Kigali.

18      Q.   And Kigali is the capital of Rwanda?

19      A.   Yes.

09:37AM 20     Q.   Where did you grow up?

21      A.   I grow up in Kigali.

22      Q.   How old are you now?

23      A.   I'm 49 years old.

24      Q.   What do you do for a living?

25      A.   I'm a doctor.
```

J.A. 614

```
 1    Q.   How long have you been a doctor?

 2    A.   Twelve years.

 3    Q.   Do you have a specialty?

 4    A.   No.

 5    Q.   So you have a general practice then?

 6    A.   Yes.

 7    Q.   And where do you practice medicine?

 8    A.   In HVP Gatagara, Congo.

 9    Q.   Is that a hospital or a private practice?

09:38AM 10    A.   It's a hospital.

11    Q.   Where did you go to medical school?

12    A.   The National University in Butare.

13    Q.   What year did you start going to school at the National

14    University of Butare?

15    A.   In '91.

16    Q.   At the time, did you have an identity card?

17    A.   Yes, I had one.

18    Q.   And on your identification card, what ethnicity did it

19    list?

09:38AM 20    A.   Hutu.

21    Q.   In 1991, did you stay on campus or at a dormitory, I'm

22    sorry, off campus or a dormitory?

23    A.   I was on campus.

24    Q.   Did you live by yourself or did you have roommates?

25    A.   I had a roommate.
```

```
 1    Q.   Who is your roommate?

 2    A.   Teganya, Leonard.

 3    Q.   Were there any other students named Jean Leonard Teganya

 4    in your school at the time?

 5    A.   None.

 6    Q.   Can you describe briefly the setup of the room.

 7    A.   It was a medium room, we had two tables and two closets

 8    and two beds and a window and a door.

 9    Q.   Were you and Mr. Teganya in the same year of medical

09:40AM 10    school together?

11    A.   We were in the same year.

12    Q.   Did you take classes together?

13    A.   Yes.

14    Q.   And did you spend time together in the room?

15    A.   Yes, but not a big time.

16    Q.   Were you and Mr. Teganya friends?

17    A.   No.

18    Q.   Were you familiar at the time with the MRND party?

19    A.   I knew it.

09:41AM 20    Q.   Did you know how the MRND felt about Tutsis?

21    A.   Yes.

22    Q.   How did they feel about Tutsis?

23    A.   They exclude them.

24    Q.   Did you have Tutsi friends?

25    A.   Yes.
```

J.A. 616

```
 1   Q.   Were you a member of the MRND?

 2   A.   No.

 3   Q.   Did you belong to a political party?

 4   A.   I was an MDR.

 5   Q.   Did you know whether the MRND was active in Butare?

 6   A.   Can you repeat the question?

 7   Q.   Do you know whether the MRND was active in Butare?

 8   A.   Yes, they had.

 9   Q.   And how could you tell that they were active in Butare?

09:42AM 10   A.   They had members, they had meetings, they had rallies and

11   small meetings.

12   Q.   And was the MRND active on campus at the National

13   University?

14   A.   Yes.

15   Q.   And how could you see that the MRND was active on the

16   National University?

17   A.   You will see the members going to the meetings, and they

18   were very many.

19   Q.   Were you familiar at all with any clothing that the MRND

09:43AM 20   would wear?

21   A.   Yes.

22        MR. GARLAND:  With the Court's permission, I'll

23   approach the witness.

24   Q.   Dr. Kalimba, on the witness stand, you should have now

25   Exhibits 12 and 15.  Exhibit 12, the hat, have you seen that
```

J.A. 617

```
     1   before?

     2   A.   Yes, I saw that.

     3   Q.   What is it?

     4   A.   It's a hat that was worn by the members of MRND.

     5   Q.   And, Exhibit 15, have you seen that before?

     6   A.   Yes, I have seen it.

     7   Q.   What is it?

     8   A.   It's a flag of MRND.

     9   Q.   Did people from MRND ever carry that or wear it?

09:44AM 10  A.   They had these hats and small flags, not big like this.

    11   Q.   The people who -- did people wear the hats and the flags

    12   around campus then?

    13   A.   Yes.

    14   Q.   And were they faculty or students or outsiders who wore

    15   them?

    16   A.   All of them, students, employees, even some teachers would

    17   wear them.

    18   Q.   When you were roommates with Mr. Teganya, did he belong to

    19   a political party?

09:45AM 20  A.   He was an MRND.

    21   Q.   And how could you see that?

    22   A.   He had this hat and he had a scarf that he used to wear,

    23   and in our room he had a small flag.

    24   Q.   Did he keep the MRND clothing in the room as well?

    25   A.   Yes.
```

J.A. 618

```
 1    Q.    And did you see him wear it outside of the room?

 2    A.    I saw him.

 3    Q.    The flag that you mentioned about, what was the size of

 4    that?

 5    A.    It was small like this.

 6    Q.    And was that in the room as well?

 7    A.    Yes, it was there.

 8    Q.    Where was it kept in the room?

 9    A.    On top of the bed, it was hung there.

09:47AM 10    Q.    Did Mr. Teganya wear those things on a daily basis or only

11    on special occasions?

12    A.    Not every day, on a special occasion.

13    Q.    What were those special occasions?

14    A.    When there was a meeting or when they had the big rally,

15    they would wear those.

16    Q.    Did you ever attend an MRND rally?

17    A.    No.

18    Q.    By the way, when you mentioned that you were part of a

19    political party, did you have any special clothing for that

09:47AM 20    party?

21    A.    We had them.

22    Q.    What type of clothing?

23    A.    Our clothes had red color and black color.

24    Q.    And were they hats or scarves or T-shirts or what items?

25    A.    We had hat, scarves and flags.
```

**J.A. 619**

```
 1    Q.    Back then, did people wear MRND clothing if they didn't

 2    belong to that party?

 3    A.    No.

 4    Q.    Can you explain why not?

 5    A.    You will not easily access that because to get that, you

 6    had to be a member of the party, and the clothes were

 7    distributed by the leader, and he would distribute those the

 8    people he's leading.

 9    Q.    So could you buy MRND clothing at a store?

09:49AM 10    A.    No, it was not possible.

11    Q.    Did you ever see MRND members after they had returned from

12    political rallies?

13    A.    Yes.

14    Q.    How could you see that they had come from a rally?

15    A.    They would be wearing those clothing, and they would be

16    gathered together having a drink.

17    Q.    And how would they act afterward?

18    A.    When they are coming from there, you could not easily go

19    and join them, they could easily hurt you.

09:50AM 20    Q.    Did you see Mr. Teganya with people with other MRND

21    members after political rallies?

22    A.    Yes.

23    Q.    And was that behavior typical of Mr. Teganya as well?

24    A.    He will look happy.

25    Q.    You said that published members would often go for a drink
```

J.A. 620

```
 1    afterwards.  Was there any particular place?
 2    A.    The bars at the campus and in the canteen.
 3    Q.    Did anything significant happen after one of these
 4    post-rally meetings at a bar with the MRND?
 5    A.    Repeat the question, counselor.
 6    Q.    Did anything significant happen after one of these
 7    post-rally bar meetings of the MRND?
 8    A.    One day, there was an act of violence, inciting violence
 9    with one of our friends.
10    Q.    What happened?
11    A.    He was going down, coming home.
12          MR. LAUER:  Objection, your Honor.  It's not clear
13    whether this is hearsay or not.
14          THE COURT:  A fair point.  Why don't you lay a
15    foundation to see if he has personal knowledge.
16          MR. GARLAND:  Yes, your Honor.
17    Q.    Did you see the initial act of violence?
18          MR. LAUER:  Objection.  It assumes facts not in
19    evidence.
20          THE COURT:  All right.  Rephrase.
21    Q.    Were you summoned to any of the bars after the meeting
22    that you were just referring to?
23    A.    Repeat the question.
24    Q.    Yes.  Did you go to one of the bars after one of these
25    meetings?
```

```
 1    A.    We could meet there and went there to help our friend.

 2    Q.    Why did you go there?

 3    A.    Someone asked for our help in saying that they took away

 4    his bicycle.

 5    Q.    When you got there, what did you see?

 6    A.    When we got there, we found out they took away his

 7    bicycle, and we took it away from them, and we left.

 8    Q.    So you can tell the jury whose bicycle was being taken at

 9    that time?

09:53AM 10    A.    It was the bicycle of Kabalisa Tharcisse.

11    Q.    Is he Hutu or Tutsi?

12    A.    He was a Tutsi.

13    Q.    When you got to the scene, did you see Kabalisa there?

14    A.    He was there.

15    Q.    And were there people, other people there near him?

16    A.    They were there.

17    Q.    And who were the people who were near him?

18    A.    The members of MRND.

19    Q.    Was Mr. Teganya there?

09:54AM 20    A.    He was there.

21    Q.    Were the members of the MRND saying anything to

22    Mr. Kabalisa or to you?

23    A.    When I got there, he was rushing them or fighting with

24    them trying to get back his bicycle.

25    Q.    And then what happened when you got there?
```

J.A. 622

```
 1    A.   We got there, but it was just not me, we were a group of
 2    people, and we were going there to help him.  When we got
 3    there, it didn't take long, they give him his bike.
 4    Q.   When you got there, were there any other Tutsis with
 5    Mr. Kabalisa?
 6    A.   They were not there.
 7    Q.   After the first year of medical school, did you continue
 8    to room with Mr. Teganya?
 9    A.   No.
10    Q.   Why not?
11    A.   Those were in charge of students are the ones who did the
12    listing of how the students will continue rooming with each
13    other.
14    Q.   Did you in the -- did you stay in school through 1994?
15    A.   Yes.
16    Q.   Did you still see Mr. Teganya around campus and in
17    classes?
18    A.   Yes.
19    Q.   During those years, did you still see him wearing MRND
20    clothes?
21    A.   I would see him.
22    Q.   And did you also see him during those years still
23    attending or coming back from MRND rallies?
24    A.   Every time they would have a rally or meetings, he would
25    attend.  There was no day he missed.
```

09:55AM 10
09:56AM 20

            1    Q.    Did you meet with prosecutors back in June of 2018?

            2    A.    Yes.

            3    Q.    Do you recall how the meeting was arranged?

            4    A.    I remember.

            5    Q.    How was it arranged?

            6    A.    I was called by an individual, and he told me he works for

            7    the American embassy, and she told me that there was a team of

            8    Americans who were in Rwanda, and she told me that they would

            9    like to talk to me so I can tell them the history of what

09:58AM    10    happened at the University of Rwanda at the genocide.

           11    Q.    During that meeting, did anybody discuss covering your

           12    travel expenses or witness fees or any sort of payment?

           13    A.    They didn't tell me that.

           14    Q.    At what point did you learn about that your hotel, travel,

           15    food and a standard witness fee would be paid to you?

           16    A.    Can you repeat that?

           17    Q.    At some point, did you learn that the United States

           18    Government would pay for your travel here?

           19    A.    At the last minute when we got to the embassy, they give

09:59AM    20    us the flight ticket.

           21    Q.    And at some point, did you learn that the government would

           22    be -- the United States Government would be paying for food and

           23    for hotel?

           24    A.    Yes.

           25    Q.    And when was that?

# J.A. 624

```
 1    A.    When we got here.

 2    Q.    At some point, did you learn that you would get a standard

 3    witness fee for the days that you were in the U.S.?

 4    A.    No.

 5    Q.    At the meeting in June of 2018, were there any Rwandan

 6    government officials attending?

 7    A.    Nobody was there.

 8    Q.    Did you visit the courthouse at any time before today?

 9    A.    Yes, we came here once.

10    Q.    Was that by yourself or with a group?

11    A.    We came as a group.

12    Q.    And who is the "we," who was in the group?

13    A.    The people that I came with.

14    Q.    And during that time, were you asked whether you would

15    meet with -- or were you informed that Mr. Teganya's lawyers

16    wanted to meet with the government's witnesses?

17    A.    They informed us that.

18    Q.    Okay.  Has anybody in Rwanda told you what to say or what

19    not to say at this hearing today?

20    A.    No.

21    Q.    Has anybody in Rwanda told you whether to come or not to

22    come to the United States?

23    A.    No, none.

24    Q.    Before you got on the witness stand, were you worried

25    about how anybody in Rwanda would treat you based on your
```

10:00AM (line 10)
10:01AM (line 20)

## J.A. 625

```
 1    testimony here today?

 2    A.    Repeat the question, please.  Can you repeat the question?

 3    Q.    Are you worried about what anybody will say when you get

 4    back to Rwanda because of your testimony?

 5    A.    No.

 6              MR. GARLAND:  No further questions, your Honor.

 7              THE COURT:  Cross.

 8                          CROSS-EXAMINATION

 9    BY MR. LAUER:

10    Q.    Good morning.

11    A.    Good morning.

12    Q.    You were Mr. Teganya's roommate for one year?

13    A.    Yes.

14    Q.    It was your first year of medical school?

15    A.    Yes.

16    Q.    Medical school was difficult?

17    A.    It was difficult.

18    Q.    There's a lot of studying involved?

19    A.    Yes.

20    Q.    Mr. Teganya worked very hard studying, didn't he?

21    A.    Yes.

22    Q.    He was a good student?

23    A.    Yes, he will pass his classes.

24    Q.    You mentioned that you and he were not friends?

25    A.    Yes.
```

J.A. 626

```
 1    Q.    You shared a room?

 2    A.    Yes.

 3    Q.    But you never formed a friendship?

 4    A.    Yes.

 5    Q.    In fact, the reason why you didn't form a friendship was

 6    because he didn't approve of your drinking?

 7    A.    That's not the reason.

 8    Q.    Did you drink a lot of alcohol during that time period?

 9          MR. GARLAND:  Objection.

10:04AM 10          THE COURT:  Let me see counsel at sidebar.

11          (THE FOLLOWING OCCURRED AT SIDEBAR:)

12          THE COURT:  The objection is?

13          MR. GARLAND:  How it's relevant.

14          MR. LAUER:  It goes to bias.

15          THE COURT:  Bias.

16          MR. LAUER:  So they were roommates.  I have a good

17    faith basis that the reason they were not friends and they did

18    not get along is because this man was drinking all the time and

19    it affected my client's studies.

10:04AM 20          THE COURT:  But, I, mean if he's intoxicated, that

21    would obviously affect his ability to perceive events, but I

22    don't hear you saying that, instead he's biased against the

23    defendant because --in other words, your argument is that the

24    defendant is biased against him, he's angry because it's

25    affecting his studies, but how does it show the witness's bias
```

1    against the defendant?

2              MR. LAUER:  They didn't get along, and the reason they

3    didn't along is because of the drinking, and as you mentioned

4    it as well, it certainly does go to his ability to make the

5    observations he's claiming to have made.

6              THE COURT:  Well, if he did perceive.  All right.  I'm

7    going to let you go a little bit down this path, I'll overrule

8    it, but pick your questions carefully.  It's not simply

9    character attack, so to speak, it has to go to credibility.

10:05AM 10              (SIDEBAR CONFERENCE WAS CONCLUDED)

11              THE COURT:  Go ahead.

12    Q.   How often were you drinking alcohol when you were living

13    with Mr. Teganya?

14    A.   I cannot remember how many numbers of alcohol I was

15    drinking at that time.

16    Q.   Were you drinking a lot?

17    A.   No.

18    Q.   Were you drinking to the point of intoxication?

19    A.   No.

10:06AM 20    Q.   Never?

21    A.   Never.

22    Q.   For the entire year that you spent on the college campus

23    living with Mr. Teganya, you never drank to the point of

24    intoxication?

25    A.   No.

J.A. 628

```
 1   Q.   Did Mr. Teganya ever express his disapproval of the amount
 2   of your drinking?
 3           MR. GARLAND:  Objection.
 4           THE COURT:  I'll allow it.  Overruled.
 5   Q.   I'll ask the question again.  Did Mr. Teganya ever express
 6   your disapproval of your drinking?
 7   A.   No, not at all.
 8   Q.   You testified about a number of observations you made
 9   while living with Mr. Teganya?
10   A.   Yes.
11   Q.   You mentioned seeing him wearing clothing associated with
12   the MRND?
13   A.   Yes.
14   Q.   You also mentioned a flag?
15   A.   Yes.
16   Q.   And you told us that that flag was something he kept out
17   in the room close to his bed?
18   A.   Yes.
19   Q.   You were asked some questions about an interview you did
20   in June with the investigators from the United States?
21   A.   Yes.
22   Q.   You remember that interview?
23   A.   I remember.
24   Q.   It was at the Kigali Marriott?
25   A.   Yes.
```

J.A. 629

```
 1    Q.   And you were interviewed for well over an hour?

 2    A.   Yes.

 3    Q.   Asked many questions about Mr. Teganya specifically?

 4    A.   Yes.

 5    Q.   During that interview, you never said anything about there

 6    being an MRND flag near his bed?

 7    A.   I said it.

 8    Q.   Your testimony is that you did tell investigators about

 9    that during that meeting?

10    A.   I said it.

11    Q.   I want to return to this incident involving Mr. Kabalisa.

12    Do you know Mr. Kabalisa?

13    A.   Yes, I know him.  He was my fellow student.

14    Q.   He was a friend?

15    A.   He was a friend of mine.

16    Q.   And you said that there was an incident in a bar where he

17    was having a problem with his bicycle?

18    A.   Yes.

19    Q.   His bicycle had been taken from him; is that correct?

20    A.   Yes.

21    Q.   And how was that brought to your attention?

22    A.   It was because I found them having the bicycle.

23    Q.   Well, I think the prosecutor asked you if you were

24    summoned to the bar.  Do you recall being asked that question?

25    A.   Yes.
```

J.A. 630

```
 1    Q.    Who summoned you?

 2    A.    Another student that we were going to school called.

 3    Gakwa LaMonzon.

 4    Q.    And you said a group of your fellow students then went to

 5    the bar together?

 6    A.    Yes.

 7    Q.    And how many of you and your fellow students went to the

 8    bar together?

 9    A.    I don't remember the number specifically but approximately

10    five.

11    Q.    Okay.  And these were all friends of yours?

12    A.    Yes.

13    Q.    And when you got to the bar, you saw there was some sort

14    of conflict between Mr. Kabalisa and others?

15    A.    Yes.

16    Q.    And the conflict was about a bicycle?

17    A.    Yes, because of that bicycle.

18    Q.    When you arrived, was Mr. Kabalisa holding his bicycle?

19    A.    No, he was not holding it.

20    Q.    Was someone else holding his bicycle?

21    A.    Yes.

22    Q.    Who was holding his bicycle?

23    A.    Another member of the other group.  I don't remember his

24    name.  It's been a long time.

25    Q.    Okay.  And the issue or the conflict was that the bicycle
```

10:11AM (line 10)
10:12AM (line 20)

**J.A. 631**

```
 1    was not being returned?

 2    A.   Yes, it's because he came and they took his bike,

 3    surprisingly.

 4    Q.   And when you arrived with a few other of your friends, the

 5    bike was returned?

 6    A.   Yes, they returned the bicycle.  It didn't take long.

 7    Q.   And you testified that Mr. Teganya was present for this?

 8    A.   Yes.

 9    Q.   Was he the one who had taken the bicycle?

10:13AM 10    A.   No.

11    Q.   Did you see him do or say anything during this incident?

12    A.   No, he didn't say anything at that time.

13    Q.   Who were the MRND members who were present with

14    Mr. Teganya?

15    A.   They were his friends.  I don't remember them right now.

16    I can't say who it was.

17    Q.   So Mr. Teganya is the only one you can name?

18    A.   That's the one I remember.

19    Q.   Okay.  Sir, when you were interviewed in June, this

10:14AM 20    incident at the bar came up?

21    A.   Yes.

22    Q.   Investigators asked you many questions about it?

23    A.   Yes.

24    Q.   And you told them that Kabalisa was attacked by MRND

25    members including Teganya?
```

```
         1    A.    Yes.

         2    Q.    That wasn't true?

         3    A.    It was true.

         4    Q.    So, do you recall also telling the investigators that

         5    Kabalisa fled and was being chased by Teganya and other members

         6    of the MRND?

         7    A.    He didn't flee, he stayed there, and we met him there.

         8    Q.    Okay.  You told the investigators in June that he fled,

         9    right?

10:15AM 10    A.    I don't recall telling them that he fled.

        11    Q.    This Kabalisa, you were friendly with him at the

        12    university?

        13    A.    Yes.

        14    Q.    Are you still friendly with him to this day?

        15    A.    We are still friends.

        16    Q.    How often do you see each other?

        17    A.    Not so often.  He's the hospital administrator, so I

        18    barely see him.

        19    Q.    Do you speak to him by phone or electronically?

10:16AM 20    A.    Once in a while.

        21    Q.    Have you spoken to him about this incident at the bar and

        22    Mr. Teganya?

        23    A.    No, we never talked about that because he knew that.  He

        24    knows that.

        25    Q.    Are you familiar with someone named Jerome Arusha?
```

J.A. 633

```
 1    A.   I know him.

 2    Q.   How do you know him?

 3    A.   He was my fellow student, too, in the first year.

 4    Q.   And he was friendly with you?

 5    A.   Yes, but we knew each other when we get to the university.

 6    Q.   What would you and Mr. Arusha do together at the

 7    university?

 8    A.   Nothing we do together.

 9    Q.   You didn't socialize?

10:17AM 10   A.   Can you rephrase the question like what did they do now or

11    what did they do then?

12    Q.   I'll ask a better question.  When you were a first year

13    student at the university, you were friends with Jerome Arusha?

14    A.   Yes.

15    Q.   And you remained friends with him during your subsequent

16    years at the school?

17    A.   Yes.

18    Q.   And you're still friends with him today?

19    A.   Even now we're friends.

10:18AM 20   Q.   When you were friends with him in Butare during school,

21    what did you do together?

22    A.   We would study together and do a study group together.

23    Q.   Would you drink together?

24    A.   Yes.

25    Q.   Not to the point of intoxication though?
```

J.A. 634

```
 1   A.    There was no way we could escape it because we had work
 2   subjects to do.
 3   Q.    So you and Mr. Arusha were very moderate in your drinking?
 4   A.    Yes, it was moderate.
 5              MR. LAUER:  Can I have a moment, your Honor?
 6              THE COURT:  All right.
 7              MR. LAUER:  I don't have any further questions for
 8   this witness.
 9              THE COURT:  Redirect.
10              MR. GARLAND:  No further questions, your Honor.
11              THE COURT:  All right.  Thank you.  You may step down.
12              MR. VARGHESE:  The United States calls Jerome Arusha.
13              Your Honor, I think we need a moment.
14              THE COURT:  While we have a break, ladies and
15   gentlemen, I should have explained.  Jurors sometimes are
16   curious about who these people are over here at the table.
17   They are my law clerks or interns.  Law clerks are recent
18   graduates of law school, very, very smart people, and interns
19   are current law students at local law schools who work part
20   time.
21              JEROME ARUSHA, having been duly sworn by the Clerk,
22   testified as follows, through the Interpreter:
23                          DIRECT EXAMINATION
24   BY MR. VARGHESE:
25   Q.    Good morning.
```

J.A. 635

```
 1    A.   Good morning.
 2    Q.   Can you please introduce yourself to the jury.  What is
 3    your name?
 4    A.   Jerome Arusha.
 5    Q.   Mr. Arusha, where are you from?
 6    A.   Rwanda in Nyamagabe, Rwanda.
 7    Q.   Where do you currently live?  Just the city.
 8    A.   I live in Kigali.
 9    Q.   Are you currently employed?
10    A.   No, I'm a businessman.
11    Q.   What business do you own?
12    A.   I have a company called Giro Limited, which does
13    environmental management and architectural services.
14    Q.   Sorry, what was the name?
15    A.   Giro Limited.
16    Q.   And it does, I'm sorry, can you repeat the answer?
17    A.   Yes, which it does environmental management and
18    architectural services.
19    Q.   What part of Rwanda did you grow up in?
20    A.   In southern region, Nyamagabe.
21    Q.   Did you carry an identity card back in 1994?
22    A.   Yes, I had it.
23    Q.   What ethnic group was listed on your identity card?
24    A.   Hutu.
25    Q.   Mr. Arusha, are you familiar with an individual named
```

**J.A. 636**

```
        1    Jean Leonard Teganya?

        2    A.   Yes, yes, I know him, I went to school with him, we met at

        3    the university in 1991.

        4          MR. VARGHESE:  Excuse me, we're having difficulty

        5    hearing the witness over here.

        6          MR. WATKINS:  Or if the witness can speak up.

        7    Thank you.

        8    Q.   How old were you in 1991?

        9    A.   Twenty-one.

10:26AM 10    Q.   What part of the university were you studying in?

       11          THE INTERPRETER:  Can I ask counsel to repeat?

       12          THE COURT:  Yes.

       13    Q.   What department in the university?

       14    A.   I was the medical school.

       15    Q.   Was Mr. Teganya in the same year as you?

       16    A.   Yes, we started the first year together.

       17    Q.   What about your second and third years?

       18    A.   We went -- we started together also in the second year,

       19    but in the third year, I repeated the second year, and they

10:27AM 20    proceeded, Teganya proceeded.

       21    Q.   Were you friends?

       22    A.   We were classmates, but we didn't have any special

       23    friendship.

       24    Q.   How often did you see him?

       25    A.   Since we were classmates, I would see him almost every day
```

J.A. 637

```
 1    of school.

 2    Q.   Did you know where he was from?

 3    A.   Yes, I knew he came from the north.

 4    Q.   Do you know where?

 5    A.   I think it was Gisenyi.

 6    Q.   That first year, where did you live?

 7    A.   I was staying in a dormitory behind the college faculty.

 8    Q.   What room were you in?

 9    A.   I was staying in the Room 208.

10    Q.   Do you know where Mr. Teganya lived his first year on

11    medical school?

12    A.   Yeah, our rooms were on the same line, and he lived in

13    202, and I live in 208.

14    Q.   Did you ever go to his room?

15    A.   Yes, because his roommate was a person I used to hang out

16    with called Kalimba Bernard.

17    Q.   How frequently would you go to his room?

18    A.   It wasn't frequent, but I would say like in a week, once

19    or twice.

20    Q.   Did you ever hang out with Mr. Teganya?

21    A.   You mean hang out chatting?

22    Q.   Did you ever socialize with him, do things with him?

23    A.   No.

24         MR. VARGHESE:  Your Honor, one second.

25    Q.   Just to be clear, did you ever socialize with Teganya?
```

10:28AM (line 10)
10:30AM (line 20)

**J.A. 638**

1    A.    No, the only things we used to meet was around the faculty

2    when we are on the break or when we are just waiting for

3    another professor to come to class.

4    Q.    Why didn't you socialize with Teganya?

5    A.    Yes, the reason I would say it was because when we were at

6    the university, people used to hang out in the groups, and

7    these groups depended which school they went to, which region

8    they came from, or some other common things they had before.

9    Q.    Who were Mr. Teganya's group of friends?

10:32AM 10    A.    We mostly hang around the fellows from the northern area.

11    Q.    Did you observe him having any Tutsi friends?

12    A.    When we were at the university?

13    Q.    Yes.

14    A.    No, none.

15    Q.    Did you live -- what was the dorm you lived in your second

16    year?

17    A.    I was staying in Cambodge.

18    Q.    Was Mr. Teganya living in that dorm as well?

19    A.    Yes.

10:33AM 20    Q.    What about the third year, the next year, what dorm were

21    you living in?

22    A.    Because I had repeated, I stayed in Cambodge, and then

23    they went to Kiza.

24    Q.    Where was the Kiza dorm located?

25    A.    It's in the University Hospital, Butare on the side of the

```
 1    University Hospital.

 2    Q.   Back in 1991 and 1992, when you started at the medical

 3    school, did you join a political party?

 4    A.   Yes.

 5    Q.   What political party were you involved in?

 6    A.   I was MDR.

 7    Q.   Was Mr. Teganya in a political party?

 8    A.   Yes.

 9    Q.   What political party was Mr. Teganya in?

10    A.   He was MRND.

11    Q.   How do you know?

12    A.   He used to be with a group of MRND, and also he would wear

13    their party colors.

14    Q.   What kinds of party colors did you see him wearing?

15    A.   The parties hat symbols, he would wear the colors of MRND

16    and also the scarves MRND.

17         MR. VARGHESE:  Your Honor, may I approach?

18         THE COURT:  Yes.

19    Q.   Mr. Arusha, I just handed you Exhibits 12 and 15, which

20    are already in evidence.  Do you recognize them?

21    A.   Yes, I do.

22    Q.   What are they?

23    A.   This is the hat that people in MRND used to wear, and this

24    is the scarf they used to wear around their neck.

25    Q.   Did you ever see Mr. Teganya wearing that clothing?
```

J.A. 640

1    A.    Yes, the first time I saw him wearing it is when

2    President Habyarimana came to receive an honorary degree at the

3    university from Laval University.

4         THE COURT:  Can I make sure he's speaking into the

5    mic. as well as the interpreter?

6         THE WITNESS:  Should I repeat?

7         THE COURT:  No, go ahead.

8    Q.    Mr. Arusha, please remember speak into the microphone.

9    Can you tell us about that event that you were just talking

10:37AM 10    about when President Habyarimana came to get an honorary degree

11    at the university?

12    A.    On that day when Habyarimana came to receive his honorary

13    degree from Laval University in Canada, it was a very big event

14    at the campus.  On that day, all the students at the university

15    because at that time it was during a heated period of political

16    party activities, every student puts on their party uniform.

17    Q.    And did you wear your MDR uniform?

18    A.    Yes, I was wearing MDR clothing, and people from MRND were

19    also wearing MRND clothing, and people from PSD and PL were

10:39AM 20    also wearing their party clothing.

21    Q.    And did you observe Mr. Teganya wearing MRND clothing?

22    A.    Yes.

23    Q.    Was that the only time you saw Mr. Teganya wearing MRND

24    clothing?

25    A.    No, even some other days, he would wear the MRND uniform,

**J.A. 641**

1   but that was a significant day because every student put on the

2   party uniform.

3   Q.   Did you ever see Mr. Teganya attending meetings or rallies

4   of MRND?

5   A.   Yes, at times, there would be some MRND events, and they

6   would wear the party symbols, and he was coming from the

7   meeting.

8   Q.   Did you ever see him with other MRND members?

9   A.   Yes.

10:40AM 10   Q.   Was that something you saw frequently?

11   A.   Yes, and some time would be during the student's body

12   campaigns and because people campaigned along the party lines,

13   so everybody, they would put on the colors of the party they

14   support and the candidates.

15   Q.   Was Mr. Teganya actively involved in the MRND party on

16   campus?

17   A.   I do not know his alliance to the party, but he used to

18   hang around the important people in the party.

19   Q.   Did you have a sense for whether or not he was a leader in

10:42AM 20   the party?

21   A.   I'm not sure because I never attended the meetings, and I

22   didn't know who they elected for what, but going by the people

23   he used to be with, he seems to be somewhat important or with

24   responsibility.

25   Q.   I'm sorry, what was the last part?

J.A. 642

```
 1   A.   He looked somewhat important or with responsibility.

 2   Q.   Did you ever see the MRND group become violent?

 3   A.   The only instance I could recall is something that

 4   happened across the university, but it was just a minor

 5   squabble, there wasn't any fight or violence.

 6   Q.   What about after rallies?  How did the MRND members act

 7   following rallies?

 8   A.   That happened at one of the bars, which was in front of

 9   the place.  This was owned by one of the doctors who was a

10   fourth-year medical student, and he was a member of MRND, and

11   people from the meeting always used to hang out there after to

12   drink after the meeting.  That's where those instances would

13   happen.

14   Q.   What instances?

15   A.   So what happened, there was one evening, people were

16   coming from the meeting.  When they got there, they start

17   gathering.  The only thing I remember was the guy called

18   Kabalisa, when he got there, they took his bike, and they

19   wanted to beat him, but he ran away.

20   Q.   Why was Kabalisa's bike taken?

21        MR. LAUER:  Objection, your Honor.  I'm not sure

22   there's a foundation that's been laid for this.

23        THE COURT:  Yes, sustained without foundation.

24   Q.   Were you at that incident, Mr. Arusha?

25   A.   Yes, I was there.
```

J.A. 643

```
 1    Q.   Did you see Mr. Kabalisa being harassed by the MRND

 2    members?

 3              MR. LAUER:  Objection.

 4              THE COURT:  I'll allow that.  Overruled.

 5    A.   What they say, they took over his bike.

 6    Q.   Were you aware of Mr. Kabalisa's ethnicity?

 7    A.   He was a Tutsi.

 8    Q.   Were you aware of why the MRND members took away

 9    Mr. Kabalisa's bike?

10    A.   No, I don't know, but Kabalisa was coming from the town,

11    coming back to the campus, and he was wearing the party symbol

12    of PL, which was a predominantly Tutsi party.

13    Q.   Had there been other incidents between MRND and PL, the

14    liberal party?

15    A.   The day when the President of Habyarimana to receive his

16    Honorary degree at the university, the party members of MRND,

17    they went grabbing the symbols of PL members, like hats and the

18    other symbols, and they burned them near the cafeteria.

19    Q.   Did you see that?  Did you observe that?

20    A.   Yes.

21    Q.   Was Mr. Teganya there?

22    A.   No, I didn't observe him being there.  I don't recall, but

23    on that day he was wearing also the MRND party symbols.

24    Q.   Mr. Arusha, has anyone forced or coerced your testimony

25    here today?
```

**J.A. 644**

```
 1    A.    Here?

 2    Q.    Yes.

 3    A.    No.

 4    Q.    Has anyone pressured you in any way regarding your

 5    testimony?

 6    A.    No.

 7    Q.    Do you have any concerns about what will happen to you

 8    when you return to Rwanda following your testimony?

 9    A.    No.

10:50AM 10  Q.    Has the government of Rwanda spoken to you about your

11    testimony or what to say or not to say here today?

12    A.    No, I don't work for the government.

13    Q.    Has anyone offered you anything for your testimony, either

14    the U.S. Government or the Rwandan Government?

15    A.    No.

16    Q.    Are you receiving per diem money for food during your stay

17    here in the United States?

18    A.    Yes.

19    Q.    And the U.S. Government paid for your flight and your

10:50AM 20  hotel while you're here?

21    A.    Yes, they had to because I wasn't homeless.

22    Q.    Is there anything about receiving that money that affects

23    your testimony here today?

24    A.    No, they give me $100.  I make more than that.

25          MR. VARGHESE:  Thank you.  I have nothing further.
```

**J.A. 645**

```
 1            THE COURT:  Cross.
 2                    CROSS-EXAMINATION
 3   BY MR. LAUER:
 4   Q.   Good morning.
 5   A.   Good morning.
 6   Q.   I'd just like to pick up where Mr. Varghese left off.  Did
 7   you just tell us that $100 in the United States currency means
 8   nothing to you?
 9   A.   What I meant, I make more than $100 a day.
10   Q.   I'd like to hear more about your work.  Can you describe
11   again what your business is?
12   A.   I have a company that deals with the environmental issues.
13   Q.   And what services does your company provide?
14   A.   We manage all lower lying areas with planting, for
15   forests, and also we dig terraces.
16   Q.   Okay.  And to do that, you have contracts?
17   A.   Yes.
18   Q.   Do you have contracts with the government?
19   A.   Yes, there are some contracts I do for government and some
20   that I do for others.  Yes, when they put up the contracts, I
21   bid.
22   Q.   Did you work for the Ministry of Agriculture?
23   A.   Yes, I worked there for nine years.
24   Q.   And when did you leave the Ministry of Agriculture?
25   A.   I don't remember well, but it was around 2009 or 2010.
```

10:52AM (line 10)
10:53AM (line 20)

**J.A. 646**

```
 1    Q.   And the experience that you had with the Ministry of
 2    Agriculture helped you start your own business?
 3    A.   Yes.
 4    Q.   You told us that you attended medical school starting in
 5    1991?
 6    A.   Yes.
 7    Q.   And your first year you lived in the Linda dormitory?
 8    A.   Yes.
 9    Q.   And your second year you lived in Cambodge?
10:55AM 10    A.   Yes.
11    Q.   And then I believe you said you had to repeat a year; is
12    that correct?
13    A.   Yes.
14    Q.   Did you actually have to leave the medical school?
15    A.   Yes, when I went back to the university because after the
16    war, I had been out of the university for some time, I found
17    they had made some changes in the medical school, so the
18    university just had me to go in the agriculture.
19    Q.   So the first year, 1991, you were in high school, correct?
10:56AM 20    A.   Yes.
21    Q.   Your second year starting in 1992, were you still in
22    medical school?
23    A.   Yes.
24    Q.   Your third year, starting in 1993, you were still in
25    medical school?
```

**J.A. 647**

```
 1    A.   Yes.  That all happened when I repeated.

 2    Q.   So, it's your testimony that you remained in medical

 3    school in 1991, 1992 and 1993?

 4    A.   Yes, until 1996, when Habyarimana's plane was shot, I was

 5    on school break but still in the medical school.

 6    Q.   Okay.  How did you spend your time when you were at the

 7    university?

 8    A.   Which time?

 9    Q.   Well, let me ask you this.  Did you study a lot?

10:57AM 10   A.   Yes, I was studying, that's all I was supposed to do

11    there.

12    Q.   Did you have a nickname, "Inzoga"?

13    A.   Me?

14    Q.   Yes.  Were you sometimes called "Inzoga"?

15    A.   My first time hearing it now.

16    Q.   The first time you're hearing the word, "inzoga"?

17    A.   No, the word "inzoga" is a Rwandan word which means,

18    "alcohol."

19    Q.   And it's your testimony that no one referred to you as

10:58AM 20   "Inzoga"?

21    A.   You're the one.

22    Q.   For now.

23         MR. VARGHESE:  Objection, your Honor.  Motion to

24    strike.

25         THE COURT:  I'll strike it.  The jury will disregard
```

J.A. 648

1    it.

2    Q.    Did you socialize with Mr. Kalimba, Bernard?

3    A.    Yes, we were classmates.

4    Q.    You were friendly with him, correct?

5    A.    Yes.

6    Q.    Did you attend primary school or secondary school

7    together?

8    A.    No, we met at the university.

9    Q.    But you became friendly at the university?

10:59AM 10   A.    Yes, the people you met at the university, and we became

11   friends.

12   Q.    And what did you do with Mr. Kalimba when you were at the

13   university?

14   A.    Other than studying, nothing else.

15   Q.    Only studying?

16   A.    Yes.

17   Q.    Would you have meals together?

18   A.    In the cafeteria?

19   Q.    Would you eat with Mr. Kalimba together, the same table?

11:00AM 20   A.    Yes, sometimes we would meet because we didn't have to eat

21   together, but sometimes we would meet in the cafeteria.

22   Q.    Would you meet at bars?

23   A.    Yes, sometimes because we didn't go to the bar every day.

24   Q.    How often would you go to the bar?

25   A.    Like after the exam on Saturday because during the school

J.A. 649

```
  1    days, you wouldn't drink.
  2    Q.   So you wouldn't go to the bars during the school day
  3    because you were busy studying?
  4          MR. VARGHESE:  Objection, your Honor.
  5          THE COURT:  Overruled.
  6    Q.   Is it true that you didn't go to the bars during the
  7    school day because you were busy studying?
  8    A.   Yes.
  9    Q.   How were your grades?
11:01AM 10         THE COURT:  Why don't we take our 11:00 break.
 11          THE CLERK:  All rise.
 12          ( A recess was taken.)
 13          (Resumed, 11:19 a.m.)
 14          (Jury enters the courtroom.)
 15          THE CLERK:  Thank you.  You may be seated.  Court is
 16    now in session.
 17          THE COURT:  All right, Mr. Lauer.
 18          MR. LAUER:  Thank you, your Honor.
 19    BY MR. LAUER:
11:19AM 20    Q.   Now, Mr. Arusha, I had been asking you some questions
 21    about your time in medical school.  I want to ask you some
 22    questions about your time in medical school and how you came to
 23    know Mr. Teganya.  You testified that you were not friends with
 24    Mr. Teganya but you knew who he was.  Is that accurate?
 25    A.   I said we didn't have any special friendship, but we were
```

J.A. 650

```
 1  classmates.
 2  Q.   And you described your time as a classmate observing
 3  Mr. Teganya on multiple occasions wearing MRND clothing?
 4  A.   So you're asking me who used to wear them?
 5  Q.   Well, you've told us that he wore them, right?
 6  A.   Yes.
 7  Q.   And you were asked if you were aware whether he had any
 8  particular status or rank in the MRND, correct?
 9  A.   What I said, I did not know the structures of MRND, and
10  going the way I observed him, if you are observing a group of
11  people, you can always identify who seems to have a leadership
12  position.
13  Q.   Okay, so who were the group of people around Mr. Teganya
14  that helped you to know that he was MRND?
15  A.   When all the MRND party member would gather together.
16  Q.   Well, you told us that you knew he was MRND because of who
17  he was with, right?
18  A.   Yes.
19  Q.   Who was he with?
20  A.   And what he was wearing.
21  Q.   Well, I'm not asking what he was wearing.  I'm asking who
22  he was with.
23  A.   I don't think I understood the question, but in the
24  university, the MRND members are about between 400 and 500.  At
25  one time, he would be with one person or the other, so I do not
```

J.A. 651

1    understand exactly what you are trying to ask.

2    Q.   Well, my question is, what are the names of the people you

3    saw him with?

4    A.   The names I can remember?

5    Q.   I'm asking you to tell me the names of the other people

6    you remember who he was with that were MRND.

7    A.   I can start with my classmates who were member of MRND.

8    Q.   I don't want you to tell me who generally was in the MRND.

9    I'm asking you to tell me who Mr. Teganya was with --

11:24AM 10            THE COURT:  He said he was going to start with his

11    classmates, and there were 300 to 500 people, I thought he

12    said.

13            MR. LAUER:  No, I just wanted to make sure he wasn't

14    going to list all of the classmates.

15    Q.   Please continue.

16    A.   It's been a long time ago.  I can't recall everybody, but

17    some people I remember I can say.

18    Q.   I'd like to actually direct your attention to an interview

19    you gave with the investigators in this case in 2016.  Do you

11:25AM 20    remember that interview?

21    A.   Yes.

22    Q.   It was at the Marriott Hotel in Kigali?

23    A.   Yes.

24    Q.   They asked you many questions about Mr. Teganya?

25    A.   Yes.  They called me through an interpreter.  Her name is

J.A. 652

1    Dora.  And when I got there, they told me that they were doing

2    an investigation about the killings at the university.

3    Q.   And at that time there were a number of questions that

4    were asked about your time at the medical school with

5    Mr. Teganya, correct?

6    A.   Yes.  When I met them, those gentleman called Brian, he

7    had a student list from my first year.  And according to the

8    alphabet order, my name was the first on the list of first-year

9    medical school; and when he went down the list, that's when I

11:27AM 10    saw Teganya.

11    Q.   And what you said about Mr. Teganya during that interview

12    was that he was active Interahamwe.  Did you say that, sir?

13    A.   What I said then I will tell to you now.

14    Q.   I'm asking, did you tell the investigators that he was

15    active Interahamwe?

16    A.   This is what I said:  We parted ways on April 6 from

17    university in 1994.  So what I told them, that I knew he was

18    very active in the MRND activity, but about the killing, I

19    wasn't with him.

11:28AM 20    Q.   Okay, did you tell the investigators that he was active

21    Interahamwe?

22    A.   I told them he was MRND.

23    Q.   Did you tell them he was a committee member for MRND?

24         MR. VARGHESE:  Objection, your Honor.  I'd ask that

25    the witness finish his answer.  He was trying to say --

J.A. 653

```
 1              THE COURT:  Yes, he can finish his answer.
 2   A.    This is what I said:  We left the campus on April 4, and
 3   the plane crash happened on April 6 in 1994.  What I told the
 4   investigators was that what I knew him was active in MRND.
 5   When they killed during the genocide, I wasn't there.  I wasn't
 6   with him.
 7   Q.    Okay, my question is about what you told the investigators
 8   of your own personal knowledge, okay?  Do you understand me?
 9   Did you tell them you personally knew him to be a committee
10   member of the MRND?
11   A.    Teganya?
12   Q.    Yes, Teganya.
13   A.    What I said, I told them that I didn't know the structures
14   of MRND, but if you observe a group, you can have some sense of
15   if one is among the leaders.
16   Q.    Okay.  Did you use the term "committee member" when you
17   spoke to the investigators in 2016?
18   A.    In MRND?
19   Q.    Yes.  Did you use term "committee member" in 2016?
20   A.    What I said was among the leaders of MRND, but I never
21   said which level or of adjunct.
22   Q.    I want to direct your attention to the incident at the bar
23   involving Mr. Kabalisa.  You recall testifying to that a few
24   minutes ago?
25   A.    Yes.
```

J.A. 654

```
         1    Q.   Can you tell me again.  You were in the bar for this?

         2    A.   I was standing close to the agriculture department near

         3    the IRST where people used to hang around.

         4    Q.   And why don't you tell us in your own words what happened.

         5    A.   Kabalisa landed into a group, and they took away his bike,

         6    and we went to help him.  We come to help him.

         7    Q.   Were you one of the people who went to help him?

         8    A.   Yes.  We went to help him because we thought he may be

         9    harmed.

11:33AM 10    Q.   And who were you with when you did that?

        11    A.   I met, one was the Kowadamuzney, Atophier.  It's been a

        12    long time ago.  I can't recall perfect, but it was a group of

        13    many people.

        14    Q.   And you and this group went to the bar to come to the aid

        15    of Kabalisa?

        16    A.   We're not at the bar, but we're just beside the bar.  And

        17    when we saw them taking his bike, that's when we came because

        18    this was a bar full of MRND people, and we wouldn't go there.

        19    Q.   Okay, but Mr. Kabalisa had gone there?

11:35AM 20    A.   Kabalisa was coming from the city, the city of Butare,

        21    coming down the campus riding on his bike.

        22    Q.   Okay.  You testified Mr. Teganya was there for this?  Was

        23    Mr. Teganya there at that time?

        24    A.   Because there was a political party event, which I don't

        25    remember which it was, and all the party members had gathered,
```

J.A. 655

```
 1   I would assume he was there also.
 2   Q.   Okay, I'm asking you personally if you have a memory of
 3   Mr. Teganya being there.
 4   A.   It's been a long time ago.  I can't recall.
 5   Q.   When you were interviewed by the investigators in 2016,
 6   did you say anything about this incident at the bar?
 7   A.   Yes.  I mentioning that there was an incidence between the
 8   MRND people and the RPF people.
 9   Q.   And you mentioned that in 2016 when you met with the
10   investigators at the Marriott Hotel?
11   A.   Yes.
12   Q.   Mr. Kabalisa, is he a friend of yours?
13   A.   Yes, he's a friend.  We went together school.
14   Q.   Is he a friend still presently?
15   A.   Yes.  We meet.  We talk.
16   Q.   And Mr. Kalimba is a friend from school and presently?
17   A.   Yes.
18   Q.   Did you all travel to the United States together?
19   A.   We did meet because they are medical doctors, and I'm no
20   longer in the profession.  I'm in agriculture.
21   Q.   When did you come to the United States?
22   A.   We got here on March the 1st.
23   Q.   March 1st?
24   A.   Yes.  That's when we arrived here.
25   Q.   So you've been here two weeks?
```

J.A. 656

```
 1    A.   Yes.

 2    Q.   And where have you been staying during that two weeks?

 3    A.   I don't know the neighborhood, but when I check on my

 4    Google map, it said in a hotel called Hampton.

 5    Q.   Is Mr. Kalimba staying at that hotel?

 6    A.   Yes.

 7    Q.   Is Mr. Kabalisa staying at that hotel?

 8    A.   Yes.

 9    Q.   Have you seen them both in traveling here and at the

11:39AM 10    hotel?

11    A.   Yes.

12    Q.   And they're both good friends of yours?

13    A.   Yes.  We met when we were traveling, and we always talk

14    about our history.

15         MR. LAUER:  No further questions.  Thank you.

16         THE COURT:  Redirect?

17         MR. VARGHESE:  Just briefly.

18    REDIRECT EXAMINATION BY MR. VARGHESE:

19    Q.   Mr. Arusha, you mentioned the Hampton Inn.  Are all the

11:40AM 20    Rwandan witnesses staying at the Hampton Inn?

21    A.   Yes.  All of us came to give their own testimony, but

22    we're all living there.

23    Q.   And there's security there provided as well?

24    A.   Yes, but they don't stop anybody from getting around.

25    Q.   Did you discuss your testimony with either Mr. Kabalisa or
```

J.A. 657

```
 1    Mr. Kalimba or any of the other Rwandan witnesses?

 2    A.    No.  We don't share our testimony.  When you come, you

 3    give your testimony.  When you go there, we are together, so

 4    that's maybe for ourselves to be protected together, but that's

 5    about it.

 6            MR. VARGHESE:  Thank you.  I don't have any further

 7    questions.

 8            THE COURT:  Any recross?

 9            MR. LAUER:  No, your Honor.

10            THE COURT:  All right, thank you.  You may step down.

11            (Witness excused.)

12            MR. VARGHESE:  Your Honor, the United States calls

13    Ms. Assumpta Numukobwa.

14                      ASSUMPTA NUMUKOBWA

15    having been first duly sworn, was examined and testified as

16    follows:

17    DIRECT EXAMINATION BY MR. VARGHESE:

18    Q.    Good morning.

19    A.    Good morning.

20    Q.    Can you make sure to speak into the microphone.  Can you

21    please introduce yourself to the jury.  What is your name?

22    A.    My name is Assumpta Numukobwa.

23    Q.    Ms. Numukobwa, where are you from?

24    A.    I'm from Kigali, K-i-g-a-l-i.

25    Q.    Are you currently employed?
```

J.A. 658

```
 1    A.    Yes.

 2    Q.    Where do you work?

 3    A.    In the Ecobank Rwanda.

 4    Q.    And what's your position at the bank?

 5    A.    I'm the branch manager.

 6    Q.    Where did you grow up?

 7    A.    I grew up in Kigali.

 8    Q.    Back in 1994, did you carry an identity card?

 9    A.    Yes.

11:44AM 10    Q.    What ethnic group was listed on your identity card?

11    A.    Tutsi.

12    Q.    Back in 1994, how old were you?

13    A.    I was twenty-three years old.

14    Q.    Were you in school?

15    A.    Yes.

16    Q.    Where?

17    A.    I was in Butare University.

18    Q.    What department?

19    A.    In medical school.

11:45AM 20    Q.    When did you start the medical school in Butare?

21    A.    In October, 1993.

22    Q.    When you started there, where did you live?

23    A.    I was in girls' dormitory called Vietnam, and my room was

24    84.

25    Q.    Did you have any brothers or sisters who went to the
```

J.A. 659

```
     1    school?
     2    A.   Yes, my older brother.
     3    Q.   And what department was he in?
     4    A.   He was in pharmacy.
     5    Q.   In what year?
     6    A.   Third year.
     7    Q.   When you arrived on campus back in October of 1993, can
     8    you explain to the jury, what was the atmosphere like on the
     9    university?
11:46AM 10 A.   When I got at the campus, I was a very brand-new student
    11    and I was very young, but the atmosphere was very bad.
    12    Q.   Why was it bad?
    13    A.   When I got there, I would see with my eyes and people
    14    would tell me, and you will pass by a group of people and they
    15    would not be -- they would not be ashamed or worried to
    16    verbally abuse you, and there were acts of -- I will say acts
    17    of terrorism.
    18    Q.   Who were the group of folks who were verbally abusing and
    19    terrorizing students?
11:47AM 20 A.   It was a group of students that we had a nickname for
    21    them, and we called them Konare.
    22    Q.   What does that mean?
    23    A.   I don't know the meaning of the name.  They nicknamed
    24    themselves.  But that group of individuals, they were very
    25    brutal.  They were dressed in dirty clothes or shabby clothes,
```

1    and they did not respect anybody.  And during the genocide,

2    that group seems like the one that got mixed up with

3    Interahamwe.

4    Q.   What kinds of things did you hear that group say to other

5    students?

6    A.   I remember one time we're passing by one group with other

7    girls that we lived together --

8            MR. LAUER:  Your Honor?

9            THE COURT:  Yes.

11:49AM 10            MR. LAUER:  Can we be heard at sidebar?

11            THE COURT:  All right.

12    SIDEBAR CONFERENCE:

13            MR. LAUER:  So I'm not sure if this question is going

14    to make its way to my client, but it would seem to just be

15    asking if she recalls conversations that took place between her

16    and unnamed individuals that were part of this group.  So

17    there's a hearsay objection unless there's a foundation to

18    establish that my client was one of the people saying it.

19            THE COURT:  What would you expect the answer to be?

11:50AM 20            MR. VARGHESE:  No, it's not relating a conversation

21    between her and other people.  It's the threats that they were

22    receiving on the campus from the groups that she's going to

23    identify were the MRND members.

24            THE COURT:  Okay, if there are threats or name-calling

25    or whatever, that's not for the truth, so it's not hearsay; but

1    if it starts going in that direction, let's head it off, okay?

2         MR. VARGHESE:  Yes, your Honor.

3         (End of sidebar conference.)

4         THE COURT:  I think her answer was interrupted.  Maybe

5    you want to put the question to her again.

6         MR. VARGHESE:  Yes, your Honor.

7    BY MR. VARGHESE:

8    Q.   What kinds of things did this group say?

9    A.   Like I was saying, we're passing by a group, that group,

11:51AM 10  one of that group, and I was with other girls that were my

11   fellow classmates; and they told one of the girls that "You,

12   we're going to cut off your legs," and that's how she died in

13   the genocide.

14   Q.   These individuals, these other students that were

15   terrorizing the students, what political party did they belong

16   to?

17   A.   Most of them were in MRND.

18   Q.   Who were they targeting?

19   A.   They were targeting Tutsis.

11:52AM 20  Q.   Did they ever target you?

21   A.   Yes.

22   Q.   What kinds of things were said to you?

23   A.   One time they attacked me in my room, and I had just

24   returned from accompanying my brother --

25   Q.   I'll get to that in a second, but let me start with, do

J.A. 662

```
 1   you recall things that they said to you or your friends when
 2   you were with them?
 3   A.   Yes.  They would always verbally abuse us, calling us
 4   snits, telling us that they're going to wipe us off, that we
 5   are idiots and stupid, things like that.
 6   Q.   Did you feel safe on campus?
 7   A.   No.
 8   Q.   Were you scared?
 9   A.   Very much so.
11:53AM 10  Q.   You started talking about a specific incident when you
11   were attacked.  What happened?
12   A.   I was coming from accompanying my brother who just came to
13   visit me, and a group of students followed us in our room and
14   they entered.  Because we knew, it was already said on the
15   campus that those Konare people, if they come in your room,
16   they will rape you --
17   Q.   Let me stop you for one second.  What room were you in?
18   A.   In Vietnam Room 83.
19   Q.   Who was with you?
11:54AM 20  A.   I was with two girls that were my roommates.
21   Q.   And how many MRND members entered the room?
22   A.   I don't recall, but there were between three and four
23   because there was a lot of commotion and chaos.
24   Q.   How did they get into the room?
25   A.   When we entered the room, they followed us, and they
```

**J.A. 663**

1    entered right away.

2    Q.   What happened when they entered the room?

3    A.   So when they entered the room, they told one of us to pull

4    up her skirt and almost be naked.  And someone who was close to

5    us, whose room was close to our room who knew us, he went

6    running to call my brother to tell him that the Konares are in

7    my room.  And my brother came and start fighting them, and it

8    was a big scandal on the campus.

9    Q.   Ultimately did the attackers leave your room?

11:55AM 10    A.   Yes.

11    Q.   Were you harmed?

12    A.   Me?  No.

13    Q.   Were your roommates harmed in any way?

14    A.   My brother, they tore his clothes off because he was the

15    one fighting them.

16    Q.   Did things get worse through the semester?  Did things get

17    worse in November and December and January?

18    A.   Yes, continued to get worse.

19    Q.   Where were you when the president's plane was shot down?

11:56AM 20    A.   I was at the university on the campus.

21    Q.   What was life like on the campus after the plane was shot

22    down?

23    A.   Life was bad.

24    Q.   Can you explain what happened.

25    A.   It was bad.  It was very bad.  When the plane of

**J.A. 664**

1    Habyarimana was shot, we didn't know it that day.  We knew it

2    the day next.  When we found out, I will say we were in the

3    situation where we didn't have any direction.  There was not

4    anything planned at the campus.  And students started to change

5    on a daily basis.  Like, for example, you'd be in your room

6    making tea, and someone would just walk into your room and just

7    grab that tea and pour it on you.  And sometimes, if you're

8    sitting in the room, someone would just walk in the room and

9    just stare at you with a scary way, and you'd just sense that

11:58AM 10   that look means something, and that person would just leave.

11   Q.    Were there threats that were being made to you as well in

12   the days following the plane crash?

13   A.    Yes.  During that time, they were taking students.

14   Q.    What about verbal threats?  Did you hear people saying

15   things to you or other Tutsis?

16   A.    Yes.  They will say always that they will wipe us out.

17   Q.    Who were the first students that you know of that were

18   killed on the campus?

19   A.    One I remember is a gentleman named Robert and Maurice.

11:59AM 20   Q.    How did Robert and Maurice die?

21   A.    Robert, he found out that his family has been killed

22   and -- sorry -- they were cut, and he was taking food for them,

23   and he was killed on the way before he got there.

24        Maurice, he was killed at the checkpoint or at the

25   roadblock in front of the campus.

# J.A. 665

```
 1   Q.   What day was that?  Do you recall?
 2   A.   If I'm -- I'm not so sure, but if I can recall, it was on
 3   the 21st.
 4   Q.   Of April?
 5   A.   Yes, of April.
 6   Q.   After the death of the first two students, what did you
 7   do?
 8   A.   We were very scared.  We stayed indoors in our room and
 9   were planning how we can organize ourselves so that we can
10   flee.
11   Q.   Did you try to escape the university?
12   A.   Yes.
13   Q.   What happened?
14   A.   We organized ourselves so we can flee, and we said that
15   "If you have a relative close to the campus, at least take one
16   individual and flee with that person."  So we organized
17   ourselves to flee.  So when we were getting out of the campus,
18   an exit continued, but for me, I was scared, and I just went
19   back.
20   Q.   What were you scared of?
21   A.   I was scared because the atmosphere had changed outside.
22   You could hear gunshots.  And, well, across the hills you could
23   see houses being burnt and smoke up in the air.  I was not sure
24   I was trusting the route that we were going to take, so I
25   decided to go back and stay in the campus.
```

J.A. 666

```
 1   Q.   When you went back on the campus, where did you go?

 2   A.   I went to my brother's room in Cambodge.

 3   Q.   Why did you go there?

 4   A.   It was a way of hiding.

 5   Q.   Was your brother there?

 6   A.   No.  He was in Kigali.

 7   Q.   What happened when you got there to your brother's dorm

 8   room in Cambodge?

 9   A.   I was with my friend who was my roommate.  We stayed in

10   that room I would say until 5:00 o'clock.  Others had left

11   around 2:00.  We stayed there.  Around 5:00 o'clock we decided

12   to go to the restaurant.  When we got a little bit out from the

13   room, one of my colleagues signaled me and told me to run.

14   Q.   Let me stop you for one second.  So you're in the room

15   with your roommate.  What was the name of your roommate?

16   A.   She was called Isabelle.

17   Q.   And you said that you were there until about 5:00, and you

18   decided to go to the restaurant?

19   A.   Yes.

20   Q.   Is that the cafeteria on campus?

21   A.   Yes.

22   Q.   Why were you going to the cafeteria?

23   A.   Because it was time -- that was the normal time that we go

24   eat at the cafeteria, and we didn't eat the whole day.  And it

25   had been some few days not eating, so we're, like, that's
```

**J.A. 667**

1    committing suicide, so we decided to go.

2    Q.   And so during this time, was the university running

3    normally?  Were there classes and normal activities of the

4    university going on?

5    A.   No.  It was very bad.

6    Q.   So what happened when you tried to go to the cafeteria?

7    A.   When that colleague signaled me to run, I passed and then

8    I met another person.  And that person, because I had a cousin

9    who worked at the university, so that person told me, "Please

12:06PM 10    try to see if you can find the key for the laboratory so we can

11    go and hide there."  I kept quiet, and they knew that was going

12    to be impossible.  All the routes were closed, so I decided I'm

13    going to continue and go to the restaurant.

14    Q.   Why did you ignore your colleague who told you to run?

15    A.   Because I knew I didn't have anywhere to go.

16    Q.   What happened when you got to the cafeteria?

17    A.   I didn't reach the cafeteria.  When I came close, there

18    was a building which was the student services.  There was a

19    group of students there, between 30 and 40, and those students

12:07PM 20    were there to be killed.  Among them, there was one called

21    Placide, and he signaled me to go back.

22    Q.   How do you know -- well, first of all, how do you know

23    those students were there to be killed?

24    A.   Because they were killed.  I never saw them again.

25    Q.   Were those Hutu or Tutsi students?

```
 1    A.    They were Tutsi.

 2    Q.    So after being signaled to go back, where did you go?

 3    A.    I went in my room.

 4    Q.    Let me just stop you for one second.  That group that was

 5    outside of the student services building, were there soldiers

 6    or Interahamwe around them?

 7    A.    The soldiers were at the door of the restaurant, but to

 8    get inside the restaurant, you had to show your ID.

 9    Q.    So what happened when you got back to the dorm?

12:08PM 10    A.    I went back to my room, and we stayed there.

11    Q.    In the Linda dorm?  I'm sorry, the Viet dorm?

12    A.    Yes.

13    Q.    And who were you with?

14    A.    I was with Isabelle.

15    Q.    And what happened?

16    A.    We stayed there until around 7:00 o'clock, 7:00 p.m., and

17    then we start hearing those students being beaten on the

18    campus.  And the girls were screaming; the boys were screaming.

19    They were beating them on the campus.

12:09PM 20    Q.    Could you see what was going on?

21    A.    No, I couldn't see it.

22    Q.    How long was the screaming going on?

23    A.    We could hear them being pulled, and we could hear them

24    being beaten.

25    Q.    But can you estimate how long you heard the screams?
```

J.A. 669

```
 1   A.   I can't recall how long it lasted, but we heard it and
 2   were very scared, and we went to hide under the bed.
 3   Q.   Why did you hide under the bed?
 4   A.   Because we were scared.  We didn't want them to come and
 5   just see us right there.
 6   Q.   What happened next?
 7   A.   We stayed under the bed, I would say around till 1:00 a.m.
 8   Q.   What happened?
 9        (Witness pausing.)
10   Q.   Are you okay?  Do you need a minute?
11   A.   Okay.  We can continue.
12   Q.   What happened?
13        (Witness pausing.)
14   A.   They came and knocked.  First, we heard someone going
15   around and calling students, and around 1:00 o'clock I heard
16   one saying, "The sister of Tunuwaya is the one remaining."
17   Q.   And who is that, the sister of Tunuwaya?
18   A.   That was me.
19   Q.   And after you heard that, what happened next?
20   A.   They came and they knocked, and we refused to open.  They
21   went around to the window.
22   Q.   Let me stop you for one second.  When you say that you
23   refused to open, did you say, "I'm not going to open it," or
24   did you try to be quiet and pretend that you weren't there?
25   A.   We kept quiet.
```

12:11PM (line 10)
12:12PM (line 20)

J.A. 670

```
 1    Q.   And then what happened?

 2    A.   So they went around.  They went to the window and broke

 3    the window.

 4    Q.   After they broke the window, what happened?

 5    A.   They moved the curtain, and they looked in our bed, but

 6    nobody was in the bed.  And they said one should go inside and

 7    grab a flashlight; and when he grabbed the flashlight, he said,

 8    "Well, you don't know the tricks of the inyenzi or the

 9    cockroaches."

12:14PM 10    Q.   And what did he do, the person with the flashlight?

11    A.   He grabbed it, and he looked under the bed, and they saw

12    us there.  They pulled us out.  So they start beating us, and

13    all of them now came in.

14    Q.   How many were there?

15    A.   I was not able to count them because we were just being

16    beaten there, but I would assume that people who could fit in

17    that room, there were between eight and ten.

18    Q.   Did you recognize any of them?

19    A.   Yes.  Yes, some of them.

12:15PM 20    Q.   Were they soldiers or students or both?

21    A.   They were students.

22    Q.   Did you say anything?

23    A.   Yes.  There's one I told, "Even you, you're doing this

24    too?"

25    Q.   Did you say that to somebody that you recognized or
```

J.A. 671

```
     1    somebody that you knew?

     2    A.   Yes.

     3    Q.   A fellow classmate?

     4    A.   No, he was not my classmate, but I knew him.

     5    Q.   Where did they take you?

     6    A.   They took us outside in front of our room.

     7    Q.   And then what happened?

     8    A.   So they start beating up Isabelle.  They start beating up

     9    Isabelle, and they told her to go and not stay with the Tutsis

12:16PM 10    anymore.

    11    Q.   Was Isabelle a Hutu or a Tutsi?

    12    A.   She was a Hutu.

    13    Q.   So after they let Isabelle go, what happened to you?

    14    A.   I stayed with one of those people who took me, and he

    15    started beating me by the foot so I cannot be able to walk.

    16    Q.   How was he beating you on the feet?

    17    A.   He had something that looked like a ruler, and it had like

    18    kind of a plastic thing on top, and that's the one he was using

    19    to beat my legs.

12:17PM 20    Q.   What happened next?

    21    A.   He was supposed to take us outside the campus.  So on the

    22    way there, we met another group that had another gentleman

    23    called Aimable.  They took us outside the campus on the main

    24    road.

    25    Q.   Let me stop you for one second.  When you met up with that
```

J.A. 672

1    other group, that other group, was that students or soldiers or

2    both?

3    A.    It was a group of students.

4    Q.    Did you recognize any of those students?

5    A.    No.   Those who brought Aimable, I didn't know them.   I

6    stayed with the one I was with.

7    Q.    Aimable, was he a Hutu or a Tutsi?

8    A.    He was a Tutsi.

9    Q.    And where did they take you and Aimable?

12:18PM 10    A.    They took us outside, outside the campus, and they give us

11    to the soldiers.   They took us at the roadblock or the

12    checkpoint outside the campus, and they gave us to the

13    soldiers.

14    Q.    Were you saying anything to the students when they were

15    taking you there?

16    A.    No.

17    Q.    What happened when they turned you over to the soldiers?

18    A.    When they give us to the soldiers, the soldiers started

19    beating us up.   They were beating us very severely, to the

12:19PM 20    point that I started lying that I'm a Hutu, but they didn't

21    believe me; and they told us to get up so they can take us to

22    be killed where they're killing others.

23    Q.    How were they beating you?

24    A.    They were kicking us using their boots, using their belts,

25    and slapping us with everything.

J.A. 673

1    Q.    Where did they take you?

2    A.    They took us in the areas to where they were killing

3    everybody.

4    Q.    Is that the Science Institute?

5    A.    Yes.

6    Q.    And what happened when you got there?

7    A.    We were taken by two soldiers, and they cocked their guns,

8    and they were smoking cigarettes.  We thought, "That's it, we

9    are dead."  So when we got where the forest of the area starts,

12:20PM 10    one soldier told us, "So if we don't kill you, what will you

11    do?"  We told him, "We can go to the bushes."  Behind us there

12    was another third soldier, the third soldier, who had a very

13    small flashlight; and he told us, "I'm going to shoot up in the

14    air.  If I do that, run because if you don't run, the third

15    one, the guy behind is going to kill you."  And we started

16    running, and he shot up in the air.

17    Q.    Where did you go?

18    A.    We went there in the bushes and were jumping the dead

19    bodies of other students, and we could see that.  We stayed in

12:22PM 20    those bushes until morning.  We got out.  We didn't know where

21    we were going the next day, but fortunately we arrived at the

22    hospital.

23    Q.    How far away was the hospital from the bush where you

24    spent the night?

25    A.    It seemed like we were just down the street from the

J.A. 674

1    hospital because when we got out, we walked a little distance

2    up the hill and we were at the hospital.

3    Q.    You mentioned that when you were running away from the

4    soldiers, you were jumping over dead bodies.  Was there a lot

5    of bodies in the area?

6    A.    There were so many.  There were so many.

7    Q.    The next morning when you left the Science Institute or

8    the bushes and headed towards the hospital, did you see more

9    bodies?

12:23PM 10    A.    No, because we had gone a little bit further, so we didn't

11    see them.

12    Q.    What happened when you got to the -- why were you going to

13    the hospital?

14    A.    It's because that's the first place we saw, and we didn't

15    have anywhere to go.  There was no route to take.  They were

16    killing people everywhere.

17    Q.    Do you remember what day this was?  What was the date?

18    A.    They took us on the 21st, so the day we arrived at the

19    hospital, it was on the 22nd of April.

12:24PM 20    Q.    What happened when you got to the hospital?

21    A.    When we got to the hospital, there was a tent outside.  In

22    that tent there is Doctors Without Borders, and they were

23    treating patients, and we lined up so we can get treated from

24    the beatings we had the night before.

25    Q.    Did you have injuries that you sustained from the

**J.A. 675**

1    beatings?

2    A.    There were no wounds, but our bodies were swollen because

3    of the beatings.

4    Q.    Did you end up getting treatment from Doctors Without

5    Borders?

6    A.    No, we didn't get treated.

7    Q.    What happened?

8    A.    So when we were still in the line with other patients, a

9    soldier came by, and he asked us where we came from, and we

12:25PM 10    told him we came from the university.  And he told us he's

11    going to blink his eyes, but when he opens his eyes, we should

12    have disappeared from his sight.  And we left, and we went a

13    little bit down.  There was a building that was made of wood or

14    built by wood, and that was the kitchen of Catholic Charities.

15    Q.    Let me stop you for one second.  That kitchen, is that

16    within the hospital?

17    A.    Yes.

18    Q.    Where is that kitchen?  Is it an outdoor kitchen?

19    A.    Yes.  It was outside from the patient wards, but it was

12:26PM 20    within the hospital compound.

21    Q.    And where was it located within the hospital compound?

22    A.    I didn't know very well the hospital buildings because

23    that was my first time there, but if I can recall, that kitchen

24    was a little bit below from the three tents that were there.

25    Q.    And what happened when you got there?

1    A.   We went there and hid there.  I think we were there, like,

2    between two to three days.  On the third day I started feeling

3    sick because I was starving, we're not getting food, and the

4    life around me.  And Aimable say he's going to get out and find

5    me something to eat.  He went outside.  He came back with a

6    biscuit and water in a cup, and he gave me that, so we decided

7    to go outside and have some little sunshine.

8              So when we went outside, we met an intern student

9    at the hospital who used to be in the same class with my

12:28PM 10   brother, and he had his young brother who was there at the

11   campus, and he asked him, "They killed Tophil?  Is that true?"

12   And he knew he was killed.  And I told him, "Yes, it's true,

13   they killed him."  And he told me, "I'm going to hide you."  So

14   he took me in the maternity ward, and he put me in the laundry

15   room.

16   Q.   So you went from the outdoor kitchen to the maternity ward

17   building?

18   A.   Yes.

19   Q.   And where in the maternity ward were you located?

12:29PM 20   A.   In that laundry room.  I knew the room was close where the

21   ladies or the mothers were sleeping.

22   Q.   And where did you go?

23   A.   In that room where they used to keep all the dirty laundry

24   from these mothers.

25   Q.   Was the man Aimable still with you, Aimable?

```
 1    A.    No, we're not together.  I left him there.

 2    Q.    And was the door to the laundry room, was it locked?

 3    A.    Yes, it was locked, and I found someone else there that he

 4    had put in there.

 5    Q.    What happened next?

 6    A.    We stayed there.  He would come and knock sometimes and

 7    would bring us something to eat.  After a while, these ladies

 8    in the maternity ward, they told the security people that they

 9    think in Dahlia Room, inyenzi or cockroaches are living there.

10    The student who was there, he said, "Well, I'm going to ask

11    permission from the hospital administration so we can break

12    this door down."

13    Q.    Did you hear all of this while you were hiding in the

14    laundry room?

15    A.    Yes.  They were talking there.  You could hear that, and

16    they were kind of directing their speech to us.

17    Q.    Were you scared?

18    A.    Very much so.

19    Q.    What happened next?

20    A.    So that student went to ask for the permission, and one

21    individual came, and it was a lady, and she spoke through the

22    door, and she said, "If there's someone there, please, can you

23    get out."  That person I was staying with, he opened the door

24    very fast.  He went his way; I went my own way.

25    Q.    And were you running?
```

J.A. 678

```
         1    A.   I was just walking fast.

         2    Q.   And where did you go?

         3    A.   I went back down where I used to be near the kitchen.

         4    Q.   And did you stay in the kitchen again?

         5    A.   No.

         6    Q.   Where did you go from there?

         7    A.   When I was walking, I met a hospital staff, a medical

         8    staff who was rolling down my cousin in a wheelchair because he

         9    was being cut with a machete and he was being shot.  So they

12:33PM 10    took him in the room, and I went with them to that room.  So we

        11    stayed in that patient room, but we're not being treated.

        12    Q.   How long did you end up staying there?

        13    A.   If I can recall, I was there about a week.

        14    Q.   And you said that your cousin had wounds, machete wounds

        15    on his body.  Did he receive any treatment from the doctors or

        16    the medical staff?

        17    A.   No.  He never got treated.

        18    Q.   During your stay in your cousin's room, what did you see

        19    while you were there?

12:34PM 20    A.   It was like our hiding place, so we're hiding there.  We

        21    just looked through the window, and they were taking people

        22    each day.  And some student found out that we didn't die, and

        23    they would come to terrorize us.  And it was there that they

        24    told us they're going to come and take us.  Then we left that

        25    room --
```

J.A. 679

```
 1    Q.    Before we do that, I want to go back and make sure I
 2    understand.  You said that there were students who discovered
 3    that you were not dead.  Did they come to the room?
 4    A.    No, they would not come.  They would send people to tell,
 5    to tell us.
 6    Q.    And what were they telling you?
 7    A.    They would tell us that they would come to pick us up.
 8    Q.    The other thing you said is that you saw people being
 9    taken away; is that right?
10    A.    That's right.
11    Q.    What did you see?
12    A.    There is a young lady that I think we met her there or she
13    came while we're there.  Her name was Epiphany.  She was one of
14    the students who had fleed to the campus coming from the
15    laboratory in Kigali.  One time she went outside, she was going
16    to get us, the students, and when she came back, they took her
17    away.
18    Q.    Who took her?
19    A.    The soldiers who lived there, but they were told by the
20    students.
21    Q.    Did you ever see her again?
22    A.    No.  They killed her.
23    Q.    After hearing that the students were going to come back
24    and get you, what did you do?
25    A.    We left that room, and we went to the Tutsi tent that was
```

J.A. 680

1    there.  There were three tents.  One was for the Tutsis who

2    were injured, and another tent was for the Hutus who say they

3    were fleeing insecurities, and the third tent was for the

4    Burundis who were there, and we went to that tent of the

5    Tutsis.

6    Q.   The Tutsis who were injured, were they receiving medical

7    care?

8    A.   There is not any medical staff who entered there.  They

9    had wounds in different bodies, and the wounds were rotten, and

12:37PM 10    nobody was getting any medication.

11    Q.   How long did you stay in that tent?

12    A.   I will not remember how many days because during that

13    time, it was hard to track the time.  Sometimes you won't even

14    know which day it was, but I can think maybe it was close to a

15    week.

16    Q.   What happened next?

17    A.   Before we left that tent, they would come and take young

18    men because the older men were no longer there.

19    Q.   Who would come to take the young men?

12:38PM 20    A.   The soldiers.

21    Q.   And what happened next?

22    A.   We stayed in that tent, we stayed there until the hospital

23    administration made announcement that they don't want any Tutsi

24    refugees around the hospital; and they put us in a Toyota, and

25    they took us to the prefecture or the district.

## J.A. 681

```
 1    Q.   Once you were taken to the prefecture, did you ever return
 2    to the hospital again?
 3    A.   We never returned to the hospital.
 4    Q.   In total, how long do you estimate that you were in the
 5    hospital, hiding in the hospital area?
 6    A.   If I can recall, I got there on the 22nd of April, like I
 7    told you.  I think I was there probably until the end of May.
 8    Q.   And you talked about moving around a lot, from the kitchen
 9    to the maternity ward to the hospital room to the tents.  Why
10    did you keep moving around the hospital?
11    A.   At one point I figured out that maybe I'm not going to die
12    because everywhere I went, nobody killed me, so this time I was
13    trying to see how I can survive.
14    Q.   Ms. Numukobwa, has anyone forced or coerced you to testify
15    here today?
16    A.   No.
17    Q.   Has anyone pressured you in any way regarding your
18    testimony here today?
19    A.   No.
20    Q.   Has the government of Rwanda spoken to you about your
21    testimony or what to say or not say here today?
22    A.   No.
23    Q.   Has anyone offered you anything for your testimony, either
24    the United States government or the government of Rwanda?
25    A.   No.
```

12:40PM (line 10)

12:41PM (line 20)

J.A. 682

```
 1    Q.   The United States government paid for your flight and your
 2    hotel stay here in the United States?
 3    A.   Yes.
 4    Q.   And you're receiving money for food and a witness fee; is
 5    that right?
 6    A.   Money for food, yes, but witness fee, no.
 7    Q.   Has anything about receiving that money affected your
 8    testimony here today?
 9    A.   No.
12:42PM 10         MR. VARGHESE:  Thank you.  I have no further
11    questions.
12         THE COURT:  Okay, cross?
13    CROSS-EXAMINATION BY MR. LAUER:
14    Q.   Good afternoon.
15    A.   Good afternoon.
16    Q.   I just want to go through some of the things you told us
17    about the hospital, okay?
18    A.   Yes.
19    Q.   So you told us, when you first arrived at the hospital,
12:43PM 20    you hid in a kitchen?
21    A.   Yes.
22    Q.   And your best estimate is that you were there for two to
23    three days?
24    A.   Yes.
25    Q.   And then you moved on to the maternity ward in a laundry
```

1   room?

2   A.   Yes.

3   Q.   And following hiding in the laundry room, you went back to

4   the kitchen?

5   A.   No.

6   Q.   Where did you go after you fled the laundry room?

7   A.   I went back down, and that's when I met someone taking my

8   cousin.  And they give him a patient room, so I stayed with him

9   in that room.

12:44PM 10   Q.   Okay, so then you stayed with your cousin in the patient

11   room?

12   A.   Yes.

13   Q.   And that was for about a week?

14   A.   I can't recall, but, yeah, three, five days, close to a

15   week.

16   Q.   And after leaving your cousin's room, you went to the

17   tents?

18   A.   Yes.

19   Q.   And you described how there were three tents?

12:44PM 20   A.   Yes.

21   Q.   There was one tent for Tutsis, one tent for Hutus?

22   A.   Yes.

23   Q.   And one tent for refugees from Burundi?

24   A.   Yes.

25   Q.   And you told us today that you went to the tent for

```
  1    Tutsis?
  2    A.    Yes.
  3    Q.    You had an interview in this case with investigators in
  4    2016, right?
  5    A.    Yes.
  6    Q.    And that was at the Marriott Hotel in Kigali?
  7    A.    Yes.
  8    Q.    And those investigators asked you many questions about
  9    what happened during the genocide and at the hospital?
12:45PM 10    A.    First, they asked me that they wanted to get the
 11    information about genocide that happened on the campus.
 12    Q.    And then they asked you questions about your experiences
 13    at the hospital too?
 14    A.    Yes, because the testimony I gave them was also how I was
 15    at the hospital.
 16    Q.    And what you told the investigator in 2016 was that you
 17    went to the tent for the refugees?
 18    A.    Coming from where?
 19    Q.    So you told us that there were three tents, one for
12:46PM 20    Tutsis, one for Hutus, one for Burundian refugees, right?  In
 21    the interview in 2016, didn't you tell the investigators you
 22    stayed with the refugees?
 23    A.    I told them I stayed with the Tutsi refugees in that tent.
 24    Q.    Okay.  Did you tell the investigators anything about
 25    staying in the kitchen?
```

J.A. 685

```
 1   A.   Yes, I said that.
 2   Q.   Did you tell them that you stayed in the laundry room?
 3   A.   Yes.  I told them where I went, everywhere I went.
 4   Q.   Did you tell them that you stayed with your cousin in a
 5   patient room for one week?
 6   A.   Yes.
 7   Q.   At one point you described how there was a person named
 8   Epiphany, right?
 9   A.   Yes.
12:48PM 10   Q.   And Epiphany was a person who had been staying in the room
11   with your cousin?
12   A.   No.
13   Q.   What was your relationship with Epiphany?
14   A.   We knew her as like a Tutsi was being hunted down like us.
15   Q.   Okay.  And you described that she had gone outside and was
16   taken away by soldiers?
17   A.   Yes.
18   Q.   And you added that the soldiers were told to do that by
19   students?
12:49PM 20   A.   Yes.
21   Q.   How were you able to know that?
22   A.   We'll know that.  Sometimes we can tell the interns who
23   are not killed yet.
24   Q.   Okay, my question is about this incident with Epiphany
25   specifically.  Do you understand that I'm asking about that
```

```
 1   specific incident?

 2   A.   Epiphany left the campus, and we knew that she's been

 3   hunted down, even she had left the (Unintelligible) in

 4   (Unintelligible) Kigali.

 5   Q.   Okay.  So you were there when she left, right?

 6   A.   Where?

 7   Q.   Well, you told us she was hunted down and that she had

 8   gone outside and was taken.  That's what you told us.

 9   A.   Yes.

10   Q.   Did you see her leave?

11   A.   I saw her when she brought me the sweater.

12   Q.   Okay, so she brought you a sweater when you were staying

13   with your cousin?

14   A.   Yes.

15   Q.   And then did she leave?

16   A.   After they called her, and then they took her.

17   Q.   Well, did that happen when she was in your brother's room?

18   A.   No.

19   Q.   That happened somewhere else at the hospital?

20   A.   Right there in front of the tents where we were where

21   other Tutsis were injured.

22   Q.   Well, did you with your own eyes see her being taken away?

23   A.   After she gave us the sweater, I saw her getting out of

24   the tent, and she never came back.

25            MR. LAUER:  Thank you.  I have no further questions.
```

12:50PM (line 10)
12:51PM (line 20)

```
 1              THE COURT:  Any redirect?
 2              MR. VARGHESE:  No, your Honor.
 3              THE COURT:  All right, thank you.  You may step down.
 4              (Witness excused.)
 5              THE COURT:  All right, we're not behind schedule,
 6      correct?
 7              MR. VARGHESE:  No, your Honor, we're not.
 8              THE COURT:  All right, in that case, why don't we
 9      break for the day then.
10              All right, ladies and gentlemen, I talked with the
11      lawyers this morning, and they said that we're on schedule, and
12      they don't expect that we need any afternoon sessions next
13      week, which I assume remains true, correct?  So we will break
14      for the weekend.  Please remember my instructions not to
15      discuss the case among yourselves or with anyone else or to
16      read or listen to anything about the case, and we will see you
17      Monday morning at 9:00 o'clock.  And have a good weekend, all
18      of you.
19              THE CLERK:  All rise.
20              (Jury excused.)
21              THE COURT:  All right, have a good weekend, and Monday
22      morning at 8:30.
23              (Adjourned, 12:53 p.m.)
24              (Whereupon, the hearing was adjourned at 3:06 p.m.)
25
```

J.A. 688