UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

No. 19-1689

_____

UNITED STATES,
Appellee,

v.

JEAN LEONARD TEGANYA,
Defendant-Appellant.

_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

JOINT APPENDIX
VOLUME II

_____


Christine DeMaso
Assistant Federal Public Defender
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061


For Jean Leonard Teganya

Alexia DeVincentis
Assistant U.S. Attorney
U.S. Attorney's Office
1 Courthouse Way, Ste 9200
Boston, MA 02210
617-748-3394


For the United States

# TABLE OF CONTENTS

## VOLUME I

District Court Docket Sheet ............................................................. J.A. 1

Indictment ......................................................................................... J.A. 23

Pretrial Conference Transcript (3/5/19) ..................................... J.A. 38

Trial Transcript Day 2 (3/11/19) .................................................. J.A. 76

Trial Transcript Day 3 (3/12/19) .................................................. J.A. 199

Trial Transcript Day 4 (3/13/19) .................................................. J.A. 375

Trial Transcript Day 5 (3/14/19) .................................................. J.A. 479

Trial Transcript Day 6 (3/15/19) .................................................. J.A. 595

## VOLUME II

Trial Transcript Day 7 (3/18/19) .................................................. J.A. 689

Trial Transcript Day 8 (3/19/19) .................................................. J.A. 818

Trial Transcript Day 9 (3/20/19) .................................................. J.A. 920

Hearing Transcript (3/21/19) ........................................................ J.A. 1015

Trial Transcript Day 10 (3/22/19) ................................................ J.A. 1042

Trial Transcript Day 11 (3/25/19) ................................................ J.A. 1142

Trial Transcript Day 12 (3/26/19) ................................................ J.A. 1250

Trial Transcript Day 13 (3/27/19) ................................................ J.A. 1348

## **VOLUME III**

Telephone Conference (3/29/19) .............................................................J.A. 1428

Trial Transcript Day 14 (4/1/19) ...........................................................J.A. 1454

Trial Transcript Day 15 (4/2/19) ...........................................................J.A. 1597

Trial Transcript Day 16 (4/3/19) ...........................................................J.A. 1663

Trial Transcript Day 17 (4/4/19) ...........................................................J.A. 1795

Trial Transcript Day 18 (4/5/19) ...........................................................J.A. 1947

Trial Exhibit 1 ........................................................................................J.A. 2065

Trial Exhibit 3 ........................................................................................J.A. 2076

Trial Exhibit 65 ......................................................................................J.A. 2091

Trial Exhibit 75 ......................................................................................J.A. 2092

Trial Exhibit 76 ......................................................................................J.A. 2093

Trial Exhibit 81 ......................................................................................J.A. 2094

Notice of Appeal (D.E. 75) ....................................................................J.A. 2095

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     UNITED STATES OF AMERICA,            )
                                           )
5     vs.                                  ) Criminal Action
                                           )
6     JEAN LEONARD TEGANYA,                ) No. 17-10292-FDS;
                         Defendant         )
7                                          )
                                           )
8                                          )

9

10    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                          JURY TRIAL DAY 7

12

13

14

                John Joseph Moakley United States Courthouse
15                        Courtroom No. 2
                          One Courthouse Way
16                        Boston, MA 02210

17

18

19                        March 18, 2019
                            9:01 a.m.
20

21

22

                          Valerie A. O'Hara
23                        Kathleen Mullen Silva
                          Official Court Reporter
24         John Joseph Moakley United States Courthouse
                      1 Courthouse Way, Room 3204
25                        Boston, MA 02210
                   E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;
5
     For the Defendant:
6
             Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.
8
     ALSO PRESENT:
9
     Augustin Mutemberezi, Interpreter
10   Moses B. Rndasunikwa, Interpreter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS                     DIRECT   CROSS   REDIRECT   RECROSS
     MEAGHANN BOYLE
3       By Mr. Garland            11                59
        By Mr. Lauer                      47
4    INNOCENT HABIMANA
        By Mr. Varghese           60               127
5       By Mr. Lauer                      106

6


7

     EXHIBITS                              FOR I.D.   IN EVIDENCE
8
         1                                                23
9        3                                                43
         4                                                45
10      29                                                77
        30                                                79
11      17                                                84
        27                                                94
12      32                                                95
        34                                                99
13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                        PROCEEDINGS
 2            THE CLERK:  All rise.  Thank you.  You may be seated.
 3    Court is back in session.
 4            THE COURT:  All right.  Good morning.
 5            MR. GARLAND:  Good morning.
 6            THE COURT:  What, if anything, do we have to talk
 7    about?
 8            MR. GARLAND:  Nothing for today, but a long term
 9    scheduling question that I personally have, which I can't
10    imagine that this trial is going to go to April 19th, but I was
11    looking at the calendar.  That's the first night of passover.
12            THE COURT:  Okay.
13            MR. GARLAND:  I don't know whether there are jurors
14    who want to celebrate.  I was wondering whether to go buy a
15    ticket to go down to D.C. to see family down there
16    mid-afternoon.
17            THE COURT:  Okay.
18            MR. GARLAND:  I wanted to raise that it was a
19    possibility with the Court, if not, that's okay as well.
20            THE COURT:  My guess is you can probably call that a
21    free day.  I don't know, Mr. Lauer, what do you think?
22            MR. LAUER:  I informed Mr. Garland I don't envision
23    our case going anywhere near April 19th.  Of course, you know,
24    how long the jury deliberates, I can't say, but I wouldn't have
25    an objection to not sitting.
</pre>

1          THE COURT:  Another possibility is that they're simply

2    deliberating, you really don't need to be here, as long as

3    someone is here.  It doesn't have to be Mr. Varghese.  If we

4    wind up taking a verdict that day, we'll cross that bridge when

5    we come to it.  Buy your plane ticket.

6          MR. GARLAND:  Thank you, your Honor.

7          THE COURT:  We'll worry about it when it happens.  All

8    right.  Anything from the defense?  Mr. Lauer.

9          MR. LAUER:  No, I don't think so, your Honor.

08:36AM 10          THE COURT:  All right.  Okay.

11          THE CLERK:  All rise.

12          (A recess was taken.)

13          THE CLERK:  All rise.  Thank you.  You may be seated.

14          THE COURT:  Counsel.

15          MR. LAUER:  Yes, your Honor, there's one issue that

16    after some discussion I'd like to bring to your attention.  The

17    government will be calling as their first witness an official

18    with the United States Citizenship and Immigration Agency,

19    and --

08:49AM 20          THE COURT:  Can I get you to move the mic. a little

21    closer?

22          MR. LAUER:  Sorry, your Honor.  The government will be

23    putting in Mr. Teganya's asylum application through their first

24    witness, Ms. Boyle.  In the list of exhibits that was provided

25    at an earlier point, the government did identify as

```
 1    Exhibit Number 2 an affidavit that was submitted by

 2    Mr. Teganya.

 3              THE COURT:  Yes.

 4              MR. LAUER:  As part and parcel of his asylum

 5    application.

 6              THE COURT:  Yes.

 7              MR. LAUER:  The government has disclosed this morning

 8    that they will not be offering that.

 9              THE COURT:  Okay.

10              MR. LAUER:  And I think we do have somewhat of a

11    problem here because the exhibit that they will be offering,

12    Exhibit Number 1, which is the form, the I-589 application for

13    asylum form on Part B, there's a number of answers provided by

14    Mr. Teganya that reference a detailed declaration to be

15    submitted, and so essentially we have an issue of completeness

16    here.

17              This is not the complete asylum application, and the

18    form itself makes clear that a more detailed statement

19    providing answers to the questions will be submitted, and, in

20    fact, was submitted in the form of the affidavit, so I would

21    raise an objection to offering only the form without the

22    affidavit that accompanied it.

23              THE COURT:  Okay.  Mr. Garland.

24              MR. GARLAND:  Thank you, your Honor.  A couple of

25    things.  First, the affidavit has lots of things in it that are
```

7-7

1    not even relevant to the questions that are really at issue in

2    this case, so if the affidavit were to come in, which it should

3    not, it would need to be redacted.

4          Second, the affidavit does not correct the misleading

5    and false answers on this application, that is, where

6    Mr. Teganya answers a question and says -- it asks for his

7    political party, and he doesn't list the MRND, on that

8    affidavit, he doesn't come out and say, do you know what, I

9    messed up there, I was part of the MRND.

08:51AM 10          Instead what he does on that affidavit is try to

11    explain why other people might think that he's in the MRND but

12    he really wasn't.

13          Another one of the questions that forms the basis of

14    these charges is whether he ever participated at all in

15    essentially genocide or violence, and that's on page 7 of

16    Exhibit 1.  That one doesn't make reference to the affidavit at

17    all.

18          It is true that there are other questions on this

19    application that do make reference to the affidavit, but those

08:51AM 20    aren't really the heart of the case, so, for example, there is

21    a question in here about why he fears harm if he were to go to

22    Rwanda, and he says here's my reason, look at the affidavit,

23    but the jury doesn't have to decide whether he was entitled to

24    asylum, all it needs to decide is whether he lied on the

25    particular questions, and for those reasons, we believe that

J.A. 695

```
 1    the affidavit doesn't come in.

 2            If we wanted to, if we had made the decision that we

 3    would want to put it in, then it comes in as an admission of a

 4    party opponent; from them, it's hearsay.

 5            THE COURT:  Right.  I don't think that's the issue, I

 6    think the issue is some variation of the rule of completeness.

 7    I haven't studied this very carefully, I haven't studied it at

 8    all before this moment, but my reaction to this is in fairness,

 9    if they ask a question that says I will submit a detailed

10    declaration prior to my asylum hearing, for example, as to

11    fearing harm if he returns, and there's something in the

12    affidavit about fearing harm that that probably ought to come

13    in in redacted version, but it has to tie in to Part A.

14            In other words, I don't think under the rule of

15    completeness he necessarily gets the whole affidavit in, he

16    gets that portion of the affidavit that's necessary to

17    understand his answer, which I don't think is everything, so

18    why don't -- I guess we're going to need to revisit this, but

19    that's my initial reaction anyway is that certain portions of

20    this may come in in redacted fashion, if necessary, to make the

21    answers complete, but I would doubt that the entire affidavit

22    needs to come in under a rule of completeness.

23            I'm going to have to read it, you are going to have to

24    tell me what you think ought to come in and not come in under

25    that ruling, and we'll have to take it from there, but I think
```

08:52AM (line 10)
08:53AM (line 20)

## J.A. 696

1    it needs to tie into the specific questions here that are the

2    subject of Part A and that are part of the trial, and there's

3    lots of stuff in here, I think, that probably is not relevant

4    to that.

5         I'm assuming that we don't necessarily need to recall

6    the witness, even if it takes us a day or two to get to that

7    point in terms of what needs to be redacted.

8         MR. GARLAND:  I guess that depends.  We have not put

9    together a redacted affidavit.

08:54AM 10    THE COURT:  Right.  In other words, is this person

11    local?

12         MR. GARLAND:  Yes, she's head of the Boston sub

13    office.

14         THE COURT:  So we could recall her without too much

15    difficulty if we need to to explain what the affidavit is if

16    you can't agree.

17         MR. GARLAND:  I think that's correct.  I mean, I can

18    also ask her a couple of questions about -- because she has

19    looked at the affidavit, I might be able to ask her questions

08:55AM 20    about whether the affidavit corrects this or says something

21    different about the MRND.

22         THE COURT:  Well, that's asking her to characterize

23    something that may or may not be in evidence.  I'm not sure.

24         MR. GARLAND:  Right.

25         THE COURT:  Well, let's take it a step at a time, and,

1    if necessary, we'll recall her.  In other words, you can put

2    her on now.  If we don't have an affidavit, redacted affidavit

3    finalized until Wednesday and we need to recall her to explain

4    that affidavit, that's not a very big deal it seems to me.

5        MR. GARLAND:  So, would she be subject to

6    cross-examination on that affidavit today then because I worry

7    about whether goes up on the screen and there are portions that

8    are shown to the jury that should have been redacted?

9        THE COURT:  Right.  I think that that's maybe

08:55AM 10    problematic, so maybe we should hold off on everything about

11    the affidavit and just assume that she is going to be recalled

12    because you probably are going to want to cross-examine her.

13        MR. LAUER:  I can refrain from that today, and perhaps

14    in the next day or two, the parties can conference, you know,

15    what parts we deem relevant or explanatory to what is at issue.

16        THE COURT:  And whether she needs to -- I wouldn't

17    recall her to authenticate the thing, I don't think that's

18    going to be necessary, but we can talk about that, whether she

19    needs to be recalled either for direct or additional cross, and

08:56AM 20    I have no idea, it might be a single sentence from this

21    affidavit, it might be pages.  Again, I haven't read it.  I

22    don't know.

23        MR. GARLAND:  Right.  Your Honor, what I'll do after

24    this is I'll go back, I just want to make sure that she has no

25    travel that's scheduled for later this week.  If it turns out

# J.A. 698

1    that it is, then maybe we'll have to think of what that looks

2    like for today.

3            THE COURT:  In the meantime, I'll read this thing and

4    try to get my own thoughts on it.

5            MR. GARLAND:  Your Honor, may I be excused so I can go

6    talk to her about that?

7            THE COURT:  Yes.

8            MR. GARLAND:  Thank you.

9            THE CLERK:  All rise for the jury.

08:59AM 10            (JURORS ENTERED THE COURTROOM.)

11            THE CLERK:  Thank you.  You may be seated.  Court is

12    now back in session.

13            THE COURT:  Ladies and gentlemen, welcome back.  I

14    hope you had a good weekend.  Are we ready to go?

15            MR. GARLAND:  We are, your Honor.

16            THE COURT:  All right.

17            MR. GARLAND:  Your Honor, the government calls

18    Meaghann Boyle to the stand.

19            MEAGHANN BOYLE, having been duly sworn by the Clerk,

08:59AM 20    testified as follows:

21                        DIRECT EXAMINATION

22    BY MR. GARLAND:

23    Q.   Good morning.  Can you tell the jury your name and how to

24    spell it?

25    A.   Good morning.  My name is Meaghann Boyle spelled

## J.A. 699

1    M-e-g-h-a-n-n B-o-y-l-e.

2    Q.    If you could move the microphone closer to you, that would

3    be helpful.  Thank you.  Who do you work for?

4    A.    I work for U.S. Citizen and Immigration Service, which is

5    part of the Department of Homeland Security.

6    Q.    Do you work within a specific office within CIS?

7    A.    Yes, I work within the asylum program.

8    Q.    In a few minutes, I'm going to ask you to explain what

9    asylum is and how aliens obtain it, but generally for now, what

09:00AM 10    does the asylum office do?

11    A.    What our office does is we process applications that are

12    filed by people who are citizens of other countries, who are

13    claiming they are afraid to return to their home country.

14    Q.    Can you tell the jury a little bit about your education?

15    Where did you go to college?

16    A.    I went to UMass Amherst.

17    Q.    And did you get a degree after college?

18    A.    Yes, I went to law school after college, the University of

19    California at Hastings.

09:00AM 20    Q.    When did you receive your law degree?

21    A.    In 2007.

22    Q.    In law school, did you study any particular area?

23    A.    I did, I focused on immigration law in law school.

24    Q.    What's your job title right now?

25    A.    I'm the director of the Boston Asylum Sub Office.

J.A. 700

```
 1   Q.   And when you say "sub office," can you explain that to the
 2   jury?
 3   A.   Yes.  There are eight main asylum offices in the
 4   United States, and then there are some sub offices that are
 5   smaller, and we report to the main office, one of the main
 6   offices in New Jersey.
 7   Q.   When did you become the sub office director in Boston?
 8   A.   In 2015.
 9   Q.   Can you tell the jury what other positions you've had
10   within the CIS?
11   A.   Yes, I started in 2007 as an asylum officer, and I've also
12   been a supervisory asylum officer.
13   Q.   In what locations?
14   A.   I was an asylum officer in both the San Francisco and the
15   New Jersey offices, and I was a supervisor in the New Jersey
16   office.
17   Q.   When did you become the supervisor?
18   A.   In 2012.
19   Q.   What geographic region does your office handle, just
20   requests for asylum from people in Boston?
21   A.   No, our office handles applications from anybody living in
22   the states of Maine, New Jersey, Massachusetts or Rhode Island.
23   Q.   And would that include people who cross over into Maine as
24   well?
25   A.   Yes.
```

```
 1   Q.   How many people do you supervise?

 2   A.   Twenty-four.

 3   Q.   What types of positions do they hold?

 4   A.   I supervise the asylum officers, the supervisory asylum

 5   officers, training officers.  We have support staff who do our

 6   clerical work, mission support staff who do administrative

 7   office functions.

 8   Q.   And what do the asylum officers do?

 9   A.   The asylum officers are reading the applications that are

10   submitted for asylum, they're interviewing the applicants, and

11   they're making the decision whether or not the applicant is

12   eligible for asylum.

13   Q.   Are they the only people who decide whether somebody is

14   entitled to asylum in the immigration process?

15   A.   No, that's also a function that's shared by the

16   immigration courts as well for applicants who are in removal

17   proceedings.

18   Q.   And what are your responsibilities as a supervisor of the

19   office?

20   A.   Right now I'm managing kind of the overall office

21   functions, making sure the office has the resources it needs to

22   do the work we're supposed to do.  I also occasionally review

23   some of the cases that come through our office to make sure

24   that we're making decisions that are within the bounds of the

25   law, and I also have conducted trainings for my staff.
```

J.A. 702

1    Q.    Have you done trainings elsewhere in the country?

2    A.    Yes, I have.  I've also conducted trainings at our -- the

3    program has a national training class that all new asylum

4    officers go to.

5    Q.    I think you said before that you had worked as an asylum

6    officer yourself.  How long have you done that function?

7    A.    I was an asylum officer for five years.

8    Q.    And can you describe at a high level what you would do as

9    an asylum officer when you got a claim?

09:03AM 10    A.    We would review the -- I would review the application that

11    was submitted by the applicant, we would run security

12    background checks on the person, and I would look at the

13    results of those checks, I would interview the applicant to

14    talk about their claim with them and to if they were giving me

15    credible testimony, and then do the -- once I had gathered all

16    that evidence, would make the decision whether they were

17    eligible for asylum under the law.

18    Q.    So from all of that, are you familiar with the processes

19    of how an alien obtains asylum in the United States?

09:04AM 20    A.    Yes, I am.

21    Q.    Why would asylum be decided by an asylum officer versus an

22    Immigration Judge?

23    A.    Well, the people that our office sees are people who have

24    come to the United States and are not in -- they have not been

25    detained, they have not been placed into removal proceedings in

**J.A. 703**

1    front of an Immigration Judge, so they are able to file with

2    our office, and then anybody who has been arrested or detained

3    and is in removal proceedings in front of an Immigration Judge

4    would have to file the asylum application with the judge.

5    Q.    And can you explain that in layman terms about removal

6    proceedings detention?

7    A.    All right.  So removal proceedings are a process through

8    which the government decides if somebody can stay in the

9    United States or if they need to be removed back to their home

09:05AM 10    country, and the detention often happens when somebody crosses

11    a border without permission, they come into the United States

12    without permission, or perhaps they came into the United States

13    initially with permission but stayed longer than they had

14    permission to be here.  They might be arrested by ICE or Border

15    Patrol.

16    Q.    And just to be clear, asylum applicants are people who

17    have no U.S. citizenship status; is that right?

18    A.    Correct.

19    Q.    Would the standards for deciding asylum be different for

09:05AM 20    an asylum officer versus an Immigration Judge?

21    A.    No, we're looking at the same law.

22    Q.    And would an Immigration Judge ever review the decisions

23    of an asylum officer to grant or deny slum?

24    A.    No, they don't review our decisions.

25    Q.    So what does it mean when a person in the United States

**J.A. 704**

1    claims asylum?

2    A.    That means that they are saying that they have either been

3    harmed, seriously harmed in their home country in the past, or

4    they fear they will be harmed in their country if they go back

5    to their country now, and the reason for that harm is a

6    characteristic that they hold that they can't change or they

7    shouldn't be required to change, and some examples of those

8    would be race or religion or political opinion.

9    Q.    What's the purpose of asylum?

09:06AM 10    A.    The purpose of asylum is to protect people who do have a

11    real fear of harm in their country.

12    Q.    And if a person is granted asylum, what do they get?

13    A.    Initially they get, you know, permission to stay in the

14    United States, we will not return them to their home country.

15    They're allowed to work, and down the line, they can apply for

16    other more permanent status in the United States, such as legal

17    permanent residence, which is referred to as getting the green

18    card, and then even farther down the line from that, they can

19    get citizenship in the United States.

09:07AM 20    Q.    Can an alien claim that he has a right to asylum in the

21    U.S.?

22    A.    No, there isn't a right to asylum.  There are times under

23    the law where even though somebody might be qualified and are

24    refugee under the law, we would say that we would not grant

25    them asylum.

1  Q.   And are there laws without naming specific with ones that

2  govern the process?

3  A.   Yes.

4  Q.   So how would an alien claim asylum?

5  A.   In the case of our office, the alien would file an

6  application called the I-589, which is the asylum application.

7  They'll fill that out with all kinds of identity and

8  biographical information about them.  It talks about how they

9  entered the country and where they're from and what they fear

09:07AM 10  if they were returned to their country.

11       Once that application is filed with us, we schedule

12  them for an interview so an officer can talk to them, and what

13  the officer is looking to do during that interview is see if

14  their testimony is credible and then see if the facts that

15  they're giving them make them eligible for asylum under the

16  law.

17  Q.   So you talked about this a little bit, but if you can be a

18  little more detailed.  What specifically would the asylum

19  applicant have to prove to be qualified for asylum?

09:08AM 20  A.   They have to prove that they would be in danger back in

21  their home country.

22  Q.   And by -- by danger from whom?

23  A.   Well, it could be from the government or it could be from

24  other people in the country that the government can't control

25  or can't protect them from.

```
 1    Q.    What would be some examples of that?
 2    A.    Probably the best example would be Jewish people in
 3    Germany during the Nazi regime.  They would have been people
 4    targeted and tortured and killed by that government because of
 5    their religion.
 6              Another would be, in fact, the genocide in Rwanda
 7    where the Hutu ethnic group was killing and torturing the Tutsi
 8    ethnic group, so those are a couple examples of reasons people
 9    might file for asylum and say they cannot return to their home
10    country.
11    Q.    And how does an asylum officer or an immigration Judge
12    tell whether the person is qualified based on the application
13    and the interview?
14    A.    Well, we're looking at, again, when we're interviewing the
15    applicant, we're seeing if what they're telling us during the
16    interview is consistent with what they've put on their
17    application.  A lot of times, they also submit a written
18    statement that summarizes why they are applying for asylum.
19              We want to see that what they say when they're talking
20    to us is consistent with that information.  We're looking at
21    reports made by organizations that study the countries that the
22    applicants are from, and we can see what kinds of conditions
23    are going on in the country, but mainly we're looking at what
24    the applicant is saying to us and assessing how credible their
25    statements are.
```

J.A. 707

```
 1   Q.   Is there a decision process that you go through or that
 2   you train officers to go through?
 3   A.   Yes, so the officers initially are going to be, like I
 4   said, assessing the credibility of the applicant, and then
 5   they're going to be looking at that testimony.  If they find it
 6   credible, they're going to look at that testimony along with
 7   the evidence of conditions in the country and looking at the
 8   law to see if those facts fit the eligibility for asylum under
 9   the law, and then they're going to assess whether or not there
10   are any reasons why we would not grant this person asylum.
11   Q.   And so any facts or factors disqualify a person from
12   obtaining asylum?
13   A.   Yes.
14   Q.   What would those be?
15   A.   There are a number of reasons under the law why we might
16   not grant somebody asylum even if we did think that they
17   legitimately had a fear of returning to their country.  Some of
18   those would be if they've engaged in certain criminal activity,
19   they would not be eligible to be granted asylum, and then
20   there's disqualifications where if you have been involved with
21   or have supported terrorist organizations or terrorist activity
22   anywhere in the world.
23        And another one would be if the applicant themselves
24   were engaged in harming other people in the same way that they
25   are claiming to fear harm in their own country.
```

09:10AM (line 10)
09:10AM (line 20)

**J.A. 708**

1    Q.    And can you give some examples of situations in which

2    somebody has been disqualified from getting asylum?

3    A.    Yes.    There are times when people have come from areas

4    where there are lots of different militaristic groups in the

5    area, and so maybe they gave money to a specific group that

6    they supported and that group committed atrocities against

7    other people, then we would say that you supported a terrorist

8    organization, and you cannot get asylum in the United States

9    even if you legitimately fear returning to your country.

09:11AM 10    Q.    And do you understand that bar that you just talked about

11    to be a government policy, or is it part of U.S. law?

12    A.    It's part of the U.S. law.

13    Q.    And just so the jury is clear, is there a difference

14    between claiming asylum and claiming refugee status?

15    A.    Yes, there is.

16    Q.    Can you explain that?

17    A.    Well, the asylum status is what we do when somebody is

18    within -- physically within the United States and claims that

19    they're afraid to go back to their country.    The refugee law is

09:12AM 20    what we use when we send -- we have a sister program, the

21    refugee program, and they send their officers overseas to

22    interview people who are living in refugee camps, and that's

23    the refugee program, and they adjudicate the refugee law.

24    Q.    So, does CIS keep records of the process you described?

25    A.    Yes, we do.

# J.A. 709

1  Q.   Have you reviewed records concerning that process

2  concerning the defendant, Mr. Teganya?

3  A.   Yes, I have.

4  Q.   So the first step in applying for asylum, I think you

5  testified before is filling out a form.  What's the name of

6  that form again?

7  A.   It's the I-589 application of asylum and withholding of

8  removal.

9  Q.   And is that form required to start the application

09:12AM 10  process?

11  A.   Yes.

12  Q.   Does it matter if the applicant entered the U.S.

13  illegally?

14  A.   No, it does not.

15  Q.   And how much does it cost to obtain a form I-589?

16  A.   There's no filing fee for the 589.

17  Q.   And have you reviewed an I-589 that you believe was

18  completed by the defendant, Mr. Teganya?

19  A.   Yes, I have.

09:13AM 20       MR. GARLAND:  We can show the witness and the parties,

21  your Honor, Exhibit 1.

22  Q.   Have you seen this before?

23  A.   Yes, I have.

24  Q.   What is it?

25  A.   It's an I-589 filled out by Jean Leonard Teganya.

```
 1              MR. GARLAND:  Your Honor, we move Exhibit 1 into
 2     evidence.
 3              THE COURT:  It's admitted, Exhibit 1.
 4              (Exhibit No. 1 received into evidence.)
 5     Q.   So, is there a way on the first page to tell that it is
 6     the I-589 of Mr. Teganya?
 7     A.   Yes, his name is on the first page.
 8     Q.   And is that typically verified throughout the application
 9     process?
10     A.   Yes.
11     Q.   How so?
12     A.   We will take his name and date of birth and run it through
13     a number of background checks through other government
14     agencies.
15     Q.   And then if you go to the page 9, do you see a printed
16     name and signature here?
17     A.   Yes, I do.
18     Q.   Whose name is that?
19     A.   Jean Leonard Teganya.
20     Q.   Sticking with this page right here, did Mr. Teganya make
21     any promises when signing this document?
22     A.   Yes, he promises to tell the truth in this document.
23     Q.   And if you could actually read that first page.
24     A.   Yes, it says, "I certify under penalty of perjury under
25     the laws of the United States of America that this application
```

09:13AM (line 10)
09:14AM (line 20)

**J.A. 711**

```
 1   and the evidence submitted with it are all true and correct."

 2   Q.   Is that standard?

 3   A.   Yes.

 4   Q.   Is there a reason why applicants are required to swear an

 5   oath that their answers will be true and correct?

 6   A.   Because we rely a lot on the testimony and the information

 7   given to us by the applicant to determine if they are eligible

 8   for asylum.

 9   Q.   Okay.  I want to go through this application with you
```

09:15AM 10   section by section, so let's go back to the first page.  Can

```
11   you tell the jury speaking very generally what types of

12   information is requested or are requested on the first page?

13   A.   The first page is requesting pretty basic information,

14   name, date of birth, where you were born, and what country

15   you're a citizen of, and then a little bit of information about

16   when and how you entered the United States.

17   Q.   And why does the form call for this information?

18   A.   For, like I said, we'll utilize the biographic information

19   to run background and security checks on the applicant.
```

09:15AM 20   Knowing where they are from will help the officer know what

```
21   country they need to familiarize themselves with before they

22   conduct the interview.

23   Q.   And when you turn to question 7 on that, can you see, what

24   does it ask for?

25   A.   Their residence in the United States.
```

**J.A. 712**

```
 1              MR. GARLAND:  And actually if we can highlight that,
 2      that will be helpful.
 3      Q.    What did Mr. Teganya answer for this question?
 4      A.    24 Long Pond Road in Plymouth, Massachusetts.
 5      Q.    Does that address have any significance to you?
 6      A.    Yes.
 7      Q.    What's the significance?
 8              MR. LAUER:  Your Honor, objection.
 9              THE COURT:  Let me see counsel at sidebar.
10              (THE FOLLOWING OCCURRED AT SIDEBAR:)
11              THE COURT:  I see Plymouth County House of Correction.
12              MR. GARLAND:  It is, and one of their elements is that
13      he's subject to a detention hearing, and I want to show that
14      he's in detention at the time of that time.
15              THE COURT:  I mean, he's detained on immigration
16      grounds, right, not on criminal grounds, right?
17              MR. LAUER:  At the time, yes.
18              MR. GARLAND:  That's correct.
19              MR. LAUER:  I would hope that the questioning would
20      make that clear and that there's not the creation of any
21      improper reference.
22              THE COURT:  I'll allow it, just make that clear with
23      even a little bit of leading if you need to.
24              MR. GARLAND:  Okay.
25              THE COURT:  Make clear that he's in immigration
```

09:16AM is noted at line 10.
09:17AM is noted at line 20.

**J.A. 713**

1    detention, at this point he's not even accused of a crime,

2    something like that.

3            MR. GARLAND:  Thank you.

4            (SIDEBAR CONFERENCE WAS CONCLUDED)

5            THE COURT:  Go ahead.

6            MR. GARLAND:  Thank you, your Honor.

7    Q.    So what's the significance of that address to you?

8    A.    That is the address of the Plymouth correctional facility.

9    Q.    And os you understand from that that Mr. Teganya at the

09:17AM 10   time was in detention only for immigration proceedings because

11   of his arrest up in Maine; is that right?

12   A.    Correct.

13   Q.    And that was just for coming over the border at that time?

14   A.    Yes.

15   Q.    What do questions -- well, let's start with Question 12.

16   What does Question 12 ask for?

17   A.    City and country of birth.

18   Q.    And then 13, 14?

19   A.    Present nationality, nationality at birth.

09:18AM 20   Q.    And then 19 as well?

21   A.    What country issued their last passport or travel

22   document.

23   Q.    And what did Mr. Teganya answer in these?

24   A.    Each one was answered with Rwanda.

25   Q.    And one thing I should have asked you a little bit

J.A. 714

            1    beforehand.  Is an applicant allowed to get the help of anybody

            2    to fill out an application like this?

            3    A.    Yes, they are.

            4    Q.    When you looked at this, could you tell whether

            5    Mr. Teganya had any help to do so?

            6    A.    It appears so, yes.

            7    Q.    And how could you tell that?

            8    A.    On the last page or page 9 where his signature was, there

            9    was also a signature of an attorney.

09:18AM 10    Q.    Okay.  So the answers to 12, 13, 14 and 19 were what

           11    country?

           12    A.    Rwanda.

           13    Q.    Does the country that's listed in any of these fields have

           14    any effect on the questions that an immigration Judge or asylum

           15    officer might ask the applicant?

           16    A.    Yes.

           17    Q.    How might he do so?

           18    A.    Well, asylum can only be claimed from your country of

           19    citizenship, so we need to know what that country is and

09:19AM 20    sometimes people may have been born in one country but have

           21    citizenship in another country, so it determines what kind of

           22    questions the officer is going to ask.

           23    Q.    Now, as a professional who has handled asylum claims, have

           24    you received any training or experience in handling asylum

           25    claims from Rwandan citizens?

# J.A. 715

```
 1   A.   Yes.
 2   Q.   And what did you learn were the significant points that
 3   you should inquire about?
 4   A.   Well, our officers and myself who have interviewed
 5   Rwandans before, we are aware of the genocide that occurred in
 6   the 1990's, and we're aware of the current conditions of who's
 7   in power in the country, and we do conduct fairly frequently
 8   trainings for our officers on country conditions from different
 9   areas where we see applications from.
10   Q.   Now, if you could highlight question 23, which is towards
11   the bottom of the page in the middle.  If you turn to question
12   23, what does it ask for?
13   A.   "Are you fluent in English?"
14   Q.   And why do they ask whether the applicant is fluent in
15   English?
16   A.   Well, when we conduct the interview, we need to know if we
17   are going to need interpreters, so if they are fluent in
18   English, there's a chance that they would testify in English
19   when they come and speak with us.
20   Q.   What did Mr. Teganya answer here?
21   A.   He said yes.
22   Q.   And does the form ask for any other languages that the
23   applicant speaks?
24   A.   Yes, it asks for their native language and then any other
25   languages that they feel they speak fluently.
```

09:20AM is noted at lines 10 and 20.

```
 1    Q.   And what languages does this indicate Mr. Teganya spoke,

 2    if any?

 3    A.   He said he speaks Kinyarwandan, French, Swahili and

 4    Spanish.

 5    Q.   And is this for the same purposes of translation you

 6    mentioned before?

 7    A.   Yes.

 8    Q.   So if we turn to the next page, generally what does this

 9    part of the application call for?

09:21AM 10    A.   This part of the application is asking for biographical

11    information about the applicant's spouse and children, if they

12    have any.

13    Q.   Why does it ask for this information?

14    A.   For a couple reasons.  Sometimes part of their claim is

15    that harm has caused to their family members, and so we want to

16    verify what family members we're talking about, but also if an

17    applicant is granted asylum, their family members can also get

18    that benefit through them as well.

19    Q.   So, is the information that's supplied or asked for in

09:21AM 20    this portion of it, is it important?

21    A.   Yes.

22    Q.   Is it important even if the applicant has no family in the

23    United States that they're declaring?

24    A.   Yes.

25    Q.   And why is that?
```

J.A. 717

```
 1   A.   Well, if they have these family members that are outside
 2   the United States, down the line, they could apply for those
 3   family members to come to the United States and get the
 4   benefits of asylum through them.
 5         Also, again, if a spouse or a child was part of their
 6   claim that that spouse or child was harmed or was in danger, we
 7   would want to know who those people are.
 8   Q.   And is this information sometimes used to verify other
 9   information throughout the asylum process?
10   A.   Yes.
11   Q.   And turning to page 4, so two pages on, what does this
12   next section ask for?
13   A.   This section is asking for where they have lived, where
14   they lived immediately prior to coming to the United States as
15   well as the last location they lived in their home country,
16   their addresses in the United States for the prior five years,
17   their educational history, their work history, and their other
18   family members, including their parents and siblings.
19   Q.   Is the information requested on this part of it important
20   to the application process?
21   A.   Yes.
22   Q.   Why is that?
23   A.   Well, we would want to know where they were living in
24   their country before they came to the United States as part of
25   the process of assessing their claim.  Oftentimes, educational
```

(line 10)

(line 20)

J.A. 718

         1    history can be relevant to an asylum claim, and, again, with

         2    family members, we're just trying to assess if there's danger

         3    to the family, who are those family members.

         4    Q.    And some of this information is verified at times?

         5    A.    Yes.

         6    Q.    Can you tell from question 1, if we could have that

         7    highlighted, where Mr. Teganya had lived in August of 2014?

         8    A.    Yes, he lived in Quebec, Canada.

         9    Q.    And if we go down to question 2 and highlight that, are

09:24AM 10    there any other places listed as places of residence during

        11    August of 2014?

        12    A.    Yes, Portland, Maine and Plymouth, Massachusetts.

        13    Q.    Okay.  We move onto the next section of the document, so

        14    going ahead one page and then the further page, so am I correct

        15    that at the top it says information about your application

        16    here?

        17    A.    Yes.

        18    Q.    And speaking very generally, what types of information

        19    does this section ask for?

09:24AM 20    A.    This section is really asking the applicant why they are

        21    filing for asylum and what they fear.

        22    Q.    And is it important?

        23    A.    Yes, it is.

        24    Q.    Why is that?

        25    A.    Well, that is the claim that they're making is that

1    they're afraid to return to their country, so this is really

2    giving us the beginning of that information of why that is.

3    Q.    So on this, does Mr. Teganya indicate a fear of returning

4    to Rwanda?

5    A.    Yes, he does.

6    Q.    Which questions does he do that in?

7    A.    In Question 1B.

8    Q.    Okay.  And so what's the importance of this question then?

9    A.    1B asks, "Do you fear harm or mistreatment if you return

09:25AM 10    to your home country," so this is important because this is the

11    applicant's opportunity to say they are afraid, that they will

12    be harmed if they return to their country.

13    Q.    So this is really the heart of the asylum claim?

14    A.    Yes, correct.

15    Q.    So then if we move to the next page, what is asked for on

16    this page by the form?

17    A.    This page is asking about if the applicant or any family

18    members have been arrested or detained, interrogated or

19    convicted in any country other than the United States.  It's

09:25AM 20    asking if the applicant or their family members have been

21    members of any types of groups, and if they are currently at

22    the time the application was filed, if they are still currently

23    members of those groups, and if they fear torture if they were

24    returned to their country.

25    Q.    Is the information that's requested on this page important

**J.A. 720**

1    to the process?

2    A.   Yes, it is.

3    Q.   If we can blow up Question 3A, which is the second

4    question down, can you read that question for the record and

5    the jurors?

6    A.   "Have you or your family members ever belonged to or been

7    associated with any organizations or groups in your home

8    country, such as, but not limited to, a political party,

9    student group, labor union, religious organization, military or

09:26AM 10   paramilitary group, civil patrol, gorilla organization, ethnic

11    group, human rights group, or the press or media?"

12    Q.   And what did Mr. Teganya write here or answer here?

13    A.   He answered yes.

14    Q.   And if the answer is yes, what does the form call for?

15    A.   "If yes, describe for each person the level of

16    participation, any leadership or positions held and the length

17    of time you and your family members were involved in each

18    organization or activity."

19    Q.   And we'll get to the answer in a moment, but why does the

09:27AM 20   form ask these two questions?

21    A.   For a couple reasons.  This could be, I said before that

22    they fear harm in their country for a specific reason, like

23    their political opinion, they fear they'll be harmed because of

24    their religion, so this is starting to get to that reason of

25    why do you think you will be harmed by people in your country,

```
 1    is it because you belong to some kind of group that others

 2    don't like?

 3            The other reason we ask this is we want to know if

 4    you've been involved in any organizations that might disqualify

 5    you from asylum, so were you a member of a group that committed

 6    terrorist activities, were you a member of a group that harmed

 7    or tortured other people?

 8    Q.    What was the answer to Question 3A by Mr. Teganya?

 9    A.    He wrote, "My father was the local president, formerly

10    Kubalare District of MRND from 1991 to 1994.  As a student, I

11    belonged to the Red Cross Youth Section from 1986 to 1991.  I

12    was president of the Red Cross Youth Section from 1989 to 1990.

13    I will submit a detailed declaration prior to my asylum

14    hearing."

15    Q.    Have you had any experience concerning the organization

16    that Mr. Teganya listed as his father's had been president of

17    the MRND?

18    A.    Yes.

19    Q.    And what did you learn about it?

20    A.    The MRND was the political party that was in power in

21    Rwanda when the genocide occurred.

22    Q.    Did Mr. Teganya in this -- on this form list that he had

23    been a member of the MRND?

24    A.    No, he did not.

25    Q.    If Mr. Teganya had belonged to or been associated with the
```

J.A. 722

 1    MRND, would that have been important to the asylum process?

 2    A.    Yes, it would.

 3    Q.    Why so?

 4    A.    Because members of the MRND were Hutus, who were

 5    committing violence and killing the Tutsis in Rwanda at that

 6    time.

 7    Q.    And if he had belonged to or been associated with the

 8    MRND, would his failure to list that in answer to 3A and the

 9    sub question be important?

10    A.    Yes.

11    Q.    Why?

12    A.    Well, because if it doesn't say that he's a member, the

13    officer won't have any indication that they need to ask

14    questions about his involvement in that group to find out if

15    he's disqualified from asylum.

16    Q.    When you read 3A and the sub question there, does it ask

17    the applicant to be selective about what groups the applicant

18    belonged to or was associated with?

19    A.    No, it doesn't.

20    Q.    And then if we go down to 3B, the one below it, what does

21    it ask for?

22    A.    It asks, "Do you or your family members continue to

23    participate in any way in these organizations or groups?"

24    Q.    And is there a reason why it asks about continued

25    participation in those groups?

1    A.    Yes.

2    Q.    Why?

3    A.    Well, continued participation, again, it's similar to the

4    prior question where that might be an indication that they

5    would be in danger in their country because they're a member or

6    currently a member of a group that maybe their government

7    doesn't like or, again, it could be if you're currently a

8    member of a group that is involved in terrorist or activities

9    where the members are seriously harming other people, that

09:30AM 10    might be a reason you would be disqualified from asylum.

11    Q.    And then question Number 4, what does that ask for?

12    A.    Are you afraid of being subjected to torture in your home

13    country or any other country to which you may be returned.

14    Q.    Okay.  What was Mr. Teganya's answer to this one?

15    A.    He answered yes.

16    Q.    Moving onto the next question, which I believe is the next

17    page, at the top, am I correct that it says, "Additional

18    information about your application"?

19    A.    Yes.

09:31AM 20    Q.    And speaking generally, what do the questions below ask

21    for?

22    A.    This is asking if any other family members have applied

23    for refugee status or asylum in the United States, if they have

24    lived in any other countries after leaving their country of

25    citizenship but before arriving in the United States and if

**J.A. 724**

1   they have been involved in the ordering or inciting or

2   assisting of persecution of others.

3   Q.   If we can highlight 2B and the answer to it.  Can you read

4   the question there?

5   A.   "Have you, your spouse, your children or other family

6   members, such as your parents or siblings, ever applied for or

7   received any lawful status in any country other than the one

8   from which you are now claiming asylum?"

9   Q.   When they say lawful status, what does that mean?

09:31AM 10   A.   It could be any other -- there's lots of statuses that

11   countries give to people that allow them to stay and work in

12   that country if they're not citizens.

13   Q.   And what did Mr. Teganya answer here?

14   A.   He answered yes.

15   Q.   And below is there a listing of other places that the

16   defendant had been in?

17   A.   Yes.

18   Q.   What countries does it list?

19   A.   He says he's lived in Congo, Kenya, India and Canada.

09:32AM 20   Q.   And is the information in this portion of the application?

21   A.   Yes, it is.

22   Q.   Why?

23   A.   Well, if somebody has already received protection from

24   another country, either in a similar process, such as asylum or

25   if they have just been given permanent status to remain in a

**J.A. 725**

```
 1    country, then we would grant them asylum here because they've
 2    already received protection somewhere else where they can be
 3    safe.
 4    Q.   Let's go a little bit lower on that page down to
 5    Question 3, if we can just highlight the question.  There we
 6    go.  Can you read that to the jury?
 7    A.   "Have you, your spouse or your children ever ordered,
 8    incited, assisted or otherwise participated in causing harm or
 9    suffering to any person because of his or her race, religion,
10    nationality, membership in a particular social group or belief
11    in a particular political opinion?"
12    Q.   Is this important to the applicant?
13    A.   Yes, it was.
14    Q.   Why?
15    A.   This is getting to what we call the persecutor bar, which
16    means that even if you, yourself, would be harmed in your
17    country of citizenship, we will not grant you asylum if we have
18    evidence that you have in turn persecuted other people or
19    caused serious harm to other people.
20    Q.   So what did Mr. Teganya answer here?
21    A.   He answered no.
22    Q.   If a person had participated in genocide in another
23    country, what answer would have to be marked here by the
24    applicant?
25    A.   They would have to answer yes.
```

J.A. 726

    1    Q.   And just to be clear, if an applicant had a well-founded

    2    fear of harm from their home government but marked yes to this

    3    question right here, would that affect the questions that they

    4    would have been asked during the process?

    5    A.   Yes.

    6    Q.   How so?

    7    A.   We would have asked exactly what they meant when they

    8    answered yes, and what did you do, what group were you part of

    9    that was committing these acts, what were these acts that were

09:34AM 10    being committed, and how were they involved.

    11    Q.   And what would the likely effect be on the adjudication of

    12    asylum?

    13    A.    If they met this definition of ordering, inciting,

    14    assisting or participating in harm or suffering to others, they

    15    would not be granted asylum.

    16    Q.   And once the form is filled out, what's done with the

    17    form?

    18    A.    Well, they would file it.  If they're applying with our

    19    office, they'd file with U.S. Citizenship and Immigration

09:34AM 20    Services.  If they're in removal proceedings, they'll file the

    21    application with the court.

    22    Q.   And who in the government processes the form?

    23    A.   That would be, again, our office if they're filing with

    24    us, and then the immigration court would process it if they're

    25    filing as part of their removal proceedings.

# J.A. 727

1  Q.   And then what's the next portion of the asylum

2  adjudication process?

3  A.   On our end, we would schedule them to come in for an

4  interview and speak to one of our asylum officers.

5  Q.   Why do an interview in addition to just getting the

6  information through the form?

7  A.   Well, the primary reason for having the interview is

8  assessing the credibility of the information that's in the

9  application and making sure it's consistent, it's detailed, and

09:35AM 10  that it, you know, we find it to be truthful testimony.

11       There are other reasons for the application, further

12  interview, sometimes applicants maybe don't understand the

13  application that well, and it helps to have them come in and

14  speak to the officers to make sure we're really understanding

15  what their claim is.

16  Q.   And if the process is going through an Immigration Judge

17  for the reasons you talk about, would the Immigration Judge

18  have an interview as well?

19  A.   They would have a hearing that would be -- there would be

09:35AM 20  an attorney representing the government and an attorney

21  representing the applicant, and they would ask questions of the

22  applicant.

23  Q.   And how many hearings might they have?

24  A.   I think they can have any number of hearings they need to

25  get to a decision.

**J.A. 728**

1    Q.   And what types of information are asked for during either

2    the interview or the immigration hearing?

3    A.   We start out with some similar questions that are on the

4    application, and then we'll ask for more detailed information,

5    and we might repeat some of the questions just to make sure,

6    like I said, we're looking for consistency in what they're

7    saying at different points in time about their claim.

8    Q.   Are there times in these hearings where there are language

9    issues?

09:36AM 10    A.   Yes.

11    Q.   And how does the officer or the Judge determine, you know,

12    that they're communicating effectively?

13    A.   Well, in our office, if the applicant is not fluent in

14    English, they bring their own interpreter, and then we also

15    call what we call a monitoring service on the phone in that

16    language so that the person on the phone can just listen in and

17    make sure the interpretation is correct.

18         In court, I believe the court supplies the

19    interpreters for the hearings if the applicant says they're not

09:37AM 20    fluent in English and can't testify in English.

21    Q.   So, are there any other additional materials that would be

22    considered in addition to the application and the interview or

23    the hearing?

24    A.   Yes.  Oftentimes, the applicant will submit kind of a

25    summary statement explaining why in a little bit more detail

J.A. 729

```
 1   than they put on the application why they're asking for asylum.

 2   They'll submit personal documents about their identity, maybe

 3   passports, birth certificates, and we'll also be looking, as I

 4   said, reports that are prepared by different organizations

 5   talking about the conditions in different countries.

 6   Q.   I want to ask you about the discretion to award asylum or

 7   to disqualify the person.  In other words, if a person

 8   qualifies for asylum, can the person who's deciding that use

 9   their discretion to deny it?

10   A.   No.

11   Q.   And if the person doesn't qualify, can the decider instead

12   say that they're going to grant asylum?

13   A.   No.

14   Q.   When a person claims asylum, are they free to live in the

15   United States without any conditions, or might there be

16   conditions imposed upon them?

17   A.   They're free to live in the United States.

18   Q.   And what about if they've been detained beforehand?

19   A.   It would depend on why they had been detained, but usually

20   if they've been granted asylum, they would be released from

21   detention if the reason for their detention was they were in

22   violation of the immigration laws.

23   Q.   And is there a process for determining whether a person

24   who's been detained for entering illegally can remain in

25   custody or be released on bond?
```

09:38AM (line 10)
09:38AM (line 20)

## J.A. 730

1    A.    Yes.

2    Q.    And who participates in that?

3    A.    That would be, again, an attorney for the government with

4    Immigration and Customs Enforcement, the applicant and an

5    Immigration Judge, and if the applicant had an attorney, their

6    attorney as well.

7          MR. GARLAND:  If we can show Ms. Boyle and the parties

8    Exhibit Number 3.

9    Q.    Have you seen this before?

09:39AM 10    A.    Yes, I have.

11    Q.    What is it?

12    A.    This is a transcript of the bond hearing for Jean Leonard

13    Teganya.

14    Q.    And did you participate in it personally?

15    A.    No, I did not.

16    Q.    But have you reviewed this?

17    A.    Yes, I have.

18          MR. GARLAND:  Your Honor, the government moves

19    Exhibit 3 into evidence.

09:39AM 20          THE COURT:  All right.  It's admitted, Exhibit 3.

21          (Exhibit No. 3 received into evidence.)

22    Q.    Exhibit 3, before we page through it, does it

23    contain -- first of all, what does it mean to be a transcript?

24    A.    So an immigration court, they record the hearings, and so

25    the transcript is just somebody typed out the word for word

```
 1   what happened during the hearing.
 2   Q.   And you've reviewed this.  Does this include all of the
 3   words that were spoken at that hearing?
 4   A.   Yes.
 5   Q.   And are there parts of it that are left out to be
 6   redacted?
 7   A.   Yes.
 8   Q.   Have you reviewed this redacted transcript in its
 9   entirety?
10   A.   Yes, I have.
11   Q.   And have you listened to the audio of the hearing?
12   A.   Yes, I have.
13   Q.   In fact, did you listen to a CD containing the audio
14   earlier today?
15   A.   Yes, I did.
16        MR. GARLAND:  Your Honor, with the Court's permission,
17   may I approach?
18        THE COURT:  Yes.
19   Q.   I'm showing you what's been marked as Exhibit 4.  Have you
20   seen this before?
21   A.   Yes, I have.
22   Q.   What is it?
23   A.   It's the audio transcript of the bond hearing.
24   Q.   And what's this writing on the front?
25   A.   I've signed it and dated it today.
```

09:40AM 10

09:40AM 20

J.A. 732

      1              MR. GARLAND:  Your Honor, this is marked as Exhibit 4,

      2      and the government moves it into evidence.

      3              THE COURT:  All right.  It's admitted.

      4              (Exhibit No. 4 received into evidence.)

      5      Q.   When you listened to the audio, did you follow along with

      6      the transcript that's on your screen?

      7      A.   Yes, I did.

      8      Q.   And how did they compare?

      9      A.   They were the same.

09:41AM 10      Q.   So turning to the first page, what was the date of this

     11      hearing?

     12      A.   September 16th, 2014.

     13      Q.   And then turning to the -- and who was it before?

     14      A.   The Honorable Steven F. Day, United States Immigration

     15      Judge.

     16      Q.   And are Immigration Judges charged with holding hearings

     17      of this sort?

     18      A.   Yes.

     19      Q.   Turning to the second page, who were the participants in

09:41AM 20      the hearing?

     21      A.   Jennifer Mulcahy for the Department of Homeland Security

     22      and David McHaffey.

     23      Q.   And turning to the next page, were there any witnesses?

     24      A.   Yes, Jean Leonard Teganya.

     25      Q.   Can you -- so I think at this point, your Honor, we would

1    like to play the audio for the jury and for the witness and

2    then have the transcript going on screen as well.

3                 THE COURT:  Okay.

4                 (Audio played.)

5                 MR. GARLAND:  If we can pause it right there.

6    Q.   To your knowledge, is an Immigration Judge authorized to

7    administer an oath to a witness?

8    A.   Yes, they are.

9    Q.   And did Mr. Teganya testify after taking that oath?

09:43AM 10   A.   Yes, he did.

11                MR. GARLAND:  Then if we could continue the audio.

12                (Audio played.)

13                MR. GARLAND:  Thank you.  If we can just forward to

14   the last page of that transcript which we don't have audio for.

15   Q.   What is this, Ms. Boyle?

16   A.   This is the certificate of the person who transcribed the

17   hearing.

18   Q.   So, as a result of this bond hearing, was a bond granted?

19   A.   Yes, it was.

09:51AM 20   Q.   How much?

21   A.   $12,000.

22   Q.   Did Mr. Teganya testify about whether he belonged to the

23   MRND?

24   A.   No, he did not.

25   Q.   Did he talk about the MRND and his father?

```
 1    A.   Yes.

 2    Q.   And did he say whether he belonged to that party?

 3    A.   He indicated that his father belonged but he did not.

 4    Q.   Did he testify about whether he had witnessed people being

 5    turned over to be slaughtered by the military that was waiting

 6    outside?

 7    A.   He said he had not witnessed that.

 8    Q.   And did he testify about whether he had seen any

 9    atrocities occur at the hospital?

09:51AM 10    A.   He did testify.  He said he had not witnessed any

11    atrocities.

12    Q.   Did he say when the atrocities had occurred?

13    A.   He said they occurred at the nighttime.

14         MR. GARLAND:  Your Honor, if I can just talk with

15    co-counsel.

16         No further questions, your Honor.

17         THE COURT:  All right.  Cross.

18                    CROSS-EXAMINATION

19    BY MR. LAUER:

09:52AM 20    Q.   Good morning.

21    A.   Good morning.

22    Q.   So asylum is what you do, correct?

23    A.   Yes.

24    Q.   And can you just describe again briefly what asylum is?

25    A.   Asylum is a claim that is made by somebody saying they're
```

J.A. 735

```
  1    afraid to return to their home country, and if they're
  2    eligible, they would be allowed to remain in the United States.
  3    Q.   And so the reason asylum exists is because in some parts
  4    of the world, persecution occurs?
  5    A.   Yes.
  6    Q.   Not everywhere but more places than probably it should,
  7    would you agree?
  8    A.   More places than it should, I don't think it should occur
  9    anywhere, so, yes.
 10    Q.   So when you're dealing with asylum claims, you consider
 11    the country that is where the persecution is alleged to be
 12    taking place?
 13    A.   Yes.
 14    Q.   And, obviously, if someone is coming from the U.K. or a
 15    western sort of democracy, that's going to raise an eyebrow on
 16    your part?
 17    A.   Yes.
 18    Q.   Because those sorts of countries aren't known to -- are
 19    not where persecution is known to occur, correct?
 20    A.   Correct.
 21    Q.   Rwanda is different?
 22    A.   Yes.
 23    Q.   Rwanda is a place right now as we sit here today where
 24    persecution occurs?
 25    A.   Yes.
```

09:52AM (line 10)
09:53AM (line 20)

```
 1              MR. GARLAND:  Objection.

 2              THE COURT:  Sustained, and I'll strike the answer.

 3     Q.   When you -- you testified on direct examination that you

 4     had participated in trainings having to do with country

 5     conditions, correct?

 6     A.   Yes.

 7     Q.   And specifically as to Rwanda, correct?

 8     A.   Yes.

 9     Q.   And part of what you've been trained to do when evaluating

09:54AM 10     conditions on the ground elsewhere in the world is look at

11     state department reports, correct?

12     A.   Yes.

13     Q.   The state department actually puts together what are

14     called country conditions reports or human rights reports,

15     correct?

16     A.   Correct.

17     Q.   And you're very familiar with those reports?

18     A.   Yes.

19     Q.   And, in fact, you review them and rely on them in

09:54AM 20     assessing asylum claims, correct?

21     A.   Among other documents, yes.

22     Q.   Okay.  And these are reports that are publicly available,

23     they're not privileged or anything like that, correct?

24     A.   Right.

25     Q.   You just go on the state department website and look at it
```

1    if you need to?

2    A.    Yes.

3              MR. LAUER:  If I could approach?

4              THE COURT:  Yes.

5              MR. LAUER:  I think the government would like to be

6    heard.

7              (THE FOLLOWING OCCURRED AT SIDEBAR:)

8              THE COURT:  This is a state department document or

9    actually what is it?

09:55AM 10              MR. LAUER:  This is the state department country

11    conditions where I've just inquired of her that she said she's

12    familiar with.

13              THE COURT:  Okay.

14              MR. GARLAND:  Your Honor, I think this goes to the

15    heart of the Court's pretrial ruling that what's going on in

16    Rwanda right now is not relevant.  It's true that the

17    application says that he fears torture, and that's necessary to

18    establish in applying for asylum, but what's going on right

19    there is not, and, in fact, there is testimony that even if he

09:55AM 20    had a well-founded fear, if he lied about the disqualifier, he

21    still would be disqualified for asylum.

22              THE COURT:  Let me ask that.  I mean, if the

23    government I think is -- correct me if I'm wrong, but I think

24    you're not disputing that he has a well-founded fear of

25    persecution, the issue is the persecution bar?

```
 1              MR. GARLAND:  Well, to be clear, the answer is no, we

 2      would dispute that.  I think Dr. Clark's testimony actually

 3      shows that he has no well-founded fear, it's just simply that

 4      whether his fear was well-founded.  He is not charged about

 5      lying about that, the question is whether the bar applies, and

 6      the bar applies whether he had a well-founded fear or whether

 7      he did not, making specifically what's going on in Rwanda

 8      irrelevant.

 9              THE COURT:  And why do you need to get it in?  In

10      other words, what accomplishes -- what do you accomplish with

11      the report, which says things about like child labor and

12      whatnot you can't accomplish with questions of the witness?

13              MR. LAUER:  I'm not going to ask about child labor,

14      what I am going to ask her is whether she's -- she's been

15      proffered as an expert, and she's testified as an expert.

16              THE COURT:  I don't think she's been proffered as an

17      expert.

18              MR. LAUER:  She was noticed as an expert.

19              THE COURT:  They didn't elicit any expert testimony as

20      far as I know.

21              MR. GARLAND:  The government noticed it and said to

22      the extent that you think this requires it, then she's an

23      expert, but that's not the way that she was proffered.

24              MR. LAUER:  Well, your Honor, she's testified already

25      that she's familiar with the report, she relies on it in her
```

09:56AM — line 10
09:57AM — line 20

# J.A. 739

1    determination.  The government asked a lot of questions about

2    what's significant and what's not significant in the assessment

3    of an asylum application.

4        I should, in fairness, be permitted to inquire about a

5    document that is informative as to that process.  It's not an

6    extended amount of questioning, I'm just going to go for a

7    couple of questions.

8        THE COURT:  Why don't we do this.  Why don't you ask

9    her the questions you want to ask her.  If she says something

09:58AM 10    that you think is contrary to this, I'll permit you to confront

11    her with it either as a party opponent or government report or

12    learned treatise.  I don't know what you would call this thing.

13        Let's take it a step at a time, and let's see if you

14    can make your points, she'll acknowledge about that there is

15    persecution, let's say, of returning Hutus in Rwanda.  I think

16    really the relevant time period is 2014, not 2018, but let's

17    ask some questions, see what her answers are, and we'll take it

18    a step at a time, okay.

19        MR. GARLAND:  The government won't object to those as

09:58AM 20    well, but then ask for a continuing objection because we

21    believe that even those questions are really beyond it because

22    the government of Rwanda is not on trial here and this

23    particular question isn't the subject of the charges.

24        THE COURT:  All right.  I'm going to permit it, again,

25    to at least some extent, and I'll give the jury a cautionary

1    instruction, just remind them what we're talking about here.

2            MR. GARLAND:  Thank you, your Honor.

3            (SIDEBAR CONFERENCE WAS CONCLUDED)

4    Q.   Ms. Boyle, I was asking you some questions about the

5    country reports issued by the state department.  Do you recall

6    that?

7    A.   Yes.

8    Q.   And those are reports, again, that you rely on as part of

9    your process in assessing an asylum application?

09:59AM 10    A.   Yes.

11    Q.   And you've received specific training as to Rwanda and you

12    familiarized yourself with the state department report as to

13    Rwanda, correct?

14    A.   I have in the past as an officer.  I haven't looked at the

15    reports, any recent reports.

16    Q.   Okay.  But you've been trained on conditions in the

17    country of Rwanda, correct?

18    A.   Yes.

19    Q.   And to the extent that the state department does issue

09:59AM 20    these reports, they're commonly relied upon by asylum officers

21    in the field?

22    A.   Yes.

23    Q.   So you would be aware that the state department has

24    concluded?

25            MR. GARLAND:  Objection.

**J.A. 741**

1              THE COURT:  Overruled.

2    Q.   The state department has concluded that human rights

3    issues include reports of unlawful and arbitrary killings by

4    state security forces, forced disappearance by state security

5    force, torture by state security forces, including

6    asphyxiation, electric shocks, mock executions, arbitrary

7    detention by state security forces, political prisoners,

8    arbitrary or unlawful interference with privacy, all of those

9    things you're aware that the state department has concluded

10:00AM 10    that those are going on?

11   A.   As I said, I read that particular report.

12   Q.   If that's what the report said, you would rely on it

13   though?

14   A.   Correct.

15              THE COURT:  Let me just caution the jury or maybe

16   remind the jury, the defendant is charged with certain specific

17   crimes, and basically and at the risk of oversimplifying, the

18   issue here is not what the current country conditions are in

19   Rwanda or even whether the defendant would be subject to any

10:01AM 20   harm in Rwanda if he were to return, the issue is whether or

21   not he made false statements on his immigration asylum

22   application, and at the hearing concerning his membership in a

23   political party or participation or activities with that party

24   or whether he participated in what I'll call genocide, but the

25   actual word is on the form where he checked the box.

J.A. 742

```
 1              So just to remind you, that's the focus of this case.

 2    You're going to be asked to render a verdict whether he is

 3    guilty or not guilty of those specific charges, and as the

 4    witness has indicated, even if you have a genuine fear of harm

 5    coming to you in some form or another in your home country, if

 6    you have participated in persecution yourself, under the law of

 7    the United States, that bars you from returning to that

 8    country.

 9              Go ahead, Mr. Lauer.

10:02AM 10    Q.    I want to ask you some questions about the different types

11    of applications for asylum.  You testified that one sort of

12    application arises when someone --

13              THE COURT:  I'm sorry, I misspoke, my mouth was behind

14    my brain.  When I say if you participated in persecution, you

15    can't return to that country, of course, what I meant to say is

16    you can't stay in the United States and claim asylum, I'm

17    sorry.

18              Go ahead, Mr. Lauer.

19    Q.    Ms. Boyle, I want to ask you, you said there's a couple of

10:02AM 20    different forms of asylum application; is that correct?

21    A.    Well, there's only one form, but there's different ways to

22    file it.

23    Q.    Okay.  And one sort of scenario would be someone who is

24    attempting to get inside the United States from abroad or

25    through a port of entry, correct?
```

**J.A. 743**

```
 1    A.    Yes.

 2    Q.    In other words, someone who's not physically present on

 3    United States soil, correct?

 4    A.    Correct, and I should correct myself, that actually is a

 5    separate form if they're outside the United States.

 6    Q.    Okay.  And then there's a different category of asylum

 7    applicants who are actually present in the United States; is

 8    that right?

 9    A.    Yes.

10    Q.    And those are people who one way or the other have managed

11    to get on U.S. soil, correct?

12    A.    Yes.

13    Q.    And under the law, the Immigration and Nationality Act,

14    someone who even enters the United States illegally can apply

15    for asylum, correct?

16    A.    That's correct.

17    Q.    Now, are you familiar with an agreement between the

18    United States and Canada having to do with the return of

19    refugees and asylum applicants?

20    A.    Yes.

21    Q.    And I'm going to ask you some questions about that, if I

22    could.  Now, sometimes the United States will enter into

23    treaties or agreements with other countries, correct?

24    A.    Yes.

25    Q.    And there is, in fact, a particular agreement that relates
```

10:03AM appears at line 10
10:04AM appears at line 20

1    to asylum applicants in Canada and the United States, correct?

2    A.    That's correct.

3    Q.    And someone who has applied for asylum in either the

4    United States or Canada and who has been denied would then have

5    to be -- is then essentially deflected if they try to apply for

6    asylum in the other country?

7              MR. GARLAND:  Objection.  Relevance.

8              THE COURT:  I guess I'll allow it.  Overruled.

9    Q.    I wasn't very clear with my question, so let me ask a

10:04AM 10   better one.  Can you describe generally what the agreement is

11   between the United States and Canada relative to asylum

12   seekers?

13   A.    In general, it says that if you pass through either the

14   United States or Canada before entering the other country, then

15   you have to apply for asylum within the country you passed

16   through first, so if somebody enters Canada, doesn't apply for

17   asylum and tries to enter the United States and then claims

18   that they're afraid to go back, and this only applies if

19   they're caught at the border, we would in a lot of cases say,

10:05AM 20   no, you've already been in Canada, you need to go back to

21   Canada and ask them for asylum first.

22   Q.    You mentioned that that only applies if you're caught at

23   the border?

24   A.    Yes.

25   Q.    Can you elaborate on that?

**J.A. 745**

1    A.    There's a specific process at the border called expedited

2    removal, where Border Patrol, somebody enters the country, if

3    they catch them kind of right away as they're entering the

4    country without permission, they can immediately turn them back

5    except if somebody claims a fear of returning to their home

6    country.

7         And then at other borders, they're not with Canada,

8    but with the Mexican border, if they say they claim a fear and

9    we thought that that claim was valid, we would allow them to

10:06AM 10    apply for asylum in the United States.

11         At the Canadian border, we would have to make a

12    separate assessment to determine whether they should be

13    returned back to Canada to make their first asylum claim there.

14    Q.    So let's take the scenario of someone who has applied for

15    asylum in Canada and who then attempts to enter the

16    United States through a port of entry.  Is it correct that that

17    person could then just be returned to Canada pursuant to this

18    agreement between the United States and Canada?

19    A.    It's a little more complex than that.  There are a lot of

10:06AM 20    exceptions to the rule that if you pass through one country,

21    you must apply for asylum in that country first.

22    Q.    Okay.  So it's a somewhat complicated legal arrangement

23    between the United States and Canada; is that fair to say?

24    A.    Yes.

25    Q.    Is there -- would I be correct in saying that the law is

```
 1   very simple for people who manage to get across the border and
 2   are on U.S. soil, there's no doubt those people can apply for
 3   asylum?
 4   A.   Well, if they've not gone through the Canadian border and
 5   they didn't get caught in that specific process of expedited
 6   removal.
 7   Q.   So the situation of a person who did not go through a
 8   designated port of entry, did not encounter Border Patrol or
 9   any sort of government personnel who manages to get on
10   United States soil, that person has an absolute right to apply
11   for asylum, correct?
12   A.   Yes, they can apply for asylum.
13           MR. LAUER:  I have no further questions, thank you.
14           MR. GARLAND:  Very brief, your Honor.
15                     REDIRECT EXAMINATION
16   BY MR. GARLAND:
17   Q.   You heard some questions from Mr. Lauer about Canadian
18   arrangements, and are you familiar with Mr. Teganya's
19   connection to Canada?
20   A.   Yes.
21   Q.   And are you familiar with what happened to him up in
22   Canada during immigration proceedings up there?
23   A.   Yes.
24   Q.   And what happened?
25   A.   He applied for refugee status and was denied.
```

J.A. 747

```
 1    Q.   So if an applicant has a well-founded fear of harm, you've

 2    testified about this before, I just want to make clear, can

 3    they still be denied asylum because of the persecutor bar?

 4    A.   Yes.

 5    Q.   If a person has a well-founded fear of harm, does that

 6    release them from their obligations to be true and correct on

 7    the other parts of the application?

 8    A.   No.

 9         MR. GARLAND:  No further questions.

10        THE COURT:  Recross.

11        MR. LAUER:  No, your Honor.

12        THE COURT:  Thank you.  You may step down.

13        INNOCENT HABIMANA, having been duly sworn by the

14    Clerk, testified, through the Interpreter, as follows:

15                         DIRECT EXAMINATION

16    BY MR. VARGHESE:

17    Q.   Good morning.

18    A.   Good morning.

19    Q.   Can you please introduce yourself to the jury.  What is

20    your name?

21    A.   Yes, Habimana Innocent.

22    Q.   Mr. Habimana, where are you from?

23    A.   I'm from Butare.

24    Q.   Are you currently employed?

25    A.   Self-employed.
```

|       |                                                                     |
|-------|---------------------------------------------------------------------|
| 1     | Q.   What do you do?                                                 |
| 2     | A.   I'm a farmer, but I'm also a construction worker.               |
| 3     | Q.   Back in 1994, where did you live?                              |
| 4     | A.   I lived in Butare.                                              |
| 5     | Q.   How old were you?                                               |
| 6     | A.   Thirty years old.                                              |
| 7     | Q.   Were you employed?                                             |
| 8     | A.   Yes.                                                           |
| 9     | Q.   What did you do?                                               |

10:11AM 10    A.   I was working as a construction worker at the university.

11    Q.   When you say construction, were you building new buildings

12    or maintaining existing buildings?

13    A.   Maintaining the old ones.

14    Q.   How old were you working at the university?

15    A.   Seven years.

16    Q.   So, since 1987?

17    A.   No.  I started in '87 until '94.

18    Q.   Where in the university did you work?  Was it a particular

19    department?

10:12AM 20    A.   Yes.

21    Q.   Where did you work?

22    A.   In travel.

23    Q.   In what?

24    A.   I was working at the Department of it's called Travel,

25    which meant that we do repairs on buildings, electricity and

J.A. 749

1    plumbing.

2    Q.    Was that for buildings throughout the university?

3    A.    Repeat the question, please.

4    Q.    Was that for buildings throughout the university?

5    A.    Yes.

6    Q.    Did you carry an identity card?

7    A.    Yes.

8    Q.    What was the ethnic group listed on your identity card?

9    A.    Hutu.

10:13AM 10    Q.    Were you a member of a political party?

11    A.    Yes.

12    Q.    What political party?

13    A.    MRND.

14    Q.    Why were you a member of MRND?

15    A.    Because the party was a Hutus' party, and the current

16    government was the government of the Hutu.

17    Q.    Was there a benefit to you to being a member of MRND?

18    A.    Yes.

19    Q.    What was the benefit?

10:14AM 20    A.    To be employed just like where I was working.

21    Q.    So being a member of the party helped you being employed

22    at the National University?

23    A.    Yes.

24    Q.    As a member of MRND, did you go to meetings?

25    A.    Yes.

**J.A. 750**

```
 1    Q.   Did you go to rallies?

 2    A.   Yes.

 3    Q.   Did you ever wear MRND clothing?

 4    A.   Yes.

 5    Q.   What type of clothing did you wear?

 6    A.   A hat.

 7    Q.   Where did you get the hat?

 8    A.   I was given it from the meetings.

 9    Q.   Did you ever wear pins?

10    A.   No.

11    Q.   Why not?

12    A.   The clothing or the symbols would be given according to

13    your ranks.

14    Q.   So would you wear the pins?

15    A.   Those were higher in the positions than me.

16    Q.   Did you ever wear both a hat and a scarf together?

17    A.   No.

18    Q.   Why not?

19    A.   Because my level would not allow me to wear both together.

20    Q.   Who wore the hat and the scarf together?

21    A.   Those were allowed to wear them together will be the

22    leaders of the groups.

23    Q.   Are you familiar with an individual named Jean Leonard

24    Teganya?

25    A.   Yes.
```

J.A. 751

```
 1    Q.    How do you know him?
 2    A.    I know him, he was a student at the university.
 3    Q.    Had you ever meet him?
 4    A.    We met at the meetings, the rallies.
 5    Q.    What meetings?
 6    A.    The rallies of the party.
 7    Q.    Was he a member of MRND?
 8    A.    Yes.
 9    Q.    Did you know where he was from?
10:17AM 10  A.    I was -- I had -- they were saying that he was from the
11    north.
12    Q.    Do you know where in the north?
13    A.    In the Gisenyi area.
14    Q.    Was he a student at the university?
15    A.    Yes.
16    Q.    What department?
17    A.    Medical school.
18    Q.    What kinds of things did Teganya do for the party?
19    A.    He was the leader of the students from his department, and
10:18AM 20  those students were the members of MRND.
21    Q.    How big was the group of medical students, of MRND medical
22    students that Mr. Teganya led?
23    A.    Between 20 and 50.
24    Q.    How often would you see Mr. Teganya?
25    A.    I saw him quite often, but I always saw him during the
```

J.A. 752

```
 1   meetings.  I didn't see him on a daily basis because he would
 2   be doing his studies, and I would be doing my job.
 3   Q.   Did you know where he lived?
 4   A.   Yes.
 5   Q.   Where did he live?
 6   A.   In Kiza.
 7   Q.   Is that a dormitory?
 8   A.   Yes.
 9   Q.   Who were the students that lived in the Kiza dorm?
10   A.   The students who are in medical school but who are on the
11   level of being interns.
12   Q.   How close is the Kiza dorm to the maternity building at
13   the hospital?
14   A.   Very close.
15   Q.   Do you know how students traveled from the Kiza dorm to
16   the hospital?
17   A.   Yes.
18   Q.   How did they do it?
19   A.   Between the Kiza dormitory and the hospital, there was a
20   wooden fence.
21   Q.   And how would they get from the dorm?
22   A.   It was a little gate.  There was another big gate, but
23   that was like a shortcut.
24   Q.   Did you ever see Mr. Teganya wearing MRND clothing?
25   A.   Yes.
```

10:19AM (line 10)

10:20AM (line 20)

J.A. 753

```
 1    Q.   How often would you see him wearing MRND clothing?

 2    A.   All the time that we went to the meetings in Butare, I

 3    would see him.

 4    Q.   What kind of clothing was he wearing?

 5    A.   The hat and the scarf.

 6    Q.   Did you ever see him wearing MRND clothing to classes?

 7    A.   No.

 8    Q.   Did you ever wear MRND clothing while you worked at your

 9    job?

10    A.   No.

11    Q.   Why not?

12    A.   Because it was a crime to wear the symbols of the party

13    when you're not in the meeting of the party.

14         MR. GARLAND:  Your Honor, may I approach the witness?

15         THE COURT:  Yes.

16    Q.   Mr. Habimana, I just handed you Exhibits 12 and

17    Exhibit 15.  Let's start with Number 12.  Do you recognize what

18    that is?

19    A.   Yes.

20    Q.   What is it?

21    A.   It's a hat.

22    Q.   What hat, for what party?

23    A.   It's a hat for the party.

24    Q.   Was it a hat that you wore?

25    A.   Yes.
```

10:22AM (line 10)
10:23AM (line 20)

**J.A. 754**

1    Q.    Was that the hat that you saw Mr. Teganya wearing?

2    A.    Yes.

3    Q.    Let's turn to Exhibit 15.  Can you explain what Exhibit 15

4    is?

5    A.    It's a scarf.

6    Q.    And do you recognize that scarf?

7    A.    Yes.

8    Q.    And was that the scarf that you saw Mr. Teganya wearing?

9    A.    Yes.

10:24AM 10    Q.    Mr. Habimana, I'm going to ask you to stand up, please, if

11    you could.  Can you please demonstrate to the jury how

12    Mr. Teganya would wear the hat and the scarf.

13    A.    Yes.

14    Q.    Go ahead.  Actually before we get to the scarf, let me ask

15    you a couple questions about that.  There are some flaps on the

16    hat.  Can you explain why there are flaps on the hat?

17    A.    Yes.

18    Q.    What's the purpose of the flaps?

19    A.    The reason why they put the flaps was so you could wear

10:25AM 20    the hat in two different ways, one like that.

21    Q.    Why would you wear the hat like that?

22    A.    When I didn't want people to recognize me.

23    Q.    When you would not want people to recognize you wearing

24    the hat?

25    A.    Like when we would go to first recruit other people to

J.A. 755

1    join our party because we would force them to join.

2    Q.   How do the hat and the flaps, how do they conceal your

3    face?

4    A.   So that the people from the back will not recognize me,

5    and I would pull it in the front so the people at the front

6    would not look at my face.

7    Q.   Could you demonstrate that.

8    A.   Like right now I'm looking at you, but you cannot look

9    through my face so you will not recognize me, and someone who

10:26AM 10   come from the back will not recognize my neck.

11   Q.   Can you now please demonstrate how the scarf was worn.

12   A.   Do you want me to wear both?

13   Q.   Yes, I apologize, I didn't let you finish.  Can you

14   explain how you wear the hat the other way.

15   A.   Yes.  So now the hat is small, and you cannot pull it

16   down.

17   Q.   And when would you wear your hat like that?

18   A.   I will do that when we're just having a meeting between

19   ourselves when we're not going to work or to force for recruit.

10:27AM 20   Q.   Can you demonstrate with the scarf now, please, as well.

21   A.   Yes.

22   Q.   Which way would the scarf go?

23   A.   Like if you wear the scarf, and this symbol is upside

24   down, that was not allowed.

25   Q.   What are the symbols on the front of the scarf?

```
 1   A.   Those symbols had the meanings according to the party's
 2   instructions, that's why you would not wear them upside down.
 3   That's how you wear the scarf so the symbols are clearly
 4   strong.
 5   Q.   And how would it attach?
 6   A.   This one is small, would not fit me, but this is how you
 7   would do it, then I'll get a pin to hold it together.
 8   Q.   And was that the way that you saw Mr. Teganya wearing the
 9   hat and the scarf?
10   A.   Yes.
11   Q.   You can have the seat again, Mr. Habimana.  I want to ask
12   you about the symbols on the scarf.  Can you just show the
13   scarf to the jury so they can see the symbols?
14   A.   Yes.
15   Q.   What are the symbols on the scarf, the MRND?
16   A.   The symbols on the scarf, there is a hoe, which is this
17   one, that is a machete, but these are meant in the old
18   traditional way, they are not the modernized ones.
19   Q.   Let me ask you about that.  Were those symbols of weapons
20   that MRND members carried or trained with?
21   A.   These symbols, they resemble the weapons, but the one the
22   MRND used were the same weapons but the modernized one that are
23   current.
24        MR. GARLAND:  If we could, if we could bring up 71,
25   the demonstrative.
```

10:29AM (line 10)
10:31AM (line 20)

**J.A. 757**

```
 1    Q.   Mr. Habyarimana, do you see what's on the screen in front
 2    of you?
 3    A.   Yes.
 4    Q.   And what is it that we're looking at here?
 5    A.   I can see a hoe that has a short handle.  There are two
 6    machetes, one is more like a sword, and there is one that is
 7    bent, so there are two types of machetes.
 8    Q.   All right.  Let's start with this one here I'm going to
 9    highlight.
10    A.   Yes.
11    Q.   First of all, let me ask you, who made these drawings?
12    A.   Me.
13    Q.   Can you explain what you drew here?  What are we looking
14    at?
15    A.   The one I drew here is this one, but this one is the
16    old-fashioned hoe, so the one we used as in the Interahamwe is
17    this one in the picture, which is the more modernized.
18    Q.   Why didn't the party use the modern one as a symbol on the
19    scarf and hat?
20         MR. LAUER:  Objection.
21         THE COURT:  Sustained without a foundation that he
22    knows.
23    Q.   Are you familiar with why those symbols were chosen for
24    the scarf and the hat?  Yes or no.
25    A.   Yes.
```

J.A. 758

1    Q.    Did you as part of a member of MRND, did you learn about

2    the symbols and what they meant and why they were chosen?

3    A.    Yes.

4    Q.    Why was the traditional pickaxe shown on the scarf and not

5    the modern one that was being used?

6    A.    Since our ancestors, they used these tools in our

7    tradition.

8    Q.    Was there a reason why the crest didn't have the modern

9    version that you were using?

10:35AM 10    A.    Because this one was used by our an ancestors, and when

11    they did, they did according to our ancestors because MRND was

12    not there during our ancestors' time.

13    Q.    I want to ask you about the other weapons that you drew.

14    What's the second drawing that you made?

15    A.    It's a machete.

16    Q.    And what's the difference between this drawing and this

17    one?

18    A.    Nothing.  They are different shapes of machetes because

19    they are made by different companies.

10:36AM 20    Q.    Are the machetes symbolized on the crest on the hat and

21    the scarf in any way?

22    A.    This one replaces that old traditional machete on the

23    scarf.

24    Q.    In addition to the clothing, did you see Mr. Teganya with

25    any other MRND items?

```
 1    A.   Yes.

 2    Q.   What did he have?

 3    A.   A clog.

 4    Q.   I'm sorry, before you get there, did you ever see him with

 5    any other MRND clothing or symbols?

 6    A.   Yes.

 7    Q.   What did he have?

 8    A.   A flag.

 9    Q.   When did you see him carrying a flag?

10:38AM 10    A.   During the meetings, that's when you will see him in the

11    front holding the flag.

12    Q.   Did you have a flag?

13    A.   No.

14    Q.   Who in the party had flags?

15    A.   Group leaders.

16    Q.   When would Mr. Teganya be carrying his flag?

17    A.   When we would go to the rallies or during the parade.

18    Q.   What would he do with the flag?

19    A.   The flag will have like a rope attached to it, and then

10:39AM 20    the flag will be moving, and then that will show him, you know,

21    as the leader of the group.

22    Q.   Would Mr. Teganya be saying anything or doing anything

23    when you saw him with the flags at the meeting?

24    A.   Yes.

25    Q.   What would he be doing or saying?
```

J.A. 760

```
 1   A.   It will be doing a mission or singing "MRND, MRND."

 2   Q.   In addition to MRND, were you involved with the

 3   Interahamwe?

 4   A.   Yes.

 5   Q.   How were you involved with the Interahamwe?

 6   A.   I was -- my role was to advise the paramilitary or the

 7   youth of the Interahamwe because my age was not allowing me to

 8   be part of the paramilitary or of the Interahamwe.

 9   Q.   So what was the age limit for the Interahamwe?

10   A.   From the age when you get your I.D., that's from 18 to 25,

11   so after 25, then you be considered not a youth anymore.

12   Q.   Was Mr. Teganya involved with the Interahamwe?

13   A.   Yes.

14   Q.   What did the Interahamwe do before the genocide?

15   A.   They will do training.

16   Q.   What other things would they do?

17   A.   The youth wing of the Interahamwe, they are the ones who

18   will lead because they were the strongest ones, and those are

19   the ones that will be used to go and force to recruit people to

20   come to our party, MRND.

21   Q.   Can you explain to the jury what do you mean by forcibly

22   recruiting people to join MRND?

23   A.   Yes.

24   Q.   Please explain.

25   A.   Yes.  To force for recruit, back then in my country,
```

10:41AM (line 10)
10:42AM (line 20)

## J.A. 761

1    Rwanda, they had one party, but they had a one-party system.

2    In 1992, they had more parties.

3        So when the multiple party system came, everybody

4    decided to join any party they wanted.  For example, there was

5    MRND, which was the ruling party, and there was another party

6    MDR, which was a Hutu party, there was PSD, there was PL, and

7    others that I don't remember.

8    Q.    And so how would you or how would the Interahamwe forcibly

9    recruit people to join MRND?

10:44AM 10    A.    We use force.

11    Q.    How?

12    A.    Like when we will have meetings, our youth wing, our

13    permit or wing will give them instructions to close the shops,

14    to close the roads, stop the vehicles.

15    Q.    Why were those instructions given?

16    A.    Because while we're doing, we're the ones in power, so

17    whatever we are doing will not allow other people to do their

18    own things if they don't listen to us.

19    Q.    And so would people be forced to come to -- would you try

10:45AM 20    to force them to come to the rallies or the meetings?

21    A.    Yes.

22    Q.    What was your role with respect to the Interahamwe?

23    A.    I was an advisor.

24    Q.    What kind of things would you advise Interahamwe to do?

25    A.    I will tell them, I will advise them if we are going to

1    attack, to have a rally in the City of Butare, one group will

2    go this way and another group will go this way, and the

3    instruction was whatever their path, their life will stop.

4    That means no actions, they will leave taking place.

5         Those who will come to the meeting will come to the

6    meeting, and those who don't want to come to the meeting, they

7    have to go home.

8    Q.    And so you were providing those directions or instructions

9    to the Interahamwe groups?

10:47AM 10    A.    Yes.

11    Q.    Was Mr. Teganya involved in those forceful recruiting

12    activities?

13    A.    Yes.

14    Q.    What was his role?

15    A.    He was the group leader of his fellow students who were

16    Interahamwe.

17    Q.    It was just for the students in the medical school or just

18    for the students at the dorm or just for the university

19    students?  How was it organized?

10:47AM 20    A.    There was each department or each faculty, they had their

21    own group.

22    Q.    And so there was a medical school group?

23    A.    Yes, medical group.

24    Q.    Was there any training for Interahamwe members?

25    A.    Yes.

**J.A. 763**

```
 1    Q.    What was the training for Interahamwe members?

 2    A.    We'll have a training, and after the training, we'll have

 3    a meeting.

 4    Q.    What was the training?

 5    A.    There was training in karate' and Kung Fu.

 6    Q.    And was there other training?

 7    A.    Yes.

 8    Q.    What was the other training?

 9    A.    The training of how to use the traditional weapons, the

10:49AM 10    one I just showed you.

11    Q.    What do you mean by traditional weapons?

12    A.    The traditional weapons are the ones that played a very

13    big role during genocide.

14    Q.    Where was the training located?

15    A.    Which training?

16    Q.    Let's start with the Kung Fu and karate' training.

17    A.    In the gymnasium.

18    Q.    All right.  Can we bring up for the witness and the

19    parties Exhibit 29.  Mr. Habimana, do you see what's on the

10:50AM 20    screen in front of you?

21    A.    Yes.

22    Q.    Do you recognize it?

23    A.    Yes.

24    Q.    Is it a fair and accurate representation of the gymnasium

25    at the university?
```

```
 1    A.    Yes.
 2          MR. GARLAND:  Your Honor, we'd ask Exhibit 29 be moved
 3    into evidence.
 4          THE COURT:  All right.  It's admitted.  29.
 5          (Exhibit No. 29 received into evidence.)
 6    Q.    Mr. Habimana, can you explain to the jury what is this a
 7    picture of?
 8    A.    Yes.
 9    Q.    What is it?
10    A.    It's a building that sports will take place.
11    Q.    I'm sorry, what?
12    A.    It's a building where sports will take place, sports
13    building.
14    Q.    Where is the building located?
15    A.    On the west campus.
16    Q.    And do you see yourself in the picture?
17    A.    Yes.
18    Q.    Was this the location of the Kung Fu and karate' training
19    you were talking about?
20    A.    Yes.
21    Q.    Where was the training in the weapons, the weapons
22    training take place?
23    A.    A little bit farther down between the hill called
24    Kabitare, a place called rugano.
25    Q.    Can you describe the location?
```

10:51AM 10

10:51AM 20

```
 1   A.   Yes.

 2   Q.   Please do.

 3   A.   That place was between two hills.  The hill called

 4   Kabitare just across, and the university forest on the other

 5   side, and there was a valley in between is in the bush, and

 6   there's a place that's you cannot easily identify.

 7   Q.   I'm sorry.

 8   A.   It's a place you cannot easily identify and easily find.

 9   Q.   Where did the weapons training take place in that valley?

10   A.   Explain?

11   Q.   Yes.

12   A.   Because the gymnasium was meant just for sports.  All the

13   students would meet there because it was not only Kung Fu and

14   karate', they would even have tennis, there was basketball.

15   All that were done in that building, even today.

16   Q.   So why was the weapons training done in the valley?

17   A.   Because it was a secret.

18        MR. GARLAND:  Can we bring up just for the witness and

19   the parties Exhibit Number 30.

20   Q.   Do you see the picture on the screen?

21   A.   Yes.

22        THE COURT:  I'm sorry.

23        MR. GARLAND:  30.

24        THE COURT:  Is there an objection to this?

25        MR. LAUER:  No.
```

J.A. 766

```
 1              THE COURT:  All right.  Let's just admit it.  It's
 2    admitted, Exhibit 30.  We can show it to everyone.
 3              (Exhibit No. 30 received into evidence.)
 4    Q.   Mr. Habimana, what are we looking at in this picture?
 5    A.   I was showing where the training of traditional weapons
 6    used to take place, and I was pointing to it.
 7    Q.   Is that the area where the light is?
 8    A.   Yeah, right there down the valley.
 9    Q.   How often was the training taking place?
10    A.   Twice a week.
11    Q.   When was it?
12    A.   On Tuesday and Friday.
13    Q.   Was it in the daytime or the evening or the night?
14    A.   In the evening from 6 p.m.
15    Q.   Who led the trainings?
16    A.   The employees who are paid by the university.
17    Q.   Was the weapons training just for Interahamwe members?
18    A.   Yes.
19    Q.   Did you attend those weapons trainings?
20    A.   Yes.
21    Q.   Did Mr. Teganya attend those weapons trainings?
22    A.   Yes.
23    Q.   Can you explain what you were learning in the weapons
24    trainings?
25    A.   Yes.
```

10:55AM (line 10)
10:56AM (line 20)

```
 1   Q.   What were you learning?
 2   A.   We were learning how to use the traditional weapons, these
 3   ones, and the others that are not here like a club.
 4   Q.   When you say use them, can you explain what you mean, use
 5   them how?
 6   A.   We were trained on where to hit a person and the person
 7   will instantly die or die right away.
 8   Q.   Can you explain to the jury where were you trained to hit
 9   the person?
10   A.   Yes, I can.
11   Q.   Please stand up and demonstrate.  Can you show where you
12   were trained to hit the person.
13   A.   The upper part or up.
14   Q.   And where specifically?
15   A.   It depends on which direction the instruction was to hit
16   here.  I can explain more.
17   Q.   Please.
18   A.   Why here, because the temple whacks the head.  If you
19   touch here, you will hear the pulse, so when you hit here is
20   like you're hitting the heart directly.
21   Q.   Were there other places on the body that you were trained
22   to hit?
23   A.   Yes.
24   Q.   Where else?
25   A.   On the back.
```

10:57AM (line 10)
10:58AM (line 20)

```
 1   Q.   Why were you trained to hit there?

 2   A.   At the neck is also will kill you instantly.

 3   Q.   Were there any other places?

 4   A.   And when I come from the back, to hit right here because

 5   the neck and the lower lobe or the lower brain are connected.

 6   Q.   Was there any places that you were taught to avoid?

 7   A.   Yes.

 8   Q.   Where were you taught to avoid?

 9   A.   On top of the head or the front.

10   Q.   Why?

11   A.   It takes a while for someone to die if you hit here.  If

12   you can hit him, the person will be injured but will not die.

13   Q.   You can have a seat.

14            THE COURT:  Are you changing subjects?

15            MR. GARLAND:  Yes, your Honor.

16            THE COURT:  Why don't we take our break.

17            MR. GARLAND:  Yes, sir.

18            THE CLERK:  All rise.

19            ( A recess was taken.)

20            THE CLERK:  All rise.

21   (Court enters.)

22            THE COURT:  Yes, counsel.

23            MR. VARGHESE:  Your Honor, during the break,

24   colleagues from our office informed us that there was a woman

25   in the back in the audience who was audibly gaping or scoffing
```

1    at Mr. Habimana's testimony and it caused concern.

2            THE COURT:  Okay.  I didn't notice or hear it.

3            MR. VARGHESE:  I don't see her in the courtroom.

4            THE COURT:  Okay.  All right.  Let's do this:  I'm

5    going to alert the Court security officers to be aware.  Do you

6    have a description of her?

7            MR. VARGHESE:  My colleagues do.  I can get it to you.

8            THE COURT:  I'm not going to kick her out.  I didn't

9    see or hear anything.  If she comes in the courtroom, I'll ask

11:17AM 10    the Court officers to keep a close eye on her if they see

11    anything like that.

12            MR. VARGHESE:  Thank you, your Honor.

13            THE CLERK:  All rise.

14    (Jury enters.)

15            THE CLERK:  Thank you.  You may be seated.  Court is

16    now in session.

17            THE COURT:  Okay.  Mr. Varghese.

18            MR. VARGHESE:  Thank you, your Honor.

19    BY MR. VARGHESE:

11:20AM 20    Q.    Mr. Habimana, before we broke we were talking about the

21    training that you and Mr. Teganya received as part of members

22    of Interahamwe.  Do you remember that?

23    A.    Yes.

24    Q.    Who were you training to fight?

25    A.    RPF because it had attacked the nation or the country.

J.A. 770

```
 1   And it was made of the Tutsis who had fled the country in '59,

 2   and their informers, who were the Tutsis inside the country.

 3   Q.   During the training sessions were there anti-Tutsi

 4   statements made about who to fight?

 5   A.   Yes.

 6   Q.   What was said?

 7   A.   Words like, "We have one common enemy."  And that one

 8   common enemy was the Tutsi who attacked -- and that common

 9   enemy was the Tutsi who attacked in 1990.

11:21AM 10   Q.   Were there words used to describe the Tutsis?

11   A.   Yes.

12        And another thing was the RPF that attacked had other

13   Tutsis, who were the cooperators, who were inside the country,

14   their relatives, sisters, brothers, who were inside the

15   country.

16        MR. VARGHESE:  Your Honor, may I approach?

17        THE COURT:  Yes.

18   Q.   Mr. Habimana, do you see what's in front of you as Exhibit

19   17?

11:22AM 20   A.   Yes.

21   Q.   Do you recognize what it is?

22   A.   Yes.

23   Q.   Is it the type of club that you trained with as part of

24   the Interahamwe?

25   A.   Yes, but I can explain.
```

```
 1   Q.   That's okay.  But you recognize it as a club?

 2   A.   Yes.

 3            MR. VARGHESE:  Your Honor, we'd ask that Exhibit 17 be

 4   admitted into evidence.

 5            THE COURT:  All right.  It's admitted.  17.

 6            (Exhibit No. 17 received into evidence.)

 7   Q.   Mr. Habimana, can you explain, is that -- how does that

 8   club, Exhibit 17, compare to what you were actually using in

 9   the weapons training?

10   A.   Yes.

11   Q.   Please explain.

12   A.   The club that we used during the training was also a

13   wooden club, but the head of the club was not pointed this way.

14   It was pointed up, just like that.  (Indicating)

15   Q.   Mr. Habimana, I'm going to ask you to come down and stand

16   here in front of the jury with Exhibit 17.

17   A.   Yes.

18   Q.   Can you bring Exhibit 17 down.  Come stand right here.

19   Can you demonstrate for the jury how you used the club when

20   attacking someone and having our interpreter standing in as a

21   body?

22   A.   Yes.

23            Can I say something?

24   Q.   Yes.

25   A.   The attack will not be made of just one individual.  And
```

11:23AM  (line 10)
11:24AM  (line 20)

J.A. 772

1    everybody during the attack, they will have -- will carry a

2    traditional weapon.  So when we will find a Tutsi that we want

3    to kill, we will surround him, and the person who will be

4    quicker or faster like me, I will approach, and I'll push the

5    individual, and then I'll push, and then I'll say, "You

6    cockroach," and then I'll hit him in the leg, and if he doesn't

7    fall, and if he protects himself, another person on the other

8    side will hit him on the temple.  And then the one who comes

9    from the back will hit the back like I demonstrated earlier.

11:26AM 10    And the person will fall down, and we'll hit him on all parts

11    of the body until that individual is completely dead.

12    Q.    Thank you.  You can take your seat.

13          Where did you get the weapons to train with?

14    A.    At the university campus there were different activities.

15    There was a place where they would prepare firewood in front of

16    the cafeteria close to the gymnasium building.  The cafeteria,

17    that's where was the kitchen for the student meal.  There were

18    employees of the university who were there just to prepare the

19    firewood.  Those are the people who made the clubs.  But when

11:27AM 20    they are making them, they will say they are just going to be

21    used as the handle for the ax, because everything was carried

22    out in secret, because at the campus there were so many

23    different people and they were not all members of Interahamwe.

24    Q.    What would you do after the trainings?  What would you do

25    with the weapons?

```
 1   A.   We would take them back to the storage where those people
 2   who prepared the firewood used to keep them.
 3   Q.   I think you testified earlier this morning that there were
 4   meetings after the training sessions.
 5   A.   Yes.
 6   Q.   What were the meetings about?
 7   A.   It was to explain to the youth wing of Interahamwe, we
 8   would inform them if there is an upcoming rally or meeting, how
 9   they will act and -- how they will act and what they will do
10   during that time.
11   Q.   Was Mr. Teganya in those meetings as well?
12   A.   Yes.
13   Q.   During the meeting, were there discussions about the
14   Tutsis?
15   A.   Yes.
16   Q.   What kinds of things were said about the Tutsis?
17   A.   In the meeting, what was said was like this training is
18   specifically to fight the common enemy.  And the common enemy
19   was the RPF, and all the Tutsis who are the RPF cooperators
20   that we are living with.
21   Q.   Was there a word that was used to describe the Tutsis?
22   A.   Yes.
23   Q.   What was it?
24   A.   Inyenzi or cockroach.
25   Q.   Following the president's plane crash on April 6, did the
```

11:29AM (line 10)
11:30AM (line 20)

**J.A. 774**

```
 1    trainings change?
 2    A.   No.
 3    Q.   Was there discussions during the trainings about what to
 4    do next?
 5    A.   Yes.
 6    Q.   What was said?
 7         MR. LAUER:  Objection, your Honor.  It's not clear
 8    whether this is Mr. Teganya or other parties.
 9         THE COURT:  All right.  Why don't you rephrase and
10    clarify.
11    Q.   Were there instructions provided at the training sessions
12    about how to proceed?
13         MR. LAUER:  Same objection.
14         THE COURT:  Well, I think that's yes or no.  But
15    you're just asking as a general matter, that is, not
16    Mr. Teganya giving instructions, but --
17         MR. VARGHESE:  Generally.
18         THE COURT:  -- people present at the meeting giving
19    instructions?
20         MR. VARGHESE:  Yes, your Honor.
21         THE COURT:  All right.  With that understanding, I'll
22    allow it.
23         MR. VARGHESE:  Thank you, your Honor.
24         THE INTERPRETER:  Repeat the question.
25         MR. VARGHESE:  Of course.
```

11:31AM 10

11:31AM 20

**J.A. 775**

```
 1   Q.   Were there instructions given to you and to the

 2   Interahamwe during the training sessions?

 3   A.   Yes.

 4   Q.   What were those instructions?

 5           MR. LAUER:  Objection.

 6           THE COURT:  Overruled.

 7   A.   The instructions that were given after the plane crash, we

 8   were told that this is what we have been telling you about,

 9   look what the enemy has done.  Our president has died in a

10   plane crash.  It's time to know yourself and know who you are.

11   Q.   Was there an MRND meeting that followed the plane crash?

12   A.   Yes.

13   Q.   Where was the meeting held?

14   A.   In the community center.

15   Q.   Before that meeting at the community center, was there a

16   meeting on campus?

17   A.   Yes.

18   Q.   Where was that meeting held?

19   A.   In front of the restaurant, at the basketball field, a

20   little bit up from the gymnasium building.

21   Q.   How many people were there?

22   A.   I would say close to 80 to 200, in between there.

23   Q.   Was Mr. Teganya present for that meeting?

24   A.   Yes.

25   Q.   Who led the meeting?
```

J.A. 776

1    A.    The vice rector of the university.

2    Q.    What happened at the meeting?

3    A.    We were given the instructions of what to do, because the

4    bad thing had happened, the president has been killed.

5    Q.    What were the instructions?

6    A.    The instructions to put in action all the training of

7    Interahamwe how to -- of using of traditional weapons.

8    Q.    Against whom?

9    A.    The one I mentioned before, the RPF was continuing

11:35AM 10    attacking, taking parts of the country, and they were coming

11    towards Butare.

12    Q.    What happened at the end of the meeting?

13    A.    After the meeting we stayed a lot, but the killings didn't

14    start right away.

15    Q.    Was there a separate meeting after -- did you see what

16    happened with Mr. Teganya at the end of the meeting?

17    A.    No.

18    Q.    You said that the killings didn't start.  Was there

19    another meeting following that meeting?

11:36AM 20    A.    Yes.

21    Q.    And when was that meeting?

22    A.    I don't recall the days, but it was a little before the

23    19th of April.

24    Q.    What happened?

25    A.    The person who now was the acting president, and he was

**J.A. 777**

1    called Sindikubwabo.  He came to Butare because that's where he

2    was from.  He held a rally or a meeting in the community

3    center.

4    Q.    Was it for everybody?

5    A.    No.  Only members of MRND.

6    Q.    Were you present for that meeting?

7    A.    Yes.

8    Q.    Was Mr. Teganya present?

9    A.    Yes.

11:37AM 10    Q.    What did President Sindikubwabo instruct you?

11    A.    He gave use -- he gave the instructions to start killing,

12    because in other regions or other parts of the country they had

13    started killing, but in Butare we had not started.

14    Q.    What words did he use to communicate that?

15    A.    He said that the people from Butare, "You made yourself

16    less concerned."

17    Q.    Was there more?

18    A.    He was trying to say that the people from Butare, they are

19    now putting in action, and because they had delayed to start

11:38AM 20    killing the Tutsis.  That's why he used the words that we're

21    "making ourselves less concerned."

22    Q.    What happened after that meeting, the president's meeting?

23    A.    They started putting roadblocks or checkpoints to check

24    IDs, to check the tribe or the ethnicity on the ID, and if they

25    will find a new ID with the word "Tutsi," then that individual

```
 1   would be killed.
 2   Q.   What did you start doing?
 3   A.   I started going to the checkpoints and putting in action
 4   what I was trained for, that our enemies are Tutsi.
 5   Q.   Where did you start putting in action your training?
 6   A.   Where I was living, in my village.  I was not on the
 7   campus because I never lived on the campus.  I was not a
 8   student.
 9   Q.   So when you started in the village, were you doing it
10   alone or were you with a group?
11   A.   You will not do it alone.  You did it as a group,
12   attacking group.
13   Q.   So what did your group do in the village in the days after
14   the speech?
15   A.   Me and my team after that speech, a lot of Tutsis fled
16   their homes, and those who stayed in their homes, we'd go hunt
17   them down and kill them.
18   Q.   How many Tutsis did you and your group kill in the village
19   where you live?
20   A.   Four.
21   Q.   Did you know them?
22   A.   Yes.
23   Q.   How did you kill them?
24   A.   We used the traditional weapons, machetes, clubs, and the
25   picking ax.
```

11:40AM 10

11:41AM 20

**J.A. 779**

```
 1    Q.   If you knew them, why did you kill them?

 2    A.   It was the instruction.  That was the enemy.

 3    Q.   After you killed the four people, the four Tutsis in your

 4    village, what did you do next?

 5    A.   I went to the town and I wanted to go and see how things

 6    are going at the university where I used to work.

 7    Q.   What happened when you got to the university?

 8    A.   When I got there, I met another group that was comprised

 9    of -- made of the employees who -- the university employees who

10    lived in the nearby villages.

11    Q.   How many people were in the group?

12    A.   Between 30 and 50.

13    Q.   Was Mr. Teganya in that group?

14    A.   No.

15    Q.   What did you and your group do?

16    A.   First of all, we started looting on the campus, and we

17    were looking for people, and then we left.  We didn't find any

18    person there.

19    Q.   Let me stop you for one second.  Why were you looting on

20    the campus?

21    A.   At the campus, there were Tutsis students and employees.

22    And there were goods that you could take and use them.

23    Q.   If they belonged to Tutsis?

24    A.   No, like the university properties, like motorcycles and

25    machines, different things.
```

J.A. 780

```
 1    Q.   After you said that you couldn't find any Tutsis, where
 2    did you go?
 3    A.   Well, we couldn't find goods, and we couldn't find any
 4    person there.  So we took off.  We went to the city or to the
 5    town.
 6    Q.   What happened on the way to the town?
 7    A.   When we left where we were at the basketball court, we
 8    went -- we passed the administration building.  We passed where
 9    the gas station was, and we continued going to the main road
10    that goes to Akanyaru.
11    Q.   And what happened?
12    A.   We crossed the road.  We took the small road that passed
13    by the hospital and the agriculture department.  When we
14    reached by the gate of the agriculture department, and just in
15    front of us, we could see the Kiza building and the
16    St. Dominic's Church.
17    Q.   What happened when you got to that location near the
18    St. Dominic's Church and the Kiza dorm?
19    A.   We were just continuing going to the town.  And we wanted
20    just to pass by the hospital.
21    Q.   And what happened?
22    A.   When we reached very close to St. Dominic, Teganya
23    himself, he came out of Kiza, because he heard us.  We were
24    making noise, and it was during the day.
25    Q.   So where was he when you saw him?
```

11:45AM (line 10)
11:46AM (line 20)

## J.A. 781

```
 1    A.    Just in front of the Kiza entrance, when you're coming

 2    from the corridor between Kiza and St. Dominic's Church.

 3              MR. VARGHESE:  For the witness and the parties,

 4    Exhibit 27.

 5    Q.    Mr. Habimana, do you recognize what's in this picture?

 6    A.    Yes.

 7    Q.    Is it a fair and accurate representation of the Kiza dorm?

 8    A.    Yes.

 9              MR. VARGHESE:  Your Honor, we'd ask that Exhibit 27 be

11:47AM 10    admitted into evidence.

11              THE COURT:  All right.  It's admitted.  27.

12              (Exhibit No. 27 received into evidence.)

13    Q.    Mr. Habimana, can you explain to the jury what is in this

14    picture?

15    A.    I see the Kiza building.

16    Q.    And can you see, where was Mr. Teganya when you saw him on

17    that day?

18    A.    Right there where I'm standing.  (Indicating)

19              MR. VARGHESE:  I think we have a better picture of it.

11:48AM 20    Exhibit 32 for the witness and parties.

21    Q.    Mr. Habimana, do you see this picture?

22    A.    Yes.

23    Q.    And is this a close-up of what we were just looking at?

24    A.    Yes.

25    Q.    And is it an accurate representation of the building?
```

```
 1    A.   Yes.
 2         MR. VARGHESE:  Your Honor, Exhibit 32 we ask to be
 3    admitted.
 4         THE COURT:  All right.  It's admitted.  32.
 5         (Exhibit No. 32 received into evidence.)
 6    Q.   So looking at Exhibit 32, where was Mr. -- first of all,
 7    can you explain what is it that we're looking at here in
 8    Exhibit 32?
 9    A.   I'm showing and explaining where Teganya lived and his
10    colleagues.
11    Q.   And where was Teganya when you saw him on that day?
12    A.   He was just in front.  You could see, if you're coming
13    from the other side, from the agriculture department, you could
14    see him in front of Kiza.
15    Q.   And what happened when you saw him?
16    A.   He called us.
17    Q.   Did you go over there?
18    A.   Yes.
19    Q.   And what happened when you got there?
20    A.   When I got there, we talked.
21    Q.   What did Mr. Teganya say?
22    A.   He said, "Here I have inyenzi" or cockroaches.
23    Q.   Was he talking to you or was he talking to your whole
24    group?
25         THE INTERPRETER:  Repeat that question, counsel.
```

11:49AM (line 10)
11:50AM (line 20)

J.A. 783

```
 1    Q.   Was he talking to you or was he talking to the whole
 2    group?
 3    A.   Me and my group.
 4    Q.   Who responded?
 5    A.   Me.
 6    Q.   And what did you say to him?
 7    A.   I said "Where are they?"
 8    Q.   And what was his response?
 9    A.   "Let me go and bring them."
10    Q.   And what happened?
11    A.   He went in the dormitory.
12    Q.   Keep going.
13    A.   And he brought four young men.
14    Q.   Was he alone or was he with anyone?
15    A.   He was with other young men, his colleagues who lived
16    there with him.
17    Q.   And how many people were part of his group?
18    A.   I didn't pay attention to know the number, but it was a
19    group.
20    Q.   When he brought out the four men, what did he say?
21    A.   He said, "Here they are.  Take them and kill them."
22    Q.   What was your response?
23    A.   I said, "Why is this possible?  You're also Interahamwe
24    like us.  What did you do?"
25    Q.   What did you want him to do?
```

11:51AM (line 10)
11:52AM (line 20)

```
 1    A.   He was supposed to kill them.

 2    Q.   So when you said that, what happened next?

 3    A.   He kept quiet.

 4    Q.   And what happened?

 5    A.   I told him, so if it's like this, you're also trained and

 6    you have the instructions.  So we're going to divide them by

 7    two.

 8    Q.   And what happened next?

 9    A.   We divided them by two.  So my group and I, we took two

10    and his group took two.

11    Q.   And where did you go?

12    A.   We went behind Kiza on the lot of EL -- IRST.

13    Q.   Behind Kiza?

14    A.   Yes, behind.

15    Q.   Why did you go behind the Kiza dorm?

16    A.   Because we could not kill them right there.  It was at the

17    main gate and there were so many people passing by.

18    Q.   Did Mr. Teganya and his group go with you?

19    A.   Yes.  But we didn't go together, but we went to the same

20    location and we could see their group what they were doing and

21    they could see our group, what we were doing.

22    Q.   Was Mr. Teganya armed?

23    A.   Yes.

24    Q.   What did he have?

25    A.   A club.
```

          1    Q.    Like Exhibit 17?

          2    A.    Yes.

          3    Q.    Were members of his group armed as well?

          4    A.    A different weapon.

          5    Q.    So how far was your group away from Mr. Teganya's group?

          6    A.    Like 20 feet to 30 feet.

          7    Q.    And he had -- his group had two Tutsi students?

          8    A.    Yes.  Each group had.

          9    Q.    On the walk behind Kiza dorm, did the Tutsi students, did

11:55AM  10    they say anything?

         11    A.    No.  They were like sheep that are taken to be killed, to

         12    be butchered.

         13    Q.    What did you see Mr. Teganya and his group do with the two

         14    Tutsi students that they had?

         15    A.    They killed them just like we killed those ones we had.

         16    Q.    How?

         17    A.    Hitting them with the traditional weapons, the weapons

         18    that I mentioned before, and hitting the upper body, not the

         19    lower body.

11:56AM  20         MR. VARGHESE:  Can we have for the witness and the

         21    parties Exhibit 34.

         22    Q.    Mr. Habimana, do you see what's on the screen in front of

         23    you?

         24    A.    Yes.

         25    Q.    Do you recognize it?

J.A. 786

```
 1    A.   Yes.

 2    Q.   Is it a site where the four Tutsis were killed?

 3    A.   Yes.

 4    Q.   Is it an accurate representation?

 5    A.   Yes.

 6              MR. VARGHESE:  Your Honor, we'd ask that Exhibit 34 be

 7    admitted into evidence.

 8              THE COURT:  All right.  It's admitted.  34.

 9              (Exhibit No. 34 received into evidence.)

11:57AM 10   Q.   Mr. Habimana, can you explain to the jury what is in this

11    photograph?

12    A.   Yes.

13    Q.   Please do.

14    A.   Where I'm pointing, that's the direction going to the

15    hospital between the maternity building and where I'm standing.

16    Q.   And what happened where you were standing?

17    A.   Where I'm pointing is where Teganya and his group killed

18    those two.

19    Q.   And where were you -- where did you and your group kill?

11:58AM 20   A.   Where I'm standing.

21    Q.   And can you point on the screen where Mr. Teganya and his

22    group killed the two Tutsis that they had?

23    A.   Where I'm pointing.  I'm pointing to the fence that

24    separates the maternity building and the lot of IRST.

25    Q.   Is that where Mr. Teganya and his party killed the other
```

J.A. 787

|     |     |
| --- | --- |
| 1 | two? |
| 2 | A.   Yes. |
| 3 | Q.   And the building in the background, what building is that? |
| 4 | A.   Maternity. |
| 5 | Q.   After the two Tutsis were killed by your group, what |
| 6 | happened to the bodies? |
| 7 | A.   We left.  We left.  We left their bodies there. |
| 8 | Q.   Did you see what Mr. Teganya and his group did with their |
| 9 | bodies? |
| 11:59AM 10 | A.   No. |
| 11 | Q.   After killing the two Tutsis, where did you and your group |
| 12 | go? |
| 13 | A.   We went to the town. |
| 14 | Q.   Why? |
| 15 | A.   We went to loot different buildings and to see if we can |
| 16 | find some Tutsis there.  Because in the buildings there was a |
| 17 | lot of food, drinks, different things. |
| 18 | Q.   Just to be clear on this point, so was Mr. Teganya and his |
| 19 | group closer to maternity than you and your group, or farther |
| 12:00PM 20 | away? |
| 21 | A.   Do you see that big tree?  He was close to that big tree. |
| 22 | Q.   Can you point on the screen which big tree you're talking |
| 23 | about. |
| 24 | A.   Right there.  (Indicating.) |
| 25 | Q.   After you left Mr. Teganya and his group, did you see |

J.A. 788

```
 1   Mr. Teganya again during the genocide?
 2   A.   Yes.
 3   Q.   When did you see him again?
 4   A.   When I came back again heading to the university.  We met
 5   in a place called Matyazo.
 6   Q.   What is that?
 7   A.   Matyazo is a trading area, commercial street in the city
 8   of Butare.
 9   Q.   What were you doing during that day?
10   A.   Me and my group, we just came to loot things, but also if
11   we find someone, we just killed that person.
12   Q.   Was there a lot of killing that was happening during this
13   time period?
14   A.   The killings was going down or being subsided a little
15   bit.  Now it was just going from house to house trying to find
16   those who are still hiding there.
17   Q.   What was Mr. Teganya doing when you saw him again?
18   A.   Him and his group, they were just walking, and they were
19   coming from the military base called ESO.  We met with my
20   group, and I asked him, "How are you doing with the work?"
21   Q.   What did you mean, "How are you doing with the work?"
22   A.   The work of killing the Tutsis.
23   Q.   Just to be clear, during the genocide were you doing your
24   normal job of maintaining university buildings?
25   A.   Yes.
```

12:02PM (line 10)
12:03PM (line 20)

**J.A. 789**

1    Q.    So when you said, "What do you mean by work," you meant --

2    what did you mean by it?

3    A.    I wanted to know how the situation is within the campus

4    and around the campus because that's where he lived.

5    Q.    What was his response?

6    A.    He told me everything's well.

7    Q.    Did you see Mr. Teganya again during the genocide?

8    A.    No.

9    Q.    How did the genocide end in Butare?

12:04PM 10    A.    Genocide ended when RPF took over Butare.

11    Q.    When the RPF made it to Butare, what did you do?

12    A.    I flew, I fled.

13    Q.    Why did you flee?

14    A.    Because we were defeated.  MRND had been defeated and we

15    didn't have the power.

16    Q.    Where did you go?

17    A.    I went to the Congo in Kibuye.

18    Q.    How long did you stay there?

19    A.    I came back.  It was two weeks to three weeks.  I came

12:05PM 20    back on the 22nd of July, after the RPF formed the government.

21    Q.    When you came back, where did you go?

22    A.    I went back home where I lived.

23    Q.    What happened when you came back to Rwanda?

24    A.    I did my work as normal, and I would go to the town, but

25    eventually I was apprehended and I was put in jail.

J.A. 790

```
 1   Q.   When was that?

 2   A.   In October '94.

 3   Q.   Were you tried during the Gacaca courts?

 4   A.   Yes.

 5   Q.   What were you prosecuted for in Gacaca?

 6   A.   Those people that I mentioned before who were killed where

 7   I lived, and those two with Teganya, and attacks and looting.

 8   Q.   During the Gacaca process did you confess to the killing

 9   of those six Tutsis?

10   A.   Yes.

11   Q.   How long were you held in prison?

12   A.   Thirteen years.

13   Q.   When were you released?

14   A.   2007.

15   Q.   Are you still serving a sentence or being prosecuted for

16   any crimes related to the genocide?

17   A.   No.  If I was there, I would not be out of jail.

18   Q.   Is there anything about your testimony here today that

19   would affect your conviction or your sentence with respect to

20   those murders?

21        THE INTERPRETER:  Can you repeat the question,

22   counsel?

23        MR. VARGHESE:  Sure.

24   Q.   Is there anything about your testimony here today that

25   would affect your conviction or your sentence with respect to
```

**J.A. 791**

 1  those murders?

 2  A.    No.

 3  Q.    During Gacaca, could you have been prosecuted for

 4  additional crimes if you didn't tell the truth?

 5  A.    That's how it would be.

 6  Q.    Were you ever prosecuted again in Gacaca after you

 7  confessed to the six murders?

 8  A.    No.

 9  Q.    Were you ever prosecuted in the ICTR?

12:09PM 10  A.    No.

11  Q.    Were you ever prosecuted in the National Court?

12  A.    No.

13  Q.    Has anyone forced or coerced you for your testimony here

14  today?

15  A.    No.

16  Q.    Has anyone pressured you in any way regarding your

17  testimony here today?

18  A.    No.

19  Q.    Has the government of Rwanda spoken to you about your

12:09PM 20  testimony or what to say here today?

21  A.    No.

22  Q.    Has anyone offered you anything for your testimony today,

23  either from the U.S. Government or the Rwandan government?

24  A.    No.

25  Q.    You're receiving money for your meals and your hotel and

1    your air fare from the United States Government; is that right?

2    A.   Yes.

3    Q.   Is there anything about receiving that money that affects

4    your testimony here today?

5    A.   No.

6    Q.   Why are you testifying here today?

7    A.   The reason why I decided is the same reason when I

8    accepted my crimes.

9    Q.   Why is that?

12:11PM 10  A.   Because Gacaca helped us or incentivized us to accept what

11   you did and those you did it with.  And they would not weigh

12   the crimes.  And if you explained everything, how it happened,

13   and the Gacaca will see it in the place where the crimes are

14   committed.  When you will try to lie, they will know.  Because

15   the Court was made of people of integrity in the neighborhood.

16   And they will hear what you say, and they will investigate what

17   they know, and then they will say, well, this person said the

18   truth.  And then they'll say if he lives, he will live well

19   with all the wonders.  They will give you a sentence or

12:12PM 20  punishment, and that sentence or punishment will have some

21   lenience or mercy to it.  And then when you finish it, you go

22   home.  And if you haven't finished that, you continue to serve.

23   And when you're done, you go home.

24   Q.   I want to go back and just ask you, the killings that you

25   talked about with Mr. Teganya and his group, was that in the

```
 1    daytime or the nighttime?

 2    A.   Daytime.

 3         MR. VARGHESE:  Thank you, Mr. Habimana, I don't have

 4    anything further.

 5         THE COURT:  All right.  Cross.

 6                   CROSS-EXAMINATION

 7    BY MR. LAUER:

 8    Q.   Can you tell us what prison was like?

 9         MR. VARGHESE:  Objection, your Honor.

10         THE COURT:  I'll allow it in general terms.

11    Overruled.

12    A.   In which way?

13    Q.   Did you have enough to eat?  Did you suffer?

14    A.   Nobody gets satisfied in jail or gets enough food in jail.

15    Q.   Did you suffer?

16         MR. VARGHESE:  Objection, your Honor.

17         THE COURT:  Overruled.

18    A.   In which way?

19    Q.   In any way.

20    A.   What do you mean, being beaten or...?

21    Q.   I mean in any way, did you suffer?

22    A.   In normal life, being in jail is not a good thing.

23    Q.   What was the -- how many people were in the jail with you?

24    A.   The numbers were going up.  When I was in the Butare jail,

25    there was a point where there was 13,000.
```

```
 1    Q.   And that's all in one place?

 2    A.   Yes.

 3    Q.   Did you have your own bed?

 4    A.   Yes.

 5    Q.   Did you have enough to eat?

 6              MR. VARGHESE:  Objection, your Honor.

 7              THE COURT:  I think you asked that already.

 8    A.   No.

 9    Q.   Was there violence in the prison?

10    A.   No.

11    Q.   How long were you in the prison for?

12    A.   Thirteen years.

13    Q.   And when was your Gacaca trial?

14    A.   May 2007.

15    Q.   And at your trial you confessed?

16    A.   Yes.

17    Q.   It's your testimony that you named all of those that you

18    participated with?

19    A.   Yes.

20    Q.   Now, you said that four people were murdered in your home

21    village.

22    A.   Yes.

23    Q.   And is your home village Matyazo?

24    A.   No.

25    Q.   Where is your home village?
```

J.A. 795

```
 1    A.   It's called Mugahenerezo in the Commune of Huye.

 2    Q.   How far is that from Butare Town and the university?

 3    A.   Between five to seven kilometers.

 4    Q.   How long would it take you to walk from your home village

 5    to Butare and the university?

 6    A.   One-hour walk.

 7    Q.   Is that where your Gacaca trial was?

 8    A.   Yes, for those four where I lived.

 9    Q.   And then you testified you also confessed to the killing

12:18PM 10  of two people at the Kiza dormitory?

11    A.   Yes.

12    Q.   What were the names of those persons?

13    A.   I don't know the names.  I was not a student.

14    Q.   Okay.  So you don't know the names of the people that were

15    killed at Kiza?

16    A.   No.

17    Q.   You weren't a student.  You wouldn't have any reason to

18    know them?

19    A.   Yes.

12:18PM 20  Q.   Now, you met with investigators in this case in June of

21    last year, correct?

22    A.   Yes.

23    Q.   And that took place in Butare?

24    A.   Yes.

25    Q.   Where in particular did that meeting take place?
```

J.A. 796

         1    A.    In a place where I do my maintenance job, a place called
         2    Lighthouse.
         3    Q.    And that's a hotel?
         4    A.    Yes.
         5    Q.    And you worked there in some sort of maintenance position?
         6    A.    Yes.
         7    Q.    Okay.  Now, you remember that the investigators asked you
         8    lots of questions about the killing at Kiza, right?
         9    A.    Yes.
12:20PM 10    Q.    And at that time you actually gave two names for the
        11    students, Innocent Nsanzimana and Aimable Sekanyambo?
        12    A.    I don't remember that.  I don't remember well.
        13    Q.    Because you've told us you didn't know the students who
        14    were killed?
        15    A.    Yes.
        16    Q.    So there would be no reason for you to know their names?
        17    A.    Yes.
        18    Q.    You testified that Mr. Teganya was with a group at the
        19    time you encountered him at Kiza.
12:20PM 20    A.    Yes.
        21    Q.    And I think you said that you were in a group yourself,
        22    correct?
        23    A.    Yes.
        24    Q.    And there were about 30 to 50 people in your group?
        25    A.    Yes.

J.A. 797

```
 1    Q.   And you couldn't give a number for the amount of people
 2    who were with Mr. Teganya; is that correct?
 3    A.   Yes.
 4    Q.   What were the names of some of those other people that he
 5    was with?
 6    A.   It was hard to know the names of people at that time
 7    because we did not ask them -- the ID was like a war.
 8    Q.   What you were telling us was it was like a war, and there
 9    were lots of people on the street; is that right?
10    A.   No.
11    Q.   Okay.  I'm asking you if you know the names of any of the
12    other people that were with Mr. Teganya at the time of this
13    killing at Kiza.  Do you know the names of any other people?
14    A.   No.
15    Q.   Now, the Kiza dormitory, it's next to a church, right?
16    A.   Yes.
17    Q.   And you told us that at the time you met Mr. Teganya
18    there, you and your group of people were walking down the road,
19    correct?
20    A.   Yes.
21    Q.   And he stepped out of the dorm and you just happened to
22    see him?
23    A.   Yes.
24    Q.   And you and your group then walked together to the
25    dormitories?
```

```
 1    A.   Yes.
 2    Q.   You testified you saw Mr. Teganya again after that
 3    incident at Kiza?
 4    A.   Yes.
 5    Q.   And that was at some sort of trading area or marketplace?
 6    A.   Between the military base and the trading street, the
 7    trading area, commercial street.
 8    Q.   And you mentioned that there was a conversation between
 9    yourself and Mr. Teganya?
12:24PM 10   A.   Yes.
11    Q.   About the work?
12    A.   Yes.
13    Q.   When you were interviewed at the Lighthouse Hotel, you
14    didn't mention anything about that conversation?
15    A.   I said it.
16    Q.   You told the investigators about running into Mr. Teganya
17    and having a conversation about the work, which meant killing.
18    That's what you told the investigators in June?
19    A.   Yes.
12:25PM 20   Q.   I want to go back to these training sessions that you
21    mentioned.
22    A.   Yes.
23    Q.   Now, you, in 1994 were 30 years old?
24    A.   Yes.
25    Q.   You told us that was actually too old to be part of the
```

**J.A. 799**

```
 1    Interahamwe?
 2    A.   Yes.
 3    Q.   And you were working as a construction worker at the
 4    university, correct?
 5    A.   Yes.
 6    Q.   Did you socialize with university students on a regular
 7    basis?
 8    A.   No.  We'd just bypass each other when they're going to
 9    their classes and when I'm going to do my job.
10    Q.   And the university, is it a big place, correct?
11    A.   Yes.
12    Q.   Many buildings?
13    A.   Yes.
14    Q.   Thousands of students?
15    A.   Yes.
16    Q.   And the students mostly kept to themselves and socialized
17    amongst themselves; is that correct?
18    A.   Yes.
19    Q.   But you testified you were active in the MRND?
20    A.   Yes.
21    Q.   And that you became familiar with Mr. Teganya through your
22    association with the MRND?
23    A.   Yes.
24    Q.   And you even told us that you were familiar with where he
25    lived?
```

12:26PM (line 10)
12:26PM (line 20)

J.A. 800

```
 1    A.   Yes.

 2    Q.   You told us he lived in Kiza?

 3    A.   Yes.

 4    Q.   How was it you were able to know he lived in Kiza?

 5    A.   Because he was the group leader.

 6    Q.   The group leader for the Kiza dormitory?

 7    A.   No.

 8    Q.   Well, let me ask you this:  Did you ever go to the Kiza

 9    dormitory into his room?

10    A.   No.

11    Q.   Did you walk with him to the dormitory?

12    A.   No.

13    Q.   What is it that makes you say he was living at the Kiza

14    dormitory?

15    A.   Because the department that he was -- the faculty that he

16    was in, and he was the leader of the wing group or the youth

17    wing group of Interahamwe, which I was the advisor.

18    Q.   Okay.  How did you know he lived in Kiza dormitory?

19    A.   All the faculties, all the departments had the leader --

20    the Interahamwe leader in those faculties, all those

21    departments.

22    Q.   Okay.  So you knew him, you knew he lived in Kiza because

23    there were these meetings taking place for months leading up to

24    the genocide; is that right?

25    A.   Yes.
```

J.A. 801

```
 1    Q.   For how many months were those meetings going on?
 2    A.   Since the multiparty system started in '92 to '94, all the
 3    meetings and trainings continued.
 4    Q.   So you had been going to meetings and trainings with
 5    Mr. Teganya for going on three years at the time of the
 6    genocide?
 7    A.   Not three years.  1992 to 1994.  Those are not three
 8    years.
 9    Q.   Okay.  So for at least two years then; is that accurate?
10    A.   Yes.
11    Q.   And you said he was a leader in his department; is that
12    right?
13    A.   Yes.
14    Q.   And his department was the faculty of medicine or the
15    medical students?
16    A.   Yes.
17    Q.   Who were the other members of his department?
18    A.   I would not know them.  He's the one who knew them and he
19    had the list of them.
20    Q.   So let me just make sure I understand this correctly.  You
21    were going to these meetings for two years, right?
22    A.   Yes.
23    Q.   And then on top of the meetings there's training sessions
24    in the woods, right?
25    A.   The training in the woods didn't start the same time with
```

12:30PM (line 10)
12:30PM (line 20)

J.A. 802

```
 1    the meeting.  They started first doing the karate in the

 2    gymnasium.

 3    Q.   So there were meetings.

 4    A.   Yes.

 5    Q.   There were trainings in the gymnasium?

 6    A.   Yes.

 7    Q.   There were trainings in the woods?

 8    A.   Yes.

 9    Q.   And your testimony is that Mr. Teganya and a group of his

10    associates for whom he was the leader went to all of those

11    things?

12    A.   Yes.

13    Q.   But you can't tell us the name of a single other person?

14    A.   No.  Sir, many years have passed.

15    Q.   But you have very specific recollections about

16    Mr. Teganya, right?

17    A.   Yes.

18    Q.   You remember him with the clothing and the sash, right?

19    A.   Yes.

20    Q.   And you remember him with the flag, right?

21    A.   Yes.

22    Q.   By the way, did you tell the investigators in that meeting

23    at the Lighthouse Hotel about the flag?

24    A.   I don't recall well.

25    Q.   But you remember that flag, as you sit here right now?
```

J.A. 803

```
 1    A.   Yes.

 2    Q.   And you remember him being a leader in this group?

 3    A.   Yes.

 4    Q.   You remember the Kung Fu sessions?

 5    A.   Yes.

 6    Q.   You remember the sessions about using the weapons?

 7    A.   Yes.

 8    Q.   And you said those trainings were actually twice a week;

 9    is that right, Tuesdays and Fridays?

12:33PM 10   A.   Yes.

11    Q.   Starting at 6:00 p.m.?

12    A.   Yes.

13    Q.   Then after the trainings there would be a meeting?

14    A.   Yes, a small meeting.

15    Q.   Okay.  And you remember this event that you say took place

16    at Kiza?

17    A.   Yes.

18    Q.   You just don't remember a single other person who was

19    there for any of it?

12:34PM 20   A.   No, I don't remember.

21    Q.   What is an advisor to the Interahamwe?

22         MR. VARGHESE:  Objection, your Honor.  I'd ask the

23    witness be able to finish his answer.  He was in the middle of

24    a sentence.

25         THE COURT:  Was your answer complete?
```

J.A. 804

```
 1              THE INTERPRETER:  Can counsel please repeat the
 2    question, your Honor.
 3              THE COURT:  My question was, did he complete the
 4    answer before the next question was asked?
 5              THE DEFENDANT:  Yes.
 6              THE COURT:  Okay.  Then put the question to him.
 7    Q.   How did you become an advisor to this particular group?
 8    A.   Because if I was young, I could be part of the group and
 9    train with the group.
10    Q.   Okay.  So when you were doing these training sessions,
11    were you the instructor?
12    A.   No.
13    Q.   You were there to observe?
14    A.   Yes, like an advisor.
15    Q.   And you told us at these training sessions there would be
16    instructions given to you about where to hit somebody, right?
17    A.   Yes.
18    Q.   And you were advising a group of medical students about
19    where to hit someone to kill them?
20    A.   Not only medical students.  The Interahamwe group that was
21    trained, these students came from different faculties or
22    different departments.
23    Q.   Okay.  So how many people would be in the woods for these
24    trainings?
25    A.   Close to 200.
```

**J.A. 805**

1    Q.   So 200 people, all university students?

2    A.   Yes.  There was not any other civilians.

3    Q.   Except for you?

4    A.   Yes.

5    Q.   You were the only one who wasn't a student?

6    A.   And the instructors were also other civilians.

7    Q.   Okay.  But you were not an instructor?

8    A.   No.

9    Q.   You were just permitted to come along to this secret

12:37PM 10   training in the woods?

11   A.   Yes.

12   Q.   And no one asked you why you were there or who you were?

13   A.   There is none, but I can explain on that one.

14   Q.   Why don't you explain.

15   A.   Because in the party there are people who are very active.

16   And I was among the elders in the party who were very active.

17   So I was just this charge to see how the youth wing were doing

18   their work.

19   Q.   So you had something of a leadership role yourself.  Is

12:38PM 20   that what you're saying?

21   A.   Yes, because I could also give a report.

22   Q.   Okay.  And so in this senior role that you had, you were

23   designated someone to teach the university students.  Is that

24   your testimony?

25   A.   No.

1    Q.    Well, I'm just trying to ask how you managed to get

2    yourself into the middle of the woods with 200 university

3    students for a group that you didn't belong to.

4    A.    Yes, I can explain.

5    Q.    Go ahead.

6    A.    In the leadership of the university there were teachers

7    who were paid for that.  They were paid for the training, train

8    for karate in the gymnasium, training tennis, training

9    basketball.  There were teachers in every sport that were paid

12:40PM 10    by the university.  Myself, where I used to work in the

11    maintenance department, my leader who was -- the individual who

12    was my leader in that department, because he was also

13    Interahamwe, he's the one -- he gave me instructions to go and

14    watch students and be the advisor.

15    Q.    And the students were happy to have a maintenance man come

16    and tell them what to do?

17    A.    None.

18    Q.    I have a question about these trainings.  How long did

19    they go, how many hours?

12:41PM 20    A.    Which trainings?

21    Q.    Let's take the trainings in the woods.

22    A.    Two hours.

23    Q.    And those started at 6:00 p.m.?

24    A.    Yes.

25    Q.    Okay.  And you said it was weapons training, right?

J.A. 807

```
 1    A.   Yes.
 2    Q.   Okay.  And then Mr. Varghese asked you to stand up and
 3    demonstrate some of that training, right?
 4    A.   Yes.
 5    Q.   And you pointed out where you were instructed to hit
 6    people?
 7    A.   Yes.
 8    Q.   It took two hours to do that?
 9    A.   Yes.
12:41PM 10   Q.   It took two hours on a Tuesday night and then two more
11    hours on a Friday night?
12    A.   Yes.
13    Q.   And then it took two more hours every Tuesday and Friday
14    for a period of months to tell you how to swing a club?
15    A.   That program never changed.
16    Q.   Excuse me.  I didn't hear your answer.
17    A.   That program never changed.
18    Q.   The program never changed?
19    A.   Yes.
12:42PM 20   Q.   And the program -- how long was this going on for?
21    A.   Like I said, since the beginning of the multiparty system.
22    Q.   Which was 1992, right?
23    A.   Yes.
24    Q.   So two years of meeting in the woods swinging clubs?
25         MR. VARGHESE:  Objection, your Honor.  We've been over
```

J.A. 808

         1    this.

         2              THE COURT:  I think it's getting a little repetitive,

         3    but I'll allow this.  Go ahead.

         4    Q.   Two years of meeting twice a week in the woods to swing

         5    clubs, is that how it went?

         6              THE INTERPRETER:  Counsel, can you repeat the

         7    question, please.

         8    Q.   You were having these meetings twice a week for two years

         9    in the woods?

12:43PM  10    A.   Yes.

        11    Q.   You talked about the plane crash where the president was

        12    killed?

        13    A.   Yes.

        14    Q.   And you remember that, right?  It was a big event?

        15    A.   Yes.

        16    Q.   And you testified that there was a meeting shortly

        17    thereafter, right?

        18    A.   Yes.

        19    Q.   And it was -- you said it was an area close to the

12:44PM  20    gymnasium?

        21    A.   Yes.

        22    Q.   And I think you said there were about 80 to 100 people

        23    there?

        24    A.   Yes.

        25    Q.   And you said the meeting was led by the vice rector of the

**J.A. 809**

1    university?

2    A.    Yes.

3    Q.    And Mr. Teganya was present?

4    A.    Yes.

5    Q.    Other than Mr. Teganya and the vice rector, who else was

6    there?

7    A.    All the members of MRND, the Interahamwe, the youth wing,

8    us who were older and people from different faculties or

9    departments.

12:45PM 10    Q.    So it wasn't just students, right?

11    A.    No.

12    Q.    So there were some students?  Is that right, there were

13    some students?

14    A.    Students and university employees.

15    Q.    Who were some of the people who were there?

16    A.    You want me to mention names?

17    Q.    Yeah.  Do you remember who else was at this meeting?

18    A.    Those who are not students?

19    Q.    You can tell me whoever you remember was there.

12:45PM 20    A.    Like I said before, the meeting was made of the people who

21    worked or lived on the campus.  Students, teachers and other

22    employees, but of the university only.

23    Q.    Okay.  And you worked at the university?

24    A.    Yes.

25    Q.    You were active in -- as an advisor, at least to this --

**J.A. 810**

```
 1   the student group?
 2   A.   Yes.
 3   Q.   So who else was there?
 4   A.   My leader in the department where I worked, a vice rector
 5   of the university, different teachers.
 6   Q.   Can you give me the name of any other students who were
 7   there?
 8   A.   Apart from Teganya, he's the only one I know because he
 9   was the leader.
10   Q.   That meeting in June at the hotel, how did that come
11   about?
12   A.   I don't understand.  What meeting?  You mentioned so many
13   meetings.
14   Q.   I'm sorry.  I'll be more specific.  In June you had a
15   meeting with investigators from the United States, right?
16   A.   Yes.
17   Q.   And to be there for that meeting, someone contacted you to
18   ask you to come.
19   A.   Yes.
20   Q.   Who asked you to come to that meeting?
21   A.   Is a female one of these?  I don't know how she got my
22   number.
23   Q.   So you got a phone call from a female?
24   A.   Yes.
25   Q.   And what is her name?
```

12:47PM (line 10)
12:48PM (line 20)

**J.A. 811**

```
 1    A.    Niela.

 2    Q.    And she told you about a meeting that you were wanted for?

 3    A.    She asked me, "How can we find you?  We need you."

 4    Q.    What else did you learn about that meeting?

 5    A.    They didn't explain to me what they wanted.  I asked them,

 6    "When do you need me?"  And they said, "Where are you?"  I told

 7    them where I worked, at the Lighthouse.

 8    Q.    When did you come to the United States for this trial?

 9    A.    I left my house on the 27th of February.

10    Q.    So you've been here now for well over two weeks?

11    A.    Yes.

12    Q.    And you're aware that you are going to be receiving about

13    100 U.S. dollars for every day you spent here?

14    A.    No.

15    Q.    What is your understanding of the money that you're

16    getting for coming here?

17    A.    Like we talked when I was in Rwanda, when we were still in

18    Rwanda.  I knew that was over.  I continued to do my regular

19    work.  And they called me -- and then they called me again and

20    they said, "Are you ready to come and testify about the

21    killings at the university and around the university?"  And I

22    said, "Yes."

23    Q.    How much money do you think you're getting for testifying

24    here?

25    A.    Testimony is not sold.
```

12:49PM (line 10)
12:50PM (line 20)

```
 1    Q.   I'm not asking you if you're selling it.  I'm asking you
 2    how much money you think you're going to go home with when
 3    you're all done?
 4    A.   I didn't come here to work.
 5    Q.   I'll ask the question again.  When you go home, how much
 6    money do you expect to be taking with you?
 7    A.   I have a question.  How am I going to get paid because I
 8    was not promised a salary?
 9         THE COURT:  Well, you have to answer his questions.
10    You don't get to ask him questions.
11    A.   Okay.
12    Q.   So I'll ask my question again.  When you go home to
13    Rwanda, how much money do you expect to be taking with you?
14    A.   None.
15    Q.   Have you had any meetings with the prosecutors in this
16    case?
17    A.   No.
18    Q.   The gentleman who was just asking you questions about an
19    hour ago, Mr. Varghese, you've never met with him before you
20    came to court this morning?
21    A.   We met.
22    Q.   When did you meet before today?
23    A.   Yesterday we met and he told me that today is my day to
24    come and explain what I said in Rwanda today.
25    Q.   Was that the first time you met Mr. Varghese, yesterday?
```

12:52PM (line 10)
12:52PM (line 20)

J.A. 813

```
 1                THE INTERPRETER:  Pardon me?

 2     Q.   Was that the first time you met Mr. Varghese, yesterday?

 3     A.   No, even before then we had met once.

 4     Q.   And you've also met with some of the other investigators

 5     in the case apart from Mr. Varghese, correct?

 6     A.   Yes, but that's the only person who asked me.

 7     Q.   At any point, whether it's with Mr. Varghese, whether it's

 8     with an investigator, has anyone talked to you about receiving

 9     a fee for coming to the United States?

10     A.   No.

11     Q.   You came here in February.

12     A.   Yes.

13     Q.   You met with Mr. Varghese yesterday.

14     A.   But I said we met even before.

15     Q.   Okay.  You've been spending the past two weeks in a hotel,

16     correct?

17     A.   Yes.

18     Q.   With all of the other witnesses from Rwanda in this case.

19     A.   Yes.

20     Q.   Has the subject of money come up at all since you've been

21     here?

22     A.   No.

23     Q.   You are self-employed?

24     A.   Yes.

25     Q.   You do some work for the Lighthouse Hotel?
```

```
 1    A.    Yes.

 2    Q.    How much money do you make?

 3    A.    300,000 from Lighthouse.  And I have a farm and I raise

 4    chickens and pigs.

 5    Q.    How much did you say you make from the Lighthouse?

 6    A.    300,000.

 7    Q.    Is that per week?

 8    A.    Monthly.

 9    Q.    Do you receive a salary from any other business?

12:56PM 10   A.    No, apart from my own farm.

11              MR. LAUER:  May I have a moment, your Honor?

12              THE COURT:  Yes.

13              MR. LAUER:  I'm all set.  Thank you.

14              THE COURT:  Okay.  Any redirect?

15                        REDIRECT EXAMINATION

16    BY MR. VARGHESE:

17    Q.    Good morning again, Mr. Habimana.

18    A.    Yes.

19    Q.    Mr. Lauer asked you some questions about why the

12:57PM 20   Interahamwe practiced so much weapons training.  Why did the

21    Interahamwe practice so much weapons training?

22    A.    Before the beginning of the multiparty system we didn't

23    have Interahamwe.  And the Interahamwe came into existence

24    because the multiparty system started, and then now we had

25    opposition.
```

J.A. 815

```
 1   Q.   And why were you practicing -- why were you training so
 2   hard in the weapons training?
 3   A.   The reason was because it was a civilian war.
 4   Q.   You wanted to be ready?
 5   A.   Yes.
 6            MR. VARGHESE:  Thank you very much.  Nothing further.
 7            THE COURT:  Any recross?
 8            MR. LAUER:  No.
 9            THE COURT:  Thank you.  You may step down, and I guess
10   we'll break there for the day.
11            THE CLERK:  All rise.
12            THE COURT:  Ladies and gentlemen -- I'm sorry --
13   remember my instruction not to discuss the case among yourself
14   or with anyone else or to read or listen to anything about the
15   case.  Okay.  We'll see you tomorrow morning at 9:00.
16   (Jury exits.)
17            THE COURT:  All right.  Just quickly on this
18   affidavit.  I glanced through it -- really nothing more, but I
19   just wanted to put a framework around it without making any
20   decisions.
21            This is Exhibit 3.  At least based on my quick read,
22   as I understand it, it's part of his statement that at some
23   point was made to CIS.  There's nothing in the affidavit that
24   is exculpatory in the sense that it directly contradicts what
25   the government says was a false statement.  Obviously it's an
```

Timestamps in left margin: 12:59PM (line 10), 01:00PM (line 20)

J.A. 816

     1    affidavit of the defendant himself, and it contains self-
     2    serving information not subject to cross-examination, and, you
     3    know, therefore, I want to approach this cautiously, to say the
     4    least, but I will listen to any argument that any portion of
     5    this is necessary for completeness in order to understand the
     6    statements that the government says are false or to put them in
     7    context or otherwise, and, of course, all of that is subject
     8    not only to, you know, hearsay, but Rule 403 issues as well.
     9    So putting it succinctly, I guess, I am skeptical, but I'll
01:01PM 10    listen to what you have to say, and I don't know that we need
    11    to resolve that tomorrow morning, but at least that's my quick
    12    and dirty view on it without the benefit of any further
    13    argument or even a close read of the affidavit.  So just so you
    14    know the benefit of my thinking, such as it is, which is early.
    15            Okay.  Anything else before tomorrow morning at 8:30?
    16            MR. GARLAND:  Not from the government, your Honor.
    17            MR. LAUER:  No.
    18            THE COURT:  Okay.  Thank you.
    19            THE CLERK:  All rise.
01:01PM 20    (Court exits.)
    21
    22
    23
    24
    25

**J.A. 817**

1

<pre>
 1                      UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
 2

 3                                        )
          UNITED STATES OF AMERICA,       )
 4                                        )  Criminal Action
          Vs.                             )
 5                                        )  No. 17-10292-FDS
          JEAN LEONARD TEGANYA,           )
 6                        Defendant       )
                                          )
 7                                        )

 8        BEFORE:   THE HONORABLE F. DENNIS SAYLOR, IV

 9

10                            JURY TRIAL DAY 8

11

12             John Joseph Moakley United States Courthouse
                          Courtroom No. 2
                         One Courthouse Way
13                        Boston, MA 02210

14

15                         March 19, 2019
                            8:30 a.m.

16

17

18

19

20

21

22

23                        Valerie A. O'Hara
                         Official Court Reporter
24        John Joseph Moakley United States Courthouse
                    1 Courthouse Way, Room 3204
25                        Boston, MA 02210
                    E-mail: vaohara@gmail.com
</pre>

J.A. 818

1   APPEARANCES:

2   For The United States:

3        United States Attorney's Office, by GEORGE P. VARGHESE,
    ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4   UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
    Massachusetts  02110;
5
    For the Defendant:
6
            Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7   and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
    Boston, Massachusetts 02210.
8
    ALSO PRESENT:
9
    Augustin Mutemberezi, Interpreter
10  Moses B. Rndasunikwa, Interpreter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            I N D E X

2    WITNESS                         DIRECT   CROSS   REDIRECT   RECROSS

3    CONSOLEE MUKESHIMANA
       By Mr. Garland                 10              57
4      By Mr. Lauer                           39                 60
     ESPERANCE MUKAMURENZI
5      By Mr. Varghese                62              94
       By Mr. Lauer                           78                 96
6

7

     EXHIBITS                              FOR I.D.   IN EVIDENCE
8
       35 and 36                                         25
9      64                                                30
       37                                                35
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|     | PROCEEDINGS |
| --- | --- |
| 1   | <u>PROCEEDINGS</u> |
| 2   | THE CLERK:  All rise.  Thank you.  You may be seated. |
| 3   | Court is back in session. |
| 4   | THE COURT:  All right.  Good morning, everyone.  Do we |
| 5   | have anything to discuss? |
| 6   | MR. GARLAND:  Nothing for the government but I think |
| 7   | the defense still wants to address meeting the affidavit. |
| 8   | MR. LAUER:  Yes, your Honor, if I could approach, I've |
| 9   | highlighted two sections from the affidavit that would be the |
| 08:34AM 10 | sections that I would be proposing to admit. |
| 11  | THE COURT:  And this is I think Exhibit 2, I may have |
| 12  | called it Exhibit 3 yesterday. |
| 13  | MR. GARLAND:  Yes, it's Exhibit 2, your Honor. |
| 14  | MR. LAUER:  Exhibit 2. |
| 15  | THE COURT:  So you're talking about paragraphs 20 |
| 16  | through 30? |
| 17  | MR. LAUER:  Paragraphs 20 through 30.  These |
| 18  | paragraphs pertain to Mr. Teganya's activities during the |
| 19  | period of the genocide.  Obviously, the allegation in this case |
| 08:35AM 20 | is that the lie on his I-589 form has to do with his |
| 21  | participation in the genocide.  These paragraphs describe his |
| 22  | activities during the genocide, so that would be the basis for |
| 23  | seeking to admit them for completeness purposes. |
| 24  | THE COURT:  What about the -- I guess two things, why |
| 25  | is it necessary to make it complete, Number 1; and Number 2, |

1    how is this not sort of an end-run around taking the stand?  In

2    other words, it permits the defendant effectively to testify

3    without being subject to cross-examination?

4         MR. LAUER:  Well, I propose thinking about this from

5    the jury, your Honor, the jury has been provided with an

6    exhibit that says that he essentially answers the questions

7    about whether he belonged to any organizations or participated

8    in the persecution of others, and his answers on that form are

9    I will submit a detailed declaration.

08:36AM  10         I think it would be helpful to the jury to see what

11    the detailed explanation is, and I think for purposes of

12    fairness and completeness, the jury needs to see what the

13    answer was in its full form.

14         I would agree that the remainder of the affidavit

15    really goes to the other issues that are not before the jury,

16    but what took place in April, May and June is at the crux of

17    the case, and the exhibit that the jury has specifically says

18    that, you know, there's a detailed declaration that will be

19    submitted, and this is the detailed declaration, so it's a

08:36AM  20    completeness argument, your Honor.

21         THE COURT:  Mr. Garland.

22         MR. GARLAND:  Yes, thank you, your Honor.  A couple

23    things.  One is if you look Exhibit 1, page 7, question 3,

24    "Have you or your spouse ever or your children ever basically

25    participated in persecution," just summarizing that, there's

1    nothing in that question, nothing in that answer that says that

2    you should look at this affidavit that may come at some point.

3    In fact, it just says no, and there's no -- nothing relating to

4    this affidavit at all.

5            The second thing is that this affidavit, it's hard to

6    say that it's even part of this document because if you look at

7    the date of Exhibit 1, the questionnaire, that is submitted on

8    September 13th, 2014.  The affidavit comes in six months, if

9    not more alter, and so the government's argument is that the

08:37AM 10    lies were complete basically at the time of making this

11    application and then testifying at the custody hearing as well.

12            There's nothing in this affidavit that is a

13    recantation of what was said in those statements, and even if

14    it were a recantation, there's no recantation doctrine in

15    either of the statutes that the defendant is charged with, so

16    this really is just a way of trying to get in what's clearly

17    hearsay to try to get more of the defendant's own story in

18    here.

19            There's nothing in here that says that what's in here

08:38AM 20    has to be contemplated or should in fairness be completed with

21    what's in here.  There's a blanket denial that the defendant

22    did not or that he participated in the MRND, if not a blanket

23    denial, a complete omission of it.

24            There's nothing in this thing that says, well, he did

25    participate in the MRND but not in the way that was material or

1   anything like that, it just talks about what he was doing, what

2   he supposedly was doing at that point, so this really is an

3   end-run, it's hearsay of the defendant, it's not part of the

4   original proceedings, and it does not amplify what was said or

5   qualify what was said in the way that's meaningful at all.

6           THE COURT:  Mr. Lauer.

7           MR. LAUER:  Your Honor, I think it's going to be odd

8   for the jury in this case to be presented with the I-589 form,

9   which specifically references a detailed statement to be

08:39AM 10  submitted and then to withhold relevant portions of that

11  detailed statement.

12          I think that's what the doctrine of completeness

13  speaks to, and I think there's ample basis that the limited

14  amount or the limited portions of the affidavit having to do

15  with the activities, Mr. Teganya's activities during the time

16  of the genocide for that to be admitted.

17          THE COURT:  All right.  Let me think about all of

18  that, and I'll issue a ruling fairly promptly, but I want to

19  reread the affidavit in light of the affidavit.  Okay.

08:40AM 20  Anything else?

21          MR. GARLAND:  No, not from the government, your Honor.

22          MR. LAUER:  For scheduling purposes, your Honor, the

23  government alerted us last night that they may conclude earlier

24  than previously believed.  We will be submitting a proffer

25  concerning our expert, Dr. Twagiramungu.  We're submitting that

Case: 19-1689     Document: 00117615537     Page: 140     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 8 of 102

8

```
 1    today, and we had been prepared to call him on Friday because

 2    the last word from the government was that they expected to

 3    conclude on Thursday.

 4          Now it seems the government may be concluding as soon

 5    as Wednesday, which leaves us in a bit of a bind because

 6    Dr. Twagiramungu is available on Friday.

 7          THE COURT:  I guess if that's the way it plays out,

 8    I'm not going to consider it bad.  Obviously, I would prefer

 9    that we go continuously, but I understand we have scheduling

10    issues if that's the way it is, the way it is.  I would like to

11    make use of the time if we can make use of it.  If your expert

12    is available on Friday, you know, let's make use of the time.

13          I assume there is going to be a defense case, in other

14    words, I don't need to be worried about sending it to the jury

15    tomorrow, correct?

16          MR. LAUER:  Correct, there will be a defense case.

17          THE COURT:  I mean, we'll do our best, I guess.  I'm

18    not going to be angry at people who have the case go shorter

19    than they thought it was going to take, let's put it that way.

20          MR. GARLAND:  Your Honor, one suggestion is that if we

21    do have this proffer of the expert's testimony today, it may be

22    that we can talk about that on whatever time is remaining on

23    Wednesday if there is time remaining.

24          THE COURT:  Okay.

25          MR. GARLAND:  Or on Thursday because the government's
```

J.A. 825

1   position, I think, is going to remain the same, which is that

2   even taking into account what he says that he's going to be

3   able to talk about, it doesn't accord with the evidence in this

4   case, the study that he's had.

5           THE COURT:  I'm sorry, the proffer has been filed?

6           MR. LAUER:  It will be filed shortly, yes.

7           THE COURT:  Let me read it, and depending on how this

8   plays out, either Wednesday or Thursday, we can have a hearing

9   on that, I guess, and anything else that we ought to be talking

08:42AM 10   about, I suppose?  Maybe we ought to even have a preliminary

11   charge conference, begin talking about what the charge ought to

12   look like and things like that.

13           Okay.  Thanks.  We'll see how it goes.  Anything else?

14           MR. GARLAND:  Nothing from the government.

15           THE COURT:  All right.

16           THE CLERK:  All rise.

17           (A recess was taken.)

18           THE CLERK:  All rise for the jury.

19           (JURORS ENTERED THE COURTROOM.)

09:00AM 20           THE COURT:  Good morning, everyone.  Are you ready to

21   go, Mr. Varghese?

22           MR. VARGHESE:  Yes, your Honor.  Your Honor, the

23   United States calls Consolee Mukeshimana.

24           CONSOLEE MUKESHIMANA, having been duly sworn by the

25   Clerk, through the Interpreter, testified as follows:

| | |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MR. VARGHESE: |
| 3 | Q.   Good morning. |
| 4 | A.   Good morning. |
| 5 | Q.   Can you please introduce yourself to the jury.  What is |
| 6 | your name? |
| 7 | A.   Consolee Mukeshimana. |
| 8 | THE COURT:  Can you ask her to speak up to make sure |
| 9 | the other people can hear. |
| 09:01AM 10 | Q.   Where are you from? |
| 11 | A.   Butare. |
| 12 | Q.   Are you currently employed? |
| 13 | A.   Yes. |
| 14 | Q.   What do you do? |
| 15 | A.   I'm an nurse. |
| 16 | Q.   Where do you work? |
| 17 | A.   At University Hospital in Butare. |
| 18 | Q.   How long have you been a nurse? |
| 19 | A.   Twenty-five years. |
| 09:02AM 20 | Q.   Back in 1994, how old were you? |
| 21 | A.   Thirty. |
| 22 | Q.   And where did you live? |
| 23 | A.   I was living in Sovu, which is in Huye. |
| 24 | Q.   How far was your house in Sovu to the hospital in Butare? |
| 25 | A.   To get there would take about 30 minutes. |

| | | |
|---|---|---|
| 1 | Q. | Is that by walking or by driving? |
| 2 | A. | By walking. |
| 3 | Q. | Who did you live with? |
| 4 | A. | With my husband and two children. |
| 5 | Q. | How old were your children? |
| 6 | A. | One was three years old, another one was one years old. |
| 7 | Q. | Were you expecting any other kids? |
| 8 | A. | Yes. |
| 9 | Q. | How far along were you back in April, 1994? |
| 09:04AM 10 | A. | Six months. |
| 11 | Q. | Back in 1994, were you working as a nurse? |
| 12 | A. | Yes. |
| 13 | Q. | Where? |
| 14 | A. | The head of center in Sovu. |
| 15 | Q. | Is that near your house? |
| 16 | A. | Yes. |
| 17 | Q. | Did you carry an identity card? |
| 18 | A. | Yes. |
| 19 | Q. | What ethnic group was listed on your identity card? |
| 09:04AM 20 | A. | Tutsi. |
| 21 | Q. | Prior to the genocide, had you been to the Butare |
| 22 | | Hospital, the University Hospital in Butare? |
| 23 | A. | Yes, I used to go there. |
| 24 | Q. | Why would you go to the hospital, University Hospital? |
| 25 | A. | We would go there for medical treatment. |

Case: 19-1689    Document: 00117615537    Page: 144    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 202    Filed 11/04/19    Page 12 of 102

12

1    Q.    Did you go there in March of 1994?

2    A.    Yes.

3    Q.    Why did you go in March of 1994?

4    A.    I had taken my second child there for treatment.

5    Q.    What was wrong with your second child?

6    A.    He used to have frequent high fevers and also a problem

7    with breathing.

8    Q.    Just so we're clear, is that the one year-old?

9    A.    Yes.

09:06AM 10    Q.    What happened when you took your child to the hospital in

11    Butare?

12    A.    He was checked and then they admitted him.

13    Q.    What ward was he in?

14    A.    Pediatric ward.

15    Q.    While he was admitted, where were you?

16    A.    I was with him.

17    Q.    Why did you stay with him?

18    A.    I was the one taking care of him.

19    Q.    What kinds of things were you doing for him?

09:07AM 20    A.    I would clean him, feed him, and whenever there's a

21    problem, I would call the nurses.

22    Q.    Is it common in Rwandan hospitals for family members to

23    stay with patients?

24    A.    Yes.

25    Q.    During your son's stay in the hospital in March, 1994, did

**J.A. 829**

 1   you become familiar with the medical staff and the personnel of

 2   the hospital?

 3   A.   Yes.

 4   Q.   Are you familiar with an individual by the name of

 5   Jean Leonard Teganya?

 6   A.   Yes.

 7   Q.   How do you know him?

 8   A.   He would come to check on the child, and it looked as if

 9   they were getting training about checking patient.

09:08AM 10   Q.   Was he a doctor or a medical student?

11   A.   He was a student.

12   Q.   How do you know?

13   A.   They would have a lab coat with their name with a tag

14   indicating their names and also their students in the National

15   University of Rwanda.

16   Q.   What did it say on the lab coat that indicated that they

17   were a student?

18   A.   It would show that it was a student.

19   Q.   Okay.  Do you recall what specifically it said?

09:09AM 20   A.   It would say that this is a student intern, medical

21   intern.

22   Q.   What did the doctor's lab coats look like?

23   A.   The doctors' would say DR, meaning doctor, and for the

24   nurses was INF, meaning for nurse.

25   Q.   Other than Mr. Teganya, were there other medical students

14

```
        1    who came and looked after your son?

        2    A.   Yes.

        3    Q.   Can you recall any of the other medical students who came

        4    and looked after your son?

        5    A.   Yes.

        6    Q.   Who?

        7    A.   His name is Ishimwe Samuel.

        8    Q.   Did your son get better while he was at the hospital?

        9    A.   Yes.

09:11AM 10    Q.   Did he eventually leave the hospital?

       11    A.   Yes.

       12    Q.   When did your son leave the hospital?

       13    A.   He left after a few days in April, I think around the 4th

       14    because we had been home for two days when

       15    President Habyarimana's plane crashed.

       16    Q.   So the 4th of April?

       17    A.   Yes.

       18    Q.   Where did you go when you left the hospital?

       19    A.   I went home.

09:12AM 20    Q.   To Sovu?

       21    A.   Yes.

       22    Q.   Following the downing of the president's plane, did you

       23    leave your home?

       24    A.   Yes, we left.

       25    Q.   Why did you leave?
```

1    A.    The Interahamwe started coming and burning homes and also

2    trying to kill people.

3    Q.    Where did you go?

4    A.    The health center in Sovu.

5    Q.    Why did you go to the health center in Sovu?

6    A.    At that time there was a vehicle that was going around

7    with the loud speaker announcing that people who live in this

8    area should go to the health center in Sovu and the other

9    people who live somewhere would go to Huye.

09:13AM 10    Q.    Who did you go to the health center with?

11    A.    I went with my husband and one child.  The other child,

12    there is another person who had took her.

13    Q.    I'm sorry, could you repeat the last part of the answer?

14    A.    The other -- I went with my husband and one child.  The

15    other child somebody had taken her.

16    Q.    Was the other child with a relative?

17    A.    Yes.

18    Q.    Who all was there at the health center in Sovu?

19    A.    Some are relatives, others are neighbors, and the other

09:14AM 20    people from the surrounding villages were formed there.

21    Q.    Were they Hutus or Tutsis or both?

22    A.    Tutsis.

23    Q.    Did you hear the speech by president Sindikubwabo?

24    A.    Yes.

25    Q.    How did you hear it?

```
 1     A.    On the radio.

 2     Q.    Where were you when you heard the speech?

 3     A.    Where we had fled to.

 4     Q.    At the medical center?

 5     A.    Yes.

 6     Q.    What do you recall about the speech?

 7     A.    He say that people of Huye, they are pretending, and he

 8     also say that if you want to bind the weeds, you gather it, and

 9     he say if you want to cut a tree, also uproot it.

09:16AM 10     Q.    Did you have an understanding of what meant?

11     A.    Yes.

12     Q.    How did you understand what he was saying?

13     A.    He also added that we should kill the Tutsis so that when

14     in the future if a Hutu child is born, we would ask how a Tutsi

15     it looked like.

16     Q.    What happened following that speech?

17     A.    The Interahamwe started burning homes and also killing

18     people.

19     Q.    Did the Interahamwe come to the health center?

09:17AM 20     A.    Yes.

21     Q.    What happened?

22     A.    Before they came, the master or the mayor of what used to

23     be called Huye with the soldiers from Isso, and he asked who

24     are the Hutus and who are the Tutsis.

25     Q.    What happened next?
```

J.A. 833

1    A.    They gave the Hutus guns and grenades, and they started

2    throwing that at the refugees, people who were there.

3    Q.    At the health center?

4    A.    Yes.

5    Q.    Was your husband and family still there?  Was your family

6    and child still with you?

7    A.    Yes.

8    Q.    What happened next?

9    A.    On the first day, my husband took the child, and he went

09:19AM 10    to his family.

11    Q.    And which child was with him, the three year-old or the

12    one year-old?

13    A.    The one year-old.

14    Q.    Why didn't you go with your husband and child to your

15    relatives?

16    A.    I was very tired and exhausted because I was also

17    pregnant.  I couldn't make it, the next day, that's when they

18    come back to kill.

19    Q.    Who came back?

09:20AM 20    A.    Interahamwe.

21    Q.    So you stayed at the medical center while your husband and

22    child left?

23    A.    Yes.

24    Q.    What happened when the Interahamwe came back the next day?

25    A.    They came and they started killing people.  When they

Case: 19-1689    Document: 00117615537    Page: 152    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 18 of 102

18

        1    finished, they say let's go and kill people at the community
        2    Huye.  Me, I was lying in dead bodies.
        3    Q.   How did you survive the attack?
        4    A.   I was lying in dead bodies.
        5    Q.   Were you hiding?
        6    A.   Yes.
        7    Q.   What did you do afterwards?
        8    A.   After I came out and went to Gihindamuyaga again.
        9    Q.   Were you going to meet your husband and child?
09:21AM 10    A.   No, I went to another family.
       11    Q.   Why didn't you go and meet up with your husband and child?
       12    A.   I didn't want all of us together in the same place and we
       13    get into problems.
       14    Q.   I'm sorry, what was that last word?
       15    A.   Getting in trouble.
       16    Q.   Where did you go?
       17    A.   I went to a home with a gentleman called Kanyabugande.
       18    Q.   Was he also a relative of your husband?
       19    A.   Yes.
09:22AM 20    Q.   Was he a Hutu or a Tutsi?
       21    A.   A Hutu.
       22    Q.   How did your husband have Hutu relatives?
       23    A.   His mother's first marriage was with a Hutu, then he left
       24    and got married to his father, who was my father-in-law.
       25    Q.   Did you stay there or go to another house afterwards?

J.A. 835

1    A.    A stayed there for a few days, then I left and went to

2    another home, which was also a relative to my husband.

3    Q.    And who was that?

4    A.    Elias.

5    Q.    What happened at Elias' house?

6    A.    So he went and called the Interahamwe, come with them, and

7    they took me from his house.

8    Q.    And where did the Interahamwe take you?

9    A.    They took me to like the checkpoint, a roadblock, which

09:24AM 10    was in Gihindamuyaga by a guy called Ignas, who was the leader.

11    Q.    Were there other Tutsis there being held at the roadblock?

12    A.    Yes.

13    Q.    Who were the other Tutsis who were there?

14    A.    There was a lady who came with two children and a third

15    one she was carrying on her back.  They hit her with a club,

16    and they hit the child at the back, and they killed all the

17    children, and also they just started putting mud over them.

18    Q.    How old were the children?

19    A.    Approximately one was like four, another one like two, and

09:26AM 20    the one I think, the one she was carrying at the back was a few

21    months old.

22    Q.    How did you survive the roadblock?

23    A.    This lady always gives us good medical care, why do you

24    want to kill her?  Have her go back to our village, they also

25    know how to kill, they will kill her, but they couldn't make a

```
 1   decision, so I stayed there.

 2   Q.   How long were you at the roadblock?

 3   A.   I was there almost the whole day waiting until

 4   approximately to 6:30 p.m.  I asked one of the child in that

 5   house to show me where the bathroom is.

 6   Q.   And what happened when you went to the bathroom?

 7   A.   I went to where the bathroom was, then I just turned in

 8   the corner, I went through a bush fence, and I crossed a log,

 9   and I run away, escaped.

10   Q.   Where did you go?

11   A.   I went to the University Hospital.

12   Q.   Why did you go to the hospital?

13   A.   When I was there, when my child was admitted, I saw there

14   were refugees from Burundi who had come in there in tents, and

15   I thought if I could go there and disguise among them and just

16   be around the hospital.

17   Q.   How did you get from the roadblock to the hospital?

18   A.   I walked there.

19   Q.   Along the road?

20   A.   Yes.

21   Q.   Were there other roadblocks that you saw on the way to the

22   hospital?

23   A.   Yes.

24   Q.   How did you get by them?

25   A.   I would dodge and avoid them so that they don't see me.
```

09:28AM 10

09:29AM 20

J.A. 837

           1    Q.   Did you make it to the hospital?

           2    A.   Yes.

           3    Q.   When you got to the hospital, where did you go?

           4    A.   I went to the surgery ward.

           5    Q.   Why did you go there?

           6    A.   There were people from Sovu who had been injured, one

           7    called Kabayiza, another called Kalido.  They had been taken

           8    there, so I wanted to check on them to see if they are still

           9    surviving.

09:30AM   10    Q.   Where were they injured?

          11    A.   In Sovu.

          12    Q.   At the health center?

          13    A.   Yes.

          14    Q.   When you went to the surgical ward, did you find anyone

          15    else that you knew?

          16    A.   Yes.

          17    Q.   Who did you find?

          18    A.   My cousin.

          19    Q.   What's your cousin's name?

09:31AM   20    A.   Mukantabana Veneranda.

          21    Q.   Was Veneranda injured?

          22    A.   No.

          23    Q.   What was she doing at the hospital?

          24    A.   She was hiding there because she used to work at the

          25    university.

```
  1    Q.    What happened next?

  2    A.    The Interahamwe came chasing us through the maternity,

  3    beating us.

  4    Q.    Were you moved from the surgical ward to the dermatology

  5    ward?

  6    A.    Yes.

  7    Q.    How were you moved?

  8    A.    They were beating us, and when we got there, we found some

  9    other, a lot of people were there.

09:32AM 10   Q.    Who came to move you from the surgery ward to the

 11    dermatology ward?

 12    A.    There was a Dr. Gatera and Dr. Gatsinzi, the students

 13    called Teganya, and another doctor called Nyaruhango.

 14    Q.    So, in addition to Interahamwe, there was also medical

 15    staff who was helping to move the Tutsis from the surgery ward

 16    to dermatology?

 17    A.    Yes.

 18    Q.    You mentioned some names of individuals that you

 19    recognized.  How did you recognize them?

09:34AM 20   A.    I knew them before.

 21    Q.    From when?

 22    A.    At the university, I used to come there for medical help

 23    or I would bring the children there.

 24    Q.    You mentioned Mr. Teganya.  How did you recognize

 25    Mr. Teganya?
```

 1    A.    I knew him during the time I was there with my children,

 2    so when I saw him, I recognized him.

 3    Q.    When you were being moved from the surgical ward to the

 4    dermatology ward, who else was being moved with you?

 5    A.    We are moved with me, my cousin, Veneranda, and the other

 6    guys I mentioned, Kalido Adrian.

 7    Q.    You mentioned that they were beating you.  How were they

 8    beating you?

 9    A.    They were kicking us, beating us.  There was some people

09:36AM 10    armed with guns and soldiers, so we thought they were going to

11    kill us.

12    Q.    Were they saying anything while they were moving you to

13    the dermatology ward?

14    A.    No, they were saying that we don't want Tutsis.

15    Q.    You mentioned that you recognized Mr. Teganya.  Did

16    Mr. Teganya recognize you?

17    A.    Yes.

18    Q.    How do you know?

19    A.    He came, and he asked me when I was with my cousin and

09:37AM 20    asked me, "Did the other child get better?"  I answered, "Yes."

21    He asked, "Where is he?"  And I said, "It's possible he may be

22    dead."

23    Q.    Why did you say it's possible that your younger child, the

24    one year-old, might be dead?

25    A.    Because since he had left with his father, I did not know

**J.A. 840**

            1    if they were still alive or dead.

            2    Q.    Did Mr. Teganya say anything else to you?

            3    A.    He asked me, "Do you know that gal?"  I said, Yes, she was

            4    my relative.

            5    Q.    What woman was she referring to?

            6    A.    Mukantabana Veneranda.

            7    Q.    Did your cousin, Veneranda, had she interacted with

            8    Mr. Teganya during her stay at the hospital?

            9    A.    Yes.

09:38AM 10          MR. VARGHESE:  At this time can we have for the

           11    witness and the parties Exhibit Number 35.

           12    Q.    Ms. Mukeshimana, do you see what's on the screen in front

           13    of you?

           14    A.    Yes.

           15    Q.    Do you recognize what it is?

           16    A.    Yes.

           17    Q.    Do you see yourself in the picture?

           18    A.    Yes.

           19    Q.    And is it a fair representation of what the building looks

09:39AM 20    like?

           21    A.    Yes.

           22          MR. VARGHESE:  Can we bring up 36 as well.

           23    Q.    The same question here, do you recognize that picture?

           24    A.    Yes.

           25    Q.    Do you see yourself in the picture?

```
 1   A.   Yes.

 2   Q.   And is it a fair and accurate representation of that part

 3   of the building?

 4   A.   Yes.

 5        MR. VARGHESE:  Your Honor, we'd ask Exhibit 35 and 36

 6   be admitted into evidence.

 7        THE COURT:  All right.  They're admitted.

 8        (Exhibit No. 35 and 36 received into evidence.)

 9   Q.   Ms. Mukeshimana, what are we looking at in this picture?

10   A.   This is not very clear.

11   Q.   Does that seem better?

12   A.   Yes.  You can't see the doors on the other side.

13   Q.   Is this the dermatology building --

14   A.   Yes.

15   Q.   -- where you were taken from the surgical ward by

16   Mr. Teganya and others?

17   A.   Yes.

18   Q.   And do you recognize the individual on the left side of

19   the picture there?

20   A.   Yes.  It appears to be me, but it's not very clear.

21        MR. VARGHESE:  And can we bring up 36.

22   A.   Yes.

23   Q.   Do you see this picture?

24   A.   Yes.

25   Q.   And where are you standing in this picture?
```

09:40AM 10

09:41AM 20

1    A.    At the corner of the dermatology building.

2    Q.    And was this another picture of the building that you were

3    taken to?

4    A.    Yes.

5    Q.    Can you explain to the jury what was it like inside the

6    dermatology building when they took you there?

7    A.    On this door, the first door, inside there was a big hall,

8    and they would put there the patient's bed.  Down below the

9    other side, there's another door which had rooms inside of it,

09:43AM 10    and in the corner, that's close to the dermatology, and the

11    maternity is on the side.

12    Q.    Was it crowded in the dermatology ward?

13    A.    Yes.

14    Q.    Were there people who were injured or people who were

15    hiding or both?

16    A.    Yeah, there were Tutsis who had been injured and others

17    who were hiding.

18    Q.    Was it just Tutsis?

19    A.    Yes.

09:43AM 20    Q.    Did you stay in the dermatology building?

21    A.    Yes.

22    Q.    Who were you with?

23    A.    I was there with many people who were afraid there, afraid

24    of that place, my cousin Veneranda and the other guys I

25    mentioned earlier who were in the hospital.

Case: 19-1689    Document: 00117615537    Page: 159    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 27 of 102

27

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
| 1     | Q. | Where were you and Veneranda hiding?                                      |
| 2     | A. | We were inside across the corner.                                        |
| 3     | Q. | Inside of the door on the picture?                                       |
| 4     | A. | Yes.                                                                     |
| 5     | Q. | And which corner?                                                        |
| 6     | A. | The corner inside when you enter through the door.                       |
| 7     | Q. | Did you see Mr. Teganya again during your time hiding in                  |
| 8     |    | the dermatology building?                                                |
| 9     | A. | Yes.                                                                     |

09:45AM 10   Q.   How often did you see him?

11   A.   I would see him every day.

12   Q.   What did you see Mr. Teganya doing?

13   A.   He came with Interahamwe and the dermatology, got some

14   younger people and women, and he also took my cousin.

15   Q.   How often would you see him come with the Interahamwe?

16   A.   Maybe once a day.

17   Q.   You say that he would remove people from the building.

18   How many people would he remove?

19   A.   The first time when he came, he took Veneranda, but the

09:47AM 20   people he was with, they took younger men, others took girls.

21   Some came back, including Veneranda, but others were killed

22   down at the building maternity.

23   Q.   When Mr. Teganya would come with the Interahamwe and take

24   people out of the building, would he say anything?

25   A.   He came and pulled Veneranda, he had knife or sword and

**J.A. 844**

 1   took her.

 2   Q.   Okay.  Before we get to her, when he came and took other

 3   people, would he say anything?

 4   A.   They would come beating them and saying they don't need

 5   Tutsi.

 6   Q.   I'm sorry, what was that last part?

 7   A.   They don't need Tutsi.

 8   Q.   And you said that they would come beat patients or

 9   refugees.  Did you see Mr. Teganya engaging in those beatings?

09:48AM 10   A.   Yes.

11   Q.   Was there other medical staff who was doing things similar

12   to what Mr. Teganya was doing?

13   A.   Yes.

14   Q.   When they came to take people to kill, how many people

15   would they take?

16   A.   They would take a few at a time, between five and six, and

17   the majority of them would be young men or men.

18   Q.   You mentioned that they were taken behind the maternity

19   ward.  How do you know that?

09:49AM 20   A.   We would hear the screams when they are killing them.

21   Q.   What kinds of things would you hear?

22   A.   They would be crying and pleading, "Why are you killing

23   us?"  "What did we do wrong?"

24   Q.   You mentioned that you saw Tutsi women also taken.  Is

25   that right?

Case: 19-1689     Document: 00117615537     Page: 161     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 29 of 102

29

|   |   |
|---|---|
| 1 | A. Yes. |
| 2 | Q. But sometimes the women came back? |
| 3 | A. Yes. |
| 4 | Q. What did they look like when they returned? |
| 5 | A. They would appear beaten with some beat marks on their |
| 6 | cheeks, and they would also tell us they raped them. They |
| 7 | wouldn't hide it. |
| 8 | Q. And you mentioned that your cousin Veneranda was taken as |
| 9 | well? |
| 09:51AM 10 | A. Yes. |
| 11 | Q. Can you explain who came to take Veneranda? |
| 12 | A. It was Teganya who took her, and they went around that |
| 13 | door. |
| 14 | Q. When Mr. Teganya came to take her, did he have any weapons |
| 15 | with him? Was he armed? |
| 16 | A. Yes. |
| 17 | Q. What did he have with him? |
| 18 | A. He had a long knife, like a sword. |
| 19 | Q. Did he say anything to her? |
| 09:52AM 20 | A. He grabbed her by the hand and shook her, beat her and |
| 21 | took her. |
| 22 | Q. Where did they go? |
| 23 | A. He took her along that door, the dermatology. |
| 24 | Q. How do you know? |
| 25 | A. I went out, and I was checking where they took her, and I |

J.A. 846

Case: 19-1689    Document: 00117615537    Page: 162    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 30 of 102

30

1    saw her being taken.

2    Q.    Did she say anything?

3    A.    Who?

4    Q.    Veneranda?

5    A.    She went out crying saying this guy is taking me again.

6         MR. VARGHESE:  Can we have Exhibit 64 for the Court

7    and the parties.

8    Q.    Ms. Mukeshimana, do you recognize what's on the screen in

9    front of you?

09:53AM 10   A.    Yes.

11   Q.    Is that you in the picture?

12   A.    Yes.

13   Q.    Is it a fair and accurate representation of the door

14   you're standing in front of?

15   A.    Yes.

16        MR. VARGHESE:  Your Honor, we'd ask Exhibit 64 be

17   admitted.

18        THE COURT:  All right.  It's admitted.

19        (Exhibit No. 64 received into evidence.)

09:54AM 20   Q.    Ms. Mukeshimana, what are we looking at in this picture?

21   A.    That's a picture of me, it's not clear, and also a door at

22   the dermatology ward.

23   Q.    Do you know what door that is?

24   A.    Yeah, it looks like the dermatology, but it is not that

25   clear.

1    Q.   Was that the door that you saw Mr. Teganya take your

2    cousin, Veneranda?

3    A.   Yes, but inside the rooms.

4    Q.   How long was Veneranda gone?

5    A.   About 20 minutes.

6    Q.   Did she come back to the dermatology ward where you were?

7    A.   Yes.

8    Q.   How did she look?

9    A.   She came crying, sobbing.

09:55AM 10   Q.   Was she upset?

11   A.   Yes.

12   Q.   How was she dressed?

13   A.   A dress, which was torn on the side.

14   Q.   Did she look like she was hurt?

15   A.   She was lying down and crying a lot.  When I asked her,

16   she said he raped me.

17   Q.   Did she say whether or not that was the first time that

18   that had happened?

19   A.   She told me that before I arrived, he used to come and

09:56AM 20   take her, and she used to be lying around trying to hide from

21   him.

22   Q.   Was that the only time that you saw Mr. Teganya come take

23   your cousin, Veneranda?

24   A.   That was the first time I saw.

25   Q.   How many more times did you see Mr. Teganya take her?

Case: 19-1689    Document: 00117615537    Page: 164    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 202    Filed 11/04/19    Page 32 of 102

32

          1    A.    Two more times.

          2    Q.    What happened on the last time?

          3    A.    Veneranda was resisting and refusing to go and crying.

          4    She was trying to hide around me, but she started saying

          5    goodbye to me and say, "This time I will tell him to kill me,

          6    we will meet in heaven."

          7    Q.    That last time, did she come back?

          8    A.    She never come back.

          9    Q.    Ms. Mukeshimana, did anyone ever come for you?

09:58AM  10    A.    He also came to take me.

         11    Q.    Who?

         12    A.    Teganya.

         13    Q.    What happened?

         14    A.    He said, "You are relative of the other girl I found you

         15    with, this time I'm taking you."

         16    Q.    Was this after Veneranda had been taken for the last time?

         17    A.    Yes.

         18    Q.    Where did Mr. Teganya take you?

         19    A.    He also took me in the dermatology around that door.

10:00AM  20    Q.    What happened?

         21    A.    He also raped me.

         22    Q.    Did he have any weapons with him?

         23    A.    He had a long knife.

         24    Q.    Did he say anything to you?

         25    A.    He went beating me.

**J.A. 849**

```
 1    Q.   I'm sorry, can you repeat that.

 2    A.   He took me beating me.

 3    Q.   Did he say anything to you before he raped you?

 4    A.   He said that your relatives is not here, and now I'm

 5    taking you, and I don't want Tutsis.

 6    Q.   After he was finished, what happened?

 7    A.   I went back to the hall where everyone was.

 8    Q.   Is that the only time that Mr. Teganya came for you?

 9    A.   He took me there a second time, then we heard the noise of

10    the Interahamwe, which was approaching.

11    Q.   Let me just go back for a second.  When he took you for

12    the second time, how did he come and get you?

13    A.   He would grab you by the hand and take you beating you.

14    Q.   Did you say anything while you were being taken?

15    A.   Counsel, would you repeat.

16    Q.   Would you say anything while you were being taken?

17    A.   I was pleading, but he refused.

18    Q.   Where did he take you the second time?

19    A.   He took me back to the dermatology.

20    Q.   Through the same door that's on the picture?

21    A.   Yes.

22    Q.   And what happened the second time that he took you?

23    A.   He left me, and also he throw me to the Interahamwe

24    because they came, a big group of Interahamwe, and they throw

25    me to them.
```
(timestamps: 10:02AM at line 10, 10:03AM at line 20)

J.A. 850

1   Q.   Was this after he had finished raping you?

2   A.   Yes.

3   Q.   Where was the group of Interahamwe?

4   A.   The Interahamwe were coming down from the hospital

5   shouting, so when he pushed me out, I had some money in my

6   clothes.

7   Q.   Before we get there, what did he say when he pushed you

8   towards the Interahamwe?

9   A.   He said, "Kill her."

10:04AM 10   Q.   And when he threw you, did you fall to the ground?

11   A.   No, I did not land on the floor.

12   Q.   And how many members of the Interahamwe were there?

13   A.   There were many.  I could not even know the number.

14   Q.   And so what did you do?

15   A.   I grabbed the money I had in a cloth, and I throw it on

16   the ground, so they started picking the money when one of the

17   Interahamwe chased me down with the gun.

18   Q.   Where did you go?

19   A.   So I went by the corner of the dermatology and passed the

10:06AM 20   corner of surgical ward, so I went around stairs, which it was

21   going down from the department of medicine and went on the

22   road.

23        MR. VARGHESE:  Can we have Exhibit 37 for the witness

24   and the parties.

25   Q.   Ms. Mukeshimana, do you see what's on the screen in front

```
      1    of you?  Do you recognize it?

      2    A.    Yes.

      3    Q.    And do you see yourself in the picture?

      4    A.    Yes.

      5    Q.    And is it a fair and accurate representation of the path

      6    that you ran down?

      7    A.    Yes.

      8          MR. VARGHESE:  Your Honor, we ask that Exhibit 37 be

      9    admitted into evidence.

10:07AM 10          THE COURT:  All right.  It's admitted, 37.

     11          (Exhibit No. 37 received into evidence.)

     12    Q.    Ms. Mukeshimana, can you explain what this picture is?

     13    A.    Here is the corner of the dermatology.  This path goes

     14    down the surgical ward.  Here is the pediatric ward.  This path

     15    goes to where the tents were near the pediatric, and this goes

     16    to surgical.  I went through those flowers, behind those

     17    flowers.  I went around because there are stairs.

     18    Q.    And you said that there was an Interahamwe person who was

     19    chasing you; is that right?

10:08AM 20    A.    Yes.

     21    Q.    Was he able to catch you?

     22    A.    No.

     23    Q.    And so were you able to get away?

     24    A.    Yes.  Yes, he told me go and die somewhere else.

     25    Q.    After you ran away, where did you go?
```

J.A. 852

1    A.    I went and was passing by the prefecture office.  I spent

2    the day and night.

3    Q.    And then where did you go from there?

4    A.    After that, I went to my sister's house in Nyanza.

5    Q.    Ms. Mukeshimana, have you previously testified in a

6    criminal case here in the United States?

7    A.    Yes.

8    Q.    Was that trial about the events that occurred at the

9    hospital in Butare?

10:10AM 10    A.    No, the testimony I gave was about what occurred at the

11    Hotel I'Lhuliro.

12    Q.    And was that at a roadblock in front of the

13    Hotel I'Lhuliro?

14    A.    Yes.

15    Q.    Did those events that you testified about occur after or

16    before the incident at the hospital?

17    A.    Yes.

18    Q.    After?

19    A.    Yes.

10:11AM 20    Q.    During that trial, did you testify about what you

21    testified about here today, the events at the hospital?

22    A.    No.

23    Q.    Did you tell your whole genocide story of how you survived

24    for 100 days?

25    A.    No.

# J.A. 853

1    Q.   Have you previously been interviewed about your genocide

2    story?

3    A.   Yes, I have.

4    Q.   Were you interviewed by academic researchers for a book

5    they were writing?

6    A.   Yes.

7    Q.   When you were interviewed by them, did you tell the story

8    of what happened at the hospital?

9    A.   No.

10:12AM 10   Q.   Why not?

11   A.   Talking about the incident and what happened at the

12   hospital was very heavy on my heart, and I felt I shouldn't be

13   disclosing it to anyone.

14   Q.   Why not?

15   A.   My heart, I was feeling I had not accepted what had

16   happened to me at the hospital, and I thought I should hide.

17   Q.   Had you ever seen Mr. Teganya again?

18   A.   No.

19   Q.   Did you know what had happened to him?

10:13AM 20   A.   No.

21   Q.   Did you think he was still alive?

22   A.   No.

23   Q.   Had you ever told your story to Rwandan prosecutors about

24   what happened at the hospital?

25   A.   No.

1    Q.   So when was the first time that you told someone your

2    story about what happened at the hospital in the dermatology

3    ward?

4    A.   I said it in 2018.

5    Q.   When the U.S. investigators came to talk?

6    A.   Yes.

7    Q.   Has anyone forced or coerced you to testify here today?

8    A.   No.

9    Q.   Has anyone pressured you in any way regarding your

10:14AM 10   testimony here today?

11   A.   No.

12   Q.   Has the government of Rwandan spoken about your testimony

13   of what to say or what not to say?

14   A.   No.

15   Q.   Has anyone offered you anything for your testimony here

16   today, either the U.S. Government or the Rwandan Government?

17   A.   No.

18   Q.   As part of your testimony, the United States Government

19   paid for your transportation and hotel to the United States; is

10:15AM 20   that right?

21   A.   Yes.

22   Q.   You're also receiving money for food while you're staying

23   here as well as a witness fee, right?

24   A.   Yes, they pay for my hotel where I'm staying and also for

25   my food.

Case: 19-1689     Document: 00117615537     Page: 171     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 39 of 102

39

1   Q.   Is there anything about receiving that money that affects

2   your testimony here today?

3   A.   No.

4        MR. VARGHESE:  Thank you.  I have nothing further.

5        THE COURT:  Cross-examination.

6                    CROSS-EXAMINATION

7   BY MR. LAUER:

8   Q.   Good morning.

9   A.   Good morning.

10:17AM 10   Q.   You told us that you're from Butare, correct?

11   A.   Yes.

12   Q.   What sector?

13   A.   Sovu.

14   Q.   Have you ever lived in Ruhashya?

15   A.   Yes.

16   Q.   Is that where you grew up?

17   A.   Yes.

18   Q.   Do you know Isabelle Mukankusi?

19   A.   Yes.

10:17AM 20   Q.   Is she a friend of yours?

21   A.   She works at the hospital.  We don't have any special

22   friendship.

23   Q.   Is she from Ruhashya as well?

24   A.   I don't know if she comes from Ruhashya.

25   Q.   Do you know most of the people who grew up in Ruhashya

 1    around you?

 2    A.    No.

 3    Q.    How big is Ruhashya?

 4    A.    It's far from the town.

 5    Q.    How far a walk from the town?

 6    A.    It can take about three hours.

 7    Q.    Now, you said that at the time of the genocide, you were

 8    living in Sovu, correct?

 9    A.    Yes.

10:19AM 10    Q.    And it's your testimony that it's about a 30-minute walk

11    from Sovu to Butare Town?

12    A.    Yes.

13    Q.    How many kilometers is it?

14    A.    I'd say a 30 minutes' walk.

15    Q.    Do you not know how many kilometers?

16    A.    I don't know.

17    Q.    You told us that in March of 1994, your son had become

18    sick?

19    A.    Yes.

10:19AM 20    Q.    What is your son's name?

21    A.    Ishimwe Samuel.

22    Q.    And you took him to the University Hospital in Butare?

23    A.    Yes.

24    Q.    Because he had a fever?

25    A.    Yes.

1    Q.    Now, at that time you were actually working as a nurse

2    yourself, correct?

3    A.    Yes.

4    Q.    And you were working at the health center in Sovu?

5    A.    Yes.

6    Q.    You didn't go to the Sovu Health Center with your son in

7    March?

8    A.    No.

9    Q.    And how long did your son stay at the hospital in March?

10:20AM 10    A.    About a month.

11    Q.    What was his diagnosis?

12    A.    He had fevers and also difficulty breathing.

13    Q.    Did he receive a diagnosis?

14    A.    No.

15    Q.    Did he receive treatment?

16    A.    Yes.

17    Q.    What was the treatment?

18    A.    Medication.

19    Q.    What was the medication?

10:21AM 20    A.    They would treat him with antibiotics and also be on

21    oxygen.

22    Q.    So he had a patient room?

23    A.    He was in a pediatric emergency.

24    Q.    And you stayed with him that month that he was there?

25    A.    Yes.

J.A. 858

 1    Q.   And you testified about some doctors and medical staff
 2    that would check in on him?
 3    A.   Yes.
 4    Q.   And you testified that you became familiar with
 5    Mr. Teganya at that time?
 6    A.   Yes.
 7    Q.   And you told us about the coats that the staff was
 8    wearing?
 9    A.   Yes.
10:22AM 10    Q.   And according to your testimony, the coats had the word
11    "intern" on them or "student"?
12    A.   Yes.
13    Q.   Were those coats otherwise like normal white doctor coats?
14    A.   Yes.
15    Q.   And you had interaction with Mr. Teganya yourself during
16    March?
17    A.   Yes.
18    Q.   He provided treatment to your son?
19    A.   Yes.
10:23AM 20    Q.   Does that mean that he actually examined your son?
21    A.   The children are always examined by the doctors, but
22    others, the interns are always around.
23    Q.   Did Mr. Teganya administer medication?  What was his role?
24    A.   He would be coming around, the doctors, and I think it was
25    just learning experience and taking notes.

J.A. 859

Case: 19-1689    Document: 00117615537    Page: 175    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 43 of 102

43

| | | |
|---|---|---|
| 1 | Q. | And this was in March? |
| 2 | A. | Yes. |
| 3 | Q. | For approximately 30 days? |
| 4 | A. | Yes. |
| 5 | Q. | Now, you told us that you remember the speech that was |
| 6 | | made by Sindikubwabo? |
| 7 | A. | Yes. |
| 8 | Q. | You told us that you had fled your home and gone to the |
| 9 | | Sovu clinic? |
| 10:25AM 10 | A. | Yes. |
| 11 | Q. | So when you were at the Sovu clinic, that's when you heard |
| 12 | | the speech by the radio? |
| 13 | A. | Yes. |
| 14 | Q. | And you explained that you were at the clinic in Sovu when |
| 15 | | it was attacked? |
| 16 | A. | Yes. |
| 17 | Q. | And you described the soldiers coming and the grenades, |
| 18 | | right? |
| 19 | A. | Yes. |
| 10:26AM 20 | Q. | So, you were asked about this a few moments ago, but you |
| 21 | | were interviewed by investigators from the United States just |
| 22 | | recently, correct? |
| 23 | A. | Yes. |
| 24 | Q. | And at that time you told them that you remembered the |
| 25 | | speech from Sindikubwabo occurring on April 19th? |

1    A.    Yes.

2    Q.    And you also told them that you fled the area of your home

3    around April 22nd or April 21st or 22nd?

4    A.    No.

5    Q.    You didn't make that statement to the investigators?

6    A.    We fled on the 18th.

7    Q.    I'm asking you about your meeting with the investigators

8    in June.  Didn't you tell them at that time that you fled the

9    area of your home around April 21st or 22nd and headed to the

10:28AM 10    area of the clinic?

11    A.    No.

12    Q.    How long were you at the clinic in Sovu when it was being

13    attacked?

14    A.    We fled to the area on the 18th, and they came to kill on

15    the 22nd and 23rd.

16    Q.    When you say they came to kill on the 22nd and 23rd,

17    that's at the clinic in Sovu?

18    A.    Yes.

19    Q.    So, as best you can recall, you were at the clinic in Sovu

10:29AM 20    for the period of April 18th through April 23rd?

21    A.    Yeah, that's the time they stopped killing there.

22    Q.    Okay.  And you told us that you left and visited various

23    houses; is that right?

24    A.    Can you repeat the question?

25    Q.    So after you fled the clinic in Sovu, you told us you

**J.A. 861**

```
 1    stayed in some different houses, right?

 2    A.   No, I lived in one house.

 3         MR. WATKINS:  Excuse me, we're having difficulty

 4    hearing the witness.  Perhaps she can speak up.

 5    A.   I stayed in one house.  When I went to the second house,

 6    that's when they called to be taken.

 7    Q.   I just want to make sure I understand.  You said on direct

 8    examination that you went to a house in Gihindamuyaga?

 9    A.   Yes.

10    Q.   And then you said you went to Kanyabugande's house?

11    A.   Yes.

12    Q.   And then you went to someone's house whose name was Elias?

13    A.   Yes.

14    Q.   And you talked about how you were captured by Interahamwe

15    at Elias' house?

16    A.   Yes.

17    Q.   And you told us how you were taken to a roadblock and

18    detained at a roadblock?

19    A.   Yes.

20    Q.   And you eventually escaped by going to the bathroom?

21    A.   Yes.

22    Q.   Staying in those houses, going to the roadblock, being

23    detained and escaping, did you tell any of that to the

24    investigators in June?

25    A.   Yes.
```

| | |
|---|---|
| 1 | Q. You said after escaping from the roadblock, you fled to |
| 2 | the University Hospital? |
| 3 | A. Yes. |
| 4 | Q. And you told us that you wanted to disguise yourself with |
| 5 | the Burundian refugees at the hospital, correct? |
| 6 | A. Yes. |
| 7 | Q. That was your thinking in why you went there? |
| 8 | A. Yes. |
| 9 | Q. When you were interviewed in June by investigators, you |
| 10:33AM 10 | told them that you learned that your cousin Veneranda had been |
| 11 | injured and left Sovu to get treatment at Butare Hospital? |
| 12 | A. No. |
| 13 | Q. Because today when you were asked about Veneranda, you |
| 14 | said she hadn't been hurt? |
| 15 | A. She went there hiding. She wasn't injured. |
| 16 | Q. Now, when you were at the hospital, there were tents? |
| 17 | A. Yes. |
| 18 | Q. And actually let me take a step back before we go further |
| 19 | on the hospital. To get to the hospital, you were by yourself? |
| 10:34AM 20 | A. Yeah, I was alone. |
| 21 | Q. And you took the main road to get there? |
| 22 | A. Yes. |
| 23 | Q. And there were roadblocks on the main road? |
| 24 | A. Yes. |
| 25 | Q. And you were permitted to pass those roadblocks? |

J.A. 863

1    A.    No, I was avoiding the roadblock and passed.

2    Q.    How was it you were able to avoid these roadblocks?

3    A.    Whenever I would see a roadblock, I would pass somewhere

4    and pass where there was no roadblock.

5    Q.    So when you got to the hospital, there were tents set up,

6    right?

7    A.    Yes.

8    Q.    And you recall Doctors Without Borders being present and

9    helping people in those tents?

10:35AM 10    A.    Yes.

11    Q.    So by the time you showed up, Doctors Without Borders, you

12    saw them when you arrived?

13    A.    Yes.

14    Q.    And when you got there, you went to what ward?

15    A.    Surgical ward.

16    Q.    And you found your cousin, Veneranda?

17    A.    Yes.

18    Q.    And as you said she was not injured?

19    A.    Yes.

10:36AM 20    Q.    Yes, she was not injured?

21    A.    Yes.

22    Q.    And you remained at the hospital for a period of time?

23    A.    Yeah, about two weeks.

24    Q.    Two weeks at the hospital?

25    A.    Yes.

J.A. 864

1    Q.   And during this time, you said you were staying in the

2    dermatology building?

3    A.   Yes.

4    Q.   And there were these regular visits from Interahamwe and

5    Mr. Teganya taking people?

6    A.   Yes.

7    Q.   Ma'am, about six years ago, you traveled on an airplane to

8    the United States, correct?

9    A.   Yes.

10:38AM 10    Q.   And you came to a courtroom just like this?

11    A.   Yes.

12    Q.   And they had you raise your right hand and swear to tell

13    the truth and the whole truth?

14    A.   Yes.

15    Q.   And in that case, you testified about some events that

16    happened in Butare during the genocide, correct?

17    A.   Yes.

18    Q.   And you're aware that everything that gets said in a

19    courtroom is recorded, correct?

10:38AM 20    A.   Yes.

21    Q.   And you talked about the killings at the health center in

22    Sovu, right?

23    A.   Yes.

24    Q.   And after you talked about the killings at the health

25    center, you were asked did you go somewhere afterwards.  Did

1    you go somewhere else after those attacks?

2    A.    Yes.

3    Q.    And then you were asked where you went?

4    A.    Yes.

5    Q.    And what you said at that time under oath was, "I went

6    back to my sister's home"?

7    A.    Yes.

8    Q.    And then a few moments later, you were asked again, "When

9    you got to your sister's house, did you stay there?"

10:39AM 10    A.    Yes.

11    Q.    And you answered, "Yes, I stayed there, I ended up leaving

12    there towards the end of the fighting but I did stay there for

13    a long time"?

14    A.    No, I also stayed at the Hotel I'Lhuliro.

15            MR. LAUER:   If I could approach the witness, your

16    Honor?

17            THE COURT:   Yes.

18    Q.    Ma'am, I'm showing you a transcript of the testimony from

19    that trial, and I'm going to ask the interpreter to read this

10:41AM 20    question to you, "When you got to your sister's house, did you

21    stay there?"  And an answer to that question, your testimony

22    was:  "Yes, I stayed there.  I ended up leaving there towards

23    the end of the fighting, but I did stay there for a long time."

24            So that was your testimony in 2012?

25    A.    That's true.

1    Q.    When you testified in 2012, did you say a single word

2    about having been at the hospital?

3    A.    No.

4    Q.    And, in fact, before you came to the United States to

5    testify, you had a meeting with investigators in Rwanda,

6    correct?

7    A.    Yes.

8    Q.    So before you traveled here, the U.S. investigators had

9    come to Rwanda and spoken to you there?

10:43AM 10    A.    Yes.

11            THE COURT:  I'm not sure, are we talking about the

12    2012 testimony or this testimony?

13            MR. LAUER:  I'm talking about 2012.  I can clarify

14    that.

15    Q.    For the record, I'm talking about a meeting you had with

16    the U.S. investigators in Rwanda in 2012.  You recall that

17    meeting?

18    A.    Yes, one.

19    Q.    And that meeting you were told they wanted to hear about

10:44AM 20    your experiences during the genocide?

21    A.    Yes.

22    Q.    And you told them that when you fled your home, you went

23    to the health center in Sovu?

24    A.    Yes.

25    Q.    And you then told them that you eventually made your way

J.A. 867

Case: 19-1689    Document: 00117615537    Page: 183    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 51 of 102

51

1    to your sister's house in Nyanza?

2    A.    Yes.

3    Q.    And in that interview, you didn't say a single word about

4    being at the University Hospital?

5    A.    Yes.

6    Q.    You did not say anything about being at the hospital in

7    that meeting; is that correct?

8    A.    Yes.

9    Q.    You've also testified in some cases in Rwanda?

10:45AM 10    A.    Yes.

11    Q.    In fact, you were interviewed by a Rwandan prosecutor in

12    1998?

13    A.    Yes.

14    Q.    And that was for a case called Habyarabatuma?

15    A.    Yes.

16    Q.    And when you were interviewed in that case, there was a

17    statement taken, correct?

18    A.    Yes.

19    Q.    And the statement was shown to you and you then initialed

10:46AM 20    every page?

21    A.    No.

22    Q.    So when you had this meeting, excuse me, when you

23    testified in the Javier Batumba case, you're aware there was a

24    statement taken?

25    A.    Yes.

**J.A. 868**

Case: 19-1689    Document: 00117615537    Page: 184    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 52 of 102

52

1    Q.   Did you have the opportunity to review that statement when

2    you were done making it?

3    A.   No.

4         MR. LAUER:  If I could approach, your Honor?

5         THE COURT:  Yes.

6    Q.   Ms. Mukeshimana, I'm showing you a document, and it's in

7    Kinyarwandan, correct?

8    A.   Yes.

9    Q.   Okay.  And someone has signed every page, correct?

10:48AM 10  A.   Yes.

11   Q.   Is that your signature?

12   A.   Yes.

13        THE COURT:  Everyone keep their voice up and make sure

14   the stenographer and everyone can hear the response.

15   Q.   For the record, I'm going to show you every page, and you

16   can see that there's a signature on each page, correct?

17   A.   Yes.

18   Q.   So, this case was about the events at Sovu, correct?

19   A.   Yes.

10:49AM 20  Q.   And you talked about your experiences in Sovu?

21   A.   Yes.

22   Q.   And you talked about going to see your sister in Nyanza?

23   A.   Yes.

24   Q.   And you didn't say a single word about going to University

25   Hospital?

**J.A. 869**

Case: 19-1689   Document: 00117615537   Page: 185   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 53 of 102

53

1    A.    Yes.

2    Q.    You were asked some questions about an interview you did

3    for a book?

4    A.    Yes.

5    Q.    And that was relatively quickly after the genocide in

6    1995?

7    A.    Yes.

8    Q.    And when you were interviewed for that book, you told the

9    authors that you had been at Sovu in the health center?

10:50AM 10    A.    Yes.

11    Q.    And you went into great detail about what happened to you

12    in Sovu?

13    A.    Yes.

14    Q.    And you talked about fleeing to your sister's house?

15    A.    Yes.

16    Q.    When you were interviewed for that book, you didn't say a

17    single word about having gone to the University Hospital?

18    A.    Yes.

19    Q.    I just have a few more questions.  When you made your

10:51AM 20    escape from the hospital, this was after you had been brought

21    back by Mr. Teganya?

22    A.    Can you repeat the question?

23    Q.    I'll try and ask a better question.  You told us that you

24    were raped by Mr. Teganya on two occasions?

25    A.    Yes.

J.A. 870

Case: 19-1689    Document: 00117615537    Page: 186    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 54 of 102

54

1    Q.   And on the second of those occasions, he brought you back

2    to the dermatology building; is that right?

3    A.   No.

4    Q.   Can you tell us what happened then?

5    A.   He threw me to the Interahamwe to kill me.

6    Q.   Okay.  And where was that happening?

7    A.   In front of the dermatology.

8    Q.   And you were led away from the dermatology building?

9    A.   Yes.

10:52AM 10    Q.   There was a large group of Interahamwe?

11    A.   Yes.

12    Q.   Was Mr. Teganya with them?

13    A.   He stayed with them.

14    Q.   So Mr. Teganya was with the Interahamwe as they're leading

15    you away?

16    A.   Yes.

17    Q.   When you were interviewed in June of this past year, you

18    said that the Interahamwe led you away from the hospital.  Do

19    you recall saying that?

10:53AM 20    A.   Yes.

21    Q.   And during that same interview in June, you also said

22    Mr. Teganya was not with them?

23    A.   One who was taking me is one Interahamwe called Musani.

24    Teganya stayed with the rest.

25    Q.   So you were being taken not by a large group but by one?

J.A. 871

Case: 19-1689    Document: 00117615537    Page: 183    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 55 of 102

55

1    A.    Yes, but he also returned soon.

2    Q.    And the way you were able to escape was by tossing some

3    coins out of your pocket?

4    A.    Yes.

5    Q.    And this soldier you were with, he went to go pick up the

6    coins; am I understanding you correctly?

7    A.    No, they were not coins, they were not.

8    Q.    Okay.  When you were interviewed in June by the

9    investigators in this case, didn't you say that you had some

10:55AM 10    coins, and while you were being walked to a killing area, you

11    threw the coins and were able to run away?

12    A.    No, I said money, I never said coins.

13    Q.    The money that you had, was it a lot of money?

14    A.    I don't know how much.

15    Q.    Okay.  And what did this soldier do when you threw the

16    money?

17    A.    No, they were not soldiers, they were the Interahamwe.

18    When I throw the money, they started picking.  Only one

19    followed me but also returned quickly.

10:56AM 20    Q.    Okay.  So I'm just trying to make sure I understand.  Were

21    you with one Interahamwe or were you with a large group of

22    Interahamwe?

23    A.    This is what happened.  When Interahamwe, a group of

24    Interahamwe was coming to kill the other people, Teganya throw

25    me out to them to kill me.  That's when I got the money and

J.A. 872

Case: 19-1689    Document: 00117615537    Page: 188    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 202    Filed 11/04/19    Page 50 of 102

56

 1   throw it down, so they started picking the money.  One

 2   Interahamwe followed me down.  So he said, "Okay, you can go

 3   and be killed by other people."  What came after, what happened

 4   after, I left, I don't know.

 5   Q.   Okay.  So you throw the money on the ground, right?

 6   A.   Yes.

 7   Q.   And most of the Interahamwe stopped what they're doing and

 8   go to pick it up?

 9   A.   Yes.

10:58AM 10   Q.   And that's the point at which you're able to run away?

11   A.   Yes, I run and turned around the corner.

12   Q.   And you weren't caught?

13   A.   Yes.

14   Q.   You were not caught?

15   A.   No.

16   Q.   I'm sorry, I'll try to ask a better question.  You were

17   not caught, correct?

18   A.   No, I wasn't caught, I left.

19   Q.   How many months pregnant were you at that point?

10:58AM 20   A.   Six months.

21        MR. LAUER:  May I have a moment.  I have no further

22   questions for this witness.

23        THE COURT:  How much redirect do you have,

24   Mr. Varghese?  Is it more than a few minutes?

25        MR. VARGHESE:  No, we could take a break.

57

```
 1              THE COURT:  All right.

 2              THE CLERK:  All rise.

 3              (A recess was taken.)

 4              THE CLERK:  All rise.

 5    (Jury enters.)

 6              THE CLERK:  Court is now back in session.

 7              THE COURT:  Redirect, Mr. Varghese.

 8              MR. VARGHESE:  Thank you, your Honor.

 9                    REDIRECT EXAMINATION

10    BY MR. VARGHESE:

11    Q.   Good morning again, Ms. Mukeshimana.

12    A.   Good morning.

13    Q.   I just want to ask a couple of questions following up on

14    what Mr. Teganya's lawyer asked you.

15    A.   Yes.

16    Q.   Mr. Lauer asked you a number of questions about the

17    timing, what day you went here, what day you went there.  Do

18    you remember those questions?

19    A.   Yes.

20    Q.   Did you have a calendar with you?

21    A.   No.

22    Q.   Did you have a watch?

23    A.   No.

24    Q.   Did you have a way of knowing which day of the month it

25    was?
```

J.A. 874

1    A.    No.

2    Q.    Mr. Lauer asked you about your transcript from the trial

3    involving the Hotel I'Lhuliro.  Do you remember those

4    questions?

5    A.    Yes.

6    Q.    And in particular he asked you about a statement in which

7    you stated that you went to your sister's house and stayed

8    there for a long time.  Do you remember that question?

9    A.    Yes.

11:18AM 10    Q.    And, in fact, what was the focus of that trial?  What was

11    that trial about?

12    A.    It's what happened to the Hotel I'Lhuliro.

13    Q.    And when did you go to the Hotel I'Lhuliro, before or

14    after you were at your sister's house?

15    A.    I went there after, went from my sister's house, and

16    before -- and after I left the hospital.

17    Q.    So you went to your sister's house first, then to the

18    Hotel I'Lhuliro?

19    A.    Yes.

11:19AM 20    Q.    And then after that, where did you go?

21    A.    After Hotel I'Lhuliro I went back to my sister's house

22    because genocide lasted for three months.

23    Q.    So Hotel I'Lhuliro was in between your time at your

24    sister's house?

25    A.    Yes.

J.A. 875

Case: 19-1689    Document: 00117615537    Page: 191    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 202    Filed 11/04/19    Page 59 of 102

59

1    Q.    During that trial, when you were testifying in a courtroom

2    in the United States, were you asked any questions about what

3    happened at the hospital?

4    A.    No.

5    Q.    Mr. Lauer asked you about a statement that was done for

6    Rwanda prosecutors.  Do you remember that question?

7    A.    Yes.

8    Q.    It was a case about an individual named Batumbi; is that

9    right?

11:20AM 10         THE INTERPRETER:  Who?  Can you repeat the name.

11    Q.    Batumbi, Batumba.

12    A.    No.  His name was Habyarabatuma.

13    Q.    And that case was about what happened in Sovu; is that

14    right?

15    A.    Yes.

16    Q.    And during that questioning with the prosecutors in

17    Rwanda, were you asked any questions about what happened at the

18    hospital in Butare?

19    A.    No.

11:21AM 20    Q.    Did that case have anything to do with the events that

21    occurred at the hospital in Butare?

22    A.    No.

23    Q.    Why didn't you volunteer information about the hospital in

24    Butare?

25    A.    I had failed completely to accept it, because what

Case: 19-1689    Document: 00117615537    Page: 192    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 202    Filed 11/04/19    Page 60 of 102

60

1    happened to me was a shameful act.  I had not accepted it

2    myself.

3    Q.   When United States investigators came to talk to you in

4    June of 2018, were they the first people to ask you about what

5    happened at the hospital in Butare?

6    A.   Yes.

7         MR. VARGHESE:  Thank you.  I have no further

8    questions.

9         THE COURT:  Recross?

11:22AM 10                    RECROSS-EXAMINATION

11   BY MR. LAUER:

12   Q.   The trial in the United States in 2012 or 2013, that was

13   about the Hotel I'Lhuliro, right?

14   A.   Yes.

15   Q.   But you were asked where you'd been before and after you

16   went to the Hotel I'Lhuliro?

17   A.   Yes.

18   Q.   You didn't say anything about going to the hospital?

19   A.   No.

11:23AM 20   Q.   The Habyarabatuma case in Rwanda in 1998, you testified in

21   that case?

22   A.   Yes.

23   Q.   And that case was about what happened at the health center

24   in Sovu, right?

25   A.   Yes.

```
 1    Q.   It wasn't about your sister's house?

 2    A.   I said that I went there, but I never mentioned the

 3    hospital.

 4    Q.   Mr. Habyarabatuma, he wasn't being prosecuted for what

 5    happened at your sister's house?

 6    A.   No.

 7    Q.   But you talked about going to your sister's house in that

 8    case?

 9    A.   Yes.

11:24AM 10   Q.   Your sister's house is in Nyanza?

11    A.   Yes.

12    Q.   And that's a different city from Butare?

13              MR. VARGHESE:  Objection.  Your Honor.

14              MR. LAUER:  It's cross.

15              THE COURT:  Overruled.

16    Q.   Is Nyanza a different city from Butare?

17    A.   No, it's a cell.

18    Q.   Is Nyanza in Butare Town?

19    A.   Yes.

11:25AM 20   Q.   How far of a walk is it from the hospital to Nyanza?

21    A.   About 20 minutes.

22              MR. LAUER:  No further questions.  Thank you.

23              The COURT:  Thank you.  You may step down.

24              MR. VARGHESE:  Your Honor, the United States calls

25    Esperance Mukamurenzi.
```

J.A. 878

| | |
|---|---|
| 1 | **ESPERANCE MUKAMURENZI, sworn** |
| 2 | THE WITNESS:  My testimony is the truth with the help |
| 3 | of God. |
| 4 | THE CLERK:  Thank you.  You may be seated. |
| 5 | DIRECT EXAMINATION |
| 6 | BY MR. VARGHESE: |
| 7 | Q.   Good morning. |
| 8 | A.   Good morning. |
| 9 | Q.   I'm going to ask you to please keep your voice up.  Okay? |
| 11:27AM 10 | A.   Yes. |
| 11 | Q.   Can you please introduce yourself to the jury.  What is |
| 12 | your name? |
| 13 | A.   Mukamurenzi, Esperance. |
| 14 | Q.   Ms. Mukamurenzi, where are you from? |
| 15 | A.   Butare. |
| 16 | Q.   Are you employed? |
| 17 | A.   No.  I'm a farmer. |
| 18 | Q.   Where do you live? |
| 19 | A.   In Huye. |
| 11:27AM 20 | Q.   Back in 1994, did you live in that same location? |
| 21 | A.   I lived in Huye. |
| 22 | Q.   And that's part of Butare? |
| 23 | A.   Yes. |
| 24 | Q.   Did you carry an identity card with you? |
| 25 | A.   I had one. |

Case: 19-1689    Document: 00117615537    Page: 195    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 63 of 102

63

1   Q.   And what group -- ethnic group was listed on your identity

2   card?

3   A.   Tutsi.

4   Q.   Who did you live with?

5   A.   With my husband.

6   Q.   Did you have any children?

7   A.   I had six children.

8   Q.   How far was your house from the hospital in Butare?

9   A.   Like two hours.

11:28AM 10   Q.   By foot or by car?

11   A.   By foot.

12   Q.   What was the first thing that you remember about the start

13   of the genocide in Butare?

14   A.   It started on Sunday.  We went to church, and they started

15   killing people.

16   Q.   What happened?

17   A.   They first came burning houses and eating our cows.

18   Q.   Who came?

19   A.   The Hutus.

11:29AM 20   Q.   Were you attacked?

21   A.   They attacked us.  When it just started, they killed

22   someone.

23   Q.   Did they attack you?

24   A.   They attacked us.  They were with Mr. Jonathan.

25   Q.   I'm sorry.  Can you please repeat that answer?

J.A. 880

```
 1    A.    They attacked us with Mr. Jonathan.
 2          THE INTERPRETER:  That's the name.
 3    Q.    How did they attack you?
 4    A.    They came burning houses and killing the cows.
 5    Q.    Was your house burned?
 6    A.    My two houses were burnt.
 7    Q.    I'm sorry.  I didn't hear that.
 8    A.    My two houses were burnt.
 9    Q.    Can you explain your two houses.  What are your two
10    houses?
11    A.    One had a clay roof, and another one had an iron roof.
12    Q.    And what was in the clay roof house?
13    A.    The one with clay roof had all the house stuff, our
14    chairs.  And we could keep even our crops there.
15    Q.    What was in the tin roof or metal roof house?
16    A.    It was a kitchen where we could keep our livestock, our
17    goats and a chicken.
18    Q.    Were both houses burned?
19    A.    Yes.  It was burnt.  They were burnt.
20    Q.    Was there anything left of those houses?
21    A.    Nothing at all.
22    Q.    Were you harmed in the attack?
23    A.    I was injured, but not very big.  They took us to the
24    commune or to the county.
25    Q.    Is that a building?
```

11:31AM 10

11:32AM 20

**J.A. 881**

Case: 19-1689    Document: 00117615537    Page: 197    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 65 of 102

65

```
 1   A.   They took us to the county and had a meeting with the

 2   master.

 3   Q.   Who all went to the county building?

 4        THE INTERPRETER:  Can you repeat the question,

 5   counsel.

 6   Q.   Who went that that meeting, to that county meeting?

 7   A.   My family and everybody who was a Tutsi, we went to Huye.

 8   Q.   And what happened?

 9   A.   He put us there so we can be in the same place so they can

10   easily kill us.

11   Q.   And is that what happened?

12   A.   That's what happened.

13   Q.   So were your husband and kids with you at the county

14   building?

15   A.   All of us, we were in there.

16   Q.   Did you have other relatives there as well?

17   A.   All of us who had that identity, we were in there.

18   Q.   And what happened?

19   A.   They came and started killing using clubs before they

20   started -- before they got the bullets.

21   Q.   What happened to your husband and your children?

22   A.   They killed them, but I was not there.  I had gone to the

23   hospital.

24   Q.   Where did you go?

25   A.   They came to kill, and they killed my nephew and other
```

J.A. 882

```
          1    people, and my brother was able to get a vehicle, and we took

          2    those who were injured to the hospital.

          3    Q.   Did you know whose car it was?

          4    A.   It was the college's vehicle.

          5    Q.   And who got in the car?

          6    A.   It was me, my brother, a driver and another woman.

          7    Q.   And was your nephew with you?

          8    A.   Yes, we were together.  I was holding him.

          9    Q.   How old was your nephew?

11:36AM  10    A.   Seven years old.

         11    Q.   Was he injured?

         12    A.   Yes.  He was beaten all over, and he was swollen.

         13    Q.   Where did you go?

         14    A.   We were going an hour to the hospital.  We reached a

         15    checkpoint in a place called Nyiramasuhuko place.

         16    Q.   What happened when you got to the checkpoint?

         17    A.   They took them away.  They took my brother and the driver,

         18    and they killed them.

         19    Q.   Who did?

11:36AM  20    A.   The soldiers who were at the roadblock or the checkpoint.

         21    Q.   Did you see your brother get killed?

         22    A.   Yes, I saw that.

         23    Q.   How did they kill your brother?

         24    A.   They had an ax in their pockets and clubs.  And they said

         25    it was a waste to use a bullet.
```

```
 1   Q.   What about the woman who was in the car, what happened to
 2   her?
 3   A.   They killed all of them.  Only me and the child.
 4   Q.   Did you say anything to them?
 5   A.   They asked me, "You stupid woman, who are you?"
 6   Q.   What did you say?
 7   A.   I said, "I'm a Hutu.  The master just asked me to take
 8   this child.  I'm just here to carry the child."
 9   Q.   And after you said that you were a Hutu, what did they
10   say?
11   A.   They called the vehicle from the hospital.
12   Q.   And what happened?
13   A.   They put him in that vehicle with the child, and then we
14   went to the hospital.
15   Q.   What happened when you got to the hospital?
16   A.   That child died right away.
17   Q.   Where did you go?
18   A.   The doctor who was -- the medical personnel who was there
19   told me to put the child down and just leave the child there.
20   Q.   Is that what you did?
21   A.   Yes.
22   Q.   Was anybody helping your nephew when you put him down?
23   A.   A medical personnel who was waiting also to be killed
24   because also he was a Tutsi.
25   Q.   Did he try to save your nephew?
```

J.A. 884

```
 1    A.    He tried to help me and show me where to put that kid

 2    because he was already dead.

 3    Q.    After your nephew died, did you leave the hospital?

 4    A.    I left the hospital saying that I'm going to go back and

 5    tell everybody what happened.

 6    Q.    What happened?

 7    A.    When I reached a little bit down the clinic, I found

 8    Interahamwe killing people.

 9    Q.    So what did you do?

11:40AM 10   A.    I went back to the hospital.

11    Q.    And where did you go?

12    A.    I stayed there at the hospital.

13    Q.    Where?

14    A.    In the maternity building.

15    Q.    Were you concerned that somebody would notice you?

16    A.    I was concerned.

17    Q.    Did you do anything to try to conceal yourself?

18    A.    I would get like a scarf and tie it all the way here

19    (indicating) because they would say the Hutus have big cheeks

11:42AM 20   and I would try to deflate or to widen my nose so my nose will

21    look big.

22    Q.    Were you trying to pretend to look like a Hutu?

23    A.    Yes.  I was trying to look like them.

24    Q.    Why?

25    A.    Because then we're not being killed.
```

Case: 19-1689    Document: 00117615537    Page: 201    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 69 of 102

69

1    Q.    Did you stay in the maternity building or did you go

2    around the hospital?

3    A.    I continued going around the hospital.  I looked like a

4    crazy person.

5    Q.    Why did you do that?

6    A.    I was trying to survive so they will not identify me.

7    Q.    Were you -- did you pretend to -- did you pretend to be

8    working at all?

9    A.    Yes.  I would pretend like I'm taking care of the sick.

11:43AM 10   Q.    What was it like in the hospital?

11   A.    There were Interahamwes and there were killings.

12   Q.    Were there a lot of people hiding?

13   A.    Yes, very many.

14   Q.    Were there a lot of people in the maternity ward?

15   A.    Everywhere.  They were there everywhere, even the surgery,

16   all over the hospital.

17   Q.    Were patients being treated for their injuries?

18   A.    No.  Nobody was treating them.

19   Q.    Did you find any of your relatives at the hospital?

11:44AM 20   A.    I was lucky, and the aunt of my husband, who was a medical

21   personnel.

22   Q.    And did you see her at the hospital?

23   A.    Yes.  I saw her at the hospital.

24   Q.    And when you saw her, what did you do?

25   A.    I acted as her caretaker, and I was lucky to see her, and

Case: 19-1689    Document: 00117615537    Page: 202    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 70 of 102

70

1    then I started to act like her caretaker.

2    Q.    Was she also in the maternity ward?

3    A.    His colleagues, who did hide her there, and they are the

4    ones and came back and took her.  They had taken her to the

5    maternity ward.

6    Q.    During your time at the hospital, did you become familiar

7    with someone known as Teganya?

8    A.    He used to come before I knew him, and then afterwards

9    there were students who were there and other people that said

11:46AM 10    these are the militia, the army of Teganya, or the wing, or the

11    paramilitary of Teganya.

12    Q.    Let me just -- let me just start back and say.  Did you

13    observe somebody known as Teganya?

14    A.    Like I said, to know him and to know that name is when

15    they came to the hospital.

16    Q.    Would Teganya and his group come often to the maternity

17    area?

18    A.    They came quite often, and the way I know that they were

19    Interahamwe is when people say that's the paramilitary group of

11:47AM 20    Teganya.

21    Q.    Can you describe what Teganya looked like?

22    A.    The only thing I can remember, he had a gap in his teeth.

23    Otherwise I don't remember him well.

24    Q.    Do you remember what he would wear?

25    A.    He would wear the medical personnel clothes, the gown.

Case: 19-1689    Document: 00117615537    Page: 203    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 71 of 102

71

1    Q.    The coat, the lab coat?

2              MR. LAUER:  Objection.

3              THE COURT:  Overruled.

4    A.    Yes, the white one.

5    Q.    When Teganya and his group came, what did you see -- what

6    did they do?

7    A.    Would run around trying to flee.

8    Q.    And what would they do?

9    A.    They had clubs and axes.  They would pick like five people

11:49AM 10    and take them, and the only -- the way we would know that they

11    are dead is because they will not return.

12    Q.    Did Teganya and his group say anything while they were

13    taking people?

14    A.    Whatever -- when they finished, they were saying that our

15    children will ask how a Tutsi looks like.

16    Q.    Were you scared of Teganya and his group?

17    A.    When I found out that he was Interahamwe, I was scared of

18    him, and everybody who will see them will run away and go to

19    die somewhere else.

11:50AM 20    Q.    Did Teganya and his group take away anyone that you know,

21    that you knew?

22    A.    I know someone.

23    Q.    Who?

24    A.    Venamcia.

25    Q.    What happened to your husband's aunt?

J.A. 888

1    A.    They kept her there until May.  They came and took her,

2    and she just waved at me.  The way I found out she was killed

3    was I never saw her again.

4    Q.    Did you see her being taken away?

5    A.    They took her in front of my eyes.

6    Q.    Was it Teganya and the group that took her?

7    A.    They were together.

8    Q.    Did you see Mr. Teganya carrying any weapons?

9    A.    They carried the clubs like you're carrying a regular

11:52AM 10    stick.

11    Q.    I'm sorry.  What was the last thing you said?

12    A.    They carried the clubs like you're carrying a regular

13    stick.

14    Q.    Can you describe what happened to the patients who were

15    identified to be taken?

16         THE INTERPRETER:  Can you repeat that question,

17    counsel.

18         MR. VARGHESE:  Sure.

19    Q.    Can you describe what happened to the people who were

11:52AM 20    selected to go with them?  What happened?

21    A.    For the females, they will take them and they will rape

22    them like today and then we'll see them back.

23    Q.    What happened to the others?

24    A.    It would continue like that.  Some would return and others

25    will not return, and then those ones are killed.

**J.A. 889**

1    Q.   For the folks that were killed, were you able to see where

2    they were taken to be killed?

3    A.   When they were finished killing and they leave, sometimes

4    we would just go down just straight from the hospital because

5    they would not kill them close to the hospital so they don't --

6    to avoid a lot of bugs.

7    Q.   Where were they killed?

8    A.   Below the maternity building.

9    Q.   Did you go see?

11:54AM 10    A.   Yes, I went.

11    Q.   Can you describe what it looked like?

12    A.   There were so many people, more than all of us here.

13    There were so many, and they were eaten by dogs, and there were

14    dead bodies eaten by dogs.

15    Q.   Did you see Teganya's group taking women as well?

16    A.   They took them.

17    Q.   And you testified that sometimes they would return?

18         THE INTERPRETER:  They would return or they would not

19    return?  Can you rephrase it?

11:55AM 20    Q.   Did you see them return?

21    A.   Sometimes they will not return, and they will finish them.

22    Q.   You testified that it was -- you testified -- you

23    described it as Teganya's Army.  Can you explain how

24    Mr. Teganya interacted or how he acted with the soldiers in the

25    Interahamwe?

J.A. 890

Case: 19-1689    Document: 00117615537    Page: 206    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 74 of 102

74

1    A.    They would come as if they are doing rounds, but instead

2    they just came to find where we are.

3    Q.    And would Mr. Teganya be leading that group?

4    A.    They would be together.

5    Q.    Did they come in the daytime or the nighttime or both?

6    A.    Sometimes they would come in the evening.  And in May,

7    that's when they started to come and picking up people.

8    Sometimes they would come like twice a day.

9    Q.    Did they ever come for you?

11:56AM 10    A.    Yeah, they took me.

11    Q.    Where?

12    A.    They will take me in a place that was nicknamed Congo

13    where people used to go and make -- prepare their food.

14    Q.    And what happened?

15    A.    They would rape me.

16    Q.    Did that happen once or on more than one occasion?

17    A.    Like three times.  Most of the time I would try to hide.

18    I will leave the maternity if they come there.  Then I will go

19    to surgery.  So wherever they come from, that's where I would

11:58AM 20    go.

21    Q.    How long did you stay at the hospital?

22    A.    Since April I didn't leave the hospital.

23    Q.    Why didn't you leave?

24    A.    I didn't have anywhere to go.  I was just wandering

25    around.

```
 1    Q.   At some point did other relatives -- did you find other
 2    relatives of yours at the hospital?
 3    A.   My daughter, she was injured.
 4    Q.   Do you remember when -- where did you see your daughter?
 5    Where did you find your daughter?
 6    A.   They brought her in.  She was carried in the arms.  She
 7    had cuts, and she had gunshot wounds on her legs.
 8    Q.   When was that, do you remember?
 9    A.   That was in May.
11:59AM 10  Q.   Did she stay at the hospital until the genocide was over?
11    A.   Yes.
12    Q.   Did you stay with her?
13    A.   I stayed with her.
14    Q.   Did you see any people that you recognized who were not
15    relatives?
16    A.   They were there.
17    Q.   Who?
18    A.   Consolee.  Another girl, and she had -- they cut her on
19    the face.
12:00PM 20  Q.   Do you remember her name?
21    A.   The other girl that we met here, the one they cut her ear.
22    Q.   The girl who cut her ear, do you remember her name?
23    A.   I'm having a hard time.
24    Q.   That's okay.  What did she look like?
25    A.   We are together.  She came here to testify.
```

J.A. 892

1    Q.    Back in -- back during the genocide in 1994, when you saw
2    her, what did she look like?
3    A.    She had cuts all over her, and her ear was cut.
4    Q.    How did -- when did you see her, how did you come to see
5    her?
6    A.    One time she came running in the hospital.  The
7    Interahamwe were trying to rape her.  And she came where I was,
8    and they put her under the bed.
9    Q.    Why did you put her under the bed?
12:02PM 10    A.    Her name is Isabelle.
11    Q.    Why did you put Isabelle under the bed?
12    A.    Because the Interahamwe were chasing her.
13    Q.    And did the Interahamwe find Isabelle?
14    A.    After I hid her, I told them I didn't see her.
15    Q.    Had you seen Isabelle after that?
16    A.    I was lucky.  After I hid her, they took other people and
17    then after they left -- she left, we never met again.
18    Q.    When was the next time that you saw Isabelle?
19    A.    Just recently where we are giving testimonies.
12:03PM 20    Q.    You also mentioned Consolee.  Did you see Consolee at the
21    hospital?
22    A.    I saw her, she was pregnant.
23    Q.    Was she hiding at the hospital as well?
24    A.    She was hiding.
25    Q.    Had you known Consolee before the genocide?

# J.A. 893

Case: 19-1689    Document: 00117615537    Page: 209    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 77 of 102

77

```
 1    A.   I didn't know her.
 2    Q.   Ms. Mukamurenzi, has anyone forced or coerced you to
 3    testify here today?
 4    A.   No.
 5    Q.   Has anyone pressured you in any way regarding your
 6    testimony today?
 7    A.   Nobody.
 8    Q.   Has the government of Rwanda spoken to you about your
 9    testimony or what to say or what not to say?
10    A.   No.
11    Q.   Has anyone offered you anything for your testimony here
12    today?
13    A.   No.
14    Q.   From either the U.S. Government or the Rwandan government?
15    A.   None.
16    Q.   The United States paid for your flight and your hotel here
17    in the United States while you stay; is that right?
18    A.   Yes.
19    Q.   And you're also receiving money for food during your stay
20    here?
21    A.   Yes.  They do.
22    Q.   Is there anything about receiving that money that affects
23    your testimony here today?
24    A.   No.
25    Q.   Why are you testifying here today?
```

12:04PM (line 10)

12:05PM (line 20)

          1   A.   Maybe that was the time.

          2          MR. VARGHESE:  Thank you.  I have nothing further.

          3          THE COURT:  Cross?

          4                    CROSS-EXAMINATION

          5   BY MR. LAUER:

          6   Q.   Good afternoon.

          7   A.   Good afternoon.

          8   Q.   You're a farmer?

          9          THE INTERPRETER:  Can you repeat.

12:06PM  10          MR. LAUER:  I'm sorry.

         11   Q.   You're a farmer?

         12   A.   Yes.

         13   Q.   What do you farm?

         14   A.   Beans, cassava, maize and potato.

         15   Q.   And do you sell the produce that you produce?

         16   A.   When the weather is good and I have enough, I sell.

         17   Q.   Are there times when the weather is not good and you don't

         18   have enough to sell?

         19   A.   Yes.  But, again, I have to feed my family.

12:07PM  20   Q.   You were asked some questions about the money that you're

         21   receiving to come here today, correct?

         22   A.   They paid for my ticket and they give me money to eat, and

         23   I go to the hotel and I eat.

         24   Q.   The money that they're giving you to eat, do you know how

         25   much money it is?

Case: 19-1689    Document: 00117615537    Page: 211    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 79 of 102

79

```
         1   A.   I don't know.  I just go buy food.

         2   Q.   Are you using all of the money that you're receiving to go

         3   buy food?

         4   A.   I go buy food.

         5   Q.   My question is whether you're using all of the money that

         6   you're receiving to buy food?

         7   A.   The day before they give me another one, I just keep going

         8   to eat.  By the time I finish that money, they are ready --

         9   they bring more money.

12:08PM 10   Q.   Okay.  When did you travel to the United States?

        11   A.   Two weeks.  I'm here for two weeks.

        12   Q.   During the two weeks that you've been here, have you

        13   received money?

        14   A.   Apart from that, the money to eat.

        15   Q.   All right.  When you get the money to eat, you were taken

        16   to a bank?

        17        THE INTERPRETER:  Can you repeat the question,

        18   counsel.

        19        MR. LAUER:  Yes.

12:09PM 20   Q.   When you got the money to eat, you were taken to a bank

        21   and handed money, right?

        22   A.   Yes.  They gave me the money they want, to eat.

        23   Q.   Do you still have some of that money?

        24   A.   I have -- I have the money to eat this afternoon.

        25   Q.   This is not the first case that you've gone abroad to
```

J.A. 896

```
 1    testify in, correct?
 2    A.    Yes.
 3    Q.    You testified in Arusha?
 4    A.    Yes.
 5    Q.    And that was the Nizeyimana case?
 6    A.    Yes.
 7    Q.    In 2011?
 8    A.    Yes.
 9    Q.    And in that case you were asked many questions about what
10    took place at the hospital, correct?
11    A.    Yes.  They asked.
12    Q.    And when you went to Arusha, you told them what you had
13    experienced, correct?
14    A.    Yes.
15    Q.    And you took an oath to tell the truth in that court?
16    A.    Yes, I did.
17    Q.    Now, today, you've told us that Mr. Teganya was the leader
18    of an Army of Interahamwe, correct?
19    A.    Yes.
20    Q.    But when you testified in Arusha, you didn't say anything
21    about Mr. Teganya?
22    A.    No.
23    Q.    You talked about soldiers and Interahamwe, correct?
24    A.    Yes.
25    Q.    And you were asked whether the medical staff had any role
```

12:10PM (line 10)
12:11PM (line 20)

J.A. 897

1    in those killings?

2    A.   I don't recall very well, but I think they asked.

3    Q.   And your answer at that time was no, medical staff were

4    not involved in the killings.

5    A.   I didn't see anybody, but I was running around.

6    Q.   Excuse me.  Could you repeat your answer?

7    A.   I didn't see anybody, but I was running around.

8    Q.   You didn't see anybody?  What do you mean by that?

9    A.   For them they had their colleagues, who would come and

12:13PM 10   take the people.  But for the medical personnel, they would

11   come, and they'd identify those who are there.

12   Q.   Okay.  But you told us a little while ago that Mr. Teganya

13   led an Army of Interahamwe who was taking people from the

14   hospital.

15   A.   Yes.

16   Q.   You didn't say that in Arusha?

17   A.   No, because I didn't mention him.  They came to ask me

18   about that testimony, and I told the people who were together

19   at the hospital.

12:13PM 20   Q.   So I want to ask you some questions about Venati

21   (phonetic).

22   A.   Venati?

23   Q.   Who is Venati?

24   A.   I don't know.

25   Q.   Did you have a sister-in-law who was at the hospital when

```
 1   you were there during the genocide?

 2   A.   She was there.

 3   Q.   Okay.  And what is her name?

 4   A.   Venancia.

 5   Q.   Venancia is your sister-in-law?

 6   A.   She's the aunt to my husband.

 7   Q.   You told us that Venancia was taken away by Mr. Teganya.

 8   A.   Yes.  His group, they're the ones who took her.

 9   Q.   Okay.  Now, you were asked specifically about Venancia in

10   Arusha.  Do you recall that?

11   A.   Yes.

12   Q.   In fact, when you testified in Arusha, you told the Court

13   that you saw three uniformed soldiers remove her.

14   A.   With those who had the lab coats.

15   Q.   Okay.  You didn't say that in Arusha?

16   A.   Which one?

17   Q.   Let me try to ask a simpler question.

18        Did you tell the Court in Arusha that you saw three

19   uniformed soldiers remove Venancia?

20   A.   I said it, and I told them, those who identified her.

21   Q.   You didn't identify Mr. Teganya in Arusha?

22   A.   No.

23   Q.   You've described for us that Mr. Teganya led a group of

24   people who took Tutsis away to be killed, right?

25   A.   Yes.
```

83

1    Q.   Okay.  You were asked about -- you were asked who was

2    doing the taking of the Tutsis in Arusha too?

3    A.   Interahamwe.

4    Q.   In Arusha you said that the people doing the killings were

5    soldiers and Interahamwe?

6    A.   Yes.

7    Q.   You didn't say anything about medical staff or

8    Mr. Teganya?

9    A.   I said it.

12:17PM 10    Q.   You gave Mr. Teganya's name in Arusha?

11    A.   I didn't say it.

12    Q.   You didn't give his name in Arusha, right?

13    A.   I didn't say it because the people who came to ask me for

14    testimony, they were asking me people who were there and the

15    Interahamwes who were there.

16         THE COURT:  One at a time.

17         THE INTERPRETER:  Can I rephrase -- if the interpreter

18    rephrase.

19    A.   They asked me about who I was with and the Interahamwes

12:18PM 20    who were there.

21    Q.   They asked you who was doing the killing?

22    A.   They came, and they asked -- in the testimony they asked

23    me how many Interahamwes and the Interahamwes who were living

24    with me.  That man, they didn't ask me about that man.

25    Q.   You told us here this morning, or perhaps this afternoon,

# J.A. 900

1    that you were taken by Mr. Teganya and raped.

2    A.    They took me out.  He left -- he left with his group.

3    Q.    So I just want to make sure I'm understanding your

4    testimony correctly.  You talked about being taken to a food

5    preparation area.

6    A.    Yes.  That's where they used to take me.  Whoever will

7    take me today is not the same person who will take me tomorrow.

8    Q.    You said that one of the people who took you there was

9    Mr. Teganya?

12:20PM 10   A.    In his group.  He was in his group.

11   Q.    You were asked about being raped in Arusha.

12   A.    I don't remember.

13   Q.    You don't remember saying that two SO soldiers removed

14   you?

15        THE INTERPRETER:  Can you repeat the question.

16   Q.    You testified in Arusha that two SO soldiers removed you.

17   A.    I said they are the ones who took me?

18   Q.    Did you say in Arusha that it was two soldiers who raped

19   you?

12:21PM 20        MR. VARGHESE:  Your Honor, we object.  The witness is

21   having trouble remembering.

22        THE COURT:  Overruled.  Overruled.

23   A.    That's not true.

24   Q.    In Arusha, did you say that Mr. Teganya was one of the

25   people who were involved in raping you?

Case: 19-1689    Document: 00117615537    Page: 217    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 85 of 102

85

1    A.    At that time they didn't ask me the names.  I said they

2    were Interahamwe.  These people came currently, they asked me

3    the names, and I explained.

4    Q.    You also explained that you were staying in the surgical

5    ward?

6    A.    Everywhere.  Everywhere in the hospital.  I went to the

7    surgical ward when I took my -- the child -- my child, when

8    they brought her.

9    Q.    So when you were at the hospital, you were never in one

12:22PM 10    location for very long?

11    A.    I didn't stay in one place because they were hunting me

12    down.

13    Q.    You testified about Ms. Mukankusi, Isabelle?

14    A.    Yes.

15    Q.    You told us that you remember meeting her at the hospital?

16    A.    Yes.

17    Q.    And you remember that she had been cut on the ear?

18    A.    The ear and all over her head.

19    Q.    Was she someone you knew prior to the genocide?

12:23PM 20    A.    I didn't know her.

21    Q.    So you met her for the first time at the hospital?

22    A.    Yes.

23    Q.    And this was again while you were not staying in one place

24    for too long?

25    A.    Yes.  Until July, when we were going -- wandering around

```
 1    so that you don't get picked up.

 2    Q.    And your testimony was that you then didn't see Isabelle

 3    again until you came to the United States?

 4    A.    We never met.  We never met again.  We met here in giving

 5    testimony.  I had never met her again.

 6    Q.    So you met her here in the United States again?

 7    A.    We met in Butare, a place called Mukoni.

 8    Q.    Excuse me?

 9    A.    We met in Butare in a place called Mukoni.

12:25PM 10    Q.    When did that take place?

11    A.    That's when they called us.  I don't remember the date and

12    I don't remember the month, but they called us to go there for

13    testimony.  That's when I met her there.

14    Q.    You said "they called us."  Who called you?

15    A.    They told me to come to Mukoni.  And when I went there, I

16    met the white men there.

17    Q.    Okay.  So you got a phone call to tell you to come to

18    Mukoni.  Is that right?

19    A.    Yes.

12:26PM 20    Q.    Who was the person who was calling you?

21    A.    The white people called me.

22    Q.    Okay.  So someone called you and spoke to you in English?

23    A.    They had an interpreter, and they asked me if I was at the

24    hospital, and I told them.

25    Q.    And you said that led to a meeting at a place called
```

J.A. 903

1   Mukoni.

2   A.   That's when I was able to meet her again.

3   Q.   What is Mukoni, is it a restaurant or hotel?

4   A.   It was at the hotel.

5   Q.   So you arrived for this meeting at the hotel and

6   Ms. Mukankusi is there?

7   A.   The first time we didn't meet.  The second time -- after

8   that, that's when I met her there.

9   Q.   Okay.  So the first time was a meeting with the Mzunga,

12:27PM 10   the investigators from the United States?

11   A.   Yes.

12   Q.   And Ms. Mukankusi was not at that meeting?

13   A.   She was not there.  We met later.

14   Q.   Okay.  I want to ask some questions about that later

15   meeting.  When did that take place?

16   A.   The meeting to meet?

17   Q.   When did you meet Ms. Mukankusi?

18   A.   I don't remember.

19   Q.   Well, you just told us that there was a meeting between

12:28PM 20   you two.

21   A.   I don't remember.  I don't know that.  I don't remember

22   that.

23   Q.   Well, why would you tell us that there was a meeting with

24   Ms. Mukankusi if there wasn't one?

25   A.   It was not a meeting.  It was not a meeting.  They had

88

      1    invited us to come to tell us they were going to go and

      2    testify.  That's when I met her, since the end of the war.

      3    Q.   This meeting where you met her to talk about coming and

      4    testifying, where did that take place?

      5    A.   Ku Mukoni.

      6    Q.   Was it in a private room or was it in a restaurant?

      7    A.   It was somewhere in the room, not in the restaurant.

      8    Q.   Who was in the room?

      9    A.   There was an interpreter.

12:29PM 10   Q.   Anyone else?

     11    A.   That's when I met Mukankusi.

     12    Q.   So you met Ms. Mukankusi in a room at Mukoni?

     13    A.   No.  I met her when she was coming out of the room, and

     14    then I went there, but we didn't sit in the same room and talk.

     15    Q.   Okay.  Where did you talk?

     16         THE INTERPRETER:  Repeat the question.

     17    Q.   Where did you talk to Ms. Mukankusi?

     18    A.   Nothing.

     19    Q.   Well, you said that you met her in Mukoni?

12:30PM 20   A.   We bypassed each other when I was going and she was

     21    coming.

     22    Q.   And you recognized her at that point?

     23    A.   I remembered her.

     24    Q.   And you didn't say hi?

     25    A.   I said hi, but because she works at the hospital, I

Case: 19-1689    Document: 00117615537    Page: 221    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 89 of 102

89

```
 1    thought that's where she was coming from.  I didn't know where

 2    she was coming from.

 3    Q.   Okay.  So you did say hi?

 4    A.   Yeah.  I said hi because I recognized her.

 5    Q.   Okay.  And was there some conversation?

 6    A.   No.  I thought she was coming from work, and I had

 7    somewhere I was going.  I didn't know she was coming there.

 8    Q.   Okay.  And this was in a hotel?

 9    A.   No.
```
12:31PM 10    Q.   Where was this taking place?
```
11    A.   Because I told you that I met her on the way, and we said

12    hi because I recognized her.

13    Q.   And then the next time you saw her was when you came to

14    the United States?

15    A.   We met when we came here.

16    Q.   You were on the same plane together?

17    A.   Yes.

18    Q.   Staying in the same hotel?

19    A.   Everybody has her own room.  Sometimes the day will pass
```
12:32PM 20    by before we -- without seeing each other.
```
21    Q.   Okay.  So she has her own room, you have your own room; is

22    that right?

23    A.   Yes.

24    Q.   The rooms are on the same floor?

25    A.   Not the same.
```

```
 1    Q.   Your room is not on the same floor as hers?
 2    A.   We do meet, but I don't know where her room is, and I'm
 3    sure she doesn't know where my room is.
 4    Q.   In the hotel there's a room that actually has some tables
 5    set up with a TV where people come together to meet, correct?
 6    A.   Yes.  It's there.  If you're tired, you go back to your
 7    room.
 8    Q.   But people come together in that room and socialize?
 9    A.   They come, we talk and we watch TV, and then everybody
10    will go to his room.
11    Q.   And this is the hotel you've been staying at now for over
12    two weeks?
13    A.   Yes.
14    Q.   You also mentioned being familiar with a woman named
15    Consolee Mukeshimana?
16    A.   Yes.
17    Q.   What is your relationship with Ms. Mukeshimana?
18    A.   Nothing.  We met at the hospital when everybody was
19    going -- the other one, another person going the other way, we
20    met later.
21    Q.   Okay.  So you didn't know her prior to the time of the
22    genocide?
23    A.   No.  We met there, when we were seeking refuge.
24    Q.   And did you form a friendship with her?
25    A.   We don't have a friendship at all.
```

12:34PM (line 10)
12:34PM (line 20)

**J.A. 907**

Case: 19-1689  Document: 00117615537  Page: 223  Date Filed: 07/16/2020  Entry ID: 6352983
Case 1:17-cr-10292-FDS  Document 202  Filed 11/04/19  Page 91 of 102

91

```
 1   Q.    In the hospital, how did you come to know her?

 2   A.    That lady?

 3   Q.    How did you come to know Consolee Mukeshimana?

 4   A.    I met her there, when we were there as refugees and each

 5   one passing the other way and another person passing the other

 6   way.

 7   Q.    So in passing, that's how you came to know her?

 8   A.    Like you will see the person here and tomorrow you'll see

 9   that person the other way.  But you're passing so people will

10   not know you are talking or see you talking.

11   Q.    Okay.  So you never actually talked to her on the

12   University Hospital campus; is that right?

13   A.    No, I didn't.

14   Q.    So you wouldn't have known her name?

15   A.    No.

16   Q.    And this woman whose name you didn't know who you saw in

17   passing, you now recognize her from the campus; is that right?

18   A.    Yes, because we had met.

19   Q.    And Ms. Mukeshimana came here with you on the same

20   airplane?

21   A.    We came together.

22   Q.    Staying in the same hotel?

23   A.    We live together, but everybody has her own room.

24   Q.    Before you came to the United States, did you have any

25   contact with Consolee Mukeshimana?
```

12:36PM appears at line 10
12:37PM appears at line 20

Case: 19-1689    Document: 00117615537    Page: 224    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 202    Filed 11/04/19    Page 92 of 102

92

```
 1    A.    We met and we said hi when she was coming from work.

 2    Q.    Okay.  When did that take place?

 3    A.    When we were doing the preparations to come.  I didn't

 4    know where -- I didn't know where she was going, but then we

 5    met when we were getting ready to board and come.

 6    Q.    Okay.  So I would imagine you've had a few conversations

 7    with her during your travels here?

 8    A.    Yes.  We talked like the people who knew each other and

 9    people who are going to the same place.

10    Q.    I want to ask you just a few more questions about the

11    meeting you had with the American investigators in June.

12    Actually, I'm sorry.  This was not in June.  This would have

13    been two years ago, in 2016.  Do you remember that?

14    A.    Yes, I remember.

15    Q.    You were asked many questions about what happened on the

16    hospital campus, correct?

17    A.    They asked me.

18    Q.    And you talked some about Mr. Teganya, correct?

19          THE INTERPRETER:  Can you repeat the question,

20    counsel.

21    Q.    You discussed what you remembered of Mr. Teganya?

22    A.    They asked me about him, but they asked me about the

23    attacks and who was leading the attacks, and then I mentioned

24    that man and others.

25    Q.    At any time in that meeting did you say anything about him
```

J.A. 909

1    being involved in rapes?

2    A.   Yes, because they did take people.  And even Venancia,

3    they had her in the maternity ward.  And then they came and

4    they took her.

5    Q.   Did you tell the investigators in the hotel that

6    Mr. Teganya was one of the people who did that?

7    A.   They were asking me about the attacks and how the attacks

8    happened and who would lead the attacks, and that's what I

9    explained to them.

12:41PM 10    Q.   So you did not say anything about Mr. Teganya being

11    involved in rapes?

12    A.   He was like their leader and they would come and take

13    people and whatever they would do, I don't know.

14    Q.   I'm just asking about what you said in that meeting in

15    2016.  At that particular time when you were asked questions

16    about Mr. Teganya, you didn't say he was involved in rapes?

17    A.   Raping them, he had his colleagues, they will take them

18    outside.  I don't know what would happen and some would not

19    return.

12:42PM 20    Q.   Did you say that when you met with the Americans in 2016?

21    A.   I told them they would come and take people and some would

22    be raped and come back and others will not come back, just like

23    me, like the way they took me.

24           MR. LAUER:  May I have a moment, your Honor?

25           THE COURT:  Yes.

J.A. 910

Case: 19-1689    Document: 00117615537    Page: 226    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 202    Filed 11/04/19    Page 94 of 102

94

```
 1              MR. LAUER:  Thank you.  I have no further questions.

 2              THE COURT:  Redirect?

 3                        REDIRECT EXAMINATION

 4    BY MR. VARGHESE:

 5    Q.   Good morning again, Ms. Mukamurenzi.

 6    A.   Good morning.

 7    Q.   I'm going to ask you some questions that Mr. Teganya's

 8    lawyer -- following up on some things that Mr. Teganya's lawyer

 9    asked you about.

 10   A.   Yes.

 11   Q.   Mr. Teganya's lawyer asked you some questions about your

 12   testimony at the International Criminal Tribunal in Arusha,

 13   Tanzania.  Do you remember that?

 14   A.   Yes.

 15   Q.   And that was in a case involving an individual by the name

 16   of Nizeyimana; is that right?

 17   A.   Yes.

 18   Q.   Did you know, what was Mr. Nizeyimana's role at -- in the

 19   genocide at the hospital?

 20   A.   I don't remember.

 21   Q.   During that trial of Mr. Nizeyimana, were you asked any

 22   questions about Mr. Teganya?

 23   A.   They didn't ask me.

 24   Q.   Today in your direct testimony, when I asked you questions

 25   earlier today, did you say anything about Mr. Nizeyimana?
```

**J.A. 911**

```
 1    A.    I didn't say anything.

 2    Q.    Did I ask you anything about Mr. Nizeyimana?

 3    A.    No.

 4    Q.    With respect to your testimony you talked about what the

 5    medical staff did and what the soldiers and the Interahamwe

 6    did.  Can you explain the difference between what the medical

 7    staff did and what the soldiers and the Interahamwe did.

 8    A.    They would come in the hospital.  They will take people,

 9    and the way you will know that they killed them, they will not

10    return.

11    Q.    And what did the medical staff, like Mr. Teganya, do?

12    A.    They would come like -- they were keeping them there just

13    to resolve for themselves, and then they will take one by one.

14    By June, there were only like five Tutsi women left that I

15    knew.

16    Q.    Did you see Mr. Teganya identify people to be taken?

17    A.    They would come and they identify people to be taken, and

18    those with machetes, with clubs, they will take them, and we'll

19    know that they are dead when they don't return.

20    Q.    Mr. Teganya's lawyer asked you a number of questions about

21    your interactions with Isabelle and Consolee.  Do you remember

22    those questions?

23    A.    I remember.

24    Q.    Did you ever discuss your testimony today, what you were

25    going to say with Isabelle or Consolee?
```

Case: 19-1689    Document: 00117615537    Page: 228    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 202   Filed 11/04/19   Page 96 of 102

96

```
 1    A.    No.

 2    Q.    Were you instructed not to talk to the other witnesses

 3    about what your testimony was?

 4    A.    No.

 5    Q.    Do you remember that we told -- that I told you not to

 6    talk to the other witnesses about what to say?

 7              THE INTERPRETER:  Repeat the question, counsel.

 8    Q.    Do you remember that I have instructed you not to talk to

 9    the other witnesses about what your testimony is?

10    A.    I remember.

11              MR. VARGHESE:  Thank you.  Nothing further.

12              THE COURT:  Recross?

13              MR. LAUER:  Very briefly.

14                         RECROSS-EXAMINATION

15    BY MR. LAUER:

16    Q.    When you were in Arusha, Tanzania, you were asked what

17    happened to Venancia?

18    A.    They asked me.

19    Q.    And you told them it was three uniformed soldiers who took

20    her?

21    A.    I said that, but she was there because the medical staff

22    put her there at the time they reached and they give her away.

23              MR. LAUER:  That's all I have.  Thank you.

24              THE COURT:  Okay.  Thank you.  You may step down.

25              We are not behind, correct?
```

J.A. 913

1          MR. VARGHESE:  No, your Honor.  We're actually ahead.

2          THE COURT:  All right.  Let's break there for the day

3     then.

4          Ladies and gentlemen, please remember my instruction

5     not to discuss the case among yourself or with anyone else or

6     read or listen to anything about the case, and we will see you

7     tomorrow morning at 9:00.

8          THE CLERK:  All rise.

9     (Jury exits.)

12:51PM 10          THE COURT:  All right.  So what is the situation with

11     the schedule?

12          MR. GARLAND:  We anticipate resting tomorrow.

13          THE COURT:  Resting tomorrow about what time,

14     ballpark?

15          MR. GARLAND:  It depends a little bit on the ruling on

16     the affidavit, because if the affidavit comes in or the

17     reactive portion of it, we need to think today whether we want

18     to bring the witness back, but I think that that would be

19     short.

12:51PM 20          THE COURT:  But other than that, you'd expect to rest

21     tomorrow?

22          MR. GARLAND:  Yes.

23          THE COURT:  And take the full or...?

24          MR. GARLAND:  No.  Even if that happens, we don't

25     anticipate taking the full day.

**J.A. 914**

1          THE COURT:  Okay.  And what about the defense case?

2     Remind me.  There's an expert who's not from Rwanda; is that

3     right?

4          MR. LAUER:  Yes.  This afternoon we'll be submitting a

5     proffer of what our expert would be testifying to, and I know

6     the government has some concerns about that, and the expert is

7     expected to be available on Friday.

8          THE COURT:  Available Friday.  So if he does testify,

9     it would be on Friday.  All right.

12:52PM 10          Let's do this then:  Let me make my ruling on the

11     affidavit, and then the expert question I'll take up as quickly

12     as I can.

13          So to cut to the chase, I'm going to exclude the

14     affidavit, which is Exhibit 2.

15          Exhibit 1 is the I-589, which was executed on

16     September 13, 2014.  There were two questions asked in that

17     form which are charged as false statements.  Confusingly, they

18     both are numbered 3 or 3A.  But question 3A on page 6

19     essentially asks whether you were ever associated with a

12:53PM 20     political group.  And the defendant gives a narrative response

21     and follows it with the statement, "I will submit a detailed

22     declaration prior to my asylum hearing."

23          Question 3 on page 7 basically asks whether he's

24     persecuted others, and he simply answers no, and there's no

25     narrative description.

**J.A. 915**

1          The affidavit, Exhibit 2, was executed on May 2, 2015,

2     which is more than seven and a half months later.  I'm not sure

3     I appreciated that at first.  I thought they were submitted

4     together, but it was executed, again, seven and half months

5     later.  This was not part of the I-589.  That's not necessary

6     to understand the I-589 and was executed long after the fact.

7          If offered by the defendant, the affidavit, Exhibit 2,

8     is the defendant's own out-of-court statements offered for the

9     truth.  It's hearsay, not subject to any exception.  If

10    admitted, the defendant would effectively testify without an

11    opportunity for cross-examination.  And so the question is

12    whether there's a rule of completeness or some other principle

13    of fairness or due process or anything of that nature that

14    requires its admission or its admission in part or favors its

15    admission under the circumstances.

16         The affidavit is not directly exculpatory.  It does

17    not contradict the alleged false statements.  It's not a

18    recantation or anything of the sort.  The question on page 7,

19    what I'll call the persecution question again, does not refer

20    to a declaration that will be submitted in the future.  There's

21    nothing in that declaration that really explains his answer.

22    He does discuss what he says he did at the hospital.  But his

23    answer that he did not persecute anyone is not incomplete

24    without that declaration.  That is, you don't need the

25    declaration, in fairness, to give a complete answer.  And, of

Case: 19-1689    Document: 00117615537    Page: 232    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 202    Filed 11/04/19    Page 100 of 102

100

1    course, he doesn't say anything like, you know, "Well, I

2    persecuted people, but I was forced to," or anything of that

3    sort.

4         The question on page 6 does refer to a future

5    declaration, but the only narrative answer he gives are first

6    about his father's membership in MRND and his own membership in

7    the Red Cross, which I don't think -- the Red Cross piece of it

8    I don't think is controversial.  So in the declaration itself

9    that's filed later there's considerably more about his father's

12:55PM 10    activities, but there's nothing in there about his own

11    membership in the MRND.  So, again, I don't think it's

12    necessary to make the answer complete, I don't think there's

13    anything about the declaration that, in fairness, requires the

14    jury to consider it together with the I-589.  I don't think

15    it's confusing or anything of the sort.

16         I think it is extremely troublesome to admit what is

17    in effect testimony without cross-examination, which I'd be

18    prepared to do if fairness requires it, but I don't see

19    anything unfair about excluding it or confusing about excluding

12:56PM 20    it or otherwise imposing any burden on his Fifth Amendment

21    privilege or otherwise affecting his right to a fair trial.

22         So I may have more thoughts on that.  I'm obviously

23    doing this a little bit at speed, so to speak, but I have

24    sufficiently, I think, considered the affidavit and the I-589

25    to be able to make a ruling, and I think that fairness does not

**J.A. 917**

1   require its inclusion, even in part, and it would be unfair to

2   permit it.  Therefore, I'm excluding it, in simple terms.

3        All right.  Let's meet tomorrow morning at 8:30.  I

4   will consider the proffer as quickly as I can.  I'm going to be

5   tied up in meetings all afternoon, but I'll try to look at that

6   tonight and think about it.  The government obviously is not

7   going to know what to respond to it until you've seen the

8   proffer, but we've had some discussion about this expert,

9   right?

12:57PM 10        MR. LAUER:  That's correct, your Honor.  The only

11   other thing I would add is your Honor has heard from a number

12   of witnesses and we hope your Honor will weigh that in

13   connection with the testimony you've already heard.

14        THE COURT:  Okay.  Well, I'll wait to see it and then

15   take it from there.  So anything else, or shall we just

16   reconvene at 8:30 tomorrow morning?

17        MR. GARLAND:  Nothing from the government, your Honor.

18        MR. LAUER:  Nothing from us.

19        THE COURT:  Actually, Mr. Garland, putting aside

12:58PM 20   whether the expert testifies on Friday, in terms of your actual

21   percipient witnesses, what's your present thought, a week or

22   two?  Does that sound about right?  I'm sorry.  Not

23   Mr. Garland.  Mr. Lauer, sorry.  You're both named Scott.  It's

24   very confusing.  I'd like you to change your names, if you

25   would, please.

```
 1              MR. LAUER:  I would say a minimum of five days,

 2      possibly slightly over.

 3              THE COURT:  Okay.  But, again, that keeps us I think

 4      well within...

 5              MR. LAUER:  Yes.  The goal from our point of view is

 6      to have our case in by April 8 at the latest.

 7              THE COURT:  Okay.  Okay.  Thank you, and we'll see you

 8      tomorrow morning at 8:30.

 9              THE CLERK:  All rise.

10      (Court exits.)

11      (12:58 p.m.)

12                      * * * * * * *

13                      C E R T I F I C A T E

14      UNITED STATES DISTRICT COURT )

15      DISTRICT OF MASSACHUSETTS     )

16              We certify that the foregoing is a correct transcript

17      from the record of proceedings taken March 19, 2019 in the

18      above-entitled matter to the best of my skill and ability.

19

20      /s/Valerie A. O'Hara                     _____
                                         Date
21      VALERIE A. O'HARA
        OFFICIAL COURT REPORTER
22

23      /s/ Kathleen Mullen Silva

24
        KATHLEEN MULLEN SILVA, RPR, CRR
25      OFFICIAL COURT REPORTER
```

J.A. 919

1                     UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3

4     UNITED STATES OF AMERICA,          )
                                         )
5     vs.                                ) Criminal Action
                                         )
6     JEAN LEONARD TEGANYA,              ) No. 17-10292-FDS
                        Defendant        )
7                                        )
                                         )
8                                        )

9

10    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11
                            JURY TRIAL DAY 9
12

13

14
                John Joseph Moakley United States Courthouse
15                        Courtroom No. 2
                          One Courthouse Way
16                        Boston, MA 02210

17
                           March 20, 2019
18                          9:01 a.m.

19

20

21

22

23                     Valerie A. O'Hara
                      Official Court Reporter
24    John Joseph Moakley United States Courthouse
                1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                E-mail: vaohara@gmail.com

J.A. 920

Case: 19-1689   Document: 00117615537   Page: 236   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 2 of 95

9-2

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;
5
     For the Defendant:
6
             Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               I N D E X

2     WITNESS                        DIRECT   CROSS   REDIRECT  RECROSS

3     THOMAS BRIAN ANDERSEN, JR.
        By Mr. Garland                14                83
4       By Mr. Lauer                           57                88

5

6     EXHIBITS                              FOR I.D.   IN EVIDENCE

7        51                                               37
         62                                               26
8        63                                               27

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        PROCEEDINGS

2              THE CLERK:  All rise.

3              THE COURT:  All right.  Good morning.

4              MR. GARLAND:  Good morning.

5              THE COURT:  What do we have to discuss?

6              MR. GARLAND:  Nothing for the witness this morning,

7    your Honor.  We have the defense's proffer of what their expert

8    would say.  I was hoping rather than talking about that this

9    morning that maybe we could do that after the next witness

08:37AM 10   testifies or tomorrow or whichever you prefer.  Some of the

11   next witness' testimony might bring some of this into focus.

12             THE COURT:  Well, I don't need to make a ruling right

13   now.  I need to do it to give the defense sufficient ability to

14   call him on Friday, assuming the government rests on Thursday.

15   I have read the proffer, and I have thought about it, but I can

16   defer argument and decision on it, I suppose.

17             Mr. Lauer, assuming I rule either at the end of today

18   or Mr. Watkins, is that fine?  He's here, in other words,

19   you're not flying him in from Kigali, right?

08:38AM 20             MR. WATKINS:  That's correct.

21             THE COURT:  So as long as you have sufficient notice,

22   not only that, he can testify, but also if I limit, you know,

23   whatever he can say, in other words, I'm not going to drop this

24   on you Friday morning.

25             MR. WATKINS:  Yes, that would be best.

Case: 19-1689    Document: 00117641537    Page: 239    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 5 of 95

9-5

 1            THE COURT:  All right.  I think we can agree with

 2    that.  All right.  I'll defer ruling on that, and I do have

 3    some thoughts, and I want, you know, to talk to counsel about

 4    it, but I don't need to do that right now.

 5            What else do we have to talk about?

 6            MR. GARLAND:  Nothing from the government.

 7            MR. LAUER:  Nothing from us either.

 8            THE COURT:  All right.  As long as we're doing that,

 9    let me hum a few bars here of one thing that I am thinking

08:39AM 10    about.  At the top of the second page of the proffer, one of

11    the concerns I have is that paragraph has stated in terms of

12    absolutes, in other words, he's not saying many Rwandans may

13    feel X or some Rwandans may feel X, it's written in the tone of

14    all Rwandans feel X, and I think that is problematic.

15            So, for example, assuming that I do permit the

16    testimony to try to analogize, someone might say many Americans

17    feel inhibited about talking about subject X is really quite

18    different from saying all Americans feel inhibited about

19    talking about subject X, and, obviously, if I allow this

08:40AM 20    testimony, one of the concerns I have is I don't want the jury

21    deciding things based on stereotypes or being told that

22    witnesses are not credible, cannot be credible because of

23    Social Factor X.  On the other hand, I think some background

24    may be appropriate.

25            You don't need to respond now.  You know, I'm just

1    trying to give you a sense of one of the things I'm thinking

2    about, but that's something that leaped out at me, I guess,

3    from the proffer.

4         For example, the last sentence of that paragraph says,

5    "A Rwandan witness' testimony will be given with the

6    expectation it will be scrutinized for narrative adherence."

7         That sounds pretty absolute, that it happens 100

8    percent of the time, and, therefore, all witnesses have that

9    expectation, and I'm just not sure I would permit that even if

08:41AM 10    I might permit some expert testimony about narrative adherence,

11    to borrow the expert's phrase, so give some thought how you

12    would respond to that, among other things.

13         MR. WATKINS:  I'm happy to address it now.  Again, I

14    don't know how much the Court wants to -- I understand the

15    Court's concern, and as I wrote those words, I understood that

16    the Court would have questions about it.

17         THE COURT:  Well, I'll let you hum a few bars, I

18    guess, as well to begin me thinking about it.

19         MR. WATKINS:  I do understand exactly because it does

08:41AM 20    sound like absolute terms.  The difficulty here, I liken it to

21    racial bias here in the United States.  All jurors come to the

22    courtroom with some level of bias, whether it's implicit or

23    explicit.

24         I know in this court particularly we have done lots of

25    training and lots of education about how there is always,

1    always a bias, whether we like to admit it or not, it is always

2    there.

3        I think that is -- I think what the expert would say

4    that is true in Rwanda because of the authoritarian nature of

5    the government.  People can fight against it, they can say no,

6    it's not going to bother them.

7        I think the government would bring it out from the

8    expert that it's not necessarily true that everybody is going

9    to succumb to that bias, but it becomes difficult to draw the

08:42AM 10  line to say some people are going to ignore it because

11   everybody is going to say, as the witnesses have said here,

12   that has nothing to do with how I'm testifying today, but

13   jurors know and they should know, they should have the tools to

14   be able to evaluate.

15       That's what we ask jurors to do all the time is

16   assume, if you will, from their cultural upbringing that they

17   have these biases, they bring to witness credibility certain

18   understandings of what makes sense and what doesn't.

19       THE COURT:  Let me push back on that.  Suppose, for

08:43AM 20  example, sticking with your analogy, suppose someone was to

21   call an expert that says, well, Mr. Watkins' theory is everyone

22   has implicit racial bias.  I'm going to call an expert to say

23   everyone in modern day Massachusetts overcorrects for racial

24   bias, so they are afraid to criticize minorities or afraid to

25   respond for fear of criticism of racial bias.

J.A. 926

        1              You might acknowledge, well, that may be a real

        2       phenomenon, but you would be unhappy probably with testimony

        3       that said all people in Massachusetts overcorrect for implicit

        4       racial bias, even though it may well be a fact.

        5              I mean, this is the problem, in other words, I

        6       wouldn't have trouble with talking about implicit racial

        7       bias -- I'm speaking in the abstract, obviously.  I don't know

        8       if I would allow this in a real case -- implicit racial bias or

        9       overcorrection, but speaking in absolutes is a real problem,

08:44AM 10      and when you stand up and say everyone has an implicit racial

       11       bias, maybe that's true, maybe it isn't.  It's a pretty

       12       sweeping statement without any limits on it like that a lot of

       13       people overcorrect.

       14              And, you know, it might be problematic for a jury to

       15       hear that and nothing more.  I mean, that's kind of the problem

       16       is trying to hit this exactly right without dealing in

       17       absolutes.  There really are no absolutes about human behavior.

       18              MR. WATKINS:  A couple responses to that.  One is I

       19       think the scholarship is there, to go back to the implicit

08:45AM 20      bias, the scholarship is there that that does exist, and

       21       there's very rich empirical research about that to the point we

       22       know that it exists and that people do overcompensate for it.

       23              There are a couple of -- first, I would say the

       24       government has already done that to a certain extent with

       25       Dr. Clark, who testified about how Gacaca courts and he can

1    actually get to the truth notwithstanding the fact that there

2    are these cultural biases.  He talked about not in absolutes,

3    but he certainly talked about this is how you get to the truth,

4    and the courts, I'm paraphrasing what he said, they're decent

5    about getting to the truth at the end of the day.

6            There are ways to -- there are cases, I think he would

7    admit, he would have to admit, did admit where that doesn't

8    happen, they don't get to it, but at the end of his testimony,

9    there was this sense that despite everything, despite the

08:46AM 10   authoritarian nature of the government, despite all the control

11   it has over the courts that, indeed, they do get to the truth.

12           THE COURT:  I think it came in without objection, if I

13   recall.

14           MR. WATKINS:  Well, I'm not sure that that makes it, I

15   mean, always there are times where we are strategic about

16   whether we object to something or not.  The government chose to

17   go into the Gacaca courts for reasons I don't fully understand

18   yet, they chose to go into that line.  They chose to elicit

19   that information from Dr. Clark.

08:46AM 20           I think at that point, they joined the battle, they

21   initiated the battle over what it actually means, what

22   witnesses coming to testify before various bodies actually

23   bring them and whether they ultimately get to the truth.

24           I think because all of us are speaking in kind of a

25   broad category, it is subject on both sides to

1    cross-examination, as Mr. Lauer did of Dr. Clark, as the

2    government can do of this witness.

3         They can talk about all the -- they can cross-examine

4    on whether that sweeping statement is true and will result in a

5    witness actually come in here to fabricate stories or not.

6    They're free to do that.  That's what cross-examination is all

7    about.

8         THE COURT:  Mr. Garland, a quick response.

9         MR. GARLAND:  Yes, a couple of things, your Honor.  Of

08:47AM 10   course, the reason that we joined that battle is we tried to

11   fight keeping this stuff out in the first place, weren't able

12   to do that, had an expert who wasn't going to come back, and

13   that's where we joined it, but to move on from that, there are

14   some issues beyond that in here.

15        The first is going to the paragraph that you

16   identified.  There's this vague reference to a narrative

17   promulgated by the government.

18        I have looked at this several times in the prior

19   filing.  I don't know at this point what that narrative is.  I

08:48AM 20   have my own suspicions about what that narrative is from having

21   reviewed Dr. Twagiramungu's scholarship, and I don't think that

22   that narrative is focused on the Hutus.  There's a whole other

23   story that I think he wants to tell about what happened once

24   the RPF came into Kigali, to Kigali and to the rest of the

25   country.

**J.A. 929**

1          It's not clear how whether there was a second round of

2    hostilities, killings, even the genocide has any bearing on

3    whether Mr. Teganya participated in the first one or whether he

4    lied, so having some sort of a specification of what that

5    narrative is would be helpful and necessary to understand.

6          The second thing is that what the defense is setting

7    up, the big propositions that would come from the testimony

8    that they're talking about are the following:

9          First, that the government's witnesses can't be

08:49AM 10    trusted, they can't be trusted because of whatever proposition

11    it is Dr. Twagiramungu is going to say.

12          The second has to be the mirror image of that, which

13    is that to the extent the defense offers anybody from Rwanda

14    who's willing to buck that trend, you should really believe

15    them because they've got courage of their convictions, the

16    courage that our witnesses did not.

17          Then there's a third one, which is even more

18    dangerous, which is, and if you believe what Dr. Twagiramungu

19    is saying, that means there are a bunch of people out there in

08:49AM 20    Rwanda who, if they had had the courage of their convictions,

21    would have come over here and testified for Mr. Teganya but

22    didn't because they had to adhere to that narrative.

23          That sort of an assertion or an implication suggests

24    that there's a lot of evidence outside of this courtroom that

25    that jury should consider, which is absolutely off bounds, and

1    that is really, really troubling.

2         I can go through the rest of this and start picking

3    apart how all of this could be relevant, the post-genocide

4    period, immediately thereafter, and the dual genocide theory,

5    but I think that it's a little bit better to at this point even

6    focus the Court on the testimony that the Court has already

7    heard, which is that each witness has been cross-examined about

8    what sort of influence has gone on in their lives, and the

9    Court has also seen the emotion with which each of the jurors

08:50AM 10    testified about what happened, what they saw, how it affected

11    them.

12         And at that point, even if there's this kind of

13    wholesale theory that Dr. Twagiramungu wants to say from that

14    right there, where it really plays it out is at retail, and at

15    retail is the question what did those witnesses say, what was

16    their motivation, what was their accuracy, their recall, their

17    perception, the credibility of them, and that's already played

18    out here.

19         And that's -- and I think all of those things together

08:51AM 20    suggest that whatever Dr. Twagiramungu might say about these

21    things, they're either not relevant, and they have some very,

22    very disturbing implications that would invite the jury to

23    think about things that are not inside this courtroom, and it

24    goes beyond essentially completely undermining, basically

25    telling the jury don't believe what you saw in that witness

1    box, don't believe what you saw there, and that's exactly what

2    we tell the jury not to do, they should see and evaluate.

3            THE COURT:  All right, to be continued.  The only

4    reason I'm down this path at all is because we're dealing with

5    not just a foreign culture but about as foreign a culture as

6    you can have on the planet from our own.

7            You know, to go back to Mr. Watkins' example, I don't

8    think I would allow testimony about implicit racial bias or

9    overcorrection of racial bias to ordinary Americans because

08:52AM 10   they would have their own experience to judge that against, but

11   whereas here, I would venture to say the jurors know nothing

12   about Rwanda or Rwandan culture or social or political factors

13   other than what they've heard on the stand, which is why I'm

14   again considering what I may or may not permit, but let's

15   continue this discussion at some later point, and we'll get

16   lined up for today's testimony.

17           Do you expect to have a full day today, correct?

18           MR. GARLAND:  No, your Honor, but that's only because

19   we're going to have a witness, and after that witness

08:53AM 20   testifies, we anticipate resting.

21           THE COURT:  Resting today?

22           MR. GARLAND:  Yes.

23           THE COURT:  Okay.  Do you think it -- when will that

24   occur, ballpark?

25           MR. GARLAND:  It depends on the cross-examination.  I

```
          1    think the cross-examination of this witness will take a while.

          2    My anticipation is that we'll probably get to the break.  After

          3    that, it's hard for me to say.  I don't believe my direct will

          4    take us to the break.

          5         THE COURT:  Okay.  We'll get started as soon as we

          6    have all our jurors.

          7         THE CLERK:  All rise.

          8         (A recess was taken.)

          9         THE CLERK:  All rise for the jury.

09:01AM  10         (JURORS ENTERED THE COURTROOM.)

         11         THE COURT:  Good morning, everyone.  Happy spring, I

         12    think, possibly.  All right.  Are we ready to go?

         13         MR. GARLAND:  The government is, your Honor.  The

         14    government calls Thomas Brian Andersen, Jr. to the stand.

         15         THOMAS BRIAN ANDERSEN, JR., having been duly sworn by

         16    the Clerk, testified as follows:

         17                        DIRECT EXAMINATION

         18    BY MR. GARLAND:

         19    Q.   Good morning.

09:01AM  20    A.   Good morning.

         21    Q.   As you pour your water, can you tell the jury your name,

         22    please.

         23    A.   Sure.  My name is Thomas Brian Andersen, Jr.  Most people

         24    call me Brian.

         25    Q.   And where do you work?
```

J.A. 933

Case: 19-1689    Document: 00117615537    Page: 249    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 203    Filed 11/04/19    Page 15 of 55

9-15

1    A.    I'm a special agent for the Department of Homeland

2    Security.  I work for Homeland Security Investigations in the

3    Boston Field Office.

4    Q.    Did you work on the investigation of the defendant?

5    A.    I did.

6    Q.    Can you pull the microphone a little closer to you.

7    A.    Usually nobody asks me to speak louder.

8    Q.    Can you briefly tell the jury your career path to become a

9    special agent?

09:02AM 10    A.    Sure.  I enlisted in the marine corps when I was 18 years

11    old.  After I completed my marine corps service, I went to

12    St. Michael's College just outside of Burlington, Vermont.  I

13    graduated with a bachelor's degree in history and secondary

14    education certification, and then I taught high school social

15    studies for five years.

16         During that time, I was a volunteer firefighter and

17    EMT, had a lot of contact with the chief of police in the

18    community I was living.  He invited me to be a part-time police

19    officer, which I thought sounded pretty cool, so I took him up

09:02AM 20    on that offer, and while I was teaching, I was also working as

21    a police officer, and the more work I did as a police officer,

22    I thought that might be an interesting career track, and so I

23    came to a point where I changed years and left teaching, was

24    hired as a full-time police officer in Bellows Falls, Vermont,

25    was ultimately promoted to detective, and during that period of

         1    time, I had begun the process of applying for the job as a

         2    special agent, but before I was hired for that position, I

         3    actually worked for two years, I was assigned to the Vermont

         4    State Police Drug Task Force.  I worked undercover doing

         5    narcotics investigations.

         6              I was hired by the Department of Homeland Security in

         7    2006, came on board that year and was assigned to the Boston

         8    Field Office.

         9    Q.   When you joined the Department of Homeland Security, what

09:03AM 10    types of cases did you start investigating?

        11    A.   So I was initially assigned to the national security

        12    group, and that group fundamentally worked on two types of

        13    cases, threats to national security and human rights violators

        14    and war criminals.

        15    Q.   When say human rights violators, what do you mean?

        16    A.   We investigate -- human rights violators are people who we

        17    suspect have committed genocide, war crimes or torture.

        18    Q.   How long did you work on human rights violation cases?

        19    A.   For about eight years.

09:04AM 20    Q.   And are you still in a unit that investigates human rights

        21    violations?

        22    A.   No, I'm not.

        23    Q.   So what types of cases do you investigate now?

        24    A.   Well, I work in the counter proliferation investigations

        25    group, which is really just a fancy way to talk about

```
 1    international weapons trafficking and foreign countries'

 2    efforts to get U.S. weapons technology to their countries or to

 3    their terrorists groups, so that's the work that I'm doing

 4    right now.

 5    Q.    But do you still work on human rights violation

 6    investigations at times?

 7    A.    Well, I worked on this one because of my previous

 8    experience working on Rwandan investigations.

 9    Q.    So, have all of the human rights violation investigations

10    that you've worked on involved Rwanda?

11    A.    No, they have not.

12    Q.    What other countries have those involved?

13    A.    Liberia, El Salvador, Peru, Cape Verde, Bosnia, obviously,

14    Rwanda.

15    Q.    Let me ask you about Rwanda.  For the cases you've worked

16    on involving Rwandan suspects or events in Rwanda, how many

17    were for in prosecution in New England and how many for

18    prosecution outside of New England?

19    A.    Teganya's case is the third I've worked on in New England,

20    and then I've worked on three others that were prosecuted in

21    districts outside of New England.

22    Q.    And have you investigated any other Rwandan suspects of

23    immigration fraud that don't involve human rights violations?

24    A.    Yes.

25    Q.    And, curiously, was that person a Hutu or a Tutsi?
```

09:04AM  10

09:05AM  20

**J.A. 936**

Case: 19-1689    Document: 00117615537    Page: 252    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 18 of 55

9-18

```
 1              MR. LAUER:  Objection.
 2              THE COURT:  Sustained.
 3    Q.    Before working on the Teganya investigation, had you
 4    visited Rwanda?
 5    A.    Yes.
 6    Q.    Approximately how many times?
 7    A.    I think eight.
 8    Q.    And over the course of all of your Rwandan investigations,
 9    how many witnesses or potential witnesses have you interviewed
10    from Rwanda?
11    A.    In all of my cases?
12    Q.    Yes.
13    A.    Hundreds, hundreds, I would say.
14    Q.    And in addition to doing investigations in the countries
15    you've already listed, have you gathered information from other
16    foreign countries as well for investigations?
17    A.    Sure, the bulk of the work that we do has an international
18    nexus, so that's something that we undertake in almost every
19    investigation.
20    Q.    What other foreign countries?
21    A.    Recently, I've done investigative work in the U.K., in
22    France, the Netherlands, we're working a number of cases in
23    China, as I said, the work that we do is generally
24    international.
25    Q.    Can you explain to the jury how the process of getting
```

J.A. 937

 1    information when you're doing investigations in other countries

 2    compares to getting information when you're investigating in

 3    Rwanda, just briefly?

 4    A.    Yeah, I don't think there's a lot of difference in that.

 5    In the United States, I'm a special agent, I have certain

 6    authorities, but when we travel outside of the United States,

 7    whatever country it is we're going to, our authorities are

 8    substantially limited, and so we have to work with our assets

 9    overseas, U.S. assets that might be stationed in a U.S.

09:07AM 10   embassy.  We also have to work with foreign law enforcement.

 11          The easiest would be the London Metropolitan Police,

 12   when we go to London, we work with them; when we go to France,

 13   we work with French Customs Service.  There's not a lot of

 14   difference between working in any other foreign country and

 15   working in Rwanda.

 16   Q.    How did you get involved in this investigation?

 17   A.    So I was contacted shortly after Mr. Teganya was arrested

 18   by the Border Patrol after he unlawfully entered the U.S. and

 19   was picked up.  I think you heard the Border Patrol agent

09:08AM 20   testify about that.  I got a phone call after a couple days,

 21   someone in our headquarters and asked me if I was aware of that

 22   arrest.

 23          MR. LAUER:  Objection.

 24          THE COURT:  Sustained.

 25          THE WITNESS:  Sorry.

```
 1                 THE COURT:  Put a question to the witness.
 2                 THE WITNESS:  Sorry.
 3      Q.    What did you do next upon being alerted to the arrest?
 4      A.    I talked with some people from our headquarters.  They had
 5      some documents that had originally been sent to Canada to our
 6      headquarters, and then some of those documents were shared with
 7      me, and I basically said let's see what he says.
 8      Q.    Do you know why you were contacted specifically?
 9      A.    I think I was contacted, first of all, because he was
10      arrested within the area of responsibility that our field
11      office covers.  Even though I work in Boston, the field office
12      here covers the six New England states, and it was within our
13      AOR, and also I was contacted, I believe, because of my
14      previous experience working on Rwandan investigations.
15      Q.    At the very beginning, when you're contacted or right
16      around that time, did you receive any information from Rwanda
17      about the defendant?
18      A.    We never received any information about the defendant from
19      Rwanda, from the Rwandan government.
20      Q.    Was there any other information that you consulted that
21      would have come from the Rwandan government?
22      A.    Well, so by extension, when Mr. Teganya was arrested, it
23      was learned that he was the subject of --
24                 MR. LAUER:  Objection.
25                 THE COURT:  Sustained.
```

**J.A. 939**

9-21

```
 1    Q.   So you're a part of the team that investigated
 2    Mr. Teganya, correct?
 3    A.   Yes, that's right.
 4    Q.   I asked you before you came to court today to bring any
 5    evidence that the investigative team received from the
 6    Rwandan's Government investigative file if they had one at all.
 7    Did you bring anything with you today?
 8    A.   I don't have anything that falls into that category.
 9    Q.   So sitting here right now, what do you know about Rwandan
10    officials' investigation into the defendant, if there was any
11    at all?
12         MR. LAUER:  Objection.
13         THE COURT:  Sustained.
14    Q.   So how did the U.S. investigation gather evidence into the
15    defendant?  What did you start with?
16    A.   We started with the basic information in the red notice.
17         MR. LAUER:  Objection.  Can I be heard at sidebar,
18    your Honor?
19         THE COURT:  Yes.
20         (THE FOLLOWING OCCURRED AT SIDEBAR:)
21         THE COURT:  Yes.
22         MR. LAUER:  So there's been not a line of questioning
23    that seeks to introduce information from third-party sources
24    that is essential to hearsay.  He can talk about his
25    investigation and what he did.
```

Case: 19-1689    Document: 00117615537    Page: 256    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 203    Filed 11/04/19    Page 22 of 55

9-22

|   |   |
|---|---|
| 1 | THE COURT:  Right. |
| 2 | MR. LAUER:  But these questions are asking him what he |
| 3 | learned about other sources. |
| 4 | THE COURT:  What are we doing here? |
| 5 | MR. GARLAND:  Your Honor, the question is going to |
| 6 | show they're getting nothing from the Rwandan government. |
| 7 | There was a red notice, there's no list of evidence, there's no |
| 8 | list of witnesses.  They got nothing from the Rwandan |
| 9 | government. |
| 09:11AM 10 | THE COURT:  I don't even know what a red notice is. |
| 11 | MR. GARLAND:  It's when Rwandan warns somebody or any |
| 12 | foreign country warns somebody, it goes up on Interpol.  If |
| 13 | Jean Leonard Teganya or Joe Smith is there, he's wanted in this |
| 14 | country, and the whole point of this is not to show that he had |
| 15 | any information that they got but to show there is nothing |
| 16 | gotten from them to show the independence of the investigation |
| 17 | from Rwanda.  That's been the major theme what they want their |
| 18 | expert to testify about and what they've been talking about |
| 19 | with the witnesses. |
| 09:12AM 20 | THE COURT:  Well, he can testify.  I guess let's take |
| 21 | this a piece at a time.  He can say he was not contacted by the |
| 22 | Rwandan government, he's not aware of any contact from the |
| 23 | Rwandan government, no evidence has been supplied by the |
| 24 | Rwandan government, but he can't talk about what's in documents |
| 25 | that are not in evidence. |

J.A. 941

```
 1              I have to say I'm very uncomfortable when the

 2     prosecution asks questions like why did you begin this

 3     investigation because, you know, the standard cop thing is to

 4     say, oh, I heard, you know, I got a tip that he was a drug

 5     dealer, you know, so I want to be very careful here why you're

 6     doing certain investigations.  Inevitably, that comes from

 7     hearsay from tips from uncorroborated information.  I don't

 8     want any of that in front of the jury, so we need to pick our

 9     spots carefully.

09:13AM 10              MR. LAUER:  Your Honor, if I could.

11              THE COURT:  Yes.

12              MR. LAUER:  He's already been asked if he asked any

13     information from Rwanda, and he very definitely said no.

14              THE COURT:  Correct.

15              MR. LAUER:  So any further inquiry on that point is --

16              THE COURT:  Well, maybe he could flesh it out a little

17     bit, but, you know, what I don't want is him testifying about

18     documents that are not in evidence.

19              MR. GARLAND:  There are not documents that are not in

09:13AM 20     evidence.

21              THE COURT:  He was just talking about something from a

22     red notice, which was not defined.

23              MR. GARLAND:  The red notice was -- I've done that,

24     there are no documents that are not in evidence.

25              THE COURT:  All right.
```

Case: 19-1689    Document: 00117615537    Page: 256    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 24 of 55

9-24

1            MR. GARLAND:  Because there was no coordination with

2       the Rwandan government.

3            THE COURT:  All right.  You can ask him what he

4       personally knows or what he's personally aware of without

5       eliciting hearsay, but let's ask him another question.

6            MR. GARLAND:  Okay.

7            (SIDEBAR CONFERENCE WAS CONCLUDED)

8            THE COURT:  All right.  Let's put another question to

9       the witness.

09:13AM 10   Q.   So did the investigation involve travel to Rwanda?

11      A.   It did.

12      Q.   Did the investigative team call somebody in Rwanda to get

13      permission to travel to Rwanda?

14      A.   No, we did not.

15      Q.   So you essentially arrived in Rwanda, and what happens

16      next?

17      A.   Well, the first thing we did was met with U.S. embassy

18      officials.  I think on that occasion we met with the U.S.

19      embassador to Rwanda, we met with the deputy chief admission,

09:14AM 20   and we met with some other embassy staffers, explained the

21      nature of our investigation, and with their agreement, we

22      proceeded into the elements of our investigation.

23      Q.   Did the U.S. investigation have to coordinate its travel

24      inside Rwanda with officials of the Rwandan government?

25      A.   No, we did not.

J.A. 943

1    Q.   Once you got to Rwanda and had these things you talked

2    about, did you meet with the Rwandan officials?

3    A.   Yes, we met with one Rwandan official.

4    Q.   Who was that?

5    A.   Jean Bosco Siboyintore.  Mr. Siboyintore is --

6    Q.   Let me put another question to you.  At that point, did

7    you seek any permission to travel within Rwanda to do

8    investigative deals or not deals but meetings or interviews or

9    looking at locations?

09:15AM 10   A.   No.

11   Q.   What was told to the Rwandan officials about the purpose

12   of your being there?

13            MR. LAUER:  Objection.

14            THE COURT:  I'll allow it in general terms.

15   A.   The purpose of the meeting with Mr. Siboyintore was to let

16   him know we were conducting the investigation that we're

17   discussing and how long we were going to be in Rwanda and where

18   we expected to be.

19   Q.   How specific were you about where you were going to be?

09:16AM 20   A.   I told him that we were going to be in Kigali and Butare.

21   Q.   And as a result of that, did the Rwandans generate any

22   sort of approving documents?

23   A.   He provided us with a one-page letter that we could use if

24   our presence in a particular location was questioned by

25   someone.

Case: 19-1689   Document: 00117615537   Page: 260   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 26 of 55

9-26

1   Q.   I'd like to show Exhibit 62 to the witness and the

2   parties.  Do you recognize this?

3   A.   I do.

4   Q.   What was it?

5   A.   That's the letter that Mr. Siboyintore provided to us in

6   2018.

7          MR. GARLAND:  I'll move that into evidence in a

8   minute.  If the witness and the parties could be shown

9   Exhibit 63 first.

09:17AM 10          THE COURT:  Hold on.  I'll admit 62.

11          (Exhibit No. 62 received into evidence.)

12          MR. GARLAND:  Thank you.

13   Q.   I'm showing you a copy of Exhibit 63.  Do you recognize

14   this?

15   A.   Yes, I do.

16   Q.   What is it?

17   A.   This is a translation of the document that was previously

18   shown in 62.

19   Q.   And if you could show the second page of the exhibit.

09:17AM 20          MR. GARLAND:  Your Honor, the government moves

21   Exhibit 63 into evidence.

22          THE COURT:  All right.  It's admitted, which I

23   understand is a translation of 62?

24          MR. GARLAND:  Yes, your Honor.

25          THE COURT:  Okay.

J.A. 945

 1              (Exhibit No. 63 received into evidence.)

 2    Q.   We can go back to the first page of Exhibit 63.  Can you

 3    read this to the jury?

 4    A.    Sure.  "Republic of Rwanda, National Public Prosecution

 5    Authority, P.O. Box 1328, Kigali, Rwanda, website,

 6    www.nppa.gov.rw, info@nppa.gov.rw, Kigali, November 30th, 2018,

 7    To Whom It May Concern:"

 8              "Reference assistance to justice employees."

 9              "Dear sir or Madam:  The National Public Prosecution

09:18AM 10    Authority is requesting your assistance to the following

11    employees of the Department of Justice in the United States of

12    America:"

13              "Number 1, Mr. Scott Garland, prosecutor;

14              2, Mr. George Varghese, prosecutor;

15              Number 3, Mr. Kevin Cronin, investigator;

16              Number 4, Mr. Brian Andersen, investigator."

17              "The employees above- mentioned are in Rwanda for

18    investigations into individuals who are suspected to have

19    committed genocide crimes and currently reside in the

09:18AM 20    United States of America."

21              "These investigations will be carried out in the City

22    of Kigali and Huye."

23              "This permission is valid until June 20th of 2018.

24    Thank you.  Jean Bosco Mutangana, National Public Prosecutor."

25    Q.   Why would you need this letter?

**J.A. 946**

         1   A.   Well, we needed it because we didn't have Rwandan

         2   officials with us, and so when we were traveling to, as it says

         3   here, Kigali and Huye, Huye is the new term for Butare, if we

         4   were asked what we were doing there, what permission we had to

         5   be there, we would use this letter to explain what we were

         6   there for.

         7          THE COURT:  Can we assume the last date is a mistake,

         8   in other words, it's dated November 30th, and you have

         9   permission to June of the same year?

09:19AM 10          THE WITNESS:  Yeah, the November 30th I think is not

        11   correct, your Honor, but the June 20th is correct.  That was

        12   reflective of when we were there.

        13   Q.   Does the letter mention Mr. Teganya's name?

        14   A.   It does not.

        15   Q.   Why not?

        16          MR. LAUER:  Objection.

        17          THE COURT:  Sustained.

        18   Q.   Did the team use this letter at all in the 2018 visit?

        19   A.   We used it once.

09:20AM 20   Q.   What was that circumstance?

        21   A.   We had travelled to the University Hospital and the

        22   University Hospital has a gate, a front door, so to speak, and

        23   one of the security officers there wanted more information

        24   about why we were there before he would let us onto the

        25   grounds, and so on that occasion, I took him aside and showed

 1    him this letter.

 2    Q.   Did the team show this letter to potential witnesses you

 3    interviewed?

 4    A.   We did not.

 5    Q.   And did you tell in meeting the Rwandan official that you

 6    were investigating Mr. Teganya?

 7    A.   I don't remember like telling them specifically, I think

 8    it was pretty clear why we were there.  Mr. Teganya's arrest in

 9    the United States generated some degree of notoriety, but I

09:21AM 10    don't remember walking into Mr. Saventuri's office and telling

11    him, hey, we're here for Mr. Teganya, I don't think that's how

12    it went.

13    Q.   Were there relevant witness interviews in 2016 as well in

14    Rwanda?

15    A.   There were.

16    Q.   Did you have a similar letter back then?

17    A.   Yeah, we didn't have the letter back then.

18    Q.   Why not?

19    A.   We met with Mr. Siboyintore, and my memory is that when we

09:21AM 20    met with Mr. Siboyintore, Mr. Mutangana, who is the one who has

21    the authority to sign that letter, was not in the country, and

22    so Mr. Sivintori provided us with his phone number if we had

23    any problems, I wrote it down, and we never had any problems.

24    Q.   Who selected potential witnesses to interview in Rwanda?

25    A.   The U.S. investigative team.

1    Q.    Did the government of Rwanda play any part in selecting

2    witnesses?

3    A.    No, they didn't.

4    Q.    Did they insist on any or suggest any?

5    A.    They did not.

6    Q.    Who contacted potential witnesses to set up initial

7    interviews?

8    A.    The U.S. investigative team or our representatives.

9    Q.    Did the government of Rwanda play any part in that?

09:22AM 10   A.    They did not.

11   Q.    Who did -- so who were the people then who made those

12   phone calls?

13   A.    Typically our interpreters.

14   Q.    And are those the interpreters that have been in court?

15   A.    They are not.  Those interpreters were hired for the

16   purpose of this trial.

17   Q.    So the interpreters who were making the phone calls back

18   in Rwanda, what were their names?

19   A.    Nara, Lillian, Sheila and Dora.

09:22AM 20   Q.    Do they live in Rwanda?

21   A.    Three of the four do.  One of them is a student actually

22   studying in the United States at this time.

23   Q.    Who do they work for?

24   A.    Well, when we're there, they work for us.  They all have

25   different occupations.

J.A. 949

```
 1    Q.   What are those occupations?
 2    A.   One of them owns an electronics store, one of them works
 3    in a business office, the other one is a homemaker, and, as I
 4    said, the third or the fourth, rather, is in the United States
 5    as a student, a graduate student.
 6    Q.   Do they do any work for the government of Rwanda?
 7    A.   None of them do any work for the government of Rwanda.
 8    Q.   Are they allowed to talk about their work for the
 9    investigative team with the government of Rwanda?
10    A.   They are not.  We have them sign nondisclosure agreements
11    with the department before they undertake the work on each
12    trip.
13    Q.   What instructions did you give to the interpreters, if
14    any, about how to talk to potential witnesses over the phone
15    before they met you?
16    A.   Yeah, we talked to them about being as general and vague
17    as possible.  We basically asked them to identify themselves by
18    what we would refer to as their first names, so Nara, Sheila,
19    Dora, that they are working with Americans from the U.S.
20    embassy and that those Americans would like to talk to the
21    person they're on the phone with about their experiences in
22    Rwanda, in this case, before the genocide, and then, obviously,
23    during the genocide itself.
24    Q.   Were they instructed to mention Mr. Teganya's name?
25    A.   They were instructed not to mention Mr. Teganya's name.
```

09:23AM (line 10)
09:24AM (line 20)

```
 1    Q.   Why?
 2    A.   Well, I think for obvious reasons.  We don't want
 3    witnesses to have a preconceived notion about what it is that
 4    we're interested in or what it is that we're investigating or
 5    who it is that we may be interested in, so keeping
 6    Mr. Teganya's name out of that ensures that witnesses are
 7    coming to us without a preconceived notion about what it is
 8    that's in our interest.
 9    Q.   Who drove the investigators and translators as well around
10    to meet with witnesses?
11    A.   A driver.
12    Q.   Was the driver an employee of the government of Rwanda?
13    A.   He was not an employee of the government of Rwanda.
14    Q.   Who employed the driver?
15    A.   So the drivers that we used in 2016 and 2018 work for a
16    transportation company that's contracted by the U.S. embassy.
17    On previous cases, the embassy motor pool was substantial.  By
18    the time 2016 came around, they were doing a lot of
19    transportation of U.S. employees, U.S. government employees
20    through this contract system, and so in 2016 and 2018, we used
21    approved contractors, essentially we subcontracted them for the
22    purposes of these trips.
23    Q.   Did the drivers sit on interviews?
24    A.   The driver had no role in the investigation other than to
25    drive us from one place to another.
```

1    Q.    When the investigative team met with potential witnesses,

2    did it make any particular choices about meeting locations?

3    A.    Yes.  We did make choices about meeting locations,

4    sometimes to the convenience of the witness, sometimes to the

5    convenience of the investigative team, always with a mind

6    towards visibility, who was going to see that we were meeting

7    with these folks and what of that would they would see, so, for

8    example, we met at one location in 2016, but in 2018, we met at

9    different locations.

09:26AM 10         We didn't repeat the same ones that we had used in

11   2016, and when we met in certain locations in Butare, we tried

12   to make sure that we could bring witnesses in or potential

13   witnesses in through a back door or a through a side door in a

14   way that was less intrusive to foot traffic or whatever that

15   might be at the front door.

16   Q.    When you met with witnesses, was it in public or in

17   private?

18   A.    Always in private.

19   Q.    What about when meeting witnesses or going with them to a

09:27AM 20   public place, like the hospital?

21   A.    Yeah, so we tried to keep those things to a minimum, but

22   there were occasions where during the course of an interview, a

23   witness might tell us about some event that occurred at a

24   particular geographical location in Butare, and so in order to

25   verify the information the witness provided, we would take them

1    out to that spot.

2         We would try to get as close to that spot as possible.

3    Usually it involves some degree of walking a little bit

4    further, and then the witness would explain this is what

5    happened here, and then we would take a photo of that and then

6    get back in the vehicle and get out.

7         We also tried to minimize the number of people that

8    were in the vehicle at the time, right, so the entire

9    investigative team did not get into the car and drive with the

09:28AM 10   witness, we tried to keep that as a small group.

11   Q.   And were there any choices made as to where the

12   investigative team from the U.S. stayed in Rwanda?

13   A.   Yeah, again, to keep our visibility and our footprint kind

14   of small, we chose not to stay in Butare, even though it's the

15   second largest city in Rwanda.  It's still in very respects a

16   town, and I think our presence there every day for X number of

17   days or weeks might have garnered more attention than if we

18   simply drove into town and drove out every day, so we stayed in

19   Kigali, and then it was about a three-hour ride to Butare in

09:28AM 20   the morning and than back again in the evening.

21   Q.   Did you look for any surveillance of you during the

22   investigation?

23   A.   We did.

24   Q.   Did you detect any surveillance?

25   A.   We did not.

**J.A. 953**

Case: 19-1689    Document: 00117615537    Page: 269    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 35 of 55

9-35

1    Q.    So before you testified about the instructions to the

2    translators about what they were instructed to say to potential

3    witnesses.  If you could, I'm going to ask you a couple of

4    questions about that.  If you could say what it was they were

5    instructed to say?

6              MR. LAUER:  Objection.

7              THE COURT:  Overruled.

8    A.    Our interpreters were instructed to ask for an appointment

9    with a particular individual.  During that conversation, that

09:29AM 10    initial conversation, they were asked to introduce themselves

11    by their what we would refer to as their first name, that they

12    were working on behalf of some Americans from the U.S. embassy,

13    and that those Americans had some questions about things that

14    occurred in Kigali, Butare, in this case, Butare, at the

15    national university before the genocide or in Butare during the

16    genocide period itself.

17    Q.    I'm sorry.

18    A.    No, I'm all set.

19    Q.    And why were they instructed to mention the U.S. embassy?

09:30AM 20    A.    Well, that's who we were.  That wasn't going to be a

21    secret once they sat down with us, and I thought at least on

22    its face, it was important that they knew who they were meeting

23    with, they could make an informed decision about whether or not

24    they wanted to come to this conversation.

25    Q.    Were you concerned at all about whether potential

**J.A. 954**

```
 1    witnesses would respond to that pretty general invitation?
 2    A.    I was not concerned about that.
 3    Q.    Why so?
 4    A.    My experience in Rwanda is that most people -- it's a
 5    talkative culture.  Everybody in Rwanda has a cell phone, they
 6    all answer their cell phones, and people will generally come to
 7    a meeting.  They might not stay.  They may decline to talk
 8    about it, but as a general rule, my experience, based on the
 9    people we spoke with, was that, at a minimum, they would show
10    up, and then we would further the conversation after they
11    arrived.
12    Q.    And when you would meet with potential witnesses there,
13    how would the interview start?  What would you say to them?
14    A.    At that point, I would introduce the interpreter almost
15    always as the person who made the phone call in the first
16    place.  Usually we had two interpreters in a meeting with a
17    witness, and so I would introduce those folks, I would
18    introduce myself and whatever colleague was there with me at
19    the time.
20         We'd say, you know, we're from the U.S. embassy and
21    we'd like to talk to you about what happened in Butare before
22    the genocide period and then what happened in Butare during the
23    genocide, would you be willing to talk to us about those
24    things?
25    Q.    Would you start the interview differently with people that
```

1    you might have known from earlier investigations?

2    A.    The difference in this case, so the interviews in 2016 and

3    2018 is that there was a component about what had occurred at

4    the university before the genocide occurred, and that was not a

5    prominent part of previous investigations, so I guess in that

6    regard, it would be a little bit different for those folks.

7    Q.    Would you tell the witnesses that you were investigating

8    Mr. Teganya?

9    A.    We never told the witnesses that we were investigating

09:32AM 10    Teganya.

11            MR. GARLAND:  I ask that Exhibit 51 be shown to the

12    witness and to the parties.

13    Q.    Have you seen this before?

14    A.    I have.

15    Q.    And speaking very, very generally because the jury hasn't

16    seen it, what is it?

17    A.    This is a list of students who were attending the medical

18    school at the University of Rwanda in 1991 and 1992 that U.S.

19    investigators received from our Canadian counterparts.

09:33AM 20            MR. GARLAND:  Your Honor, the government moves to

21    admit Exhibit 51.

22            THE COURT:  It's admitted.

23            (Exhibit No. 51 received into evidence.)

24    Q.    Was this document used during the investigation?

25    A.    We used it in the unconscious.  We did not use this

         1    specific document in Rwanda.  We took the names that are on

         2    this list and basically typed them into a generic Word document

         3    that had no description or indication of time, and it was that

         4    list that we used in Rwanda.

         5    Q.    And was the document that you just referred to the generic

         6    Word document, was that shown to any witnesses?

         7    A.    It was shown to quite a few witnesses, yes.

         8    Q.    And for what purpose?

         9    A.    In order to determine whether or not the person we were

09:34AM 10    meeting with on that occasion was familiar with any of the

        11    people in this list, which included Teganya and a number of

        12    others.

        13    Q.    I'm sorry.

        14    A.    Sorry, we would ask them to review the list and let us

        15    know if they were familiar with any of the names of the people

        16    on that list, and as was often the case, witnesses indicated

        17    that they knew quite a few of the folks that were listed here.

        18    Q.    And if they identified a name or names, what would happen

        19    next?  What would they be asked?

09:34AM 20    A.    Generally speaking, witnesses who had any knowledge about

        21    these students knew several of them, quite a few of them, and

        22    if they included Teganya in the list of students who they were

        23    familiar with, they said a word, I remember that guy or, oh, he

        24    lived down the hall from me, or whatever the case may be.

        25          After they had gone through the entire list, we'll

Case: 19-1689    Document: 00117615537    Page: 273    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 203    Filed 11/04/19    Page 39 of 55

9-39

 1    just say, for example, they had identified 10 people, we would

 2    go back to them with questions about four or five of those

 3    people, but, of course, we included Teganya in the group of

 4    four or five if he had been identified by the witness.

 5    Q.   During the interviews, what language or languages were

 6    spoken?

 7    A.   Well, I spoke English.  Even though I've been to Rwandan

 8    several times, I can't speak Kinyarwandan.  Interpreters spoke

 9    Kinyarwandan and English, so my question in English to the

09:35AM 10    interpreter, translated into Kinyarwandan to the witness, and

11    then back in Kinyarwandan, and then back to me again in

12    English.

13    Q.   Were there witnesses who also spoke English as well?

14    A.   There were witnesses who had some facility with English,

15    but it was not sufficient enough to have the kind of

16    conversation that we needed to have where we could do it in

17    English, so we insisted that it be conducted in the way that I

18    just described.

19    Q.   The translators who were used for the interviews in

09:36AM 20    Rwanda, were they certified for court translations?

21    A.   They are not.

22    Q.   Were there any issues with communication?

23    A.   I would say generally no, but there are always issues in

24    translation, and when we knew about those, when we recognized

25    them in the moment, then we tried to correct them.

1  Q.   Generally how long did the interviews go?

2  A.   That was largely dependent upon how much time the witness

3  had, what our schedule was like at that particular moment, and

4  then it was largely dictated on what type of information a

5  witness had, so if it was somebody, for example, who was in

6  Butare studying at the university but was not in Butare during

7  the genocide period, well, essentially the interview, the

8  things that were of interest to us were cut in half, and so we

9  would explore those topics, work from the top, and drill down,

09:37AM 10  but a person who was at the university and also had a genocide

11  experience, a survival story or a participant story, then those

12  interviews tended to be much longer.

13  Q.   And do you have an estimate as to the number of minutes or

14  hours?

15  A.   I would say that it was rare that we met with someone for

16  less than a half an hour or 45 minutes, and there may have been

17  interviews that lasted several hours, two, three hours at a

18  first sitting.

19  Q.   Were you trying to get each witness' whole genocide story?

09:37AM 20  A.   It's not possible.  You couldn't do that in the amount of

21  time that we had.

22  Q.   So what were you trying to do at those initial interviews?

23  A.   Fundamentally, I think the goal of our interviews was to

24  identify people who were in Butare at the school or during the

25  genocide at various locations in town, including the hospital,

J.A. 959

```
 1   and then get a general understanding about whether or not they
 2   had relevant information to this investigation, and, if so,
 3   again, in the time that we had with them, get an understanding
 4   of what their experience was, what they saw, and what they
 5   heard, and we were really doing an evaluation of whether or not
 6   they had information that was relevant to our investigation.
 7   Q.   And once you found or had selected people who you thought
 8   had relevant information, would you meet with them again?
 9   A.   We met with witnesses, I mean, particularly the ones who
10   came here to testify, we've met with those witnesses five or
11   six times by now.
12   Q.   And would you ask the witnesses the same questions each
13   time?
14   A.   No.  In 2016, what we knew about Mr. Teganya, about the
15   events that occurred specifically at the university or
16   specifically on the grounds of the University Hospital, what I
17   know about that today is dramatically different than what I
18   knew about that in 2016, and so the questions that we ask
19   people are informed by our ongoing conversations with them and
20   our increased understanding of what took place.
21            MR. LAUER:  Objection.
22            THE COURT:  I think we're pretty far beyond the
23   question.  Put another question to him.
24   Q.   Would you learn additional information from witnesses over
25   time?
```

09:39AM  (lines 10, 20)

**J.A. 960**

            1    A.   Yes, that is true in almost all of the cases that I've

            2    investigated.

            3    Q.   In your experience, have there been any special challenges

            4    in investigating in Rwanda?

            5    A.   I think one of the challenges that I've experienced based

            6    on the people that I've talked to I think largely centers

            7    around our use of dates and times, April 14th, April 15th,

            8    April 16th and, you know, 9:30 a.m.

            9         My experience is that Rwandans, based on the

09:40AM  10    interviews that I've done, Rwandans are not particularly good

           11    with --

           12         MR. LAUER:  Objection.

           13         THE COURT:  I'm going to sustain the answer in that

           14    form.  I think he can testify to his experience with the

           15    witnesses he spoke to but not Rwandans in general.

           16    A.   Sure, sorry for that.

           17    Q.   So if you could explain the experience you've had with the

           18    witnesses that you have talked to?

           19    A.   Sure.  It comes out loud and clear, the witnesses who I've

09:41AM  20    spoken with have difficulty recalling specific dates and

           21    specific times during the day in a way that we would use those.

           22    They're not very good with distances either.

           23    Q.   And how does that play out?

           24    A.   It happens often in the course of the interviews that I've

           25    conducted that we're asking people who are describing one event

**J.A. 961**

1    and then moving somewhere else, you know, how far away was

2    that, but usually the answer we get is how long it took for

3    them to walk there.  For example, they don't have cars.

4    Especially in 1994, you moved around by walking.

5    Q.    Given what you testified about concerning dates and times,

6    how would you as an investigator try to overcome that and

7    figure out what happened when?

8    A.    One of the strategies that we used in the course of our

9    interviews was to focus on known events or large events,

09:42AM 10    well-known events.  By way of example, an easy one that we used

11    often --

12              MR. LAUER:  Objection.

13    A.    -- was --

14              THE COURT:  Hold on, hold on.

15              THE WITNESS:  Sorry, your Honor.

16              THE COURT:  I'll allow it, again, focusing on his

17    investigation and the witnesses he spoke to.  Go ahead.

18    Q.    If you can, again, the same question focusing on --

19    A.    Sure.  In our investigation and the witnesses we talked

09:42AM 20    with, we used particular events all the time because they were

21    well-known, so we would talk to witnesses about what they

22    remember about the president's plane being shot down, what they

23    remember -- in Butare, we would often ask what, you know, where

24    were you or what was going on when you heard about

25    President Sindikubwabo's speech, what do you remember about

Case: 19-1689    Document: 00117615537    Page: 278    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 44 of 55

9-44

 1    roadblocks going up, so we would use those events and work

 2    forward or backward based on things that were widely known and

 3    widely experienced by our witnesses.

 4    Q.   And the witnesses you've talked to from Rwanda, do you

 5    ever talk with them about their ability to talk with defense

 6    counsel?

 7    A.   We talked about that several times.

 8    Q.   What would be the first instance that you would tell a

 9    witness, the witnesses that you talked to about that?

09:43AM 10    A.   The first instance that I recall is at the end of the 2018

11    investigative trip, the investigative team had a pretty good

12    idea about who we thought would potentially come to the

13    United States and testify, and so we spoke to all of those

14    people and said you might be contacted by attorneys or

15    investigators representing Mr. Teganya, in our system, you are

16    allowed to talk to them, the choice to do so is yours, the only

17    thing we would ask if you are contacted, to let us know that

18    you have been contacted, and a similar admonition occurred when

19    they came to the United States.

09:44AM 20    Q.   To your knowledge, did any of the witnesses express

21    interest in talking with defense counsel?

22    A.   No, none of them expressed interest in talking to defense

23    counsel.

24    Q.   And do you ever talk with witnesses about discussing their

25    testimony with each other?

**J.A. 963**

1   A.   Yes, we talked to them about that on a number of

2   occasions.

3   Q.   And what would you instruct them?

4   A.   The instruction was that your testimony is yours, that

5   your genocide story is your own, and when they arrived at Logan

6   Airport and were going through the admission process, I

7   gathered them as a group and told them that very thing, that

8   they were not to discuss their story, their information, their

9   experiences with other witnesses gathered.

09:45AM 10        We gave them the same admonition several days later

11   when we met as a group in the hotel they're staying in, the

12   same exact information, prosecutors were present and said you

13   keep your information to yourself, you are here to testify

14   about what you saw and what you heard and not what anybody else

15   did.

16   Q.   Is there any way that you would learn about whether anyone

17   was not following those rules?

18   A.   Yeah, I think so.  We have four interpreters.  The same

19   four interpreters who we used in Rwanda traveled with the

09:46AM 20   witness to the United States.  They have been working with us

21   for quite some time and know what our expectations are

22   particularly on that point, and if witnesses were talking about

23   their testimony in common spaces or whatever, I think our --

24        MR. LAUER:  Objection, your Honor.  We're into a

25   hypothetical here.

## J.A. 964

```
 1              THE COURT:  Yes.  Let's stop it there.
 2              MR. GARLAND:  Okay.
 3    Q.   Was this investigation funded at all by the Rwandan
 4    government?
 5    A.   I'm sure my headquarters wishes it was.  No, the Rwandan
 6    government did not have any role in the finance of this
 7    investigation.
 8    Q.   In a federal criminal trial, in your experience, what
 9    reimbursement is given to witnesses?
10    A.   In a federal criminal trial, witnesses who travel from
11    outside of the area where that trial is taking place are
12    provided a reimbursement of $40 a day, I think, and are given
13    money for food, a per diem, and if they require it, are
14    provided with lodging and transportation costs.
15    Q.   Is that just for genocide-related cases or cases that
16    involve investigation in genocide?
17    A.   I think that's true for all cases where people are
18    traveling, have to travel to Boston to testify in a proceeding
19    in this court.
20    Q.   Does that go just to prosecution witnesses?
21    A.   It goes to all witnesses who need to travel to the court.
22    Q.   In this investigation, were potential witnesses told
23    during these initial meetings about the possibility of this
24    reimbursement?
25    A.   No, absolutely not.
```

1    Q.    When were they told about reimbursement?

2    A.    In this case?

3    Q.    In this case.

4    A.    I think they weren't told until we, as an investigative

5    team, had decided which witnesses we wanted to travel to the

6    United States, and then we began to discuss with them the

7    logistics of how that transportation would occur.

8    Q.    So was that before or after those people had given

9    information about the defendant?

09:48AM 10    A.    It was long after.

11    Q.    So I think you had said before that you had worked on

12    other investigations that involved allegations of Hutus being

13    involved in the genocide of Tutsis; is that right?

14    A.    Yes.

15    Q.    In any of those investigations, did you learn about either

16    government or defense witnesses complaining of pressure put on

17    them by the government of Rwanda or anybody else?

18             MR. LAUER:  Objection.

19             THE COURT:  Let me see counsel at sidebar.

09:48AM 20             (THE FOLLOWING OCCURRED AT SIDEBAR:)

21             THE COURT:  So if I do allow testimony that the

22    government puts pressure on witnesses, why should I not allow

23    testimony that they are not aware of any government pressure on

24    witnesses?  In other words, how does the government respond to

25    your expert if not, you know, testimony like that?

Case: 19-1689   Document: 00117615537   Page: 282   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 48 of 55

9-48

          1          MR. LAUER:  Well, it wasn't clear to me what the

          2    answer was going to be, but if the answer has to do with

          3    witnesses in other cases having been pressured then that is --

          4          THE COURT:  I assume the answer is going to be the

          5    witnesses were not pressured, in other words, if they were

          6    pressured, then we're down a rabbit trail.

          7          MR. LAUER:  I was concerned that there might be an

          8    answer that there was pressure to the defendants in those cases

          9    against government witnesses.

09:50AM  10          MR. GARLAND:  Well, we'll get to that when your

         11    witnesses take the stand, but, yeah, the evidence here, Judge,

         12    will be that there was one case, as in this trial, I'm not

         13    going to get into the specifics about that, there were

         14    witnesses for both sides, as in this trial, they go back to

         15    Rwanda, the same crew comes back, and they're asked whether

         16    there's any government pressure, the same people come back, the

         17    same people testify at that point, and the people who are asked

         18    about it said, no, there was no pressure whatsoever, and it's

         19    borne out by the fact that they came back here.

09:50AM  20          MR. LAUER:  Well, he can testify if he knows that they

         21    came back, but for him to say that there was no pressure, he's

         22    just testifying to what someone else experienced.  He wouldn't

         23    have any personal knowledge as to that.

         24          THE COURT:  All right.  I guess.

         25          MR. LAUER:  This is getting pretty far afield.

**J.A. 967**

1        THE COURT:  That's sort of my concern.  Let's do this.

2   I'm going to let him answer that he is not personally aware of

3   any witness reporting to him or any witnesses, and I'll let you

4   lead to make sure I get this exactly right.

5        MR. GARLAND:  Yes, thank you.

6        THE COURT:  No witnesses ever reported to him feeling

7   pressure, and he's not aware of any investigation he's involved

8   in of witnesses reporting pressure, and let's leave it at that.

9   Okay.

09:51AM 10        MR. GARLAND:  Thank you.

11        THE COURT:  I assume, of course, that that's true.

12        (SIDEBAR CONFERENCE WAS CONCLUDED)

13        THE COURT:  Let's put another question to him.

14        MR. GARLAND:  Thank you.

15   Q.   Are you personally aware of any of the investigations that

16   you've been involved with of any witness complaining of

17   pressure put on them by the government of Rwanda or anybody

18   else in Rwanda?

19   A.   No, I am not aware of that.

09:51AM 20   Q.   Have you visited the hospital at the National University

21   of Butare?

22   A.   Yes, I have.

23   Q.   Do you remember how many times?

24   A.   Half a dozen maybe.

25        MR. GARLAND:  Your Honor, at this point we'd like to

1    take that blow-up of Exhibit 23 and put it on an easel in front

2    of the jury so that Agent Andersen can point out some buildings

3    and some locations as well.

4           THE COURT:  All right.  That's fine, he can come down

5    and counsel can move around.

6           MR. GARLAND:  Approaching with the Court's permission,

7    I'm going to hand some stickers to Agent Andersen.

8           THE COURT:  Okay.  I'll ask Mr. Andersen if you can

9    take care as you're pointing out, make sure all of the jury can

09:53AM 10   see it and that your back isn't turned so the stenographer can

11   hear whatever it is you have to say.

12          THE WITNESS:  Sure.

13   Q.   So when you were at the hospital, how did you get around

14   to the different places in the hospital?

15   A.   We walked.

16   Q.   So on Exhibit 23, can you identify the areas that you

17   considered to be kind of the front and the back of the

18   hospital?

19   A.   Sure.  The front of the hospital is this area, and,

09:53AM 20   consequently, I would describe the back of the hospital as this

21   side, so this is the northern edge, this is the southern edge,

22   like if you were comparing it to the main road.

23   Q.   And just beyond the southern edge, what's the building to

24   the left of that, I guess to the south of that?

25   A.   This one?  This one?

Case: 19-1689    Document: 00147615537    Page: 285    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 203    Filed 11/04/19    Page 31 of 55

9-51

1   Q.   Yes, that one.

2   A.   This is the Kiza dormitory.

3   Q.   Can you take a sticker and just write "Kiza" on it and put

4   it right next to it.

5   A.   Sure.  Do you want on it?

6   Q.   I think right next to it so that the jury can see it.

7   Then a sticker for reception as well, please.  Maybe just

8   r-e-c.

9   A.   (Witness complies)

09:54AM 10   Q.   How long would it take to walk the distance between those

11   two stickers?

12   A.   Five minutes.  Five minutes, I'd say.

13   Q.   And if you were going to walk the distance between the

14   western most and the eastern most, the top and bottom, how long

15   would that take?

16   A.   That's less, I would say three minutes.

17   Q.   You heard testimony about the Doctors Without Borders

18   tents in this, and are those seen in the photo that you've got

19   there?

09:55AM 20   A.   Yes.

21   Q.   Can you point that out.

22   A.   (Witness complies)

23   Q.   And can you put a sticker right there.

24   A.   Sure.

25       THE COURT:  Tell them or state for the record what

Case: 19-1689    Document: 00117615537    Page: 286    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 32 of 55

9-52

1    you're putting on that sticker.

2    Q.   Can you read what's on that sticker, please.

3    A.   "Tents."  For Kiza, I wrote "Kiza," and for reception

4    because my handwriting is just not that great, I put

5    "r-e-c-e-p."

6    Q.   Are you familiar with where the dermatology ward was?

7    A.   Yes.

8    Q.   If you can put a sticker, point it out for us, please.

9    A.   (Witness complies)

09:56AM 10    Q.   And if you could put a sticker and announce for the

11    record.

12    A.   I'm never going to get dermatology on this sticker,

13    "d-e-r-m."

14    Q.   The old maternity ward, do you know where that is?

15    A.   I do.  That's this building here.

16    Q.   Okay.  And if you could write "m-a-t" on that.

17    A.   Done.

18    Q.   And place that on there?

19    A.   Sure.

09:56AM 20    Q.   Now, I said old maternity.  Are you aware of a new

21    maternity building that's on campus currently?

22    A.   Yes.

23    Q.   And can you point to where that is?

24    A.   It's actually in the area where the tents were.

25    Q.   All right.  And what I want to ask you now is you looked

1    at the exhibits, the photo exhibits that have been admitted as

2    evidence at trial here?

3    A.    Yes.

4    Q.    And are you familiar with where those locations are on the

5    map that you've just been pointing to?

6    A.    Yes.

7         MR. GARLAND:  If we can show everybody Exhibit 28,

8    which I believe has already been admitted into evidence.  With

9    the Court's permission, if Agent Andersen can just turn around

10   that monitor so it's a little bit easier for him to see what's

11   going on.

12        THE COURT:  Don't unplug it, but, yes.

13   Q.    Do you see Exhibit 28?

14   A.    Yes.

15   Q.    And can you identify what's that building in the

16   background?

17   A.    That's maternity.  That's the back side of the maternity.

18   Q.    The wall there, where is that on the Exhibit 23?

19   A.    There was no wall in 1994.

09:58AM 20   Q.    So that wall that we see in the picture is a new wall?

21   A.    Yes.

22   Q.    All right.  So are you aware of the location of where

23   Ms. Mukankusi was standing and where that is on the map?

24   A.    Yes, I'm aware of that.

25   Q.    Since that's Exhibit 28, can you put 28 approximately in

Case: 19-1689    Document: 00117615537    Page: 288    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 54 of 55

9-54

 1    there.

 2    A.    (Witness complies)

 3          MR. GARLAND:  If we can show everybody previously

 4    admitted Exhibit 39.

 5    Q.    Are you aware of where that location corresponds to on the

 6    map?

 7    A.    Yes, yes.

 8    Q.    Okay.  You see Mr. Gasasira there in the foreground of

 9    that?

09:59AM 10    A.    Yes.

11    Q.    If you can put a sticker saying 39 on that approximate

12    position.

13    A.    Okay.  That's done.

14          MR. GARLAND:  If we can next pull up Exhibit 43, which

15    I believe was previously admitted into evidence.

16    Q.    Do you see Exhibit 43?

17    A.    I do.

18    Q.    And do you see Mr. Gasasira standing in that?

19    A.    I do.

09:59AM 20    Q.    Where is that?

21    A.    That's next to the new maternity.

22    Q.    Okay.  And you previously told us that's where on

23    Exhibit 43?

24    A.    The area where the tents used to be.

25    Q.    Okay.  So if you can put a sticker saying 43 at that

           1    location but don't cover that other sticker.

           2    A.    Right about there.

           3    Q.    All right.  And Exhibit 35, which I believe has previously

           4    been admitted into evidence, if you can bring that up for

           5    everybody.  Do you see that and recognize what that is?

           6    A.    I do.

           7    Q.    Where is that?

           8    A.    That's standing basically in front of the dermatology

           9    building.

10:00AM   10    Q.    All right.  If you can put a sticker that says 35 at that

          11    location.

          12    A.    Okay.

          13    Q.    Then if we can bring up Exhibit 37, which has been

          14    previously admitted into evidence.  Do you see that, and, if

          15    so, can you identify where that is on the Exhibit 37.

          16    A.    Yes, I can.  So, yeah, Ms. Mukeshimana is standing in this

          17    part of that covered walkway that's looking out towards -- over

          18    to the faculty of medicine but looking out that walkway.

          19    Q.    If you can put a sticker saying 37 on that, please.

10:01AM   20    A.    (Witness complies).

          21          MR. GARLAND:  And if we can bring up Exhibit 34, which

          22    has previously been admitted into evidence.

          23    Q.    Do you see that on the screen?

          24    A.    I do.

          25    Q.    And what's the building in the background, if you can

1   identify it?

2   A.   The building in the background is the maternity ward, old

3   maternity ward.

4   Q.   Again, with a wall, which is new to that area?

5   A.   Yes, the wall wasn't there in 1994.

6   Q.   Do you see where that is on the map, approximately?  When

7   I say map, I mean Exhibit 23.  You can put a sticker there that

8   says 34.

9   A.   (Witness complies)

10:03AM 10   Q.   The farthest away stickers that you have other than the

11   ones I asked you about at the front and the back, how long

12   would it take to walk those distances say from maternity to

13   dermatology?

14   A.   Oh, maternity to dermatology.

15   Q.   Yes.

16   A.   A minute.  It's not a long distance.

17   Q.   And Exhibit -- the sticker that says 34 to Kiza, how long

18   would it take to walk from there?

19   A.   From 34, sorry, let me get myself oriented.

10:03AM 20   Q.   34 is the one that's on the screen?

21   A.   34 to Kiza?

22   Q.   Yes.

23   A.   They're right next to each other basically, a minute or

24   less.

25   Q.   Okay.

J.A. 975

Case: 19-1689      Document: 00117615537      Page: 291      Date Filed: 07/16/2020      Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 37 of 55

9-57

                     MR. GARLAND:  Your Honor, if I can take one minute to

  2    confer with co-counsel.

  3                     THE COURT:  Yes.

  4                     MR. GARLAND:  Thank you.  Your Honor, no further

  5    questions.

  6                     THE COURT:  Let's take down the easel for now.  All

  7    right.  Cross-examination.

  8                                CROSS-EXAMINATION

  9    BY MR. LAUER:

10:04AM 10    Q.   Good morning, sir.

 11    A.   Good morning, Mr. Lauer.

 12    Q.   So you talked a lot about the interviews that you did the

 13    in this case, correct?

 14    A.   Yes, sir.

 15    Q.   That was a major part of your investigation?

 16    A.   It was.

 17    Q.   Conducting interviews is a major part of your

 18    responsibilities as an agent?

 19    A.   Sure, yes.

10:05AM 20    Q.   You are trained to do that?

 21    A.   Yes.

 22    Q.   You've attended special seminars on interview techniques?

 23    A.   Yes.

 24    Q.   And you've said you've conducted probably thousands of

 25    your interviews?

```
 1    A.   Over the entire course of my law enforcement career?

 2    Q.   Yes.

 3    A.   Sure.

 4    Q.   In this case, you took perhaps more safeguards in

 5    interviewing than you would in other cases, correct?

 6    A.   I'm not sure what you mean.

 7    Q.   Well, you explained that you discussed before you

 8    interviewed witnesses how to approach them, correct?

 9    A.   I discussed with whom?

10    Q.   You were part of an investigative team, correct?

11    A.   Yes.

12    Q.   And you explained that you had a certain way of conducting

13    the witnesses through an interpreter, correct?

14    A.   Yes.

15    Q.   And you went into some detail about the introduction and

16    what information was to be conveyed and what information was

17    not to be conveyed, correct?

18    A.   That is right.

19    Q.   Would you agree with me that those are safeguards?

20    A.   They are.

21    Q.   Were any of the interviews you did in this case recorded?

22    A.   No, they were not.

23    Q.   Was there any discussion about whether to record the

24    interviews?

25    A.   No, no, there wasn't.
```

J.A. 977

1    Q.    Didn't consider it?

2    A.    It's against his policy to record a witness interview, and

3    I don't have authority to record an interview in a foreign

4    country.

5    Q.    Okay.  Are you aware that other law enforcement agents

6    routinely record interviews?

7            MR. GARLAND:  Objection.

8            THE COURT:  Sustained.

9    Q.    All right.  So you interviewed dozens of witnesses in this

10:06AM 10    case, correct?

11    A.    Yes.

12    Q.    Some in 2016, correct?

13    A.    Yes.

14    Q.    Some again in 2018?

15    A.    I'm not sure those are --

16    Q.    There were additional interviews conducted in 2018?

17    A.    That's correct.

18    Q.    Did you take notes for those interviews?

19    A.    For some, yes.

10:07AM 20    Q.    And those notes were later boiled down to a final report,

21    correct?

22    A.    Yes.

23    Q.    And that report is essentially the only record that

24    remains of the interview, correct, the only written record of

25    the interview?

J.A. 978

         1    A.    It is a written record of the interview, yes.

         2    Q.    It's not recorded, you don't have a transcript of it,

         3    right?

         4    A.    That's correct.

         5    Q.    And report writing is another area that you've been

         6    trained, correct?

         7    A.    Yes.

         8    Q.    Trained to include any information that's important to the

         9    case?

10:07AM 10    A.    Sure, yes.

        11    Q.    Now, obviously, a report is a summary, you can't write

        12    down every single word of what was said?

        13    A.    Yeah, that's a fair point.

        14    Q.    But you are trained to include all the important details?

        15    A.    Yes.

        16    Q.    You're aware that the reports will be relied on later if

        17    the case is brought?

        18    A.    Yes.

        19    Q.    The reports will go to the prosecutors, and they'll go to

10:08AM 20    the defense?

        21    A.    Correct.

        22    Q.    And if there's something significant said in an interview,

        23    you include it in your report?

        24    A.    In the course of that interview, yes, that's correct.

        25    Q.    Okay.  And the other members of your investigative team in

Case: 19-1689    Document: 00117615537    Page: 295    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 203    Filed 11/04/19    Page 61 of 55

9-61

         1    this case, they're trained agents as well, and they have the

         2    same training about interview writing that you do?

         3    A.    Yes.

         4    Q.    You authored a number of reports in this case, correct?

         5    A.    I don't know how many I authored.

         6    Q.    Some?

         7    A.    Sure.

         8    Q.    At a minimum?

         9    A.    I agree.

10:08AM 10    Q.    And your colleague, Mr. Cronin, authored some others?

        11    A.    He did.

        12    Q.    You're the case agent on this case, correct?

        13    A.    Case agent is a kind of an administrative title.  I'm not

        14    the case agent in this case.

        15    Q.    You're the only agent who is testifying today, correct?

        16          MR. GARLAND:  Objection, your Honor.

        17          THE COURT:  I'll allow it.  As far as he knows, I

        18    guess.

        19    A.    As far as I know, I am the only agent testifying today.

10:09AM 20    Q.    And you've testified about the investigation, right?

        21    A.    I'm here to testify about the investigation, yes.

        22    Q.    And because it's an investigation you've been involved in

        23    from its inception, you've certainly reviewed all of the

        24    reports on the case?

        25    A.    I have, yeah, that's fair, yes.

                    MR. LAUER:  May I approach the witness, your Honor?

 1                  THE COURT:  Yes.

 2      Q.   Agent Andersen, I'm handing you a binder.  I'll ask you to

 3      just open it and flip through it.  Take as long as you want,

 4      and just look up at me when you're done.

 5      A.   Okay.

 6      Q.   All set?

 7      A.   Yeah.

 8      Q.   So, what's in the binder are the reports that were

 9      generated as a result of the interviews of all of the witnesses

10:11AM 10   who have testified in this trial, correct?

11      A.   This is every witness who's testified in this case.

12      Q.   Excuse me, actually a number of witness who testified?

13      A.   Yes, I agree with that.

14      Q.   I'm going to ask you some questions about what's in those

15      reports, and if you need to refer at any point just let me

16      know.

17      A.   All right, thank you.

18      Q.   So if you turn to the first tab, you recognize this

19      to be the report generated from the interview of

10:11AM 20   Esperance Mukamurenzi?

21      A.   Yes.

22      Q.   And she was interviewed in 2016?

23      A.   She was.

24      Q.   At the Hotel Ibis in Butare?

25

**J.A. 981**

Case: 19-1689    Document: 00117615537    Page: 297    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 63 of 55

9-63

          1    A.   Correct.

          2    Q.   The interview lasted about an hour from 10 a.m. to 10:59;

          3    is that correct?

          4    A.   Yes.

          5    Q.   She discussed her experiences at the hospital?

          6    A.   She did.

          7    Q.   During that interview, Ms. Mukamurenzi did not say

          8    anything about Mr. Teganya having involvement in rapes?

          9    A.   I don't see that.

10:12AM  10    Q.   There's also no indication that she said anything about

         11    being raped herself?

         12    A.   During this initial interview, no, there is not.

         13    Q.   I'm going to ask you to turn to the next tab.

         14    A.   Okay.

         15    Q.   Do you remember this report to be generated from the

         16    interview of Consolee Mukeshimana?

         17    A.   I do.

         18    Q.   And actually Ms. Mukeshimana is someone you interviewed in

         19    connection with a separate case in 2012?

10:13AM  20    A.   That's correct.

         21    Q.   You testified generally about asking witnesses what

         22    happened to them in Butare during the genocide, correct?

         23    A.   That is correct.

         24    Q.   And Ms. Mukeshimana in 2012 was asked about her

         25    experiences in the genocide, correct?

1    A.   That's right.

2    Q.   And in that interview in 2012, Ms. Mukeshimana didn't say

3    a word about having been at the hospital?

4    A.   She certainly did not.

5    Q.   She didn't say that she had been there for two weeks?

6    A.   She didn't.

7    Q.   She never mentioned Mr. Teganya's name?

8    A.   In 2012?

9    Q.   Correct.

10:13AM 10   A.   She did not.

11   Q.   You interviewed or actually Ms. Mukeshimana was

12   interviewed again by you in 2018, correct?

13   A.   That's correct.

14   Q.   And in that interview, Ms. Mukeshimana stated that after

15   the speech by Interim President Sindikubwabo, she had fled her

16   home around April 21st or 22nd to go to the clinic in Sovu?

17   A.   Yes, that sounds familiar.

18   Q.   By the way, are you familiar with Sovu at all?

19   A.   Personally, no, I'm not.

10:14AM 20   Q.   Did you travel there at all in the course of any

21   investigation?

22   A.   I did not.

23   Q.   Referring back to the report, Ms. Mukeshimana went on to

24   state that after arriving in Sovu, she learned that her cousin

25   Veneranda had been injured and had gone to the University

**J.A. 983**

Case: 19-1689    Document: 00117615537    Page: 299    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 203    Filed 11/04/19    Page 65 of 55

9-65

 1    Hospital for treatment.  That's what she said in that

 2    interview?

 3    A.    That is what we understood her to say through our

 4    interpreter, yes.

 5    Q.    She did not mention going to a series of houses before

 6    arriving at the University Hospital?

 7    A.    She did not.

 8    Q.    She did not mention that before arriving at the hospital,

 9    she had been detained at a roadblock and had escaped?

10:15AM 10    A.    She had not.

11    Q.    At a later point in the interview, Ms. Mukeshimana did

12    discuss how she had escaped from the Interahamwe at the

13    hospital?

14    A.    Yes.

15    Q.    And what she said was that she had thrown some coins and

16    was able to run away?

17    A.    Yes, that is what I recall her having said through our

18    interpreter.

19    Q.    And she also said that Mr. Teganya was not with her when

10:15AM 20    that happened?

21    A.    That's correct.

22    Q.    As an aside, when you did your preliminary instructions

23    with the witnesses during these interviews, did you address the

24    fact that there was a translator in the room?  Let me ask that

25    a different way.

Case: 19-1689    Document: 00117615537    Page: 300    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 66 of 55

9-66

1    A.   Yes, thank you.

2    Q.   Did you tell the witness if you're having trouble what I'm

3    asking, understanding what I'm asking, let me know so we can

4    try and clear it up, words to that effect?

5    A.   Yes, as a matter of fact, we did.

6    Q.   All witnesses were told if you're having a problem

7    communicating, you need to let us know?

8    A.   I don't think we said communicating, but if you don't

9    understand the question, please ask for clarification,

10:16AM 10   something to that effect.

11   Q.   All right.  I'd like to direct your attention to the next

12   tab in the binder, please.  This is the report generated from

13   the interview of Innocent Habimana.  Do you have that in front

14   of you?

15   A.   I do.

16   Q.   He was interviewed on June 4th, 2018?

17   A.   Correct.

18   Q.   For a total of about two and a half hours?

19   A.   Yes.

10:16AM 20   Q.   In that interview, he discussed the killing of students at

21   the Kiza dormitory?

22   A.   Yes.

23   Q.   And at that time he provided names for the two students he

24   killed, correct?

25   A.   Provided names of the students that he killed.

J.A. 985

Case: 19-1689   Document: 00117615537   Page: 301   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 67 of 55

9-67

        1    Q.   If I could direct --

        2         MR. GARLAND:  Your Honor, one objection for

        3    clarification.  The question is Mr. Lauer asking what happened

        4    during that or what the report actually says.

        5         THE COURT:  I guess make clear what his report says as

        6    opposed to the facts.  Obviously, he wasn't there.

        7    Q.   I'm going to ask you to turn to page 3 of the report, and

        8    then in the second paragraph, the last two sentences.  Can you

        9    look at those and look up at me when you're done.

10:17AM  10    A.   The last two sentences?

       11    Q.   Of the second paragraph.

       12    A.   Yes.

       13    Q.   Mr. Habimana in his interview said that he was present

       14    when other students were killed but was specifically involved

       15    in killing two from Kiza.  The students were identified as

       16    Innocent and Nzeyimana and Amable Sekiambo.  That's what's in

       17    the report, right?

       18    A.   That's what we understood him to say through our

       19    interpreter, yes.

10:18AM  20    Q.   I ask you to turn to the next tab.  This is the report

       21    that was generated after the interview of Assumpta Numukobwa?

       22    A.   Okay.

       23    Q.   She was interviewed in 2016?

       24    A.   That's correct.

       25    Q.   The interview lasted from about 6:30 until 7:48?

Case: 19-1689    Document: 00117615537    Page: 302    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 68 of 55

9-68

```
             1    A.   Also correct.

             2    Q.   In that interview, she reported that she had been staying

             3    at the hospital for about two weeks?

             4    A.   Correct.

             5    Q.   And she further stated that at the hospital, she had

             6    stayed with the refugees?

             7    A.   Also correct.

             8    Q.   She didn't say anything about hiding in a laundry room?

             9    A.   On that occasion, she did not.

  10:19AM    10   Q.   On that occasion, she did not say anything about staying

             11   in a patient room?

             12   A.   On that occasion, she did not say that.

             13   Q.   And on that occasion, she did not tell investigators that

             14   she observed people being taken away?

             15   A.   During this initial interview, she did not say that.

             16   Q.   Can you please turn to the next tab.  Have you had a

             17   chance to look at this report?

             18   A.   Since you handed it to me, sure.

             19   Q.   You see that this is the report for Jerome Arusha?

  10:20AM    20   A.   I do.

             21   Q.   And he was interviewed in 2016?

             22   A.   That's correct.

             23   Q.   And during that time, he claimed that Mr. Teganya was an

             24   MRND committee member?

             25   A.   Yeah, during this initial interview, that's what we
```

J.A. 987

         1   understood him to have said through our interpreter.
         2   Q.   And during this interview, he did not say anything about a
         3   Mr. Tharcisse Kabalisa?
         4   A.   I'm not sure what you mean.
         5   Q.   Let me ask it a different way.  During this interview in
         6   2016, did Mr. Arusha say anything about an incident involving a
         7   bicycle being taken?
         8   A.   During this first 50-minute interview, he did not say
         9   anything about that.
10:20AM 10   Q.   Can I ask you to turn to the next tab?
        11   A.   Sure.
        12   Q.   Do you recognize this to be the report generated from the
        13   interview of Bernard Kalimba?
        14   A.   I do.
        15   Q.   He was interviewed in 2018?
        16        MR. GARLAND:  Objection, your Honor.  Mr. Kalimba --
        17   I'm sorry, I withdraw the objection.
        18        THE COURT:  I'm sorry, can you state the name again.
        19        MR. LAUER:  Yes, the report that I'm now referring to
10:21AM 20   concerns Bernard Kabalisa.
        21   Q.   Do you have that in front of you?
        22   A.   I do.
        23   Q.   He was interviewed in 2018?
        24   A.   Yes, he was.
        25   Q.   And during that statement, during that interview he made

```
  1   some statements relative to MRND clothing?

  2   A.   He did.

  3   Q.   During this interview, he didn't mention anything about a

  4   flag located next to Mr. Teganya's bed?

  5   A.   During this first interview, he didn't mention anything

  6   about that, no.

  7   Q.   He was also questioned about an altercation involving a

  8   gentleman named Tharcisse Kabalisa?

  9   A.   Yes, I do see mention of that.

10:22AM 10   Q.   Okay.  And at no time in that interview, did he say that

 11   the reason for the altercation had to do with a bicycle?

 12   A.   He didn't say anything about that during that first

 13   interview through our -- you know, based on our understanding

 14   using that interpreter, that didn't come up.

 15   Q.   If you could just turn to the next tab for Jean Pierre

 16   Gasasira.  Do you have that in front of you now?

 17   A.   Yeah, I do have that.

 18   Q.   Mr. Gasasira was interviewed in June of 2018?

 19   A.   Yes, he was.

10:22AM 20   Q.   And he was certainly interviewed about his experiences

 21   during the genocide?

 22   A.   Yeah, that's correct, during that, yes.

 23   Q.   During that interview, Mr. Gasasira didn't say a thing

 24   about having been attacked at a soccer field?

 25           MR. GARLAND:  Objection, your Honor, the same
```

J.A. 989

Case: 19-1689    Document: 00117615537    Page: 305    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 71 of 55

9-71

```
 1    objection about whether the question was about what was said in
 2    the interview or what's in the report.
 3              MR. LAUER:  I can ask the question to make it clearer.
 4              THE COURT:  All right, go ahead.
 5    Q.   During his interview with your investigative team in
 6    June of 2018, did Mr. Gasasira say anything about having been
 7    attacked at a soccer field?
 8    A.   During the initial interview with him, I don't recall
 9    that.
10    Q.   During that same interview, he didn't say anything about
11    having been attacked at his primary school?
12    A.   Also the same, it doesn't appear that he said anything
13    about that during that first interview with him.
14    Q.   He did discuss activities at the hospital during the
15    genocide in that interview?
16    A.   He did.
17    Q.   And in particular he discussed the killing of a gentleman
18    named Karekezi?
19    A.   Yes, during that hour and a half interview, he did talk
20    about Karekezi.
21    Q.   And in talking about Karekezi's killing, he described it
22    as a sort of ceremony and the soldier for whom he was caring
23    wanting to witness it?
24    A.   That is what we understood him to have said through our
25    interpreter, yes.
```

J.A. 990

Case: 19-1689    Document: 00117615537    Page: 306    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 72 of 55

9-72

1    Q.   And he followed that by saying that he pushed the soldier

2    in the wheelchair to the place where the killing occurred?

3    A.   That is what we understood him to have said through our

4    interpreter, yes.

5    Q.   In that same interview, he discussed the killing of

6    another gentleman named Protais Nyangezi?

7    A.   Yes, he did.

8    Q.   And during that interview in June of 2018, he told your

9    team that he did not witness the killing?

10:25AM 10   A.   That is what we understood him to have said at that time,

11   yes.

12   Q.   And he elaborated on that by saying that when one of the

13   soldiers returned, he told the others, including Gasasira, that

14   they killed him?

15   A.   Yeah, I agree, that is what we understood him to have said

16   through our interpreter.

17   Q.   The topic of Matias Gasarabwe also came up in that meeting

18   in June of 2018?

19   A.   Yes.

10:25AM 20   Q.   During his interview in June, Mr. Gasasira stated that he

21   did not see the actual killing of Matias Gasarabwe?

22   A.   Well, that's what we understood him to have said.

23   Q.   Do you have any reason to doubt the quality of the

24   interpretation services you were receiving?

25   A.   No.

Case: 19-1689    Document: 00117615537    Page: 307    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 73 of 55

9-73

        1    Q.    In fact, you brought them back to be here for this trial,
        2    right?
        3    A.    Yeah, we did.
        4    Q.    And there was no moment during any of these interviews
        5    where you had to stop because the interpreter couldn't keep up,
        6    right?
        7    A.    I can't sit here and tell you that that didn't happen.
        8    There's a lot of information coming at us, as I said, in a very
        9    short period of time, fifty-four minutes, an hour and fifteen
10:26AM 10   minutes, a lot of names, a lot of places, so I disagree that
       11    it's not possible that we had to stop because there was a lot
       12    of information coming at us.  We definitely had occasions like
       13    that where we did have to stop.
       14    Q.    These reports are important, right?
       15    A.    These reports are a summary of the information that
       16    witnesses provided, and they are important to prosecutors and
       17    defense attorneys and to us as we are trying to decide who has
       18    relevant information and who we might want to follow up with
       19    for a future interview.
10:27AM 20   Q.    You want to get the details right?
       21    A.    We do.
       22    Q.    And would you agree with me that whether someone saw a
       23    killing with his own eyes is an important detail?
       24    A.    That is always an important detail.
       25    Q.    So when Mr. Gasasira was talking about the death of

Case: 19-1689    Document: 00117615537    Page: 308    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 203    Filed 11/04/19    Page 74 of 55

9-74

1    Matias Gasarabwe, what he told you in that interview and your

2    team was that he did not see the actual killing?

3    A.    What the report reflects, what we understood him to say

4    was that he did not see it, and, obviously, we later went to a

5    location with him where he said a certain event occurred, and

6    we took a photograph of what he told us at that time.

7         As I've said before, we have spoken with him on more

8    than one occasion, which is reflected in this report.

9    Q.    I'm going to direct your attention to page 4 of the

10:28AM 10    report.

11   A.    Gasasira still?

12   Q.    Gasasira's report.

13   A.    Okay.

14   Q.    And in particular the third paragraph from the top that

15   begins with the word, "A Tutsi and family friend."  Do you see

16   that paragraph?

17   A.    I do.

18   Q.    Can you go to the last sentence, and you agree this

19   paragraph concerns the killing of Matias Gasarabwe?

10:29AM 20   A.    It does.

21   Q.    Can you read for the jury what the last sentence of that

22   report says?

23   A.    Sure.  "As reported in this ROI, Gasasira did not see the

24   actual killings but saw the body later."

25   Q.    Okay.  Do you think something got lost in the translation

1    about seeing the body later?

2    A.    Well, as I sit here today after that interview, no, I

3    don't think something was lost on that occasion.  This is the

4    first time we spoke with him, not the last time we spoke with

5    him.

6    Q.    Okay.  I want to go back to -- actually there's one more

7    tab in this binder, correct?

8    A.    Yes.

9    Q.    And that would be the report concerning

10:30AM 10    Isabelle Mukankusi?

11    A.    Yes, it is.

12    Q.    In this interview, Ms. Mukankusi discussed her experience

13    during the genocide?

14    A.    Well, I mean we met with her for 58 minutes.  She

15    certainly did not talk about all of her experiences during the

16    100 days of the genocide.

17    Q.    No, but the topic of the interview was what was your

18    experience?

19    A.    Yes, obviously, as previously discussed.

10:30AM 20    Q.    Did she tell you that her house had been burned?

21    A.    Not during this 58-minute interview.

22    Q.    Did she say that she saw people being taken -- strike

23    that.

24          You talked about arranging for these interviews

25    through interpreters, right?

```
 1    A.    Yes.
 2    Q.    And what I want to ask is what happened before you reached
 3    the stage of contacting the witnesses.  How did you get their
 4    phone numbers?
 5    A.    Different ways.  So do you have like a specific question?
 6    I mean --
 7    Q.    No, tell me --
 8    A.    -- we got them in different ways.  So doctors, for
 9    example, had a public profile.  We were able to use some social
10    media, and we were able to find doctors who we believed were
11    still in Rwanda, found phone numbers, found out where their
12    offices were.
13    Q.    You got phone numbers through social media?
14    A.    Yeah, I think some of the doctors have web pages, yeah,
15    that's my recollection.
16    Q.    The number of witnesses you spoke to, only a small number
17    were doctors, right?
18    A.    A number of witnesses who appeared here, only a few of
19    them were doctors.  We obviously spoke with more than who were
20    here.
21    Q.    Okay.  For the people who were not doctors who did not
22    have a social media presence that included their private cell
23    phone number, how did you get their phone numbers?
24    A.    We asked other people who we spoke with, do you know
25    so-and-so, do you happen to have their phone number?
```

1    Q.    Okay.  So, during interviews, you were asking witnesses

2    for phone numbers of other witnesses; is that fair to say?

3    A.    At the conclusion of an interview, yes.

4    Q.    Okay.

5    A.    At the conclusion of the interview, we would ask for

6    those.

7    Q.    Now, you said some witnesses were transported to the

8    interviews by drivers?

9    A.    No, that was pretty rare.  We had a driver on standby to

10   pick people up, but my memory of 2016 and 2018 was that we

11   didn't need to use that very often.

12   Q.    Okay.  You were asked some questions on direct

13   examination, and you mentioned that there were some sort of

14   subcontracting with drivers, right?

15   A.    I said we basically, we were a subcontractor to the

16   embassy's approved contract for transportation services through

17   the embassy motor pool.

18   Q.    And you said that to the extent you did use drivers, it

19   was merely to have the witness transported to and from the

20   interview, right?

21   A.    If we used them for that purpose, and I think I said a

22   couple minutes ago that I don't think we used that very much

23   during that trip.  The driver fundamentally was used to

24   transport us back and forth, but I think there were a couple of

25   occasions where we would ask them to go pick up a witness and

**J.A. 996**

1    bring them to our location.

2    Q.    But the drivers weren't, didn't have any sort of

3    investigational role, correct?

4    A.    The drivers didn't know what we were doing there.

5            MR. LAUER:  Your Honor, can I have a moment?

6            THE COURT:  Yes.

7            MR. LAUER:  Could we be seen at sidebar?

8            (THE FOLLOWING OCCURRED AT SIDEBAR:)

9            MR. LAUER:  So there's a document that I'd like to

10:36AM 10   show this witness.  I didn't expect it to come up.  I don't

11   have it printed.  I need to locate it and either print it or

12   locate it on the computer and show it.  It's going to take me a

13   couple minutes.  I don't know if you'd consider doing an early

14   break today, especially considering --

15           THE COURT:  All right.  Why don't we take a break.

16           MR. GARLAND:  Is this something we've seen?

17           MR. LAUER:  There's a reference to the driver

18   providing information.

19           (SIDEBAR CONFERENCE WAS CONCLUDED)

10:36AM 20          THE COURT:  Are we all set?

21           MR. LAUER:  I think we can go forward, yes, thank you.

22   Q.    Sorry, I apologize, I don't have it printed but I'm going

23   to approach and show you the document on the computer.  Do you

24   recognize this to be one of the reports from your investigative

25   team?

Case: 19-1689    Document: 00117615537    Page: 313    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 79 of 55

9-79

```
 1    A.    It's not an official report because it's not in the format
 2    that would make it an official report.
 3              THE COURT:  Keep your voice up, Mr. Andersen.
 4              THE WITNESS:  Sorry, your Honor.
 5    Q.    Would you agree it has a Bates stamp on it, meaning it was
 6    in the same format that it was provided to the defense?
 7    A.    Sure.
 8    Q.    And I'm going to direct your attention --
 9              THE COURT:  Can we have the witness identify the
10    document for the record?
11              MR. LAUER:  Yes.
12    Q.    For the record, I'm showing you a report concerning your
13    interview of a witness named Sixbert Nkurikiyumukiza.
14    A.    I wouldn't have tried that.
15    Q.    I did my best.
16    A.    I wouldn't have tried that.
17    Q.    But I'm just going to ask you to look at the very last
18    paragraph there, what's described as an agent's note.  Do you
19    see that?
20    A.    Yeah.
21    Q.    And, in fact, what's being referred to there is what the
22    witness told the driver?
23    A.    Correct.
24    Q.    Meaning that the driver then conveyed what the witness was
25    talking about to the agent, that's how it ended up in the
```

J.A. 998

           1    report?

           2    A.    That's correct.

           3    Q.    You were asked some questions about your conversations

           4    with witnesses about their travel arrangements and the fees

           5    that they were receiving, correct?

           6    A.    Yes, I was.

           7    Q.    And you testified that all witnesses are receiving the

           8    same fee and meals and incidental expenses, correct?

           9    A.    Well, yes, that's right.  The U.S. Government doesn't pay

10:39AM   10    for testimony, but all witnesses are afforded a reimbursement

          11    for their daily appearance, and then as we already talked

          12    about, the per diem and lodging and transportation costs.

          13    Q.    Okay.  And the per diem costs for the Boston area are over

          14    $70 a day, correct?

          15    A.    Well, I'm not entitled to per diem here because this is

          16    where I work so I actually don't know what the number is.

          17    Q.    Okay.  Your testimony was that the witnesses were not told

          18    about reimbursement during these initial meetings that you had,

          19    correct?

10:40AM   20    A.    That is correct, that is my testimony because that's what

          21    occurred, we did not talk about it.

          22    Q.    But at a later point, it certainly came up?

          23    A.    Yes, really late point, I think at the time where we

          24    started to discuss the very specific logistics of moving

          25    witnesses from Rwanda to Boston to testify.

**J.A. 999**

Case: 19-1689    Document: 00117615537    Page: 315    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 31 of 55

9-81

1    Q.    Now, did all of the Rwandan witnesses come at the same

2    time?

3    A.    Yes, our witnesses came at the same time.

4    Q.    And, in fact, they came in February, correct?

5    A.    I think maybe they arrived February 28th, something like

6    that, yeah, I think maybe the last day of February.

7    Q.    And have the witnesses already returned to Rwanda?

8    A.    They have not.

9    Q.    So, they've been here now for going on three weeks?

10:41AM 10   A.    Something short of three weeks, yes.

11   Q.    And they were here over a week in advance of the trial

12   date?

13   A.    Yes, a week and a weekend.

14   Q.    And some of the witnesses who testified last week, they're

15   still here?

16   A.    Correct.

17   Q.    Meaning that for going on three weeks, they can receive a

18   $40 witness appearance fee and whatever the per diem amount is?

19   A.    Yes, the choice about their arrival and departure is not

10:42AM 20   theirs.  That's something that's done by the U.S. Attorney's

21   Office and with the investigative team.

22   Q.    And it just so happens that the longer they stay, the more

23   money they're going to go home with, right?

24   A.    I guess that's true.

25   Q.    You told us a lot about the investigation and the

J.A. 1000

Case: 19-1689    Document: 00117615537    Page: 316    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 82 of 55

9-82

```
 1    interviews you did in Rwanda, correct?

 2    A.    Yes.

 3    Q.    You were shown a document with student names on it.  Do

 4    you recall that document?

 5    A.    I do.

 6    Q.    And you said that that was actually something that you

 7    used to decide who to interview?

 8    A.    Yes, that's correct.

 9    Q.    Did you have any interviews outside of Rwanda?

10:43AM 10    A.    I didn't.

11    Q.    Did anyone on the investigative team go outside of Rwanda

12    to interview people?

13    A.    I believe so, yes.

14    Q.    Not you?

15    A.    Not me.

16    Q.    Who went outside of Rwanda to interview people?

17    A.    I don't know the details of that, but my understanding is

18    that other interviews were conducted outside of Rwanda, but as

19    I earlier discussed, I actually don't work on these cases

10:43AM 20    anymore, so I think those were conducted by other agents, not

21    by me.

22    Q.    You're aware that a number of the people on that list of

23    medical students no longer live in Rwanda, correct?

24    A.    I actually don't know how they are all situated.  I didn't

25    look into the backgrounds of everybody who was on that list.
```

J.A. 1001

Case: 19-1689    Document: 00117615537    Page: 317    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 83 of 55

9-83

1    Q.   But in terms of the people you undertook to interview, all

2    inside Rwanda?

3    A.   Yeah, I guess that's true.

4         MR. LAUER:  One moment.  I have no further questions.

5         THE COURT:  All right.  Redirect.

6         MR. GARLAND:  Yes, your Honor.

7                   REDIRECT EXAMINATION

8    BY MR. GARLAND:

9    Q.   Special Agent Andersen, you were asked a lot of questions

10:44AM 10   by Mr. Lauer about reports.  Do you recall those questions?

11   A.   Yes.

12   Q.   I'm not going to go over each of those reports, but I did

13   have a couple of questions.  First, your reports, you were

14   asked questions about your training on reports and how you

15   write reports.  Do you recall those questions?

16   A.   I do.

17   Q.   Are they meant to be verbatim transcripts?

18   A.   It's not possible that they could be.  They are not meant

19   to be a transcript of an interview.

10:45AM 20   Q.   And I'll ask you specifically, when you write a report,

21   are you intending it to be a verbatim transcript?

22   A.   I am not.

23   Q.   Are you trying to get down every detail that's being told

24   to you at that time?

25   A.   I think it's an aspiration to get every detail, but the

Case: 19-1689     Document: 00117615537     Page: 318     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 34 of 55

9-84

         1    interviews, as was pointed out before, lasts for a certain

         2    amount of time.  A lot of information is conveyed to us, and in

         3    cases like this, was being conveyed to us in another language

         4    and trying to keep up with taking notes and also thinking about

         5    the information that we're receiving in response to a question

         6    and how that might impact the next question or series of

         7    questions and then always thinking about the amount of time

         8    that we have left with any particular individual on that day.

         9    Q.    And so I think we covered this on direct.  So, is it true

10:46AM  10    that you meet with witnesses on multiple occasions?

        11    A.    We absolutely do, yes.

        12    Q.    And is a report generated each time there's another

        13    subsequent meeting with a witness?

        14    A.    No, there is not a report generated on each subsequent

        15    occasion.

        16    Q.    But during those, sometimes you get different details or

        17    additional details?

        18    A.    Well, yes, as I said earlier, our understanding of series

        19    of events, what happened at the university, what happened at

10:46AM  20    the hospital is informed and takes greater shape, which allows

        21    us to ask better, more in-depth questions, and that's how the

        22    progression of interviews with particular witnesses goes,

        23    that's how it takes shape.

        24    Q.    The interview with Consolee Mukeshimana, were you present

        25    for that in Rwanda?

         1    A.    The one in 2018?

         2    Q.    Yes.

         3    A.    Yes, I believe I was.

         4    Q.    How did that interview go with her?

         5    A.    So Consolee was a witness in a previous investigation, and

         6    so I had met with her on a number of occasions before, and,

         7    obviously, the events under investigation include events that

         8    occurred at the hospital.  I knew from my prior interaction

         9    with Consolee that she was an employee of the hospital, a

10:47AM  10    current employee, and so one of the things that I -- the reason

        11    I contacted her was because if I was trying to find out

        12    information about what occurred at the hospital, I wanted to

        13    talk to people that had a connection to the hospital, and that

        14    as an employee, I expected Consolee might know people in the

        15    community who had survived the genocide because they were

        16    hiding at the hospital or knew stories of people whose genocide

        17    story intersected at the hospital because every year there is a

        18    commemoration event at the hospital where people discuss

        19    their -- one or two people will get up and talk about their

10:48AM  20    experience, and so I thought Consolee would have information

        21    about who that had a connection to the hospital might still be

        22    around to speak with me.

        23    Q.    And can you --

        24    A.    Sorry.

        25    Q.    Do you recall her emotional state during that interview?

1    A.   Yeah, actually, when we started talking about the

2    hospital, she was shaken and nervous, like I could sense that

3    that -- that talking about that was upsetting to her.

4         MR. LAUER:  Objection.  Motion to strike.

5         THE COURT:  I'll allow the testimony to stand.  It's

6    his interpretation of her demeanor.  I'll let that stand.  Put

7    another question.

8    Q.   And did you observe the same emotional state throughout

9    the interview?

10   A.   I would say that there were peaks and valleys of that, but

11   as we talked in more detail about her experience at the

12   hospital, she was very upset about that, yes.

13   Q.   And when was the first time that you learned from her that

14   she had been raped?

15   A.   During that interview.

16   Q.   And when you were talking to her during that interview,

17   had you provided her the name of Mr. Teganya?

18   A.   We didn't provide anybody with the name Teganya.

19   Q.   So how did the name of Teganya come up during that

20   interview?

21   A.   I think with her and with people situated like her, it was

22   a general question about, you know, a description of events,

23   she's describing what her experience was at the hospital, and

24   then we asked her, as we did with most witnesses, you know that

25   thing that you're talking about there, do you know anybody who

Case: 19-1689    Document: 00117615537    Page: 321    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 87 of 55

9-87

|  | 1 | was involved in that? |
|---|---|---|
|  | 2 | And she and others in response to a question like that |
|  | 3 | provided information about people who they knew, and I think |
|  | 4 | she identified a number of people, and included in that group |
|  | 5 | was Teganya. |
|  | 6 | Q.   And when did Esperance tell you about being raped? |
|  | 7 | A.   When did Esperance tell me about being raped, I'm not sure |
|  | 8 | she told me directly that she had been raped.  I think I've |
|  | 9 | only met with her once or twice. |
| 10:51AM | 10 | Q.   So that might be another member of the investigative team |
|  | 11 | who had been talking with her about that? |
|  | 12 | A.   Yes, I think so. |
|  | 13 | Q.   Okay.  Have you talked to other witnesses, female |
|  | 14 | witnesses, who have suffered some sort of sexual assault? |
|  | 15 | MR. LAUER:  Objection. |
|  | 16 | THE COURT:  I'm going to sustain it.  Sustained. |
|  | 17 | Q.   In your experience with the witnesses you have talked to, |
|  | 18 | are you learning details when you meet with them on subsequent |
|  | 19 | occasions? |
| 10:52AM | 20 | A.   Always. |
|  | 21 | Q.   I want to ask you about you were asked some questions and |
|  | 22 | things about the housing of the Rwandan witnesses.  Is HSI able |
|  | 23 | to send those witness back one-by-one? |
|  | 24 | A.   We don't -- we have no authorization to send them back. |
|  | 25 | Q.   So when they go back, the Rwandan witnesses, do you expect |

Case: 19-1689    Document: 00117615537    Page: 322    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 38 of 55

9-88

```
        1    them to travel back to Rwanda?

        2    A.   I absolutely do.

        3    Q.   And are they going to go back in a group or one-by-one?

        4    A.   We're going to send them back as a group.

        5    Q.   And are you aware what generally have the witnesses who

        6    have testified here been doing since they arrived on 2-28 other

        7    than testifying or meeting with prosecutors or agents?

        8    A.   Well, I mean, that's largely what they've been doing, so

        9    that takes up quite a bit of their time.  They have seen some

10:53AM 10   of the sites, they went to Revere Beach, they had Kelly's roast

       11    beef, and I would say generally they spend a lot of time in

       12    their room.

       13          There is a common room.  I think they're there

       14    together in the evening.  They go out and have -- grab dinner

       15    and then sit and eat as a group, but I think generally they

       16    spend most of their time in their rooms.

       17          MR. GARLAND:  If I can take a moment.  Your Honor, no

       18    further questions.

       19          THE COURT:  Recross.

10:54AM 20                    RECROSS-EXAMINATION

       21    BY MR. LAUER:

       22    Q.   So just a few final questions.

       23    A.   Sure.

       24    Q.   Actually about what you were just asked, the hotel where

       25    the witnesses are staying?
```

         1    A.    Sure.

         2    Q.    They are all on the same floor of the hotel, correct?

         3    A.    Yes, that's correct.

         4    Q.    And there's essentially agents at one end of the hall and

         5    agents at the other end of the hall, correct?

         6    A.    That's correct.

         7    Q.    And they can't actually leave that hallway unless they're

         8    accompanied by someone?

         9    A.    Yeah, that's correct.

10:54AM 10    Q.    And in that hall, the witnesses have their individual

        11    rooms, correct?

        12    A.    Yes.

        13    Q.    And then there's one room where the furniture has been

        14    moved out, correct?

        15    A.    The bed was moved out and couches and tables were brought

        16    in.

        17    Q.    And that's the common room that you referred to?

        18    A.    Yes.

        19    Q.    And the point of that room is to have a place for them to

10:55AM 20    go so they're not couped up in their rooms all day?

        21    A.    We will do the same for your witnesses as well.

        22    Q.    And you testified that they've been busy meeting with

        23    agents and prosecutors, correct?

        24    A.    Yes, they are here to testify.

        25    Q.    How many times are you meeting with these witnesses, have

1   you met with these witnesses over the course of three weeks?

2   A.   I would say we've probably met with each of them a couple

3   of times.

4   Q.   For how long?

5   A.   It depends on the witness.  It depends on the day.

6   Q.   So maybe an hour or two one day, an hour or two another

7   day?

8   A.   Maybe.

9   Q.   And the remainder of that time, they're just in their room

10  or in the common room?

11  A.   If they're not out, like I said before, yes.

12  Q.   If they're not out together traveling for dinner or a

13  field trip to Revere Beach?

14  A.   Yes, that's right.

15          MR. LAUER:  May I just check one more thing, your

16  Honor?

17          THE COURT:  Yes.

18          MR. LAUER:  Thank you, sir.

19          THE WITNESS:  Thank you, Mr. Lauer.

20          THE COURT:  Thank you.  You may step down.

21          MR. GARLAND:  Your Honor, the government rests.

22          THE COURT:  Okay.  Let me talk to counsel at sidebar

23  for a minute.

24          (THE FOLLOWING OCCURRED AT SIDEBAR:)

25          THE COURT:  All right.  I'm going to send the jury out

```
 1    before I hear the defense motion, but in terms of scheduling,

 2    we're off tomorrow, we have, assuming I allow it, defense

 3    expert witness but no other witnesses?

 4              MR. LAUER:  Correct.

 5              THE COURT:  Then your Rwandan witnesses will begin

 6    Monday next week, and I am out Thursday and Friday?

 7              THE CLERK:  Yes.

 8              THE COURT:  And you don't expect to be completed next

 9    week, it's going to spill over into the week after that.

10    Everyone agree that's the schedule?

11              MR. GARLAND:  Yes.

12              THE COURT:  I'm going to basically tell them that

13    that's the schedule and tell them we'll see them Friday morning

14    at 9:00 unless for some reason we tell them not to come.

15              (SIDEBAR CONFERENCE WAS CONCLUDED)

16              THE COURT:  All right.  Ladies and gentlemen, here is

17    the schedule going forward.  This all falls under the category

18    of good news in the sense that we're considerably ahead of

19    where we expected to be.  We do expect that the defense is

20    going to call witnesses, but because of the same scheduling

21    issues, bringing people in from Rwandan and so forth, we don't

22    have any witnesses for the rest of today and tomorrow, so I'm

23    going to send you home today and we're going to take tomorrow

24    off.

25              I expect that we will have a witness on Friday.  It
```

1    probably will not take the whole day, and then we'll have

2    normal days resuming on Monday of next week.  I apologize for

3    the stopping and starting.  It's just we're coordinating a lot

4    of things here, including a lot of international travel, and

5    it's kind of the way it's played out, and the good news is

6    we're ahead of schedule at this point.

7         Next week we're only going to have trial Monday,

8    Tuesday and Wednesday.  I think I told you I have to be in

9    Washington on Thursday and Friday owing to my age and date of

10:59AM 10   appointment, I'm about to become the Chief Judge of the court,

11   and we have meetings in Washington that are mandatory for me to

12   attend.  It's a very dubious honor, I won't complain to you

13   about it, but it isn't as good as it sounds.

14        In any event, so I have to be there Thursday and

15   Friday, and then I think it will spill over into next week,

16   which is when I expect the case will wrap up with the last

17   witnesses and closings and so forth.  That's the schedule.  I

18   appreciate your patience and understanding.

19        Again, there's a lot of aspects that are unusual.  We

10:59AM 20   don't have witnesses coming from places like Boston or Revere,

21   they're coming from Rwanda, and it's hard to make all the

22   pieces fit perfectly into place, so I'm going to let you go for

23   the day.  I will see you at 9:00 on Friday.  Enjoy your break,

24   and please remember my instructions not to discuss the case

25   among yourselves or with anyone else or read or listen to

# J.A. 1011

1    anything about the case, and we'll see you Friday.  Thank you.

2              THE CLERK:  All rise.

3              (JURORS EXITED THE COURTROOM.)

4              THE COURT:  All right.  Is there a defense motion?

5              MR. LAUER:  Yes, your Honor, I'll submit a written

6    motion later today, but I would move for directed verdict, you

7    know, credibility is within the province of the jury.  There's

8    been a lot of evidence and testimony elicited as to

9    inconsistencies and witness statements, so I think there would

11:01AM 10   be grounds to conclude that no rational jury could convict

11   based on the evidence that's been heard, but I'm cognizant of

12   the fact that credibility determinations are usually to be made

13   with the jury.

14             THE COURT:  All right.  And I will deny that subject

15   to reconsideration once I've reviewed your written motion.

16             All right.  The timetable for discussing the expert

17   witness, do you want to do it this morning?  Do you want to do

18   it tomorrow morning?  I now suddenly have a little bit of free

19   time.

11:01AM 20             MR. GARLAND:  I think your Honor has said that the

21   Court wanted a little more time to look at this, and we had

22   some argument before.  We're available tomorrow to discuss that

23   at a hearing if you'd like or later today.

24             THE COURT:  Mr. Lauer, what's your pleasure?

25             MR. LAUER:  It's up to the Court.  We're available

1  today or tomorrow.  I think it's not an issue either way.

2          THE COURT:  Why don't we do it tomorrow morning, okay,

3  if everybody is indifferent.  We'll convene at 9:00, I guess,

4  and anything else that occurs to you that we ought to discuss

5  going forward, you know, we can take that up as well.

6          If we have a better handle on the schedule once

7  counsel has a chance to catch your breath and think about it,

8  that would be great, too, if we know when the jury is likely to

9  get the case.  I will check on the status of the draft jury

11:02AM 10  instructions.  I assume it will be just a general verdict form,

11  guilty or not guilty as to each of the five counts, but I'll

12  try to get you something in that regard as well so we can begin

13  talking about that.

14          Just so you know, again, because I give a written, a

15  copy of the written charge to everyone, I like to have what is

16  in effect a rolling charge conference where we begin talking at

17  multiple points in the trial what the charge is going to look

18  like so I don't have to wait until the actual close of the

19  evidence.  Hopefully everything will be resolved by then, and

11:03AM 20  so I guess I'd like to start that process sooner rather than

21  later.

22          Mr. Watkins.

23          MR. WATKINS:  Mr. Teganya, he would waive his

24  appearance for tomorrow so that he need not come up here for

25  the argument.

**J.A. 1013**

Case: 19-1689    Document: 00117615537    Page: 329    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 95 of 95

9-95

1            THE COURT:  Thank you, that's a good point.  That's

2       correct, Mr. Teganya, you'll waive your appearance tomorrow for

3       the argument on the expert and at least some possible

4       discussion of the jury charge?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Thank you.  And I'll see you tomorrow

7       morning.

8            THE CLERK:  All rise.

9            (Whereupon, the hearing was adjourned at 11:03 a.m.)

10                    C E R T I F I C A T E

11      UNITED STATES DISTRICT COURT )

12      DISTRICT OF MASSACHUSETTS ) ss.

13      CITY OF BOSTON )

14            I do hereby certify that the foregoing transcript,

15      Pages 1 through 95 inclusive, was recorded by me

16      stenographically at the time and place aforesaid in Criminal

17      Action No. 17-12092-FDS, UNITED STATES OF AMERICA vs.

18      JEAN LEONARD TEGANYA and thereafter by me reduced to

19      typewriting and is a true and accurate record of the

20      proceedings.

21            Dated March 25, 2019.

22                        s/s Valerie A. O'Hara
                          _____
23                        VALERIE A. O'HARA
                          OFFICIAL COURT REPORTER
24

25

1

1             UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,          )
                                        )
5    vs.                                )  Criminal Action
                                        )
6    JEAN LEONARD TEGANYA,              )  No. 17-10292-FDS
                    Defendant           )
7                                       )
                                        )
8                                       )

9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11
                         <u>HEARING</u>
12

13

14

                 John Joseph Moakley United States Courthouse
15                       Courtroom No. 2
                       One Courthouse Way
16                      Boston, MA 02210

17
                        MARCH 21, 2019
18                       8:30 a.m.

19

20

21

22

23                    Valerie A. O'Hara
                    Official Court Reporter
24       John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                     Boston, MA 02210
                 E-mail: vaohara@gmail.com

2

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;

5
     For the Defendant:
6
             Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.

8

9

08:56AM 10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J.A. 1016

```
  1                          PROCEEDINGS
  2              THE CLERK:  All rise.  Thank you.  Please be seated.
  3              THE COURT:  All right.  Good morning.
  4              MR. GARLAND:  Good morning.
  5              THE COURT:  This is a hearing on what, if anything, to
  6      do about the defense expert, Noel Twagiramungu.  Who's going to
  7      take the lead?
  8              MR. LAUER:  My colleague.
  9              THE COURT:  All right.  Go ahead.
09:02AM 10              MR. WATKINS:  Your Honor, unless the Court has
 11      specific questions, how would the Court --
 12              THE COURT:  Well, I guess, I could frame the problem,
 13      I guess.
 14              MR. WATKINS:  So, after reflection yesterday and
 15      looking a little more at what we expect to testify, I don't
 16      think there's going to be a need -- well, first I should back
 17      up.  It is always difficult in a proffer to predict exactly how
 18      testimony will come in, but I think in this case, we can
 19      certainly proceed without the kind of more sweeping
09:03AM 20      generalizations that the Court talked about, that a Rwandan
 21      witness necessarily will be -- I did not put it that way in the
 22      motion, but I think we can certainly avoid that or they will be
 23      giving testimony with the expectation, it can certainly be
 24      -- it may not come anywhere close to that once it comes
 25      into -- once we get the witness up on the stand.
```

J.A. 1017

```
 1              So, I guess what I'm trying to say is I understand the
 2      Court's concerns to stay away from broad, sweeping
 3      generalizations about what witnesses will do, and I think we'll
 4      be able to police that line appropriately.
 5              THE COURT:  Maybe it is helpful for me to frame it, I
 6      guess, which involves me in part thinking out loud.  So I think
 7      it's fair for the defense to be concerned, the jury knows
 8      nothing about Rwanda, I know nothing about Rwanda, you know,
 9      its political, cultural, social norms, and you have the jury
10      trying to assess the credibility of witnesses, who inevitably
11      are going to filter that through American eyes, that is, their
12      own experience, their own cultural and social norms, and it
13      seems not unreasonable for both sides to be able to offer
14      evidence of ways in which Rwanda is different and how that
15      might affect how we view the evidence.
16              The problem, of course, which I highlighted yesterday
17      but really has many subtle layers is the problem of
18      generalizations and how they relate to specifics and how
19      fraught with danger that is.
20              You know, stereotyping is problematic not because
21      stereotyping doesn't have a colonel of truth, because it
22      usually does, or large colonel of truth, but because it's so
23      easy to leap from the general to the specific.
24              You know, as I was driving home last night, I was
25      reminded visitors to Boston from Europe, particularly Northern
```

09:04AM 10
09:04AM 20

1    Europe or Central Europe are often surprised by basically how

2    dirty Boston is, the Big Dig is filthy, it's never clean, the T

3    is filthy, and Europeans, you know, have said things to me like

4    why don't they just clean this, why is this so dirty, and

5    you've probably had the experience of being in other countries,

6    Southeast Asia comes to mind, why don't people pick up the

7    litter, and we can stereotype, and, again, there's a big

8    colonel of truth.

9        Are Swiss people or Norwegians more likely to be

09:05AM 10    cleaner than Bostonians?  Yes is the answer, yes, that is

11    certainly true, but, of course, it doesn't tell us whether this

12    particular Norwegian is more clean than this particular

13    Bostonian, and the problem is is how easy it is to make that

14    leap and how hard it is to erase that stereotype.

15        You know, that's a harmless example, you know, the

16    stereotype because someone is from Zurich, he, therefore, must

17    be clean or, you know, keep clean.  Maybe, you know, a more

18    real or troublesome example, "troublesome" maybe isn't the

19    right word, but complicated, there is a phenomenon in rape or

09:06AM 20    sexual assault cases of the victim not reporting right away,

21    which might happen for a variety of different reasons,

22    particularly depending on what culture the victim is from, and,

23    of course, that is something that has changed dramatically over

24    time, so there is a possible explanation in an individual case

25    why the victim did not report the assault for some period of

1    time, and you might say, well, there's a cultural norm there

2    that helps to rebut the inference that the witness recently

3    fabricated her story.

4         In other words, it's difficult for someone, let's say

5    from a Middle Eastern country to report a sexual assault, and

6    she had to, you know, work her way through that before she had

7    the courage to do it, but that itself has been turned around

8    sometimes where you'll hear people say, I've heard them say, I

9    had it in a case once that delay itself is affirmative proof

09:07AM 10    that the assault happened.

11         In other words, if the woman reported it right away,

12    that's proof that it happened.  If the woman didn't report it

13    right away, that's also proof that it happened, again, going

14    from these general propositions that help to sometimes explain

15    things to coming up with a specific absolute that controls the

16    situation, which is what's unfair, I guess, and dangerous about

17    it.

18         And, you know, the overlay here, of course, is my own

19    ignorance of Rwanda, which is contributing to my difficulty

09:08AM 20    understanding this.  You know, suppose this were not a Rwandan

21    case but involving a Nazi camp guard, I don't know if those

22    cases exist, but, as you probably know, there used to be cases

23    involving -- immigration cases basically where people had lied

24    about whether they had served as a camp guard at Auschwitz or

25    Belsen, and surely, surely I would not allow a holocaust denier

```
 1    to testify as an expert in a case to say, you know, that this
 2    didn't happen, and, therefore, all the witnesses are making it
 3    up because I understand that context.
 4         And I don't have the comfort level, I guess, any
 5    comfort level really that I quite know what I'm doing regarding
 6    Rwanda, you know, is there a government narrative, is this
 7    true, is this closer to holocaust denial than a fact?
 8         I just don't have any idea how to assess that, and I
 9    guess, you know, some other maybe random points illustrating my
10    thinking that the original version of the proposed testimony,
11    which I think Mr. Watkins said the defense is backing off from
12    has basically said that all Rwandan witnesses will be biased
13    because of the government narrative, all Rwandan witnesses will
14    testify with the expectation that their narrative will be
15    scrutinized by the government, which is not really very far off
16    which is saying all Rwandans are going to lie about the
17    genocide in order to please the government, which I think is
18    clearly impermissible, so even if we're dialing that back and
19    the witness simply says many Rwandans lie because of the
20    government narrative or their fear of scrutiny, it's pretty
21    easy for a jury to close that gap and to go from because many
22    Rwandans lie, therefore, the specific Rwandan is lying.
23         And -- well, I guess I'll stop there.  Those are my
24    concerns, but I guess I'll also circle back to my original
25    point, which is it does seem fair to allow something about how
```

1   Rwanda is different and how the jury ought to take that

2   information or consider that information in light of whatever

3   realities exist in Rwanda either then or now.

4           So let me hear, I guess, from the government.

5           MR. GARLAND:  Thank you, your Honor.  Your Honor, I'd

6   like to address actually a point that's really prior to all of

7   what you've identified.

8           THE COURT:  Yes.

9           MR. GARLAND:  Obviously, the Court started off early

09:11AM 10   on saying that stereotypes shouldn't be talked about, it has no

11   place in this courtroom for a variety of reasons and that there

12   may be a colonel of truth, but that colonel of truth, of

13   course, comes up in a variety of different ways, right,

14   somebody comes to Boston, to use the Court's example, and says

15   I can't believe Americans are so dirty.

16           THE COURT:  Well, Boston, in particular, the Big Dig,

17   I was driving at the Big Dig when I had this thought.

18           MR. GARLAND:  Understood, but the way that stereotypes

19   and generalizations work is that somebody comes to Boston and

09:11AM 20   says I can't believe how bad Boston is, how dirty it is, I

21   can't believe how dirty Massachusetts is, forgetting that

22   there's an entire western part of our state, I can't believe

23   how dirty America is, not realizing that there are plains that

24   haven't seen litter at all, and the reason that's particularly

25   important is the question is the way the Court was describing

1  it, and this may be unintentional, but is basically buying the

2  premise that there is something substantiating the view that

3  Rwanda is different, and part of what goes on with any expert,

4  of course, is to identify, well, what expertise do you actually

5  have?  Was it just that you went to Boston one time and you saw

6  what Boston was but now you're going to talk about the rest of

7  the United States?

8          That's particularly true, of course, with 703

9  evidence.  We haven't had the expert come up here and testify

09:12AM 10  about the basis for his conclusions and how the extent to

11  which, if, at all, they are borne out by the scholarship, but

12  the disclosure by the defense is essentially that the expert

13  hasn't been in Rwanda since 2004.

14          Now, it may be that despite that with modern day

15  technology, he has interviewed all sorts of people who are

16  inside of Rwanda who can talk about this.  It may be that he

17  has interviewed all sorts of people who have been in Rwanda,

18  traveled outside, and he has a basis of knowledge on which to

19  talk about that.

09:13AM 20          But we're not going to know that, in fact, we don't

21  know that at this point whether that's true or not.  There's

22  some vague, I guess I'm not going to call them allegations but

23  references to that there's some scholarship out there, but

24  getting from that scholarship to a wide generalization that has

25  all the dangers that the Court has already identified, that's a

1    big gulf, and the concern that the government has is that

2    working that out on the stand in front of the jury at that time

3    may wind up that they're prejudiced once they hear it, once

4    they hear what the person's views are and then what scholarship

5    or experience that is based upon.

6        The Court might at that point say, you know what,

7    actually, I don't think that there's enough really to back up

8    that claim.

9        THE COURT:  So you're saying I should do a voir dire?

09:14AM 10        MR. GARLAND:  I think there should be -- I think that

11    there should be some voir dire of that witness beforehand to

12    find out really what's behind that person's viewpoint, and

13    there are a variety of things that the government will try to

14    establish if the expert is on the stand.

15        I'm not going to say necessarily that the government

16    is going to go through all of those avenues beforehand at the

17    voir dire because I don't want to necessarily prepare him for

18    his testimony before the jury, but there are a variety of

19    reasons to doubt that that proposition actually should be

09:14AM 20    something that's testified to at all by this person.

21        THE COURT:  Okay.  Let's say, suppose we get over that

22    hump and I say whatever his qualifications, I'll permit him to

23    testify about current norms in Rwanda, whatever the right word

24    is, what then?  In other words, rather, he's qualified to talk

25    about current norms.  Should I let him do so, assuming I make

1    that decision?

2          MR. GARLAND:  I think not, especially in the terms of

3    how the Court has been framing it, and I'll contrast the way it

4    was discussed up in New Hampshire.

5          Again, there, the decision was made, they were talking

6    about credibility, and, clearly, this jury has the ability to

7    judge the credibility of people who have sat up there, been in

8    front of them for hours in the crucible of direct,

9    cross-examination, redirect, recross and all that, and so to

09:16AM 10   begin with, the idea of looking at this as a credibility

11   determination I think is incredibly dangerous, so to the extent

12   that the Court is going to have any instructions to the jury

13   about that at all, I would suggest that the sole lens through

14   which you should be looking at it is possibly bias, even though

15   the government doesn't think there is any of that at all.

16          But the second thing, the second reason that having

17   him testify about this is so dangerous is what I suggested

18   yesterday, and I'm not certain that there are jury instructions

19   that can caution against this adequately, which is that

09:16AM 20   essentially this witness will basically be saying when you

21   distill it that the government witnesses have succumb to the

22   pressure.  Any Rwandan witnesses that the defense have put up

23   have not succumb to that pressure, including, by the way, this

24   witness who is from Rwanda because that's where he grew up, and

25   that's where he came from.

1          He, because he was able to resist that pressure is

2      really the bearer of the truth, and then the third proposition,

3      I think, is that -- and just think about all the witnesses we

4      could have had here who would testify from the defense if there

5      weren't this pressure, and that's the thing that's actually a

6      little bit of a problem with this testimony, that if you

7      actually buy the argument that or the proposition that that

8      expert wants to talk about, it doesn't necessarily suggest a

9      reason why people would lie about what happened to them during

09:17AM 10      the genocide when the current administration wasn't even there

11      at all, it doesn't even suggest that there is this sort of,

12      well, there's this narrative, but I think that the narrative

13      that's being talked about is actually quite different from the

14      narrative that all Hutus are guilty of genocide, as long as one

15      person points the finger.

16          I think the narrative that this expert is known for is

17      a quite, quite different narrative that talks about what

18      happened post-genocide, which the Court has already ruled

19      really doesn't matter, but then so the last proposition is

09:18AM 20      going to be that we really could have had other people come in

21      if there wasn't this proposition, but what I was getting at is

22      that if that expert were to say, well, you know, people don't

23      want to come forward because they're worried about what the

24      government would do to it if they did, that's the argument for

25      why there wouldn't be more witnesses coming forward for the

1    defense, and that's an argument about what happens outside this

2    courtroom, and the jury can't consider that at all.

3         That's why I think there are a whole variety of

4    problems with, 1, assuming that there is scholarship to back up

5    the opinion; Number 2, of even if you let it in, that invites a

6    lot of inferences that are going to be front and center for

7    that jury about whole categories of people.  It's the very

8    antithesis of what juries are supposed to do.  They are

9    supposed to take person by person, testimony by testimony,

09:19AM 10    credibility determination by credibility determination.

11         THE COURT:  If you were to stand up in your closing

12    argument and say something like this, are there imperfections

13    in the witness's testimony?  Of course.  It happened 25 years

14    ago, the events were traumatic, shocking, and it's hardly a

15    surprise that some of the witnesses' memory of certain details

16    or dates or times or whatever are perhaps less than perfect.

17    We would all understand that.  We have enough knowledge of

18    that, of how human memory works or the effect of PTSD or

19    equivalent psychological phenomena.

09:20AM 20         We don't really need to have it explained to us by an

21    expert, maybe in some case you might want to offer it, but I

22    think we all kind of understand that, but if the defense says

23    these witnesses changed their story, they added details because

24    that's the social norm in Rwanda, how do they make that

25    argument, in other words, without an expert, without someone

J.A. 1027

```
 1   explaining that?

 2           I, of course, I can't judge whether or not that's

 3   true.  That's not really the question, it's whether or not it

 4   would be unfair, or let's take that woman who I'm blanking on.

 5           MR. GARLAND:  This is Consolee Mukeshimana?

 6           THE COURT:  Not Consolee.

 7           MR. GARLAND:  Esperance?

 8           THE COURT:  Esperance.  So, someone who is a Rwandan

 9   subsistence farmer or was in 1994, as you would be free to

10   argue, doesn't have a Smartphone with a calendar app that's

11   helping them keep track of things, right, and that may be why

12   the dates, you know, aren't quite aligned as neatly as they

13   might otherwise be, and, again, we know that, and we understand

14   that.

15           We can easily picture that because we have a frame of

16   reference for it even though none of us have ever been

17   subsistence farmers in Rwanda, but, again, how does the defense

18   make this argument assuming that there's -- I'm assuming, you

19   know, he's qualified to make -- to render this opinion, I'm

20   assuming that problem away right now.  How does the defense

21   make that argument without the testimony?

22           MR. GARLAND:  I think the defense makes that argument

23   by showing, A, that this happens in Rwanda; and, B, that it

24   happened with these witnesses.  And the defense has been unable

25   to show that with these witnesses.  There has been no evidence
```

J.A. 1028

1   whatsoever that these witnesses have been swayed whatsoever by

2   the government.  There's no evidence whatsoever, and to the

3   contrary that the Rwandan government had anything to do with

4   this investigation.  The evidence has been that the Rwandan

5   government wasn't even surveilling or that no surveillance was

6   spotted of the investigation.

7          The cases that talk about allowing an expert to talk

8   about this sort of stuff, the battered women syndrome, as you

9   talk about, I think it was the *Don Vaughn* case that they had

09:23AM 10   cited basically say when something unusual happens in a trial

11   where a jury wouldn't understand it and they need expert

12   testimony in order to explain it, that's the time that you

13   bring in an expert, and so battered women syndrome is a perfect

14   example of that.

15          The *Don Vaughn* case, it was as well the fact that I

16   believe it was among women and among people in general had

17   specific respect for government officials, and that's why women

18   did not report the fact that they were being raped by a

19   government official, so that's an unusual circumstance that the

09:24AM 20   jury has no experience with whatsoever.

21          Here, what unusual circumstance has been shown?  So

22   the point is that even if there weren't this backdrop of what

23   the defense the expert will say, which is that when people are

24   affected by the government over there or that people can be

25   affected over there, what's the proof at all that that's what's

1    happened in this trial with these witnesses in this

2    investigation because if there were, that would be unusual, and

3    if that were unusual, then explaining that would be useful

4    possibly by a defense expert, but there's been no evidence

5    whatsoever that this has been that case because all of the

6    things that the Court just identified, fuzzy details over time,

7    not tracking events in a highly charged and adrenalized

8    situation that lasted a long time, things that happened 24, 25

9    years ago, not recounting certain details in different

09:25AM 10    interviews.

11    That happens in America cases all the time, so there's

12    no -- so that's the argument is that if there were any proof

13    whatsoever in this case with these witnesses, that would need

14    to be explained by that proposition, perhaps, but not this

15    case, not these witnesses.

16    THE COURT:  Mr. Watkins.

17    MR. WATKINS:  Your Honor, I want to back up a little

18    bit because there was a series of straw men being put out

19    there, and I'm going to try to unpack all of them.  First,

09:25AM 20    there's no inclination, elicited opinion that says all Rwandans

21    are affected.

22    THE COURT:  That's exactly -- well, I don't know about

23    all Rwandans, but his offer said a Rwandan witness' testimony

24    will be given with the expectation that it will be scrutinized.

25    A Rwandan called to testify about genocide events brings to his

J.A. 1030

1  or her testimony a different set of biases because the witness'

2  testimony is anchored by the narrative proffered by the

3  government.  The witness actually -- that sounds to me like 100

4  percent of Rwandan witnesses are affected by this.

5      MR. WATKINS:  So what I want to back up here is the

6  bias exists.  It will be there.  It may not affect their

7  testimony in this particular case.  As I say, we can present

8  testimony in such a way that it does not indicate that every

9  person is affected by the bias, but the bias will potentially

09:26AM 10  exist, so there is really not a difficulty there at all.

11      The thought that Dr. Twagiramungu is a genocide

12  denier, that is not true.  All of his scholarship is about the

13  genocide.  There's no indication.  We've heard talk about the

14  double genocide.  That is not part of his scholarship.  That is

15  not something he's going to opine, and that would be something

16  he would fervently disagree with that particular concept.

17      So, at the end of the day, we keep coming back to

18  bias, which is what this is all about.  Bias is something that

19  we instruct the jury on about specifically.  It is a factor

09:27AM 20  that they are to consider whether the witness had any kind of

21  bias.

22      We instruct them in that way because we expect a

23  shared experience of what constitutes bias and how one can take

24  a look at bias as one is testifying on the stand.

25      What we do not have with these jurors are people who

1    have lived under an authoritarian government for five decades

2    with some mild gaps in there for five decades under a

3    authoritarian government.  That is not something that the

4    average juror, really any juror, can understand how that is a

5    part, it's internalized in any particular witness.

6         This jury is not going to be able to understand it,

7    and, in fact, as the Court pointed out and Mr. Garland has

8    affirmed, we're going to argue the typical kinds of American

9    biases, the kinds of things that we would argue there to put

09:28AM 10   out something that is the elephant in the room, right, that

11   they all of these witnesses come from an authoritarian country,

12   which is very, very motivated to craft speech and to -- well,

13   to craft speech and has extraordinary control over its

14   citizenry about particularly speech I think would ignore what

15   is a reality with that kind of bias, so that's what we're

16   trying to suss out here.

17        To go to the sexual assault allegations, it is

18   similar.  We do allow the government to bring in experts to

19   talk about something that isn't perhaps not a common experience

09:29AM 20   or at least not up until the last few years a common

21   experience.

22        Why would a woman wait so long?  That's a specific

23   aspect of how the jury, right, is going to evaluate this

24   person's testimony, evaluate whether there is bias or whether

25   the bias is explained, right, these kinds of credibility

1    determinations that require, demand the jury to evaluate a

2    person's bias when they come in here.

3         I guess what I'm trying to say here is that this

4    exists.  There's no doubt about it.  Dr. Clark testified

5    himself.  The government put this into play.  In my notes, he

6    wrote down that coercion, I wrote down coercion on witnesses

7    can be subtle, that it exists regardless of political status.

8         Dr. Clark, the government has put this into play

9    already and has started talking about it, immediately tried to

09:30AM 10   talk about why it wasn't present in people that went through

11   the Gacaca courts.

12        They took some pains to try to explain why their

13   witnesses are credible here.  That's what they're going to

14   argue at the end of the case from Dr. Clark's testimony, so

15   it's before the jury.  It is not something that is contradicted

16   in any way that there's an authoritarian government and that

17   this has an effect on the people that are coming here to

18   testify because it has an effect on everybody that is in

19   Rwanda.

09:30AM 20       THE COURT:  I'm not going to allow absolute testimony,

21   I'm not going to allow anyone to say it has an effect, okay,

22   because that just -- that is expressing an opinion about the

23   credibility of a witness.  It means that all of the government

24   witnesses have been affected by this.

25        MR. WATKINS:  It's not something we would elicit from

1    the expert, it's not something we would even argue.  We

2    wouldn't even be coming close to that kind of --

3         THE COURT:  I'm reacting because you just said it.  If

4    I allow this, and I'm obviously struggling with it, it's going

5    to be dialed back.  I am not going to allow any witness to say

6    all Rwandans have this bias, all Rwandans are affected by that,

7    I'm just going to allow it, okay.

8         He can say it's pervasive perhaps or, you know, many

9    people, whatever, but I'm not going to let him say that every

09:31AM 10   single solitary Rwandan, and you just said it, it's in his

11   proffer, I'm not going to allow that, okay.

12        MR. WATKINS:  And I understand that, and I'm obviously

13   not explaining it well, but at the end of the day, it is not

14   something we are going to elicit from the expert here.

15        What he is going to talk about is what it is like

16   specifically in Rwanda to live under an authoritarian

17   government and to talk about the genocide stories in that

18   context, and it is in the literature.

19        The expert that the government often uses,

09:32AM 20   Dr. Timothy Longman, who we've heard about, that is part of his

21   scholarship is talking about this narrative that exists and

22   talking about how that affects witnesses on a general matter,

23   as a general matter.

24        Again, we are not going to get close to the point

25   where we're saying these witnesses are suffering from that, but

1    it needs to have that or through the expert, but it needs to

2    have that background, otherwise the jury does not have a tool

3    to accurately assess the kinds of bias that we expect jurors to

4    deal with.

5              MR. LAUER:  If I could add one thing, your Honor.

6              THE COURT:  Yes.

7              MR. LAUER:  I'm going to be the one who closes in this

8    case, and the government raised some concerns about how I might

9    make arguments from the expert testimony that was raised, in

09:33AM 10   particular, that certain witnesses are more believable or less

11   believable based on this testimony.

12             It would be improper for me or for any attorney to

13   vouch for a witness, and I have absolutely no intent to do

14   that.  The only intent here is to make clear to the jury that

15   credibility determinations are theirs and that there are

16   certain factors and forces about Rwanda, unique to Rwanda, that

17   are different than their shared experience or common experience

18   having lived in this country.

19             I certainly will not be arguing that some witnesses

09:33AM 20   are braver than others, some witnesses are necessarily lying or

21   not lying.  That would be vouching, and that's, you know, not

22   my role.

23             THE COURT:  There's nothing wrong with you saying -- I

24   mean, vouching is expressing personally.  You can certainly say

25   witness X did not tell the truth.  Obviously, that's fair game.

J.A. 1035

1    MR. LAUER:  Right.  But for me to suggest that somehow

2  because some witnesses are coming from Rwanda to testify for

3  the defense, they are more believable.  That is not an argument

4  that I think flows from the evidence.  The issue here is really

5  just making the jury aware of the forces that are at work, the

6  norms that operate in this foreign culture as they relate to

7  credibility.

8    THE COURT:  Okay.  Let me ask this.  If I do a

9  voir dire, suppose I did a voir dire tomorrow morning at nine,

09:34AM 10  we told the jury to report by ten on the expectation that we'd

11  get started somewhere between 10:00 and 10:30, assuming if he

12  testifies, would we be able to get him on and off the stand,

13  would that cut too much into the day?  I'm just thinking the

14  timing here.

15    MR. WATKINS:  Can we get him on and off the stand, is

16  that the question?

17    THE COURT:  In other words, let's say we had a

18  voir dire and argument from 9:00 to 10:15, I decide I'm going

19  to allow him to testify, he starts at 10:30, could we get him

09:35AM 20  done by 1:00?

21    MR. WATKINS:  I think so.

22    MR. GARLAND:  Cross-examination will take a while,

23  your Honor.

24    THE COURT:  But he's not -- if it spills over to

25  Monday, I guess that's not the end of the world either because

1     you're going to have other witnesses, right?

2          Let's do that.  I would like to tell the jury to

3     report at ten, we can do that, right, Lisa, the 800 number?

4     I'd like to do a voir dire at nine.  It's not going to be a dry

5     run of his entire testimony.

6          I would like to hear about his qualifications,

7     particularly the issue that the government raises about him,

8     the particular focus on him not having traveled to the country

9     since 2004, which is not necessarily a show-stopper, obviously,

09:36AM 10     but I'd like to, you know, hear that and then at least

11    understand his principal points how he is going to phrase them,

12    which may need to be revised, should be revised in light of

13    this discussion, and I'll take it from there.

14          And I'm not sure what I'm going to do, obviously, but

15    I would not assume that I'm going to keep him off the stand

16    entirely, but let's see how this plays out.  Okay.  Will that

17    work?  I think I need the voir dire.

18          MR. WATKINS:  It will, your Honor, and just to be

19    clear, the government has conceded that he is an expert witness

09:36AM 20     to talk about the social history post-genocide regardless of

21    this particular issue.  We will be putting him up for that, and

22    I don't think there's any reason to go through that at the

23    voir dire.

24          THE COURT:  I just want to focus on the disputed

25    issues, I guess, if that's makes sense.  Obviously, you can put

1   a framework on it, but I'd like to get right to the heart of

2   it, whatever the issue is.  Okay.

3            MR. WATKINS:  Also, I'll raise one other issue that I

4   expect to come up.  We might as well address that in the

5   morning.  There is an unreported decision regarding

6   Dr. Twagiramungu's testimony.  I expect maybe the government is

7   going to cross-examine him concerning that decision.  I think

8   it's irrelevant.  I don't think that the government should be

9   able to cross-examine him on that.  I have the case or I can

09:37AM 10   give it to the Court.

11            THE COURT:  Sure.

12            MR. WATKINS:  I don't think we have to decide it by

13   today, but I wanted to at least bring it to the attention of

14   the Court that that will also be an issue.

15            MR. GARLAND:  Your Honor, I can be clear on this.

16   This would not be part of my cross-examination, the fact that

17   another court kept Dr. Twagiramungu off the stand because, as

18   that Court correctly noted, this is about -- the case is about

19   what happened in Rwanda during the genocide of the Hutus

09:38AM 20   against the Tutsis and what that defendant was saying in the

21   immigration proceedings, markedly, like this case, where the

22   only things that really matter are what happened during the

23   genocide of Hutus against Tutsis and what Mr. Teganya did

24   during his immigration proceedings.

25            Clearly, the government would suggest that for the

1    same reasons that were used by the Court in here, and this

2    decision should be applied by this Court, but I don't

3    anticipate, I'm asking about that.

4         That being said, while the government has said that,

5    yes, Dr. Twagiramungu has written extensively about

6    post-genocide Rwanda, the government continues to say that's

7    not what this case is about.  It's not about where he's going

8    back to, it's not about what happens to him after he's

9    convicted, it's not about what the suggestion is about what

09:39AM 10   post-Rwanda looks like for the witnesses.

11        One other thing that the Court might want to consider

12   in this case to get at this issue is there are a couple of

13   undeniable facts here that there's been lots of testimony.

14        The testimony has been that the people who we have

15   testifying about what Mr. Teganya did during the genocide are

16   Tutsis.  He is a Hutu.  The history is very clear, Mr. Watkins

17   talked about 50 years of authoritarian government.  I believe

18   that 20 of the years that he was talking about were under Hutu,

19   was under the Hutu authoritarian government at that point.

09:40AM 20        It's undeniable that since 1994 when the genocide

21   ended that it has been a Tutsi-led government, undeniable about

22   that.  A jury may or may not read anything into that.  That

23   might be significant, but the point is that some of the bias

24   that Mr. Watkins and Mr. Lauer have talked about are sort of --

25   could be inherent or understood by a jury, but based on the

1       history of the conflict, which they've already heard about, the

2       identities of the witnesses and the defendant as well.

3               None of that, of course, should be, as the Court

4       identified, taken as a stereotype at all, but I guess the point

5       is is that those issues are already before the Court, and if

6       the United States needs to stipulate that it has been a

7       Tutsi-led government for the last 25 years, which I believe is

8       already testified to, that's fine, but to get into this

9       scholarship and how it applies to witnesses who have said they

09:41AM 10      weren't affected by the Rwandan government and an investigation

11      that wasn't affected by the Rwandan government seems to venture

12      right into 403.

13              MR. WATKINS:  Well, it sounds like to me that the

14      government is conceding relevance.  If they're saying the jury

15      can't take that into account, they already have enough

16      information to take it into account, then the question becomes

17      do they truly have enough information to accurately assess how

18      the witnesses are affected by that?

19              As to the decision, if there's no issue that this is

09:42AM 20      going to come up in front of the jury, then my work is done on

21      that.  The Court will read the decision and determine whether

22      it has any effect on this Court's decision whether to allow the

23      testimony in.

24              As the Court will see, it was a very different issue

25      with a very different standard of review and different standard

J.A. 1040

 1   for admission of testimony there and a factual, major factual

 2   difference, so I don't think it has anything to do with how

 3   this Court should deal with this.

 4          THE COURT:  Okay.  All right.  Let's leave it this

 5   way.  Let's convene tomorrow at quarter to nine, voir dire to

 6   start at nine, hopefully to be completed by ten highlighting

 7   the disputed areas or the principal disputed areas.  We'll tell

 8   the jurors to come in at ten with the expectation that if he is

 9   going to take the stand, it will begin somewhere, 10:00, 10:15,

09:43AM 10   10:30, somewhere in that time frame.  All right.  We'll see you

11   tomorrow morning.

12          THE CLERK:  All rise.

13          (Whereupon, the hearing was adjourned at 9:43 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

                    UNITED STATES DISTRICT COURT
2                     DISTRICT OF MASSACHUSETTS

3
                                         )
4    UNITED STATES OF AMERICA,           )
                                         )  Criminal Action
5    Vs.                                 )
                                         )  No. 17-10292-FDS
6    JEAN LEONARD TEGANYA,               )
                       Defendant         )
7                                        )
                                         )
8
     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
9

10
                         JURY TRIAL DAY 10
11

12        John Joseph Moakley United States Courthouse
                      Courtroom No. 2
13                    One Courthouse Way
                      Boston, MA 02210
14

15                     March 22, 2019
                        8:30 a.m.
16

17

18

19

20

21

22

23                    Valerie A. O'Hara
                   Official Court Reporter
24    John Joseph Moakley United States Courthouse
              1 Courthouse Way, Room 3204
25                   Boston, MA 02210
              E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3         United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;
5
     For the Defendant:
6
             Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.
8
     ALSO PRESENT:
9
     Joseph Bizimana, Interpreter

08:37AM 10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2    WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

3    VOIR DIRE OF NOEL TWAGIRAMUNGU
       By Mr. Lauer                4
4      By Mr. Garland                     17

5    NOEL TWAGIRAMUNGA
       By Mr. Lauer               41            88
6      By Mr. Garland                     63              94

7


8    EXHIBITS                        FOR I.D.   IN EVIDENCE

9     A                               99
      Dr. Twagiramungu's curriculum vitae    5
10    was marked for identification

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        PROCEEDINGS
 2            THE COURT:  All right.  Good morning.  Are we ready to
 3    go for a voir dire?
 4            MR. LAUER:  We are, your Honor.
 5            THE COURT:  All right.  I guess if you all are ready,
 6    we can start any time, unless there's something else you want
 7    to discuss or should we --
 8            MR. LAUER:  We're ready to proceed if the Court is.
 9            THE COURT:  All right.
10            NOEL TWAGIRAMUNGU, having been duly sworn by the
11    Clerk, testified as follows:
12                     DIRECT EXAMINATION
13    BY MR. LAUER:
14    Q.   Good morning, sir.  Can you please state your name and
15    spell your last name for the record.
16    A.   Noel Twagiramungu, T-w-a-g-i-r-a-m-u-n-g-u.
17    Q.   Where do you work, Mr. Twagiramungu?
18    A.   I work at Boston University as a research fellow.
19    Q.   In what department?
20    A.   The Department of African Studies Center.
21    Q.   Do you have a Ph.D.?
22    A.   Yes, I have a Ph.D. degree.
23    Q.   And where did you get your Ph.D.?
24    A.   I received my Ph.D. degree at Tufts University, the
25    Fletcher School of Law and Diplomacy in 2014.
```

08:51AM (line 10)
08:52AM (line 20)

Case: 19-1689    Document: 00117615537    Page: 361    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 204    Filed 11/04/19    Page 5 of 101

10-5

```
 1   Q.   And what was the area of your study?

 2   A.   My area of study is international lessons.

 3   Q.   And do you focus on a specific region or countries?

 4   A.   Yes, I focused on the Great Lakes Region with a focus on

 5   Rwanda and Burundi.

 6   Q.   Have you also published as an academic?

 7   A.   Yes, I have extensively published especially on Rwandan

 8   politics, human rights and the genocide and post-genocide

 9   issues.

10          MR. LAUER:  Perhaps rather than inquiring of his

11   qualifications, I could have his C.V. marked as an exhibit.

12          THE COURT:  Yes.  If you could get a copy for me.  For

13   some reason the copy that was on the system, on CM-ECF has

14   gibberish and symbols.  I don't know why that happened.

15          (Dr. Twagiramungu's curriculum vitae was marked for

16   identification.)

17   Q.   You mentioned that you had focused on Rwanda and the

18   genocide.  I want to direct some questions to you about that.

19   A.   Yeah.

20   Q.   Have you studied the evolution of the Rwandan government,

21   both present and post-genocide?

22   A.   Yes.  In fact, my doctorate dissertation was on the

23   transition from genocide to rebel governors in Rwanda and

24   Burundi comparing both countries.

25   Q.   And, just briefly, can you give us a brief overview of how
```

```
 1    the Rwandan Government has evolved post-genocide?

 2    A.   So in the post-genocide in my studies, I found out that

 3    current government, which was established in July in 1994 after

 4    the horrors of the genocide really started in hope, in

 5    moderation.  It was inconclusive, it was actually, it was

 6    including of that time of people from the pre-genocide position

 7    political parties.

 8         It included figures from civil society groups, but

 9    over time, those people have been excluded, and the government

10    to becoming more militarized and more authoritarian and

11    centered around one strong man.

12    Q.   And the strong man that you're referring to, who is that?

13    A.   The strong man is the current president, Paul Kagame.

14    Q.   And what role has Kagame played in the government of

15    Rwanda since the time of the genocide?

16    A.   So Paul Kagame, who was the commander in chief of the

17    Rwandan Patriotic Front, the group which removed from -- which

18    stopped the genocide and removed from power, who took over

19    government first was vice-president and the Minister of Defense

20    in the first government established in 1994, and later he

21    became president in 2000, after forcing into resignation the

22    then president, whose name is Pasteur Bizimungu, but also after

23    forcing into resignation other key figures of the government,

24    including the then prime minister, the Speaker of the House and

25    after dismissing all the Supreme Court Judges.
```

J.A. 1047

Case: 19-1689    Document: 00117615537    Page: 363    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 7 of 101

10-7

1    Q.   So you've described essentially the Rwandan government

2    becoming more authoritarian since the time of the genocide.

3    How has that affected the general population?

4    A.   So these affected the general population in many ways,

5    including, for instance, not to honor those removed from power,

6    those who have been included in the government from other

7    political forces than the RPF, but also there was a systematic

8    campaign to target human rights groups of media to corrupt

9    those independent organizations replacing the leadership by

08:57AM 10   those very close to the government in narrative.

11   Q.   What is the government narrative you're referring to?

12   A.   So the government narrative is really a key here to

13   understanding Rwanda.  The narrative government is a very

14   simplified vision of Rwanda in the understanding of the history

15   of Rwanda.

16        In fact, just after the genocide, the government

17   ordered its schools to stop teaching the history of Rwanda as a

18   subject.  Instead, the government imposed a new version of the

19   history of Rwanda, which is taught through what is known in

08:58AM 20   Rwanda as re-education camps in Ingando, so people are taught

21   this is the true history of Rwanda.

22   Q.   That true history of Rwanda or the narrative, as you've

23   referred to it, what are the features of that narrative?

24   A.   There are several features of the narrative, but key among

25   those narratives is that the Rwandan Patriotic Front and

1       especially its military forces liberated Rwanda from the Hutu

2       tyranny and the Hutu regime, which had been in power since

3       1959, and they removed from power the genocidaire government,

4       and because of that, the RPF is the savior of the country,

5       President Kagame is the Moses of Rwanda, he is really the

6       guardian of the new Rwandan dignity in existence in unity.

7              In that narrative also, the military, the military is

8       really the glue that holds the whole country together.

9       Q.   What about the role of the Hutu?  Is there a role that the

09:00AM 10   Hutu are described as having in this official narrative?

11      A.   In that official narrative because the Hutu are just taken

12      as a whole group that those Hutu who have been in power since

13      1959, they are collectively guilty of either the genocide or

14      the genocide ideology.

15      Q.   What is meant by genocide ideology?

16      A.   Genocide ideology means -- it really means anything the

17      government wants it to mean but especially it's about there's a

18      notion of challenging the government in terms of political or

19      military or how the country, how the RPF governs the country,

09:01AM 20   how the RPF built its narrative over the history of Rwanda, so

21      mostly it's about challenging.  There is no clear-cut actually

22      according to the national narrative between really genocide and

23      any form of challenging those who stopped the genocide.

24      Q.   What are the means by which this message or this narrative

25      is transmitted?

J.A. 1049

Case: 19-1689    Document: 00117615537    Page: 365    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 9 of 101

10-9

1    A.    So, there are several means which are meant first to

2    cement the legitimacy over this ruling party, which stopped the

3    genocide and also to silence anyone who may challenge this

4    party, especially both local actors and international

5    community, so those means one of them is what I refer to here

6    as Ingando, so re-education camps.

7    Q.    The re-education camps, who attends those and who

8    administers them?

9    A.    So actually the re-education camps just are attended by

09:03AM 10   every Rwandan at different levels.

11   Q.    And who runs these trainings?

12   A.    Those trainings are run by the government, but what is

13   interesting is that really the teachers are not qualified

14   teachers or qualified school or scholars, and, as I said, they

15   are not taught in normal schools but actually most of them

16   train as RPF officials, including military officers.

17   Q.    And why do people go to these trainings?

18   A.    Actually, those trainings are mandatory.  First, those who

19   are re-educated are the leaders or the officials, so,

09:04AM 20   ministers, members of the religious elective, members of the

21   judiciary, and then to professional levels, and then district

22   levels, and then all the way down so ordinary citizens now are

23   trained.

24         The training, it's always about telling them this is

25   the true history of Rwanda, this is the values that every

10-10

            1    Rwandan patriots has to promote and has to defend.

            2    Q.   Aside from these trainings, the Ingando, are there other

            3    means that the government has at their proposal to promote this

            4    message?

            5    A.   Yes, there are other means, especially one is the control

            6    of the political -- the social and political spaces, so there

            7    was, for instance, the elimination of position political

            8    parties.  There was these co-optation, really controlling civil

            9    society groups in the media.

09:06AM    10    Q.   Let me back up.  What do you mean by civil society groups?

           11    A.   So, here civil society groups refer to human rights

           12    groups, they are like association of the genocide survivors,

           13    like churches, so we can talk about really those interested

           14    groups.

           15    Q.   How did the government accomplish the co-optation of those

           16    sort of groups?

           17    A.   So, as I said that the government started in moderation

           18    being inclusive in the beginning of a time of human rights

           19    groups, which actually have been targeted by the genocidaire

09:06AM    20    while allowed to re-organize and actually to help the

           21    government in many ways, but the more government was becoming

           22    exclusive and authoritarian, the more civil society groups were

           23    attacked, were harassed, some of the leaders killed, others

           24    arrested, others are forced into exile, and then others

           25    cooperated to become actually the instrument of government

# J.A. 1051

Case: 19-1689    Document: 00117615537    Page: 367    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 11 of 101

10-11

1    propaganda.

2    Q.   Is there a meaningful opposition to Paul Kagame in Rwanda?

3    A.   No.

4    Q.   Are there media organizations?  Is there free speech?

5    A.   No.

6    Q.   Why is that?

7    A.   Because, as I said, the government ended up just I mean

8    becoming obsesses with just eliminating any meaningful or

9    challenge to its narrative and its legitimacy.  As I said, this

09:08AM 10   didn't happen overnight, it was a process, which, actually, as

11   I said, coincided with the time when President Kagame decided

12   to put all of the power in his hands.

13        That was the period of '99, '99 to 2000, and

14   especially after he was elected as a president in 2003.  This

15   has been well-documented by many scholars and by many other

16   agencies, especially including the United States, Department of

17   States in its human rights report.

18   Q.   I want to follow up on something you said earlier.  You

19   said that dissidents or political opponents could face killing

09:09AM 20   or arrest.  Can you describe how the judicial system functions

21   vis-a-vis Paul Kagame's regime?

22   A.   So, like any other branch of the government, really we

23   don't have -- in Rwanda, there is no such notion as separation

24   of power.  In Rwanda, there is no such thing as professional

25   careers, as we have here.  Here, we have Judges who are

         1    professional careers, we have prosecutors who are professional

         2    careers, we have military who are professional careers.

         3              In Rwanda, everyone is subject to be appointed or

         4    removed at the wish of the government, especially at the wish

         5    of President Kagame, so because of that, because of those

         6    Judges especially have no job security, they need to comply

         7    with the government official or otherwise they are just sucked

         8    from their positions and actually these have been happening

         9    over and over.

09:11AM 10              And what is special about Rwanda is that every area,

        11    at every single area, you can have just high profile figures,

        12    ministers, military officers, Judges, prosecutors, who are

        13    either arrested or forced into exile.

        14    Q.   When these sort of figures are arrested, what are they

        15    prosecuted with?

        16    A.   Mostly, it's the accusation of what is known as

        17    divisionism.

        18    Q.   And what is divisionism under Rwandan law?

        19    A.   Divisionism is the crime of attacking the foundation of

09:12AM 20    the Rwandan unity, the foundation of the Rwandan unity being

        21    this narrative of the RPF as of the savior over the country,

        22    Paul Kagame as the Moses of Rwanda, and that's why actually the

        23    country had to change the Constitution in 2015 to allow him to

        24    run for a third time, which was actually forbidden by the

        25    Constitution, the narrative that the military is the glue that

Case: 19-1689    Document: 00117615537    Page: 369    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 204    Filed 11/04/19    Page 13 of 101

10-13

      1    holds the society together, the narrative that because the

      2    Hutu, Hutu are collectively guilty of the genocide, they have

      3    no claim really to bid for high positions in a competitive way

      4    unless they are just allowed by the government to serve, and

      5    there's a narrative that because of the RPF is the savior over

      6    the Tutsi, who preside over the genocide in '94, no Tutsi has

      7    the right to criticize Kagame or to challenge his policies.

      8         The narrative is that the international community has

      9    no say in Rwanda because the international community abandoned

09:13AM 10    Rwanda during the genocide, and we can go on and go on, but

     11    division is about really challenging the government but

     12    especially if you dare, for instance, suggest that RPF was

     13    responsible for war crimes and crimes against humanity, those

     14    people are actually accused.  They say it's another form of

     15    divisionism, which is known as genocide ideology.

     16    Q.   You've talked a lot about the influence of the Rwandan

     17    Government on various government officials.  What is the

     18    influence of the Rwandan Government through other levels of

     19    society?

09:14AM 20    A.   So, the system, the government seems so organized in

     21    Rwanda.  It's very hard to understand it, for instance, from an

     22    American perspective.  Here, are we know that the leaders

     23    should be accountable to the population because the population

     24    elect those people.

     25         In Rwanda, there is a notion actually that it's the

```
 1    leaders who have to hold populations accountable, so it's a
 2    total putdown approach.
 3    Q.    Just, organizationally, how is that accomplished?
 4    A.    How it is accomplished, I can give just a good example of
 5    these large design of governors in Rwanda which actually was
 6    consolidated after the elections of 2003.
 7           First, it's a design which is probably grounded in the
 8    Rwandan ancient organizational structure of Rwanda before
 9    colonial era and the Kings.
10    Q.    Can you elaborate on that a little bit?
11    A.    That's a part of history that I started, so then there is
12    a system which was established in 2006 known as "imihigo" in
13    Rwanda.  "Imihigo" translates in English language as
14    performance contract, so the performance contracts are based on
15    this notion that the president is above all institutions in the
16    country.
17           Then under the president, there is those executive
18    branches of government, so there is the national government or
19    registrative parliament, and there is the province level, like
20    the states here in America, then there are districts, almost
21    like here.
22           Under district, there is another structure known as
23    sector.  Under the sector level, there is another structure
24    known as cell.  Under the last level, which mostly operates
25    infirmary is what is known as a 10 household unit.  In
```

           1    Kinyarwandan, they call it "nyumbakumi."  Actually, It's a
           2    Swahili word.
           3    Q.   How did the performance contracts operate in the context
           4    of that structure?
           5    A.   So this is how it happens.  Every year, the government
           6    present the program, so there is a program, this is what we
           7    need to accomplish, as we see here, for instance, the president
           8    maybe need to meet some budget request to Congress.
           9         In Rwanda, what happens after the government has a
09:18AM 10    list of what they need to accomplish.  Now it happens to all of
          11    those branches to plead allegiance to the president.   In
          12    ancient time under the king's rule, this was, of course, done
          13    or that's before talking verbally, but now it's formalized.
          14         They signed a contract of performance, so we have, as
          15    you see, it's well-known in the news, you can see a day, for
          16    instance, when all the Supreme Court Justices met with the
          17    president, and everyone sign a formal contract with the
          18    president.  All members of the government do that.  The
          19    governors do that.  At the district level, the mayors do that,
09:19AM 20    the sector level.
          21         More interestingly, when you arrived at the 10-house
          22    unit, it's every citizen who has actually to sign that contract
          23    for that unit, but at the local level that is no formal writing
          24    contract that people meet democratically, as they say, in a
          25    meeting, so people say do we agree on this, when all those say

1    are we going to do this, so this is a corrective bridge, so now

2    it's happened, too, those leaders from the down level, so the

3    nyumbakumi leader will be reporting to the sector level, the

4    sector level will umushyikirano be reporting to the district,

5    the district will be reporting to the provinces, the provinces

6    will be reporting to national government, which will be

7    reporting to the president, and every year, there is these

8    national governing, those meetings known as umushyikirano,

9    which means it's just like a national dialogue.

09:20AM 10         All of those people come actually under those, both

11   sides are invited, and then there is also what they say the

12   retreat of leaders, where they have to evaluate what they have

13   accomplished, and rewards are distributed.

14   Q.   Let me just frame a different question.

15         THE COURT:  The only reason any of this is going to be

16   relevant would be if it affects the credibility of current

17   witnesses, so we only have so much time.  Let's focus on that.

18   Q.   Let me just frame that a little differently.  In light of

19   this system of organization and performance contracts that

09:21AM 20   you've described, is the government able to enlist the

21   population to carry out its program or agenda?

22   A.   Yes, and in a very effective way.

23   Q.   Does the government need to use force or coercion in order

24   to do that?

25   A.   Not necessarily because it's done in a more erratical way

J.A. 1057

Case: 19-1689    Document: 00117615537    Page: 373    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 204    Filed 11/04/19    Page 17 of 101

10-17

1    all the way down.  That's very soft ways of doing this.  The

2    only time when the government needs to use force is when there

3    is for someone opposing the policy being, for instance, in the

4    hierarchy of power or when there are those who criticize

5    sharply policies, like media or like civil society groups, and

6    that way there is a very obsession to make sure that all those

7    independent voices were silenced.

8              MR. LAUER:  Thank you, sir.

9              MR. GARLAND:  Your Honor, I'll go through voir dire,

09:22AM 10    however, before doing that, I would just note that I didn't

11    hear anything that was relevant to this trial, to this

12    investigation, to witnesses' credibility.

13              THE COURT:  I'll let you argue in a moment.  Let's do

14    the cross, if you choose to.

15              MR. GARLAND:  I do, thank you.

16                        CROSS-EXAMINATION

17    BY MR. GARLAND:

18    Q.    So, Doctor, good morning.

19    A.    Good morning.

09:23AM 20    Q.    So I want to establish a couple of things first.  One of

21    those things, you knew Mr. Teganya when you were in high

22    school, correct?

23    A.    Correct.

24    Q.    And so you were in high school together for a while, and

25    actually secondary school, that's what it was called, right?

**J.A. 1058**

1    A.   Correct.

2    Q.   So he was a year ahead of you or a year behind you?

3    A.   He was behind me.

4    Q.   Okay.  So you probably knew him then for about five years

5    back in Rwanda?

6    A.   Yeah, in high school.

7    Q.   Okay.  And then you went to the National University of

8    Butare at Butare, correct?

9    A.   In Ruhengeri.  There was one university, but the campus

09:23AM 10   was in Ruhengeri.

11   Q.   But you were in Butare during the genocide, right?

12   A.   Yes.

13   Q.   Okay.  And specifically because you were studying at the

14   university, right?

15   A.   Yeah, because I was but to do research at the Institute of

16   Research in Butare, yes.

17   Q.   And you know as well Mr. Teganya was at the National

18   University in Rwanda at the time?

19   A.   Yeah, but I never met with him at that time.

09:24AM 20   Q.   So the next thing is that I want to establish is when

21   Mr. Teganya applied for asylum, he reached out to you to

22   support that; isn't that correct?  Yes or no.

23   A.   Yeah, his lawyer reached out to me.

24   Q.   And you submitted an affidavit for that purpose, right?

25   A.   Yes.  Yes, I did.

Case: 19-1689    Document: 00117615537    Page: 375    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 19 of 101

10-19

```
 1   Q.   And in addition to holding an academic position, you hold
 2   yourself out as an activist, correct?
 3   A.   As a human rights scholar and practitioner.
 4   Q.   And an activist, right?
 5   A.   It depends on what you call activist.  I'm a practitioner,
 6   yes.
 7   Q.   Do you remember an article that you wrote recently, I can
 8   pull it out, if you'd like, Rwanda, Inc.?
 9   A.   Yes.
10   Q.   And do you remember at the bottom of it, it has a place
11   where it says what your biography is, it's just two sentences
12   really?
13   A.   Can you produce?
14   Q.   Yes.
15            MR. GARLAND:  Your Honor, if I may approach?
16            THE COURT:  Yes.
17   Q.   Sir, you recall this article that you wrote, Rwanda, Inc.?
18   A.   Yes.
19   Q.   By Dr. Twagiramungu?
20   A.   Yes.
21   Q.   And if we go to the bottom, this is where you talk about
22   you, correct?
23   A.   Yes.
24   Q.   And so could you read the third sentence, please.
25   A.   "His extensive academic research is informed by his
```

Case: 19-1689 Document: 00117615537 Page: 376 Date Filed: 07/16/2020 Entry ID: 6352983
Case 1:17-cr-10292-FDS Document 204 Filed 11/04/19 Page 20 of 101

10-20

```
 1    educated, long firsthand experience as a civil society leader
 2    and human rights activist in Rwanda under the Great Lakes
 3    Region."
 4    Q.   Okay.  So just using the words that you had used, you
 5    style yourself as an activist, correct?
 6    A.   Yes, depending on how you understand the term "activist."
 7    Q.   But you've worked as an activist, correct?
 8    A.   Yes.
 9    Q.   Have you testified in federal court before?
10    A.   Yes.
11    Q.   And have you always testified for people who are accused
12    of having participated in the genocide or have you testified on
13    the other side?
14    A.   I've participated in other cases.  I participated, for
15    instance, in two instances in the Netherlands with the RPF,
16    including one military soldier.
17    Q.   I'm not sure I understand the answer.  Have you testified
18    on behalf of people who have been accused of genocide before?
19    A.   Yes.
20    Q.   And have you testified ever for the people who have
21    accused others of genocide?
22    A.   Yes.
23    Q.   And when you testified for the accusers, was that only
24    when the person who was accused was a member of the RPF?
25    A.   It depends on when I'm called upon.
```

**J.A. 1061**

```
  1   Q.   Could you answer yes or no to that question.

  2   A.   Can you reframe the question?

  3   Q.   Yes.  When you have testified for a side that is accusing

  4   a person of genocide, have you done so only when the person

  5   being accused of genocide was with the RPF?

  6   A.   No.

  7   Q.   No.  So, can you tell us the names of the people that you

  8   have testified against who were part of the MRND or other Hutu

  9   who participated in the Rwandan genocide?

09:28AM 10   A.   So actually there is an interesting case in which I

 11   testified last year.  It's a case in Sweden on -- first I

 12   testified just on the side of the prosecution, and then later I

 13   testified on the side of the defense, and actually I did these

 14   through the Office of Prosecution here.

 15   Q.   Now, you have your own feelings about Rwanda in part

 16   because you left in 2004; is that correct?

 17   A.   No.

 18   Q.   What year was it that you left?

 19   A.   I left in 2004 but not my feelings now.

09:28AM 20   Q.   And you haven't been back to Rwanda since then; is that

 21   right?

 22   A.   No.

 23   Q.   Okay.  So you answered no, so that means I'm not right or

 24   that you haven't been back there?

 25   A.   No, I have not.
```

1    Q.   Okay.  And what that means is that you haven't conducted

2    any interviews of people who have been witnesses of any

3    genocide prosecutions in Rwanda, correct?

4    A.   Yes, I have through the direct means, not face-to-face

5    sitting as we were here, but there are several tentative ways

6    we conduct research, especially because I speak the language, I

7    know the culture, I know many people from government positions

8    to lay people, so it's not very difficult for me to continue my

9    research on Rwanda.

09:29AM 10    Q.   I'm sorry, maybe the question wasn't clear.  Since 2004,

11    since you left Rwanda, how many witnesses who have appeared in

12    Gacaca courts or in the criminal courts there, how many

13    witnesses have you interviewed either face-to-face or through

14    electronic means?

15    A.   Witnesses, no specific witness.

16    Q.   Okay.  And I just want to be clear as well.  Your Ph.D. is

17    in international relations; is that correct?

18    A.   Yes.

19    Q.   So it's not in criminal justice, right?

09:30AM 20    A.   No, but I have done a dissertation.  My law school degree

21    I wrote my dissertation in 2005 actually on Gacaca.

22    Q.   Okay.  On Gacaca but not on the general nature of criminal

23    justice, correct?

24    A.   It was actually on Gacaca from a human rights'

25    perspective, so, with regards, I was comparing the Rwandan

J.A. 1063

```
 1    justice with international standards of justice.
 2    Q.    Okay.  None of which, by the way, you testified about
 3    earlier when Mr. Lauer was bringing you through questions,
 4    right?
 5    A.    Sorry.
 6    Q.    You didn't testify about any of that when Mr. Lauer was
 7    bringing you through questions, right?
 8    A.    Well, it depends on the questions that you asked.
 9    Q.    Sir, you are aware that there have been about five or six
10    prosecutions in the United States of people similarly situated
11    to Mr. Teganya?  You're aware of that; is that right?
12    A.    Yes, I'm aware of some cases, yeah.
13    Q.    And so let's start with one of those, Beatrice Munyenyezi.
14    Are you familiar with that case?
15    A.    I know them just barely.  I didn't study them or get
16    involved in those.
17    Q.    So can you tell the Court how many of the people who
18    testified in the Munyenyezi case the first time, how many of
19    those witnesses you interviewed before and/or after that?
20          MR. LAUER:  Objection.
21    A.    It was not my job to interview them.
22    Q.    I'm sorry, could you repeat that?  How many people, what's
23    the number?
24    A.    I don't know them.
25    Q.    So that hasn't been part of your academic research?
```

09:31AM 10

09:32AM 20

1    A.    No.

2    Q.    And you're aware that the witnesses who testified in

3    Munyenyezi went back to Rwanda and then came back for a second

4    trial, correct?

5    A.    I don't know.

6    Q.    You don't know, so that means as part of your academic

7    research, you haven't interviewed any of those witnesses who

8    were at the second trial, correct?

9    A.    My research is not on those particular individuals.    I

09:33AM 10    study the political system in Rwanda, the evolution over the

11    political system, by the way, in the comparative perspective,

12    to make sense of the evolution of post-genocide Rwanda.    That's

13    what my scholarship is about.

14    Q.    Sir, as part of your research, you also didn't interview

15    any of the witnesses who appeared in the Teganya prosecution

16    here in New England either, did you?

17    A.    I don't know whether this has anything to do with my

18    research.

19        MR. GARLAND:    Your Honor, I'd ask that you direct the

09:33AM 20    witness to answer the question.

21        THE COURT:    Please answer the question.

22    Q.    How many of the witnesses who testified in the Teganya

23    prosecution did you interview either before they testified or

24    after they testified as part of your academic research?

25    A.    None.

Case: 19-1689    Document: 00117615537    Page: 381    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 25 of 101

10-25

| | |
|---|---|
| 1 | Q.   And would that answer be the same for the other similar |
| 2 | cases that we mentioned before, people who were accused of |
| 3 | participating in the genocide in America like Mr. Teganya? |
| 4 | A.   Yes. |
| 5 | Q.   And you talked -- so is part of your -- well, let me get |
| 6 | to one of the premises that you have.  One of your premises |
| 7 | that goes throughout your writing is the fact that the RPF |
| 8 | should be prosecuted for whatever accesses may have happened in |
| 9 | 1994 and afterwards, correct? |
| 09:34AM 10 | A.   Accesses? |
| 11 | Q.   Accesses, killings, whatever term you'd like to use? |
| 12 | A.   Yes. |
| 13 | Q.   So, for example, in your Ph.D., you talk about genocide |
| 14 | prosecution as being a Victor's paradigm, that the only people |
| 15 | who are being prosecuted for genocide are the Hutus who engaged |
| 16 | in genocide in 1994, correct? |
| 17 | A.   That's a standard as one justice, Victor's justice, yes, |
| 18 | that was evidenced. |
| 19 | Q.   And that's the term that you have.  So you do agree that |
| 09:35AM 20 | people should be prosecuted for participating in killings and |
| 21 | genocide for what happened in 1994 in Rwanda? |
| 22 | A.   Yes, yes. |
| 23 | Q.   So, is one of your premises that no Rwandan who lives in |
| 24 | Rwanda today can testify accurately or truthfully in a case |
| 25 | that involves genocide allegations? |

```
 1    A.   That's not my allegation.

 2    Q.   So you're not going to say that.  Is it going to be your

 3    testimony that most Rwandans who live in Rwanda today cannot

 4    testify accurately or truthfully in genocide allegation trials?

 5    A.   That's not my allegation, but I say we need always to take

 6    into account the context and the nature of the cases, the

 7    issues, the cases at issue.

 8    Q.   So, are you prepared to say what percentage of witnesses

 9    then who are called upon to testify in a genocide allegation
```
```
10    case are going to be unable to testify accurately or

11    truthfully?

12    A.   I think this is not really a question of statistical

13    status.  It's not something we can say I have statistical

14    evidence that it's a high percentage.  The only thing I know,

15    given the nature of the government, which is obsessed with

16    controlling the narrative and controlling the minds of people.

17         Any case which it can solve political interest, the

18    government, we make sure that people testify the way they want.

19    For other cases, they have no problem or interest, they can
```
```
20    elect to go.  In fact, there are instances where the government

21    has been silencing witnesses when they are accusing someone who

22    is a government protege'.

23    Q.   So I want to go back to the statistics.  What you said,

24    there's no way to measure this statistically, correct?

25    A.   Yes.
```

# J.A. 1067

1  Q.   So that means that there are no studies out there that

2  suggest that witnesses who live in Rwanda cannot testify

3  accurately or truthfully because of the whole political/social

4  complex you talked about, right, no statistics?  Yes or no.

5  A.   Let me give you an example.

6         MR. GARLAND:  Your Honor, I'd ask that you direct the

7  witness to answer the question that's put to him.

8         THE COURT:  Well, let me hear his answer, and then you

9  can press the point.  Go ahead.

09:38AM 10  A.   If I refer to the literature, according to a post-exit

11  assessment of Gacaca in 2002, in the study commissioned by the

12  commission sovereign system of the country, this was conducted

13  by the scholars at the University of Rwanda, they have

14  statistics, for instance, evaluating the quality of evidence in

15  the Gacaca courts.

16         According to one study, I can give you a reference to

17  that, on one statistic, they said, for instance, 29 percent

18  said that they are confident about the quality of evidence.

19  Another thing they said, 29 percent say they were more or less

09:39AM 20  confident about the accuracy of evidence, so those are official

21  figures, so if they say only 29 percent over the sample are

22  confident about the quality of evidence presented, the

23  conclusion we can draw from that is we cannot be very confident

24  about the quality of evidence on the basis of which people have

25  been convicted or released.

Case: 19-1689    Document: 00117615537    Page: 384    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 28 of 101

10-28

1    Q.    That's one study, right?

2    A.    Yes.

3    Q.    One study from 2002?

4    A.    Yeah, it was post-exit assessment over the Gacaca court,

5    and that's when the Gacaca court closed the activities.

6    Q.    So that's one study from 2002.  Was that a study that you

7    participated in?

8    A.    No.

9    Q.    And have you done any comparison, systematic comparison of

09:40AM 10    the statistics that related in that study to how people have

11    feelings about the quality of evidence in other countries?

12    A.    So, in my doctoral dissertation, I wrote a chapter on the

13    justice system comparing Rwanda and Burundi, how the two rebel

14    governments are governing the country.  I discussed other

15    issues.  Maybe the specific statistics is not something I'm

16    working on.  My research is essentially qualitative and

17    interpretive, so it's a political analysis.  Interpretive

18    statistics is not my field of specialty.

19    Q.    And by interpretive, you mean interpreted by you according

09:41AM 20    to the results that you're going -- that you're studying and

21    that you're hoping to promote as an activist, correct?

22    A.    No, it's according to the norms and parameters of

23    political science and social science.

24    Q.    Political science and social science but not psychology of

25    witness testimony and not criminal justice, right?

J.A. 1069

       1    A.    Those including much disciplinary efforts.  I'm aware of

       2    political science in America because I did my studies here in

       3    America.  I know how political science, especially it's about

       4    statistics, but if you look at, for instance, the European

       5    scholarship, you'll see that statistics, it's not a norm.  In

       6    fact, if you look at established scholars, especially studying

       7    Rwanda, I can give you a long list, read the books you want to

       8    find really statistics in the studies, so it's another approach

       9    of addressing social phenomenon.

09:43AM 10    Q.    But, again, that's other scholars who have done that work,

      11    right, not you?

      12    A.    I mean the discipline in which I am and the scholars in

      13    whose footsteps I do follow.

      14    Q.    The last thing I want to ask you about is this.  You

      15    mentioned a couple of times that the government gets involved

      16    in prosecutions or court cases when it is being sharply

      17    criticized by some sort of a dissident or somebody who is

      18    criticizing their policies.  That's not word for word what you

      19    said but pretty close, right?

09:43AM 20    A.    Yes.

      21    Q.    Before Mr. Teganya came to America, he was in Canada for

      22    about 15 years, right?

      23    A.    I think.

      24    Q.    And he went through several other countries as well before

      25    that?  Yes?

```
 1    A.    Maybe.

 2    Q.    As you sit there, you don't know what countries he was in

 3    before that?

 4    A.    I'm not aware of that because I didn't do research on

 5    that.

 6    Q.    So, Mr. Teganya, first of all, he's not sitting over in

 7    Rwanda today criticizing Kagame's government, right?

 8    A.    I'm not aware of that.

 9    Q.    And he didn't do that when he was back in Canada either,

09:44AM 10    did he?

11    A.    I don't know.

12          MR. GARLAND:  Excuse me.  May I confer with counsel?

13          THE COURT:  Yes.

14          MR. GARLAND:  Your Honor, I have no further questions.

15          THE COURT:  All right.  Thank you, you may step down.

16    I'll take your argument, Mr. Lauer.

17          MR. LAUER:  Your Honor, I want to start off by

18    emphasizing the purpose for which this expert is being called,

19    and that is, again, because this is a case out of Rwanda, a

09:45AM 20    very different place than the United States.  He is being

21    called to give the jury testimony concerning political norms,

22    social norms and cultural norms that are at play in Rwanda that

23    are different than those in our country.

24          He is not being called to testify that witnesses

25    categorically are or are not or a certain percentage are or are
```

J.A. 1071

Case: 19-1689    Document: 00117615537    Page: 387    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 31 of 101

10-31

|    |    |
|----|----|
| 1 | not testifying truthfully and accurately.  That's certainly not |
| 2 | what is being elicited from him.  What is being elicited from |
| 3 | him is testimony about the state of affairs in Rwanda today, |
| 4 | and that is an inescapable fact that Rwanda, and we heard this |
| 5 | from the government's expert as well, Rwanda is an |
| 6 | authoritarian state, and for the jury to not consider that and |
| 7 | not to have any insight into what that means is really to |
| 8 | cripple their availability to evaluate and assess the evidence |
| 9 | in the case. |
| 09:46AM 10 | So with those limitations on the scope of his |
| 11 | testimony in mind, I would suggest that he's an established |
| 12 | scholar, he certainly has a basis of knowledge to testify as to |
| 13 | the subjects that he's being asked about, and his testimony |
| 14 | would be proper for the purpose of assisting the jury in |
| 15 | understanding this very different place and very different |
| 16 | culture that this case concerns. |
| 17 | MR. GARLAND:  Your Honor, Dr. Twagiramungu wrote a |
| 18 | really interesting Ph.D. thesis.  I read it.  It's very |
| 19 | interesting.  There's some points on it that if you allow him |
| 09:46AM 20 | to get on the stand -- |
| 21 | THE COURT:  You read it, you say? |
| 22 | MR. GARLAND:  Oh, yeah.  It was good.  It was |
| 23 | interesting.  It traces how the current political system has |
| 24 | its ties to the monarchy, how it was different, and the |
| 25 | monarchy was different in I think it was Burundi versus Rwanda |

J.A. 1072

1    and how that has effects going forward.

2         I'm not sure what any of that has to do with the case.

3    As we've said before, and I hate to repeat myself, Rwanda is

4    not on trial here, modern day Rwanda is not on trial here, and

5    what happened since 1994, July of 1994, isn't on trial here.

6    What's on trial is Mr. Teganya and what he did during that

7    genocide.

8         There is nothing that Dr. Twagiramungu said that

9    suggested that he has the qualifications to or the experience

09:47AM 10   to help the jury understand anything that's come from that

11   witness stand so far, not about the witnesses' credibility, not

12   about their bias, and, in fact, their credibility of the

13   witnesses is solely the jury's determination.

14        None of what Dr. Twagiramungu talked about really even

15   comes close to what would be allowed under Daubert even if you

16   take it as sociological, qualitative science because none of it

17   affects any of the issues that are at issue here.

18        There's no replicability of what he's talking about.

19   He talked about a study that was done 16 years ago, one study

09:48AM 20   about the quality of evidence.  I have no idea if you were to

21   ask Americans what they think the quality of evidence in courts

22   would be, whether it would be any similar or any different to

23   the study that he talked about at that point.

24        And so the whole notion of whether this is even

25   relevant, whether it is backed by anything other than what

           1    Dr. Twagiramungu said was his interpretive ability is

           2    exceptional, given the fact as well that if we're going to be

           3    relying upon Dr. Twagiramungu and his interpretive ability

           4    about a nonscientific, qualitative political science education

           5    and study, what's also at stake is that he was a personal

           6    friend of the defendant, helped him during the asylum process

           7    as well, and has a major stake in criticizing the government

           8    because it is prosecuting Hutu genocidaires but not RPF

           9    genocidaires if there are any, none of which has anything to do

09:49AM   10    here.

          11            Finally, to the extent that the Court finds any

          12    relevance, any methodology, anything that would represent

          13    Dr. Twagiramungu as being qualified to testify and appropriate,

          14    it is all unduly prejudicial to dress up what it is that he was

          15    saying about the control by the president of people, none of

          16    which is tied to prosecutions or what happens on the witness

          17    stand, and to dress up an academic card that way would replace

          18    the function of what the jury is supposed to do, which is to

          19    take the evidence as it sees it, and that evidence has been no

09:50AM   20    involvement of the Rwandan government in the investigation, no

          21    involvement of the Rwandan government with any of the witnesses

          22    as well.

          23            And they were asked not just did anybody talk to you

          24    about what you were going to say, but they are also asked are

          25    you feeling any pressure from the Rwandan Government or from

Case: 19-1689    Document: 00117615537    Page: 390    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS  Document 204  Filed 11/04/19  Page 34 of 101

10-34

1    anybody about what you should say or not say, and every single

2    witness on that stand said no.

3         For all those reasons, Dr. Twagiramungu should not be

4    allowed to testify about anything that he talked about.  If he

5    wants to talk about the history of the Rwandan people up to

6    July of 1994, the government has already said, yes, he is

7    qualified to talk about that.

8         We're happy to have a conversation with him during

9    cross-examination about that.  Anything else that he testified

09:51AM 10  about before on voir dire should be kept off the stand.

11         MR. LAUER:  Can I just respond in one way, your Honor?

12   The government in a sense has put this into play by asking

13   their expert whether he found evidence of government

14   involvement or executive interference in judicial proceedings.

15   They put it in play by continually asking each witness whether

16   the Rwandan government has forced or pressured them to do

17   anything.

18         And by doing that, the door is wide open for the

19   defense to rebut that point and to rebut that point with

09:51AM 20  testimony about an authoritarian regime that does not

21   necessarily need to put a gun to anyone's head to exert

22   influence over them, so this is a matter at issue.  The

23   government has placed it at issue, and the defense should have

24   the right to respond.

25         THE COURT:  Okay.  Here's what I'm going to do.

J.A. 1075

1    Obviously, simplifying, the question is whether the defendant

2    made false statements about things that happened in Rwanda in

3    1994 or earlier, and anything about events in Rwanda after 1994

4    is basically relevant only to the extent that it might affect

5    the credibility of any witness.

6         I certainly have my doubts here.  I think the evidence

7    is perhaps marginal relevance, and his qualifications are

8    perhaps less than perfect, but I think that if the testimony

9    does not go any farther than the proffer, this voir dire,

09:53AM 10   rather, his proffer went quite a bit farther, if he's not

11   making statements about how all witnesses are pressured, all

12   witnesses are biased, all witnesses face retaliation, which I

13   would not permit, but if the direct goes no farther than the

14   voir dire, and I'm going to give a cautionary instruction to

15   the jury, I'm going to permit it.

16        I think, again, there is a good argument, and the

17   government has made it, as to why it should be excluded, but it

18   is a criminal case.  He's a defense witness.  He's not charged

19   with murder or rape, but certainly there's been evidence of

09:53AM 20   that.  It's a pretty serious case.

21        The testimony is at least somewhat responsive to

22   Dr. Clark's evidence -- is it Clark?  Right, the Australian,

23   anyway, the government's expert, and perhaps some of the

24   testimony of the witnesses.

25        I'm not sure the door is wide open, but it's open I

**J.A. 1076**

1   think far enough to permit this, and, obviously, things like

2   his possible bias or friendship with the defendant or lack of

3   qualifications are all absolutely fair grounds for cross.

4            And, again, I'm going to permit it on the assumption

5   that the direct goes no farther than the voir dire, and I'm

6   going to caution the jury about what it's being offered for and

7   what use they can make of it, if they choose to, and basically

8   how evidence of general trends or propositions, you know,

9   have -- how they should be considered in terms of evaluating

09:55AM 10   specific people or specific situations which, as you know, can

11   be quite dangerous, but with that limitation, I'm going to

12   permit it.

13           And, obviously, any particular question or answer is

14   subject to objection and limitation or further instruction as

15   appropriate.  So that's how we'll handle it, and I guess that's

16   that unless anyone -- yes, Mr. Garland.

17           MR. GARLAND:  Your Honor, a couple of things.  One is

18   that I'd ask that the government have a continuing objection to

19   all of the testimony that's going to be within the voir dire.

09:55AM 20           THE COURT:  Yes.

21           MR. GARLAND:  And as well, I will stand up, I would

22   like to make the first objection audibly but then afterwards if

23   Dr. Twagiramungu goes beyond what I believe that the Court has

24   said, I'd like to be able to --

25           THE COURT:  Object then and there, in other words,

1    don't wait until the horse is out of the barn, so to speak.

2              MR. GARLAND:  Understood.

3              THE COURT:  If he gets on the stand and says -- you

4    know, I'll give an extreme example, and that's why all, you

5    know, Tutsi witnesses lie in these proceedings, I would expect

6    you to leap to your feet and object.

7              MR. GARLAND:  I think I probably would.

8              THE COURT:  Okay.

9              MR. GARLAND:  Thank you.

09:56AM 10              MR. LAUER:  If I could just make one inquiry?

11              THE COURT:  Yes.

12              MR. LAUER:  There was quite a bit of cross-examination

13    during the voir dire about whether he had knowledge of other

14    individuals in the United States who were prosecuted under

15    similar circumstances.

16              It would seem to me that that went to the issue of

17    whether he had the necessary qualifications to give an opinion

18    in this case.  With the Court's ruling, it would seem to be

19    that sort of cross-exam would exceed the scope of proper expert

09:56AM 20    cross.

21              I mean, he's testified he didn't have any involvement

22    in those other cases, and to basically suggest that, put in

23    front of the jury that the defendant is one of a long line of

24    people who have been prosecuted under similar circumstances is

25    I believe irrelevant and unduly prejudicial.

Case: 19-1689    Document: 00117615537    Page: 394    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 30 of 101

10-38

1          THE COURT:  Mr. Garland.

2          MR. GARLAND:  Your Honor, that goes right to the depth

3     of Dr. Twagiramungu's marginal, at best, qualifications to

4     testify in this trial about anything that he testified up

5     there.

6          It's absolutely relevant if at the end of the day what

7     the defendant wants Dr. Twagiramungu to do is to support some

8     sort of inference that this political structure has an effect

9     on what witnesses say from Rwanda and how it should be

09:57AM 10    interpreted, and the fact that he hasn't talked to anybody

11    about this either in Rwanda or other witnesses who have been in

12    similar witness boxes in similar prosecutions is absolutely

13    relevant and crucial.

14         MR. LAUER:  But that's not --

15         THE COURT:  I'm sorry, go ahead.

16         MR. LAUER:  But that's not what I elicited from him.

17    I did not elicit from him whether he had examined the cases of

18    persons charged in the United States and the credibility or the

19    reliability of witness testimony in those cases.  That was not

09:58AM 20    part of his direct examination.

21         THE COURT:  Well, I don't think he can opine on that,

22    but I think if the -- I mean, why would it be improper for the

23    government to elicit something along these lines, that there

24    have been multiple prosecutions and court proceedings in

25    different countries involving people who are alleged to have

J.A. 1079

1    participated in the genocide, and, you know, you personally,

2    Doctor, have not interviewed any witnesses, I think this is the

3    thrust of it to, you know, to learn whether or not they were

4    intimidated or retaliated against, and he says not personally,

5    no.

6              In other words, certainly I think it would be

7    problematic if the government said every other person

8    prosecuted in the United States for crimes like this has been

9    convicted, I think obviously that's out of bounds.

09:59AM 10         MR. LAUER:  Well, that's the danger that I foresee by

11   continually referencing other prosecutions and emphasizing the

12   fact that he has not spoken to other witnesses in those

13   prosecutions that it creates a perception that the defendant is

14   part of a cohort, and there's all sorts of unfair, improper

15   inferences that could be drawn by that perception, so to a

16   certain extent, the fact that he has or has not interviewed

17   people in cases may be fair game, but to repeatedly suggest

18   that there's been other cases with similarly situated

19   defendants, we're getting into dangerous territory.

10:00AM 20         THE COURT:  All right.  I think I'm going to allow it

21   along the lines that I suggested, and I'll give a caution to

22   the jury.  It may not be necessary, but I'll give one about,

23   you know, basically that this case, of course, has to rise and

24   fall on its own evidence without regard to what might have

25   happened in other cases, whether the United States, Sweden or

J.A. 1080

       1    anywhere else, and I think that will take care of that.

       2            I mean, you know, it's routine for experts in civil

       3    and criminal cases to say they've testified in lots of

       4    different cases.  You know, the DNA expert is always asked how

       5    many, you know, how many times have you done this?  Oh, I've

       6    testified in 342 criminal cases, but that's kind of routine,

       7    and I don't see this as being that far removed from it, but,

       8    you know, I'll caution the government to phrase its question

       9    carefully to make sure that there's no suggestion here that

10:00AM 10    this case, you know, that the jury should convict because

      11    everyone else has been convicted or anything else even close to

      12    that, and I think something along the lines that I've suggested

      13    the prosecutions or proceedings in the United States or

      14    elsewhere because I think that's true, there's been both

      15    prosecutions and immigration proceedings in the United States

      16    and various other countries, other international tribunals, I

      17    think that's a fair statement, so I think that would cover it.

      18            Okay.  It's 10:00.  Let's see if we have all of our

      19    jurors.  Hopefully we'll get started in about five or ten

10:01AM 20    minutes, and this is our witness for the day, right?

      21            MR. LAUER:  Correct.

      22            THE CLERK:  All rise.

      23            (A recess was taken.)

      24            THE CLERK:  All rise for the jury.

      25            (JURORS ENTERED THE COURTROOM.)

```
 1              THE COURT:  All right.  Good morning, ladies and
 2       gentlemen.  Welcome back.  Again, I appreciate your patience
 3       with our on and off schedule this week.  Today what we're going
 4       to accomplish, we have one witness for the defense.  I don't
 5       know if that's going to take the whole morning or not, but
 6       that's all we're going to accomplish today, that's why we're
 7       starting late.  We had to deal with some other issues
 8       beforehand.
 9              Mr. Lauer.
10:13AM 10              MR. LAUER:  The defendant calls Dr. Twagiramungu.
11              NOEL TWAGIRAMUNGA, having been duly sworn by the
12       Clerk, testified as follows:
13                          DIRECT EXAMINATION
14       BY MR. LAUER:
15       Q.   Good morning.
16       A.   Good morning.
17       Q.   Can you please state your name and spell your last name
18       for the record.
19       A.   I am Noel Twagiramunga, T-w-a-g-i-r-a-m-u-n-g-u.
10:14AM 20       Q.   Dr. Twagiramungu, where were you born?
21       A.   I was born in Rwanda.
22       Q.   And how long did you live in Rwanda?
23       A.   I was born and grew up in Rwanda and lived in Rwanda until
24       2004.
25       Q.   Did you receive both your high school and college
```

J.A. 1082

```
 1   education in Rwanda?
 2   A.   Yes, I received my high school and college education in
 3   Rwanda.
 4   Q.   What schools in Rwanda did you attend?
 5   A.   First I attended a primary school in my home town in
 6   Southwest Rwanda, then I went to a Catholic seminary in the
 7   north of the country.
 8   Q.   Is that secondary school known as Nyundo?
 9   A.   Yes, secondary school.
10   Q.   Are you aware of whether the defendant, Mr. Teganya,
11   attended that school?
12   A.   Yes, he was behind me.
13   Q.   Was he behind you by one year or how far behind you was
14   he?
15   A.   Two years, I believe.
16   Q.   Did you have a personal relationship with him?
17   A.   No, he attended the seminary like me.
18   Q.   Did you attend college in Rwanda?
19   A.   Yes, sir, I did.
20   Q.   What college did you attend?
21   A.   I attended the National University of Rwanda, the campus
22   of Ruhengeri in the north of the country.
23   Q.   Did you also study for a time at the university in Butare?
24   A.   Yes, I studied at the University of Butare first part time
25   in 2003, and then after the genocide -- in 1993, and then after
```

Case: 19-1689    Document: 00117615537    Page: 399    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 43 of 101

10-43

```
 1    the genocide, 1995 and 1996.
 2    Q.   When you were studying in Butare, did you have any contact
 3    with Mr. Teganya?
 4    A.   Not at all.
 5    Q.   Where do you work today?
 6    A.   I work at Boston University.
 7    Q.   What is your position?
 8    A.   I'm a research fellow.
 9    Q.   In what department?
10    A.   In African Studies.
11    Q.   Have you held other positions in the academic realm?
12    A.   Yes, over the last year actually I have taught at the
13    University of Massachusetts, Lowell since 2005, at Smith
14    College, at Hampshire College, at the University of Tanzania.
15    I also held academic positions at Harvard University in Paris,
16    Sorbonne in France.
17    Q.   Do you hold a Ph.D.?
18    A.   Yes.
19    Q.   Where did you receive your Ph.D.?
20    A.   I received my Ph.D. at Tufts University at the Fletcher
21    School of Law and Diplomacy in 2014.
22    Q.   And what was the area of your study in obtaining your
23    Ph.D.?
24    A.   My Ph.D. was international relations with the focus on
25    really the transition from genocide to rebel governance in the
```

Case: 19-1689    Document: 00117615537    Page: 400    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 44 of 101

10-44

1   context of Rwanda and Burundi.

2   Q.   Is the country of Rwanda in that region the focus of your

3   scholarship?

4   A.   Yes, it is.

5   Q.   Do you publish academically?

6   A.   I have extensively published in the area of peer-reviewed

7   articles and conference papers.

8   Q.   Do you also regularly attend conferences or round tables

9   regarding Rwanda scholarship?

10:18AM 10   A.   Yes.

11   Q.   I take it you speak Kinyarwanda?

12   A.   Yes.

13   Q.   Is that your mother tongue?

14   A.   It's my mother tongue, yes, and actually I started

15   linguistics in Africa literature with the focus on Rwanda.

16   Q.   I want to ask you whether you were present last week when

17   Dr. Phil Clark testified here in this trial.  Were you present

18   for that?

19   A.   Yes.

10:18AM 20   Q.   Did you listen to his account of Rwandan history leading

21   up to the genocide?

22   A.   Yes.

23   Q.   Generally speaking, do you agree with the account that he

24   provided?

25   A.   Yes.

J.A. 1085

Case: 19-1689     Document: 00117615537     Page: 401     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS  Document 204  Filed 11/04/19  Page 45 of 101

10-45

         1    Q.   Do you recall that Dr. Clark was asked about whether the

         2    present government in Rwanda was authoritarian?

         3    A.   Yes.

         4    Q.   Do you recall his answer was yes?

         5    A.   Yes.

         6    Q.   In your view, does that go far enough?

         7    A.   Yes, yeah.

         8    Q.   In other words, would you agree with Dr. Clark that the

         9    current government is authoritarian?

10:19AM  10    A.   I agree, and actually it can be highlighted in stronger

        11    tongues.

        12    Q.   How would you describe it?

        13              MR. GARLAND:  Objection, your Honor.  Asked and

        14    answered.

        15              THE COURT:  I'll allow it.  Go ahead.

        16    Q.   How would you describe the present state of the Rwandan

        17    government?

        18    A.   So it's a military authoritarian government centered

        19    around one strong man.

10:19AM  20    Q.   And who is that strong man?

        21    A.   The strong man is a General Paul Kagame, who is the

        22    current president.

        23    Q.   And briefly, if you could, can you just describe how he

        24    came to be the president and to have this role as a strong man?

        25              MR. GARLAND:  Objection.  Relevance to this entire

1   line of questioning.

2          THE COURT:  I'll allow it.

3   Q.   Can you just tell us briefly how Kagame came to assume

4   that role?

5   A.   Well, President Kagame was the military commander of the

6   Rwandan Patriotic Front, the armed group which assumed power in

7   Rwanda in July, 1994 and started the genocide.

8          At that time he became vice-president and the Minister

9   of Defense, and then since 2000, he has been the president of

10:20AM 10  Rwanda.  Now he is serving a third time for which the country

11  had to change the Constitution in 2005 to allow him to run for

12  the third time, which was normally forbidden by the

13  Constitution.

14  Q.   I think you said that the third term began in 2005?

15  A.   2015, sorry.  The third time started in 2017.

16  Q.   Can you tell us, just, again, as briefly as you can, has

17  the government under Kagame always been authoritarian?

18  A.   Well, it has involved in different stages.  The government

19  started in the hope and moderation just after the genocide.  It

10:21AM 20  was a government, which was inclusive.  It included people from

21  the pre-genocide political parties.  It included key figures

22  from human rights groups.  It included people from both -- to

23  make a group of Hutu and Tutsi, and there were civilians and

24  military.

25  Q.   Did that government of inclusion change?

J.A. 1087

1   A.   Unfortunately, these did change over time because those

2   people who are not members of the RPF who are included, who

3   tried to challenge the RPF, especially President Kagame, while

4   excluded, and then the government has become more and more

5   exclusive and authoritarian, especially starting the time in

6   2000, when president forced many key figures into his

7   administration, and he concentrated all of the means of power

8   in his hands.

9   Q.   What was driving this consolidation of power?

10:23AM  10   A.   This consolidation of power really was informed by a new

11   narrative, which is at the heart of really the governing system

12   in Rwanda to ensure that the RPF holds control on power by all

13   means.

14   Q.   What is the state of the political system in Rwanda today?

15   Is there an opposition?

16   A.   No.

17   Q.   Why not?

18   A.   There is no opposition because the political parties,

19   which used to be actually part of the governing coalition,

10:24AM  20   which tried to challenge the RPF, while out loud, some of the

21   leaders have been assassinated, others forced into exile, and

22   others co-opted and forced to join the RPF.

23   Q.   How was that affected?  How was that consolidation of

24   power affected?

25   A.   This is affecting the country in many ways because those

Case: 19-1689    Document: 00117615537    Page: 404    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 204    Filed 11/04/19    Page 48 of 101

10-48

1    political parties were excluded, but also the media that is now

2    independent media of the country and the civil society groups

3    have been also silenced or cooperated.

4    Q.    What do you mean by civil society groups?

5    A.    By civil society groups, I mean like human rights groups,

6    associations for the defense of the genocide survivors, women

7    groups, groups working for environment or children, but it also

8    include in a broader sense chachas.

9    Q.    You said that the government has co-opted those groups.

10:25AM 10    What do you mean by that?

11    A.    By co-opting is when you lead an interested group or let's

12    say a group of defending the interest of the genocide

13    survivors, and then as what this happened actually in 1999,

14    there was a major human rights group defending the interests of

15    the Tutsi genocide survivors.  The name is Ibuka.

16          There is a group.  At that time there were tensions

17    between the government and this group, and then in 2000, the

18    founding father, the founding president of that group was

19    assassinated, and the whole committee was forced into exile at

10:26AM 20    that time, then there was new leadership, which was very close

21    to the government, which has been leading the group since.

22    Q.    You also mentioned the media?

23          MR. GARLAND:  Your Honor.

24          THE COURT:  Yes.

25          MR. GARLAND:  I ask that the Court give an instruction

J.A. 1089

Case: 19-1689    Document: 00117615537    Page: 405    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 204    Filed 11/04/19    Page 49 of 101

10-49

        1    to the jury in conjunction with the government's objection to

        2    this entire line of questioning.

        3            THE COURT:  Let me hear a little more testimony, then

        4    I'll give the instruction.

        5            MR. GARLAND:  Thank you.

        6    Q.   You had mentioned a little while back that there was no

        7    free speech.  Can you describe what you mean by that?

        8    A.   Yes.  So that there is no free speech means, again, in the

        9    beginning, there are many independent media, and there are

10:27AM 10    established journalists who are speaking.  They might, but over

       11    time, those voices have been silenced by some journalists who

       12    have been killed, again, others arrested, and others forced

       13    into exile.  As we speak, the newspapers, radio and

       14    televisions, most of them are either owned by the government or

       15    owned by business people close to the government.

       16    Q.   Are there international sources of media in Rwanda?

       17    A.   There used to be or so international medias, but

       18    especially what is particular for Rwanda because genocide

       19    really brought much attention to the region because of the

10:28AM 20    horrors which were there.

       21            There is some media, including the voice of America,

       22    which is based here, which is funded by the American government

       23    and the British, the BBC in London, or actually they

       24    established some admissions in Kinyarwanda, but as we speak,

       25    those admissions in Kinyarwanda have been shut down by the

# J.A. 1090

1    government.

2    Q.    You mentioned that the consolidation of power occurred at

3    the time a narrative developed concerning the genocide.  Can

4    you elaborate on that?

5    A.    Yes, that's why some of those people have been cited in

6    civil society groups in the media because after ceasing the

7    power, the Rwandan Patriotic Front, the first thing they did

8    was to prevent schools from teaching history of Rwanda as a

9    subject in schools.

10:30AM 10        What they introduced instead was a system of teaching

11    a very simplified history of Rwanda, and this history is taught

12    to every Rwandan at all levels.

13    Q.    And what are the features of this simplified history?

14    A.    So there's a simplified history that says that the Rwandan

15    Patriotic Front, especially its military forces stopped the

16    genocide at a time when international community had a Band-Aid

17    of Rwanda.  Because they did so, no one has the right to

18    challenge them on how they govern the country.

19        There is only the Rwandan Patriotic Front, people who

10:31AM 20    are rebels of the country, who knows what is best for the

21    country.  Anyone who is challenging their ways of doing things

22    is sympathizing with the genocidaire.

23    Q.    Does that simplified history or that narrative address

24    relations between Tutsis and Hutu?

25    A.    Yes.

# J.A. 1091

1    Q.    Can you speak to that?

2    A.    Yes.  Because of that narrative, the Hutu collectively are

3    portrayed as either genocidaire, those who actively

4    participated in the genocide, or those people who just are

5    affected by the genocide ideology, and then the Tutsi are

6    portrayed, the Tutsi are victims, and the Tutsi owe their lives

7    to the RPF because the RPF is their survivance, so that means

8    the Hutu have no right to criticize the government because they

9    are genocidaire, what can they do, is it to confess or just let

10:32AM 10    the RPF teach them how to be, to behave as true Rwandans and

11    that the Tutsi has no right to criticize their survivance.

12    Q.    What you've just described, is that taught in some form?

13    A.    Yes, this is taught in some form and to force through a

14    vast range of really programs designed to make this narrative

15    the standard norms, the standard benches against which

16    patriotism and those standards over being in Rwanda is actually

17    measured.

18    Q.    How is it taught?

19    A.    So especially this is taught through different programs,

10:33AM 20    but one where known is a program of re-education camps known in

21    Rwanda as Ingando.

22    Q.    What are the Ingando re-education camps?

23    A.    Ingando re-education camps, as I say, because history of

24    Rwanda, it's no longer taught in normal schools, there are

25    those organized camps, first the first one to attend those

J.A. 1092

1    trainings were top leaders, the members of the executive,

2    members of the parliament, members of the judiciary, and the

3    other bodies, universities, so we see that university

4    professors just go into a training camp to be taught about the

5    history of Rwanda.  Even if you are a historian, you go there.

6    Q.   Who runs these?  Who does the training?

7    A.   The trainings are run by the government, and the teachers

8    are RPF officials, especially the military officers.

9    Q.   And you mentioned that leaders or academics would attend

10   these camps.  What about the rest of the population?

11   A.   So, as I said, this is done at different levels, so there

12   are those top leaders, international level, and then at the

13   province level.  Province level is just comparable to states.

14         There's a country, then there are those which organize

15   then for the leaders at province level and then at the district

16   level and then local levels, including the sector level, the

17   civil level, even a very small unit known as 10 house

18   structures, 10 households or structures.

19   Q.   Why do people go to these?

20   A.   This is mandatory because they said from the Colonial era,

21   and especially from 1959, then when Hutu came into power, they

22   said the country had been taught the wrong history of divisions

23   of trade of dependency to outsiders of colonial ideas, so this

24   re-education is to reeducate people who are worth of the new

25   Rwanda.

# J.A. 1093

Case: 19-1689    Document: 00117645537    Page: 409    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 53 of 101

10-53

1    Q.    The message that you're talking about, the message of the

2    new Rwanda, are there other ways that that's disseminated?

3    A.    Yes, this is disseminated through other means, just I

4    mentioned control of media, control over civil society groups,

5    control over schools, what teachers can teach or not but also

6    through these mechanisms of harassing and into silencing any

7    independent voices.

8    Q.    How are those voices silenced?

9    A.    So as these have been extensively documented by scholars,

10   by thick tongues, and even by governments, including the U.S.

11   State Department in its annual human rights groups, this is

12   done by a combination of harsh means, like killings of people,

13   arresting them, putting them in a jail.

14   Q.    Let me just stop you there.  How are people arrested and

15   put in jail?  How does that take place?

16   A.    So, mostly those people, they are accused of the crime of

17   divisionism.

18   Q.    What is divisionism?

19   A.    Divisionism is a crime which was introduced in Rwandan

20   legal system after the genocide, and it has been just

21   expanding, but it's basically what the government wanted to

22   be -- to mean.  First, it was targeting mostly the Hutu, those

23   who were Hutu in the government or who are criticizing the

24   government or those Hutu in civil society, then it was expanded

25   to include the Tutsi, who are critical of the government, and

Case: 19-1689    Document: 00117615537    Page: 410    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 204    Filed 11/04/19    Page 54 of 101

10-54

 1    now, especially now it's targeting those military and officials

 2    within the RPF, who are criticizing President Kagame and his

 3    government, so there is a vast range of the ways the

 4    divisionism is used as a tool to silence anyone who not only is

 5    criticizing of the government but also maybe is not complying

 6    with these narratives.

 7          THE COURT:  Let me pause there and interject a caution

 8    to the jury.  Simplifying, the question here basically is

 9    whether or not the defendant made false statements about things

10:40AM 10    that happened in Rwanda in 1994 or earlier.  I'm permitting

11    evidence about events in Rwanda after 1994 to the extent that

12    they may have any bearing on the credibility of any of the

13    witnesses.

14          In other words, you, the jury, decide with any witness

15    whether you believe their testimony, what weight do you give

16    it.  That's entirely up to you.  Testimony about what is

17    happening in Rwanda now is relevant here really only for

18    whatever bearing it may have on the credibility of the

19    witnesses in this case.

10:41AM 20          So let me give you a caution.  Testimony about general

21    propositions, general trends, particularly about human behavior

22    has limits when applied in a specific situation, and you have

23    to be careful how you use a general proposition in a specific

24    situation.

25          Let me give you a very simple example.  It's, of

Case: 19-1689    Document: 0011765537    Page: 411    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 55 of 101

10-55

1    course, true, sometimes people have trouble remembering things,

2    right, and they have more trouble remembering things that

3    happened long ago, and that tends to get worse as you get

4    older.  That's obviously true.

5         It's a general statement, and it doesn't mean you

6    would apply it to a specific person's memory and say, well,

7    this specific person's memory is bad or inaccurate, meaning

8    everyone is different.  Every situation is different.  You have

9    a whole mix of information.  Sometimes people remember things

10:42AM 10   quite well, sometimes they don't.

11        And the general proposition is true, people forget

12   things, but you have to be cautious about applying it to

13   specific situations, you know, you don't know want to say older

14   people always forget things, and, therefore, this older person

15   must have forgotten that.  That's a dangerous thing to do.

16        You have to be careful, again, it's a general

17   proposition, it's part of the mix of information, but you have

18   to view each person as an individual, so, again, I'm permitting

19   testimony about current events in Rwanda for whatever weight

10:42AM 20   you choose to give it in evaluating the credibility of

21   witnesses.

22        It's up to you to decide what witnesses to believe,

23   all of them, none of them, anything in between, but, again, be

24   cautious about any proposition concerning human beings, human

25   behavior, that's general in applying them in specific context.

1    It's part of the mix of information, but it doesn't transfer

2    neatly from one thing to the other without careful thought and

3    reflection.

4         I hope that made sense, and, Mr. Lauer, you may

5    continue.

6    Q.   So I've been asking you some questions about the means by

7    which the government asserts its narrative and its control.

8    Are there well-known examples of that?

9    A.   Yeah, so other means they used is the justice system, as

10:43AM 10   we said here.  When the justice system -- of course, everyone

11   agrees that people need to do justice, those victims of the

12   genocide needed justice, those killers needed to be held

13   accountable for what they did, but in the case of Rwanda,

14   unfortunately, because the genocide happened in the context of

15   a civil war, the RPF, which won that war, has been using

16   justice as the means of consolidating its power and making sure

17   that nobody can challenge its own power.

18   Q.   I have a question that is somewhat related.  Were you

19   present when Dr. Clark testified about the Gacaca proceedings?

10:44AM 20   A.   Yes.

21   Q.   Did you yourself personally observe Gacaca proceedings in

22   Rwanda?

23   A.   Yes.

24   Q.   And in your role as an academic, have you also reviewed

25   scholarly literature with respect to the Gacaca courts?

1    A.    Yes.  In fact, I wrote my law degree thesis on the Gacaca

2    from an international justice standards perspective.

3    Q.    Do you recall Dr. Clark testifying that he found no

4    evidence of governmental interference or coercion?

5    A.    Yes.

6    Q.    Is that a mainstream view?

7    A.    Really, it's not.

8    Q.    Have other scholars been more critical of that process?

9    A.    Many other scholars and practitioners and especially those

10:45AM 10   who are involved in the system have shown that --

11           MR. GARLAND:  Objection.

12           THE COURT:  I'm sorry.

13           MR. GARLAND:  Objection.

14           THE COURT:  I'll let him complete this thought

15   responding to Dr. Clark, but I'm not really sure the Gacaca has

16   much relevance to this proceeding at all, but I'll let him

17   finish his answer.  Go ahead.

18   A.    Having shown what is lacking in his understanding is

19   really the context.  If you allow me, just I have with me a

10:46AM 20   book, Transitional Justice in Rwanda by a man known

21   Gerald Bahima.  I think the prosecution, they know of him.

22   Q.    Without referring specifically to another book, can you

23   just finish the thought as to the other criticisms or what the

24   more mainstream view is of the Gacaca proceedings?

25   A.    Yes, the mainstream accounts are that the nature of the

1    government and especially the government's obsession with

2    controlling everything is affecting very much the proceedings

3    of the justice.

4    Q.   I want to ask you about the relationship between the

5    Rwandan government and ordinary citizens.  What role does the

6    government play in the lives of ordinary citizens?

7    A.   So, as I must make clear here, there is one thing we need

8    to understand especially because being here in America, it's

9    very hard to understand there's a different system, the system

10:47AM 10    of accountability.  Here, we expect people to hold the leaders

11    accountable.  In Rwanda, it's the other way around.  The

12    leaders hold people accountable, so people have to comply with

13    what the governments want them to accomplish.

14    Q.   How does that work in practical terms?

15    A.   So, in practical terms, here maybe I can talk about

16    another system of control.

17    Q.   Please tell us what you mean.  My question is essentially

18    how does the government exert that control?

19    A.   As I said, the government has becoming more and more

10:48AM 20    authoritarian wanting to control everything, and the government

21    succeeded in 2006 to establish a system of control known as

22    performance contract.

23    Q.   Is there a Kinyarwandan term for that?

24    A.   Yeah, the Kinyarwandan term for that imihigo,

25    i-m-i-h-i-g-o.

Case: 19-1689    Document: 00117615537    Page: 415    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 59 of 101

10-59

        1    Q.   And what are those performance contracts?

        2    A.   So the performance contracts is a system, so according to

        3    the government, which is grounded in the Rwandan culture, that

        4    is the governing system which existed in Rwanda in the

        5    pre-colonial time under the king's rule, so the system just

        6    portrays the president as above the whole country, like the

        7    ancient king, and the president is the government and the other

        8    branches of the government, and then there are governors, and

        9    then there is the district level, as I said.

10:49AM 10   Q.   So if I could just stop you there, I'm going to ask that a

       11    chalk be displayed, and perhaps you could elaborate using a

       12    chalk.

       13    A.   Thank you.

       14    Q.   When I say a chalk, I think what's appearing on your

       15    screen right now.

       16         THE COURT:   Chalk is an old-fashioned term, ladies and

       17    gentlemen, for when we used to have blackboards.

       18    Q.   Can you describe what we're seeing here?

       19    A.   So, roughly, this is how the Rwanda administrative

10:50AM 20   structure looks like since 2006.   There is the presidency, then

       21    there is the national government, there is the province, which

       22    are like the states here, the district, then sector level, the

       23    civil level, and the 10 household unit.

       24    Q.   And what is the governmental structure at these levels?

       25    What is the presence of government at these different levels?

1    A.    So at this level then, everywhere, like in America here,

2    we know that so the government will submit a budget request to

3    the Congress, then the Congress will just approve or changes.

4         In Rwanda, in addition to having this national

5    government, there is no notion of separation of power, of

6    course, but the president is above everyone, so the national

7    government of parliament and the judiciary members, they have

8    to sign with the president a contract.

9         In ancient time, the time of the king, this was done

10:51AM 10   verbally, but now it's done in the formal way.  It's a signed

11   contract.

12   Q.    And how far -- what you're referring to is the imihigo

13   performance contracts?

14   A.    Yes.

15   Q.    How far does that contract go?

16   A.    They go all the way down, so the national governments, the

17   province leaders and district leaders, each of those leaders

18   sign individual contact of performance to the president, say

19   Mr. President, I pledge my allegiance to you, this is what I

10:52AM 20   will accomplish with the aim of preserving the integrity and

21   the unity and progress over this country, and then at the

22   sector level, the sector level pledge the allegiance to the

23   district level, the civil leaders pledge the allegiance to the

24   sector level, and the 10 household leaders pledge the

25   allegiance to the cell, and then ordinary citizens have to

1    pledge their allegiance to the 10 household leaders.

2         So it's quite well-controlled, and what is interesting

3    here, people were taught that because they have just to be what

4    is known in Rwanda as mandatory appointment, so if you need to

5    report anything about security, about any problems which can

6    happen, so you report to the level above you, so it's these

7    top-down control system where the ordinary citizens, what do

8    they have to do is to comply and report to the units.

9    Q.   You've talked a lot about the performance contracts, and

10:53AM 10   those are actually formal contracts; is that correct?

11   A.   Yes.

12   Q.   Are there more informal means by which the government can

13   play a part in the lives of every day citizens?

14   A.   Yes, this is really part of the Rwandan system.  Sometimes

15   people would expect that the government because it's a military

16   government, so because they have military everywhere, the

17   military does what they do every day, to kill people or use

18   harsh means, actually that's not the case because the

19   government uses this combination of several means of control of

10:54AM 20   forcing people to comply.

21        This becomes internalized especially now because

22   everyone is watching the other one, but pressures really mostly

23   now as we know according to the literature, and it was

24   recommended really the pressures are really at these local

25   level, the sector levels, where people have to on every day

Case: 19-1689    Document: 00117615537    Page: 418    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 62 of 101

10-62

1    basis to show that they are ready to comply and actually knew

2    based on studies suggested that mostly families, communities

3    are the major guardians over this system, so to say don't cause

4    us trouble because if someone is not complying, not only he may

5    be in danger, but he may put all his family, his community in

6    danger.

7    Q.   Does the government need to directly threaten or pressure

8    people to ensure that they fall in line?

9    A.   Not really unless the government just wants to set the bar

10:56AM 10   or to give an example as the president so often reminds

11   Rwandans, there is a red line.  Everyone that is Rwandan is now

12   familiar with this notion of there is a red line not to cross.

13   Q.   What is meant by that?

14   A.   So what is meant by that, and, again, this is a common

15   notion among Rwandans is that there is just this narrative of

16   why the RPF government has this notion of an extentual

17   phenomenon because without the RPF, it will be another

18   genocide, so whenever you challenge the RPF, when you say

19   something that there can be an alternative way of governing the

10:57AM 20   country, there can be someone you can, for instance, challenge

21   President Kagame elections, as this happened in 2010 or 2016,

22   then you are crossing the red line.

23   Q.   And what are the consequences that are associated with

24   crossing the red line?

25   A.   So the consequence, again, here as the president,

1    Paul Kagame has made it clear more and more often, he said,

2    "There are always consequences," and most of the time he uses

3    those terms, there are consequences always when there is one

4    leader who is assassinated, especially now that there's a trend

5    of assassinating dissidents living abroad.

6              MR. LAUER:  I have no further questions.  Thank you.

7              THE COURT:  All right.  Cross.

8              MR. GARLAND:  Your Honor, I can begin at this point.

9    It's going to be awhile.  I don't know if you want to take a

10:58AM 10   break.

11             THE COURT:  We haven't even gone an hour yet.  Why

12   don't we just start.

13                        CROSS-EXAMINATION

14   BY MR. GARLAND:

15   Q.    So, good morning.

16   A.    Good morning.

17   Q.    Your Ph.D., it's in international relations, correct?

18   A.    Yes, from the School of Law and Diplomacy.

19   Q.    But international relations?

10:59AM 20   A.    Yes, with a law degree.

21   Q.    But your Ph.D. is in international relations?

22   A.    Correct.

23   Q.    And one of the other things that you do in addition to

24   being a lecturer is that you act as an activist, correct?

25   A.    Yes, I was an activist, human rights activist in Rwanda

**J.A. 1104**

Case: 19-1689    Document: 00117615537    Page: 420    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 64 of 101

10-64

```
 1    from 1994 until 2004.

 2    Q.   And you mentioned this before, but you were in secondary

 3    school with Mr. Teganya, correct?

 4    A.   I went to secondary, yes.

 5    Q.   You were one year ahead of him?

 6    A.   Two years ahead of him.

 7    Q.   Two years ahead of him.  So that means you would have been

 8    in school with him for about four years?

 9    A.   Four years, yes.

10:59AM 10    Q.   Four or five years, okay.  Then during the time of the

11    genocide of the Hutus, you were at Butare during that period,

12    correct, April through I'm assuming July of '94?

13    A.   Until May, yes.

14    Q.   Until May, okay.  And then years later, Mr. Teganya

15    applies for asylum in the United States, and he and his lawyer

16    reach out to you to support him in his asylum claim, correct?

17    A.   Yes.

18    Q.   And, in fact, you submitted an affidavit supporting him in

19    his asylum claim, correct?

11:00AM 20    A.   Yes, I submitted an affidavit describing the situation in

21    Rwanda.

22    Q.   And that was in his support for the asylum application,

23    right?

24    A.   Yes.

25    Q.   Now, at the beginning of your testimony, do you recall you
```

```
 1    were asked whether you agreed with Dr. Clark's description of

 2    the genocide in Rwanda?  Do you recall that question from

 3    Mr. Lauer?

 4    A.   Yes.

 5    Q.   And you said generally, right?

 6    A.   Yes.

 7    Q.   So I just want to understand what you mean by that.  So,

 8    first you agree that a genocide started in Rwanda on April 6th,

 9    1994, right?

10    A.   Yes, and I put that in my writings.

11    Q.   I'm sorry, could you repeat the last?

12    A.   I wrote extensive writings of that.

13    Q.   Yes, in fact, you've called it the worst genocide since

14    the holocaust, correct?

15    A.   Correct.

16    Q.   And in that genocide, it was the Hutus who sought to

17    exterminate Tutsis, correct?

18    A.   No, that's a generalization.  There are Hutu militia,

19    activists who are killing Tutsis, also actually who killed many

20    other Hutu.

21    Q.   Okay.  But it's the genocide that started on April 6th

22    that targeted Tutsis with the intent to slaughter Tutsis as a

23    whole, correct?

24    A.   Correct.

25    Q.   And it was perpetrated by the Hutu-led government of
```

**J.A. 1106**

 1    Rwanda at the time, correct?

 2    A.    Correct.

 3    Q.    And you also agree that that genocide killed approximately

 4    500,000 to 800,000 Tutsis?

 5    A.    Correct.

 6    Q.    And that was one of the fastest genocides that the world

 7    had known, correct?

 8    A.    Correct.

 9    Q.    And one of the most effective genocides as well?

11:02AM 10  A.    Correct.

11    Q.    You also agree that the genocide started and was led by

12    the MRND political party, correct?

13    A.    Maybe some doubt people within the ruling party because

14    now there are people who are leaders of the MRND who are with

15    the RPF government, so we cannot say everyone within the MRND

16    was in the general site enterprise.

17    Q.    Now, in your thesis, you did say that the genocide was

18    started and led by the MRND political party, correct?

19    A.    Yes.

11:03AM 20  Q.    Now, before 1992, everybody who was in Rwanda, at least of

21    a certain age, was a member of the MRND, correct?

22    A.    Until November, 1991, yeah.

23    Q.    Okay.  And after that, that's when the multi-party system

24    began, right?

25    A.    Yes.

1    Q.   And the MRND had to compete for political members at that

2    time against the other parties?

3    A.   Yes, correct.

4    Q.   And you agree that that happened with physical force?

5    A.   Yes, it did after this happened.

6    Q.   And that happened at political rallies and political

7    meetings, right?

8    A.   Correct.

9    Q.   And you also agree that people from the MRND would wear

11:03AM 10    certain clothes, right?

11    A.   Yeah, and other parties, yes.

12    Q.   And the other parties did, too, right?

13    A.   Yes.

14         MR. GARLAND:   I'm approaching with the Court's

15    permission.

16    Q.   I hand you this right here, which I believe is Exhibit 12

17    and Exhibit 15.  That's the political clothing and the

18    political colors of the MRND during that period, correct?

19    A.   Correct.

11:04AM 20    Q.   And during 1994 as well?

21    A.   Correct.

22    Q.   And it's also true that if you were not a member of that

23    party, you wouldn't wear that clothing, right?

24    A.   No.

25    Q.   And that's because you couldn't get that clothing at the

         1    local store, you can only get it at a political rally or from a

         2    political leader, correct?

         3    A.    Yeah, even though they were just available anywhere.

         4    Q.    Now, you also agree that the genocide was aided by the

         5    Interahamwe, correct?

         6    A.    Correct.

         7    Q.    And that was a youth wing of the MRND for people who are

         8    under 30, right?

         9    A.    Correct.

11:05AM  10    Q.    And that the Interahamwe were especially vicious during

        11    the genocide, yes?

        12    A.    Most of them, yes.

        13    Q.    And that they trained in combat both armed and unarmed,

        14    correct?

        15    A.    Yes, but I have done research on these, and I can

        16    correctorize that framing.

        17    Q.    But you agree that there was training in combat, correct,

        18    by the Interahamwe?

        19    A.    Yes.

11:05AM  20    Q.    And the reason that they did that was in part so that they

        21    could force people into the MRND?

        22    A.    Yes.

        23    Q.    And later on they used that training to kill Tutsi during

        24    the genocide, right?

        25    A.    During the genocide, yes.

Case: 19-1689   Document: 00117615537   Page: 425   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 69 of 101

10-69

1   Q.   And they work with soldiers in order to do that, right?

2   A.   Yes.

3   Q.   And you also agree that during the genocide, it wasn't

4   just military Interahamwe but government officials were also

5   complicit, correct?

6   A.   Yes.

7   Q.   And that regular citizens also participated as well?

8   A.   Yes, there are those who participated in the Interahamwe,

9   and there are others who were forced to participate.

11:06AM 10   Q.   And that some of the people who participated were people

11   that you might not have expected, such as neighbors might

12   have -- Hutu neighbors might have participated in persecuting

13   their Tutsi neighbors?

14   A.   Yeah, sometimes that happened.

15   Q.   Sometimes not always, we don't want to say all, but

16   sometimes that happened, right?

17   A.   Yes.

18   Q.   And sometimes even members of the clergy participated as

19   well, correct?

11:07AM 20   A.   Correct.

21   Q.   And just to be clear, the weapons that were used were guns

22   by soldiers, right?

23   A.   Yes.

24   Q.   And Interahamwe used machetes and clubs, right?

25   A.   Correct.

**J.A. 1110**

Case: 19-1689    Document: 00117645537    Page: 426    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 70 of 101

10-70

1    Q.   In fact, the club might even be, again, approaching with

2    the Court's permission, might be something like this as

3    Government's Exhibit 17 or Exhibit 17, correct?

4    A.   Yes.

5    Q.   And I'll take back 12 and 15.  And you'd also agree that

6    the citizens who participated also sometimes used these local

7    weapons, like that club and machete as well, correct?

8    A.   Yes.

9    Q.   And that among the other effects of the genocide, there

11:07AM 10    was a killing but also burning houses, sexual assault, and

11    rape, correct?

12    A.   Correct.

13    Q.   And since you were in Butare, you'd also agree that the

14    genocide eventually came to Butare, correct?

15    A.   Yes.

16    Q.   And that came to Butare later than it did in other parts

17    of the country, right?

18    A.   Exactly.

19    Q.   And that's because Butare was in the south and had a

11:08AM 20    higher concentration of Tutsis, correct?

21    A.   Yes.

22    Q.   But when it came, it came with some ferociousness,

23    correct?

24    A.   Yes.

25    Q.   In fact, in two weeks of massacres, the authorities

J.A. 1111

```
         1   annihilated more than half of the Tutsi in Butare, right?
         2   A.   Yes.
         3   Q.   And so when you were in Butare, you either experienced or
         4   witnessed some of this as well, correct?
         5   A.   Yes.
         6   Q.   So you're familiar with the roadblock at the Hotel Faucon
         7   where children were murdered, correct?
         8   A.   Well, I didn't manage to get to that place.  I was in
         9   Mille Collines, which is another place.
11:08AM  10  Q.   But you're familiar as part of the historical record that
        11   children were murdered there, correct?
        12   A.   Yes.
        13   Q.   And that there was a slaughter that went through town
        14   systematically, correct?
        15   A.   Yes.
        16   Q.   And that military swept through neighborhoods, right?
        17   A.   Yes.
        18   Q.   And that civilians in Butare were also a large part of
        19   this sweep through Butare and to kill Tutsis during that
11:09AM  20  genocide, correct?
        21   A.   Yes.
        22   Q.   So turning to the hospital, you're also familiar that the
        23   genocide was visited on the hospital in the National
        24   University, too, correct?
        25   A.   Yes.
```

1    Q.   And that leading historians called the genocide at the

2    hospital a slaughter?

3    A.   Yes.

4    Q.   And that slaughter included slaughter of medical

5    personnel, students and Tutsi patients, right?

6    A.   Yes.

7    Q.   Including Tutsis who came to the hospital not because they

8    were hurt but because they sought refugee, right?

9    A.   Yes.

11:09AM 10    Q.   And you're familiar also historically that soldiers didn't

11    just go to the hospital once to do those, to search out Tutsis,

12    but they came back repeatedly to search for them, right?

13    A.   Yes.

14    Q.   And you're familiar as well that there was a mass grave at

15    a pit near the hospital?

16    A.   Yes.

17    Q.   And also a mass grave near the university, right?

18    A.   Yes.  In fact, I was at the hospital for Rwanda when we

19    paid respect for those remains in April, 1995.

11:10AM 20    Q.   So, fair to say that during that period of genocide,

21    April through July of 1994, it was pervasive throughout Rwanda,

22    correct?

23    A.   Yes.

24    Q.   And it wasn't a secret at that time, right?

25    A.   No.

**J.A. 1113**

Case: 19-1689    Document: 00117615537    Page: 429    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 73 of 101

10-73

```
 1   Q.   And the slaughter wasn't hidden, right?

 2   A.   Yes.

 3   Q.   And the slaughter wasn't done just at night, right?

 4   A.   Yes.

 5   Q.   It was done during the day as well, correct?

 6   A.   Yes.

 7   Q.   And that's because basically the country was controlled by

 8   the military, the local authorities, the Interahamwe, and the

 9   citizenry who participated, right?

11:11AM 10   A.   Yes.

11   Q.   And that's true during what I just said of Rwanda, that

12   was true of Butare as well, correct, that it was pervasive in

13   Butare?

14   A.   Yes.

15   Q.   Happened during the day, happened during the night,

16   right?

17   A.   Yes.

18   Q.   The same true at the hospital, it was pervasive in the

19   hospital?

11:11AM 20   A.   Yes.

21   Q.   And happened during the day and happened during the

22   night?

23   A.   Yes.

24   Q.   And it was pervasive, correct?

25   A.   Yes.
```

**J.A. 1114**

Case: 19-1689    Document: 00117645537    Page: 430    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 204    Filed 11/04/19    Page 74 of 101

10-74

1    Q.    So, I gathered from your testimony that you're not a fan

2    of the current government of Rwanda, right?

3    A.    Yes.

4    Q.    So if you were going to do research in Rwanda to figure

5    out what went on in Rwanda, you would take some precautions to

6    distance yourself from Rwanda because of the views that you

7    hold, correct?

8    A.    Yes.

9    Q.    So, one of the ways that you would do that is that you

11:12AM 10    wouldn't accept funding from the government of Rwanda to fund

11    your research, would you?

12    A.    Sorry.

13    Q.    You would not accept funding from Rwanda, the government

14    of Rwanda to fund your research, right?

15    A.    Well, it depends the nature of the research.

16    Q.    But given the views that you've just talked about and your

17    views of the government of Rwanda, you would want to have an

18    independent source of funding, that would be ideal, wouldn't

19    it?

11:12AM 20    A.    It would be, but in Rwanda, you need to know that since

21    2005, all independent organizations, they need government

22    authorization before they accept funds from international

23    donors.  This is one of the mechanisms of controlling civil

24    society groups.

25    Q.    Okay.  But you wouldn't be seeking to have government of

**J.A. 1115**

1    Rwanda fund your research if that's what you were intending to

2    do, right?

3    A.   Being here, no.

4    Q.   And another thing that you would probably do if you were

5    to conduct your research in Rwanda, you wouldn't want the

6    government officials to be with you while you conducted your

7    research, right?

8    A.   But actually I've been interacting with Rwandan officials

9    here.

11:13AM 10    Q.   But I'm asking about if you were doing research in Rwanda,

11    given the views that you said about the Rwandan government, you

12    would want to do your research there independent of Rwandan

13    officials, wouldn't you?

14    A.   No.

15    Q.   I'm sorry, can you say that audibly?

16    A.   No.

17    Q.   Okay.  And if you employed assistance to help you with

18    your research, you wouldn't want those assistants to work for

19    the government of Rwanda either given the views you've said,

11:14AM 20    right?

21    A.   Not working with the government because I have nothing

22    against the government except for some practices that have been

23    documented.

24    Q.   And, in fact, you might even, given the views you

25    described, if you had helpers in Rwanda, you might ask them to

J.A. 1116

Case: 19-1689     Document: 00117615537     Page: 432     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 76 of 101

10-76

```
 1    sign nondisclosure agreements, right, so they wouldn't talk to
 2    Rwandan officials about your research, right?
 3    A.   No, I don't use that method, no.
 4    Q.   You wouldn't use a nondisclosure agreement, okay.  So,
 5    another thing you might do because of what you've talked about
 6    before is when you were talking to people in Rwanda, you
 7    probably, as a researcher, wouldn't tell them exactly what it
 8    is you're researching, right, because you wouldn't want to
 9    taint what they would tell you, correct?
10    A.   For which period of time are you talking about?
11    Q.   I'm talking about if you went there right now and started
12    doing research.
13    A.   If I was to go, I'm not doing face-to-face interview today
14    in Rwanda, so I'm not using those things.
15    Q.   But if you did, hypothetically, you would, when you met
16    with people, you wouldn't be telling them what your hypothesis
17    is, what it is you want to prove, right, you would want to try
18    to talk to them generally and see what information they have to
19    offer, right?
20    A.   No, I can't do that.
21    Q.   You can't do what?
22    A.   Academic, I can't do that, for instance, to conduct
23    interview using the deceit.
24    Q.   But you wouldn't say to a person that you're interviewing,
25    I want to prove X, tell me what you have to say about X, right,
```

        1    because that could mean that could bias what they were telling

        2    you, right?

        3    A.    The only kind of information I can recollect, for

        4    instance, I can ask someone, I said there is a new law which

        5    was published today, can you send me a copy or you can ask

        6    specifically, you can verify information, is it true that it's

        7    on this date that the government adopted this law, was it in

        8    May or in April?  This information you can verify, but I

        9    cannot, for instance, now conduct interview with someone, I can

11:16AM 10    say what people told me they are doing this, I didn't have

       11    unity of law, that I can't do.

       12    Q.    Speaking generally, if you went there, you would take

       13    steps to make sure that you had the investigation that was

       14    independent from the government of Rwanda, wouldn't you?

       15    A.    Can you repeat the question?

       16    Q.    Yes.  If you were going to Rwanda today to investigate

       17    something that happened in Rwanda during the genocide, you

       18    would take many steps in order to ensure that your

       19    investigation, your research would be independent from the

11:17AM 20    government of Rwanda, correct?

       21    A.    Yes.

       22    Q.    And that would be good research practice?

       23    A.    It would be good research if the government allows me to

       24    do that, yes.

       25    Q.    So one of the things that you talked about before, and I

```
 1   don't want to oversimplify, but I want to understand is that
 2   the current government in Rwanda uses its authority to silence
 3   dissent, correct?
 4   A.   Correct.
 5   Q.   So, and it might do so in order to silence political
 6   appointments, correct?
 7   A.   Yes.
 8   Q.   Now, Mr. Teganya, you've known him for a while.  Do you
 9   know is he running for political office in Rwanda at this
10   point?
11   A.   No.
12   Q.   Do you know whether he's ever run for political office in
13   Rwanda?
14   A.   No.
15   Q.   You've known him for awhile.  He isn't a dissenter of the
16   type that you were talking about, is he?
17   A.   No, but the contemporaries of targeted people in the
18   narrative are not those only openings.
19   Q.   Mr. Teganya hasn't written any articles of political
20   dissent that you know of?  Yes or no.
21   A.   No.
22   Q.   And he didn't do that in the last five years since he's
23   been in America, right?
24   A.   Yeah.
25   Q.   And he didn't do so in 15 years before that he was in
```

# J.A. 1119

Case: 19-1689    Document: 00117615537    Page: 435    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 204    Filed 11/04/19    Page 79 of 101

10-79

1  Canada, correct?

2  A.    Correct.

3  Q.    As far as you know, he didn't did so when he was in Congo,

4  Kenya and India either, correct?

5  A.    Yeah.

6  Q.    You talked a while about the ideals of the legal system or

7  a country and how the current government of Rwanda falls short

8  in that.  I want to make sure I understand the political

9  framework that you're talking about.  First, as a political

11:19AM 10  scientist with a degree in international relations, you would

11  want to see a commitment to the rule of law, correct?

12  A.    In some forms, yes.

13  Q.    In some forms or in all forms?  In other words, I'm

14  talking about an ideal legal system if you're able to construct

15  it right now with your understanding of political systems, you

16  would want a legal system in a country to have a commitment to

17  the rule of law, correct?

18  A.    Yes.

19  Q.    And that's because a commitment to the rule of law is a

11:20AM 20  commitment to fairness and to rights, correct?

21  A.    Yes.

22  Q.    And the second thing that you would want of a political

23  system is you would want a functional legal system, a legal

24  system that works, right?

25  A.    Yes.

**J.A. 1120**

Case: 19-1689    Document: 00117615537    Page: 436    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 204    Filed 11/04/19    Page 80 of 101

10-80

1    Q.   And you understand that a legal system has lots of

2    challenges to it, and so there are varying degrees, but you

3    would want a relatively functioning legal system in place in an

4    ideal place, correct?

5    A.   Yes.

6    Q.   The third thing is you would want that economy to have an

7    independent judiciary, right?

8    A.   Yes.

9    Q.   And that's because having an independent judiciary means

11:20AM 10   that Judges can hold all parties to being fair and also to

11   protect people's rights, correct?

12   A.   Yes.

13   Q.   You'd also want, if we're going to take it to Rwanda, you

14   would want Judges to come from all ethnic backgrounds, right,

15   because representativeness is an important ideal in a legal

16   system, right?

17   A.   Yes.

18   Q.   And as well, if a person were accused of genocide in

19   Rwanda, ideally you would want to see that when things go to

11:21AM 20   trial that there's a significant record of acquittals because

21   that would be an indication that that system is working, right?

22   A.   Yes.

23   Q.   And that would also show that people weren't afraid to let

24   the accused go free, a rate of acquittal that's significant,

25   correct?

 1    A.   Yes, but it also can be used by the government of

 2    cooperating even those people who are, who did something wrong

 3    but co-opt them so they can serve the government, and we have

 4    good, we have examples in all cases.

 5    Q.   So, all things being equal, however, a record of

 6    acquittals in various tribunals would help to demonstrate that

 7    when the government brings an allegation against somebody, that

 8    that person, that the result isn't predetermined, right, all

 9    things being equal?

11:22AM 10    A.   Yes.

11    Q.   So just to recap, these are the things, and tell me if

12    I've got them wrong, commitment to the rule of law, a

13    functioning legal system, an independent judiciary, a

14    representative judiciary, and a significant record of

15    acquittals.  That's what we just talked about, right?

16    A.   That's the example.

17    Q.   That's what we just talked about?

18    A.   Yes.

19    Q.   So I want to start with the rule of law.  You've written

11:22AM 20    in the past that Rwandans' commitment to the rule of law has

21    been relatively successful, have you not?

22    A.   Yeah, I said that's how it started, and then there was

23    problem over time.

24    Q.   And so in supporting the post-genocide transition in 2004,

25    you wrote that with two other authors, correct?

Case: 19-1689    Document: 00117615537    Page: 438    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS  Document 204  Filed 11/04/19  Page 82 of 101

10-82

```
 1    A.   Yes.
 2    Q.   And you're familiar that the introduction says right there
 3    that Rwandans' commitment to the rule of law has been
 4    relatively successful, right?
 5    A.   Yes.
 6    Q.   All right.  So that's rule of law.  Now, the next thing is
 7    a functioning legal system.  You've written in the past that
 8    Rwanda has a relatively functioning legal system, have you not?
 9    A.   Yes.
10    Q.   And that was, again, in supporting the post-genocide
11    transition in Rwanda, that was done from the Netherlands
12    Institute, correct?
13    A.   Yes.
14    Q.   That's where you said that it was a relatively functioning
15    legal system.  And, in fact, one of the things you said was
16    that there was increasing professionalism throughout that legal
17    system, right?
18    A.   Yes.
19    Q.   Now, you've also, the next thing that we talked about was
20    an independent judiciary, correct?
21    A.   Yes.
22    Q.   In your thesis, remember, when you wrote about Rwandan's
23    judiciary?
24    A.   Yes.
25    Q.   In fact, you wrote that the judiciary was relatively
```

11:23AM (line 10)
11:24AM (line 20)

         1    independent despite the RPF's control, correct?

         2    A.   Yes, I qualified that sense of independence.

         3    Q.   Right.  I can give you a copy of the thesis, but page 147,

         4    you said, "While the RPF's control over other strategic sectors

         5    was evident, the judiciary was relatively independent."  Do you

         6    recall that sentence?

         7    A.   Yes, but then you can continue.

         8    Q.   Then let's talk about a representative judiciary as well.

         9    You already testified that you're familiar with Gacaca courts,

11:25AM  10    correct?

        11    A.   Yes.

        12    Q.   And you are also familiar with the research that says that

        13    even though the current government of Rwanda is led by Tutsis,

        14    that the majority of Gacaca Judges were, in fact, Hutus.

        15    You're familiar with that research, right?

        16    A.   Correct.

        17    Q.   Let's talk about acquittals because I think that was the

        18    last thing that we talked about.  Sir, you're familiar with the

        19    fact that when people have been accused of genocide in the

11:25AM  20    Gacaca courts and the specialized criminal courts and

        21    elsewhere, there have been significant acquittals of people

        22    accused of genocide, correct?

        23    A.   Correct.

        24    Q.   So you're familiar with the specialized chambers, right,

        25    that prosecuted, correct?

# J.A. 1124

```
 1   A.   Correct.

 2   Q.   And, in fact, in your thesis, you cite to statistics that

 3   say that if you do the math, about twenty-one and a half

 4   percent of the people who are accused in those specialized

 5   chambers of genocide were set free?

 6   A.   Correct.

 7   Q.   And so that means that during the period that you cited in

 8   your thesis, one in five suspects were acquitted of genocide,

 9   correct?

11:26AM 10   A.   Correct.

11   Q.   And then you're also aware that of significance acquittals

12   in Gacaca Court as well, correct, that about 25 percent there

13   of the accused were acquitted, correct?

14   A.   Correct.

15   Q.   Then when you go back to your thesis, you also talk about

16   the genocidaire prosecutions in the ICTR, right?

17   A.   Yes.

18   Q.   And there I think your statistics were that of the 75

19   cases completed at the time, 12 were acquitted, right?

11:26AM 20   A.   Yes.

21   Q.   So, one of the things that I wanted to ask you about is

22   you agree that in research, especially this sort of very

23   academic research that you do, it's important to listen to

24   ordinary people, right?

25   A.   Yes.
```

J.A. 1125

Case: 19-1689    Document: 00117615537    Page: 441    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 85 of 101

10-85

```
 1    Q.   In fact, that was in your thesis at the -- I can't
 2    remember whether it was the introduction, but you said it was
 3    incredibly important to talk to ordinary people, right?
 4    A.   That's correct.
 5    Q.   And you need that in order to essentially confirm the sort
 6    of research that you're doing if it's at an academic level?
 7    A.   Yes, especially for an outsider who doesn't speak the
 8    language or doesn't know some of the records or doesn't know
 9    really those hidden transcripts.
10    Q.   And you're aware that there have been people tried for
11    genocide in various tribunals, we talked about the genocide,
12    I'm sorry, Gacaca Courts, we talked about the specialized
13    criminal courts, we talked about the ICTR, and they've also
14    been tried in other countries, including the United States,
15    where there is accusation of participation into the genocide,
16    correct?
17    A.   Yes.
18    Q.   And just following up on this idea about talking to
19    ordinary people, of those prosecutions that I just mentioned,
20    how many of the witnesses, whether prosecution or defense, how
21    many of them have you interviewed for your academic research?
22    A.   Now or in the country?
23    Q.   Let's start with in Rwanda, and just to be clear, you
24    haven't been back to Rwanda yourself since 2004, right?
25    A.   Correct.
```

11:27AM at line 10
11:28AM at line 20

J.A. 1126

Case: 19-1689    Document: 00117615537    Page: 442    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 86 of 101

10-86

1    Q.   So I take it that you would not have interviewed any

2    witnesses to any of these proceedings in Rwanda since 2004,

3    right?

4    A.   Yes.

5    Q.   That was 15 years ago?

6    A.   Yeah.

7    Q.   And so outside of Rwanda then since we know it happened

8    inside Rwanda, how many of the witnesses either the government

9    or defense have you interviewed for any of the sort of

11:29AM 10    proceedings that we've talked about outside of Rwanda?

11    A.   None.  I'm not dealing with those specific cases.

12    Q.   And, in fact, therefore, you have no statistics about the

13    extent to which any of what you talked about before about the

14    political system has an effect on how witnesses testify in

15    those proceedings, right?

16    A.   What I can speak to is really given an understanding in

17    the context within which people can evaluate witnesses, can

18    evaluate defendants, can evaluate the narrative they are

19    taught, so understanding and the context from social scientific

11:30AM 20    perspective.

21    Q.   And the perspective that you've talked about is a

22    qualitative perspective, right?

23    A.   Yes.

24    Q.   And it's an interpretive perspective, right?

25    A.   Yes, to understand the effect of over the system, for

Case: 19-1689    Document: 00117615537    Page: 443    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 294   Filed 11/04/19   Page 87 of 101

10-87

```
 1    instance, this controlling system, how do people cope with the
 2    system and those sophisticated mechanism put in place with the
 3    aim of controlling specific and narrative for political
 4    interest.
 5    Q.    And that's an interpretation by an academic, by you,
 6    correct?
 7    A.    Yeah, in a comparative perspective comparing Rwanda to
 8    other similar systems.
 9    Q.    But, again, no statistics, right?
10    A.    Oh, statistics is not my field of specialization, I'm in a
11    scholarship which values your interpretation and withstand the
12    political culture to understand how people's behaviors and
13    reactions and responses respond to a system, what are they
14    expected to do, when they can benefit from that system.  That's
15    really my scholarship is about the political culture as it
16    shapes how we behave in the real world.
17    Q.    I just want to understand.  So you have had no interviews
18    with the witnesses, and you have no statistics, correct?
19    A.    On those specific cases, no.
20              THE COURT:  Okay.  Go ahead.
21              MR. GARLAND:  I just wanted do consult with
22    co-counsel.
23              THE COURT:  Go ahead.
24              MR. GARLAND:  Your Honor, no further questions.
25              THE COURT:  All right.  Why don't we take a quick
```

11:31AM (line 10)
11:32AM (line 20)

J.A. 1128

```
 1    break, and then we'll have redirect when we come back.

 2              THE CLERK:  All rise.

 3              (A recess was taken.)

 4              THE CLERK:  All rise for the jury.

 5              (JURORS ENTERED THE COURTROOM.)

 6              THE COURT:  Redirect.

 7                      REDIRECT EXAMINATION

 8    BY MR. LAUER:

 9    Q.   Good morning, again.

10    A.   Good morning.

11    Q.   You were asked some questions on cross-examination about

12    attending school with Mr. Teganya.  Do you recall that?

13    A.   Yes.

14    Q.   And there was a suggestion that you had a friendship with

15    him.  Do you recall being asked about that?

16    A.   Yes.

17    Q.   Were you Mr. Teganya's friend in seminary school?

18    A.   No.

19    Q.   Were you his friend at the university?

20    A.   No.

21    Q.   Were his friend when you immigrated to America?

22    A.   No.

23    Q.   When you were conducted about his asylum application, who

24    contacted you?

25    A.   His lawyer.
```

**J.A. 1129**

Case: 19-1689    Document: 00117615537    Page: 445    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 89 of 101

10-89

1    Q.   Were you contacted because you had gone to school with him

2    or were you contacted because of your academic work?

3            MR. GARLAND:  Objection.

4            THE COURT:  Sustained in that form.

5    Q.   The nature of the affidavit you provided in that case, was

6    it academic in nature?

7    A.   Yes, it was academic in nature, and I made that clear in

8    the writing.

9    Q.   Are you a historian?

11:44AM 10   A.   Yes.

11   Q.   Is your particular field of study the events of the

12   genocide or is your focus something else?

13   A.   So it's really on political science with the focus on the

14   genocide and human rights.

15   Q.   Were you present at the hospital in Butare in April,

16   May or June of 1994?

17   A.   Never.

18   Q.   Do you have any personal knowledge of what went on there?

19   A.   Never.

11:45AM 20   Q.   You were asked some questions having to do with your

21   research and how you would go about conducting research in

22   Rwanda.  Do you recall that?

23   A.   Yes.

24   Q.   You stated you left Rwanda in 2004?

25   A.   Yes.

1    Q.    Why did you leave Rwanda in 2004?

2    A.    I left Rwanda because of the pressures and threats against

3    scholars.  In fact, I left the country, and I came and visited

4    the country as a scholar at risk.

5    Q.    What is a scholar at risk?

6             MR. GARLAND:  Objection.

7             THE COURT:  I'll allow it.

8    Q.    What is a scholar at risk?

9    A.    A scholar at risk, people who are organized as people who

11:46AM 10    were at risk in their home countries, and then they need host

11    institutions to give them a place where they can continue their

12    work to think freely and to do research.  I was given that

13    opportunity to be a scholar at risk at Harvard University.

14    Q.    Now, you were asked some questions about not having

15    completed any interviews in Rwanda since 2004.  Do you recall

16    that?

17    A.    Yes.

18    Q.    Why is it that you have not been able to do field work in

19    Rwanda since 2004?

11:47AM 20    A.    So, as this has been established, and actually there was a

21    very debate, a hot debate among scholars about doing research

22    in Rwanda.  It has been established that Rwanda is a hostile

23    environment for independent researchers to do research, and, of

24    course, the government is using that strategy to make sure that

25    only those who are sympathetic to its narrative can be allowed

Case: 19-1689    Document: 00117615537    Page: 447    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 91 of 101

10-91

 1    into the country, and the others will be denied access.

 2    Q.    What strategies do you use to continue to do your research

 3    in light of that?

 4    A.    The strategy is actually now one of the projects I'm

 5    working on at Boston University is about human rights and

 6    activism, so how scholars and practitioners can compliment each

 7    other in their research, in their hostile environments to make

 8    sure that they protect the integrity of the research and they

 9    protect their sources.

11:48AM 10          One ways of doing that is to do research, but only

11    your publications came out after being peer-reviewed by other

12    established scholars through a regressed system of

13    verification.  For instance, my doctoral dissertation, it went

14    through that process.  Two book chapters that I have recently

15    published went through that process and other books I'm

16    publishing went through this system of just academic regress

17    peer review.

18    Q.    Now, independent of not being able to travel to Rwanda,

19    you are a Rwandan yourself, and I take it you have many

11:49AM 20    colleagues and friends who are still present in Rwanda?

21    A.    Yes.

22    Q.    Are you able to talk to people in Rwanda on a regular

23    basis?

24    A.    Yes.  In fact, there are scholars in Rwanda with whom I

25    have already published some papers and other works.

# J.A. 1132

         1    Q.    When you tell us that you left the country because you

         2    felt you couldn't do your work independently, what are the

         3    concerns for being able to do independent research?

         4    A.    So being there or being here?

         5    Q.    Being on the ground in Rwanda, what are the concerns about

         6    the conduct of on the ground research in that country?

         7    A.    As it is now common ground, it's very hard in Rwanda for

         8    scholars who take positions which would tend to be in favor of

         9    the dominant narrative.  In fact, this is one of the topics

11:50AM 10    discussed in the literature to say why we don't hear from

        11    scholars from Rwanda, where are they, why they don't publish,

        12    why they don't talk about what is happening, and when they do,

        13    mostly it's just to side with the government narrative but

        14    mostly to attack other scholars who say something which is

        15    against the government narrative.  Again, this is

        16    well-established in the literature.

        17    Q.    You were asked a series of questions about what an ideal

        18    justice system would look like and commitment to the rule of

        19    law and functioning legal system and a number of other things.

11:51AM 20    Do you recall those questions?

        21    A.    Yes.

        22    Q.    One of those questions concerned an independent judiciary.

        23    Does Rwanda have an independent judiciary?

        24    A.    No.

        25    Q.    Why not?

1    A.   Because the nature of the government is to control

2    everything, all the branches of the government.  In fact, in

3    Rwanda, the last time we had an independent judicial

4    system more or less was of the period from '95 until '99.  In

5    between, one Supreme Court Justice was assassinated in 1997,

6    and there are five members on the justice system.  The other

7    four, remaining four were dismissed, summarily dismissed from

8    their positions, actually forced into the resignation in 1999.

9         Since then, we see Justices have been appointed by the

11:52AM 10   executive.  Actually, there is no tenure in the justice system,

11   so it's another kind of job, you can be appointed today,

12   tomorrow you are dismissed, then you go to work for

13   Zabinware (ph), so it's not an institution where we have

14   professional or justices who can expect to stay in that

15   position.  They are subject just to the wish of the government.

16   Q.   You were asked some questions about the acquittal rate in

17   various venues.  Do you recall that?

18   A.   Yes.

19   Q.   In your view, is an acquittal rate indicative of a lack of

11:53AM 20   executive interference?

21   A.   No.

22   Q.   Can you explain why not?

23   A.   So here it's not my suggestion that the government is

24   behind everyone, wants to put everyone in jail, but it depends

25   on how its case fits into the narratives, so there are people

```
 1    who have been fairly acquitted because there was no need to

 2    charge them, there are people who were acquitted because the

 3    government didn't want them to be prosecuted even though there

 4    was evidence against them, and there are some interesting cases

 5    where people were just charged and convicted, but after their

 6    political negotiations where there were now the same witnesses

 7    who I used to accuse them again while used to backtrack their

 8    confessions saying, "Oh, we don't know what we said, we were

 9    wrong, it was hearsay," so we have specific cases falling into

11:55AM 10  those categories, so it depends on how the case fits into the

11    narrative.

12    Q.   Many of those questions about the commitment to the rule

13    of law or an independent judiciary or fairness, they were put

14    to you with the preface, all things being equal.  Do you recall

15    that was how they were put to you?

16    A.   Yes.

17    Q.   Are all things equal in Rwanda?

18    A.   Things are not equal.

19         MR. LAUER:  Thank you, sir.

11:55AM 20      MR. GARLAND:  I have two very brief questions.

21         THE COURT:  All right.

22              RECROSS-EXAMINATION

23    BY MR. GARLAND:

24    Q.   Doctor, first to be clear, none of your research has to do

25    with whether Rwanda witnesses testified credibly, does it?
```

J.A. 1135

Case: 19-1689    Document: 00117615537    Page: 451    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 204   Filed 11/04/19   Page 95 of 101

10-95

1    A.    Recent or the past?

2    Q.    None of your research has to do whether Rwanda witnesses

3    testified credibly, does it?

4    A.    Yeah, it does somehow.

5    Q.    Your research?

6    A.    Yes.

7    Q.    And it's not your thesis that people in Rwanda can't

8    testify truthfully against genocide suspects, is it?

9    A.    That's not my point.

11:56AM 10        MR. GARLAND:  No further questions.

11        THE COURT:  Thank you.  You may step down.  We will

12    break there for the day.  I would like to ask two of the jurors

13    to stay behind.  I want to talk to you quickly.  That would be

14    Ms. Awah in seat 13 and Ms. Pierre-Louis in seat 6.

15        As for the rest of you, have a good weekend.  We will

16    commence again on Monday at 9:00 sharp.  Again, we have to take

17    Thursday and Friday off next week, and so it's going to

18    continue into the week after that, but I'll talk to the lawyers

19    about the schedule, try to get a better handle how long this is

11:57AM 20    expected to go, but in the meantime, please remember my

21    cautions not to discuss the case among yourselves or with

22    anyone else or read or listen to anything about the case, and

23    have a good weekend.  We'll see you Monday morning at 9:00.

24        THE CLERK:  All rise.

25        (JURORS EXITED THE COURTROOM.)

1    THE COURT:  Can I see counsel and Ms. Awah at sidebar.

2        (THE FOLLOWING OCCURRED AT SIDEBAR:)

3    THE COURT:  All right.  We have Ms. Awah at sidebar.

4    She wrote a note, which I will read into the record and mark as

5    Exhibit A.  "My name is Patience Awah.  I work for Sunny Acres

6    Nursing Home in Chelmsford.  HR called me the other day and

7    said they would only pay me for three days of jury duty, and I

8    either will go without pay for the remaining days or they will

9    use my vacation time, which I don't have much of to pay me.

11:58AM 10   While I am not on vacation, my accrued time of vacation would

11   be unfair to me.  I don't know how it works.  I need some

12   clarification.  Thank you."

13       Anything you want to add to that, Ms. Awah?

14   THE JUROR:  No, that's what they told me.

15   THE COURT:  Can I get you to step away and let me talk

16   to the lawyers.

17       All right.  What, if anything, do you want me to do

18   with that?  She doesn't know of it, of course, but she's the

19   second alternate, so we could let her go, and it's stating it

11:59AM 20   mildly, so we're down to one alternate.

21       We can try to call the nursing home.  I think that

22   second witness has, you know, a variation of the same problem.

23   Any thoughts?

24   MR. GARLAND:  I think the call is an appropriate move.

25   THE COURT:  I can't really force them to pay.  They

**J.A. 1137**

```
 1    can't retaliate against her.

 2         MR. LAUER:  I think it would have some indication with

 3    the HR department to prevail upon them.

 4         THE COURT:  Why don't we start there, and we'll see

 5    what happens, and I can't promise her anything else, obviously,

 6    at this point, but I'll say, well, we'll at least take that

 7    step, assuming she's comfortable with it.

 8         Ms. Awah.  All right.  What we're going to to do as a

 9    first step.  We're going to call your HR department and talk to

10    them and see what their view of the situation is.  Their not

11    allowed to retaliate against you or discriminate against you

12    based on jury duty, but we'll take it a step at a time.  I

13    certainly understand your concerns.

14         I can't make any promises right now, and we'll call

15    and see what happens, so unless you hear otherwise, I'll ask

16    you to be here Monday.  We may have a different answer before

17    that, I don't know, but we'll just start with the phone call,

18    okay, and take it from there.  Thank you again so much.  I

19    understand it's a hardship.  Thank you.

20         All right.  Ms.  You're Pierre-Louis; is that right?

21         THE JUROR:  Yes.

22         THE COURT:  I understand you had expressed a concern

23    to Lisa, and can you just state it for the record.  I was going

24    to have you write a note.  You can tell me out loud.

25         THE JUROR:  I wasn't receiving any payment from my
```

# J.A. 1138

Case: 19-1689    Document: 00117615537    Page: 454    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 204    Filed 11/04/19    Page 98 of 101

10-98

1    work.  I'm not really sure of their policy because I didn't

2    ask.  I could call again today and find out.  Nothing was told

3    to me that I'm not even going to get anything.

4              THE COURT:  Are you an LPN?

5              THE JUROR:  RN.

6              THE COURT:  At a treatment center?

7              THE JUROR:  Yes.

8              THE COURT:  Can you do this.  Ms. Awah is basically in

9    a similar situation, and what I told her and I'm going to tell

12:01PM 10   you is we will call your HR department and see what the

11   situation is.  They're not allowed to discriminate against you

12   or retaliate against you for jury service, but we don't know

13   what the situation is.

14            What we'll do is we'll call and just I'll take it a

15   step at a time.  I can't make any promises right now.  We'll do

16   what we can, and we'll take it from there.  If you don't hear

17   otherwise, I'll ask you to come back Monday.  We might --

18   again, I don't know how this is going to play out.  Unless you

19   hear otherwise, I'll ask you to come back Monday, and we'll see

12:02PM 20   how it goes and do the best we can.  I know you're making

21   sacrifices.  I really appreciate it, and I'm sympathetic and

22   we'll do what we can.

23            THE JUROR:  No problem.

24            THE COURT:  So we'll see how that goes.  I think

25   usually what we do is we have Jim McAlear from our jury office

**J.A. 1139**

Case: 19-1689    Document: 00117615537    Page: 455    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 204    Filed 11/04/19    Page 99 of 101

10-99

1    call with the heavy hand of the Judge, and he has to do this as

2    part of his job periodically and we'll just see how it goes,

3    and I'll report back to counsel.

4         Anything else on that topic?

5         MR. GARLAND:  No, your Honor.

6         THE COURT:  Just while I have you at sidebar, I

7    thought I was in a bizarre world here when Mr. Garland was

8    talking about how great acquittals were and Mr. Lauer was

9    saying, no, no acquittals, acquittals are not a sign of a

12:03PM 10    justice system that's functioning.

11         MR. LAUER:  In some ways, bizarre world is coming here

12    from our point of view.

13         THE COURT:  Of course, in a perfect system, conviction

14    would be 100 percent because no one would ever be charged

15    unless they were clearly guilty beyond a reasonable doubt, but

16    that's another argument for another day.  Anything else?

17         MR. GARLAND:  No, your Honor.

18         THE COURT:  Again, barring anything else, I will see

19    you at 8:30.  I'm a little behind on the jury instructions, but

12:03PM 20    I'm hoping to circulate something, and if something comes up

21    with the jurors that I would need to talk about, we can either

22    convene, I may be able to have a conference call or something

23    if need be, otherwise we'll call about it Monday morning.

24    Thanks.

25         (Juror note was marked Exhibit A for identification.)

1          (Whereupon, the hearing was adjourned at 12:57 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3                                          )
     UNITED STATES OF AMERICA,             )
4                                          )  Criminal Action
     Vs.                                   )
5                                          )  No. 17-10292-FDS
     JEAN LEONARD TEGANYA,                 )
6                      Defendant           )
                                           )
7                                          )

8    BEFORE:   THE HONORABLE F. DENNIS SAYLOR, IV

9

10                        JURY TRIAL DAY 11

11

12            John Joseph Moakley United States Courthouse
                        Courtroom No. 2
                        One Courthouse Way
13                      Boston, MA 02210

14

                          March 25, 2019
15                         8:30 a.m.

16

17

18

19

20

21

22
                        Valerie A. O'Hara
23                     Kathleen Mullen Silva
                       Official Court Reporter
24          John Joseph Moakley United States Courthouse
                   1 Courthouse Way, Room 3204
25                      Boston, MA 02210
                  E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3         United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;
5
     For the Defendant:
6
             Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.
8
     ALSO PRESENT:
9
     Joseph Bizimana, Interpreter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2    WITNESS                    DIRECT   CROSS  REDIRECT  RECROSS

3    DIOGENE NSENGUMUREMYI
       By Mr. Lauer                10               30
4      By Mr. Varghese                    18

5    SPIRIDION SEMINEGA
       By Mr. Lauer                31
6      By Mr. Garland                     40

7    JEAN PAUL MUNYENTWARI
       By Mr. Lauer                55               75
8      By Mr. Garland                     64

9    FIDELE BARINDA
       By Mr. Lauer                76               105
10     By Mr. Varghese                    86

11

12

13                  Exhibits - None marked.

14

15

16

17

18

19

20

21

22

23

24

25

11-4

<u>PROCEEDINGS</u>

1

2          THE CLERK:  All rise.  Thank you.  Please be seated.

3     Court is now back in session.

4          THE COURT:  All right.  Good morning.  To begin where

5     we left off, we had the jury clerk's office contact the two

6     nursing homes, whatever they are, for the two jurors, and

7     basically got nowhere, so what I propose to do is to have a

8     quick voir dire at sidebar with the two jurors individually and

9     just report that their employers said what they said.

08:36AM 10          I'm not sure what else to do.  One of these people is

11     an alternate, and my conscious is pricking at me for causing

12     her to lose all this money, and at the end of the day, we're

13     saying, well, you're not sitting anyway, or, on the other hand,

14     we're down to two alternates.

15          I don't know if counsel has a brighter idea.  For what

16     it's worth, as you know, it's wrong to make generalizations as

17     we did on Friday, but it was reported to me that the exactly

18     worse category of employers for this sort of thing is nursing

19     homes, so we have this problem periodically, but it is what it

08:37AM 20     is, and I guess what I'm going to say is, you know, ask the

21     jurors what they want me to do.

22          You know, if they think that they're sufficiently

23     troubled by this that it's going to affect their service, then

24     that creates a problem, but if they're willing to soldier on, I

25     think I'll leave them on.  I don't know if anyone has a

**J.A. 1145**

1    different view.  Mr. Garland.

2              MR. GARLAND:  I think that's right, your Honor.

3              THE COURT:  Mr. Lauer.

4              MR. LAUER:  We certainly don't want to see two jurors

5    dismissed when we still have two weeks left in the trial, and I

6    would also point out for the record that the two jurors are the

7    only two people of color.

8              THE COURT:  Well, that's just a random coincidence.  I

9    don't think that's of any legal significance.

08:37AM 10              MR. LAUER:  It is not, your Honor, perhaps of legal

11    significance, it is, however, notable, and I would urge the

12    Court to, as you indicated you would do, to have conversation

13    and inquire whether they are willing to continue to serve

14    notwithstanding whatever employment consequences there may be.

15              THE COURT:  All right.  So I'll have the clerk bring

16    them down individually as soon as everyone available.  Anything

17    else?

18              MR. GARLAND:  Your Honor, the only thing that just

19    came to me is one way to shorten the trial would be to go full

08:38AM 20    days.

21              THE COURT:  Well, we could do that.  What's defense

22    best estimate of where we are and how long the case is going to

23    take to put on?

24              MR. LAUER:  So we have a block of witnesses who are

25    present in Boston right now who we intend to present on Monday,

# J.A. 1146

Case: 19-1689    Document: 00117615537    Page: 462    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 6 of 109

11-6

1    Tuesday and Wednesday of this week.  There's another block of

2    witnesses arriving over the weekend.  We, in theory, could

3    present, you know, we could do full days next week, and perhaps

4    that would allow us to conclude a little bit earlier.

5            We're going to be going into next week, there's no

6    question about that.  The only way to shorten it would be to

7    have some full days and hopefully conclude the week of

8    April 1st as opposed to April 8th.

9            THE COURT:  Lisa, can I see the calendar?  I'm not

08:40AM 10   going to do today without warning anyone.  I can't do

11   Wednesday, the 27th but do I hear you saying that --

12           MR. LAUER:  This week, I'm not sure.

13           THE COURT:  Would you run out of witnesses if we went

14   all days.

15           MR. LAUER:  Yes.  This week it's not going to do us

16   much good.  If we did it, next week would be the better option.

17           THE COURT:  Like Monday, Tuesday?

18           MR. LAUER:  Yes, we could do that, and that might save

19   us a day or two.

08:40AM 20   THE COURT:  All right.  Why don't I -- let's think

21   about that.  I'll give a jury warning, so to speak, saying

22   we're thinking going all days Monday and Tuesday next week or

23   both and see what the reaction is.  I can't do Wednesday, the

24   3rd.  Let's see how that goes.  Okay.  Anything else?

25           MR. GARLAND:  Not from the government, your Honor.

# J.A. 1147

```
 1              MR. LAUER:  No, your Honor.

 2              THE COURT:  Again, I'll have the clerk bring down

 3     Ms. Awah and Ms. Pierre-Louis as soon as they're available.

 4              THE CLERK:  All rise.

 5              (A recess was taken.)

 6              THE CLERK:  All rise.

 7              (THE FOLLOWING OCCURRED AT SIDEBAR:)

 8              THE COURT:  We're at sidebar with Juror Awah; is that

 9     correct?

08:47AM 10              THE JUROR:  Yes.

11              THE COURT:  So we called your employer and basically

12     didn't get anywhere at all.  What you said was accurate, and we

13     couldn't get them to budge, so here's the situation.  We're

14     going to have three days of trial this week.  We're going to go

15     into next week.  I'm going to tell everyone that I may have all

16     day sessions on Monday and Tuesday to try to speed it up, and

17     it may well spill into the following week, the week of

18     April 8th, which is when I think the jury will probably get the

19     case, so it's kind of up to you.

08:48AM 20              Basically if you are so concerned about this that it's

21     going to affect your ability to be a fair juror, then you need

22     to tell me and I'll need to let you go, but if it's just a

23     hardship and you're unhappy about it, which I certainly

24     understand, but you still are going to do the best you can, I'm

25     going to keep you on, but you have to tell me, I guess, what
```

J.A. 1148

1     you're thinking because I can't do it for you.

2             THE JUROR:  I'm okay with it.  I wanted some

3     clarification.  I wanted to make sure that I'm treated fairly

4     and that that's what I'm supposed to do.

5             THE COURT:  Well, I'm not sure that you necessarily

6     are, that's my opinion.  I'm not your boss, so I don't know

7     what the circumstances are, you know, so everyone thinks this

8     is an inconvenience unless they are actually on trial where

9     they get charged, and suddenly it's more important to them, you

08:49AM 10     know, the way these things work, but, anyway, so I really

11     appreciate it, and, again, it's up to you, and if you have a

12     problem, you change your mind, or if you have a concern, let me

13     know, okay, and I do appreciate it.

14             THE JUROR:  I'll have to finish this, that's fine.

15             THE COURT:  Thank you so much.

16             THE JUROR:  You're welcome.

17             THE COURT:  All right.  This is Ms. Pierre-Louis,

18     correct?

19             THE JUROR:  Yes.

08:49AM 20             THE COURT:  So we called down to your employer, and

21     basically we got nowhere, what you said is right, so I'm

22     terribly sorry about that, but the situation is this.  We're

23     going to have three days of trial this week, I'm going to ask

24     everyone whether we can go a full day next Monday or Tuesday or

25     maybe both to try the get this case to the jury more quickly,

1    and it looks like it will probably spill into the week of

2    April 8th, which is when the jury will get the case, so it's

3    kind of up to you in this sense.

4            If your financial situation is affecting you to the

5    point where you don't think you can be fair or don't think you

6    can be a proper juror, I'll have to let you go, but if you're

7    unhappy with the hardship but you're still, you know, willing

8    to be a fair juror, I guess I'm going to keep you on.  I

9    certainly understand why you're unhappy, but it's kind of up to

08:51AM 10    you.  You have to let me know what you want to do.

11            THE JUROR:  I'll stay, I'm fine.

12            THE COURT:  Well, I just told Ms. Awah it's a shame

13    some employers are so difficult about this, but I certainly

14    appreciate this, if nobody else does, so I'm very grateful to

15    all of you, but some are making a bigger financial sacrifice

16    than others, so I really appreciate that.

17            Again, if you have a problem or you change your mind

18    or something else comes up, let me know.

19            THE JUROR:  Yes, no problem.

08:51AM 20            THE COURT:  Thank you.

21            Counsel, anybody want me to do anything else here?

22            MR. GARLAND:  No.

23            MR. LAUER:  No.

24            THE COURT:  Okay.

25            (SIDEBAR CONFERENCE WAS CONCLUDED)

**J.A. 1150**

Case: 19-1689    Document: 00117615537    Page: 466    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 10 of 109

11-10

 1              THE COURT:  We still don't have a complete complement,

 2     so we'll stand in recess.

 3              THE CLERK:  All rise.

 4              (A recess was taken.)

 5              THE CLERK:  All rise for the jury.

 6              (JURORS ENTERED THE COURTROOM.)

 7              THE COURT:  All right.  Good morning, ladies and

 8     gentlemen.  Welcome back.  I think we're ready to continue with

 9     the defense case.  Mr. Lauer.

09:02AM 10              MR. LAUER:  Yes, your Honor, the defense calls

11     Diogene Nsengumuremyi.

12              (The Interpreter was sworn.)

13              DIOGENE NSENGUMUREMYI, having been duly sworn by the

14     Clerk, testified as follows through the Interpreter:

15              THE CLERK:  Thank you, you may be seated.

16              THE COURT:  Could I have the interpreter state his

17     name for the record.

18              THE WITNESS:  Joseph Bizimana.

19              THE COURT:  Thank you.

20                            DIRECT EXAMINATION

21     BY MR. LAUER:

22     Q.   Good morning, sir.

23     A.   Good morning.

24     Q.   You see your name appearing on the screen.  Is that the

25     correct spelling of your name?

Case: 19-1689    Document: 00117615537    Page: 467    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 11 of 109

11-11

```
 1    A.    Yes.

 2    Q.    Where do you live, Mr. Nsengumuremyi?

 3    A.    Kigali, Rwanda.

 4    Q.    Are you Rwandan by birth?

 5    A.    Yes, I was born in Rwanda.

 6    Q.    What did you do for work?

 7    A.    I'm a part-time teacher at the university, lecturer at the

 8    university, and I have management work also as part time also.

 9          THE COURT:  Can you ask the witness not to speak quite

09:04AM 10    so close to the microphone, not too far away either.

11    Thank you.

12    Q.    Do you have a family?

13    A.    Yes.

14    Q.    Tell us about your family.

15    A.    I have a one wife, family and four children.

16    Q.    Before entering the management field, did you attend

17    university?

18    A.    I was a student.

19    Q.    Where did you attend university?

09:05AM 20    A.    University of Rwanda, and I went also University of India,

21    Mahatma Gandhi University.

22    Q.    Where is the University of Rwanda?

23    A.    It's in the south, Butare, used to call it Butare, now

24    it's Huye.

25    Q.    When did you enter the university in Butare?
```

```
 1    A.    1981.  '91 I was in the faculty of medicine.

 2    Q.    Is that the medical school?

 3    A.    Yes.

 4    Q.    I'm going to direct your attention to the defendant,

 5    Mr. Teganya.  Are you familiar with Mr. Teganya?

 6    A.    Yes, I know him.

 7    Q.    How do you know him?

 8    A.    We were in the same school.

 9    Q.    In medical school?

10    A.    Yes.

11    Q.    Were you a friend of Mr. Teganya's?

12    A.    He was a colleague at school.  We were classmates, not

13    really friends.

14    Q.    How long were you classmates together?

15    A.    '91 to '94 before the genocide.

16    Q.    And during that period when you were classmates, how often

17    would you see Mr. Teganya?

18    A.    It wasn't a constant contact, but when we were at school,

19    I could see him, but when we were not at school, we did not see

20    each other.

21    Q.    How long was the school day?

22    A.    It's eight to noon, then we go for break, then 2 to 5.  It

23    was like a normal job, hourly job.

24    Q.    In your dealings with Mr. Teganya, how would you describe

25    him?
```

Case: 19-1689    Document: 00117615537    Page: 468    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 13 of 109

11-13

1    A.    At that time he was a young man like me.  He was a person

2    who could, you know, attend composition, and he liked studying.

3    He was calm.  There are those who we called gentlemen and

4    others we called canard.  He was one of the gentlemen.

5    Q.    What do you mean by that, he was one of the gentlemen?

6    A.    Yes, there were contempt procedures of, you know, young

7    men, there are those who are composed, gentle and others who

8    are not so trustworthy.

9    Q.    You used the term, "canard."  What does that term mean?

09:10AM 10   A.    He was among the gentlemen, young man who were calm, who

11   were gentle.  Canard are the people who are talking too much,

12   who talk without any control, who talk anything.

13   Q.    That period of time when you were in the medical, was that

14   a period of time when there was a lot of political activity in

15   Butare?

16   A.    That's a time we had many, multiple parties there.

17   Q.    And what were some of the multiple parties that were

18   active at that time?

19   A.    There were many that were non, that were MRND, MDR, PSD,

09:12AM 20   PL, PL.  Those three came together, and they called themselves

21   in French, democratic, force of change.

22   Q.    Were you active in the political party during this time?

23   A.    I just -- I was just a phonetic in the parties.  I wasn't.

24   Q.    Did you belong to a party or did you attend certain

25   parties' meetings?

Case: 19-1689    Document: 00117615537    Page: 470    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 14 of 109

11-14

1    A.   Although I wasn't registered in any party, but if there

2    was a meeting of a position, I was attending.

3    Q.   What was the level of political activity among the medical

4    students in particular?

5    A.   Political activities were not in classes, they were not at

6    school, it was outside school.  When we were in school, we were

7    just learning.

8          MR. LAUER:  I'm going to ask permission to approach

9    the witness and show him some exhibits, your Honor.

09:14AM 10          THE COURT:  All right.

11    Q.   Sir, I'm going to show you a few items.  I'm going to show

12    you this, which has been admitted as Exhibit 12 and ask you to

13    take a look at that and tell me if you recognize it?

14    A.   Yes, I do.

15    Q.   And what is that?

16    A.   This is a hat of MRND party.

17    Q.   I'm going to show you another item.  This has been

18    admitted as Exhibit 15.  I show you that and put it in front of

19    you.  Do you recognize this type of scarf?

09:15AM 20    A.   This was an MRND party flag.

21    Q.   I'm also going to ask that you look at your screen.  Do

22    you see what's been admitted as Exhibit 9 on your screen?

23    A.   Yes.

24    Q.   Do you recognize these items?

25    A.   Yes, very much.

Case: 19-1689    Document: 00117615537    Page: 471    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 15 of 109

11-15

```
 1       Q.    What are these?

 2       A.    Yeah, it has the ex-president, Habyarimana.

 3       Q.    And were these type of pins worn by people of a certain

 4       political party?

 5       A.    Before the multiple party system came, almost all Rwandans

 6       had these because there was one party.

 7       Q.    What about when the time of the multi-party system came

 8       about, who would wear these type of things?

 9       A.    Yes, after the multi-party came, those who were in MRND

09:17AM 10   party are to wear this because he was the founder.

11       Q.    Do you -- have you ever seen Mr. Teganya wearing pins like

12       these?

13       A.    The time we were together at school, I never saw him

14       wearing these.

15       Q.    Did you ever see him wearing a hat like the hat that I

16       showed you?

17       A.    The time we were together at school, I never saw him with

18       a hat or a scarf or anything that identified him as an MRND

19       party member.

09:18AM 20   Q.    Did you ever hear him say anything supportive of MRND?

21       A.    He was a colleague.  We all met in the class at school.

22       There was no other relationship we had outside that.

23       Q.    When you were in school with him, with Mr. Teganya, did

24       you ever hear him say anything negative or insulting about

25       Tutsi people?
```

1    A.    I did not see him and did not hear him say anything.  I

2    saw him leaving with other people like any other, like any

3    other person in a good relationship.

4    Q.    Were there some people in the medical school who were

5    members of the MRND?

6    A.    There are those who were at school, and they hardly wear

7    all those signs with them.

8    Q.    Do you remember any of those people in particular?

9    A.    The one who was non, it was seen by everybody.

09:20AM 10    Q.    Did you ever see Mr. Teganya associating with Lambert or

11    other members of the MRND?

12    A.    I did not see them together.  They were not even in the

13    same class.

14    Q.    Were you aware of who Mr. Teganya was close to, who he did

15    associate with?

16    A.    I remember two that we used to go together at school.

17    Q.    Who were those two people?

18    A.    Aimable Patrick, Patrick Ndimubanzi.  Those are the ones I

19    know.

09:21AM 20    Q.    Are you aware of where Mr. Teganya was living when you

21    were studying in the medical school?

22    A.    There are times I was living in the campus, sometimes

23    outside, but I know he was close to the campus, not inside the

24    campus.

25    Q.    I'm sorry, what was the last part?

1    A.   Not in the campus.

2    Q.   Was it a private residence or a house?

3    A.   He was renting residence near, closer to the campus.

4    Q.   And who was he living with, if you know?

5         THE INTERPRETER:  The interpreter is asking to repeat,

6    please.

7         THE COURT:  Yes.

8    A.   Those, I think, I think they lived together, and they are

9    the ones who they were working together, Aimable,

09:23AM 10   Patrick Ndimubanzi, those when we were outside, we were having

11   a team so that you can afford to rent a house.

12   Q.   I want to direct your attention in particular to the time

13   of the genocide in the fall of 1994.  Were you in Butare at

14   that time?

15   A.   I was elected not to be there.

16   Q.   Where were you?

17   A.   I was in Kigali, Nyarugunga.

18   Q.   Did you ever spend any time in Butare during the period of

19   the genocide?

09:24AM 20   A.   I could not, not even one day.  There was no way to go

21   from Kigali to Butare.

22        MR. LAUER:  Thank you, sir, I have no further

23   questions.

24        THE COURT:  Cross.

25

**J.A. 1158**

Case: 19-1689     Document: 00117615537     Page: 474     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 18 of 109

11-18

1                          CROSS-EXAMINATION

2       BY MR. VARGHESE:

3       Q.   Good morning, sir.

4       A.   Good morning.

5       Q.   You currently live in Kigali; is that correct?

6       A.   Yes.

7       Q.   Back in 1994, you carried an identity card; is that right?

8       A.   Again, please.

9       Q.   Sure.  Back in 1994, you carried an identity card?

09:24AM 10      A.   Yes.

11      Q.   What was the ethnicity that was listed on your identity

12      card?

13      A.   Hutu.

14      Q.   Now, you testified that you were at the university in the

15      medical school; is that correct?

16      A.   Before the genocide.

17      Q.   That wasn't the first apartment that you started at the

18      university?

19      A.   I requested to go into medicine, but they put me in

09:25AM 20      biology.

21      Q.   So, when did you start in the biology department at the

22      university?

23      A.   1990.

24      Q.   And you didn't do well in the biology department; isn't

25      that right?

J.A. 1159

Case: 19-1689    Document: 00117615537    Page: 475    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 19 of 109

11-19

1   A.   I wanted to go into medicine, but I did biochemistry in

2   high school.

3   Q.   That wasn't my question.  My question was you did not do

4   well in the biology department; isn't that right?

5   A.   I got it but I requested to go into medicine.

6   Q.   You were told not to come back to the biology department;

7   isn't that right?

8   A.   No.

9   Q.   You then went to the medical school, and in your first

09:27AM 10   year of the medical school, you didn't do well in the medical

11   school; isn't that right?

12   A.   I finished and I went to another class.

13   Q.   I'm talking about when you were in the medical school, you

14   started in 1991?

15   A.   1991, that's true.

16   Q.   And you were expelled from the program?

17   A.   In medicine?

18   Q.   Yes.

19   A.   No.

09:27AM 20   Q.   You didn't move back to Kigali?

21   A.   Going into vacation or when I was expelled?

22   Q.   When you were expelled?

23   A.   No, never.

24        THE INTERPRETER:  Your Honor, I'd like him to speak in

25   Kinyarwandan so it can be easier for me to translate.

**J.A. 1160**

Case: 19-1689    Document: 00117615537    Page: 476    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 20 of 109

11-20

|        |                                                              |
|--------|--------------------------------------------------------------|
| 1      | THE COURT:  Yes.                                             |
| 2      | THE INTERPRETER:  Thank you.                                |
| 3      | Q.   Sir, I just want to be clear about this.  It's your    |
| 4      | testimony here today that you were not expelled from the    |
| 5      | medical school?                                             |
| 6      | A.   Yes, I can testify today that I was not expelled and I |
| 7      | could even go back in the study.                            |
| 8      | Q.   But you didn't finish your medical degree, you never   |
| 9      | became a doctor; isn't that right?                          |
| 09:29AM 10 | A.   That's true, I did not go back after genocide, that's |
| 11     | true.                                                        |
| 12     | Q.   And then you went to Mahatma Gandhi University?        |
| 13     | A.   I started, first of all, I went to KIST in Kigali.     |
| 14     | Q.   And then you got a degree from Mahatma Gandhi University? |
| 15     | A.   No, I started first at KIST, I got a bachelor's degree in |
| 16     | business administration, then I did master's at Mahatma Gandhi |
| 17     | University.  I go to master's in business studies.          |
| 18     | Q.   And you began working for SORAS Insurance; is that     |
| 19     | correct?                                                     |
| 09:30AM 20 | A.   No, I worked with Minnie Corrine (ph) before.         |
| 21     | MR. GARLAND:  I'm sorry, can the interpreter repeat         |
| 22     | that?                                                        |
| 23     | A.   I worked for Minnie Corrine before that.               |
| 24     | Q.   When did you begin working for SORAS?                  |
| 25     | A.   June 4th, 1997.                                        |

**J.A. 1161**

Case: 19-1689    Document: 00117615537    Page: 477    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 21 of 109

11-21

1    Q.   Then you began working for Radiant Insurance; isn't that

2    correct?

3    A.   Yes, from that date.

4    Q.   And you currently still work at Radiant Insurance; isn't

5    that correct?

6    A.   I'm not an employee, but I work as a dealer.

7    Q.   There was another witness who will be testifying later

8    today, Fidele Barinda.  Do you know who he is?

9    A.   Yes, I know him.

09:31AM 10    Q.   You two are friends?

11    A.   Yeah, we went to Gillett School.

12    Q.   And you're at Radiant Insurance together?

13    A.   Yes, we did.  We used to work, but now I'm not an employee

14    anymore.

15    Q.   But you traveled here to the United States together?

16    A.   Yes, we came together.

17    Q.   And you're staying together?

18    A.   They put us in same hotel.

19    Q.   And you remember Mr. Barinda being a member of MRND when

09:32AM 20    you and he were at the medical school together?

21    A.   Yes, I remember that.

22    Q.   But you didn't list him in the names that you were asked

23    about when Mr. Lauer asked you who else was members of MRND?

24    A.   I said those who are obvious who show they belong to that

25    party.

```
 1    Q.    So you decided to leave Mr. Barinda out of your list of

 2    people who were members of MRND?

 3    A.    To belong to MRND wasn't a sin or a crime to be there.

 4    Q.    Sir, that's not the question.  The question wasn't is it a

 5    sin or a crime, the question from Mr. Lauer was who else was

 6    members of MRND, and you did not include Mr. Barinda; is that

 7    correct?  Yes or no.

 8          I'm sorry, the question was a yes or no question?

 9          MR. LAUER:  Objection, your Honor.

10          THE COURT:  We need the translation of the question.

11    A.    Will you please repeat the question, if you don't mind.

12    Q.    Yes or no.  You left out Fidele Barinda when Mr. Lauer

13    asked you who else was at the medical school was a member of

14    MRND, correct?

15    A.    I did not say his name.  You did not ask me to say all the

16    names.

17    Q.    In fact, Fidele Barinda wasn't just a member, you have

18    said that he was a leader of MRND on campus; isn't that right?

19    A.    I wasn't in MRND to know that he's a leader or not, I know

20    him as one of the MRND.

21    Q.    Well, you remember you were interviewed by the defense

22    back in Kigali, Rwanda, right?  Do you remember that?

23    A.    Yeah, I remember some.

24    Q.    And when you were interviewed, you said that

25    Fidele Barinda was the leader of MRND in the medical school,
```

J.A. 1163

```
 1    isn't that correct?  Yes or no.
 2    A.   I don't remember that they said he was a leader, but I
 3    know he was a member.
 4    Q.   How do you know that Fidele Barinda was a member of MRND?
 5    A.   At the time he put on the hat and he accepted it.
 6    Q.   Let's talk about Mr. Teganya.  You were in medical school
 7    with Mr. Teganya; isn't that correct?
 8    A.   Yes, true.
 9    Q.   What year or where was Mr. Teganya living his first year
10    in the medical school?
11    A.   Where he lived?
12    Q.   Yes.
13    A.   He wasn't a friend of mine.  I did not know where he was
14    living.
15    Q.   What about his second year, you said you weren't expelled,
16    so you were still presumably on campus.  Where did he live his
17    second year on campus?
18    A.   I was outside of the campus, but I think he was living
19    outside the campus also.
20    Q.   What about his third year, his last year at the
21    university, what dormitory was Mr. Teganya living in?
22    A.   I think he was around there.  It's a small town, and we
23    could meet at school.
24    Q.   So you never saw him outside of school, did you?
25    A.   On our way to school or coming from school or in the city,
```

09:37AM (lines 10, 20)

# J.A. 1164

```
           1    it's possible.

           2    Q.   Well, had you ever been to his room?

           3    A.   No.

           4    Q.   So if he had an MRND flag in his room, you wouldn't know

           5    that, would you?

           6    A.   How would I know that?

           7    Q.   And if he had MRND clothing hanging up in his room, you

           8    wouldn't know that either?

           9    A.   It's impossible, I could not know that.

09:39AM   10    Q.   If he went to an MRND rally after class, you wouldn't know

          11    that either?

          12    A.   That's his program.  It wouldn't be my program to meet

          13    with him.

          14    Q.   Just answer the question.  So you wouldn't know if he went

          15    to an MRND rally?

          16    A.   It's impossible, it's understandable, I could not know

          17    that.

          18    Q.   And, in fact, if he went to a rally every single night of

          19    the week when you were in class every single day, you wouldn't

09:39AM   20    know at all, would you?

          21    A.   What is not done at school or around the campus, how would

          22    I know that?

          23    Q.   You knew that Mr. Teganya was a Hutu?

          24    A.   We didn't say that every day, it wasn't our daily talk to

          25    say this is a Hutu, this is this, we were all Rwandans.
```

1   Q.   Just answer the question, please.  You knew that

2   Mr. Teganya was a Hutu?

3   A.   I didn't know.  I did not ask him.  He did not tell me

4   that.

5   Q.   You knew he was from Gisenyi?

6   A.   I knew he was from north.  I did not know if he was from

7   Gisenyi or Ruhengeri.

8   Q.   And when you were first interviewed by the defense, you

9   said he could be considered a member of MRND?

09:41AM 10   A.   The way I was asking in Kinyarwandan, I don't know how to

11   say it was written, but they did not show me, they did not show

12   me.  They did not show me what they have written.

13   Q.   That's not my question.  My question was when you were

14   asked by the defense back in Rwanda, you said you did not know

15   whether or not he was a member of MRND or not; isn't that

16   right?

17   A.   Did they write that I don't know or I know?

18   Q.   You don't remember what you told the defense, do you?

19   A.   Would you repeat the way it is written, the way they said

09:42AM 20   it?

21   Q.   Sure.  You told the defense you don't remember whether he

22   was a member of MRND, isn't that correct?

23   A.   I didn't know.  I don't remember that he was in the MRND

24   or in the other party.

25   Q.   But you said that because he was from the northern region,

```
 1    he could be considered as a member of MRND?  Do you recall
 2    saying those things to the defense?
 3    A.   I remember saying he was from the north.  Majority of
 4    those who were from north were in MRND, which doesn't mean that
 5    everybody was in the MRND, although they were from the north.
 6    I said that way.  I don't know the one who wrote it, I don't
 7    know how they wrote it, but that's how I say it.
 8    Q.   You also know that the folks from the north, the Hutus
 9    from the north were more extreme?
10    A.   No, no, no, that's a lie, that's a lie.  That's not true.
11    It's not true.
12    Q.   It's your testimony the Hutus from the north were more
13    welcoming?
14    A.   It is not good to put people the same basket, it's no
15    good.
16    Q.   Well, the president's stronghold was the north of Rwanda,
17    correct?
18    A.   Yes.
19    Q.   And MRND was strongest in the north; isn't that right?
20    A.   Before it was stronger in the whole country because that's
21    one party.
22    Q.   After 1991, it was stronger in the north; isn't that
23    right?
24    A.   It was a ruling party that was stronger that had the power
25    and had other members in other parts of the country.
```

09:44AM 10
09:45AM 20

**J.A. 1167**

1    Q.   You testified on direct that you had never seen

2    Mr. Teganya wearing the hat and the scarf, Exhibits 12 and I

3    believe 15; is that correct?

4    A.   Yes, I did.  They asked me, then I said that I've never

5    seen him, and before you and I forgot, I did not see him.

6    Q.   But if he wore them after class every day, you wouldn't

7    know that because you wouldn't have seen him?

8    A.   I could not know that.

9    Q.   And if he wore it every day to go after class to go to

09:46AM 10   meetings and rallies, you wouldn't know that either?

11   A.   Again.

12   Q.   If he wore the hat and scarf every day after class to go

13   to rallies, you wouldn't know that either?

14   A.   If you don't have the same program, the same plan to go

15   together, how would you know that?

16   Q.   In the evenings on Tuesdays and Friday, if he was training

17   in the forest with weapons with the Interahamwe, you wouldn't

18   know that either because you weren't there?

19   A.   I don't know that.  I don't know if it happened or not.

09:47AM 20   Q.   Now, you stated that you weren't on the campus in April of

21   1994 during the genocide; is that correct?

22   A.   I was in Easter Holidays in Kigali.

23   Q.   Were you aware that Mr. Teganya was there on the campus in

24   April, in May, in June and in July of 1994?

25   A.   I don't know if he was there or not, all I know I wasn't

Case: 19-1689     Document: 00117641537     Page: 484     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 28 of 109

11-28

1    there.

2    Q.   So you don't know what he was doing in April, in May, in

3    June, and in July of 1994?

4    A.   I can't know that.  We were not together.

5    Q.   You're aware that there was a mass slaughter at the

6    hospital in Butare?

7              MR. LAUER:  Objection.

8              THE COURT:  Sustained.

9    Q.   You're aware that there was genocide atrocities that

09:49AM 10   occurred at the hospital?

11             MR. LAUER:  Objection.

12             THE COURT:  Sustained.  He said he wasn't there.

13   Q.   How were you contacted by the defense to appear?

14   A.   The first person I remember that contacted me, the first

15   person that contacted me was Dick.

16   Q.   That's Mr. Prudence Munyeshuli, Dick Prudence Munyeshuli?

17   A.   Yes.

18   Q.   He contacted you on behalf of Mr. Teganya; is that

19   correct?

09:50AM 20   A.   Yes, when he contacted me was telling me about the case.

21   He said he would call me to talk to me about it, but he never

22   came back.

23   Q.   Was that before he was arrested in 2014 with tampering

24   with witnesses?

25             MR. LAUER:  Objection.

```
 1              MR. WATKINS:  Objection.
 2              THE COURT:  Sustained.
 3    Q.   Did he offer you anything for your testimony?
 4    A.   No, I did not hear him from that time, and I was contacted
 5    after that by John.
 6    Q.   After he no longer contacted you?
 7    A.   I don't know where he went.  After I was contacted by
 8    John, he was telling me about the case.
 9    Q.   In your interview with the defense, you stated that you
10    didn't want to show your face in public while testifying for
11    Mr. Teganya; is that correct?
12              MR. LAUER:  Objection.
13              THE COURT:  Overruled.
14    A.   Can be seen in public?
15    Q.   You didn't want to be seen in public testifying on behalf
16    of Mr. Teganya?
17    A.   I was saying that because of the security, of security of
18    a person, not here.
19    Q.   I'm not sure I understand.  Can you explain?
20    A.   Well, here there is no way you can go in court in public
21    in court that people can see you, they can see you, it's
22    impossible that people can see you.  I was talking about the
23    safety of the person who is witnessing.
24    Q.   It's true that you're not -- isn't it correct that you're
25    not afraid of testifying against Mr. Teganya?
```

09:51AM (line 10)
09:53AM (line 20)

Case: 19-1689    Document: 00117615537    Page: 486    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 30 of 109

11-30

1    A.    I wish that the justice can be rendered.

2    Q.    Answer my question, please.  You are not afraid to testify

3    here today in court and then return to Rwanda?

4    A.    I'm not afraid to testify here and to go back to Rwanda,

5    we go back to Rwanda.

6            MR. VARGHESE:  Thank you, sir, I have nothing further.

7            THE COURT:  Any redirect?

8            MR. LAUER:  Briefly.

9                    REDIRECT EXAMINATION

10   BY MR. LAUER:

11   Q.    You spoke a few minutes ago about the schedule that

12   medical school students have, and you said the classes ended

13   about 5:00?

14   A.    Yes.

15   Q.    What happened after classes ended?

16   A.    Students had time to play and to go to eat, talk, then

17   they would go back to class.

18   Q.    Was the course work in medical school difficult?

19   A.    Course work?

09:56AM 20   Q.    The class work, was it difficult?

21   A.    It was like any other work at school, any class, if you

22   want to do it, you can do it and do it well.

23   Q.    Did medical students commonly study together?

24   A.    We had groups because no one knows everything, so if one

25   knows something, another one knows something, you help each

# J.A. 1171

Case: 19-1689    Document: 00117615537    Page: 487    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 31 of 109

11-31

1    other, you ask each other.

2    Q.    And when would that sort of interaction or that sort of

3    study take place?

4    A.    Study together?

5    Q.    When during the day would students study together?

6    A.    After classes when we are doing studies or we have

7    assignments, homework to do, we go together and work together.

8    Q.    Would that be at the end of the day and in the evening?

9    A.    Mostly it was after the classes or the professor is not

09:58AM 10    available but left work to do.

11    Q.    If you know, was Mr. Teganya someone who studied a little

12    bit or who studied a lot?

13    A.    The way I know him, he's a student who liked to study.  He

14    liked to study.

15            MR. LAUER:  No further questions, thank you.

16            THE COURT:  Recross.

17            MR. VARGHESE:  No, your Honor, thank you.

18            THE COURT:  Thank you.  You may step down.

19            MR. LAUER:  The defense will be calling

09:59AM 20    Spiridion Seminega.

21            SPIRIDION SEMINEGA, having been duly sworn by the

22    Clerk, testified as follows through the Interpreter:

23                        <u>DIRECT EXAMINATION</u>

24    BY MR. LAUER:

25    Q.    Good morning.

Case: 19-1689    Document: 00117645537    Page: 488    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 32 of 109

11-32

```
 1    A.   Good morning.

 2    Q.   Does your name appear correctly on the screen before you?

 3    A.   Yes.

 4    Q.   Mr. Seminega, where do you live?

 5    A.   In Kigali, City of Kigali.

 6    Q.   Is that in Rwanda?

 7    A.   Yes.

 8    Q.   Were you born in Rwanda?

 9    A.   Yes.

10    Q.   Where in Rwanda were you born?

11    A.   In the west, Karongi.

12    Q.   What do you do for work?

13    A.   I'm a teacher in high school.

14    Q.   What do you teach?

15    A.   Chemical -- chemistry.

16    Q.   How long have you been doing that?

17    A.   Twenty years.

18    Q.   Before becoming a chemistry teacher, did you attend

19    university?

20    A.   Yes.

21    Q.   Where did you go to university?

22    A.   Rwanda, University of Rwanda and University of Teachers in

23    Kigali.

24    Q.   When did you enter the University of Rwanda in Butare?

25    A.   1991.
```

Case: 19-1689     Document: 00117615537     Page: 488     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 33 of 109

11-33

```
 1    Q.   And what was your field of study?

 2    A.   Agriculture.

 3    Q.   In your time at the university, did you become familiar

 4    with Mr. Teganya, Jean Leonard Teganya?

 5    A.   Yes.

 6    Q.   How did you know him?

 7    A.   Meeting in the restaurant or in the chapel to pray or

 8    study hall where we were doing our studies.

 9    Q.   Was he someone you considered a friend?

10    A.   Yes, at school.

11    Q.   Was he part of your program in agriculture?

12    A.   No.

13    Q.   What did he study?

14    A.   Medicine.

15    Q.   Were you two in the same classes, school classes?

16    A.   What do you mean?

17    Q.   Did you have classes together?

18    A.   No.

19    Q.   Under what circumstances would you see Mr. Teganya?

20    A.   When we go to school, go to the restaurant, go to pray.

21    Q.   And how often would that be?  How many times per week

22    would you see Mr. Teganya?

23    A.   Like two or three.

24    Q.   How would you describe him as a student?  What kind of

25    student was Mr. Teganya?
```

10:03AM 10

10:04AM 20

J.A. 1174

Case: 19-1689    Document: 00117615537    Page: 490    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 34 of 109

11-34

1    A.    He was a student who liked to do study well -- so much.

2    He was into instructing student.  He was very concentrated and

3    focused on studies.

4    Q.    You mentioned that you would see each other in the chapel.

5    What chapel was that?

6    A.    It's a chapel where the Catholic students would go to pray

7    on Sunday.

8    Q.    Would you see him every Sunday?

9    A.    There are times I didn't see him, but most of the time I

10:05AM 10   saw him going to church.

11   Q.    I want to ask you some questions about political activity

12   during your time at the university.

13   A.    Yes.

14   Q.    When you were a student in Butare, were there a number of

15   different political parties that students, some students became

16   involved with?

17   A.    Yes.

18   Q.    What were some of those parties, if you recall?

19   A.    MRND, PSD, PL, CDR and others.

10:06AM 20   Q.    How would students become involved with a political party?

21   A.    They are free to join any time.

22   Q.    And did some students join political parties and some

23   students did not?

24   A.    Yes.  Not everybody was a member of political parties.

25   Q.    Were you, yourself, a member of a political party?

**J.A. 1175**

Case: 19-1689    Document: 00117615537    Page: 491    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 35 of 109

11-35

```
 1    A.    No.
 2    Q.    Were you familiar generally with the clothing that was
 3    worn by people who were associated with political parties?
 4    A.    Yes, there are some that I knew and the signs that were
 5    there but not all of them.  I did not know everything.
 6          MR. LAUER:  If I could approach the witness, your
 7    Honor?
 8          THE COURT:  Yes.
 9    Q.    Sir, I'm going to show you a couple of items of clothing.
10    First, I'd like to show you a hat that's been admitted as
11    Exhibit 12, ask you to take a look at that.  Do you recognize
12    it?
13    A.    Yes, I saw this one.  I remember this a little bit.
14    Q.    Was this a hat that was associated with a particular
15    political party?
16    A.    No.
17    Q.    Well, who would wear this type of hat?
18    A.    I think the CDR.
19    Q.    What sort of political party was CDR?
20    A.    There are people who are democracy in Rwanda.
21    Q.    I'm going to show you another exhibit that's been admitted
22    as Exhibit 15.  It's a scarf.  Why didn't you look at that.
23    Sir, do you recognize this type of scarf?
24    A.    I don't remember this.
25    Q.    Did some students on campus wear scarfs like this to
```

10:08AM (line 10)
10:09AM (line 20)

J.A. 1176

1    signify that they belong to a party?

2          MR. GARLAND:  Objection.

3          THE COURT:  Overruled.

4    A.   They wear this when they come to pick them up when they go

5    to meetings.

6    Q.   I'm going to ask that another exhibit be displayed on the

7    screen.

8          THE CLERK:  In evidence?

9          MR. LAUER:  Yes.

10:10AM 10   Q.   It's Exhibit 9 for the record.  Do you see two pins

11   appearing on your screen?

12   A.   Yes, I see it.

13   Q.   Do you recognize that style of pin?

14   A.   Yes, I remember this.

15   Q.   And what are we seeing here?

16   A.   I see a picture of one who used to be the president of the

17   country.  He's got a medal, something like a medal to wear.

18   Q.   What political party would wear -- people from what

19   political party would wear these pins?

10:11AM 20   A.   MRND.  Even leaders, even if they are not in this party,

21   they had to wear this.

22   Q.   In any of your dealings with Mr. Teganya, did you ever see

23   him wearing pins like this?

24   A.   No.

25   Q.   In all of your dealings with Mr. Teganya, did you ever see

```
 1   him wear a hat like the hat that I showed you?
 2   A.   No.
 3   Q.   In all of your dealings with Mr. Teganya, did you see him
 4   wearing a scarf like the scarf I showed you?
 5   A.   No.
 6   Q.   In any of your dealings with Mr. Teganya, did you ever
 7   hear him express support for the MRND?
 8   A.   No.
 9   Q.   In any of your dealings with Mr. Teganya, did you ever
10   hear him say anything negative or insulting about Tutsis?
11   A.   No.  He wouldn't have that time because he was studying
12   too much.
13   Q.   I want to direct your attention to the time of the
14   genocide in April, May and June of 1994.  Were you in Butare at
15   that time?
16   A.   Yes, I was at the university.  We were preparing exams
17   when we finished the holidays.
18   Q.   And did you remain in Butare during some period of the
19   genocide?
20   A.   Yes, until the end of May.
21   Q.   And where were you at that time?  Where were you living?
22   A.   I was in a room where I was living.
23   Q.   Was that in a dormitory or on campus?
24   A.   Yes, it was in a campus because there were dorms, rooms
25   where we lived.
```

Case: 19-1689    Document: 00117615537    Page: 494    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 38 of 109

11-38

 1    Q.   And during that period of time that you were on campus

 2    during the genocide, did you ever go to the University

 3    Hospital?  During the period of time that you were living on

 4    campus during the genocide, did you ever visit the University

 5    Hospital?

 6    A.   No.  It wasn't easy for me.

 7    Q.   Why wasn't it easy for you?

 8    A.   I did not have I.D. card.  It was stolen, so not to have

 9    an I.D. card at that time would cause me to die.  From where I

10:16AM 10  was living to the hospital, it was a distance, so I could not

11    trust those I would meet on the road.

12    Q.   What did you do to remain safe?

13    A.   I was hiding and dodging anybody that I don't know.  Even

14    going into the restaurant at the time I could not go but when

15    the tension reduced I would go once in a while.

16    Q.   You mentioned that you stayed in Butare until some time in

17    May.  What happened then?

18    A.   It was very bad because after the one, the passing of the

19    president saying in the speech, there was a bad -- at most stay

10:18AM 20  at the university.

21    Q.   Did you flee?

22    A.   There was nowhere to go, no way to get out.  I was in the

23    campus inside.  There are times I was hiding, and there is time

24    I was sleeping under the bed.

25    Q.   How long did you remain in Butare?

Case: 19-1689    Document: 00117615537    Page: 495    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 39 of 109

11-39

```
  1    A.   End of May.

  2    Q.   What happened at the end of May?  Where did you go?

  3    A.   There is a military officer from my place who helped me to

  4    go.  I went to Gisovu.

  5    Q.   Where is Gisovu?

  6    A.   In the west of Rwanda in the Karongi.

  7    Q.   Is that where you were from?

  8    A.   Yes, that's where I was born.  Then after a while, I went

  9    to Congo, like any other refugee.

 10    Q.   When did you go to Congo?

 11    A.   End of May -- end of June.

 12    Q.   And you said you went there as any refugee.  Why did you

 13    go?

 14    A.   At that time many people or all people were afraid of the

 15    war that was going on.  I went with the other refugees, and I

 16    fled.

 17    Q.   How long did you live in Congo?

 18    A.   From 1984 to 2000.

 19    Q.   And what happened in 2000?

 20         MR. GARLAND:  Objection.  Relevance.

 21         THE COURT:  I'll allow it.

 22    Q.   What happened in 2000?

 23    A.   I came back.

 24    Q.   Is that when you began working as a chemistry teacher?

 25    A.   I came back in August, then this September I started
```

10:19AM (line 10)
10:21AM (line 20)

J.A. 1180

```
 1   teaching.
 2          MR. LAUER:  Thank you very much.  No further
 3   questions.
 4          THE COURT:  Cross.
 5                    CROSS-EXAMINATION
 6   BY MR. GARLAND:
 7   Q.   Good morning.
 8   A.   Good morning.
 9   Q.   In 1991, everybody belonged to the MRND, right?
10   A.   No.
11   Q.   So, before -- the multi party system started in 1992,
12   right?
13   A.   1991.
14   Q.   1991 was when the multi-party started to your
15   recollection?
16   A.   Yes.
17   Q.   Before the multi-party system, it's true that everybody
18   belonged to the MRND, correct?
19   A.   Yes.
20   Q.   And once the multi-party system started, political parties
21   were competing for members, right?
22   A.   Yes.
23   Q.   And there were political rallies and meetings in town?
24   A.   Yes.
25   Q.   And the MRND appeared at those political rallies and
```

```
     1   meetings as well?

     2   A.    Again, please?

     3   Q.    The MRND members went to those political rallies and

     4   meetings in town, right?

     5   A.    Yes, when there's a meeting, yes, or rally.  Those who had

     6   time, they went.

     7   Q.    But you said before that you were not particularly

     8   political during that time, correct?

     9   A.    Yes.

10:24AM 10   Q.    And I just want to make sure I understand.  This hat that

    11   you saw before, Exhibit 12, what political party do you recall

    12   this as being worn by?

    13   A.    I remember but not so sure that it was CDR.

    14   Q.    Do you know why you're not sure about that?

    15   A.    Because I was not participating in any of those parties.

    16   Q.    Okay.  I want to talk to you a little more about

    17   Mr. Teganya.

    18   A.    Yes.

    19   Q.    So you didn't live in the same dorms as Mr. Teganya,

10:25AM 20   right?

    21   A.    Yes.

    22   Q.    You didn't live in the same dorm as him in 1991, 1992,

    23   1993 or 1994, right?

    24   A.    Not in the same room.

    25   Q.    Did you live in the same dorm as him in any of those
```

J.A. 1182

Case: 19-1689    Document: 00117615537    Page: 498    Date Filed: 07/16/2020    Entry ID: 6352983

```
 1   years?
 2   A.   There were too many -- there are many rooms a student can
 3   live in.
 4   Q.   Okay.  What dorm did Mr. Teganya live in in 1991?
 5   A.   I don't know at that time because I know him in 1992.
 6   Q.   Okay.  So that means you never visited his room in 1991,
 7   right?
 8   A.   No.
 9   Q.   And you wouldn't have seen any MRND clothing that would
10   have been in there if there were any, right?
11   A.   I did not see him wearing those clothes.  If they were in
12   his bags, his suitcase or his whatever he put it, I don't know.
13   Q.   You didn't visit him at all during 1991 because you didn't
14   know him at that point, right?
15   A.   I did not visit him, but we met when we were going to the
16   restaurant or church.
17   Q.   Okay.  So that means you didn't go and see him at his dorm
18   room in 1992 either, did you?
19   A.   No.
20   Q.   Or in 1993 or in 1994?
21   A.   No.
22   Q.   And you didn't attend classes with Mr. Teganya either
23   because you were in either faculties, right?
24   A.   We were not in the same faculty, we were not in the
25   same -- we would not be together.
```

Case: 19-1689    Document: 00117615537    Page: 499    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 43 of 109

11-43

1   Q.   And so church, church you'd see him once a week on Sunday

2   mornings, right?

3   A.   Or two.

4   Q.   One or two.  Okay.  And during church, people wouldn't

5   wear their political clothing to church, would they?

6   A.   No, no, no.

7   Q.   And people wouldn't be talking about politics during

8   church service either, would they?

9   A.   No.

10:29AM 10   Q.   And then the other times you said that you would see

11   Mr. Teganya was when you would share a meal at the restaurant;

12   is that right?

13   A.   Yes, or in the evening when we were going in the study,

14   everyone will go to his room.

15   Q.   But since you were on a totally different field of study

16   and a different part of campus, you wouldn't be with

17   Mr. Teganya very much on any particular day, right?

18   A.   We had one restaurant, and that's the time we could meet.

19   It's one restaurant that we could meet, all of us.

10:30AM 20   Q.   And that restaurant, that was a cafeteria-type restaurant?

21   A.   Yes, it was one.

22   Q.   And you, yourself, didn't go to the political rallies or

23   meetings because you weren't political, right?

24   A.   I did not participate in any political party.

25   Q.   And you didn't know Mr. Teganya's family either, did you?

Case: 19-1689    Document: 00117615537    Page: 500    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 44 of 109

11-44

1  A.    We didn't know each other.  We didn't know whose family,

2  that's not -- it was not our aim was to -- a colleague at

3  school, that's it.

4  Q.    And you didn't really know anything about his background

5  either, did you?

6  A.    Before he come, he came to university, I didn't know.

7  Q.    And because you're not particularly political, you and

8  Mr. Teganya really never talked about politics, did you?

9  A.    We never talked about it.

10:31AM 10  Q.    So, sitting here, you wouldn't know much at all, if

11  anything, about Mr. Teganya's political beliefs, would you?

12  A.    Any time we were together, the time I saw him, we never

13  talked about anything with parties.

14  Q.    And because you were in different places, you wouldn't

15  have necessarily seen him go off to political rallies or

16  meetings in the evenings, right?

17  A.    No.

18  Q.    And you wouldn't have seen him if he was up at the

19  gymnasium training or out in the woods training either on

10:32AM 20  Tuesdays or Fridays, would you?

21  A.    There was nothing to do -- there was nothing on the campus

22  pertaining to training or anything to do with the parties.

23  Q.    And do you know that because you went to the gymnasium and

24  you went to the woods to look in on that?

25  A.    If it happened, I would have heard it, but I never heard

Case: 19-1689    Document: 00117615537    Page: 501    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 45 of 109

11-45

1    anything to do with the training at the campus or close to the
2    campus about that.
3    Q.    Okay.  Now, you were on campus during the genocide, you
4    testified before, right?
5    A.    Yes.
6    Q.    And you weren't living in the Kiza dorm during the
7    genocide, right?
8    A.    Yes.
9    Q.    And you weren't going onto the hospital grounds because it
10   was too dangerous, right?
11   A.    I could not go there.
12   Q.    Now, when you walked around university during the
13   genocide, you saw there were manned roadblocks in the area,
14   right?
15   A.    Not only seeing them but I heard them.
16   Q.    Can you explain that?  You said you heard them.  How so?
17   A.    I heard about it because the military officer who helped
18   me to go home, he came to pick me up from my place to help me
19   go around, around so that I can get to the vehicle that would
20   take me to Sovu.  Even if he wasn't there, I could not get out
21   of that place.
22   Q.    So when you saw the roadblocks around the university, did
23   you see Tutsis being taken at those roadblocks?
24   A.    It was ending at the time.  I didn't see people taken.
25   Q.    Before that you had not seen the roadblocks because you

1    were too scared to go outside the dorm?

2    A.    Before that, I did not see the barriers.

3    Q.    But at the restaurant, you did see people, Tutsis being

4    taken away from the restaurant, right?

5    A.    I did not see them.

6    Q.    You did not?

7    A.    I did not see that, but I heard that Interahamwe took

8    them.  There is a time it was really bad.  I went into hiding.

9    I think that's the time they took them.

10:37AM 10    Q.    Okay.  But you did see people going through your dormitory

11    going from door to door knocking on doors looking for Tutsi,

12    correct?

13    A.    Where I was hiding, I heard the banging of doors and the

14    yelling.

15         THE INTERPRETER:  I would like the witness to repeat,

16    please.

17    A.    Where I was hiding, I was scared.  I went from the room I

18    was hiding in, I went to another room.  I thought that they

19    were going to find me in that room.  That night I was under the

10:38AM 20    bed fearing they came back in my room.  I did not go in the

21    restaurant in the morning or lunchtime or evening.  After a few

22    days, things were reducing a little bit, and I was hearing and

23    knowing what was going around the campus.

24    Q.    When people -- when you heard people knocking on the

25    doors, the dormitory and yelling, did you hear other people

Case: 19-1689    Document: 00117615537    Page: 503    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 203    Filed 11/04/19    Page 47 of 109

11-47

 1    screaming after that?

 2    A.   Yes, I heard people screaming, and that's why I was

 3    scared.

 4    Q.   During April and May of 1994, during the genocide, did you

 5    see Mr. Teganya at all?

 6    A.   No, no, I did not see him.

 7    Q.   So you have no idea what he was doing during that time,

 8    right?

 9    A.   No.

10:40AM 10    Q.   When you left Butare, you said that you had lost your

11    ethnic I.D. card?

12    A.   Yes, it was stolen when I was in my vacation.

13    Q.   On your vacation?

14    A.   That genocide starts when I was on vacation.  It starts

15    when I had really lost my identification.

16    Q.   I'm confused.  Was it lost or stolen?

17    A.   It was stolen, and it was stolen with 1,000 francs when I

18    was in the city.

19    Q.   And was that because your ethnic identity card wasn't on

10:41AM 20    you at the time?

21    A.   Yes.  I did not have that identification at that time.  It

22    was stolen.  That's the reason I called for help from this

23    military officer because he could not say I know this person

24    and then do something against me, they wouldn't do that.

25    Q.   I'm confused.  Even before the genocide started, you were

```
 1    required to have your identity card with you at all times,
 2    right?
 3    A.   Before the genocide, you could not have identification and
 4    nothing would happen to you.  You could have a student card.
 5    Q.   And on your identity card, what ethnicity did it list at
 6    the time?
 7    A.   Hutu.
 8    Q.   When the military officer took you away from the campus,
 9    how many roadblocks or checkpoints did you go through?
10    A.   Two roadblocks from where he put me in the car.
11    Q.   And then in a car, when you went in a car, how many
12    roadblocks or checkpoints did you go through after that?
13    A.   You could not count them.  From the campus to my place,
14    there were too many barriers.
15    Q.   And how did you get through without an identity card?
16    A.   That time, the one who was managing the campus, I went to
17    him.  There are many others who went to him who did not have
18    I.D. cards.  He met at least and went to the Attorney General
19    and we go to something that will -- a paper that will replace
20    the I.D. card that has Hutu ethnic, but that wasn't enough.
21         At the barrier, that one was not accepted.  That's why
22    I plead with him to take me to our vehicle that will take me
23    home and talk to the people who are going there that he knows
24    me.
25    Q.   And on the way either in the car or walking there, how
```

10:43AM (line 10)
10:44AM (line 20)

1    many dead bodies did you see or how often did you see them?

2    A.    Many.

3    Q.    Were they -- did you see single bodies, or were they in

4    piles?

5    A.    There are times I will see too many together, 10, then

6    more than 10 gathered together.

7    Q.    When you were meeting Mr. Teganya at church and at the

8    restaurant occasionally, that was in 1992, 1993 and 1994?

9    A.    1992, '93, '94.

10:46AM 10    Q.    And so even though you didn't talk about politics or visit

11    him at his room or know anything about his family, you still

12    consider yourselves friends with him, right?

13    A.    A friend from school, just no more friend.  We felt going

14    into details knowing who is the father, where is he coming

15    from.

16    Q.    Now, you've testified for a while today.  You're not

17    worried about whether anything you've said today will subject

18    you to any pressure back in Rwanda when you return, do you?

19    A.    I think there is none.  I'm not in the hearts of those who

10:48AM 20    would cause those --

21    Q.    I'm sorry, could you repeat?

22    A.    I think, I believe the testimony I'm giving there will be

23    no bad outcome when I go back to Rwanda, but I don't have

24    any -- I don't have any -- I don't know anything about the

25    outcome or the source of the outcome, I can't have any -- I

|   | |
|---|---|
| 1 | don't have any with this person.  I don't know anything about |
| 2 | it, otherwise I don't see anything that will happen to me |
| 3 | because of the testimony. |
| 4 | Q.    Okay.  So you're not worried about that. |
| 5 |         MR. LAUER:  Objection, your Honor. |
| 6 |         THE COURT:  That will be struck, that comment.  You're |
| 7 | not allowed to testify. |
| 8 |         MR. GARLAND:  Yes, your Honor. |
| 9 |         THE COURT:  Put another question to the witness. |

10:49AM 10         MR. GARLAND:  Yes, your Honor.

11  Q.    Can you tell the jury who contacted you on behalf of the

12  defense?

13  A.    Scott.  I don't remember the other name, Leopold.

14  Q.    Leopold was the last word, Leopold?

15  A.    Leopold, yes.

16  Q.    Was that who contacted you back in Rwanda?

17  A.    Yeah, we talked when I was in Rwanda.

18         MR. GARLAND:  Your Honor, if I could just confer with

19  counsel.  No further questions, your Honor.

10:50AM 20         THE COURT:  Redirect.

21         All right.  I think the interpreter is asking for a

22  bathroom break, so why don't we take our break now.

23         THE CLERK:  All rise.

24         ( A recess was taken.)

25         THE CLERK:  All rise.

1    (Court enters.)

2            THE CLERK:  Thank you.  You may be seated.  Court is

3    now back in session.

4            THE COURT:  Counsel wanted to see me.

5            MR. LAUER:  Yes, your Honor.  There was one question

6    put to an earlier witness in cross-examination about contact

7    with a defense investigator.

8            THE COURT:  Yes.

9            MR. LAUER:  And whether the witness was aware that the

11:03AM 10    defense investigator had been arrested for witness tampering.

11            THE COURT:  Yes.

12            MR. LAUER:  I did object contemporaneously and the

13    Court sustained that.  I'm concerned that could resurface.

14    It's certainly not something that should be put before this

15    jury.  There's no evidence, or really even a good faith basis,

16    to believe that anything like that went on with these

17    witnesses.

18            MR. VARGHESE:  Your Honor, that's entirely not true.

19    These witnesses were contacted by a defense investigator who

11:04AM 20    was arrested for witness tampering.  When he was arrested, he

21    had materials related to this case.  So we intend to inquire of

22    all of the witnesses who were contacted by that investigator

23    whether or not they were offered money, whether or not their

24    testimony has been shaped by him.

25            THE COURT:  I think you can ask whether they were

Case: 19-1689    Document: 00117615537    Page: 508    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 52 of 109

11-52

1    offered money, whether the testimony was shaped.  The question

2    is can you ask about his arrest for witness tampering?  Does it

3    have to do with this case?  And as you know, an arrest is not a

4    conviction.  Why does the arrest come -- why does the question

5    about the arrest come in?

6        MR. VARGHESE:  Your Honor, I believe the question was

7    proper given the fact that if the witness is aware of that, the

8    witness -- whether or not the witness -- what kind of dealings

9    the witness had with the investigator beforehand.

11:04AM 10        THE COURT:  Well, again, I don't see any problem with

11   you asking were you offered any money, were you pressured to

12   change your story, whatever type questions like that you want

13   to ask.  But were you aware that this person was arrested for

14   witness tampering, there's an awful lot going on in that

15   question, and suppose the witness says yes, then what?  Are you

16   trying to prove he was arrested for witness tampering?  That's

17   not a competent witness to prove that.  The question is, was

18   this witness tampered with, which is fair game, and if you have

19   a good faith basis to ask that, but I'm not sure I see why --

11:05AM 20   asking a witness about whether or not he was aware of this

21   arrest is appropriate.

22        MR. LAUER:  And your Honor, if I could just add one

23   thing.

24        THE COURT:  Yes.

25        MR. LAUER:  The fact of the matter is, he was not

Case: 19-1689    Document: 00117615537    Page: 509    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 59 of 109

11-53

1    arrested for witness tampering.  That terminology is wrong.  He

2    was arrested for violating a protective order regarding the

3    international tribunal, which is a different thing, not witness

4    tampering.  And I would agree that, you know, Mr. Varghese is

5    well within his rights to question the witnesses whether they

6    have received any benefit or were promised anything, but to

7    throw that accusation out there in those terms, it's -- I don't

8    think there's a good faith basis for it, and it's certainly

9    more prejudicial than whatever limited probative value a

11:06AM 10    witness's knowledge of that might have.

11         MR. VARGHESE:  Just to counter that, your Honor, he

12    was indicted with four other individuals.  It is a witness

13    tampering case.  There's allegations from the ICTR that

14    witnesses were paid, that he was disclosing the names of other

15    witnesses to other potential witnesses to try to undermine

16    their credibility.  All of that goes to whether or not he was

17    doing the exact same kinds of things in this case.

18         THE COURT:  Again, you can ask, but the fact that this

19    person who's not here in court has been accused of doing these

11:07AM 20    bad things, I don't see how these witnesses can answer that

21    question or why it's a fair question.  If nothing else, under

22    Rule 403.  So I think it's out of bounds without some greater

23    foundation.  I mean, if you have something to work with, you

24    know, that this person actually offered this person money or

25    whatever, then maybe it's a different question.  I don't know.

J.A. 1194

```
 1    But I think it's fair to inquire whether they were offered

 2    bribes, money, pressured to change their story, shown the

 3    testimony of other witnesses to try to get them in sync with

 4    their own testimony.  I think that's all fair game, but I think

 5    your last question unless you have more is not.  So I'm going

 6    to keep it out.

 7              MR. LAUER:  Thank you.  We're ready to resume.

 8              THE COURT:  If they're ready.

 9              THE CLERK:  All rise.

11:08AM 10    (Jury enters.)

11              THE CLERK:  Thank you.  You may be seated.  Court is

12    now back in session.

13              THE COURT:  All right.

14    BY MR. LAUER:

15    Q.   Good morning again.

16    A.   Good morning.

17    Q.   You've talked about meeting Mr. Teganya in restaurants

18    during the time that you were both university students.

19    A.   Yes.

11:10AM 20    Q.   When during the day was that?

21    A.   We used to go to a restaurant three times a day.  We could

22    meet in the morning and we could not meet for lunch because

23    people were many, and they were going in groups.

24    Q.   What about dinnertime?  When was dinnertime?

25    A.   We used to start by 6:00 p.m. and finish by 8:00.  We
```

J.A. 1195

Case: 19-1689    Document: 00117615537    Page: 514    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 55 of 109

11-55

1   could meet today, and tomorrow we could not meet, and then

2   after tomorrow we could meet.  We could have met twice or three

3   times a week.

4           MR. LAUER:  Thank you, sir.

5           THE WITNESS:  Thank you.

6           THE COURT:  All right.

7           MR. VARGHESE:  No questions.

8           THE COURT:  All right.  You may step down.  Thank you.

9   You're done.

11:12AM 10          Mr. Lauer.

11          MR. LAUER:  Yes, the defense calls Jean Paul

12   Munyentwari.

13                  **JEAN PAUL MUNYENTWARI, sworn**

14                      DIRECT EXAMINATION

15   BY MR. LAUER:

16   Q.   Good morning.

17   A.   Good morning.

18   Q.   Do you see your name appearing on the screen in front of

19   you?

11:13AM 20   A.   Yes, I see it.

21   Q.   Is that the correct spelling of your name?

22   A.   Yes.

23   Q.   Mr. Munyentwari, where do you live?

24   A.   Kigali.

25   Q.   In Rwanda?

```
 1   A.   Yes.

 2   Q.   Are you also from Kigali?

 3   A.   Yes.

 4   Q.   What do you do for work?

 5   A.   I'm a farmer of mushrooms.

 6   Q.   Prior to becoming a farmer, did you attend university?

 7   A.   Yes.

 8   Q.   Where did you go to university?

 9   A.   Butare.

10   Q.   And when did you enter the University in Butare?

11   A.   '88.

12   Q.   What was your field of study?

13   A.   Agriculture.

14   Q.   Do you recall the period of time when many different

15   political parties emerged?

16   A.   Yes.

17   Q.   During that period of time, did you join a political

18   party?

19   A.   Yes.

20   Q.   What party did you join?

21   A.   PSD.

22   Q.   What does PSD stand for?

23   A.   Can I say it in French?

24   Q.   Yes.

25   A.   Social Democratic Party.
```

1    Q.    Was that an opposition party to the MRND?

2    A.    Yes.

3    Q.    Did you eventually have a leadership position in that

4    party?

5    A.    Yes.

6    Q.    What position did you hold?

7    A.    I was the president of PSD in the university.

8    Q.    When were you president of PSD in the university?

9    A.    1993 to '94.

11:16AM 10    Q.    As the president in that time period, what were some of

11    your responsibilities?

12    A.    We met with the committee -- the national committee party.

13    They would tell us what to tell the members in the university.

14    Q.    On campus, did you ever meet with members or leaders of

15    other political parties?

16    A.    Yes.

17    Q.    Can you tell us under what circumstances you would meet

18    with members or leaders of other political parties?

19    A.    When there was a problem between the parties -- party

11:17AM 20    members, we will meet then to get a solution to those problems.

21    Q.    Were there sometimes problems or conflicts between the

22    MRND party and your party?

23    A.    There are three parties that were in a position there, PL,

24    PSD and MD.  We meet sometimes to -- when there is a problem

25    that, you know, raised from the members, we will meet at the

J.A. 1198

        1    university so that we can get a solution before any problems

        2    are caused at the university.

        3    Q.    In your role as president of PSD, did you know who some of

        4    the leaders of the MRND party were?

        5    A.    Yes.

        6    Q.    And who do you recall being leaders of the MRND party on

        7    campus?

        8    A.    It's a long time, but I remember one person named Marcel,

        9    who was in charge of the youth at the university, he was like a

11:19AM 10    president.  There was another one, Lambert.  I don't remember

       11    others, because it's a long time.

       12    Q.    Do you know Mr. Teganya?

       13    A.    Yes, I know him.

       14    Q.    How do you know him?

       15    A.    I know him as a student at the University of Butare when

       16    he was in the doctorate.

       17    Q.    Do you know what faculty or what school he was in?

       18    A.    He was in medicine.

       19    Q.    You have told us you were in the agronomy school?

11:20AM 20    A.    I was finishing -- I was in the last year in the agronomy.

       21    Q.    When and how would you see Mr. Teganya?

       22    A.    We were going the same path when we were going to -- he

       23    was going to medicine, I was going to agronomy, and we meet in

       24    the cafeteria also.

       25    Q.    Are the school of medicine and school of agriculture close

Case: 19-1689    Document: 00117615537    Page: 515    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 59 of 109

11-59

1    to each other?

2    A.    It's like -- they were all close to each other.  First you

3    go to agronomy and then you continue to go to medicine.

4    Q.    Was Mr. Teganya someone you considered a friend?

5    A.    I saw him as a student that we go together at school.

6    Q.    Was he one of the leaders of the MRND that you had to meet

7    with in your role as president of the PSD?

8    A.    No.

9          MR. LAUER:  If I could approach the witness, your

11:21AM 10    Honor.

11          THE COURT:  Yes.

12    Q.    Sir, I'm going to show you some articles of clothing.

13    First I'll begin with what's been marked as Exhibit 12.  I'm

14    going to ask you to take a look at that.  Do you recognize that

15    style of hat?

16    A.    Yes, I do.

17    Q.    And what do you recognize that style of hat to be?

18    A.    This was the members of the MRND party wearing it.

19    Q.    I'm going to show you what's been marked as Exhibit 15, a

11:22AM 20    scarf.  Do you recognize this item?

21    A.    This was MRND.

22    Q.    Did you sometimes see students at the university wear

23    articles of clothing like this?

24    A.    Yes.

25    Q.    I'll ask that Exhibit 9 be displayed on the monitor.

```
 1    A.   I used to see this one too.

 2    Q.   Okay.  Exhibit 9 has been displayed before you.  What do

 3    you recognize these items to be?

 4    A.   Even before the multi-party system came, these pins,

 5    anybody could put it on their jacket.

 6    Q.   In all of your dealings with Mr. Teganya, did you ever see

 7    him wear pins like this?

 8    A.   No.

 9    Q.   In any of your dealings with Mr. Teganya, did you see him

10    wearing a hat like the hat that I showed you?

11    A.   No.

12    Q.   Did you ever see Mr. Teganya wear a scarf like the scarf

13    that I showed you?

14    A.   No.  I did not see him with anything of those.

15    Q.   Did you ever see him holding a flag, an MRND flag?

16    A.   No.

17    Q.   In any of your dealings with Mr. Teganya, did you hear him

18    express support for the MRND?

19    A.   I did not hear anything from him at all.

20    Q.   In any of your dealings with Mr. Teganya, did he say

21    anything negative or insulting about Tutsis or about the

22    opposition?

23    A.   I never heard anything from him.

24    Q.   What do you recall about Mr. Teganya when he was a

25    university student?
```

11:23AM (line 10)

11:24AM (line 20)

Case: 19-1689     Document: 00117615537     Page: 513     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 61 of 109

11-61

         1    A.   He was a student who liked to go to study in the library.

         2    He was a quiet person.  I did not hear anyone -- anyone telling

         3    me that they had an issue with him at the university.

         4    Q.   I want to direct your attention to the period of the

         5    genocide in April, May and June of 1994.  Were you in Butare at

         6    that time?

         7    A.   Yes, I was at the university.  That's where I was.

         8    Q.   Where were you living?

         9    A.   I was on the campus.

11:25AM 10    Q.   And did you remain on the campus for the entire period of

        11    the genocide?

        12    A.   I left in June 23.

        13    Q.   So from the period of April to June, did you ever go to

        14    the University Hospital?

        15    A.   No, I did not -- I could not do it -- make it because

        16    there was a barrier of soldiers.

        17    Q.   What did you do during that time period of April, May into

        18    June?

        19    A.   I was -- that time was a time when we were finishing our

11:27AM 20    year and graduating.  So I had a lot of work to do with that.

        21    We had an aboretum forest that we were using as

        22    experimentation.

        23    Q.   Did you leave -- I think you said you left the campus in

        24    June.  What prompted that?  What caused you to leave the campus

        25    in June?

         1   A.   The war was being intense.  It was coming closer to where

         2   we were, and life was difficult.  There was no food at the

         3   university.  So we were trying to go, if we're going to get

         4   food at home.

         5   Q.   Where did you go?

         6   A.   Gisagara.

         7   Q.   Where is that?

         8   A.   In the south.

         9   Q.   How long did you remain there?

11:28AM 10   A.   I stayed there until I fled.  I did not come back to the

        11   university.

        12   Q.   And where did you flee?

        13   A.   Burundi.

        14   Q.   Where did you live in Burundi?

        15   A.   Ngozi, Marangara.  In Marangara, but I don't remember the

        16   city where I was.  But afterwards I went to the University of

        17   Bujumbura.

        18   Q.   Is that where you finished your studies, at the University

        19   at Bujumbura?

11:29AM 20   A.   We were still doing research when the war started.  We

        21   fled before we graduated.  I graduated in Bujumbura.

        22   Q.   How long did you remain in Bujumbura?

        23   A.   Seven years.

        24   Q.   Did you eventually return to Rwanda?

        25   A.   Yes.  '96 I went back to Rwanda.

Case: 19-1689    Document: 00117615537    Page: 519    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 63 of 109

11-63

1    Q.    And what were the circumstances that you went back to

2    Rwanda?

3    A.    I remember the community where I was like closer to

4    Rwanda.  There is a time they say the people who went to school

5    are the ones who are blocking the other people to go back home.

6    For those of us who went to school, we were taken back to

7    Rwanda.

8    Q.    How were you taken back to Rwanda?

9    A.    The military of Burundi who took us to Rwanda, a place

11:31AM 10    called Kanage, and then we went back to Rwanda.

11    Q.    What happened to you when you went back to Rwanda?

12    A.    I was in jail.

13    Q.    Why were you in jail?

14    A.    They were taking people in general, putting many people in

15    jail saying that we are going to search and see if there is any

16    crime you have committed.

17    Q.    How long were you in jail?

18    A.    Eleven years.

19    Q.    What happened after eleven years?

11:31AM 20    A.    I went to the Gacaca court.

21    Q.    What happened at the Gacaca court?

22    A.    I was cleared, and they said that don't have any crime.  I

23    was released.

24              MR. LAUER:  I have no further questions.  Thank you.

25              THE COURT:  Cross?

J.A. 1204

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | CROSS-EXAMINATION                                            |
| 2     | BY MR. GARLAND:                                              |
| 3     | Q.   Good morning.                                          |
| 4     | A.   Good morning.                                          |
| 5     | Q.   So I want to pick up with what Mr. Lauer left off with. |
| 6     | You said --                                                 |
| 7     | A.   Yes.                                                   |
| 8     | Q.   You said that when you returned to Rwanda you were     |
| 9     | arrested; is that right?                                    |
| 11:32AM 10 | A.   Yes.                                               |
| 11    | Q.   Do you recall when you applied for a visa to come to this |
| 12    | country?                                                    |
| 13    | A.   Yes, I remember.                                       |
| 14    | Q.   And you applied online, I believe; is that right?      |
| 15    | A.   Yes.                                                   |
| 16    | Q.   And during -- when you applied online, you were asked a |
| 17    | question about whether you'd ever been arrested, correct?   |
| 18    | A.   Yes, I remember.                                       |
| 19    | Q.   In fact, the question asked, have you ever been arrested |
| 11:33AM 20 | or convicted for any offense or crime even though subject of a |
| 21    | pardon, amnesty or similar action, correct?                 |
| 22    | A.   Yes, I remember that.                                  |
| 23    | Q.   And your answer to that question at that time was no.   |
| 24    | Correct?                                                    |
| 25    | A.   I remember, yes.                                       |

Case: 19-1689    Document: 00117615537    Page: 521    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 65 of 109

11-65

 1   Q.   And so you answered -- so when you answered that question

 2   online, that wasn't accurate, was it?

 3   A.   I don't understand the question.

 4   Q.   When you answered online that you had never been arrested,

 5   that wasn't true, was it?

 6   A.   There is another question that is above that.

 7   Q.   I'm not asking you about those questions.  I'm asking you

 8   about the question of whether you had ever been arrested.

 9        Sir, let me ask the question again:  When you answered

11:35AM 10   the visa form that you had never been arrested, that wasn't

11   true, was it?

12   A.   I don't remember.

13   Q.   Would you like me to show you a printout of the questions

14   that you answered?

15   A.   That would -- grateful.

16   Q.   As I do that, it is true that English is one of your

17   languages, correct?

18   A.   No.  I speak French.

19   Q.   So let me ask you about that.  Do you recall on the online

11:36AM 20   application process you were asked the languages that you

21   spoke?

22   A.   Yes, I remember.

23   Q.   And do you recall that you answered French, Kinyarwanda

24   and English?

25   A.   May I respond?

Case: 19-1689    Document: 00117645537    Page: 528    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 60 of 109

11-66

1    Q.    You can respond yes or no.  Do you recall having...

2    A.    It wouldn't be complete.

3    Q.    I'm not sure I understand.  So let me re-ask the question.

4          Do you recall filling out the online form and saying

5    that you spoke French, Kinyarwanda and English?

6    A.    Just a little English.

7    Q.    Okay.  I said that I would show you this.

8          MR. GARLAND:  May I approach with the court's

9    permission?

11:37AM 10          MR. LAUER:  Mr. Garland.

11          MR. GARLAND:  Oh, I'm sorry.

12          (Handing document.)

13    Q.    This is your name, right?

14    A.    Yes.

15    Q.    And if you look through it, you can see the questions you

16    were asked during the online application.  Do you see those

17    questions?

18    A.    Yes, I see them.

19    Q.    Okay.  And if you'd turn to the third page, and you go to

11:38AM 20    the top of the upper left corner.

21          MR. GARLAND:  Your Honor, I have a copy of this for

22    the Court if you'd like one.  I can hand it up.

23          THE COURT:  I don't need it.

24          MR. GARLAND:  Okay.

25    Q.    Do you see where it says "Provide a list of languages you

```
 1   speak"?

 2   A.   It is written this way, but when we are filling them out,

 3   it's somebody who did it for me, it's not me.  I did not do it.

 4   Q.   So somebody who was filling this out on your behalf just

 5   added "English" without you knowing?

 6        THE INTERPRETER:  Again, please.

 7   Q.   Did somebody who was filling this application out for you

 8   add English as one of your languages without you knowing?

 9   A.   That's why I said here I speak a little English.

10   Q.   Okay.  And then if you go -- turn one page back to the

11   second page, and if you go down to the bottom of the right-hand

12   column, do you see the question that starts out, "Have you ever

13   been arrested?"

14   A.   Yes, I see it.

15   Q.   And what's the answer that you put in there?

16   A.   I put "no," but it didn't say the whole thing.

17   Q.   I see.  Let me move on to another area I'd like to ask you

18   about.

19        Do you recall hearing a bunch of questions from

20   Mr. Lauer asking you about all your dealings with Mr. Teganya?

21   A.   Yes, I remember.

22   Q.   And did I understand your testimony correctly that your

23   dealings with Mr. Teganya were essentially walking the same

24   path with him when you went to your classes in agriculture and

25   he went to his classes in medicine?
```

            1    A.    Yes.

            2    Q.    So just to be clear, you didn't have any classes with

            3    Mr. Teganya, correct?

            4    A.    True.

            5    Q.    You didn't live with him, right?

            6    A.    We never lived in the same room.

            7    Q.    And you didn't live in the same dormitories, did you?

            8    A.    No, we did not live in the same dorm.

            9    Q.    You weren't in the same political party as him, right?

11:42AM 10    A.    We were not in the same party.

           11    Q.    Now, moving to political parties.  In 1993 and 1994 the

           12    MRND was still the ruling party, right?

           13    A.    Yes.

           14    Q.    And the majority of students who were on campus who were

           15    in political parties belonged to the MRND?

           16    A.    That's not true.

           17    Q.    That's not true.  Okay.

           18          The MRND had lots of members, however, correct?

           19    A.    I said no, it's not true, in the university.

11:43AM 20    Q.    I'm sorry.  I don't understand the question.

           21    A.    In the university, where we were, MRND did not have

           22    majority of members.

           23    Q.    What about in the town?

           24          THE INTERPRETER:  In town?

           25          MR. GARLAND:  In town.

```
 1   A.    Even in the city, there were not many.
 2   Q.    Okay.  So I just want to be clear.  You're saying that in
 3   1993 to 1994 there weren't many MRND members at the school or
 4   in town; is that right?
 5   A.    The reason I'm saying that is that there were elections of
 6   somebody who represented AJNR at the university.  There were
 7   elections, two elections.  And two -- in all those two
 8   opposition was winning the elections.
 9   Q.    Okay.  I want to be clear.  I'm not asking you how many
10   members now there were in MRND versus other parties.  I'm just
11   asking about MRND.  Are you telling -- are you testifying that
12   in 1993 and 1994 there weren't very many MRND members at the
13   university or in town?
14   A.    Maybe I didn't hear the question well.
15         Are you asking that the members of the MRND party were
16   majority in the university?
17   Q.    At this point I'm not asking about majority at all.  I'm
18   asking you whether or not there were a lot of MRND members at
19   the university from 1993 to 1994?
20   A.    They were there, members of MRND.
21   Q.    And weren't there a lot of MRND members in town as well in
22   1993 and 1994?
23   A.    1993, there were many because the students were going to
24   school.  Schools were on.
25   Q.    So, in fact, isn't it true that there were problems with
```

11:44AM (line 10)

11:45AM (line 20)

## J.A. 1210

Case: 19-1689    Document: 00117615537    Page: 526    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 70 of 109

11-70

```
  1    MRND even before the genocide at the university?

  2    A.    Yeah, problems were there before that.

  3    Q.    For example, in February of 1994 Tutsis had been harassed

  4    by the MRND, right?

  5    A.    In February, I remember what happened at the university --

  6    I'm just talking about university -- what I remember at that

  7    time, the female students who were at the school, they went to

  8    sleep outside of the campus, but no one touched them or harmed

  9    them.

11:48AM 10    Q.    But you also remember that they did that because they were

 11    afraid of the MRND, right?

 12    A.    That's what they said.

 13    Q.    And there were other conflicts as well between the MRND

 14    and other parties, right?

 15    A.    I said earlier about we had meetings to stop all those

 16    problems that were there with MRND, PSD, PL, and said these

 17    things should stop at the university.

 18    Q.    So let me ask you the question again.  There were other

 19    problems with MRND on campus at the time, yes or no?

11:49AM 20    A.    Yes.

 21    Q.    Now, you were the president of PSD in '93 and '94,

 22    correct?

 23    A.    Yes.

 24    Q.    Do you recall how many students were in PSD at the time?

 25    A.    I can't memorize that.  There were many.
```

J.A. 1211

Case: 19-1689    Document: 00117615537    Page: 527    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 71 of 109

11-71

```
 1   Q.   So when you would go to political rallies or political
 2   meetings, you would be with PSD members, not with MRND members,
 3   right?
 4   A.   It wasn't really a meeting as you call a meeting for
 5   parties, but it was for leaders only to see if they can get a
 6   solution for the problems that were on the campus.
 7   Q.   Do you remember going to political rallies, however, where
 8   lots of people would show up from different parties, right, yes
 9   or no?
10   A.   I went in my own party.  I was not in MRND party.
11   Q.   And when you went, since you were the president, you were
12   most concerned with your own party members, right?
13   A.   Concerning what?
14   Q.   When you went to those rallies as the president, you had
15   responsibility to your members, right?
16   A.   Of course.  That was my concern, so that there's no
17   problem between us -- among us.
18   Q.   So when you went to those rallies, you were more concerned
19   with the actions of your own members than the members of other
20   parties, correct?
21   A.   Yes.
22   Q.   I want to ask you another thing about PSD.  As the
23   president of the party, did you have a group of people who
24   helped you out?
25   A.   Yes.
```

Case: 19-1689    Document: 00117615537    Page: 528    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 72 of 109

11-72

1    Q.   And these were people you went to when you had problems or

2    wanted advice, correct?

3    A.   We went to our authorities, our leaders in the party.

4    Q.   And I'm asking you about people below you as president.

5    Did you have a group of advisors below you in the party?

6    A.   Yes.

7    Q.   Not all of those were elected to any particular position,

8    right?

9    A.   No.  They were elected.

11:53AM 10    Q.   So you went only to elected people to talk to them about

11    concerns?

12    A.   Our party had a committee.  And the others had their own

13    committees.  When there is an issue, we had to meet, first of

14    all, with our members, party members.

15    Q.   You had many members in PSD who weren't part of the

16    elected positions, correct?

17    A.   Yes.  There were many other members who were not in the

18    leadership of PSD.

19    Q.   And a number of those PSD members who were not leaders

11:54AM 20    were also active in the party, yes or no?

21          THE INTERPRETER:  Could you repeat, please, for me.

22    Q.   A number of your PSD members who were not elected were

23    still active in the party, correct?

24    A.   Yes.

25    Q.   I want to turn now to your time on campus during the

```
 1    genocide.

 2    A.   Yes.

 3    Q.   When you were on campus during the genocide, you saw

 4    people going door to door at the dormitory looking for Tutsi

 5    students, didn't you?

 6    A.   Yes, I saw them.

 7    Q.   And you saw students aiding soldiers during that time,

 8    right?

 9             THE INTERPRETER:  Eating?

10             MR. GARLAND:  I'll withdraw the question and re-ask

11    it.

12    Q.   The people going door to door looking for Tutsis were both

13    soldiers and students, yes or no?

14             THE INTERPRETER:  The question, please.

15    Q.   When you saw people going door to door in the dormitory

16    and they were looking for Tutsis, it was both soldiers and

17    students who were looking for Tutsis?

18    A.   Yes.  Yes.

19    Q.   Okay.

20             Now, you said that you didn't go to the hospital at

21    all during the genocide because it was too dangerous; is that

22    right?

23    A.   Yes.

24    Q.   So if Mr. Teganya was over at the hospital during the

25    genocide, you wouldn't know at all what he was doing?
```

J.A. 1214

Case: 19-1689    Document: 00117615537    Page: 530    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 74 of 109

11-74

1    A.   I can assure you I did not know what he did, because I did

2    not go to the hospital to see what he was doing.

3    Q.   Do I understand your prior testimony to be that during the

4    genocide, you spent your time doing lots of school work so you

5    would graduate; is that correct?

6    A.   In April -- it was in April.  I'm just focusing on that.

7    I was going to the school and going to the campus, but I did

8    not go to the hospital.

9    Q.   Okay.  The question I asked was, do I understand correctly

11:58AM 10  that during April, May and June you spent most of your time

11   during the genocide studying for graduation?

12   A.   Yes, that's what I said.

13   Q.   Were you ever contacted by Dick Prudence Munyeshuli for

14   Mr. Teganya, or anybody working for Mr. Teganya?

15   A.   He's the one who called me first.

16   Q.   Okay.  And how many times did you speak with him?

17   A.   Two times.

18   Q.   Did he tell you what to testify to or ask you to change

19   your story?

11:59AM 20  A.   He told me what to say in the testimony, not to change the

21   story.

22   Q.   So he told you what to say during your testimony?

23   A.   No.  He asked me.  Then I responded.  Then I said what I

24   know.

25   Q.   And did he offer you any money?

Case: 19-1689    Document: 00117615537    Page: 531    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 75 of 109

11-75

```
 1   A.    No.

 2   Q.    You live in Rwanda, correct?

 3   A.    Yes.

 4   Q.    And you plan to return to Rwanda after testifying?

 5   A.    I will go back.

 6   Q.    And you're not worried about any consequences of your

 7   testifying today back in Rwanda, are you?

 8   A.    No.  We are just supporting justice and go back to Rwanda.

 9            MR. GARLAND:  If I may.  No further questions, your

10   Honor.

11            THE COURT:  Redirect.

12                       REDIRECT EXAMINATION

13   BY MR. LAUER

14   Q.    You had told us earlier that the medical school and the

15   agricultural school were nearby; is that correct?

16   A.    It's like they are together, closer to each other.

17   Agronomy, then medicine.

18   Q.    How often would students from the medical school and

19   students from the agriculture school see each other?

20   A.    We met in the cafeteria.  We used the same path to go to

21   the school.  There is a time we met in the games.  We would

22   play agronomy against medicine.

23   Q.    What kind of games are you referring to?

24   A.    Football, soccer.

25            THE INTERPRETER:  Sorry.
```

12:00PM (line 10)
12:01PM (line 20)

1    A.   Yeah.  Competed in volleyball, basketball, all these

2    tournaments.

3    Q.   Was it common for people from the medical school to

4    socialize with the students from the agriculture school?

5    A.   Yeah.  We'd socialize.

6         MR. LAUER:  Thank you, sir.  I have no further

7    questions.

8         THE COURT:  Any recross?

9         MR. GARLAND:  Nothing, your Honor.

12:03PM 10      THE COURT:  Okay.  Thank you.

11        THE DEFENDANT:  Thank you.

12        MR. LAUER:  Defense will be calling Fidele Barinda.

13        MR. GARLAND:  Your Honor, may I approach the witness

14   stand and take back the document that was in front of the

15   witness?

16        THE COURT:  Yes.

17              **FIDELE BARINDA, sworn**

18        THE CLERK:  Thank you.  You may be seated.

19                   DIRECT EXAMINATION

12:05PM 20   BY MR. LAUER:

21   Q.   Good afternoon, sir.

22   A.   Good afternoon.

23   Q.   Is your name correctly displayed on the screen in front of

24   you?

25   A.   Yes.

|    |    |                                                          |
|----|----|----------------------------------------------------------|
| 1  | Q. | Where do you live?                                       |
| 2  | A. | Kigali, Rwanda.                                          |
| 3  | Q. | Were you born in Kigali?                                 |
| 4  | A. | Yes.                                                     |
| 5  | Q. | Do you have a family?                                    |
| 6  | A. | Yes, I do.                                               |
| 7  | Q. | You have children?                                       |
| 8  | A. | Yes, I do.  I have five children.                        |
| 9  | Q. | Do you work?                                             |
| 12:05PM 10 | A. | Yes, I do.                                        |
| 11 | Q. | Where do you work?                                       |
| 12 | A. | Insurance company.                                      |
| 13 | Q. | And what is the nature of your work at the insurance     |
| 14 |    | company?                                                 |
| 15 | A. | Customer care.                                          |
| 16 | Q. | Before entering the insurance field, did you attend      |
| 17 |    | university?                                              |
| 18 | A. | Yes.                                                     |
| 19 | Q. | Where did you go to university?                          |
| 12:06PM 20 | A. | In Butare.                                        |
| 21 | Q. | When did you enter the university in Butare?             |
| 22 | A. | 1989.                                                    |
| 23 | Q. | And what field of study -- what was your field of study? |
| 24 | A. | Medicine.                                               |
| 25 | Q. | Are you familiar with Mr. Teganya?                       |

Case: 19-1689    Document: 00117615537    Page: 534    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 78 of 109

11-78

```
 1   A.   Yes, I know him.

 2   Q.   Was he a classmate of yours in the faculty of medicine?

 3   A.   Yes.

 4   Q.   Was he always your classmate?  Did you enter at the same

 5   time?

 6   A.   Yes.  We were in the same class.

 7   Q.   Did you enter the university at the same time; in other

 8   words, did you and Mr. Teganya both enter the university in

 9   1989?

12:07PM 10   A.   No.

11   Q.   How did it come to be that you were in the same class?

12   A.   I was -- he came when I doubled the first class, the first

13   year.  I repeated the first year.

14   Q.   And was that --

15             THE INTERPRETER:  I'm sorry.

16   A.   Second year I repeated.  That's where he found me.

17   Q.   So when you repeated the second year, that was when you

18   became his classmate?

19   A.   Yes.

12:08PM 20   Q.   How often would you see Mr. Teganya as a classmate?

21   A.   Any time we went in the class, we were together.

22   Q.   What kind of a student was he?

23   A.   He was a young man who liked to study.  He was shy a

24   little bit.  He was the smartest in the class.

25   Q.   Were you and Mr. Teganya friends?
```

Case: 19-1689    Document: 00117615537    Page: 535    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 79 of 109

11-79

```
 1   A.    No.  No, we were just students.

 2   Q.    Do you recall during your time at the university when a

 3   number of different political parties came about?

 4   A.    I think it was in 1991.

 5   Q.    And what were some of the parties that were active on the

 6   university campus?

 7   A.    MRND.  I was one of that party.  MDR, PSD, PL and CDR, but

 8   that one came afterwards.

 9              MR. LAUER:  If I could approach the witness, your

10   Honor.

11              THE COURT:  Yes.

12   Q.    Sir, I'm going to show you two items of clothing, the

13   first of which is marked as Exhibit 12.  It's a hat.  I'm going

14   to ask you to take a look at that.  Do you recognize what that

15   is?

16   A.    I was putting that on myself.

17   Q.    Was that an MRND hat?

18   A.    This is MRND.

19   Q.    And did you yourself wear a hat like that?

20   A.    Yes, I did very much in the party.

21   Q.    I'm going to show you another item of clothing here, a

22   scarf.  It's marked as Exhibit 15.  I'm going to ask you to

23   take a look at that.  Do you recognize that?

24   A.    Yes, I do.

25   Q.    What is that?
```

12:10PM (line 10)

12:11PM (line 20)

J.A. 1220

Case: 19-1689 Document: 00117615537 Page: 536 Date Filed: 07/16/2020 Entry ID: 6352983
Case 1:17-cr-10292-FDS Document 205 Filed 11/04/19 Page 80 of 109

11-80

1    A.    This is an MRND scarf.

2    Q.    Did you have a scarf like this?

3    A.    Yes.

4          MR. LAUER:  If we could have Exhibit 9.

5    Q.    Sir, on the screen in front of you there's two items.  Do

6    you see those?

7    A.    Yes, I can see it.

8    Q.    Do you recognize these items?

9    A.    Yes.  This is Juvénal Habyarimana.  He was the president

12:12PM 10   of the country at that time.

11   Q.    Were these associated with any political party?  Were

12   these pins that you see on the screen, were they associated

13   with a political party?

14   A.    These pins you see here when the Habyarimana took power,

15   every Rwandan who was an MRND had to put it on.

16   Q.    In your time at the university, as Mr. Teganya's classmate

17   did you ever see him wearing an MRND hat like the one I showed

18   you?

19   A.    I did not see him with that hat.

12:13PM 20   Q.    Did you ever see him wear a scarf like the scarf I showed

21   you?

22   A.    I put them on, but I've never seen him even a single day

23   wearing it.

24   Q.    Did you ever see him wearing pins like the pins displayed

25   on the screen?

Case: 19-1689    Document: 00117615537    Page: 537    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 81 of 109

11-81

1    A.   At the campus it was not even acceptable to put it on.  I

2    did not see him wearing it one single day.

3    Q.   You stated that you wore this sort of clothing yourself.

4    What were the circumstances where this sort of clothing would

5    be worn?

6    A.   When we were -- when we go to MRND meetings, we will put

7    it on.

8    Q.   And were you familiar, being an MRND member yourself, with

9    who other MRND members at the university were?

12:14PM 10          THE INTERPRETER:  The first word, please.

11   Q.   You stated you were an MRND member yourself, correct?

12   A.   Yes.

13   Q.   Were you familiar with other university students who were

14   MRND members?

15   A.   Yes, I did.

16   Q.   Was Mr. Teganya a member of the MRND?

17   A.   No.  Those I know, Teganya was not one of them.

18   Q.   Do you recall some of the other people who were MRND

19   members at that time?

12:15PM 20   A.   Yes, I do.

21   Q.   Who do you recall as being MRND members?

22   A.   President, his name was Marcel.  Uruvugundi Marcel.  He

23   was born in Kibuye.

24   Q.   Do you recall others?

25   A.   Yes.

**J.A. 1222**

Case: 19-1689    Document: 00117615537    Page: 538    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 82 of 109

11-82

```
 1    Q.   Can you give us an example?

 2    A.   Barimwabo Justin.

 3         Should I continue?

 4    Q.   If you can.

 5    A.   Munyaneza Lambert.

 6    Q.   Were those people that you've just listed people with whom

 7    you associated?

 8    A.   Those were the leaders in MRND.

 9    Q.   Was Mr. Teganya your friend?

12:16PM 10    A.   No.  He was one of the students who were meeting at

11    school.  That's it.

12    Q.   Were you aware of who he did associate with?

13    A.   Because he and others were living outside the campus, I

14    didn't know who were his friends, but I remember one.

15    Q.   And who was that?

16    A.   Cyaga Patrick.

17    Q.   You mentioned that Mr. Teganya lived off campus.  Where

18    did you live?

19    A.   I lived into the campus.

12:17PM 20    Q.   In a particular dorm?

21    A.   Misereor, that was closer to the restaurant.

22    Q.   How many days a week would you see Mr. Teganya?

23    A.   In class I would see him.

24    Q.   What happened after class?

25    A.   Not so much, because he was going out, living outside and
```

J.A. 1223

Case: 19-1689    Document: 00117615537    Page: 539    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 83 of 109

11-83

1    I was living inside the campus.  When we were in group work, we

2    could meet outside the class.

3    Q.    At any time did Mr. Teganya express support for the MRND?

4    A.    Me as a person who was an MRND party, I did not see

5    Teganya in MRND business.

6    Q.    Did you ever observe or hear him insulting Tutsis or

7    insulting members of opposition parties?

8    A.    No, I never see him even one day doing that.

9    Q.    I want to direct your attention to the period of the

12:19PM 10    genocide in April, May and June of 1994.  Were you in Butare

11    during that time?

12    A.    No.  I left the end of March.

13    Q.    Why did you leave at the end of March?

14    A.    We were going on vacation, and I was going to -- I was

15    preparing marriage with my fiancée.  So we left together.

16    Q.    You said you had been on vacation.  Was there a holiday

17    occurring at the end of March?

18    A.    Yes.  Yes, in April we have vacations.

19    Q.    What was the particular holiday?

12:20PM 20    A.    Shorter holidays.  Yeah, we had the shorter vacations,

21    two.  The other one was longer, which will lead us into another

22    year, moving into another class.

23    Q.    Where were you during April, May and June when the

24    genocide was occurring?

25    A.    I was in Murambi.

# J.A. 1224

Case: 19-1689    Document: 00117615537    Page: 540    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 203   Filed 11/04/19   Page 84 of 109

11-84

|    |    |
|----|----|
| 1  | Q.   Where is that? |
| 2  | A.   In Kigali. |
| 3  | Q.   Do you have any personal knowledge about what took place |
| 4  | in Butare during the genocide? |
| 5  | A.   Yes, I do. |
| 6  | Q.   You do.  Were you in Butare during the time of the |
| 7  | genocide? |
| 8  | A.   I was in Kigali. |
| 9  | Q.   Did you remain in Kigali after the genocide was over? |
| 12:22PM 10 | A.   No.  I fled. |
| 11 | Q.   And where did you flee? |
| 12 | A.   In Zaire. |
| 13 | Q.   Why did you flee? |
| 14 | A.   We were fleeing bullets.  There were a lot of bullets |
| 15 | around there. |
| 16 | Q.   Where did you live in Zaire? |
| 17 | A.   Katali.  Camp Katali. |
| 18 | Q.   Would that be a refugee camp? |
| 19 | A.   Yes. |
| 12:22PM 20 | Q.   How long were you in the refugee camp? |
| 21 | A.   Two years. |
| 22 | Q.   What happened after two years? |
| 23 | A.   I came back to the country. |
| 24 | Q.   And how did that occur? |
| 25 | A.   The camps were attacked.  Then we were obliged to go back. |

J.A. 1225

1    Q.   What happened when you came back?

2    A.   I went back to Rwanda.  I got a job and I worked.

3    Q.   Where did you work at that time?

4    A.   I worked in a hospital near Rutongo, Kigali.

5    Q.   Did you remain working at that hospital for very long?

6    A.   '96 to '98 I worked there.

7    Q.   From 1996 to 1998?

8    A.   Yes.

9    Q.   And what happened in 1998?

12:24PM 10   A.   I went back to university to study.

11   Q.   Would that be the university in Butare?

12   A.   Yes.

13   Q.   What happened at the university?

14   A.   In December I was arrested and jailed.

15   Q.   And what was the reason why you were arrested and jailed?

16   A.   They thought that I committed genocide.

17   Q.   Did you remain in jail?

18   A.   Yes.

19   Q.   For how long?

12:25PM 20   A.   Ten years.

21   Q.   What happened after ten years?

22   A.   There was a Gacaca justice.

23   Q.   And did you appear before a Gacaca court?

24   A.   Yes.

25   Q.   And what was the outcome of that proceeding?

J.A. 1226

```
 1    A.    They found me without any crime.  They released me.

 2    Q.    And since that time have you lived and worked in Rwanda?

 3    A.    Yes, I work.

 4          MR. LAUER:  I have no further questions.  Thank you.

 5    A.    I have all the necessary papers to live there.

 6          MR. LAUER:  Thank you.

 7          THE COURT:  Thank you, sir.

 8          Ladies and gentlemen, let me -- I'm going to take

 9    judicial notice of this.  We've heard the country referred to

12:26PM 10    as Zaire.  There's a country in Africa that borders Rwanda that

11    for some years was called Zaire.  It's now called the Congo or

12    the Democratic Republic of Congo.  The witnesses have referred

13    to it by all three names.  There are two countries that are

14    called Congo, just to make things more confusing.  This is the

15    Democratic Republic of the Congo, which borders Rwanda.

16          MR. LAUER:  Thank you, your Honor.

17          THE COURT:  Mr. Varghese.

18                     CROSS-EXAMINATION

19    BY MR. VARGHESE:

12:26PM 20    Q.    Good afternoon.

21    A.    Good afternoon.

22    Q.    Currently you reside in Kigali; is that right?

23    A.    Yes, that's where I reside.

24    Q.    Before the genocide you carried a national identity card?

25    A.    Yes.
```

J.A. 1227

| | |
|---|---|
| 1 | Q.   And what ethnicity was listed on your identity card? |
| 2 | A.   Hutu. |
| 3 | Q.   And currently you work for Radiant Insurance; is that |
| 4 | correct? |
| 5 | A.   Yes. |
| 6 | Q.   And you work with Diogene Nsengumuremyi? |
| 7 | A.   He used to work there, but he worked -- he works now, at |
| 8 | this time he works independently. |
| 9 | Q.   And you two are friends? |
| 12:27PM 10 | A.   Not so much.  We just know each other as a worker.  He's a |
| 11 | safety person.  He drinks his soda and I drink beer.  There's |
| 12 | no way we could meet. |
| 13 | Q.   Would you be surprised that he characterizes your |
| 14 | relationship as friends? |
| 15 |      THE INTERPRETER:  I'm sorry. |
| 16 | Q.   Would you be surprised that he characterizes your |
| 17 | relationship as friends? |
| 18 | A.   It would surprise me. |
| 19 | Q.   You started in the medical school in 1989, correct? |
| 12:28PM 20 | A.   No. |
| 21 | Q.   When did you start medical school? |
| 22 | A.   1998.  1989, that's when I started medicine. |
| 23 | Q.   Right.  That was my question.  You started the medical |
| 24 | school in 1989, correct? |
| 25 | A.   Yes. |

**J.A. 1228**

1   Q.   Then you had to repeat a year, and that's when you entered

2   Mr. Teganya's class?

3   A.   Yes, but 1990 there was a year that we did not go to

4   school.  No one went back -- went back to school.

5   Q.   In 1990, is that your testimony?

6   A.   Yes.

7   Q.   So what year did you start in Mr. Teganya's classes?

8   A.   Second year, when I repeated.

9   Q.   What year was that that you started in Mr. Teganya's

12:29PM 10   class?

11   A.   1993.

12   Q.   October of 1993, correct?

13   A.   That's when we were together in the class.

14   Q.   So, in fact, you were only in class with Mr. Teganya from

15   October of 1993 to April of 1994, correct?

16   A.   I'm sorry.

17   Q.   Please do not answer anything until I ask you a question,

18   sir.

19   A.   Okay.

12:30PM 20   Q.   I'll ask questions.  You give answers.  If there's no

21   question, don't answer.  Okay?

22   A.   Thank you.  Yes.

23   Q.   So you were in class with Mr. Teganya from October of 1993

24   until April of 1994; isn't that correct?

25   A.   Yes.

J.A. 1229

Case: 19-1689     Document: 00117615537     Page: 545     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 89 of 109

11-89

```
 1    Q.   So a period of only six months?

 2    A.   We were together one year, and those four months for the

 3    second year.

 4    Q.   You were together from October of 1993 until April of

 5    1994, correct?

 6    A.   Yes.

 7    Q.   And you would see him in class; is that correct?

 8    A.   Yes.

 9    Q.   And you knew some things about him as well, right?  And

10    you knew him?

11    A.   Yes, I knew him.

12    Q.   You knew he was a Hutu?

13    A.   It's very hard to know that.  We did not talking about

14    ethnicity.

15    Q.   You knew he was from Gisenyi?

16    A.   No.

17    Q.   Did you know what dorm he lived in?

18    A.   He lived outside.

19    Q.   What dorm did you live in?

20    A.   Misereor.

21    Q.   Had you ever been to where Mr. Teganya's dorm was?

22    A.   No.

23    Q.   Do you know where the Kiza dorm is?

24         THE INTERPRETER:  Kiza?

25         MR. VARGHESE:  Kiza.
```

J.A. 1230

|     |     |                                                              |
|-----|-----|--------------------------------------------------------------|
| 1   | A.  | Yes.                                                         |
| 2   | Q.  | Had you been to the Kiza dorm?                               |
| 3   | A.  | No, but the building where he was, I know it.                |
| 4   | Q.  | So you knew he was in that dorm?                             |
| 5   | A.  | Kiza, no.                                                    |
| 6   | Q.  | You were taking classes at the hospital, right?  You were   |
| 7   |     | doing the clinical section?                                 |
| 8   | A.  | Yes.                                                         |
| 9   | Q.  | And Mr. Teganya was at the hospital doing his preclinic     |
| 12:33PM 10 |  | year as well, right?                                     |
| 11  | A.  | Would you repeat, please.                                   |
| 12  | Q.  | Mr. Teganya was at the hospital doing his clinical          |
| 13  |     | training as well?                                           |
| 14  | A.  | Yes, he was there studying.                                 |
| 15  | Q.  | And so when you said that you were in classes with him, in  |
| 16  |     | fact you were at the hospital doing clinical training that  |
| 17  |     | year?                                                        |
| 18  | A.  | No.  We were in class.                                       |
| 19  | Q.  | You weren't doing clinical training?                         |
| 12:34PM 20 | A. | There's a class called semiology.  It's one class.  It's  |
| 21  |     | an exercise how to treat patients.  It wasn't really -- we were |
| 22  |     | not in a training.  It was a class.  We were following a class. |
| 23  | Q.  | It was at the hospital, correct?                            |
| 24  | A.  | It was a class that we participated in.                     |
| 25  | Q.  | Okay.  It was at the hospital, correct?                     |

**J.A. 1231**

Case: 19-1689    Document: 00117615537    Page: 547    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS  Document 205  Filed 11/04/19  Page 91 of 109

11-91

```
        1   A.   The course that we were following was in the hospital,
        2   inside.
        3   Q.   So you were in the hospital, Mr. Teganya was in the
        4   hospital, correct?
        5   A.   When we would go to that class, we would finish the class
        6   and go back to --
        7   Q.   That's not the question.  Please listen to the question
        8   and answer the question.  It's a yes or no question.
        9   A.   Yes.
12:36PM 10  Q.   You were in the hospital with Mr. Teganya in class,
       11   correct?
       12   A.   Yes.
       13   Q.   When you were in the hospital, you would go to different
       14   wards.  You would see different patients, correct?
       15   A.   Yes.
       16   Q.   And you testified that you were a member of MRND, yes?
       17   A.   Yes.
       18   Q.   Why did you choose to remain in MRND after the start of
       19   the multiparty system?
12:36PM 20  A.   MRND was a party that was there.  It was a powerful party.
       21   When the party started, I decided to stay in that one.
       22   Q.   Why did you decide to stay in that party?
       23   A.   I didn't see any problem with it.
       24   Q.   You didn't have a problem with any of the policies of
       25   MRND?
```

J.A. 1232

```
          1    A.   I didn't have a problem with that when it was starting.

          2    Q.   In fact, you weren't just a member of MRND, you were an

          3    active member; isn't that right?

          4    A.   I was just a normal member.

          5    Q.   Isn't it true that you were a leader of the MRND party in

          6    the medical school?

          7    A.   No.

          8    Q.   So if your friends characterized you as a leader of MRND

          9    in the medical school, that wouldn't be correct?

12:38PM  10    A.   I will deny that because I was never one of them -- one of

         11    the leaders.

         12    Q.   And you testified that you wore the MRND hat and the MRND

         13    scarf; is that right?

         14    A.   That was like identification -- it was an identification

         15    of MRND party.

         16    Q.   And you'd wear them together, correct?

         17    A.   Yes, I did.

         18    Q.   You'd wear the hat with the scarf?

         19    A.   Yes, I did.

12:39PM  20    Q.   The clothing, that was handed out at the rallies, correct?

         21    A.   Yes, they gave it to us.

         22    Q.   You couldn't just buy that, you'd actually have to get it

         23    at the rallies, correct?

         24    A.   Yes.  They give it to us because every party will

         25    distribute their clothing identifying who they are.
```

Case: 19-1689    Document: 00117645537    Page: 548    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 93 of 109

11-93

```
 1    Q.   What kind of things did you do in the MRND party?

 2    A.   I don't hear the question well.

 3    Q.   What kind of things did you do as a member of the MRND

 4    party?

 5    A.   When we go to meetings -- we go to hear what their plan

 6    and programs and their vision and what they want to do for the

 7    people.

 8    Q.   So when you went to meetings -- did you go to a lot of

 9    meetings?

10    A.   Yes, I did.

11    Q.   When you went to those meetings, you would hear a lot of

12    anti-Tutsi statements?

13    A.   Yes, I did.

14    Q.   And you heard about the RPF invading the country?

15    A.   Yes.

16    Q.   And you heard there were Tutsi collaborators within --

17    inside the country?

18    A.   Yes, they said it.

19    Q.   And they used names like inyenzi to talk about the Tutsis;

20    isn't that right?

21    A.   There were a lot of extremists in the MRND party.  They

22    said it.

23    Q.   And you were told in those meetings to look around for the

24    enemy within; isn't that correct?

25    A.   There were extremists who were saying it.
```

Case: 19-1689     Document: 00117615537     Page: 550     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 94 of 109

11-94

```
 1    Q.   At the meetings that you went to?

 2    A.   Yes, they did say it.

 3    Q.   And they said that there were inyenzis hiding within the

 4    country?

 5         THE INTERPRETER:  And they were saying that there were

 6    cockroaches -- I'm sorry.

 7    Q.   And you were told that they were -- okay.

 8         THE COURT:  You can translate that.

 9    A.   Yeah, they said it very much.

10    Q.   And these were the kinds of things that were repeated at

11    the meetings, at the rallies?

12    A.   There were a lot of things that were said in the meetings,

13    and those words were passing by.  They were said.

14    Q.   Because these were the views of MRND, correct?

15    A.   I can't say that that was the main thing, but that was --

16    it was one of those things that they were saying in the

17    meetings.

18    Q.   Were there things that were being said at the meeting that

19    were not anti-Tutsi?

20    A.   Yes.

21    Q.   What kinds of things were being said in the meetings that

22    you feel were not anti-Tutsi?

23    A.   They were saying that if the MRND wins, they will put in a

24    government that will go through all the population.  That we

25    give life to the population.
```

12:42PM (line 10)
12:43PM (line 20)

1    Q.    So it's your testimony here today that the MRND political

2    party was trying to reach out to the Tutsi population?

3              MR. LAUER:   Objection.

4              THE COURT:   Sustained.

5    Q.    Well, you said that you believed in the views of MRND; is

6    that correct?

7    A.    At that time I agreed to it.

8    Q.    So you believed in the things that people were saying at

9    those meetings?

12:44PM 10   A.    There are things that we could not agree on, like talking

11   bad about Tutsis, and some of them were friends.

12   Q.    These meetings, they were attended not only by -- they

13   were attended by MRND students, right?

14   A.    The outsiders are the ones who organized this, but the

15   students could participate.

16   Q.    So there were faculty there as well?  There were faculty

17   there at the meeting as well?

18   A.    Yeah, they were there.

19   Q.    In addition to the meetings, there was also training for

12:45PM 20   MRND members as well, correct?

21   A.    I did not -- I don't know the training as a person who was

22   in MRND.  At the university, I don't know it.

23   Q.    There was also -- there was training for Interahamwe

24   members, right?

25   A.    I did not know the training.  We were students studying.

**J.A. 1236**

```
 1    I did not know about training.
 2    Q.   I'm sorry.  Are you saying you did not know or --
 3    A.   I did not know about the training.  I was just a student.
 4    Q.   Were you a member of Interahamwe?
 5    A.   No.  I was a member of MRND only.
 6    Q.   But everyone under 26, MRND members, were made members of
 7    Interahamwe; isn't that right?
 8    A.   I'm not hearing well the question.
 9    Q.   Isn't it true that MRND members under the age of 26 were
10    recruited for the Interahamwe?
11    A.   That's not true.  There were those who were being called
12    militias, who were in those groups, but not everybody was
13    there.
14    Q.   How did the Interahamwe recruit from MRND meetings?
15    A.   Ask the question again.
16    Q.   You were never asked to join Interahamwe?
17    A.   No one asked me.
18    Q.   And it's your testimony that you never joined Interahamwe?
19    A.   It was not possible.
20    Q.   And you didn't participate in the trainings?
21    A.   It was not possible.
22    Q.   After the meetings the MRND members would go to a
23    particular bar; isn't that right?
24    A.   Yes.
25    Q.   And oftentimes there'd be a lot of drinking after the
```

12:47PM (line 10)

12:48PM (line 20)

Case: 19-1689    Document: 00117615537    Page: 553    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 97 of 109

11-97

```
 1    meetings as well, right?

 2    A.    Yes.

 3    Q.    And there would be violence, the MRND members would start

 4    fights with other political parties?

 5    A.    It did not happen when I was MRND at the university.

 6    Q.    It's your testimony the MRND never got into fights with

 7    other political parties on the university campus?

 8    A.    I'm repeating and repeating that it never happened.

 9    Q.    So MRND got along with PL, the Tutsi party?

10    A.    As a student we were living together.  There was nothing

11    bad that could happen.  And anyone trying to do that would be

12    punished.

13    Q.    Is it your testimony, sir, that there was no ethnic

14    conflict on the university?

15    A.    I can testify that nothing happened at the university

16    concerning ethnicity, nothing happened.

17    Q.    It's your testimony that nothing happened in 1993, when

18    you were there leading up to April of 1994?

19    A.    When I was there, nothing happened.

20    Q.    Tutsis weren't scared to go to class?

21    A.    It did not happen because when you don't come to class,

22    you can't do the exam.  And they came and did the exams.

23    Q.    Is it your testimony that Tutsi women, Tutsi students who

24    were women weren't threatened with rape or were raped?

25          MR. LAUER:  Objection.
```

12:49PM (line 10)
12:51PM (line 20)

Case: 19-1689    Document: 00117615537    Page: 554    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 205    Filed 11/04/19    Page 98 of 109

11-98

1           THE COURT:  Overruled.

2     A.    I don't know that.

3     Q.    So your testimony is that the Hutus and the Tutsis got

4     along well in the university in the years leading up to the

5     genocide?

6     A.    Nothing happened.  They were all going to school and

7     studying, and no one fought with another when I was present.

8     Q.    Well, expanding even beyond when you were present, were

9     you aware of any other ethnic violence or party violence on the

12:53PM 10   campus while you were there?

11    A.    There was no fighting when I was there at the university.

12    I was inside.  Nothing happened.

13    Q.    You left the campus on April 2, 1994; is that correct?

14    A.    Yes.

15    Q.    So you weren't there during the genocide in April, May,

16    June and July?

17    A.    I wasn't there.

18    Q.    And you have no knowledge of what Mr. Teganya was doing at

19    the hospital in April, May, June and July of 1994?

12:53PM 20   A.    I couldn't not know that because I wasn't present.

21    Q.    And then you were arrested again in Butare in 1994; isn't

22    that correct?  Actually, I believe it was 1998.

23    A.    I was detained in 1998.

24    Q.    And in prison for ten years; is that right?

25    A.    Yes.

**J.A. 1239**

Case: 19-1689    Document: 00117615537    Page: 555    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 99 of 109

11-99

```
 1    Q.   And that was at the Karabunda prison?

 2    A.   Yes.

 3    Q.   And while you were in prison, you told other inmates that

 4    they shouldn't confess to crimes, correct?

 5    A.   That's not possible.

 6    Q.   It's not possible?

 7    A.   It's not possible.

 8    Q.   In fact, you said that the Inkotanyi killed Hutus in

 9    Kibeho, correct?

12:55PM 10           THE INTERPRETER:  In what?

11    Q.   You said the Inkotanyi killed Hutus in Kibeho?

12    A.   No.

13    Q.   And you told other inmates, "Why should we admit to

14    killing Tutsis?"

15    A.   Would you repeat, please.

16    Q.   Sure.  You told other inmates, "Why should we admit to

17    killing Tutsis?"

18    A.   I never said that.  Never.

19    Q.   You never tried to convince inmates in Karabunda Prison

12:55PM 20    not to confess to killing Tutsis?

21           MR. LAUER:  Objection.

22           THE COURT:  Overruled.

23    A.   I never said that.

24    Q.   In fact, your brother was in the armed forces, was he not?

25    A.   Yes.  I have my older brother who was in the military,
```

Case: 19-1689     Document: 00117615537     Page: 556     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 100 of 109

11-100

| | |
|---|---|
| 1 | yes. |
| 2 | Q.    And he was shot down by the RPF; is that correct? |
| 3 | A.    He was killed October 7, 1990.  He was a pilot, and a jet |
| 4 | came down. |
| 5 | Q.    He was shot down by the RPF; isn't that correct? |
| 6 | A.    Yes. |
| 7 | Q.    Because he was a member of the military, the Rwandan Army, |
| 8 | the Hutu Rwandan Army, correct? |
| 9 | A.    Yes. |
| 12:57PM 10 | Q.    When you traveled to the United States to come testify |
| 11 | here today, you had to fill out a visa application; isn't that |
| 12 | right? |
| 13 | A.    I have a passport for my country, and I got a visa. |
| 14 | Q.    You applied for a visa online with the United States? |
| 15 | A.    Yes. |
| 16 | Q.    As part of that visa process you were asked a number of |
| 17 | questions.  Do you remember that? |
| 18 | A.    Yes. |
| 19 | Q.    It was important to be truthful in those questions; isn't |
| 12:57PM 20 | it? |
| 21 | A.    You called me to come and give testimony as a process. |
| 22 | Q.    That wasn't my question.  My question was, when you filled |
| 23 | out your visa application online, you knew that it was |
| 24 | important to be truthful when you answered those questions? |
| 25 | A.    Yes. |

J.A. 1241

Case: 19-1689  Document: 00117615533  Page: 557  Date Filed: 07/16/2020  Entry ID: 6352983
Case 1:17-cr-10292-FDS  Document 205  Filed 11/04/19  Page 101 of 109

11-101

         1    Q.   You understood that it was important for you to be

         2    truthful to those questions on the online visa application

         3    form?

         4    A.   Yes.

         5    Q.   And one of those questions asked whether or not you'd been

         6    arrested.  Do you remember that question?

         7    A.   Yes.

         8    Q.   It specifically says, have you ever been arrested or

         9    convicted for any offense or crime even though subject of a

12:59PM 10    pardon, amnesty or other similar action?  Do you remember that

        11    question?

        12    A.   I don't remember that.  It was too much.  It was too much.

        13    I was clicking, clicking and with my little English.

        14    Q.   Well, I can show it to you.  Would you like to see it?  I

        15    can show it to you.

        16    A.   Yes.  Show me, please.

        17         MR. VARGHESE:  Your Honor, may I approach?

        18         THE COURT:  Yes.

        19    Q.   This is your visa application form that you submitted

01:00PM 20    online, correct?

        21    A.   Yes.

        22    Q.   Do you see your name?

        23    A.   Yes.

        24    Q.   And do you see your picture?

        25    A.   Yes.

# J.A. 1242

1    Q.    Do you see the question right there, "Have you ever been

2    arrested or convicted for any crime?"  Do you see that

3    question?

4    A.    I see it.

5    Q.    What was your answer?

6    A.    I said "Yes."

7    Q.    Do you see that right there?

8    A.    Yes, I see it.

9    Q.    That says "No," right?

01:01PM 10   A.    Maybe it was a mistake.  From a long time I said I was

11   detained.  I said a long time.

12   Q.    So your testimony is that you meant to write "Yes" on the

13   visa application form to that question?

14   A.    Yes.

15   Q.    Because if you had written "No" on this visa application

16   form, that would be a lie?

17   A.    No.  It won't be, because I said it a long time from those

18   who are doing investigation, I told them.

19   Q.    I'm not asking about other people you might have told.

01:02PM 20   I'm asking you about this form, the visa form that you

21   submitted online to the U.S. Embassy.  If you answered no to

22   the question, "Have you been arrested," that would be a lie?

23   A.    Maybe I didn't understand it well.  But I have been

24   jailed.

25              THE COURT:  How much more do you have, Mr. Varghese?

Case: 19-1689    Document: 00117615537    Page: 559    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 103 of 109

11-103

1          MR. VARGHESE:  Not much, your Honor, I just have a

2     couple minutes.  But if you'd like to break...

3          THE COURT:  Is your redirect more than five minutes?

4          MR. LAUER:  No.

5          THE COURT:  Okay.  Why don't we see if we can wrap up

6     this witness.  Is that okay, ladies and gentlemen?

7          THE JURORS:  Yes.

8     Q.   Last question on this visa application form.  You filled

9     it out, correct?

01:03PM 10    A.   Yes.

11    Q.   You went online, you clicked it, you did everything

12    yourself?

13    A.   Somebody helped me.  I could not manage to do it.  My

14    English was not -- wasn't enough to do that.

15    Q.   How were you contacted by Mr. Teganya and his legal team?

16    A.   Dick Munyeshuli is the one who called me earlier, first.

17    Q.   And what did he tell you?

18         MR. LAUER:  Objection.

19         THE COURT:  Overruled.

01:04PM 20    Q.   What did he tell you?

21    A.   Asked me if I know Teganya.

22    Q.   And you talked to him.  How many times did you talk to

23    Dick Prudence Munyeshuli?

24    A.   He came to see me two times.

25    Q.   And you talked to him both times?

        1    A.    Yes, we did.  We did talk.  But after that I could not

        2    know where this person is.

        3    Q.    During your conversations with him, did he tell you about

        4    what to say?

        5    A.    He just asked me if I know Teganya.  That's it.  If I went

        6    to school together with him.

        7    Q.    Did you give him information about Diogene and how to get

        8    ahold of him?

        9    A.    No.

01:05PM 10    Q.    Did he offer you any money for your testimony?

       11    A.    No.  No.

       12    Q.    Mr. Barinda, after your testimony here today, you're going

       13    to be returning to Rwanda; isn't that correct?

       14    A.    Yes, very much.

       15    Q.    And there's nothing -- you're not afraid of returning to

       16    Rwanda because of your testimony here today, are you?

       17    A.    No.

       18    Q.    Mr. Barinda, I just have one final question.  Is it your

       19    testimony here today that Mr. Teganya was not a member of MRND?

01:06PM 20    A.    I can repeat it.  I have never seen him in MRND

       21    activities.

       22    Q.    Thank you, Mr. Barinda.

       23            THE COURT:  All right.  Redirect.

       24

       25

Case: 19-1689    Document: 00117615537    Page: 561    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 105 of 109

11-105

                              REDIRECT EXAMINATION

        BY MR. LAUER:

        Q.   Good afternoon again.  I just want to clarify the time

        period that you were at the university.  You said you entered

        the university in 1989.

        A.   Yes.

        Q.   Were you there for one academic year, from 1989 until

        1990?

        A.   Yes.

01:07PM  Q.   And at the conclusion of that school year, were there no

        classes the next year, from 1990 until 1991?

        A.   There was a period where there were no schools.

        Q.   And was that due to the war?

        A.   Yes.

        Q.   Did you come back to school after that period where the

        school had been closed?

        A.   Yes.

        Q.   And that would have been your second year?

        A.   Yes.

01:08PM  Q.   In your second year, did you repeat medical school, did

        you repeat the first year?

        A.   Would you repeat the question.

        Q.   I'll try and ask this in a different way.

                Between 1989 and 1994, were you in the medical school

        when it was operating?

Case: 19-1689   Document: 00147615537   Page: 562   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 205   Filed 11/04/19   Page 106 of 109

11-106

1    A.    Yes.

2    Q.    Do you recall when Mr. Teganya entered the medical school?

3    Did Mr. Teganya enter the medical school during your first year

4    or at a later point?

5    A.    I was ahead of them.

6    Q.    Okay.  And at some point did you end up in the same class?

7    A.    Yes.

8    Q.    For how long were you in the same class as Mr. Teganya?

9    A.    One year, and those months.

01:09PM 10   Q.    When you say "those months," are you referring to the time

11   period before the genocide?

12   A.    Yes, before the genocide.

13   Q.    And would that have been from October until April?

14   A.    Yes.

15         MR. LAUER:  No further questions.  Thank you.

16         THE COURT:  Any recross?

17         MR. VARGHESE:  No, your Honor.

18         THE COURT:  All right.  Thank you.  Ladies and

19   gentlemen, thank you for letting us wrap up this witness today.

01:10PM 20         One thing I am contemplating doing after consulting

21   with the lawyers is next week maybe having an all-day session

22   Monday or Tuesday, that's April 1 or April 2, conceivably even

23   both depending on where we are.  Can you think -- think about

24   that.  I'll ask you tomorrow morning when we reconvene whether

25   that would cause you any hardship or whatever.  Just trying to

# J.A. 1247

1    move the trial along.  Again, we're not going to have trial

2    Thursday and Friday of this week.  Give some thought to that

3    and let me know if you have any problem with either or both of

4    those days.  So we can think about trying to move it along.

5         Thank you again.  Remember my instructions not to

6    discuss the case among yourselves or with anyone else or read

7    or listen to anything about the case and we'll see you tomorrow

8    morning at 9:00.

9         THE CLERK:  All rise.

01:11PM 10    (Jury exits.)

11         THE COURT:  Do I understand that we expect to have

12    another 25 or 30 or 35 witnesses sort of along these lines?  Is

13    that the idea here?

14         MR. LAUER:  It may not be 30.  It will certainly be

15    more than ten.

16         THE COURT:  All right.  Let me exhort both sets of

17    counsel.  If we can the tighten this up even a little bit.

18    Tightening it up five or six minutes per hour, three minutes or

19    six minutes per hour, which is five or 10 percent, we could

01:12PM 20    conceivably shorten this entire case by a day.  And that means,

21    you know, cleaner, crisper questions, less repetition, maybe

22    cut out some things that are marginally relevant or whatever.

23    I'm not going to tell you how to try the case, but it would be

24    desirable to expedite this somewhat at least.

25         And it begins with clean, crisp questions that are

J.A. 1248

1    easier for the translator to translate and, therefore, the

2    witness to understand.  So I beg you to give some thought to

3    that.

4          Otherwise, I will see you tomorrow morning at 8:30,

5    unless there's anything else we need to take up.  Okay.  Thank

6    you.

7          THE CLERK:  All rise.

8    (Court exits.)

9    (1:12 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 19-1689    Document: 00117615537    Page: 565    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 1 of 99

12-1

1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     UNITED STATES OF AMERICA,        )
                                       )
5     vs.                              )  Criminal Action
                                       )
6     JEAN LEONARD TEGANYA,            )  No. 17-10292-FDS
                        Defendant      )
7                                      )
                                       )
8                                      )

9

10    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11
                           JURY TRIAL DAY 12
12

13

14
                 John Joseph Moakley United States Courthouse
15                        Courtroom No. 2
                          One Courthouse Way
16                        Boston, MA 02210

17
                          March 26, 2019
18                          8:30 a.m.

19

20

21

22

23                        Valerie A. O'Hara
                        Official Court Reporter
24        John Joseph Moakley United States Courthouse
                  1 Courthouse Way, Room 3204
25                        Boston, MA 02210
                   E-mail: vaohara@gmail.com

Case: 19-1689   Document: 00117614537   Page: 566   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 2 of 99

12-2

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;

5
     For the Defendant:
6
             Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.

8    ALSO PRESENT:

9
     Joseph Bizimana, Interpreter

08:37AM 10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 19-1689    Document: 00117641537    Page: 567    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 3 of 99

12-3

1                              I N D E X

2   WITNESS                          DIRECT   CROSS  REDIRECT  RECROSS

3   JEAN PIERRE BALIGIRA
      By Mr. Lauer                     9              35, 38
4     By Mr. Varghese                         17                37

5   AIMABLE RWABUKUMBA
      By Mr. Lauer                    38              84
6     By Mr. Garland                          63

7   ERNEST MUVUNANDINDA
      By Mr. Lauer                    91

8

9       —

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2          THE CLERK:  All rise.  Thank you.  You may be seated.

3    Court is back in session.

4          THE COURT:  All right.  Good morning.

5          MR. GARLAND:  Good morning.

6          THE COURT:  What, if anything, do we have to talk

7    about?

8          MR. GARLAND:  Your Honor, yesterday we were talking

9    about whether it would make sense to have full days on Monday

10   or Tuesday of next week.

11         THE COURT:  Yes.

12         MR. GARLAND:  And that was certainly a suggestion that

13   I had floated, but at this point we're thinking that that might

14   not be the best way to go, and there's a reason for that, and

15   the reason is that if we go full days on Monday, for example,

16   I'm assuming that we would have somewhere between five and

17   seven witnesses that we would have to prepare for, which, of

18   course, we have to do, it's our case, we have the burden of

19   going forward and of carrying a reasonable doubt, but the issue

20   that we're facing on Sunday, this past Sunday, we got the list

21   of witnesses of who is going forward on Monday at 5:10 and

22   didn't get the discovery completed until 6:33, and then

23   yesterday we got our list of witnesses who are going on today

24   at 3:53, and then we didn't get the full discovery until 5:13,

25   which necessarily compresses our ability to prepare for that.

**J.A. 1253**

         1           If that's what we need to do, we'll obviously do it,

         2    but we're mindful that better preparation makes for a smoother

         3    questioning.

         4           THE COURT:  All right.  I think those are two

         5    different issues.  I'm not looking forward to having an all-day

         6    session that's going to look like yesterday, but we do need to

         7    get this trial over somehow, and in terms of the notice, is

         8    there any reason, Mr. Lauer, you can't provide more notice to

         9    the government, like 48 hours notice instead of 12 hours?

08:35AM 10           MR. LAUER:  It's a challenging situation for us

        11    because a number of witnesses have arrived who I have not met

        12    with, who I have not spoken with and strategically --

        13           THE COURT:  But you know who they are, right?

        14           MR. LAUER:  We do know who they are, and the

        15    government knows who they are, too.  It's not a matter of their

        16    identities not having been provided, it's a matter of us

        17    meeting them for the first time and making an assessment

        18    whether we intend to call them or not.

        19           It's something we're handling on a rolling basis due

08:35AM 20    to the nature of people coming in with very little time before

        21    they'll be presented as witnesses, so what we can represent is

        22    that we are doing our best to meet with people, you know, given

        23    our trial schedule going into one o'clock, we're meeting with

        24    witnesses in the afternoon, and we're providing notice to the

        25    government as soon as we're in a position to do so.  It's not

Case: 19-1689    Document: 00117641537    Page: 570    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 6 of 99

12-6

1    ideal but it is really the best we can do.

2            THE COURT:  What about provision of discovery on a

3    more expedited basis?  Is there any way that can be ramped up a

4    little bit?

5            MR. LAUER:  Well, it goes hand-in-hand with the

6    meeting with the witnesses and deciding who we're intending to

7    present.  I think maybe my co-counsel and I can have a

8    conversation today.  There are probably some witnesses who we

9    have more of a -- we probably will be presenting, and perhaps

08:36AM 10   that would make sense for those witnesses to provide the

11   discovery for the statements that we have earlier than, you

12   know, the afternoon before, but that's a relatively small

13   category.

14           As I said, most of these people I have not met, I have

15   not spoken to, and until I do, it's really impossible to say,

16   you know, who we will be presenting and who we will elect not

17   to present.

18           THE COURT:  Okay.  All right.  I'm not going to issue

19   any further orders at this point, but I would -- let's see if

08:37AM 20   we can't smooth this out a little bit, make this go a little

21   bit better just as a matter of courtesy, if nothing else, but

22   I'm going to leave it as it is.

23           In terms of whether we go all day Monday or Tuesday or

24   both, I want to get this case to the jury, and if we still have

25   witnesses piled up at the beginning of next week, I think

1    that's we're going to have to grind our way through it.

2         All right.  Later today I'm finally going to

3    distribute a copy of the jury instructions, which I've been

4    promising.  It's confounded me just a little bit because

5    they're so duplicative, and, of course, as criminal elements

6    often do, you have different words for the same concept, you

7    know, you have deliberately, intently, knowingly, willfully,

8    all of it basically describing the same thing in circular

9    things, but, anyway, I'm going to distribute a draft.  It's a

08:38AM 10   work in process, but at least you can see what it is I'm

11   thinking about so we can get going on it.

12         I'm assuming that the *Neff* requirement of perjury

13   requires two witnesses, if that still exists.  Does anyone have

14   a different view of that?

15         MR. GARLAND:  Well, I think it requires either two

16   witnesses.

17         THE COURT:  Or one witness.

18         MR. GARLAND:  Or one witness plus strongly

19   corroborating evidence.  Yes.

08:39AM 20         THE COURT:  It has not changed, it feels somewhat

21   antiquated, but it has not changed?

22         MR. GARLAND:  I think that's correct.  We can

23   certainly confirm that.

24         MR. LAUER:  That's our view as well.

25         THE COURT:  Okay.  Anything else?

J.A. 1256

Case: 19-1689    Document: 00117645537    Page: 573    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 8 of 99

12-8

```
 1              MR. GARLAND:  No.  I mean, once we take a look at the

 2       instructions, I think there are a couple of instructions that

 3       we were thinking about, at least in concept that have developed

 4       out of some of the issues we've seen, one of them the redacted

 5       documents that are in here, and maybe the jury should be

 6       cautioned not to speculate and some other issues as well,

 7       but...

 8              THE COURT:  Something like that I would prefer to tell

 9       them rather than have them guess, just say -- I've done this in

10       the past where we say documents are redacted for other reasons.

11       It might be personal identifiers, or, you know, irrelevant

12       information, and, you know, not conjecture about what the

13       redactions might mean or, you know, the omitted information.

14       Conceptually I'm fine with that.

15              What was redacted?  I don't remember.

16              MR. GARLAND:  The hearing transcript.

17              THE COURT:  Oh, yes.

18              MR. GARLAND:  The other thing we've done is we went

19       through the I-589, and to the extent we thought there was any

20       sort of personal identifying information that the defendant

21       wouldn't want to have about his family, we've taken that out as

22       well.  I'm trying to think if there are any others.  That might

23       be the only document that was redacted.

24              THE COURT:  Okay.

25              MR. GARLAND:  Then, as I said, there are a couple of
```

08:39AM (line 10)
08:40AM (line 20)

J.A. 1257

```
 1    other ones that we need to think about a little bit more,
 2    but...
 3              THE COURT:  What exhibit number is the transcript?
 4              MR. GARLAND:  The transcript is 3, I believe.  And you
 5    may not have the redacted one at this point, but that's the one
 6    that's in our system.
 7              THE COURT:  Mr. Lauer.
 8              MR. LAUER:  We'll certainly look at what the Court is
 9    proposing, and if there's anything that we want to bring to
10    your attention.
11              THE COURT:  All right.  Okay.  Anything else?
12              MR. GARLAND:  Not from the government.
13              MR. LAUER:  No.
14              THE COURT:  All right.  Thank you.
15              THE CLERK:  All rise.
16              (A recess was taken.)
17              THE CLERK:  All rise for the jury.
18              (JURORS ENTERED THE COURTROOM.)
19              THE COURT:  All right.  Good morning, everyone.
20    Mr. Lauer, are you ready?
21              MR. LAUER:  Yes.  Defense calls Jean Pierre Baligira.
22              JEAN PIERRE BALIGIRA, having been duly sworn by the
23    Clerk, testified as follows through the Interpreter:
24                            DIRECT EXAMINATION
25    BY MR. LAUER:
```

08:41AM (line 10)
09:02AM (line 20)

12-10

| | | |
|---|---|---|
| 1 | Q. | Good morning, sir. |
| 2 | A. | Good morning. |
| 3 | Q. | Does your name appear correctly on the screen? |
| 4 | A. | Yes. |
| 5 | Q. | Where do you live? |
| 6 | A. | Burundi. |
| 7 | Q. | Were you born in Burundi? |
| 8 | A. | No. |
| 9 | Q. | Where were you born? |
| 09:03AM 10 | A. | Rwanda. |
| 11 | Q. | Where in Rwanda are you from? |
| 12 | A. | Butare. |
| 13 | Q. | Are you employed? |
| 14 | A. | Yes. |
| 15 | Q. | What is your job? |
| 16 | A. | I'm a driver. |
| 17 | Q. | What sort of driver? |
| 18 | A. | I drive a car. |
| 19 | Q. | Do you deliver anything? |
| 09:04AM 20 | A. | Yes. |
| 21 | Q. | What do you deliver? |
| 22 | A. | I check mails from the post office. |
| 23 | Q. | I want to direct your attention to the period of time from |
| 24 | | roughly 1992 through 1994.  Were you living in Rwanda at that |
| 25 | | time? |

J.A. 1259

Case: 19-1689  Document: 00117615537  Page: 575  Date Filed: 07/16/2020  Entry ID: 6352983
Case 1:17-cr-10292-FDS  Document 206  Filed 11/04/19  Page 11 of 59

12-11

```
 1    A.    Yes.

 2          THE COURT:  I'm sorry, can I ask the interpreter to

 3    ask Mr. Baligira to speak up a little bit, maybe move the

 4    microphone a little closer.  Thank you.  Go ahead.

 5    Q.    Were you living in Rwanda in roughly 1992 through 1994?

 6    A.    Yes.

 7    Q.    Where in Rwanda were you living?

 8    A.    Butare.

 9    Q.    And did you have a job during that time?

10    A.    Yes, I work.

11    Q.    And what was your job?

12    A.    Laundry for students and cooking.

13    Q.    Were you working for the university or were you working in

14    a different way?

15    A.    I was assisting students who are renting on their own.

16    Q.    Renting outside the university campus?

17    A.    Yes, outside the campus.

18    Q.    Was there a particular residence that you worked at?

19    A.    There were houses that were next to big houses, and these

20    were rented by the students.

21    Q.    And where were those houses located?

22    A.    It was a little bit above the university campus below a

23    place called Linda.

24    Q.    How close was it to the main road?

25    A.    It was on the road.
```

09:05AM (line 10)
09:07AM (line 20)

J.A. 1260

Case: 19-1689    Document: 00117615537    Page: 576    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 12 of 59

12-12

1    Q.    What were your duties or your responsibilities working in

2    this house?

3    A.    Doing laundry and the cooking.

4    Q.    How long did you work doing laundry and cooking at this

5    residence for university students?

6    A.    From 1992 to 1984.

7    Q.    Over the course of that time, did you become familiar with

8    who was living in the residence?

9    A.    Those who lived in the house I was serving, I knew them.

09:09AM 10    Q.    And who did live in the house that you were serving?

11    A.    There were students.

12    Q.    Do you recall their names?

13    A.    Jean Marie Mbonyinshuti, Levine Nkunzimana, Eric Nshimiye,

14    Michel Nkubiri, Patrick Ndimubanzi, and there was another

15    business person who lived there, Kabalisa.

16    Q.    That Kabalisa, was he a student?

17    A.    He was a businessman, person.

18    Q.    Did you know Mr. Teganya?

19    A.    Teganya was among them.

09:10AM 20    Q.    When you say he was among them, was he also living there?

21    A.    Yes, he lived with them.

22    Q.    What was your schedule working there?  What days would you

23    work?

24    A.    The days I worked were the days in the week.

25    Q.    Was that every day?

**J.A. 1261**

Case: 19-1689     Document: 00117615537     Page: 577     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 13 of 59

12-13

```
 1    A.   Monday through Friday.  Saturday and Sunday, I would be at
 2    home.
 3    Q.   Did you live elsewhere?
 4    A.   I lived in Tumba.  It wasn't far.
 5    Q.   Would you work a full day there starting in the morning
 6    and ending at the end of the day?
 7    A.   Yes.
 8    Q.   Was part of your duties to clean the house?
 9    A.   Yes.
10    Q.   And to do laundry?
11    A.   Yes.
12          MR. LAUER:  Your Honor, may I approach the witness?
13          THE COURT:  Yes.
14    Q.   Sir, I'm going to show you some items of clothing.  First,
15    I'm showing you what's been marked as Exhibit 12.  It's a hat.
16    I'm just going to ask you to look at that and tell me if you
17    recognize that.
18    A.   I see it and I know it.
19    Q.   What do you know that to be?
20    A.   For the members of MRND.
21    Q.   Did Mr. Teganya have a hat like this in the house?
22    A.   I didn't see Teganya's.
23    Q.   Did you ever see Mr. Teganya wearing a hat like this?
24    A.   I did not see him wearing it, and the time I worked there,
25    they were at school, and at school, they were not allowed to
```

09:12AM (line 10)
09:13AM (line 20)

**J.A. 1262**

Case: 19-1689    Document: 00117615537    Page: 578    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 14 of 59

12-14

 1    put on any sign of parties.

 2    Q.   I'm going to show you a different item.  It's a scarf that

 3    has been marked as Exhibit 15.  I'm going to ask if you

 4    recognize that item as well.

 5    A.   The same.

 6    Q.   Is it also something that would be worn by MRND members?

 7    A.   Yes.

 8    Q.   Did Mr. Teganya have a scarf like this?

 9    A.   I did not see him wearing that.  At the time I was there,

09:14AM 10   he was at school, I didn't see him wearing it, and at school,

11    he didn't have it, they weren't allowed to wear it.

12    Q.   Did you ever encounter an MRND flag in Mr. Teganya's room?

13    A.   No.

14    Q.   Did anyone in Mr. Teganya's house have MRND clothing like

15    the clothing I just showed you?

16    A.   I did not see it.

17    Q.   Did you have interaction with Mr. Teganya on a regular

18    basis?

19    A.   Every day that I worked, I saw him.

09:15AM 20   Q.   Did you ever hear him expressing support for the MRND?

21    A.   Due to my status as a worker, they could not share that

22    with me or discuss that with me.

23    Q.   Did you ever hear Mr. Teganya say anything negative or

24    insulting about Tutsi people?

25    A.   I don't think it was possible because even where they were

Case: 19-1689    Document: 00117615537    Page: 579    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 15 of 59

12-15

    1    renting was a house that belongs to a Tutsi.

    2    Q.    The person who owned this house that you cleaned, he was a

    3    Tutsi?

    4    A.    Yes.

    5    Q.    Do you recall his name?

    6    A.    Mutyanganga Sixse.

    7    Q.    And how long was Mr. Teganya in his group of housemates

    8    living together in this house?

    9    A.    How long?

09:17AM 10  Q.    For how long was Mr. Teganya and his group of housemates

    11   together in that residence?

    12   A.    There were five.

    13   Q.    Starting in what year did Mr. Teganya begin living there?

    14   A.    I don't know when he started living there.  I know that I

    15   worked there from 1992 to '94, and when they were paying us,

    16   they were all putting their money together and pay me.

    17   Q.    Had he been living there for some period of time before

    18   the genocide?

    19   A.    From 1992 to '94, he lived there because he was a student,

09:18AM 20  he was going to school.

    21   Q.    I asked you some questions about the clothing associated

    22   with the MRND.  Were you a member of a political party during

    23   this period of time?

    24   A.    I was in the other party called liberal party, PL.

    25   Q.    Was that a part of the opposition?

## J.A. 1264

```
 1    A.   Yes.

 2    Q.   When the genocide began, did you continue to work at this

 3    house?

 4    A.   No.

 5    Q.   What did you do?

 6    A.   Because the student I was working for, they did not get

 7    any scholarship, so there was no money to pay me, so I had to

 8    go.

 9    Q.   I think you said you lived in Tumba.  How far away is

09:20AM 10    Tumba?

11    A.   Five kilometers.

12    Q.   Is that where you stayed during the period of the

13    genocide?

14    A.   Yes.

15    Q.   Are you familiar with someone named Jean Pierre Gasasira?

16    A.   Gasasira?

17    Q.   Gasasira.

18    A.   Yes, I know him.

19    Q.   How do you know him?

09:20AM 20    A.   I know where he was born, his father and mother.

21    Q.   Are you from the same area as Mr. Gasasira?

22    A.   We were in the same location but not very close.

23    Q.   Did you know him and his family?  Did you know

24    Mr. Gasasira and his family?

25    A.   Yes, I know his siblings and his father and mother.
```

1    Q.    During the period of the genocide, did you have any

2    contact or did you see Mr. Gasasira?

3    A.    Yes.

4    Q.    And when and where was that?

5    A.    I saw him during the genocide to a place where -- to a

6    house that belongs to Dominique.

7    Q.    And where is Dominique's house?

8    A.    It was in Tumba but in a small location called Gitwa.

9    Q.    And what did you see him doing there?  What did you see

09:23AM 10    Mr. Gasasira doing in Tumba?

11    A.    I passed by.  He was a young kid who was playing with the

12    other children when I was passing by Dominique's house.

13    Q.    Is that the only contact you had with him during the

14    genocide?

15    A.    That's the only time I saw him.

16          MR. LAUER:  Thank you, sir.  I have no further

17    questions.

18          THE COURT:  Cross.

19                    CROSS-EXAMINATION

20    BY MR. VARGHESE:

21    Q.    Good morning, sir.

22    A.    Good morning.

23    Q.    Mr. Baligira, you currently live in the country of

24    Burundi; is that correct?

25    A.    Yes.

Case: 19-1689    Document: 00117615537    Page: 582    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 206    Filed 11/04/19    Page 18 of 59

12-18

```
 1    Q.    Back in 1994, you carried a national identity card; is

 2    that correct?

 3    A.    Yes.

 4    Q.    And that card listed your ethnicity as a Hutu?

 5    A.    Yes.

 6    Q.    I want to talk about your testimony cleaning Mr. Teganya's

 7    house.  When you were first asked the question who lived in

 8    that house, you didn't say Mr. Teganya lived in that house,

 9    isn't that correct?

10    A.    I said his name.

11    Q.    And you said that you were cleaning and washing clothes,

12    and you said you were doing that every day, I believe?

13    A.    From Monday through Friday.

14    Q.    But it wasn't -- were you working there the full day?

15    A.    Yes.

16    Q.    You didn't have any other jobs?

17    A.    No.

18    Q.    Do you remember that you were interviewed by members of

19    the defense in Burundi?

20    A.    I didn't understand the question.

21    Q.    Do you remember that you were interviewed by Mr. Teganya's

22    investigator when you were in Burundi?

23    A.    Yes, I remember that.

24    Q.    Who was that investigator?

25    A.    Leopold.
```

Case: 19-1689     Document: 00117615537     Page: 583     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 19 of 59

12-19

         1    Q.   And when you were interviewed by Leopold, you said this

         2    was a part-time job; isn't that right?

         3    A.   That's what I said.

         4    Q.   And you said that you also worked as a bartender in

         5    addition to this job of cleaning and cooking in Mr. Teganya's

         6    house; isn't that right?

         7    A.   I worked at that bar.  I think it was mixed up.  I worked

         8    at the bar 1990, somebody called White Eye.  That's the owner

         9    of the bar.

09:28AM 10    Q.   You told the investigator that you worked as a bartender

        11    because the job for Mr. Teganya didn't require your continuous

        12    presence; isn't that correct?

        13    A.   Yes, Saturday and Sunday, I would go and have a part-time

        14    job.  It wasn't a full-time job.

        15    Q.   And you said after you finished your task, you were free

        16    to take on your own business since there was no work for you to

        17    do?

        18    A.   Please, would you repeat what you said.

        19    Q.   I said you told them that after you finished your tasks,

09:28AM 20    you would take on your own business because there was no work

        21    for you to do?

        22    A.   Yes, I said that.

        23    Q.   So when I asked you if you were doing any other work, you

        24    first said no.  Are you now saying that you were doing other

        25    work?

# J.A. 1268

Case: 19-1689    Document: 00117615537    Page: 584    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 206    Filed 11/04/19    Page 20 of 59

12-20

```
 1    A.    I said that was a full-time job, but the other one was
 2    just part-time jobs.
 3    Q.    And you said that you worked until 1994.  When did you
 4    stop working for Mr. Teganya and his friends?
 5    A.    When the genocide started, everything stopped, no money to
 6    pay me, and everything was stopped, and I had to go.
 7    Q.    When you were interviewed by the defense investigator, you
 8    stated that you finished working there in March of 1994; is
 9    that correct?
10    A.    I don't remember well.
11    Q.    When you stopped working there, where did Mr. Teganya and
12    his friends go?
13               MR. LAUER:  Excuse me, your Honor, we believe there's
14    a translation issue here.  If I could be heard at sidebar.
15               (THE FOLLOWING OCCURRED AT SIDEBAR:)
16               MR. LAUER:  So this is the first time we've
17    encountered this.  Our investigator is also a certified
18    Kinyarwandan interpreter, and the way that question was
19    translated was apparently off.  I don't know how the Court
20    wants to --
21               THE COURT:  How was it off?  How do you think it was
22    off?
23               MR. LAUER:  The way it was translated to the witness
24    apparently was different than the way the question was asked.
25    So, I don't know, perhaps we could ask that the question be
```

Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 21 of 59

```
 1    repeated.  If we want, we can have our investigator explain.

 2    To be honest, I was unable to get the nuance of it.

 3              THE COURT:  Okay.  I'm not sure what to do.  You can

 4    repeat the question.  Why don't we try that and take it from

 5    there.

 6              MR. WATKINS:  Can we pause for just a second to make

 7    sure that the translation is correct?

 8              THE COURT:  All right.

 9              (SIDEBAR CONFERENCE WAS CONCLUDED)

09:32AM 10        THE COURT:  Let's try asking the question again or a

11    version of the question.

12    Q.   When you ended your employment at the house, where did the

13    students go?

14    A.   I don't know where they went.

15    Q.   You said you cooked meals for the students in that house;

16    is that correct?

17    A.   Yes.

18    Q.   And so the students were eating in the house.  How many

19    meals did you cook for them a day?

09:33AM 20   A.   Lunch and dinner.

21    Q.   So they would come back to the house to eat at the house?

22    A.   Yes.

23    Q.   So they weren't eating at the university cafeteria?

24    A.   No.

25    Q.   How far was this house from the hospital?  How long would
```

1    it take to walk to the hospital?

2    A.    Like 200 meters, 200 or 300 meters.

3    Q.    How long would it take to walk to the hospital?

4    A.    It doesn't go beyond 10 minutes.

5    Q.    You testified that you didn't see Mr. Teganya wearing the

6    hat and the scarf; is that correct?

7    A.    I did not see him.

8    Q.    But you also testified that you wouldn't see him for most

9    of the day?

09:35AM 10    A.    I saw him going to school and coming back from the school.

11    At school, it was prohibited to wear those things.

12    Q.    So if he was a member of MRND and wearing those clothing,

13    you wouldn't know that because you weren't there when he was

14    wearing them?

15    A.    I did not see him wearing it.  We just met for work I was

16    doing.

17    Q.    And as you just testified, you weren't permitted to wear

18    your MRND clothing when you went to and from school; is that

19    correct?

09:36AM 20    A.    Yes.

21    Q.    You also testified that Mr. Teganya didn't talk to you

22    about politics; isn't that correct?

23    A.    About what, please?

24    Q.    Politics.

25    A.    We could not have been talking of other things, I was just

```
 1   their servant.  They could not tell me about that.

 2   Q.   So you have no idea what Mr. Teganya's political views

 3   are?

 4   A.   No.  I was just their servant so I don't know.

 5   Q.   You also testified that you didn't have any conversation

 6   with Mr. Teganya about his anti-Tutsi views; is that correct?

 7   A.   I say that wasn't true because Teganya's house where he

 8   was renting belonged to a Tutsi.

 9   Q.   So you're assuming he didn't have anti-Tutsi views?

10   A.   That's what I think, and I never heard it from him.

11   Q.   Sure.  But you were the servant, he wasn't talking to you

12   about those things; isn't that correct?

13   A.   No.

14   Q.   And if he attended rallies, you wouldn't know about it?

15   A.   I could not know that.

16   Q.   And if he went to meetings, you wouldn't know about it?

17   A.   No.

18   Q.   And if he was saying anti-Tutsi things to other members of

19   the medical school, you wouldn't know that either?

20   A.   Even that I wouldn't know that.

21   Q.   And you wouldn't know if he was training in the evenings

22   on Tuesdays and Fridays as part of the Interahamwe?

23   A.   No.

24   Q.   I want to talk to you about your time during the genocide.

25   You said that you returned to Tumba; is that correct?
```

J.A. 1272

1    A.    Yes.

2    Q.    And the genocide came to Tumba, it was very strong, it was

3    very fierce, right?

4    A.    Yes.

5    Q.    During the genocide, you never went to the hospital, did

6    you?

7    A.    No.

8    Q.    So you have no idea what happened at the hospital in

9    April, May, June and July of 1994?

09:39AM 10    A.    I could not get there because the military were securing

11    that place, and no one was going there, but I was going to

12    Butare.

13    Q.    So, you, during the genocide, were free to roam around

14    Butare?

15    A.    Repeat, please.

16    Q.    During the genocide, you would roam around Butare?

17    A.    Yes, I could go to Butare.  People knew me.  There was not

18    a problem.

19    Q.    What would happen when you would go to the roadblocks?

09:40AM 20    A.    When you find someone at the roadblock, and this person

21    doesn't know you, they ask you to produce your I.D.

22    Q.    And you were okay because you said you were a Hutu?

23    A.    No.

24    Q.    So how would you get passed the roadblock?

25    A.    Most of the people knew me, and when they asked me for an

Case: 19-1689    Document: 00117615537    Page: 589    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 206    Filed 11/04/19    Page 25 of 59

12-25

1    I.D., I would just show it to them, then I would continue.

2    Q.    And there were many roadblocks during this time?

3    A.    Yes.

4    Q.    In your interview with the defense, you told them that

5    many of the genocide accusers are lying about what happened at

6    the hospital; isn't that correct?

7    A.    I don't remember that I say that, but if you tell me the

8    names, I would tell you who are lying.

9    Q.    And you know who are lying even though you never actually

09:42AM 10    went to the hospital?

11    A.    Those who are known who made it to profession.

12    Q.    I'm sorry, can you repeat that answer?

13    A.    There are those who are known, they made it a profession.

14    Q.    A profession to lie about what happened at the hospital;

15    is that your testimony?

16    A.    Yes.

17    Q.    And, in fact, you told the investigators when you met with

18    them that you believed that Mr. Gasasira was lying about what

19    happened at the hospital; isn't that right?

09:43AM 20    A.    Yes, because Gasasira never went to the hospital.

21    Q.    And you're saying that even though you just testified you

22    saw him once from April to July of 1994; is that correct?

23    A.    Yes.

24    Q.    You saw him one time on a single occasion playing with

25    kids; is that correct?

1    A.    Yes.

2    Q.    And because of that, you told the investigators you think

3    he didn't make it to the hospital; isn't that correct?

4    A.    Yes.

5    Q.    You also told the defense that you believe hundreds or

6    thousands of Tutsis survived at the hospital; isn't that

7    correct?

8    A.    Hundreds or thousands?

9    Q.    Hundreds or thousands of Tutsis survived at the hospital?

09:44AM 10    A.    I don't know that.  I didn't go to the hospital.

11    Q.    Do you recall telling the investigators hundreds or

12    thousands of Tutsis were still at the hospital and survived?

13    A.    I did not say hundreds or thousands, but I know there are

14    people who survived, and they are alive today.

15    Q.    Do you believe there was a genocide that occurred at the

16    hospital?

17    A.    I don't -- maybe the question is not asked the way I can

18    understand it.

19    Q.    Do you believe that there was a genocide that occurred at

09:46AM 20    the hospital?

21    A.    I don't know.

22    Q.    You don't know that there were hundreds of Tutsis killed

23    at the hospital in Butare?

24            MR. LAUER:  Objection.

25            THE COURT:  I'll sustain it in that form.  He said he

```
 1    wasn't there.

 2    Q.   Do you believe that there were hundreds of Tutsis killed

 3    at the hospital in Butare?

 4              MR. LAUER:  Objection.

 5              THE COURT:  I'll allow that.

 6    A.   I don't know that.  Those who say that they survived,

 7    those were there.  I wasn't there.

 8    Q.   When you were interviewed by the defense, you told them

 9    you hadn't been accused of any crime in Rwanda; isn't that what

10    you told them?

11    A.   Yes.

12    Q.   That wasn't true, was it?

13    A.   It's true.

14    Q.   Following the genocide, you were arrested and held in

15    prison; isn't that right?

16    A.   No, I was never jailed.

17    Q.   You were never jailed in Karabunda?

18    A.   No.

19    Q.   Held there until 2007?

20    A.   I left Rwanda in 2009.

21    Q.   And you were held in prison until 2007; isn't that

22    correct?

23    A.   I never been in a prison even one day.

24    Q.   You were held in Block 3 of that prison?

25              MR. LAUER:  Objection.
```

J.A. 1276

12-28

```
             1              THE COURT:  Overruled.
             2   A.    I have never been in prison, even one day.
             3   Q.    Your two brothers were held there as well in Karubanda
             4   Prison; isn't that correct?
             5   A.    I don't have two siblings.
             6   Q.    You have a brother named Pascal Niyonzima?
             7   A.    One.
             8   Q.    And he was convicted of genocide crimes in Gacaca, right?
             9   A.    That's not how I see it.
    09:49AM 10   Q.    He was convicted of killing Tutsis in the Gacaca process;
            11   isn't that correct?
            12   A.    Would you give me time to explain that?
            13   Q.    I'm just asking a question.  Yes or no.  He was convicted
            14   in Gacaca for killing Tutsis; isn't that correct?
            15   A.    Yes.
            16   Q.    And he was sentenced to life in prison, and he's being
            17   held at Karabunda Prison; isn't that correct?
            18   A.    Yes.
            19   Q.    And you testified on his behalf because you believed he
    09:50AM 20   was framed; isn't that correct?
            21   A.    He was --
            22   Q.    Framed?
            23   A.    Yes.
            24   Q.    You also know an individual Charles Gashirabake?
            25   A.    Gashirabake?
```

# J.A. 1277

Case: 19-1689    Document: 00117615537    Page: 593    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 29 of 59

12-29

1    Q.    Gashirabake?

2    A.    Yes, I know him.

3    Q.    And you're related to him?

4    A.    None.

5    Q.    And he was also convicted of genocide crimes?

6    A.    He accepted the crime.  He was used to accuse my brother,

7    and what he did, he put it on him.

8    Q.    And your father as well was accused of genocide crimes;

9    isn't that right?

09:52AM 10    A.    That's a lie.

11    Q.    Well, he died during the genocide, isn't that correct, in

12    Tumba?

13    A.    Yes.

14    Q.    He was killed by the RPF when they came and liberated that

15    town, right?

16    A.    Yes.

17    Q.    And he was alleged to have committed genocide crimes;

18    isn't that correct?

19    A.    No.

09:52AM 20    Q.    You told the defense that you had to appear at Gacaca for

21    crimes committed by your father; isn't that correct?

22    A.    It wasn't for Gacaca crimes, it was for the robbery,

23    somebody who had a boutique, then he left, and they said that

24    he stole things.

25    Q.    He was looting, he was accused of looting during the

Case: 19-1689    Document: 00147615537    Page: 594    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 206    Filed 11/04/19    Page 30 of 59

12-30

1    genocide; isn't that correct?

2    A.    That's how they call it, but somebody who was renting a

3    house, and they left things inside there.  That was not

4    stealing.

5    Q.    Because it was a Tutsi house; isn't that correct?

6    A.    The house was my father's house.  The Tutsi was one who

7    was renting.

8    Q.    After -- I want to ask you a couple of questions about why

9    you live in Burundi.  You told the defense that you had to flee

09:54AM 10    because you started to face problems.  What problems were you

11    facing?

12    A.    The first is the one that you just said that I was going

13    to respond to a case of my father, but my father died before

14    any looting happened because the house was left closed, and he

15    died before they looted the house, and I won the case, by the

16    way.

17    Q.    So if you won the case, why did you flee?

18    A.    Another case came up for my brother, I requested it to be

19    heard in a court for those that were accusing him.  They say

09:56AM 20    that he killed two people, Martha and Kanyabugoyi, that he

21    undressed them and put them in a pit.  The reason I was asking

22    to be heard, to win, they moved him from that pit.  They were

23    clothed, they had clothes on them.

24    Q.    I'm not asking you about what your brother has been

25    convicted of.  I'm asking you about the new charges.  There are

**J.A. 1279**

         1    new charges that stemmed against you; isn't that right?

         2             THE INTERPRETER:  He's repeating.

         3    Q.   Sorry, what was the answer?

         4             THE INTERPRETER:  The interpreter wants this witness

         5    to repeat what he said.

         6             THE COURT:  Okay.

         7             THE INTERPRETER:  Thank you.

         8    A.   I asked the Court how will -- how did he kill them and

         9    remove their clothes and put them in the pit.

09:58AM 10    Q.   Let me stop you there.  I'm not asking you about your

        11    brother's murders, I'm asking about the current charges that

        12    were levied against you that caused you to flee.

        13    A.   You asked me why I fled.

        14    Q.   I'm asking about the current charges that you were facing,

        15    which is why you fled?

        16    A.   There's no crime that I was accused of.  The reason was

        17    that I asked those questions why, how that somebody killed

        18    someone and put it in a pit naked, did he go back in the pit

        19    and clothed them?

09:59AM 20    Q.   And so by asking that questions, that's what caused you to

        21    flee to Burundi and live there ever since 2009?

        22    A.   Yes.

        23    Q.   Are you familiar with a woman named Nyirandugu?

        24    A.   Nyirandugu.

        25    Q.   Who is she?

Case: 19-1689    Document: 00117615537    Page: 596    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 32 of 59

12-32

```
 1    A.    She's one of those who lies, and they made it a

 2    profession.

 3    Q.    She accused you of raping her; isn't that right?

 4    A.    There's no such crime that I was accused of.

 5    Q.    And she works for Gasasira, she worked for the Gasasira

 6    family; isn't that right?

 7    A.    Again?

 8    Q.    She worked as a house girl for the Gasasira family?

 9    A.    Gasasira never had a house.

10    Q.    And that's why you fled to Burundi; isn't that correct?

11    A.    I did not understand the question.

12    Q.    And that's why you fled to Burundi and have been living

13    there since 2009?

14    A.    The reason I fled to Burundi is that question I asked the

15    Court, it is not for that Nyirandugu.

16    Q.    So you said that Nyirandugu I think you said she was a

17    liar.  What was she lying about?

18    A.    It's not just her alone, it's something people do every

19    day.  I wasn't the one, the target to be accused, but my

20    brother was the target to be accused, and they changed it, my

21    brother was accused by someone else.

22    Q.    You testified already that you testified in Gacaca on

23    behalf of your brother; is that correct?

24    A.    It's a question I asked, it's not testimony I gave.

25    Q.    You also testified in Gacaca on behalf of
```

10:00AM 10

10:02AM 20

J.A. 1281

Case: 19-1689    Document: 00117615537    Page: 597    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 33 of 59

12-33

1    Dr. Ndindabahizi who was accused of looting in the genocide?

2    A.    Do you know the name correctly?

3    Q.    Ndindabahizi?

4    A.    I know Ndindabahizi, but I don't know the case that has

5    happened with him.

6    Q.    You also were flown to Arusha, and you testified at the

7    ICTR on behalf of the genocide suspect; isn't that correct?

8           MR. LAUER:  Objection, your Honor.  Can we be seen at

9    sidebar?

10:03AM 10           THE COURT:  All right.

11           (THE FOLLOWING OCCURRED AT SIDEBAR:)

12           MR. LAUER:  So he did, this witness did testify in

13    Arusha, and he had a preserved status.  I don't know if the

14    question is going to ask him what his identity was.  He can be

15    cross-examined about the subject.

16           THE COURT:  Meaning he testified under a pseudo?

17           MR. VARGHESE:  We're not getting into anything more

18    than he testified at Arusha.

19           MR. LAUER:  Okay.

10:04AM 20           THE COURT:  All right.

21           MR. LAUER:  Is that a problem?

22           THE COURT:  I mean, how does it go to his credibility,

23    just simply that he testified?

24           MR. VARGHESE:  He testified on behalf of the genocide

25    suspect.  He testified on behalf of the genocide suspect.

1        THE COURT:  You're not going any farther than that?

2        MR. VARGHESE:  No.  We'd just note, your Honor, that

3    they cross-examined one of our witnesses who had a protected

4    identity in the ICTR transcript.

5        THE COURT:  I'll allow it based on those

6    representations.

7        (SIDEBAR CONFERENCE WAS CONCLUDED)

8        THE COURT:  Go ahead, Mr. Varghese.

9        MR. VARGHESE:  Thank you, your Honor.

10:05AM 10   Q.   You were flown to Arusha and testified at the ICTR on

11   behalf of a genocide suspect; isn't that correct?

12   A.   Yes.

13   Q.   And he was accused of a number of crimes, including

14   murder, abduction and rape during the genocide?

15       MR. LAUER:  Objection, your Honor.

16       THE COURT:  I'll allow this question.  Overruled.

17   Q.   Sorry, and that suspect or that defendant was accused of a

18   number of crimes, including, murder, abduction and rape; isn't

19   that correct?

10:06AM 20   A.   I don't know the name of that person, I don't say the name

21   of that person.

22   Q.   You don't remember who the defendant was?

23   A.   Is it me who should say the name?

24       THE COURT:  Why don't we move on.  Ladies and

25   gentlemen, as I understand it, this International Criminal

J.A. 1283

Case: 19-1689    Document: 00117615537    Page: 599    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 206    Filed 11/04/19    Page 35 of 59

12-35

1    Tribunal concerning Rwanda often would have witnesses testify

2    under aliases or some sort of name disguise, and so I think

3    we're pretty far afield, and I think to honor that, why don't

4    we move on.

5         MR. VARGHESE:  That's fine, your Honor.

6    Q.   Mr. Baligira, in Burundi, are you part of a group called

7    the Imbonerakure?

8    A.   Excuse me.

9    Q.   Imbonerakure?

10   A.   Imbonerakure, no.

11   Q.   You're not part of that group?

12   A.   No.

13   Q.   It's an armed Hutu militia group, you have no

14   participation in that?

15   A.   No.

16        MR. VARGHESE:  Thank you, Mr. Baligira, I have nothing

17   further.

18        THE COURT:  Redirect.

19                    REDIRECT EXAMINATION

20   BY MR. LAUER:

21   Q.   Good morning again.

22   A.   Good morning.

23   Q.   You were asked a lot of questions about where you've

24   testified and why you live in Burundi.  Why did you go to

25   Burundi?

```
         1    A.    Because of my safety.

         2    Q.    Why were you afraid of your safety?

         3    A.    I explained it's because of those cases have been going

         4    on.

         5    Q.    And what were you afraid might happen to you?

         6    A.    It's not just a fear, I was informed that I could be

         7    killed.

         8    Q.    And how were you informed of that?

         9    A.    Jean D'Amour, he's a cousin of those who are accusing my

10:10AM 10    brother.

        11    Q.    And what did he tell you?

        12    A.    Because of what I said in court, I said what was in court,

        13    and no one said anything about it, they accused me of twisting

        14    the case.

        15    Q.    And what did he say might happen?

        16    A.    He told me that I can be killed.

        17    Q.    And what did you do after learning that?

        18    A.    I left, I went to Burundi.

        19    Q.    At the time you went to Burundi, were you accused of

10:11AM 20    anything?

        21    A.    They did not accuse me of anything because I left, and the

        22    Gacaca gave me a paper to say that I don't have any crime that

        23    I'm accused of.

        24    Q.    When did you leave to go to Burundi?

        25    A.    2009.
```

J.A. 1285

```
 1    Q.   Have you been back to Rwanda since then?

 2    A.   No.

 3              MR. LAUER:  Thank you, sir.

 4              MR. VARGHESE:  Just briefly, your Honor.

 5                        RECROSS-EXAMINATION

 6    BY MR. VARGHESE:

 7    Q.   So you got a paper from Gacaca; that's your testimony?

 8    A.   Repeat, please.

 9    Q.   You had a Gacaca case against you?

10    A.   No.

11    Q.   But you just testified that you got a paper from Gacaca?

12    A.   Yes, I got it.

13    Q.   So the Gacaca court gave you a piece of paper even though

14    there was no court case against you?  It's a yes or no

15    question.  The Gacaca court gave you a piece of paper even

16    though there's no court case against you?

17              MR. LAUER:  Objection.

18              THE COURT:  Rephrase.

19    Q.   You obtained a paper from the Gacaca court even though

20    there was no case against you?  Is that your testimony?  Yes or

21    no.

22    A.   Yes.

23              MR. VARGHESE:  Thank you, sir.

24              MR. LAUER:  If I could, your Honor?

25              MR. VARGHESE:  Your Honor, we would object to
```

10:12AM (line 10)
10:13AM (line 20)

Case: 19-1689    Document: 00117615537    Page: 602    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 38 of 59

12-38

```
 1    additional re-redirect.
 2            MR. LAUER:  I have one question, your Honor.
 3            THE COURT:  All right.  I'll give you one question and
 4    I'm going to allow re=recross.  Go ahead.
 5                    REDIRECT EXAMINATION
 6    BY MR. LAUER:
 7    Q.   Sir, the paper that you received, was it a charge or did
 8    it say something else?  The paper you received from Gacaca,
 9    what did it say?
10    A.   It's a paper they give you saying that you don't have any
11    case in Gacaca, there's nothing that you are accused of in
12    Gacaca.
13            MR. LAUER:  Thank you.
14            THE COURT:  All right.
15            MR. VARGHESE:  No, your Honor, thanks.
16            THE COURT:  Thank you.  That will be all.
17            AIMABLE RWABUKUMBA, having been duly sworn by the
18    Clerk, testified as follows through the Interpreter:
19                    DIRECT EXAMINATION
20    BY MR. LAUER:
21    Q.   Good morning.
22    A.   Good morning.
23    Q.   Does your name appear correctly on the screen in front of
24    you?
25    A.   That's true.
```

J.A. 1287

```
 1    Q.   Mr. Rwabukumba, where do you live?

 2    A.   France.

 3    Q.   Are you French by birth?

 4    A.   I was born in Rwanda.

 5    Q.   And where in Rwanda were you from?

 6    A.   Ruhengeri.

 7    Q.   What do you do for work?

 8    A.   I work in the health, I don't know what they say in

 9    Rwanda.

10    Q.   What is your job?

11         THE INTERPRETER:  Your Honor, I'd like him to say in

12    Kinyarwandan, it would be easier to translate.

13         THE COURT:  Go ahead.

14    A.   I have workers, nurses, doctors that I'm responsible of.

15    Q.   Are you a doctor yourself?

16    A.   Yes.

17    Q.   Do you work in a hospital?

18    A.   Yes.

19    Q.   Before becoming a doctor, did you attend university?

20    A.   Yes.

21    Q.   Where did you attend university?

22    A.   Butare.

23    Q.   When did you enter the university in Butare?

24    A.   1991.

25    Q.   Do you know Mr. Teganya?
```

```
 1    A.   Yes.

 2    Q.   What was your relationship to Mr. Teganya when you were in

 3    medical school?

 4    A.   We were in the same school.  I was the head of the school.

 5    We did studies together.

 6    Q.   You mentioned that you were the head of the school.  What

 7    do you mean by that?  Is that a position that you held?

 8    A.   I was a representative of the class.

 9    Q.   A representative of the class.  What did that entail?

10    A.   Yes, I was mediator between the students and the faculty.

11    The professors would give me papers, then I would give them to

12    the students with the materials for learning, I would give them

13    to the students.

14    Q.   During the time period you were a student at the

15    university, did you have an identity card?

16    A.   Yes, I did.

17    Q.   And what ethnicity was listed on your identity card?

18    A.   My name.

19    Q.   Did it list whether you were a Hutu or Tutsi?

20    A.   It was written that I'm a Hutu.

21    Q.   Was that true?

22    A.   No.  I'm a Tutsi.

23    Q.   Are you, in fact, a Tutsi?

24    A.   It's true.

25    Q.   Why did you have an identification card that listed your
```

(line 10)
(line 20)

J.A. 1289

```
 1   ethnicity as Hutu if you were in fact Tutsi?

 2   A.   At that time the Tutsi had bad life.  To be a Tutsi at

 3   that time was like a crime.

 4   Q.   And did you -- were you careful about who knew that you

 5   were a Tutsi?

 6   A.   Yes, I was.  I could have had problems if anybody knew

 7   that I'm a Tutsi.

 8   Q.   Did any of your medical school classmates know that you

 9   were a Tutsi?

10   A.   They did know.

11   Q.   Who in particular?

12        THE COURT:  I thought he said they did not know.  You

13   better clear that up.

14        MR. LAUER:  Okay.  I'm sorry.

15   Q.   Let me go back.  Were there some students who knew your

16   true ethnicity?

17   A.   Yes, they did.

18   Q.   Did you tell that to every student and every classmate

19   that you had?

20   A.   No, I did not tell them but there are those who knew me.

21   Q.   And who were those who knew that your ethnicity were

22   Tutsi?

23   A.   Jean Leonard knew it.

24   Q.   Why did you tell him that?

25   A.   I did not tell him.
```

Case: 19-1689    Document: 00117615537    Page: 606    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 42 of 59

12-42

1    Q.   How did he know?

2    A.   There are people who knew, and they knew me.

3    Q.   Did you tell other students in your medical school class

4    about your ethnicity?

5    A.   No.  I could not tell them.  I could not even say it at

6    all.

7    Q.   What was the political environment during the time that

8    you were a student?

9    A.   When I was a student in 1991, that is when the multi-party

10:24AM 10   system came.  Things were difficult.

11   Q.   Difficult in what way?

12   A.   There are those who were in the party that was a unique

13   party, and there are other parties that were created a new

14   position.

15           THE COURT:  Let me ask, I think he's testifying both

16   in French and Kinyarwandan.

17           THE INTERPRETER:  Yes, some French, there are some

18   french words that are coming up.

19           THE COURT:  French words, but his testimony is mostly

10:25AM 20   Kinyarwandan?

21           THE INTERPRETER:  Yes, it is.

22           THE COURT:  Okay.  Go ahead.

23           THE INTERPRETER:  Your Honor, that's why I ask him to

24   continue in Kinyarwandan, but there are some words in French

25   that are coming up.

Case: 19-1689    Document: 00117615537    Page: 607    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 43 of 59

12-43

```
 1              THE COURT:  Okay.  Go ahead.
 2    Q.   So I had asked you what the political environment was
 3    like, and you were talking about the multi-party system.  Was
 4    one of the political parties that was active on campus the
 5    MRND?
 6    A.   Again, please, would you rephrase, ask the question again,
 7    please.
 8    Q.   Was one of the political parties that was active at that
 9    time the MRND party?
10    A.   MDR was also there, the PSD also and the PL.
11              MR. LAUER:  If I could approach the witness, your
12    Honor?
13              THE COURT:  Yes.
14    Q.   Dr. Rwabukumba, I'm showing you an article that's been
15    marked as Exhibit 12.  That's a hat.  Do you recognize that
16    style of hat?
17    A.   Yes, I do.
18    Q.   And what do you recognize that to be?
19    A.   It's a member of MRND.
20    Q.   Did Mr. Teganya ever wear that hat?
21    A.   I did not see him.
22    Q.   I'm going to show you a different article of clothing.
23    It's a scarf marked as Exhibit 15.  Do you recognize this item?
24    A.   Yes, I do.
25    Q.   And what is that?
```

Case: 19-1689    Document: 00117615537    Page: 608    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 44 of 59

12-44

```
 1    A.    It's a scarf.

 2    Q.    Was that associated with the MRND party as well?

 3    A.    Yes, it was MRND, too.

 4    Q.    Did you ever observe Mr. Teganya wearing a scarf like

 5    this?

 6    A.    No, I never saw him with that.  I never saw him with that.

 7    Q.    When you were a medical student, where did you live?

 8    A.    I lived outside.  I did not leave the campus.

 9    Q.    Were you aware where Mr. Teganya lived?

10    A.    The first year he lived in the campus, but in the house it

11    was outside the campus.

12    Q.    Did he move outside the campus for his second and third

13    year?

14    A.    He went to rent a house outside the campus and other

15    friends of his, six.

16    Q.    Did you spend any time at his house?

17    A.    The friends, his colleagues at school who lived together

18    with him, they were collecting money, and they looked for a

19    servant who would cook for them, will wash clothes for them.  I

20    was one of that group, and I've been giving money, too, so I

21    will go to eat lunch there and dinner.

22    Q.    Did you actually live in that house or did you just take

23    meals there?

24    A.    I was eating only.

25    Q.    Where did you live?
```

J.A. 1293

          1    A.   Closer to where they lived, 100 or 200 meters.

          2    Q.   How often throughout the course of a typical day at

          3    medical school would you see Mr. Teganya?

          4    A.   In class or we could meet when we are having lunch, and we

          5    meet in the evening when we are having our dinner.  We could

          6    also meet when we were in the library doing our work.

          7    Q.   Can you describe Mr. Teganya as a student?

          8    A.   He was a student who was a hard worker.  He was smart.  He

          9    could understand with many other students, many, many, many,

10:32AM  10    and he's a person who liked helping other people, especially

         11    when you have problems understanding the course, the classes,

         12    you go to him, he would help you to understand it.

         13    Q.   At any time that you spoke to Mr. Teganya, did he express

         14    support for the MRND?

         15    A.   No.

         16    Q.   At any time in your dealings with him, did he say anything

         17    negative or insulting about Tutsi people?

         18    A.   I did not hear that.

         19    Q.   In your time taking dinner with him, would he excuse

10:33AM  20    himself to go to any trainings?

         21    A.   No.

         22    Q.   How did Mr. Teganya spend his evenings?

         23    A.   We went to evening studies.

         24    Q.   How often did those take place?

         25    A.   Every day.

1    Q.    I want to direct your attention to the period of the

2    genocide in 1994.  Were you in Butare at that time?

3    A.    Yes, I was in Butare.

4    Q.    And what did you do when the genocide started?

5    A.    On vacation, Easter vacation.  We went back to prepare our

6    exams that were very hard.  That was the time they shot the

7    presidential flight.

8    Q.    Were you in Butare when the president's plane was shot

9    down?

10:35AM 10    A.    I was in Butare.  I had just arrived that same day.

11    Q.    And to your knowledge, was Mr. Teganya in Butare at that

12    time?

13    A.    Mr. Teganya came to prepare exams also, but I don't know

14    if he came that same day.

15    Q.    Were you two studying together for exams?

16    A.    Yes, we were studying together, as we did as usual.

17    Q.    After the president's plane was shot down, was there

18    violence immediately in Butare?

19    A.    No, Butare did not have violence immediately.

10:36AM 20    Q.    And were you and Mr. Teganya studying in the time period

21    after the plane crash?

22    A.    That's the day we arrived in Butare.  We didn't go to

23    study at the same time, but I didn't even see him that day.

24    Q.    After the plane crash, did classes resume and did the

25    exams take place?

         1   A.   No, it did not continue because people were not allowed to

         2   come out.  There was a curfew, and the students were on

         3   vacation.

         4   Q.   You had told us that you and Mr. Teganya both lived

         5   outside the university campus?

         6   A.   Yes.

         7   Q.   Did you remain in your same residences during the period

         8   of the genocide?

         9   A.   We did not stay in the same residence because life was

10:38AM 10   becoming difficult, and we did not have food, and we were

        11   afraid of security.

        12   Q.   So did you move?

        13   A.   Yes, we moved, and we went in the residential building for

        14   the student, medical students.

        15   Q.   And what was the name of that facility?

        16   A.   Kiza.

        17   Q.   And where is the Kiza building located?

        18   A.   Closer to the hospital below the maternity.

        19   Q.   And why did you move to Kiza?

10:39AM 20   A.   We went to Kiza because there were other students and

        21   those who were finishing their school.

        22            MR. LAUER:  Can we have Exhibit 27.

        23            THE CLERK:  It's in evidence?

        24            MR. LAUER:  I believe so.

        25   Q.   Exhibit 27 has been displayed on the screen.  Do you

Case: 19-1689   Document: 00117615537   Page: 612   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 48 of 59

12-48

1    recognize what this is?

2    A.   That's Kiza.

3    Q.   Is that where you moved during the period of the genocide?

4    A.   Yes, I was there with Jean Leonard.

5    Q.   Did you both move there at the same time?

6    A.   I found him there because we were not living together

7    before.

8    Q.   And can you estimate when that was, how far after the

9    plane crash?

10:40AM 10    A.   How far?

11    Q.   How many days after the plane crash it was before you

12    moved there?

13    A.   I don't remember well.  I think it is a week.

14    Q.   And who was living in this building?

15    A.   Here in Kiza?

16    Q.   Yes.  Who was living there at that time?

17    A.   There were students who are finishing their studies in

18    medicine.

19    Q.   Were they more senior or more junior students in the

10:41AM 20    medical school?

21    A.   Yeah, there were also those who were not yet eligible for

22    graduation.

23    Q.   You had mentioned that this building is close to the

24    hospital.  Was there a reason you wanted to be close to the

25    hospital?

Case: 19-1689    Document: 00117615537    Page: 613    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 49 of 59

12-49

 1    A.    We had to go there because students who lived there, we

 2    knew one another, and it was close to the hospital.

 3    Q.    Were you spending time at the hospital?

 4    A.    Yes, yes.

 5    Q.    And why were you going to the hospital?

 6    A.    Because we were in the third year, we went to the hospital

 7    to see how the students who were graduating were doing.  They

 8    were doing exercises and the training.

 9    Q.    And what were you -- what was your role in going to the

10:43AM 10   hospital?

11    A.    Just to see.

12    Q.    And is that something that started during the time period

13    of the genocide or is that something that had been occurring

14    before the genocide?

15    A.    We did it before the genocide.

16    Q.    How often?

17    A.    It all depended on the professors who were teaching us.

18    Q.    Was it every day that you would go there before the

19    genocide or was it less often?

10:44AM 20   A.    No, we did not go there every day because we had classes.

21    Q.    When you did go there, as a third-year student, were you

22    permitted to wear a coat, a white coat?

23    A.    Yes.

24    Q.    Did the coat identify you as a medical student?

25    A.    Nothing was -- nothing showed that we are students.  It

12-50

1    was for us and those who are finishing their school, medical

2    school.

3    Q.   Did it have names stitched on the coat?

4    A.   No.

5    Q.   Did the students in your -- in the third year, were they

6    permitted to do any sort of -- provide any sort of care to a

7    patient?

8    A.   The third year?

9    Q.   Yes.

10:45AM 10    A.   There were third year and fourth year.

11    Q.   So --

12    A.   The fifth year and the sixth year.

13    Q.   Can you describe generally what levels of care could be

14    provided by students?

15    A.   It depends on the service they were in.  Those who were in

16    the surgery, they would do surgery, those who were in

17    maternity, they were helping delivery and C-section, and those

18    who were in the pediatrics department were continuing to treat

19    children.

10:47AM 20    Q.   In 1994, you were in your first doctorate year?

21    A.   I was in the first year, doctorate first year which means

22    the third of the whole medicine school, medical school.

23    Q.   What would first-year doctoral students do when they went

24    to the hospital?

25    A.   They just observe how things are done.

**J.A. 1299**

12-51

 1    Q.    Now, you said that you did go to the hospital during the

 2    genocide?

 3    A.    Yes, I did.

 4    Q.    Did you do that together with Mr. Teganya?

 5    A.    Yes.

 6    Q.    Would you go together in the morning?

 7    A.    Yes.

 8    Q.    Would you come back to the Kiza dormitory in the evening?

 9    A.    After lunch, we move and go to eat outside in the campus.

10:48AM 10    Q.    Were you together with Mr. Teganya for large portions of

11    the day?

12    A.    Yes, we were together most of the time.

13    Q.    Did there come a time when Butare was not quiet?

14    A.    Yes.

15    Q.    Do you recall approximately when that was?

16    A.    After -- the 20th of April, April 20th, after the -- after

17    when the president, he went back the Butare, he had a speech,

18    after that speech, that's how the trouble started.

19    Q.    How did that affect the hospital?

10:50AM 20    A.    People started getting killed, and people who were

21    targeted to be killed were running to the hospital, those were

22    coming injured, they had injuries.

23    Q.    What was the volume of people that the hospital was seeing

24    at that time?

25    A.    In the beginning, there were not too many.  The more days

Case: 19-1689    Document: 00117615537    Page: 616    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 32 of 59

12-52

         1    goes, the more people came.  People came to be too many, many

         2    of those who were injured.

         3    Q.   What was the level of staffing or what was the presence of

         4    doctors and medical staff at the hospital during that time?

         5    A.   At that time I did not see any physician or any doctor.

         6    Q.   During that time, you did not see any doctors?

         7    A.   I did not see any doctor there beside those who were doing

         8    the training at the last year.

         9    Q.   Who was providing care to the patients?

10:51AM 10    A.   The students.

        11    Q.   And were there enough students --

        12    A.   Sorry, continue.  Continue, please.

        13    Q.   Were there enough students to treat the patients?

        14    A.   There were many.  There were many in the third year and

        15    the fourth year.

        16    Q.   How did the genocide affect the operations of the

        17    hospital?

        18    A.   It stopped.

        19    Q.   Why did it stop?

10:52AM 20    A.   There were no doctors besides the students.

        21    Q.   And were patients being admitted and registered and

        22    followed up in terms of their care?

        23    A.   The patients who were coming were those who had been

        24    injured, who were injured.  We saw those, but I don't know if

        25    there's other ones that came, and those who had injuries due to

# J.A. 1301

Case: 19-1689    Document: 00117615537    Page: 617    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 53 of 59

12-53

1    that the massacre that was going on, they were not registered.

2    Q.   Can you walk me through what a day at the hospital was

3    like for you during this time?

4    A.   Those who were injured came to the hospital.  They were

5    crying and screaming.  They were bleeding.  Many students went

6    to support them, to treat them.  Myself and Jean Leonard, we

7    went there.  In the beginning, we were just going to see.  We

8    didn't have authority to touch the patient.

9    Q.   Did that change?

10:55AM 10    A.   It changed because people were many, many, many.  The

11    doctors who were there could not manage to treat all those

12    people who were coming.  To helping many people, after the

13    stitches, they were telling us to clean them and bandage them

14    up.

15    Q.   Is that what you did?

16    A.   Yes.

17    Q.   So, what you were doing was bandaging people up and

18    cleaning wounds?

19    A.   Yes, after the stitches, they put the stitches on.

10:56AM 20    Q.   Who would put the stitches on?

21    A.   The students.  The students had the right to touch them.

22    Q.   Are those students at your level or are those older

23    students?

24    A.   Those who are in their final year.

25    Q.   What part of the hospital were you doing that in?

```
      1    A.   There's a place we were doing it.  I can't describe where

      2    unless I see a picture, but it was locals, it was in the

      3    hospital space.

      4    Q.   Was it in a building or in a tent?

      5    A.   Inside.

      6    Q.   Were there tents on the hospital campus?

      7    A.   There's a time we go there, the tents.  We knew that this

      8    is a Medical Without Borders.  Afterwards, they left.

      9    Q.   Were you there at the time they left?

10:57AM 10  A.   I don't know when they left, but that time I was there.

     11    Q.   Were you aware of why they had left?

     12    A.   No.

     13    Q.   When you were dressing wounds and cleaning wounds, was

     14    Mr. Teganya with you doing that?

     15    A.   Yes, we were together, and he was doing what I was doing.

     16         MR. LAUER:  Your Honor, I have more questions, but

     17    this may be a good time to break.

     18         THE COURT:  Okay.

     19         THE CLERK:  All rise.

10:58AM 20       (A recess was taken.)

     21         THE CLERK:  All rise.

     22    (Jury enters.)

     23    (Court enters.)

     24         THE CLERK:  Thank you.  You may be seated.  Court is

     25    back in session.
```

J.A. 1303

Case: 19-1689    Document: 00117615537    Page: 619    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 35 of 59

12-55

1       THE COURT:  All right.  Mr. Lauer.

2       MR. LAUER:  Thank you.

3   BY MR. LAUER:

4   Q.   Before the break I was asking you some questions about

5   what it was like at the hospital during the genocide.  Were you

6   required to be at the hospital in this time?

7   A.   No.  I was not required to be there.

8   Q.   Why were you going there?

9   A.   I went there because I was in the third year.  I was going

11:15AM 10   to see how things are done as we who used to do it before that.

11   Q.   What would happen to the patients after you were done

12   dressing their wounds?

13       THE INTERPRETER:  Again, please.

14   Q.   What would happen to the patients after you dressed their

15   wounds?

16   A.   I was not treating them.  They were being treated by the

17   people -- the students who were ahead of us.  What I did,

18   because there were too many people, after treating the wounds,

19   they requested me to bandage them.  I was not treating them.  I

11:16AM 20   didn't have any right to do that.

21   Q.   Where did the patients go when they were done being

22   treated?

23   A.   They went out so that they can give room to others.  There

24   were too many that we could not leave in the room where they

25   were treated.

```
 1    Q.   What time of day would you go to the hospital?

 2    A.   In the morning at 8:00.

 3    Q.   And how long would you remain there?

 4    A.   8:00 to noon, when we go for lunch, the university

 5    restaurant.  And we go back at 1:00, and then I will get out at

 6    6:00, when I go to eat at the restaurant at the university.

 7    That's the way we did it every day.

 8    Q.   Aside from lunch, what would you be doing all day from

 9    8:00 in the morning until 6:00 p.m.?
```

11:18AM
```
10    A.   Yeah.  I would be at the hospital.

11    Q.   What in particular would you be doing?

12    A.   Observe how students are treating the patients, those who

13    are ahead of us, those students who are ahead of us, the way

14    they are treating patients.

15    Q.   Did there come a point where soldiers arrived at the

16    hospital?

17    A.   Yes, I saw them.

18    Q.   Do you recall when that was?

19    A.   I don't remember exactly when, the time.
```

11:19AM
```
20    Q.   Did the arrival of the soldiers change how the hospital

21    worked?

22    A.   It did not change.  It continued.  It wasn't usual when

23    the military came in.

24    Q.   In what way wasn't it usual?

25    A.   Before there were civilians.  Then we saw the soldiers who
```

Case: 19-1689    Document: 00117615537    Page: 621    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 37 of 59

12-57

            1    were injured also.  That was not usual, because we were not

            2    receiving -- the hospital was not receiving military officers.

            3    Q.    The people that you were treating, were they soldiers or

            4    civilians?

            5            MR. GARLAND:  Objection.

            6            THE COURT:  Overruled.

            7    A.    We did not treat military.  We treated civilians.

            8    Q.    Was that also the case for Mr. Teganya?

            9    A.    The same as Teganya.

11:20AM    10    Q.    At any time when you were at the hospital during the

           11    period of the genocide, did you see patients being killed?

           12    A.    I did not see patients being killed.

           13    Q.    Did you see patients being taken away?

           14    A.    I did not see patients being taken.  At that time we were

           15    treating them.  We could not see other things that were

           16    happening.

           17    Q.    Did you become aware that patients had been killed?

           18    A.    Yes.  I knew -- I became aware of it.

           19    Q.    How did you become aware of it?

11:22AM    20            THE INTERPRETER:  How?

           21    Q.    How did you become aware of it?

           22    A.    There were other staff that were working at the hospital.

           23    Those who we were finished treating, we put them outside and

           24    then we hide here and there.  When you come the second day you

           25    hear from staff who are doing cleaning and doing other things

1    that there are patients who were taken and went to be killed.

2    But that would be done at night.

3    Q.   You said there were staff.  Were there staff that worked

4    in the nighttime?

5    A.   They are staff that were there -- who remained there, but

6    it's like they also took refuge there.  Otherwise we didn't

7    have anything -- any work to do at night.

8    Q.   When would you leave the hospital?

9    A.   In the evening by 6:00 p.m.

11:23AM 10    Q.   And, again, when would you come in the morning?

11    A.   8:00.

12    Q.   Did you ever see anyone being taken away to be raped or

13    sexually assaulted?

14    A.   I did not see anybody.

15    Q.   Did you see any medical students assisting soldiers?

16    A.   I did see that.

17    Q.   What were the medical students doing?

18    A.   I don't understand the question.

19    Q.   What were the medical students at the hospital doing?

11:24AM 20    A.   It's a question that makes me laugh.  They went to treat

21    people who are injured, who are....

22    Q.   Did you see any bodies on the campus, the hospital campus?

23    A.   I did not see any dead bodies, but it doesn't mean that

24    the dead bodies were not there.  The path we used to go

25    through, there was no body -- no dead body.

1   Q.   How long did you stay working at the hospital?

2   A.   I left Butare May 28, 1994.

3   Q.   Before leaving Butare, had you been staying in the Kiza

4   dormitory?

5   A.   I lived there all the time.

6   Q.   How close to Mr. Teganya were you when you lived there?

7   A.   I was in a room that was not far away from where Teganya

8   was.

9   Q.   Did you ever observe students being taken away to be

11:26AM 10   killed from the Kiza dorm?

11   A.   I did not see it, but I became aware the following day

12   that there were people who were taken, but there were not too

13   many.

14   Q.   Did Mr. Teganya, to your knowledge, participate in taking

15   students from the Kiza dorm?

16   A.   We came home tired.  What we needed was to sleep, because

17   in the morning we were supposed to go early in the morning so

18   that we can go back.  I did not see Jean Leonard taking people.

19   I was sleeping in my room.  In the morning we woke up, and when

11:28AM 20   we woke up, we all go to have our breakfast.

21   Q.   You had said before that you were Tutsi.

22   A.   Yes.

23   Q.   Did Mr. Teganya know that?

24   A.   He knew that.

25   Q.   Did he ever tell anyone or point you out to soldiers?

```
 1    A.   He did not tell them because if he told them, I will not

 2    be here talking to you.

 3    Q.   Did you and he discuss the violence?

 4    A.   When we go to see those who are hurt by machetes, I

 5    remember Teganya asking me, "Why are they doing this?"  They

 6    saw a kid --

 7              MR. GARLAND:  Objection.

 8              THE COURT:  Counsel --

 9              MR. LAUER:  I can rephrase it.

11:29AM 10              THE COURT:  All right.

11    Q.   Was there an occasion when you and Mr. Teganya both saw a

12    wounded child?

13    A.   At the hospital.

14    Q.   And did you talk to Mr. Teganya about this wounded child?

15    A.   When Teganya looked at that kid, he was distressed.

16    Q.   How was he distressed?

17    A.   I saw tears in his eyes.  And he was talking, you know,

18    with -- angry.  He was very far upset and saying, "Why are they

19    doing this?"

11:30AM 20    Q.   You said you left Butare in late May.  How were you able

21    to leave Butare?

22    A.   A friend of mine came to pick me up.  And that friend came

23    to pick me up from Kiza.

24    Q.   And where did you go?

25    A.   I went to a place where he was hiding.
```

J.A. 1309

Case: 19-1689    Document: 00117615537    Page: 625    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 61 of 59

12-61

```
 1    Q.   And did you hide yourself?

 2    A.   I went in hiding because I went in a region where people

 3    knew me.

 4    Q.   Where you thought you would be safe?

 5             THE INTERPRETER:  Safe?

 6    Q.   Where you thought you would be safe?

 7    A.   I went with this person because I trusted this person.

 8    Because of that person I'm still alive.

 9    Q.   Did you remain in Rwanda after the genocide?

11:31AM 10  A.   I stayed in Rwanda to finish my school.

11    Q.   When did you finish your school?

12    A.   1999.

13    Q.   And did you begin practicing medicine?

14    A.   I did it a few months because I went to Europe.

15    Q.   I want to ask you if you're familiar with someone named

16    Jerome Arusha.  Do you know that person?

17    A.   Yes, I know him because we went to the same medical

18    school.  But during genocide he wasn't with us anymore.  He had

19    changed his faculty.

11:33AM 20  Q.   Did he move to a different school?

21    A.   He went to agriculture, agronomy, if you want.

22    Q.   Was he someone you were friendly with?

23    A.   I was supposed to talk to everybody.  We didn't have a

24    particular relationship that we had.

25    Q.   What do you recall about Mr. Arusha?
```

Case: 19-1689    Document: 00117615537    Page: 626    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 62 of 59

12-62

```
 1    A.    He was an alcoholic.

 2              MR. GARLAND:  Objection.

 3              THE COURT:  Sustained.

 4    Q.    Where would you often encounter Mr. Arusha?

 5              MR. GARLAND:  Objection.

 6              THE COURT:  Let me see counsel at sidebar.

 7    (SIDEBAR CONFERENCE AS FOLLOWS:

 8              THE COURT:  What do you expect the evidence to be?

 9              MR. LAUER:  I expect the evidence to be that this

10    witness is familiar with him as his classmate, and that he

11    knows that Mr. Arusha in that time drank alcohol to excess

12    regularly.

13              THE COURT:  Okay.  And it's offered to impeach his

14    credibility?

15              MR. LAUER:  Impeach his credibility.  He was asked

16    about it and denied it.

17              MR. GARLAND:  It's more prejudicial than probative.

18              THE COURT:  We have had quite a bit of testimony

19    already about this topic.  I'll allow this.

20              MR. GARLAND:  Okay.

21    END OF SIDEBAR CONFERENCE.)

22              THE COURT:  Go ahead, Mr. Lauer.

23    BY MR. LAUER:

24    Q.    Where did Mr. Arusha often spend his time?

25    A.    Besides the classes, he will be with his friends, but I
```

J.A. 1311

Case: 19-1689    Document: 00117615537    Page: 627    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 63 of 59

12-63

1   didn't see him so much.  But all I know, he liked going to a

2   bar.

3   Q.   Are you familiar with a gentleman named Bernard Kalimba?

4   A.   Yes.  We were together in the same school.

5   Q.   Do you know how Mr. Kalimba liked to spend his time?

6   A.   Besides the classes, he liked going to bars also.  It

7   doesn't mean that every day he would go into a bar, out to a

8   bar.  He may not have money on those days.

9          MR. LAUER:  May I have a moment, your Honor?

11:36AM 10          THE COURT:  Yes.

11          MR. LAUER:  Thank you, sir.  I have no further

12   questions.

13                    CROSS-EXAMINATION

14   BY MR. GARLAND:

15   Q.   Good afternoon.

16   A.   Good afternoon.

17   Q.   You've known Mr. Teganya since 1991; is that right?

18   A.   Yes.

19   Q.   And you went to school together?

11:37AM 20   A.   Yes, we went to school together.

21   Q.   You studied together?

22   A.   The same class.

23   Q.   You also took meals together; is that correct?

24   A.   Yes.

25   Q.   In 2002 you sent Canada a letter for Mr. Teganya's

         1    immigration proceedings, right?

         2    A.    Yes.

         3    Q.    And in 2016 you sent America a letter for his asylum

         4    application, right?

         5    A.    Yes.

         6    Q.    So you want to support Mr. Teganya however you can,

         7    correct?

         8    A.    I want to support the truth.

         9    Q.    Go ahead.

11:38AM 10    A.    I support Teganya in normal.

        11    Q.    And you don't want anything bad to happen to Mr. Teganya,

        12    right?

        13    A.    Yes, that's true.

        14    Q.    You testified before that you left Butare at the end of

        15    May 1994, right?

        16    A.    Yes.

        17    Q.    When you sent that letter to America in 2016, you also

        18    said that Mr. Teganya left Butare in May 1994, right?

        19    A.    Maybe it wasn't written well.  I said it's me who left.

11:39AM 20    Q.    The letter that you sent said that you and Mr. Teganya

        21    both left each other to depart from Butare in May 1994,

        22    correct?

        23    A.    Myself, I left Butare May 1994.  I left him there.

        24    Q.    So the letter that you sent America, if it said that

        25    Mr. Teganya also left in May 1994, that would be incorrect?

Case: 19-1689    Document: 00117615537    Page: 629    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 206    Filed 11/04/19    Page 65 of 59

12-65

 1    A.    The letter that I sent here or I sent to Canada?

 2    Q.    The letter you sent to America in 2016.

 3    A.    Myself leaving Butare, I left Teganya in Butare.  I said

 4    good-by to him.  And he told me he's not going to stay longer

 5    there.

 6    Q.    I'm sorry, the question I asked was about the letter that

 7    you sent in 2016.  If you sent a letter to America in 2016

 8    saying that, "Around the end of May 1994 we left each other to

 9    depart from Butare," that would be wrong, correct?

11:41AM 10    A.    That's how -- we left each other, going my way and him

11    going his way.

12    Q.    So between the end of May and July, you were not there on

13    campus to see what Mr. Teganya did; is that right?

14    A.    At that time I was not in Butare.  I had left.  I didn't

15    know where Teganya was and what he was doing.

16    Q.    All right.  Let me ask you a question about the cook that

17    you testified about before.

18              THE INTERPRETER:  Cook?

19    Q.    You testified before that Mr. Teganya and his roommates

11:43AM 20    employed a cook; is that correct?

21              THE INTERPRETER:  It's not coming in.  Sorry.

22    Q.    Did you testify earlier that you took meals with

23    Mr. Teganya and his roommates at his apartment?

24              THE INTERPRETER:  Thank you.  Thank you.

25    A.    Yes.

Case: 19-1689    Document: 00117615537    Page: 630    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 66 of 59

12-66

```
       1   Q.   And those were lunches and dinners, correct?

       2   A.   Even in the morning.

       3   Q.   And the morning meal, correct?

       4   A.   Which period are you talking about?

       5   Q.   Before the genocide.

       6   A.   Before genocide we were eating together lunch and dinner.

       7   Q.   And that was at Mr. Teganya's apartment or apartment

       8   house, right?

       9   A.   Yes.  In Teganya's residence with his six friends.

11:44AM 10  Q.   So Mr. Teganya in that period wasn't eating lunch or

      11   dinner at the cafeteria, was he?

      12   A.   No.

      13   Q.   I want to ask you now about the genocide period.  So you

      14   testified before that you and Mr. Teganya lived during the

      15   genocide in Kiza, correct?

      16   A.   Yes.

      17   Q.   You testified that you would go to sleep right after

      18   dinner because you had to be back the next morning at the

      19   hospital, right?

11:45AM 20  A.   Yes, because we went home tired.  It's understandable that

      21   we could not go straight to bed after.  We had to talk with

      22   other students who are there.  Five minutes, ten minutes, then

      23   we go to bed.

      24   Q.   So just to be clear, when you were asleep you wouldn't

      25   know what Mr. Teganya did or where he went, would you?
```

Case: 19-1689    Document: 00117615537    Page: 631    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 67 of 59

12-67

1    A.   No.

2    Q.   You testified that you had to go back the next morning,

3    but weren't there no classes during the genocide?

4    A.   It was vacation.

5    Q.   All right.  And then after the vacation was over, there

6    still were no classes during the genocide, were there?

7    A.   Yes, true.

8    Q.   And you also testified that you and Mr. Teganya weren't

9    even treating people because you hadn't been trained to do so,

11:46AM 10    right?

11    A.   Yes.

12    Q.   So why did you have to -- so you didn't really need to be

13    there at 8:00 each morning, did you?

14    A.   We went to observe what others are doing.

15    Q.   So you understood at that time that there was a war going

16    on, right?

17    A.   Yes.

18    Q.   But you were keen to observe what was going on at the

19    hospital?

11:47AM 20         THE INTERPRETER:  You were keen?

21    Q.   But you were keen to observe what was going on at the

22    hospital?

23    A.   That was my priority.

24         MR. GARLAND:  With the court's permission we'd like to

25    set up Exhibit 23, a blow-up of Exhibit 23, on the easel.

**J.A. 1316**

Case: 19-1689    Document: 00117615537    Page: 632    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 68 of 59

12-68

```
 1              THE COURT:  All right.

 2              MR. GARLAND:  Your Honor, if I may approach the easel.

 3    Q.   Doctor, can you see Exhibit 23 from where you are?

 4              THE INTERPRETER:  Come again?

 5    Q.   Can you see Exhibit 23 from where you are?

 6    A.   I don't see it.

 7              MR. GARLAND:  Your Honor, I'd ask that the doctor be

 8    allowed to come off the witness stand --

 9              THE COURT:  Yes.

11:49AM 10              MR. GARLAND:  -- so he can see.

11              THE COURT:  All right.

12    Q.   Doctor, do you recognize this as an overhead picture of

13    the hospital and also the Kiza dormitory?

14    A.   Yes.

15    Q.   And this right here is the Kiza dorm on the left-hand side

16    of Exhibit 23, correct?

17    A.   Yes.

18    Q.   Can you show the jury the path that you and Mr. Teganya

19    took from Kiza to the cafeteria where you got your food?

11:49AM 20    A.   The cafeteria is the other side towards the campus.

21    Q.   So if you'd come to the map and show the jury where the

22    cafeteria was.

23    A.   The cafeteria was not here.

24    Q.   Was it on the left side of this?

25    A.   (Indicating.)  Towards this side.
```

J.A. 1317

Case: 19-1689     Document: 00117615537     Page: 633     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 69 of 59

12-69

       1   Q.   All right.  When you walked back from --

       2        THE COURT:  Can I ask -- to make this work, if the

       3   witness would stand like this so he's not blocking the view of

       4   any of the jurors, and the interpreter may stand behind him.

       5   Q.   Now, can you show the jurors the path that you and

       6   Mr. Teganya took from the cafeteria to the hospital?

       7   A.   When we were coming from the cafeteria on the right, it's

       8   like one kilometer, 800 meters or one mile -- one kilometer,

       9   sorry.  We were just going -- using this path going up.  We

11:51AM 10   were going to Kiza.  We took our coats.  Then we went up there.

      11   We went through that path.

      12        THE COURT:  I'm sorry.  Can I request the interpreter

      13   to step just one step.

      14        THE INTERPRETER:  Yes.

      15        THE COURT:  Thank you.

      16   A.   That's maternity there.  Then we went up.  This is an

      17   overhead picture.  I don't see exactly where we treated the

      18   people.  It's there, that place.

      19   Q.   And can you show where you would walk on campus to get to

11:52AM 20   that place where you treated patients?

      21   A.   From the campus to where we were treating people?

      22   Q.   From Kiza to where you were treating people.

      23   A.   There were many pathways.  You could go up from there.

      24   Then we'd go to maternity.  That is the surgery place.  You

      25   could go beside it there.  There were many paths you could use

# J.A. 1318

Case: 19-1689    Document: 00117615537    Page: 634    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 70 of 59

12-70

1    to get there.  We could even go through the buildings.  There

2    are many paths you could use to get to that place.  But we used

3    to go from there to -- then we would go to lunch and go to the

4    other side and go to that place.

5    Q.   And would you take the same path back when you would go to

6    the cafeteria for your lunch?

7    A.   That's the path we used.  Then we went to Kiza and removed

8    our coats.  Then we went to this path.  This is a big road.

9    Then we went to the university cafeteria.

11:54AM 10   Q.   And then when you came back from the cafeteria after

11   lunch, you would use the same path to go back to where you

12   worked?

13   A.   We used one path.

14   Q.   And then the same path going back to Kiza at the end of

15   the night, correct?

16   A.   Morning, lunch and the evening.  Any time we come from the

17   cafeteria, we used to through Kiza to remove our coats, and we

18   went through there to put on our coats.

19   Q.   And this was a quick walk from Kiza to where you were

11:55AM 20   working, right?

21   A.   That's the shortcut we could use.

22   Q.   And it didn't take long to go there, right?

23   A.   No.  You could even use that road there, and it goes

24   there, or you could go around.  That's what we decided was

25   closer.

```
 1   Q.   So the question I'm asking is, to get from Kiza to where
 2   you worked didn't take long, did it?
 3   A.   It was a short time.  The longest you could walk is five
 4   minutes.
 5   Q.   The maternity ward is right there (indicating), correct?
 6   A.   Yes, I see it.
 7   Q.   You knew that there were patients in the maternity ward
 8   during the genocide, correct?
 9   A.   Not only maternity.  People were everywhere.  I did not
10   see them because I did not go into maternity.  People were all
11   over and all servicers were hiding.
12   Q.   So if I understand what you said, during April and May,
13   you never observed anybody being treated in maternity, yes or
14   no?
15   A.   No.
16   Q.   And you knew that there were patients who were in the
17   dermatology building too, correct?
18   A.   I did not see them.
19   Q.   But you knew that there were patients there, correct?
20   A.   Patients were everywhere.
21   Q.   So you never observed anybody treating patients in the
22   dermatology ward, did you?
23   A.   The maternity is on the right side.  What would we be
24   going to see in the maternity?
25   Q.   Sir, I'm asking the question.  Did you see anybody
```

11:56AM (line 10)

11:57AM (line 20)

J.A. 1320

12-72

```
       1   treating patients in dermatology, yes or no?

       2   A.   No.

       3   Q.   I want to ask you some more questions about what you saw

       4   or didn't see at the hospital during the genocide.  But we can

       5   take this down.  So first, when you stayed in Kiza, you could

       6   hear gunshots, correct?

       7   A.   Yes.  Not all the time.

       8   Q.   When you went outside Kiza, you could see bodies being put

       9   into a pit near Kiza, couldn't you?

11:59AM 10 A.   No.

      11   Q.   So you never saw bodies at the pit near Kiza?

      12   A.   I did not see the bodies in the pit.  It doesn't mean that

      13   there were no bodies.  I cannot say no.  But I did not see

      14   them.

      15   Q.   So there could have been bodies at the pit but you never

      16   saw them, correct?

      17   A.   I did not see them.

      18   Q.   Did you hear people screaming from the area of the pit?

      19   A.   Which pit?

12:00PM 20 Q.   The area right near Kiza.

      21   A.   I don't see -- I don't remember -- I don't see a pit near

      22   Kiza, but I know they were going to kill people below a place

      23   called IRST.

      24   Q.   Sir, you talked a bit about the week of April 20, and I'd

      25   like to ask you some more questions about that.
```

# J.A. 1321

Case: 19-1689    Document: 00117615537    Page: 637    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 206    Filed 11/04/19    Page 73 of 59

12-73

       1    A.    Yes.

       2    Q.    When the soldiers came to the hospital, did you hear the

       3    helicopters bringing them in?

       4    A.    No, I did not hear it.

       5    Q.    But you know that soldiers were brought to the hospital by

       6    helicopter, right?

       7    A.    I did not know.

       8    Q.    That week you knew that Butare had new checkpoints and

       9    roadblocks, right?

12:01PM 10    A.    Yes, there were.

      11    Q.    Did you go by the roadblock by the Hotel Falcon?

      12    A.    I went there -- I passed there going home.

      13    Q.    Did you go there on --

      14    A.    There were barriers, roadblocks.

      15    Q.    Did you go there April 22?

      16    A.    I did not go through those -- that area those dates, the

      17    22nd.  I went through those areas when I was going home.

      18    Q.    So on April 23 or April 24 there was testimony that about

      19    30 or 40 children had gone missing and were never seen again.

12:02PM 20    Did you observe that?

      21          THE INTERPRETER:  Would you repeat, please.

      22          MR. GARLAND:  That's a lot to translate.  I can break

      23    it down.

      24          THE INTERPRETER:  Would you repeat, please.

      25    Q.    There was testimony that 30 or 40 children went missing

J.A. 1322

Case: 19-1689    Document: 00117615537    Page: 638    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 74 of 59

12-74

1    from the hospital and were never seen again.  The testimony was

2    that it happened on April 22 or 23.  Did you notice that those

3    children were missing?

4    A.   I did not know that.

5    Q.   April 23, did you get to the hospital at 8:00 a.m. like

6    usual?

7    A.   I don't recall exactly that date, but every time we went

8    there at 8:00.  When we left, we knew where we were going.  And

9    that's where the people who were wounded were.

12:04PM 10   Q.   So on April 23, you would have been at the hospital at

11   8:00 a.m., yes or no?

12   A.   I was at the hospital because I went there every day.

13   Q.   There was testimony before that at that time 30 to 40 dead

14   civilians were being loaded onto dump trucks.  Did you see

15   that?

16            THE INTERPRETER:  40?

17            MR. GARLAND:  30 to 40.

18   A.   I don't know.

19   Q.   There was testimony that that morning a soldier said that

12:05PM 20   the place stunk with Tutsis.  Did you hear that?

21            MR. LAUER:  Objection, your Honor.  I'm not sure

22   there's been a foundation using the same place as the witness

23   that saw this.

24            THE COURT:  Well, it's implicit in the question, I

25   think, but why don't you make that clear.  He can ask whether

J.A. 1323

```
 1   he heard any -- any soldier say it, I guess that's...

 2   Q.   The morning of April 23, did you hear any soldiers say

 3   that the place stunk with Tutsis and should be cleaned up?

 4   A.   I did not hear that.

 5   Q.   Now, you knew that Doctors Without Borders was working at

 6   the hospital at that time, right?

 7   A.   I saw them.

 8   Q.   There was testimony that a lot of Doctors Without Borders

 9   staff were killed before that.  Did you know that?

12:06PM 10   A.   I did not know.

11   Q.   You didn't observe the reduction in Doctors Without

12   Borders staff, correct?

13   A.   I did not see it.

14   Q.   There was testimony that during the morning or day of

15   April 23 a number of nurses who were working for Doctors

16   Without Borders were taken away by soldiers.

17   A.   I don't know.

18   Q.   Did you work at all with Nurse Sabine?

19        THE INTERPRETER:  Sabine?

12:07PM 20        MR. GARLAND:  Sabine.

21   A.   Who is Sabine?

22   Q.   Sir, did you work with Nurse Sabine, yes or no?

23   A.   I don't know this person.

24   Q.   Did you see when Nurses Sabine, Nadine, Rose, Alex or Jean

25   Marie were taken away?
```

 1   A.   No.  I don't know anything about it.

 2   Q.   Did you notice that Doctors Without Borders nurses were

 3   missing later on on April 23?

 4   A.   I did not know that.

 5   Q.   There was testimony that many patients were led away by

 6   soldiers during the day of April 23.  Did you see that?

 7   A.   What time?

 8   Q.   During the day, sir.

 9   A.   I did not know that.

12:09PM 10   Q.   There is testimony that the patients and nurses that were

11   led away on April 23 screamed and pleaded for their lives.  The

12   question is, did you hear any of that?

13   A.   I never heard anybody -- I heard people who were suffering

14   because they were cut by machetes.  I didn't hear any other

15   voice.  It's possible that they were among those names, those

16   people who are cut by machetes.  We were aware that we were

17   treating people.

18   Q.   So there's testimony that on April 24 Doctors Without

19   Borders left the hospital.  Did you notice that they had left

12:10PM 20   on April 24?

21   A.   I don't know the day they left, but I used to see their

22   tents.  Then I didn't see them anymore.

23   Q.   And there was also testimony that by April 24 about 150

24   patients were missing.  Did you notice that they were missing?

25             THE INTERPRETER:  150?

Case: 19-1689    Document: 00117615537    Page: 641    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 77 of 59

12-77

```
 1              MR. GARLAND:  Yes, 150.
 2    A.    I don't know.
 3    Q.    The patients who were coming in to the hospital who
 4    weren't soldiers were civilians, correct?
 5    A.    They were civilians.
 6    Q.    And they were Tutsi civilians, correct?
 7    A.    Yes.
 8    Q.    So there were lots of -- during that week there were lots
 9    of Tutsi civilians coming into the hospital, correct?
12:12PM 10              THE INTERPRETER:  Civilians?
11              MR. GARLAND:  Civilians, yes.
12    A.    Yes, many.  Many, many.
13    Q.    And the wounds that they had received were horrible,
14    correct?
15    A.    Yes.
16    Q.    And you and Mr. Teganya didn't treat them, you just
17    observed other people doing so, right?
18    A.    Myself and Teganya, we did not have that authority to --
19    permission to treat people.  Those who were in the last year
12:12PM 20    medical -- last year who are in training, they're the ones who
21    are treating them, but we were watching, observing how they are
22    doing it.  We were giving them materials to use.
23    Q.    Did you work with Dr. Karekezi at the hospital, yes or no?
24    A.    Karekezi, I don't know him.
25    Q.    Never heard that name before?
```

J.A. 1326

1    A.   I know people who -- I know the names, but that one, no.

2    Q.   And there was testimony that a person named Nyangezi

3    Protais was killed.  Did you know him?

4         THE INTERPRETER:  Nyangezi?

5         MR. GARLAND:  Nyangezi Protais.

6    A.   I don't know.  I don't know Nyangezi Protais.

7    Q.   There was also testimony that a patient called Gasarabwe

8    Mathias was killed.  Were you there for that?

9    A.   I don't know that person.

12:14PM 10    Q.   Sir, did a genocide occur at the hospital or not?

11    A.   Yes, I know that people were killed at the hospital.  I

12    can't deny that.

13    Q.   That wasn't the question I asked.  Did a genocide happen

14    at the hospital or not?

15    A.   Yes.

16    Q.   When was the first time that you realized that a genocide

17    had occurred or was occurring at the hospital?

18    A.   Every time we went to the hospital we went there, and then

19    we found that people are missing.  They told us that they were

12:15PM 20    taken -- went to be killed at night.  But myself, I did not see

21    anyone being killed at the hospital with my eyes.

22    Q.   From the week of April 20 on the soldiers were in control

23    of the hospital, correct?

24    A.   I don't understand what it is.

25    Q.   Once the soldiers came to the hospital the week of April

Case: 19-1689    Document: 00117615537    Page: 643    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 206    Filed 11/04/19    Page 79 of 99

12-79

1    20, they were in charge of the hospital, correct?

2    A.    I did not see it.  I didn't even know that.  I did not

3    know that.

4    Q.    You did not perceive that the soldiers were in charge of

5    the hospital starting the week of April 20?

6    A.    I didn't know that.

7    Q.    You testified before that at that point there were no

8    doctors, right?

9    A.    There were no doctors, yes.

12:16PM 10    Q.    And the only people who were giving medical care, you

11    said, were medical students?

12    A.    Yes.

13    Q.    So are you saying that the people who were running the

14    hospital, once the soldiers came there, were medical students

15    and not soldiers and not doctors?

16    A.    The students were going there to treat people.  The way

17    that things were, there was a lot of chaos.  I did not know

18    that there were soldiers who come to manage the hospital.  I

19    didn't even hear anything about it.  I just heard it today.

12:17PM 20    Q.    So you didn't know that there were soldiers at the

21    hospital from April 20 through May?

22    A.    The soldiers who came there are the soldiers who were

23    injured.  That one I knew.  If they are those who are being

24    saved, I didn't know that they were the ones who took

25    management of the hospital.

Case: 19-1689    Document: 00117615537    Page: 644    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 80 of 99

12-80

1    Q.   You said that you were the head student when you were at

2    medical school, correct?

3    A.   Yes.

4    Q.   Which years?

5    A.   From 1991 to 1999.  Every year students will elect me.

6    Q.   And did you know Joseph Nsengiyumva?

7    A.   Yes, I know him.

8    Q.   And isn't it true that he was the head student from 1991

9    to 1992?

12:19PM 10   A.   Joseph Nsengiyumva had repeated the year.  When somebody

11   has repeated a year, the school year, will make himself a

12   representative or chief of the class, but without being

13   elected.

14   Q.   Did you know Paul Mbonyi?

15   A.   I know him.

16   Q.   And isn't it true that he was head student between 1993

17   and 1994?

18   A.   That one I don't know, because he was expelled because he

19   failed.

12:20PM 20   Q.   But in 1993 isn't it true that he was head student?

21   A.   He wasn't there.

22   Q.   You had an identity card that listed you as Hutu, correct?

23   A.   Yes.

24   Q.   What was the ethnicity on your father's identity card?

25   A.   He was a Tutsi.

**J.A. 1329**

1    Q.   And the identity on your mother's identity card?

2    A.   It was a Hutu.

3    Q.   Now, your family was from Ruhengeri, correct?

4    A.   Yes.

5    Q.   That's in the north of Rwanda?

6    A.   Yes.

7    Q.   And that was an area that the MRND was powerful, correct?

8    A.   Yes.

9    Q.   Where did you get the identity card listing you as Hutu?

12:21PM 10        THE INTERPRETER:  What?

11   Q.   Where did you get the identity card listing you as Hutu?

12   A.   It was natural.  You go to the administrative --

13   administrator of the commune, you give money, they give you an

14   ID.  It was normal.

15   Q.   How did you get it to say Hutu rather than Tutsi?

16   A.   I explained in the beginning of the question.  To be a

17   Tutsi at that time was a crime.  There are some advantages you

18   could not get when you are a Tutsi, but you get them when you

19   are a Hutu.

12:22PM 20   Q.   So my question was, how did you get them to say that it

21   was Hutu rather than Tutsi?

22   A.   That's all I -- I explained.  If you want administration

23   to look for some services and you show your ID, they can give

24   you the services because you are a Hutu, or they refuse the

25   services because you are a Tutsi.

12-82

```
 1   Q.   So you could give money and get a Hutu identity; is that
 2   right?
 3   A.   You can give money and get ID, and at the time you could
 4   get it without paying any money.  It depends on the
 5   relationship you have with the person that's giving it.
 6   Q.   When you were in Butare, you attended MRND meetings and
 7   rallies, right?
 8   A.   Not a single day.
 9   Q.   And you wore the clothing -- the type of clothing you
10   identified before, correct?
11   A.   No, I never put it on.
12   Q.   And you attended the trainings at the gymnasium and at the
13   Hidden Valley in the forest for the Interahamwe?
14   A.   Leave alone being in the training, I never even been in
15   the party.
16   Q.   But it was important at that time for people to believe
17   you were a Hutu, right?
18        THE INTERPRETER:  That what?
19   Q.   But at the time it was important for people to know that
20   you were Hutu?
21   A.   Yes.
22        MR. GARLAND:  If I can take a moment to confer with
23   co-counsel.
24   Q.   While you were at the hospital during the genocide, you
25   did see atrocities, didn't you?
```

J.A. 1331

Case: 19-1689    Document: 00147615537    Page: 647    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 206    Filed 11/04/19    Page 33 of 59

12-83

1    A.    I did not see atrocities with my eyes, which doesn't mean

2    that there was no atrocities, but with my eyes I did not see

3    any killing at the hospital.

4    Q.    And you didn't see Tutsis moving between buildings hiding?

5    A.    We were treating people.  Even when we finished treating

6    people when we go home, we saw people all around.  There were

7    Tutsis, yeah, that's true, but Hutus should be -- may be among

8    them.

9    Q.    So I understand, the Hutus and the Tutsis were living

12:26PM 10    together peacefully at the hospital during the genocide?

11    A.    Not all the Hutus -- not all Hutus hurt the Tutsis.  There

12    were Hutus who saved the Tutsis.  Even those who helped them at

13    the hospital and those who brought them to the hospital.

14    Q.    And so you understood that there was a genocide going on,

15    but you just never saw it yourself, right?

16    A.    Yes, I knew that.  I did not see it with my eyes.

17    Genocide at the hospital or in the whole country?

18    Q.    Hospital.  I think you said this before, but you didn't

19    treat anybody in dermatology, maternity or the Doctors Without

12:27PM 20    Borders tent, right?

21    A.    I never went to treat anybody.

22    Q.    Did you work at the hospital or observe at the hospital on

23    Saturdays and Sundays?

24    A.    Every time we went there, that was a daily job.  People

25    were killed every --

Case: 19-1689    Document: 00117615537    Page: 648    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 34 of 59

12-84

1   Q.   Sir, if I could interrupt.  The question was, did you work
2   at the hospital on Saturdays and Sundays, yes or no?
3   A.   Yes.
4   Q.   So you were at the hospital nine or ten hours a day seven
5   days a week for five weeks and you saw no atrocities yourself?
6   A.   We were in the -- where we were treating people, I will
7   repeat this, I did not see people being killed.
8   Q.   And during nine or ten hours a day seven days a week for
9   five weeks, did you hear any atrocities?
12:29PM 10        MR. LAUER:  Objection, your Honor.  Asked and
11   answered.
12        THE COURT:  No.  He asked about seeing.  This is about
13   hearing.
14        MR. GARLAND:  This is about hearing, your Honor.
15        THE COURT:  All right.  Overruled.
16   A.   I heard that.  I heard, but I did not see them with my
17   eyes.
18        MR. GARLAND:  No further questions.
19        THE COURT:  Redirect.
12:30PM 20                    REDIRECT EXAMINATION
21   BY MR. LAUER
22   Q.   Good afternoon.
23   A.   Good afternoon.
24   Q.   You were asked some questions about a letter that you
25   wrote for Mr. Teganya's asylum application.  Do you recall

```
 1   those questions?

 2   A.   Yes.

 3              MR. LAUER:  May I approach the witness, your Honor?

 4              MR. GARLAND:  I'd like to see that.

 5              (Handing document.)

 6              MR. GARLAND:  Your Honor, may I approach?

 7              THE COURT:  Okay.

 8   (SIDEBAR CONFERENCE AS FOLLOWS:

 9                 THE COURT:  Are you going to offer this as an

10   exhibit?

11              MR. LAUER:  I'm not going to offer it.  I'm going to

12   show it to him and ask him what he said.

13              MR. GARLAND:  If I can address that, your Honor, when

14   you have a chance.

15              THE COURT:  Yes.

16              MR. GARLAND:  So there are two versions of this letter

17   translated, one letter in French, two translations.

18              THE COURT:  Was the original in French?

19              MR. GARLAND:  And the original was in French.  In this

20   original, it says -- it's at the end of the page.  "We left

21   each other to depart from Butare."  And if you look at the

22   actual letter, I don't speak French, but that looks an awful

23   lot like "May" to me.

24              THE COURT:  Well, I can take judicial notice of the

25   fact that the French word for "May" is "M-a-i" and it
```

1    appears -- my French is limited, but it appears to say "C'est

2    vers la fin du mois de mai 1994."  It is toward the end of the

3    month of May 1994.  And the sentence goes on to -- it's a

4    little hard to read, but "we left Butare."  I can't quite read

5    the words.

6              MR. GARLAND:  In this version of the letter, there is

7    a certificate of translation as well.  Translation number 2

8    there is another certificate of translation.  That does not

9    seem to be an accurate translation.  This does (indicating).

12:33PM 10         MR. LAUER:  Without being a fluent French speaker

11   myself, your Honor, the questioning -- the line of questioning

12   that Mr. Garland pursued left the impression that this witness

13   claimed that both he and Mr. Teganya left in May of 1994.

14   There's a different translation also in the file that reads

15   very differently.

16             THE COURT:  Okay.  But here's the problem I have:  I

17   have high school French, but I know enough to know that this

18   translation is wrong because it missed the words "May 1994."

19   So I have a problem with that, as well as there's no

12:33PM 20   certification or anything.  It seems to me that if we're going

21   to confront the witness with the letter, we should confront him

22   with his own letter in French and the interpreter can translate

23   from French to English, but I'm not going to let either the

24   letter in or this intrinsic evidence going to credibility.  I

25   don't see it as important that that come in, or at least I'm

J.A. 1335

Case: 19-1689    Document: 00117615537    Page: 651    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 87 of 99

12-87

```
 1   not convinced.  But I also don't see how you can show him an

 2   English translation of a letter that is not certified, at least

 3   as near as I can tell, making a preliminary determination as

 4   best I can tell, that's not accurate.  We can try to revisit

 5   this.

 6        MR. LAUER:  What I would ask to do is perhaps, the

 7   original is really what counts and make sure that the original

 8   translation is being accurately conveyed.  I may want to

 9   revisit this once I've had the chance to review it in its

10   original French, but I'll move on for now.

11        THE COURT:  Okay.

12   END OF SIDEBAR CONFERENCE.)

13        MR. LAUER:  Can I have Exhibit 51 displayed on the

14   screen.

15   BY MR. LAUER:

16   Q.   Sir, there's a document being displayed on the screen

17   that's been admitted as Exhibit 51.  Do you recognize this?

18   A.   I remember this list.

19   Q.   What is this list?

20   A.   This is a list of the students who were in the first year,

21   1991.

22   Q.   Do you see there's some handwriting at the top of the

23   document and what appears to be a fax number.  Whose

24   handwriting is that?

25   A.   I did.
```

12-88

```
  1    Q.   Did you submit this letter -- excuse me, this list to the
  2    Canadian government?
  3    A.   I gave it to Teganya.  He's not the one who requested it.
  4    I gave it together with the testimony that he had requested.
  5    Q.   Why did you have this list?
  6         MR. GARLAND:  Objection, your Honor.  It seems beyond
  7    the scope of cross.
  8         MR. LAUER:  He was questioned about his role as --
  9         THE COURT:  Well, it's -- I'll allow it.
12:37PM 10   Q.   Sir, why did you have this list?
 11    A.   I don't know.  Myself, I don't know.  When I was -- when I
 12    got to Europe I found that I had things in my package.  It's
 13    the first -- as you see, it's a list of the first year, 1991,
 14    and we were in the third year.  I should have a third-year
 15    list.
 16    Q.   In your role as the head of the class, were you provided
 17    with lists like this?
 18    A.   Yes.
 19    Q.   I want to ask you some questions about activities at the
12:38PM 20   hospital during the time of the genocide.  You were asked a lot
 21    of questions about whether you saw certain people and many
 22    names were asked about.  Do you recall being asked those names?
 23    A.   Would you repeat the question, please?
 24    Q.   Do you recall you were asked about a number of hospital
 25    staffers?
```

Case: 19-1689    Document: 00117615537    Page: 653    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 39 of 59

12-89

1    A.    Yes.

2    Q.    How many people worked at the hospital?

3    A.    I don't know the number.  I cannot know the number.

4    Q.    How many buildings were part of the hospital campus?

5    A.    There are many houses.  I don't know the number.

6    Q.    How many people were present on the hospital campus during

7    April and May of 1994?

8          MR. GARLAND:  Objection, your Honor.  The witness said

9    he didn't know.

12:39PM 10          THE COURT:  Well, it's a slightly different question.

11   He asked how many people worked.  This is how many people were

12   on the campus, so I'll allow it.

13   Q.    How many people were present on the campus in April and

14   May of 1994, the hospital campus?

15   A.    You mean the staff or patients?

16   Q.    Both.

17   A.    There were many.

18   Q.    Where did you spend your days when you were working at the

19   hospital during April and May?

12:40PM 20   A.    The hospital.

21   Q.    What particular department or building?

22   A.    Where we are treating people who are injured, that's where

23   we were every time.  That's where we went every day.

24   Q.    You were asked some questions about Doctors Without

25   Borders.  Did you work for Doctors Without Borders?

Case: 19-1689    Document: 00117615537    Page: 654    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 206   Filed 11/04/19   Page 90 of 59

12-90

```
 1    A.    No.

 2    Q.    Where were the Doctors Without Borders staff?  Where did

 3    they work?

 4    A.    Their tents were near to the door going to the hospital --

 5    into the hospital.  Your colleagues say that they were near

 6    dermatology, but I did not see them there.  I'm saying where I

 7    said, near the surgery.

 8    Q.    Did you work in the tents for Doctors Without Borders?

 9    A.    I did not go there.

12:42PM 10  Q.    Were you working in a tent or in a building?

11    A.    Buildings.

12    Q.    You were asked whether you personally were a member of the

13    MRND and whether you attended training sessions with

14    Interahamwe.

15    A.    I wasn't a member of MRND.  I did not even attend a

16    training.

17    Q.    What is your ethnicity?

18    A.    I'm a Tutsi.

19    Q.    Did you lose family members in the genocide?

12:42PM 20  A.    Yes.

21              MR. LAUER:  Thank you, sir.

22              THE COURT:  Any cross?

23              MR. GARLAND:  Nothing, your Honor.

24              THE COURT:  Thank you.  You may step down.

25              MR. LAUER:  We would call Ernest Muvunandinda.
```

J.A. 1339

1          **ERNEST MUVUNANDINDA, sworn**

2               THE DEFENDANT:  It's true.

3               THE CLERK:  Thank you.  You may be seated.

4                         DIRECT EXAMINATION

5     BY MR. LAUER:

6     Q.   Good afternoon.

7     A.   Good afternoon.

8     Q.   Does your name appear correctly on the screen in front of

9     you?

12:45PM 10    A.   Yes.

11    Q.   Where do you live?

12    A.   Liberia.

13    Q.   Are you Liberian by birth?

14    A.   I was born in Rwanda.

15    Q.   Where in Rwanda were you born?

16    A.   Gikongoro.

17    Q.   Where in the country is that located?

18    A.   South.

19    Q.   What do you do for work?

12:46PM 20    A.   I'm a doctor, physician.

21    Q.   Do you have a specialty?

22    A.   Bones.

23    Q.   Excuse me?

24    A.   Bones.  Traumatology.

25    Q.   In order to become a doctor, did you have to attend

1    medical school?

2    A.    Yes.  I went to school.

3    Q.    Where did you go to school?

4    A.    National University of Rwanda.

5    Q.    Is that located in Butare?

6    A.    Yes.

7    Q.    When did you enter the university in Butare?

8    A.    1988.

9    Q.    In 1994 how far along were you in your studies?

12:47PM 10    A.    I was in the fifth year.

11    Q.    And what sort of coursework did fifth year students do?

12    A.    We were in training, I might say.

13    Q.    Where would you train?

14    A.    I was in a period doing dentistry.

15    Q.    And did you work at a particular, or did you train at a

16    particular place or facility?

17    A.    The University Butare medical.

18    Q.    As a medical student, did you know Mr. Teganya?

19    A.    He was behind me.

12:48PM 20    Q.    Was he more junior than you?

21    A.    Yes.

22    Q.    Did you have any personal dealings with him or contact?

23    A.    Not so much.

24    Q.    Directing you to your studies in academic years 1993 and

25    1994, where were you spending your days?

Case: 19-1689    Document: 00117615537    Page: 657    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 206    Filed 11/04/19    Page 93 of 59

12-93

 1   A.   The question is...?

 2   Q.   Did you go to a classroom or did you spend time at the

 3   hospital?

 4   A.   We were -- we had finished the theory.  We were just doing

 5   practical in the hospital.

 6   Q.   So were you in the hospital on a daily basis?

 7   A.   Beside the day I wasn't on guard.

 8   Q.   I'm sorry?

 9   A.   Beside the day I was not on guard.

12:50PM 10   A.   (In English.)  On call.

11        THE INTERPRETER:  "On call" the witness said.

12   Q.   What did it mean to be on call?

13   A.   When the work hours are done, you have to be at the

14   hospital to receive those who are in emergencies.

15   Q.   So there were times when you would be on call, and there

16   were times when you would work a regular day?

17   A.   There was a schedule.

18   Q.   As a fifth year student, what responsibilities did you

19   have; what were you able to do in treating patients?

12:51PM 20   A.   It would depend -- the department way was I was placed at

21   dentistry.

22   Q.   Can you give us an example of what your role was in

23   dentistry?

24   A.   To check patients who had a mouth problem.

25   Q.   Were you permitted to provide care directly to the

Case: 19-1689    Document: 00117615537    Page: 658    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 206    Filed 11/04/19    Page 94 of 59

12-94

```
 1    patients?

 2    A.    Yes, I was at the level of a treating -- giving treatment.

 3    Q.    Did more junior students have different restrictions?

 4    A.    Juniors were not allowed to do that.

 5    Q.    Directing your attention -- actually, did you have any

 6    other role within the medical school?

 7    A.    I was a vice president of Red Cross Society.

 8    Q.    What was the Red Cross Society, what did that organization

 9    do?

12:53PM 10   A.    To harvest the blood.

11    Q.    What kind of supplies?

12    A.    Harvesting blood for transfusion.

13    Q.    If I could direct your attention to the time of the

14    genocide in April of 1994.  Were you working in the hospital in

15    that time?

16    A.    From the beginning, no.  It was vacation time.

17    Q.    Did you at some point return from your vacation back to

18    Butare?

19    A.    It was mandatory for me as vice president of Red Cross to

12:54PM 20   come back.

21    Q.    When did you come back?

22    A.    Two days after.

23    Q.    Two days after what?

24    A.    Before the genocide started in Butare.

25    Q.    And approximately when was that?
```

J.A. 1343

```
 1    A.   The genocide started at Butare and I came two days after.

 2    Q.   Do you recall what dates specifically?

 3    A.   It was a Saturday.

 4    Q.   Do you remember how far into April that was?

 5    A.   I came in the morning to see the president of Red Cross.

 6              MR. LAUER:   Your Honor, we're pretty close to 1:00.

 7              THE COURT:   Why don't we keep going.  Let's use the

 8    five minutes.

 9    Q.   You said that you came back as part of your role with the

12:56PM 10    Red Cross.  What were you doing?

11    A.   At that time I was coming to see the president of Red

12    Cross to talk about how to help people who are injured in my

13    location where I lived.

14    Q.   Did you come to work at the hospital more frequently?

15    A.   Yes, many times.

16    Q.   How often were you working at the hospital during the

17    genocide?

18    A.   Because of the hours of work, the schedule changed.  There

19    was a curfew.  We were working from 8:00 to 2:00 p.m.

12:58PM 20    Q.   And where were you living at that time?

21    A.   I lived at home at Matyazo.

22    Q.   Did the genocide change how the hospital operated?

23    A.   It changed so much.

24    Q.   Can you elaborate?

25    A.   The normal treatment stopped, and we -- there was a lot of
```

1    emergencies because many people were coming with injuries and

2    those who were cut, and many people were laying on the floor.

3    Q.    Were there enough doctors and medical staff to treat

4    everyone?

5    A.    No, there were not enough.

6    Q.    What was the level of medical staff that was available?

7    A.    I don't have a statistic.

8    Q.    How did it compare to before the genocide?  How did the

9    number of doctors and staff during the genocide compare to

12:59PM 10    before the genocide?

11    A.    There were very few.  They were reduced.

12    Q.    You said that there were many, many people coming to the

13    hospital.  What sort of injuries did those people have?

14    A.    There were those who you could see that they were cut.

15    Q.    And was there a process for dealing with all the people

16    who were hurt?

17    A.    And those who were shot.

18    Q.    Was there a process in place to deal with all of those

19    people?

01:00PM 20    A.    Yeah.  It was like something that came, you know, suddenly

21    without plan.

22    Q.    How were people being cared for?  How were people being

23    treated?

24    A.    Not in a clean way, because we -- there were no

25    treatments -- treating staff were not enough, and the materials

1    were not enough.

2    Q.   You personally, what was your job during the genocide?

3    A.   I was sent to surgery.  That's where there was a lot of

4    work.

5    Q.   And what did you do in the surgery department?

6    A.   Stitches on those who were cut.  We put the stitches on

7    the wounds, cleaned the wounds and the -- most importantly we

8    took them into the operations.

9             THE COURT:  Okay.  Why don't we break there.

01:02PM 10             All right.  Ladies and gentlemen, I ask you to think

11    about whether or not you'd be available for a Monday or Tuesday

12    afternoon session next week.  Let me ask first, does anybody

13    have a problem with Monday?  No hands.  How about Tuesday?  I'm

14    going to talk to the lawyers about the schedule.  Why don't we

15    assume we're going to have a Monday afternoon schedule.  Let's

16    leave open Tuesday.  We'll see how this all plays out.  That

17    will be my working assumption.  I'll talk to the lawyers about

18    the schedule, and we'll give a sort of final plan -- well,

19    semifinal plan tomorrow.  Okay?

01:03PM 20             Thank you for your cooperation and patience.  Remember

21    all of my instructions about discussing the case, that is, not

22    discussing the case.  And I will see you tomorrow morning at

23    9:00.  Thank you.

24             THE CLERK:  All rise.

25    (Jury exits.)

**J.A. 1346**

        1            THE COURT:  All right.  How are we doing in terms of

        2    the schedule?

        3            MR. LAUER:  We're on track, your Honor.  I think we

        4    would be prepared to have a full day on Monday, but to follow

        5    that with a full day on Tuesday would be difficult.

        6            THE COURT:  If we had a Monday afternoon session, when

        7    would you expect to rest?

        8            MR. LAUER:  By the end of that week.

        9            THE COURT:  Meaning on Friday of that week?

01:04PM 10            MR. LAUER:  Possibly Thursday --

       11            THE COURT:  Okay.

       12            MR. LAUER:  -- depending on how long --

       13            THE COURT:  At this point does the government expect a

       14    rebuttal case?

       15            MR. GARLAND:  That's unclear.  If we did, it would be

       16    very, very short, your Honor.  Some of it depends on how much

       17    more we're going to hear about people's drinking problems and

       18    stuff like that, if they even had one at all.

       19            THE COURT:  Well, again, I urge you to streamline this

01:04PM 20    as best you can.  But I will see you tomorrow morning at 8:30.

       21    Okay.

       22            THE CLERK:  All rise.

       23    (Court exits.)

       24    (1:05 p.m.)

       25

13-1

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,          )
                                        )
5    vs.                                )  Criminal Action
                                        )
6    JEAN LEONARD TEGANYA,              )  No. 17-10292-FDS
                      Defendant         )
7                                       )
                                        )
8                                       )

9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11
                          JURY TRIAL DAY 13
12

13

14

                 John Joseph Moakley United States Courthouse
15                        Courtroom No. 2
                         One Courthouse Way
16                        Boston, MA 02210

17
                          March 27, 2019
18                          8:30 a.m.

19

20

21

22

23                      Valerie A. O'Hara
                      Official Court Reporter
24        John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                E-mail: vaohara@gmail.com

J.A. 1348

 1    APPEARANCES:

 2    For The United States:

 3        United States Attorney's Office, by GEORGE P. VARGHESE,
      ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
 4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
      Massachusetts  02110;
 5
      For the Defendant:
 6
              Federal Public Defender Office, by SCOTT LAUER, ESQ.,
 7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
      Boston, Massachusetts 02210.
 8
      ALSO PRESENT:
 9
      Joseph Bizimana, Interpreter
08:37AM 10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

   WITNESS                        DIRECT   CROSS   REDIRECT   RECROSS
3
    ERNEST MUVUNANDINDA, RESUMED
4     By Mr. Garland                 12
      By Mr. Varghese                         22
5     By Mr. Lauer                                      32
      By Mr. Varghese                                              33
6
   JEAN BAPTISTE BIZIMANA
7     By Mr. Lauer                   34
      By Mr. Garland                         42
8
   MICHEL MUSILIKARE
9     By Mr. Lauer                   53               78
      By Mr. Varghese                       64
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 19-1689    Document: 00117645537    Page: 666    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS  Document 207  Filed 11/04/19  Page 4 of 81

13-4

```
  1                           PROCEEDINGS

  2             THE CLERK:  All rise.

  3             THE COURT:  All right.  Good morning.

  4             MR. GARLAND:  Good morning.

  5             THE COURT:  Anything that we need to talk about?

  6             MR. GARLAND:  Just having looked over the draft

  7    instructions very briefly, we haven't gone through and looked

  8    at all of the elements, but the Court had posed a question

  9    about the two witness rule.

08:36AM 10             THE COURT:  Yes.

 11             MR. GARLAND:  The answer is that for one of the

 12    statutes, 1322, which is not charged in this case, that was

 13    statutorily eliminated.  There are some exceptions that I need

 14    to look into more, but I'm not sure it's going to be a big

 15    issue.

 16             THE COURT:  Okay.  If there's any heavy legal

 17    thinking, don't drop it on me at the last second.

 18             MR. GARLAND:  We will not, your Honor.

 19             THE COURT:  You and my clerks may take it up quickly,

08:36AM 20    but I may not.

 21             MR. GARLAND:  The second is that we did not see an

 22    instruction, and we didn't ask for one, but we think at this

 23    point it's prudent that the jury be instructed not to consider

 24    the consequences of their decision one way or the other.

 25    That's been done in other trials.  There's been, I think, a lot
```

J.A. 1351

Case: 19-1689    Document: 00117641537    Page: 667    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 5 of 81

13-5

```
  1    of testimony here about a variety of potential consequences,

  2    and that's clearly not the jury's province.

  3            THE COURT:  It's part of my boilerplate, it's

  4    somewhere early on, but it's just said in passing with other

  5    things that, you know, but I'd be happy to consider it if you

  6    want to propose something specific, I'd be happy to look at it

  7    and let the defense respond to it.

  8            MR. GARLAND:  We'll draft something up.

  9            THE COURT:  Okay.

08:37AM 10            MR. GARLAND:  Another issue that has come up has to do

 11    with the defense witnesses have already testified, which is

 12    when they're brought into the country, the ones that have been

 13    brought in so far have been brought in under parole, and what

 14    that means is they're here for a particular purpose, when

 15    they're done, they should go back, and at this point we haven't

 16    done anything yet, but we think at least the witnesses who

 17    either testified this week or were going to testify but the

 18    defense has decided not to call should be put on planes back to

 19    wherever they came from.

08:38AM 20            THE COURT:  I'm sure that's true in the abstract.  On

 21    the other hand, it's not an hourly shuttle to Kigali from

 22    Boston.  Is it the Marshal?  Who's doing the actual

 23    transportation arrangements?  Is it the Marshals?

 24            MR. WATKINS:  Perhaps I can speak to that, your Honor.

 25    It is the Marshals.  We actually in the Federal Defender Office
```

1    make the actual reservations and send them to the Marshal, but

2    the Court is quite correct that it's not exactly an easy thing

3    to get them back.

4         We are taking steps.  Part of the calculus, is as the

5    government is doing itself, they have kept I think all or

6    nearly all of their witnesses here in the country while they

7    find out what our case is about.

8         There's going to be a little bit back and forth at

9    least for a couple of days as we try to figure out what the

08:39AM 10   government might do on rebuttal, so we don't anticipate

11   witnesses staying for a long period of time, but it's certainly

12   not going to be this afternoon that they're flying out or even

13   tomorrow or Friday, but we are making efforts now to determine

14   who we need to keep and how long we need to keep them for.

15        THE COURT:  Okay.  I think just in light of the

16   logistics of all this, I think we need a little bit of play in

17   the joints here.  What you say is correct, you know, in theory,

18   if it was like going back to Maryland or something, boom, they

19   should be gone.

08:39AM 20        This is, again, a complicated situation, and I think

21   it would be fair for both sides to hold back a little just to

22   see how the evidence develops.  We can't get the witness here

23   on a dime.  If you want to recall somebody, for example, if you

24   decided in a rebuttal case you wanted to recall one of your

25   witnesses and I permitted it, presumably, you would want that

J.A. 1353

1      person at the Marriott, not in Butare.

2           MR. GARLAND:  Your Honor, that's fine.  Just to

3      correct the record, we actually did not retain most of our

4      witnesses here.  We sent most of our witnesses back.  We held

5      onto only the witnesses that I thought we might put up.

6      That's actually a small group at this point.

7           THE COURT:  Even as a small group, in other words,

8      presumably you have at least one person here who is not

9      presently scheduled to testify but you want to reserve judgment

08:40AM 10    on that until the defense rests, and, anyway, this is all a

11     little bit abstract to me, I guess.

12          I'm not going to force this, among other things, I'm

13     not an Immigration Judge, I don't know what my rights and

14     authorities are.  I'm, obviously, going to be deferential to

15     the Marshals on the logistics of all of this because I don't

16     quite understand how this works.

17          MR. GARLAND:  Yes.  Part of the concern as well since

18     they are here under parole, you've heard a little bit of

19     testimony about, which is that the witnesses who are here on

08:41AM 20    parole are at a particular hotel.  They to have guards, not

21     guards but agents there basically to make sure that nobody

22     absconds 24-7.

23          It's true there aren't flights every hour, but there

24     are flights pretty much every day to Amsterdam and down to

25     Kigali as well, which is why they'd like to go ahead and start

Case: 19-1689    Document: 00117615537    Page: 670    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 8 of 81

13-8

```
 1    scheduling that sooner rather than later, not to wait until

 2    next week.

 3              THE COURT:  Let's keep an eye on that.  I guess they

 4    could go to Revere Beach.  I was wondering if it was a reward

 5    or a punishment to the witnesses when they got to go to --

 6              MR. GARLAND:  I know this is being recorded, but I

 7    think Winthrop is the punishment.

 8              THE COURT:  Mr. Watkins.

 9              MR. WATKINS:  If Mr. Garland is done, we have one

08:41AM 10    other emerging issue.

11              MR. GARLAND:  Yes.

12              MR. WATKINS:  I'm not asking the Court to make a

13    decision, but because it's the last day until we see the Court

14    again on Monday, I notified the Court this morning we have

15    three, actually two witnesses in Burundi.  The refugees from

16    Rwanda, they are essentially stateless.

17              The Homeland Security, the Department of Homeland

18    Security has issued parole letters, which permits them come to

19    the United States.  The problem for these particular witnesses

08:42AM 20    is getting passports or some alternative in Burundi.  For

21    several weeks we've been working on that with these two

22    particular witnesses.  Other Burundian witnesses I think you're

23    going to have one today do have those travel documents and are

24    able to come here.

25              We learned early this morning for us that it will take
```

J.A. 1355

1    another week before they are afforded refugee cards in Burundi,

2    which will then trigger getting the travel documents which will

3    take another week.  That takes us to April 9th.  Of course,

4    that is problematic because as we have reported and right now

5    we are on track to finish the defense case by April 5th.

6         What I have done actually over the past week or so, it

7    seemed like this might not come to fruition, is contact the

8    U.S. Embassy in Bujumbura, Burundi in order to see if they have

9    video conference.

08:43AM 10        THE COURT:  Bujumbura, isn't it?

11        MR. WATKINS:  Did I say it wrong, Bujumbura, Burundi

12   to see if they have the capabilities to do video conferencing

13   in the embassy.  I've been assured by the end of the day they

14   will have a decision on that.  It's going up apparently to the

15   embassy whether they can do this for us.  I have asked them to

16   have those available for next Wednesday or Thursday to enable

17   these two witnesses to testify by video conference.

18        I mentioned I alerted the government only this

19   morning, an hour or so ago, and sent them the witness

08:44AM 20   statements so we can all understand the materiality of their

21   testimony.

22        My understanding is the government will oppose it.

23   We're not asking the Court to make a decision at this point.  I

24   think the first thing to see is whether it's logistically and

25   technologically feasible.  I should get that answer by the end

13-10

1    of the day, so rather than spring this on the court on Monday.

2    THE COURT:  I appreciate that.  I'm only going to be

3    in Washington, so I'll be able to read things as well if you

4    have something, you know, you want to file a letter or

5    something on the docket, you know, bringing me up to date or

6    setting out the government's position if you know what it is, I

7    would appreciate it.

8    MR. VARGHESE:  Your Honor, we can talk just quickly

9    about what the government's position is with respect to these

08:45AM 10    witnesses now if that would be helpful.

11    THE COURT:  Sure.

12    MR. VARGHESE:  A couple of things, your Honor, with

13    respect to these two witnesses, we would note that they are of

14    marginal relevance.  Neither of them mentioned Mr. Teganya at

15    all or any relationship with Mr. Teganya.  Both of them

16    convicted genocidaires who are living in refugee camps in

17    Burundi.

18    For the witness statements, they spent a lot of time

19    talking about prison conditions within Rwanda, which we don't

08:45AM 20    believe is relevant.  One of them is convicted of murdering

21    Jean Pierre  Gasasira's father and claims that Mr. Gasasira was

22    not at the hospital.

23    You know, the credibility of a convicted murderer

24    talking about whether or not his --

25    THE COURT:  I can't make -- whatever my decision is, I

Case: 19-1689    Document: 00117615537    Page: 673    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 11 of 81

13-11

1    can't make it based on credibility.  Obviously, it could be

2    cumulative or marginally relevant.  At some point, I may have

3    to make a choice, you know, continue the trial, go forward

4    without them, do a video conference if that's available.  I

5    have nothing.

6         MR. VARGHESE:  Of course, your Honor.  With respect to

7    that, I mean, there are a lot of technical difficulties that we

8    can explain about, but the Bujumbura embassy is actually not a

9    full-time embassy, it's a part-time embassy.

08:46AM 10        The Court has sat through the trial so far.  You

11   realize the challenges when they're live here in the courtroom

12   and present.  We think those challenges would be magnified if

13   we're talking about the video conference.  We also think there

14   will be interpreter issues.  We'd have to have an interpreter

15   there as well as an interpreter here to make sure everything is

16   clear to everyone.

17        We do have a lot of concerns about this, and given the

18   marginal relevancy of this, we are likely going to be opposing

19   it.

08:46AM 20        THE COURT:  All right.  I'm not going to make any

21   decision now.  You know, let's see how all this plays out.

22   Hopefully, it won't come to that, but let's keep an eye on it,

23   and if you could update me, again, if you have developments, I

24   appreciate that just to focus my thinking on it, and if you

25   want me to read the witness statements if that would be a

Case: 19-1689    Document: 00117615537    Page: 674    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 207    Filed 11/04/19    Page 12 of 81

13-12

1    useful exercise, I'm willing to do that as well.  Okay.

2    Anything else?

3            MR. GARLAND:  No, your Honor.

4            MR. LAUER:  No, your Honor.

5            THE COURT:  Okay.  We'll convene as soon as we have a

6    full jury.

7            THE CLERK:  All rise.

8            (A recess was taken.)

9            THE CLERK:  All rise for the jury.

09:02AM 10            (JURORS ENTERED THE COURTROOM.)

11            THE COURT:  All right.  Good morning, everyone.  Do

12    you understand you're still under oath?

13            THE WITNESS:  Yes.

14            THE COURT:  Okay.  Mr. Lauer.

15                ERNEST MUVUNANDINDA, RESUMED

16                DIRECT EXAMINATION, CONTINUED

17    BY MR. GARLAND:

18    Q.   Good morning.

19    A.   Good morning.

09:02AM 20    Q.   So before we proceed, I just want to let you know if

21    you're experiencing any difficulties understanding my questions

22    or with the translation, please say so, and we'll do our best

23    to clear it up.

24    A.   Yes.

25    Q.   So yesterday we were discussing your experiences at the

1   hospital during the time of the genocide.  Can you tell us in

2   as much detail as possible what specifically were you doing,

3   what services, medical services you were providing during that

4   time?

5   A.   Yes, in details, when the killing started in Butare, it

6   started when it was Thursday, 21st.  The following day, it

7   continued the following day, Friday.  Saturday, that's the time

8   they allowed the people to get out of their homes.  That's the

9   time I decided to get out of the house because I have seen many

09:04AM 10   wounded people.

11        I went, I checked and see if I can go and see the

12   president of Red Cross to see if they can come and help me to

13   treat the people who are injured where I lived.

14        Our Red Cross had an ambulance.  I thought that was

15   the means helping them taking them to hospital.

16   Q.   Did you drive the ambulance to the hospital?

17   A.   The ambulance was at the hospital.  I used my bike,

18   bicycle to get to the hospital.

19   Q.   What did you do when you got to the hospital?

09:05AM 20   A.   When I got to hospital, I saw many people who had been

21   wounded.  They were laying on the floor in the surgery rooms.

22   I met the president of Red Cross.  I told this person, this

23   person the problem I had, it was very hard, and he told me the

24   problems that the hospital had.  He told me that even Tumba,

25   those problems are existing.

1    Q.    When you say those problems, are you referring to the

2    violence that was taking place in the city?

3    A.    The killing were two days earlier.

4    Q.    And did you have a plan of action?  What did you do after

5    meeting with the director of the Red Cross?

6    A.    The plan was to take them to the hospital where they can

7    get treatment because if we treated them where they were, we

8    could then be killed or those ones could be killed, too.

9    Q.    Did you, in fact, take people to the hospital?

09:07AM 10    A.    The ambulances started helping us to take people, the

11    injured people to the hospital.

12    Q.    And what was your role in that?

13    A.    Where I went to study my primary school, that's where I

14    went to help and the Matayzo.

15    Q.    Can you describe, you said many people?

16    A.    Matayzo Health Center.

17    Q.    You said many people had been wounded and came to the

18    hospital.  Can you describe how different the hospital was from

19    how it had been before the genocide?

09:08AM 20    A.    The hospital in Butare, it used to work in a normal way,

21    not emergency, and the workers started at eight, then it would

22    be a pause for 12 p.m. to 2 p.m.  They had a break from noon to

23    2 p.m. for lunch, then after two, they would continue their

24    service.

25    Q.    How did that change when the violence started?

Case: 19-1689      Document: 00117615537      Page: 677      Date Filed: 07/16/2020      Entry ID: 6352983
Case 1:17-cr-10292-FDS      Document 207      Filed 11/04/19      Page 15 of 81

13-15

 1              THE COURT:  I'm sorry, is the witness testifying in

 2      French?

 3              THE INTERPRETER:  No.

 4              THE COURT:  It's in Kinyarwandan?

 5              THE WITNESS:  It's in Kinyarwandan.

 6              THE COURT:  It sounded French.

 7              THE INTERPRETER:  There are some changes I'm trying to

 8      tell him to change it into Kinyarwandan so it can be continuous

 9      Kinyarwandan.

09:10AM 10              THE COURT:  I'm sorry, please continue.

11              THE INTERPRETER:  Thank you.

12      A.   Because of the killing that had already occurred, some of

13      the -- just a minute.  Because some stuff had already been

14      killed at the hospital and those who were injured, those were

15      hiding, the numbers of their staff had reduced.  So the

16      patients who were coming to the hospital for no more

17      treatments, it became helping the survivors of this war.

18      Q.   Was the hospital functioning well?

19      A.   It changed it to be emergency but also the other problem

09:12AM 20      was there was staff but very reduced staff.  It required many

21      doctors but because there were a lot of people who were

22      injured.

23      Q.   Were there enough doctors and staff to treat the people

24      who were injured?

25      A.   There were not enough.  The number of patients who are in

Case: 19-1689    Document: 00117615537    Page: 678    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 16 of 81

13-16

 1    the surgery and those were, there were many than what you can

 2    handle.

 3    Q.   How much time were you spending at the hospital and how

 4    much time were you spending with the ambulance?

 5    A.   The time in the hospital and the time in the ambulance?

 6    Q.   Yes.  Can you clarify how much time you were spending at

 7    the hospital because you had already mentioned driving an

 8    ambulance?

 9    A.   Because I was in the Red Cross Service earlier, and I was

09:13AM 10   a student in the medical school, my primary work was to show

11    them where the people who are survivors, those who were

12    injured, where they are.  We go with a driver and show them

13    where they are at the health center and at schools, that's

14    where they were killed.

15    Q.   At the hospital, did you provide treatment to patients

16    yourself?

17    A.   Would you repeat, please?

18    Q.   The question was did you at the hospital, did you provide

19    treatment to patients yourself?

09:14AM 20   A.   Yes, I did.

21    Q.   Can you describe in detail what treatment you provided to

22    patients?

23    A.   Those who required stitches, I did the stitches on their

24    wounds.  Those who required just cleaning and putting bandage

25    on head.

1    Q.    Were there other medical students who were doing similar

2    sorts of things?

3    A.    It would depend the level of studies he's on.

4    Q.    Can you explain what you mean by that?

5    A.    Those who were in pre-clinic, the first and the second,

6    they were not able to meat the patients.

7    Q.    What about more senior?

8    A.    The first doctorate because they had already started going

9    into the hospital to see the patients, now those started coming

09:16AM 10   to help us, like covering the wounds and also see if he can

11   learn to put stitches on the wounds and to help us in many

12   things.

13   Q.    How many medical students were at the hospital?

14   A.    I'm not the right person to know the number of the

15   students.

16   Q.    Did you, for instance, see Mr. Teganya at the hospital

17   during this time?

18          THE INTERPRETER:  See him?

19          MR. LAUER:  Yes.

09:17AM 20   A.    Yes, I saw him.

21   Q.    What did you see him do?

22   A.    I saw him the first time where a person from my home was,

23   name of Suzanne.  She called me, and when I went, I saw Teganya

24   helping this patient.

25   Q.    Where was Mr. Teganya in relation to where you were

```
 1    helping people?  How close was Mr. Teganya to where you were?

 2    A.   It's one hall.  There was just a curtain.  It was the

 3    recovery room, yes.  That's where many patients were laying,

 4    and Suzanne was there, and she was calling me.

 5    Q.   Did you see Mr. Teganya often when you were at the

 6    hospital?

 7    A.   Because he was a student, and the same faculty was in.  I

 8    saw him in the library, I saw him on break, to go to my class,

 9    you would pass his side of the class, in front of their class.

09:19AM 10    Q.   During the time period of the genocide in the hospital,

11    how often did you see him?

12    A.   I did not pay attention to count how many times I saw him.

13    Q.   Were you busy when you were at the hospital?

14    A.   Myself, I had a lot than him.

15    Q.   Can you elaborate on that?  What did you have a lot of?

16    A.   Because of the level of studies, I was a third-year

17    doctorate, I knew how to do stitches.

18    Q.   Did he know how to do stitches?

19    A.   The level he was in, he could not do it, but we are the

09:21AM 20    ones who taught them how to do it.  They were just covering the

21    wounds.  We allowed them to do some work because there are some

22    other courses they have done like traumatology.

23    Q.   Did there come a time when you stopped going to the

24    hospital?

25    A.   Yeah, there's a time I stopped, and there are times I
```

13-19

```
 1    wasn't there.

 2    Q.   Why was there times when you weren't there?

 3    A.   Why?

 4    Q.   Yes.

 5    A.   Okay.  I was working there helping at the hospital, but I

 6    was working with the Red Cross.  When we see that there is a

 7    shortage of blood, we went in the rural area to get blood.

 8    Q.   You also said there was a time when you stopped going to

 9    the hospital.  Approximately when was that?

09:22AM 10    A.   Mid-May I stopped.

11    Q.   Why did you stop going?

12    A.   That time we went to Nyaruteja to search blood.  When we

13    came back, we brought blood.  People came and stopped us at

14    roadblocks.  They said that we're taking the blood to help

15    Tutsis and that they were really hard on us.  I was scared and

16    some days not to do it again.

17    Q.   Did you live close to the hospital?

18    A.   Yes, I was close to the hospital.  I was in Matayzo.

19    Q.   How far a walk is it from Matayzo?

09:23AM 20         THE INTERPRETER:  Your Honor, interpreter wants the

21    witness to give it again?

22         THE COURT:  Yes.

23    A.   The problem is that I understand English, that's why.

24    Okay.

25    Q.   For purposes of ensuring that there's no
```

J.A. 1366

Case: 19-1689    Document: 00117615537    Page: 682    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 20 of 81

13-20

1    miscommunications, can you just wait until the interpreter has

2    finished interpreting, and we'll do it that way.

3         THE INTERPRETER:  That's what interpreter say exactly,

4    thank you.

5    Q.    So my question was how far of a walk was it from Matayzo

6    to the hospital?

7    A.    It's like five kilometers.

8    Q.    To get to Matayzo and back did you have to pass by

9    roadblocks?

09:24AM 10   A.    Yes.

11   Q.    And is what you were saying is that in mid-May, it became

12   too difficult or too dangerous to pass through those

13   roadblocks?

14   A.    In May, that's when we had problems when we were taking

15   blood from Matayzo.

16   Q.    Did you remain in Butare until the end of the genocide?

17   A.    I did not move.

18   Q.    Did there come a time when you did leave Butare?

19   A.    That's the time I did not move from Butare unless I'm

09:26AM 20   going to have this blood, otherwise I left Butare when the

21   genocide was over.

22   Q.    When the genocide was over, where did you go?

23   A.    I went to Gikongoro, then I went to Congo.

24   Q.    How long were in Congo for?

25   A.    Three years.

1   Q.   What did you do after those three years?

2   A.   I came back to Rwanda, came back to Butare.

3   Q.   What did you do when you came back to Butare?

4   A.   I went back to school and finished my school.

5   Q.   You finished medical school?

6   A.   Yes, I did.

7   Q.   Dr. Muvunandinda, at any time when you were in the

8   hospital, did you see with your own eyes someone being killed?

9   A.   I could not see them.

09:27AM 10   Q.   At any time that you were at the hospital during the

11   genocide, did you see people being taken away to be killed?

12   A.   I did not see them.

13   Q.   At any time when you were at the hospital during the

14   genocide, did you see medical students assisting with people

15   being taken away?

16   A.   Those that took people, they did not do it in an open way

17   where people can see it.

18   Q.   Were you aware that people were disappearing or people

19   were being taken from the hospital?

09:28AM 20   A.   Yes, people were disappearing.

21   Q.   How did you become aware of that?

22   A.   To know that like there is a patient that you are

23   treating, then the following day, you don't see this patient.

24   Q.   Did you know what happened?

25   A.   Continue.

13-22

1   Q.   I think he was finishing his answer, so please finish.

2   A.   When you don't see the patient that you have been

3   treating, then you know that some people have taken the

4   patient.

5   Q.   Did you ever see that happen yourself?

6   A.   It happened when we already left the hospital.

7        MR. LAUER:  Thank you, sir.  No further questions.

8        THE COURT:  Cross.

9                     CROSS-EXAMINATION

10  BY MR. VARGHESE:

11  Q.   Good morning, Doctor.

12  A.   Good morning.

13  Q.   I want to ask you just a few questions about some things

14  that Mr. Lauer asked you about, okay.  Let me start with what

15  you ended on.  Suffice to say, you knew there was a genocide

16  going on at the hospital, correct?

17  A.   Genocide was happening in Rwanda.  The hospital wasn't in

18  Rwanda.  There was no way of not going through there.

19  Q.   So you would agree with me that there was a genocide going

09:31AM 20  on at the hospital, correct?

21  A.   I agreed to that because I have seen -- I know people have

22  been dying from there.

23  Q.   And it was impossible not to know that there was a

24  genocide going on in the hospital; isn't that right?

25  A.   It wasn't possible.

J.A. 1369

```
 1    Q.   It wasn't possible not to know, correct?
 2    A.   It was impossible -- it was hard for somebody not to know.
 3    Q.   Because patients were missing, correct?
 4    A.   As I said earlier, there are patients who were
 5    disappearing.
 6    Q.   And there were patients -- there were people that were
 7    hiding, Tutsis were hiding in the hospital?
 8    A.   Yes, they were hiding there.
 9    Q.   And they were scared?
10    A.   Let alone them, we also were afraid.
11    Q.   And that's because medical staff were also being taken and
12    being killed; isn't that correct?
13    A.   No, a medical student, no.  They were not there.  The
14    Tutsis were no longer there.
15    Q.   You mean the Tutsi medical staff were no longer there?
16    A.   Unless those who were hiding.  It was known that some of
17    them were hiding.  Others were no longer there.
18    Q.   And you knew a doctor who was hiding who was killed; isn't
19    that right?
20    A.   There's no doctor who was killed.
21    Q.   Do you remember Dr. Karekezi?
22    A.   Oh, Karekezi I know is not a doctor, but he's a nurse.
23    Q.   And Dr. Karekezi was hiding in the intensive care unit;
24    isn't that right?
25    A.   I want to tell you that Karekezi you are talking about was
```

09:32AM (line 10)
09:34AM (line 20)

Case: 19-1689   Document: 00117615537   Page: 686   Date Filed: 07/16/2020   Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 24 of 81

13-24

```
 1    not a doctor, he was a nurse.

 2    Q.   That wasn't my question, my question was he was hiding in

 3    the intensive care unit; isn't that right?

 4    A.   Yes.  He was hiding in the intensive care unit, but he was

 5    not a doctor, he was a nurse.

 6    Q.   Okay.  Very important to you.  So the Nurse Karekezi was

 7    hiding in the intensive care, and they found him, they took him

 8    and they killed him; isn't that right?

 9    A.   They killed him there.

09:35AM 10   Q.   In the intensive care unit?

11    A.   Yes.

12    Q.   How do you know that?

13    A.   They told me because it happened during the day.

14    Q.   I'm sorry, say that again.

15    A.   They told me because it happened during the day.

16    Q.   While you were there?

17    A.   Yes, that day I was there at the hospital.

18    Q.   So the nurse was killed in the intensive care unit during

19    the day while you were at the hospital; is that what your

09:36AM 20   testimony is?

21    A.   Yes, and I knew that's where he was hiding.

22    Q.   How did you know he was killed?

23    A.   Those who took food to him, they found him dead.

24    Q.   How was he killed?

25    A.   He was suffocated.
```

J.A. 1371

Case: 19-1689    Document: 00117615537    Page: 687    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 25 of 81

13-25

        1    Q.   Was it soldiers or civilians or medical staff who were
        2    involved in killing him?
        3    A.   Soldiers.
        4    Q.   You also knew a student who was killed in the hospital as
        5    well; isn't that right?
        6    A.   No student was killed at the hospital.
        7    Q.   You knew a person named Crete?
        8    A.   Crete.
        9    Q.   You knew a student named Crete; is that right?
09:38AM 10    A.   Yes, I know him.
       11    Q.   He was in the biology school, right?
       12    A.   He had graduated.  He worked at Kibuye.
       13    Q.   And he was hiding in the hospital as well; is that
       14    correct?
       15    A.   Can I tell you exactly about Crete?
       16    Q.   Actually let's start with answering my question.  He was
       17    hiding in the hospital?  Let the translator translate, and then
       18    you can answer.  He was hiding in the hospital as well,
       19    correct?
09:38AM 20    A.   I was hiding in the hospital.
       21    Q.   Where in the hospital?
       22    A.   Near the eye consultation, ophthalmology.
       23    Q.   How far was the ophthalmology department from where you
       24    were working in the surgical ward?
       25    A.   Just a chapel that was between them.

# J.A. 1372

1    Q.    Pretty close?

2    A.    Close, yes.

3    Q.    And he was hiding there because he had fled there from

4    Gikongoro; is that correct?

5    A.    Yes.

6    Q.    And he had fled from Gikongoro with some nuns; is that

7    correct?

8    A.    Yes, and they came before the genocide had started, got

9    there.

09:39AM 10    Q.    How many nuns were there?

11    A.    There were more than two.

12    Q.    And were they both in the ophthalmology department as

13    well?

14    A.    It wasn't the ophthalmology itself, but it was a room that

15    was close to the ophthalmology, the way to go to ophthalmology.

16    Q.    And so he and the nuns were hiding in that same location;

17    isn't that correct?

18    A.    And many other people and the other people who came from

19    Kibuye.

09:41AM 20    Q.    And they were all Tutsis?

21    A.    Yes, they were Tutsis.

22    Q.    And they were taken?

23    A.    The one I know that was taken is Crete, the one I knew.

24    Q.    How did you know that Crete and the nuns and the other

25    individuals were hiding in that ophthalmology area?

J.A. 1373

Case: 19-1689    Document: 00117615537    Page: 689    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 27 of 81

13-27

1    A.    Because I knew Crete, and I saw Crete when I was coming

2    from Kibuye.  From Kibuye, you had to go through our place.

3    Q.    I'm sorry, through your place?

4    A.    From Kibuye to the hospital, you had to go through our

5    place, through our home.

6    Q.    How did you know he was in the ophthalmology area of the

7    hospital?

8    A.    I went there first with a priest who came with them.

9    Q.    So you knew they were hiding there, you knew they were

09:42AM 10    Tutsis, and you knew they were in the ophthalmology area; is

11    that correct?

12    A.    I knew that.

13    Q.    And you knew that Crete was taken, he was found; is that

14    right?  You knew that Crete was found by the Interahamwe and

15    the soldiers?

16              MR. LAUER:  Objection, your Honor.

17              THE COURT:  Overruled.

18    Q.    You can answer.

19    A.    Crete, I knew that because he came back with injuries.

09:43AM 20    Q.    So why don't you explain when did he come back with

21    injuries?

22    A.    Where he was hiding, he did not have wounds.

23    Q.    He wasn't an injured patient, was he?

24    A.    He did not have injuries.

25    Q.    But then you saw him again and he had severe injuries;

**J.A. 1374**

```
 1        isn't that correct?
 2        A.   He was tired with wounds, and he told us how it happened.
 3        Q.   And he told you he was taken to a killing site; isn't that
 4        correct?
 5        A.   Yes.  They threw him.  They thought he's dead.
 6        Q.   And they threw him into a pit; isn't that right?
 7        A.   We did not ask them all those details.
 8        Q.   And did he say if he was taken alone or if he was taken
 9        with other individuals?
09:44AM 10        A.   He was taken with other people.  He was taken with other
11        people.
12        Q.   Was he taken with the nuns?
13        A.   We did not ask him that.
14        Q.   What wounds had he suffered?
15        A.   On the forehead and his back.
16        Q.   What was on his forehead?
17        A.   Sorry.
18        Q.   What was the wound on his forehead?
19        A.   We see that he was hit by something.
09:45AM 20        Q.   And so, in fact, you knew that there were atrocities that
21        were happening at the hospital, isn't that correct?
22        A.   Would you repeat that again, please?
23        Q.   You knew while you were working at the hospital that there
24        were atrocities happening at the hospital?
25        A.   I knew that it was happening.
```

J.A. 1375

1    Q.   Because you knew about the nurse who had been killed in

2    intensive care, and you knew about your friends who was taken

3    to the killing site with others to be killed; isn't that right?

4    A.   Your question is not clear.

5    Q.   I'll move on.  Did you know of other people who were

6    killed in the hospital during the daytime?

7    A.   I said earlier that many people were not killed during the

8    day because we were there.

9    Q.   I understand that, but you also testified that the Nurse

09:46AM 10   Karekezi was killed during the day in the intensive care unit,

11   so my question to you is are you aware of other people who were

12   killed during the day at the hospital?  What was the answer?

13   A.   Beside who?

14   Q.   I'm asking if you know of other people besides

15   Nurse Karekezi who was killed at the hospital during the day?

16   A.   I don't know that.

17   Q.   But you know that was happening, correct?

18   A.   Yes, I knew that was happening because they were

19   disappearing.

09:47AM 20   Q.   In fact, it was impossible not to know; isn't that

21   correct?

22   A.   Earlier I said it was impossible not to know because

23   myself as a doctor, I could know.  There was no way I could not

24   know because there were patients that I could not see, and I

25   treated this patient, and others would tell you another patient

**J.A. 1376**

Case: 19-1689    Document: 00117615537    Page: 692    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 30 of 81

13-30

         1    disappeared.

         2    Q.   Are you familiar with a Dr. Karekezi, Jean Claude?

         3    A.   You continue to say that he's a doctor, he's not a doctor.

         4    Q.   I'm not talking about Murkezi, I'm talking about Karekezi.

         5    A.   I'm telling you that -- I'm telling you that he went to a

         6    group in Butare.  They don't teach to be a doctor, but they

         7    teach nursing.  He was not a doctor.

         8    Q.   I'm asking about somebody else.  I'm asking you about a

         9    doctor named Dr. Karekezi, Jean Claude?  Do you know who that

09:49AM 10    is?

        11    A.   There's no doctor called Karekezi Jean Claude who worked

        12    at Butare.

        13    Q.   That's your testimony?

        14    A.   Yes, I affirm that, no one.

        15         MR. VARGHESE:  One second, your Honor.

        16    Q.   I want to bring up Exhibit 60 which is admitted.  Doctor,

        17    do you see what's on the screen in front of you?

        18    A.   He was young.

        19    Q.   Do you know who he is?

09:51AM 20    A.   Yes, I know him.

        21    Q.   Do you know he was killed at the hospital; isn't that

        22    correct?

        23    A.   Yes.

        24    Q.   He was killed during the day; isn't that correct?

        25    A.   Yes, he was killed during the day.

Case: 19-1689    Document: 00117615537    Page: 693    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 207    Filed 11/04/19    Page 31 of 81

13-31

|    |    |
|----|----|
| 1 | Q.  This is somebody different than who you were talking about |
| 2 | in the intensive care unit; isn't that correct? |
| 3 | A.  Karekezi was killed in the intensive care unit during the |
| 4 | day. |
| 5 | Q.  You testified that you knew Mr. Teganya; is that correct? |
| 6 | A.  Yes, I knew him. |
| 7 | Q.  And you testified that you knew him from the library, from |
| 8 | classes; is that correct? |
| 9 | A.  Yes, I knew him. |
| 09:52AM 10 | Q.  But he wasn't in the Red Cross with you, was he? |
| 11 | A.  No, he was not. |
| 12 | Q.  And if you said that he was in the Red Cross with you, |
| 13 | that wouldn't be correct; is that correct? |
| 14 | A.  It wouldn't be correct. |
| 15 | Q.  You testified that you saw him at the hospital once; is |
| 16 | that correct? |
| 17 | A.  I said I saw him and I said also the way I saw him. |
| 18 | Q.  And you said that the hospital was operating from 8 a.m. |
| 19 | to 2 p.m.; is that correct? |
| 09:53AM 20 | A.  That's what I said. |
| 21 | Q.  It wasn't operating until 6 p.m. every day during the |
| 22 | genocide, was it? |
| 23 | A.  The hospital should open 24 hours, but because of the war, |
| 24 | the genocide that was going on, it opened from 8 to 2 because |
| 25 | of safety. |

1    Q.   And you mentioned that there was a two-hour lunch period

2    usually at the hospital; is that correct?

3    A.   Those two hours were before the genocide and not during

4    genocide.

5    Q.   So, was there a lunch period during the genocide?

6    A.   There was no time.  People were ending their work at two

7    and go home.

8    Q.   So the day was from 8 a.m. to 2 p.m. with no lunch break?

9    A.   No break.

09:54AM 10    Q.   Do I have that correct, from 8 a.m. to 2 p.m. with no

11    lunch break?

12    A.   No break.

13    Q.   And if someone said that the day was from 8 a.m. to 6 p.m.

14    with a lunch break, that was before the genocide; isn't that

15    correct?

16    A.   It would be lying.

17         MR. VARGHESE:  Thank you.  I have nothing further.

18         THE COURT:  Redirect.

19                   REDIRECT EXAMINATION

20    BY MR. LAUER:

21    Q.   Can I have Exhibit 60 on the screen.  You were shown this

22    photograph and asked some questions about it.  Is this the

23    person that we were referring to as Murekezi?

24    A.   We called him the Degaule.

25    Q.   Do you know with certainty was his real name was?

Case: 19-1689    Document: 00117615537    Page: 695    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 207    Filed 11/04/19    Page 33 of 81

13-33

```
 1    A.    They told me that his father was Karekezi, and his name
 2    should be Karekezi.
 3    Q.    Is this the gentleman that you were referring to who was
 4    killed in the intensive care unit?
 5    A.    Yes.
 6    Q.    Did soldiers do that?
 7    A.    There was a soldier who passed by there, then afterwards
 8    they found him dead.
 9    Q.    Do you have any knowledge of whether Mr. Teganya was there
10    at the time he was found dead or not?
11    A.    He was not there.
12          MR. LAUER:  No further questions.  Thank you.
13          THE COURT:  Recross.
14                      RECROSS-EXAMINATION
15    BY MR. VARGHESE:
16    Q.    I just want to make sure I understand.  You testified
17    earlier that you weren't there when Mr. Karekezi or
18    Dr. Karekezi was killed?
19    A.    I said that I was at the hospital that time.
20    Q.    But you didn't see him get killed?
21    A.    I did not see him.
22    Q.    So you don't know if Mr. Teganya was there, do you?
23    A.    He was not there.
24    Q.    How do you know?
25    A.    That time it looked they were not coming to the hospital.
```

# J.A. 1380

Case: 19-1689     Document: 00117615537     Page: 696     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 34 of 81

13-34

```
 1    Q.   I'm sorry.

 2    A.   That's the time they were not coming to hospital.

 3    Q.   You don't know if Mr. Teganya killed Dr. Karekezi at all,

 4    do you?

 5    A.   It's not Teganya who killed him.

 6    Q.   But you weren't there?

 7    A.   I was at the hospital, but it's not him.  The one they

 8    said he killed him --

 9    Q.   Wait a second, I'm not asking what you heard, I'm asking

09:59AM 10  what you saw.  You didn't see Mr. Karekezi get killed; isn't

11    that correct?

12    A.   I did not see him.

13    Q.   And you didn't see the people who killed him; isn't that

14    correct?

15    A.   I did not see the people who killed him.

16              MR. VARGHESE:  Thank you.  No further questions.

17              THE COURT:  All right.  Thank you.

18              MR. LAUER:  The defense calls Jean Baptiste Bizimana.

19              JEAN BAPTISTE BIZIMANA, having been duly sworn by the

20    Clerk, testified as follows through the Interpreter:

21              THE CLERK:  Thank you.  You may be seated.

22                        DIRECT EXAMINATION

23    BY MR. LAUER:

24    Q.   Good morning.

25    A.   Good morning.
```

J.A. 1381

Case: 19-1689    Document: 00117615537    Page: 697    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 35 of 81

13-35

1    Q.   Does your name appear correctly on the screen in front of

2    you?

3    A.   Yes.

4    Q.   Where do you live, Mr. Bizimana?

5    A.   Bujumbura, Burundi.

6    Q.   Are you from Burundi?

7    A.   Yes.

8    Q.   Were you born in Burundi?

9    A.   I was born in Rwanda.

10:01AM 10   Q.   Where in Rwanda were you born?

11   A.   Butare.

12   Q.   Do you work?

13   A.   I'm a painter.

14        MR. WATKINS:   Your Honor, can I interpret, can we have

15   him move the microphone a little closer?

16        THE COURT:   Yes.

17        MR. WATKINS:   Thank you.

18   Q.   I want to direct your attention to the time period of the

19   genocide in 1994.   Where were you living at that time?

10:01AM 20   A.   I was in Butare.

21   Q.   And approximately how old were you?

22   A.   Twenty-four.

23   Q.   At a certain point, did you go to the University Hospital

24   in Butare?

25   A.   I was there for two months.

Case: 19-1689    Document: 00117615537    Page: 698    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 36 of 81

13-36

```
  1    Q.    What were the two months you were at the hospital?

  2    A.    What?

  3    Q.    What two months were you at the hospital?

  4    A.    April 2nd to June.

  5    Q.    What brought you to the hospital on April 2nd?

  6    A.    My uncle was injured in Kigali, then he was brought to

  7    Butare to be treated.

  8    Q.    And where did he receive treatment in Butare?

  9    A.    He was at University Hospital in Butare.

10:03AM 10    Q.    And you said that you went there on April 2nd.  Is that

 11    the date he came to the hospital?

 12    A.    He was being treated in Kigali, but they could not make

 13    it, and they brought him to Butare.

 14    Q.    When did he arrive in Butare?

 15    A.    I knew the day he was transported to Butare University

 16    Hospital on the 2nd.

 17    Q.    April 2nd?

 18    A.    April 2nd, yes.

 19    Q.    Were you staying with him at the hospital?

10:04AM 20    A.    There's a time I left him there to go back home to get

 21    food to cook and to come back.

 22    Q.    What were you doing at the hospital with your uncle?  What

 23    was your purpose in being there?

 24    A.    Because he was injured his leg, he could not walk, I had

 25    to cook for him and wash his clothes and also his beddings.
```

1    Q.   Is it common in Rwanda for family members to come to the

2    hospital and cook and care for people who are wounded?

3    A.   At this time I don't know how it is, how it works, but

4    that's a time a patient to have somebody to help this patient

5    out to do the food and the clothing and everything.

6    Q.   How many days a week were you at the hospital with him?

7    A.   It also, you know, when the food is over, I will go home

8    and get food.  It depends on how the food ends, when the food

9    ends.

10:06AM 10   Q.   Can you describe what the hospital was like when your

11   uncle first arrived on April 2nd?

12   A.   When he arrived there, the patients were okay, no problem.

13   When days continued to change, things continued to change also.

14   Q.   When did things change?

15   A.   When the presidential plane was shot, it was shot down,

16   that's when things started changing.

17   Q.   And how did the hospital change?

18   A.   There are those who came to the hospital with wounds and

19   they came in the hospital to hide there.  At that time the

10:07AM 20   medical staff were not working full day, they were working a

21   few hours and go home.

22   Q.   And what was the amount or the volume of people who were

23   coming in?

24   A.   People were coming in big numbers, and all the communes

25   surrounding Butare were coming in.

1    Q.    And where were these people who were coming in going?

2    A.    The hospital had many rooms, and they were all going to

3    those rooms, and others were going on their corridors and

4    arundas and others were living outside.

5    Q.    Where was your uncle?

6    A.    He was in internal medicine, then he was transferred in

7    surgery, then it was amputated, his leg.

8    Q.    How long was he in the internal medicine building before

9    being transferred to surgery?

10:08AM 10    A.    The whole month of April.  April he was in internal

11    medicine, then in May, he was transferred to surgery.

12    Q.    During that month of April when he was in the internal

13    medicine building, were you staying with him?

14    A.    When he was in the internal medicine, it was easy to leave

15    him and go out, but when he went into surgery, I was there all

16    the time.

17    Q.    Where were you sleeping during this period of time in

18    April and May?

19    A.    Sometimes when there are no patients, we will use the

10:10AM 20    beds, and when there are too many patients on the beds, we

21    would sleep on the cement, on the floor.

22    Q.    You had mentioned that the staff, the amount of staff

23    changed in the genocide.  Can you describe more about how that

24    changed?

25    A.    They were reduced to few because some of them were afraid

Case: 19-1689    Document: 00117615537    Page: 701    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 39 of 81

13-39

 1    to be killed.

 2    Q.   And were there enough staff to treat all the people who

 3    were coming?

 4    A.   Because there were a lot of people who are injured, the

 5    medical staff were not enough to treat them.

 6    Q.   Do you recall a speech given by the Interahamwe president,

 7    Sindikubwabo?

 8    A.   I don't remember.

 9    Q.   Did there come a time when soldiers arrived at the

10:11AM 10    hospital?

11    A.   Yes, it happened because some of them soldiers came

12    wounded, and they were in groups, calle', then when they were

13    overflowing, they brought them to University Hospital.

14    Q.   Was the University Hospital, did you see any acts of

15    violence at the University Hospital when you were there?

16    A.   There was no attack that came to the hospital in a group

17    attack, but people were being taken and were being killed

18    somewhere else, and I did not follow it too much because that

19    was not my mission to come there.

10:13AM 20    Q.   You said that people were being taken.  How were people

21    being taken?

22    A.   Because people sought refuge in that hospital from

23    surrounding towns or hills.  People that they knew they were

24    hiding there, they came searching for them.

25    Q.   Did you with your own eyes see people being taken away?

Case: 19-1689    Document: 00117615537    Page: 702    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 40 of 81

13-40

1    A.    I did not see with my eyes, but I heard people say that
2    such-and-such were taken, such-and-such were taken, but I did
3    not see with my eyes.
4    Q.    Where were you spending your days at the hospital?
5    A.    If I was not cooking, I was closer to the patients every
6    day.
7    Q.    Were you remaining with your uncle?
8    A.    Yes.
9    Q.    Were there times when you had to leave to get more food?
10   A.    Yes.
11   Q.    And how did you do that?
12   A.    I had pots to cook, I would go and cook and bring it and
13   share with him.
14   Q.    You said that at some point in May, your uncle had a
15   surgery, an amputation?
16   A.    Yes.
17   Q.    Was he transferred to a different building?
18   A.    They give him a room to live in, and they gave him a
19   scooter to push you.
20   Q.    Like a wheelchair?
21   A.    Yeah, it's a wheelchair.
22   Q.    Was your uncle being cared for?
23   A.    Cared for?
24   Q.    Cared for by doctors or medical staff?
25   A.    Yeah, they changed his bandage, and they cared for him,

Case: 19-1689    Document: 00117615537    Page: 703    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 207    Filed 11/04/19    Page 41 of 81

13-41

1    and sometimes those who are in training, they came and cared

2    for him, too.

3    Q.    Did your uncle survive?

4    A.    No, he did not.  Now I don't know where he is.

5    Q.    How did you leave the hospital?

6    A.    June 3rd I went to look for food, but it was not possible

7    for me to come back, too many barriers, roadblocks and people

8    were running away, then I had to run away, too.

9    Q.    Where did you run to?

10:17AM 10    A.    I stayed with my mother where we lived.

11    Q.    Where did you live with your mother?

12    A.    Kansi Sector.

13    Q.    Is that part of Butare?

14    A.    Yes.

15    Q.    At any time during the hospital -- during your time at the

16    hospital, did you see medical staff taking people away?

17    A.    I did not see any medical -- any doctor coming to take

18    people, but they come to treat them, not to take them.

19    Q.    Did you stay in Rwanda at the end of the genocide?

10:18AM 20    A.    Yes, I stayed in Rwanda.

21    Q.    And what happened at the end of the genocide?

22    A.    That time was time to search who took part in the

23    killings, in the genocide, then they jailed them.

24    Q.    Were you jailed?

25    A.    Yes.

J.A. 1388

1    Q.   Did you take part in the genocide?

2    A.   I did not.

3    Q.   How long were you in jail?

4    A.   Twelve years.

5    Q.   What happened after twelve years?

6    A.   The Gacaca started and I went to Gacaca courts, and I was

7    released.

8    Q.   After being released from Gacaca, where did you go?

9    A.   I was released in 2007, I was there a few months, and the

10   time remaining, then in 2009, I went to Bujumbura.

11   Q.   Why did you go to Bujumbura?

12   A.   I went to Bujumbura because I could not get a job there, I

13   did not get a job there.

14   Q.   Why couldn't you get a job in Rwanda?

15   A.   You know, it was hard that somebody coming from the jail

16   to be harder to live peacefully with people who are farming the

17   village.

18            MR. LAUER:  Thank you.  No further questions.

19            THE COURT:  Cross.

20                      CROSS-EXAMINATION

21   BY MR. GARLAND:

22   Q.   Good morning.

23   A.   Good morning.

24   Q.   I want to start at the very beginning.  Did you tell the

25   jury before that you were born in Rwanda?

Case: 19-1689    Document: 00117615537    Page: 705    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 43 of 81

13-43

```
 1    A.    Yes.

 2    Q.    And is Rwanda where you were born?

 3    A.    That's where I was born, but that's not where my parents

 4    originated.

 5    Q.    Do you have a passport?

 6    A.    Yes.

 7    Q.    And that passport is from the country of Burundi; is that

 8    right?

 9    A.    Yes.

10    Q.    What place of birth is on that passport?

11    A.    What?

12    Q.    What place of birth is listed on your Burundi passport?

13    A.    It's where my father came from in Ruhengeri, Burundi.

14    Q.    That wasn't the question I asked you.  On your passport,

15    does it say what your place of birth was?

16    A.    Burundi.

17    Q.    Sir, your passport says Burundi, that you were born in

18    Burundi, but you've testified that you were born in Rwanda,

19    correct?

20    A.    It's possible like in the culture where your parents came

21    from, that's where you write you come from, where you are born.

22    Q.    Just to be clear, your passport from Burundi lists your

23    place of birth as Burundi, but you weren't born in Burundi; is

24    that correct?  Yes or no.

25    A.    Where I was born for real is in Rwanda.
```

1    Q.    Okay.  I want to nail down the date that you were at the

2    hospital during the genocide.

3    A.    Yes.

4    Q.    You got there on April 2nd, 1994?

5    A.    Yes.

6    Q.    And did you leave on June 2nd, June 3rd or June 23rd?

7    A.    23rd.

8    Q.    June 23rd, do I have that right?

9    A.    Yes.

10:24AM 10    Q.    Sir, you testified before that you were at the hospital

11    for only two months, but you were really there for almost three

12    months, correct?

13    A.    The 3rd wasn't complete, but I can say that I was there

14    two months.

15    Q.    Two months and three weeks; is that correct?

16    A.    Yes.

17    Q.    Now, your uncle, you testified got a lot of care at the

18    hospital, right?

19    A.    Yes.

10:24AM 20    Q.    And he needed a lot of help, didn't he?

21    A.    Yes.

22    Q.    Because his injuries were severe, right?

23    A.    Yes.

24    Q.    Your uncle was part of the MRND, wasn't he?

25    A.    That's the reason he was injured, he was injured when he

Case: 19-1689    Document: 00117615537    Page: 707    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 207    Filed 11/04/19    Page 45 of 81

13-45

```
 1    was -- he was injured because of the position they had issues

 2    between.

 3    Q.   So just to be clear, your uncle was in the MRND?  Yes or

 4    no.

 5    A.   Yes.

 6    Q.   Now, you were in the MRND as well, correct?

 7    A.   I did not belong to any party.

 8    Q.   You had an ethnic identity card at that time, right?

 9    A.   Yes, I did.

10    Q.   And what ethnicity was listed on it?

11    A.   It was written that I'm a Hutu.

12    Q.   I want to ask you a little more about where you stayed and

13    where you went in the hospital during the genocide.  Am I right

14    that your uncle was at first in internal medicine and you were

15    there with him?

16    A.   I was with him.

17    Q.   And then he moved to a different part of the hospital,

18    surgery, correct, and you were with him?

19    A.   Yes.

20    Q.   And you weren't with your uncle at the hospital 24 hours a

21    day, correct?

22    A.   You weren't?

23    Q.   You were not with your uncle 24 hours a day at the

24    hospital?

25    A.   I explained earlier.  There is a time I left him there and
```

J.A. 1392

13-46

```
          1    I left him to go.
          2    Q.   And sometimes he would go out of the room for a little
          3    while and come back in to get a breath of fresh air, right?
          4    A.   Yes.
          5    Q.   And sometimes you would go out to do laundry at the
          6    hospital, too, right?
          7    A.   And the cooking.
          8    Q.   Sir, you got to wander around the hospital a bit, didn't
          9    you?
10:28AM  10    A.   When I finished my working of cooking and all this, I was
         11    in the hospital, in the room.
         12    Q.   But at the hospital, you got to go around the grounds,
         13    didn't you?
         14    A.   I did not have the time to go around.
         15    Q.   You weren't preparing food -- didn't you just say you
         16    prepared food and did laundry at the hospital?
         17    A.   To cook and wash clothes and to go around is different.
         18    Q.   You did that -- you had full access to the hospital
         19    grounds?  Yes or no.
10:29AM  20    A.   It was possible, but I did not have time to do that.
         21    Q.   By the way, what was your uncle's position within the
         22    MRND?
         23    A.   He was in the youth of MRND.  He didn't have any other
         24    position.
         25    Q.   Was he under 30?
```

|  |  |  |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | So he was part of the Interahamwe? |
| 3 | A. | He was older than me two years. |
| 4 | Q. | So he was part of the Interahamwe? |
| 5 | A. | He was in the MRND party, but he was not in Interahamwe. |
| 6 | Q. | Now, you don't believe that anybody was killed at the |

1    A.    Yes.

2    Q.    So he was part of the Interahamwe?

3    A.    He was older than me two years.

4    Q.    So he was part of the Interahamwe?

5    A.    He was in the MRND party, but he was not in Interahamwe.

6    Q.    Now, you don't believe that anybody was killed at the

7    hospital during the genocide?  Yes or no.

8    A.    People were killed there, but I didn't see them.

9    Q.    Now, do you recall being interviewed by somebody working

10:30AM 10    for the defense?

11    A.    Yes.

12    Q.    And you told that person that no single person was killed

13    within the hospital during the genocide, didn't you?

14    A.    I said I did not see anyone being killed at the hospital,

15    but people were killed at the hospital.

16    Q.    So you do believe that people were killed at the hospital

17    during the genocide?  Yes?

18    A.    Yes, there were people who died there.

19    Q.    And you heard some of them screaming, didn't you, when

10:31AM 20    they were being killed?

21    A.    They took them and they killed them outside of the

22    hospital.  I did not hear the screaming.

23    Q.    You heard them at least pleading for their lives, didn't

24    you?

25    A.    Those who were screaming, they had injuries, they had

# J.A. 1394

Case: 19-1689    Document: 00117615537    Page: 710    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 207    Filed 11/04/19    Page 48 of 81

13-48

1    wounds because they came in with wounds.

2    Q.    The place where the people were being led away to be

3    killed, that was behind the maternity ward, wasn't it?

4    A.    Not all of them were taken near the maternity, others were

5    taken far near the medical school.

6    Q.    I see.  So there were two places that patients were taken

7    to be killed; is that right?

8    A.    Yes.

9    Q.    And when we say near the maternity ward, we mean or you

10   mean the woods near the maternity ward, correct?

11   A.    Behind it, there were little forests near the ISSO.

12   That's where they took them.

13   Q.    A lot of Tutsi were killed at the hospital or taken from

14   the hospital around the week of April 20th, right?

15   A.    On the 20th, April 20th, the time things became intensive,

16   that's when the refugees came, many.

17   Q.    And then many of them were taken away to be killed over

18   the next two weeks, right?

19   A.    Yes.

20   Q.    And so there weren't as many Tutsi there after so many

21   were killed, right?

22   A.    Near Butare, it was very difficult to know who is a Hutu,

23   who were the Tutsi because they were mixing of ethnicity, so

24   even Hutus were killed.

25   Q.    That wasn't my question.  My question, you said before

```
 1    that after two weeks beginning April 20th, many Tutsi at the
 2    hospital were killed, were taken away, correct?
 3    A.   Yes.
 4    Q.   And after that, there weren't nearly as many Tutsi or
 5    other refugees there, right?
 6    A.   Those who took refugees, they are considered to come.
 7    Q.   And you testified before that they were in hiding,
 8    correct?
 9    A.   Yes.
10    Q.   They would hide in the buildings and move between
11    buildings trying to stay hidden, right?
12    A.   Yes, they hid, but all of us, when we see new faces
13    coming, we all went to hide because we didn't know who they are
14    coming to take.
15    Q.   So, lots of people were hiding at the hospital, right?
16    A.   Yes.
17    Q.   And I can't remember whether you testified about this
18    before, but you knew that people in the village wanted to find
19    people at the hospital, right?
20    A.   Yes.
21    Q.   And so the people who wanted to find people at the
22    hospital needed somebody to show them, right?
23    A.   There are people who knew somebody that they knew, they
24    came to ask me to show them where he is, but I did not tell
25    them.  Even now I save a life.
```

(10:35AM on line 10, 10:36AM on line 20)

**J.A. 1396**

13-50

```
 1    Q.    But my question is because people were hiding, other
 2    people needed help finding them, correct?
 3    A.    Yes.
 4    Q.    During the time of the genocide, the government of Rwanda
 5    was in control of the country, right?
 6    A.    It's true.
 7    Q.    And the soldiers and the Interahamwe were in control of
 8    Butare, right?
 9    A.    Because Butare did not want to kill, and they brought many
10    youth to come in and help killing.
11    Q.    So, Butare, during the genocide, was controlled by the
12    government soldiers and by the Interahamwe?  Yes or no.
13    A.    They are in charge of the security.
14    Q.    I'm sorry, could you repeat?
15    A.    They were in charge of the security.
16    Q.    And they were also in charge of the hospital during the
17    genocide, too?  Yes or no.
18    A.    The police were guarding the hospital.
19    Q.    And the soldiers and the Interahamwe were also in charge
20    of security there, too?  Yes?
21    A.    Yes.
22    Q.    So they didn't need to wait until nighttime to take away
23    patients or doctors or medical students, did they?
24    A.    Most of the time it happened during the night.
25    Q.    But other times it happened during the day, didn't it?
```

J.A. 1397

```
 1    A.   Not all the time.

 2    Q.   But you knew -- not all the time, but sometimes it did,

 3    yes?

 4    A.   Even when it happened, it didn't come as a group coming to

 5    attack, but two or three, four people would come and do that.

 6    Q.   So you knew during the genocide that genocide was

 7    happening at the hospital, didn't you?

 8    A.   I can't say that genocide was happening at the hospital

 9    because there was no group attack that came at the hospital

10:40AM 10   that I see.

11    Q.   But lots of people were taken away and terrorized and

12    killed, yes?

13    A.   Yes, it happened.

14    Q.   And you knew that at the time, yes?

15    A.   It was being, you know, talked everywhere, everybody knew

16    that.

17    Q.   Did Dick Prudence Munyeshuli ever visit or call you?

18    A.   (No response.)

19    Q.   Did Dick Prudence Munyeshuli ever visit or call you?

10:41AM 20   A.   I don't know him.

21    Q.   You were arrested before that you were arrested for

22    genocide crimes in 1994 and spent a number of years in jail,

23    correct?

24    A.   Yes.

25    Q.   Did any of that experience affect your testimony here
```

J.A. 1398

Case: 19-1689    Document: 00117615537    Page: 714    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 32 of 81

13-52

1   today?

2   A.   (No response.)

3   Q.   Did any of that experience affect your testimony here

4   today?

5   A.   Yeah, this would be -- it will have an effect because when

6   you know that somebody had been unjustly accused, things come

7   back, and they had to.

8   Q.   I'm confused.  Did you know Mr. Teganya during the

9   genocide?

10:42AM 10   A.   From where I was born to the hospital was 12 kilometers.

11   Q.   I'm sorry, the question is did you know Mr. Teganya during

12   the genocide?  Yes or no.

13   A.   I know Teganya as somebody who was at the hospital during

14   his residence, that's it.

15   Q.   So, you, sitting here, you don't know whether he was

16   unjustly accused or not, do you?

17   A.   You need not tell me what you are accusing him, if you

18   tell him what you are accusing him, we know that it's false or

19   true.

10:43AM 20        THE COURT:  All right.  This is not a productive line

21   of questioning.  Let's put something else to the witness.

22        MR. GARLAND:  If I can confer with counsel?

23        THE COURT:  Yes.

24        MR. GARLAND:  No further questions.

25        MR. LAUER:  I don't have any redirect, thank you.

**J.A. 1399**

Case: 19-1689    Document: 00117615537    Page: 745    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 53 of 81

13-53

```
 1              THE COURT:  Thank you.  You may step down.

 2              MR. LAUER:  Defense calls Michel Musilikare.

 3              THE COURT:  Do you want to take a break?

 4              THE INTERPRETER:  Okay, we'll take our break early.

 5              THE CLERK:  All rise.

 6              (A recess was taken.)

 7              THE CLERK:  All rise for the jury.

 8              (JURORS ENTERED THE COURTROOM.)

 9              THE CLERK:  Thank you.  You may be seated.  Court is

11:02AM 10   back in session.

11              THE COURT:  Mr. Lauer.

12              MR. LAUER:  The defense calls Michel Musilikare.

13              MICHEL MUSILIKARE, having been duly sworn by the

14   Clerk, testified as follows through the Interpreter:

15                        DIRECT EXAMINATION

16   BY MR. LAUER:

17   Q.   Good morning.

18   A.   Good morning.

19   Q.   Does your name appear correctly on the screen?

11:02AM 20   A.   There is one that is missing.

21   Q.   What is missing?

22   A.   Charles.

23   Q.   Is your full name Michel Charles Musilikare?

24   A.   Yes.

25   Q.   Mr. Musilikare, where do you live?
```

**J.A. 1400**

13-54

```
         1    A.   Bujumbura.

         2    Q.   Is that in Burundi?

         3    A.   Yes, in Burundi.

         4    Q.   Where were you born?

         5    A.   Muyinga.

         6    Q.   Is that also in Burundi?

         7    A.   Yes, in Burundi.

         8    Q.   What do you do for work?

         9    A.   I'm a doctor.

11:03AM 10    Q.   Do you work at a hospital?

        11    A.   International ONG.

        12    Q.   Would that be an NGO, a nongovernmental organization?

        13    A.   It's an organization that treats refugees from Congo who

        14    are in Burundi.

        15    Q.   Do you work as a doctor treating refugees?

        16    A.   Yes, I treat refugees.

        17    Q.   Have you ever lived in Rwanda?

        18    A.   Yes, I lived there.

        19    Q.   When did you live in Rwanda?

11:04AM 20    A.   '72.

        21    Q.   How old were you when you were living in Rwanda?

        22    A.   I went there when I was four years old.

        23    Q.   Did you attend school in Rwanda?

        24    A.   That's where I started primary school, secondary school

        25    and the university.
```

13-55

| | |
|---|---|
| 1 | Q.   What university did you go to? |
| 2 | A.   National University of Rwanda. |
| 3 | Q.   Is that in Butare? |
| 4 | A.   Yes, Butare. |
| 5 | Q.   When did you enter the university? |
| 6 | A.   1991. |
| 7 | Q.   What was your field of study? |
| 8 | A.   Medicine. |
| 9 | Q.   Do you know Mr. Teganya? |
| 11:05AM 10 | A.   Yes, I know him. |
| 11 | Q.   How do you know him? |
| 12 | A.   I know him well.  He's a very calm person and very smart. |
| 13 | Q.   Was he in your medical school class? |
| 14 | A.   We went the same class. |
| 15 | Q.   Did you know where he lived when he was in medical school? |
| 16 | A.   Yes, I knew where he lived. |
| 17 | Q.   Where did he live? |
| 18 | A.   He was closer to the university, close to the hospital. |
| 19 | Q.   Was he living in a university residence or a private |
| 11:06AM 20 | residence? |
| 21 | A.   Outside. |
| 22 | Q.   Did you ever visit his house? |
| 23 | A.   A few times I went there. |
| 24 | Q.   Was he someone as a classmate that you studied with and |
| 25 | got to know? |

**J.A. 1402**

Case: 19-1689     Document: 00117615537     Page: 716     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 36 of 81

13-56

```
 1    A.    Yes, I knew him at school.

 2    Q.    The period that you were in school, was that at a time

 3    when there were a number of different political parties that

 4    were active in Butare?

 5    A.    Yes, parties were coming up, they were there.

 6          MR. LAUER:  If I could approach the witness, your

 7    Honor?

 8          THE COURT:  Yes.

 9    Q.    Sir, I'm going to show you some articles of clothing, the

11:07AM 10  first of which has been admitted as Exhibit 12.  It's a hat.

11    Do you recognize that style of hat as being associated with a

12    political party?

13    A.    Yes, I know that.

14    Q.    What political party was that hat associated with?

15    A.    MRND.

16    Q.    I'm also going to show you a scarf.  This has been

17    admitted as Exhibit 15.  I'll ask you to take a look at that.

18    Do you recognize this item?

19    A.    Yes, I do.

11:08AM 20  Q.    Is that also associated with the MRND party?

21    A.    Yes.

22    Q.    Were you affiliated with a particular political party

23    during your time at the university?

24    A.    I was a refugee.  I did not belong to any party.

25    Q.    Were there some students who were known to be in the MRND?
```

1    A.    Yes, that's when we were together at school.

2    Q.    Was Mr. Teganya one of those students?

3    A.    No.

4    Q.    Did you ever see Mr. Teganya wear a hat like the kind of

5    hat that I showed you?

6    A.    No.

7    Q.    Did you ever see him wear a scarf like the scarf I showed

8    you?

9    A.    I did not see him.

11:10AM 10    Q.    In any of your dealings with Mr. Teganya, did he express

11    support for the MRND?

12    A.    We did not talk about politics.

13    Q.    Can you describe Mr. Teganya, what kind of student was he?

14    A.    He was a student who likes to study, he was a genius, and

15    he was very, very calm.  We loved him all.

16    Q.    If I could direct your attention to the period of genocide

17    in April of 1994, were you present in Butare at that time?

18    A.    Yes, I was there.

19    Q.    And where were you living?

11:11AM 20    A.    Tumba.

21    Q.    How far is Tumba from the university?

22    A.    It's one-half kilometers.

23    Q.    During the time of the genocide in April, did you ever

24    visit the University Hospital?

25    A.    Yes, I did.

Case: 19-1689    Document: 00117615537    Page: 720    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 58 of 81

13-58

1    Q.    Why were you visiting the University Hospital in that

2    time?

3    A.    I was a student.  We were just training to be doctors.

4    Q.    And what did going to the hospital have to do with

5    training to be doctors?

6    A.    That's where we did our training.

7    Q.    And what would the training consist of?

8    A.    The general medicine.

9    Q.    When you went to the hospital, what would you do?

11:12AM 10    A.    We were put in groups, and I was in a group of those who

11    was caring for the injured.

12    Q.    Was it difficult for you to get to and from the hospital

13    during the time of the genocide?

14    A.    Yeah, it wasn't easy because there were barriers.

15    Q.    How many barriers would you have to pass to get to the

16    hospital?

17    A.    Two.

18    Q.    And what would happen when you would pass those barriers?

19    A.    I had a coat, a medical coat, a doctor coat.

11:13AM 20    Q.    The doctor coat that you had, what color was it?

21    A.    It was white.

22    Q.    Did it have any other writing?  Did it identify you as an

23    intern or a student?

24    A.    In the left-hand pocket was written, "University

25    Hospital."

```
 1    Q.    Did it say anything else?

 2    A.    In an abbreviation, H-U.

 3    Q.    But did it say anything else?

 4    A.    No.

 5    Q.    Why did you carry your coat with you when you walked

 6    through the areas?

 7    A.    It was to identify me from other people that I am passing

 8    and to what I am going to do.

 9    Q.    Did you have an identity card during this time?

11:14AM 10    A.    Yes, refugee card.

11    Q.    Did it identify your ethnicity?

12    A.    No.

13    Q.    How often did you go to the hospital during the genocide?

14    A.    Many times.

15    Q.    When would you go and when would you come home?

16    A.    9 a.m. and come back home between 1 and 2 p.m.

17    Q.    So between approximately 9 a.m. and 1 or 2 p.m., you were

18    at the hospital?

19    A.    Yes, I was there.

11:15AM 20    Q.    What was the hospital like during that time?

21    A.    There were soldiers who were injured, and there were

22    civilians, too.

23    Q.    How many people were at the hospital?

24    A.    There were many.

25    Q.    Were there doctors?
```

J.A. 1406

```
 1    A.    They were there, especially who were ahead of us in class.
 2    Q.    What was the amount of doctors or medical staff that was
 3    present at the hospital?
 4    A.    There were very few compared to the patient numbers.
 5    Q.    Were there enough doctors and staff to treat the patients?
 6    A.    There were not enough.
 7    Q.    Was the hospital functioning that normal way?
 8    A.    No.  They were not functioning well.
 9    Q.    How was it not functioning well?
10    A.    It was in a war.  People were afraid.  The hospital was
11    used to receive civilians only.  It happened that the soldiers
12    also were coming in.  The people started fearing.
13    Q.    Where were you assigned within the hospital?
14    A.    Myself, other student, who is in the same thing, I didn't
15    have too much work to do, but I could take temperature from the
16    patients, I could see if the water is dripping well.
17    Q.    You're referring to an I.V. drip?
18    A.    Yes, I.V. is dripping well, cleaning the wounds and put
19    bandage.
20    Q.    What building within the hospital were you working in?
21    A.    Surgery place.
22    Q.    And what types of patients were you treating?
23    A.    Myself, I was treating soldiers.
24    Q.    How many soldiers were there?
25    A.    It's very hard to count them, but the room where I was,
```

**J.A. 1407**

1    there were beds and every bed had a soldier patient.

2    Q.    Who were you working with?

3    A.    There is a doctor who was called Severin.

4    Q.    Was Serverin a full doctor, or was he a student?

5    A.    He was the last year.

6    Q.    And how were you helping him?

7    A.    I helped him with what I said, take the temperature, to

8    follow I.V., and to clean the wounds of the soldier that he

9    showed me.

11:20AM 10    Q.    Did you see other medical students on the hospital

11    grounds?

12    A.    Yes, I did.

13    Q.    Did you see Mr. Tavares there?

14    A.    Yes.

15    Q.    What did you see Mr. Teganya doing?

16    A.    Teganya had a patient that he was following, too.  He had

17    his room that he was working in.

18    Q.    Was that the same room where you were working?

19    A.    We were in different rooms.

11:20AM 20    Q.    How often did you see him at the hospital?

21    A.    We were there until May.  We could see each other three

22    times a week.

23    Q.    Would that just be in passing or did you have longer

24    interaction?

25    A.    We could not have longer talk or chat because we were

13-62

 1    working.

 2    Q.   Was the hospital busy?

 3    A.   We had all, we all had patients to follow, and the time

 4    was very short.  You took time to do your job and go home when

 5    you are done.  There was no time to talk.

 6    Q.   At any time when you were at the hospital, did you see

 7    people killed with your own eyes?

 8    A.   No.

 9    Q.   At any time you were at the hospital, did you see people

11:22AM 10   being taken away to be killed?

11    A.   No, I did not see it.

12    Q.   At any time that you were at the hospital, did you see

13    other medical students hurting patients?

14    A.   I did not see it.

15    Q.   Did you become aware that people were being taken and

16    killed?

17    A.   I did not see that.

18    Q.   Did you become aware of it at some point?

19    A.   Yes, we heard about it.

11:23AM 20   Q.   And how did you hear about it?

21    A.   In the morning when they come, they would tell us that

22    there is somebody who was taken, and that's how we knew it.

23    Q.   Did you ever see patients being led away with your own

24    eyes?

25    A.   No, I did not see it.

J.A. 1409

13-63

```
       1    Q.   How long did you stay working at the hospital?

       2    A.   Mid-May.

       3    Q.   What happened in mid-May?

       4    A.   We were afraid because when you are working, you find

       5    yourself you're all alone on the street.  We were afraid, we

       6    stopped it.

       7    Q.   You didn't want to pass the barriers anymore?

       8    A.   When I went home, I went through the barrier, the

       9    roadblocks.

11:24AM 10    Q.   And did you stay at home until the genocide was over?

      11    A.   I stayed home until June.

      12    Q.   What happened in June?

      13    A.   I went to Congo.

      14    Q.   Why did you go to Congo?

      15    A.   It was easy to go through Congo.

      16    Q.   Why?  What led to you going to Congo?

      17    A.   In Burundi, there was also war.

      18    Q.   What did you do in Congo?

      19    A.   I was a refugee.

11:25AM 20    Q.   How long were you a refugee in Congo?

      21    A.   Fourteen years.

      22    Q.   And what did you do during that 14 years?

      23    A.   When the refugee comes, the refugee comes, they were

      24    destroyed, we went in the bush, in the forest, then in 2008, I

      25    went home.
```

Case: 19-1689    Document: 00117615537    Page: 726    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 64 of 81

13-64

```
 1    Q.   And what did you do when you went home?

 2    A.   When I back to Burundi, I went to school.

 3    Q.   To medical school?

 4    A.   Yes.

 5    Q.   And have you been working as a doctor since then?

 6    A.   After I finished school, 2014, from that time until now I

 7    work as a doctor.

 8             MR. LAUER:  Thank you, sir.  No further questions.

 9             THE COURT:  Cross.

10                        CROSS-EXAMINATION

11    BY MR. VARGHESE:

12    Q.   Good morning, sir.

13    A.   Good morning.

14    Q.   Doctor, you live in Burundi currently, correct?

15    A.   Yes, that's where I live.

16    Q.   And you are a Hutu; is that correct?

17    A.   That's true.

18    Q.   And you started in medical school in 1991 with

19    Mr. Teganya?

20    A.   Yes.

21    Q.   In your testimony, you said a lot of things about

22    Mr. Teganya, but I want to ask you about one thing you said.

23    You said we all loved him; is that correct?

24    A.   Yes.

25    Q.   And you still love him, isn't that correct?
```

11:26AM

11:27AM

# J.A. 1411

```
 1    A.    Even now I love him.

 2    Q.    And that's why you're here today?

 3    A.    Yes, true.

 4    Q.    To testify for him?

 5    A.    Yes.

 6    Q.    Because you love him?

 7    A.    That's true.

 8    Q.    You also said that we all loved him.  I want to ask you

 9    about that.  There were other people that loved Mr. Teganya;

10    isn't that right?

11    A.    Yes.

12    Q.    Like Aimable Rwabukumba?

13    A.    Yes.

14    Q.    He loved him, too, correct?

15    A.    Yes.

16    Q.    Still loves him; isn't that correct?

17          MR. LAUER:  Objection.

18          THE COURT:  Sustained.

19    Q.    You testified on direct that you have never seen

20    Mr. Teganya wearing the MRND hat and the MRND scarf; is that

21    correct?

22    A.    That's true.

23    Q.    You don't know if he was a member of MRND, do you?

24    A.    I don't know.

25    Q.    You don't know, and, in fact, when you were interviewed by
```

13-66

 1    the defense, you said that -- you said you didn't know whether

 2    he was or if he wasn't?

 3    A.    I don't know.

 4    Q.    You said you never really talked to him about politics;

 5    isn't that right?

 6    A.    Yes.

 7    Q.    So you have no idea what his political views were; is that

 8    right?

 9    A.    No, I don't know.

11:29AM 10    Q.    You have no idea what his views are toward Tutsis; isn't

11    that right?

12    A.    I don't know.

13    Q.    I want to ask you about your time during the genocide.

14    Actually, before I get there, Mr. Lauer asked you some places

15    where Mr. Teganya lived.  Do you remember that?

16    A.    Yes.

17    Q.    And you said he lived off campus; isn't that right?

18    A.    Yes.

19    Q.    That's not true.  His first year he lived on campus; isn't

11:30AM 20    that correct?

21    A.    No.

22    Q.    He never lived in the Linda dorm?

23    A.    No.

24    Q.    Do you know an individual named Bernard Kalimba?

25    A.    I don't know this person.

1    Q.    You don't know that person?

2    A.    I don't know him.

3    Q.    You said that you would go over to his house.  Why would

4    you go over to his house?

5    A.    He lived with a person named Aimable.  Aimable was a

6    friend of my brother.

7    Q.    Aimable Rwabukumba?

8    A.    Yes.

9    Q.    All of you were friends?

11:31AM 10    A.    Yes, we were friends.

11    Q.    So you would go see your friend Aimable who was living

12    with his friend Teganya?

13    A.    Yes.

14    Q.    Where were you living before the genocide?

15    A.    Tumba.

16    Q.    And so when you go to visit Mr. Teganya, would you ever go

17    to his room?

18    A.    No.

19    Q.    So you don't know anything about what's in his room, do

11:32AM 20    you?

21    A.    I did not know.

22    Q.    So if he had an MRND flag in his room, you wouldn't know

23    about it?

24    A.    I did not know that.

25    Q.    You continued to live in Tumba when the genocide started;

**J.A. 1414**

```
 1   is that right?
 2   A.   Yes.
 3   Q.   How long would it take you to walk from your house to the
 4   hospital?
 5   A.   20 to 25 minutes.
 6   Q.   And you would pass through the two roadblocks, you said,
 7   and you said that you would have your doctor's coat on; is that
 8   correct?
 9   A.   Yes, I had it on my shoulder.
11:33AM 10   Q.   And would you tell the soldiers or the Interahamwe that
11   you were a doctor going to treat patients?
12   A.   When they see that clothes, they wouldn't even ask me.
13   Q.   Did they ask you what your ethnicity was?
14   A.   They did not ask me.
15   Q.   They just let you pass?
16   A.   Yes.
17   Q.   When you were at the roadblocks, would you see bodies
18   along the sides of the roads?
19   A.   I did not see any bodies out on the road.
11:33AM 20   Q.   And you said that you worked there from 9 a.m. to 2 p.m.;
21   is that right?
22   A.   Yes.
23   Q.   Why would you only work until 2 p.m.?
24   A.   It was to go early because at night it was very dangerous.
25   Q.   What would happen at night?
```

Case: 19-1689    Document: 00117615537    Page: 731    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 69 of 81

13-69

         1    A.   All things bad happen at night.

         2    Q.   Are you talking about in Tumba or at the hospital?

         3    A.   Everywhere.

         4    Q.   And in Tumba, did you see houses burn?

         5    A.   I did not see them.

         6    Q.   Did you hear about attacks in Tumba?

         7    A.   Taxi?

         8    Q.   Attacks?

         9    A.   Yes.

11:34AM 10    Q.   Did you see dead Tutsis?

        11    A.   Yes, I saw them.

        12    Q.   At the hospital, you said -- was that a strict curfew at

        13    the hospital?  Did everybody go home at 2:00?

        14    A.   When the time arrived, we would go.  What happened after,

        15    we don't know.

        16    Q.   And so to the times that you saw Mr. Teganya, and I think

        17    you said it was about three times a week, you wouldn't see him

        18    after 2:00, would you?

        19    A.   We didn't know what was happening after 2 p.m.  We knew,

11:36AM 20    we came to know what happened the following morning.

        21    Q.   That's not my question.  My question is you have no idea

        22    what Mr. Teganya was doing after 2 p.m.; isn't that correct?

        23    A.   I did know.

        24    Q.   Did you know where Mr. Teganya was living during the

        25    genocide?

Case: 19-1689    Document: 00117615537    Page: 732    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS    Document 207    Filed 11/04/19    Page 70 of 81

13-70

```
 1    A.    Yes, I know.

 2    Q.    Where was he living?

 3    A.    Where he lived before, that's where he stayed.

 4    Q.    Oh, so it's your testimony that he never moved from his

 5    residence before the genocide?

 6    A.    He remained where he lived.

 7    Q.    How do you know that?  Did you visit him?

 8    A.    We greeted each other good morning, how are you, he just

 9    went, I went.

11:37AM 10    Q.    That wasn't my question.  My question is how do you know

11    he was still living in that same location that he was before

12    the genocide?

13    A.    We knew everybody.

14    Q.    I'm sorry?

15    A.    We knew where people lived.

16    Q.    Are you familiar with the Kiza dorm?

17    A.    I know it.

18    Q.    Where is the Kiza dorm located?

19    A.    Below the maternity.

11:37AM 20    Q.    It's pretty close to the maternity building; is that

21    right?

22    A.    Yes.

23    Q.    And you knew that there were medical students who were

24    living in the Kiza dormitory; isn't that right?

25    A.    Yes.
```

J.A. 1417

1              MR. VARGHESE:  Ms. Pezzarossi, can we have Exhibit 27,

2    which is admitted in evidence.

3    Q.   Doctor, do you see what's on the screen in front of you?

4    A.   Yes, I see it.

5    Q.   Do you recognize that?  That's the Kiza dorm?

6    A.   No.

7    Q.   What do you recognize it as?

8    A.   I don't remember this place, but it looks a hospital

9    house.

11:39AM 10   Q.   Okay.  Well, let me ask you a couple more questions about

11   the Kiza dorm.  You're aware that individuals were taken from

12   the Kiza dorm and killed; are you not?

13   A.   I heard about it.

14   Q.   You knew that one of your classmates was taken; isn't that

15   correct?

16   A.   Yes.

17   Q.   What was his name?

18   A.   Diogene, but I don't remember the other name.

19              THE COURT:  I'm sorry.

11:40AM 20             THE WITNESS:  Diogene.

21   Q.   When did you learn that your classmate Diogene was taken

22   from the Kiza dorm?

23   A.   It was in May.

24   Q.   And how did you learn?

25   A.   When we were having a conversation with others.

Case: 19-1689    Document: 00117615537    Page: 734    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 72 of 81

13-72

```
 1    Q.    Who were you having a conversation with?

 2    A.    We were many students there, and we knew each other.  We

 3    knew that our friend lived there.

 4    Q.    Diogene, he was a Tutsi, correct?

 5    A.    Yes.

 6    Q.    And what happened to Diogene?

 7              MR. LAUER:  Objection.

 8              THE COURT:  I'll let him testify what he learned, not

 9    to prove that it happened that way but that he was told.  In

10    other words, they may consider it for the limited purpose of

11    learning what the witness was told.  They can use it for that

12    purpose only.  Go ahead.

13              MR. VARGHESE:  Thank you, your Honor.

14    Q.    What did you learn happened to Diogene?

15    A.    We heard that he was taken, that he was taken to be

16    killed.

17    Q.    Did you learn where?

18    A.    When we were talking with the colleagues.

19    Q.    Did you learn where he was taken to be killed?

20    A.    Yes, I heard about that place.

21    Q.    Where was he taken to be killed?

22    A.    In the bush that was the other side.

23    Q.    The other side of what?

24    A.    The other side of Kiza in the bush.

25    Q.    So, on the other side of the Kiza building in a bush,
```

13-73

```
 1    that's where Diogene was killed?

 2    A.   That's what I heard.

 3    Q.   Did you hear about others being taken from the Kiza

 4    dormitory and being killed?

 5    A.   I did not hear anyone else.

 6    Q.   Was it well-known in your class that Diogene was a Tutsi?

 7         MR. LAUER:  Objection.

 8         THE COURT:  Sustained.

 9    Q.   How did you know that Diogene was a Tutsi?

10    A.   We knew each other.  The Hutu and Tutsi, we know one

11    another.

12    Q.   So, is it your testimony that the folks in your class knew

13    who the Tutsis were?

14         MR. LAUER:  Objection.

15         THE COURT:  Sustained.

16    Q.   Diogene, was he working at the hospital, too, before he

17    was taken?

18    A.   No.

19    Q.   What was he doing, if you know?

20    A.   He was hiding at Kiza.

21    Q.   Do you know if he was taken during the daytime or the

22    nighttime?

23    A.   I don't know when he was taken.

24    Q.   You mentioned that you were working in the surgery ward, I

25    believe; is that correct?
```

11:43AM appears at lines 10 and 20.

Case: 19-1689     Document: 00117615537     Page: 736     Date Filed: 07/16/2020     Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 74 of 81

13-74

```
 1    A.   Yes.

 2    Q.   Did you go to any other of the buildings at the hospital?

 3    A.   I stayed in the surgery.

 4    Q.   You never went to dermatology?

 5    A.   No.

 6    Q.   Or maternity?

 7    A.   No.

 8    Q.   All of your patients were soldiers; isn't that correct?

 9    A.   Yes, they were soldiers.

11:44AM 10    Q.   Who were there with you in the surgical ward?

11    A.   Yes, military soldiers.

12    Q.   You mentioned that Mr. Teganya was working in the room

13    next to you, I believe; is that right?

14    A.   Yes.

15    Q.   And he was working with soldier patients as well; isn't

16    that correct?

17    A.   I don't know.  The people he was treating, I don't know

18    them.

19    Q.   And the wounds that the soldiers were being treated for

11:45AM 20    were wounds that they had received during the war, during the

21    fighting with the RPF?

22    A.   It was bullet wounds.

23    Q.   Now, you testified that you didn't see anybody being taken

24    from the hospital; is that correct?

25    A.   Yes.
```

**J.A. 1421**

Case: 19-1689    Document: 00117615537    Page: 737    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 75 of 81

13-75

          1    Q.   But are you aware that was happening; isn't that right?

          2    A.   We heard about it.

          3    Q.   And you saw that patients were missing; isn't that right?

          4    A.   Yes.

          5    Q.   And so you were aware that people were disappearing from

          6    the hospital; is that correct?

          7    A.   Yes.

          8    Q.   So you were aware that there was a genocide going on at

          9    the hospital; isn't that right?

11:46AM  10    A.   And others who were dying because of the wounds and other

         11    diseases.

         12    Q.   That wasn't my question.  My question was you were aware

         13    that there was a genocide happening at the hospital?

         14    A.   We knew -- we heard that -- we heard that there are people

         15    who are being taken.

         16    Q.   You knew there were atrocities being carried out on the

         17    Tutsis; isn't that right?

         18    A.   We didn't know who were taken.

         19    Q.   So it's your testimony that you thought that Hutus were

11:47AM  20    being taken?

         21    A.   I don't know.  I didn't see anyone being taken.  I can't

         22    say this one was taken or this one was.

         23    Q.   Did you hear cries from patients who were being carried

         24    away?

         25    A.   No.

Case: 19-1689    Document: 00117615537    Page: 738    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 76 of 81

13-76

```
 1    Q.   Or cries from people who were being killed?

 2    A.   No.

 3    Q.   Did you see soldiers going through the hospital?

 4    A.   Yes.

 5    Q.   Did you see Interahamwe members going through the

 6    hospital?

 7    A.   I didn't know how to detect them from the hospital from

 8    the military.

 9    Q.   Okay.  So you saw armed individuals walking through the

10    halls of the hospital?

11    A.   Yes.

12    Q.   And that was during the daytime; isn't that right?

13    A.   Yes.

14    Q.   Because you were there, it was between 9 and 2, right?

15    A.   Yes.

16    Q.   You saw them go into the different buildings?

17    A.   They passed checking the patients.

18    Q.   I'm sorry?

19    A.   They passed checking the patients.

20    Q.   Can you explain, what do you mean?

21    A.   A patient who was taking care of him or her when a soldier

22    is sick and a patient there, we have another soldier taking

23    care of him.

24    Q.   Oh, so the patients you're talking about -- the soldiers

25    you're talking about are the soldiers taking care of patients?
```

```
 1   A.   Yes, those are the ones who are passing with the guns,
 2   arms, checking how their colleagues are.
 3   Q.   Did you see soldiers going around to other parts of the
 4   hospital?
 5   A.   No.
 6   Q.   So the only soldiers you saw at the hospital were the ones
 7   caring for the wounded soldiers?
 8   A.   Those are the ones I saw.
 9   Q.   Where you were working, did you see Tutsis hiding?
10   A.   I did not see them.
11   Q.   Not in the surgical ward where the soldiers were; isn't
12   that right?
13   A.   Not what?
14   Q.   Not in the surgical ward where the soldiers were?
15   A.   No.
16   Q.   Did you know there were Tutsis hiding in the hospital?
17   A.   We heard about it.
18   Q.   You never saw it?
19   A.   I did not see them.
20   Q.   After 2 p.m., where would you go?
21   A.   I went to Tumba.
22   Q.   Were you aware of Tutsi nurses being taken?
23   A.   I heard about it.
24   Q.   And were you aware that they were taken to be killed?
25   A.   Yes.
```

Case: 19-1689    Document: 00117615537    Page: 740    Date Filed: 07/16/2020    Entry ID: 6352983
Case 1:17-cr-10292-FDS   Document 207   Filed 11/04/19   Page 78 of 81

13-78

```
 1    Q.   Were you aware that Tutsi doctors were taken?

 2    A.   Yes, I heard about it.

 3    Q.   And you knew they were taken to be killed as well?

 4    A.   What?

 5    Q.   You knew that they were being taken to be killed as well?

 6    A.   Yes.

 7    Q.   So you knew there were Tutsis who were being killed from

 8    that hospital while you were working there; isn't that right?

 9    A.   Yes.

11:52AM 10        MR. VARGHESE:  Thank you, Doctor, I have nothing

11    further.

12            THE COURT:  Redirect.

13                    REDIRECT EXAMINATION

14    BY MR. LAUER:

15    Q.   Good morning again.

16    A.   Good morning.

17    Q.   You were asked some questions about your friendship with

18    Mr. Teganya.

19    A.   Yes.

11:52AM 20    Q.   When was the last time you saw him before you came to the

21    courtroom today?

22    A.   The first time?

23    Q.   Since when?

24    A.   From the time we arrived here.

25    Q.   Was the last time you saw him before today in 1994?
```

```
 1    A.    Yes.

 2    Q.    Did you speak to him between 1994 and today?

 3    A.    No single day.

 4              MR. LAUER:  Thank you, sir.

 5              THE COURT:  Anything else?

 6              MR. VARGHESE:  No, your Honor.

 7              THE COURT:  All right.  Thank you.

 8              MR. LAUER:  That would conclude the witnesses we have

 9    available today.

11:53AM 10         THE COURT:  Okay.  All right.  Then I guess we have no

10    choice but to break for the day.  I take it we need to do

11    Monday afternoon to stay on track, right?

13              MR. LAUER:  We're prepared to do that, yes.

14              THE COURT:  All right.  What we will do is we will

15    break for the day.  I guess that means we're a little bit ahead

16    of schedule, an hour and 5 minutes anyway, but we will

17    reconvene on Monday at 9:00.

18              I apologize, I have mandatory meetings Thursday and

19    Friday that I have to attend, and I think we should be prepared

11:54AM 20    to go in the afternoon from 2:00 to 4:00 just to again continue

21    to make headway.

22              Try to leave Tuesday afternoon, part of it open.  I'll

23    check with the lawyers on Monday and see where we are.  It's

24    hard to go all day on everyone, and I'd rather not do it, but I

25    do want to keep the case on schedule, so that's where we are.
```

**J.A. 1426**

         1                Again, the lawyers I believe think that you're going
         2     to get the case the following week, that is, the week of
         3     April 8th.  I take it that has not changed, correct?
         4                MR. LAUER:  It has not.
         5                THE COURT:  So, again, please remember all of my
         6     cautions not to discuss the case among yourselves or with
         7     anyone or to listen or read anything about the case.  I, again,
         8     appreciate your cooperation.  Have a good weekend when it
         9     comes, and I will see you 9:00 on Monday.
11:55AM 10                THE CLERK:  All rise.
        11                THE COURT:  Anything before Monday?  We'll convene
        12     8:30 on Monday.  I have access to e-mail, and I can do a
        13     telephone conference with a little bit of notice.  If something
        14     comes up, I'd rather deal with it rather than have it dumped on
        15     me at 8:30 Monday morning.
        16                MR. GARLAND:  Yes, your Honor.
        17                (Whereupon, the hearing was adjourned at 12:57 p.m.)
        18
        19
        20
        21
        22
        23
        24
        25

J.A. 1427