# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————————

No. 19-1689

———————————————

UNITED STATES,
Appellee,

v.

JEAN LEONARD TEGANYA,
Defendant-Appellant.

———————————————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————

JOINT APPENDIX
VOLUME III

———————————————

Christine DeMaso
Assistant Federal Public Defender
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061

For Jean Leonard Teganya

Alexia DeVincentis
Assistant U.S. Attorney
U.S. Attorney's Office
1 Courthouse Way, Ste 9200
Boston, MA 02210
617-748-3394

For the United States

# TABLE OF CONTENTS

## VOLUME I

District Court Docket Sheet ............................................................ J.A. 1

Indictment ................................................................................... J.A. 23

Pretrial Conference Transcript (3/5/19) .................................... J.A. 38

Trial Transcript Day 2 (3/11/19) ............................................... J.A. 76

Trial Transcript Day 3 (3/12/19) ............................................. J.A. 199

Trial Transcript Day 4 (3/13/19) ............................................. J.A. 375

Trial Transcript Day 5 (3/14/19) ............................................. J.A. 479

Trial Transcript Day 6 (3/15/19) ............................................. J.A. 595

## VOLUME II

Trial Transcript Day 7 (3/18/19) ............................................. J.A. 689

Trial Transcript Day 8 (3/19/19) ............................................. J.A. 818

Trial Transcript Day 9 (3/20/19) ............................................. J.A. 920

Hearing Transcript (3/21/19) ................................................. J.A. 1015

Trial Transcript Day 10 (3/22/19) ........................................... J.A. 1042

Trial Transcript Day 11 (3/25/19) ........................................... J.A. 1142

Trial Transcript Day 12 (3/26/19) ........................................... J.A. 1250

Trial Transcript Day 13 (3/27/19) ........................................... J.A. 1348

## VOLUME III

Telephone Conference (3/29/19) ........................................................... J.A. 1428

Trial Transcript Day 14 (4/1/19) ........................................................... J.A. 1454

Trial Transcript Day 15 (4/2/19) ........................................................... J.A. 1597

Trial Transcript Day 16 (4/3/19) ........................................................... J.A. 1663

Trial Transcript Day 17 (4/4/19) ........................................................... J.A. 1795

Trial Transcript Day 18 (4/5/19) ........................................................... J.A. 1947

Trial Exhibit 1 ........................................................................................ J.A. 2065

Trial Exhibit 3 ........................................................................................ J.A. 2076

Trial Exhibit 65 ...................................................................................... J.A. 2091

Trial Exhibit 75 ...................................................................................... J.A. 2092

Trial Exhibit 76 ...................................................................................... J.A. 2093

Trial Exhibit 81 ...................................................................................... J.A. 2094

Notice of Appeal (D.E. 75) ................................................................... J.A. 2095

<pre>
1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2


3

   UNITED STATES OF AMERICA          )
4                                    )
                                     )
5  vs.                               )  CR No. 17-10292-FDS
                                     )
6                                    )
   JEAN LEONARD TEGANYA              )
7


8
   BEFORE:  THE HONORABLE F. DENNIS SAYLOR
9


10
                      TELEPHONE CONFERENCE
11


12
   APPEARANCES:
13
        OFFICE OF THE UNITED STATES ATTORNEY (By: Scott Garland,
14      AUSA, and George P. Varghese, AUSA), One Courthouse Way,
        Boston, Massachusetts 02210.  On Behalf of the Government.
15
        FEDERAL DEFENDER OFFICE (By: Scott Lauer, Esq., and
16      Timothy Watkins, Esq), 51 Sleeper Street, Boston,
        Massachusetts 02210.  On Behalf of the Defendant.
17


18
              John Joseph Moakley United States Courthouse
19                         Courtroom No. 2
                          One Courthouse Way
20                         Boston, MA 02210
                       Friday, March 29, 2019
21                           3:45 p.m.

22
                    Cheryl Dahlstrom, RMR, CRR
23                     Official Court Reporter
              John Joseph Moakley United States Courthouse
24              One Courthouse Way, Room 3510
                          Boston, MA 02210
25         Mechanical Steno - Transcript by Computer
</pre>

1                P R O C E E D I N G S

2          THE COURT:  Everybody ready?  This is a telephone

3    conference.  I'm calling from the lobby at my hotel, having

4    been kicked out of my room by the cleaning people.  So there

5    may be some background noise.

6          I have first, I think, pending the defense motion to

7    permit two witnesses to appear by videoconference.  I read the

8    defense submission.  Who's going to take the lead by the

9    government in terms of responding.

03:45 10          MR. VARGHESE:  It's going to be me, your Honor.

11    George Varghese, V-a-r-g-h-e-s-e.

12          Your Honor, we sent along the two write-ups that were

13    provided by the defense with respect to these witnesses, and I

14    think if you look at them -- and I'll start first with Albert

15    Minani -- it doesn't appear that Mr. Minani has very many

16    relevant things to add to this trial.  Not any of these

17    witnesses have any firsthand, direct contact with Mr. Teganya,

18    and Mr. Minani doesn't seem to offer anything other than sort

19    of background evidence and context evidence.

03:46 20          I think Mr. Gashirabake is a slightly different story.

21    According to the defense, he's going to testify that he was

22    actually the perpetrator of one of the murders that's alleged

23    to have happened with those -- allegedly happened by Mr.

24    Teganya.  Just looking at the reporting, it's unclear whether

25    they're talking about the same person.  What is evidently clear

J.A. 1429

1   is that Mr. Gashirabake is planning on talking about where Mr.

2   Gasasira -- where one of the government's witnesses was during

3   the asylum process -- I'm sorry, during the genocide.  The

4   issue with that, your Honor, is there's already been evidence

5   about this, that they put on another witness already who said

6   that Mr. Gasasira wasn't there for a day during the genocide,

7   and it doesn't appear that Mr. Gashirabake is going to say

8   anything more than that, that he saw anyone at this person's

9   house.  We think this evidence is cumulatively and largely

03:47 10   irrelevant regarding none of them have anything to do with

11   Teganya.

12        Looking at the legal authority to do this, video

13   telephone conference, we only find one case -- I think it was

14   an opinion by Judge Gertner about 10, 11 years ago.  And so

15   this is not something that's supposed to be done in the normal

16   course, and we don't think this is the extraordinary

17   circumstance that would require it.

18        There's also some other challenges that we think that

19   this entails.  You know, first of all, we just note that we had

03:48 20   a pretrial conference before the trial started where we raised

21   the issue about the availability of these witnesses, and we

22   talked to defense counsel about this, and we asked and we

23   raised with the Court about whether or not they wanted a

24   continuance.  They assured us they didn't and they wouldn't be

25   moving for a continuance.  This was an issue that was flagged

1    long before the trial started.  And to be in this situation now

2    we think -- we don't think the government should be prejudiced

3    by that.  The witness -- the trial date was set a long time

4    ago.  They had the opportunity to get the travel documents in

5    place and get their witnesses here, as we did, from Rwanda.

6            The other concern is just how -- you know, a technical

7    concern.  You know, I participated in videoconferences

8    involving witnesses testifying in Sweden and, actually, in

9    particular, with the defense expert, Noelle Twagiramungu.  The

03:49 10   videoconference was terrible.  We ended up -- there were large

11   delays, and we ended up switching over to a phone and just

12   doing, like, an audio conference call because the transmission

13   quality wasn't very good.  I do have some concerns about a

14   videoconference from Burundi and whether or not that's going to

15   work just feasibly.

16           The last concern we wanted to raise, your Honor, was

17   just an issue about whether or not the witness is really

18   testifying under the pains and penalties of perjury.  Having a

19   witness come to Boston, sit in the stand and testify, to swear

03:49 20   an oath and testify, is just something very different than

21   showing up for, you know, an hour or two hours at the U.S.

22   Embassy in Burundi and then going home back to the refugee

23   camp.  It seems like it's a different scenario here where, you

24   know, if the witness comes in and lies and says, Oh, yeah, I

25   committed this murder or I committed multiple murders that Mr.

1  Teganya is accused of and then just leaves, the government

2  doesn't -- it doesn't have the same sense of solemnity and the

3  same sort of authority as it does with a witness coming into

4  the courtroom and doing the same thing.  For those reasons,

5  your Honor, we would ask that the motion be denied.

6  THE COURT:  Okay.  As to the witness Gashirabake --

7  for the reporter, G-a-s-h-i-r-a-b-a-k-e -- the proffer, such as

8  it is, seems to suggest that it is relevant.  Obviously, I

9  can't exclude someone based on credibility issues.  If he were

03:50 10  in the hallway, I would certainly permit him to testify.

11  In terms of the situation of the oath, it would be an

12  oath administered by the courtroom clerk in Boston, not in the

13  Embassy in Burundi, as I understand it.

14  In terms of the technical issues, they're real, and

15  this may not work for a variety of reasons.  I have very little

16  faith in just how well all this is going to work.  But I also

17  feel that I have some poor choices here, and I think the more

18  prudent choice under the circumstances is to permit that to go

19  forward and hope that it works.  And if, for some reason, you

03:51 20  know, the transmission is lost partway through or something

21  like that happens, we'll just take that up in due course.  If

22  need be, if it's only half a testimony, I can strike it or take

23  some action like that.  But I think, on balance, again, given

24  my not very good options as I see them, I'm going to permit it

25  to occur.

J.A. 1432

1          In terms of -- and the interpreter, I have to assume,

2    is also going to be the interpreter in Boston, which -- because

3    I don't know who the person in Burundi would be.

4          In terms of the witness Minani, I'm having trouble

5    seeing that he's only -- any real relevance here or it may be

6    -- I should say, it's marginal relevance.  I guess I would need

7    to be convinced that there's some real reason to call him.  Mr.

8    Lauer, do you want to take that up?

9          MR. LAUER:  If your Honor is willing, Mr. Watkins is

03:52 10   here.

11         MR. WATKINS:  Tim Watkins from the Federal Defender

12   Office.  I'll take this one.

13         The government is quite correct.  He will not testify

14   specifically about Mr. Teganya.  What the government mentioned

15   is that it is about context, and that is exactly what he would

16   be there for.  In particular, he would talk about the

17   Interahamwe, which for the court reporter is spelled

18   I-n-t-e-r-a-h-a-m-w-e -- lost myself for a minute -- about the

19   Interahamwe from whom we heard quite a bit in the government's

03:53 20   case about how the Interahamwe was operating particularly on

21   the hospital grounds.  That was where Mr. Minani would come in

22   to talk about exactly what the Interahamwe was doing in Butare

23   generally, frankly, their lack of activity on the hospital

24   grounds.  I think that would go a long way.  I would suggest it

25   is quite relevant where the government has put on witnesses to

1   talk in some detail about the large groups of Interahamwe that

2   was on the campus at the time.  So that would be the reason for

3   his testimony.  I would suggest it is material.  Given that

4   we're already going to be there, it is perfectly appropriate,

5   if the government thinks it should do so, for them to start

6   objecting as he goes on about whether it is relevant or not,

7   cumulative -- or cumulative and the like.

8       I think right now what we're trying to do is the

9   threshold of whether we do the videoconferencing.  And as I

03:54 10   understand it from the Court, the Court has decided that we

11   should go forward on that.  I think we can easily do the same

12   kind of objections and bring this up as he's testifying rather

13   than try to micromanage it at this point.

14       THE COURT:  All right.  Here's what I'm going to do.

15   I'm going to issue a tentative ruling that I'm going to permit

16   it.  I may reverse field or I may limit it substantially, but,

17   at least for planning purposes, let's assume it's going to go

18   forward, and I will at least, you know, permit some testimony

19   down this path.  So we'll deal with it that way subject to

03:55 20   refinement or revision as we go along.

21       So we'll deem that motion, just to clear up the

22   record, to be -- I'll just call it granted subject to, of

23   course, to whatever comments or limitations I've made here.

24       There's also a -- I'm sorry.  Anything further on the

25   videoconference?

1          MR. WATKINS:  Not from the defendant, your Honor.

2          MR. VARGHESE:  Not from the government, your Honor.

3          THE COURT:  Okay.  I also have pending a motion for an

4     order directing the government and its agents to provide

5     voluntariness information to defense witnesses, and this

6     concerns an alleged event that occurred at Logan Airport.  I'm

7     going to -- at the risk of wasting everyone's time, I'm going

8     to tell the following story:  When I was a lawyer, I was

9     representing a company that had operations in Canada.  When I

03:56 10     flew to Toronto to interview some witnesses, someone from the

11     Department of Justice had given my name to the Canadian Customs

12     authorities who pulled me out of line, interrogated me for

13     about an hour and a half, threatened me with incarceration for

14     working -- or attempting to work in Canada without a work

15     permit, threatened me with not being able to get a visa to come

16     into Canada.  When I refused to answer certain questions on

17     attorney/client privilege grounds, threatened me with

18     incarceration for failure to cooperate and eventually gave me a

19     48-hour visa and said that a warrant would be issued for my

03:57 20     arrest if I had not presented myself to the Canadian Customs at

21     Pearson Airport 48 hours from the date of the visa, which made

22     we quite nervous about getting a flat tire on the way back to

23     the airport.

24          I'm telling that story because who knows what rights I

25     had under Canadian law.  Maybe none.  I thought it was not fair

## J.A. 1435

play, and the Department of Justice should not have been in a
position to be harassing an attorney attempting to do his job
even in a foreign country. The AUSA isn't there anymore, and I
won't name names, but I was pretty unhappy about the situation.

And assuming for the moment that what is presented is
true -- and, of course, I don't know whether it is or not, even
before we get to the legal niceties of it, which I guess we're
about to discuss, I guess I'm unhappy to hear that Customs or
anybody else, you know, even if they have the right to
interrogate people at the border and that there are essentially
no constitutional protections, which may well be true, it
doesn't seem quite exactly like fair play to me under the
circumstances presented here.

So I'm making several assumptions there: obviously
that this, in fact, happened. But I'd like to hear the
government's response to that. Who's going to take the lead?

MR. GARLAND: That will be me, your Honor. Scott
Garland for the government.

THE COURT: Yes, Mr. Garland.

MR. GARLAND: So if this happened, it was not done at
our request. I think we've confirmed that the witness was
talked to. We don't know the contours of what was actually
talked about, about timing or content or anything like that.
That was not done at our request. It was not done at the case
agent's request either. It is -- if he was talked to about

1  Teganya or anything like that, I believe there may be a note on

2  there about -- that these witnesses are coming in for the

3  purpose of testifying and that there's notice.

4      But there hasn't been instructions to CBP about what

5  they should talk to them about or not.  I didn't see anything

6  in the allegations of facts suggesting that there actually was

7  an abuse or that it was a coercive situation at all.

8      THE COURT:  It must have been custodial.  Someone who

9  doesn't -- you know, who's being paroled into the country is

03:59 10  not exactly free to walk away, I wouldn't think.

11     MR. GARLAND:  I don't know that these -- actually, I

12  don't know that these are witnesses who are paroled into the

13  country or this was a witness who was paroled into the country,

14  your Honor.

15     THE COURT:  Okay.

16     MR. GARLAND:  I'm not certain and the defense may know

17  otherwise.  I think this is somebody who's able to either get

18  his visa or didn't need a visa, in which case, being taken into

19  secondary, I don't think -- under the case law, I don't think

04:00 20  it's automatically custodial.  I think there are a lot of

21  factors that have to happen before it does become custodial.

22  And while we haven't looked up exactly the contours of what the

23  Court is allowed to do in a circumstance like this, certainly

24  the case that was cited by the defense for the Court's broad

25  powers really has nothing to do with this case.  That was a

J.A. 1437

1    case about closing argument and what can be said during closing

2    argument, not what can be done at the border.  When we haven't,

3    as I said, done research as to what the Court's authority is at

4    the border, I think there are probably some limitations to what

5    the Court can do, especially prospectively as they are asking

6    you to do, to say that if something happens in the future with

7    this case, there are these prospective things that the Court

8    should do.

9         So I think, given all of that, what they're asking for

04:01 10    is really quite broad and specially since we haven't looked at

11    them or, if we looked at them, who knows if we've even tried to

12    use them at court.  Those are the --

13         THE COURT:  But -- let me ask this:  You know,

14    obviously, we're doing all this on the fly.  Are you -- are you

15    defending the -- let's talk about the prospective.  Let's

16    assume that witnesses are going to continue to land.  Maybe

17    they've all landed.  I don't know.  Let's talk about

18    prospective.  Are you defending the practice?  In other words,

19    do you want to be able to do this to the next witness who

04:02 20    lands?

21         MR. GARLAND:  We're not asking anybody to -- we're not

22    asking CBP to do anything.  I will note that at least one of

23    the witnesses who came in earlier for the defense and who I

24    believe even testified, came in and had two long knives in

25    their luggage, checked luggage, not carry-on luggage, but it

1    was a little bit concerning to them at that point.

2          To us, the point is the border search authority is

3    there, that CBP exercise -- it is based on whatever criteria it

4    has.  That's independent of what we're asking to do.  We

5    certainly don't think that CBP should be precluded from talking

6    to witnesses that the defense came in -- just because they were

7    requested by the defense to come in.

8          THE COURT:  But there's a lot of space between having

9    no conversation at all or interrogation about long knives and

04:03 10   interrogation about the content of their testimony that they

11   intend to give at trial, which is more concerning to me, to put

12   it mildly.  That's -- go ahead.

13         MR. GARLAND:  Yeah.  No, understood about that.  You

14   know, certainly there are a couple of things that they say --

15   that the defense says in their motion about why this is really

16   troubling to them.  One is they haven't talked to their

17   witnesses.  I don't know that there's any rule saying that the

18   government can't talk to their witnesses before the defense

19   has.  And I understand --

04:03 20         THE COURT:  Of course, you can, but it's -- you can't

21   go out and arrest every defense witness either and do an

22   interrogation and say, We have a right to talk to the

23   witnesses.  That doesn't excuse the method of talking to them.

24         MR. GARLAND:  Understood completely.  I was about to

25   say that happens in a different context from just talking to

# J.A. 1439

1    them at the hotel or asking to talk to them at the hotel.

2         I guess the point is, is that CBP was not asked by the

3    agent or by -- asked to do that, but, on the other hand, we

4    also didn't say, you know, everybody should -- all of the

5    defense witnesses should go through without being secondaried

6    because that's not our decision either.  That's really CBP's

7    decision, and we don't think they should be precluded from

8    doing so if they have an independent reason for doing so.

9         THE COURT:  All right.  Let me ask the defense.  I

04:04 10   don't know if this is you, Mr. Watkins.  You've asked for

11   written order, which would be in English, and it's, of course,

12   not entirely clear to me what that would do.  Presumably, you

13   send it to your witnesses, and they could show it to the CBP.

14   I think that's probably where you're going with that.  And I

15   have a retrospective and a prospective piece of it.  The

16   retrospective piece, I can say any notes that were taken,

17   interview memos, should be turned over forthwith.

18   Prospectively, I guess, thinking out loud, I could -- I

19   certainly have the authority to direct the parties who are

04:05 20   appearing in front of me, that is, the government, to

21   communicate with CBP that they are not to discuss the

22   anticipated trial testimony with any witness without express

23   permission of the Court.  They can interview them about

24   anything else, about their long knives or whatever else they

25   happen to have in their luggage but not their actual trial

**J.A. 1440**

1    testimony.  I probably have the authority to do that.

2           But I'm -- let me -- Mr. Watkins, you want to respond

3    to all this before I continue to think out loud?

4           MR. WATKINS:  Yes, your Honor.  As the Court has

5    itself seen and probably seen in a motion, we were struggling

6    with what the remedy is both, as the Court says,

7    retrospectively and prospectively.

8           A couple things occurred to me as I heard Mr. Garland

9    talking.  One is that, if they truly did not know about it, I

04:06 10   take them at their word on that.  It seems to me quite possible

11   that the government can now form some kind of wall, some kind

12   of team, to keep them from looking at any kind of report or any

13   kind of notes that come from CBP.  If that is truly where the

14   government was going on this, it simply happened independently

15   of anything they asked to do, they should not then be able to

16   use the fruits of this accidental and quite troubling inquiry

17   about all this case.  I suggest that as one more avenue.

18          I will go back, the message that I suggested the Court

19   could send, I actually envisioned that Customs and Border

04:07 20   Protection would be doing that.  They would be the ones showing

21   that and explaining in their own words and giving the witnesses

22   in writing that that -- not warning but that advisement, that

23   they need not speak and that it does not have any impact.

24          I don't know that that goes all the way.  I disagree

25   with the government quite severely, that this is a

1    significantly coercive kind of environment that they're going

2    into.  Having traveled, as I'm sure we all have, to foreign

3    countries, it is a daunting experience.  And the idea of

4    starting to say no to officials in another country is a very,

5    very difficult thing even for those of us schooled in the law.

6    So it is certainly coercive.  Even giving them this advisement

7    seems to be pretty weak tea.  But I can't really think of very

8    much else that is going to help here.

9           It does seem that CBP has the ability to talk to

04:08 10   visitors when they come in.  Having said that, it is extremely

11   troubling, as the Court has recognized, about the circumstances

12   when they start delving into the specifics of an ongoing trial

13   to defense witnesses that are already at some distress about

14   having been called in here.

15          I'm not sure I'm helping the Court very much other

16   than suggesting these are the kinds of issues we're trying to

17   fix.

18          THE COURT:  All right.  I guess I'm drawn to the

19   attraction of some kind of B-team type of thing to kind of

04:09 20   preserve the status quo.  It's Friday afternoon.  I'm standing

21   in a hotel lobby, and I have to make the best call I can here

22   without the benefit of briefing or legal research or anything

23   else.  But I like the idea of having at least some separate

24   group from -- or person from Mr. Varghese and Mr. Garland to at

25   least look into what happened and to wall it off pending the --

1   pending something further, I guess, let's put it that way,

2   until I figure out whether there's a better solution.

3        I guess I'm going to order as follows:  I'm going to

4   order the government to have someone who is not on the trial

5   team, that is, whether it's a prosecutor or an agent, to

6   contact Customs and Border Protection, try to ascertain what

7   happened.  Tell them that I do not want witnesses to be

8   interrogated about their expected trial testimony without my at

9   least advance permission and that if there are any notes or

04:10 10   memos that those should be collected and then kept separate

11   from the prosecution team pending further resolution.

12        I don't know whether that needs to be put in writing,

13   which I'll have difficulty doing here, but, you know, I would

14   trust the government to communicate the essence of it, which is

15   that, whoever these agents are at Logan -- I'm sure there's

16   more than one -- are -- you know, they can do whatever

17   secondary investigation they think is appropriate under the

18   circumstances, but it's not to involve the anticipated trial

19   testimony of any witness.

04:11 20        Let me stop there.  Mr. Garland, anything you want to

21   add or ask questions about or have me refine as to that?

22        MR. GARLAND:  Well, no.  I mean, the first thing is

23   the defense -- I guess the first question is:  Is the Court

24   asking for us to -- I haven't heard it so far -- asking for us

25   to have some sort of reporting back to the Court about what

1    happened because --

2         THE COURT:  Sorry.  That was implicit in that.  I

3    guess I do want to know -- well, I don't know.  Let's put that

4    on hold for the time being.  Implicit in that at some point

5    someone could tell me what happened so I could react to any

6    problems if necessary.  I was trying to hit sort of the

7    equivalent of a preliminary injunction, trying to preserve the

8    status quo here over the weekend so I can sort it out later, is

9    what I'm trying to do.

04:12 10         MR. GARLAND:  Yes.  I guess my reaction is that a way

11   -- the way Mr. Watkins was talking about it suggests that

12   necessarily first that what that person told them happened

13   actually happened in the way that they did.

14        THE COURT:  Of course, I don't know that.  Yes.

15        MR. GARLAND:  Right.  Secondarily, more of a legal

16   conclusion that the circumstances are inherently coercive,

17   which I think is actually quite contrary to what all of the law

18   of border search is about.  There are times when it becomes

19   coercive.  That tends to happen when you have many agents in

04:13 20   the room, with a person who's not free to go, display weapons,

21   not always necessary for weapons.  Making that immediate

22   conclusion that it was coercive; and, therefore, all of the

23   notes should be turned over to the defense without the

24   prosecution having been able to see it.

25        THE COURT:  I didn't say turn over to the defense.  I

**J.A. 1444**

1    said collect them, No. 1.

2            MR. GARLAND:  Understood.  That's what I'm trying to

3    clear up.

4            THE COURT:  Number 2 -- we may get to that, but I'm

5    not ordering that now.

6            Number 2, this is not a Fourth Amendment situation.

7    It's not a Miranda situation.  It's me attempting, at least as

8    I see it off the top of my head, to use my inherent powers to

9    protect the integrity of the trial process; and from that

04:14 10   standpoint, whatever the law is on ordered searches, which may

11   be analogous irrelevant, but at least from my perspective, it's

12   sufficiently inherently coercive that the witness who normally

13   we tell them you can talk to defense counsel or the government

14   if you choose or not -- right?  It's up to them -- putting

15   aside the subpoena power and the Fifth Amendment, that this is

16   something altogether different and at least potentially

17   involves the government using its ability to conduct searches

18   to potentially harass or intimidate defense witnesses.  So

19   that's the rubric, again, at least as I see it off the top of

04:14 20   my head.

21           MR. GARLAND:  Yes, your Honor.

22           THE COURT:  Okay.  Mr. Watkins.

23           MR. WATKINS:  Yes, just one technical matter that was

24   brought up that I should have addressed.  This was a witness

25   who was entering from Paris, I believe with a visa.

1          THE COURT:  Okay.

2          MR. WATKINS:  And that is -- that seems to be the

3     issue.  I will say we have had absolutely no indication that

4     witnesses were talked to, the paroled witnesses were talked to.

5     And I believe that those agents monitoring them at the hotel

6     have been quite insistent that no one be able to talk to them,

7     government or the defense.  So this would be, as we see it or

8     as it developed yesterday, in regard to witnesses that are

9     coming in, non-paroled witnesses, for want of a better term.

04:15 10          There will be, by my count, seven coming in over the

11    weekend.  So it is important to try to get to the bottom of

12    this as quickly as we can.

13          THE COURT:  I would like that to happen forthwith;

14    that is, I recognize the hour and the day but to have someone

15    from the U.S. Attorney's Office, not on the trial team, to

16    attempt to make that communication to CBP and, you know,

17    communicate the substance of my order, which is that witnesses

18    are not to be talked about, about their -- interrogated about

19    their trial testimony absent my express permission, and we will

04:16 20    -- we'll take it from there.

21          MR. GARLAND:  The government will have that done.

22          THE COURT:  Okay.  Anything else?

23          MR. VARGHESE:  There was a third issue that we wanted

24    to raise.  I don't know what your timing is there in the hotel

25    lobby.  If you have to go, I don't want to take up your time;

# J.A. 1446

1    but if you do have a minute, I would like to talk to you about

2    a third issue.

3            THE COURT:  Do it before I order a drink from the bar.

4    Go ahead.

5            MR. VARGHESE:  There is a third issue.  Several of the

6    witnesses are -- at least three, I believe, of the defense's,

7    as identified, are individuals who have -- who were born in

8    Rwanda and have subsequently obtained some sort of status here

9    in the United States, either through the asylum process or a

04:17 10   refugee process and then have moved on to either becoming

11   naturalized citizens or the like, a green cardholder, a lawful

12   permanent resident.

13           The issue that arises is that the government is -- one

14   of the things folks do is, when they come in and they come in

15   for asylum and they fill out the asylum application and go

16   through the asylum proceeding, those proceedings are governed

17   by confidentiality, at Section 208.6 of 8 C.F.R.  What that

18   means is that the government is entitled to see what's in those

19   asylum applications.  We're not necessarily allowed to disclose

04:18 20   it or discuss it with witnesses in open court.

21           The way this is handled typically in immigration

22   proceedings is that we are allowed to do it if it's the

23   defendant's asylum application; but if it's the witnesses'

24   asylum application, we need to get a waiver from the witnesses.

25   Absent --

1    THE COURT:  Go ahead.

2    MR. VARGHESE:  Absent a waiver, there's the practice

3    in some immigration courts to exclude that witness because the

4    government wouldn't have a meaningful right to cross-examine

5    especially considering the testimony is concerning the same set

6    of facts as that's contained in the asylum application.

7    And so in a scenario here where a witness takes the

8    stand and says, you know, I was in Rwanda, in Butare, with Mr.

9    Teganya and we have his asylum application and that might say

04:18 10    he was in Kigali during the genocide.  So we wouldn't be able

11    to meaningfully confront him on that false statement, and we

12    would also be suborn -- or knowing that there would be a sort

13    of perjury situation going on.

14    So what we did is we have sent over the waiver form to

15    the defense and have requested that the witnesses complete that

16    waiver form that would allow sort of meaningful

17    cross-examination on items that are within their asylum

18    application.

19    To the extent that witnesses -- I know Mr. Lauer wrote

04:19 20    back saying that he didn't believe that he was the appropriate

21    person to be consulting with the witnesses on that because,

22    obviously, he's Mr. Teganya's lawyer and not the witness'

23    lawyer.  We said we understood and the witnesses could consult

24    outside counsel if that was the appropriate thing to do.

25    I wanted to flag the issue because, absent a waiver

## J.A. 1448

1    signed by the witnesses, we may be coming back and ask that the

2    witnesses be excluded from testimony because the government

3    wouldn't be allowed to have meaningful examination on them

4    based on what was written in their A files or asylum papers.

5            THE COURT:  Mr. Lauer or Mr. Watkins.

6            MR. LAUER:  Yes, your Honor.  As you heard, we were

7    notified that the government wanted our assistance in obtaining

8    waivers from their category of witnesses this morning.  This is

9    the first we're hearing of any issue as far as the use of their

04:20 10   asylum claims or whatever form of status they have.

11           Our concern, obviously, is that this is a form of

12   legal significance.  I would take it that many of these

13   witnesses were probably represented by counsel throughout the

14   course of their immigration proceedings.  And I think we are

15   not in a position to do that.  I don't think it's appropriate

16   for myself or anyone from Mr. Teganya's team to be advising a

17   witness about the potential ramifications of such a waiver and

18   how their information might be used.

19           So I would note that, you know, we've looked at the

04:21 20   confidentiality regulations, and the applicable C.F.R. would

21   indicate that the Secretary of the Department of Homeland

22   Security can't authorize the disclosure even absent the

23   witness' waiver.  So the government has other recourse.  The

24   fact that they've waited until this morning to sort of have

25   this issue come to a head, it may be too late for them to do

1    that.  But under the C.F.R., they would seem to have the

2    ability to.

3            So that's fundamentally our position, is that it's

4    really not appropriate for us to be advising a witness about a

5    form that -- a waiver form that has obvious legal significance.

6            THE COURT:  Okay.  When is this -- when is the first

7    -- when is this first going to come up?  First witness, Monday,

8    Tuesday?

9            MR. LAUER:  Probably Monday.

04:22 10            THE COURT:  Okay.  Mr. Varghese, what's your response

11    about the Homeland Security having the authority to authorize

12    release?

13            MR. VARGHESE:  Your Honor, I apologize for talking

14    over your Honor.

15            So the reason why -- the reason why this is coming up

16    now is we got their universe of witnesses yesterday in terms of

17    who was going to be potentially coming up on Monday or Tuesday.

18    That's sort of the first group of witnesses that this issue

19    applies to.

04:22 20            With respect to the regulation, the regulation

21    actually says it can be approved by either the Secretary of

22    Homeland Security or the Attorney General.

23            THE COURT:  Okay.

24            MR. VARGHESE:  And we've spoken to folks at the

25    Department of Justice as well as the Department of Homeland

1   Security and -- who handle these issues regularly, and they say

2   that this is the practice that there is no sort of mechanism in

3   place for the Attorney General or the Secretary of Homeland

4   Security to approve these requests.  They say typically what

5   happens in immigration proceedings where an asylum grantee is

6   being testified -- is coming in as a witness, you know, the

7   waiver is presented, and that's kind of the mechanism that's

8   used in order to allow that asylum confidentiality to be --

9           THE COURT:  If the Reg. 8 says that the AG can

04:23 10   authorize it --

11           MR. VARGHESE:  It does.

12           THE COURT:  It certainly is a lot -- maybe it's not

13   their practice, but it certainly is a heck of a lot easier than

14   me dealing with the waiver issue; do I need counsel for these

15   people; how do I advise them of their rights and so forth, as

16   opposed to the AG can simply do it by fiat, you know,

17   presumably through -- I'm exaggerating.  Obviously, I assume

18   there would have to be some reasonable basis for doing it.  But

19   under the circumstances where the -- presumably the AG or his

04:24 20   delegee could simply say, We authorize you to disclose it to

21   the extent necessary for impeachment purposes at the trial to

22   provide the witness with a prior inconsistent statement.  That

23   will simply solve the problem as far as I can see.

24           But I don't know what -- I don't have the benefit of

25   looking at the reg.  I can't give an advisory opinion.  I'm

1    uncomfortable, obviously, with letting someone testify who

2    previously gave statements that maybe were inconsistent that

3    can't be revealed, and I don't want to keep a defense witness

4    off the stand.  It would be best to resolve this thing.

5         I would guess you could go back to whoever you're

6    speaking to at DOJ and say the judge, you know, would like this

7    resolved.  How about that?  If it's permitted under the reg,

8    why not?  And if the AG chooses not to do that, I'll have to

9    make the best decision I can under the circumstances, okay.  I

04:25 10  don't know what else to say.  Again, I don't have the reg in

11   front of me.  I don't have the benefit of briefing.

12        MR. VARGHESE:  I understand, your Honor.  That's fine.

13   I will say that this is not -- this is not something we haven't

14   tried, but I'm happy to return and say that and then --

15        THE COURT:  And the disclosure doesn't have to be any

16   further than, In the event that a witness testifies in a way,

17   you know, inconsistent with the information set forth in this

18   asylum form, which is a condition that may never come --

19   hopefully, will not come to pass, you know, then nothing ever

04:25 20  happens.  But it gives you the right to confront him if there

21   is something inconsistent.

22        MR. VARGHESE:  Right.  Okay.  All right.

23        THE COURT:  Okay.

24        MR. VARGHESE:  We'll endeavor to figure that out.

25        THE COURT:  Okay.  So let's put that on pause as well.

1          Anything else?

2          I will see you then 8:30 Monday morning.  Okay.

3          ALL:  Thank you, your Honor.

4          THE COURT:  Thank you, all.

5     (Whereupon, at 4:26 p.m. the hearing concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

2

3

4    UNITED STATES OF AMERICA,      )
                             )

5    vs.                       ) Criminal Action
                             )

6    JEAN LEONARD TEGANYA,       ) No. 17-10292-FDS
               Defendant   )

7                                 )
                             )

8                                 )

9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                     JURY TRIAL DAY 14

12

13

14

15        John Joseph Moakley United States Courthouse
                 Courtroom No. 2
                One Courthouse Way

16                   Boston, MA 02210

17

18                   April 1, 2019
                 8:30 a.m.

19

20

21

22                  Valerie A. O'Hara

23                Kathy Mullen SIlva,
             Official Court Reporters

24       John Joseph Moakley United States Courthouse
           1 Courthouse Way, Room 3204

25                Boston, MA 02210
         E-mail: vaohara@gmail.com

1    APPEARANCES:

2    For The United States:

3        United States Attorney's Office, by GEORGE P. VARGHESE,
     ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4    UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
     Massachusetts  02110;
5
     For the Defendant:
6
             Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7    and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
     Boston, Massachusetts 02210.
8
     ALSO PRESENT:
9
     Augustin Mutemberezi, Interpreter
10   Moses B. Rndasunikwa, Interpreter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2    WITNESS                    DIRECT   CROSS  REDIRECT  RECROSS

3    JEAN PAUL MIHIGO
        By Mr. Lauer              9                 31
4       By Mr. Varghese                   16

5    IGNACE RUKERIBUGA
        By Mr. Lauer             32                 48
6       By Mr. Garland                    41

7    **AUGUSTIN MINANI**
        By Mr. Lauer             50                 62
8       By Mr. Garland                    56

9    **TATIANA MUREBWAYIRE NAHIMANA**
        By Mr. Lauer             63                 98
10      By Mr. Varghese                   81

11   **JEAN FRANCOIS HABIMANA**
        By Mr. Lauer            102
12

13

14                  Exhibits - None marked.

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2      THE CLERK:  All rise.  Thank you.  You may be seated.

3 Court is now back in session.

4      THE COURT:  All right.  Good morning.

5      MR. GARLAND:  Good morning.

6      THE COURT:  All right.  Where are we on the various

7 issues that we were discussing on Friday, particularly this

8 issue of I guess I'll start with that, about the waiver issue?

9 Mr. Garland.

08:34AM 10      MR. GARLAND:  Thank you, your Honor.  After a lot of

11 work on Friday, Saturday and Sunday, late Sunday, we got

12 approval from the Attorney General to proceed with the waiver

13 of confidentiality or authorization to use that material.

14      THE COURT:  I didn't -- this wasn't like Bill Barr,

15 having to interrupt his Sunday dinner to sign?

16      MR. GARLAND:  I don't know whether it was his dinner

17 or whether it was his midnight snack or what.  Actually, it was

18 not his midnight snack, but it was --

19      THE COURT:  The attorney general had to do it

08:35AM 20 personally?

21      MR. GARLAND:  Yes.

22      THE COURT:  Okay.

23      MR. GARLAND:  So that means that we are not seeking

24 for those witnesses to go on Wednesday.  We would ask that any

25 of those witnesses go tomorrow rather than today.

1       One of them was noticed to us late yesterday by the

2   defense after we had gone home, didn't have a chance to

3   actually have that file in our possession, and so we would like

4   the chance to be able to do that this afternoon, but there's no

5   objection to those witnesses appearing tomorrow.

6       THE COURT:  Okay.  Mr. Lauer.

7       MR. LAUER:  The witnesses are here, and we may be able

8   to wait until tomorrow.  The issue is going to be for today's

9   purposes, we do have a full day.  If we are holding back, it's

08:36AM 10   really I think only for today one witness who is affected, but

11   if we are holding that witness until tomorrow, we may not last

12   until 4 p.m.

13       THE COURT:  Why don't we put that on witness last.

14   Let's see where we are.  It may be, you know, we could do that

15   person's direct.  Let's see where we are.  So the government's

16   motion, I guess, I can terminate as moot, that is Number 143.

17       MR. GARLAND:  Yes, your Honor.

18       THE COURT:  Okay.  So that was one issue.  What about

19   the -- what do we know about the airport situation?

08:36AM 20       MR. GARLAND:  We're unaware of any other incidents of

21   that happening.  What we did, we went back, we contacted our

22   criminal chief, who has supervised the case, but we figured the

23   message coming from the criminal chief would present and be

24   heard best.

25       THE COURT:  Is that Mr. Hafer?

1    MR. GARLAND:  That's Mr. Hafer.  And so he contacted a

2    supervisor at CVP.  They're going through the mechanisms of

3    trying to release the information.  It's not as easy as just

4    going to the agent.  He's having a conversation with their I

5    think ICE or CPC's counsel today about getting that

6    information, so we don't anticipate any other issues in that

7    regard.

8            THE COURT:  Mr. Lauer, anything further to report on

9    that?

08:37AM 10        MR. LAUER:  No, we're unaware of any similar

11   questioning.

12           THE COURT:  The video conferencing question, what day

13   is it that we're going to do this?

14           MR. WATKINS:  We're presently targeting Wednesday

15   morning at 9 a.m.

16           THE COURT:  What time will it be there?  Will it be

17   the evening in Burundi?

18           MR. WATKINS:  Afternoon.  It will be about 3:00 in the

19   afternoon there.

08:37AM 20        THE COURT:  Okay.

21           MR. WATKINS:  Yes, 3:00 in the afternoon.  We're

22   ironing out the last technical details.  I believe they're

23   communicating with the clerk, and the clerk is communicating

24   with the IT people here.

25           THE COURT:  Okay.  It will be surprising if this goes

1       off without a glitch, but we'll see what happens.  Okay.  What,

2       if anything, do we have to talk about?  Mr. Varghese.

3              MR. VARGHESE:  Yes, your Honor, there's one other

4       issue with one of the defense witnesses.  You know, we were

5       noticed at 11:00 last night that they were adding a person for

6       the list today, and that person is scheduled to go second, I

7       believe, in their order.

8              We believe that late disclosure not only violates this

9       Court's trial order but it's also just unfair to the

08:38AM 10      government.  As the Court is aware, we do an extensive amount

11      of work preparing for cross-examination, and when we get a name

12      at 11:00 at night, we're just not in a position to go forward

13      with that witness as the second witness today, and so we would

14      ask that that witness be kicked to at least Tuesday or at least

15      until after the lunch break into the afternoon so we have an

16      opportunity to at least review this person's record.  We didn't

17      get the statement from the witnesses until that same time,

18      after 11:00 last night.

19             THE COURT:  Mr. Lauer.

08:39AM 20      MR. LAUER:  We did inadvertently neglect to provide

21      the witnesses until late last night, however, I would say that

22      the witness' name was on the witness list that was filed nearly

23      two months ago.

24             THE COURT:  But, you know, look --

25             MR. LAUER:  I'll say I don't have a problem delaying

**J.A. 1460**

1    that witness until later in the day or until tomorrow.

2           THE COURT:  Let's -- at a minimum, let's delay the

3    witness, at a minimum, until after lunch break and let's see

4    where we are.

5           MR. VARGHESE:  Thank you, your Honor.

6           THE COURT:  You know, look, I tried cases both as a

7    prosecutor and a defense.  When we were prosecutor, we got no

8    notice at all, but when I was a defense attorney, you know, you

9    need to know.  You're preparing your cross, it's easy to say

08:39AM 10   that a list of 50 people, you're going to have to cross-examine

11   one of them, but you need to know.

12          MR. LAUER:  Also, late last week, I sent an e-mail to

13   both of the Assistant U.S. Attorneys notifying them that this

14   witness was part of the universe of witnesses that would be

15   testifying this week.

16          THE COURT:  Okay.

17          MR. LAUER:  So it's not entirely out of left field,

18   but I will say it is our fault that we did not provide the

19   statement more quickly.

08:40AM 20          THE COURT:  Let's try to do better on that.  Anything

21   else?

22          MR. GARLAND:  Not for the government.

23          THE COURT:  There was another story in *The Globe*

24   today, again, unless wants me to raise it, I plan to not say

25   anything at all.

1          MR. LAUER:  I'm not asking for the Court to do

2     anything.

3          MR. GARLAND:  Nor the government.

4          THE COURT:  The shocking conclusion that this case may

5     turn on the credibility of the witnesses.  I guess even if they

6     read it, yeah, I guess, that's right.  It's not going to be

7     much of an issue.  We'll start as soon as we have a full group

8     of witnesses.

9          THE CLERK:  All rise.

08:51AM 10          (A recess was taken.)

11          THE CLERK:  Thank you.  You may be seated.  Court is

12     now back in session.

13          THE COURT:  Good morning, welcome back.  Thank you for

14     your patience taking a couple of days off at the end of last

15     week so I could go to Washington, and I think we're ready to

16     go.  Mr. Lauer.

17          MR. LAUER:  We are.  The defense calls

18     Jean Paul Mihigo.

19          JEAN PAUL MIHIGO, having been duly sworn by the Clerk,

09:04AM 20     testified as follows:

21                         DIRECT EXAMINATION

22     BY MR. LAUER:

23     Q.   Good morning.

24     A.   Good morning.

25     Q.   Can you please state your name for the record.

         1    A.    My name is Jean Paul Mihigo.

         2    Q.    Is your name correctly spelled on the monitor?

         3    A.    Yes, it is.

         4    Q.    Mr. Mihigo, where do you live?

         5    A.    I live in Dayton, Ohio.

         6    Q.    And what do you do for work?

         7    A.    I'm a systems safety engineer.  I work for Air Force

         8    Research Laboratory.

         9    Q.    Did you attend university?

09:05AM 10    A.    I did, yes.

        11    Q.    Where did you attend?

        12    A.    I went for my undergraduate, I went to Wright State

        13    University, it's in Dayton, Ohio, and I did mechanical

        14    engineering, and I did masters for mechanical engineering as

        15    well at the University of Tennessee Space Institute.

        16    Q.    How long have you lived in the United States?

        17    A.    I arrived in the United States in 1998.

        18    Q.    Where were you born?

        19    A.    I was born in Rwanda, Central Africa.

09:05AM 20    Q.    Where in Rwanda were you born?

        21    A.    I was born in Kibuye.

        22    Q.    What region of the country is that?

        23    A.    It's in south central, south central.

        24    Q.    Did you attend seminary school in Nyundo?

        25    A.    Yes, I did.

1  Q.  When did you enter the seminary school in Nyundo?

2  A.  1988.

3  Q.  And did you come to know Mr. Teganya?

4  A.  Oh, yes, I did because he was a vice dean.

5  Q.  What was the vice dean?

6  A.  A vice dean was a position, it was a student position.  At

7  the beginning of the school year, in the seminary, the

8  priests -- it was a catholic high school.  That was led by the

9  catholic and the priests, and the dean was the lead, the dean

09:06AM 10  was lead of the students really who help students to show them

11  what to do, discipline, kind of organize the students.

12  Q.  Were you in the same class as Mr. Teganya?

13  A.  No, I wasn't.  When I arrived in high school, when I was

14  in first grade, Teganya was in fifth grade, yes.

15  Q.  And did he have any responsibility --

16  A.  No, he was in fourth grade when I was in the first grade,

17  so he was three years ahead of me.

18  Q.  Did he have any responsibilities as far as your class or

19  what was your contact with him?

09:07AM 20  A.  My contact?

21  Q.  Yes.

22  A.  My contact with him was as the vice dean, he instructed

23  students on many occasions.  Since I was new, usually the dean

24  or vice dean, they would show students where the dormitories

25  are, show them around and stuff like that, and I know him also

J.A. 1464

1    because he used to play basketball and volleyball.  He was

2    pretty good.  He played for the school team.  I think he was

3    left-handed, I think.  He was pretty good, so a lot of students

4    knew him and they admired him because he was good in

5    volleyball.

6    Q.   I want to ask you some questions about Nyundo more

7    generally.

8    A.   Okay.

9    Q.   Were there both Hutu and Tutsi students at Nyundo?

09:08AM 10   A.   Yes, sir.

11   Q.   Can you tell us approximately how many Hutu students

12   versus how many Tutsi students?

13   A.   Oh, in the whole class?

14   Q.   In the whole school.

15   A.   Different classes had different percentages, proportions,

16   but for the school as a whole, I think about 40 percent.

17   Q.   40 percent?

18   A.   40 percent Tutsi and 60 percent, maybe close to 50-50.

19   Q.   Were there a substantial number of Tutsi students?

09:09AM 20   A.   I'm sorry, sorry.

21   Q.   Were there a substantial number of Tutsi students?

22   A.   Yes, there were.

23   Q.   What was Nyundo like in terms of the academic atmosphere?

24   A.   Nyundo was a catholic high school.  It was a seminary that

25   prepared students to become priests, not become priests, but

1  that was the goal.  It was a very -- it was among the top best

2  schools academically and disciplined.

3  Q.   You talked about discipline.  What was the role of

4  discipline and conduct at Nyundo?

5  A.   Discipline was -- they were really strict about

6  discipline.  Students had to be disciplined.  Like one thing I

7  remember, for example, they graded each student at 40 points

8  every year.  That's for the -- we called it conduct, it's like

9  for discipline, so you had to have at least a half to continue

09:10AM 10  the next year, so...

11  Q.   What would your happen if your marks in conduct were poor?

12  A.   If you were below 20, they would expel you from school.

13  So, for instance, if they caught you cheating in a test, for

14  example, so it was automatically 20 points, and so you had a

15  chance to, with 20 points, that was half, you were still okay,

16  but if you lose like one point, they had to expel you from

17  school.

18       One other thing, they were strict about the behaviors

19  of students.  If you said a cross word, for example, to a

09:11AM 20  student, it was two points, I think it was two points.  It was

21  really a very strict school.

22  Q.   I asked you a few moments ago about the percentage of

23  Tutsi and Hutu students.  I want to follow up on that.  Was

24  there ethnic conflict between Hutu students and Tutsi students

25  at Nyundo?

1   A.   No, I didn't see that.  I know student, like I had friends

2   that were Tutsi and Tutsi had Hutu friends, so they emphasized

3   on not talking, the management, no, the management, the

4   direction of the school, they emphasized not to talk on no

5   politics, so there was no really, I didn't see -- we lived in

6   harmony, Hutu and Tutsi.  I didn't see any conflict.

7   Q.   I asked you about the students already.  What about the

8   faculty, what about the teachers?  Were there Hutu and Tutsi

9   faculty?

09:12AM 10   A.   Yes, there were.  We had -- I said it was a catholic-run

11   school, so there were five priests, and three of them were

12   Tutsi and two were Hutu, and there was a lot of Tutsis who were

13   teachers and Hutus also.  Some of the teachers, we had a lot of

14   teachers from Congo, but there were Tutsis and Hutus, that's

15   correct.

16   Q.   If there were anti-Tutsi statements made by a Hutu

17   student, what would have been the result of that in terms of

18   discipline?

19   A.   They would expel you.  They would -- you would have to

09:13AM 20   go -- you couldn't stay at the school.  They were really

21   strict, the priests.

22   Q.   Did you continue to attend Nyundo until the time of the

23   genocide in 1994?

24   A.   No, I went to -- I was in Nyundo for four years and a

25   half, then I asked for a transfer.  I went to another school in

1    Kigali, the capital city, and that was common in the country,

2    some students, you start in one school, and you go to another

3    school.

4    Q.   Were you in Kigali in 1994, when the genocide occurred?

5    A.   No, I was in Kibuye.  When it happened, we were in Easter

6    break, it was in April, so I was in Kibuye.

7    Q.   Did you remain in Kibuye for the period of the genocide?

8    A.   Yes, sir.

9    Q.   What about when the genocide ended, what happened, where

09:14AM 10   did you go?

11   A.   When it ended, I was -- I went to Congo, but before I

12   went, there were three regions that were protected under by the

13   French, and so there were three big regions.  We called them

14   prefecture.  It was Kibuye, Gikongoro and Cyangugu, so I went

15   through that corridor because it was the one that was safer.

16   There was no war over there, so from there I went to Congo.

17   Q.   And how did you end up coming to America?

18   A.   I went to -- from Congo, I went to Cameroon.  I went to

19   Kenya, first of all, in 1995.  I went to Kenya for just two

09:15AM 20   months.  It was transit.  My destination was Cameroon.  I

21   wanted to go to Cameroon.  It's another country in West Africa.

22   It's a French-speaking country, so I wanted to go to a country

23   where they speak french so I can go to school, and because I

24   had a sister who lived in Kenya, and Kenya was closer to

25   Rwanda, so I transited in Kenya, I stayed there for two months,

1    then I went to Cameroon.  I stayed there for almost two years.

2         At that time I had a sister who lived in Austria, and

3    she helped me find a student visa.  I went to Austria, and once

4    I got in Austria, I applied for the visa lottery to become an

5    immigrant, green card, what they call a green card here, and

6    one year later, they told me I won, and I started the process

7    of coming.

8    Q.   Since coming to the United States, did you maintain any

9    relationship with Mr. Teganya?

09:16AM 10   A.   No, actually I haven't seen him until last -- I think it

11   was last year, when his aunt or his mom passed away in

12   North Kuranda, that's when I met him since the genocide, since

13   1994.

14   Q.   That was the first time you had seen him since 1994?

15   A.   Yes.

16        MR. LAUER:  I have no further questions.  Thank you.

17        THE COURT:  Cross.

18                    <u>CROSS-EXAMINATION</u>

19   BY MR. GARLAND:

09:17AM 20   Q.   Good morning.

21   A.   Good morning.

22   Q.   You testified that you started at Nyundo Junior Seminary

23   in 1987; is that right?

24   A.   '88.

25   Q.   '88?

```
 1   A.   Yes, sir.
 2   Q.   And you stayed there for four and a half years, you said?
 3   A.   Correct.
 4   Q.   And after that, you graduated from a school in Kigali; is
 5   that correct?
 6   A.   Yes, sir.
 7   Q.   When you attended Nyundo, did you live on campus or off
 8   campus?
 9   A.   Oh, I lived on campus, this school, everybody lived on
10   campus.  It was, I forgot how they called it, but everybody
11   lived on campus, we all lived on campus.
12   Q.   What dormitory or hall?
13   A.   What dormitory?
14   Q.   Yes.
15   A.   We changed dormitory by year.  I lived in, we had two big
16   dormitories, one was called Saint Pie, another one was
17   Santa Marie, so I lived in both actually because they moved us
18   every year.
19   Q.   And when you attended Nyundo, did you play any sports?
20   A.   I did, I played soccer.
21   Q.   You played soccer?
22   A.   Yes.
23   Q.   And did you belong to any school clubs at Nyundo?
24   A.   School clubs, yes, I was in Boy Scouts, and I was
25   in -- there was another club that was related to Virgin Mary.
```

09:17AM (line 10)
09:18AM (line 20)

J.A. 1470

1    It's called Legend Marie, I forget how they call it in English,

2    but it was focused on Virgin Mary, so I was in that club.

3    Q.   When you attended Nyundo, what were your favorite classes?

4    A.   You mean subjects?

5    Q.   Yes.

6    A.   I liked biology and chemistry actually.

7    Q.   And when you attended Nyundo, how often did you see the

8    defendant?

9    A.   You mean Jean Leonard Teganya?

09:19AM 10   Q.   Yes.

11   A.   Almost every day because -- I would say every day, I would

12   say every day.

13   Q.   And do you remember the locations in Nyundo where you saw

14   him?

15   A.   Where every day we woke up in the morning, and we had to

16   do exercises outside the classes, and after that, we would go

17   and take showers, and you had to go to the mass.  We had a mass

18   every day, so all students had to attend the mass, so it was a

19   small school of about 300 people.

09:19AM 20          Most people, they knew each other, and so we go to the

21   mass, mass was about 45 minutes.  It was every day.  After

22   that, we'd go to take a breakfast, then before the classes

23   begin, so during the mass, you would see everybody, obviously.

24   Q.   And your birthday is July 23rd, 1973; is that correct?

25   A.   Yes, sir.

1    Q.   So, in 1997, you applied for an immigrant visa; is that
2    correct?
3    A.   1987?
4    Q.   '97.
5    A.   Not '97.
6    Q.   What year was it that you applied for that immigrant visa?
7    A.   It was 19 -- in '97, yes, sir, I was in Austria, when I
8    was in Austria.
9    Q.   And to apply for that immigrant visa, you had to fill out
09:20AM 10    a form, right?
11    A.   Yes.
12    Q.   That was your applicant for immigrant visa and alien
13    registration form; is that right?
14    A.   It was the first form you would fill out was just to put
15    your name and address and your contact, then they do the
16    drawing.  When you win, they tell you you won, then you started
17    some interviews.  I did interviews in U.S. Embassy in Austria.
18    Q.   Instead of doing the interviews, I want to ask you about
19    the form you filled out, but you did fill out a form for that
09:21AM 20    visa, correct?
21    A.   Yes, yes, yes.
22    Q.   You understood that the answers on that form needed to be
23    true and correct because they were important, right?
24    A.   Yes, sir, I understood it.
25    Q.   And you understood the answers were important because you

**J.A. 1472**

1   were applying for something important, the right to live in the

2   U.S. for a particular period, right?

3   A.   Yes, sir.

4   Q.   And you understood that when you wrote down answers on

5   that form, the answers would be evaluated to determine whether

6   you would get that, correct?

7   A.   Yes, sir.

8   Q.   So you took that form seriously when you filled it out,

9   right?

09:21AM 10   A.   Yes, I did, yes.

11   Q.   And as part of the application process, do you remember

12   filling out a supplemental registration form?

13   A.   Supplemental registration form?

14   Q.   Where you listed the schools that you had attended?

15   A.   Yes, you list the school you attended, you listed your

16   siblings and where you lived, yeah, yeah.

17   Q.   And on that form, you were asked whether you were a high

18   school graduate.  Do you remember that?

19   A.   Yes.

09:22AM 20   Q.   And you answered yes, that you graduated in 1993, right?

21   A.   Yes, sir.

22   Q.   And on that form you wrote down the high school that you

23   attended from 1987 to 1993, right?

24   A.   It's from 1988, not from 1987.

25   Q.   Well, I'm not asking you what you remember, I'm asking you

1    if you remember what you wrote down on that form?

2    A.   I think I should remember, yeah, I remember, because I

3    wrote what I did.

4    Q.   Now, when you got on the stand today, you swore an oath as

5    well, right, to give true testimony and accurate testimony?

6    A.   Yes, sir.

7    Q.   And that's because you understand your answers here today

8    are important as well, correct?

9    A.   Yes.

09:23AM 10    Q.   And that there could be serious penalties if you were to

11    testify falsely, correct?

12    A.   Yes, sir.

13    Q.   Let me ask you again what high school or secondary school

14    did you attend from 1988 or 1987 through 1993?

15    A.   I attended the seminary high school.

16    Q.   That would be Nyundo, correct?

17    A.   That would be Nyundo, then I went to Lycee de Kigali.

18    It's in the capital city of Rwanda.

19    Q.   I want to turn to back to that supplemental registration

09:23AM 20    form.

21          MR. GARLAND:  I'm going to hand a document to the

22    defense and then with the Court's permission, I'm going to

23    approach the witness.

24          THE COURT:  Yes.

25    Q.   Sir, do you see the document that's in front of you?

```
 1    A.    Yes, I see it, sir.

 2    Q.    And do you recognize it?

 3    A.    I do.

 4    Q.    That's your name at the top, right?

 5    A.    Yes, sir.

 6    Q.    And your handwriting is on it as well?

 7    A.    It is, yes.

 8    Q.    And on the back of that, the second page, you'll see

 9    there's a signature there, and that's your signature, correct?

10    A.    Yes, sir.

11    Q.    And what's the date of that signature?

12    A.    December 8th, 1997.

13    Q.    And right above your signature on that document, you

14    basically certified that you had read and understand all the

15    questions set forth above and that the answers that you

16    furnished on the form were true and correct to the best of your

17    knowledge and belief and that any false or misleading statement

18    might result in the denial of your visa or entry into the U.S.,

19    right?

20    A.    Yes.

21    Q.    So, going back to that first page of this form, when you

22    applied for your visa application, you didn't say that you

23    attended the Nyundo Junior Seminary in Gisenyi, did you?

24    A.    Yeah, I didn't because --

25    Q.    This is a yes or no question.  Did you or did you not list
```

09:24AM (line 10)
09:25AM (line 20)

J.A. 1475

1   Nyundo on there?

2   A.   I did not because they asked me where I graduated from,

3   and I graduated from the school in Kigali, not Nyundo.  It was

4   common in Rwanda to start from one school and graduate from

5   another one, so I listed the school where I graduated from.

6   Q.   Could you read what the question called for at Subsection

7   D or Question D?

8   A.   Question D?

9   Q.   Yes.

09:26AM 10   A.   "Names and addresses of all schools, colleges and

11   universities attended, include trade and vocational school."

12   Q.   So that question asked you to list all schools that you

13   attended, not all schools that you graduated from, correct?

14   A.   Yes, sir.

15   Q.   And when we go down to the entry for the school in Kigali,

16   what months did you say that you attended that school in

17   Kigali?

18   A.   What months?

19   Q.   Yes.  It's the middle column.  Does it say the secondary

09:26AM 20   school you attended?

21   A.   Yes.

22   Q.   And what are the months that you said you attended there?

23   A.   Oh, it says from '87 to 93.

24   Q.   I couldn't understand.  Was that September, 1987 to June,

25   1993?

```
 1   A.    September, '87 to June, '93.

 2              MR. GARLAND:  Your Honor, the government moves the

 3   supplemental registration for diversity immigrant visa program

 4   into evidence.

 5              MR. LAUER:  Objection.

 6              THE COURT:  May I see counsel at sidebar.

 7              (THE FOLLOWING OCCURRED AT SIDEBAR:)

 8              THE COURT:  All right.  This is extrinsic evidence to

 9   impeach, right?  Is that your objection?

09:27AM 10              MR. LAUER:  Yes.

11              MR. GARLAND:  It's to impeach, it completely undercuts

12   everything he says.  It's a prior inconsistent statement that

13   completely undercuts.

14              THE COURT:  Again, he's a witness, he's not a party.

15   I understand why you say it undercuts it, but doesn't the rule

16   say that at least -- I should have put the rule in front of me,

17   but the thrust of it is normally extrinsic evidence of

18   impeachment doesn't come in.  I have the discretion to allow

19   it, but, obviously, it's exceptional circumstances, so why

09:28AM 20   should I allow it here?

21              MR. GARLAND:  I think you should allow it here because

22   the witness got up and painted this picture of the defendant,

23   the school that he attended, and it's clearly out of bounds

24   what he has in this document.  At the end of his testimony, I'm

25   going to ask you to strike the entire testimony.
```

J.A. 1477

       1              THE COURT:  I'm not going to strike it.  Striking his

       2       testimony, I'm not going to do that, obviously.  All right.

       3       I'm going to permit this because, Number 1, it's given under

       4       oath; and, Number 2, I don't see this as opening up a whole

       5       rabbit hole of hours of testimony to rebut it, so I will admit

       6       this.  Under the circumstances, we'll mark it whatever the next

       7       exhibit number is.

       8              MR. GARLAND:  Thank you.

       9              (THE FOLLOWING OCCURRED AT SIDEBAR:)

09:29AM 10              THE COURT:  I will admit the exhibit.  What is our

      11       next number?

      12              MR. GARLAND:  I believe it's 72, your Honor.

      13              THE COURT:  It's admitted, 72.

      14              (Exhibit No. 72 received into evidence.)

      15       Q.   So this is the document you have up there on the stand,

      16       correct?

      17       A.   Yes, sir.

      18       Q.   So going down to the bottom, this is where you've listed,

      19       the Lycee de Kigali, correct?

09:30AM 20       A.   Yes.

      21       Q.   And that's the school you say you graduated from, correct?

      22       A.   Yes, sir.

      23       Q.   And these are the dates you testified to before,

      24       September, 1987 to June, 1993, correct?

      25       A.   Yes.

# J.A. 1478

1    Q.   In fact, let me just zoom in right there.  Below that,
2    you've listed the Ecole Primaire Gihango; is that correct?
3    A.   Yes, that's where I attended elementary school.
4    Q.   September, 1979 to June, 1987?
5    A.   Yes.
6    Q.   And it says you got a certificate there, and then you've
7    also listed Technic University below that, correct?
8    A.   In Austria, yes.
9    Q.   And, in fact, you didn't even list a degree or certificate
09:31AM 10   listed there, did you?
11    A.   I'm sorry.
12    Q.   For the Technic University, you did not list having
13    received any certification or degree?
14    A.   I didn't have a certificate, I was there for a short time
15    before I came to America.
16    Q.   Can you point out to me on this page where you listed the
17    Nyundo Petit Seminary?
18    A.   Nyundo is not listed there because I listed the school I
19    graduated from.
09:31AM 20   Q.   Now, you testified before that you attended Nyundo from
21    '98 to '91, correct?
22    A.   Yes, sir.
23    Q.   So, sir, I ask you, you didn't actually attend Nyundo, did
24    you?
25    A.   I did, I did attend Nyundo.  I did attend Nyundo.  Just to

1    clarify maybe here, when they like, you know how on the diploma

2    where they ask you where you went to school, you say I went to

3    school to this university, but, for instance, when they asked

4    me where I graduated from my mechanical engineering, I stated

5    Wright State University, but I took some community classes,

6    community colleges sometimes in summer, but I still released

7    only one university.

8    Q.   We agree Nyundo is not listed here for the months you said

9    you attended, right?

09:32AM 10   A.   Yeah, Nyundo is not listed because I listed where I

11   graduated from.

12   Q.   So, when you were in school in Kigali, that was a

13   three-hour ride away from Nyundo, correct?

14   A.   Yeah, I would say about three hours, yes.

15   Q.   So, when you were in the Lycee de Kigali, you weren't

16   traveling back to Nyundo on a daily basis, were you?

17   A.   When I was in Lycee de Kigali?

18   Q.   Yes.

19   A.   No.

09:33AM 20   Q.   And you weren't going there every other day, were you?

21   A.   Not really.  I don't know.

22   Q.   You would have had to have taken a bus?

23   A.   Yeah, a bus or a taxi.

24   Q.   And that would have cost money, and three hours there and

25   three hours back, right?

```
 1    A.   Yes.
 2    Q.   And so you weren't even going there every week or every
 3    month, were you?
 4    A.   No, not really.
 5    Q.   So, at best, if you were going to Nyundo during the time
 6    you were at Lycee de Kigali, that might have been once a year,
 7    twice a year, at most, right, if even that?
 8    A.   I don't recall going back to Nyundo because I really
 9    didn't have any business over there, so I was not attending the
10    school there, so I didn't -- I don't recall when I went back.
11    Q.   So you didn't really then when you were at the Lycee de
12    Kigali, you didn't see the defendant at all, did you?
13    A.   No, no, when I was at Lycee de Kigali, I didn't see him.
14    Q.   The fact that you went to Lycee de Kigali during these
15    periods of time, did you tell the defense that when you were
16    talking to them?
17    A.   Did I tell who?
18    Q.   Did you tell the defense that you attended the Lycee de
19    Kigali when you talked to them?
20    A.   Yes, I did.
21    Q.   Do you remember when you applied to naturalize as well?
22    A.   Here in America?
23    Q.   Yes.
24    A.   Yes.  That would have been -- that would be five years
25    after I came.
```

J.A. 1481

1   Q.   And you filled out a form to do that, right?

2   A.   Yes, sir.

3   Q.   And in that form, you had to swear under the pains and

4   penalties of perjury that your answers would be true and

5   accurate?

6   A.   Yes.

7   Q.   And do you remember on that form it asked you whether you

8   had lied to immigration officials at any other point, correct?

9   A.   Yes.

09:35AM 10   Q.   And do you recall what you wrote on that?

11   A.   It's been a while.  I don't really recall.

12   Q.   You don't recall?

13   A.   I don't recall everything, but if you ask me a specific

14   question, I would know it.

15   Q.   Okay.  Let me turn to that then.  Do you recall that there

16   was a question on that form asking you whether you had ever

17   lied to any U.S. officials?

18   A.   I think that question was there.

19   Q.   I'm sorry.

09:35AM 20   A.   I think that question was there, yes, sir.

21   Q.   Okay.  And when you were asked a question whether you had

22   ever lied to U.S. officials, what did you say?

23   A.   I said I didn't.  I never lied.  Again, if you are

24   referring to this form here, what I didn't list Nyundo, I

25   specifically said why, because I listed the school where I

1   graduated from.  That's exactly the same.  If somebody asked me

2   where I graduated from, I tell them Wright State University,

3   but I went to Sinclair Community College.

4   Q.   That's not what's on the form though, is it?

5        THE COURT:  Why don't we move on.

6   Q.   Do you recall also on your immigration form you also were

7   asked whether you had ever given false or misleading testimony

8   to U.S. Government officials?

9        MR. LAUER:  Objection.

09:36AM 10        THE COURT:  This is getting pretty cumulative.  I'll

11   allow this question, but let's move on.

12   Q.   So you weren't in Butare during the genocide, right?

13   A.   I was in Kibuye.

14   Q.   So you don't have any idea what the defendant was doing

15   during the genocide, correct?

16   A.   No, I haven't seen him until last year.

17   Q.   You turned 18 in 1991; is that right?

18   A.   '91, so I was born in 1973.  I'm trying to do the math,

19   but, yeah, it's '91, that's true.

09:37AM 20   Q.   What was your political party when you turned 18?

21   A.   When I turned 18?

22   Q.   Yes.

23   A.   I didn't have any political party.

24   Q.   Did you have a political party in 1992, '93, or '94?

25   A.   No.

1          MR. GARLAND:  If I can just take a moment to consult

2     with counsel.  No further questions, your Honor.

3          THE COURT:  Redirect.

4                    REDIRECT EXAMINATION

5     BY MR. LAUER:

6     Q.   Good morning.

7     A.   Good morning.

8     Q.   You were asked a number of questions about this

9     supplemental form that you filled out in 1997, correct?

09:38AM 10    A.   Yes.

11    Q.   Did you consciously lie on this form?

12    A.   I don't think I lied.

13    Q.   I'm going to show you.

14    A.   You mean this form here?

15    Q.   Yes, the form that you were shown by the prosecutor.  When

16    you wrote down Lycee de Kigali, was that a lie?

17    A.   No, it was not a lie.

18    Q.   Were you trying to hide that you had attended Nyundo High

19    School when you filled out this form?

09:38AM 20    A.   No, I was not trying to hide that I attended it, it's

21    just --

22    Q.   Why did you not list Nyundo there?

23    A.   Because that's not where I graduated from.

24         MR. LAUER:  Thank you, sir.

25         THE WITNESS:  You're welcome.

1         THE COURT:  Recross.

2         MR. GARLAND:  No, your Honor.

3         THE COURT:  You may step down.

4         MR. LAUER:  Next we will be calling Ignace Rukeribuga.

5         (The interpreter was sworn.)

6         THE CLERK:  Would you please identify yourself for the

7   record.

8         THE INTERPRETER:  For the record my name is

9   Eva Bethune, interpreter.

10         IGNACE RUKERIBUGA, having been duly sworn by the

11   Clerk, testified through the Interpreter as follows:

12                    DIRECT EXAMINATION

13   BY MR. LAUER:

14   Q.   Good morning, sir.

15   A.   Good morning.

16   Q.   What is your name?

17   A.   My name is Ignace Rukeribuga.

18   Q.   Does your name appear correctly on the screen in front of

19   you?

09:42AM 20   A.   Yes, that's my true name.

21   Q.   Mr. Rukeribuga, where do you live?

22         MR. GARLAND:  Your Honor, we'd ask that the

23   interpreter speak audibly so we can interpret the french as

24   well over here.

25         THE COURT:  Okay.

1    Q.    So, where do you live?

2    A.    I live in Eindhoven in the Netherlands.

3    Q.    What did you do for work?

4    A.    I work in Anvers, Belgium in a medical laboratory, and I

5    am a biologist.

6    Q.    To become a biologist, did you attend university?

7    A.    Yes, I did a master's in biological sciences.

8    Q.    And where did you receive that master's?

9    A.    First I went to the National University of Rwanda on the

09:44AM 10    Butare campus, and then I did the rest of my master's at the

11    University of Ouagadougou.

12    Q.    Where is that located?

13    A.    For Burkina Faso.

14    Q.    Mr. Rukeribuga, where were you born?

15    A.    I was born at the commune of Rabuyu, District of Gisenyi

16    in Rwanda.

17    Q.    Did you attend seminary school?

18    A.    For six years after my elementary school, I went to do my

19    secondary studies or school at the seminary in Wesane.

09:45AM 20    Q.    Is that Nyundo?

21    A.    Yes, that's a little seminary at Nyundo.

22    Q.    When did you enter Nyundo?

23    A.    I went to Nyundo in September, 1994.

24         THE INTERPRETER:  Excuse me, correction from the

25    interpreter, 1984.

1    Q.   Did you know Mr. Teganya?

2    A.   Yes, Mr. Teganya entered the little seminary when I

3    was -- when I went to my second year.

4    Q.   Were you then one year ahead of him in school?

5    A.   Yes, that's true.

6    Q.   Do you also know a gentleman name Jean Paul Mihigo?

7    A.   No, I do not recall him at the little seminary.

8    Q.   How did you know Mr. Teganya?

9    A.   It's perfectly normal that second-year students would

09:47AM 10   welcome the newbies that start.  And I'd like to highlight this

11   fact that we were second-year students had to welcome any other

12   student that would start in that seminary.

13   Q.   Was Mr. Teganya a friend of yours at Nyundo?

14   A.   Not a personal friend, but, you know, as a young man who

15   had just started at the seminary, I did consider him like a

16   young brother.

17   Q.   Did you -- were you aware of any activities that

18   Mr. Teganya participated in at Nyundo?

19   A.   Yes, given the fact that we were residing at the school, I

09:48AM 20   would see him often for the Red Cross activities because I was

21   a member of the Red Cross myself, and thanks to that, through

22   that activity, I have become the person in the infirmary.  I

23   was a nurse.

24   Q.   You mentioned the Red Cross.  What sorts of activities did

25   the Red Cross do?

1    A.   It's mainly how to organize first aid.

2    Q.   Were you trained in first aid?

3    A.   Yeah, that was mandatory to become the nurse, then after

4    attending all courses for that purpose, you would receive a

5    certificate.

6    Q.   Thank you.  I want to ask you what you recall about

7    Mr. Teganya as a student.  What kind of student was he?

8    A.   I remember that he was a very hard-working student and

9    also should I say intelligent because to be promoted from one

09:51AM 10   year to the other the following year within the seminary, that

11   was not an easy task.

12   Q.   I'd like to ask you some questions about the role of

13   behavior or conduct at Nyundo.  Was conduct and behavior

14   something that was important in the seminary school?

15   A.   Conduct, given the fact that you were there to become a

16   catholic priest, was extremely important.

17   Q.   In what way was it important?  Were students graded on

18   their conduct?

19   A.   Yes.  Yes, conduct was graded with a maximum of 40 points,

09:52AM 20   and after the semester, the professorial body would study your

21   marks.  After deliberation, if you did not have 20 points

22   independently of what your grades may have been in mathematics

23   or biology, you would have been expelled.

24   Q.   Were there Tutsi students and Hutu students at Nyundo?

25   A.   Yes, yes, both ethnic groups were there, Tutsis and Hutus.

J.A. 1488

1  Q.   Can you estimate approximately how many Hutus versus how

2  many Tutsis?

3  A.   At the time from that vantage point at that time, I

4  couldn't really tell you or estimate how many people from each

5  ethnic group there were, but, in today's terms, looking back in

6  hindsight, there were far more Tutsis than Hutus.

7  Q.   Were there --

8  A.   And I really like to highlight this issue because at the

9  time being Tutsi or Hutu was not a consideration, an important

09:55AM 10  consideration.

11  Q.   Was ethnicity something that was discussed or that was

12  important at Nyundo?

13  A.   No, no, during my whole six years as a student, we didn't

14  talk about it at all.

15  Q.   When did you graduate Nyundo?

16  A.   It was on June 30th, 1990.

17  Q.   And did you continue your studies?

18  A.   Yes, I did want to continue with my studies, but in the

19  meantime, a war started in Rwanda.  And the university, the

09:56AM 20  college, which was the only one in Rwanda, did not have any

21  activities for a whole year.  We call it the white year, so I

22  resumed my studies in September, 1991.

23  Q.   Where did you go in September, 1991?

24  A.   I went to the University of Rwanda, the Butare campus in

25  the science department, and I did biology.

1　Q.　Was Mr. Teganya also in Butare at that time?

2　A.　Oh, yes, yes, yes, you know, since we had spent five years

3　together, I had seen him.

4　Q.　How often would you see him in Butare?

5　A.　Yes.  Well, I could say I would see him practically daily

6　because we had meals together at the student's restaurant.

7　Q.　And were you also involved in the church in Butare?

8　A.　Yes, yes, I was very much engaged in the college

9　community.  Yes, I was the president of the Catholic Youth

09:59AM 10　Organization, which is an international organization.

11　Q.　And did you also come to know Mr. Teganya through the

12　church activities?

13　A.　Yes, as a seminary student, Mr. Teganya would attend many

14　activities at the parish.  That was the university or student

15　parish.

16　Q.　How often would you have church activities?

17　A.　Yes, we had the Sunday mass, and we also had the choir,

18　which was integrated mainly by former seminary students.

19　Q.　Was Mr. Teganya a part of the choir?

10:00AM 20　A.　Yes, yes, he would come and sing.

21　Q.　During the time that you were in Butare, where were you

22　living?

23　A.　I was living at the student's residence or dorms.

24　Q.　And did you stay in the dorms through the entire time you

25　were in the university?

J.A. 1490

1    A.   Yes, for the first two years, I lived in the dorms, and

2    then when I became the president of the university or college

3    catholic community, in my third year, I was able to move into a

4    house, which was, you know, the appropriate dwelling for the

5    president of that catholic.

6             And I'd like to point out that this very same house

7    was next door to the Faculty of Medicine where Mr. Teganya was

8    a student.

9    Q.   Were you friendly with him in Butare?

10:02AM 10    A.   Yes, of course, because we had already been friends for

11    the last five years when we were at the seminary.

12    Q.   During the time you were in Butare, did a number of

13    political parties come to be active?

14    A.   Yes, of course.

15    Q.   Were you, yourself, a member of any political party?

16    A.   Personally, no.

17    Q.   Why not?

18    A.   Because, you know, as a president of the Student Catholic

19    Community, and also as a student of biology, I had plenty of

10:03AM 20    work on my plate already.

21    Q.   I'm going to show you some articles of clothing.  First,

22    I'm showing you a hat.  It's been admitted as Exhibit 12.  I'd

23    just ask you to take a look at that briefly.  Do you recognize

24    what this is?

25    A.   Yes, this is the hat that people would wear when they went

1    to the meetings of the political party in Rwanda.

2    Q.   Do you know what particular political party that hat was

3    affiliated with?

4    A.   Yes, these are the colors of the MRND party.

5    Q.   I'm going to show you another item as well, a scarf that's

6    been admitted as Exhibit 15.  I'd just ask you to look at that,

7    and, again, do you recognize it?

8    A.   Yes, yes, this is the scarf of people that would go to the

9    political meetings of the MRND party.

10:05AM 10    Q.   Was Mr. Teganya a member of the MRND?

11    A.   As far as I know, no, I've never seen him.

12    Q.   Did you ever see him wear a hat like the hat I just showed

13    you?

14    A.   Myself, no, I never saw him.

15    Q.   Did you ever see him wear a scarf like the scarf I just

16    showed you?

17    A.   No, truly, no.

18    Q.   Were the political meetings or rallies taking place on

19    weekends?

10:06AM 20    A.   That I do not recall because those activities, I couldn't

21    care less about them.

22    Q.   In 1994, were you on campus in Butare when the genocide

23    began?

24    A.   No, I had gone back home in Gisenyi.  I was not in Butare.

25    Q.   Did you spend any time in Butare during the time of the

1    genocide?

2    A.   I never went there because I had gone on vacation to my

3    home.

4    Q.   During any of your dealings with Mr. Teganya either at

5    Nyundo or in Butare, did he ever express support for the MRND?

6    A.   I'd like to make very clear that Nyundo at the seminary,

7    there were no political parties.  At the time, you know, the

8    only party was the MRND party for everybody.  It was not

9    something that we were interested in.

10:08AM 10   Q.   Later on when you went to Butare, there were a number of

11   political parties, correct?

12   A.   Yes, yes, there was a certain number of political parties,

13   but I had never seen Mr. Teganya or had any conversation about

14   political parties with him.

15   Q.   Did you ever hear him say anything negative about Tutsis?

16   A.   Of course not because if he or anybody else for that

17   matter had, made any negative comments or had displayed conduct

18   against the Tutsis, they would have been expelled.

19   Q.   What about later on?

10:09AM 20   A.   In Butare, neither, I never heard him say or display any

21   behavior, any discriminatory behavior against the Tutsis.

22              MR. LAUER:  Thank you.  No further questions.

23              THE COURT:  Cross.

24

25

<u>CROSS-EXAMINATION</u>

BY MR. GARLAND:

Q.   Good morning.

A.   Good morning.

Q.   So, you were one year ahead of the defendant, correct?

A.   Yes, that's true.

Q.   So did you meet him in 1984 or 1985?

A.   Logically, of course -- I met him in 1995, no, 1985.

Q.   So you've been friends with him for a long time, correct?

A.   Yes, like my little brother for five years at the

seminary.

Q.   And then for more years when you were back in Butare,

right?

A.   Yes, yes, we would see each other in college, that's true.

Q.   And you treasured the time that you had with him, right?

A.   Yes, yes.

Q.   And you don't want anything bad happen to him, do you?

A.   Could you kindly clarify your question?

Q.   You don't want to see Mr. Teganya get convicted, do you?

A.   My intention is to tell the whole truth, the whole truth

about this situation.

Q.   I understand, but my question was about whether you want

to see Mr. Teganya convicted or not?

A.   If that's the case, given the truth, yes.

Q.   So, one more question about -- I wanted to ask you about

1   Nyundo Petit Seminaire.  You knew the students who were behind

2   you, correct?

3   A.   Not all of them but just the ones that would come after

4   us, first-year students, we call that special, we call it the

5   baptism.

6   Q.   And Jean Paul Mihigo is not one of the students you

7   remember at Nyundo, correct?

8        THE INTERPRETER:  May the interpreter hear the

9   question again?

10:14AM 10   Q.   Would you like me to repeat the question?  Jean Paul

11   Mihigo is one student that you don't remember or one person you

12   don't remember as having attended Nyundo, correct?

13   A.   Given the fact that he had not come after me two or three

14   years after I started, I don't recall having ever had any

15   conversation with him.

16   Q.   The question I asked was do you remember a person named

17   Jean Paul Mihigo as having attended Nyundo?

18   A.   After the situation here, yes, because I met him, but at

19   the Petit Seminaire, at the seminary, I did not.

10:15AM 20   Q.   You testified that Petit Seminaire was a very disciplined

21   place, correct?

22   A.   Yes, of course.

23   Q.   And that there was no conflict between Hutus and Tutsis,

24   correct?

25   A.   As far as I know, that's out of the question.

## J.A. 1495

1    Q.   And you knew that Mr. Teganya was Hutu, correct?

2    A.   Personally, when we were at the Petit Seminaire, I didn't

3    even know that.

4    Q.   Now, the Nyundo Petit Seminaire was run by its director,

5    Father Edouard Nkuriye, correct?

6    A.   May the interpreter hear the name again?

7    Q.   Father Edouard Nkuriye?

8    A.   Yes, he was the rector or dean of the seminary.

9    Q.   He also went by the name of Simba, correct?

10:17AM 10  A.   Yes, yes, yeah, we called him Simba as well.  That's his

11   moniker.

12   Q.   He was Hutu, right?

13   A.   Yes, yes, I think he was Hutu, yes.

14   Q.   And so he was the one who would enforce the high moral

15   character and discipline of the school, correct?

16   A.   Well, he was not the only one because the management was

17   also in charge of that, all the professors, and also mainly the

18   team of priests appointed by the bishop.

19   Q.   But as the director, he had ultimate responsibility for

10:18AM 20  that, correct?

21   A.   Not the only one because he would be in charge of managing

22   the seminary with all the priests.

23   Q.   During the genocide, are you aware that 60 Tutsis were

24   massacred at the Nyundo seminary where you went to school?

25   A.   Yes, I have learned that afterwards.  That was the most

1    unfortunate thing, and it had also happened to my very dear

2    professors.

3    Q.   You're aware that the Tutsis who were massacred there had

4    gone there to seek refuge, right?

5              MR. LAUER:  Objection.  Your Honor.

6              THE COURT:  I'll allow it, overruled.

7              THE INTERPRETER:  May the interpreter hear the

8    question again?

9    Q.   Yes.  You're aware that the 60 Tutsis that had been

10:19AM 10   murdered at Nyundo had gone there to seek refuge, correct?

11   A.   I have learned that afterwards.

12             THE COURT:  Let me see counsel at sidebar.

13             (THE FOLLOWING OCCURRED AT SIDEBAR:)

14             THE COURT:  So, presumably, where are you going with

15   this?  You're going to say that this Father Simba was, what,

16   convicted of genocide crimes that occurred at the, what was it,

17   the seminary, is that the point of this more or less?

18             MR. GARLAND:  That, and other priests were also

19   implicated in turning over the Tutsis.

10:20AM 20   THE COURT:  So, and he obviously has no personal

21   knowledge of this, right, so why does this come in?  In other

22   words, he's repeating things that he's heard that occurred

23   after he was at the seminary.  Why is it coming in?

24             MR. GARLAND:  I think it bears on whether and what he

25   was testifying about before was accurate or not accurate.

# J.A. 1497

1          THE COURT:  Well, he's talking about what events were

2     like and whenever it was, 1988, as opposed to 1994, right?

3          MR. GARLAND:  I think 1988 through '90 or probably

4     through '90.

5          THE COURT:  Okay.  Does the defense want to weigh in

6     here?

7          MR. LAUER:  He's made clear he has no personal

8     knowledge.  To the extent it bears on his state of mind, it's

9     not clear that that goes to anything.  Essentially, it comes in

10:21AM 10   as hearsay through a witness who has no personal knowledge of

11    it.

12         THE COURT:  All right.  I guess we're sort of -- we're

13    deep into what seems like character witness, the character of

14    the seminary is such that people couldn't step out of line,

15    right, you elicited that, right, now we have the government

16    saying, well, their character wasn't such that they didn't

17    participate in genocide, right, so, right, I mean, didn't you

18    elicit testimony about the conduct grades and how important

19    discipline was at the seminary, and how people had to behave?

10:22AM 20   I'm thinking out loud here.  Why couldn't we complete that

21    thought?

22         MR. LAUER:  They could with someone who has personal

23    knowledge.

24         THE COURT:  All right.  I guess I'm troubled enough by

25    this that I'm going to shut it down.  I'm not sure it's fair to

         1    elicit his secondhand knowledge of events that occurred at the

         2    seminary after the fact.

         3            (SIDEBAR CONFERENCE WAS CONCLUDED)

         4            THE COURT:  Let's put another question to the witness.

         5    Q.   You testified that you had meals frequently with the

         6    defendant?

         7    A.   Yes.

         8    Q.   And you had meals with him during your time in Butare?

         9    A.   Yes, it was the only cafeteria, student cafeteria on

10:23AM 10    campus, so we did have meals often over there.

        11    Q.   And that's where you had meals with the defendant at the

        12    cafeteria, correct?

        13    A.   Yes, yes.

        14    Q.   Didn't have meals with him at his apartment or house?

        15    A.   You know, at the student dorms in those rooms, we couldn't

        16    eat there, it was too small.

        17    Q.   How much time did you spend on weekends with Mr. Teganya?

        18    A.   Mainly more than anything at the Sunday mass.

        19    Q.   And that would go for about an hour?

10:24AM 20    A.   Yes, the mass lasts one hour, yes.

        21    Q.   Did you spend any other time with him on the weekend?

        22    A.   Yes, given the fact that, you know, the choir had to sing

        23    at the Sunday mass, of course, there were rehearsals.

        24    Q.   And how long did the rehearsals last on the weekends?

        25    A.   One hour, an hour and a half, yes.

1   Q.   So you would spend each weekend about two and a half hours

2   with the defendant, right?

3   A.   Yes, if we calculate it mathematically, yes.

4   Q.   Now, students didn't wear their political clothing to

5   mass, right?

6   A.   Oh, never.

7   Q.   They didn't wear it to choir practice, did they?

8   A.   Neither because, you know, it was an activity merely a

9   catholic activity, Christian, nothing to do with any political

10:26AM 10   activities.

11   Q.   They didn't wear their political clothing to meals at the

12   cafeteria, did they?

13   A.   You know, once in a while, I do recall having seen some

14   who were coming right back from the meetings, yes.

15   Q.   But that didn't happen very often, did it?

16   A.   Not daily, of course not because those political meetings

17   were not daily.

18   Q.   Now, you didn't attend the political meetings, did you?

19   A.   No.

10:27AM 20   Q.   That's because you were not political yourself, right?

21   A.   No, personally, no.

22   Q.   And you didn't talk politics with Mr. Teganya, did you?

23   A.   It depends on what you call politics.

24   Q.   So if Mr. Teganya had been attending the political

25   meetings or political rallies, you wouldn't have seen him do

1    so, right, because you weren't there?

2    A.   At the political meetings themselves, no, I would not have

3    seen him, but maybe I had seen him coming back after the

4    meeting at the cafeteria, the students' cafeteria.

5    Q.   But sitting there you don't know, do you?

6    A.   Had he been wearing those political, that political

7    clothing or pieces of clothes during the meal, I would have

8    certainly noticed.

9    Q.   And you weren't in Butare during the genocide, right?

10:29AM 10   A.   No, no, I went for the Easter holidays, I went back to

11   Gisenyi.

12   Q.   I didn't mean to interrupt.

13   A.   I went back to my home in Gisenyi.

14   Q.   So you wouldn't have any idea what the defendant was doing

15   in Butare during the genocide, would you?

16   A.   Since I was not at Butare, it is perfectly logical that I

17   have no idea what happened in Butare.

18           MR. LAUER:  No further questions.

19           THE COURT:  Redirect.

10:30AM 20                    REDIRECT EXAMINATION

21   BY MR. LAUER:

22   Q.   You mentioned earlier that you I think in your last year

23   lived in a house due to your status as president of the

24   catholic organization; is that correct?

25   A.   Yes, that was the house that was called actually in the

 1  Latin language, *Domus Pacis*, next door to the Faculty of

 2  Medicine where Mr. Teganya was completing his studies.

 3  Q.   Would you often see him going to and from the Faculty of

 4  Medicine?

 5  A.   Yes, yes, very often because actually the road that would

 6  take you to the Faculty of Medicine would be just in front of

 7  my house, and I would also run into him, and we run into each

 8  other because I would also go downstairs to the basement to the

 9  Department of Biology.

10:31AM 10      Also, should I highlight the fact that the medical

11  students would also come to the biology department to take

12  courses, and I would see Mr. Teganya as well?

13  Q.   Did you spend time with Mr. Teganya regularly in Butare?

14  A.   Well, of course, because, you know, from the fact that we

15  would have three meals together, and then we will run into each

16  other daily, of course.

17  Q.   Would you remember if Mr. Teganya was wearing that MRND

18  hat?

19  A.   Myself, I never saw him wearing that.

10:32AM 20  Q.   If he did, do you think you would remember it sitting here

21  today?

22  A.   I think I would have remembered, yes.

23      MR. LAUER:  No further questions.  Thank you.

24      THE COURT:  Recross.

25      MR. GARLAND:  No, your Honor.

```
 1              THE COURT:  All right.  Thank you.  You may step down.

 2              MR. LAUER:  The defense calls Augustin Minani.

 3              THE COURT:  We have a request for a break, so we'll

 4      have our break early.

 5              THE CLERK:  All rise.

 6              (JURORS EXITED THE COURTROOM.)

 7              (A recess was taken.)

 8              THE CLERK:  All rise for the jury.

 9              (JURORS ENTERED THE COURTROOM.)

10:52AM 10              THE CLERK:  You may be seated.  Court is now back in

11      session.

12              THE COURT:  Counsel.

13              MR. LAUER:  Augustin Minani.

14                      **AUGUSTIN MINANI, sworn**

15              THE CLERK:  Thank you.  You may be seated.

16              THE INTERPRETER:  Judge, this interpreter was

17      explaining how to wait for the interpretation, then respond to

18      the interpretation, not to speak over the interpreter.

19              THE COURT:  Okay.  Thank you.

10:53AM 20              THE INTERPRETER:  Thank you, your Honor.

21                              DIRECT EXAMINATION

22      BY MR. LAUER:

23      Q.   Good morning, sir.

24      A.   Good morning.

25      Q.   What is your name?
```

```
 1    A.    Minani Augustin.

 2          THE COURT:  Do we have -- let's go ahead while he's --

 3    Q.    Sir, does your name appear correctly on the screen before

 4    you?

 5    A.    Yes, it is correct.

 6    Q.    Where do you live?

 7    A.    Austrich.

 8    Q.    Austria?

 9    A.    Austria.

10:54AM 10  Q.    How long have you lived in Austria?

11    A.    Twenty years.

12    Q.    What sort of work do you do?

13    A.    I'm an engineer, and I work in an industry that makes the

14    machines to heat the houses.

15    Q.    Where are you from, where were you born?

16    A.    I was born in Rwanda.

17    Q.    Where in Rwanda?

18    A.    In the east -- in the west of Rwanda.

19    Q.    Did you attend seminary school?

10:55AM 20  A.    Yes, I did.

21    Q.    Where did you go to seminary school?

22    A.    Nyundo Seminary.

23    Q.    When did you enter Nyundo?

24    A.    1990.

25    Q.    And how old were you at that time?
```

J.A. 1504

1    A.    I was sixteen years old.

2    Q.    Did you know Mr. Teganya?

3    A.    I know him.

4    Q.    How do you know him?

5    A.    I found him in the seminary.  When I started, he was the

6    last year.

7    Q.    Was he -- so at the end of your first year he graduated?

8          THE INTERPRETER:  End of what?

9    Q.    He was in his last year, you were in your first year; is

10:56AM 10   that correct?

11   A.    I was -- when I came in, he was in the last year.  When

12   the year ended, he got his diploma and left.

13   Q.    Did he have any sort of position within Nyundo?

14   A.    In the seminary, Teganya Jean Leonard, he was an assistant

15   to the head of students.

16   Q.    Is that a position that's sometimes referred to as vice

17   dean?

18   A.    That's the title he had.

19   Q.    As a vice dean did he interact with you and other first-

10:57AM 20   year students?

21   A.    The senior, or his vice, they had a lot of work at the

22   campus.  Those services and the tasks they had were the

23   concerns of the students, the time to eat they make sure that

24   the food is there and it's ready.  In the evening when the

25   study time comes, they will go around and see if students are

**J.A. 1505**

1    doing their studies, that they are not making noise.

2         When we were -- ourselves we were in the first year

3    and we were in the honor classes, and from second year to sixth

4    year, they were in the same room.  Because we were younger a

5    little, the head of students and his vice, they used to come

6    where we were studying to make sure that we are studying well,

7    to check if there is not any other student from other classes

8    who come to disturb our classes.

9         MR. VARGHESE:  Objection, your Honor.  I think we're

11:00AM 10   just in a narrative at this point.

11        THE COURT:  Yeah.  We're pretty far beyond the

12   question.

13        MR. LAUER:  I'll put another question to the witness.

14   BY MR. LAUER:

15   Q.   Did Mr. Teganya do those sorts of things you just listed

16   as responsibilities of the dean or the vice dean?

17   A.   Nothing else he holds.

18   Q.   Excuse me?

19   A.   He didn't hold any other position.

11:00AM 20   Q.   No.  My question -- you had just told us about how the

21   dean or the vice dean would assist students at mealtime and

22   check in on students in the evening.  Did Mr. Teganya do those

23   things during the time he was vice dean?

24   A.   He did it very well.

25   Q.   How would you describe him as a student; what was your

1    impressions of him?

2    A.   He worked and did his job very well.  He helped us as

3    newcomers or newbies.  On the campus there is a habit of

4    initiation baptism.  Some students --

5         MR. VARGHESE:  Objection, your Honor.  I think we're

6    beyond the question.

7         THE COURT:  Yes.  Put another question to him.

8    BY MR. LAUER:

9    Q.   You had started to tell us about your experiences with

11:02AM 10   Mr. Teganya.  Did he treat you and other first year students

11   well?

12   A.   Yes.  And when he was graduating he came to say good-by to

13   us.  He came into our class and he shook our hands, all of us,

14   and wishing us to do well.

15   Q.   At Nyundo, how big was the school?

16   A.   Closer to 300.

17   Q.   Did you know another student by the name of Jean Paul

18   Mihigo?

19   A.   Yes, I know him, because I started my first year when he

11:03AM 20   was in his third year.

21   Q.   Was Jean Paul Mihigo a student at Nyundo?

22   A.   He was a student at Nyundo.

23   Q.   Did he live there in the same dormitory as you did?

24   A.   We were not living in the same dormitory.

25   Q.   Did you -- are you certain he was a student?

```
 1    A.    Yes, he was there.

 2    Q.    Within the school, were there both Hutus and Tutsis?

 3    A.    Yes, we were mixed.  There were Hutus and Tutsis.

 4    Q.    Can you estimate how many Hutus versus how many Tutsis?

 5    A.    If I may estimate, we were 50/50.

 6    Q.    Was there tension or conflict between Hutu and Tutsi

 7    students at Nyundo when you were there?

 8    A.    We did not see that because at Nyundo the first thing was

 9    to have discipline.
```

11:05AM
```
10    Q.    Can you elaborate on that; what was the importance of

11    discipline at Nyundo?

12    A.    That seminary was forming students who would become

13    priests, and the students and the professors, they're all Hutu

14    and Tutsis together.  There was no such culture of creating

15    conflict between the ethnic groups there, and they were very

16    solid Christians.

17    Q.    When you were in the first year and Mr. Teganya was vice

18    dean did he treat Tutsi students any differently than he

19    treated Hutu students?
```

11:06AM
```
20    A.    He treated them all the same way.  The table where we were

21    having our dinner, our food, he treated us the same way.  We

22    were all together.  In our dorms we will sleep where the priest

23    has designated our beds, and where we're going to sleep, you

24    could find sleeping in the same room with a Tutsi.  Teganya was

25    treating us the same as one of the leaders because he took us
```

J.A. 1508

```
 1   all the same at the same time.
 2   Q.   After Mr. Teganya graduated did you remain at Nyundo?
 3   A.   I stayed there.
 4   Q.   Were you still in school at Nyundo at the time of the
 5   genocide in 1994?
 6   A.   1994 I was still at Nyundo.  I fled before I graduated my
 7   seminary.
 8   Q.   So in April of 1994 were you at Nyundo?
 9   A.   Yes.  We were on vacation, Easter vacation.
10   Q.   Where were you?  Were you in your hometown?
11   A.   I was in my home, my hometown.
12   Q.   Do you have any knowledge, personal knowledge, about what
13   took place during the genocide either in Nyundo or in Butare?
14   A.   Nyundo or Butare were far away from where I was.  I don't
15   know what happened there.
16            MR. LAUER:  Thank you, sir.  No further questions.
17                     CROSS-EXAMINATION
18   BY MR. VARGHESE:
19   Q.   Good morning, sir.
20   A.   Good morning.
21   Q.   You mentioned you live in Austria; is that correct?
22   A.   Yes, I am in Austria.
23   Q.   And what part of Rwanda are you from?
24   A.   In the west of Rwanda.
25   Q.   I understand that, but what province?
```

J.A. 1509

1    A.    Kibuye Province.

2    Q.    Is that near Nyundo?

3    A.    That's far way, because Nyundo is in Gisenyi.

4    Q.    And you said you started at Nyundo Petit Seminaire in

5    1990; is that correct?

6    A.    That's true.

7    Q.    And you were sixteen; is that right?

8    A.    True.

9    Q.    And Mr. Teganya, the defendant, was in his last year; is

11:10AM 10    that correct?

11    A.    That's true.

12    Q.    So he was five years ahead of you?

13    A.    He was in the sixth year, so he was ahead of me five

14    years.

15    Q.    And you just overlapped that one single year; is that

16    right?

17    A.    I don't understand the question you're asking.

18    Q.    You only knew him for one single year, correct?

19    A.    Yeah.  We lived together one year.

11:11AM 20    Q.    So everything you've testified about was based on that one

21    single year that you overlapped; is that correct?

22    A.    The only testimony I gave was the one year that we lived

23    together in the seminary in Rwanda.

24    Q.    Because he was five years ahead of you, it's not like --

25    you didn't hang out with him, correct?

J.A. 1510

```
 1    A.    In the seminary we lived together as a family.  Everybody
 2    knew -- we knew one another.
 3    Q.    You weren't in class with him?
 4    A.    We were not in the same class.
 5    Q.    And he was -- he had his friends from his year, correct?
 6    A.    Yes, he did.
 7    Q.    And you had your friends from your year?
 8    A.    Yes.  Yes.
 9    Q.    That was just the question, yes or no.
11:12AM 10    A.    Yes.
11    Q.    And after he graduated, he went to Butare, and you never
12    saw him again, correct?
13    A.    I never saw him again.  I saw him again in the refugee
14    camp -- in a camp in the Congo.
15    Q.    That was after the genocide?
16    A.    That's true.
17    Q.    I'll come back to that in one second.  So when he went to
18    the university, you don't know if he joined a political party,
19    do you?
11:13AM 20    A.    That's what I don't know.  I never knew his stories.
21    Q.    And you don't know what he did while he was on the campus
22    before the genocide, correct?
23    A.    I don't know.
24    Q.    And during the genocide at the hospital in Butare, you
25    have no idea what he was doing at that hospital; isn't that
```

         1    right?

         2            THE INTERPRETER:  I'm sorry.  Would you repeat,

         3    please.  Would you repeat the question for me?

         4            MR. VARGHESE:  Sure.

         5    Q.   And during the genocide while he was at that hospital in

         6    Butare, you have no idea what he was doing either?

         7            THE INTERPRETER:  Thank you.

         8    A.   I didn't know.

         9    Q.   So everything that you've testified about is this one

11:14AM 10    single year that you overlapped, right?

        11    A.   My testimony is for one year while together in the same

        12    school.

        13    Q.   And you talked about that school as a very solid Christian

        14    place; is that correct?

        15    A.   That's true.  They selected the students from Christian

        16    families.

        17    Q.   And it was a very high moral place run by that director;

        18    isn't that right?

        19    A.   Yes, it's true.

11:14AM 20    Q.   And you don't know anything about what happened during the

        21    genocide at that school?

        22            MR. LAUER:  Objection, your Honor.

        23            THE COURT:  I'll allow the answer just in general

        24    terms.

        25    A.   It was far away from me.  I don't -- I could not know what

# J.A. 1512

1    happened there.

2    Q.   You mentioned that you saw Mr. Teganya again at the

3    refugee camp; is that correct?

4    A.   Yes.

5    Q.   What year was that?

6    A.   1994.

7    Q.   And where?

8    A.   Nyakavogo Camp.

9    Q.   And did you hang out with Mr. Teganya while he was in the

11:15AM 10    refugee camp?

11   A.   I was happy to see somebody who was with me in the

12   seminary, and we used to be -- we used to go to a choir to sing

13   as people who were in the seminary.

14   Q.   How long were you guys together at the refugee camp?

15   A.   1996.

16   Q.   Just that single year?

17   A.   1994 to 1996.

18   Q.   So for two years you two were together at the refugee

19   camp; is that correct?

11:16AM 20   A.   Yes.

21   Q.   And you were friends?

22   A.   Yeah, we were friends because we knew that we were in the

23   same seminary.

24   Q.   And did you leave -- who left first from the refugee camp?

25   A.   I don't remember.

```
 1    Q.   Did you have any contact with him after you left the
 2    refugee camp?
 3    A.   We talked when he was in Canada.
 4    Q.   Did you guys call each other?
 5    A.   Yeah.  There are people we knew we had contact with,
 6    through those people.
 7    Q.   Because you two were friends?
 8    A.   Yeah.  We were in the same school and we were in the same
 9    camp.
11:18AM 10   Q.   How often would you talk to him when he was in Canada?
11    A.   If I remember, we talked twice, but I don't remember well.
12    Q.   And what about when he came to the United States, did you
13    talk to him when he was in the United States?
14    A.   We did not talk, but I think I knew that he came to
15    America.
16    Q.   And then you were contacted to come testify here today on
17    his behalf, right?
18    A.   Yeah.  Leopold told me.
19    Q.   And when you came, you were happy to come to the United
11:19AM 20   States to testify, right?
21             THE INTERPRETER:  Pardon?
22    Q.   You were happy to come to the United States to testify on
23    his behalf?
24    A.   I found it necessary to come to testify how I know Teganya
25    the time we were together.
```

## J.A. 1514

1    Q.   When you spoke to the defense, you said that Mr. Teganya

2    was the most admired student by all; isn't that right?

3    A.   In the seminary --

4    Q.   I'm sorry.  Let me just say I'm looking for a yes or no

5    answer here.

6         You said that he was the most admired student by all,

7    yes or no?

8    A.   (In English)  Yes.

9         MR. VARGHESE:  Thank you.  No further questions.

11:20AM 10    THE COURT:  Redirect.

11                   REDIRECT EXAMINATION

12   BY MR. LAUER:

13   Q.   You spent one year at Nyundo, correct?

14   A.   That's true, together one year.

15   Q.   Then you also told us that you spent two years in the same

16   refugee camp together?

17   A.   One year, two years?

18   Q.   Two years in the same camp.

19   A.   That's true.

11:20AM 20   Q.   After you left the refugee camp, how many times have you

21   spoken to Mr. Teganya?

22   A.   I guess we talked two times, but I can't remember all.

23   Q.   Have you seen him in person since you were in the Congo?

24   A.   Yes, true.

25   Q.   When was that?

 1   A.   1994 to 1996.

 2   Q.   After you left the Congo, have you ever seen him in person

 3   again before today?

 4   A.   We never saw each other until today.  This is the day to

 5   see him.

 6              MR. LAUER:  Thank you, sir.

 7              THE COURT:  Any questions?

 8              MR. VARGHESE:  No, your Honor.

 9              THE COURT:  Thank you.

11:22AM 10              MR. LAUER:  Defense will be calling Tatiana

 11   Murebwayire Nahimana.

 12              **TATIANA MUREBWAYIRE NAHIMANA, sworn**

 13                    DIRECT EXAMINATION

 14   BY MR. LAUER:

 15   Q.   Good morning.

 16   A.   Good morning.

 17   Q.   Does your name appear correctly on the screen?

 18   A.   Yes.

 19   Q.   Ms. Nahimana, where do you live?

11:23AM 20   A.   Burundi.

 21   Q.   Are you from Burundi?

 22   A.   Yes, I came from Burundi.

 23   Q.   Where were you born?

 24   A.   Rwanda.

 25   Q.   Where in Rwanda were you born?

```
 1   A.   Butare.

 2   Q.   Are you married?

 3   A.   Yes.

 4   Q.   Do you have children?

 5   A.   Yes.

 6   Q.   How many children do you have?

 7   A.   Four.

 8   Q.   Do you work?

 9   A.   I don't work.

11:23AM 10  Q.   In 1994 at the time of the genocide where were you living?

11   A.   In Rwanda.

12   Q.   Where in Rwanda?

13   A.   Butare.

14   Q.   Were you living with your family?

15   A.   I didn't have a family at that time.

16   Q.   Where were you living in Butare in 1994?

17   A.   I lived in Rwanda.

18   Q.   Who were you living with?

19   A.   1994?

11:24AM 20  Q.   Before the genocide in 1994, who were you living with?

21   A.   My parents.

22   Q.   Did you have an identity card in 1994?

23   A.   Yes.

24   Q.   And what was the ethnicity listed on your card?

25   A.   Tutsi.
```

J.A. 1517

         1    Q.   Around the time of the genocide, did you go to the

         2    hospital?

         3    A.   I was at the hospital.

         4    Q.   Why did you go to the hospital?

         5    A.   During the genocide?

         6    Q.   Well, let me stop you.  Before the genocide, did you get

         7    sick?

         8    A.   Yes, I was sick.

         9    Q.   What were you sick with?

11:25AM 10    A.   Malaria.

        11    Q.   When you were sick with malaria, did you go to the

        12    hospital?

        13    A.   Yes.

        14    Q.   Was that shortly before the genocide?

        15    A.   Yes.

        16    Q.   Were you treated at the hospital?

        17    A.   Yes, they did.

        18    Q.   Did you get better?

        19    A.   Yes.

11:26AM 20    Q.   Were you released and did you go home?

        21    A.   Yes.

        22    Q.   And where was your home at that time?

        23    A.   Rwimbogo.

        24    Q.   How far is that from Butare Town?

        25    A.   From Butare to Rwimbogo?  It's like two hours.  That's my

1    guess.  I don't know well.

2    Q.   Were you home with your parents when the president's plane

3    was shot down?

4    A.   When the plane of the president was shot down, I was at

5    home.

6    Q.   And was there violence immediately after that plane

7    crashed?

8    A.   It did not start immediately.

9    Q.   When did it start?

11:27AM 10   A.   It was a few days.  I can't say how many days but a few

11   days before.  It did not start immediately.

12   Q.   Did something happen that caused you to leave your home?

13   A.   When -- the reason I left home, after the president's

14   plane was shot down, after a few days the war started, but the

15   war did not start immediately where I was born.

16   Q.   Where you were, were people being killed?  Near your home,

17   were people being killed?

18   A.   Closer to where I lived?

19   Q.   Were people -- did you hear about people being killed in

11:28AM 20   other areas?

21   A.   Yes, I heard about it.

22   Q.   And what did you do when you heard about that?

23   A.   The war started when I had gone back to Butare.

24   Q.   Okay.  When did you go back to Butare?

25   A.   When the war started, before it came to where I was born.

## J.A. 1519

1    Q.    So you left your home.  What caused you to leave?

2    A.    That war.  I left because of that war.

3    Q.    Did you go by yourself?

4    A.    Yes, I went by myself.  I saw -- when I was going I saw

5    two people ahead of me.  Then I went with them.

6    Q.    And where did you go?

7    A.    I went to Butare, the same hospital.

8    Q.    Why did you go to the hospital?

9    A.    I don't know either.  I found myself there.

11:30AM 10    Q.    On the way, were there roadblocks?

11    A.    There were barriers but things were not so difficult.

12    Q.    Were you able to make it to the hospital?

13    A.    Yes, I did.

14    Q.    What did you do when you got to the hospital?

15    A.    I went to the children's hospital.

16    Q.    To the place where children were being treated?

17    A.    Yes.

18    Q.    Before you went inside the children's building, what did

19    you see at the hospital?

11:31AM 20    A.    Hmm?

21    Q.    Did the hospital look the same as it did when you were

22    treated there for malaria?

23    A.    Where I was admitted?

24    Q.    I'll ask a different question.

25         Did you come to the hospital by yourself?

J.A. 1520

```
 1    A.    I went alone, but I told you when I was on my way, there
 2    are two people that I went with.
 3    Q.    Were other people coming to the hospital along with you?
 4    A.    When I reached the hospital, I went alone in.  I don't
 5    know where the others went.
 6    Q.    Were there other people doing the same thing that you were
 7    doing, going to the hospital to hide?
 8    A.    I didn't see them.  I didn't see much, but -- I saw a few
 9    at night, but I didn't see them well.
10    Q.    In the pediatric building where did you go?
11    A.    Where did I go?  What's it called?
12    Q.    Was there a particular room or type of room that you were
13    in?
14    A.    It was in a ward.
15    Q.    Were there patients being treated in that ward?
16    A.    Yes, there were children who were being treated there.  It
17    was a children's hospital.
18    Q.    Did the children have other family members who were
19    helping them?
20    A.    Yeah.  They were together with their parents.
21    Q.    Once you got to the children's ward, did you stay there?
22    A.    I stayed there.
23    Q.    How long did you stay there?
24    A.    A short time because the war was intensifying.
25    Q.    Could you see evidence that the war was intensifying?
```

11:32AM 10

11:33AM 20

1    A.    They were looking for Tutsis to kill them.

2    Q.    And was that something that you saw from your place in the

3    children's ward?

4    A.    We heard them where I was born.

5    Q.    You heard that people were being killed near where you

6    were born?

7    A.    Yes.

8    Q.    Once you got to the hospital, can you tell us

9    approximately how long you stayed at the hospital?

11:35AM 10    A.    I was there days.  I don't remember how many days I was

11    there, but I had to leave sometimes.

12    Q.    What were you doing when you were there?

13    A.    I was hiding.

14    Q.    Did you go outside?

15    A.    No.  I could not go outside.

16    Q.    How were you able to eat?

17    A.    We were afraid, and we ate food that was available, like

18    African doughnuts and ground nuts.

19    Q.    When you were inside the ward, were there doctors coming

11:36AM 20    to check on the patients?

21    A.    They were coming to treat children.

22    Q.    Did you see the doctors come and examine the children and

23    administer medication?

24    A.    Yes.

25    Q.    How often would the doctors come?

1    A.   You mean per day?

2    Q.   Yes.

3    A.   Two times.  They were rotating.

4    Q.   When the doctors would come, would they see you?

5    A.   Yes, they did.

6    Q.   Did you talk to them?

7    A.   I talked to one doctor.

8    Q.   Do you remember the name of the doctor you talked to?

9    A.   I remember him, but I don't know him.

11:37AM 10   Q.   During the time that you were in the children's ward, was

11   anyone taken?  Were any Tutsis taken from the children's ward?

12   A.   In that hospital?

13   Q.   Yes.  When you were there.

14   A.   If they were taken, I was one of them that would have been

15   taken.

16   Q.   At any time when you were in that room with the children,

17   did soldiers come in?

18   A.   We did not see the soldiers.

19   Q.   In the room where you were, did you see militia or

11:38AM 20   Interahamwe come in and take people?

21   A.   I did not see them, but at night I heard that they were --

22   they took people, but we didn't know where they were taken.

23   Q.   How did you learn about that?

24   A.   Those who were inside, they told us that there are some

25   people who are being taken, and you watch yourself.

J.A. 1523

1    Q.   Did that happen in the children's area where you were?

2    A.   Yes.

3    Q.   Did soldiers or -- did anyone come to take people from the

4    room where you were?

5    A.   They did not.

6    Q.   At any time when you were at the hospital did a doctor

7    come with a soldier and point to you?

8    A.   Doctors and soldiers?

9    Q.   Did the doctors who came to the children's ward ever have

11:40AM 10    soldiers with them?

11   A.   No.

12   Q.   Did the doctors who came to the children's ward ever have

13   Interahamwe with them?

14   A.   They did not.

15   Q.   Did anyone ever come to the children's ward to take women

16   to be raped?

17   A.   No.

18   Q.   From the room where you were staying, could you see

19   outside?

11:40AM 20    A.   Not -- yes, I could, but not so much.  Not many times.

21   Q.   Did you know what was going on in other hospital

22   buildings?

23   A.   No.

24   Q.   Did there come a point when you left the hospital?

25   A.   Yes.

1    Q.   How were you able to go?

2         THE INTERPRETER:  The interpreter would like to ask

3    for clarification, your Honor.

4         THE COURT:  Yes.

5    A.   My husband came to pick me up from there.  It's a husband

6    that we already made a civil marriage.

7    Q.   Did he take you away?

8    A.   When he knew that I was at the hospital, he came at night

9    to pick me up from there.

11:42AM 10    Q.   Was your husband Hutu or Tutsi?

11    A.   Hutu.

12    Q.   When he came to take you away, did he come alone?

13    A.   There were three.  He came with two others.

14    Q.   Did you walk all the way back to your home?

15    A.   Yeah, to my husband.

16    Q.   How was your husband able to get you through roadblocks?

17    A.   We went through the barriers.  There's a place called

18    Kabuga.

19    Q.   Did your husband do most of the talking when you came to a

11:43AM 20    barrier?

21         MR. VARGHESE:  Objection, your Honor.

22         THE COURT:  Sustained.  It's leading.  Sustained.

23    Q.   Can you describe how you were able to get home?

24    A.   Those who were at the barrier, it's like they knew one

25    another.

## J.A. 1525

1    Q.   Did you have any difficulty getting through the barrier?

2    A.   I did not -- I was not -- nothing happened to me, but I

3    was really afraid.  I was shaking.

4    Q.   When you got home, what did you do?

5    A.   My husband hid me.

6    Q.   Did you stay in hiding?

7    A.   Most of the time.

8    Q.   Why did you stay in hiding most of the time?

9    A.   The war had intensified and it was a long time in the war.

11:44AM 10  Q.   How long did you stay at home?

11   A.   Until Kagame took power.  Then I fled.

12   Q.   Where did you flee to?

13   A.   The Congo.

14   Q.   You were Tutsi.  Why did you flee?

15   A.   I fled because Kagame came to take the country and they

16   were looking for Hutus who were criminals.

17   Q.   And was your husband Hutu?

18   A.   Yes, he was a Hutu.

19   Q.   Did you flee with him?

11:45AM 20  A.   Yes, we did.

21   Q.   Where did you flee to?

22   A.   Congo.

23   Q.   How long did you live in Congo?

24   A.   Yes.  It was before I was pregnant with my first child.

25   Q.   Did you give birth to a child in Congo?

          1        MR. VARGHESE:  Objection, your Honor.

          2        THE COURT:  Overruled.

          3   Q.   Did you give birth to a child in Congo?

          4   A.   Yes.

          5   Q.   Do you remember exactly how long you were in the Congo?

          6   A.   The time I was there in the Congo?

          7   Q.   Yes.  Do you know exactly how long you were there?

          8   A.   After the child was nine months old there was another war

          9   in the Congo, and we separated with my husband.  I could not

11:47AM  10   see him anymore.  Then I went back to Rwanda when the child was

         11   already starting the first grade.

         12   Q.   When you went back to Rwanda, where did you go?

         13   A.   I went back to my husband.  I found him back in Rwanda.

         14   Q.   Where in Rwanda?

         15   A.   Rwimbogo.

         16   Q.   And did you reunite with him?

         17   A.   Yes, we did.

         18   Q.   Were you living in Rwanda when the Gacaca court started?

         19   A.   Yes, we did -- we were.

11:48AM  20        MR. VARGHESE:  Objection, your Honor.  Can we come to

         21   sidebar?

         22        THE COURT:  Yes.

         23   **(SIDEBAR CONFERENCE AS FOLLOWS:**

         24        THE COURT:  Go ahead.

         25        MR. VARGHESE:  Your Honor, I believe Mr. Lauer is

1    going down a line of questioning where he's going to elicit

2    from this witness that she feels like she was pressured to

3    testify against medical personnel at the hospital.  We think

4    it's completely irrelevant and prejudicial because she's not

5    talking about this case.  She's not talking about Mr. Teganya.

6    The fact that she might have been pressured in a Gacaca

7    proceeding is completely irrelevant in terms of this trial.

8              THE COURT:  Mr. Lauer.

9              MR. LAUER:  It could hardly be more relevant.  That is

11:49AM 10   the testimony that I would expect the witness -- that I'm

11   eliciting from the witness.  She would say that when the Gacaca

12   court started, she was approached by a group of survivors who

13   asked her to testify in a certain way.  She declined and, after

14   declining, she sustained consequences in terms of financial

15   consequences, ostracization and that sort of thing.

16             THE COURT:  And tell me why it's relevant here.

17             MR. LAUER:  Well, it's relevant --

18             THE COURT:  In other words, she's a defense witness.

19   So she's -- right?  I mean, she's not being accused of having

11:50AM 20   changed her testimony.  Why is it relevant?

21             MR. LAUER:  It's relevant because when the time comes

22   for closing arguments, the prosecution is going to say that

23   there's been no evidence presented that witnesses have been

24   pressured, forced, coerced in any way, and that's true of their

25   witnesses, but the experience of this witness suggests that

**J.A. 1528**

1    that sort of thing is more than a possibility, that that sort

2    of thing does occur.  So it's highly relevant, and it really

3    goes to an issue that's going to be central when it comes to

4    arguments.

5            MR. VARGHESE:  Your Honor, I think Mr. Lauer's

6    response elicits the problem with this testimony.  I mean, he's

7    saying that all of our witnesses, in fact, did say that they

8    were not forced, pressured or coerced.  So to have a witness

9    come on the stand that says 15 years ago in Rwanda in a

11:51AM 10   proceeding that has nothing to do with this trial she was asked

11   to give testimony, it has nothing -- it has no bearing

12   whatsoever on this case.

13           If this was an argument the defense wanted to go down,

14   they could go down it with a witness actually testifying in

15   this case.  To bring in somebody to say a long time ago

16   somebody coerced or asked me to testify about something and I

17   refused is completely irrelevant and prejudicial.

18           MR. LAUER:  It's certainly harmful to the government's

19   case, but there's no question it's relevant.

11:52AM 20          THE COURT:  Is there going to be any evidence that she

21   was pressured in this case?

22           MR. LAUER:  She was pressured as someone who was

23   present at the hospital who was a Tutsi who survived at the

24   hospital in Butare.  She was asked to lie, and she declined and

25   suffered consequences for it.  This really -- it's a microcosm

J.A. 1529

1   of what we've already heard expert testimony about.  These

2   subjects came up in expert testimony.  This is not extrinsic

3   evidence.  It's evidence that's already before the jury from

4   the expert.

5          MR. VARGHESE:  But there's a difference between coming

6   from an expert and having a witness talk about it.  We don't

7   know the defendant.  We don't know the circumstances.  We don't

8   know anything about the Gacaca trial.  She's going to say

9   someone approached me and offered me money to testify about a

11:53AM 10   medical doctor.  We don't know anything about it.  It's

11   completely irrelevant.

12          MR. LAUER:  Well, she would provide some details about

13   that, but as a general matter, it's relevant.  It's something

14   that the jury has already heard testimony about, and it's -- it

15   directly concerns accusations being made at the hospital

16   against medical personnel.  That is this case.

17          MR. VARGHESE:  But what the defense is trying to do is

18   jump from this witness to the government's witnesses and say

19   you see, so they must have been pressured too.  That's a step

11:53AM 20   too far, you Honor.  They had the witnesses on the stand.  They

21   could have crossed them on this issue.  All of the witnesses

22   testified that they were not forced or coerced.  This is a

23   backdoor way to attack them.

24          MR. LAUER:  As I said, this is really a fact witness

25   testifying to what we've already heard expert testimony about.

# J.A. 1530

 1    There was testimony from Dr. Clark that witnesses faced

 2    consequences, including the loss of survivor benefits.  That is

 3    her experience.  There has been testimony about the Gacaca

 4    proceedings, and it is not beyond anything the jury has heard

 5    about to this point.

 6         THE COURT:  Well, I guess that's the question, whether

 7    it is or not.  I mean, we've had some expert testimony on these

 8    topics, which was, you know, around the periphery of relevance.

 9    I allowed it, because of basically the jury's and my

11:54AM 10    unfamiliarity with Rwanda culture or current Rwandan

 11    circumstances.

 12         But now are you bolstering the expert testimony with a

 13    specific example?  Is that the idea here?  I mean, normally we

 14    wouldn't allow that.  Again, if she's pressured in this case,

 15    obviously that's all fair game.  Are you bolstering the expert

 16    testimony that these pressures do occur?

 17         MR. LAUER:  Well, I wouldn't characterize it as

 18    bolstering the expert testimony.  I would characterize it as an

 19    example of what an expert has already testified to.  Was she

11:55AM 20    asked to invent accusations as to Mr. Teganya?  No, that would

 21    not be the testimony.  But she would say that she was

 22    approached regarding Gacaca proceedings having to do with the

 23    hospital in Butare and specifically asked to fabricate

 24    accusations against medical staff and doctors, which she was

 25    not willing to do.

# J.A. 1531

1          THE COURT:  But, again, since no one -- no player in

2     this case either asked her to fabricate the intentions or was

3     the target of the testimony.  Right?  So it really only could

4     come in to show kind of, again, the cultural and social

5     pressures placed upon witnesses is the idea.  Right?

6          MR. LAUER:  Yes, that was the purpose.

7          THE COURT:  For which we had the expert testimony.

8          MR. LAUER:  Yes.

9          THE COURT:  So this is really like an individual

11:56AM 10     example of that.  And are you saying I've allowed them to do

11     counter examples to bolster their own experts?

12          MR. LAUER:  Well, they certainly elicited from their

13     witnesses that they haven't been pressured, that they haven't

14     been coerced.

15          THE COURT:  In this case.

16          MR. LAUER:  Yes.  That leaves the jury with the

17     impression that that doesn't happen in Rwanda, and that is

18     contradicted by the testimony of this witness.

19          THE COURT:  I think -- as I view this, this is an

11:56AM 20     example of -- an individual example offered to show I guess an

21     example of what the expert was talking about that is not

22     directly relevant to this case.  So I think we're kind of far

23     afield here.  So I think I'm going to keep it out.

24          MR. VARGHESE:  Thank you.

25     **END OF SIDEBAR CONFERENCE.)**

1       THE COURT:  Thank you for your patience, ladies and
2  gentlemen.
3           Let's put another question to the witness.
4  BY MR. LAUER:
5  Q.   How long did you live in Rwanda after returning?
6  A.   From Congo -- when I came from Congo to Rwanda?
7  Q.   Yes.
8  A.   When I came from Congo -- I don't understand it well.
9  Q.   You had told us you were in Congo when your first child
10  was born, and then you came back to Rwanda.
11  A.   When the child started the first year.
12  Q.   How long -- did you continue to live in Rwanda for a
13  number of years?
14  A.   Yes, I did.
15  Q.   Do you still live in Rwanda?
16  A.   No.  I went to Burundi.
17  Q.   When did you go to Burundi?
18  A.   2013.
19  Q.   Why did you go to Burundi?
20  A.   My husband came first before me.
21  Q.   And did you go there to meet your husband?
22           MR. VARGHESE:  Objection, your Honor, relevance.
23           THE COURT:  I'll allow it.
24  Q.   Did you go to Burundi to reunite with your husband?
25  A.   Yes, I went to Burundi to meet with my husband.

J.A. 1533

1    Q.   Ma'am, I notice you have a number of scars on your

2    forehead.  Is that true?

3    A.   Yes.

4    Q.   How did you receive those?

5    A.   They told me that I had an eye problem when I was born.

6    Then they burned me here.

7    Q.   Those marks that you have on your forehead, they were from

8    a treatment for eye problems?

9    A.   That's what they say when a child is having eye problems.

12:00PM 10    When they put these marks with fire here, it will be healed.

11              MR. LAUER:  Thank you.  No further questions.

12                        CROSS-EXAMINATION

13   BY MR. VARGHESE:

14   Q.   Good morning.

15   A.   Good morning.

16   Q.   I just want to make sure I understand everything you

17   talked about.  You mentioned that you are a Tutsi; is that

18   correct?

19   A.   Yes, I am a Tutsi woman.

12:00PM 20    Q.   And you were married -- you are married to a Hutu; is that

21   right?

22   A.   Yes.

23   Q.   What's his name?

24   A.   Musemakweli Straton.

25   Q.   And you testified you were born in Rwanda; is that

 1    correct?

 2    A.   Yes.

 3    Q.   Where in Rwanda were you born?

 4    A.   Rwimbogo.

 5    Q.   That's in Butare?

 6    A.   Yeah, Butare, yes.

 7    Q.   Is it near Gishamvu?

 8    A.   It's a community called Gishamvu.

 9    Q.   So it's within Gishamvu; is that correct?

12:02PM 10    A.   Yes.

 11    Q.   But you currently reside in Burundi; is that right?

 12    A.   Yes.  I live in Burundi.

 13    Q.   And you carry a Burundi passport; is that right?

 14    A.   Yes.

 15    Q.   And that Burundi passport asked for your place of birth as

 16    well, correct?

 17    A.   Yes, on passport, yes.

 18    Q.   Where does your passport say that you were born?

 19    A.   The passport says that -- it all came from the identity

12:03PM 20    card.

 21    Q.   Okay.  Let's start with your identity card.  You carry a

 22    Burundi identity card; is that correct?

 23    A.   Yes.

 24    Q.   And on that identity card it lists a place of birth; isn't

 25    that correct?

J.A. 1535

 1   A.   Yes.

 2   Q.   Where is the place of birth that's listed on your identity

 3   card?

 4   A.   It's written that I was born in Rugazi to get it.

 5   Q.   And just so we're clear, your identity card listed you

 6   were born in Rugazi, and that's in Burundi, correct?

 7   A.   Yes, true.

 8         MR. VARGHESE:  Your Honor, may I approach?

 9         THE COURT:  Yes.

12:04PM 10   Q.   Ms. Nahimana, that's a copy of your identity card,

11   correct?

12   A.   Yes, true.

13   Q.   But, in fact, that place of birth is not true, correct?

14   A.   That's not true.  I was born in Rwanda.

15   Q.   So the identity card is not correct?

16   A.   That's a Burundi identity card.

17   Q.   I understand that.  That's your identity card; isn't that

18   right?

19   A.   It's mine, yes.

12:05PM 20   Q.   And your Burundi identity card is not correct?

21   A.   It is true.

22   Q.   Because you lied to get that identity card, correct?

23   A.   Yeah, to get it I had to lie.

24   Q.   And with that identity card you got a passport; isn't that

25   correct?

```
 1    A.   Yes, I do.

 2              MR. VARGHESE:  Your Honor, may I approach again?

 3              THE COURT:  Yes.

 4    Q.   And that's a copy of your Burundi passport; isn't that

 5    correct?

 6    A.   Yes.

 7    Q.   And what place of birth is listed on your Burundian

 8    passport?

 9    A.   Rugazi.

10    Q.   And that's also in Burundi, correct?

11    A.   That's Burundi.

12    Q.   So that's not correct, yes?

13    A.   It's not true because I was not born there.

14    Q.   So the passport's a lie; isn't that right?

15    A.   This is a lie because I was not born there.

16    Q.   And with that false passport, you used that to travel to

17    the United States; is that correct?

18    A.   True.

19    Q.   To testify here today, correct?

20    A.   That's true.  That's how it is.

21    Q.   I want to ask you about your story that you told us about.

22    You said that you were at the hospital before the genocide; is

23    that correct?

24    A.   Yes, true.

25    Q.   And you were being treated for malaria; is that right?
```

12:06PM (line 10)
12:06PM (line 20)

```
 1    A.   That's how I said it.

 2    Q.   What ward were you in?

 3    A.   I was in number 10.

 4    Q.   Number 10.  What department were you in?  Were you in

 5    surgery, dermatology?

 6    A.   I was in the children's ward.

 7    Q.   You were -- before the genocide you were in pediatrics?

 8    A.   No.  I was in an adult ward.

 9    Q.   Okay.  I'll try it again.  What ward were you in when you

10    were being treated for malaria?

11    A.   I was in internal medicine.

12    Q.   And when were you discharged?

13    A.   I didn't stay there longer -- too long.  I was healed.

14    Q.   And then you went back home; is that right?

15    A.   I went back home.

16    Q.   Now, you testified that during the genocide you returned

17    to the hospital; is that correct?

18    A.   Yes.

19    Q.   And you said you didn't know why you went there; is that

20    correct?

21    A.   I went there because the war had started.

22    Q.   Was it -- were you running from the war or were you

23    running from the genocide?

24    A.   The genocide.

25    Q.   Do you call it the war?
```

12:08PM (line 10)
12:09PM (line 20)

```
 1   A.   That's how we called it.

 2   Q.   Your husband didn't go with you, though, correct?

 3   A.   We did not go together.

 4   Q.   What did he do?

 5   A.   I was not living with him.  I was a single person.

 6   Q.   Because you hadn't completed your marriage, right?

 7   A.   Yes.

 8   Q.   And so when you went there, you said that you went alone;

 9   isn't that right?

10   A.   I went alone, but I told you before me there were two

11   people ahead of me that we went together.

12   Q.   Do you remember you were interviewed by the defense?

13   A.   Who, what?  The defense?

14   Q.   Maybe Leopold or Dick Prudence Munyeshuli.

15   A.   Yes, I remember him.

16   Q.   They interviewed you in Burundi, right?

17   A.   Yes.

18   Q.   And during that interview you said you actually went to

19   the hospital with your aunt; isn't that correct?

20   A.   It's my aunt on my father's side.

21   Q.   So you weren't alone?

22   A.   I wasn't alone.

23   Q.   So why did you testify that you were alone?

24   A.   Going to hospital?

25   Q.   Yes.
```

J.A. 1539

1    A.    When I went to the hospital sick, when I went to hospital,

2    when I was sick going to hospital I was alone, but my aunt

3    found me there.

4    Q.    So let me just make sure I'm clear.  When you went to the

5    hospital during the genocide, did you go with your aunt?

6    A.    No.

7    Q.    So if you told the defense investigator that during the

8    genocide you left your house with your aunt, that would have

9    been a lie?

12:12PM 10    A.    That I went with my aunt, I don't remember.

11    Q.    I'll move on.

12          You were there -- when did you get there?

13    A.    Going when I'm sick or during the genocide?

14    Q.    During the genocide.

15    A.    In the evening.

16    Q.    What was -- do you remember, was it -- I'm sorry.

17    A.    I don't remember the hours.

18    Q.    I'm asking about in terms -- was it in April or was it in

19    May, do you remember?

12:12PM 20    A.    It was in April.

21    Q.    And you were hiding in pediatrics; is that right?

22    A.    Yes.

23    Q.    And you were told not to leave the building; isn't that

24    right?

25    A.    No one told me, but I told myself not to get out.

# J.A. 1540

1   Q.   No one told you to stay inside?

2   A.   No one told me.  It's me who decided to stay by myself.

3   Q.   Do you remember when you had the interview with Leopold or

4   Dick Prudence Munyeshuli, you said that a medical doctor

5   advised you to remain in the ward and not go out even for food

6   or other basic needs?

7   A.   I did not get out of there.  People brought me some

8   African doughnuts only.

9   Q.   That wasn't my question.  My question was, do you remember

12:14PM 10   telling the defense investigator that you were told not to

11   leave the ward, not even to go out for food or basic needs?

12   A.   They told me not to go out of there.  The doctor told us

13   that it's very hard.  Don't get out of here.

14   Q.   So there was somebody who instructed you not to leave?

15   A.   The doctor.

16   Q.   He told you to stay there if you had a chance to survive;

17   is that right?

18   A.   They said stay here hiding because the war started.

19   Q.   And you knew -- and there were other people like you who

12:15PM 20   were hiding in pediatrics; isn't that right?

21   A.   I didn't know that.  I knew my own.

22   Q.   So when the doctor told you to, "Stay here, don't even go

23   outside," he was talking just to you?

24   A.   There were others.  I don't know if they were guarding

25   their children in the hospital.  I knew my own business.

J.A. 1541

         1    Q.   So he was speaking to more than just you, right?

         2    A.   There were not too many.  I think I remember three

         3    people -- three women.

         4    Q.   And you understood that if you were to go outside, you

         5    might be harmed, correct?

         6    A.   I was afraid not to go out.

         7    Q.   Because you knew if you did go out, you might be killed?

         8    A.   I did not think of that, because the killing had not yet

         9    started.

12:17PM 10    Q.   So what were you hiding from?

        11    A.   The genocide.

        12    Q.   So you knew that if -- you didn't want to leave the

        13    building because you might be killed; isn't that correct?

        14    A.   Yes.  I was afraid.

        15    Q.   You were afraid because you knew that there were people at

        16    the hospital looking for Tutsis to kill?

        17    A.   They did not get to the hospital.  I just thought they

        18    will come here -- come there and kill me.

        19    Q.   You knew that there were people who might come kill you if

12:17PM 20    you left that building; isn't that right?

        21    A.   That's how I thought.  If I go out, they will kill me.

        22    Q.   Because you were a Tutsi?

        23    A.   Yes, because I was a Tutsi.

        24    Q.   And so you hid in that building; isn't that right?

        25    A.   Yes, I did hide in the building.

# J.A. 1542

1  Q.   And you hid in the building during the daytime; isn't that

2  right?

3  A.   Then and night.

4  Q.   Because you knew they could kill you in either the day or

5  the night?

6  A.   I didn't know where the enemy is, where they can get me.

7  Q.   And the pediatrics building, that's right behind the

8  dermatology building; isn't that right?

9  A.   Hmm?  What?

12:19PM 10  Q.   The pediatrics building where you were hiding was right

11  behind the dermatology building; isn't that correct?

12  A.   Yes.

13  Q.   Did you ever go to the dermatology building?

14  A.   No.

15  Q.   Did you know that there were other Tutsis hiding in the

16  dermatology building?

17  A.   I didn't know.

18  Q.   Did you know -- did you ever go to the maternity ward?

19  A.   In the maternity?

12:19PM 20  Q.   Yes, maternity.

21  A.   No, I did not go in maternity.

22  Q.   Did you go to the surgical wards?

23  A.   Where is the surgery?

24  Q.   I'll take that as a no.  Did you go to the tents at the

25  entrance to the hospital?

1    A.    No.

2    Q.    So you don't know what was going on in the dermatology

3    building, the maternity building, the surgical wards or the

4    tents at the front of the hospital; is that right?

5    A.    I did not know what was going on in maternity.

6    Q.    And you didn't know what was going on in dermatology?

7    A.    No, I did not know.

8    Q.    Surgical wards?

9    A.    I didn't know.

12:20PM 10    Q.    Or the tents?

11    A.    No, I did not.

12    Q.    Did you see Tutsi patients who had come to the hospital

13    suffering from machete wounds and large cuts?

14    A.    We heard that there are people in the tents that were

15    wounded, but we don't know where they were wounded from --

16    where they were from or where they were wounded.

17    Q.    Did you see them?

18    A.    I did not see them.

19    Q.    Well, did you see Tutsis that were hiding in the hospital

12:21PM 20    as well?

21    A.    I did not see them.

22    Q.    I think you testified that you didn't see any soldiers as

23    well; is that correct?

24    A.    I did not see soldiers.

25    Q.    But you did see Interahamwe or militia?

1    A.    I did not -- I left there before I see Interahamwe.

2    Q.    But you knew that patients were being removed from the

3    hospital, correct?

4    A.    Yes.

5    Q.    How many patients did you know of that had been removed

6    from the hospital?

7    A.    Two children who went home.

8    Q.    I'm sorry?

9    A.    Two children who went home.

12:22PM 10    Q.    I don't mean patients who got better and left the

11    hospital.  I mean taken to be killed.

12    A.    Who are you asking me about?

13    Q.    I'm asking you about, you knew there were patients who

14    were taken from the hospital to be killed, correct?

15    A.    I did not know that.

16    Q.    Do you remember when you met with the defense

17    investigators?

18    A.    Yes, I remember.

19    Q.    Do you remember telling them that you knew that there were

12:23PM 20    four people who were taken from their hospital beds?

21            THE INTERPRETER:  Four?

22            MR. VARGHESE:  Four.

23    A.    I don't know who took them.  It was at night.

24    Q.    That wasn't my question.  My question is, do you remember

25    telling the defense investigators that you knew that there were

## J.A. 1545

         1    four people taken from their hospital beds?

         2    A.    Patients?

         3    Q.    Yes.

         4    A.    Patients who are released?

         5    Q.    No.  Do you remember telling the defense investigators you

         6    were aware of four patients who were taken from their hospital

         7    beds?

         8    A.    Not in the hospital.  They were taken from outside.

         9    Q.    Where were they taken from?

12:24PM 10    A.    Outside.  I don't know who they were.

        11    Q.    Where were they taken from?  Outside what?

        12    A.    Outside of the hospital.

        13    Q.    One of those people that you mentioned was a person named

        14    Theogene; is that correct?

        15    A.    Yes.

        16    Q.    He was taken from the hospital; isn't that right?

        17    A.    He was taken from the hospital.

        18    Q.    Where was Theogene when he was taken?

        19    A.    He was at the hospital also.  He was outside of the

12:25PM 20    hospital too.

        21    Q.    What happened to Theogene?

        22    A.    He was taken by other people.  What I hear, I hear that

        23    he's in Kigali.

        24    Q.    I'm not asking where he is today.

        25         I'm asking in 1994 at the hospital, when he was taken,

1    what happened to him?

2    A.    I don't know where they took him.

3    Q.    Are you familiar with a patient in the pediatric ward

4    named Ray Twayitare?

5         THE INTERPRETER:  What?

6    A.    I don't know him.

7    Q.    He was in the pediatric ward and taken as well.  Do you

8    know that?

9         MR. LAUER:  Objection.

12:26PM 10    THE COURT:  Well, she said she doesn't know him.  I

11   mean, it -- let's get to the point.

12        MR. VARGHESE:  Yes, your Honor.

13   Q.    Did you ever hear screams and cries coming from Tutsis as

14   you walked around the hospital?

15   A.    If they were Tutsis who were screaming, I would have heard

16   them and I would have been one of them.

17   Q.    But it's in your testimony that you never heard that; is

18   that right?

19   A.    You mean at the hospital?

12:27PM 20   Q.    Yes.

21   A.    I did not know anything at the hospital.

22   Q.    You testified that you were rescued by a team led by your

23   husband; is that correct?

24   A.    The people he sent.

25   Q.    And one of the people he sent was an individual by the

         1   name of Albert Minani; is that correct?

         2   A.    Yes.

         3   Q.    And Mr. Minani, he's a Hutu; is that correct?

         4   A.    He's a Hutu.

         5   Q.    He was a member of the Interahamwe as well, correct?

         6   A.    Yes, he was.

         7   Q.    And he actually manned one of the roadblocks near the

         8   hospital; isn't that correct?

         9   A.    He was -- he came from Rwimbogo.

12:28PM 10   Q.    That wasn't my question.  He manned one of the roadblocks

        11   near the hospital; isn't that correct?

        12         THE INTERPRETER:  He met?

        13         MR. VARGHESE:  He manned.

        14   Q.    He worked at one of the roadblocks near the hospital?

        15   A.    No.  He was coming from Rwimbogo.  My husband told him to

        16   go and bring my wife.

        17   Q.    So Mr. Minani is close to your husband; is that correct?

        18   A.    He was a friend.

        19   Q.    And when he came to rescue you, was Mr. Minani armed?

12:29PM 20   A.    He had a stick.

        21   Q.    And there were others with him; isn't that right?

        22   A.    There were other weapons, but he came with a stick.

        23   Q.    And there were other people with him as well; isn't that

        24   right?

        25   A.    Two people.

```
 1    Q.   And they were armed as well; isn't that right?
 2    A.   Those were sticks.
 3    Q.   And they were all members of Interahamwe; isn't that
 4    correct?
 5    A.   They were all Interahamwes.
 6    Q.   And these members of Interahamwe, they are the ones who
 7    took you out of the hospital and returned you to your home;
 8    isn't that correct?
 9    A.   Yes.
12:29PM 10  Q.   And you fled to the Congo after -- after the genocide, you
11    fled the Congo with your husband; isn't that right?
12    A.   That's true.
13    Q.   And when the RPF attacked the refugee camps, he was taken
14    by the RPF; isn't that correct?
15    A.   Who attacked the camp?
16    Q.   Your husband was taken back to Rwanda?
17    A.   Yes.
18    Q.   He was put in prison; isn't that right?
19    A.   No.  We are together.
12:30PM 20  Q.   Not now.  But back then.
21    A.   The time he was -- from Congo?
22    Q.   Yes.
23    A.   From Congo?
24    Q.   Yes.  He was taken and put in prison; isn't that right?
25    A.   From Congo he did not go into prison immediately.
```

J.A. 1549

```
 1    Q.    Mr. Minani also went into prison; isn't that correct?

 2    A.    Yes, he went to prison.

 3    Q.    And they both went into prison for crimes they had

 4    committed during the genocide; isn't that correct?

 5          MR. LAUER:  Objection.

 6          THE COURT:  I think we're pretty far afield.

 7    Sustained.

 8    Q.    And now you live in Burundi; isn't that correct?

 9    A.    Yes.

12:31PM 10    Q.    And Mr. Minani's in Burundi as well; isn't that right?

11    A.    He lived in Burundi.

12    Q.    Well, and with your husband as well; isn't that right?

13    A.    Yes.

14          MR. VARGHESE:  Thank you.  I have no further

15    questions.

16          THE COURT:  Redirect?

17          MR. LAUER:  May I be seen at sidebar?

18    (SIDEBAR CONFERENCE AS FOLLOWS:

19          MR. LAUER:  So the government went into a great deal

12:32PM 20    of detail about her background, where she's from, her living

21    situation in Burundi.  The reason why she's living in Burundi,

22    and the reason I would say she had to get documents in Burundi

23    is because she did not agree to testify in those Gacaca

24    proceedings.  Part of the reprisal against her caused her to

25    flee, and that the reason she fled is her fear of her personal
```

J.A. 1550

1    safety.

2              THE COURT:  And how does it tie into the false

3    statement on the identity of place of birth?

4              MR. LAUER:  She could no longer remain in Rwanda.  She

5    had to go to Burundi, and -- I mean, I can also establish she's

6    illiterate.  This is a peasant, a farmer who does not have

7    great sophistication.  She went to Burundi.  She got documents.

8    The reason why she's in Burundi is because of reprisal from

9    this failure to testify falsely.  So I'd like to respond to

12:33PM 10   what the government did on cross-examination by eliciting that.

11             MR. VARGHESE:  That's a non sequitur.  The question

12   was why is there a lie on her passport.  She could have said

13   Rwanda on her Burundi passport.  To say that, oh, because she

14   lied on her passport you can now say that she was being asked

15   to give false testimony --

16             THE COURT:  Let's do this:  I think it's a fair

17   question, why did you put a false name on your passport?  We'll

18   listen to the answer and take it a step at a time.

19             MR. LAUER:  Okay.  Thank you.

12:34PM 20   **END OF SIDEBAR CONFERENCE.)**

21                         REDIRECT EXAMINATION

22   BY MR. LAUER:

23   Q.  Ms. Nahimana, you were asked a lot of questions about your

24   identity card in Burundi and your passport.

25   A.  Yes.

1   Q.   When you left to go to Burundi, were you afraid?

2   A.   No, I wasn't afraid to go to Burundi.

3   Q.   Why did you go to Burundi?

4   A.   I went to Burundi because when I was in Rwanda I was a

5   Tutsi.  I was considered as a woman -- an Interahamwe wife and

6   married to a Hutu.

7   Q.   How were you being treated in Rwanda?

8   A.   We were given a medical plan called a FARG, and they knew

9   that my husband had fled.

12:35PM 10   Q.   Your husband, was he accused of being Interahamwe?

11   A.   Yes, he was accused of being Interahamwe.

12   Q.   Was that true?

13   A.   Because all the Hutus, my home was Interahamwe.

14   Q.   Were they all accused of being Interahamwe, or were they

15   all, in fact, Interahamwe?

16   A.   All the Hutus were Interahamwe.

17   Q.   Was your husband -- who saved you?  How did you survive?

18   A.   How?

19   Q.   So -- I'm sorry, I'm not asking a clear question.  When

12:37PM 20   you came back to Rwanda after living in the Congo, what exactly

21   happened to your husband?

22   A.   He was called into the Interahamwe.  He went to a place

23   called seminary -- in a seminary.  There was my younger sibling

24   was going to bring -- was shot in both hips.  When he came from

25   there, he was accused of going where the attacks were.

1    Q.   Did your husband face a trial in Gacaca?

2    A.   Yes, he went.

3    Q.   What happened to him at that trial?

4    A.   He was accused of going to the seminary.  He said he went

5    to seminary.  Then explained what happened.

6    Q.   Was he -- did he continue to stay in prison, or was he

7    released?

8    A.   Yeah.  They arrest him.

9    Q.   To the best of your knowledge, was your husband

12:39PM 10  Interahamwe?

11   A.   He was not Interahamwe because he did not kill anybody.

12   Q.   Earlier you said all Hutus were Interahamwe.  Can you

13   explain what you meant by that?

14   A.   That's how they called them in Rwanda.

15   Q.   After your husband was released, did you and he continue

16   to live in Rwanda?

17   A.   Oh, he was taken to -- when he was released, he was taken

18   to work in a place of being -- instead of being in prison was

19   going -- was given work to do.

12:40PM 20  Q.   At what time did you -- did he go to Burundi?

21   A.   I don't know when he went to Burundi.  I don't remember.

22   Q.   You said he went to Burundi before you did.  Is that

23   right?

24   A.   Yes.

25   Q.   Okay.  Was it difficult being married to a Hutu who had

```
 1   been accused of being Interahamwe?
 2             MR. VARGHESE:  Objection, your Honor.
 3             THE COURT:  Well, I think that's -- it's leading, but
 4   I'll allow it.  Overruled.
 5   Q.   Was it difficult being a Tutsi who was married to a Hutu
 6   accused of being Interahamwe?
 7   A.   Yes, it was difficult.
 8   Q.   Can you tell us how it was difficult?
 9   A.   When a woman is married to a Hutu, it's like -- it's not
10   considered to have any value.
11   Q.   Were you -- at the time you fled to Burundi, were you in a
12   difficult position?
13             MR. VARGHESE:  Objection, your Honor.
14             THE COURT:  I think we've been over this.
15             MR. LAUER:  I'll move on, your Honor.
16             THE COURT:  All right.
17   BY MR. LAUER:
18   Q.   Ms. Nahimana, what kind of work have you done throughout
19   your life?
20             MR. VARGHESE:  Objection, your Honor.  Beyond the
21   scope.
22             THE COURT:  I'll allow it.
23   Q.   Ms. Nahimana, can you tell us what kinds of work you've
24   done throughout your life?
25   A.   Farming in Rwanda.
```

12:41PM  (line 10)
12:42PM  (line 20)

# J.A. 1554

```
 1   Q.   Did you go to school?

 2   A.   Third grade in primary school.

 3   Q.   No farther than third grade?

 4   A.   No.  I was sick.  I got out.

 5   Q.   Are you able to read and write very well?

 6   A.   I don't know very well.  I don't know very well.

 7   Q.   When you went to Burundi to live, was it difficult for you

 8   to fill out forms?

 9   A.   No, people had to help me to fill them out.

10   Q.   Who helped you?

11   A.   I did not know -- anyone I would see there would help me

12   to do it.

13   Q.   Why did you need help?

14   A.   Because I didn't know how to write.

15        MR. LAUER:  Thank you.  No further questions.

16        THE COURT:  Recross?

17        MR. VARGHESE:  No, your Honor.

18        THE COURT:  All right.  Thank you.

19        THE CLERK:  Would you please raise your right hand.

20              JEAN FRANCOIS HABIMANA, sworn

21        THE CLERK:  Thank you.  You may be seated.

22                     DIRECT EXAMINATION

23   BY MR. LAUER:

24   Q.   Good afternoon.

25   A.   Good afternoon.
```

J.A. 1555

1    Q.    Can you please state your name.

2    A.    Jean Francois Habimana.

3    Q.    Does your name correctly appear on the screen?

4    A.    Yes.

5    Q.    Mr. Habimana, where do you live?

6    A.    I live in Canada, Montreal.

7    Q.    Do you work?

8    A.    Yes.

9    Q.    What is your job?

12:46PM 10    A.    I am an engineer, and I work for a company in Canada that

11    is an electricity provider.  The name is Hydro-Quebec.

12    Q.    How long have you lived in Canada?

13    A.    I've been in Canada since the year 2000.

14    Q.    Where were you born?

15    A.    I was born in Rwanda at Birenga.

16    Q.    Where in the country is that located?

17    A.    It's east of the capital, nation's capital, east of

18    Kigali.

19    Q.    Did you attend university in Rwanda?

12:48PM 20    A.    Yes.

21    Q.    What university did you attend?

22    A.    The National University of Rwanda, the campus in Butare.

23    Q.    When did you begin attending the university in Butare?

24    A.    1992.

25    Q.    And what was your field of study?

1  A.   I started studying medicine.

2  Q.   Did you know Mr. Teganya?

3  A.   Yes, I did know him.

4  Q.   Was he in the same class as you?

5  A.   No.  He was a year ahead of me.

6  Q.   How did you first come to know Mr. Teganya?

7  A.   I met him on the very first day I started college.  I

8  didn't have a room.  So he helped me find a place.

9  Q.   As a classmate in the medical school, did you continue to

12:49PM 10  see him over the course of the year?

11  A.   Yes, I did see him often, because every time we had our

12  recess, I was able to see him, and we had several.

13  Q.   Did you ever have occasion to visit his home?

14  A.   Yes, I did have the opportunity to go to his place three

15  or four times.

16  Q.   Was he someone that was a friend of yours?

17  A.   Mr. Teganya?

18  Q.   Yes.  Was Mr. Teganya someone you considered a friend?

19  A.   Yes.

12:50PM 20  Q.   Well, would you see him elsewhere, at church or other

21  activities?

22  A.   I would see him often at the Sunday mass.  We attended the

23  same church.  So I would see him at mass.

24  Q.   During the time you were a student in Butare, were there a

25  number of different political parties that were active at that

1  time?

2  A.   Yes.

3  Q.   Were you yourself a member of any political party?

4  A.   No.

5  Q.   Were you interested in politics?

6  A.   No.

7  Q.   As a student were you aware that other students were going

8  to meetings and getting involved in politics?

9  A.   Yes.

12:52PM 10  Q.   I'm going to show you two items.  The first is a hat.

11  It's been introduced as Exhibit 12.  Do you recognize that as a

12  hat that was associated with a political party at that time?

13  A.   Yes, I do know.

14  Q.   Do you recognize what party that sort of hat was

15  affiliated with?

16  A.   This was worn by the people of MRND.

17  Q.   I'm also going to show you a scarf.  It's been introduced

18  as Exhibit 15.  I ask you to look at that as well.  Do you

19  recognize that item?

12:53PM 20  A.   Yes.  This is a scarf that was also worn by the MRND

21  affiliates.

22  Q.   Did you sometimes see students wearing clothing like this?

23  A.   Yes, I have seen.

24  Q.   Did you ever see Mr. Teganya wear a hat like that?

25  A.   No, I have never seen.

1    Q.   Did you ever see him wear a scarf like the one I just

2    showed you?

3    A.   No, I have never seen him.

4    Q.   Was Mr. Teganya a member of the MRND?

5    A.   Not as far as I know.

6    Q.   In your dealings with Mr. Teganya, did he ever speak

7    negatively about Tutsis?

8    A.   No.  I've never heard him speak about that.

9    Q.   What kind of a student was he?

12:55PM 10    A.   In college he was among the best students, very good, and

11    he was properly dressed all the time, and he would observe a

12    very proper conduct.

13    Q.   I'm going to ask you if you know a student named Jerome

14    Arusha?

15    A.   I do know him, yes.

16    Q.   What do you recall about Mr. Arusha?

17    A.   Arusha was in the same class as Mr. Teganya, but, you

18    know, he did not pass.  So he became one of my classmates.

19    Q.   Mr. Arusha, was he known for anything?

12:56PM 20         MR. GARLAND:  Objection.

21         THE COURT:  I'll sustain it in that form.

22    Q.   What do you know about how Jerome Arusha spent his time in

23    Butare?

24    A.   You know, Mr. Arusha was very sociable.  He loved to talk

25    to a lot of people.  He was very joyful.  And he liked partying

       1    on the weekends.
       2    Q.    What do you mean by he liked partying?
       3          MR. GARLAND:  Objection.
       4          THE COURT:  Overruled.
       5    A.    At the campus and college there was a canteen, and, you
       6    know, often on weekends he would enjoy, you know, partying over
       7    there and to drink beer.
       8    Q.    Were you also familiar with a student named Bernard
       9    Kalimba?
12:58PM 10    A.    I did meet him at the faculty of medicine as well.
      11    Q.    Do you remember anything in particular about Mr. Kalimba?
      12    A.    No, not about him.
      13    Q.    At the time of the genocide in April of 1994, were you on
      14    campus?
      15    A.    No.
      16    Q.    Where were you at that time?
      17    A.    When the genocide broke out, I was at the town Murama,
      18    Bugesera.
      19    Q.    Is that in your home region?
12:59PM 20    A.    Yes.  That's where my -- my region, where I was living.
      21    Q.    Did you ever go to Butare during the genocide?
      22    A.    No.
      23    Q.    After -- at some point did you leave Rwanda?
      24          THE INTERPRETER:  May the interpreter ask for the last
      25    geographical name?

                    1   A.    After the war broke out, two or three weeks after, I did
                    2   flee, and I went to the south of Kilgari to a place called
                    3   Bugesera.
                    4   Q.    At some point did you leave Rwanda?
                    5   A.    Yes.
                    6   Q.    Can you describe just briefly how you came to arrive in
                    7   Canada after leaving Rwanda?
                    8   A.    In July 2014 I went to Zaire, where I stayed --
                    9   Q.    Excuse me.  You said July 2014.  Is that the date?  Was it
        01:02PM    10   2014 or are you referring to the time of the genocide?
                   11   A.    No.  Sorry.  1994.
                   12   Q.    Just tell us again where you went in 1994.
                   13   A.    In 1994 in the month of July I left Rwanda and I went to
                   14   Zaire.
                   15   Q.    And how did you come to Canada?
                   16         THE INTERPRETER:  May the interpreter finish the
                   17   previous --
                   18         THE COURT:  He had explained in his previous answer
                   19   which was never interpreted, I think about going to Togo and so
        01:03PM    20   forth.  Why don't we hear that.
                   21         THE INTERPRETER:  Yes, the interpreter will repeat it
                   22   again.
                   23   A.    In 1994, the month of July, I left Rwanda.  I went to
                   24   Zaire, where I spent some months.  From there I went to Togo,
                   25   where I studied medicine and graduated, but due to the

1   political instability in that country, that's when I decided to
2   go to Canada and request asylum.
3   Q.   Have you lived in Canada since that time?
4   A.   Yes.
5            MR. LAUER:  That concludes my examination.  Thank you.
6            THE COURT:  Okay.  Ladies and gentlemen, let's break
7   for lunch.  As I told you, we're going to have an afternoon
8   session that will not go past 4:00.  It may end sooner than
9   that depending on how this plays out.  I won't cheat you of
01:04PM 10  your three minutes.  We'll reconvene a couple, three minutes
11  after 2:00 and have an afternoon session.
12           Okay.  Thank you.
13           THE CLERK:  All rise.
14  (Jury exits.)
15  (Court exits.)
16  (A recess was taken.)
17           THE COURT:  Counsel.
18           MR. LAUER:  Yes, your Honor.  A scheduling update, we
19  are making very good progress here today.  We do have other
02:03PM 20  witnesses in the building, and we're prepared to proceed with
21  them.  At the rate we're going now, we think that we'll have
22  possibly only one, maybe two witnesses for tomorrow.
23           THE COURT:  Okay.
24           MR. LAUER:  So I think tomorrow we could be ending
25  very early in the day.  I don't know if the Court's preference

# J.A. 1562

1    would be to conclude before four today, and, you know, continue

2    with additional witnesses tomorrow, but if we do proceed until

3    today tomorrow, I think tomorrow, we will probably be done

4    between 11 and 12.

5         THE COURT:  Does that mean you're going to rest at

6    that point?

7         MR. LAUER:  Well, we have the video conferencing on

8    Wednesday, and then there's one additional witness who's

9    arriving in Boston tomorrow who we would be prepared to call on

02:04PM 10   Wednesday.

11        THE COURT:  Okay.  So the likely scenario is we would

12   have argument Thursday.  I don't know if there's a government

13   rebuttal case, but thinking about this probably --

14        MR. LAUER:  I think the defense case will last at

15   least until Wednesday, possibly Thursday if Mr. Teganya elects

16   to testify.

17        THE COURT:  Okay.  I was assuming he would not.  All

18   right.

19        MR. VARGHESE:  Your Honor, just on that point, if

02:04PM 20   there's going to be dead space tomorrow, we would suggest that

21   if Mr. Teganya is going to testify, he should testify tomorrow

22   so we don't waste the jury's time and the Court's time.

23        THE COURT:  I don't know if I can force him to testify

24   before other witnesses testified, so let's do this.  Why don't

25   we certainly complete the current witness, Mr. Habimana, and

1   then you have how many other witnesses if you needed to fill up

2   today, how many more would you have?

3          MR. LAUER:  We have two or potentially three, although

4   I don't think we would finish with three.

5          THE COURT:  Why don't we do him and one more, break a

6   little early, like maybe that takes us to three or something

7   and then spill over into tomorrow.

8          MR. LAUER:  I think that's about right.

9          MR. GARLAND:  Why don't we do that, the names of the

02:05PM 10   witnesses and the *Jencks* of those people at the end of the

11   Court today.

12          THE COURT:  Yes.

13          THE CLERK:  All rise for the jury.

14          (JURORS ENTERED THE COURTROOM.)

15          THE CLERK:  Would Mr. Habimana please resume the

16   stand.

17                    <u>CROSS-EXAMINATION</u>

18   BY MR. GARLAND:

19   Q.   Good afternoon.

02:06PM 20   A.   Good afternoon.

21   Q.   I think you testified earlier that during medical school

22   you were not interested in politics; is that right?

23   A.   Yes, that's correct.

24   Q.   And so during medical school, you weren't involved in

25   politics either, right?

```
 1   A.    That's exact, I was not involved in politics.
 2   Q.    In fact, you didn't attend the political meeting when
 3   President Habyarimana came to the university, did you?
 4   A.    No, I never went.
 5   Q.    And you didn't attend other political meetings or rallies
 6   either, did you?
 7   A.    I have never attended.
 8   Q.    So you wouldn't have seen what happened there, did you?
 9   A.    In the meetings?
02:08PM 10   Q.    Right.
11   A.    I have never attended, so I have no idea what was going
12   on.
13   Q.    You testified that when you were in medical school, you
14   went to the defendant's house only three or four times, right?
15   A.    Yes, I said three or four times.
16   Q.    When you went to his house on those occasions, did you go
17   to his room?
18   A.    I was mainly, I stayed mainly in the kitchen and in the
19   living room.
02:09PM 20   Q.    So you wouldn't have seen whether the defendant had any
21   MRND clothing or flags or pins in his room, would you?
22   A.    I've never been in his room.
23   Q.    You never talked about politics with the defendant either,
24   did you?
25   A.    No, we have not spoken about politics.
```

J.A. 1565

```
 1    Q.   You never talked to him about Tutsis either, did you?
 2    A.   No.
 3    Q.   And you don't know anything about the defendant's
 4    political beliefs, do you?
 5    A.   No, I don't.
 6    Q.   You were not in Butare during the genocide, correct?
 7    A.   I was not there.
 8    Q.   So you don't know what the defendant did during the
 9    genocide in Butare, do you?
02:10PM 10    A.   That's exact, that's correct, I was not there to know.
11    Q.   You did live in Canada for a while at the same time as the
12    defendant though, correct?
13    A.   Yes.
14    Q.   And how far apart did you live?
15    A.   At the beginning, it was about 15 kilometers away, and
16    then after when I moved out to a different place, it was 5
17    kilometers.
18    Q.   How often did you see each over in Canada?
19    A.   Practically every week.
02:11PM 20    Q.   And did your families get together as well?
21    A.   Yes.
22    Q.   And I don't remember whether you testified, but do you
23    have children?
24    A.   Yes, I do have two children.
25    Q.   And did your children play together with the defendant's
```

1    children?

2    A.   Currently, yes.

3         MR. GARLAND:  I'll take one second.  No further

4    questions, your Honor.

5         MR. LAUER:  No redirect.

6         THE COURT:  Thank you.  Please step down.

7         MR. LAUER:  We would call Jean Pierre Rukebesha.

8         JEAN PIERRE RUKEBESHA, having been duly sworn by the

9    Clerk, testified as follows:

02:13PM 10                  <u>DIRECT EXAMINATION</u>

11   BY MR. LAUER:

12   Q.   Sir, you're comfortable in English?

13   A.   Yes, I am.

14   Q.   Good afternoon.  Can you please state your name for the

15   record.

16   A.   My name is Jean Pierre Rukebesha.

17   Q.   Is your name correctly spelled on the screen in front of

18   you?

19   A.   Yes, it is.

02:14PM 20   Q.   Where do you live?

21   A.   Huh?

22   Q.   Where do you live?

23   A.   I live in Alberta in Canada.

24   Q.   How long have you lived in Canada?

25   A.   Since 2011.

```
 1    Q.    Where were you born?

 2    A.    In Rwanda, in Kigali.  It's a region called Masaka.

 3    Q.    Did you attend university?

 4    A.    Yes, I did.

 5    Q.    Where did you attend university?

 6    A.    Butare.

 7    Q.    When did you enter the university in Butare?

 8    A.    In 1992.

 9    Q.    What was your field of study?

02:14PM 10  A.    Medicine.

11    Q.    As a medical student, did you know Mr. Teganya?

12    A.    Yeah, I did.

13    Q.    Was he in your class?

14    A.    No, he was one year ahead of me.

15    Q.    What kind of student was he?

16    A.    What?

17    Q.    What kind of student was he?

18    A.    Very studious, very brilliant person.

19    Q.    Did you have a friendship with him?

02:15PM 20  A.    No, not in particular, but we used to talk to each other

21    sometimes during coffee breaks.

22    Q.    At the time you were a medical student, were there a

23    number of different political parties that were active in

24    Butare?

25    A.    At the beginning, no.
```

```
 1   Q.   Did there come to be a number of political parties that
 2   were active?
 3   A.   Yeah, but not really very, very active at the beginning,
 4   like in '92.
 5   Q.   Were you a member of a political party yourself?
 6   A.   No.
 7   Q.   Was there a reason why you were not a member of a
 8   political party?
 9   A.   Because I was putting studies ahead of everything else I
10   was doing.
11   Q.   Was medical school demanding?
12   A.   Yes, it is, especially in the first two years, it was very
13   demanding.
14   Q.   I'm going to approach you and show you some items.
15   A.   Okay.
16   Q.   The first thing I'm showing you is a hat.  It's been
17   marked as Exhibit 12, and I ask you to look at that and tell me
18   do you recognize it?
19   A.   Yeah, I do.
20   Q.   What is that hat?
21   A.   It must be for MDR.
22   Q.   MDR?
23   A.   Yeah, it was because I can recognize the signs.
24   Q.   I'm going to show you a scarf.  Do you recognize that
25   style of scarf?
```

1    A.   Yeah, I do.

2    Q.   And What is that?

3    A.   The same thing, but sometimes MDR and CDR, some of the

4    colors were pretty much close, so I believe it is for MDR or

5    CDR, one of them.

6    Q.   Were there students who wear that sort of clothing in the

7    medical school?

8    A.   Yeah, sometimes.

9    Q.   Did you ever see Mr. Teganya wear a hat like that?

02:17PM 10    A.   No.

11    Q.   Did you ever see him wear a scarf like the scarf I showed

12    you?

13    A.   No.

14    Q.   Did you ever see him attending any sort of political

15    rallies or meetings?

16    A.   No.

17    Q.   How often were you seeing Mr. Teganya on a day-to-day

18    basis?

19    A.   Because we were in medical school, the campus was

02:18PM 20    separated from the other university students, and usually from

21    Preclinic 2, which is the second year upwards, we were not very

22    many, so we have got our own separate campus, so we would come

23    across each other sometimes in the hallways.

24    Q.   Where were you living when you were a medical student?

25    A.   In Misereor.

1    Q.    Is that a dormitory?

2    A.    Yes.

3    Q.    Did Mr. Teganya live in that dormitory?

4    A.    No, I don't think so because I know he used to live

5    outside the campus, but I didn't take note if he moved in

6    because what happens some students when they got the rooms,

7    they could, if they prefer to stay outside, they would give it

8    to other student and stay there.

9    Q.    Did you ever visit his residence?

02:19PM 10    A.    No, but I know he used to live outside close to a

11    restaurant outside a little bit when you come off the campus

12    towards the city.

13    Q.    In April of 1994, were you in Butare?

14    A.    No, I was going home on holidays.

15    Q.    And I think you mentioned before, you were from Kigali?

16    A.    Yeah.

17    Q.    At some point, did you leave your home in Kigali in

18    April of 1994?

19    A.    To go to Butare, yeah, I did towards probably the

02:19PM 20    beginning of May.

21    Q.    And why were you leaving your home to go to Butare?

22    A.    Because the war was coming from the east pushing everybody

23    towards the west, so I decided to go to Butare because I wanted

24    to pick up some of my documents.

25    Q.    From your dormitory?

```
 1    A.    Yeah.

 2    Q.    Did you make it to Butare?

 3    A.    Yeah, I did.

 4    Q.    And what did you do once you arrived in Butare?

 5    A.    So there was nothing to do because there was no schools,

 6    so what we did was surviving on every day trying to get food

 7    and eat and very much stay around, nothing specific.

 8    Q.    Did you ever go to the hospital at any point when you were

 9    in Butare?

02:20PM 10    A.    Yeah, I did twice.

11    Q.    What brought you to the hospital?

12    A.    Nothing really very specific because Butare is a very

13    small city, and not having anything to do specific, sometimes

14    we just move around.

15    Q.    When you were at the hospital, were you there for long?

16    A.    No, because we were just passing.  I wasn't there for a

17    long time.

18    Q.    Were you doing any sort of observation or anything for

19    school?

02:21PM 20    A.    No, I can't say there's any reason really because every

21    morning we woke up, once we get something to eat, we just start

22    moving around.

23    Q.    At the hospital, did you see any other medical students

24    you knew?

25    A.    Yeah, I did.
```

```
 1    Q.    Who did you see?

 2    A.    I saw Teganya twice, but we just waved to each other, we

 3    didn't really talk, and I knew because he was -- especially

 4    those who were in the doctorate level, some of them were

 5    helping during the war at the hospital, especially many of the

 6    doctors had already left.

 7    Q.    You said you saw him in passing?

 8    A.    Yeah.

 9    Q.    Did you stop to have a conversation?

02:21PM 10    A.    No, because he was just rushing like probably he was

11    having things to do.

12    Q.    Could you tell what he was doing at the hospital in that

13    time?

14    A.    No, it was around the emergency area, and I saw him

15    passing.  We just waved because we knew each other, that's all.

16    I didn't ask what he was doing.

17    Q.    What was the emergency area where you saw him?  What was

18    that like at that time?

19    A.    During that time, Butare was pretty quiet.  It was very

02:22PM 20    like an emergency area where you see people injured, so just

21    coming or whoever is sick.

22    Q.    Did you actually see any violence taking place on the

23    campus on those occasions?

24    A.    No, when I arrived in Butare, there was no longer any

25    violence.
```

J.A. 1573

1    Q.   And as best you can recall, when do you think you arrived

2    in Butare?

3    A.   I think it was the beginning of May or late April.

4    Q.   Did you remain in Butare -- how long did you remain in

5    Butare?

6    A.   It must be close to a month and a half because we left

7    among the last people.  It was towards the end of mid-June.

8    Q.   And what prompted you to leave?

9    A.   Because the war was getting very close and everybody was

02:23PM 10   evacuating, leaving the place.

11   Q.   Where did you go?

12   A.   So we were heading west, so basically we took a bus, which

13   went south because we couldn't take the main road towards

14   Cyangugu.  There was war on that side, so we had to head south

15   like going to Burundi, then we had an accident, then we had to

16   walk all the way to Cyangugu.

17   Q.   How long did it take you to walk through Cyangugu?

18   A.   It took us two days to arrive to a place called Kitabi,

19   which is at the outskirts of Nyungwe Forest, so those who had

02:24PM 20   got money could pay themselves, take a lift in the track or

21   something like that, so I paid, but there were some guys who

22   went all the way to Cyangugu walking through the forests.

23   Q.   Did you leave Rwanda?

24   A.   Yeah, I did.

25   Q.   When did you leave Rwanda?

1    A.   That was in July, I think, because Cyangugu was the last

2    place to be.  People stayed in Cyangugu for a while.  I

3    remember there were because we left after the World Cup, I

4    can't remember what was the date because we were still watching

5    the World Cup in the jungle.

6    Q.   When you left Rwanda, where did you go?

7    A.   I stayed in Congo for like three days, then I went all the

8    way through Tanzania, then Zambia, then I lived in Swaziland.

9    Q.   And at some point, did you continue your studies?

02:25PM 10   A.   Yeah, it was very, very hard, but I had to study on my

11   own, buy books, so then later I went to U.K. to finish school.

12   Q.   You went where to finish school?

13   A.   U.K., United Kingdom.

14   Q.   In United Kingdom, what were you studying?

15   A.   Chartered accountancy and management studies.

16   Q.   After you studied accounting, what did you do?

17   A.   At the time, I personally did not want to go back to

18   Rwanda because I wasn't feeling very safe.  It was almost 10

19   years I wasn't there, so I tried to get refugee status in U.K.,

02:25PM 20   so they turned me down, so they sent me back to Rwanda.

21   Q.   When you got back to Rwanda, what did you do?

22   A.   So I've done a lot of things.  I worked first as lecturer

23   at the School of Finance and Banking, then I went to work at

24   KPMG, then in the InterContinental Hotel, then Rwanda

25   Investment Group, then SORAS, always as a chief financial

1    officer.

2    Q.    When did you emigrate to Canada?

3    A.    In June, 2011.

4    Q.    And what sort of work do you do in Canada today?

5    A.    Still an accountant.

6    Q.    When you were a medical student, did you know someone

7    named Jerome Arusha?

8    A.    Yes, he was in our class because he used to be with

9    Teganya but the same class.  I think he doubled in second year,

02:26PM 10    I believe, yeah.

11    Q.    Did he -- was he placed in your class because he did not

12    advance?

13    A.    Yeah.

14    Q.    What do you recall about where Mr. Arusha spent his time?

15    A.    I would say he was kind of the type of person who was very

16    opportunistic, who takes advantage of many situations, and also

17    he's very, very active in politics.

18    Q.    Do you remember anything about where he liked to spend his

19    time?

02:27PM 20    A.    Very hard to tell, but I know especially if it was

21    rallies, you would see him as some of the guys were wearing MDR

22    signs and clothes, and also people usually who stayed behind

23    were very unhappy people.

24    Q.    Well, let me just ask you about another medical student

25    named Bernard Kalimba.  Do you recall Bernard Kalimba?

          1    A.    No, not very much.

          2          MR. LAUER:  Thank you very much.  No further

          3    questions.

          4          THE COURT:  Cross.

          5                    CROSS-EXAMINATION

          6    BY MR. VARGHESE:

          7    Q.    Good afternoon, sir.

          8    A.    Good afternoon.

          9    Q.    So you currently, you're a resident of Canada; is that

02:28PM  10    correct?

         11    A.    I'm a citizen of Canada.

         12    Q.    Sorry?

         13    A.    Citizen.

         14          THE COURT:  Citizen.

         15    A.    Yeah.

         16    Q.    Are you a Hutu?

         17    A.    Yeah.

         18    Q.    And what part of the country are you from?

         19    A.    Masaka in Kigali.  It's close to the airport.

02:28PM  20    Q.    And so you were a year behind Mr. Teganya; is that

         21    correct?

         22    A.    Yeah, that's true.

         23    Q.    And so you wouldn't have classes with him, right, because

         24    you were a year behind him?

         25    A.    Not the same class, yeah.

           1   Q.   But you knew he was from Gisenyi?

           2   A.   Yeah.

           3   Q.   You knew he was from Gisenyi?

           4   A.   At the beginning, I didn't really pay too much attention

           5   on it, but I know he's from Gisenyi.

           6   Q.   And you knew that his father was well-known; is that

           7   right?

           8   A.   Because I wasn't following too much politics, I wasn't

           9   very much interested, no.

02:29PM   10   Q.   I'm sorry.

          11   A.   I wasn't very much interested into politics.

          12   Q.   Yes.

          13   A.   I didn't really know that.

          14   Q.   Well, you remember you had a call or you talked to a

          15   defense investigator before you came and testified here.  Do

          16   you remember that, in February of 2018?

          17   A.   No.

          18   Q.   You had a call with maybe Leopold or Dick Prudence

          19   Munyeshuli?

02:30PM   20   A.   Of Philpott, yeah.

          21   Q.   What's that, Philpott?

          22   A.   Mr. John, yeah.

          23   Q.   And when you spoke to Mr. Philpott, you said Mr. Teganya's

          24   father was well-known; isn't that right?

          25   A.   Yeah, he was known like someone they talk about sometimes

1  in politics, and also I know Teganya, after I heard about this,

2  I could recall some of those names but not know him like saying

3  he did that or that or he was in charge of the specific law

4  within MDR.

5  Q.  How was his father well-known?  What did you know about

6  his father?

7  A.  Because Rwanda is a very small country, and usually when

8  there are rallies or some people who are known, you can hear

9  their names.  That's how I heard about him.

02:30PM 10  Q.  So you knew he was involved in politics; is that right?

11  A.  Yeah.

12  Q.  Do you know what party he belonged to?

13  A.  I believe probably MDR because he's from Gisenyi in

14  general.

15  Q.  MDR?

16  A.  No, no, no, MRND, yeah, sorry.

17  Q.  That's okay.  MRND, so you knew his dad was in MRND?

18  A.  Uh-hum.

19  Q.  You also mentioned that Mr. Teganya always stayed with his

02:31PM 20  group; isn't that right?

21  A.  Yeah.

22  Q.  By that you meant other Hutus from the north, right?

23  A.  No.  I meant that Teganya was part of a group, people used

24  to call gents, guys who care about their look, a very close

25  group because he was with some of his friends.  I know most of

J.A. 1579

1    his friends, the ones he was always with.

2    Q.   So, was this a social group or this is what you're calling

3    it?

4    A.   It's a social group.

5    Q.   And so you're saying that that was the group that he was

6    always a part of?

7    A.   Yeah, because they used to be together, so I didn't pay

8    attention who were Hutus or Tutsis, no.

9    Q.   And he didn't socialize with others, that's the other thin

02:32PM 10   you said; isn't that right?

11   A.   No.

12   Q.   He stayed with his group?

13   A.   So, this is how the life was at the university, you had

14   some extreme groups, guys who liked having fun at the

15   university, who always like have fun together, then you had the

16   other gents, and also Teganya because he's from some of the

17   guys he was with, some of the kids, their parents were like

18   diplomate in the past and probably from the same area, so I

19   wouldn't say that he was with a specific group for a specific

02:32PM 20   reason.

21   Q.   I'm not sure I quite understand what you're saying, but do

22   you mean that he was from the elites?

23   A.   No, I wouldn't say elite because I would be qualifying

24   everybody.  I didn't know all the guys he was with because some

25   of his friends were my friends, and they live in Rwanda, and I

1    know who they are.

2    Q.   The tensions started rising on the campus as the years

3    passed; isn't that right?

4    A.   Yeah, it was towards the end of 1993, yeah.

5    Q.   And you told, you said that things were out of hand; is

6    that right?

7    A.   Yeah.  It was, at one stage, it was the first time at the

8    university where we had to like to our association, which never

9    existed before, so the student groups were breaking towards the

02:33PM 10   political lines.

11   Q.   And you said that you were in survival mode.  What did you

12   mean by that?

13   A.   What I meant is in Rwanda at the time if you moved around,

14   you had people getting shot, and you didn't know if you could

15   survive the next day if you went to your place.

16   Q.   This was before the genocide; isn't that right?

17   A.   Yeah, it is.

18   Q.   So were you scared to be on campus before the genocide?

19   A.   Not on campus, in general, because we had the head of

02:34PM 20   political parties, some of which were ministers getting shot,

21   and it was really getting a little bit dangerous for everybody.

22   Q.   Was anybody threatening you?

23   A.   No, nobody.

24   Q.   You mentioned, you testified that you thought this was

25   CDR, MDR clothing; is that right?

1    A.   Yeah.

2    Q.   You don't know, and you said that you never saw

3    Mr. Teganya wearing that clothing?

4    A.   Yeah.

5    Q.   You don't know whether or not Mr. Teganya was in a

6    political party?

7    A.   If he was wearing one of the political signs, I would

8    certainly know.

9    Q.   Sure.  But you don't know what party he belonged to; isn't

02:35PM 10   that right?

11   A.   I know some of the colors were close to each other, the

12   red color.

13   Q.   That's not my question.  You don't know what political

14   party he was a part of; isn't that right?

15   A.   No, I don't know.

16   Q.   You don't know?

17   A.   No.

18   Q.   You told the defense investigator -- well, you testified

19   here today that you weren't politically active; isn't that

02:35PM 20   right?

21   A.   Yes.

22   Q.   But you told the defense investigator that you were pro

23   MDR?

24   A.   Yes, I was.

25   Q.   What did you mean by that?

1   A.    Because in Rwanda, we had all the time some tensions based

2   on the region where we came from or where your parents came

3   from, and my dad was originally from Gitarama, which is the bed

4   hot of the MDR, and I practically supported it but not active.

5   Q.    Did you go to the rallies?

6   A.    No.

7   Q.    Did you go to meetings?

8   A.    No.

9   Q.    Did you wear the clothing?

02:36PM 10   A.    No.

11   Q.    So how did you support MDR?

12   A.    Just a feeling like you can be, if you're from the

13   United States, I can be pro conservative and not go to a rally

14   or even have a membership card.

15   Q.    You were aware that Tutsi students were being harassed on

16   campus?

17   A.    No, not really during that moment, no.

18   Q.    You didn't know that Tutsi female students were being

19   harassed?

02:36PM 20   A.    No.

21   Q.    No, you didn't know or no, it wasn't happening?

22   A.    No, I would say no because really the university was the

23   last place where you see violence or people threatening each

24   other because it's an area of dedicated people, and they were

25   not really physical like threatening to anybody.

J.A. 1583

1   Q.   Did you have a nickname when you were there?

2   A.   Sorry.

3   Q.   Did you have a nickname when you were there?

4   A.   Not really.

5   Q.   Did you ever hear the name Sotos?

6   A.   Yeah, I know that.

7   Q.   That means bully, right?

8   A.   No.  Later they give it a different definition, but I

9   wasn't supposed to be a bully.

02:37PM 10   Q.   That was your nickname, right?

11   A.   That was the name given to people because -- so let me

12   explain to you what happened.  People were in the second year,

13   they had initiation process, right, and when we went in the

14   second year, there was initiation, there were some problems at

15   the university, so people started calling those who were being

16   questioned by the administration, they started calling them

17   Sotos.

18   Q.   And that was because you were caught harassing Tutsi

19   female students?

02:37PM 20   A.   No, no, it has nothing to do with that.

21   Q.   And did you lose your scholarship?

22   A.   No, I got it back before we left.

23   Q.   Well, you got it back.  How did you lose it?

24   A.   No, because it was partly suspended when I was wrongly

25   accused, and before the war, before '94 in April, everything

1    came back to normal.

2    Q.   Well, let's talk about it before we come back to how you

3    got it back, how did you lose it?

4    A.   Because I was wrongly accused.

5    Q.   Of harassing Tutsi female students, correct?

6    A.   Not harassing Tutsi student, of doing the initiation at

7    the campus, and the initiation didn't have to segregate

8    anybody, it was a general thing for people that were coming in

9    the first year.

02:38PM 10   Q.   And so you were accused of bullying?

11   A.   No.

12   Q.   When you say initiation, what were you doing?

13   A.   First of all, I contest you saying that I'm a bully

14   because it was an initiation, and I was wrongly accused, that's

15   why I got back my scholarship.

16   Q.   My question was what were you doing as part of the

17   initiation?

18   A.   I was explaining what I did.  It was the general thing the

19   student asking, like the first year student, say things which

02:39PM 20   you usually don't say.

21   Q.   Were you insulting them?

22   A.   No.

23   Q.   Well, help me understand.  What were you doing that caused

24   you to have your scholarship suspended?

25   A.   By the way, if I want to explain to you if you really want

J.A. 1585

1    me to explain that, I didn't even do it, it was just because I

2    was part of the people they think that might have done it but I

3    wasn't.

4    Q.   I'm asking what was the reason why your scholarship was

5    suspended?

6    A.   Do I need to answer that?

7    Q.   Yes, that's the way this works, I ask questions, you

8    answer.  Why was your scholarship suspended?

9    A.   I was wrongly accused.

02:39PM 10    Q.   Of what?

11    A.   Of doing the initiation.

12    Q.   Of harassing students?

13    A.   No, I got it back, and --

14    Q.   I'm not asking about how you got it back, I'm asking what

15    were you doing that caused it to be suspended?

16    A.   Because I did nothing, if I did do something, they

17    wouldn't give it back to me.

18    Q.   And that's what earned you the nickname Sotos, correct?

19    A.   Yeah, the student could say whatever they want but not

02:40PM 20    necessarily that I did something.

21    Q.   You also participated in training; is that right?

22    A.   Training of what?

23    Q.   On Tuesdays and Fridays with members of the Interahamwe?

24    A.   No.

25    Q.   You didn't do training in the gym?

1  A.    No.

2  Q.    Or weapons training down in the forest?

3  A.    You mean like no more sports like playing sports?

4  Q.    No, I mean with the Interahamwe, with clubs and machines?

5  A.    No, I have never been in the Interahamwe, and I try to

6  despise them if you know that.

7  Q.    Let me ask that.  So you were in Masaka when the

8  president's plane was shot down; is that right?

9  A.    Soccer?

10 Q.    You were in Kigali when the plane was shot down?

11 A.    I was watching a World Cup game, I think it's a World Cup

12 game, yeah.

13 Q.    And then you returned to Butare on May 2nd, correct?

14 A.    I don't know the date, but I know it's the beginning of

15 May.

16 Q.    And your testimony was that the killings had stopped in

17 Butare; is that what you said?

18 A.    Yeah, there was no violence going on at that moment.

19 Q.    So the genocide was over in Butare by May 2nd?

02:41PM 20 A.    I can't say it was over, but it wasn't (incomprehensible)

21 if you remember the history, some time in April, late April,

22 that's when there was violence in Butare.

23 Q.    Where did you go when you returned to Butare in May?

24 A.    At the university.

25 Q.    Back to your dorm room?

```
 1   A.    Yeah.
 2   Q.    There was no classes going on back then; is that right?
 3   A.    Sorry.
 4   Q.    There were no classes going on then?
 5   A.    No, there wasn't.
 6   Q.    And so you said every day you just moved around?
 7   A.    Yeah.
 8   Q.    What do you mean by that?  What would you do?
 9   A.    Because if you have nothing to do, what do you do?  Do you
10   sit and wait or are you just going to try to find foot to eat?
11   Q.    So you'd go around in a group?
12   A.    Yeah, with some of my friends because in Rwanda, during
13   the war, if you move around with your friends or people who
14   knows you, it was very risky.
15   Q.    So just to be clear, in May of 1994, you didn't have any
16   fear of walking around Butare?
17   A.    Everybody had fear because if you came across people who
18   don't know you, you may be in very, very big danger.
19   Q.    And there were road blocks, correct?
20   A.    Yeah, there was.
21   Q.    And so you would have to navigate the roadblock?
22   A.    Yeah, usually a roadblock, if you go through it once or
23   twice and they know you're a student and you live in the area,
24   you don't have a problem.
25   Q.    And you saw Tutsis hiding out at government office
```

J.A. 1588

1    buildings; isn't that correct?

2    A.    Tightening up?

3    Q.    Hiding?

4    A.    Yeah, there was a little bit protecting, yeah.

5    Q.    And they were hiding there because they were afraid of

6    being killed, correct?

7    A.    Yeah.

8    Q.    But according to you, all the killing was over?

9    A.    By the way, sometimes not everybody who was hiding was

02:43PM 10    Tutsi, some people were scared because people didn't know who

11    they are.  You can't say he was a Hutu or a Tutsi, no.

12    Q.    You also said that Tutsis were taken in a truck to be

13    killed; isn't that right?

14    A.    Yeah, because you know our Shalom, he was well known in

15    Butare.  I saw him passing one time with people in his truck.

16    Maybe he was saving them or I don't know what he was taking

17    them to.

18    Q.    He was taking a truck full of Tutsis, and you think he was

19    saving them?

02:43PM 20    A.    Yeah, sometimes people would pick up those they know and

21    they go and hide them.

22    Q.    That was the Shalom who was convicted at the ICTR for

23    genocide crimes?

24    A.    Yeah, Shalom, yeah.

25    Q.    You also said there was a young boy who was killed that

1    you saw; isn't that right?

2    A.    Yeah, one time, yeah.

3    Q.    But yet you and your friends felt comfortable walking

4    around Butare?

5    A.    Not very comfortable, I wouldn't say that.

6    Q.    But you did at each and every day that you were there from

7    May and June and July?

8    A.    Yeah, because it was the same route we would take the same

9    day every day.

02:44PM 10    Q.    And you went to the hospital twice; isn't that right?

11    A.    Yeah.

12    Q.    And you'd have to pass roadblocks to get to the hospital?

13    A.    Yeah.

14    Q.    But it was okay because they knew you?

15    A.    Yeah, we were friends, people who knows you.

16    Q.    What would happen when you went to the hospital?

17    A.    What would happen?

18    Q.    Why did you go to the hospital?

19    A.    Just spending the day like moving around.

02:44PM 20    Q.    Something to do?

21    A.    Huh?

22    Q.    It was something to do that day?

23    A.    I don't know if you ever have been in a situation where

24    you have no goal, nothing to do, just trying to survive, right,

25    and you can move around if people knows you, that's what we

J.A. 1590

1  were doing.

2  Q.   And when you got to the hospital, you said that you saw

3  Mr. Teganya, he was by the emergency room; is that right?

4  A.   Yeah, he was passing by.

5  Q.   And where were you?

6  A.   At the emergency area.

7  Q.   And you were just taking a stroll through the hospital?

8  A.   I can't recall why I went there, but there was no specific

9  reason.

02:45PM 10  Q.   Did you see Tutsis hiding in the hospital?

11  A.   No.

12  Q.   Did you see soldiers at the hospital?

13  A.   No, I saw some soldiers dropping their soldiers or friends

14  who were injured, that's what I saw.

15  Q.   And did you see Interahamwe at the hospital?

16  A.   Huh, sorry.

17  Q.   Interahamwe, militia?

18  A.   No.

19  Q.   So the hospital was just functioning as normal?

02:45PM 20  A.   You wouldn't call it normal because like the City of

21  Butare, they didn't have electricity.  Things were very, very

22  difficult.

23  Q.   But there was not -- there were no soldiers, there was no

24  Interahamwe, there were no Tutsis hiding there?

25  A.   No, but probably sometimes you see a car passing with some

1  people inside Interahamwe, but you didn't know where they were

2  going or what they were doing but not at the hospital.

3  Q.  When did you go to the hospital the first time?

4  A.  A date?

5  Q.  Yeah.

6  A.  I don't know.

7  Q.  Why did you go back to the hospital?

8  A.  I went a few days later just again wandering around.

9  Q.  What building in the hospital did you go to?

02:46PM 10  A.  At the emergency area, that's the only place I went to.

11  Q.  So you never went to the maternity ward?

12  A.  No.

13  Q.  Dermatology building?

14  A.  No.

15  Q.  Did you see the tents by the entrance?

16  A.  Tents?

17  Q.  The tents.

18  A.  I can't recall seeing a tent, yeah.

19  Q.  And you didn't go in the hospital, you'd just walk up to

02:46PM 20  the emergency room and then leave?

21  A.  Yeah, you know, from the university to the city, there are

22  two main roads, right, there's the main road, then there's

23  another one which goes passing the medical school.  This was

24  the only two places you can pass by to go to the city.

25  Q.  How long were you at the hospital those two occasions?

J.A. 1592

1    A.    Probably maybe five or ten minutes, not much.

2    Q.    You told the defense investigators that there were no

3    killings at the hospital after May 2nd; isn't that right?

4    A.    As far as I know.

5    Q.    How do you know if you're only there twice for five, ten

6    minutes?

7    A.    Because they asked me if I saw any killings in Butare from

8    May during the time I was there, I didn't hear or see anything.

9    Q.    So you actually don't know if there were killings at the

02:47PM 10    hospital, you were only there twice for a handful of minutes?

11    A.    If you wonder the way it was, this is the way it was,

12    sometimes someone would be suspected wherever he is, and people

13    would catch him and take him.

14         Like me, if I go, for example, outside the city, and

15    people don't know me, I may not survive that, right, so that

16    was the same thing.  Someone might come to the hospital maybe,

17    people suspect him to be a soldier or whatever.

18    Q.    That wasn't my question, sir.  My question was you don't

19    really know if there were no killings at the hospital if you

02:48PM 20    were only there twice for a handful of minutes?

21    A.    I know there isn't, but I can't assume 100 percent because

22    I wasn't everywhere all the time.

23    Q.    Well, you weren't there, correct?

24    A.    When I was there, there was nothing.

25    Q.    And you didn't get beyond the emergency room; is that

## J.A. 1593

 1   right?

 2   A.    No.

 3   Q.    So throughout this time period, May, June and July of

 4   1994, you weren't actually hiding, were you?

 5   A.    No, I wasn't hiding.

 6   Q.    You were taking strolls around the area, right?

 7   A.    Yeah, like most of the students who stayed on the campus.

 8              MR. VARGHESE:  Thank you, sir, I have nothing further.

 9              THE COURT:  Redirect.

02:49PM 10          MR. LAUER:  No redirect.

 11             THE COURT:  All right.  Thank you.  You may step down.

 12             We're going to break there for the day because we are

 13   ahead of schedule, as I understand it.

 14             Ladies and gentlemen, just for planning purposes, and

 15   this is tentative, lots of things can change.  It looks like

 16   we're going to have evidence tomorrow and Wednesday, and that

 17   the most likely scenario, I'm not making any promises, the most

 18   likely scenario is the evidence will be done Wednesday, and

 19   we'll have closing arguments, and you'll get the case on

02:49PM 20   Thursday, if it plays out that way, and, again, it may not.

 21             We're juggling, again, witnesses coming from different

 22   countries, and there's a lot of things going on, so to speak.

 23   Remember that you should plan to be here all day because if you

 24   get the case on Thursday or whatever day you get the case,

 25   you'll deliberate all day until five o'clock if you need.

1    Again, for planning purposes this is how I think it

2  will play out, and I'll have more information, of course, as we

3  go along, and, again, sometimes things happen, and I can't

4  promise the schedule is going to be exactly that.

5    So it does look like we're ahead of schedule, that's

6  the good news, and please remember my instructions not to

7  discuss the case among yourselves or with anyone else and not

8  to read or listen to anything about the case.  I appreciate

9  your patience in having an afternoon session.  We would not

02:50PM 10  need one tomorrow, so I think whatever we're going to do

11  tomorrow, we can get done in the morning.  Thank you, and I'll

12  see you tomorrow morning at 9:00.

13    THE CLERK:  All rise.

14    (JURORS EXITED THE COURTROOM.)

15    THE COURT:  Okay.  Assuming that it plays out that

16  way, which, of course, it may not, but I think it probably

17  makes sense to have at least a preliminary discussion about the

18  jury charge tomorrow after the evidence concludes just to let

19  me get the benefit of your thinking on the draft charge so far.

02:51PM 20    And I'll also get to you, again, a verdict form which

21  keeps slipping my mind, it's going to be a general verdict

22  form, guilty, not guilty as to each of the five charges.

23    Anything else we need to talk about before tomorrow

24  morning?

25    MR. GARLAND:  We just need to know the names of the

J.A. 1595

1    witnesses in the *Jencks*, but that's between us.

2         THE COURT:  And I will direct that that be provided

3    forthwith.

4         MR. LAUER:  Yes, we will, your Honor, and the only

5    thing I would add is that in terms of scheduling, the one thing

6    that certainly could change the schedule that you outlined

7    would be Mr. Teganya testifying.

8         THE COURT:  Understood.  I was trying to dance around

9    that topic without mentioning it because I don't want to make

02:52PM 10  it look like -- well, for obvious reasons.  I don't need to

11   explain myself.  If he testifies and the case takes longer,

12   that's the way it is.

13        We'll cross that bridge when we come to it.  I will

14   see you tomorrow morning at 8:30.

15        THE CLERK:  All rise.

16        (Whereupon, the hearing was adjourned at 2:52 p.m.)

17

18

19

20

21

22

23

24

25

1          UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,        )
                                      )
5    vs.                             )   Criminal Action
                                      )
6    JEAN LEONARD TEGANYA,            )   No. 17-10292-FDS
                     Defendant        )
7                                     )
                                      )
8                                     )

9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11
                     JURY TRIAL DAY 15
12

13

14
          John Joseph Moakley United States Courthouse
15                    Courtroom No. 2
                      One Courthouse Way
16                    Boston, MA 02210

17
                      April 2, 2019
18                    8:30 a.m.

19

20

21

22

23                 Valerie A. O'Hara
                 Official Court Reporter
24   John Joseph Moakley United States Courthouse
            1 Courthouse Way, Room 3204
25              Boston, MA 02210
          E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

    United States Attorney's Office, by GEORGE P. VARGHESE, ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts  02110;

For the Defendant:

      Federal Public Defender Office, by SCOTT LAUER, ESQ., and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor, Boston, Massachusetts 02210.

ALSO PRESENT:

Augustin Mutemberezi, Interpreter
Moses B. Rndasunikwa, Interpreter

1                         I N D E X

2  WITNESS                    DIRECT   CROSS   REDIRECT  RECROSS

3  STANISLAS KURAZIKUBONE
      By Mr. Lauer              7
4     By Mr. Varghese                   12

5  ERIC NSHIMIYE
      By Mr. Lauer             14              50
6     By Mr. Varghese                   26

7

8

9                        EXHIBITS

10                    None marked.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2      THE CLERK:  All rise.  Thank you.  You may be seated.

3  Court is now back in session.

4      THE COURT:  All right.  Good morning.

5      MR. GARLAND:  Good morning.

6      THE COURT:  I have finally the draft verdict form for

7  your review.  What otherwise do we have to talk about?

8  Anything from the government?

9      MR. GARLAND:  Your Honor, we'll deal with instructions

08:37AM 10  after testimony today.

11      THE COURT:  Yes.

12      MR. GARLAND:  And I think that Mr. Varghese has a

13  couple of issues.

14      MR. VARGHESE:  Your Honor, two minor ones.  We're

15  preparing our closing arguments, and I just had two questions.

16  The first one was if it was okay to have a TV available.

17      THE COURT:  Yes.

18      MR. VARGHESE:  And then the second question was we

19  were planning on showing some excerpts from transcripts,

08:37AM 20  whether or not that was okay with the Court as well.

21      THE COURT:  As long as you make clear it's the jurors'

22  memory that controls, so to speak, in other words, this is not

23  an official transcript, it may be an official transcript, but

24  I'm not going to call it that.

25      MR. VARGHESE:  Yes, your Honor.

# J.A. 1600

1          MR. LAUER:  Along those same lines, your Honor, we

2     discussed some time ago due to the amount of witnesses the jury

3     has heard from, in closing argument possibly when discussing

4     their testimony, having a photograph of them to display, like a

5     photograph of the witness?

6          THE COURT:  As long as the government agrees that's

7     the person.  I mean, I'll consider that to be like a chalk,

8     right?

9          MR. VARGHESE:  Yeah, we were planning on doing the

08:38AM 10    same thing, your Honor.

11          THE COURT:  And as I told you, I think, for your

12    closings, I permit you to -- you'll have a written copy of the

13    final charge, and you'll be permitted to quote from that, in

14    other words, to say I expect Judge Saylor will instruct you X,

15    and so if you want to use the charge to frame any part of your

16    argument, you can do that.

17          I mean, obviously, I don't want you to take over my

18    role, but this idea that you can't mention the law at all seems

19    to me to be a little preposterous, especially if you know

08:38AM 20    exactly how I'm going to charge the jury.

21          All right.  We're still looking at Thursday morning

22    for that, again, depending on whether the defendant takes the

23    stand.

24          MR. LAUER:  I think that's the only thing that would

25    stand in the way unless the government has a rebuttal case.

# J.A. 1601

1          THE COURT:  Okay.  How long do you expect we'll go
2    today, ballpark?
3          MR. LAUER:  Two hours maybe.
4          THE COURT:  Two hours.  Okay.  Then video tomorrow,
5    and then you said one other witness after the videos?
6          MR. LAUER:  Two witnesses via video.  We do have our
7    investigator in Burundi, and we do expect the witnesses to be
8    there, so that looks good.  We do have one other witness who is
9    here in Boston or who has arrived yesterday or is arriving
08:39AM 10   today, and we may or may not elect to present that witness.  If
11   we did, it would be tomorrow.
12         THE COURT:  Okay.
13         MR. VARGHESE:  And, your Honor, just for the record,
14   the government is objecting to one of the Burundian witnesses
15   is irrelevant.
16         THE COURT:  Are these the video people?
17         MR. VARGHESE:  Yes, one of the video people, which we
18   mentioned to counsel.
19         THE COURT:  All right.  Unless someone points me to
08:40AM 20   law indicating I'm doing it improperly, my intention is to have
21   Ms. Pezzarossi administer the oath by video to the people in
22   Burundi and to have the interpretation be here in court with
23   our interpreters who are sworn here just because I don't know
24   who's administering the oath or what ability they have to do
25   that in Burundi.  It's probably a silly detail, but I want to

```
 1    control what I can control.
 2                MR. VARGHESE:  We don't know another way to do that,
 3    your Honor.
 4                MR. LAUER:  No objection to that.
 5                THE COURT:  Okay.  Anything else?
 6                MR. GARLAND:  No, not from the government.
 7                MR. LAUER:  No, your Honor.
 8                THE COURT:  All right.
 9                THE CLERK:  All rise.
08:49AM 10          (A recess was taken.)
11                THE CLERK:  All rise for the jury.
12                (JURORS ENTERED THE COURTROOM.)
13                THE CLERK:  Thank you.  You may be seated.  Court is
14    now back in session.
15                THE COURT:  Good morning, everyone.  Mr. Lauer, are
16    you ready?
17                MR. LAUER:  Yes, your Honor, the defense calls
18    Stanislas Kurazikubone.
19                STANISLAS KURAZIKUBONE, having been duly sworn by the
09:01AM 20    Clerk, testified as follows:
21                      DIRECT EXAMINATION
22    BY MR. LAUER:
23    Q.   Good morning.
24    A.   Good morning.
25    Q.   What is your name, sir?
```

J.A. 1603

```
 1   A.    My name is Stanislas Kurazikubone.

 2   Q.    Does your name appear correctly on the screen in front of

 3   you?

 4   A.    Yes, sir.

 5   Q.    Where do you live?

 6   A.    I live in Vienna, Austria.

 7   Q.    How long have you lived in Vienna?

 8   A.    I've been living there for 25 years now.

 9   Q.    What do you do for work?

09:02AM 10   A.    I work with Mozart Museum as a custodian.

11   Q.    At the Mozart, would that be the Wolfgang Amade' Mozart

12   Museum?

13   A.    Exactly, sir.

14   Q.    And you are a custodian there?

15   A.    Yes, sir.

16   Q.    Where were you born?

17   A.    I was born in Gakenke (ph), Ruhengeri, Rwanda.

18   Q.    Did you attend school in Rwanda?

19   A.    I attended primary and secondary school and even

09:03AM 20   university in Rwanda.

21   Q.    When you attended university, what did you study?

22   A.    I studied English and American literature.

23   Q.    Do you have a bachelor's degree?

24   A.    I do.

25   Q.    Do you also have a master's degree?
```

1  A.  I do.

2  Q.  Are those both in literature?

3  A.  In British and American literature, yes.

4  Q.  Directing your attention to the time period of

5  approximately 1985, were you working?

6  A.  I was working as a teacher of English at the seminary of

7  Nyundo in the west of the country.

8  Q.  What did you teach at Nyundo?

9  A.  I taught English.

09:03AM 10  Q.  Did you teach Mr. Teganya?

11  A.  Yes, sir.

12  Q.  For how long did you teach Mr. Teganya?

13  A.  For two academic years.

14  Q.  What kind of student was Mr. Teganya?

15  A.  I remember him as a quiet, very attentive student.  He was

16  doing Latin and science, and in that orientation, students were

17  not necessarily interested in learning languages.  Their major

18  was science, but he was one of the students who were bright and

19  very attentive, that's why I remember him still today.

09:04AM 20  Q.  In Nyundo at that time, how were students graded?

21  A.  Students were graded according to academic performance and

22  also according to their personal conduct, but the personal

23  conduct was the most important thing, so if any student failed

24  in personal conduct, he was dismissed from the school.

25  Q.  Why was behavior so important?

J.A. 1605

1    A.   It was a Roman Catholic school, and it was very important

2    for us teachers and educators to get them to behave correctly

3    because they were the future of the country, so we were

4    preparing them to become priests and really just leaders.

5    Q.   The atmosphere at Nyundo, what was the role of ethnicity?

6    A.   Excuse me, sir.

7    Q.   Were there both Hutu and Tutsi students at Nyundo?

8    A.   Yes, sir.

9    Q.   Was there tension or conflict between Hutu and Tutsi

09:06AM 10   students?

11   A.   None that I know.

12   Q.   What about in the staff or the faculty, were there Hutu

13   and Tutsi faculty?

14   A.   So when I came to Nyundo, there were major changes in the

15   faculty.  Before I arrived, the faculty was almost, I mean,

16   composed of Tutsis exclusively plus some ex-patriots, and there

17   were no Hutus in there, so when I arrived, they had appointed a

18   new Hutu rector, and he came there with another two Hutu

19   colleagues who were the first three Hutu teachers in the whole

09:07AM 20   history of the seminary.

21   Q.   And what year did you come to teach at Nyundo?

22   A.   I taught English.  My other colleagues taught French and

23   history.

24   Q.   What year did you begin teaching there?  What year?

25   A.   We started teaching there 1985.

J.A. 1606

1    Q.    Was it difficult being one of the first Hutu teachers at
2    Nyundo?  I should ask you first, are you yourself Hutu?
3    A.    I'm Hutu, sir.
4    Q.    Was it difficult being one of the first Hutu teachers at
5    Nyundo?
6              MR. VARGHESE:  Objection, your Honor.  Relevance.
7              THE COURT:  Sustained.
8    A.    It was very difficult --
9    Q.    I'll ask a new question.  How long did you teach at Nyundo
09:08AM 10   in total, for how many years?
11   A.    Two academic years, sir.
12   Q.    And what happened at the end of those two years?
13   A.    At the end of those two years, I resigned because I had
14   been treated badly by one of my colleagues, a Tutsi lady called
15   Rose Macomgishen (ph).
16   Q.    Where did you go after you resigned?
17   A.    I went back to university to do my postgraduate studies.
18   Q.    And did you complete those postgraduate studies?
19   A.    Yes, I did.
09:08AM 20   Q.    Was the last year you were at Nyundo 1987?
21   A.    Yes, sir.
22   Q.    And Mr. Teganya -- how many students did you teach in
23   total?
24   A.    Well, I can't remember the figure, but let's say each
25   class counted approximately 25 to 30 students.

J.A. 1607

1    Q.   We are now 30 years from when you taught Mr. Teganya.  Why

2    do you remember him?

3    A.   I remember him as a brilliant student.  I said earlier

4    that in the orientation where he was, language and sciences.

5    Students were not interested in languages, but he was, that's

6    why I remember him.

7         MR. LAUER:  Thank you.  No further questions.

8         THE COURT:  Cross.

9                    CROSS-EXAMINATION

10   BY MR. VARGHESE:

11   Q.   Good morning, sir.  How are you?

12   A.   Good morning, sir.  I'm okay.  You?

13   Q.   Pretty good.

14   A.   Great.

15   Q.   So you were there from '85 to '87; is that right?

16   A.   Say it again, please.

17   Q.   You were at that school from 1985 to 1987; is that

18   correct?

19   A.   Yes, sir.

09:10AM 20   Q.   So you don't know what happened to the school after 1987;

21   is that correct?

22   A.   I don't.

23   Q.   And the rector who took over, Father Edouard Ntuliye, he

24   changed the atmosphere of the school; isn't that correct?

25   A.   I don't know.

1    Q.   Well, you testified that there were major changes that he

2    undertook; isn't that correct?

3    A.   He was a new rector.

4    Q.   And he brought in Hutus, isn't that correct?

5    A.   He was a Hutu, yes.

6    Q.   And he brought in Hutus to the school; isn't that correct?

7    A.   He was not the one who chose the students, the students

8    were...

9    Q.   That wasn't my question.

09:10AM 10   A.   Yes.

11   Q.   You said, you testified on direct that he brought in some

12   Hutu teachers; isn't that correct?

13   A.   He was not the one who chose the teachers.

14   Q.   Okay.  But you have no idea what happened to that school

15   in the seven years after you left leading up to the genocide;

16   isn't that correct?

17   A.   I don't.

18   Q.   And you have no idea what happened to Mr. Teganya in the

19   seven years after you left leading up to the genocide; isn't

09:11AM 20   that correct?

21   A.   I was not there, I don't.

22   Q.   Right.  And you have no idea what Mr. Teganya was doing

23   during the genocide; isn't that correct?

24   A.   I don't.

25            MR. VARGHESE:   Thank you.

**J.A. 1609**

1          MR. LAUER:  No redirect.

2          THE COURT:  All right.  Thank you.

3          MR. LAUER:  The defense calls Eric Nshimiye.

4          ERIC NSHIMIYE, having been duly sworn by the Clerk,

5     testified as follows:

6                        DIRECT EXAMINATION

7     BY MR. LAUER:

8     Q.   Good morning, sir.

9     A.   Good morning.

09:14AM 10    Q.   What is your name?

11    A.   Eric Nshimiye.

12    Q.   Is your name correctly spelled on the monitor in front of

13    you?

14    A.   Yes.

15    Q.   Is that a shortened form of your name?

16    A.   Yes.

17    Q.   What is the longer form of your name?

18    A.   Nshimiyimana.

19    Q.   When did you shorten your name?

09:14AM 20    A.   When I became a U.S. citizen.

21    Q.   And when was that?

22    A.   It was probably 2003, if I recall well.

23    Q.   I take it your --

24         THE COURT:  Can you speak up just a little bit.

25    A.   It was in 2003.

# J.A. 1610

1          THE COURT:  Thank you.

2     Q.   Where do you live?

3     A.   I live in Uniontown, Ohio.

4     Q.   Uniontown, Ohio?

5     A.   Yes.

6     Q.   How long have you lived in the United States?

7     A.   Since December of 1995.

8     Q.   Where were you born?

9     A.   In Rwanda.

09:15AM 10    Q.   Where in Rwanda?

11    A.   Ruhengeri.

12    Q.   Do you know Mr. Teganya?

13    A.   Yes.

14    Q.   When did you first meet him?

15    A.   In 1991.

16    Q.   And what were the circumstances that you met him?

17    A.   We met at an exam, it was a national exam where we had

18    to -- they picked the top ten students in each school that were

19    like the best, and then they give us an exam, and if you pass

09:15AM 20    that exam, you have a chance to go to study in Europe and the

21    United States, so that's where we met the first time.

22    Q.   Where was the exam taking place?

23    A.   It was in Kigali, in Berera Butero.

24    Q.   Had you traveled to Kigali to take that exam?  Did you

25    take that exam in Kigali?

1   A.   Yes.

2   Q.   And was Mr. Teganya also taking that exam?

3   A.   Yes.

4   Q.   Following taking that exam, did you subsequently see him

5   again?

6   A.   Not until we met in Butare, I'd say in National University

7   of Butare, so that was in September of '91, that's where we met

8   again.

9   Q.   Did you enter the university in Butare in September of

09:16AM 10   1991?

11   A.   Yeah.

12   Q.   What were you studying?

13   A.   Premedical school.

14   Q.   And was Mr. Teganya also studying medical school?

15   A.   Correct.

16   Q.   Did you form a relationship with him?

17   A.   Yeah, we had met before, during that national exam, we had

18   known each other since that time, so when we met again, we

19   reconnected our acquaintances.

09:17AM 20   Q.   In 1991, your first year at the university, where were you

21   living?

22   A.   I was living in a building called Linda, that's where I

23   was living.

24   Q.   Is that a dormitory-type building?

25   A.   Yes.

J.A. 1612

         1    Q.    Was Mr. Teganya also living there?

         2    A.    Yeah, he was living in the same building.

         3    Q.    Did you come to be friendly with him?

         4    A.    Yes.  He was in my -- we were studying the same major, so

         5    we had met in several classes.

         6    Q.    The second year in 1992 and 1993, did you continue on in

         7    the medical school?

         8    A.    Yes.

         9    Q.    Where were you living at that time?

09:17AM 10    A.    The second year, we decided to move off campus, and then

        11    we rented a space to live off campus.

        12    Q.    You said we decided to move off campus.  Who did you move

        13    off campus with?

        14    A.    It was myself, Mr. Teganya, and Michele Haviti (ph),

        15    Patrick Ndimubanzi, Eric Ndimubanzi, Yves Utazirubanda,

        16    Oliviere Hunsimana.

        17    Q.    Were all of those students in the university?

        18    A.    Yes.

        19    Q.    And the place that you moved, where was it?

09:18AM 20    A.    Actually, I don't recall the name of the owner, the

        21    landlord, but it was not too far from the campus.  It was a new

        22    building that was meant to be like several floors, but it was

        23    still being built, like it had like the first floor finished,

        24    so it was a nice new space, and that's where we lived.

        25    Q.    Why did you want to live off campus?

1    A.   We didn't like the food that was being fed on the campus.

2    They ate almost the same food every day, and also when you live

3    off campus, they give you more money because, you know, they

4    knew you had to rent your own space, so they give you basically

5    double the money that the students living on the campus were

6    getting, so we could pay our own cook and eat whatever we want,

7    and also if you manage your money well, you could save a little

8    bit.

9    Q.   You mentioned that you hired a cook?

09:19AM 10   A.   Yes.

11   Q.   Who was that person?  Do you remember?

12   A.   I don't recall his name.

13   Q.   What did that person do within your residence?

14   A.   He basically went shopping.  We told him what we wanted

15   him to buy, he would go buy it, prepare the food, and did a

16   great job feeding us well.

17   Q.   How many -- within this residence, did you share a room?

18   A.   Yeah, I shared a room with Mr. Teganya.  It was a room

19   large enough that you could share with another person.

09:20AM 20   Q.   So how long did you share that room with Mr. Teganya?

21   A.   Until we fled the country basically.

22   Q.   So would that be in 1992, 1993 and 1994?

23   A.   Yeah, part of '94 because we fled in the middle of the

24   year, you know, we did not finish that year.

25   Q.   During the time that you were living with him, was he a

**J.A. 1614**

1    friend?

2    A.    Yeah, I could say he was a friend.

3    Q.    How often would you see him?

4    A.    We went to classes.  You know, again, we were attending

5    the same major, and we studied together, so we spent most of

6    the time studying because medical school, it was very, very

7    difficult.

8         Sometimes we would go to the exam without finishing

9    the material, so as a group, we strategized to share the

09:21AM 10   material, so one person will study like a chapter, and they

11   will master it very well, and they will come to you, you know,

12   that chapter, so with our strategy, we did very well.  We were

13   very successful.

14   Q.    How often did you study with Mr. Teganya?

15   A.    Almost every day.  We had a lot of material to study, and

16   we spent most of our time studying, you know.

17   Q.    What was your schedule throughout the day?  Can you walk

18   us through what a typical day of classes would consist of?

19   A.    So, in the morning, we would eat breakfasts, and then we

09:22AM 20   would go to school.  It would be like initially courses were

21   offered throughout the campus.  You know, it was not just in

22   the same building, so we would go in one building, go to

23   another.  After that, we come back to take, to eat lunch, and

24   then we would take a nap.

25         I remember I like to take a nap because it was just so

much material, you know, just to rest my head, then we would go

back to school, and then in the evening, we would go to eat

dinner, and we would go back to studying until we went to bed.

Q.    Where would you study?

A.    Most of the time, we went back to the faculty of medicine,

they had study rooms and library, that's where we studied.

Q.    Did you study on Tuesday and Friday evenings?

A.    Of course, we studied every day.

Q.    Do you recall Mr. Teganya ever excusing himself on a

09:23AM Tuesday or Friday evening to go to some sort of training?

A.    What kind of training are you talking about?

Q.    Did Mr. Teganya ever leave to go anywhere on Tuesday and

Fridays as far as you know?

A.    Not that I recall.  I remember that we studied every day

trying to catch up with the material.  You cannot believe how

hard it was to finish a course like anatomy and physiology and

to be able to go to the exam having read every single chapter,

so it was very hard, so that's what we spent most of the time

doing.

09:24AM Q.    During this time period that you were at the university in

Butare, were there a number of political parties that were

active?

A.    Yeah, during that time, it was, yeah, the political

parties were starting to be created during that time.

Q.    I'm going to approach and show you a couple of items, just

1   ask if you recognize them.  First, I'm showing you a hat marked

2   Exhibit 12.  I ask you to look at that and tell me if you

3   recognize that style of hat.

4   A.   I don't remember this type of hat.

5   Q.   I'm also going to show you another item that's been marked

6   Exhibit 15.  It's a scarf.  Do you recognize what this is?

7   A.   No.

8   Q.   Were you yourself a member of a political party as a

9   university student?

09:25AM 10   A.   Never.

11   Q.   Did you ever see a hat like that being worn by

12   Mr. Teganya?

13   A.   No.

14   Q.   Did you ever see a scarf like that being worn by

15   Mr. Teganya?

16   A.   No.

17   Q.   Did Mr. Teganya have a hat or a scarf like that in the

18   room that you shared?

19   A.   No.

09:26AM 20   Q.   Did Mr. Teganya have any sort of flag displayed in his

21   room?

22   A.   No.

23   Q.   To the best of your knowledge, did Mr. Teganya go to any

24   political meetings or rallies?

25   A.   Not that I know of.

        1    Q.    In your last year at the university, would that have been

        2    1993 and 1994?

        3    A.    Yes.

        4    Q.    During that time, what was that year of medical school

        5    referred to as?

        6    A.    It was -- so the first two years was premedical studies,

        7    and then at the end of those two years, we were supposed to

        8    have like a bachelor degree, and then you go -- then the third

        9    year, you start to take a clinical course studies, so it was

09:27AM 10   like the beginning of medical school.

       11    Q.    And did you pass and reach that clinical stage in your

       12    third year?

       13    A.    Yes.

       14    Q.    In that third year, what did it mean to do clinical work?

       15    A.    You were studying to take what they call like pathological

       16    courses, instead of taking like a human anatomy or human

       17    physiology, you would take like anatomy/pathology, so like

       18    anatomy of somebody who is sick or the physiology of somebody

       19    who is sick, so you would take those courses, and then you get

09:27AM 20   a chance to go to the hospital and to witness the doctor doing

       21    surgery or delivering babies, so, at that stage, you were

       22    allowed to do that.

       23    Q.    In your third year, did you visit the hospital from time

       24    to time?

       25    A.    Yes.

1    Q.    And what was the purpose of that?

2    A.    Just to witness, you know, things, to see how they handle

3    patients, how they do the conduct, the diagnoses of a disease,

4    or, you know, or deliver a baby or do surgeries, those type of

5    things.

6    Q.    Did medical students wear doctor's coats?

7    A.    Yes.

8    Q.    Did those doctor's coats identify students as such, in

9    other words, did it say student or intern on the coat?

09:28AM 10    A.    Not that I remember.  It was just a white coat.

11    Q.    Were you permitted to have any role in treating patients

12    as a third-year medical student?

13    A.    I don't think so, you were just allowed to see what's

14    going on and to ask questions.

15    Q.    To ask questions of who?

16    A.    The doctor that was performing something, you could ask

17    what are you doing there, or they would just, say, go ahead and

18    explain to you what's happening, you know, referring maybe to

19    if it's a surgeon who will say, hey, we are doing this, so if

09:29AM 20    you're not clear, you know, you ask what's going on, what are

21    you going to do, and why you are doing certain things.

22    Q.    Did you have a direct contact with patients as a medical

23    student at that time?

24    A.    You could go and ask how you are doing, you could ask,

25    again, the first year of medical school, you're just an

 1  observer, you're not supposed to touch.  Maybe somebody who is

 2  in the second year or third year, they would start doing,

 3  performing things on patients, but the first year, you are

 4  mainly an observer.

 5          THE COURT:  Can I get you to back away from the

 6  microphone.  It's very sensitive.

 7          THE WITNESS:  Sorry.

 8  Q.   I want to direct your attention to the time of the

 9  genocide in April of 1994.  Were you on campus when the

09:30AM 10  president's plane was shot down?

11  A.   No.

12  Q.   Where were you?

13  A.   I was in Kigali.

14  Q.   And why were you in Kigali at that time?

15  A.   I was on my way to go to Butare because we were in the

16  two-week break.  I had to spend one week at home, and I want to

17  go back home to Butare to catch up on studies.

18  Q.   Were you able to go back to Butare after the president's

19  plane was shot down?

09:30AM 20  A.   No.

21  Q.   Did you spend any time in Butare during the genocide?

22  A.   No.

23  Q.   Where did you go?

24  A.   So I was able to spend a couple of days in Kigali, and

25  then that's when the fighting started, then I was able to get

1    out as soon as possible to go back to Ruhengeri.

2    Q.    And was Ruhengeri your home?

3    A.    Yes.

4    Q.    Did you stay in Ruhengeri until the genocide was over?

5    A.    I stayed in Ruhengeri until Kigali was captured, and then,

6    you know, there were a lot of violence being reported, and then

7    we felt like maybe it was safer to flee the country.

8    Q.    Where did you flee to?

9    A.    To the DRC, Congo.

09:31AM 10    Q.    Did you live in a refugee camp?

11    A.    Yes.

12    Q.    For how long?

13    A.    For a couple months.

14    Q.    And where did you go after a couple months?

15    A.    I went to Kenya.

16    Q.    And how did you come to the United States?

17    A.    My uncle sent us, filled out the affidavit of

18    relationship, and then with that, we went to an agency, a

19    refugee agency called JVA, and they manage all of the refugees

09:32AM 20    sent to the U.S., so we sent out the affidavit, and we ask them

21    if they can interview us to allow us to join our uncle in the

22    United States, so that's what we did.

23    Q.    When did you come to the United States?

24    A.    December, '95.

25    Q.    And have you lived in the United States since that time?

```
 1    A.    Yes.

 2    Q.    Where do you now work?

 3    A.    I work for the Goodyear Tire and Rubber Company.

 4    Q.    And what is your position there?

 5    A.    I'm a principal engineer in the engineering department.

 6          MR. LAUER:  Thank you very much, sir.  No further

 7    questions.

 8          THE COURT:  Cross.

 9                    CROSS-EXAMINATION

10    BY MR. VARGHESE:

11    Q.    Good morning, sir.

12    A.    Good morning.

13    Q.    So Mr. Nshimiye; is that right?

14    A.    Yes.

15    Q.    You currently reside in Ohio?

16    A.    Yes.

17    Q.    And as you just testified, you were accepted as a refugee

18    to the United States?

19    A.    Yes.

20    Q.    And you are a Hutu, correct?

21    A.    Yes.

22    Q.    Now, you started medical school in 1999 with Mr. Teganya,

23    correct?

24    A.    No.

25    Q.    Oh, no.  When did you start?
```

J.A. 1622

```
 1   A.   1991.

 2   Q.   Oh, I apologize, that was my fault.  1991?

 3   A.   Yes.

 4   Q.   And you testified that you were friends with him, right?

 5   A.   Yes.

 6   Q.   And that first year you lived in the Linda dorm, correct?

 7   A.   Yes.

 8   Q.   And he lived in Room 202 of the Linda dorm; isn't that

 9   right?

10   A.   I don't recall the number.

11   Q.   But you weren't his roommate that first year?

12   A.   No.

13   Q.   Do you know who was his roommate?

14   A.   I don't remember.

15   Q.   But you were in that same dorm, right?

16   A.   The same building block, yes.

17   Q.   And then the next year, you ended up living together off

18   campus; that's your testimony?

19   A.   Yes.

20   Q.   And not only were you living together, you actually shared

21   a room together?

22   A.   Yes.

23   Q.   And you two were good friends?

24   A.   Yeah, we were friends.

25   Q.   You hung out together?
```

09:34AM (line 10)
09:34AM (line 20)

         1    A.    Yes.

         2    Q.    You ate together?

         3    A.    Yes.

         4    Q.    You studied together?

         5    A.    Yes.

         6    Q.    You had a close friendship; is that right?

         7    A.    Yeah, we were friends.

         8    Q.    Well, you've actually called it a close friendship; isn't

         9    that correct?

09:35AM 10    A.    It's okay, yeah.

        11    Q.    In fact, when you walked into this courtroom today, you

        12    waved at him when you sat down; is that right?

        13    A.    What did you say again?  Sorry.

        14    Q.    I said when you walked into this courtroom, you actually

        15    waved at Mr. Teganya when you sat down?

        16    A.    Yes.

        17    Q.    So you had three years together in Rwanda at the

        18    university; isn't that right?

        19    A.    Yes.

09:35AM 20    Q.    And then you reconnected with him when he ended up in

        21    Canada; isn't that right?

        22    A.    Yes.

        23    Q.    Had you seen him in the Congo at the refugee camps?

        24    A.    No.

        25    Q.    So how did you get in touch with him again in Canada?

         1    A.    I don't recall, but I heard that -- I heard that, you

         2    know, he was in Canada, so I don't recall exactly how I got his

         3    number, but we were about to connect, reconnect.

         4    Q.    And you called him up?

         5    A.    Yeah, yeah, sometimes.

         6    Q.    And you talked to him frequently, right?

         7    A.    I shouldn't say frequently, I was a very busy man, but

         8    every once in a while.  I don't recall how frequently we spoke.

         9    Q.    Did you ever go up and visit him?

09:36AM 10    A.    No.

        11    Q.    Did you follow his asylum claim in Canada?

        12    A.    In the newspaper mainly.

        13    Q.    You never talked to him about it?

        14    A.    I believe occasionally we would talk about it, but I don't

        15    recall how many times.  It was mainly through the newspapers.

        16    Q.    And you knew that he was denied asylum in Canada; isn't

        17    that right?

        18    A.    Yeah, yeah.

        19    Q.    You talked about it with him, correct?

09:36AM 20    A.    Yes.

        21    Q.    And when you found out that he was denied his asylum in

        22    Canada, did you talk to him about what he was going to do next?

        23    A.    No.

        24    Q.    You didn't?

        25    A.    No.

```
 1    Q.   Did he tell that he was going to try to enter the
 2    United States illegally?
 3    A.   No.
 4    Q.   So you didn't know that he was going to try to cross the
 5    border?
 6    A.   No.
 7    Q.   So how did you hear that he was in the United States?
 8    A.   Through the -- I mean, the newspapers.
 9    Q.   Through the newspapers?
10    A.   Yeah, mainly through the newspapers.
11    Q.   What newspaper?
12    A.   I don't recall.  If you Google his name, you see his name
13    all over the place.
14    Q.   When he crossed into the United States, did he contact
15    you?
16    A.   No.
17    Q.   He didn't contact you?
18    A.   No.
19    Q.   What about his lawyers, did his lawyers contact you?
20    A.   His lawyer did not contact me.
21    Q.   One month after he crossed into the United States, you
22    wrote him a letter of support; is that right?
23    A.   Yes.
24    Q.   How did you end up writing him a letter of support?
25    A.   His uncle, you know, asked me if I could write something,
```

1    you know, to testify to his -- to how I know him.

2    Q.    His family member called you?

3    A.    Yes.

4    Q.    Which uncle?

5    A.    Greg.

6    Q.    Greg Myer in North Carolina?

7    A.    Yes.

8    Q.    So he asked you to help out Mr. Teganya; is that right?

9    A.    To write how I know him, about how I know him.

09:38AM 10    Q.    And you obliged, you did that; isn't that right?

11    A.    Yes.

12    Q.    You wrote a letter on his behalf to help him get asylum in

13    the United States; isn't that correct?

14    A.    It was to write to testify to how I know him.

15    Q.    And that was a letter you wrote on September 9th of 2004,

16    a little over a month after he illegally crossed into the

17    United States; isn't that correct?

18          THE COURT:  2004?

19          MR. VARGHESE:  2004.

09:39AM 20    Q.    I'm sorry, 2014.

21    A.    That's not right.

22    Q.    2014, your Honor, I apologize.

23    A.    I believe he came into the United States in 2017.  Maybe I

24    may be wrong, but in 2014, that's when he came to the U.S.

25    Q.    Do you not recall the date of your letter?

        1    A.   I don't recall.

        2         MR. VARGHESE:  Your Honor, may I approach?

        3         THE COURT:  Yes.

        4    A.   Okay, yeah.

        5    Q.   That's the letter you wrote on his behalf?

        6    A.   Yeah, I didn't recall the date.

        7    Q.   And the date on that letter is September 9th, 2014, right,

        8    and you said his uncle called you to write that letter?

        9    A.   Yes.

09:40AM 10   Q.   And in that letter, you talked about your close

        11   relationship with Mr. Teganya; isn't that right?

        12   A.   Yes.

        13   Q.   You talked about how you met him in Kigali at that high

        14   school competition, right?

        15   A.   Yes.

        16   Q.   And how you earned a scholarship to the University of

        17   Rwanda in Butare, correct?

        18   A.   Yes.

        19   Q.   Both of you did?

09:40AM 20   A.   Yes.

        21   Q.   It was hard to get into the University of Rwanda, right?

        22   A.   I don't know.  I got in.

        23   Q.   And you were a good student?

        24   A.   Yes.

        25   Q.   I think you said you were one of the top 10 percent in the

1    country; is that right?

2    A.    Not in the country, in each school.  They would select the

3    best students, and then they would invite you to go take an

4    exam.

5    Q.    And that was the exam that you took with Mr. Teganya; is

6    that right?

7    A.    Yes.

8    Q.    And then the two of you ended up at the University of

9    Rwanda in Butare?

09:40AM 10    A.    Yes.

11    Q.    And in the end of your letter, you said that bad things

12    happen to good people, and that is really true in the case of

13    Jean Leonard Teganya concerning what has been happening to him

14    ever since he got to Canada until today?

15    A.    Yes.

16    Q.    That's how you ended your letter; isn't that right?

17    A.    Yes.

18    Q.    What was the bad thing that was happening to him?

19          MR. LAUER:  Objection.

09:41AM 20          THE COURT:  Well, overruled.

21    Q.    What was the bad thing that was happening that you

22    referenced in your letter?

23    A.    Okay.  So when I read to what was being said to him in the

24    newspapers, okay, and how he was being described, so I felt

25    inside my heart that this is not the man I know, okay, so that

J.A. 1629

1   was the reason.

2   Q.   And so you thought that he was being unfairly accused; is

3   that right?

4   A.   Yeah, the way he was being described is not the man that I

5   know.

6   Q.   And that's why you wrote the letter on his behalf; is that

7   right?

8   A.   Yes.

9   Q.   And that's why you're testifying here today; is that

09:42AM 10   right?

11   A.   Yes, yes, to speak to the truth about what I know about

12   him.  I read a lot of reports in the media.  I said that

13   they're describing the wrong person.  This is not the person

14   that I know.

15   Q.   But you would agree with me, wouldn't you, lying on an

16   asylum form or a refugee form, that's wrong, right?

17   A.   Yeah, that's wrong.

18   Q.   You shouldn't do that?

19   A.   Yeah.

09:42AM 20   Q.   Let's talk a little bit about your background.  Your full

21   name is Eric Nshimiyimana?

22   A.   Yes.

23   Q.   I apologize, Nshimiyimana?

24   A.   Yes.

25   Q.   And your birth date is November 1st, 1971; is that

J.A. 1630

          1    correct?

          2    A.    Yes.

          3    Q.    You grew up in Ruhengeri?

          4    A.    Yes.

          5    Q.    Your father is Ezechiel Ntibarwiga?

          6    A.    Yes.

          7    Q.    Your mother, her name is Madeleine Masyaliro?

          8    A.    Mabyaliro, yes.

          9    Q.    And you have seven siblings, correct?

09:43AM   10    A.    Yes.

         11    Q.    Four brothers, three sisters?

         12    A.    Yes.

         13    Q.    And all your siblings, you altogether share the same

         14    parents, right?

         15    A.    My father had several wives, okay, so he had several

         16    children, okay, so it depends on what you call, you know,

         17    siblings.  It's like you shared the same mother or, you know,

         18    same father.  My dad had a lot of children.  Some of them I

         19    don't even know.

09:43AM   20    Q.    Your dad was a Hutu, correct?

         21    A.    Yes.

         22    Q.    One of your older brothers actually served in the

         23    government of President Habyarimana; is that correct?

         24    A.    He was, yeah, he was like a director in the ministry, yes.

         25    Q.    And what ministry was that?

```
 1    A.    Commerce.

 2    Q.    And isn't it true that one of your uncles was in

 3    President Habyarimana's cabinet; isn't that correct?

 4    A.    No.

 5    Q.    Did you have a relative on the plane with

 6    President Habyarimana?

 7    A.    No, no.  Hell, no.

 8    Q.    And you started your secondary school at

 9    Petit Seminaire Rwesero; is that correct?

09:44AM 10   A.    Yes.

11    Q.    And then you transferred to the Lycee de Kigali, correct?

12    A.    Yes.

13    Q.    When did you start at the Lycee de Kigali?

14    A.    1990.

15    Q.    I'm sorry.

16    A.    I believe in 1990.

17    Q.    And that's the high school or secondary school that you

18    graduated from, correct?

19    A.    Yes.

09:45AM 20   Q.    And then from there, you went on to the National

21    University with Mr. Teganya?

22    A.    Correct.

23    Q.    And your testimony was that during the genocide, you were

24    in Kigali; is that correct?

25    A.    Yes.
```

J.A. 1632

1    Q.   And what were you doing in Kigali?

2    A.   I was about to go to Butare, I was on my way to go to

3    Butare.

4    Q.   And were you with your family?

5    A.   Yeah, I was with my brother, one of my brothers.

6    Q.   Were you hiding?

7    A.   Hiding?

8    Q.   Were you hiding?

9    A.   What do you mean, hiding?

09:45AM 10    Q.   Were you walking around openly or were you hiding?

11    A.   No, I was with my brother.

12    Q.   You travelled around freely; isn't that right?

13    A.   No, I was visiting with my brother and waiting to catch a

14    bus to go to Butare.

15    Q.   You weren't scared or threatened, right?

16    A.   In general, people were nervous because the country was in

17    turmoil.

18    Q.   But you weren't being targeted by Interahamwe, right?

19    A.   Not at that time, no, I was on my way to school.

09:46AM 20    Q.   But nobody came and tried to burn down your house or

21    attack your family; isn't that right?

22    A.   What do you mean, attack my family, or, you know, I was

23    visiting with my brother.  I was waiting to go to Butare, so I

24    was at my brother's.

25    Q.   But you didn't make it back to Butare; is that right?  You

        1   actually didn't make it to Butare?

        2   A.   No, because the next morning, I was supposed to travel,

        3   that's when the airplane got shot.

        4   Q.   And so what happened, your bus got turned around?

        5   A.   No, I didn't go anywhere because I stayed with my brother.

        6   I stayed where I was.  We heard the news that the plane got

        7   shot, then we stayed where we were.

        8   Q.   Was that the brought that was in the commerce ministry

        9   with --

09:47AM 10  A.   No.

       11   Q.   A different brother?

       12   A.   Yeah, different brother.

       13   Q.   And where were your parents?

       14   A.   My mother was in Ruhengeri.  My father passed away a long

       15   time ago.

       16   Q.   Your father actually passed away before you started high

       17   school; isn't that right?

       18   A.   Yes.  I was seven years old.

       19   Q.   So following the genocide, you fled the country; is that

09:48AM 20  right?

       21   A.   Yes.

       22   Q.   And you went to Tanzania, is that right, at some point?

       23   A.   Kenya.

       24   Q.   Or Kenya, and you fled because of the approaching RPF; is

       25   that right?

```
 1   A.   There was insecurity in the country.  People were being

 2   killed left and right.  If you are going to be in the wrong

 3   place at the wrong time, you could be killed, so it was not a

 4   safe country to live in.

 5   Q.   And it was from there in Kenya that you filled out the

 6   application for asylum; is that correct?

 7   A.   Yes.

 8   Q.   Before we get there, I want to go back to Kigali High

 9   School, and I want to show you a document, if I can.

10          MR. VARGHESE:  Your Honor, may I approach?

11          THE COURT:  Yes.

12   Q.   Mr. Nshimiye, do you see what I handed you?

13   A.   Yes.

14   Q.   That's a record from Lycee de Kigali, which is the high

15   school you went to, correct?

16   A.   Yes.

17   Q.   And you see your name on that document?

18   A.   Yes.

19   Q.   And it's got your birth date, November 1st, 1971, correct?

20   A.   Yes.

21   Q.   Your ethnicity that you're a Hutu?

22   A.   Yes.

23   Q.   It lists your father's name --

24   A.   Yes.

25   Q.   -- Ezechiel Ntibarwiga -- and it indicates that he has
```

09:48AM (line 10)
09:49AM (line 20)

J.A. 1635

 1  passed away, correct?

 2  A.   Yes.

 3  Q.   It says that he's dead?

 4  A.   Yes.

 5  Q.   And then it lists your mother, correct?

 6  A.   Yes.

 7  Q.   And this was filled out in 1999, if you look all the way

 8  at the bottom, do you see that?

 9  A.   Yes.

09:49AM 10  Q.   And I think that's your picture that's sort of cut off up

11  at the top; is that right?

12  A.   Yes.

13  Q.   And on the second page, there's a certificate of records

14  that's been filled out by the deputy headmaster of Lycee de

15  Kigali, correct?

16  A.   Yes.

17  Q.   So this information that we just went over, that's

18  accurate, right?

19  A.   Yes.

09:50AM 20  Q.   You were there at Lycee de Kigali November 1st, 1971,

21  Hutu, your father had passed away, correct?

22  A.   Yes.

23  Q.   When you filled out your asylum application, you had

24  a -- you did that in Kenya; is that right?

25  A.   Yes.

**J.A. 1636**

```
 1              MR. VARGHESE:  Your Honor, may I approach?
 2              THE COURT:  Yes.
 3     Q.   Sir, did you see what I just handed you?
 4     A.   Yes.
 5     Q.   Now, this is a U.S. Department of Justice immigration
 6     naturalization service form, classification as a refugee,
 7     registration for classification as a refugee; do you see that?
 8     A.   Yes.
 9     Q.   And it lists your name, Eric Nshimiye, correct?
10     A.   Yes.
11     Q.   And it's got your birth date there, 1971, correct?
12     A.   Yes.
13     Q.   And if you look at the bottom, it says that you went to
14     Lycee de Kigali that we talked about, correct?
15     A.   Yes.
16     Q.   And it says that you went to the University of Nationale,
17     Rwanda, correct?
18     A.   Yes.
19     Q.   And if you flip the page on that second page where it says
20     biographic information, it lists your dad, Ezechiel Ntibarwiga;
21     do you see that?
22     A.   Yes.
23     Q.   And your mom as well, correct?
24     A.   Yes.
25     Q.   If you go back to the first page, could you read what the
```

1   reason was that you were applying for refugee status in the

2   United States?

3   A.   Yes, "Fled my country because I was threatened with my

4   family to be killed by the Militia Interahamwe, as they have

5   killed my father during the massacres against the minority

6   ethnic Tutsi."

7   Q.   Sir, I'm going to ask you to read it again slowly and

8   loudly.

9   A.   "I fled my country because I was threatened with my family

09:52AM 10   to be killed by the Militia Interahamwe, as they have killed my

11   father during the massacres against the minority ethnic Tutsi."

12   Q.   That's not correct, is it, sir?

13   A.   Yeah, so --

14   Q.   Before you explain, just answer my question.  That's not

15   correct, is it, sir?

16   A.   So --

17   Q.   Sir, that's not correct, is it?

18   A.   Yes, but I can explain.

19   Q.   I didn't ask.  You agree with me that's not correct,

09:52AM 20   correct?

21   A.   Yes.

22   Q.   And the reason why that's not correct because this says

23   first that you fled the country because you were threatened

24   with my family to be killed by the Militia Interahamwe, that's

25   your first sentence in there, correct?

J.A. 1638

```
 1    A.    Yes.

 2    Q.    And you wrote that; isn't that right?

 3    A.    Yes.

 4    Q.    And you just testified that the Interahamwe didn't

 5    threaten you during the genocide, did they?

 6    A.    But if you let me explain.

 7    Q.    Before you do that, just answer my question.  You just

 8    testified that the Interahamwe did not threaten you during the

 9    genocide; isn't that correct?

09:53AM 10   A.    Yes, but are you going to let me explain?

11    Q.    I will in one second, sir.

12    A.    Yes.

13    Q.    The second part of that sentence says that your father was

14    killed during the massacres against the minority ethnic Tutsis;

15    isn't that correct?

16    A.    Yes.

17    Q.    Your father wasn't killed during the massacres against the

18    ethnic minority Tutsis; isn't that correct?

19    A.    Yes, but what I called, you know, when I my died, you

09:53AM 20   know, we had like another person to take care of us.

21    Q.    Well, the father you listed in the form was

22    Ezechiel Ntibarwiga; isn't that right?

23    A.    Yes.

24    Q.    He was not killed during the genocide; isn't that right?

25    A.    No.
```

J.A. 1639

1   Q.    This statement was a lie?

2   A.    Yeah, but we had a stepfather.

3   Q.    And the statement that you were threatened by the

4   Interahamwe, that was also a lie?

5   A.    Yes.  My mother, my mother was a Tutsi, okay, so it was in

6   the context -- you know, the form, the affidavit was sent to my

7   mother, okay.  It was sent to my mother, and as her children,

8   okay, we were just, you know, she basically through an

9   interpreter, that's what she said, okay.

09:54AM 10   Q.    Well, she didn't fill out this form, you did?

11   A.    Listen, you know, so my mother -- the affidavit we did was

12   under my mother, who was a Tutsi, okay, and she was threatened.

13         In Rwanda, if you were like a mixed ethnicity, okay,

14   so if you were a Hutu in the Tutsi area, your life was at risk.

15   If you are a Hutu and you have Tutsi in your Hutu area, so my

16   mother, it was a situation of my mother, and we had --

17   Q.    With all due respect, sir --

18   A.    We can't --

19         THE COURT:  One at a time.  I'll ask the witness to

09:55AM 20   stop.  Put a question to the witness.

21   Q.    You wrote that you were threatened by the Interahamwe, and

22   that is not true, correct?

23   A.    My mother was, and I, therefore, I could.

24   Q.    But you weren't?

25   A.    By extension.

J.A. 1640

1    Q.   But you weren't, and you were a Hutu, isn't that correct,

2    because ethnicity follows the line of your father?

3    A.   Yes, yeah, but my mother, my mother -- people, some people

4    could be killed because their mother is a Tutsi.  That was the

5    context.

6    Q.   And you used this application, and you got refugee status

7    in the United States; isn't that correct?

8    A.   Yeah, because, again, if you happen to be either at the

9    wrong place at the wrong time, you could be killed.  I could be

09:56AM 10   killed because my father was a Hutu or I could be killed

11   because my mother was a Tutsi.  That was the context.

12   Q.   And the context was that you said my father was killed

13   during the massacres, you didn't say my stepfather, did you?

14   A.   Yeah, I say my father.

15   Q.   You didn't say the person that I consider to be my father

16   after my father has actually died, you didn't say that either?

17   A.   It was to stress that, hey, you could be killed under any

18   circumstances, okay.  That was the context.

19   Q.   And you didn't list anybody else as father, you listed

09:56AM 20   Ezechiel Ntibarwiga?

21   A.   Yeah.

22   Q.   And he was dead long before 1989; isn't that correct?

23   A.   Yes, so that was to make the case that it's dangerous to

24   go back, okay, you could be killed, you know, because you are

25   mixed ethnicity.  You know, if you are in the area of the Tutsi

1    and they like the Hutus, you could be killed.  If you are in

2    the area of the Hutus and they like the Tutsis, you could be

3    killed.  That was the context.

4    Q.   I appreciate that, thank you.  And with that false

5    application, you then used it to get a naturalization, a green

6    card in the United States; isn't that correct?

7    A.   That was after that when I got here after one year, yeah.

8    Q.   And to get that green card, you were asked questions about

9    whether or not you had ever lied on your visa application

09:57AM 10   process; isn't that correct?

11   A.   Yes.

12   Q.   And you said no?

13   A.   Again, I explained the context, okay.

14   Q.   Just answer the question yes or no.  You said no; isn't

15   that correct?

16   A.   It was a context of I could be killed because of coming

17   from the mixed ethnicities.

18   Q.   And then you took that further, and you ended up getting a

19   United States citizenship; isn't that correct?

09:58AM 20   A.   Yes.

21   Q.   And to get the United States citizenship, you also were

22   asked that question, you were asked that question had you ever

23   lied in an immigration form; isn't that right?

24   A.   Yes.

25   Q.   And you said no; isn't that correct?

**J.A. 1642**

1    A.    Again, in this context, I explained the context.

2    Q.    I understand the context.  But you said no; isn't that

3    correct?

4    A.    Yes.

5    Q.    And to be fair, sir, in your application, you never

6    explained what the context was, did you?

7    A.    I don't remember.

8    Q.    You didn't --

9    A.    I don't remember what I wrote.

09:58AM 10    Q.    Well, it's in front of you.  You certainly didn't write

11    anything in the description about the context, did you?

12    A.    You're talking about, you know, like citizenship

13    application, I don't remember.  I just saw this today.

14    Q.    You were also interviewed by consular officials when you

15    applied to be a refugee; isn't that correct?

16    A.    I don't remember.

17    Q.    You don't remember being asked questions about your father

18    being killed in the genocide?

19    A.    I don't remember.

09:59AM 20          MR. VARGHESE:  Your Honor, may I approach?

21          THE COURT:  Yes.

22    Q.    These are the notes of an interview that you did with the

23    U.S. consular official about your Rwanda visa.  I'm going to

24    ask you to turn to the second page.  Do you see that?  And if

25    you look at the second question that was asked you, it was:

**J.A. 1643**

```
 1    "Were you in any way personally affected by the events that
 2    took place there, in particular, were you in any way personally
 3    affected by the atrocities that took place?  Were you a victim,
 4    a witness, were you otherwise involved?"  The answer you gave
 5    was your father was killed, he was in hiding.  That wasn't
 6    correct, sir, was it?
 7    A.    Yeah, you asked me the same question already.
 8    Q.    That's not correct?
 9    A.    And I explained the context.
10:00AM 10   Q.    Earlier today or earlier in our examination, I asked you
11    if it was wrong to lie in a Visa application.  Do you remember
12    that?
13    A.    Yes.
14    Q.    You said it was.  Do you remember that?
15    A.    Yes.
16    Q.    Question 14 on that application asks you which political
17    parties you belong to on the original written application.  Do
18    you see that?
19    A.    Yes.
10:01AM 20   Q.    You listed none?
21    A.    Yes.
22    Q.    In fact, you were a member of MRND; isn't that correct?
23    A.    No.
24    Q.    You wore that hat?
25    A.    No.
```

## J.A. 1644

1    Q.   You wore that scarf?

2    A.   No.

3    Q.   You testified on direct you don't even remember it, but,

4    in fact, you wore it; isn't that correct?

5    A.   No.

6    Q.   You wore the pins as well?

7    A.   No.

8    Q.   You attended rallies and parties and meetings?

9    A.   No, never.

10:01AM 10    Q.   And you were a member of the Interahamwe?

11    A.   No.

12    Q.   You attended trainings with Mr. Teganya at the gym and in

13    the forest?

14    A.   No; hell, no.

15    Q.   And when the genocide happened, you weren't in Kigali, you

16    were in Butare?

17    A.   No.

18    Q.   You made it back to Butare, didn't you?

19    A.   No.

10:02AM 20    Q.   And you were present for the speech by

21    President Sindikubwabo?

22    A.   No; hell, no.  No.

23         MR. LAUER:  Objection.

24         THE COURT:  Hold it, basis.

25         MR. LAUER:  He's answered where he was.

**J.A. 1645**

1          THE COURT:  He can cross-examine.  Overruled.

2     Q.   I'm sorry, your testimony is you were not present for the

3     speech by President Sindikubwabo?

4     A.   No, no.

5     Q.   And then you were there at the Kiza dorm with Mr. Teganya

6     when four Tutsi students were taken out and killed?

7     A.   No, I was not in Butare.

8     Q.   And you participated in that killing of those students?

9     A.   No, I was not in Butare.

10:02AM 10     Q.   Sir, I remind you you're under oath for these answers.

11     A.   I was in Kigali, then I managed to get back to Ruhengeri.

12     Q.   So your answer is no, that you didn't participate in the

13     genocide?

14     A.   No.

15     Q.   Is there any context you'd like to add to that?

16     A.   No.

17          MR. VARGHESE:  Nothing further.

18          THE COURT:  Redirect.

19                    REDIRECT EXAMINATION

20     BY MR. LAUER:

21     Q.   Good morning again.  When did your father die, your

22     biological father?

23     A.   1970.

24     Q.   How old were you?

25     A.   I was eight -- I was seven.

```
 1   Q.   Did your mother become involved with another man?
 2   A.   No, just, you know, to have presence for the family,
 3   that's all.
 4   Q.   Did I understand that you -- there was someone you
 5   referred to as a stepfather?
 6   A.   Yeah, he was my -- he was like a grandfather, but he would
 7   come to visit us and then take care of us.
 8   Q.   Who was that person?
 9   A.   He used to live like in Kibungo, and his name was Matyazo.
10   Q.   Was he a relation to your mother?
11   A.   No, he was my -- he was a younger brother to my
12   grandfather, and then he got killed during that time, you know.
13   Q.   Was he a Hutu or a Tutsi?
14   A.   He was a Hutu.
15   Q.   Do you know why he was killed?
16   A.   You know, he got killed because he was in the wrong place
17   at the wrong time.
18   Q.   What role did he play in your life growing up?
19   A.   He would come to visit us, and, you know, spend time with
20   us and give us, you know, advice.
21   Q.   Did you consider him to be like a father?
22   A.   Yeah, I would consider him to be like a father, yes.
23   Q.   When you were filling out that immigration form, were you
24   trying to lie?
25   A.   No, no.  You know, we were trying to make the point that,
```

10:04AM 10

10:05AM 20

## J.A. 1647

1   you know, if we go back to Rwanda, we could be killed, you

2   know, we could be killed either by the Hutus or the Tutsis, you

3   know, because there are Hutus who were killed by other Hutus

4   maybe because they lived well with the Tutsis or they were

5   trying to hide them or be friendly with them the way Tutsis who

6   got killed because they were, you know, friendly with the

7   Hutus, so it was like it depends on the way you were, okay,

8   where you happened to be, so that's what I meant to be at the

9   wrong place at the wrong time, you could be killed, you know,

10  by anybody who doesn't like who you are or who you are friends

11  with, you know, so it was an uncertain situation, so in that

12  sense, it was to make the point that it's unsafe to go back to

13  Rwanda, you could be killed by either side, so, you know, we

14  lost people on both sides, okay, we lost.

15  Q.    Did you personally lose family members in the genocide?

16  A.    Yeah, like my brother, his wife is a Tutsi, the one that

17  they mentioned that he works for the government.  His wife is a

18  Tutsi, so she lost all her family members.  She's the only one

19  left in her family, so... and then on my dad's side, you know,

20  like example of that man Matyazo, all his family was wiped out.

21       They used to live in Kibungo, so that's what I

22  considered like my father, you know, so, in that context, I

23  consider, so we lost, you know, members of Tutsis in our

24  families and members of Hutu in the family, so then we had like

25  a proof that, hey, you know, that way, you know, you could be

1    killed if you happen to be in the wrong place at the wrong

2    time.

3    Q.   Thank you.

4              THE COURT:  Recross.

5              MR. VARGHESE:  No, your Honor.

6              THE COURT:  All right.  Thank you.  You may step down.

7              MR. LAUER:  Your Honor, could I be seen at sidebar?

8              THE COURT:  Yes.

9              (THE FOLLOWING OCCURRED AT SIDEBAR:)

10:08AM  10              THE COURT:  Yes.

11             MR. LAUER:  Those were the two witnesses we have

12   available today.  Before you release the jury, maybe discussing

13   scheduling with them, at this point we think it will be likely

14   that Mr. Teganya will testify, so I don't know that you will

15   necessarily want to tell them that they'll be getting the case

16   on Thursday because I think that is probably the decision that

17   he will be making.

18             THE COURT:  Okay.  All right.

19             (SIDEBAR CONFERENCE WAS CONCLUDED)

10:09AM  20             THE COURT:  All right.  Ladies and gentlemen, as it

21   turns out, those are the witnesses that we have for today.

22   Obviously, this is not optimal to doing this piecemeal and

23   stopping and starting.

24             We have a lot of logistical issues with foreign

25   witnesses, and, anyway, it played out this way.  So, I

# J.A. 1649

1    apologize bringing you in, at least one of you from the Cape,

2    such a long distance for such a short amount of testimony, but,

3    again, that's the way it happened.

4          Tomorrow I expect we're going to have some video

5    testimony from Burundi for people for one reason for another

6    were not able to get mere.  This is one of the things we were

7    struggling with.  That's not going to be optimal either because

8    it's going to be by video and there's going to be some issues

9    there but there will be witnesses like any other subject to

10:10AM 10   cross-examination and placed under oath.

11          I don't quite know what the schedule is going to look

12   like from that point forward.  Again, I do hope you get the

13   case certainly this week and at the end of the week, but we'll

14   have a better idea tomorrow what that's going to look like.

15   With that, I'm going to send you home for the day.  Again, I

16   apologize for the inefficiencies here, and that's just kind of

17   way it is, and I'll see you tomorrow morning at 9:00.

18          THE CLERK:  All rise.

19          (JURORS EXITED THE COURTROOM.)

10:11AM 20   THE COURT:  All right.  The two videos tomorrow, how

21   long do you think that's going to take?  Is that going to be on

22   the order of an hour, two hours?

23          MR. LAUER:  I would say two hours in totality.

24          THE COURT:  All right.  However long it lasts, if

25   Mr. Teganya is going to take the stand, we're going to go

## J.A. 1650

1    directly to that, and we're going to keep pressing forward on

2    that.

3          One way or another, I think you should be prepared to

4    close on Thursday.  Again, I don't know how all this is going

5    to look, but we can't keep bringing people back for an hour or

6    two, it's just not fair to them.

7          One of these people is coming in from the Cape every

8    day, so I've been indulgent, but I think we need to tighten up

9    here, so either we're going to have the video witnesses and

10:12AM 10   that's that.  I assume there's at this point no rebuttal case

11   from the government, is that the plan?

12          MR. GARLAND:  We think it's very unlikely.

13          THE COURT:  So either we're going to have the two

14   video witnesses, and then I will indulge you to close first

15   thing Thursday morning, or we're going to go directly to

16   Mr. Teganya's direct and we're going to power through that as

17   best we can, and you should be prepared to close on Thursday

18   one way or the other, and, if necessary, to wrap this up, I

19   could even require a short afternoon session, although I'll

10:12AM 20   check with everyone first.

21          In the meantime, we probably ought to take the issue

22   of the jury charge.  Is there anything anybody wants to raise

23   with me while I have you here?  Again, this isn't the final

24   charge conference, just to get your reaction to thoughts.

25          MR. GARLAND:  Yes, your Honor.  I have a few things to

1    suggest.  One is I noticed that there was no tapes and

2    transcripts instruction.  We can certainly propose a standard

3    one.  There will be one transcript in here if the Court wants

4    to --

5          THE COURT:  Sorry, tapes and transcripts meaning that

6    there will be no transcripts?

7          MR. GARLAND:  No, a tapes and transcript instruction,

8    I think the standard instruction is that you're going to hear,

9    you have audio, you have a transcript.  The transcript is only

10:13AM 10    a memorialization of that, but if there's a difference between

11    the transcript and the tape.

12          THE COURT:  Oh, because of the testimony at the trial?

13          MR. GARLAND:  That's right.

14          THE COURT:  Okay.

15          MR. GARLAND:  At the detention hearing, so that would

16    be the first issue.  The second issue is on page 6 of the

17    Court's proposed instructions.

18          THE COURT:  Yes.

19          MR. GARLAND:  In the third paragraph, we'd suggest a

10:14AM 20    slight amendment to that where it says, "You may not consider

21    or be influenced by any possible punishment," we would insert

22    there, "or immigration consequences."  That might be a

23    possible.

24          THE COURT:  "Or other consequences."

25          MR. GARLAND:  "Or other consequences."

1          THE COURT:  Okay.

2          MR. GARLAND:  The next is going to page 7, the second

3     paragraph.

4          THE COURT:  Yes.

5          MR. GARLAND:  It says, "Whether the government has

6     sustained its burden of proof does not depend on the number of

7     witnesses it has called."  We would ask that you insert "or the

8     defense has called," so it would read, "does not depend upon

9     the number of witnesses it or the defense has called."

10:15AM 10     THE COURT:  But it's the government's -- we're talking

11    about the government sustaining its burden of proof.  It seems

12    confusing to me.

13         MR. GARLAND:  I think it's still accurate, however,

14    whether the government has sustained its burden of proof

15    doesn't depend on the number of witnesses it has called or the

16    number of witnesses that the defense has called.

17         THE COURT:  All right.  Let me think about that.

18    Okay.

19         MR. GARLAND:  The next one, and this is really just a

10:15AM 20    minor point, is on page 13, it refers to law enforcement

21    witnesses.  My recollection is actually -- I'm sorry, I

22    withdraw that.  I was going to put that in the singular, but,

23    in fact, there was a CVP officer and Agent Andersen, so there's

24    nothing to do there.

25         THE COURT:  Okay.

1          MR. GARLAND:  Then I can go to the instructions

2     themselves --

3          THE COURT:  Okay.

4          MR. GARLAND:  -- on the charges.

5          THE COURT:  Okay.

6          MR. GARLAND:  The first is if you go to page 21, which

7     addresses Counts 1 and 3.

8          THE COURT:  Yes.

9          MR. GARLAND:  It says that the third element is that

10:16AM 10     the statement was made under oath.  I believe that it actually

11     should be under oath or penalty of perjury according to the

12     statute, and I think that that carries through to some other

13     instructions as well.

14          THE COURT:  Okay.  I will take a look at that.  The

15     statute meaning --

16          MR. GARLAND:  1546(a), I think it's the third

17     paragraph of (a), but I'm relying on memory.

18          THE COURT:  Okay.

19          MR. GARLAND:  The second, and this pops up later on as

10:16AM 20     well in the instruction for Count 2 and 4.  There's nothing in

21     these elements that specifically say that the defendant needs

22     to know that the statement was false at the time that he made

23     it.  That is, it says, "The defendant has to have made a false

24     statement."  That's the first element, and the fifth element is

25     that the defendant made a statement knowingly, that is, that he

 1    had to know he's making it.

 2              THE COURT:  What page are you on?

 3              MR. GARLAND:  Still 21.

 4              THE COURT:  I'm sorry.  Yes.

 5              MR. GARLAND:  The first element is that the defendant

 6    made a false statement.  That actually would be accurate.  The

 7    fifth element says that the defendant has to make the statement

 8    knowingly, that is, he's not making the statement by accident.

 9              THE COURT:  Right.

10:17AM 10        MR. GARLAND:  But there's no element in here that

11    captures, in fairness to the defense, that the defendant has to

12    know that the statement that he made was false at the time that

13    he made it, and I believe that that pops up again later as

14    well.

15              I think that the government's proposed instructions,

16    while they may not be the exact way that the Court wants to

17    give them, tried to make that clear, and that may need to be

18    made clear here.

19              THE COURT:  The sentiment is certainly true is to know

10:18AM 20    that the statement was false and made it intentionally.

21              MR. GARLAND:  Exactly.

22              THE COURT:  I'll take a look at that.  I certainly

23    want to get that accurate.  It's confusing because we have

24    knowingly and willfully.

25              MR. GARLAND:  Yes.

1        THE COURT:  And it's often in the statutes when it's

2    really all talking about the same thing.

3        MR. GARLAND:  On page 25, again, there's this issue of

4    whether the statement was made under oath or under the penalty

5    of perjury.

6        THE COURT:  Yes.

7        MR. GARLAND:  Page 26, I haven't looked up whether the

8    form I-589 is required by immigration law or a regulation, but

9    the Court might want to avoid confusion by in the second

10:19AM 10    paragraph inserting the words, "and regulations after federal

11    immigration law."

12        THE COURT:  Is it a regulation law?

13        MR. GARLAND:  It is, and so up in the first

14    paragraph --

15        THE COURT:  I see.

16        MR. GARLAND:  -- it says, "law or regulations."  It's

17    merely a matter of consistency more than anything else.

18        THE COURT:  Okay.

19        MR. GARLAND:  Page 33 gets to Counts 2 and 4, the

10:19AM 20    perjury in a written document.

21        THE COURT:  Yes.

22        MR. GARLAND:  And the second paragraph says that a

23    statement is, "A written statement is willfully subscribed as

24    true if the defendant made the statement deliberately and with

25    knowledge that the statement was false at the time he made it."

1        Again, the sentiment is accurate, the defendant has to

2    have known that it was false, but it's just the wording is odd

3    because it says that something is willfully subscribed as true

4    if the person knew that it was false, whereas there are lots of

5    documents we willfully subscribe as true because we know them

6    to be true at the time.

7        THE COURT:  Okay.  Fair enough.  My first draft of

8    this, I had a fifth element where I broke out "willfully

9    subscribed" into two pieces, which I think is not standard, but

10:20AM 10    I think it might capture this idea better, in other words, you

11    have to know it's false and yet willfully subscribe that it's

12    true.

13        MR. GARLAND:  I think that probably gets closer to

14    the -- yes.  And then paragraph, not paragraph, but page 35,

15    which is the description of the charge for the perjury at the

16    detention hearing.

17        THE COURT:  Yes.

18        MR. GARLAND:  Either here or on page 39, we would like

19    some sort of statement from the Court that the jury doesn't

10:21AM 20    have to find that the defendant -- that all of these were

21    false, that the jury can sustain --

22        THE COURT:  Let's talk about that.  Do they have to

23    reach unanimity on any one of the three?  In other words, like

24    with objects of a conspiracy, you instruct the jury they have

25    to find either A object unanimously or B object unanimously or

1   both but they can't be six and six.

2          MR. GARLAND:  I wish the law were that they didn't

3   have to agree, but having done the research, I believe they do

4   have to agree.

5          THE COURT:  They have to agree to all three?

6          MR. GARLAND:  No, I think they can agree that the

7   first statement was false, the second statement was false, or

8   the third statement was false, or 1 and 2, 1 and 3 or 2 and 3,

9   or all three, but they don't have to find all three were false

10:22AM 10   for him to be guilty.

11          THE COURT:  That's the same point, but they have to be

12   unanimous.

13          MR. GARLAND:  Yes.

14          THE COURT:  At least one or any combination of one.

15          MR. GARLAND:  That's correct, there has to be

16   unanimity on that, and so, as I say, I don't know whether the

17   better place to put that in is on page 35.  It might be,

18   however, that the better place to put that in there is on

19   page 39.

10:22AM 20          THE COURT:  Okay.  It may be its own freestanding

21   instruction, and, again, off the top of my head, I would model

22   that on the object of a conspiracy instruction, which says,

23   again, from memory you have to unanimously agree that as to one

24   object of the conspiracy, at least.

25          You can't -- again, you can't do it 6 and 6, if

1    there's two objects, it has to be all 12 have to agree that at

2    least one object of the conspiracy was --

3              MR. GARLAND:  The government agrees with that as long

4    as they're also told that they don't have to find that all

5    three.

6              THE COURT:  Yes.

7              MR. GARLAND:  Yes.  Those are the only notes that we

8    have on the instructions.

9              THE COURT:  Okay.  Mr. Lauer.

10:23AM 10    MR. LAUER:  Yes, your Honor, we'll be submitting --

11             THE COURT:  Mr. Garland is doing your job for you

12   here.

13             MR. LAUER:  Mr. Garland is doing my job?

14             THE COURT:  Yes.

15             MR. LAUER:  In a way, he is, yes.  As to the last

16   point, we are requesting a unanimity instruction as to the

17   perjury, Count 5, for the reasons that were just discussed.

18             Separately, we'll also be submitting today a request

19   for two other instructions, one of which has to do with

10:23AM 20   ambiguity in a question or ambiguity in an answer.  We're

21   proposing that the Court should instruct the jury that if they

22   find that a question was ambiguous or capable of being

23   understood in different ways and that Mr. Teganya's answer to

24   that question was a reasonable interpretation of the question,

25   in other words, if he provided a truthful answer to a

**J.A. 1659**

1    reasonable interpretation of the question, then that would not

2    be a false answer.

3         Similarly, it's really the converse, if the question

4    was clear but the answer that he provided was ambiguous, and

5    one reasonable interpretation of his answer would be truthful,

6    then that would not be an instance of perjury.

7         THE COURT:  Okay.  You're going to submit specific?

8         MR. LAUER:  Yes, we will be submitting that today, and

9    there's sort of another variation of that has to do with

10:24AM 10   unresponsiveness, and if the answer provided by Mr. Teganya was

11   literally true, in other words, that the answer that he

12   provided was factually correct but perhaps not responsive to

13   the question or tangential, then that would not be an instance

14   of a false statement, it would be a true statement that was

15   nonresponsive to the question or tangential, so we'll submit

16   specific language to the Court today.

17        THE COURT:  Case cites are helpful as well.

18        MR. LAUER:  Yes.  What we're submitting is actually

19   adapted from some pattern instructions.

10:25AM 20   THE COURT:  Okay.  All right.  I will take a look at

21   that, give some thought to the instructions, tinker with this a

22   little bit and then recirculate another version to both of you.

23   Okay.  Anything else?

24        MR. GARLAND:  That's it.  Your Honor, just to be clear

25   about the schedule for tomorrow, if Mr. Teganya does testify,

1 are we going into the afternoon?

2   THE COURT:  Well, we might.  I guess I'm just

3 threatening it because I want this case to get to the jury.

4 Obviously, they've made their plans.  I haven't warned them, so

5 I'll ask, but I'm just warning you all to be prepared that I

6 may, it depends on how much we have to do.  I don't know the

7 answer to that.  I don't want to spill into the week after if

8 we can avoid it, let's put it that way.  If we can get it done,

9 I'd like to get it done, it kind of depends where we are.

10:26AM 10   MR. GARLAND:  The last question, to what extent does

11 the testimony of Mr. Teganya fall under the Court's pretrial

12 order of giving the government the witnesses and the names of

13 the witnesses who are testifying at the end of the trial day

14 for the next day?

15   THE COURT:  Well, I think he just said it was very

16 likely.  I don't know if I can force him to commit, but he said

17 it was very likely.  I would hope as a matter of courtesy, he

18 isn't simply decoying you to put you through a lot of work, I

19 don't know.

10:26AM 20   MR. LAUER:  The name of the witness is

21 Jean Leonard Teganya, and at this point our expectation is that

22 he will testify, although certainly being that he is the

23 defendant, the decision rests with him, but at this point, I am

24 comfortable in saying that is our expectation.

25   THE COURT:  Okay.  I will see you tomorrow morning at

1    8:30.

2              THE CLERK:  All rise.

3              (Whereupon, the hearing was adjourned at 10:27 a.m.)

4

5

6                 C E R T I F I C A T E

7

8    UNITED STATES DISTRICT COURT )

9    DISTRICT OF MASSACHUSETTS ) ss.

10   CITY OF BOSTON )

11

12             I do hereby certify that the foregoing transcript,

13   Pages 1 through 66 inclusive, was recorded by me

14   stenographically at the time and place aforesaid in Criminal

15   Action No. 17-10292-FDS, UNITED STATES of AMERICA vs.

16   JEAN LEONARD TEGANYA and thereafter by me reduced to

17   typewriting and is a true and accurate record of the

18   proceedings.

19             Dated this 13th day of September, 2019.

20

21                  s/s Valerie A. O'Hara

22             _____

23                  VALERIE A. O'HARA

24                  OFFICIAL COURT REPORTER

25

J.A. 1662

1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,          )
                                        )
5    vs.                                )  Criminal Action
                                        )
6    JEAN LEONARD TEGANYA,              )  No. 17-10292-FDS
                        Defendant       )
7                                       )
                                        )
8                                       )

9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                      JURY TRIAL DAY 16

12

13

14
                John Joseph Moakley United States Courthouse
15                       Courtroom No. 2
                        One Courthouse Way
16                       Boston, MA 02210

17
                          April 3, 2019
18                         8:30 a.m.

19

20

21

22

23                    Valerie A. O'Hara
                     Official Court Reporter
24       John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                   Boston, MA 02210
                 E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

    United States Attorney's Office, by GEORGE P. VARGHESE, ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts  02110;

For the Defendant:

      Federal Public Defender Office, by SCOTT LAUER, ESQ., and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor, Boston, Massachusetts 02210.

ALSO PRESENT:

Augustin Mutemberezi, Interpreter
Moses B. Rndasunikwa, Interpreter

1                                    INDEX

2

3   WITNESS                                                        PAGE

4   JEAN-CLAUDE KABAGEMA

5       Direct Examination By Mr. Lauer                              8
        Cross-Examination By Mr. Garland                            16
6
    JEAN LEONARD TEGANYA
7
        Direct Examination By Mr. Lauer (Continued)                20
8       Cross-Examination  By Mr. Varghese                         112

9

10                              E X H I B I T S

11

12

13  EXHIBITS                                    FOR I.D.   IN EVIDENCE

        74                                                      30
14      77                                                      48
        76                                                      51
15      75                                                      51
        23A                                                     65
16      78                                                      85
        79                                                      85
17      80                                                      88

18

19

20

21

22

23

24

25

1                                     PROCEEDINGS

2              THE CLERK:  All rise.  Thank you.  You may be seated.

3    Court is now back in session.

4              THE COURT:  All right.  Good morning.  Quickly I'm

5    recirculating an updated draft of the jury instructions.  I

6    have no secretary, so I did my own typing, so that's Warning

7    Number 1, and I forgot to change the header where it says

8    draft, so you might want to throw away your earlier copy.

9              On page 24, I think I've incorporated most of what the

08:58AM 10   defense asked for in terms of literal truth and ambiguity.  I

11   reworked it somewhat.  You may want to take a look at that.

12             I had a question.  The defense has proposed, and it's

13   not in this draft that I track the entire indictment concerning

14   the testimony at the hearing, which involves, you know,

15   considerably more than the current draft.

16             Does the government have a view on that?  I mean, if

17   it's in the indictment.  I mean, I could simply give them the

18   indictment.  I would prefer to state the charge here in the

19   instructions.

08:59AM 20            MR. GARLAND:  A couple of things, your Honor.  One is

21   that I believe that the Court already has an instruction that

22   sets out the statements that are being charged, and I think

23   you've indicated that you're going to send the indictment back

24   with them anyhow.

25             THE COURT:  I didn't.  I normally do, but, yes.

# J.A. 1666

           1          MR. GARLAND:  The instruction that they were asking

           2     for would basically have the Court characterizing the

           3     government's arguments about what its arguing for, and that

           4     just doesn't seem to be right.  It seemed that the Court really

           5     had it right with the first draft in that respect.

           6          There's also an issue I'd like to raise with respect

           7     to page 24.

           8          THE COURT:  Yes.

           9          MR. GARLAND:  So the instructions that they submitted

08:59AM 10     yesterday on this point actually pertain to the cases -- in the

          11     instruction itself pertain to 1621, which is the perjury

          12     counts, not the false statement counts.  It's not clear to me

          13     that the language that they're suggesting actually applies to

          14     the counts that this is under.

          15          The second thing is that the way that they submitted

          16     those proposed instructions was they cited to a particular

          17     thing from a treatise.

          18          They took, I think, paragraph 1 of that instruction

          19     and broke it out as one instruction.  Paragraph 3 left out

09:00AM 20     paragraph 2, which talks about you need to take the questions

          21     and the answers into context as well.

          22          If the Court is going to be giving the paragraphs that

          23     that they are suggesting, that paragraph should be put back in,

          24     and the whole thing, I think, should be related to the correct

          25     statutes as well.

# J.A. 1667

1        THE COURT:  All right.  In terms of, I mean, if the

2    idea is true, I mean, let's take the concept that something can

3    be literally true, you know, and, therefore, not false, even if

4    it's misleading, if that's a concept in perjury, I don't know

5    why it wouldn't be the same concept in a charge of making a

6    false statement.

7        Why don't we do this, why don't we cut this short for

8    now.  Why don't you get me that model jury instruction,

9    whatever it is, that has that language, I'll take a look at it,

09:01AM 10    and then we'll talk about it later.  I didn't mean to have the

11    whole charge conference here, I was just pointing out some

12    things.

13        MR. GARLAND:  Right.

14        THE COURT:  And just to complete the thought, I

15    reworked this a little bit because the way the defense had

16    proposed it, it wasn't clear, you could have an incomplete

17    literally true answer, and that would not be false, but, of

18    course, if the question calls for a complete answer, the

19    gestalt countries that you have traveled to in the last 10

09:01AM 20    years, and you list 6 of the 8, that's false even though it's

21    literally true that you've been to those six countries, so that

22    concept needs to be worked in here, which is what I've tried to

23    do, but let's put all that on hold for now.

24        MR. GARLAND:  Thank you, your Honor.

25        THE COURT:  Today's lineup, Mr. Lauer.  We're not

## J.A. 1668

1      doing Burundi videos, right?

2              MR. LAUER:  Correct.  We appreciate the work that

3      everyone did to be ready for that, but, on reflection, it is

4      not necessary, so we do have one witness to testify here today.

5      He's ready as soon as we get started, and then we do expect

6      Mr. Teganya to testify following that.

7              THE COURT:  Okay.  All right.  We're short a juror.

8              THE CLERK:  All rise for the jury.

9              (JURORS ENTERED THE COURTROOM.)

09:05AM 10              THE CLERK:  You may be seated.

11              THE COURT:  Good morning, ladies and gentlemen.

12      Thank you again for your patience, particularly with the way

13      the last couple days played out.  I know you're all making

14      significant sacrifices in terms of your time and sometimes your

15      money to be here, and I'm sorry it played out the way it did,

16      but I think we're ready to go.

17              Mr. Lauer.

18              MR. LAUER:  Yes, we call Jean-Claude Kabagema.

19              THE COURT:  Ladies and gentlemen, I had said that we

09:05AM 20      were going to do a video linkup from Burundi, which apparently

21      is not going to happen, so we're going to have only live

22      witnesses.

23              JEAN-CLAUDE KABAGEMA, having been duly sworn by the

24      Clerk, testified as follows through the Interpreter:

25

<u>DIRECT EXAMINATION</u>

BY MR. LAUER:

Q. Good morning.

A. Good morning.

Q. Can you please state your name for the record.

A. Jean-Claude Kabagema.

Q. Does your name appear correctly on the screen?

A. There is a hyphen missing between Jean and Claude.

Q. But other than that is the spelling correct?

A. Everything is correct.

Q. Where do you live, Mr. Kabagema?

A. I live in the Netherlands.

Q. How long have you lived in the Netherlands?

A. For up till now, almost 21 years.

Q. What do you do for work?

A. I am a computer engineer, computer science engineer, to be more precise, a medical imaging.

Q. Were you born in the Netherlands?

A. No, I was born in Rwanda.

Q. Where in Rwanda were you born?

A. Precisely in the community of Kamembe.

Q. Did you attend university in Rwanda?

A. Yes.

Q. Where did you go to university?

A. The National University of Rwanda in Butare.

1   Q.   And when did you enter the university in Butare?

2   A.   In 1992.

3   Q.   What was your field of study?

4   A.   Medicine at the faculty of medicine.

5   Q.   As a medical student, did you know Mr. Teganya?

6   A.   Yes, I have met him.

7   Q.   How often -- let me ask you this.  Were you in the same

8   class as Mr. Teganya?

9   A.   No, he was a year ahead of me.

09:09AM 10   Q.   Was he a friend of yours?

11   A.   I wouldn't say a bosom friend, too close, but, yes, we

12   would have a frequent relationship.

13   Q.   How often would you see him in Butare?

14   A.   Practically daily during the recesses.

15   Q.   Where were you living when you were a medical student?

16   A.   Most of the time at the dormitories at Linda.

17   Q.   Did you know where Mr. Teganya lived?

18   A.   Yes, he was living outside campus under the Linda

19   dormitory.  Those were private dwellings.

09:10AM 20   Q.   Was that close to where you were living in the Linda

21   dormitory?

22   A.   Not far away at all.

23   Q.   Did you visit him at his home?

24   A.   No, I never did.

25   Q.   Did you know who he lived with?

1   A.   I always saw the people that, you know, were always

2   together with him.

3   Q.   And who were those people?

4   A.   Most of the time, it was Patrick and Aimable.  I do recall

5   very well that.

6   Q.   What kind of student was Mr. Teganya?

7   A.   I would say truly he was somebody sociable and who was

8   always very focused on his studies.

9   Q.   Was medical school difficult?

09:11AM 10   A.   Yes, yes, for everybody, you know, you have to really,

11   really dig in on it and work very hard.

12   Q.   How did medical students spend their time by and large?

13   A.   I will say most of the time first- and second-year medical

14   students would spend their time very focused on their studies,

15   including evenings and weekends, very focused, especially those

16   who would do their residency, the ones that had already passed

17   the tests to become residents.

18   Q.   Was Mr. Teganya?

19   A.   I will truly say that people like Teganya were role models

09:13AM 20   for us.

21   Q.   Was Mr. Teganya someone you personally studied with?

22   A.   No, I never had any classes with him because he was a year

23   ahead of me.

24   Q.   When you were a university student, was there -- were

25   political parties active in Butare?

J.A. 1672

1    A.    Yes, at Butare, there were, yes.

2    Q.    What were some of the political parties that were active

3    in Butare?

4    A.    I would say that at Butare, it was mainly the DSP party,

5    which is the Democratic Socialist Party.  There was also the

6    MDR, then there was the MRND, PL.

7    Q.    Is that PL?

8    A.    PL.  The liberal party, yes.

9    Q.    Were you a member of a political party?

09:14AM 10    A.    Personally, since I was born in Gitarama, personally I

11    didn't have any affiliation to any political party, but I did

12    have certain sympathies for the MDR party because they were

13    from my birthplace.

14    Q.    Is your birthplace in the south of the country?

15    A.    We call it south, but Gitamara is truly the center, the

16    center of the country.

17    Q.    Was the opposition stronger in Gitarama than other parts

18    of the country?

19    A.    Yes, it was the MDR, the prevailing party, I would say.

09:16AM 20    Q.    I'm going to approach and show you two items.  The first

21    is a hat that's been marked as Exhibit 12.  I'm going to ask

22    you to look at that and tell me if you recognize it.

23    A.    It's been a long time, but it looks to me like it was an

24    MRND one.

25    Q.    I'm going to show you another article.  This has been

J.A. 1673

1   introduced as Exhibit 15.  It's a scarf.  I'm going to ask if

2   you recognize that.

3   A.   Yes, but the disposition, the order of the colors has

4   changed.

5   Q.   What do you recognize this scarf to be?  Was that

6   affiliated with a certain party?

7   A.   Yes, it was the MRND party, but it was also being very

8   similar to the CDR party.  There was not much difference

9   between the CDR and MRND.

09:17AM 10   Q.   Were there some medical students who were members of the

11   MRND?

12   A.   Of course, surely, there were, but publicly nobody would

13   say anything about it.

14   Q.   Do you remember anybody in particular who was known for

15   advocating for the MRND?

16   A.   During the conversations as far as I can recall, there was

17   somebody by the name of Barinda.

18   Q.   When students -- were there sometimes political meetings

19   or rallies that students would attend?

09:18AM 20   A.   Truly, I would say that on campus in the middle of the

21   campus, there was nothing, but, of course, outside there were

22   always things going on.

23   Q.   Did you occasionally see people wearing hats or scarfs

24   like the ones I just showed you?

25   A.   On campus truly, no, but if you went downtown in the city,

J.A. 1674

1    there were people wearing those things, yes.

2    Q.    At any time when you were in Butare, did you see

3    Mr. Teganya wear a hat like the hat I just showed you?

4    A.    Oh, no, frankly, somebody like Teganya wearing something

5    like that, a hat like that, no.

6    Q.    What about a scarf like the scarf I showed you?

7    A.    No, no, I have never seen.

8    Q.    Did you ever hear Mr. Teganya say insulting or offensive

9    things about Tutsis?

09:20AM 10    A.    That would have been even stranger to hear him say things,

11    anything against the Tutsi since he was always with Tutsi

12    friends.  He was hanging out with Tutsi friends, people like

13    Aimable, and that would have been a contradiction.

14    Q.    Did you know another medical student by the name of

15    Jerome Arusha?

16    A.    Jerome Arusha, yes, I do know him well.

17    Q.    Was he in the medical school at the same time you were?

18    A.    Yes, of course, he was in the second year with

19    Mr. Teganya.

09:22AM 20    Q.    Where did Mr. Arusha like to spend his time, if you know?

21    A.    I would say that on the one hand, he was an MRND

22    affiliate, and he was not very focused.  You would run into him

23    a little bit everywhere, you know, even after the classes, in

24    the little bars.

25    Q.    Was he known for going to the bars?

J.A. 1675

|     |     |     |
| --- | --- | --- |
| 1   |     | MR. GARLAND:  Objection. |
| 2   |     | THE COURT:  Sustained. |
| 3   | Q.  | Did you ever see Mr. Arusha intoxicated? |
| 4   |     | MR. GARLAND:  Objection. |
| 5   |     | THE COURT:  Overruled. |
| 6   | A.  | Oh, yes, quite a few times. |
| 7   | Q.  | How often did you observe him to be intoxicated? |
| 8   | A.  | Well, most of the time, I would say -- well, since I was |
| 9   |     | in Butare, most of the time I saw him, you know, he would be |
| 09:23AM 10 |     | there.  He would be intoxicated frequently. |
| 11  | Q.  | And -- |
| 12  | A.  | You could say that he had taken something. |
| 13  | Q.  | In 1994, when the genocide started, were you in Butare? |
| 14  | A.  | No, I was in Kigali. |
| 15  | Q.  | And did you ever go to Butare during the genocide? |
| 16  | A.  | I was always in Kiyovu in Kigali during the whole time |
| 17  |     | that since the war broke up until it ended. |
| 18  | Q.  | When it ended, did the RPF come? |
| 19  | A.  | Yes. |
| 09:25AM 20 |     | THE INTERPRETER:  May the interpreter request a -- |
| 21  | A.  | Yes, I did see them, I saw the soldiers, the RPF soldiers |
| 22  |     | coming to Kigali. |
| 23  | Q.  | Did you join the RPF shortly thereafter? |
| 24  | A.  | The following day, one day after, I did join the RPF Army. |
| 25  | Q.  | What did you do when you were in the RPF Army? |

J.A. 1676

```
 1          MR. GARLAND:  Objection.  Relevance.
 2          THE COURT:  Sustained.
 3   Q.   Did you remain in Rwanda for a period of time after you
 4   joined the Army?
 5   A.   Yes, yes, yes, I was always there with the RPF.  We went
 6   to different places, but I remained with them and over there
 7   until I left the country.  Most of the time after joining the
 8   RPF, I was at their training camp in Kibuye.
 9   Q.   When did you leave Rwanda?
10   A.   May I tell you a short story?
11          MR. GARLAND:  Objection, your Honor.
12   Q.   I'm just asking you to tell us what year you left Rwanda.
13   A.   At the end of the month of April in 1995.
14   Q.   Sir, earlier I asked you some questions about whether you
15   ever saw Mr. Teganya wearing that clothing.  Do you recall
16   that?
17   A.   Yes, I do recall.
18   Q.   As best you can tell, was Mr. Teganya a member of the
19   MRND?
20   A.   Honestly, all the time that I've known him, I have never,
21   ever seen him wear any clothing or pins of the MRND party.
22   Q.   Did you know him to be politically active at all?
23   A.   Not at all, not at all, not at all.  He was very focused,
24   very focused.
25          MR. LAUER:  Thank you, sir.  No further questions.
```

09:27AM (line 10)
09:28AM (line 20)

**J.A. 1677**

<pre>
 1            THE COURT:  Cross-examination.

 2                    CROSS-EXAMINATION

 3   BY MR. GARLAND:

 4   Q.   Good morning.

 5   A.   Good morning.

 6   Q.   The university at Butare was an excellent school, wasn't

 7   it?

 8   A.   It was the academic haven, yes, but you had to work very

 9   hard as well.

09:29AM 10  Q.   So to get into that school, you had to be a serious

11   student, right?

12   A.   Yes, yes, especially the medical college, the College of

13   Medicine.

14   Q.   And you had to be studious both before and after you got

15   into that school, correct?

16   A.   Always, yes.

17   Q.   And you had to have done well in secondary school, right?

18   A.   Yes, among the best students you had to be.

19   Q.   Now, you weren't testifying today that very smart, very

09:30AM 20  studious students couldn't have been involved in genocide, are

21   you?

22   A.   I would say that people who are very studious and very

23   sociable are people who would never have anything to do with

24   things like that.

25   Q.   Never; is that correct?
</pre>

J.A. 1678

1    A.   Well, they're human beings, but most of the people that I

2    know in most instances, no.

3    Q.   So you were one year behind the defendant at school,

4    correct?

5    A.   Yes.

6    Q.   You didn't attend classes with him, right?

7    A.   No.

8    Q.   You said that most of the time you talked to him was

9    during recesses, right?

09:31AM 10    A.   Yes, during recesses.

11    Q.   And by recesses, you mean the couple minutes you have

12    between going to one class to another class, right?

13    A.   Yes, but like in any college, sometimes you would have a

14    whole hour between classes or for some students to go back

15    home, they would wait an hour.

16    Q.   You never visited the defendant at his house, right?

17    A.   No.

18    Q.   So that means that the defendant could have had MRND

19    clothing or pins or flags in his house, but you wouldn't have

09:32AM 20    seen it, right?

21    A.   I never control that, I never went there, but, in public,

22    I never saw him wearing anything.

23    Q.   And you saw him in public at school, right?

24    A.   Yes, yes, practically daily.

25    Q.   And students didn't wear political clothing to school, did

    1    they?

    2    A.    No.

    3    Q.    And you didn't attend MRND rallies or meetings yourself,

    4    did you?

    5    A.    MRND, never, but MDR, yes.

    6    Q.    So if the defendant attended MRND meetings or rallies, you

    7    wouldn't have seen him there, would you have?

    8    A.    It seems like you said MRND, but since I was never there,

    9    I could have never seen him.

09:34AM 10    Q.    And you didn't attend the Interahamwe training in the gym,

    11    did you?

    12    A.    Myself, no.

    13    Q.    Yes, you never did, did you?

    14    A.    No, I never did that.

    15    Q.    You never -- I'm sorry, I didn't mean to interrupt you.

    16    A.    And I didn't even know that things of that sort existed,

    17    at least.

    18    Q.    I'm sorry, could you repeat?

    19    A.    At least at Butare.

09:35AM 20    Q.    And so you didn't attend Interahamwe training in the woods

    21    either, did you?

    22    A.    No, I never did.

    23    Q.    So if the defendant --

    24    A.    I know nothing about it.

    25    Q.    So if the defendant attended the Interahamwe training, you

1    wouldn't have seen that either, would you?

2    A.   I was never aware of that, but, you know, what I know

3    about him, I don't think he would have ever done something of

4    the sort.

5    Q.   You and Mr. Teganya never talked politics, did you?

6    A.   No, we have never spoken about politics.

7    Q.   And you and Mr. Teganya never talked about his views on

8    Tutsis, did you?

9         THE INTERPRETER:  May the interpreter hear the

09:36AM 10    question?

11    Q.   You and Mr. Teganya never discussed his views on Tutsis,

12    did you?

13    A.   Never, never, we have never spoken about that.

14    Q.   And since you were not in Butare during the genocide, you

15    don't know what Mr. Teganya did during that time, do you?

16    A.   I have no idea, everything that happened in Butare, no

17    idea.

18         MR. GARLAND:  No further questions.

19         THE COURT:  Redirect.

09:37AM 20         MR. LAUER:  No, thank you.

21         THE COURT:  All right.  Thank you.  You may step down.

22         MR. LAUER:  The defense calls Jean Leonard Teganya.

23         JEAN LEONARD TEGANYA, having been duly sworn by the

24    Clerk, testified as follows:

25

DIRECT EXAMINATION

BY MR. LAUER:

Q.  Good morning.

A.  Good morning.

Q.  What is your full name?

A.  My full name is Jean Leonard Teganya.

Q.  Does your name appear correctly on the screen before you?

A.  Yes.

Q.  Where were you born?

09:38AM  A.  I was born in Rwanda; Gitarama, Rwanda.

Q.  Where in the country is that?

A.  It's in the former district of the province of Gisenyi, it was in the north.

Q.  Who is your father?

A.  My father is Innocent Teganya.

Q.  What is his ethnicity?

A.  He is a Hutu.

Q.  Who is your mother?

A.  My mother's name is Bernadette Mukaruhumuriza.

09:38AM  Q.  What is your mother's ethnicity?

A.  She's a Tutsi.

Q.  Do you have siblings?

A.  Yes, I do.

Q.  How many siblings do you have?

A.  We are eight siblings, five brothers and three sisters.

1    Q.   Are you the oldest, the youngest?

2    A.   I'm the first born.

3    Q.   You said your father's name was Innocent Teganya?

4    A.   Yes.

5    Q.   You share the name Teganya with your father?

6    A.   Indeed, yes.

7    Q.   Is that unusual in Rwanda?

8    A.   Very unusual.

9    Q.   How is it that you came to share your father's name?

09:39AM 10   A.   Normally in Rwandan culture, you do not inherit your

11   father's name, but some people who went to school, they end up

12   having those -- they adapted some western practices, and they

13   started giving their name, so that's how I end up having my

14   father's name.

15   Q.   What did your father do for work?

16   A.   When I was born, my father was working for the Justice

17   Department, the Office of Prosecutor.  In french, they call it,

18   "Bureau du Procureur."

19   Q.   At some point, did he move on to do other work?

09:39AM 20   A.   Yes.

21   Q.   What other work did he do?

22   A.   In 1975, my father resigned from the Justice Department

23   job, and he went to working for a mining company, a private

24   company.

25   Q.   How long did he work for the mining company?

J.A. 1683

```
 1   A.   From 1975 to the end of the -- until 1994, I would say.

 2   Q.   Was your father a member of the MRND?

 3   A.   As any Rwandan citizen, he was a member of MRND.

 4   Q.   Why do you say as any Rwandan citizen?

 5   A.   Back in time, since 1975 to 1991, every other Rwandan

 6   belonged to MRND.

 7   Q.   Did your father become a leader in the MRND?

 8   A.   Yes, he did.

 9   Q.   And what position did he hold?

09:41AM 10   A.   In 1991, he was elected to be the president, the local

11   president of MRND in a native small district, Kabaya.

12   Q.   And what year was that?

13   A.   1991.

14   Q.   Were you living with your parents at that time?

15   A.   No, at that time I was living in Butare.

16   Q.   At some point in your childhood, did you leave your

17   family's home to go to school?

18   A.   Yes, when I was 14, I was sent to high school, which was a

19   boarding school.

09:41AM 20   Q.   And what was the name of your high school?

21   A.   I attended the Le Petit Seminaire in Nyundo.  It's a

22   seminary of Nyundo.

23   Q.   Where was Nyundo located?

24   A.   Nyundo was in the Gisenyi.  That would be in the north of

25   the country.
```

J.A. 1684

 1    Q.    Can you describe the academic environment at Nyundo?

 2    A.    Nyundo, the seminary was a special school, it's a private

 3    school owned by a catholic church, and it's a vocation school.

 4    The mission was just to educate people who will become priests.

 5    Even if you don't become a priest, they wanted to train people

 6    with high standards, moral knowledge, just make sure they

 7    provide the country with people who are well trained.

 8    Q.    How many students attended Nyundo?

 9    A.    Every year we would have around 300 students for the

09:42AM 10   seminary.

 11   Q.    In terms of Hutus and Tutsis, what was the makeup of the

 12   student body?

 13   A.    I would say half-half, 50-50, even sometimes you would see

 14   more Tutsis than Hutus, which was unusual because outside in

 15   the country, we have a situation where the majority, minority,

 16   but in the seminary, that was not the case.

 17   Q.    What about the faculty?  What was the composition of the

 18   faculty?

 19   A.    I would say the majority of faculty was Tutsis.  We had a

09:43AM 20   lot of Rwandan refugees coming from Congo, people who cross the

 21   border every day from Goma coming to teach in Nyundo.  Also, we

 22   have a couple of ex parte people, the Europeans teaching in the

 23   seminary.

 24   Q.    Was there tension or conflict between Hutus and Tutsis at

 25   Nyundo?

J.A. 1685

1    A.   Not at all because, remember, just keeping in mind, the

2    mission of the school was just to train people who would become

3    religious leaders, so the entire program was focused on the

4    philosophy of living in harmony regardless of your ethnic

5    background.

6    Q.   Was conduct or behavior important at Nyundo?

7    A.   Very important.

8    Q.   Can you describe the role of conduct and behavior?

9    A.   I could say you could be Ashtan, you could have 100

09:44AM 10   percent in every subject, but if you don't have 50 percent of

11   your conduct because we were graded according to our behavior,

12   the way you behave, the way you interact with people around

13   you, if you don't have 50 percent of the conduct, you will be

14   expelled from the school.

15   Q.   Was conduct a part of how you were graded?  Was it part of

16   your report card?

17   A.   Yes, the conduct, the mark on the conduct was on your

18   report card.

19   Q.   I'm going to ask that a document be displayed and see if

09:45AM 20   you recognize it.

21           THE CLERK:  Just the witness?

22           MR. WATKINS:  Just the witness.

23   Q.   If we could go to the second page.  Do you recognize this

24   document?

25   A.   Yes.  It looks like my report card when I was in the fifth

        1    year.

        2    Q.   Did the school maintain records of performance and

        3    behavior as part of its regular functioning?

        4    A.   Yes.

        5    Q.   Is this in essence your report card?

        6    A.   Yes, you can see it.  I don't know if everybody can see on

        7    the left side --

        8    Q.   Well, before you describe what you're seeing, I'd move

        9    this document into evidence.

09:46AM 10              THE COURT:  All right.

       11              THE CLERK:  73.

       12              MR. VARGHESE:  Your Honor, I would object on relevance

       13    grounds.

       14              THE COURT:  I'll admit it.  Exhibit 73.

       15              MR. WATKINS:  73?

       16              THE COURT:  73.

       17              MR. WATKINS:  It's premarked.

       18              THE COURT:  What is it?

       19              THE CLERK:  73.

09:46AM 20    Q.   I think we're all seeing the document now.  Can you just

       21    describe generally what we're seeing here?

       22    A.   On the top, you see my name, my major, I was doing Latin

       23    and sciences, we are 13 students during that year.  On the left

       24    side, you see the list of different subjects, you see religion,

       25    Kinyarwandan, French, English, initiation known arts or physics

1   or lab, sciences, biology.

2   Q.   If we go way down to the bottom.

3   A.   Way down.

4   Q.   Is there a box for conduite?

5   A.   Yes.

6   Q.   What is conduite?

7   A.   Conduite would be the conduct, the behavior.

8   Q.   And can you discuss how -- what was the grading system for

9   conduct?

09:47AM 10   A.   The conduct was graded on 40, so you have to make sure you

11   have at least 20 of a 40.  If ever you score below 40, you are

12   expelled from the school.

13   Q.   Under the conduct, there's a place at pourcentage.  What

14   is that?

15   A.   That would be the percentage of your overall grades, and

16   then the ones on the system were ranked because you have to

17   show where you are.

18   Q.   And is there a percentage there?

19   A.   Yes, the percentage is there.

09:48AM 20   Q.   What does the percentage mean?

21   A.   Percentage means just the overall marks.  They are just

22   going to make a total of your marks, and then around on

23   percent, every time you have above 70 percent, that is

24   considered like A in the American system.  If you score between

25   60 and 70, it would be like a B.  If you go below, between 60

1    and 55, it would be like C.  If you score below 50, it would be

2    that's a fail.

3    Q.    Did you hold -- were you involved in any activities at

4    Nyundo?

5    A.    Yes, I was involved in many activities.

6    Q.    What activities were you involved in?

7    A.    Because Nyundo was a boarding school, after school we have

8    a lot of activities, youth associations, and I was involved in

9    the Red Cross.

09:49AM 10   Q.    I think many people probably have a good idea what the

11   Red Cross is already, but what sorts of things did you do

12   within the Red Cross organization?

13   A.    Well, mainly it was training.  First of all, you would be

14   trained about the principles, getting principles of the

15   Red Cross, then you would have some technical training.  There

16   was a class, a kind of program we have to undergo to be first

17   respondent, kind of EMT.

18          I did the same training principle and philosopher for

19   Red Cross the first year, the second two years, I was involved

09:50AM 20   in the first aid training, and then afterwards, I went further

21   to become a trainer.  I was a trainer, I was training the

22   people who did first aid.

23   Q.    And did you hold any position within the Red Cross?

24   A.    When I was in my fifth year, I was elected to be the

25   president of the Red Cross for the high school in Nyundo.

## J.A. 1689

1    Q.   Why did you join the Red Cross at Nyundo?

2    A.   I felt compelled to join Red Cross because when we were

3    younger, the majority of the youth organization just having fun

4    play, just having fun, play, dance, but when I saw the kind of

5    work the Red Cross was doing, I saw many good things.  I felt I

6    could make a difference because those people were visiting

7    patients.

8         In Nyundo, we had a leper house.

9    Q.   Excuse me, a leper?

09:51AM 10   A.   A leper house, yeah.  It's imaginable for us to see people

11   who are ostracized, who are excluded from the society, so I saw

12   those people going visiting lepers.  For me, I was charged, I

13   said it would be worthy of my time to join the Red Cross.

14   Q.   At Nyundo, did you hold any other leadership positions?

15   A.   Yes, from the first year, I was first year, first and

16   second year, I was president of my class.  In third year, I was

17   in charge of colors because we have to walk around the seminary

18   to maintain the buildings and the property around the school,

19   and the fourth and fifth year, I was in charge of program, and

09:52AM 20   in my last year, sixth year, I was appointed to be vice dean of

21   students.

22   Q.   What was the vice dean of students?

23   A.   The dean or the vice dean was the people, they go to

24   people, someone who would be looking after the other students.

25   Q.   You said you were appointed.  How did you become appointed

1  to the position?

2  A.   The dean and the vice dean are appointed by the teaching

3  body.   That's the group of professors under the group of the

4  priests who are living with us in the seminary because we live

5  in the community.   We have the part of students and another

6  part of the priests who are in the same compound with us.

7  Q.   Did you have responsibilities as vice dean with respect to

8  younger students?

9  A.   Yes, you were in charge of the rest of the students.   Just

09:53AM 10  to give you an idea, the seminary building was a big compound

11  symmetrical, just one part joining the other, so the north path

12  was called Saint Pius, that's named after the Pope, Pius, the

13  X.   On the south side, it was called Saint Mary.

14       So, on my last year, the dean was Santa Sagus Sove'

15  (ph).   He was in charge of St. Pius, and I was in charge of

16  St. Mary's side, so everyone would be in charge of around 150

17  students.

18  Q.   Did you graduate from seminary school at Nyundo?

19  A.   Yes, I did.

09:54AM 20  Q.   I'm going to ask that another document be displayed to the

21  witness only.   Do you recognize the document before you?

22  A.   Yes, this is my high school diploma.

23       MR. LAUER:   I'd move this into evidence, your Honor.

24       MR. VARGHESE:   Same objection.

25       MR. WATKINS:   74.

## J.A. 1691

1          THE COURT:  I'll allow it, 74.

2          (Exhibit No. 74 received into evidence.)

3     Q.   What date did you graduate Nyundo?

4     A.   It was June 27th, 1991.

5     Q.   And I noticed that there's a note that you graduated with

6     distinction.  What did that mean?

7     A.   It means I got a good grade, good mark.  As I told you,

8     any time you have more than 70 percent will be like in the As

9     in American system.

09:55AM 10   Q.   After graduating from Nyundo, was there some sort of

11    competition for university scholarships?

12    A.   Yes.

13    Q.   Where did that take place?

14    A.   It would take place in Kigali.  Back in time, there was a

15    system of the scholarship for excellency.  They would select

16    the top five students from every single science school, so the

17    top students in Kigali, and they would take an initial exam.

18    At the end, they would select again people who scored a high

19    mark from that exam, and they were being rewarded with

09:56AM 20   scholarships.

21    Q.   When you went to take that exam, did you meet a number of

22    people who would later become your friends?

23    A.   I remember Eric Nshimimana, who you saw, who testified

24    here, I met Ingrid Gasarasi, I met Theogene Rurangina, I met

25    Dorcyne Rugamba, a lot of people I came to know later on when I

        joined the National University.

        Q.   After you took that exam, did you receive a scholarship?

        A.   Yes, I did.

        Q.   Where was the scholarship?

        A.   The majority of people just after the end of this exam,
        they would receive the top scholarship to go to study abroad.
        I was supposed to go to study abroad, but at the end, there was
        some problem about financing, and then when September came, we
        were still in Rwanda.

09:57AM        We were asking for just an information session in the
        scholarship office, the higher education department.  We were
        told there was at least a risk we could end up just missing our
        academic year, so we were asked to make a decision, either we
        wait until the financing is resolved or we join the local
        National University.

        Q.   And where is the National University in Rwanda?

        A.   The National University, the science faculty I was
        interested in, the campus was the Butare campus.

        Q.   What decision did you make?

09:58AM        A.   I consulted with my family, and my parents thought it was
        preferable to just go study in Butare.

        Q.   Why did you go to Butare instead of waiting to study
        abroad?

        A.   Because one of my dreams was becoming a doctor, and I knew
        there was a school of medicine in Butare, so I decided to join.

1   Q.   Why did you want to become a doctor?

2   A.   It was very personal for me.  My father and my grandfather

3   was in mining business.  Sometimes mining activity can be

4   dangerous.  I've seen a member from my mother's side.  He was

5   involved in a mining accident, and he had to have his both legs

6   amputated.

7        A few years after another uncle of mine, he goes into

8   an accident.  His legs were crushed, but he was rushed to the

9   hospital.  There was a new doctor, an orthopedic surgeon.  He

09:59AM 10  was able just to perform like six or seven intervention, and

11  his legs were saved.  I remember visiting him in the hospital.

12  It was my first time I saw screws, metal screws in the body,

13  just screwing in the leg, and I was -- my father was discussing

14  with the doctor about the progress that my uncle was doing, so

15  I was impressed to see one of a family member lost both legs,

16  another one has his legs saved.

17       I remember asking the doctor how do you become a

18  doctor?  The doctor told me if you work hard in school, if you

19  are good in science, it takes long to become a doctor, but if

10:00AM 20  you want, you can become a doctor.  I was 11 years old, but

21  that day I knew what I have to do.

22  Q.   When you went to Butare to study medicine, where did you

23  live?

24  A.   When I arrived in Butare, I came like three weeks late.  I

25  was behind because the previous problem I talked about, when I

 1  arrived, I was placed in the Linda dormitory.  That's where the
 2  medical students were housed.
 3  Q.   Did you have a roommate?
 4  A.   Yes, I was teamed with Bernard Kalimba.
 5  Q.   Is that the same Bernard Kalimba who testified a few weeks
 6  ago?
 7  A.   Exactly.
 8  Q.   Did you get along with Mr. Kalimba?
 9  A.   Not at all.
10:01AM 10  Q.   Why not?
11  A.   Very quickly, just I came to see there was a compatibility
12  problems because I was from a seminary, a place very
13  regimented, structured.  Kalimba was from another high school
14  in the City of Kigali.  He has never lived at a boarding
15  school, so we would have classes in evening or do our reading
16  just to get ready, but later on when everybody just had enough
17  reading, Kalimba and most of his friends, they would choose to
18  go to the university bar to drink or to have a beer.
19       Then because I joined the medical school late, I had
10:02AM 20  to work hard because I have to catch up on my reading just to
21  make sure I'm updated just to make sure I pass my classes, so
22  my roommate will be gone just having a beer, having fun with
23  his friends.
24       When they come back, they would find me in our room
25  still reading, but those people just coming, they would be loud

1    and noisy.  At that moment, I had just to speak up to tell them

2    to respect the fact that I was still reading because I really

3    needed to pass to make sure I succeeded in my classes.

4    Q.   Was that an argument between you two?

5    A.   Oh, yeah, there was a lot of arguments because those

6    people.  They used to say you think you still are in seminary,

7    it's no longer the seminary you used to know, the university,

8    you are supposed to be able to work in the chaos.  It was this

9    group where they called the "connard."  It's a french term like

10:03AM 10   a shit-head or jerk.

11        Those people were very loud, never considerate, and

12   then it was really -- it was a fast fail-out because I told

13   them I'm not imposing you my lifestyle, but at the same time,

14   I'm resolved to pass this year this class because medical study

15   was very complicated.  You had to be dedicated because you

16   start the year, like 100 students, less than half pass the

17   first year.

18   Q.   Did you hear Bernard Kalimba testify that you had MRND

19   clothing?

10:04AM 20   A.   Yes, I heard him.

21   Q.   Was that true?

22   A.   That's not true.

23   Q.   Did you have an MRND flag in your room with Mr. Kalimba?

24   A.   No.

25   Q.   Are you familiar with Jerome Arusha?

1    A.    Yes, I'm familiar with Jerome Arusha.

2    Q.    How do you know Mr. Arusha?

3    A.    Arusha was one of the close friends of Kalimba.  He was

4    what they call buddy beer people.

5    Q.    Excuse me.

6    A.    A beer buddy.

7    Q.    A beer buddy?

8    A.    Yeah, just one of the people that would be hanging around.

9    Back in time, there was this idea some students would say after

10:05AM 10    reading enough in the evening, you can just go to the canteen,

11    to the campus bar, just have a beer.  The idea is just you have

12    a beer after reading to reinforce your memory.  Of course,

13    there is no science behind that.  That was just an excuse just

14    to go into the bar to have a beer, so frequent friends of

15    Kalimba's, among them was Arusha Jerome.  Arusha Jerome was an

16    activist, very loud activist for MDR party.

17         Arusha was from Congo.  Arusha also had despised

18    people from the north, and every time after drinking, he would

19    be loud, talking against people from the north.  Everybody knew

10:06AM 20    about his family story.  Looks like his dad, Arusha, Sr. was a

21    member of the First Republican Government.  Then when after the

22    Habyarimana regime started, some people from the south were

23    sucked from the government, so every time Arusha would see

24    someone from the north, he would resent him because of that

25    tension that happened, that program that happened to his

J.A. 1697

1    father, so many times I was a target of those rants because he

2    would be venting against people from the north, but we didn't

3    take him very seriously because he would be talking about those

4    issues when he was drunk, so we tended to just dismiss him as

5    just a miserable guy.

6    Q.   Did he have a nickname?

7    A.   Yes.

8    Q.   What was his nickname?

9    A.   His nickname over at the university was "Inzoga."  It

10:07AM 10   means beer.

11   Q.   You mentioned that the first year of medical school

12   involved a lot of work.  How did you spend your time that first

13   year of medical school?

14   A.   I was doing whatever I had to do just to pass.

15   Q.   Can you give us an idea of what your daily schedule was?

16   A.   Very simple, I would say just the morning you wake up

17   about 6:30, 7:00, but you do your morning routine, then you go,

18   you travel back to the campus because leaving the dormitory is

19   the other side of the campus.

10:08AM 20        You cross the lawn, you go to your campus, you have

21   your breakfast, then you come back, you go back to the Linda

22   dormitory, you pick up your reading material, whatever you have

23   to bring to the faculty, then you walk up to the hill, to the

24   medical school.  We have classes from eight to noon, then from

25   twelve to two o'clock, there was a break, lunch break, before

1    we travel back to the main campus again to have lunch.

2          Back in time in Rwanda, people used to have naps.

3    People used to nap after their lunch, then at 2:00, we go back

4    again to the faculty to have classes from 2 to 5, then at five

5    will be the end of the day.  Between five and six, people who

6    were interested in sports or people who have other hobbies,

7    they would just be doing that.

8          At six, six the university cafeteria is open, just you

9    go to the restaurant for the dinner.  People were busy with the

10:09AM 10   dinner between 6 to 7, 7:30.  Then again around 7:00, 7:30, you

11   go back to the library reading, just making sure you are ready

12   for your exams.  There would be a reading from 7:00, 7:30 to

13   almost 11:00, 11:30.  Some people, they would call it a night,

14   finish some other people, they keep reading until 1:00.

15   Q.   And how long did the school year last?

16   A.   The school year would start the end of September, October,

17   beginning of October till end of June.

18   Q.   How many students were in your medical school class in

19   your first year?

10:10AM 20   A.   In my first year, we were around 100.

21   Q.   How many students advanced to the second year?

22   A.   Only 47.

23   Q.   Were you one of the students who advanced?

24   A.   Yes.

25   Q.   Did your second year in the university begin in the fall

 1    of 1992 and continue into the spring of 1993?

 2    A.    Yes.

 3    Q.    Did you continue living in the Linda dormitory?

 4    A.    No.

 5    Q.    Where did you move?

 6    A.    I moved out because my experience with my roommate has not

 7    been very positive, so at the end, toward the end of my first

 8    year, I was discussing with people I knew, people I thought

 9    were more compatible with me, so I found a group of students I

10:11AM 10    knew, just we team up together.  We found a house nearby the

11    university just below the Linda dormitory.  We found our house.

12         The challenge was just to raise the rent because it

13    was a high rent, it was like 10,000 at that time, so we find

14    five students we could just team up, to then have a rent.

15    Q.    Who were the other students you moved in with?

16    A.    In that compound, there was already two students I knew.

17    There was Diogene Nsengumuremyi and Patrick Ndimubanzi, who was

18    a classmate.  They lived in that compound, and then we moved in

19    the big house in that compound, five of us would be myself,

10:12AM 20    Eric Nshimimana, the guy you saw here.

21    Q.    Excuse me.  Eric?

22    A.    Eric Nshimiye.

23    Q.    Is that the same Eric Nshimiye who testified yesterday?

24    A.    Yes.  We had Cyaga Patrick, we had Hunsimana Rivan, and we

25    had Mbonyinshuti Jean Marie.

**J.A. 1700**

1    Q.    Were all of those people students?

2    A.    Yeah.

3    Q.    Were all of those people in the medical school?

4    A.    No, not all of those.  We were just three in medical

5    school, myself, Eric Nshimiye and Patrick Ndimubanzi.  Cyaga

6    Patrick was doing public demonstration.

7    Jean Marie Mbonyinshuti was doing chemistry.

8    Q.    Did you and your housemates employ a domestic worker?

9    A.    Of course, we were living outside.  We have to make

10:13AM 10    arrangements, found a kind of house boy, servant who would do

11    our cooking, cook our meals, maintain the house for us,

12    cleaning the house, do the laundry for everybody.

13    Q.    Who was that domestic worker?

14    A.    That would be Jean Pierre Baligira?

15    Q.    Is that the Jean Pierre who testified last week?

16    A.    Correct.

17    Q.    What was the school work like in your second year of

18    medical school?

19    A.    It was intense because the first two years of medical

10:13AM 20    school are really heavy.  You have to do all the basic

21    sciences, and then at the end of the second year, you are

22    rewarded with a bachelor degree in biology just to make sure

23    you finish.

24          To give you an idea, you have to complete 80, around

25    between 80 and 85 credits in two years.  That would just be to

**J.A. 1701**

1    dabble for the work in the America system, so we still had to

2    work hard to make sure we would go from the premed to advance

3    to the doctorate.

4    Q.   Did your schedule remain largely the same in terms of

5    going to school and studying in the evening?

6    A.   Pretty much the same, beside we didn't have to go to the

7    university cafeteria anymore because we were having our meals,

8    you know, at a private house, otherwise we do the same, having

9    a breakfast, then after breakfast going to the medical school,

10:14AM 10   having more classes, back, having lunch, nap, the afternoon

11   classes, then evening, we do some sports activity just to

12   relax, then in the evening around 7:00, 7:30, we would start

13   again reading because we really have to put in the maximum time

14   just to make sure you pass your class.

15   Q.   Did you pass your exams and advance?

16   A.   Yes, I did.

17   Q.   Were there students who did not?

18   A.   Yeah, there are a lot.

19   Q.   Do you recall approximately how many students advanced all

10:15AM 20   the way to the third year?

21   A.   Third year, only 38, 38 students passed in the third year.

22   Q.   Did your third year of medical school begin in the fall of

23   1993 and continue into the spring of 1994?

24   A.   Exactly.

25   Q.   How did your third year of medical school differ from your

J.A. 1702

1    first two years?

2    A.    That's the second side of medical school, that's where you

3    start having clinical studies.  The first two years you start

4    mainly sciences, you do anatomy, philosophy.  You study

5    either the normal body, the healthy body, but starting the

6    third year, you start just the clinical study, the pathology,

7    you study the anatomy, the appearance of a sick body, so you

8    start studying diseases and all the clinical work.

9    Q.    What was the third year of medical school referred to as?

10:16AM 10    A.    They would call it Doctorate 1.

11    Q.    And you mentioned that that was, that year involved the

12    start of clinical work?

13    A.    Yes.

14    Q.    Where would clinical work take place?

15    A.    Clinical work would take place in we have a teaching

16    hospital.  The university hospital was just right behind the

17    medical school.  That's a teaching hospital, so if you have to

18    go to the hospital, you would be going to the same hospital I

19    told you about.

10:17AM 20    Q.    As part of your third-year studies, were you in the

21    hospital on a daily basis?

22    A.    Not on a daily basis.

23    Q.    How often were you in the hospital?

24    A.    There was kind of an introduction to the hospital.  First

25    of all, you have to take the class of medical ethics, you have

1     to know the code of conduct, how people behave in a hospital

2     environment.  At the end of the class, if you pass, you have to

3     promise also to treat everyone without discrimination, and you

4     have to promise never to do harm to anyone.  It's like a first

5     step to the hippocratic oath you take when you graduate from

6     medical school.

7               So after completing those introduction courses, we

8     would have the first introduction class to the clinical study,

9     we call it semeiology.  Semeiology means it's like the science

10:18AM 10   of symptoms.  It's where you study the symptoms, and the way

11    you study it, there is a theory part of the class.  There is

12    also the practical part of that class.  That's doing the

13    practice part of the class, you have to go in a hospital

14    sometimes to observe how a physician interacts with the

15    patients.

16    Q.   And when you would go to the hospital to observe, were

17    there rules for first-year doctorate students?

18    A.   Yes, of course, there are.

19    Q.   What were the rules?

10:19AM 20   A.   The first rule is just discrimination because being in an

21    examination room as an observer, it's like intruding, you are

22    intruding, so the general rule is just to be as discrete as

23    possible, just you stand in the back with your notepad, and you

24    take notes.  You are there to observe the main physician giving

25    care to the patient or directing the patient.  What you do, you

J.A. 1704

1    hang in the back and you take notes.

2    Q.   Were you permitted to touch the patient yourself?

3    A.   No.

4    Q.   What would you be wearing when you would accompany a

5    physician for observation?

6    A.   After completing that class of semeiology, you would be

7    allowed to buy the medical coat, the white coat, we call it.

8    You would be wearing the same coat to go to the hospital.

9    Q.   Did the coat that you would wear as a medical student

10:20AM 10    identify you as a medical student?

11    A.   No.  It's the same coat as doctors have.

12    Q.   In your observations at the hospital, had you ever been

13    assigned to the pediatrics ward?

14    A.   No.

15    Q.   Where would you accompany doctors when you were doing this

16    clinical work?

17    A.   In general medicine only.

18    Q.   And why was that?

19    A.   Because that's at the very beginning of the general

10:21AM 20    medicine to go in specialized wards like pediatrics or

21    maternity or dermatology.  You have, first of all, to complete

22    that class, which is a specialized class.  I can be dealing

23    with a treated patient because I have to do first pediatrics, I

24    then do some psychology before I start dealing with sick

25    children, but in the general medicine, there were just general

J.A. 1705

1   patients.  That's where we would be observing the normal

2   patients.

3   Q.   In March of 1994, did you spend any time doing

4   observational work at the pediatrics department?

5   A.   No.

6   Q.   How long did you live in Butare in total?

7   A.   From 1991 to June, 1994.

8   Q.   During the time that you were a medical student, were

9   there a number of different political parties that were active

10  in Butare?

11  A.   There were.

12  Q.   What political parties were active in Butare at that time?

13  A.   There were a number of political parties at the time.  I

14  would say MDR, PSD, MRND, PL, CDR.  That's what I recall.

15  Q.   And in general terms, was Butare a place where MRND was

16  strong or was Butare a place where other parties were strong?

17  A.   I would say it was a stronghold of PSD, the social

18  Democratic party because the two cofounders of PSD were from

19  Butare and native Congo.

20  Q.   And were there some students who were active in political

21  parties?

22  A.   Yes, they were.

23  Q.   Were all students active in political parties?

24  A.   Not at all.

25  Q.   As a medical student in Butare, were you ever a member of

1    the MRND?

2    A.    No.

3    Q.    Did you ever wear an MRND hat?

4    A.    No.

5    Q.    Did you ever wear an MRND scarf?

6    A.    No.

7    Q.    Did you ever wear any MRND insignia at all?

8    A.    Never.

9    Q.    Did you ever attend any political meetings or rallies?

10:23AM 10    A.    No.

11    Q.    Why not?

12    A.    Because I was not interested in the politics.  As I told

13    you, I was dedicated to my studies.  I knew to become a good

14    doctor, being political would not advance my career as a

15    doctor, so with my background from Red Cross, a guy doing

16    medical studies, the politics was not advancing my plans, so I

17    consciously decided not to do anything political.

18    Q.    Did you go to Interahamwe trainings between 6 and 8 p.m.

19    every Tuesday and Thursday for two years?

10:24AM 20    A.    Never.

21    Q.    Generally, where did you spend your time between

22    6 and 8 p.m. on Tuesdays and Thursdays?

23    A.    Between 6 and 8, I would be just having my dinner with my

24    friends.  After we finished our dinner around 7:00, 7:15, we

25    would be heading to the medical school faculty just in the

1   library just reading just to get ready for a class.

2   Q.   Do you know Innocent Habimana?

3   A.   No.

4   Q.   When was the first time you saw him?

5   A.   The first time I saw him in this court.

6   Q.   Your father was involved in the MRND?

7   A.   Yes.

8   Q.   Did he ever try to ask you or influence you to join the

9   MRND?

10:25AM 10   A.   No.

11   Q.   What role did politics play within your family?

12   A.   Politics was my father's business because he had decided

13   just to go into politics.  My mother was a teacher, first grade

14   teacher.  We had a very normal family life.  The few days I

15   spent with my family, just remember since age 14, I was living

16   in a boarding school, so whenever just I had a chance to be

17   home, I would be bonding with my siblings, visiting with my

18   grandparents, all extended family, but we have normal family

19   life.  We never just -- politics was not a big deal at our

10:26AM 20   table, at our family table.

21   Q.   During the time you were a medical student, were there

22   contentions or conflicts due to politics in Butare?

23   A.   Yes, there were some contentions, yes.

24   Q.   Were there some people who were very extreme in their

25   views?

```
 1   A.   Oh, yeah, there were.

 2   Q.   Were there people who would use terms like Inyenzi and

 3   other negative terms for Tutsis?

 4   A.   Yeah, during the time everywhere in the country there was

 5   a tension because of the war that was going on since 1990, so

 6   you could hear some heated debate everywhere.

 7   Q.   Did you use that type of language yourself?

 8   A.   No.   That's not me.

 9   Q.   Did you have friends who were Tutsi?

10   A.   Yes, of course, I did.

11   Q.   Who were some of your Tutsi friends?

12   A.   I can just give like my close friends,

13   Jean de Dieu Kayibanda.  That was a guy like a twin brother.

14   We spent nine years together.  I found him in a Nyundo seminary

15   when I was 14, so we were educated at the same schools and

16   program.  We spent the same days from 1985 to 1994 working

17   together every day.

18        I can give you Diogene Nkulikiyinka.  He was a bright

19   student.  I met him in Kigali taking my test.  We had the same

20   hobby because we both liked the Gregorian music.  Went to the

21   choir, university choir.  We spent a good time on the weekends.

22   I can give you Aimable Rwabukumba, you saw him here.

23   Q.   Is that the Aimable Rwabukumba, the --

24   A.   From France.

25   Q.   From France, the doctor?
```

J.A. 1709

```
 1   A.   I can give you Dorcyne Rugamba, Rugamba daughter, very
 2   well-known family.
 3   Q.   Without asking you to give names, I'm going to ask you a
 4   different question.  Are there many photos remaining of the
 5   time that you spent in Butare?
 6   A.   Not that many, but there were quite a few.
 7        MR. LAUER:  I'm going to ask that the witness be
 8   displayed photo of 77, please.
 9   Q.   There's a photograph on your screen.  Do you recognize
10   that photograph?
11   A.   Yes.
12   Q.   Are you in this photograph?
13   A.   Yes, I am.
14   Q.   When was this photograph taken?
15   A.   That focus was taken somewhere in May, 1993.
16   Q.   Was that in Butare?
17   A.   That's in Butare downtown.  It's a kind of bar.
18        MR. LAUER:  I'd move this into evidence, your Honor.
19        MR. VARGHESE:  Same objection, your Honor.
20        THE COURT:  I'll allow it.  77.
21        (Exhibit No. 77 received into evidence.)
22   Q.   Using the screen, can you circle yourself.
23   A.   That would be me in the corner.
24   Q.   Who are the people who are with you?
25   A.   These are people from my area because you had some
```

J.A. 1710

1    witnesses here talking about me hanging out with people from my

2    home town.  This is a typical social gathering.  Sometimes a

3    few times a year, like once or twice, we would have this type

4    of gathering just to share a beer, eat brochettes, or have this

5    kind of --

6    Q.   Are brochettes the kabobs?

7    A.   Yeah, the kabobs, the meat.  That's what people are

8    holding on the sticks, so these are the people I'm socializing

9    with.

10:30AM 10   Q.   Is there anyone in this photograph who you know to be

11   Tutsi?

12   A.   There are quite a few here.

13   Q.   Can you point them out, and, again, maybe using your

14   finger with the screen so that we can follow you.

15   A.   You have this big guy just behind me, Anastais.  He's a

16   good friend of mine, was a good friend of mine.  He's a Tutsi.

17   Again, here, the second person on my right, Ramazani Gagawa

18   (ph), he's a Tutsi, well-known.  He's a very successful man in

19   Kigali now, like an accountant.

10:31AM 20        There's this guy, Kazura Jean Bosco (ph).  He's a

21   Tutsi from a very well-known family.  Everybody knows in

22   Rwanda, Colonel Charles, Charles, he was the commanding officer

23   of Ruhengeri, the guy who said he was the one who helped the

24   RPF to capture the Ruhengeri city, so this guy was his young

25   brother.

# J.A. 1711

1        In the corner here, there is a guy, we don't see him

2    very well, his name is Albert.  He was doing chemistry.  Later

3    on, he became a priest, so in this group were like ten people,

4    around ten people.  We have four, five Tutsis in this group, so

5    the group is a very fine group.

6    Q.    Was it normal for you to share a meal or a drink with

7    Tutsi friends?

8    A.    Very normal because I spent six years in the boarding

9    school just living in harmony with people from different ethnic

10:32AM 10  backgrounds.  For me, it was not a concern.

11   Q.    I'm going to ask you if you recall Mr. Gasasira testifying

12   a few weeks ago and describing you as balding and a little bit

13   chubby.  Do you recall that?

14   A.    Yes, I remember.

15        MR. LAUER:  Can we display for the witness only

16   Exhibit 76.

17   Q.    This is another photograph displayed on your screen.  Do

18   you recognize this photograph?

19   A.    Yes.

10:33AM 20  Q.    And who is the person in this photograph?

21   A.    That would be me.

22   Q.    Where was this taken?

23   A.    This is taken in front of the central building, the

24   administration building for the university.

25   Q.    And when was this photograph taken?

# J.A. 1712

1    A.   This was taken at the end of '92, 1992.

2         MR. LAUER:  I'd move this into evidence, your Honor,

3    this is Exhibit 76.

4         THE COURT:  All right.  I'll allow it.  76.

5         (Exhibit No. 76 received into evidence.)

6    Q.   Does this photograph fairly and accurately depict your

7    appearance at that time?

8    A.   Yes.

9         MR. LAUER:  I'm going to ask that another exhibit be

10:34AM 10    displayed to the witness only, Exhibit 75.

11   Q.   There's another photograph that's been displayed on your

12   screen.  Do you recognize this photograph?

13   A.   Yes.

14   Q.   Who is the person in this photograph?

15   A.   This is me, 22 years old, 1993.

16   Q.   Does this fairly and accurately represent your appearance

17   at that time?

18   A.   Yes.

19        MR. LAUER:  I'd move this into evidence as Exhibit 75.

10:35AM 20        (Exhibit No. 75 received into evidence.)

21        THE COURT:  All right.  It's admitted.

22   Q.   What room was this taken in?

23   A.   This was one of my roommates.  This was a

24   Patrick Ndimubanzi.

25   Q.   Was this the residence off campus where you were living?

## J.A. 1713

1    A.    Exactly.

2    Q.    Do you recall Mr. Gasasira stating that you had a gap in

3    your teeth?

4    A.    Yes, I recall, but you see me smiling.  I never had a gap

5    in my front teeth.

6    Q.    Have you had any dental work between now and 1994?

7    A.    No, because in Rwandan culture, having a gap between your

8    teach is like a beauty feature.  For us back in Rwanda, if you

9    have a gap, ininya (ph), it's a sign of beauty.

10:35AM 10    Q.    I want to direct your attention to the date of the

11    Presidential plane crash in 1994.  Were you in Butare at that

12    time?

13    A.    Sorry.

14    Q.    When the president's plane was shot down in 1994, were you

15    in Butare?

16    A.    Yes, I was in Butare.

17    Q.    What were you doing in Butare?

18    A.    During April, 1994, when the president's aircraft was shot

19    down, it was during the Easter holidays, but due to our

10:36AM 20    program, we have a very big exam coming, so I decided to cut

21    short my vacation, and I traveled back to Butare just to get

22    ready for my exam.

23    Q.    And what was -- how did you intend to spend your time in

24    Butare before classes started?

25    A.    I intended just to spend time in a hospital just observing

J.A. 1714

1    to get ready for my exam of semiology and to spend the evening

2    reading for my cardiology exam that was following just next.

3    Q.    After the plane was shot down, what was the atmosphere

4    like in Butare?

5    A.    There was a confusion like everywhere in the country when

6    we heard about the crash.  Everybody understood it was

7    something really bad that happened, and everybody feared that

8    the provocation would come next, so the initial reaction from

9    everybody was shock.  Everybody was shocked.  Really we didn't

10:37AM 10    know what to do next.

11    Q.   For the first few days after the plane crash, what did you

12    do with yourself?

13    A.    I remember the first day we stayed home, just everybody

14    stayed home because it was a kind of chaos and confusing.

15    Everybody was waiting for instructions on what to do.  The

16    message that came through the media, the authority back in

17    time, they were asking people just to keep doing the activities

18    business as usual, so me being in the hospital, being in Butare

19    for my class work, just to go try to go to the university to

10:38AM 20    see how the other students were doing, so on the main campus,

21    there was no classes going on, people were confused, but at the

22    same time, I saw people who were the medical residents, their

23    last year student for medical school.

24         They were still going to hospital just doing their

25    internship, so I decided just to tag along just go to the

J.A. 1715

1   hospital, just observe, as I was supposed to be doing, then try

2   to read in the evening.

3   Q.   Was there violence in Butare immediately after the plane

4   crash?

5   A.   No, Butare was calm at the time.

6   Q.   At that time when Butare was calm, what was the hospital

7   like?

8   A.   In the first days, you could see there was some changes

9   because when the violence started around the country, we had

10:39AM 10   reporting of killings, violences across the country, so

11   everybody was tense, was afraid what might happen to Butare

12   city, but at the same time, Butare was still calm.

13       Because of some people were afraid, some people who

14   were scared just to get out of their homes, some people, they

15   would keep going to go to job, so we were -- the hospital was

16   understaffed because of that.

17   Q.   And how was the hospital functioning at that time when

18   things were calm?

19   A.   I won't say it was a normal functioning because at the

10:40AM 20   same time, we had Burundian refugees, those people were living

21   in refugee camps in Congo, because of the violence going on

22   already in Congo, those refugees had to flee the Congo

23   prefecture, and they were marching towards Butare seeking

24   refuge because at that time Butare was safe again.

25       So, at that time, there was an organization, the

Doctors Without Borders.  They were the ones who were in charge

of the Burundian refugees.  The Doctors Without Borders, they

have a presence at the University Hospital.  Because of that,

the Burundian refugees, who were fleeing Congo ended up coming

to the University Hospital, so gradually we saw a number of

people coming on the university, the hospital ground.  It

became like a refugee camp.  People were camping everywhere.

Q.   In this time period, did you continue to live in your

residence off campus?

A.   No.  I moved out from our private home.  I want just to

go -- to be close to other students because violence had

started outside, then the general --

Q.   When you say violence started outside, outside where?

A.   No, all over the country, we had a report about violence,

so the instinct was just to be around people who knew you very

well.  For a student, many students felt it would be much safer

to be among friends, so I was living outside the campus.

        My friend, Aimable Rwabukumba, who was living outside

the campus, decide just to move inside the Kiza dormitory.

That's where the medical students were housed.

Q.   Is the Kiza dormitory close to the hospital?

A.   Yeah, very close to the hospital.

Q.   Who was living in Kiza at that time?

A.   Usually people, the residents, the doctor residents,

people on the sixth year, their last year was in Kiza, sixth

J.A. 1717

1    year and the Fifth year because it's not a big building.

2    Q.   Once you moved into Kiza, can you estimate when you moved

3    into Kiza?

4    A.   It was like a week after the plane crash.  It would be

5    like 12th of April.

6    Q.   Once you moved into Kiza, how often were you going to the

7    hospital?

8    A.   I go to the hospital every day because those medical

9    residents, they literally live in the hospital, they go there

10:43AM 10   every day, so every time you see someone going, you just tag

11   along because whether you are there to observe, but at the same

12   time, the need was already there because we saw the hospital

13   was understaffed.  They needed people to help.

14   Q.   And what was your role in helping?  What were you doing at

15   that time?

16   A.   My role was a limited role as a junior student, it was

17   just doctorate work.  I had no authorization to perform any

18   acts, but you could be there just helping a senior student or a

19   resident doctor assisting him in whatever care he's giving.

10:44AM 20   Q.   What part of the hospital were you doing that?

21   A.   Because the need was on an emergency side.  During the

22   time, people who showed up to the hospital, I would say like 95

23   percent of people were people, genocide survivors, people who

24   have wounds of many sorts, so the hospital was overflowed by

25   people, the victim of the massacres.

## J.A. 1718

1    Q.    Where were those people coming from?

2    A.    On the first days, you had people coming from the

3    surrounding area of Butare because around the second week, we

4    start having people coming to the hospital from Gikongoro.

5    Those people have been walking among people fleeing Gikongoro,

6    hiding, that massive caravan, so we saw people coming to the

7    hospital.  Sometimes you would see people having some diseases,

8    some diarrhea problems, but mostly we have people just who are

9    wounded, but you could see that they are not fresh wounds, they

10:45AM 10   have been wounded a few days ago because the wounds were

11   infected, and then it was a nightmare.

12       That was the biggest job was just to make sure all the

13   wounded people who showed up at the hospital are taken care of.

14   Q.    Where would these wounded people go?

15   A.    Normally they would show up to the emergency department of

16   the University Hospital have emergency, would go right into the

17   emergence for general emergencies, but for the people who have

18   emergency, some people have traumatic injuries, they would head

19   to the emergence of the surgery department, that way they

10:46AM 20   perform microsurgeries.  All those wounded people, they were

21   showing up to their emergence of the surgery department.

22   Q.    I'm going to ask for Exhibit 25 to be displayed.  This has

23   already been admitted.  I'm sorry, 23.

24       MR. VARGHESE:  Your Honor, I think there's some

25   mistake.  25 is not admitted.

# J.A. 1719

1          THE COURT:  This aerial photo, we haven't seen this

2     before?

3          MR. VARGHESE:  No, your Honor, the one that's admitted

4     is 23.

5     Q.   I'm showing you what's been displayed as Exhibit 23.  Do

6     you recognize this to be an overhead shot of the hospital

7     campus?

8     A.   Yes.

9     Q.   Can you with your finger show us where the emergency area

10    was.

11    A.   Yes.  The emergency area will be just this is the

12    entrance.  The emergency will be here.

13    Q.   And you said that you were seeing many patients with

14    wounds that were several days old.  What kind of wounds were

15    you seeing?

16    A.   Generally cuts, machete cuts, several wounds, upper

17    bodies, heads, some people have wounds on their limbs, their

18    legs or their arms.

19    Q.   Was there a process in place to determine who needed to be

20    treated more quickly?

21    A.   Yes.  Like the situation of emergency, I would just put

22    into context of the war, it was a war, a civil war situation.

23    There was a lot of people around that hospital.  I never saw

24    less than 50 people waiting in front of that emergency of

25    surgery, so the medical personnel, they have to make sure no

**J.A. 1720**

 1    one will lose his life just waiting in front of this, so anyone

 2    just showing up like this is really bleeding, someone with an

 3    opening wound bleeding will be taken care of immediately, so we

 4    would admit a group like 20 people in the waiting room, so

 5    among the 20, they would figure out who needs the immediate

 6    care because he's bleeding or he's falling into

 7    unconsciousness, so just make sure he's treated very quickly.

 8    Q.   So there was never less than 50 people waiting to be

 9    treated?

10:49AM 10    A.   Yeah, there was lines and lines.  There was a lot of

11    people.

12    Q.   Why was there such a wait?

13    A.   Because, again, the hospital was understaffed.  There was

14    not enough personnel, there was not enough nurses or doctors to

15    treat these people.  At the same time, there was hundreds and

16    hundreds of people just fleeing the massacres, seeking refuge

17    and the care to that hospital.

18    Q.   Are you meaning people who were not wounded but were just

19    coming to the hospital?

10:50AM 20    A.   There were a mix, there were people who were not wounded

21    who came to the hospital just to seek refuge, and there were a

22    lot of people who survived with wounds who came in the hospital

23    compound just hiding at the same time looking for care.

24    Q.   Prior to the time of the genocide, was there a system in

25    place where people were administered or registered or something

J.A. 1721

1    like that?

2    A.   Yes, prior to genocide, already there was a system like

3    any hospital.  After the admission, you would be admitted,

4    registered, they would you give you kind of a file, you would

5    go somewhere, pay a fee, then you go to different department

6    just to be treated.  At the end, either you are hospitalized or

7    they send you home, but it was really a process there.

8    Q.   Did that process remain in place during the genocide?

9    A.   Not at all.  It was really a chaos.

10:51AM  10    Q.   Why was it a chaos?

11   A.   I can't just describe it.  War time, war is messy.  War is

12   messy.  Everywhere, it is disorganized.  At the same time,

13   there is a mass of people overflowing this hospital compound.

14   I can point you on this map, you see all the green areas like

15   in the middle here, this place was full of people who came just

16   to seek refuge, people with a small personal tent.  This area

17   here, there was also some, a lot of people just gathered here.

18        In this area, there was some tents from the Doctors

19   Without Borders that were just in this area, but here around

10:52AM  20   this place again, these are people who came just to set up

21   their tents because people were fleeing just to have like a

22   safe place in the middle of this hospital compound.

23   Q.   During this time period, was it possible to know who was a

24   patient and who was not?

25   A.   There was not a chance.

J.A. 1722

1   Q.   Why is that?

2   A.   Because people came en masse to the hospital, then when

3   they showed up, there was no process of registration, there was

4   no intake, there was no contra, so everyone who came in, either

5   he came to seek refuge, or they came to seek for treatment.

6   Once people were treated, some people returned back home, some

7   people remained in the hiding inside the hospital.  Some people

8   just kept hiding in the middle of this noise camping, so there

9   was no way you could know exact number of people who are on the

10:53AM 10   hospital ground.

11   Q.   Can you estimate how many people were on the hospital

12   ground either as patients or as people seeking refuge?

13   A.   There's no way you could estimate that because I would say

14   it's more than 10 times the normal capacity, and then it was

15   like me being in a market.  It's like really it's a big crowd

16   on the hospital ground, and then the hospital compound, the

17   hospital campus, there is no fence around the hospital.  You

18   could get into the hospital from anywhere, so there was no way

19   you can know exactly how many people on the hospital ground.

10:54AM 20   Q.   When would you go to the hospital in the morning?

21   A.   Usually you go there around eight in the morning.

22   Q.   And where in the hospital were you -- you mentioned the

23   emergency department.  Is that where you were spending the

24   majority of your time?

25   A.   Yes.

1    Q.    And just in very little terms, what were you doing?

2    A.    Just doing my best just to help people who are looking for

3    treatments.  We would show up in the morning around eight and

4    usually just they would assign people to different positions,

5    people who are senior, the medical resident.  They were

6    assigned to different tasks because those people could move

7    around giving care because they are trained on the license to

8    do.

9    Q.    Who were the people -- you mentioned that many people had

10:55AM 10    cuts and wounds.  Who were the people who were stitching those

11    patients?

12    A.    Those would be the medical residents.  People, the last

13    year of medical studies, sixth year.

14    Q.    And were you assisting those medical residents?

15    A.    Yes, as a junior student just here on the emergency side

16    of the department, you could just go there and assist during

17    those small microsurgery or just assisting, just passing around

18    the instruments.

19          When the operation, the procedure is done, the surgeon

10:56AM 20    would ask you to do the dressing, just to put a bandage on the

21    wounds while he's doing something else or he's preparing for

22    the next patient.

23    Q.    Would the residents who were performing those stitches

24    have anesthesia?

25    A.    Yes, they did.

1    Q.   Did you see them administer it?

2    A.   Yes, I did, many times.

3    Q.   Were there times when the residents did not administer

4    anesthesia?

5    A.   No, not that I recall because if you were stitching

6    someone without anesthesia, it would be someone would be crying

7    or screaming.  You would hear.

8    Q.   Who made the decision -- who actually was the one who made

9    the decision to administer anesthesia and get it to the

10:57AM 10   patient?

11   A.   That would be the person who is in charge of care, the

12   main caregiver would be either the doctor or the doctor

13   resident.

14   Q.   At some point, when you were working at the hospital, do

15   you recall there being a speech by the Interahamwe president in

16   Butare?

17   A.   Yes, we heard about it.

18   Q.   How did you hear about it?

19   A.   We heard about just hearsays because during the war,

10:57AM 20   travel by rumors, people talk, people talk, so somewhere in

21   April, people were talking about a visit of the then president

22   and the speech he made in Butare.

23   Q.   After that speech, did things at the hospital change?

24   A.   Yeah, it changed very dramatically.

25   Q.   How so?

## J.A. 1725

1    A.   Because after that speech, right after, we start seeing

2    many victims, many wounded victims, the survivors who started

3    arriving at the university with fresh wounds.  That was

4    unusual.

5    Q.   What sort of wounds were you seeing at this time?

6    A.   The first time you see someone who is heavy bleeding, you

7    could tell has been cut within hours.  Usually we saw people

8    coming to the hospital with wounds but infected wounds, not

9    bleeding, but following that speech, we saw people coming with

10:58AM 10    blood, fresh blood.  You could say the killing was going on in

11    the area of Butare itself, so the area was no longer safe.

12         MR. LAUER:  Your Honor, this might be a good time for

13    the morning recess.

14         THE COURT:  All right.  We'll take our morning break.

15         THE CLERK:  All rise.

16         (A recess was taken.)

17         THE CLERK:  All rise.

18    (Court enters.)

19    (Jury enters.)

11:18AM 20         THE CLERK:  Thank you.  You may be seated.  Court

21    is back in session.

22         MR. LAUER:  Your Honor, at this point I would ask for

23    this version of the overhead map with Mr. Teganya's markings to

24    be admitted as Exhibit 23A.

25         THE COURT:  In other words, you want to take a screen

J.A. 1726

          1    shot with all the...

          2              MR. LAUER:  Exactly.

          3              THE COURT:  All right.  I'll allow that.  23A.

          4              (Defendant Exhibit 23A **received in evidence.**)

          5                          DIRECT EXAMINATION

          6    BY MR. LAUER (Continued):

          7    Q.   Before the break, Mr. Teganya, I had asked you about how

          8    things at the hospital changed after the speech by the

          9    president elect in Butare.  Do you recall approximately when

11:18AM   10    that was?

         11    A.   It was approximately April 19.

         12    Q.   You mentioned already that the freshness of the wounds was

         13    a change.

         14    A.   Yes.

         15    Q.   Did the volume of patients change?

         16    A.   Drastically.  Very more so changed.

         17    Q.   How so?

         18    A.   There was a lot of wounded people.  It was much more than

         19    previous days.  There was a lot of people coming wounded.

11:19AM   20    Q.   Where were the doctors and other hospital staff during

         21    this time?

         22    A.   Some were facing the same problems as the other civilians.

         23    Some were killed even because -- during the -- among the

         24    hospital staff we had Tutsis, and then there were people who

         25    were afraid to come out from their home just to come to work.

## J.A. 1727

1    There were people who had already taken refuge someplace else.

2    And there were people who had been killed.  So the hospital

3    was, again, understaffed because of what was going on around

4    Butare City.

5    Q.   How busy were you at the hospital at that time?

6    A.   I was extremely busy because the amount of wounded

7    survivors coming to the hospital was way much bigger than the

8    capacity of the people who were present giving care.

9    Q.   How many hours a day were you at the hospital?

11:20AM 10   A.   I went there mornings like from 8:00.  Then I came -- it

11   was during the crisis period that the administration of the

12   hospital, who has reduced the working hours, because the

13   hospital was understaffed.  The normal working hours would be

14   like from 8:00 to 2:00, one shot without breaks.  That was to

15   allow people who are living outside the campus, the staff, to

16   allow them to travel back to their places because they have to

17   go through roadblocks.  And at the time there was a curfew.

18   You have to make sure you are at your home place before the

19   curfew started.

11:21AM 20   Q.   Would you leave the hospital at 2:00 p.m.?

21   A.   No, because of the students, the resident doctors and the

22   medical students who were living on the campus, we were housed

23   on the campus.  We would have access to the university

24   cafeteria.  We have our meals on campus.  So we were asked to

25   stay longer because all the emergency cases were wounded

**J.A. 1728**

1  people, and by 2:00 p.m. there was a line-up -- a huge line-up

2  of wounded people still there.  So they have just to make sure

3  they take care of the maximum of people throughout the day.

4  Q.   When would you go home from the hospital?

5  A.   Around 6:00.

6  Q.   Is this every day?

7  A.   It's every day, because every day people were fleeing to

8  the hospital.

9  Q.   The people who had been injured, were the wounds severe?

11:22AM 10  A.   Very severe.  Life-threatening, because I think the people

11  who are wounding, giving those wounds, the intention was to

12  kill.  Very severe wounds.

13  Q.   This probably goes without saying, but were the people you

14  were seeing traumatized?

15  A.   Very traumatized.  You would see the look in their faces.

16  When you say someone is scared to death, I don't know if you

17  really mean what you say, but to see the look of someone who

18  just escaped death, it's threatening.  It's...

19  Q.   How were you processing what was happening around you?

11:23AM 20  A.   Very, very badly.  It was a very intense situation,

21  intense moment, very stressful, because being in a hospital,

22  it's always a battle.  You are trying just to win a battle

23  between an illness and the life of a patient.  But when you see

24  a medical emergency not caused by a natural disease, it's

25  another level of stress.  You can see a victim of a car

J.A. 1729

 1  accident, one or two.  It's really hard to take in.  But when

 2  you see heavy deep wounds, not one, not two, more than three

 3  every hour, at the end it gets to you.  There is a limit to

 4  what you can take.

 5  Q.   What was your mental state during this time?

 6  A.   Too much stress, anger, frustration, the sentiment of just

 7  being powerless of what is going on.  And then the sense of

 8  duty, because you were there just to help people, just giving

 9  care.

11:24AM 10  Q.   Did you consider fleeing yourself?

 11  A.   No, because at the beginning of the hostilities in Butare,

 12  there was orders given by the authorities.  They asked

 13  everybody just to remain where we are.  To move around, you

 14  have to have a kind of laissez-passer for a physician just to

 15  move around.  You have to provide a reason, the business why

 16  you're moving around.

 17       In the beginning it was quite logical to remain in

 18  Butare because Butare was safe.  There was no killing.  There

 19  was no traveling in Butare City.  So for the first time just

11:25AM 20  staying in Butare made sense.

 21       Then when the killings started, when we saw the kind

 22  of emergencies happening in the hospital, the need of the

 23  staff, people went in just to take care of the wounded people.

 24  There was a real sense of duty.  For me it would be like

 25  abandoning people in need.

# J.A. 1730

1    Q.   Did there come a time when soldiers arrived at the

2    hospital?

3    A.   Yes.  Around 20th or 21st of April.

4    Q.   How did those soldiers arrive?

5    A.   The first day, we had air ambulances, the helicopters.

6    They landed on the hospital grounds, on the parking of the

7    university hospital just in front of the emergency.  So when a

8    helicopter lands, you can hear all the noise and the travel.

9    So the first wounded soldiers came by air ambulance.

11:26AM 10   Afterwards, some wounded soldiers were also brought in by

11   ground, by ambulances.

12   Q.   Where did the soldiers go on the hospital grounds?

13   A.   Most of those wounded soldiers, they were coming from the

14   battleground.  Most of them, they had heavy wounds,

15   life-threatening wounds.  They needed heavy surgery, to

16   amputate their legs or sometimes to reconstruct the body

17   because of bullets and heavy bombs.  So most of them, they had

18   to go through the major surgery because they needed big

19   surgery.  After they would be housed where the people from

11:27AM 20   surgery were recovering.

21        In this picture, it would be one of these two

22   buildings.  (Indicating.)  I don't know if you can see.

23   There's two buildings.  There were two main surgical blocks.

24        After, when they recover, they would be moved here in

25   one of those two buildings.  This one building in the back,

this was a building of internal medicine. (Indicating.) So

there was a path reserved for soldiers who were recovering.

And the soldiers were housed together.

Q.   Did you treat the soldiers yourself or were you involved

in treating the soldiers yourself?

A.   Never.  It was really our specialized treatment for people

who are advanced in surgery.

Q.   At some point when you were working at the hospital did

you learn that patients had been taken?

11:28AM 10   A.   Yes.  I heard about it.

Q.   How did you hear about that?

A.   The morning of April 21 or 22 we arrived at the hospital

in the morning, and the previous night the hospital had been

attacked by militiamen from outside and they attacked the

hospital.  Patients had been dragged from their hospitalization

rooms and then been killed outside the hospital.

Q.   Who were you getting that information from?

A.   Again, during this wartime, rumors, people talk.  Every

morning when we arrived at the hospital, just the first

11:29AM 20   greeting, the first gathering, people would be sharing

information about what's going on.  So the first people who

came, the first medical students, they learned from the

hospitalized patients that they there were attacks that

happened last -- the previous night.  So when I showed up, I

was told the same story, the same horror story of what happened

1   on the previous night.

2   Q.   When you showed up, was the attack still going on?

3   A.   No.

4   Q.   Did you see any militia people taking anyone on the

5   hospital grounds?

6   A.   No.

7   Q.   How did you react when you learned that people had been

8   taken?

9   A.   It was shocking news.  It's shocking news, and it's

11:30AM 10  inconceivable just to even think that someone would be killed

11   in a hospital.  So when we heard that, everybody was shocked.

12   It was a kind of frustration because it's inconceivable just

13   to -- it's not really easy to process.  That's when just we

14   really realized there is no safety finally.

15   Q.   Was that the only occasion that you learned that people

16   had been taken from the hospital?

17   A.   No.  Two more occasions.

18   Q.   When did those take place?

19   A.   The following morning also we had people who had been

11:31AM 20  dragged out from their rooms, on the morning of the 22nd.  And

21   there were discussions because the senior doctors, they were

22   talking with the hospital administration, asked them just to

23   talk to the local authorities and the military people because

24   during that period of war, there was a kind of chaos.  There

25   was no law.  There was no order.  When there's this kind of

lawlessness, just the person who has really the power is the
guy with the gun who can just kill whoever he wants.  So the
only way is to just at least ask the military leadership just
to make sure they protect the hospital.

Q.   Were you a part of those discussions?

A.   No.  That was -- the discussion we had -- the report we
had is from the doc -- the senior students who talked to the
university, the hospital administration, the director of the
hospital at the time.  He was the one who supposedly met with
the military leadership.

Q.   When you learned about these other occasions on which
people were taken, did you learn it in the same way, just by
people at the hospital talking when you showed up for work?

A.   Every incident you learn about, it's the following morning
when you show up.  There was no way just to know beforewards.
It's always afterwards.

Q.   How long did you stay working at the hospital during the
period of the genocide?

A.   I stayed until mid-June.

Q.   During the genocide, were you working for Doctors Without
Borders?

A.   No.  I never worked for Doctors Without Borders.

Q.   Were you involved in treating patients in the Doctors
Without Borders tents?

A.   No.  Those tents -- previously they were there just to

1   take care of Burundian refugees, but when the killings started

2   in the Butare area, everybody just -- any wounded person, would

3   show up to any tent, anywhere you see a nurse or doctor would

4   show up, so there was no discrimination.  So they were treating

5   everyone at that time.  And then it didn't last long because

6   shortly after the killings started in Butare, we learned that

7   Doctors Without Borders were leaving the hospital already.

8   Q.   At that time did you know anything about why Doctors

9   Without Borders had left?

11:34AM 10   A.   At the time we didn't know what happened, because I was

11   not involved with their operations.

12   Q.   During the time you were working at the hospital in the

13   genocide, were you ever in the maternity ward?

14   A.   No.

15   Q.   Were you ever in the dermatology ward?

16   A.   No.  As I told you, to go in those wards, you have to be

17   specialized in that field.  So as a junior student I was not

18   trained either specialized to be in maternity or doing

19   deliveries or to do dermatology for skin diseases.  I was not.

11:34AM 20   Q.   At any time when you were working at the hospital, did you

21   see anyone killed with your own eyes?

22   A.   Not with my own eyes, never.

23   Q.   Did you ever see patients being taken?

24   A.   No, all of those actions happened at nighttime when I was

25   not on the hospital grounds.

# J.A. 1735

```
 1   Q.   Did you ever see any medical staff, students or doctors
 2   assisting with patients being taken?
 3   A.   No, not with my eyes.
 4   Q.   Did you kill anyone at the hospital?
 5   A.   Never.  I never killed anyone.
 6   Q.   Were you involved in killing anyone at the hospital?
 7   A.   Never.
 8   Q.   Were you involved in killing anyone at the Kiza dormitory?
 9   A.   Never.
10   Q.   Did you rape anyone?
11   A.   No.
12   Q.   Were you involved in any rapes?
13   A.   No.
14   Q.   Before this trial, had you ever seen Consolee Mukeshimana
15   before?
16   A.   Never seen her face before.
17   Q.   Before this trial, had you ever seen Esperance Mukamurenzi
18   before?
19   A.   Never seen her face before.
20   Q.   Before this trial, had you ever seen Mr. Gasasira before?
21   A.   Never met him before.
22   Q.   Did you hurt anyone during the genocide?
23   A.   Never.
24   Q.   Were you yourself hurt during the genocide?
25   A.   Yes.
```

**J.A. 1736**

1    Q.   When did that occur?

2    A.   Somewhere in the second week of May.

3    Q.   How were you hurt?

4    A.   I was struck by a militia group.  I received two cuts of

5    machete on my legs.

6    Q.   Before we talk about those wounds, did you receive them

7    because you tried to help people?

8    A.   Yes.  Somewhere in the beginning of May there was a couple

9    of people who came to the hospital, a brother and a sister.

11:36AM 10   They were coming for treatment.  The brother had wounds on his

11   head.  He received a treatment, and they were hiding on the

12   hospital grounds, but those people, they recognized me because

13   they knew my family.

14        So on my way to --

15   Q.   Before you go on, do you remember the names of those --

16   that couple?

17   A.   That would be Anna Patrick and Mary Beata.

18   Q.   Patrick and Beata?

19   A.   Yes.

11:37AM 20   Q.   Did you know them?

21   A.   No, I didn't know them personally, but they knew my

22   family.

23   Q.   Where were they from?

24   A.   Their father is from our native place.  So they are from a

25   Tutsi family.  They know my grandfather, and by extension they

**J.A. 1737**

1    know my father.

2    Q.    I think you said you were involved in treating one of

3    them?

4    A.    No.  One had been treated for wounds on his head, and

5    because they saw me, they recognized me, I was -- some people

6    from my area, they knew me.  There are not a lot of people who

7    go to university.  So if you are attending university, some

8    people, they know you because it's a, you know.

9            On my way to the cafeteria to the lunch break, they

11:38AM 10   approached me and said, "Okay, we know you.  We recognize you.

11   You are Leonard from the Teganya family?"  I said, "Yes."  They

12   told me they are from the Munyanziza family.  And I knew the

13   family.  They're from -- it was a Tutsi family close to my

14   grandfather.  So they told me they were in hiding on the

15   hospital grounds.

16   Q.    Did they ask you for anything?

17   A.    Yeah.  They told me they were -- because I told them where

18   are they hiding or their plans.  Some people were in hiding,

19   but waiting for an opportunity just to escape, to get out.

11:39AM 20   They told me they were planning -- they were -- during that

21   time, there were people who were trying to make some money just

22   smuggling people from Butare towards Akanyaru border just to --

23   people would flee to Burundi.  So people were having some

24   personal cars, taxis or small cars.  Just hide people in your

25   car, drive them from Butare to Akanyaru was like a 30, 35

1    miles.  People would pay a fee like 1,500 just to make that

2    journey.

3          The problem with those two people that have been

4    living in hiding like for a week, they had filthy clothes.

5    They were really dirty.  The brother, you could see his shirt

6    was already stained with blood.  So they told me it would be

7    suspicious for them just to travel with other passengers.  You

8    could not pretend you were traveling with other passengers.

9    You could see they were just people in hiding.

11:40AM 10          So what they asked me to do is if they could come to

11    my room, just have a bath, clean up, have a spare change of

12    clothes, clean clothes, so that they can make that travel just

13    from Butare to Akanyaru fleeing to Burundi.  That was the

14    nature of the request they made.

15    Q.   Did you agree to help them?

16    A.   I agreed to help them because someone recognized you

17    through the family.  So it's kind of a moral obligation.  I

18    could not just turn them down, but there was also concern

19    because I told them it was almost impossible for them to leave

11:41AM 20    the hospital grounds.

21    Q.   Why was it impossible for them to leave the hospital

22    grounds?

23    A.   Still there were some of the militia people, sometimes

24    they would pass through the hospital or walking around, because

25    those people, they were monitoring people coming and -- coming

J.A. 1739

1    or going from the hospital.  The militia people were hunting

2    down people just to kill them.  So for them, it would be very

3    dangerous just to be exiting the hospital in the daytime.

4    Q.    What happened next?

5    A.    We had just a previous discussion, just a day, like two

6    days after, because they always used to make the travel

7    arrangements on a weekend.  People would just leave on the

8    weekend when there was not much going on outside.  So two days

9    after, they told me -- they approached me, they told me that

11:42AM 10    they want like just to come to do the cleaning the same evening

11    so they can make the traveling the next day.

12           So I told them, because they knew I was living with

13    where the students lived, if they could make it to my place in

14    the evening, in the evening I would be gone for my dinner in

15    the cafeteria between like 6:00 or 7:00.  I told them if they

16    could make it around 7:00, 7:30 to my room, I told them I lived

17    in the fourth door of the building.  If you come knock at 7:30,

18    I'll be waiting for you.  You come, have your bath.  You clean

19    up.  Then you keep on your venture.

11:42AM 20    Q.    Did they come to your room that night?

21    A.    Yes, they came.

22    Q.    And did you take them into your room?

23    A.    Yes.

24    Q.    After you took them into your room, what happened?

25    A.    Right after like two or three minutes, I had people just

## J.A. 1740

1   knocking on my door, just knocking very loud on my door.

2   Q.   Did you open your door?

3   A.   No.  It was during a war situation that you cannot open a

4   door for whoever knocks.  And I asked them who they are, what

5   it's for.  And they told me I have to open the door because

6   they're looking for people in that room.

7   Q.   Did you open the door for them?

8   A.   No.  I told them my name.  My name is Jean Leonard

9   Teganya.  I'm a medical student.  I live in this room.  I'm by

11:43AM 10   myself.

11   Q.   Did they go away?

12   A.   No.  They kept insisting because they told me they had

13   been monitoring people coming from the hospital.  They told me

14   that, "We just saw two people entering your room.  You have to

15   open up your room."

16   Q.   At that point did you open the door for them?

17   A.   No.  I didn't open the door.  They forced the door by

18   force.

19   Q.   What happened next?

11:44AM 20   A.   They forced my door.  Three people -- I see people in the

21   door frame.  One of the people -- one of the three people just

22   dragged me out of the room.  Two people entered the room just

23   going around just looking for the people who were in there.  It

24   was a small room.  There was no place to hide beside just --

25   Q.   Were Patrick and Beata found?

# J.A. 1741

1   A.   They just -- yeah, the closet and under the bed.  So like

2   a minute or two they dragged them out too.  So they were

3   saying, "These are the people we're looking for."

4   Q.   Were you taken anywhere?

5   A.   Yeah.  They wanted just to take them away, and I told

6   them, it's -- I begged.  I tried just to talk on their behalf.

7   I told them these are people I knew.  This kid from family,

8   they are not the enemy of the country you're looking for.

9   Just -- I tried just to explained, but they told me, "No, we're

11:45AM 10   looking for them."  I told them, "If you're taking them

11   anywhere, I am going with them," because they came just for me.

12   They came for help.  I could not just let them go by

13   themselves.

14   Q.   Were you taken somewhere with them?

15   A.   We were dragged behind the Kiza dorm.  There was a field

16   area, and there is a kind of -- I can't say -- like a garden,

17   but there is a big field with bushes and trees.  It's on the

18   grounds for the institute of scientific research.  That's where

19   they dragged people just to be killed.

11:46AM 20   Q.   How far of a distance away from Kiza was that?

21   A.   It was like between a seven- and ten-minute walk.

22   Q.   What happened when you made it to that area?

23   A.   It's -- just when we arrived in that secluded area, one of

24   the people just was walking behind me.  He struck me with a

25   big -- like a mace.

J.A. 1742

1    Q.    Like a mace?

2    A.    Yeah.  He had like a big stick, but at the end of the

3    stick they have a big ball.  It's like a club or mace.  He

4    struck me on the head, on the back of the head.  I fell to the

5    ground.  So when I fell to the ground, I thought it was over

6    for me because once I was on the ground, I could see people

7    just surrounding me.  The instinct was just to protect my head,

8    because if anyone attacks on the head, try to protect the neck

9    and the head, and I was in the fetal position just trying to

11:47AM 10    make myself just little.  And the other guy who was with him,

11    he had a machete.  He struck me with his machete on my left --

12    my left thigh, and another strike on my right ankle.

13    Q.    Were you wounded when you were struck?

14    A.    Yes, in both places.

15    Q.    Could you -- did you know what was happening to Patrick

16    and Beata?

17    A.    Yeah.  The other guy with me was being beaten at the same

18    time.  Where I was on the ground I could hear the girl

19    screaming.  I could hear the girl screaming because someone was

11:48AM 20    forcing just to take her clothes off.

21    Q.    Was that something you could see yourself?

22    A.    No.  I was on the ground just hiding, protecting my head.

23    I could hear it, but I could not see, because I was on the

24    ground.  And people were just on top of me.

25    Q.    This area where you were, was it lit?

**J.A. 1743**

     1    A.    Yeah.  It was lit.  It was around 8:00.  It was nighttime.

     2    Q.    Was it lit by lights?

     3    A.    I'm sorry?

     4    Q.    Were there lights in this area --

     5    A.    No.

     6    Q.    -- any sort of lighting?

     7    A.    No.  There was no lighting.

     8    Q.    Was the sun dark?  Had it become nighttime?

     9    A.    It was already nighttime.  In Rwanda after 6:30 it's dark

11:49AM 10    already, it's dark.

    11    Q.    How did you survive?

    12    A.    I don't know.  Only chance.  Because when you are just on

    13    the ground, someone with a weapon on top of you, it's -- I

    14    thought I was dying.  I thought it was the end of it.  I don't

    15    even know how long, just I was there.  My only thought was just

    16    waiting for the next strike that will be the final one.  But a

    17    few more minutes, then we heard people approaching.  They

    18    called out.  We heard voices from outside, and they happened to

    19    be a group of soldiers.  There was one officer soldier and two

11:50AM 20    of his aides.

    21    Q.    What did that group of soldiers do?

    22    A.    They were calling out on this militia to stop, because

    23    there was this woman screaming, this young girl screaming.  His

    24    brothers were screaming.  There was me scared to death on the

    25    ground.  But people who passed by, probably these people they

# J.A. 1744

1   came for us, they heard the screams.  So they were calling from
2   a distance asking to stop.
3   Q.   What did the people who were beating you do?
4   A.   Obviously they realized the people who coming were the
5   soldiers, the regular soldiers, because during that time, the
6   militia, some of them they have a piece of clothing, military
7   clothing, or they have just weapons.  But the regular soldiers,
8   they were fully dressed from head to toe.  You could see a
9   regular soldier with proper firearms.  So those people, they
11:51AM 10   have power on the militia.  So if a soldier for the army asked
11   you to stop, you stopped.  It's a power struggle.
12   Q.   Did they stop attacking you?
13   A.   Yeah, they stopped.  Then they ran away.
14   Q.   What did they do?
15   A.   They ran away.
16   Q.   Did you know the soldier or any of the soldiers who --
17   A.   Yeah, the officer, I know him.  He was one of the medical
18   students.  They were kind of ROTC.  Some officers came on the
19   campus to be trained.  So the soldier was one of the people who
11:51AM 20   are just looking after people at the hospital.
21   Q.   You mentioned that you were struck and wounded.  Did you
22   need to receive stitches yourself?
23   A.   Yes.
24   Q.   Where did you go to do that?
25   A.   I was taken to the hospital, back to the same hospital.

1    They said they had to give me six stitches on my right ankle.

2    On my thigh I was wounded, but I had two pants on most of the

3    time during the war.  People had two or three layers of

4    clothing.  So it was not deep.  I had just a regular cut.

5    Q.   I think you mentioned you were wearing two layers of

6    clothing.  Why were you wearing two layers of clothing?

7    A.   During that moment of insecurities, you don't know when or

8    under which condition you would have to flee where you are to

9    some major security.  Everyone has to put on like two or three

11:53AM 10    layers of clothing because most of the time people had to flee

11    without notice, on short notice.

12    Q.   When did you go to the hospital to receive those stitches?

13    A.   It was that night.  It was around 8:30, 9:00.

14    Q.   Do you have scars?

15    A.   Yes, I do.

16         MR. LAUER:  If I could have Exhibit 78 displayed for

17    the witness.

18    Q.   There's a photograph displayed on the monitor.  Do you

19    recognize what this photograph is?

11:53AM 20    A.   That's the back of my foot.  That's my right ankle.

21    Q.   Is this the scar you received from the incident you just

22    described?

23    A.   Yes.  This is it (indicating).

24         MR. LAUER:  Your Honor, I'd move this into evidence as

25    Exhibit 78.

# J.A. 1746

1      THE COURT:  All right.  It's admitted.  78.

2      **(Exhibit No. 78 received in evidence.)**

3  Q.   And just to clarify the perspective here, this is the back

4  of your right ankle?

5  A.   Right ankle, yes.

6  Q.   Near the Achilles heel?

7  A.   I'm sorry?

8  Q.   Near the heel of your foot?

9  A.   Yes.

11:54AM 10  Q.   Did you also receive a scar on your thigh?

11  A.   Yes.

12      MR. LAUER:  I'm going to ask that Exhibit 79 be

13  displayed for the witness only.

14  Q.   Do you recognize what's before you on the monitor?

15  A.   Yes.

16  Q.   What is depicted in this photograph?

17  A.   That's the other scar on my mid thigh, on the left side.

18  This is it (indicating.)

19      MR. LAUER:  I'd move this into evidence as Exhibit 79.

11:55AM 20      THE COURT:  All right.  It's admitted.  79.

21      **(Exhibit No. 79 received in evidence.)**

22  Q.   Do you know what became of Patrick and Beata --

23  A.   No.

24  Q.   -- after this incident?

25  A.   Yeah.  They were taken back to the hospital because there

1    was only one place people were hiding, and I were asked to go

2    back to my room, as usual.

3    Q.    Did there come a point when you fled Butare?

4    A.    Yes.

5    Q.    When was that?

6    A.    It was in the middle of June.

7    Q.    What caused you to flee Butare?

8    A.    At that time the war was progressing.  Already we had --

9    there were reports of Kigali under siege.  We had RPF advancing

11:56AM 10    towards the south.  And they would had the regular army exiting

11    to the west.  So it was like a crash between the two fighting

12    armies.

13          During that time the entire population was fleeing

14    because at the same time there was this militia group, people

15    who were killing people.  Just they wanted -- they didn't want

16    people to join.  This was occupied, controlled by RPF.  So

17    everybody was just leaving.

18          So around 15 or 17 in the Butare area people could see

19    people started really getting out of the city.  Before moving

11:56AM 20    around, you needed a laissez-passer from authorities, but at

21    that time everybody was getting out.  So that's in the same

22    circumstances I decided just to leave because it was becoming

23    impossible.

24    Q.    When you left, were you riding in a vehicle?

25    A.    No.

1    Q.   How did you flee?

2    A.   I walked with the other people.  There were big caravans,

3    people walking.

4    Q.   When you say "big caravans" can you describe how many

5    people there were?

6    A.   Try to imagine the entirety of Boston leaving the city.

7    There were hundreds and hundreds of people just walking, and

8    people are having the same -- their small belongings on their

9    heads or just fleeing the battlefield.

11:57AM 10    Q.   What did you take with you?

11    A.   I took a small bag I had with me.  During the war people

12    just -- when the war started from the north, people fled the

13    region for Byumba and Ruhengeri.  Those people, they lived in

14    tents.  They lived in the wild field for more than two years.

15    Those people were experienced just to move around.  So we had

16    the same people talking about the experiences, how they left

17    everything behind.  So the advice from their experiences was

18    always to have a small bag with your dearest, your must-have

19    belongings.

11:58AM 20         At that time the most important possession I had to

21    have was just my academic papers, my identification papers and

22    my academic papers.  That was the most important for me.

23    That's what I left with.

24    Q.   Did you take a suitcase or any sort of large bag?

25    A.   No.  It was just a small bag.  I remember I had two

**J.A. 1749**

1   bottles for water.  I took a bag -- a bag or two bags of sugar

2   I bought at a kiosk.  I knew people when there is nothing else

3   to eat or to survive on, at least if you have a little sugar

4   you can survive on that.

5          Everybody was headed towards the Turquoise Zone.

6   Q.   The Turquoise Zone?

7   A.   Yes.

8   Q.   What was the Turquoise Zone?

9   A.   The Turquoise Zone was the only safe place during that

11:59AM 10   period of time.  It was the area by Kibuye, Gikongoro and

11   Cyangugu.

12          MR. LAUER:  Before you continue, I'm going to ask for

13   Exhibit 80 to be displayed for the witness only.

14   Q.   Do you see the map before you?

15   A.   Yes, I see it.

16   Q.   Is this a map of Rwanda at that time?

17   A.   Yes.

18          MR. LAUER:  I'd move this into evidence as Exhibit 80.

19          THE COURT:  All right.  It's admitted.  80.

12:00PM 20          **(Exhibit No. 80 received in evidence.)**

21   Q.   Can you perhaps circle Butare on the map so we have that

22   as a reference point.

23   A.   Yeah.  Butare, the prefecture of Butare would be like this

24   one.  That would be Butare (indicating).

25   Q.   And do you see to the left of that is the Turquoise Zone

        1    actually marked there?

        2    A.    Yeah, the Turquoise Zone would be all this here, Kibuye,

        3    Gikongoro and Cyangugu.

        4    Q.    So when you left Butare, were you heading west?

        5    A.    Yes.

        6    Q.    How long did it take you to get to the Turquoise Zone?

        7    A.    It took me two days.

        8    Q.    And once you -- two days of walking?

        9    A.    Two days walking from Butare here.  Just walking this

12:01PM 10    distance from Butare, walking just close and arriving in

       11    Gikongoro.

       12    Q.    When you arrived in Gikongoro, did you stop there or did

       13    you keep going?

       14    A.    I kept going, because when we were at Gikongoro, people --

       15    you could see people keep going toward east -- toward west,

       16    because as you see there, the east of the country was already

       17    occupied by RPF, and they were advancing towards west.  At the

       18    same time, we had the foreign armed forces, the regular army.

       19    It was a battlefield on this front.

12:02PM 20            So everyone -- the country was just going -- everyone

       21    was fleeing the country because we don't want to be caught

       22    between those two fighting armies.  So people were heading

       23    either north to exit north.  That would be the border from the

       24    north of Gisenyi or the next exit would be this one from the

       25    south in Cyangugu.  That's why when we saw almost everybody

# J.A. 1751

1    heading to Cyangugu, the group I was walking with, we decided

2    to join the caravan and keep going.

3    Q.    Did you make it all the way to Cyangugu at the far west of

4    the country?

5    A.    Yes, I did.

6    Q.    How long did that take?

7    A.    It takes more than three days -- three weeks.  I'm sorry.

8    It's like 150 miles.

9    Q.    Did you have a place to stay when you were walking?

12:03PM 10    A.    No.  Everybody was just sleeping in the open in the field.

11    Q.    How were you eating?

12    A.    Just buy some stuff.  There were people selling fruits or

13    a small meal just on the street.  Some people who had food,

14    they cooked.  Some people who knew people on the way, you could

15    just stop at a family and ask for food.  People were helping

16    each other.  But mainly you had to buy your own stuff.  There

17    were a lot of people just trying to make some money on the

18    people fleeing.

19    Q.    When you reached Cyangugu, what did you do?

12:04PM 20    A.    We were waiting because there was these people -- some

21    people they hoped -- they said the regular army will keep

22    fighting the RPF until they win.  Some people, they thought it

23    was already over.  So it was a kind of stalemate.  We didn't

24    know what to do.  We waited.

25            Around July, July 4 or 5 already the RPF declared a

J.A. 1752

victory.  They said they were already in control of the country

in Kigali.  Kigali was already captured.  But the rest of the

country, the west, all this area was still free and the north,

they had still regular armed forces from Rwanda.

Q.   I'm not sure I asked you this already.  Why was this area

safe?  Why was the Turquoise Zone safe?

A.   It was safe because it was under the French army.  The

French army was in charge of Kibuye, Gikongoro and Cyangugu.

It was a demilitarized zone.  So whoever entered in the

Turquoise Zone, they have to take the weapons.  No one was

armed in the Turquoise Zone.  And people were assured there was

no fighting in the Turquoise Zone.  That's why many people do

their best just to join the Turquoise Zone.

Q.   When the RPF declared victory, I think you said on July 4

or 5th, what did you do?

A.   Everybody was waiting because at the same time we have the

RPF victory, at the same time they had a government in exile,

the regular government.  Most of the ministers, they were still

here in Cyangugu.  So it was a kind of stalemate.

        Some people, they thought maybe they'll go and fight

back from the west of the country, try to retake Kigali, or

they were fleeing.  But in mid-June, I think like 14 or 15 --

Q.   I'm sorry, you said June.

A.   July.  July, I'm sorry.  We heard a report about just the

members of government were already fleeing the country.  So

J.A. 1753

1  they were crossing going into -- into Congo.  So everybody knew

2  it was over.  So the general population was fleeing, also

3  crossing the border towards Congo.

4  Q.    Did you cross the border into Congo?

5  A.    Yes.

6  Q.    When was that?

7  A.    It was July 17 in the evening.  I remember it was a

8  Sunday.

9  Q.    Where did you go in Congo?

12:07PM 10  A.    When we walked into Bukavu, there was a city near the

11  border, just in a city.  Usually the refugees and the people

12  they placed, you go on either in a church or somewhere where

13  there was a big ground.  So people were -- there was a college,

14  a Jesuit college, they called it Alfatizi.  Many refugees, they

15  went, and on that ground there was a huge structure.  In the

16  front of that they have a huge parking lot.  So people were

17  just going.  They were just camping at that college.

18  Q.    Did a refugee camp form?

19  A.    No.  There was no refugee camp at that time.  Everybody

12:08PM 20  just was arriving from Rwanda, entering Bukavu, and the

21  Congolese authorities, they were really asking people to

22  evacuate, to get out of the city because they didn't want

23  refugees in the middle of the city.

24  Q.    So were you directed outside of the city?

25  A.    Yeah.  And then the next morning there were already some

J.A. 1754

          1   people -- the European people, people from NGOs who were
          2   starting a refugee camp.  So I remember there was these people
          3   from the Order of Malta.  They were starting a refugee camp
          4   nearby in Bagira.  The refugee camp was named Nyakavogo.
          5   Q.   You mentioned the Order of Malta.  What was the Order of
          6   Malta?
          7   A.   The Order of Malta is an organization.  I think it's a
          8   Catholic charity.  They have a lot of charity works.  They
          9   build hospitals in war zones.  They have charity works in poor
12:09PM  10   countries, and they also intervene during natural disasters
         11   sometimes.  Most of the volunteers, they are from the military,
         12   from the European army.  So they are into operations during the
         13   war zones.
         14   Q.   So this organization created a refugee camp?
         15   A.   Yes.  They were starting a refugee camp, but at the same
         16   time you have to recruit refugees.  They have a site, but there
         17   were no refugees there.  So on the next morning, on July 18, I
         18   met this couple of French people, Mr. and Mrs. DePargevaux.
         19   They were approaching the refugees, especially people who could
12:10PM  20   speak French.  The majority of refugees were uneducated people.
         21   So anyone who could talk with these French people, they were
         22   asking people if they are willing to move into a refugee camp.
         23   We were told it's not far from the city.  And I was among the
         24   first people who went to the site to see how it is.
         25   Q.   How long did you end up living in the refugee camp?

J.A. 1755

1   A.   I stayed in the refugee camp two years.  Yeah, two years.

2   Q.   What was it like there?

3   A.   It was an inferno.  It was -- it's a hell of life.

4   Q.   Why was it difficult?

5   A.   First of all, you have the bad weather.  You can go

6   camping for a weekend when it's sunny, when it's 85.  But

7   living in a refugee camp all year round in the tropics, the

8   heavy rains, cold, windy or rainy.  It's really tough, bad

9   weather.  You have epidemics, a lot of diseases, infectious

12:11PM 10   diseases.  People are dying of cholera, diarrhea, malaria, all

11   kinds of infections.  You have a problem of malnutrition.  The

12   access to food is always a problem in the refugee camps.  The

13   welfare program was in charge of feeding refugees.  Also, they

14   have security concerns and strays.  Among those refugees, there

15   are former militias, former soldiers among the regular

16   population, and it is not easy co-habitation.  You inhabit the

17   same camp with those people.  It's a stressful situation.  And

18   there are security concerns.

19   Q.   Were you living with any family members in the refugee

12:12PM 20   camp?

21   A.   Not at that time, no.

22   Q.   Did you know what had happened to your family?

23   A.   Yeah.  They --

24        MR. VARGHESE:  Objection, your Honor.  Relevance.

25        THE COURT:  Sustained.

J.A. 1756

1  Q.  You mentioned you lived in the refugee camp for two years?

2  A.  Yes.

3  Q.  How were you able to leave?

4  A.  In 1996 there was an incident because the Rwandan Army was

5  crossing the border just attacking the refugee camps.  Again, I

6  found myself struggling for survival because the refugee camps

7  were no longer safe.

8       At the time there were occasions just to get away.

9  There were some aircrafts, the NGOs, the private cargoes would

12:13PM 10  be delivering supplies to the refugee camps.  When they land,

11  they are fully loaded, but when they went back, they were

12  empty.  So sometimes if you have a connection with people you

13  work with, if you have provided a passport and a place to land,

14  when they are sure you have a place to go, they were able to

15  help people get out of the refugee camp, because everybody was

16  trying to get away of the situation.

17  Q.  Did you have a contact who helped you get out?

18  A.  Yes, I did.

19  Q.  Who was that?

12:14PM 20  A.  It was a father who was working in the Caritas.  Caritas

21  was in charge of the operation of the refugee camp.  So I was

22  able just to have a -- just a space on the aircraft that left

23  from Bukavu to Kenya.  So I ended up going to Kenya.

24  Q.  Did you have family members in Kenya?

25  A.  I have a distant auntie who was living in Kenya with her

1    husband.  That's where I was going.

2    Q.   How long did you live in Kenya?

3    A.   Over a year, like 13, 14 months.  I don't recall exactly

4    the dates.

5    Q.   What were you doing in that time?

6    A.   At that time I was trying all I could just to do contact

7    if I can go back to school, because when the war ended and

8    genocide subsided, I didn't have a chance to finish my

9    education.  So for me just waiting for the situation to become

12:15PM 10    clear in the country, I thought it would be wonderful for me at

11    least to complete my education.

12    Q.   Were you able to arrange to further your education?

13    A.   Yes.

14    Q.   Where did you go?

15    A.   I ended up having an inscription and admission to an

16    Indian institution.  I went to study in India.

17    Q.   What was the name of the institution in India where you

18    went to study?

19    A.   The name of the school is Tilak Maharashtra Vidyapeeth,

12:15PM 20    but they call it Nehru Institute of Social Sciences.

21    Q.   Where is that located?

22    A.   It's located in Pune in the State of Maharashtra.  It's

23    like a hundred miles from Mumbai.

24    Q.   When did you enter that university?

25    A.   '97.

1  Q.   And in order to study there, did you first have to obtain

2  a student visa?

3  A.   Of course you have to prove you are admitted to the

4  authority, the requirements, get tested and then have a student

5  visa before you are admitted into the country.

6  Q.   What were you studying at this university?

7  A.   When I went there, I wanted -- I still wanted to do

8  medical studies, but during the process I was told that in

9  India for a foreign student to study medicine or engineering

12:17PM 10  school, you have to be sent by your government.  If you are a

11  private student, you have to make a donation.  At the time the

12  donation was around 450 rupees, quite a sum of money I could

13  not have.  And they told me outside that I could study

14  whatever I wanted to.  The closest scientific area I could do

15  was economics.

16  Q.   How long were you in India studying economics?

17  A.   Two years, and a program for master's was a two-year

18  program.

19  Q.   Did you complete that program?

12:17PM 20  A.   Yes, I did.

21  Q.   After you completed that program, did your student visa

22  allow you to remain in India?

23  A.   No.  I was allowed to stay in India as long as I was

24  studying only.

25  Q.   So after you completed your program in India, did you have

1    a safe place to go?

2    A.    No.  There was no safe place to go because of the -- I've

3    learned the story of my family already.

4    Q.    What had happened to your family?

5         MR. VARGHESE:  Objection.

6         THE COURT:  I think that's a little far afield.

7    Sustained.

8    Q.    Were you willing to return to Rwanda?

9    A.    No, I was not.

12:18PM 10   Q.    Did you formulate another plan?

11   A.    Yes.

12   Q.    What did you decide to do?

13   A.    I decided to go into a country where I could apply for

14   refugee status.

15   Q.    Did you pick a country to go to?

16   A.    Yes.  I decided to go to Canada.

17   Q.    Why did you go to Canada?

18   A.    Because I knew about Canada.  The majority of my

19   professors, my teachers at the University of Rwanda, they did

12:19PM 20   their Ph.D. in Canada.  So I knew about the Canadian culture.

21   I knew about their reputation.  Canada is a welcoming country

22   for refugees.

23        At the same time when I was in the refugee camp, I

24   came to know a girl.  I started a relationship with a girl in

25   the refugee camp.  Shortly after her family decided to go back

J.A. 1760

1   to Rwanda.  Then they moved to Madagascar.

2          From there, my girlfriend at that time -- I'm talking

3   about the same girl -- she was sent to Canada to study there.

4   So it was --

5   Q.   Who was your girlfriend?

6   A.   That's Nicole Gahamanyi.  My actual wife.

7   Q.   What had she gone to Canada to study?

8   A.   She was going to study engineering, I think.

9   Q.   Was she a factor in why you decided to go to Canada?

12:20PM 10   A.   Yeah.  She was one of the factors I decided to go to

11   Canada, because I wanted to join her to start a life with her

12   as I planned.

13   Q.   What did you need to have in order to be able to fly to

14   Canada?

15   A.   You have a travel document that allows you to enter the

16   country.

17   Q.   Did you have a valid travel document that allowed you to

18   enter Canada?

19   A.   No, no.  I didn't have any at that time.

12:20PM 20   Q.   What did you do?

21   A.   While discussing with some refugee students who were in

22   India at that time, there was a big community of Sudanese and

23   Somalis studying in India.  They told me there was smugglers,

24   people who just can help you out to make the travel.  So the

25   arrangement was to buy a traveling document that allowed you to

1    travel to Canada.  That's what I did.

2    Q.   And did you buy a false travel document?

3    A.   Yeah.  I asked that if I had family to buy a traveling

4    document, because I didn't have money.  I was a student.

5    Q.   What was the travel document that you obtained?

6    A.   It was a passport from Zimbabwe.

7    Q.   Was it your name that was on the passport?

8    A.   No.  It had a Zimbabwean name on the passport.

9    Q.   Was there a particular reason why you obtained a

12:21PM 10   Zimbabwean passport?

11   A.   Yes.  At the time Zimbabwe was a part of -- a member of

12   Commonwealth, and a country from the Commonwealth, they can

13   enter Canada without a visa.  So with a Zimbabwean passport, I

14   could travel to Canada without a visa.

15   Q.   Did you, in fact, travel to Canada using that passport?

16   A.   Yes, I did.

17   Q.   What happened when you arrived in Canada?

18   A.   I traveled with the travel document, the Zimbabwean

19   passport.  When I arrived at the airport, Pierre Elliott

12:22PM 20   Trudeau Airport, I went to the immigration officer in the

21   airport.  I declared myself a refugee.  I told them --

22   Q.   Did you provide the Canadian immigration officer with your

23   true name?

24   A.   Yes.  Because I had to bring also my real passport, my

25   real identity card or document showing I was really a Rwandan

## J.A. 1762

           1    citizen, because at that time there was a lot of Rwandan people

           2    fleeing to Canada.

           3    Q.   Once you arrived in Canada, did you seek protection as a

           4    refugee?

           5    A.   Yeah, the same day at the airport.

           6    Q.   When you arrived in Canada, did you have any money?

           7    A.   Not really.  I had like $60 or $70 in my pocket.

           8    Q.   What did you have in terms of personal items, personal

           9    property?

12:23PM 10    A.   I had a small bag, because the official reason, you were

          11    supposed to be visiting just for two or three days, and then go

          12    back from wherever you were.  I could not pack a big bag.  Just

          13    I had a small personal belongings.

          14    Q.   After you arrived in Canada, were you released?

          15    A.   Actually, they don't detain an asylum seeker.  From the

          16    airport you are given a voucher or money -- or they put you in

          17    a taxi, pay the taxi, take a taxicab.  From the airport, they

          18    drive you to downtown.  There is a YMCA place.

          19    Q.   A YMCA?

12:24PM 20    A.   Yeah, a YMCA.  They house all the newly arriving refugees.

          21    There you are processed.  There are people just helping you

          22    around to make sure you are -- you start your immigration

          23    process.  And then within two or three weeks, they give you a

          24    check for social assistance to be able just to rent a studio

          25    and then you start your life.

# J.A. 1763

         1    Q.   Were you able to move out of the YMCA?

         2    A.   Yes, I did.

         3          MR. VARGHESE:  Objection, your Honor.  I'm not sure

         4    why all of this is relevant.

         5          THE COURT:  Well, I'll allow it to some extent, but --

         6          Go ahead.

         7    Q.   Were you able to move out of the YMCA?

         8    A.   Yes.  I moved out of the YMCA.  I moved into my first

         9    studio apartment.

12:25PM 10    Q.   Did you seek a job?

        11    A.   Yes.  After -- just to get a Social Security number, you

        12    have to pass a medical examination to have a clear bill.  If

        13    you are fit and healthy, they give you a work permit.  Then you

        14    start working.

        15    Q.   What sort of work did you do in Canada?

        16    A.   First of all, I was working just for a warehouse at the

        17    shipping/receiving.  Then I have to go for some training just

        18    to get a specialized job.

        19    Q.   Did you eventually move on to a more specialized job?

12:25PM 20    A.   Yes, I did.

        21    Q.   What is the more specialized job that you acquired?

        22    A.   I was working in procurement, supply chain management as a

        23    corporate buyer.

        24    Q.   During this time did you reconnect with your girlfriend

        25    Nicole?

# J.A. 1764

1    A.    Yeah.  I reconnected with her, and we set up a plan for

2    the future.  She was just going to college, finishing her

3    school, and then mine, I was just trying to do the best I could

4    for my job.  And at the end we were supposed to have a wedding

5    and then start a family.

6    Q.    Did you get married?

7    A.    Yes, we did get married.

8    Q.    When did you marry Nicole?

9    A.    We had a civil wedding on October -- in October 2004.

12:26PM 10    Then the following summer we had a wedding in a church.

11    Q.    How many years after arriving in Canada was that?

12    A.    That was like four years after.

13    Q.    By this time had you moved in together?

14    A.    Yes.

15    Q.    Did you start a family?

16    A.    Yes.  After our wedding, we had our first child, our first

17    boy in 2007.

18    Q.    What is his name?

19    A.    His name is Boris Teganya.

12:27PM 20    Q.    Is he your only child?

21    A.    No.  Two years after we had another son.

22    Q.    What is your second son's name?

23    A.    Miguel Bright Teganya.

24    Q.    Are they currently living with Nicole?

25    A.    Yes.  They live near Laval.

```
 1   Q.   In Canada?

 2   A.   In Canada, yes.

 3   Q.   Did you two buy a house together?

 4   A.   Yes.

 5            MR. VARGHESE:  Objection, your Honor.

 6            THE COURT:  I'll sustain that.

 7   Q.   How long did you live in Canada?

 8   A.   Around 14, 15 years.

 9   Q.   During that time, how were you living your life?

10   A.   I was living like any person, just trying to work hard and

11   living, and all during all that time I was in proceedings just

12   to have my immigration status cleared.

13   Q.   Did you eventually receive a final decision --

14   A.   Yes, I did.

15   Q.   -- with respect to your status?

16   A.   At the end, yes.

17   Q.   Were you successful in getting status in Canada?

18   A.   No.

19   Q.   When did you receive that decision?

20   A.   It was in October 2012.

21   Q.   Once you received that decision, what was going to happen

22   to you?

23   A.   I was being deported back to Rwanda again.

24   Q.   Were you willing to accept that?

25   A.   No.  It was too risky for me.  It was a matter of death or
```

1    life.

2    Q.    Why do you say it was a matter of death or life?

3    A.    Because I knew that with the situation of my father being

4    in jail in Rwanda and also all the media attention that was on

5    my case I was already a high-profile individual sought in

6    Rwanda.  So for me it was really risky to go back to Rwanda.

7    Q.    What had happened to your father in Rwanda?

8    A.    My father was -- has been in jail since last -- almost 23

9    years ago.

12:29PM 10    Q.    Did he receive a 22- or 23-year sentence?

11    A.    He received a 22-year sentence.  Actually, he already did

12    his time but he's still in jail.

13    Q.    What did you consider your options to be?

14    A.    My option was just to get away from Canada, because

15    it's -- otherwise I was being sent by force back to Rwanda.

16    Q.    What did you decide to be the best option?

17    A.    It was not an easy decision.  I remember at the end of the

18    process I knew there was just two outcomes.  Either I was

19    admitted into Canada or I was forced outside.  So I spoke to

12:30PM 20    the immigration officials.  I told them just to give me my

21    passport, because I had already started the contacts to get a

22    visa in a foreign country, because I told them if you don't

23    want me in this country, Canada, I will leave by myself, self-

24    deportation, and go another place.

25    Q.    Were you able to get your passport to do that?

1    A.    No.  They told me they wanted me to go to Rwanda, which I

2    found kind of like bizarre, because in 2012 nobody was looking

3    for me in Rwanda or accusing me or anything.  So I thought --

4    just let me go in a country I feel safe.  I was denied that

5    opportunity.

6    Q.    So what did you do instead?

7    A.    My only option was just to live in hiding from that day.

8    I disappeared from the public life.

9    Q.    Did you eventually decide to enter the United States?

12:31PM 10    A.    That's the only close country to Canada.  That's the only

11    place I could do it.

12    Q.    Why did you decide to come to the United States?

13    A.    Because I thought it was -- it was a better chance to be

14    heard by an independent system, because I thought from the

15    beginning I didn't receive fair treatment in my proceedings in

16    Canada.  Then I had a family member in the U.S.  I thought

17    maybe if I managed to get in here, they could be helpful.

18    Q.    Did you consider entering the United States through a

19    legal port of entry with the Border Patrol?

12:32PM 20    A.    No.  I didn't consider that because I thought if I were

21    ever to show up to any legal port of entry, they would

22    automatically hand me back to the other Canadian side, the same

23    people I was fleeing.

24    Q.    What did you do instead?

25    A.    I tried just to sneak in, to go the farthest possible,

1   just to pass in an unguarded place.

2   Q.   Where did you go to do that?

3   A.   During the time I just was looking on the map trying just

4   to find a physical place where I could just pass by.  The only

5   place accessible was Maine.

6   Q.   And did you travel to the Maine border in August of 2014?

7   A.   Yes, I did.

8   Q.   Did you cross the border into the United States?

9   A.   Yes, I did cross the border.

12:33PM 10   Q.   Shortly after doing that, were you encountered by a Border

11   Patrol agent?

12   A.   Yes, I was intercepted by a Border Patrol agent.

13   Q.   Did you identify yourself to that agent?

14   A.   Yes.  He arrested me.  He asked me who I was.  I told him

15   my name, Jean Leonard Teganya, and I'm seeking refuge in the

16   United States.

17   Q.   When you were in custody in Maine, were you advised that

18   you did not have to make any sort of statement if you didn't

19   want to?

12:34PM 20   A.   Yes.  They told me I have a right to remain silent.  I

21   have a right to a lawyer, and I made contact.  I was able to

22   talk to a lawyer to discuss with him about the proceedings.

23   Q.   Did you then provide a handwritten statement to officials

24   about the reasons why you were seeking asylum?

25   A.   Yes.  I had to do -- after discussion with my lawyer, he

1    told me --

2    Q.   Without getting into details about what you were told, did

3    you write out a statement that was several pages long?

4    A.   Yes, I did, a couple pages.

5    Q.   Has the prosecution introduced that at your trial?

6         MR. VARGHESE:  Objection, your Honor.

7    A.   No.

8         THE COURT:  Sustained.

9    Q.   After you were arrested in Maine, where were you taken?

12:35PM 10   A.   I was taken to Portland; Portland, Maine.

11   Q.   How long did you stay in Portland?

12   A.   I don't recall exact days, but it might be like three or

13   four days.

14   Q.   Where were you taken from Portland?

15   A.   From Portland, the immigration official, they told me all

16   immigration cases in New England are treated in Boston.  From

17   Portland, I was sent here in Boston.

18   Q.   Were you able to obtain the assistance of a lawyer by this

19   time?

12:35PM 20   A.   No.  At that time I was just by myself when I showed up to

21   the immigration charge.  They told me just I have to get an

22   immigration lawyer, and I had people, my family from outside to

23   arrange for a lawyer.  So the next time I went in front of a

24   judge, I had a lawyer.

25   Q.   I'm going to ask for Exhibit 1 to be displayed.  Do you

1    recognize Exhibit 1?

2    A.    That's the Form I-589 application for my asylum

3    application.

4    Q.    Did your attorney assist you in submitting this?

5    A.    Yes, he did.

6    Q.    I'd like to turn to question 3A of the form, which is a

7    couple pages in.  Question 3A, do you see that question?

8    A.    Yes, I do.

9    Q.    Did that question ask whether you or family members had

12:37PM 10   ever belonged to organizations or groups in your home country

11   such as, but not limited to, a political party, student group,

12   labor union, religious organization, military or paramilitary

13   group, civil patrol, guerilla organization, ethnic group, human

14   rights group, or the press or the media?  Is that what the

15   question says?

16   A.    Yes.

17   Q.    What did you answer?

18   A.    I answered yes.

19   Q.    And in the space below that, just directing your attention

12:37PM 20   to the first sentence, what is written there?

21   A.    It says, "My father was the local president (formerly

22   Kibilira District) of MRND from 1991 to 1994."

23   Q.    Was that a true statement?

24   A.    That's true.

25   Q.    For the next two sentences, can you read your answer?

1    A.   "As a student I belonged to the Red Cross Youth Section

2    from 1986 to 1991.  I was the president of the Red Cross Youth

3    Section from 1989 to 1990."

4    Q.   Were those true statements?

5    A.   True.

6    Q.   What is the last sentence?

7    A.   "I will submit a detailed declaration prior to my asylum

8    hearing."

9    Q.   Did you, in fact, submit a ten-page affidavit at a later

12:38PM 10    date?

11    A.   I did.

12    Q.   Does that later affidavit contain a variety of information

13    about your background and your time at the university?

14         MR. VARGHESE:  Objection.

15    A.   Yes.

16         THE COURT:  Sustained.

17         Mr. Lauer, I ruled on this.

18    Q.   If we could move to Part C, question 3.  Perhaps if we

19    could have that magnified.  This question asked you, "Have you,

12:39PM 20    your spouse, or your children ever ordered, incited, assisted

21    or otherwise participated in causing harm or suffering to any

22    person because of his or her race, religion, nationality,

23    membership in a particular social group or belief in a

24    particular political opinion?"  Is that the question that was

25    asked of you?

J.A. 1772

```
 1   A.   Yes.
 2   Q.   What did you say?
 3   A.   No.
 4   Q.   Was that a truthful answer?
 5   A.   A truthful answer.
 6   Q.   A few days after this application was submitted, did you
 7   have a hearing in immigration court before a judge?
 8   A.   Yes.  I had a hearing.
 9   Q.   Did you provide sworn testimony at that hearing?
10   A.   Yes, I did.
11   Q.   At that hearing did you tell the Judge that you never
12   belonged to your father's political party?
13   A.   I did say that.
14   Q.   Was that a truthful statement?
15   A.   True.
16   Q.   Were you ever a member of MRND?
17   A.   Never.
18   Q.   At the bond hearing were you asked whether you witnessed
19   people being turned over to the military to be slaughtered?
20   A.   I was asked.
21   Q.   What was your answer to that question?
22   A.   I said no, personally no.
23   Q.   Was that a truthful statement?
24   A.   Truthful statement.
25   Q.   Did you ever personally witness people being turned over
```

J.A. 1773

         1    to the military to be slaughtered?

         2    A.   No, at the hospital.

         3    Q.   At the bond hearing, were you asked whether you saw

         4    atrocities occur?

         5    A.   Yes.

         6    Q.   What did you say?

         7    A.   I said no.

         8    Q.   Was that a truthful answer?

         9    A.   That was a truthful answer.

12:41PM 10    Q.   Did you personally see any atrocities occurring at the

        11    hospital?

        12    A.   I saw the victims of atrocities, people coming to be

        13    treated, but I never saw atrocities occurring.

        14    Q.   Did you testify truthfully before the immigration judge?

        15    A.   I did.

        16              MR. LAUER:  Thank you.  No further questions.

        17              THE COURT:  All right.  Cross-examination.

        18                        CROSS-EXAMINATION

        19    BY MR. VARGHESE:

12:41PM 20    Q.   Good afternoon, sir.

        21    A.   Good afternoon.

        22    Q.   Now, you've been in immigration proceedings starting back

        23    in 1999 in Canada; isn't that correct?

        24    A.   Correct.

        25    Q.   So for more than 20 years you've been making this asylum

J.A. 1774

         claim; is that correct?

    A.   Story of my life.

    Q.   In that time you filled out a lot of forms, correct?

    A.   Yes.

    Q.   Provided a lot of information about what you claim
    happened to you in Rwanda; isn't that correct?

    A.   Yes.

    Q.   You've testified in a lot of hearings, both in Canada and
    the United States, about your story and what you say happened
    in 1994 in Rwanda; isn't that correct?

    A.   I testified in the United States once and in Canada more
    than three or four times.

    Q.   You're also testifying here today, correct?

    A.   Yes, the second time.

    Q.   So twice?

    A.   Yeah.

    Q.   And when you were filling out these forms, whether in the
    United States or in Canada, you knew that it was important to
    tell the truth, correct?

    A.   Correct.

    Q.   Because asylum officers or immigration officers, they rely
    on that information that you're providing, correct?

    A.   Correct.

    Q.   They rely on that information to make a determination
    about whether or not you should be granted asylum; isn't that

1    correct?

2    A.    Correct.

3    Q.    So you know you have to be accurate in those forms,

4    correct?

5    A.    Yeah, to the best of my ability accurate.

6    Q.    And you know you have to be accurate when you testify

7    under oath, correct?

8    A.    Correct.

9    Q.    And when you were filling out these forms, you also signed

12:43PM 10    your name to them, correct?

11   A.    Yes, I did.

12   Q.    You attested to what was said in those forms, correct?

13   A.    Yes.

14   Q.    You attested that they were true?

15   A.    Yes.

16   Q.    And some of those forms were even under the penalties of

17   perjury, correct?

18   A.    Correct.

19   Q.    So you knew that if you were lying, you could be

12:43PM 20    prosecuted, correct?

21   A.    Yes.

22   Q.    There was no ambiguity about this?

23   A.    No.

24   Q.    You understood that?

25   A.    That's true.

1   Q.   And you signed those documents subscribing them to be

2   true, correct?

3   A.   Yes.

4        MR. VARGHESE:   If we could, could we bring up Exhibit

5   1, please.  And can we have page 10, please.

6   Q.   Mr. Teganya, you see your signature here, right?

7   A.   Yes.

8   Q.   And in this -- and that's at the bottom, correct?

9   A.   Mm-hmm.

12:44PM 10   Q.   And in this signature section it says that you are

11   certifying what you are saying under penalty of perjury under

12   the laws of the United States of America; isn't that correct?

13   A.   Yes.

14   Q.   Similarly when you testified in September of 2014 you took

15   an oath to tell the truth, right?

16   A.   Yes.

17   Q.   And you understood that taking an oath, just like you did

18   today, you're supposed to provide truthful answers, correct?

19   A.   Yes.

12:45PM 20   Q.   And on that day, September 16, 2014, you took an oath

21   before Judge Steven Day of the immigration court here in

22   Boston, correct?

23   A.   I did.

24   Q.   And when you gave those answers, you knew they had to be

25   true?

1    A.   Yes.

2    Q.   And you'd agree with me that someone shouldn't lie in

3    asylum forms, correct?

4    A.   That's the idea.

5    Q.   Well, it's more than just the idea, sir, right?

6    A.   Yeah, that's the concept of telling the truth under oath.

7    Q.   It's not just an idea; it's the law?

8    A.   It's not an idea.  It's the law.

9    Q.   You knew that you had to tell the truth, and if you didn't

12:45PM 10   you were breaking the law, correct?

11   A.   Yes.

12   Q.   Lying on forms is wrong?

13   A.   Wrong.

14   Q.   It's illegal?

15   A.   Illegal.

16   Q.   Lying in immigration proceedings same thing, lying under

17   oath is wrong?

18   A.   Wrong.

19   Q.   Lying's illegal?

12:45PM 20   A.   Illegal.

21   Q.   And the purpose of all of these forms that you have filled

22   out and all of this testimony you've given, both in Canada and

23   the United States, is to avoid going back to Rwanda, correct?

24   A.   That's the fear of my --

25   Q.   That wasn't the question.  The purpose of you doing all of

1    this was to avoid you going back to Rwanda; isn't that correct?

2    A.    To get the protection.

3    Q.    So you wouldn't have to go back to Rwanda, correct?

4    A.    Yes.

5    Q.    And you knew that the asylum process is a way for people

6    who are persecuted to find safety here in the United States,

7    correct?

8    A.    Correct.

9    Q.    People who are harmed based on their race, their religion,

12:46PM 10    their ethnicity or other characteristics, right?

11    A.    Or political reasons or so.

12    Q.    That's who asylum is for, correct?

13    A.    Correct.

14    Q.    And you knew that asylum, either in Canada or the United

15    States, is for people from all over the world who fear for

16    their lives because they're being persecuted, correct?

17    A.    Correct.

18    Q.    And you would agree with me that somebody who admitted to

19    participating in the genocide would not be granted asylum,

12:47PM 20    correct?

21    A.    Yes, correct.

22    Q.    And you knew that if you admitted to any involvement in

23    the genocide, you weren't going to get asylum, correct?

24    A.    Of course.

25    Q.    Because persecutors are barred from asylum?

J.A. 1779

1    A.    Yes.

2    Q.    That's not who asylum is for.

3    A.    Mm-hmm.

4    Q.    And so if you in any way admitted to any role in that

5    genocide, that was going to harm your asylum process, correct?

6    A.    Correct.

7    Q.    Mr. Teganya, I want to ask you some questions about your

8    story that you've told not only here today but also in Canada

9    and the United States about what happened to you in Rwanda.  I

12:47PM 10    want to pick up with your departure from the hospital in

11    Butare.  Fair?

12    A.    Yes.

13    Q.    When did you leave Butare?

14    A.    I left Butare around June -- 17 June, 1994.

15    Q.    The 17th of June, 1994?

16    A.    Yes.

17    Q.    That's your testimony?

18    A.    Yes.

19    Q.    Now, do you remember when you filled out this application

12:48PM 20    it asked you when you left Butare?  Do you see what I've blown

21    up on the screen, sir?

22    A.    Yes.

23    Q.    Now, this document you filled out, correct?

24    A.    Yes.  It was --

25    Q.    I haven't asked you a question.  I just asked you, you

1     filled out this document, correct?

2     A.   Yes.

3     Q.   And in this document it asked you where you were living,

4     correct?

5     A.   Yes.

6     Q.   That's what this question is that I highlighted, correct?

7     A.   The way I understand the question, it's the last --

8     Q.   Sir, please just answer my questions. The question that I

9     highlighted was a question that asked you about where you were

12:48PM 10     living; isn't that correct?

11     A.   Yes.

12     Q.   And you answered that question by saying that you were in

13     Butare from October of 1991 to July of 1994. Isn't that

14     correct?

15     A.   That's not correct. The way I --

16     Q.   Wait a second.

17         THE COURT: Hold on. Hold on. I mean, you can't just

18     keep interrupting him. First off, I can't even see the

19     question. Can we put the question up.

12:49PM 20         MR. VARGHESE: Sure, your Honor.

21         THE COURT: All right. Let's put a question to the

22     witness.

23     Q.   So you -- your testimony is -- let me strike that.

24         You listed in this form that you were in Butare until

25     July of 1994; isn't that correct?

## J.A. 1781

1    A.   Yes.

2    Q.   And that's -- and your testimony here today is that is

3    actually not true, correct?

4    A.   No.  My testimony here is true.  I left Butare in June 17.

5    Q.   So what you filled out on this form under the pains and

6    penalties of perjury is not true; is that your testimony?

7    A.   The way I understand the question, they ask that you list

8    the place -- the last place of residence you lived.  So the

9    last place of my residence in Rwanda was Ruhande, Butare.  So

12:50PM 10   when I left Rwanda, the last place of residence for me was

11   Ruhande.  I was not living in the Nyungwe Forest or in Kamembe

12   and outside in the field.

13        The last place of residence in Rwanda for me was

14   Ruhande.  That's why I said in July my last place of residence

15   was Ruhande.

16   Q.   Okay.  So your explanation for this incorrect answer is

17   that that was your last residence.  Do I have that correct?

18   A.   Yes.

19   Q.   Do you remember you were asked a more specific question on

12:50PM 20   September 16, 2014 at the immigration hearing?

21   A.   There was a lot of questions asked of me.  You'd have to

22   refresh my memory.

23   Q.   Well, do you remember you were asked when you left the

24   hospital?

25   A.   Yes.

1    Q.   Do you remember what your answer was?

2    A.   I couldn't recall exactly.  I would have to just go

3    through the transcripts.

4    Q.   Why don't we do that.  Why don't we bring up Exhibit 3A,

5    page 11, and Exhibit 4, and I'll play you the clip.  If we can

6    begin at 148.

7         THE COURT:  Just before the clip, ladies and

8    gentlemen, just to let you know, the recording itself, the

9    testimony is the evidence.  There's a transcript that's

12:51PM 10  intended to guide you, but the recording itself is what the

11   actual evidence is.  Go ahead.

12        MR. VARGHESE:  We're having a slight delay. (Pause.)

13   Q.   So, sir, what I'm going to do is we have the transcript up

14   on the right side.  I'm beginning around line 17.  Do you see

15   that on your screen?

16   A.   Yes.  I see it.

17        MR. VARGHESE:  Why don't we play the clip, and then

18   I'll ask you about it.

19        (Video played.)

12:53PM 20  Q.   So your sworn testimony before Immigration Judge Steven

21   Day on September 16, 2014 was that you didn't leave the

22   hospital until July; isn't that correct?

23   A.   That's not correct, because later on during the hearing I

24   gave the specification it was two months.

25   Q.   Well, I'm sorry.  Let me take this a step at a time.  Now,

1   first of all, we just heard the clip, correct?

2   A.    Yes.

3   Q.    And you recognized your voice?

4   A.    Yes.

5   Q.    And you heard the questions?

6   A.    Yes.

7   Q.    And the question was "Until when?"  And your answer was

8   "Until July."  Isn't that correct?

9   A.    That's not correct.  I got confused between the month of

12:53PM 10   July and June.  I keep getting confused.  But later on during

11   my testimony I cleared specifically it was two months, June,

12   July.

13   Q.    So your testimony here today was that you were confused by

14   the question on the application, and then you were confused at

15   the hearing.  Do I have that correct?

16   A.    Yes, because during that period of war no one kept agenda

17   on the calendars, but I recall the time period was two months,

18   not three months.

19   Q.    I'm going to move on.  How did you leave Butare?

12:54PM 20   A.    I walked with people.

21   Q.    And you testified that it took you three weeks of walking,

22   and you arrived at Kamembe; is that right?  Do I have that

23   right?

24   A.    Yes.

25   Q.    Now, in the immigration hearing you were asked a similar

1   question about leaving.  Do you remember that?

2   A.   About...?

3   Q.   I'm sorry?

4   A.   I didn't get the question.  Please.

5   Q.   Okay.

6        MR. VARGHESE:  Your Honor, may I approach?

7        THE COURT:  Yes.

8        MR. VARGHESE:  Counsel, this is page 18.  It's not

9   part of the excerpt, just so you know.

12:55PM 10   Q.   I'm going to direct your attention down here to line 22.

11   Okay?  Just to show you.  This is a transcript of the hearing.

12   A.   Yes.

13   Q.   Okay.  And you testified, "I left my country home on July

14   17, 1994."  Do you see that?

15   A.   Yes.

16   Q.   And the Judge said, "And that's when you were still

17   working at the hospital?"

18   A.   That was still the confusion.

19   Q.   I'm sorry?

12:55PM 20   A.   That was the confusion I was talking about.  For me --

21   when I left Butare was the date that's confusing me.

22   Q.   I'll tell you what, before you explain it, let's just talk

23   to the jury about what was in there.  Okay?

24   A.   Yeah.

25   Q.   So you said -- the Judge said, "And that's when you were

1   still working at the hospital?"  What was your response?

2   A.   I said, "Yeah.  It was like after two days of walking from

3   Butare."

4   Q.   So in the testimony before Judge Day, you stated that it

5   took two days of walking from Butare; is that correct?

6   A.   From Butare to Turquoise area.

7   Q.   Hold on.  We're not done yet.  So then the Judge says,

8   "You walked?"  What was your response?

9   A.   "Yes."

12:56PM 10   Q.   "How far is that?"

11   A.   It says, "Like 150 miles away."

12   Q.   "Okay.  Then what did you do?"

13   A.   "I entered Congo."

14   Q.   So you testified it took you two days to walk 150 miles

15   and enter Congo; isn't that correct?

16   A.   Again, I'll explain to you the confusion here.  It was two

17   steps.  I walked from Butare to Gikongoro.  That's the entrance

18   of the Turquoise Zone.  It's about 35 miles.  Then from

19   Gikongoro to Kamembe three weeks of walking, around 150 miles.

12:56PM 20   Q.   So just so we're clear, when you said that it took you two

21   days to walk from Butare and the Judge said "You walked?"  And

22   you said, "Yeah."  And he said, "How far is that?"  "It's like

23   150 miles away."  You're saying when you said 150 miles, you

24   weren't referring to the two days of walking?

25   A.   That's the confusion during the interview because there

J.A. 1786

1    was no geography references because we're talking about areas

2    we don't have even a map.  So for me it was confusion, total

3    confusion.

4    Q.   So far we've talked about confusion in the application

5    about how long you were in Butare.  We've talked about

6    confusion about when you left the hospital in the hearing.  And

7    now there's confusion about how long it took you to walk; is

8    that correct?

9    A.   Yes.

12:57PM 10    Q.   You also testified that you carried a small bag with you;

11    is that correct?

12    A.   Yes.

13    Q.   Now, when you submitted your asylum affidavit, you

14    testified that you didn't have a bag.  You said, "I didn't even

15    go back to my room to get my belongings.  I was wearing two

16    layers of clothes, but those were all the belongings I had with

17    me."  You never mentioned the bag.

18    A.   The small belongings, when people just move away, you

19    carry all your belongings.

12:58PM 20    Q.   I'm sorry?

21    A.   When you move, flee, you carry all -- whatever you own,

22    all your possessions, but my small carry-on documents was, for

23    me it was not a big bag.

24    Q.   You said, "I didn't even go back to my room to get my

25    belongings.  I was wearing two layers of clothes, but those

**J.A. 1787**

1    were all the belongings I had with me."

2    A.   Yes, the same bag.  Like when you leave, you go to a job,

3    you have your carry-on, a small backpack you carry around with

4    you everywhere.

5    Q.   One of the things you didn't talk about in your testimony

6    is your travel from Butare from Congo.

7    A.   Yes.

8    Q.   Now, you needed to get past roadblocks, correct?

9    A.   Yes.

12:58PM 10    Q.   How did you get past the roadblocks on your way to the

11    Congo?

12    A.   You show your identity card, like everybody did.

13    Q.   I'm sorry?

14    A.   I showed my identity card, like everybody did.

15    Q.   That's not what you said in your affidavit, though, is it?

16    A.   What did I say?

17    Q.   In your affidavit you said that you went with patients,

18    and you said, "My colleagues and my patients helped me get

19    through the roadblocks by vouching for me and saying I was a

12:59PM 20    Hutu."

21    A.   Yes, because I have to explain how someone from the north

22    found himself all the way down the south.  It could be

23    suspicious because people asked why you are here.  That was not

24    a natural place for me to be.

25    Q.   But you never said you showed your identity card?

         1    A.    Everyone carried an identity card during that time.  Not
         2    having it could --
         3    Q.    If you carried an identity card, why did they have to
         4    vouch for you to say that you were a Hutu?
         5    A.    Because if you are found in a suspicious place, they will
         6    ask you, because during that period of time it was known people
         7    had fake identity cards.  You could have an identity card with
         8    ethnicity Hutu or Tutsi but not being a real one.  This was
         9    frequent.
01:00PM 10    Q.    From there you went to the Congo; is that right?
        11    A.    Right.
        12    Q.    And you entered by the border post -- the Ruzrit border
        13    post; is that correct?
        14    A.    Rusizi 1, yes.
        15    Q.    That's an actual lawful border; isn't that right?
        16    A.    During that time it was an open border.  Everybody was
        17    crossing en masse.
        18    Q.    Okay.  But you knew it was important to cross into a
        19    lawful border entry, right?
01:00PM 20    A.    In that situation there was really no processings.  People
        21    just walked through.  There was no checking.
        22    Q.    And from there you were in the refugee camp for two years,
        23    I believe; is that right?
        24    A.    Yes.
        25    Q.    And then Father Carlos from Caritas arranged a small

1    private plane to get you to Kenya?

2    A.    Helped me to get there.

3    Q.    And when you got to Kenya, you didn't apply for refugee

4    status in Kenya, correct?

5    A.    No.

6    Q.    Because you didn't want to be a refugee in Kenya, correct?

7    A.    No.  The process there in Kenya, they asked the Rwandan

8    people just to go in the refugee camps.  It was in the north of

9    Kenya where they have Somalians and Ethiopians and Sudanese.

01:01PM 10    That area is very dangerous.  If you go there, you have to know

11    the local languages.  So I could not have survived there.  I

12    had no chance.

13    Q.    Well, when you say you couldn't survive there, you weren't

14    under any physical threat?  Nobody was threatening your life in

15    Kenya?

16    A.    No.  At that time, no.

17    Q.    And you weren't under any kind of fear in Kenya, correct?

18    A.    Besides just fearing going back to Rwanda, I was not in

19    any fear in the Congo.

01:01PM 20    Q.    And yet you didn't apply for refugee status in Kenya,

21    correct?

22    A.    No.

23    Q.    In fact, you were there on a tourist visa; isn't that

24    correct?

25    A.    That was the only kind of visa they could give you when

1   you arrive in Kenya.

2   Q.   That wasn't my question.  You were there on a tourist

3   visa, correct?

4   A.   Yes.

5        THE COURT:  Why don't we -- are you changing subjects,

6   Mr. Varghese?

7        MR. VARGHESE:  It's fine to break here, your Honor.

8        THE COURT:  Okay.  Can I see counsel at sidebar about

9   the schedule.

01:02PM 10   **(SIDEBAR CONFERENCE AS FOLLOWS:**

11        THE COURT:  Ballpark, how much longer is your cross?

12        MR. VARGHESE:  I'll be a couple hours, your Honor.

13        THE COURT:  And you still don't expect a rebuttal

14   case; is that right?

15        MR. VARGHESE:  No, your Honor.

16        THE COURT:  So if it's a couple hours.

17        MR. LAUER:  There would likely be some redirect but

18   not extensive.

19        THE COURT:  What I'm going to tell them is it's

01:02PM 20   possible that they'll get the case tomorrow, but it's more

21   likely on Friday.  It depends on what the schedule is like.

22   I'm not going to split up the closings and all of that, but any

23   reason to think that's not the likely schedule?

24        MR. VARGHESE:  No.

25        MR. GARLAND:  No.

# J.A. 1791

1          THE COURT:  Okay.

2     **END OF SIDEBAR CONFERENCE.)**

3          THE COURT:  All right.  Ladies and gentlemen, despite

4     my threat, I'm not going to have an afternoon session today.

5          I'm reasonably confident that the evidence is going to

6     end tomorrow.  Depending on when that happens, we may have

7     closing arguments.  What I don't want to do is to split the

8     closing arguments up so that there's an overnight in between.

9     I want to do it all as one package.  So depending on when we're

01:03PM 10    done tomorrow, we may go to closings or it may spill over into

11    Friday.  But I think one way or another I don't think you'll

12    get the case any later than Friday.  So you should at least

13    prepare for the possibility you'll be here all day tomorrow or,

14    again, once you get the case you can take as much time or as

15    little time as you need to deliberate.  It's up to you.  But

16    you should prepare to be here all day.  And we would provide

17    lunch for you.  It's probably more likely than not that we'll

18    have closing arguments first thing Friday, I think.  If I had

19    to predict, I think it's probably the most likely scenario, but

01:04PM 20    still we just don't know, and I don't want to have any further

21    unnecessary delays.

22         So that's the schedule as best I can make it out.

23    Please remember my instructions not to discuss the case among

24    yourselves or with anyone else or to read or to listen to

25    anything about the case.  We're certainly in the home stretch,

1   so to speak, and you should, as I said, get the case no later

2   than Friday.  And I will see you tomorrow morning at 9:00.

3          THE CLERK:  All rise.

4   (Jury exits.)

5          THE COURT:  In terms of the jury instructions, what

6   I'd like to do is this:  The government I think indicated you

7   had -- you wanted to submit something concerning the

8   instruction on page 24.

9          MR. GARLAND:  That's correct, and to look at the rest

01:05PM 10   of it as well, but yes.

11          THE COURT:  Okay.  All right.  What I'd like to do is

12   to get that as quickly as I can.  Either side can submit

13   whatever you want.  I am going to look at the issue of adding

14   to the language describing the testimony to track the

15   indictment as the defense has suggested and, of course, the

16   instruction on page 24.  I'd like to, I think, convene probably

17   at 8:15 tomorrow.  I'll try to circulate a redraft of

18   instructions depending if I get things in time this evening so

19   you can have a chance to think about that.  What I'm trying to

01:06PM 20   avoid is to have a long charge conference at the close of the

21   evidence, depending on how all this plays out.  If for some

22   reason we're done in an hour tomorrow and we're going into

23   closings, I'd like to not have a lengthy charge conference if I

24   can avoid it.  So I'm going to do this circulating drafts by

25   email and looking at whatever it is you submit and we'll take

1      it from there, if that makes sense.  Okay?  Obviously, we'll

2      have whatever charge conference we need.  I'm just trying to

3      make it as short as possible.

4              MR. GARLAND:  That's fine, your Honor.

5              MR. LAUER:  That's fine.

6              THE COURT:  Just for your own planning purposes, I'm

7      teaching a class, and I'm going to need to leave at about 3:30

8      or 3:45 today.  So if you can get something in sooner than

9      that, that would be good, but I'll also check the docket this

01:07PM 10     evening as well.  Okay?

11             MR. GARLAND:  Do you want us to file things on the

12     docket or just email?

13             THE COURT:  You probably ought to put it on the

14     docket, I think, if you're suggesting a specific instruction.

15     I'll leave it up to you.  You could also send an email to the

16     clerk and follow it up with something formal.  But if either

17     side is formally requesting an instruction, I think it needs to

18     be on the docket.

19             MR. GARLAND:  Thank you, your Honor.

01:07PM 20     MR. LAUER:  All set.  Thank you.

21             THE COURT:  Okay.  8:15 tomorrow.

22             THE CLERK:  All rise.

23     (Court exits.)

24     (Whereupon, the hearing was adjourned at 1:07 p.m.)

25

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                                 )
vs.                              )   Criminal Action
                                 )
JEAN LEONARD TEGANYA,            )   No. 17-10292-FDS
                    Defendant    )
                                 )
                                 )
                                 )


BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV


JURY TRIAL DAY 17




John Joseph Moakley United States Courthouse
Courtroom No. 2
One Courthouse Way
Boston, MA 02210


April 4, 2019
8:19 a.m.







Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 3204
Boston, MA 02210
E-mail: vaohara@gmail.com

J.A. 1795

APPEARANCES:

For The United States:

    United States Attorney's Office, by GEORGE P. VARGHESE, ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts  02110;

For the Defendant:

      Federal Public Defender Office, by SCOTT LAUER, ESQ., and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor, Boston, Massachusetts 02210.

1                          I N D E X

2    WITNESS                      DIRECT   CROSS  REDIRECT RECROSS

3    JEAN LEONARD TEGANYA

4      By Mr. Varghese                      22              132
       By Mr. Lauer                                124
5

6
     EXHIBITS                              FOR I.D.  IN EVIDENCE
7
       24                                            129
8      65                                            116
       81                                            135
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

THE CLERK:  All rise.  Thank you.  You may be seated.
Court is now back in session.

THE COURT:  All right.  I understand Mr. Teganya is
not here, and I understand he's given you authorization to go
forward concerning the jury instructions and being present?

MR. LAUER:  Correct, your Honor.

THE COURT:  All right.  What do we have to talk with
on the instructions?  Mr. Garland.

MR. GARLAND:  So for the instructions that were sent
around last night --

THE COURT:  Yes.

MR. GARLAND:  -- I think for the government, it's
really just a few typographical things.

THE COURT:  Okay.

MR. GARLAND:  I had previewed that there was going to
be some language that we would ask you to insert.  We looked it
over, we think this captures it, so we're not worried about it.

So for the typographical things --

THE COURT:  Yes.

MR. GARLAND:  -- if you go to page 14, second line --

THE COURT:  Yes.

MR. GARLAND:  -- the word "reflect" I think should
have an "s" at the end of it.

THE COURT:  Yes.  Go ahead.

1          MR. GARLAND:  The next one is page 33, the heading.  I

2   think that that's the fourth element rather than the third

3   element.

4          THE COURT:  Yes, yes, yes.

5          MR. GARLAND:  And then the same issue on the next

6   page, the fourth element became the fifth element.

7          THE COURT:  By the way, because I give written copies

8   to the jury, I really tried to scrub it for typos.  I had been

9   a Judge I think for nine years before I managed to do it

10  without any typos.  I became obsessed with it, had my whole

11  staff looking, still typos went through.  It was shocking.

12         MR. GARLAND:  Your Honor, I still have typos on a

13  post-it note.

14         THE COURT:  One of them was like the third word.  It

15  said United States District, and like the "i" and the "c" had

16  been transposed.  Anyway, go ahead.

17         MR. GARLAND:  Exactly.  On page 36, there are two

18  things.

19         THE COURT:  Yes.

08:20AM 20      MR. GARLAND:  One is if you go down to the answer for

21  the second question.

22         THE COURT:  Yes.

23         MR. GARLAND:  The "left of dead," it should be "left

24  for dead."  And to be very clear, I believe that what the

25  government got there was from the indictment.  When I checked

**J.A. 1799**

1    the indictment against the transcript, the transcript says the

2    more logical word, which is "left for dead."  I think that the

3    indictment has that wrong.

4         THE COURT:  Because it doesn't -- I think it's a

5    variance that probably doesn't matter.  Mr. Lauer, do you have

6    a different view as to whether it should be "for" or "of"?

7         MR. LAUER:  So it strikes me that the indictment says

8    what it says, and we should not be departing from the language

9    of the indictment, even if the language from the indictment is

08:21AM 10   not entirely faithful to the recording itself.

11        THE COURT:  Mr. Garland.

12        MR. GARLAND:  I think that the Court has captured it.

13   There's no way that this is a variance or a material variance

14   from the indictment.  Moreover --

15        THE COURT:  It's not the charged answer.

16        MR. GARLAND:  And the Court has an instruction in

17   there saying that what matters is not the transcript but

18   actually the recording.

19        THE COURT:  Although this is a little different

08:22AM 20   because this is the charge.  The only reason this is in here at

21   all really I think is kind of concept for the answer that comes

22   on the next page.  Here's what I'm going to do, I'm going to

23   put the word "for" in brackets, but I'm going to make it "for,"

24   so left bracket, "for."

25        MR. GARLAND:  Thank you.  Further down below, I

1    believe that there should have been an ellipsis in the

2    indictment between the answer that starts out, "As I was

3    telling his Honor" and the next question because you go again

4    to the transcript, I think there's material between those two.

5            THE COURT:  I will double check that.

6            MR. GARLAND:  I think the three asterisks would help

7    the jury there.  And then the last thing that I spotted was

8    page 44, the second paragraph, first line.

9            The last clause proposed read, "Rather than but you

08:23AM 10   cannot agree on which one."

11           THE COURT:  Yes.

12           MR. GARLAND:  It should say, "But you cannot agree on

13   at least one."

14           THE COURT:  Okay.  I think that's fair.

15           MR. GARLAND:  As far as the defendant's request for a

16   special verdict form on Count Five, we have no objection to a

17   special verdict form as such.  The objections that we would

18   have on that are just the way it characterizes each of the

19   statements.  I think you set out what Statement 1, Statement 2

08:24AM 20   and Statement 3 is, I think just identifying on that special

21   verdict form Statement 1, Statement 2, and Statement 3 is

22   sufficient without the words after.

23           And then they also have spaces for proven, not proven,

24   and we would say that that should be guilty, not guilty.

25           THE COURT:  Part of the problem, it is a special

1    interrogatory, which I thought in criminal cases was not

2    permitted.  I mean, we don't do this with objects of the

3    conspiracy, for example, and that's kind of the problem is what

4    are you asking them to say?  It should be proved, use the

5    correct past particle rather than proven, but what are they

6    being asked to do?  That's part of the problem.

7         It's not guilty on each of those because it's just

8    guilty of the one charge.  I'm kind of uncomfortable with it

9    for that reason.  I'm not sure what I'm asking them exactly to

08:25AM 10   do.  I guess if both sides agree, I suppose that maybe is the

11   end of it, but it's part of the problem with the special

12   interrogatory in a criminal case.

13         MR. GARLAND:  Well, yeah.

14         THE COURT:  I should probably have to given an

15   instruction what it means to say proved.

16         MR. GARLAND:  That was something that I raised with

17   the defense.  I would hate to see them come back, then on

18   appeal the argument being or collateral attack meaning that,

19   well, it says proved but not proved beyond a reasonable doubt,

08:25AM 20   so there are a couple of ways dealing with it.

21         One would be to adopt the government's suggestion,

22   another way would be to not give it at all.  Another way that

23   you could do it would be to, and I've never seen this before,

24   this is just me thinking is you could say unanimous, not

25   unanimous on it, which would capture things, but my worry there

J.A. 1802

1  is if you do that, what they're going to do is they're going to

2  write numbers in, and I don't think anybody wants numbers in

3  there as to who says, you know, who's for, who's against, so

4  another way of doing it would be not to give a special verdict

5  form.

6        THE COURT:  I mean, one of the many advantages of

7  giving each individual juror a written instruction or set of

8  instructions is that they can not only follow along as I read

9  that particular instruction about how they would have to

08:26AM 10  unanimously agree, you know, as to at least one statement, but

11  they can go back and reread it and think about it.

12        In other words, if part of the issue here is having

13  something in writing that guides their decision-making process

14  in a way they have that with the written instruction as opposed

15  to being, you know, the way most Judges do it, read it in a

16  monotone at the end of the instructions and hope they're paying

17  attention, which I think is suboptimal.

18        Well, let me hear from Mr. Lauer.

19        MR. LAUER:  My colleague will speak to this.

08:27AM 20        THE COURT:  Mr. Watkins.

21        MR. WATKINS:  Your Honor, as you have been, we've

22  struggled with it.  It is essentially three simple charges

23  within the perjury count.  They could have been charged

24  separately, they weren't, they're charged in this particular

25  count.

1          The question is how to capture that in a way that the

2     jury understands that they really do have to make an

3     individualized assessment.  It's certainly clear from the

4     instructions that that is true, but as the government's pointed

5     out, and I will say we struggled with what is the best way to

6     do it.  Is it to ask for a guilty, not guilty as to each one of

7     the charges?  That doesn't seem comfortable because then you're

8     asking, guilty, not guilty, but also guilty, not guilty going

9     down.

08:28AM 10          I will tell you that I took this from -- I

11     conceptualized it as we would in a RICO case where you're

12     taking a look at the predicates to see if those have been

13     proven because it seems somewhat analogous there that where we

14     have to ask the jury specific questions about which predicates

15     in order to make the overall charge, and that seemed to be the

16     way conceptually to approach this all, but it is not an easy

17     question.

18          We don't know how jurors actually come to decisions,

19     and that is the problematic issue.  There are consequences if

08:28AM 20     they arrived at a verdict as to one of them versus some of the

21     others, sentencing consequences, if nothing else.  I do think

22     that that would make a difference.

23          THE COURT:  This isn't like RICO like a murder

24     predicate makes quite a bit of difference in the sentencing, I

25     mean, whether, you know, it's one or two or three of the

**J.A. 1804**

1    statements if he's convicted.  It's hard to picture that would

2    have a dramatic impact on the sentencing.  It's hard to picture

3    any impact on sentencing at all, frankly.  I'm sorry, go ahead.

4         MR. WATKINS:  I'm not sure I have very much to say

5    beyond that.  I do have more on the jury instructions.  Perhaps

6    once we discuss the jury instructions and get the Court's view

7    on that, that might change what we want to do on the verdict

8    form, so perhaps we can punt that, if you will, until later in

9    the day or find out.

08:29AM 10         THE COURT:  Let me first, did you have anything else,

11    Mr. Garland, on the instructions?

12         MR. GARLAND:  No, the only thing I was going to say is

13    that I can understand the argument that they've made that which

14    one of those statements might affect the sentencing decision,

15    but ultimately sentencing decision is yours.  The standard

16    isn't beyond a reasonable doubt, it's preponderance of the

17    evidence.

18         You sat here, you'll be able to figure out what you

19    believe those facts to be at that time, and so I also think

08:30AM 20    that the other statement, the other instruction on unanimity

21    addresses this very, very clearly.  It's not a lengthy

22    statement, but it's pretty good on directing them what to do.

23         If a special verdict form is going to confuse jurors

24    when that other instruction should have made it clear for them,

25    then the special verdict form should be out at that point.

1      THE COURT:  Okay.  Mr. Watkins.

2      MR. WATKINS:  As far as the instructions, your Honor,

3  the first issue we have is you have placed the literal truth

4  and ambiguous question instruction on page 23 in the context of

5  false statements under oath and the application.

6      THE COURT:  Yes.

7      MR. WATKINS:  I think all of us would agree that's

8  absolutely much more germane to Count Five.  It applies to

9  Count One and Three, but those questions are sharper, if you

08:31AM 10  will, than what happens at the bond hearing, and that's really

11  where the action is on the ambiguous and literal part of it.

12      THE COURT:  I understand that.  The reason I did it

13  this way is we basically have five counts that require

14  something to be false, and I want to give the instruction once,

15  if I can, and just say it's the same for each count.

16      If I give a different instruction for Count Five, then

17  the question becomes, well, does that also apply to One and

18  Three?  You're right, I mean, it's true sort of as a practical

19  matter that what we're really talking about here is Count Five,

08:31AM 20  but, you know, even then, you know, like the question

21  concerning whether an answer is complete, the question is in

22  Count One for each person, you know, as a member of a political

23  organization, describe for each person the level of

24  participation in a leadership or other positions held and the

25  length of time you or your family members were involved in each

J.A. 1806

1    organization or activity, and then the answer is my father did

2    this, and I belonged to the Red Cross.

3          That's an example where I think the government would

4    say that answer is literally true but incomplete because it

5    doesn't include the MRND, so, you know, to that extent the

6    instruction applies, that is, the literal truth but incomplete

7    answer applies.

8          And, you know, maybe somebody -- these are not the

9    least ambiguous questions of human history.  You know, they're

08:32AM 10   ambiguous as a matter of law, but they certainly could be more

11   felicitously phrased.  Maybe the jury --

12         MR. WATKINS:  Perhaps I can suggest to the Court on

13   page 41 where the Court goes into perjury and that the

14   defendant made a false statement, what the Court has written

15   is, "I've already explained to you how a statement may be

16   false."  Maybe that is the time to reiterate that instruction

17   about ambiguity and literal truth at that point to focus the

18   jury's attention to that because it is, as I think we all

19   recognize, that count is qualitatively different.  I think the

08:33AM 20   jury should understand that in some way.

21

22         THE COURT:  I guess I'm disinclined to do that.  I

23   mean, the problem with repeating any instruction is now you're

24   sort of putting double weight on that instruction, and other

25   than occasionally reminding them that it's proof beyond a

1    reasonable doubt, I don't like to repeat anything because,

2    again, you're now emphasizing that as, you know, at the risk of

3    de-emphasizing other things, so, I mean, I can, you know, once

4    this is final, I've already explained to you at page 23 how a

5    statement may be false, I mean, a specific reference back to

6    the instruction, maybe that would be helpful.

7         Mr. Garland, do you want to respond to this one?

8         MR. GARLAND:  Yes.  The government agrees with the

9    analysis by the Court but initially notes that putting it on

08:34AM 10   Count Five does lend special emphasis, and there are perjury

11   counts earlier in the indictment.  That's what 2 and 4 are all

12   about as well, perjury, and so it doesn't seem that every time

13   there's a perjury count we need to go back and say and

14   remember, you know, about this literal truth ambiguity.  You've

15   got one instruction, the jurors are smart, they can go back and

16   they can consult that.

17        THE COURT:  All right.  Mr. Teganya has now joined us.

18        All right.  I think what I'm going to do is this.  I

19   will put in -- I'll put in cross references to the pages where

08:34AM 20   I'm referring them back to an earlier instruction, so, again,

21   they have it in writing, they'll know exactly where to look if

22   it's an issue, and, of course, you can argue it, obviously.  I

23   let lawyers argue from the charge.

24        MR. WATKINS:  Your Honor, just to make it clear, we

25   will probably object to this, but further if the Court was

 1    concerned that by not giving it originally with Count One and

 2    Count Three that in regards to Count One and Three, that might

 3    prejudice the government because the jury needs to be

 4    instructed that literal truth or ambiguous truth, a literal

 5    answer might be incomplete, so that's helping the government,

 6    but where it comes to Count Five where the ambiguousness might

 7    enure to the benefit of the defendant to not have the

 8    instruction there seems to be somewhat unfair.

 9          THE COURT:  I'm not trying to help the government or

08:36AM 10   hurt the government, the idea here is to describe what

11    something -- what it means for something to be false once, and

12    then if it applies five times, they can refer back to it.  It's

13    the same instruction, and if they find, if they're concerned

14    about literal truth or ambiguity or natural meaning of the

15    words, whatever the issue is, they'll have it in one place,

16    they can look at it and read all the instructions once in

17    context, so I'm not trying to help or hurt anybody, I'm trying

18    to be as neutral as I can.

19          I think I'm going to handle it the way I said, I'm

08:36AM 20   going to do cross page references and leave it there.  Okay.

21          MR. WATKINS:  Shall I move on?

22          THE COURT:  Yes, go ahead.

23          MR. WATKINS:  Pages 36 and 37, which go through the

24    statements.

25          THE COURT:  Yes.

1        MR. WATKINS:  The Court has divided up the second and

2    third statements by on page 37, third, the defendant was asked

3    and responded as follows, breaking that up.

4        THE COURT:  Yes.

5        MR. WATKINS:  The discourse there was actually

6    continuous, right, there was no actual break in the testimony

7    between those two things.

8        Where we're talking about context, which is why we

9    asked the Court to put in this extra material, I think the jury

08:37AM 10    needs to understand that this was all part of one discourse

11    because that is the context there.  That's why we phrased those

12    things as one set of statements that resulted in two false

13    statements as alleged by the government, and we'd ask that the

14    Court continue to do that.

15        THE COURT:  All right.  How I'll handle that is as

16    follows:  Rather than say first, second, third, I'll say first,

17    some equivalent of that, and then I'll say second and third,

18    and we'll have it as one continuous statement.  Okay.

19        MR. WATKINS:  Similarly, we asked that at the end of

08:37AM 20    it where the Court has written the indictment charges the three

21    underlying statements were false --

22        THE COURT:  Yes.

23        MR. WATKINS:  -- and constitutes perjury, we ask for a

24    longer explanation about exactly what the specifics of the

25    allegations that the government made in the indictment.  We ask

that the Court include, "The government alleges that the first

no answer is false because the government alleges that or

Teganya witnessed Tutsis at the hospital being turned over to

the military to be killed, the government alleges a second no

answer as false because it alleges that Teganya saw atrocities

at the hospital during the genocide."

THE COURT:  Hold on, let me pull up the indictment.

Did you supercede?  I've got a four-count indictment that was

printed out.

08:38AM MR. WATKINS:  I have an extra copy.

THE COURT:  The one I have printed out for some

reason -- oh, it's got pages missing the way it was printed

out.

MR. WATKINS:  I think it's page 14.

THE COURT:  I think that's fair, so what I will do is

say constitute perjury in some way, I'll quote what they

alleged was false is that the Defendant Teganya was a member of

the MRND before and during the Rwandan genocide, and then he

observed atrocities at the hospital during the genocide,

08:39AM including Tutsis being turned over to the military to be

killed.  Okay.  I will add that in some form.

MR. WATKINS:  Moving on from the instructions --

THE COURT:  Before we leave the instructions, the two

places where I say that the testimony of two witnesses at

page 30, I'm going to clarify the falsity of the statement in

J.A. 1811

1    Counts Two and Four must be established either by the testimony

2    of two or more independent witnesses, and then, again, at

3    page 41, I'll say the falsity of the statement as to

4    Count Five, just to make clear that it applies to Two and Four

5    and Five but not to One and Three.

6            MR. GARLAND:  Yes, thank you.

7            THE COURT:  I'm sorry, Mr. Watkins.

8            MR. WATKINS:  We have discussed whether and how the

9    indictment should be submitted to the jury.  The Court

08:40AM 10   indicated it would submit the indictment to the jury.  This is

11   a speaking indictment.  There are allegations for several pages

12   that go on about the history of Rwanda and what happened during

13   the genocide.  That's been testified to at trial.

14           There's simply no reason to put that back to the jury,

15   so we've asked the government to consider redacting out all the

16   way to, let's see, basically the first five pages, and then to

17   start on Count six and omit the aspects of it that say that the

18   grand jury realleges at that point.

19           Honestly though, once you talk away all of that, then

08:41AM 20   it becomes pretty much what the Court's instructions are

21   questioning whether this is the case where the indictment needs

22   to go back to the jury at all.

23           This is not a particularly complex case where the

24   indictment might provide some kind of road map of how they need

25   to consider each kind of charge.  I think because of the

 1   specificity of the indictment and the narrowness of what they

 2   have to decide, sending the indictment back doesn't make a

 3   whole lot of sense, but if it were to go back, there's simply

 4   no need for the government to be able to reallege its case in

 5   the lead-up to the actual charges.

 6        MR. GARLAND:  Your Honor, the only time we've

 7   seen -- well, first of all, the idea that this is a simply case

 8   when we've heard from two experts and all that --

 9        THE COURT:  That's a rhetorical flourish.

08:42AM 10        MR. GARLAND:  Moreover is the fact that the only time

11   that we've seen this sort of redaction has generally been when

12   a count has been dismissed, you've got one defendant being

13   tried in a multi-defendant case, and the Court wants to make

14   sure there's no prejudice from there.

15        I've never been aware of a rule that in a speaking

16   indictment, you just redact out the speaking allegations and

17   just leave the charges.

18        The Court has an instruction that says that the

19   indictment is not evidence and has something about what an

08:43AM 20   indictment is.  The government believes that that takes care of

21   it and that the normal practice would be to send it back

22   unscathed.

23        THE COURT:  All right.  I think the defense may have

24   raised a valid concern but I would like to have more

25   confidence, I guess, in how this ought to be handled.  I would

## J.A. 1813

1    like to see a case about the rules.

2              MR. WATKINS:  I'm sorry, your Honor.

3              THE COURT:  I'd like to see a case or case law

4    concerning does the jury have to see the indictment?  What are

5    the rules?  You know, this must have come up before.  It's the

6    kind of things that Judges say to their clerks and partners say

7    to their associates, you know, I'm sure there's a case, find

8    one, but I would like to see some case law about what the rules

9    are here before I proceed.

08:43AM 10             Okay.  So I don't need a memo, but if you can just

11   come up with a case that tells me, that guides me in some way.

12   It doesn't have to be First Circuit if there's no First Circuit

13   law.  That would give me some comfort.  Okay.  Let's handle it

14   that way, and I will put that on hold.  Anything else?

15             MR. GARLAND:  Not from the government, your Honor.

16             THE COURT:  The schedule still looks about what it did

17   at the end of yesterday, that is, in terms of the length of

18   examinations and so forth?

19             MR. GARLAND:  Yes, that's correct, we anticipate going

08:44AM 20   to or past the 11:00 break.

21             MR. LAUER:  In the interest of avoiding surprises or

22   unnecessary sidebars, I just wanted to alert the Court to one

23   potential issue that may arise during the cross-examination.

24   The government is in possession of transcripts that were

25   translated from the French that were made by Mr. Teganya during

1    his immigration proceedings there.  The transcript itself --

2              THE COURT:  Immigration proceedings in Canada?

3              MR. LAUER:  In Canada, so I expect there will be some

4    degree of cross-examination as to that.

5              THE COURT:  Are you meaning, I'm sorry, that the

6    proceeding was in English and translated in English?

7              MR. LAUER:  No, the proceeding was in French.

8              THE COURT:  Was in French.

9              MR. LAUER:  The government has produced transcriptions

08:45AM 10   that are in English.

11             THE COURT:  Okay.

12             MR. LAUER:  To the extent that that may arise, I want

13   to alert the Court that the nature of that proceeding and the

14   nature of the questioning is not particularly clear.  There

15   were several, I think at least two examiners of the defendant,

16   and when you read the transcript, the people are talking all

17   over each other constantly.

18             It's very difficult to parse the transcript.  It's not

19   as simple as question, answer, question, answer, so to the

08:45AM 20   extent that that may arise, I just want to alert the Court that

21   this is an issue that the defense may be objecting to portions

22   if the defendant is being asked about statements that were part

23   of a very complex or unclear examination.

24             THE COURT:  Well, I'm not sure that the way to handle

25   that is to keep it out but rather to permit cross and redirect

 1   on the topic, you know.

 2           MR. LAUER:  No, I wasn't suggesting that it should be

 3   kept out necessarily, but it is an issue, and I want the Court

 4   to have some understanding of what it is in the case of an

 5   objection.

 6           THE COURT:  You know, if there's an issue with the

 7   accuracy of the translation, you know, I suppose if need be, we

 8   could, you could call an interpreter or something, but let's

 9   call that bridge when we come to it.

08:46AM 10           Okay.  Unless there's anything else then, we'll resume

11   when we have a full complement.

12           (A recess was taken.)

13           THE CLERK:  All rise for the jury.

14           (JURORS ENTERED THE COURTROOM.)

15           THE COURT:  All right.  Good morning, everyone.

16   Mr. Varghese, are you ready to resume?

17           MR. VARGHESE:  I am, your Honor.  Thank you.

18           THE COURT:  Do you understand that you're still under

19   oath.

09:09AM 20           THE WITNESS:  Yes, your Honor.

21           THE COURT:  Okay.  Go ahead.

22                   JEAN LEONARD TEGANYA, RESUMED

23                   CROSS-EXAMINATION, CONTINUED

24   BY MR. VARGHESE:

25   Q.   Good morning, Mr. Teganya.

1    A.    Good morning.

2    Q.    I want to begin today with where we left off yesterday

3    talking about your travel from Butare to Congo to Kenya, okay?

4    A.    Yes.

5    Q.    I want to go back and ask you, you left Butare because the

6    RPF soldiers had made it to the city or they were on the

7    outskirts of the City of Butare, correct?

8    A.    We left because the reports we had, it was about combat

9    coming from Gitarama, I think, so everybody around the Butare

09:09AM 10    city was leaving.

11    Q.    Well, not everybody.

12    A.    Not everybody, the majority.  I saw a huge crowd of people

13    leaving the city.

14    Q.    In fact, you talked about in your affidavit that you knew

15    somebody who was a Tutsi who was staying?

16    A.    Yeah, there were people who were staying.

17    Q.    Who were Tutsi, correct?

18    A.    Yes.

19    Q.    And you were leaving, and that combat you're talking

09:10AM 20    about, that's the RPF that's advancing on Butare, correct?

21    A.    Correct.

22    Q.    And yesterday, you spent a lot of time talking about it,

23    and you described it as a war, a civil war, a messy war, but

24    the war wasn't actually going on in Butare, correct?

25    A.    In Butare, there was no war, but there were killings.

J.A. 1817

1    Q.    A genocide?

2    A.    Genocide, yes.

3    Q.    Of the Tutsis?

4    A.    Yes.

5    Q.    You agree with that?

6    A.    Yes, I agree.

7    Q.    And so you fled to the Congo, and we talked about this

8    yesterday, you never claimed asylum in the Congo, correct?

9    A.    There was no such process in Congo.  Even the discussion

09:10AM 10    we had with people, the refugees, they said the main mission

11    was just to keep those refugees, the people, the Rwandan people

12    to keep them alive.  They were not starting to give refugee

13    status to more than 2 million people.

14    Q.    And then you left the Congo, and one of the reasons you

15    left the Congo was because the RPF started attacking the

16    refugee camps; is that correct?

17    A.    Correct.

18    Q.    And they were looking for genocide suspects, taking them

19    back to Rwanda, correct?

09:11AM 20    A.    I don't know the reason for those attacks, but for me, it

21    was unsafe.

22    Q.    But you knew genocide suspects were returned to Rwanda,

23    correct?

24    A.    Yes, among the refugees, there were some genocide

25    suspects.

1    Q.   And you were here when Ms. Tatiana Nahimana, a witness

2    that you called, testified about her husband, an Interahamwe

3    member, being forcibly returned from the Congo to Rwanda,

4    correct?

5    A.   Correct.

6    Q.   And so you went by private plane to Kenya, correct?

7    A.   Yes.

8    Q.   And while you were in Kenya, you were working with the

9    Rwandan exile community there; isn't that correct?

09:11AM 10    A.   There was this pastor, he has a church --

11    Q.   You can just answer my question.  You were working with

12    the Rwandan exile community there, correct?

13    A.   I volunteered combat service.

14    Q.   And within the Rwandan exile community in Kenya, there

15    were several genocide suspects within that community as well,

16    correct?

17    A.   Not that I know.

18    Q.   You didn't know that Shalom Ntahobali was there?

19    A.   No.

09:12AM 20    Q.   Do you know who Shalom Ntahobali is?

21    A.   No, I don't know him.

22    Q.   You don't know that he's a well-known genocidaire from

23    Butare?

24    A.   I know he's a son of Ntahobali Maurice, but I don't know

25    him personally.

**J.A. 1819**

1    Q.    And he was there in Kenya, correct?

2    A.    Kenya is a huge city.  I don't know.  I don't know

3    everybody who was living in Kenya at that time.

4    Q.    You were here when your friend, Jean Pierre Rukebesha,

5    testified and you called him as a witness; isn't that correct?

6    A.    Yes.

7    Q.    And one of the things he testified about was about

8    Shalom Ntahobali having a pickup truck full of Tutsis in

9    Butare, correct?

09:12AM 10    A.    Correct.

11    Q.    Do you remember that testimony?

12    A.    Yes, I remember.

13    Q.    When you applied for refugee status in Canada, you listed

14    the work that you were doing with the Rwandan exile community

15    in Kenya, correct?

16    A.    I don't recall exactly the term I used.

17    Q.    But when you applied and you filed your asylum affidavit

18    here in the United States in May of 2015, you didn't mention

19    anything about working with the Rwandan exile community in

09:13AM 20    Kenya, correct?

21    A.    No, I didn't give the specifics.

22    Q.    You didn't want to give the specifics?

23    A.    No, I didn't give the specifics.

24    Q.    And the reason you didn't give the specifics was because

25    by the time that affidavit was filed in May of 2015, there were

1    a number of genocide suspects who were arrested in the Kenya

2    Rwandan exile community, correct?

3    A.    No, that's not the reason.

4    Q.    That's not the reason or that's not what happened?

5    A.    That's not what happened, that's not the reason.

6    Q.    You're not aware the Rwandan genocide suspects were

7    arrested in Kenya?

8    A.    Yeah, there were, but I am not aware or nor I know every

9    one of the citizens was living in Nairobi.

09:14AM 10    Q.    So, your reason for omitting your work with the Rwandan

11    exile community in Kenya was what?

12    A.    There is a church, there was a bishop.  His name is

13    somewhere.  I don't recall his other name.  He had a church,

14    and that church, among the service they give to the Rwandan

15    community was just distributing foods and to give information

16    for the new arrival people.

17    Q.    With all due respect, sir, that's not --

18          THE COURT:  Don't interrupt him.  You asked him an

19    open-ended question.  Let him give his answer.

09:14AM 20          MR. VARGHESE:  Very well, your Honor.

21    A.    So the service, what I did is I volunteer just to show up

22    to the church, mainly Wednesday afternoon.  If people show up,

23    just to help people who don't have food, who don't have any

24    services just to help to distribute that kind of food.  That's

25    the only thing I did in that church, and the organization is a

```
 1   church.  It's not any kind of an organization.
 2   Q.   Sir, that wasn't my question.  My question was why did you
 3   omit that from your affidavit in the U.S. asylum application?
 4   A.   Because I didn't consider that a significant event.
 5   Q.   And then in November of '97, you went to India, correct?
 6   A.   Correct.
 7   Q.   And the way you made it there was a priest passing through
 8   Nairobi who offered you an opportunity to go there; is that
 9   correct?
09:15AM 10   A.   Yes, his name is Pastor Mannaseh Twadasejo (ph).
11   Actually, he's a genocide survivor, a Tutsi.  He lives in
12   Rwanda, actually.
13   Q.   And you flew to India?
14   A.   Yes.
15   Q.   Was that commercial or private?
16   A.   Commercial via India from Nairobi to Mumbai.
17   Q.   How did you pay for it?
18   A.   It was paid by Rwanda Hope.  Rwandan Hope is an
19   organization that is based here in the United States.  They
09:15AM 20   were the same people who were collecting money to pay for our
21   scholarships and all our travelings.
22   Q.   And when you got to India, you didn't feel threatened,
23   correct?
24   A.   No, not by India.
25   Q.   And you didn't feel pressured or harmed, did you?
```

J.A. 1822

```
 1   A.   Not really.

 2   Q.   And you never applied for asylum in India either, correct?

 3   A.   Correct, because I was there as a student.  I was admitted

 4   in India on a student visa.

 5   Q.   That wouldn't have stopped you from applying for asylum?

 6   A.   Yes, it would have.  That's a dictatous (ph).

 7   Q.   And so then you tried to go to Canada, correct?

 8   A.   I didn't try, I did.

 9   Q.   Well, before you went to Canada, you had to figure out how

10   to get there; isn't that right?

11   A.   I had to.

12   Q.   And so you purchased a fake Zimbabwean passport; is that

13   correct?

14   A.   Correct.

15   Q.   In the name of Mitzui Nikiwana?

16   A.   Mitzui Nikiwana.

17   Q.   That's not you, correct?

18   A.   That's not me.

19   Q.   That was a lie, correct?

20   A.   That was a lie, that's how people, they smuggle, how they

21   travel with those documents.

22   Q.   So you're not that person?

23   A.   No.

24   Q.   But you knew you needed to lie in order to get -- to make

25   that trip happen, to get to Canada, correct?
```

1    A.    I knew I have to get out of there.  That's the only one

2    way out.

3    Q.    Because you knew if you didn't lie, you wouldn't be able

4    to get to Canada; isn't that correct?

5    A.    That's correct.

6    Q.    And so you made the choice to lie to get yourself status

7    in the country you wanted to be in, correct?

8    A.    I decided just to get out because it's a motto for life

9    and death.

09:17AM 10    Q.    So, again, just please answer my question.  You chose to

11    lie to get yourself status in the country you wanted to be in,

12    correct?

13    A.    That's not correct.  Rephrase your question because the

14    question is not true.

15    Q.    You chose to lie to get to Canada to get refugee status;

16    isn't that correct?

17    A.    Correct.

18    Q.    Because in your view, the ends justified the illegal

19    means, correct?

09:18AM 20    A.    No.

21    Q.    No?  The ends of going to Canada didn't justify using the

22    illegal passport?

23    A.    Because I don't like the way you are assuming or the way

24    you are formulating your questions.

25            THE COURT:  That's a fair objection.  It's grossly

**J.A. 1824**

1   argumentative.  Let's move on.

2   Q.   So, how did you go about creating the fake passport?

3   A.   Because we have to ask for information from people who do

4   that, people who smuggle, people who do human trafficking, even

5   today.  In this world, there are millions and millions of

6   people who are trying to get out of the situation because if

7   you don't get out, you get killed.  It's a matter of life and

8   death.  If ever you find yourself in that situation, you will

9   try to get out at any means.

09:18AM 10   Q.   To be fair, sir, you testified earlier that you weren't

11   under life and death in India; isn't that correct?

12   A.   In India, that situation, I was facing the only situation

13   to be deported to Rwanda.

14   Q.   So, my question, which you did not answer, how did you get

15   the fake passport?

16   A.   I asked for information, I was provided by those people,

17   the other refugees from Sudan and Ethiopia.  The only one way

18   to get out is to provide a fake document, which I did.

19   Q.   How did you buy the fake document?

09:19AM 20   A.   You give money to the person, the contact person they give

21   to you.

22   Q.   And so was that person in Zimbabwe?

23   A.   No, he was in Kenya actually.

24   Q.   So I thought you said yesterday that your aunt got you the

25   fake passport?

1  A.   They told me there was a person who was in Kenya, just to

2  have someone pay him get the document done, and the document

3  will be sent to you.  I didn't do the traveling just to go

4  there to pick up the documents.

5  Q.   I'm sorry, I didn't understand your answer.

6  A.   I did not do the travel to go pick up the documents.

7  Q.   So you had to give your photo or information to someone to

8  get the passports?

9  A.   All I sent was my photo, period.

09:20AM 10  Q.   And you sent it to your aunt or you sent it to somebody

11  else?

12  A.   I sent it to the person who did it.

13  Q.   And then your aunt picked up your passport?

14  A.   No, my aunt paid the money.

15  Q.   And then how did you get the passport from the person who

16  had your photo?

17  A.   They mailed to it me in India.

18  Q.   And then you used that fake passport to get to Canada; is

19  that correct?

09:20AM 20  A.   Correct.

21  Q.   And with that fake passport, you then arrived in Montreal;

22  is that correct?

23  A.   Correct.

24  Q.   And you were here on Tuesday when your good friend,

25  Mr. Nshimiye, testified, correct?

## J.A. 1826

1  A.  Correct.

2  Q.  And he testified similarly that in his asylum application,

3  he stated his father was killed in the genocide, correct?

4  A.  Correct, that's what he say.

5  Q.  And he used that to get to the United States, correct?

6  A.  Correct.

7  Q.  And you were here when your friend, Mr. Jean Baptiste

8  Bizimana testified, correct?

9      MR. LAUER:  Objection, your Honor.

09:21AM 10      THE COURT:  I'll allow that.  Overruled.

11  A.  I don't recall his name.

12  Q.  I'm sorry.

13  A.  I don't recall that person.

14  Q.  You don't recall that witness being called by your team?

15  A.  Jean Baptiste?

16  Q.  Jean Baptiste Bizimana?  Do you recall

17  Ms. Tatiana Nahimana testifying on your behalf?

18  A.  Yes, Ms. Tatiana Nahimana, I recall her.

19  Q.  And she similarly testified that she used a false

09:21AM 20  Burundian passport to travel to the United States; isn't that

21  right?

22  A.  Yes, that's right.

23  Q.  And your friends Fidele Barinda testified as well,

24  correct?

25  A.  Correct.

Q.    And Jean Paul Munyentwari?

A.    Yes.

Q.    And they testified that they misstated answers in their U.S. visa applications; isn't that correct?

A.    Correct.

Q.    And they used those to get to the United States?

A.    Yes.

Q.    You testified yesterday when we began that lying on immigration paperwork was wrong, correct?

09:22AM

A.    Correct.

Q.    You said it was a crime, correct?

A.    Yeah.

Q.    Now, when you got to Canada, you applied for asylum, but you were denied; is that correct?

A.    Correct.

Q.    In fact, you were originally denied in 2002, correct?

A.    Correct.

Q.    You appealed that decision, it was overturned on procedural grounds, and you applied again in 2005, correct?

09:22AM

            MR. LAUER:  Objection.

A.    Correct.

            THE COURT:  I'll allow it.  Overruled.

Q.    You were denied on September 6, 2005, correct?

A.    Correct.

Q.    You appealed that decision, that appeal was denied on

May 12th, 2006, correct?

A.   Yeah.

Q.   In September of 2008, you filed for additional relief to stay in Canada, correct?

A.   Correct.

Q.   And that was denied on May 31st, 2010, correct?

A.   Correct.

Q.   You appealed that decision, and that appeal was denied on March 18th, 2011, correct?

09:23AM   A.   Correct.

Q.   You appealed that again at the end of 2011, and that was denied on March 7th, 2012, correct?

A.   Correct.

Q.   And you appealed that, and that was denied in June of 2012, correct?

A.   I don't recall exactly the dates, but it looks like.

Q.   And you were scheduled to be deported to Rwanda on Tuesday, October 23rd, 2012, correct?

A.   Correct.

09:23AM   Q.   I believe it was 3:30 a.m.; is that correct?

A.   The flight was supposed to be like 5 a.m. morning.

Q.   And you filed an emergency appeal to stay that deportation on October 22nd, 2012, correct?

A.   That was the last day, yes.

Q.   And that was appeal was denied?

A.   Yes.

Q.   And you were ordered to be deported back to Rwanda on October 23rd, 2012, correct?

A.   Yes.

Q.   And there was a Court Order directing you to do so, correct?

A.   Correct.

Q.   And rather than obey that Court Order, you chose to ignore it again, correct?

09:24AM
A.   Correct.

Q.   You chose to run rather than be deported, correct?

A.   Run for my life.

Q.   And you went into hiding from Canadian authorities, correct?

A.   Correct.

Q.   For more than two years, you were alluding Canadian authorities; isn't that correct?

A.   Almost two years.

Q.   And you knew that you were the subject of an active
09:24AM Canadian-wide arrest warrant, correct?

A.   I didn't know.

Q.   And you knew the Canadian Border Services Agency was looking for you, correct?

A.   I suspect, but I didn't know.  There was no way to know.

Q.   And you knew on March 20th of 2014 that they put you on

their most wanted foreign criminals in Canada list?

        MR. LAUER:  Objection.

        THE COURT:  Sustained.

Q.   Did you know that your picture was published?

A.   How could I know?  I was living off crime greed.  I didn't have access to Internet or phone or any way.  How could I know?

Q.   Do you know your picture was published in newspapers?

        THE COURT:  Let's move on.

A.   No.

09:25AM

Q.   You mentioned that you were hiding.  How were you hiding in Canada?

A.   I was hiding in a -- just renting a small room in a crowded area and lived there.

Q.   Who were you with?

A.   I was by myself.

Q.   Did your friend Jean Francois Habimana help you?

A.   No.

Q.   He was only five kilometers away from you, correct?

A.   I was not living by my place because I knew if ever they

09:25AM

come looking for me, they would be going around my place, they'd be visiting all my friends, all my known contacts.

Q.   And you were moving from place to place, correct?

A.   No, I went far away like 20 kilometers from where I was living, then I rented a small room in a crowded area.  I stayed there.  I could not take a chance to meeting people who knew me

J.A. 1831

before.

Q.   And so you decided to come to the United States, correct?

A.   I was looking for any way to get out of Canada.

Q.   After two years of hiding in Canada, correct?

A.   Almost, sir, 15 months.

Q.   And so on the morning of August 3rd of 2014, you came to Houlton, Maine, correct?

A.   Correct.

Q.   And, again, why did you choose to come to Houlton, Maine?

09:26AM

A.   Geography.  It was the only place I could cross to come to U.S.

          MR. VARGHESE:  Could we bring up Exhibit 21.

Q.   Do you see Exhibit 21 on the screen, sir?

A.   Yes.

Q.   Now, Houlton, Maine is about 450 miles from Laval, Quebec. Why did you come all that way to cross into the United States?

A.   Because it was much safer for me here nearby Laval, Quebec.  The U.S. border there, it's an Indian Reserve, and there's a lot of trafficking, drugs going there.  I didn't want

09:27AM

to be caught into that kind of -- try going there.  I didn't want just to be on Indian Reserve or to be in the middle of the trafficking of these drugs, I wanted to be in an area where there was nothing criminal going on, that's why I chose to go to Maine.

Q.   So you skipped New York, you skipped Vermont, you skipped

**J.A. 1832**

New Hampshire, and you skipped all of Western Maine, correct?

A.   Correct.

Q.   And you knew you weren't looking for a lawful point of entry, correct?

A.   Yes.

Q.   And you were looking for a place to cross over the border and be undetected, correct?

A.   Yes.

Q.   And you knew that was illegal?

09:28AM  A.   Yeah, I knew it was illegal.  I was running for my life. Again, I tell you if you run for your life, the law becomes secondary.

Q.   And you were willing to break the law to get what you wanted?

A.   I was breaking the law to save my life.

Q.   And you knew that was wrong, correct?

A.   Yes, it was wrong, but it was the only way to survive today.

Q.   And when you were entering Maine, you skipped the lawful

09:28AM  border entry, correct?

A.   Correct.

Q.   How did you get all the way from Laval, Quebec to Houlton, Maine?

A.   I took a cab actually from Laval to Maine.

Q.   Four hundred fifty miles?

A.    Yes.  I paid around 600 something.

Q.    And where did they drop you off?

A.    They dropped me nearby the border.

Q.    By the border crossing?

A.    No, nearby the border.  I have to walk like five hours walking.

Q.    Can we bring up Exhibit 57.  Do you see Exhibit 57 on your screen, sir?

A.    Yes, I see.

09:29AM

Q.    When you were arrested by Agent Radatz, you were walking away from the port of entry, correct?

A.    Yes.  I was going toward Portland City.

Q.    Well, no, you were walking away from that direction; isn't that right?

A.    I was walking towards Portland.

Q.    Where were you trying to get to?

A.    I was trying to get into Portland in the city just to catch a bus to come down here to Boston.

Q.    Who were you coming to see?

09:29AM

A.    No one.  I was just coming here just to present myself in front of Immigration officials.

Q.    If you wanted to present yourself in front of Immigration officials, there were plenty of immigration officials in Houlton, Maine; isn't that right?

A.    No.  Again, I am telling you I was fearing just to be

J.A. 1834

deported back to Canada, so there was no way I could stay nearby the border. I wanted to get as far as possible.

Q. How were you going to get there? You said you were going to catch a bus; is that correct?

A. Yes, when I encountered the border patrol, I had ready cash on me.

Q. You had $2500 in cash on you, U.S.?

A. Yes.

Q. And about $800 in Canadian, correct?

09:30AM

A. Correct.

Q. And you had all that cash because you didn't want a record of what you were doing, correct?

A. Sorry.

Q. You didn't want to use credit cards because you didn't want to have a record of what you were doing, correct?

A. I didn't have a credit card since the last two years. I never did any transaction or did any electronic communication.

Q. So, you had spent 15 years in Canada trying to make your asylum claim, and it was only after you failed in Canada, and

09:30AM

then two years later after you had been hiding that you decided to cross into the United States, correct?

A. Correct.

Q. And it's your testimony here that you were eventually going to declare asylum; is that correct?

A. Sorry, come again.

Q.   It was your -- it's your testimony here that you were
coming to Boston to declare asylum; is that your testimony?

A.   Right away, that was my plan just to show up and to go to
apply for asylum.

Q.   But you skipped all the available opportunities in
New York, Vermont, New Hampshire and Houlton, Maine to declare
asylum; isn't that right?

A.   All those places was nearby Canadian border.  I didn't
want just to be nearby Canada because I feared to be deported
back to Canada, the same people I was running away from.

09:31AM

Q.   Well, to be clear, the people you were running away from
were in Rwanda, correct?

A.   No.  At that time, it's the Canadian government I was
running from.  The Canadian government wanted to deport me to
Rwanda.  I told you yesterday during my testimony toward the
end of my procedure, I knew two outcomes.  I told them just in
case you don't want me in your country, give me my passport, I
have three countries who are giving me a visa.  If you don't
want me on your soil, I'm willing to leave your country and go
somewhere else.  What I was told, he told me, no, we want you
to go to Rwanda.

09:32AM

Q.   Because there was a lawful Court Order to send you to
Rwanda, correct?

A.   No, at that time, there was no Court Order when I did the
contact.

**J.A. 1836**

Q.   Like the fake passport, you were willing to break the law to get what you wanted; isn't that right?

A.   No, that's not right.  You are assuming.

Q.   Well, you knew you were breaking the law?

A.   You are assuming again.  I'll tell you I broke the law because I was running for my life.  It's a matter of life or death.  I knew what I was facing if I was deported to Rwanda.

          THE COURT:  We've been over this ground, Mr. Varghese.

Q.   Let's move on and let me ask you about your asylum application.  So you filled out your asylum application.  Can we bring up Exhibit 1, page 7.  You're familiar with this question, obviously, right?

A.   Yes.

Q.   And you understood that you were supposed to include each organization or activity that you or your family members were involved in, correct?

A.   Correct.

Q.   You weren't supposed to just put down selected ones, you were supposed to put them all down, correct?

A.   Correct.

Q.   And you would agree that if you had put down that you were a member of MRND, there would be a lot of questions to you about your role in the genocide, correct?

A.   Yes, I understand.

Q.   And when you were in Canada, you had told the Canadian

J.A. 1837

courts that the majority of radical Hutus belonged to the MRND, the party in power at the time of the genocide, correct?

A.   That's the assumption.  They say the majority of people are MRND, the majority of people where I'm from, they belong to MRND.  That's a fact.

Q.   And the majority of extreme Hutus, well, you said the party in power at the time of the genocide, that was the MRND as well, right?

A.   Yes.

09:34AM

Q.   And the MRND was the ones who instigated the genocide, correct?

A.   Sorry.

Q.   The MRND was the party in power that instigated the genocide, correct?

A.   That's an assumption also.  You are assuming again.

Q.   Is your answer no, the MRND didn't instigate the genocide?

A.   That's an opinion.  They say MRND is responsible for genocide, but how it started, who planned it, everyone has an opinion about that.

09:34AM

Q.   Is your opinion that MRND was not behind the genocide?

A.   There is a lot of people from MRND who did horrible stuff, who were responsible for genocide, but all people from MRND, I don't think so.

Q.   And in your immigration proceeding before Judge Day, you went further than -- you went further, and you explicitly

J.A. 1838

denied being a member of MRND; isn't that right?

A.    I've never been a member of MRND.  I repeated it today,
I've never been a member of MRND.

Q.    And that's what you said under oath before Judge Day as
well, correct?

A.    Correct, and I'm saying this today again.

Q.    And you testified that it was true that your dad was a
leader of MRND in the Kibilira District; is that right?

A.    My father was the local representative.  That's the
official title he had, period.

Q.    And -- well you said he was a local president in your
application?

A.    Yes, I said he's the local president, yes.

Q.    That's not just a representative, he's a local president,
correct?

A.    It's what they call president locally.

Q.    And you testified yesterday on direct that he was being
held in prison, correct?

A.    Yes.

Q.    It's also true that in Kibilira in October of 1990, there
was a massacre of about 350 Tutsis; isn't that correct?

A.    All over the region, there was killing all over the region
of Gisenyi.

Q.    I'm not talking about the genocide, I'm talking about
three years before the genocide ever started.

09:35AM

09:36AM

**J.A. 1839**

A.   Correct.

Q.   In October of 1990, there was a massacre of 350 Tutsis; isn't that correct?

A.   Correct, but I'm telling you it didn't happen in Kibilira only, it happened all over the Gisenyi area.

Q.   And local political leaders, like your dad, were charged with inciting the Hutus to that kind of violence; isn't that correct?

A.   People who were in charge were charged, and some people went to jail.  My father has never been charged in '90.

Q.   He wasn't charged in 1990, but he was charged with those activities; isn't that right?

A.   No.

Q.   He was charged with participating in the genocide, correct?

A.   In '90, no.

Q.   I'm sorry.

A.   In 1990, no.

Q.   In 1994, in the 1994 genocide as well.

A.   1994, he was charged being a member of MRND for political reasons.

Q.   Okay.

A.   His charges, he's charged with being a leader of MRND.

Q.   And yesterday you talked about Dr. Bernard Kalimba and Jerome Arusha, you said some things about them.  Do you

09:36AM

09:37AM

**J.A. 1840**

remember that?

A.     Yes, I remember.

Q.     And you admit that Mr. Kalimba was your freshman year roommate, right, your first-year roommate, correct?

A.     Yes.

Q.     And you were here when they both came in and testified that you were, in fact, a member of MRND, and you wore that hat, you wore that scarf, correct, you remember that testimony?

A.     I heard them talking, saying that.

09:37AM     Q.     And they also testified you went to MRND rallies and meetings, correct?

A.     Yes, I heard them saying that.

Q.     And you heard that they said you were an MRND leader on campus?

A.     Yes, I heard them saying that.

Q.     And yesterday you explained that there was bad blood between you and Mr. Kalimba, there was a disagreement?

A.     Exactly, Kalimba and Jerome.

Q.     So your testimony is that 28 years later, they traveled
09:38AM     across the world to say that they saw you wear a hat and scarf; is that your testimony?

A.     Exactly.

Q.     Because of a freshman year grudge?

A.     No, because, because exactly this guy, Jerome Arusha, I told you the story of his family who resented everyone from the

north, so for them just even 30 years after to travel 17,000 miles to come here just to put me in trouble, I'm not surprised to see them because on the entire campus, entire city, more than 10,000 students, how come the only two people who saw me who outraged me, who outraged me just being a member of MRND happens to be the same two people who happen to have a grudge with me.

Q.   And you said this grudge was because you wanted to study hard, and they wanted to party, that was your testimony,

correct?

A.   The first was just incomparability of character, and the second, I told you about the Jerome Arusha family, his father was a member of the First Republic.  When, after the Habyarimana regime started, his father was sucked from his position, so every time they will see someone from the north, they would be resentful because just too responsible for anyone from the north from the family situation.

Q.   Well, Mr. Kalimba wasn't part of that family, he wasn't part of that?

A.   No, but Kalimba was a close friend of Jerome.

Q.   And so your testimony is that you wanted to study and they resented you because they wanted to go have drinks; is that correct?

A.   They resented me because of the front, they resented me because I behave my temperament and my lifestyle.

Q.    And you testified that Jerome Arusha had a nickname,
"Ingoza;" is that correct?

A.    Ingoza.

Q.    Ingoza, sorry.  But not a single one of the witnesses and
friends that you brought in here testified to that; isn't that
correct?

A.    Everyone, every time someone just was asking about the
drinking habits of Jerome, there was objection from the
witness.  Everyone who spoke about Arusha and his drinking
habits, everybody knew he was a drinker.

Q.    That wasn't my question, sir.  You were the only person
who took that stand and gave him that nickname; isn't that
correct?

A.    No, I'm not the only one.

Q.    Eric Nshimiye didn't call him Ingoza?

A.    He wasn't asking about Arusha.

Q.    Aimable Rwabukumba didn't call him Enzoga?

A.    He wasn't asked about Arusha.

Q.    All of those witnesses that you brought before this jury,
not a single one of them gave him that nickname; isn't that
correct?

A.    I remember one witness who was asked about that nickname
by the defense counsel, you're talking about even Arusha
himself was asking about his nickname when sitting here.

Q.    Yesterday you didn't mention anything about

09:40AM

09:41AM

**J.A. 1843**

Dr. Anicet Nzabonimpa?

A.   Yes, I remember him from high school.

Q.   He went to high school with you, he went to medical school with you, correct?

A.   He was one year behind me.

Q.   And you were here for his testimony, correct?

A.   Correct.

Q.   Now, there was no high school or freshman year grudge against him, Dr. Nzabonimpa, correct?

09:41AM   A.   No, he's someone I never just forget frequently.

Q.   I'm sorry.

A.   He's someone I never just have to deal with frequently. He was just a distance, sir.

Q.   He wasn't interfering with your studying?

A.   No.

Q.   He's not a family that was resentful of people from the north?

A.   Yes, you could tell how the way he pictured me here.

Q.   I'm sorry.

09:42AM   A.   The way he tried to portray in this court, I could say he resented me somehow.

Q.   You didn't have a nickname for him, did you?

A.   No.

Q.   You didn't call him wine or liquor or anything like that?

A.   No.  In fact, we call him "Honeybell" when we were in high

J.A. 1844

school.  "Honeybell" is a roman character.  That's the only one
I recall.

Q.   And you remember his testimony that he testified as well
that you were a member of MRND, correct?

A.   Which is not true.

Q.   And he said that that he was actually scared of you,
correct?

A.   For what reason?

Q.   Well, do you remember his testimony?

09:42AM    A.   Yes, I remember.

Q.   Do you remember that he testified that you were scary when
you were coming back from MRND rallies, correct?

A.   I never been to MRND rally.  No one was scared around me.

Q.   That you were angry and looking to harass Tutsis and other
students, correct?

A.   Never.

Q.   And you were here when Innocent Habimana came in and
testified, correct?

A.   Correct.

09:43AM    Q.   Could you bring up Exhibit 34, please.  Do you remember
Mr. Habimana?

A.   Yes, I remember him.

Q.   Now, he was the maintenance man at the university,
correct?

A.   Sorry.

J.A. 1845

Q.   He was the maintenance man at the university, services, facilities?

A.   I never see him before in my life.

Q.   And that's what you testified to yesterday; isn't that correct?

A.   Yes, correct.

Q.   Now, he wasn't a student, correct?

A.   He wasn't a student.

Q.   He wasn't in classes with you?

09:43AM    A.   Never.

Q.   He didn't hang out with you at the cafeteria?

A.   Never.

Q.   Never saw him at the library, correct?

A.   Never saw him.

Q.   And yet he testified that he knew you; isn't that correct?

A.   How could he knew me?

Q.   And he testified that he knew you were in medical school, correct?

A.   Never.  That's a public information, how they --

09:43AM    Q.   But it's true, you were in medical --

          THE COURT:  Don't talk over him, Mr. Varghese.  If you keep asking argumentative questions, I'm going to let the witness explain, okay.

          MR. VARGHESE:  Yes, your Honor, I apologize.  I thought he was done.

J.A. 1846

A.   Because anyone showing up here just claiming to know me,
how can you justify that because my information, my name or my
information is out there in the media.  Everyone can claim to
know me, but they don't know me.  This man, Anicet Habimana,
have never met me in his life.

Q.   He knew you were from Gisenyi; isn't that correct?

A.   How could he know that?

Q.   Well, you were here when he testified to that; isn't that
correct?

09:44AM   A.   Yes.

Q.   And that's true, you are from Gisenyi; isn't that correct?

A.   I am actually.

Q.   And he testified that you were living in the Kiza dorm
during the genocide; isn't that correct?

A.   How could he know that?

Q.   And that was true, you were living in the Kiza dormitory?

A.   Because that is public information, which is public.
Anyone can claim to know that.

Q.   I'm sorry, is it your testimony that it was public

09:44AM   information which dorm you were living in during the genocide?

A.   Yes, when I gave the information, people who came from
Rwanda, they knew some student who lived in the Kiza, that's a
public knowledge.  For anyone who was working, pretending
working for university, it was just a matter of just detection.

Q.   I'm sorry, I just want to make sure I understand your

answer.  Is it your testimony that the facilities or the
maintenance man knew the dorm that the students lived in; is
that your testimony?

A.    They can assume.  You are going after someone just who is
doing medical students, you can assume where he lived.  That's
an assumption, and then for them to recall my residence area
was not Kiza, it was outside in a private building.

Q.    During the genocide, you lived in Kiza; isn't that
correct?

09:45AM    A.    Yes.  I lived, I moved from my habitual place, I moved to
Kiza.

Q.    And Mr. Habimana identified you as a leader of MRND in the
hospital; isn't that correct?

A.    That's what he alleged.

Q.    And he said that he also saw you wear the clothing?

A.    That's what he alleged.  He never saw me.

Q.    And that you wore the hat and the scarf actually together
as a leader does; isn't that correct?

A.    I never did that.

09:46AM    Q.    And you also heard him testify about how he said you
participated in trainings, correct?

A.    I never participated.

Q.    In both the gym and down in the forest; isn't that right?

A.    That's what he said.

Q.    But your testimony was that you weren't there because you

were in the library; isn't that correct?

A.    I never did anything related to politics when I was in Butare.  I never been to Butare, I never been to training, I never been to any Interahamwe stuff.

Q.    And your testimony -- I apologize if I'm cutting you off, but your testimony yesterday was that you were, in fact, at the library when those training sessions were happening; isn't that correct?

09:46AM

A.    That's actually any Tuesday or Friday during around 7 to 11, what I would be doing every single week, in the library studying.

Q.    Now, you testified yesterday that you stayed at the hospital in April and May and June and possibly in July as well because you wanted to help people, correct, that was your testimony?

A.    Yes.

Q.    During your Canadian immigration proceedings, you told them you didn't leave because you wanted to finish your internship; isn't that correct?

09:47AM

A.    Go there, there is another -- that's another accomplished response.  When we said there was this obligation not to leave the patients, so the obligation not to leave the patients because I saw them, the people who were asked to be at the hospital as interns during that period of the genocide, during that crisis when the hospital was understaffed.

**J.A. 1849**

If you leave, it was just leaving, so in the same context, I say to the immigration official this obligation to stay and to finish would have to be done because we still have one day that the war will be over, and we're going to carry on our lives.

Q. And so you told the Canadians that you didn't leave because you wanted to finish your internship; isn't that correct?

A. Yeah, maybe it was a wrong choice of words.

Q. And so there was a genocide going on, and you wanted to keep finishing your studies; is that correct?

A. At that time, people were just asked to keep doing whatever they are doing. It's not -- when it was happening, when the killings started happening, nobody knew the extent of what was going on or even the definition of a genocide.

Q. And you told us yesterday that you went to the hospital every day; is that right?

A. Yeah, almost every day.

Q. So you traveled from the Kiza dorm to the hospital; is that correct?

A. Yes, many times.

MR. VARGHESE: And can we bring up Exhibit 23.

Q. And, Mr. Teganya, do you see what's on the screen in front of you?

A. Yes, I see.

Q.   And do you recognize where the Kiza dorm is?

A.   Yes.

Q.   Can you point out where the Kiza dorm is?

A.   Kiza dorm will be this building.

Q.   And can you show the jury the path that you took to get to where you say you were working in the emergency room?

A.   Usually, there was like the conventional way would be just to follow the road, which is a very long way.  People used to do -- all the students, at least when it's not raining, will take a shortcut.

09:49AM

Q.   And the shortcut -- yes, thank you.

A.   Here, go around to the maternity ward, enter this hallway way down to here.

Q.   So the path you took would take you right by the maternity ward; isn't that right?

A.   Yeah, behind the maternity ward.

Q.   And the maternity ward -- well, can you point out which one is the maternity ward.

A.   This is the maternity ward.

09:50AM

Q.   It would also take you right past the dermatology building; isn't that right?

A.   Yes, the dermatology is like one of these buildings.

Q.   And you would do that in the morning; is that right?

A.   Yes.

Q.   And you'd do it in the evening?

**J.A. 1851**

A.   Yes.

Q.   When work was done?

A.   Yes.

Q.   You also testified yesterday that you got a lunch break; isn't that correct?

A.   Yes.

Q.   When was the lunch break?

A.   At noon.

Q.   How long -- I'm sorry.

09:50AM   A.   At noon, we have like one hour just to travel because from here, the university cafeteria, it's the other side of the campus.  You have to go way down the hill, cross the main road, enter the main campus.  That's where the students were.

Q.   And so how would you get from the emergency room to the lunch room?

A.   Many times just we take this exit, go down, all the way down here.  Most of the time, we leave our courts, and the Kiza, then you continue this road down, down the hill where there is a university lab, you cross, there is a small kiosk, 09:51AM   there's an entrance to the university, you go down the main campus.

Q.   And that was the same process you went through during the genocide; is that your testimony?

A.   Yes.

Q.   Didn't change at all, still had your lunch break, one-hour

lunch break during the genocide?

A.   It could be some changes, but mainly it was the main routine.

Q.   What about the naps you testified about, did you still take your naps during the genocide?

A.   No, the naps was during just the regular time before war.

Q.   And so weren't there roadblocks on the way to the cafeteria as well?

A.   There were roadblocks at the entrance of the university.

09:52AM   Q.   How did you get by the roadblocks?

A.   You have to show your student I.D. because most of the time, there were students on the roadblock, and sometimes also they would ask you for your identity card.

Q.   Right, because your student I.D. doesn't list your ethnicity, correct?

A.   Correct.

Q.   So you'd have to show your national identity card which would list if you are a Tutsi or a Hutu, correct?

A.   Yes, sometimes, yes.

09:52AM   Q.   And during this time, you knew that Tutsi students were being killed; isn't that correct?

A.   Yes, that's what we heard.

Q.   Now, you were here when Dr. Muvunandinda was here, correct?

A.   Correct.

J.A. 1853

Q.   That's one of the witnesses you called as well?

A.   Correct.

Q.   And he told you that the hospital closed or he testified to this jury that the hospital closed at 2 p.m. every day during the genocide; isn't that right?

A.   Yes, that was the working hours.

Q.   And he also said there was no time for lunch breaks; isn't that also correct?

A.   Let me explain again.  During the war, the administration of the hospital because of the shortage, because of the staff, which was not sufficient, they shortened the working hours, so the hospital would be working during hours from 8 to 2.  That's normal people, people who are leaving, just working regular at the hospital would be working between 8 to 2.

     But people, especially students, interns who were there, they were asked to stay at the emergency because emergency was open 24 hours, and during that period of time, the majority, the majority of patients that came to the hospital were going to the emergency, special emergency of surgery because although those wounded people, so at two in the afternoon, you would still have a hundred people waiting in line in front of this emergency.

Q.   Sir, that wasn't my question.  My question was do you remember when Dr. Muvunandinda testified that there were no lunch breaks during the genocide?

A.    For the regular workers.

Q.    Oh, so you could still have your lunch break; is that right?

A.    Yes, as a student, I still go to the university cafeteria.

Q.    And you heard from Dr. Musilikare as well; isn't that right?

A.    Yes.

Q.    Another witness that testified?

A.    Yes.

09:54AM

Q.    That you called, sorry.  And he testified that the hospital was only opened to 2 p.m. as well; isn't that right?

A.    Yes, again, Dr. Musilikare, Dr. Muvunandinda were experienced students.  They lived outside.  Those people, again, the regular worker, the student who lived outside the campus, they have to finish early so that they can travel back to their home during the time there was a curfew.  They have to make sure everybody has enough time to travel back home because traveling back home, you have to go through many roadblocks.

Q.    And so after the regular staff left, it would only be the students; is that your testimony?

09:55AM

A.    Mainly, yes.

Q.    And what would you do when it was just you and the students who were in charge of the hospital?

A.    All people who were on emergency ward or the surgery ward or just taking care of the wounded, there was no one just

J.A. 1855

going, just to treat people who have colds or who have aches, it was just wounded people.

Q.   But you testified yesterday that you didn't actually provide medical care because you didn't have the training; isn't that right?

A.   I was assisting.

Q.   Who were you assisting if everybody went home?

A.   I keep telling you there were interns, there was final years' medical student who were there permanently.

09:56AM   Q.   You also testified that you didn't go into maternity or dermatology because you didn't have specialized training; isn't that correct?

A.   Yes.

Q.   Wasn't that your testimony?

A.   I never went there.

Q.   So, during the genocide, there was still dermatology work going on?

A.   I hope so because there were still dermatology patients there.

09:56AM   Q.   You knew that there were patients in the dermatology building; isn't that right?

A.   Yes.

Q.   And you knew there was patients in the maternity ward; isn't that right?

A.   Yeah, every building was full.

## J.A. 1856

Q.   And you testified earlier that you wanted to help people, isn't that correct?

A.   Correct.

Q.   And if you wanted to help people, you never went and checked on the people in the maternity ward or the dermatology ward?

A.   You have with your abilities.  How can I have, without any skill, no authorization, how could I be of any help?  The only place I could be helpful was helping people doing microsurgery at the emergency.  That's the only one way I could be helpful.

09:57AM

Q.   In addition to that, you knew there were Tutsis hiding in the dermatology building; isn't that right?

A.   Not dermatology building, everywhere.

Q.   Well, let's take it a step at a time.  You knew there were Tutsis in the dermatology building hiding?

A.   Yes, there was public knowledge, yes.

Q.   And you knew there were Tutsis hiding in the maternity ward; isn't that correct?

A.   Yes, correct.

09:57AM

Q.   And as you were walking passed those buildings, did you ever hear screams or cries coming from those buildings?

A.   No, because, again, I just tried to give you the full picture of the situation there.  In this screen, every place you see like a green space, like here, the central was overcrowded with people with just personal tents.

J.A. 1857

This place, just in front of the dermatology, this was full of refugees. This place was full of people, so if you walking around, you walk among a crowd of people who are camping there on the university, on the hospital grounds, so if you hear people, the noise or the scream, it's from people outside, but walking by, you cannot hear what's being said from inside.

Q. So, just to be clear, you heard screams, you're just not sure where the screams were coming from?

09:58AM
A. No, the screams of voices was people from the crowd, that was from the crowd on the ground outside.

Q. Why were there people screaming outside?

A. It was during the war, wartime.

Q. Well, war or genocide?

A. Genocide. Genocide is civil war, whatever you want to call it, but I don't know if you have ever been in a war zone or in a situation where the crowd is not controlled. It was kids crying, there were people who were wounded, people who are traumatized. Every noise, if you walk by, it's not a quiet

09:59AM
crowd.

Q. I'm sorry, are you finished?

A. It's noisy.

Q. And did you stop to help the people who were screaming on your walk to the emergency room?

A. Again, I'm telling you I was there just as a medical

student.  The only place I could be of any help, it's emergency

or surgery ward when I reported every day, so in this crowd of

people, especially there were probably there were a lot of

needs, but I didn't see anything I could go there just to

provide any help.

Q.   And so you walked past the dermatology building, the

dermatology building, all the people that you circled in that

camping area there through the hallway, past the other

courtyard where there were more people camping and screaming

10:00AM     and then all the way to the reception?

A.   Hundreds and hundreds of people.

Q.   I'm sorry.

A.   Hundreds and hundreds of people.

Q.   And you testified yesterday that you observed lots of

patients coming in with fresh wounds, right?

A.   Yes, around 20th, 21st and 22nd of April, yes.

Q.   Machete wounds?

A.   Uh-hum.

Q.   Lacerations, correct?

10:00AM     A.   Yes.

Q.   And they were all Tutsis, correct?

A.   Yes, the majority was Tutsis, but there were some Hutus,

too.

Q.   And they were being attacked because they were Tutsis,

correct?

J.A. 1859

A.   Yes.

Q.   And you qualified your answer, you said it was just on April 22nd and 23rd; is that right?

A.   It was around the 20, 21, 22nd.

Q.   And so is it your testimony that those types of wounds didn't appear in the rest of April and May and June and in July?

A.   That was the beginning, and there was a real major difference because the wounded people we saw are the second -- around the 10, 20 or the 15th of April were wounded people, but you could see their wounds were not fresh, you could see people who have wounds, that they are already infected, there is a lot of bleeding, you could assume they have been wounded a couple of days ago, but from the 20th, we saw people bleeding.

Q.   And that continued throughout until you left Butare; isn't that right?

A.   It continues like a full five days, then after it was sporadically you will see some people but not the same volume as we saw like three, four days.

Q.   And there were also soldiers that appeared at the hospital, I think you testified about a helicopter; isn't that right?

A.   Yes, soldiers started arriving around the 20th or the 21st, I don't recall the date.

Q.   And there were Interahamwe as well, who were arriving as

10:01AM

10:01AM

well; isn't that right?

A.    I don't know exactly, but the reporting we have, all information we have is because you talk with the patient who come in for treatment, so every time there was people walking around, the only one way just to identify someone as Interahamwe or any militia, it's because you see a group of people walking in, if they are armed, if they have traditional weapons, or if they have firearms, or if they have a piece of clothing, just anything can be related to military that would be assumed as Interahamwe as a group, so any time those people walk by and walk by the hospital, people were terrified, so if you see people just trying to run away because it's safe, we saw or we heard about the group that this is walking around. That's how we heard about those people running around the hospital.

Q.    So, to be clear, you saw malicious men armed walking around the hospital; is that correct?

A.    I saw a couple, just like two or three times.

Q.    You saw them, and they were armed?

A.    Yes.

Q.    They had local weapons?

A.    Yes.

Q.    They weren't dressed like a full soldier, they were dressed like militia members, right?

A.    Yes.

J.A. 1861

Q.   And you saw them walking around amongst the people hiding and the people camping in the hospital, correct?

A.   Yes, because during that time, they knew there was a lot of people hiding among the crowd, in the crowd or inside the building, so the only one reason they were walking around was they were looking for the Tutsis, the survivors.

Q.   And you knew they were looking for Tutsis, correct?

A.   Yes, I knew.  That's what we assumed.

Q.   And you knew they were looking for Tutsis to come and take away, correct?

A.   That's what we assumed, but I didn't know their mission because you don't know their reason of being there.

Q.   And you knew that they were coming around taking Tutsis to go get killed, correct?

A.   You saw them or you hear about them, but knowing, there's no way you can know unless you are in their program or you know what they are doing.  You learn about that fact, their presence only.

Q.   Well, I just want to make sure we're clear.  You actually did see them though, correct?

A.   Yeah, factually I saw them like twice.

Q.   And was that in the beginning, in April, or was that in July at the end?  When was that?

A.   It was somewhere in May.

Q.   And you saw them twice, you said, or three times?

J.A. 1862

A.    Yes, twice.

Q.    And you knew there was a genocide going around outside the hospital, correct?

A.    Yes, that's public knowledge.

Q.    And you knew -- you said that your assumption, well-reasoned assumption was that they were coming in to look for Tutsis to come and take and kill, correct?

A.    Yes, because I can't see any other reason armed people would be just running inside in the hospital.

10:05AM

Q.    So you knew there was a genocide going on inside the hospital as well, correct?

A.    Yeah, afterwards I knew.

Q.    Well, what do you mean by afterwards?  You said that you saw -- let me finish the question.  You said that you saw them walking around the hospital; isn't that right?

A.    Yes, right.

Q.    And you said that you assumed they were coming to take Tutsi patients, right?

A.    That's what we assume afterwards because when you see

10:05AM

people and after when you have information that people have been taken out, people have been dragged out from the hospital by the same people, you connect the dots.

Q.    And so you were aware there was a genocide going on in the hospital?

A.    Yes, I knew afterwards.

Q.   And so if they came twice, which was your testimony,
correct?

A.   No, it's only two times I saw them.  Just if you are
walking in the corridor here and you see people just walking
back the same area, I can say I saw them visually.  That's the
only two times I saw them.

Q.   I understand.  The first time you saw them --

A.   Yeah.

Q.   -- you knew afterwards that there was a genocide going on

10:06AM   at the hospital; is that correct?

A.   Yes, correct.

Q.   So, the next time that you see them, Time Number 2, you
now know they're back for the genocide; isn't that right?

A.   You can assume that.

Q.   And so it's not about afterwards you see them again, you
know it's the genocide again; isn't that right?

A.   Yes.

     MR. VARGHESE:  Can we bring up Exhibit 3A, page 12,
Exhibit 46, the Audio Clip at 2:25.

10:07AM        (Audio played as follows:

Q.   There's documentary evidence that actually shows that
people came to that particular hospital, and this is at Bond
Exhibit 5 that people were actually being turned over to be
slaughtered by the military that was waiting outside.  Did you
witness any of that?

A.   No.

Q.   It talks about the horror that went on in this hospital where you were an intern for two months at the height of the genocide, and you didn't see any of this; is that correct?

A.   There's a lot of details, according to my opinion, which are not really accurate, I'm not the first one to state that even there is a woman who participated, and I'm reading this document.  He give me -- she give me testimony in Canada so that just all I can say is what I have seen.  What is written down, I -- I cannot -- I cannot confirm that.

Q.   So you never saw any atrocities occur?

A.   As it is written in the -- the document, most of atrocity occurred nighttime.

Q.   Did you see any atrocities occur?

A.   No.

Q.   Then why did you testify what you did in front of the Canadian Court that there were people there who sowed terror?

A.   Sowed terror -- for me, sowed terror, they are -- I -- I can express -- I can explain the -- the situation.

There was victims coming to the hospital looking for care.  There were some paramilitary groups and the militia groups just coming to the same hospital.

So, these victims were afraid of the Interahamwe people, that's what I was trying to say.

Q.   Were you aware there was a genocide occurring at the

hospital?

A.    No, just afterward.)

Q.    Mr. Teganya, I want to ask you a couple questions about the way you testified before Judge Day, but let me start with the last part there, "Were you aware there was a genocide occurring at the hospital?"  "No, just afterwards."  Do you see that question and answer?

A.    Yes.

Q.    I think after we just talked about, after the first time you say you saw the militia come through, you knew there was a genocide going on inside that hospital; isn't that correct?

A.    I knew there was killing that happened to the hospital, and then when you say you know about something happening and you learn about it afterwards, the way you want to phrase it, it's just like I knew what was going to happen already because the presence of this militia running around, their presence, and the result of that was the killings, but knowing the killings happening, I always learned afterwards, like everybody else, like Dr. Zachariah who was there, everybody knew what happened the previous night, we knew that the following morning.

Q.    Well, I'm going to get to Dr. Zachariah in one second, but I just want to make sure I understand because I thought your testimony before we played the clip was that after the first time you saw the militia come through, the next time you see

J.A. 1866

the militia, you know there's a genocide going on; isn't that the way you answered the question?

A.   No, the way I understand it, I next time I saw the militia running around, you could connect the dots saying this is the same people who are chasing around people, who are hunting down the people.

Q.   And you saw them hunting down people, right?

A.   No, no, I don't see them hunting people, just you saw them running around.  When they are walking around, that's what I tried to explain by sowing terror.

10:11AM

Q.   I'm sorry, I'm a little confused.  Did you see them running around or walking around because I think you said --

A.   Walking around.

Q.   And then sometimes they were running around?

A.   No, no, I missed that, sorry.

Q.   Just so we're clear, you would see them walking around heading towards looking for Tutsis; isn't that right?

A.   The only one, the two times I saw those people, it was because myself, I was walking from the emergency department,

10:12AM   walking just towards the exits, just going to Kiza dorm or going to -- and then if you see people just in the corridor, if you see a group that is suspected to be those, paramilitary Interahamwe, you could say, okay, those are people people are scared of.  That's the only one way you can see those people going around.  But I never -- I never, ever followed them or

J.A. 1867

just tried to see what they were doing, just passing by.

Q.   So let me just follow-up on that, when you say that there were people that were scared of them, what do you mean, what were they doing?

A.   Because we have genocide survivors, you have Tutsis, you have some Hutus who are in hiding, you have all these people who are so refuged on the university -- on the hospital grounds, so they view, they encounter with this militia, it was terrifying, that's what I meant when I said they saw terror.

10:13AM   People were terrified to see them around.

Q.   I'm not asking about that, I'm asking about when you say that they were terrorized, what do you mean?  What did you see them do?

A.   No, people were terrorized by their presence only.

Q.   I understand that.  What did you see them do?  How do you know that they were terrorized?  How do you know that they were scared?

A.   You see people running.  If you see someone wounded, a victim or a genocide survivor, who is having a bandage, and he or she is walking in the corridor, and you see a group of

10:13AM   people just walking by, and you see the victim just running away trying just to escape, you can assume he is terrified because of the presence.

Q.   And that's what you saw, you saw patients running away from militia in the hospital, is that your testimony?

A.    I'm telling you when I say, when people walked by, if they
are armed, there are people trying just to go in hiding.

Q.    I'm just trying to get an answer here.  Did you see
patients running away from the militia as they were walking
around the hospital?

A.    No, no, no, not with my eyes, but people when -- there is
a communication problem here again.  In Rwandan culture, it's
an ordinary tradition.  Sometimes you acquire knowledge or
information because you heard about it, so sometimes when you
report about a thing or an event you heard about it, the way it
comes out, you may assume it's an event you witness personally,
but living with the patient at the hospital, living with all
people who were coming for treatment, every time, we ask them
why you don't come regularly to treatment, frequent answers was
we are terrified, sometimes we are on our way coming here just
to get stitches or to get our dressing renewed, but when we see
people running, just we have to hide, we have to run.  That's
how I learned about the situation.

Q.    I'm not asking you about what patients would tell you, I'm
asking you about what you said in this hearing, and you said
that there were victims who were afraid of these armored
people, right?

A.    Yeah, they are, they were.

Q.    And you've testified today that you've actually seen this
armored militia coming through the hospital; isn't that right?

10:14AM

10:15AM

J.A. 1869

A.    I saw two occasions people just running through the hospital.

Q.    Running into the hospital?

A.    Not running, walking by through the hospital.

Q.    And when they were -- well, was it running or was it walking because I think we've been through this?

A.    Walking by.

Q.    And as they were walking by, what were the Tutsis who were hiding and the Tutsis who were patients that they were walking towards, what did those people do?

10:16AM

A.    I'm telling you again people were terrified by the presence of the militia, even the presence of soldiers who would show up sometimes, so I'm telling you again the information we had.  Why people were scared, they were scared by the presence.

Q.    I'm not asking for what they told you, I'm asking for what you saw.

         MR. LAUER:  Objection.

         THE COURT:  Let's get this answer and then move on.

10:17AM

Q.    I'm asking for you what you saw, when you saw the militia coming through, what were the Tutsi patients, what were the Tutsis refugees, what were they doing?

A.    Just I walk by, just you see people, a distance group, not close, and then, of course, everyone just was getting out of the way.  No one wants to encounter people who were armed.

Q.   So you saw them running away?

A.   No, no, I'm telling you everybody was getting out of the way.  We're talking about a situation of war, of killings.  Nobody wants just to face someone who is armed.  Everybody, those people walking by, people were just getting out of their way.

Q.   Just making room for them to come through?

A.   Yeah.

Q.   And your testimony, getting back to this, were you aware there was a genocide occurring at the hospital?  Again, it sounds like you're saying that you were aware there was a genocide occurring at the hospital?

          MR. LAUER:  Objection.

          THE COURT:  Why don't you rephrase in a less argumentative form.

Q.   Is your testimony today that you were aware there was a genocide occurring at the hospital after that first time you saw the militia come through?

A.   Even the definition of a genocide, we didn't have an idea during that time.  We were in a situation where people are killing each other, and the way you learn about it, you learn it a day after, and we never -- nobody knew the extent of what was going on, so now looking back, I could say the genocide was going on, but on the morning of April 22nd, I could not even just know the definition or the extent or the implication of a

10:17AM

10:18AM

J.A. 1871

genocide. I knew people had been killed. I learn about it the same morning.

Q. You knew people were being killed, but you also knew those people were Tutsis who were being killed; isn't that right?

A. Yes, that's right.

Q. And you knew they were being killed because they were Tutsi; isn't that right?

A. Right.

Q. And you knew that, you said, on April 22nd?

10:19AM A. That's when I show up on April 21st, we learned the previous night they come in and kill in the hospital.

Q. And so if you learn that on April 22nd, you certainly know this was going on in May and June and July; isn't that right?

A. Yes, everyone knew in Rwanda in every square inch in Rwanda, there were people being killed.

Q. And you were here when Dr. Noel Twagiramungu came in and testified, right?

A. Yes.

Q. And he was called by you as well, right?

10:19AM A. Yes.

Q. And he was the Rwandan genocide historian?

A. Correct.

Q. And he testified that the slaughter -- that there was a slaughter of Tutsis at the hospital; is that correct?

A. Yes.

Q.   And he said it was happening both during the daytime and the nighttime; isn't that right?

A.   Yes.

Q.   And he said that the killings at the hospital were pervasive; do you remember him testifying about that?

A.   Yes, what he said, yes.

Q.   And he said there were mass graves of the Tutsis at the hospital location; do you recall him testifying about that?

A.   Yes, I recall him saying that.

10:20AM

Q.   And he testified that there was commemoration ceremonies that he had actually gone to?

        MR. LAUER:  Objection, your Honor.

        THE COURT:  Overruled.

A.   Yes.

Q.   About all the Tutsis who had died there; is that right?

A.   Right.

Q.   Do you disagree with Dr. Twagiramungu's testimony?

A.   No, not entirely.

Q.   What parts?

10:20AM

A.   I can only just testify about what I saw personally.  You saw the hospital compound, it's huge, it's massive.  I cannot know exactly what happened to every single area of the hospital, all I can tell you is what I saw personally.

Q.   Now, in your Canadian immigration proceedings, you admitted that Tutsi patients were massacred on the presence of

the University Hospital; isn't that correct?

A.   Yes, this is the public knowledge.

Q.   And you admitted that there was an existence of systematic human rights violations committed at the hospital, correct?

A.   No, not me.  Not systematic, that's what the people in Canada, they were trying just to express, to say there was systematic extermination of people at the hospital, but in the end, it was proved there were people who survived who were at the hospital.  It was not systemic.

10:21AM Q.   You also stated in your Canadian proceedings in addition to soldiers who were present in the corridors of the hospital, there were also people dressed in partial military uniforms who had sown terror; isn't that right?

A.   That's what I have been telling you the last 10 minutes, people, the presence of those people, their presence itself was terrifying.

Q.   And you testified that you had actually witnessed massacres, abductions, and disappearances of hospitalized Tutsis; isn't that correct?

10:22AM A.   No.

Q.   You didn't say that?

A.   I didn't say that.

Q.   You didn't say in the Canadian Court that that happened?

A.   No, I said what I learned from the information we had, but personally seeing that, I never see that.

J.A. 1874

Q.   I'm sorry.

A.   I never saw that personally.

Q.   You never saw massacres, abductions and disappearances of hospitalized Tutsi?

A.   No.

Q.   In your February 7th, 2005 hearing in Canada, you said that militias came to the hospital looking for the sick, and you contemplated this with desolation; is that right?

A.   We learned with desolation.  Again, it's a poor choice of words the way you translate from French to English.  I never saw anything.  We learned with desolation what happened, but I never saw personally.

Q.   You said that we realized that the sick were being kidnapped, their numbers had been dropping, or the numbers had dropped?

A.   Yes.

Q.   You said you knew they were being taken because they were Tutsi?

A.   Yes, that's a fact.

Q.   And then you also said that I saw some Tutsi patients that had been taken from their beds and shot outside the hospital.  Do you remember saying that?

A.   No.  That was again a misstatement.  We learned because every, every reporting, every investigation that happened, people were abducted from the hospital in the nighttime.  I

J.A. 1875

never saw that.  We learned about that.  What we saw, it's our
realization in the morning when you come to the hospital, you
learn from people saying that about that.  I never saw that.

      MR. VARGHESE:  Your Honor, may I approach?

      THE COURT:  Yes.

      MR. WATKINS:  Can we have the page number, please?

      MR. VARGHESE:  I was actually going to hand it to you.

Q.   Mr. Teganya, I'm just going to ask you to turn to page 4.
This is the Canadian notice of decision.  Do you see that?

10:24AM

A.   Yes.

Q.   Can you turn to page Number 4.  Do you see the sentence
that starts, "When"?  It's up the top.  It's the first full
paragraph right above the number 4.

A.   Yes.

      MR. LAUER:  Objection.  Can we be heard at sidebar,
your Honor?

      THE COURT:  Yes.

      (THE FOLLOWING OCCURRED AT SIDEBAR:)

      MR. LAUER:  So this document does contain quoted

10:25AM

language, but it also contains conclusions reached by the
Court.  He can certainly be cross-examined about statements he
made, but the Court's conclusions are a different matter.

      THE COURT:  Okay.  I think that's fair.

      MR. VARGHESE:  I agree, your Honor, these are just
observations.  It says here, "When the applicant or as a

student in the hospital -- "

   THE COURT:  This doesn't look like a quotation, that looks like a conclusion.

   MR. VARGHESE:  I disagree, your Honor, I believe it's a characterization of his testimony.

   THE COURT:  We're not going to allow it.  It's characterization of his testimony.  Why would I allow that? Sustained.

   You can quote him on his prior statements that are inconsistent if you have a transcript or anything like that, you can confront him, but someone else's characterization of his testimony is not fair game, so sustained.

   (SIDEBAR CONFERENCE WAS CONCLUDED)

   THE COURT:  Put a different question to the witness.

Q.   So the statement you made that the other students and I saw that some of the Tutsi patients had been taken away from their beds and shot outside the hospital, correct, do you remember making that statement?

A.   That is a misstatement again.  We learned, never saw personally.

Q.   And you were hear for the testimony of Dr. Ernest Muvunandinda, correct?

A.   Correct.

Q.   And he was a witness that you called?

A.   Yes.

J.A. 1877

Q.   And he testified it wasn't possible not to know that a genocide was occurring at the hospital; do you remember him saying that?

A.   Yes.

Q.   He said, "There was no way I could not know because there were patients I could not see, and I treated this patient and others would tell you another patient disappeared."  Do you remember that testimony?

A.   Yes, I remember.

10:27AM

Q.   And you don't disagree with that, correct?

A.   No, I don't disagree.

Q.   And so it's clear there was a genocide happening at the hospital?

A.   Yes, but, again, I'm telling you that in April, even a few people have the definition of genocide, but we knew people were being killed.

Q.   And by May, June and July, you were confident of that, you were certain of that; isn't that right?

A.   Yes.

10:27AM

Q.   And you were still at the hospital in May, June and July, correct?

A.   There was nowhere else to go.  I don't know if you have that in mind, the entire country, there was killing, there was genocide in the entire country, everywhere.

Q.   And you also said that you never saw women being taken

**J.A. 1878**

from the hospital; is that your testimony?

A.    No, I never saw that.

Q.    You never heard screams or cries from Tutsis when they were being walked around the hospital?

A.    No, again, I was telling you the hospital was overcrowded. There was people outside everywhere, the crowd, noisy crowd, people stressed out.

Q.    And when those Tutsi patients were running away or trying to make way for the Interahamwe, they weren't screaming or crying or trying to escape?

A.    There was all kind of noises.  You could not tell exactly what was happening unless you were among the crowd, unless you are following individually every person to know what's going on.

Q.    And you were there in the hospital on April 22nd, I think you've talked about that, right?

A.    Yes, I was inside the hospital.

Q.    And did you learn that the 40 children had been taken from the hospital?

A.    We learned that morning.

Q.    And that's consistent with what Dr. Zachariah testified about, right?

A.    Yes.

Q.    And that following day, on April 23rd, you learned -- did you learn that the 40 Tutsi patients were taken out of the

hospital and killed overnight?

A.    Yes, we learned as we learned the day before.

Q.    And did you see the dump trucks that were being used to cart the bodies away?

A.    No.

Q.    That was right up by the reception area; isn't that right?

A.    Yes.

Q.    And that was near the emergency ward where you were working; isn't that right?

10:29AM    A.    Yes, but I didn't see them.

Q.    And you said you got there at 8:00 every morning; isn't that right?

A.    Yes.

Q.    And that's about the same time that Dr. Zachariah got there; isn't that right?

A.    Yes.

Q.    And he testified he saw soldiers carrying bodies out to the dump trucks; do you remember that testimony?

A.    Yes.

10:29AM    Q.    And it's your testimony you didn't see that?

A.    I didn't see that because you have to walk to go to that place he showed.  That was not my way, it was not the places I was going.

        MR. VARGHESE:  Can we bring up 23 again.

Q.    Again, Mr. Teganya, I'm just going to point out.  Why

J.A. 1880

don't you do it, can you explain, can you circle one more time

where you were or that you say you were taking care of

patients?

A.   This place.

Q.   If you wouldn't mind putting a circle.  I'm sorry for

making you do it again.

A.   Okay.

Q.   And the tents that are seen there, can you circle those as

well?

10:30AM  A.   The tents are for the Doctors Without Borders.  There were

like three tents here.

Q.   Those are the tents that Dr. Zachariah was talking about,

correct, in his testimony?

A.   Yes.

Q.   And, in fact, on your journey from the Kiza dorm to where

you say you were walking, you would have to walk right by those

tents?

A.   Yeah, I would walk down here, all the way down here.

Q.   And just so we're clear, that line that looks like a

10:30AM  hallway, that's actually an open hallway, right?

A.   It's an open hallway.

Q.   And so when you're walking along there, you can see the

tents right there, right?

A.   Not really because it's overcrowded.  It was an enormous

crowd outside on the ground.  This place, it's overcrowded.  If

I am walking around here, I can't see the face of this building because of the crowd being here.

When I walk down there towards the emergency, I can see part of the Doctors Without Borders tent, but this place is also overcrowded with refugees, so according to Dr. Zachariah, he saw the truck parked here, how can I see from emergency, someone who is parking down here on the road?

Q.   Well, actually, I wasn't asking you about the trucks, but I appreciate.

10:31AM

MR. LAUER:  Objection.

MR. WATKINS:  Objection.

THE COURT:  I will let it stand.

Q.   You walked by the tents, correct?

A.   I'm following you, just I'm trying to explain to you why I could not see that.

Q.   I appreciate just answer the questions I put to you, okay?

A.   Yes.

Q.   You would walk by the tents; is that correct?

A.   Yes, yes, I walk just in the back of their tents.

10:32AM

Q.   And you heard that there were nurses that were taken away from those tents; isn't that right?

A.   We had like two or three days after when they left.

Q.   You walked by those tents, but you didn't see or hear any of the nurses being taken away from those tents?

A.   No.

J.A. 1882

Q.   You didn't hear about Nadine being taken away or Rose or Alex or Jean Marie that he testified about?

A.   No, I heard the testimony but the same day I could not hear about that.

Q.   And you knew that -- and you learned that Hutu nurse, Sabene, who was pregnant with a Tutsi child?

A.   No, that's what you learn in the media and documentation afterwards.

Q.   Dr. Zachariah from those tents he could hear the screams and the cries of people taken away.  Did you hear those screams and cries?

A.   No.  Again, someone who is outside in the tent, you can hear if you are inside the tent you can hear from someone outside but, again, I was inside a hard building, an operating room, a surgery room is nice environment when you are inside, there is no natural light, the air you breathe comes through ventilation, you could not hear something that's happening outside the surgical ward.  It's a clean room.  It's totally isolated from outside so when you are inside, you don't hear what's going outside unless you get out and see.

Q.   So I'm going to ask you about two things.  One things you said in a surgical ward.  I thought you weren't in the surgical ward?

A.   The emergency room of this there is emergency room off the surgical operation, the summer department.

Q. And you were here when Dr. Rwabukumba testified, your friend, right?

A. Yes.

Q. And he testified you were treating people in the hallways, isn't that right, not in the surgical rooms?

A. The hallway is the entrance of the emergency department, that's a hallway because people coming in were in a big number. There was a big hall that's like a hallway actually, but that's at the beginning of the surgical department.

10:34AM

Q. So you weren't actually in the surgery department; isn't that right?

A. No, no, no, not surgery department, but it is the emergence of the surgery department when they do the microsurgery.

Q. And you were actually in that hallway which has windows out onto where the tents are; isn't that right, sir?

A. No, when you are inside, you don't see outside because you never know if anyone doing a procedure or working on a patient, you can't just be doing that and looking outside. There is no

10:35AM

even natural light from outside.

Q. You testified yesterday that you saw medical students performing microsurgeries in your word, "without lidocaine;" isn't that right?

A. No.

Q. And you heard Dr. Zachariah's testimony about that?

**J.A. 1884**

A.   Yes, I had.

Q.   And he actually indicated it was in the same location that you circled; isn't that right?

A.   Yes.

Q.   And he indicated that he went in and put a stop to it; is that right?

A.   I was not aware of that.  I never witnessed that.

Q.   And you heard that there were patients who were screaming because they were in pain; isn't that right?

10:35AM
A.   People were screaming because they were hurt, and everybody who showed up was already distressed and stressed out.  Most of the people were incoherent or someone who was scared to death.  There was not a single person who was calm and collected.

Q.   Let me turn to the attack on your two Tutsi friends. Well, actually you testified yesterday that they weren't actually friends, they were just from your area; is that right?

A.   Yes.

Q.   You didn't actually know them very well; is that right?

10:36AM
A.   No, but they knew me.

Q.   They knew you?

A.   Uh-hum.

Q.   And you testified yesterday that they showed up, and I believe you said it was in May; is that correct?

A.   Yes, somewhere in May.

J.A. 1885

Q.   And they were injured, correct?

A.   Yes.

Q.   And it was a brother-sister; do I have that right?

A.   Yes.

Q.   And you testified yesterday that they had machete wounds on their heads; is that right?

A.   Yes.

Q.   Is that both of them?

A.   Yeah, not on all, the brother.

10:36AM   Q.   The brother?

A.   Yeah.

Q.   He had machete wounds on his head?

A.   Yes.

Q.   Was it severe?

A.   Yeah, it was severe, but he was being treated.

Q.   I'm sorry.

A.   It's a severe wound, but he was treated.  He was no longer bleeding.

Q.   Was it one machete cut or was it more than one?

10:37AM   A.   I think it was more than one because he had a cut you could see from here, but he has another, an area where they have shaved his hair you can see, but he told me he also had cuts in the back, like three.

Q.   And you were motioning to your head, and I just want to make sure the record is clear.  How long were the machete cuts

J.A. 1886

on his head?

A.   Sorry.

Q.   How long were the machete cuts on his head?

A.   It was like from the eyebrows to around his neck all across the head.

Q.   So, from the front of your head down past your ear?

A.   Down past the ear, yeah.

Q.   Down past the ear, sorry.  In front of the ear and all the way down to the neck; is that right?

10:37AM
A.   Yes.

Q.   It's a fairly long cut?

A.   Yes.

Q.   And a pretty sensitive area of your body; isn't that right?

A.   Yes, people were just attacking people with an intents to kill, serious wounds.

Q.   And this is a potentially deadly wound; is that right?

A.   Yes.

Q.   When you submitted your affidavit to the United States in

10:38AM
connection with asylum affidavit, you say that I can't remember now what exactly they needed to be treated for, but I believe they were relatively minor wounds; isn't that correct?

A.   Because, again, the details, I came away with the details when I was discussing with preparing for my testimony, anyone who was severely wounded, a long wound, but which is not deep,

I consider it's mild wound because someone you have a cut but still you can still walk because if you receive some deep wound on your head, you will be in a coma or you could not even move, so anyone I consider having a wound on your head but still you can walk around, it's not a severe wound for me.

Q.   So, before, a couple seconds ago, I asked you if this was a potentially deadly wound, and you said yes?

A.   Potentially, yes, you can die of it.

Q.   But now it's your testimony that a wound that goes from the front of your eyebrow down in front of your ear all the way to the back of your neck, that's relatively minor?

A.   If you are not just dying of it, again, I repeat, if you receive a wound on your head, and it knocks you out, you become unconscious or just it's open, this is a severe wound that can be just put you down, but if you have a wound which is open but still walking away, for me, it's not a life-threatening wound.

Q.   And that affidavit that you filed in that U.S. immigration proceeding was May of 2015; isn't that right?

A.   May, yes, somewhere after, around, yeah.

Q.   And so in May of 2015, you said I can't remember now exactly what they needed to be treated for, but I believe they were relatively minor wounds, but now four years later you know exactly where that wound was?

A.   Because we have to talk through all this situation, we have to go through all the small details.  Again, I'm telling

J.A. 1888

you from my perspective when you present the story, I presented the main idea, but every time you tell your story, people keep telling you walk me through this story, help me to understand, give me more details, that's why I'm always asked about the details, details and details, which I didn't provide before in the beginning.

Q.    So in the four years since you filed that affidavit, attesting that affidavit be true you've now learned more; is that your testimony?

10:41AM

A.    Because I'm forced -- I'm forced just to go over and over and over the situation.  Before -- before all this case started, the only one time I had to discuss in small details about all the incident about all the situation was with migration lawyer because of all the trauma.

It's not a story I really like to visit, to go through the details because it's traumatic, it's very painful for me to do that, but they told me for the case, I have to go back on those moments to find out really what was going on because if you ask me before this is the topic I don't like to talk about

10:42AM

because it's too painful for me to talk about.

Q.    Okay.  And you testified that you took him back to your room and you gave them a bath, I think, and a change of clothes; is that right?

A.    That was my intent.  That is what they asked me to do.

Q.    But then some people came to your room; is that right?

J.A. 1889

A.    Yes.

Q.    It was Interahamwe?

A.    Yes.

Q.    And how many people came?

A.    I recall it was three people just knocking on my door, but at the end, I found out it was a group who was about six or seven people.

Q.    And they took you from the Kiza dorm, here, right?

A.    Yes.

10:42AM    Q.    Can you just point out to the jury so they can recall where is the Kiza dorm?

A.    This is the Kiza dorm.

Q.    And you testified yesterday that you said that if they were going to drag them out, they should take you, too; is that right?

A.    Yes, they dragged me out of Kiza.  If you can pick it up, I can show you where.

Q.    I'm sorry, maybe that wasn't a clear question.  Let me rephrase it.  You actually stood up and said if you're taking

10:43AM    my two Tutsi friends, you have to take me too; is that your testimony?

A.    They dragged me out from my room.  There was some arguing. They want to take my friends away.  I told them just you can't take them away; if you take them away, I'm coming with them.  I can't abandon them.  That's how I was taken away with them.

J.A. 1890

Q.   But you testified a couple minutes ago that they weren't actually friends of yours?

A.   When you say friends, it's people who knows you, who are with you.  When they say you are friends, your friends of friends, but those people happened to be with me at that time.

Q.   And you were willing to sacrifice your life for two people who a second ago were just people from your neighborhood?

A.   Yeah, someone running into your house, what kind of human being would you just let someone who pretends to know you just let go?  I'm not that kind of person.  If I see someone being killed, I'm ready to stand up for that person.  I cannot let that happen.

Q.   And so you testified yesterday that they took you to where they dragged people to be killed?

A.   Yes, that's what I said.

Q.   And where was that?

A.   If you can just pick them up, it's down there, down the hill.  It was a bush area.  They call it IRST.

Q.   And how do you know that's where people were taken to be killed?

A.   That's public knowledge.  That's what people said about people have been dragged, people who survived from this space came back to the hospital.  That was a public knowledge. Everybody knew about the situation.

Q.   But that was the killing site?

J.A. 1891

A.    Yes.

Q.    And so when you got to the killing site, was there anybody else there?

A.    No, not at that time.

Q.    It was just the three of you, and the six, I think you said --

A.    Yeah, around.

Q.    -- Interahamwe?

A.    Yeah.

10:45AM    Q.    And you testified yesterday that you heard screams from the sister as someone was trying to pull her clothes off; is that correct?

A.    Yes.

Q.    And could you see what was happening to her?

A.    No, when I was just on the ground hiding just trying to protect my head, I could not see, but you hear because I can hear.  I could hear.

Q.    And you heard that somebody was trying to take her clothes off, correct?

10:45AM    A.    Yeah, trying to take her clothes off and to rape her.  I could deduct that.

Q.    And in your Canadian application, you stated that she was raped by six different militia men; is that correct?

A.    That's just what I assumed because when you are on the ground, you hear what's going on.  You can imagine what is

J.A. 1892

going on.

Q.   So, to be clear, are you imagining this happening or did you observe this happen?

A.   First of all, it's nighttime.  You have no visual, but you hear the only perception is because of the noise, the sound you hear, and all I just deducted, it was a girl being raped.

Q.   And so you actually didn't see it, so when you said that you saw she has raped by six militia men, that's not correct?

A.   I didn't see it because it was dark.

10:46AM

Q.   And you testified yesterday that your lower leg was cut as a result of the machete attack on you; is that correct?

A.   Yes, two places.

Q.   Your lower right ankle and your left thigh; is that right?

A.   Yes.

Q.   And you showed some pictures to the jury as well, correct?

A.   Yes.

Q.   In 1999, when you landed in Canada and applied for asylum, you never mentioned that you were cut with a machete; isn't that correct?

10:47AM

A.   No, nobody asked me about that.

Q.   And, in fact, during your 15 years of refugee proceedings in Canada, you never said that you were injured in the genocide; isn't that correct?

A.   No one has ever asked me about me personally during my immigration process.  It's never been about me, never any

**J.A. 1893**

single moment. Every time we discussed about all the incident, they were either talking about my father, either talking about the hospital and its leadership. Nobody asked me personally what kind of injury happened to me.

Q.   Just to be clear, you were trying to get asylum in Canada, correct?

A.   Correct.

Q.   For 15 years, correct?

A.   Correct.

10:47AM   Q.   Trying to say that you had a well-founded fear to return to Rwanda, correct?

A.   Correct.

Q.   And you never told any Canadian authority that you had been harmed; isn't that correct?

A.   I was repeating again, no one asked me personally what happened to me. Every single -- every single hearing I went to, the transcription you have there, the same morning I showed up, the two person who are in charge of the hearing, they showed up with two documents.

10:48AM        There was the list from one of the Canadian government, and there was this extract from another group called -- the one that the African write. They were interested on me in hearing the story of my father and the story of the hospital. Nobody asked me about personally if I was injured or if I was harmed.

**J.A. 1894**

Q.   And that wasn't the kind of information you thought you should volunteer in support of your application?

A.   Because they asked if you have a fear or if you have a personal injury, they ask you, but nobody asked me about it, nobody.

Q.   And what happened?  When you came to the United States and you snuck across the border and you were stopped by Agent Radatz, you never mentioned you were harmed in the genocide; isn't that right?

10:49AM    A.   He asked me just to give a broader statement.  It's not even -- Agent Stilling, I think, I give a statement of four or five just stating the main reason why I fear to go back to Rwanda.

Q.   A five-page statement on why you're afraid to go to Rwanda, and you never mentioned that you were attacked with a machete during the genocide?

A.   No, that's not a reason to fear being going back to Rwanda because if I go back, I show up in Rwanda with a scar, that's not -- it's not a reason to be feared.

10:49AM    Q.   You stated that nobody ever asked you if you were harmed; is that correct?

A.   Correct.

Q.   Can we bring up Exhibit 1, page 6.  This is your asylum application that you submitted, and Question A:  "Have you, your family or close friends or colleagues ever experienced

J.A. 1895

harm or mistreatments or threats in the past by anyone?"  Do
you see that question?

A.   Yes.

Q.   Sir, now the United States Government is asking you if
you've ever been harmed; isn't that right?

A.   Yes.

Q.   And in your answer, you talk about your father?

A.   Yes.

Q.   You talk about your brother?

10:50AM   A.   Yes.

Q.   You talk about your uncle?

A.   Yes.

Q.   You talk about your aunt's husband?

A.   Yes.

Q.   You talk about your other uncle?

A.   Yes.

Q.   And you never mentioned that you were cut?

A.   Do you see the next sentence?

Q.   I'm going to get to that.  In your initial answer, you

10:50AM   never mentioned you were cut by the machete; isn't that right?

A.   Again, I'm telling you my entire story could go in a book
or two.  I say I would submit said declaration prior to the
asylum hearing because I knew the story from -- the entire
story from the hospital was big enough not to cover this.  In
the subsequent correction I submitted after, I detailed all the

story.

Q.    I'm going to get to that in a second, but in your answer on the form, you never mentioned that you were cut by a machete; isn't that right?

A.    I didn't even just discuss all my traveling from all I went through to the hospital.

Q.    And the question was:  "Have you ever been harmed in the past by anyone?"

A.    Yes, which I detailed and in the next declaration I made.

10:51AM

Q.    And this application that you submitted that we looked at last time was on September 13th of 2014; isn't that right?

A.    Yes.

Q.    And then you have the immigration hearing before Judge Day as well, correct?

A.    Correct.

Q.    And that was in September of 2014 as well, September 16th, 2014?

A.    It was like three days after.

Q.    And in that immigration hearing, you never testified about

10:52AM

being attacked either; is that right?

A.    Again, I'm telling you arriving in a stressful situation. I'm sent to jail.  They're asking me the main reason I'm being just -- I'm afraid of just going back to Rwanda.  Having a scar on my body is not a reason to fear go back to Rwanda, but when I submitted a detailed declaration, I give the full story.

J.A. 1897

Q.   And it wasn't until that affidavit that you filed on May,
2015, which was seven months later, that you first talked about
being cut with a machete; isn't that right?

A.   Yes, it was even before I went through a couple accounts
of fear of accusation just to talk about it because when I
started, it was painful to talk about this story, what I went
through.  I was asked by my lawyers to go to seek help from
therapist to talk, to get the details because I was struggling
with giving details.  That's when I started just giving the
10:53AM   details, being comfortable talking about what happened to me.
That's when I gave all the details.

Q.   So, from 1999, when you land in Canada, until May of 2015,
what is that, that's 15 years, 16 years, you never talked about
being cut by a machete; isn't that right?

A.   No, personally, I knew I was cut, but I never -- no one
have ever asked me personally.  I keep repeating to you because
during all my procedures in Canada, it was always about my
father, about the leadership of the hospital, never being about
myself, what I went through.

10:54AM        When I arrived in the U.S., when we started talking
about what happened to me, my personal story, it was a
struggle, it was difficult to talk about it.  I was asked by my
immigration lawyer to talk, to go seek counseling, a
professional.  I saw, I went countless, many, many times on
therapy session just to talk through all that happened to me

**J.A. 1898**

just to give the details. It's not a topic I like to talk about it. I would like to be talking about the Celtics at this moment, but I have to discuss all those moments of my life. That's not a topic I will discuss on a daily basis.

Q. Dr. Aimable Rwabukumba, he was your good friend, correct?

A. Yes.

Q. And he was living with you in the Kiza dorm during the genocide; correct?

A. No, he was living in just the same dorm but not with me, not in the same room.

10:55AM

Q. I apologize, I didn't mean to imply the same room. He was living in the Kiza dorm with you during the genocide?

A. Yes.

Q. And you were here when he testified that he was with you each and every day to and from the hospital, correct?

A. Yes.

Q. And yet during his testimony, he never mentioned anything about seeing these two Tutsi friends of yours; isn't that correct?

10:55AM

A. That happened at nighttime again I'm telling you.

Q. And he never testified that you brought back injured Tutsis to the Kiza dorm?

A. No, he never saw me. Nobody I never told about the incident or the situation. I could not just go around and advertise I was having people coming to my place. It was not

safe for me.  It was not safe for them also just for everyone to know these people team were coming to me.

Q.    And you never testified that you had been cut with a machete or taken to the hospital to get stitches or received a wound during the genocide?

A.    How could he know that?  How could he know that?

Q.    So, is it your memory that your good friend who you were with every single day going to the hospital didn't know you were cut with a machete?

10:56AM    A.    Yes, because no one just -- this is personal wounds.  This is a horrible situation that happened to you.  I don't know, maybe I'm not normal, but there is a lot of people who keep all that situation that happened to them, they decide to keep to themselves.  Maybe I'm one of those.

Q.    When you did you go get your stitches?

A.    Sorry.

Q.    When did you go get your stitches?

A.    The same night.

Q.    So the hospital was open and ready to receive you to get

10:56AM    stitches?

A.    No, there was always someone on emergency.

Q.    What happened to your two acquaintances, your two Tutsi acquaintances?

A.    They were taken back to the hospital.  They went back the way they were headed.

**J.A. 1900**

Q.   And they went that same night back to the hospital?

A.   Yes.

Q.   Were they treated for their injuries?

A.   I assume.

Q.   You don't know, you didn't stay with them?

A.   No, I didn't stay with them.

Q.   And you didn't let them stay at your room after that?

A.   I'm telling you, it was not safe to keep them with me.  I could not protect them.  I don't see how they could be staying with me.  They went back where they were.

10:57AM

Q.   You testified yesterday the attacks stopped when three soldiers came down and saw you and the attackers; is that correct?

A.   Yes.

Q.   And you said it was three soldiers.  Do I have that correct?

A.   Yeah, that's what I recall, yes.

Q.   Now, when you talk about this attack in your Canadian asylum application, you said that the militia men just left after they finished raping the sister?

10:58AM

A.   Again, again, talking about the incident, their recollection of what I have, it's a very stressful experience I went through.  I have during the treatment, during the therapy session, they asked me just to try to recall every single detail.  I can't just have, but I knew the person who saved us,

**J.A. 1901**

he was a soldier.

Q.   So in the Canadian application, you didn't say anything about soldiers coming to save you?

A.   No.

Q.   In the U.S. affidavit, you said it was a hospital safety officer who stepped in; is that right?

A.   Yeah, because when I recalled his name, when I was talking about going through the incident with my therapist, we recalled the name of -- I recalled the name of that officer.

10:59AM Q.   So it wasn't three soldiers, it was a hospital safety officer?

A.   No, actually I don't know how we call it here in the U.S., the ROTC, you know the kind of officer who are sent for the training in the colleges or university, the guy who was there as a medical student, but at the same time, he's an officer from the Army.

During that time of genocide and during the wartime, the officers have aides with themselves.  He used to have two or three guys, so the three -- the two guys who were with him 10:59AM or sometimes his aides, but the only one I knew the name I know, the main guy, the officer, I know him.

Q.   You didn't mention the name of anybody in your U.S. affidavit; isn't that right?

A.   No, I didn't give a name.

Q.   You testified earlier that you knew that soldiers were

removing patients and killing them; isn't that right?

A.   We had.  That was the public knowledge.

Q.   But yet in this case, soldiers actually intervened to stop the Interahamwe from attacking you and your two Tutsi acquaintances?

A.   Everything happened, people who are saving, people who are killing, everything happened.

THE COURT:  Why don't we take our break.

MR. VARGHESE:  That's fine, your Honor.

11:00AM    THE CLERK:  All rise.

(JURORS EXITED THE COURTROOM.)

(A recess was taken.)

THE CLERK:  All rise for the jury.

(JURORS ENTERED THE COURTROOM.)

THE CLERK:  Thank you.  You may be seated.

THE COURT:  All right.  Counsel.

MR. VARGHESE:  Thank you, your Honor.

Q.   Mr. Teganya, I just want to finish up asking you about the attack that we were talking about.

11:17AM    A.   Yes.

Q.   You testified that they were taken because they were Tutsis, correct?

A.   Sorry, come again.

Q.   They were taken because they were Tutsis, correct?

A.   Yes.

**J.A. 1903**

Q.    And that you testified that you, as well as them, were beaten and that the sister was raped; is that correct?

A.    Correct.

        MR. VARGHESE:  Can we bring up Exhibit 3, page 13.

Q.    So, what you participated in or what you lived through is an atrocity, isn't it?

A.    Yeah, looking back, it's an atrocity.

Q.    And so when you were asked the question, did you see any atrocities occur, you said no; isn't that right?

11:18AM  A.    Well, they said, "Did you see any atrocity in the hospital?"

Q.    Okay.  And they were taken, and you testified they were taken because they were Tutsis, so you were aware there was a genocide occurring at the hospital?

A.    Yes.

        MR. VARGHESE:  Could we bring up Exhibit 1, page 8.

Q.    I just want to ask you a few questions about this answer that you gave.  This is the question that asks you if you've ever ordered, incited, assisted or otherwise participated in

11:19AM  causing harm or suffering to any person because of his or her race, particular social group, or political opinions.  Do you see that?

A.    Yes, I see.

Q.    And you understood that this question was trying to get at the persecutor bar, correct?

J.A. 1904

A.    Yes.

Q.    You knew that a yes answer to this question meant that you were not going to get into the country with an asylum, correct?

A.    Correct.

Q.    Now, we talked a lot about the Kiza dorm.  I want to bring up Exhibit 27, if we could.  This is the Kiza dorm that you were living in during the genocide, correct?

A.    Correct.

Q.    Going in and out of every single day, correct?

11:19AM    A.    Yes.

Q.    And you knew there were Tutsis hiding there?

A.    There were some students, even some friends who came to hide inside, yes.

Q.    And they were hiding there because they were Tutsis, correct?

A.    Yes.

Q.    And you knew there were Tutsis who were found there and killed; isn't that correct?

A.    In the Kiza dormitory, no.

11:20AM    Q.    And you were here when Dr. Michele Charles Musilikare testified, correct?

A.    Correct.

Q.    And he testified about a Tutsi medical student named Diogene who was found and killed?

A.    Yes.

**J.A. 1905**

Q.   From the Kiza dormitory; you heard that testimony?

A.   Yes, I heard him saying that.

Q.   Did you know Diogene?

A.   Yes, he was a friend of mine, actually, same classmate, we started medical study together.

Q.   Did you know that he was hiding in the Kiza dormitory?

A.   Yes, I know.

Q.   Did you know he was taken and killed from the Kiza dormitory?

11:20AM
A.   Yes.  The report we had, he was taken on the roadblock that was on Isso.  He was coming from central region, from downtown, they call it Muchadago (ph), Arab area.  He was coming back to the Kiza.  He was arrested in front of Isso, that's what we had, that's the report we had, and who was killed by a soldier.

Q.   So your testimony was that he wasn't taken and killed from the Kiza dormitory; is that correct?

A.   I wasn't there, I didn't witness anything, but that's the report we have in that evening.  He was killed in the morning.

11:21AM
Q.   That's inconsistent with what Dr. Musilikare testified about; is that correct?

          MR. LAUER:  Objection.

          THE COURT:  Overruled.

A.   Correct, because Musilikare --

          THE COURT:  You answered the question.  Go ahead.

J.A. 1906

Q.   You testified that there was a killing site not too far from the Kiza dormitory; is that correct?

A.   It's quite far.  Maybe I should show you on the map if you want to see the walking distance.

Q.   Why don't we pull up Exhibit 32.  Sorry.  I apologize, Exhibit 34, I apologize.  Do you see Exhibit 34 on the screen?

A.   Yes.

Q.   Was this the killing site that you were talking about?

A.   No.

11:22AM   Q.   You don't recognize this area as being a killing area?

A.   No.

Q.   This is steps below the maternity ward; isn't that correct?

A.   Yeah, the building in the back will be the maternity ward.

Q.   And you heard the testimony of Esperance Mukamurenzi, correct?

A.   Yes.

Q.   And she testified there were bodies laid out all over this hearing?

11:22AM   A.   I heard her saying that.

Q.   And is it your testimony that you never saw any of that?

A.   No, any time I walked behind that, and then maybe on a map I can show you where I was when there was a small walk, you could see where people walked back, but this place is in the middle of the wooded area.  There was no walking space there.

J.A. 1907

Q.   Why don't we put up Exhibit 23.  That's the Kiza dorm,
right?

A.   Yes.

Q.   And the place that we were looking at is this area here;
isn't that right?

A.   No.  We were looking just this place.

Q.   Oh, no, I apologize.

A.   That's the place we were showing.

Q.   Sorry.  Where do you think that Exhibit 34 picture

11:23AM   location is?

A.   Would be here.

Q.   And the path that you walk every day would take you right
by there, wouldn't it?

A.   Yeah.

Q.   It's your testimony that you didn't see any bodies in that
area?

A.   I never went in this wooded area.  During that period of
time, it was said people were killed in the bushes under the
forest.  You had no business going this kind of area because

11:24AM   unless you want to go see dead bodies, I'm not the kind of
person just to go see dead bodies.

Q.   Well, did you know that there were dead bodies there?

A.   They were reporting just everywhere knew people who had
been killed, they'd be dumped from those kind of places.  Why
should I want to go there just to see dead bodies?

**J.A. 1908**

Q.   So, I just want to be clear about your testimony.  Is it your testimony that you were aware that there were dead bodies there?

A.   I heard about it, but I never saw it.

Q.   She testified that there were more bodies than people in the courtroom; do you remember that?

A.   I remember her saying that.

Q.   Were you aware there were that many or that volume --

A.   No.

11:25AM

Q.   -- of bodies in that area?

A.   No.

Q.   But you would pass it twice a day, at least, correct?

A.   Yes.  I didn't see the distance.  On this map, you can see the distance.  It's not really like you're passing by.

     MR. VARGHESE:  Can we bring up Exhibit 39, please.

Q.   This is Jean Pierre Gasasira.  Do you see that?

A.   Yes.

Q.   And you testified yesterday that you didn't know him; is that correct?

11:25AM

A.   I never know him.

Q.   Were you familiar with the street boys who were helping out the soldiers getting food and laundry?

A.   No.  The military, soldiers were taking care one another among themselves.  They don't even mix up with the civilians. I don't even imagine a civilian boy taking care of a soldier.

**J.A. 1909**

Soldiers, they have their brother soldiers taking care of them.

Q.   And so you didn't know him while he was at the hospital?

A.   I didn't know him.  I saw him the first time in my life in this court.

Q.   And he testified you had a gap in your teeth, correct?

A.   That's what he say.

        MR. VARGHESE:  Can we have just Exhibit 65 for the parties and the witness.

Q.   Do you recognize that, sir?

11:26AM   A.   That's a photo taken in 2016 or '17.

Q.   And that's you, isn't it?

A.   That's me.

        MR. VARGHESE:  Your Honor, we ask Exhibit 65 be admitted.

        THE COURT:  All right.  It's admitted.

        (Exhibit No. 65 received into evidence.)

A.   You can compare the same photo with the photo I showed taken of me.

Q.   I'm sorry, sir, there's no question posted.

11:27AM   A.   Sorry.

Q.   This is Exhibit 16.  Do you see it?

A.   Yes.

Q.   It's a photo taken of you of your face; is that right?

        THE COURT:  Exhibit 16?

        MR. VARGHESE:  I'm sorry, Exhibit 65, your Honor.

**J.A. 1910**

Q.   It's a photo that was taken of you; is that correct?

A.   Yes.

Q.   And it shows your teeth as well, correct?

A.   Yes.

Q.   In addition to talking about your teeth, he also identified you here in the courtroom; do you remember that?

A.   Sorry.

Q.   He also identified you here in the courtroom?

A.   Who?

11:27AM   Q.   Mr. Gasasira?

A.   Yes, because I was sitting with my counsel.  Anyone can identify me.

Q.   And he testified about a number of people, Dr. Karekezi, were you familiar with him?

A.   No.

Q.   You weren't aware that he died at the hospital?

A.   No, just through the reporting of the media out.

Q.   So were you aware that he died at the hospital or not?

A.   No, I didn't know him personally.  I learned people had 11:28AM   been killed at the hospital, but that name specifically, no.

Q.   So at the time you were not aware that he had died at the hospital?

A.   No.

Q.   And Nyangezi Protais?

A.   No.

**J.A. 1911**

Q.    Mathias Gasarabwe?

A.    Never.

Q.    I'm sorry.

A.    No.

Q.    You don't know who that is?

A.    No.

Q.    You were also here when Consolee Mukeshimana testified; is that right?

A.    Yes.

11:28AM    Q.    And like Mr. Habimana and like Mr. Gasasira, you testified that you didn't know Ms. Mukeshimana either; is that right?

A.    Yeah, I don't know her.

Q.    You testified yesterday that injured soldiers came to the hospital and the surgical wards had to be cleaned out to make room for them.  Do you remember that?

A.    Come again.

Q.    Sure.  When the soldiers arrived at the hospital, you talked about the helicopters coming in?

A.    Yes.

11:29AM    Q.    You testified that they were put in the surgical wards; is that correct?

A.    Yeah, there is a part of when people who have undergone heavy surgery where they are hospitalized, it was a different hospitalization room.  That's where part of that hospitalization area was even to soldiers.

J.A. 1912

Q.   And in order to make room for that, the hospital had to move out the Tutsis who were there and the Tutsis who were hiding there; isn't that right?

A.   I don't know what happened because this is an administration.  Any logistical move, unless you are involved in that, I could not know.

Q.   Are you saying that you weren't involved in moving Tutsis out of the surgical ward?

A.   I was not.  I was not involved.  I was not a member of the administration of the hospital, so any logistical move they made, I could not know.

11:30AM

Q.   And it's your testimony that you never went into dermatology either; is that right?

A.   Right, never been to dermatology.

Q.   Because there were still dermatology procedures going on during the genocide; is that correct?

A.   There were some dermatology patients there, but there's also some people who went hiding in that department.

Q.   How do you know that if you never went in?

11:30AM

A.   If someone shows up to the microsurgery room and sometimes you ask people where they are, are you living outside the compound or are you living inside, so people would say I'm living in the compound, I'm camping outside on the ground, or I'm hiding in this department, so you came to know some people who are living inside.

**J.A. 1913**

Q.   And you would pass the dermatology building at least twice a day when you were going to and from the Kiza dorm?

A.   Yes, yes.

Q.   And, in fact, you'd go right by it, actually?

A.   Not right by it, there's quite a distance.  I showed you in front of the dermatology, there is a huge crowd of people camping in that big ground.

Q.   And you were also here when Esperance Mukamurenzi testified; isn't that right?

11:31AM

A.   Yes.

Q.   And she talked about the maternity ward?

A.   Yes.

Q.   And you passed right by that as well on your travels to and from the emergency room; isn't that right?

A.   Yes.

Q.   Twice a day?

A.   Yes.

Q.   And you say you never heard anybody screaming or you never heard of any cries for help from the maternity ward; is that

11:31AM correct?

A.   No.

Q.   And you never saw anybody taken out of that dorm; is that correct?

A.   No.

Q.   And to your knowledge -- well, did you know there were

J.A. 1914

people hiding in the maternity ward?

A.    It's a public knowledge.  We knew in every single building there are people hiding inside.

Q.    But you never went in to help any of those people?

A.    I told you from the beginning, I had no business going inside because I have no reason to go there just for walk.  I have no personal people have to go just to visit, I don't see why I should be going running around entering the maternity department where I knew there were wounded people waiting on an

11:32AM

emergency just to be treated, just to stop there.  Why should I be going around visiting people?  The only way I can be helpful is just being there when wounded people were being treated.  That's what I spent my time doing.

Q.    And so you would walk by buildings filled with people and wouldn't go in because that wasn't your job; is that your testimony?

            MR. LAUER:  Objection.

            THE COURT:  Sustained in that form.

Q.    You walked passed maternity building because that wasn't

11:33AM

your assignment; is that your testimony?

A.    I walked by because I'm making my way to the cafeteria or I'm on my way going home, no, going to the dorm, and then remember during the genocide and during the entire wartime, there were curfew, you have to be at your place at six, so if I leave the area I'm walking in, it's no more time just to going

J.A. 1915

around visiting people, and then I see -- I don't see what I

can be -- just be doing, no help providing those people in the

maternity ward.  I was not there.  I couldn't just go in and

helping people to deliver babies or going there just giving

hugs or going there doing work.

Q.   Because you weren't there to help them?

A.   There was no help I could provide maternity.  The only way

I could help is just help people who are wounded, what I tried

my best to do every single day.  There was no other help I was

11:34AM   able to provide for those people.

        MR. VARGHESE:  Thank you, Mr. Teganya, I have nothing

further.

        THE COURT:  Redirect.

        MR. LAUER:  Before I begin, may we be seen at sidebar?

        THE COURT:  Okay.

        (THE FOLLOWING OCCURRED AT SIDEBAR:)

        MR. LAUER:  So, one of the lines of redirect that I

would be intending to go into has to do with the affidavit, the

larger affidavit that is not in evidence in the case.

11:35AM   Mr. Varghese asked a number of questions about the form and a

particular question on the form about whether Mr. Teganya had

ever had family members that were hurt, and there was a

suggestion that or he established that Mr. Teganya did not

reference being hurt himself.

        That particular answer references a detailed

declaration that was submitted later. I intend to go through some of the substance of that.

THE COURT: Well, show me exactly what you want to do.

MR. LAUER: So, in that later declaration, that event is discussed extensively. I'm not saying he didn't produce it, but I'd like to establish some of the details that were provided.

THE COURT: Okay. And this is from what date is the affidavit?

11:36AM

MR. VARGHESE: It's May, 2015.

THE COURT: Why can't he get into this?

MR. VARGHESE: He can certainly get into the details that he provided in the affidavit. We actually elicited this on cross that he talked about this, the May, 2015 affidavit. The affidavit should not come into evidence.

THE COURT: The affidavit doesn't come in, but you can ask about paragraphs 31 to 34.

MR. WATKINS: May I raise one concern I had? Much of the cross, and, particularly, where the end of the cross was,

11:36AM

and this goes to the jury instructions, it's very specific about what the acts are, what the government's theory before the grand jury was, which was that Mr. Teganya witnessed people being taken.

There was a suggestion that at the end of the cross, particularly, he didn't help. That is not consistent with what

J.A. 1917

was before the grand jury.  They're going to try to argue a new

theory on their closing.  I'm very, very concerned about that.

        THE COURT:  We'll cross that bridge when we come to

it.  If they do something in closing that you think is

improper, you can stand up and object.

        MR. WATKINS:  I guess I'm also suggesting it's

irrelevant, and this should be stricken, those last two

questions, whether or not he helped or not.

        THE COURT:  It's too late for that.  The time to

11:37AM  object to a question or answer is when that's given, so

overruled.

        (SIDEBAR CONFERENCE WAS CONCLUDED)

        THE COURT:  All right.  Mr. Lauer.

                    REDIRECT EXAMINATION

BY MR. LAUER:

Q.    Good morning.

A.    Good morning, sir.

Q.    I'd like to begin by displaying Exhibit 1.  Yesterday, you

were asked some questions by Mr. Varghese about when you left

11:38AM  Butare and whether it was June or July.  Do you remember that?

A.    Yes, I remember.

Q.    And there is, in fact, a question on the Exhibit 1 having

to do with when you left, correct?

A.    Correct.

Q.    And if we could just proceed to the next page.  And

specifically you were asked questions about Question Number 1

on this page and the addresses that you listed there.  Do you

recall that?

A.    Yes, I recall.

Q.    And you listed in this your response to this question that

you lived in Butare from 1991 until July of 1994?

A.    Yes.

Q.    At the very top, can you just read what the question was?

A.    "List your last address where you lived before coming to

the United States.  If this is not a country where you fear

persecution, also list the last address in the country where

you fear persecution.  List, address, city/town, department,

province, or state and country."

Q.    What was the last address you had in Rwanda?

A.    My last address was in Butare, Rwanda on the campus.

Q.    Is that what you listed on the form?

A.    Yes.

Q.    Why didn't you have an address between June and July of

1994?

A.    I was on the run.  I was working in the caravan of other

refugees.  I was like a vagrant.  I didn't have a residential

address in the middle of the Nyungwe Forest or the street in

Kiyumba.  My last residential address in Rwanda was Butare,

Rwanda.

Q.    You were asked some questions also by Mr. Varghese about

**J.A. 1919**

the schedule at the hospital during the time period of the genocide.  Do you recall that?

A.    Yes, I recall.

Q.    Was there a curfew in effect in Butare during the time of the genocide?

A.    Yes.

Q.    What was that curfew?

A.    Everybody was asked to be inside their home at 6 p.m. in the evening.

11:40AM

Q.    And how did that curfew affect the schedule at the hospital?

A.    It affected the functioning because a lot of the people working at the hospital was living outside the city or some people have to walk to job or to commute.  Some people ride their bikes to work or something, so they did a lot of traveling to and from their job, so the administration of the hospital said just to shorten their working hours was from 8 to 2 straight, no break, so everyone who was working at the hospital will be just showing up, do their job.  At two, they

11:41AM

head back home, just make sure they are home way before the curfew start.

Q.    Were you released from the hospital at two?

A.    No.

Q.    Why not?

A.    Because the group of the students, the interns and a few

students who were housed on the campus, for us, we didn't have
any traveling to do.  We were housed on the campus.  We ate on
the campus cafeteria, the university cafeteria, so for us, we
were inside.  We couldn't still move after 6:00.

Q.   Did Dr. Muvunandinda live on the campus at the Kiza
dormitory?

A.   No, Dr. Muvunandinda was an external student, who was
living in the Mudchazel (ph), kind of six to seven kilometers
from the hospital.

11:42AM  Q.   Did Dr. Michel Musilikare live at the Kiza dormitory?

A.   No.  Musilikare was an external student.  He was living in
Tumba outside the city.

Q.   Mr. Varghese asked you some questions about what you knew
to be going on at the hospital in April and May.  Do you recall
a number of questions about that?

A.   Yes.

Q.   He also asked you why you didn't go, why you didn't leave.
Did he ask you -- do you recall being asked that?

A.   Yes, sir.

11:43AM  Q.   Why didn't you leave?

A.   In the beginning, it made sense to remain in the Butare
area because Butare was the only one safe place.  Everywhere
else in the country, there were killings already, people were
killing each other, so remaining in Butare made sense
security-wise, then when the killings started in Butare, just

shortly before they had made just a decision, the civilian authorities and the military, they have just started to asking people to have special authorization to move. If you had to move, you have to justify the reason of your business. No one was moving around. You have to provide that kind of permit, special permit, to show why you were moving away, so it was difficult to leave Butare.

At the same time, the atrocities started in Butare. It was mass casualties, a lot of victims coming to the hospital looking for treatment. At the same time, there is no stuff, there is no medical stuff, there is no one to treat them, so I felt compelled, there's a moral obligation to stay there just to help because for me. Just leaving will be like abandoning people who need help.

Q.  If we could have a larger map displayed for the witness only. Mr. Teganya --

THE COURT:  Exhibit 23 for the record.

MR. LAUER:  Yes, for the record, this is Exhibit 23.

Q.  -- is this a larger map?

THE CLERK:  This is in evidence, correct?  You said only for the witness.  23 is in evidence.  Do you want it shown?

MR. LAUER:  I'm sorry, it can be displayed.

Q.  Mr. Teganya, this is Exhibit 23.  Do you recognize this to be a larger map of the hospital campus?

11:44AM

11:45AM

A.   Yes.

Q.   You were asked a number of questions about the incident where you were wounded?

A.   Yes.

Q.   And you had asked if there would be a larger map, you could indicate where that took place?

A.   Yes.

Q.   Can you do that here?

A.   Do you have a larger map than this?  I would if I had a

11:46AM larger map than this.  I go down this area, this direction.  If you can go like two or three inches down there.

            MR. LAUER:  May I have a moment?

            THE COURT:  Yes.

            MR. WATKINS:  Just for the witness here.

A.   Yes, this is much better, yes, this one.

            THE COURT:  This is Exhibit 24.  Any objection to this?

            MR. VARGHESE:  No, your Honor.

            THE COURT:  Let's admit it, Exhibit 24.

11:47AM          (Exhibit No. 24 received into evidence.)

Q.   All right.  I'm sorry for the delay.  Is this a larger map of the hospital?

A.   Yes.

Q.   Do you see the Kiza dormitory on the map?

A.   Yes.

Q.   Can you circle the Kiza dormitory on this building?

A.   It would be this building.

Q.   Can you indicate where the assault took place?

A.   Right here.  This is the compound, what they call IRST, the research institute.

Q.   That's the I-R-S-T?

A.   Yes.

Q.   Mr. Varghese, when he was questioning you about that attack, he displayed your immigration form, which is Exhibit 1.

11:48AM  Perhaps we could have that again, Exhibit 1.  And on page at the bottom of page 5, question A asks whether you or your family, close friends or colleagues ever experienced harm, and you listed a number of relatives there; is that correct?

A.   Correct.

Q.   What is the last sentence?

A.   "I would submit a detailed declaration prior to my asylum hearing."

Q.   Did you submit a detailed declaration prior to your asylum hearing?

11:49AM  A.   I did.

Q.   Did you discuss the attack?

A.   I discussed it.

Q.   Did you, in fact, write five paragraphs about that, excuse me, four paragraphs about that assault?

A.   Yes, in detail because when I discussed with my

immigration lawyer, he asked me to give all the details.

Q.   Did you discuss trying to help your Tutsi friends?

A.   Yes.

Q.   Did you discuss being in your dorm room and having yourself and these friends removed?

A.   Yes.

Q.   Did you discuss being taken to the area near the IRST?

A.   Yes.

Q.   Did you discuss being hit?

11:50AM   A.   Yes.

        MR. VARGHESE:  Objection, your Honor.  This is all leading.

        THE COURT:  I'm sorry.

        MR. VARGHESE:  Leading.

        THE COURT:  I'll allow it only in this context.  Go ahead.

Q.   Did you discuss being hit in the head?

A.   Yes.

Q.   Did you discuss being slashed with a machete?

11:50AM   A.   Yes.

Q.   Did you discuss being -- the intervention of the hospital safety soldier?

A.   Yes.

Q.   Did you discuss going to a doctor for the purposes of having your scars documented?

A.    Yes, I did.  I went to Boston Medical Center.

        MR. VARGHESE:  Objection, your Honor.

        THE COURT:  Overruled.

Q.    Did you go to a doctor in order to have your scars documented?

A.    Yes.

        MR. LAUER:  No further questions.  Thank you.

        THE COURT:  Recross.

RECROSS-EXAMINATION

BY MR. VARGHESE:

Q.    Mr. Lauer just asked you about what you described in this affidavit in May, 2015 about your attack; isn't that correct?

A.    Yes.

Q.    And in that affidavit, that's the affidavit that you said your Tutsi friends only had a minor role, correct?

A.    That is what I explained.

Q.    Yes or no.  Yes?

A.    Yes.

Q.    You said I believe they had relatively minor wounds, correct?

A.    Yes.

Q.    And that's different than the way you described it today from the eyebrow all the way down to the back of the neck; isn't that correct?

A.    I described the length.  You asked me how big was the

11:51AM

wound.

Q.   And then the other thing you mentioned in here was the details of you being attacked; isn't that right?

A.   Yes.

Q.   And sustaining machete cuts?

A.   Yes.

Q.   And that was the first time in 16 years of asylum proceedings that you've ever told that story?

11:52AM
A.   After I was in therapy sessions because I was asked about an incident.  I was not able to talk about it after.  After I was in therapy sessions, I was asked to provide details because I was able to talk about that.

Q.   Mr. Lauer asked you about going to Boston Medical Center; isn't that correct?

A.   Yes, for the scars.

Q.   And what year did you go to Boston Medical Center?

A.   I was sent there, I don't recall exactly, 2016, '16 or '17.  I don't recall.  It might have been '16 or '15.

Q.   So, if it's 2016, that's 22 years after you say you were cut, correct?

11:53AM
A.   No, I discussed my incidents on 2014 when I started.

Q.   That's not the question, sir.  When you went to Boston Medical Center for your scars, that was 22 years after you said that you were cut; isn't that correct?

A.   No, I spoke with my therapist before I went to the doctor.

J.A. 1927

Q.   Sir, that wasn't the question.  When you went to Boston
Medical Center and had your scars looked at, that was 22 years
after you say that they were inflicted upon you?

A.   No, for medical reasons, it was my first time because I
went there for expertise just to testify.

          THE COURT:  I'm going to ask the witness to answer the
question.  Put it to him again.

Q.   When you went to Boston Medical Center, that was 22 years
after you say you were cut with a machete?

11:53AM

A.   Yes.

Q.   And so the doctor who looked at you in Boston Medical
Center has no idea how you got those scars; isn't that correct?

A.   He's the one that is a professional on traumatic injuries.
He's a doctor who works with immigration.  Everyone who have
traumatic wounds, anyone who has PTSD, anyone who is injured,
he's referred to that doctor.  That's where I was sent for
expertise, for evaluation.

Q.   And he has no idea if you got those scars in 1994 or in
2014; isn't that correct?

11:54AM

A.   That expertise, I told her the story, she had to
corroborate my story with the knowledge from my therapist.  I
went there for the result for expertise.

          MR. VARGHESE:  Thank you, Mr. Teganya.

A.   That's not my area of expertise.

          MR. VARGHESE:  There's no question to you.

**J.A. 1928**

THE COURT: Thank you. You may step down. Anything further for the defense?

MR. LAUER: The parties have a stipulation. Would you like me to read that into the record?

THE COURT: Yes. Let me explain. Stipulation is a lawyer word. It means basically something that they've agreed upon and as to which no additional evidence will be necessary. It's been marked as an exhibit. Is it the plan to have it go to the jury as an exhibit?

11:55AM

MR. LAUER: Yes.

THE COURT: Exhibit 81.

(Exhibit No. 81 received into evidence.)

THE COURT: Go ahead.

MR. LAUER: Shall I read it, your Honor?

THE COURT: Yes.

MR. LAUER: "The defendant, Jean Leonard Teganya and the United States of America hereby stipulate and agree as follows:"

"1. In Butare, Rwanda during the period of 1992

11:55AM

through 1994, the earliest sunset during the year was at 5:51 p.m. and the latest it set was at 6:22 p.m."

"2. Civilian witnesses for the prosecution and defense who were summoned to testify at trial each received $71 per day to spend on meals and incidental expenses and an additional $40 per day in witness fees for each day they were

in the United States.  They received $35.50 for the first and last days of travel."

THE COURT:  Okay.  Anything else?

MR. LAUER:  With that, the defense would rest.

THE COURT:  Let me see counsel at sidebar.

(THE FOLLOWING OCCURRED AT SIDEBAR:)

THE COURT:  Is there a renewed motion?

MR. LAUER:  There is, your Honor, I have a written motion I'll submit.  This is a witness credibility case.  We made the argument at the close of the government's evidence that notwithstanding that, no reasonable jury could arrive at a finding of guilt.

I would renew that motion now.  Certainly after the defense case, there's quite a bit of evidence as to membership as well as to his activity at the hospital, and we would again renew the motion on the basis that no reasonable jury could return a finding of guilt.

THE COURT:  Okay.  That motion is denied.  Is there a government rebuttal case?

MR. GARLAND:  There is not.

THE COURT:  I'm going to send the jury home because it's a few minutes before twelve, and I don't want to have a split between the closing arguments, so let me send them home and then we'll talk about logistics.  Okay.

(SIDEBAR CONFERENCE WAS CONCLUDED)

11:56AM

11:57AM

**J.A. 1930**

THE COURT:  All right.  Ladies and gentlemen, that concludes the evidence in the case.  In light of the hour, again, I don't like to split closing arguments.  It has a potential for unfairness, so I think what we're going to do is I'm going to send you home, and we're going to have closing arguments and jury charge tomorrow, okay.

Again, I'm sorry about the gaps in this case.  I hope you understand, and I appreciate your patience, but you're going to get the case tomorrow.  We're going to have a government closing argument followed by defense closing argument followed by very, very brief government rebuttal.

At that point, I'll instruct you on the law that you're to follow.  Each of you will have your own copy of the jury instructions in writing to read along with me as I read them allowed to you and to take with you into the jury room.

You'll, of course, have all the exhibits with you once you begin your deliberations.  Once you have the case, you can take, as I said, as little amount of time or as much amount of time as you think is appropriate.  It's a Friday, but you shouldn't feel pressured to render a decision, you render a decision when you're ready to do so, and we'll just have you come back on business days, again, until you're ready to render the verdict, so that will be the schedule.

We will provide lunch for you tomorrow.  You don't have to worry about that, and if you haven't rendered a verdict

11:58AM

11:58AM

J.A. 1931

by 5:00, I may ask if you want to keep going to 5:30, but basically we'll send you home at the end of day if you haven't rendered a verdict. With that, it's, again, very important that you not discuss the case among yourselves.

        We'll see you tomorrow morning at 9:00 sharp for the government's closing argument.

        THE CLERK: All rise.

        (JURORS EXITED THE COURTROOM.)

        THE COURT: All right. Why don't we recess for about

12:00PM   15 minutes or so. I made changes to the jury instructions. Let me make sure they are correct. Let's make it 20 minutes, so we'll reconvene at 12:20 for the formal charge conference. Okay.

        THE CLERK: All rise.

        (A recess was taken.)

        THE CLERK: All rise.

        THE COURT: All right. I'm redistributing copies of the jury instructions. There aren't any truly significant changes here, the ones that were suggested this morning, and

12:25PM   then if you look at, for example, page 30 and 31 are examples how I refer back to earlier definitions of what's false and what's material. I've inserted the page numbers, so I've done that throughout.

        Then if you go to pages 36 and 37, this has changed somewhat. Up at the top, second paragraph, I say, "This charge

is based on three statements in that testimony, which are underlined below," so I say upfront that they're underlined, and then I say first, the defendant was asked to respond as follows, with the quotations, and the defendant was also to respond as follows with the quotations, including the ellipsis that was missing.

And then when you get to the end, I've quoted from the indictment in the last two paragraphs, and I think that's the only thing significant.

12:26PM        Whoops, I just noticed a typo on page 43, it refers back to page 31, it should refer back to page 24.  That's my mistake.  I'll correct that.  I'll give you a moment to look at that, and while we're doing that, do we have anything further you want to point me to in terms of either the form or the verdict, or having a speaking indictment going back to the jury?  In terms of the indictment, where I can make the final call tomorrow morning, I don't need it, you know, right this second, I just wondered if you had some further thoughts or cases.

12:27PM        MR. WATKINS:  As to the speaking indictment issue, the case we would cite is *United States vs. Esso*, E-s-s-o.  That's 684 F.3d 347.

THE COURT:  I'm sorry, 684 F.3d 347?

MR. WATKINS:  Right.  And it's at 352, Note 5.  This is a case in dicta, this is a case where the District Court

actually sent the indictment for the jurors to take home with them.

The Second Circuit characterized that as disfavored, but they upheld the judgment nonetheless, but in doing so, they talked specifically about speaking indictments during deliberations. I'm going to quote here, "Indeed, while it is permissible, as we have noted above, to send the indictment into the jury room, the practice is hardly mandatory, and not all Trial Judges follow up, particularly where the indictment does not merely state the statutory charges against the defendant, but, additionally, contains a running narrative of the government's version of the facts in the case, including detailed allegations of facts not necessary for the jury to find in order to address the elements of the charged defense."

There is a District Court case, *United States vs. Warner*, which is 396 F. Supp. 2d, somewhere around 930, I'm sorry, I don't have the pinpoint, but the pinpoint cite is actually 930 to 931. There the defendants objected to sending the indictment back to the jury room.

The Judge did so, but, nevertheless, redacted the indictment because of the accommodating defendant's concerns that the indictment was inflammatory and prejudicial. It directed the parties to prepare a redacted version that simply set forth the charges in the case.

So I think *Esso,* the Second Circuit case, is a good

case here that the indictment need not go back at all.  While
the case has been complicated in many respects as the trial has
gone on, the charges themselves are fairly simple and defined
here, and with the Court's jury instructions that go into it at
some length about what it is, the specific acts why the jury
needs the indictment is a little unclear to me, but, again,
even if it were to go back, the kinds of allegations in
paragraphs 1 through 12, I'm sure the Court has had the
opportunity to read them, they are indeed prejudicial, they
12:29PM      talk about genocidaire acts across the country and giving the
kinds of background generally as to Rwanda, which is immaterial
to the jury's decision here.

They talk about Mr. Teganya, also facts that either
have already been presented in evidence or should be presented
in evidence because they were not presented as evidence.

For all those reasons, I think the indictment need not
go back.  At a minimum, it should be redacted to keep out those
opening paragraphs.

MR. GARLAND:  Your Honor, we have not had a chance to
12:30PM      look at the cases to find cases either.  I don't believe that
the indictment in this case is inflammatory or prejudicial at
all.  The allegations that are in there, the factual things are
things that the jury heard about.

I'll all say at this point is if the Court is thinking
about redacting the indictment in the way that the defense has

J.A. 1935

asked, then our preference is that the indictment not go back at all.  That's where I'll leave that.

THE COURT:  All right.  Let me give some thought to that.  I think that can be a last minute call, so to speak.  What about the verdict form and what I'll call the special interrogatory issue, anything on that?

MR. WATKINS:  We're sticking to our guns on that, your Honor.  We would like the verdict form as we submitted, which would be guilty, not guilty on the overall charge, and then either proven or proved, as the Court wants to do underneath.

THE COURT:  Okay.

MR. WATKINS:  But we do expect, I think it's clear in the charge that each one of those is unanimously beyond a reasonable doubt.

THE COURT:  All right.  I'm going to leave the verdict form the way it is.  I think there's more potential mischief in the special interrogatory form.  I'm just using that as shorthand than benefit gained, particularly, again, when I'm going to specifically instruct the jury that they have to unanimously agree on at least one statement, and they'll have that instruction in writing and can refer back to it in the jury room, so I think I could hardly be more clear on that subject.

So I'm going to leave the verdict form just as a basic general verdict, guilty, not guilty as to each of the counts.

Okay.  Anything else?  Obviously, if I do either
redact or keep it out, I need to change the instruction.  Where
is it?

MR. GARLAND:  It's on page 17, your Honor.

THE COURT:  17.  Yes, I will delete the second
sentence if I don't send it back, otherwise it will stand.
Okay.  Anything else that you want to take up?

Mr. Watkins.

MR. WATKINS:  Yes.  In regards to the Court's new
draft, page 37 again with Count Five.

THE COURT:  Yes.

MR. WATKINS:  At the end, the new language, the Court
has included as to the second and third statements, "The
indictment charges that they were false, that Defendant Teganya
observed atrocities at the hospital during the genocide,
including Tutsis being turned over to the military to be
killed."

The only -- up until the cross-examination questions
until today, the only theory that the government was going
under for proving atrocities was being turned over to the
military to be killed.

The way that the Court has phrased it here --

THE COURT:  No, I'm quoting the indictment, I'm not
phrasing anything.

MR. WATKINS:  Yes, by copying completely from the

12:33PM

12:33PM

indictment in that respect, it allows the jury to open up and speculate about any number of things what might be an atrocity and what might be considered atrocity.

That's especially difficult in this case where there's no legal definitions, I'm not even sure an accepted general definition of what an atrocity is. I'm quite concerned now that if the jury instructions are expanded to where the jury can now start to look at whatever they think is an atrocity aside from what the government has talked being atrocity, which

12:34PM  is Tutsis being turned over to the military to be killed, that is absolutely an atrocity that nobody is going to argue with that, but the language here goes far beyond that and invites the jury to start thinking about all kinds of other possibilities for atrocities.

THE COURT: Well, I guess there's many layers to this. At the first layer, is the indictment constitutionally infirmed because the word "atrocities" is ambiguous? I think it's -- I don't think that's correct, and I think it's kind of late in the day anyway to raise that issue.

12:35PM  Second, as to the idea that atrocity may be undefined or an ambiguous word, I think that the language that the defense suggested, which I included, which I think is now at page 23, the last paragraph, I think takes care of that. If the question is ambiguous, and you can argue this, that the word "atrocities" is ambiguous or, you know, can be understood

in multiple ways and so on.

I think that that's fair argument under the circumstances. As far as the fact that the charge of what is false has been combined into one sentence, that's the way the indictment was charged. I guess I'm not comfortable doing anything other than quoting the indictment. I mean, that's how it was charged. As soon as I start manipulating that sentence, it's now something that he wasn't charged with, right?

MR. WATKINS: Well, it's the opposite. He was charged with the atrocity, witnessing, observing atrocities of Tutsis being turned over to the military to be killed. That's what he was charged with with the indictment. It's often the case that indictments cover broad conduct, broad kinds of things, and as trial approaches and as the evidence is presented, the specifics of the charge and the theory become clear. That's what's happened here. We were certainly not on notice beyond the Tutsis being turned over to the military to be killed. That atrocity could be almost anything that Mr. Teganya witnessed there. It seems to be where the government is heading.

THE COURT: Well, again, the jury charge is what the charge is, in other words, if this is a Rule 29 motion, it should have been made at the close of the evidence. We're in the charge conference now, and the question is how do I -- I'm just trying to tell the jury what the government has charged,

and if you think that sentence is unfair because somehow you're combining the second and third statements in a way that's unfair or one is modifying the other, I guess I'm prepared to think about that.

I guess I could ask the government, there is a potential ambiguity here in that although I think it favors -- well, I don't know if it favors the defense or not that Tutsis being turned over to the military to be killed is a subset of atrocities and that it kind of suggests if they find Tutsis being turned over to the military, therefore, they must find atrocities, I could put that sentence -- I guess I could do it in two parts.

I could say the second statement charges were false and that he observed atrocities at the hospital during the genocide, and the third statement was false because he observed Tutsis being turned over to the military to be killed.

Mr. Garland.

MR. GARLAND: Your Honor, the government agrees that if you start parsing the indictment and rewriting the indictment, it becomes not what the grand jury found but something else. I think that this was taken care of before in the way that the earlier instruction had been written and had broken them about.

I don't think that -- I don't think that the word "atrocities" is unconstitutionally vague, and as you pointed

J.A. 1940

out, there is a instruction in there that they can make their argument about, but these are the words that were used at a hearing, these are the words that were used by Mr. Teganya, and the jury should be able to interpret atrocities using their common sense.

And, moreover, I don't see the reading that the word "including" means specifically or only either.

THE COURT:  Wait, I'm sorry.

MR. GARLAND:  I don't see that the word "including," that is, including Tutsis, the word "including" doesn't mean specifically, the word "including" doesn't mean only.

THE COURT:  It doesn't mean only, but it means it's a subset of atrocities.

MR. GARLAND:  It is a subset of atrocities, and so, therefore, the question about atrocities should be interpreted in the way that jurors and people normally interpret that.

THE COURT:  Mr. Watkins, anything else?

MR. WATKINS:  Judge, I want to clear something up first.  We did move on sufficiency of evidence grounds at the end of both the government's and our own case.  The issue right now --

THE COURT:  I wasn't trying to suggest otherwise, yes.

MR. WATKINS:  But here's where it gets complicated in the analyses here.  If the jury comes back guilty as to 1, 2, 3 and 4, clearly there would be sufficiency.  The difficulty is

going to be if the jury comes back not guilty on 1, 2, 3 and 4, and then we're stuck with Count Five, what becomes an atrocity at that point.

In other words, I guess it is 2 and 4 which talk about actually observing killings, then clearly that would create -- that would be an atrocity. That would satisfy.

What happens if the jury comes back not guilty as to those others and the jury starts thinking, well, for this particular charge, whether an atrocity occurred at the hospital, we can look at really anything under the sun at that point, and they are guided by really nothing at that point.

So that would be where the sufficiency may come up. Again, we have no idea what the jury is going to do, but these are the issues that the jury may have to grapple with when we get to the end of the case.

MR. GARLAND: Your Honor, there's two sentences on that. The jury is going to be guided by the common meaning of the words, just as the instruction means, and that's going to be sufficient to guide them, and there's been sufficient evidence of atrocities that are happening and that Mr. Teganya would have observed them and did observe them. Sufficiency is not going to be an issue either.

THE COURT: All right. In terms of the phrasing of the jury instructions, these two paragraphs, I guess I'm going to give it a little bit more thought before I make a final

suggestion, but I have to say that it seems to me the prudent thing to do is to default to what's charged in the indictment, particularly since it doesn't quite perfectly match the actual testimony.

For example, the word "killed" as opposed to the word "slaughtered," the phrase "waiting outside" is missing. I think I'm likely to leave it where it is, but I'm going to think about that.

MR. WATKINS: Just more thing, as the Court continues, the question on Number 2, the answer is that people were actually being turned over to be slaughtered by the military that was waiting outside. Because of that actually also belongs to in the sum up, including Tutsis actually being turned over to the military to be killed.

THE COURT: Well, again, that's the problem. You know, if I'm summarizing as opposed to simply stating what's in the indictment, which is what I'm trying to do here, this instruction is simply to say what's in the charge is the point of this, and I could forego all this and simply give them the indictment or give them the indictment in redacted form without the first few pages, and I thought this was an improvement in the sense that it might be easier to follow or to highlight that there's three statements, but I have to say I'm quite concerned about going beyond the language of the indictment. I don't know that I have the power to do that, to restate the

12:42PM

12:43PM

indictment, to clarify the indictment, to narrow it, improve it. I mean, it is what it is.

Okay. I'll give it some more thought. I think I'm inclined to leave it where it is, but I'll give it some more thought. Anything else leap off the page here or maybe not leap off the page but should be addressed anyway?

MR. GARLAND: Not at this point, your Honor, no, I haven't seen anything.

THE COURT: All right. How long do you expect the government's closing will be?

12:44PM

MR. VARGHESE: Your Honor, I think we're going to be around 40, 45 minutes, and then we'll have a 10 to 15 minutes for rebuttal.

THE COURT: Okay. More like 5 or 10 minutes. In other words -- well, let me put it this way. The idea here is not to have two bites at the same apple, the idea is to respond to things in the defense closing that in fairness you ought to have an opportunity to respond to.

So don't assume, I guess, that you'll get as much time

12:45PM

as you want on rebuttal, and don't assume you're going to simply cover the same ground, but other than that, you know, the time frames sound fine to me.

Mr. Lauer.

MR. LAUER: I'd estimate also probably around 45 minutes.

J.A. 1944

THE COURT:  Okay.  I'm not going to interrupt anybody, you know, if you go 50 or even 60, you know, that's fine.  I'll begin clearing my throat at some point when we get into the second hour.  You know, again, I don't want to cut anybody off as long as you're within reason, but at the risk of telling you what you already know, no time is shorter than the time allowed for closing argument.

You know, every word you say takes up space and time, and I witness an awful lot of undisciplined rambling closing arguments that go too long because the lawyer didn't seem to have done any planning beforehand.

I guess I don't have anything more to say on that topic.  Anything else we should talk about before tomorrow morning?  Oh, electronics.  You want to show things, maybe both of you, electronically?

MR. GARLAND:  Yes.

MR. VARGHESE:  That's correct, your Honor, we've talked, and I think there's going to be a TV that they'll bring in.

THE COURT:  All right.  The only suggestion I have is have a backup plan just in case, you know, things go awry because sometimes they do.  I'll tray to be indulgent, but, you know, it doesn't always work the way it's supposed to.

All right.  I think we probably ought to meet at I guess 8:30 again tomorrow morning.  I'll get you the final copy

J.A. 1945

of the verdict form, jury charge, give my final ruling on the indictment, anything else that needs to be taken up.

If you are going to use a summary or a chart, I think fairness suggests that you ought to show your opponent that so that they have a chance to see it before you show it to the jury. Obviously, you can use any exhibit, and as I indicated, I'll permit you to quote from my jury instructions as long as you're making clear that, you know, I'm the one who gives the instructions at the end of the day, and this is what you expect, and, second, I'll permit you to quote from trial testimony as long as you are not suggesting in any way that this is somehow an official transcript or something like that.

12:47PM

Okay. Anything else?

MR. GARLAND: No, your Honor.

MR. LAUER: No, thank you.

THE COURT: All right. Thank you.

THE CLERK: All rise.

(Whereupon, the hearing was adjourned at 12:47 p.m.)

**J.A. 1946**

1                   UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS

2

3

4   UNITED STATES OF AMERICA,      )
                            )

5   vs.                      )  Criminal Action
                            )

6   JEAN LEONARD TEGANYA,        )  No. 17-10292-FDS
                Defendant   )

7                            )
                            )

8                            )

9

10  BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                   JURY TRIAL DAY 18

12

13

14

15      John Joseph Moakley United States Courthouse
                Courtroom No. 2

16               One Courthouse Way
               Boston, MA 02210

17

18                April 5, 2019
                8:19 a.m.

19

20

21

22

23             Valerie A. O'Hara
            Official Court Reporter

24   John Joseph Moakley United States Courthouse
          1 Courthouse Way, Room 3204

25            Boston, MA 02210
         E-mail: vaohara@gmail.com

1  APPEARANCES:

2  <u>For The United States:</u>

3        United States Attorney's Office, by GEORGE P. VARGHESE,
   ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT
4  UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston,
   Massachusetts  02110;
5
   <u>For the Defendant:</u>
6
            Federal Public Defender Office, by SCOTT LAUER, ESQ.,
7  and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor,
   Boston, Massachusetts 02210.
8
   ALSO PRESENT:
9
   Augustin Mutemberezi, Interpreter
10 Moses B. Rndasunikwa, Interpreter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3    CLOSING ARGUMENTS
       By Mr. Varghese              10
       By Mr. Lauer                 52
4
     REBUTTAL
5      By Mr. Garland               82

6    JURY CHARGE                    87

7    VERDICT                       115

8

9    EXHIBITS                        FOR I.D.   IN EVIDENCE

10      26                                          9
        28                                         19
11      39                                        101
        58                                         69
12      60                                         78

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        PROCEEDINGS

2          THE CLERK:  All rise.  Thank you.  You may be seated.

3   Court is now back in session.

4          THE COURT:  All right.  Good morning.

5          MR. LAUER:  Good morning.

6          THE COURT:  I've provided to you what I think are the

7   final versions of the jury instructions.  We've caught a number

8   of typos, including third element, fourth element, fifth

9   element, there are a number of things like that where they

08:37AM 10  didn't match, and I think we caught all of that.

11          I decided I'm not going to give the indictment to the

12  jury.  I read the *Esso* case.  I'm also not going to let them

13  take it home, for what it's worth, but I'm certainly convinced,

14  I guess, that under the circumstances because I am giving them

15  a detailed description of the charge that that will suffice

16  under the circumstances, and I think the government itself said

17  if I'm going to redact the first part of the indictment, we may

18  as well just skip it altogether, and I think that's what I'm

19  going to do.

08:37AM 20         So unless anybody has last minute thoughts on the

21  instructions.  Mr. Watkins.

22          MR. WATKINS:  Your Honor, the instruction that's now

23  on page 37 that we talked about yesterday, after more

24  reflection in the office because I was not able to articulate

25  it well on the spur of the moment, I think what has happened is

1    that the Court has essentially merged the second and third

2    bases of finding the perjury, and I guess that's where my

3    queasiness about it is.

4            THE COURT:  I didn't, the indictment, tracking exactly

5    what it says in the indictment, yes.

6            MR. WATKINS:  Correct, the indictment does, and that

7    is why we suggested that those two things have to be broken out

8    as per our instructions.  I understand that the Court has come

9    to a decision on that, and I will object at the appropriate

08:38AM 10    time.

11            THE COURT:  Okay.  And, again, I think I certainly

12    understand the comment, but I think the prudent thing to do is

13    to track the indictment and leave it at that, so that's what

14    I'm going to do.

15            MR. WATKINS:  As I understand it, the Court is not

16    going to do a specific verdict.

17            THE COURT:  Correct, it will just be the general

18    verdict.  I think I circulated where it's just guilty, not

19    guilty as to the five counts.

08:38AM 20            MR. WATKINS:  That would be the original verdict form

21    we had some time ago?

22            THE COURT:  Yes.

23            MR. WATKINS:  One other matter not necessarily related

24    to the instructions.

25            THE COURT:  Yes.

**J.A. 1951**

1          MR. WATKINS:  As the Court has heard over the last

2     couple of days, we have a certain amount of uneasiness about

3     Count Five and how that can be satisfied on the burden of

4     proof.

5          THE COURT:  Yes.

6          MR. WATKINS:  Much will depend on what happens during

7     the government's closing about what they choose to suggest is

8     evidence of a violation as alleged in Count Five.  I do not

9     like to object during closing arguments.  I think that

08:39AM 10     attorneys should be allowed to argue as best they can.

11          THE COURT:  If you need to object, you need to object.

12     The time to fix it is right then and there.

13          MR. WATKINS:  But what the First Circuit has suggested

14     is that if the parties and the Court agree they we can all hold

15     our objections to the end of the argument that that would be

16     sufficient, so that's what I'm asking whether the Court would

17     be willing to do that in this case.

18          THE COURT:  Well, what's tricky is this.  Sometimes

19     I'll get an objection to something that was said 45 minutes

08:40AM 20     earlier, and I have to like roll the tape back in my head, and

21     if it's something that I can cure, so suppose the government

22     says, and the defendant has the burden of proving himself

23     innocent or whatever, you should object.  I should fix it right

24     then and there, not wait.

25          MR. WATKINS:  I would shoot through the roof at that

**J.A. 1952**

1    point.

2         THE COURT:  Obviously, I'm using an extreme example,

3    but sometimes, as you know, it's a little more subtle than

4    that.  You know, it's something that may be arguably is

5    commenting on a failure to take the stand but could go either

6    way, and it's much easier for me to just right then and there

7    remind them the defendant has the right not to testify, and no

8    inference can be taken from that.

9         On the other hand, if it's something that's purely

08:40AM 10    legal, and that, you know, can wait until the end, there's no

11    point in interrupting, so I guess the answer is it depends.  If

12    it's something that I can fix with a cautionary instruction

13    right then and there, I want to do that.

14         If it's something that you think is broader, more

15    cosmic that goes to the nature of the way the case is charged

16    and argued, maybe it can wait until the end, but I'm not sure I

17    can say in advance more than that.

18         I'm not articulating that well, but, I mean, part of

19    the point of the objection process, whether it's a question or

08:41AM 20    an argument or anything else, is for me to be able to fix it if

21    I can, to just take care of it right then and there, dispel it,

22    you know, and it's hard for me long after the fact to

23    reconstruct what happened.

24         I mean, so, for example, if you were to now object to

25    something that occurred two weeks ago, I'd be, well, wait a

1    second, let me find my notes, what was said, let me look at the

2    transcript.

3          MR. WATKINS:  That would not be nature of these

4    particulars objections.  Having said all that, I understand the

5    Court's ruling, and because First Circuit case law is very

6    clear on this, I will out of an abundance of caution object at

7    the time no matter whether I think it's cosmic or otherwise

8    just to make sure that the record is clear.

9          THE COURT:  Okay.  Again, I'm not telling you you have

08:42AM 10    to do that.  It depends and, again, if it's a legal point that

11    you think, for example, there's a variance, you can probably

12    wait until the end on that.

13          The standard is whether it's something I can say right

14    then and there to the jury that fixes the problem, and if it's

15    a variance, nothing I say is going to fix that problem, so I'll

16    leave it up to you.  You don't have to interrupt for something

17    like that.  I'm not sure what your theory is, but if it's

18    something like that, I don't think you need to interrupt for

19    it.

08:42AM 20          MR. WATKINS:  I think I have that.  Because I've taken

21    the lead on this, it would be me, I think, rather than

22    Mr. Lauer objecting, and I would try to do so quietly as I

23    could also.

24          THE COURT:  Okay.

25          MR. WATKINS:  So perhaps the Court can look my way

1    every once in awhile.  That I won't guarantee, but I'm sure you

2    can speak up, and it doesn't bother me < to have two lawyers

3    speaking as long as you're not talking over one another or

4    doing a tag team sort of thing.

5              THE COURT:  Okay.

6              MR. GARLAND:  Nothing for the government, your Honor.

7              THE COURT:  And the equipment works-ish?

8              MR. VARGHESE:  There was a slight scare, but I think

9    we fixed it.  Your Honor, we wanted to make the TV was

08:43AM 10   positioned okay for you because we, obviously, didn't want to

11   block.

12             THE COURT:  Yes, it might move myself around.

13   Actually, I assume you will want to do that as well, Mr. Lauer?

14   I assume you can't see the TV from where you're sitting?

15             MR. LAUER:  Yes, we can see it on ours.

16             THE COURT:  So I'll have it here.  Of course, that's

17   fine.  No problem.  All right.  Then if there's nothing further

18   on the instructions, I'm going to go tell my secretary to hit

19   print so we get 14 copies for each of the jurors, and we'll get

08:44AM 20   started as soon as everyone is here.

21             THE CLERK:  All rise.

22             (THE FOLLOWING OCCURRED AT SIDEBAR:)

23             THE COURT:  All right.  The juror, Patience, I think

24   her last name is Awah has an issue.  Her daughter has a high

25   fever.  She's scrambling to get her husband to cover for her.

J.A. 1955

1     This is the woman who's not being paid, African woman. I feel

2     sick to my stomach about all of this. She wants to come in,

3     you know, she's scrambling to try to make all this work, and

4     anyway, I feel awful about it. I'd like to discharge her even

5     though she doesn't want to be discharged because she's an

6     alternate. What do you think I ought to do?

7         MR. LAUER: I don't have a position. The timing is

8     unfortunate but she is an alternate. We're at the close of the

9     case.

08:55AM 10         MR. VARGHESE: That's really unfortunate.

11         THE COURT: Lisa is trying to make some phone calls.

12     If the husband is there and we can get her here in five or ten

13     minutes, maybe I'll let it go, but otherwise, you know, and I

14     would like to thank her, of course, which I'm not going to be

15     able to do if I discharge her. Let's see how it goes, and if

16     it's going to cause a substantial delay, meaning more than 10

17     minutes, I'm just going to let her go. Thanks.

18         (SIDEBAR CONFERENCE WAS CONCLUDED)

19         THE CLERK: All rise for the jury.

09:08AM 20         (JURORS ENTERED THE COURTROOM.)

21         THE COURT: Good morning, everyone. I think we're now

22     ready for the closing arguments. Is the government ready?

23     Mr. Varghese.

24                  <u>CLOSING ARGUMENT</u>

25         MR. VARGHESE: Good morning. Jurors, good morning.

1      For 25 years, Jean Leonard Teganya has been running

2   from the truth, 25 years.  That run has taken him from Butare

3   to the Congo, from the Congo to Kenya, from Kenya to India, and

4   then with a fake Zimbabwean passport from India to Canada, and

5   then from Canada 450 miles from his home, through the woods,

6   through the brush into Houlton, Maine.  25 years he's been on

7   the run.

8      Now, he's crossed three continents in those 25 years.

9   Mr. Teganya would not have been doing all of this running

09:10AM 10   unless there was something big that he was running from.  After

11   five weeks sitting here in this trial room, you now know the

12   truth.  He's running from the truth, the truth of what he did

13   in Rwanda during that unimaginable time, the 1994 Rwanda

14   genocide.  He's running away from his actions at that hospital

15   in Butare.  He's running away from the terror that he caused,

16   he's running away from the murders that you heard about, he's

17   running away from the rapes that he committed.

18      Now, you've heard him say that people were sown in

19   terror in that hospital, but now you know the truth, the truth

09:10AM 20   was he was the one who was sewing terror, sewing terror on

21   those victims who were in that hospital who were too scared to

22   leave but who were petrified, petrified to stay.

23      Now, you heard him -- you heard from witnesses that he

24   would walk around those hospital rooms, and he would say, "Our

25   children will have to learn what a Tutsi looks like.  They will

1   have to learn it because there will be none left."  That was

2   the defendant, Jean Leonard Teganya.

3          And you heard that outside those hospital walls behind

4   the maternity ward, there was a field, a field that was

5   littered with bodies.  Esperance Mukamurenzi told you that

6   there were more bodies in that field than there were people in

7   this courtroom, bodies that were abandoned there left to rot

8   being eaten by dogs.  That was the scene at the hospital in

9   Butare.

09:12AM 10          Now, Mr. Teganya kept running for years, and he hoped

11   that run would end here in this country, in the United States,

12   and that's why he drove 450 miles to a remote part of Maine,

13   came through the brush and the woods and crossed the border

14   illegally.

15          He wasn't coming to claim asylum, he was continuing to

16   run, and you know that because when Border Patrol Agent Radatz

17   testified, he told you that he found Mr. Teganya five miles

18   from the border walking in the opposite direction from the

19   lawful border entry.

09:12AM 20          He wasn't coming to claim asylum, he was coming to

21   hide, like he had for two years in Canada, but he got caught.

22   He got caught by Agent Radatz, and when he did, he filed an

23   asylum application.  That was his way out.  He filed that

24   asylum application, and in it, he lied.  He told false

25   statements, and he followed that up with more lies during his

**J.A. 1958**

1    immigration hearing, lies that you've heard on tape.

2         He thought he was going to get away with it, just like

3    he had with that fake Zimbabwean passport, just like he had

4    when he ignored that Court Order from the Canadian Court to

5    return to Rwanda, just like he had when he crossed the border.

6         Now, you heard yesterday that the defendant knew that

7    these things were wrong, he knew that he shouldn't be doing

8    them, he knew that they were illegal, but he did them anyways.

9    Why?  Because in his mind, he believed that his ends, staying

09:13AM 10   in Canada or staying in the United States justified his illegal

11   means, but make no mistake about it, he absolutely knew what he

12   was doing was illegal, he just thought he was above the law.

13        How do you know the truth about who Jean Leonard

14   Teganya is?  How do you know the truth about what happened in

15   Rwanda in 1994?  The answer to that question is the witnesses

16   who took that witness stand, who came in here and told you

17   their stories.

18        Over the past five weeks, you've learned a lot about

19   Rwanda, probably more than you wanted to know.  You've learned

09:14AM 20   about Rwanda and what happened in 1994.

21        I want to start with what both sides agree on, both

22   the government and the defense agree on these points.

23        The Rwandan genocide started in 1994 with the downing

24   of the president's plane.  It led to a massive genocide.  In a

25   100-day period, 800,000 Tutsis were killed.  That's 8,000

1    people a day.

2         Now, you've heard that this genocide was the worst

3    genocide that's ever happened since the Holocaust in

4    World War II.

5         You heard from the government's expert,

6    Dr. Phil Clark.  Now, he told you that the genocide made it to

7    Butare late, but when it did, it was fierce.  You heard that

8    Butare and that in Butare, Tutsis were massacred, and one of

9    those massacre sites was the hospital at the university.  He

09:15AM 10   told you that, but you didn't just hear it from him.  You heard

11   it from Dr. Noel Twagiramunga.  He's the defense's expert.  He

12   corroborated a lot of what Dr. Karekezi already said.

13        He told you there was a massive slaughter at the

14   hospital.  He said it was pervasive, that Tutsis were being

15   killed both in the daytime and in the nighttime.  He told you

16   as a historian that there are mass graves at that hospital,

17   that there are bodies of Tutsis who were killed there.

18        None of this is disputed by the defense.  The other

19   thing that is not in dispute is that the defendant,

09:16AM 20   Jean Leonard Teganya, was there.  He was there from April 6th

21   until the end of the genocide in Butare when he fled when the

22   RPF came.  Every single day he was there, at the site of a

23   massive genocide, he was there.

24        The question for you, what was he doing there for

25   those 100 days?  You have heard that Jean Leonard Teganya was

1   an active member of the MRND, that while he was in school, he

2   was a leader of the MRND in the medical school, that he was an

3   Interahamwe member, that he trained on Tuesdays and Fridays

4   with weapons like an ubihiri club?

5        And you heard that when the genocide started, he

6   participated in it, he led it, he walked around the hospital

7   with soldiers and Interahamwe members identifying Tutsis,

8   pulling them out of hospital beds, and you heard that he

9   killed, that he raped, that he was not only, not only a

09:17AM 10   caregiver, as he likes to claim, he was a participant in this

11   massive genocide occurring at that hospital.

12        Now, how do you know this testimony is true?  Well,

13   you saw the government's witnesses, you heard them testify on

14   that stand, you saw the emotion in their face, the tears that

15   were welling up in their eyes as they recounted some of the

16   most traumatic stories of their lives, but ultimately the

17   question of credibility, evaluating a person's credibility,

18   it's something you do each and every day.

19        When you hear somebody's story, you sit there and you

09:18AM 20   have to decide, is it the truth, or is it a lie?  What kind of

21   things do you take to make that determination?

22        There are three things that I'll point you to:

23   Corroboration, Consistency, Common Sense.  Let me explain what

24   I mean.

25        Corroboration, is what the witness saying corroborated

**J.A. 1961**

                    by either other witnesses or other evidence that you have seen

                    and heard?

                           Let me give you an example.  Isabelle Mukankusi, who

                    you may remember her.  She was one of the first witnesses,

                    earlier witnesses.  She testified that she was a young girl

                    during the genocide.  Do you remember?  She was at the

                    hospital.  She had machete cuts in her head.  Do you remember,

                    when her grandparent's house was attacked?  She told you how

                    she witnessed her grandfather being killed right in front of

                    her eyes, and there she was at the hospital with the machete

                    wounds in her head and her ear cut.

                           She testified it was dangling behind her.  She told

                    you her story, and part of that story is she told you that she

                    was attacked, that a soldier tried to rape her.  She told you

                    that she ran, she ran through the hospital and ended up in the

                    maternity ward, and in that maternity ward, there was an older

                    woman who protected her, who hid her under the bed so that when

                    the soldier looking to rape her came, couldn't find her.

                           Well, you heard from that woman,

                    Esperance Mukamurenzi.  She was the government's last Rwandan

                    witness, and she told you that same story.  She told you she

                    remembered a young girl with a bandaged head coming into her

                    hospital room, and she hid her under the bed, and then the

                    soldiers couldn't find her and ran away.

                           Corroboration, that's how you know the story is true.

**J.A. 1962**

1          Let me move on.  Consistency.  What do I mean by that?

2     Is the witness' story consistent?  Does it make sense with what

3     you know and the evidence you have?

4          Let me give you an example, an easy one from

5     yesterday.  The defendant took the stand.  He told you a story

6     about being attacked by Tutsis.  Do you remember that?  He said

7     there are two Tutsi acquaintances, and we were all together,

8     and I saw them at the hospital when they showed up with machete

9     wounds.

09:20AM 10          I asked him, "Can you describe the machete wounds?"

11    He said, "Yeah, they were serious."  He said, "They were

12    deadly," and he traced with his finger where they went.  Do you

13    remember?  He started at his eyebrow, traced it down under his

14    ear and then all the way to the back of his neck.  That's what

15    the defendant did in explaining the machete wound that he saw.

16          There's a problem.  In 2015, he filed an affidavit in

17    his asylum case, four years ago.  He said he couldn't remember

18    the injuries, but he believes they were relatively minor.  Does

19    a machete cut that goes from your eyebrow under your ear and

09:21AM 20    all the way back to your neck that's potentially deadly sound

21    minor to you?

22          Inconsistency.  He also said that he had been cut with

23    a machete in his leg, his ankle and his thigh.  You also heard

24    that was the first time that he had ever said that, 15 years of

25    Canadian immigration proceedings, and he never once, never once

1    mentioned it.  Inconsistencies.  That lets you know that story

2    is false.

3            Lastly, Common Sense.  Does the witness's testimony

4    make sense to you?  You took an oath when you became jurors to

5    listen to the evidence and follow Judge Saylor's instructions,

6    but that doesn't mean that you leave your common sense at the

7    courthouse doors.

8            When you hear witnesses testify, you can reflect and

9    think does this make sense to me?  Let me give you a final

09:22AM 10   example.  There was a defense witness who came in and testified

11   about how during the genocide, he lived in his dorm, and every

12   morning he would get out, he'd walk with his friends, and they

13   would walk around Butare.

14           Do you remember that witness?  He said they walked to

15   the university, they would walk to the hospital, they would

16   pass roadblocks as if it was just another beautiful spring day.

17           Does that make sense to you?  Does that even seem

18   plausible to you?  There was a massive genocide going on, and

19   he and his friends were just wandering around.

09:23AM 20           Common sense tells you that either he's making that

21   story up or he was a member of the Interahamwe himself.  Common

22   sense tells you that story has problems.

23           Now, through evaluating the credibility of the

24   government 's witnesses and the defense witnesses, you'll know

25   the truth about Mr. Teganya.  You'll know the truth about who

J.A. 1964

1    he is and what he's done.

2         Let me turn to Mr. Teganya's false statements that

3    were made in the asylum application and the immigration

4    hearing, but before I do, I just want to quickly summarize the

5    charges in this case.

6         Now, Judge Saylor is going to give you some detailed

7    instructions about those charges, but I'm just going to quickly

8    summarize them so you understand.

9         Now, Mr. Teganya is charged with both visa fraud and

09:23AM 10    perjury.  Visa fraud, the elements of visa fraud is that the

11    defendant knowingly made a false statement.  It was of a

12    material fact under oath in an immigration form.

13         Now, there's no debate about many of these elements,

14    under oath and immigration form, you know, you've seen the

15    immigration form, it's Exhibit Number 1.

16         Perjury.  Similar to visa fraud, the defendant

17    knowingly made a false statement of a material fact under

18    penalty of perjury subscribed as true.  That last element means

19    that when he was signing it, he was certifying that what he was

09:24AM 20    saying was true.

21         Now, the charges are -- now for each lie that was in

22    the asylum form, the charges, he's been charged with both visa

23    and perjury, and the reason for that is this.  When he signed

24    the form, he did so under penalty of perjury under the laws of

25    the United States.  So the lies that he made were not only a

J.A. 1965

1    case of visa fraud, they were also a case of perjury.

2           As I mentioned, a lot of these elements -- oh, sorry,

3    one last thing.  Count Five charges him with perjury for

4    statements he made in that immigration hearing on

5    September 16th, 2004 before Immigration Judge Steven Day.

6           The elements of this one are slightly different than

7    the written perjury charge, but it's that he took an oath to

8    testify truthfully authorized by law before a competent

9    tribunal, willfully made a false statement about a material

09:25AM 10   matter.

11          Again, there's no dispute that he took an oath to tell

12   the truth, and he took an oath in a competent tribunal before

13   Judge Day.

14          Before I get to that, these are the elements that you

15   need to find in order to find the defendant guilty.  Like I

16   said, a lot of them are not in dispute.  It was a competent

17   tribunal, he took an oath.

18          Material matter.  That's an element for all the

19   charges.  You heard from Meghann Boyle.  She was with the

09:26AM 20   United States Citizen and Immigration Services.  She testified

21   that there is a bar on anyone who -- there's a persecutor bar

22   for anyone trying to get asylum.

23          What that means is that if you participated in the

24   genocide, you are ineligible for asylum.  She talked about the

25   questions that Mr. Teganya lied about.  She talked about the no

**J.A. 1966**

1    answer to whether or not he participated in the genocide.  She

2    told you that if it was a yes, he would have been barred from

3    asylum, so you know that's a material matter.

4         She talked about MRND and how she knew that if you had

5    answered yes, that you were a member of MRND, there would be

6    follow-up questions, there would be an investigation to figure

7    out whether or not you had a role in the genocide.

8         But the heart of this case, what you have to decide

9    more than anything else is whether or not these are false

09:27AM 10    statements.  That's what this case is about, whether or not

11    when he denied he was a member of the MRND, when he denied he

12    participated in the genocide, when he denied seeing atrocities,

13    were those wrong, were those lies.  We would submit to you that

14    the evidence is that they were.

15         As I mentioned, Count One is this one, have you ever

16    or your family members ever belonged to or associated with any

17    authorizations or groups, including political groups, social

18    groups, et cetera?  He writes "Yes," and then he explains that

19    his father was the local president of MRND and that he belonged

09:27AM 20    to the Red Cross Youth Section.  What he leaves out is that he

21    was a member of MRND, as you all well know by now.

22         Judge Saylor will instruct you that if a question

23    calls for a complete answer and you only provide a partial

24    answer, even if that partial answer is true, it's still a false

25    statement.  If you're asked what groups do you belong to, and

1    you belong to the MRND and the Red Cross, and you say Red Cross

2    and you leave out MRND, that's a false statement, that's a

3    false statement because the question asks for each organization

4    that you belong to.

5         Mr. Teganya's answer concealed his participation in

6    the MRND.  That's Count One charged as visa fraud.  That's also

7    Count Two charged as perjury.

8         How do you know this statement is false?  Well, you've

9    heard from these folks, Dr. Anicet Nzabonimpa.  He went to high

09:29AM 10   school with Mr. Teganya.  He went to medical school with

11   Mr. Teganya.  He testified that he saw Mr. Teganya wearing the

12   MRND hat, the MRND scarf and MRND pins.

13        He testified that Mr. Teganya only hung out with Hutus

14   from the north, they didn't have Tutsi friends, and that

15   Mr. Teganya and his friends would make anti-Tutsi statements,

16   that they called Tutsis "Inyenzi" or cock roaches, that when

17   they came back from meetings or rallies, they would harass

18   Tutsi students and other people on campus.

19        Dr. Nzabonimpa told you that he was personally afraid

09:29AM 20   of Mr. Teganya and his friends.  Even though he was a Hutu,

21   there is not a single reason to doubt Dr. Nzabonimpa's

22   testimony, not one.  When the defendant was on the stand, he

23   couldn't even come up with a reason to doubt Dr. Nzabonimpa's

24   testimony.

25        The next witness, Dr. Bernard Kalimba, he was

J.A. 1968

1    Mr. Teganya's roommate, Room 202 in the Linda dorm.  He came in

2    and testified that Mr. Teganya not only wore the clothing, he

3    went to meetings, he went to rallies, he also had an MRND flag

4    in his room.

5         Jerome Arusha, he lived in Room 208.  He was friends

6    with Mr. Kalimba.  He would come visit Mr. Kalimba.  He

7    testified as well that he saw Mr. Teganya wearing these

8    clothes, going to meetings, going to rallies.

9         The testimony of these three witnesses was consistent

09:30AM 10   with one another.  The testimony of these three witnesses

11   corroborated one another.  That's how you know it's true.

12        But there's more.  Because you also heard from him,

13   Innocent Habimana.  You probably remember Mr. Habimana.  He was

14   the member of MRND and the Interahamwe member.  He's the one

15   who talked to you about the clothing and he talked to you about

16   the club.  He's the one that told you that he was trained to

17   kill and that he, in fact, did kill.  He told you about how he

18   killed six Tutsis during the genocide.

19        He showed you this scarf, and he talked to you about

09:31AM 20   the symbols.  He talked to you about the pickaxe and the scythe

21   and what they meant.

22        He showed you how it was worn across the chest.  He

23   also talked to you about the hat and the flaps and how he would

24   wear the flaps down so nobody could recognize him when they

25   were out assaulting people.  He told you all of these things.

**J.A. 1969**

1    It was clear he knew what he was talking about.  Did you doubt

2    him for a second?  Of course not.

3         And he told you that Mr. Teganya wore those clothes.

4    He told you that Mr. Teganya was an MRND leader in the medical

5    school.  He told you that he trained with Mr. Teganya.  He told

6    you that he killed with Mr. Teganya.

7         Mr. Habimana's testimony corroborates the testimony of

8    Dr. Nzabonimpa, Dr. Kalimba and Mr. Arusha.  Mr. Habimana has

9    nothing to do with these three men.  You have two doctors and a

09:32AM 10   businessman living in Kigali.  Mr. Habimana is a maintenance

11   man, a part-time worker at a hotel and a farmer.  He lives in

12   Butare.  They don't run in the same social circles.  They're

13   not friends, but their testimony is consistent.  Their

14   testimony is corroborating each other.  That's how you know

15   it's true, and that's how you know that Mr. Teganya is guilty

16   of Counts One and Count Two.

17        Let me move on.  Counts Three and Four charge the

18   defendant with this question, have you ever ordered, incited,

19   assisted, or otherwise participated in causing harm or

09:33AM 20   suffering to any person because of their race, or ethnic social

21   group?  This was a flat denial, no, no.

22        This question is the basis of Counts Three and

23   Count Four, Count Three for visa fraud, Count Four for perjury.

24        How do you know that this answer was false?  You heard

25   from this man, Jean Pierre Gasasira.  Do you remember him?  He

1    was the 17-year-old Tutsi boy back in 1994.  He came in and

2    testified.  He began his testimony by telling the story about

3    him and his dad trying to get back to their home.  They were

4    approaching a roadblock, and his dad told him to turn around

5    and go back to the city, that they weren't going to make it

6    through the roadblock, and that's what he did.

7         Do you remember the fear in his face, the quivering in

8    his voice when he told you about how he had seen his dad for

9    the final time walking towards that roadblock?

09:34AM 10        From there, he went to the hospital.  He told you that

11   he pretended to be a homeless boy helping a Hutu soldier.  He

12   went to the hospital, and he stayed there during the period of

13   the genocide.

14        During that time, you saw this man,

15   Jean Claude Karekezi.  He called him Dr. Karekezi at the

16   hospital.  He knew Dr. Karekezi because Karekezi had won a

17   bicycling competition in his village, and he said he saw

18   Dr. Karekezi at the hospital.

19        What do we know happened next?  Mr. Gasasira told you

09:35AM 20   that he saw Mr., sorry, he saw Dr. Karekezi afraid, scared,

21   that Dr. Karekezi told another doctor that he was running for

22   his life, that Mr. Teganya was coming for him, that Mr. Teganya

23   was hunting him down, and that's what happened.

24        Jean Pierre Gasasira told you that Mr. Teganya found

25   Dr. Karekezi, they found Dr. Karekezi, and they killed him.  He

## J.A. 1971

1    showed you where.  This is the spot where they took

2    Dr. Karekezi, and they clubbed him to death.

3          Was there anything about that story that didn't ring

4    true to you?  There was a massive genocide going on at that

5    hospital.  Dr. Karekezi was Tutsi, he was hiding for his life,

6    and then he was killed on the hospital grounds by Mr. Teganya.

7          Not only that, Mr. Gasasira actually stood up and

8    identified him.  Do you remember that?  He told you what

9    Mr. Teganya looked like.  He told you that Mr. Teganya had a

09:37AM 10   gap in his teeth, he told you that he was sitting here in this

11   courtroom.  He described what he looked like, he described

12   where he was sitting, and then he told you exactly where he

13   was.

14         Then the way he ended his testimony, he stood there,

15   and he said, "And he's looking at me," "And he's looking at

16   me."  It was chilling.  It was fear of a 17 year-old boy who

17   had just witnessed a murder.  It was the fear of a 17 year-old

18   boy who's confronting the murderer for the first time,

19   Jean Leonard Teganya.

09:37AM 20         That wasn't the only murder he told you about.  He

21   told you about these two men, Nyangezi Protais and

22   Mathias Gasarabwe.  He told you that Mr. Protais was actually a

23   friend of his dad's, that he worked in the lab, that he was a

24   Tutsi, that he was hiding in the hospital, and he told you that

25   Mr. Teganya and his friends found him, they dragged him out,

1  they were beating him, they were kicking him, and he was

2  pleading, he was pleading with them.  He said he had a wife, he

3  said he had kids, he said don't do this.

4      And Mr. Gasasira told you what Mr. Teganya said in

5  response.  Mr. Gasasira told you that Mr. Teganya responded to

6  those pleas by saying, "You're a Tutsi," then he took him and

7  he killed him.

8      Mathias Gasarabwe, he was a patient at the hospital.

9  He was older.  He was in a hospital bed.  Mr. Gasasira told you

09:38AM 10  that he saw them dragged out, that they were kicking him, they

11  were pushing him, that they were beating him, and then

12  Mr. Teganya killed him with a single blow.

13      This testimony from Mr. Gasasira, it was powerful.  It

14  was emotional.  You could see it in his face.  You could see

15  the emotional welling up when he talked.  Do you have any

16  reason to doubt him?  None.

17      He was a 17 year-old boy living in that hospital, and

18  he was witnessing some of the worst horrors imaginable, horrors

19  perpetrated by Mr. Teganya, but that wasn't it.  He also told

09:39AM 20  you that Mr. Teganya came and told the soldiers that he knew

21  where Tutsi women were hiding.  "Mr. Teganya came, and he told

22  us Tutsi soldiers, Tutsi women were to be found to be raped."

23      Do you remember what he said?  Here's a copy of the

24  transcript portion.  Now, I'll remind you that your memory

25  controls, and this is only here to help you, but what you

**J.A. 1973**

1    remember is what's important.

2         But this is what Mr. Gasasira said Mr. Teganya said:

3    "Come.  I will show you where they are.  Help yourself."  Help

4    yourself.

5         The soldiers responded, "Well, what about you?  Aren't

6    you going to rape these women, too?"  Mr. Gasasira told you

7    what Mr. Teganya's response was.  Mr. Teganya responded, "I

8    started that when the genocide started.  I have raped them and

9    had them enough."

09:40AM 10    Mr. Gasasira told you that he was very proud to say

11   that.  In case there was any doubt, he identified the speaker

12   as Mr. Teganya.

13        Mr. Gasasira's testimony is one of unimaginable

14   horror.  It doesn't even sound like it's from this planet,

15   people hiding for their lives, people getting killed by axes,

16   women being raped as sport for the soldiers who were there.

17        There is no reason to doubt his testimony, but there's

18   more because his testimony is consistent with the testimony of

19   her, Consolee Mukeshimana.

09:41AM 20    Do you remember her?  She was the woman who came into

21   this courtroom and told you her story, her genocide story.  She

22   told you before we even get to the hospital, she told you about

23   her ordeal in getting there, about how she hid among a pile of

24   dead bodies pretending to be one of the dead bodies so the

25   Interahamwe wouldn't find her.

**J.A. 1974**

1    She told you about how she dodged roadblocks and how

2    she made it to the hospital, and when she got there, she found

3    her cousin, Veneranda.  They hid in the surgical ward until the

4    soldiers needed that ward, and then they cleared them out.

5    They were taken out of that ward and moved to the

6    dermatology building, and she told you that Mr. Teganya was

7    with the soldiers and the Interahamwe who came to move them.

8    She recognized him because she had been at that hospital

9    earlier with her one year-old, Samuel.  She had been there

09:42AM 10    before the genocide in March, and she had met Mr. Teganya.

11    The soldiers, the Interahamwe members and Mr. Teganya

12    took her to the dermatology building.  She showed you where,

13    here, and she told you that inside that dermatology building,

14    there were Tutsis hiding for their lives.  She told you that

15    there were Tutsis hiding for their lives and there were Tutsis

16    who were injured.

17    You know what was not going on there?  Dermatology

18    procedures.  Do you remember when Mr. Teganya took the stand,

19    he said he never went into dermatology because he wasn't

09:43AM 20    trained in dermatology procedures.  They weren't fixing acne in

21    this building, they were hiding for their lives.  They were

22    scared.

23    Ms. Mukeshimana told you she saw Mr. Teganya each and

24    every day coming in with soldiers, with Interahamwe members.

25    She told you they would go through, and they would pick out

1    Tutsis, and they would take them to be killed.

2         She told you that she could hear the cries of the

3    Tutsis as they were being taken to be killed.  Do you remember

4    what she said?  She said this:  "We would hear the screams when

5    they were killing them.  They would be crying, they would be

6    pleading, why are you killing us?  What did we do wrong?"

7         She was in the dermatology building.  She could hear

8    Tutsis being killed.  "Why are you killing us?  What did we do

9    wrong?"

09:44AM 10         Mr. Teganya told you that he walked by that building

11   every single day twice a day.  He showed you the path he took

12   from the Kiza dormitory, past dermatology, past maternity, past

13   the killing site.  "Why are you killing us?  What did we do

14   wrong?"

15         Ms. Mukeshimana also told you about her cousin,

16   Veneranda.  She told you that Mr. Teganya and the Interahamwe

17   members would come and take women to be raped, and they took

18   Veneranda.

19         She told you that she watched as Mr. Teganya grabbed

09:45AM 20   Veneranda and took her to a different part of the dermatology

21   building.  She told you that they had been gone for about 20

22   minutes, and then Veneranda returned.  She had a bruise on her

23   face, her dress was ripped, and she was sobbing, and Veneranda

24   told you, sorry, Ms. Mukeshimana told you that Veneranda told

25   her that Mr. Teganya had raped her.

**J.A. 1976**

1        It wasn't the first time, and it wasn't the last.

2   Mr. Teganya came for Veneranda again and again, and do you

3   remember what Ms. Mukeshimana told you about that third time,

4   that third time when he came for Veneranda?

5        Veneranda had decided that this was going to be the

6   end, that she didn't want to live this horror anymore, and she

7   told Ms. Mukeshimana, "I'm going to tell him to kill me."

8        This is what she said:  She started saying goodbye to

9   me and say, "This time, I will tell him to kill me, we will

09:46AM 10  meet in heaven."  That last time, did she come back?  She never

11  came back.

12       "This time, I will tell him to kill me.  We will meet

13  in heaven."

14       The story doesn't end there.  As you heard from

15  Ms. Mukeshimana that after Veneranda disappeared, Mr. Teganya

16  came for her.  She told you that she was six months pregnant

17  hiding in that dermatology building, and Mr. Teganya came for

18  her.

19       And when he did, when he did, he took her to that same

09:47AM 20  wretched place in the dermatology building, he beat her, he

21  raped her, and then he returned her to the dermatology

22  building, but that wasn't the only time because you heard from

23  Ms. Mukeshimana that Mr. Teganya came back for her.

24       He came back a second time to rape this woman, he came

25  back a second time to rape a six-month pregnant woman, and

**J.A. 1977**

1  after that second time, he threw her to the Interahamwe to be

2  killed.  They were passing by, and he took her and he threw her

3  to them, and he said, "Take her to be killed."

4         She told you that she had some money bundled up in her

5  pocket, and she threw it on the ground, and she used that as a

6  mullet to escape.  A soldier started to come after her but then

7  basically gave up and told her, "Go and die somewhere else."

8  "Go and die somewhere else."

9         Ms. Mukeshimana's testimony, it's hard to hear.  It's

09:48AM 10  even harder to retell, but do you have any doubt that it's

11  true?  It's horrible.  It's awful.  You saw her on that stand.

12  You saw the emotion, the pain as she told that story.  You saw

13  her tears.  She reached for a Kleenex.

14         Do you have any doubt that what she was telling you

15  actually happened?  Do you have any doubt it was 100 percent

16  true?  Do you have any doubt that this man tormented her?

17         But there's still more because you heard from this

18  woman, Esperance Mukamurenzi.  She was the older woman, and she

19  told you about how she was hiding in the maternity ward, but

09:49AM 20  before you even get there, she told you how she got there,

21  about how her house was burned down, how she went with her

22  husband and her six kids to the government building to hide

23  because that's what they were told to do, and she told you that

24  the Tutsis were attacked there.

25         She lost her husband, she lost her kids, she made it

1   into a car with her brother and her seven year-old nephew to

2   get to the hospital.

3           And as the car went, got stopped at a roadblock, and

4   while they were at the roadblock, she saw her brother killed to

5   death in front of her.  She saw that they used an axe, and she

6   told you that they used an axe, and they told her that they

7   didn't want to waste a bullet, that he wasn't even worth the

8   bullet, and they let her and her injured seven year-old nephew

9   go to the hospital.

09:50AM 10       The seven year-old died.  He didn't make it, but

11   Ms. Mukamurenzi did, and she told you that she hid in the

12   maternity building because she couldn't leave the hospital.

13   She was scared for her life to leave.  She was scared for her

14   life to stay.

15           And she told you that while she was there hiding in

16   that maternity building, she saw the defendant, Mr. Teganya,

17   that he would come through with soldiers, with Interahamwe.

18   They were coming and looking for Tutsis, they were coming and

19   taking Tutsis to be killed.  She described them.  She described

09:51AM 20   what he looked like.  She said he had a gap in his teeth, just

21   like Mr. Gasasira said.

22           Do you remember what she called it?  She called it

23   Teganya's Army, Teganya's Army would come through and take

24   people, and they would talk about it.  They would say to each

25   other, Teganya's Army is coming, and they would hide, but it

1    wasn't just people to be killed.  They took women to be raped.

2         Esperance Mukamurenzi told you that Teganya's Army

3    came for her, that they took her, they took her to that kitchen

4    area in the hospital, and they raped her.

5         It happened more than once.  She testified that it

6    wasn't even the same person, "Whoever will take me today is not

7    the same person who will take me tomorrow."  Teganya's group

8    came for her.

9         You may remember Ms. Mukamurenzi.  You could see the

09:52AM 10   pain etched in her face when she told this story.  You could

11   see the tears when she talked about what happened.

12        Mr. Gasasira, Ms. Mukeshimana, Ms. Mukamurenzi, their

13   stories corroborate one another, are consistent with one

14   another.  Common sense tells you they're true.  Their stories

15   interlock together.

16        They talk about Mr. Teganya coming through with

17   soldiers and Interahamwe members, taking patients to be killed,

18   taking women to be raped.  Their stories fit together.  That's

19   how you know they're true.

09:53AM 20   Esperance Mukamurenzi told you that she even saw a

21   pregnant woman at the hospital.  She saw Consolee Mukeshimana.

22   That's how you know the stories are true, and that's how you

23   know the defendant lied.  That's how you know the defendant is

24   guilty of Counts Three and Four, but there's still more because

25   you also heard from these witnesses, Dr. Rony Zachariah,

**J.A. 1980**

1    Isabelle Mukankusi, and Assumpta Numukobwa.  They also told you

2    what happened at the hospital.  Their stories are consistent

3    and corroborate the powerful, emotional stories, Mr. Gasasira,

4    Ms. Mukamurenzi and Ms. Mukeshimana.

5         Dr. Rony Zachariah was our second witness, the doctor

6    from Doctors Without Borders.  He told you about the work they

7    were doing at that hospital.  He told you about the tents that

8    they had set up for refugees, and he told you he knew there was

9    a genocide going on when he showed up to work and 40 children

09:54AM 10   were missing, 40 children were missing, 40 children were

11   missing.

12        He told you about how he came on August 23rd, and

13   there were dump trucks, and they were looting the bodies up 40

14   to 50 Tutsi patients in the building to be taken away.

15        He said in total, Doctors Without Borders estimated

16   that about 150 patients had been killed in two days.  Doctors

17   Without Borders, their job is to go to war zones.  He told you

18   about how he had been all over the world in war zones, but on

19   April 23rd, 1994, Doctors Without Borders left because being at

09:55AM 20   that hospital in Butare on April 23rd, 1994, Doctors Without

21   Borders told you that it was too dangerous.  Doctors Without

22   Borders told you it was too dangerous to be there.

23        Mr. Teganya told you it was another day at work.

24   Dr. Zachariah's story doesn't stand alone, it is corroborated.

25   It is consistent with Isabelle Mukankusi.  She's the women I

**J.A. 1981**

 1   told about you earlier, the woman with the machete wounds.  She

 2   stood up and showed you where on her head had been cut, and she

 3   told you about how she was taken from the dermatology building,

 4   the same building that Consolee Mukeshimana was in.

 5        She told you how she was taken to the body pit.  Where

 6   was that body pit?  Behind the maternity building.  Here, she

 7   told you.  This is the same location where

 8   Esperance Mukamurenzi told you there were bodies strewn about

 9   being eaten by dogs.

09:56AM 10        Isabelle Mukankusi took you to that body site, and she

11   told you that she was taken there with a pastor, his wife, and

12   their two kids, a three-year old and a seven year-old.

13        Do you remember that story?  Ms. Mukankusi told you

14   that the Interahamwe members and the soldiers killed the

15   pastor, the wife, and those two kids.

16        She told you that the wife pleaded, "Please, can I

17   just have one of my two kids?"  Can you imagine that?  The

18   three-year old or the seven-year old, can I just have one of

19   them?  Both were killed.

09:57AM 20        She imagined to escape, but her story rings true.  You

21   know it's true because it is consistent, because it is

22   corroborated.

23        Assumpta Numukobwa, the same way, she told you about

24   how she was hiding in the laundry in the maternity building,

25   how she was scared for her life, how she was worried the

**J.A. 1982**

1    soldiers were going to come and take her.

2         All of these stories corroborate and are consistent

3    with the stories that you've heard from Mr. Gasasira,

4    Ms. Mukeshimana and Ms. Mukamurenzi, and taken together, they

5    provide overwhelming evidence that when the defendant said in

6    that statement that he didn't participate in the genocide,

7    those were wrong, but there's still more.

8         Innocent Habimana.  He was the member of MRND, an

9    Interahamwe member that I discussed earlier.  He explained that

09:58AM 10   in those MRND meetings, there was discussion about Tutsis, that

11   he was talked -- they told him about how the RPF was attacking

12   from abroad and how the Tutsis inside the country were

13   collaborators.

14        He told you that Mr. Teganya was at those meetings.

15   He told you that they were trained in those meetings and in

16   those training sessions to become killers.

17        He told you that is how the MRND wanted it.  They

18   called Tutsis "Inyenzi" or cock roaches.  They trained twice a

19   week in the gym and in the jungle, in the forest between two

09:59AM 20   hills.  They trained with weapons like this, the ubihiri.  He

21   showed you how to use it.  He came and stood basically where I

22   am.  He told you he was trained on where to hit somebody with

23   it, to kill somebody with it.  He explained it to him.  He said

24   the best place to strike the person is here, the temple.  It's

25   also the back of the neck and, here, the back of the head.

**J.A. 1983**

1    He explained it like this.  If you touch here, you'll

2   hear a pulse, so when you hit here, it's like you're hitting

3   the heart directly.

4    On the back, at the neck is also will kill you

5   instantly, and when I come from the back to hit right here

6   because the neck and the lower lobe of the lower brain are

7   connected.

8    This was not a hobby.  This was not something that

9   this maintenance man learned on his own, he was trained to

10:00AM 10   kill.  Do you have any doubt about that whatsoever?  You saw

11   him.  He demonstrated for you how he would do it, and he told

12   you that Mr. Teganya was his brother in arms.

13    He described what it was like.  He said this:  When we

14   will find a Tutsi that we want to kill, we will surround him,

15   and the person who will be quicker or faster, like me, I will

16   approach, and I will push the individual, and then I'll push,

17   and I'll say, "You, Cockroach," then I'll hit him in the leg,

18   and if he doesn't fall, and if he protects himself, another

19   person on the other side will hit him on the temple, and then

10:01AM 20   the one who comes from the back will hit the back, like I

21   demonstrated earlier, and the person will fall down, and we

22   will hit him on all part of the body until that individual is

23   completely dead.

24    Do you have any doubt at all Mr. Habimana knows what

25   he's talking about?  He's a trained killer.  He is somebody who

**J.A. 1984**

1    is admitted to killing six Tutsis.  Do you have any doubt about

2    that?  His testimony was horrifying, but it was true, and he

3    told you that he killed with the defendant, Mr. Teganya.

4         He told you he was walking by the Kiza dorm and he was

5    flagged down by Mr. Teganya.  Mr. Teganya had found four Tutsi

6    students hiding in the Kiza dorm, called him "Inyenzi,"

7    Cockroaches.

8         Mr. Teganya brought them out, wanted to turn them over

9    to Habimana and his group.  Do you remember what Mr. Habimana

10:02AM 10 said?  "No, we're all Interahamwe.  You take two, I'll take

11   two."  That's what happened, and they walked behind the Kiza

12   dorm.  They walked behind the Kiza dorm to that field, that

13   field that Isabelle Mukankusi showed you, that field that

14   Esperance told you about, that same killing field.

15        I asked if the four Tutsis said anything while they

16   were being walked to their death?  Mr. Habimana said, "No, they

17   were like sheep that are taken to be killed," to be butchered.

18   These four medical students, these four Tutsi medical students

19   were silent as they were walked to their death right here.

10:03AM 20       This is the location that Mr. Habimana said that he

21   killed two and Mr. Teganya and his group killed the other two

22   behind the maternity ward in the field, steps from the Kiza

23   dorm, the Kiza dorm where Mr. Teganya was living going about

24   his day each and every day.

25        All of this evidence, Jean Pierre Gasasira,

**J.A. 1985**

1   Consolee Mukeshimana, Esperance Mukamurenzi,

2   Isabelle Mukankusi, Assumpta Numukobwa, Dr. Rony Zachariah,

3   Innocent Habimana, all of this evidence corroborated

4   consistently.  That's how you know, that's how you can be

5   confident that this answer, this answer is false, this answer

6   is false.  That's how you know.

7          The fifth and final count charges the defendant with

8   perjury for the testimony that he gave before Judge Steven Day

9   on September 16th, 2014.  You've seen and heard that

10  Mr. Teganya was sworn in.  He was sworn in, he was given an

11  oath to tell the truth, just like the oath he took when he sat

12  before you and testified.

13         Mr. Teganya took that oath, he was asked questions,

14  and he answered them, and he denied that he was a member of

15  MRND.  He said that was my father's party, that's not me.

16         Then he also said this:

17         (Audio was played as follows:

18  Q.   Did you see any atrocities occur?

19  A.   No.

20  Q.   Then why did you testify what you did in front of the

21  Canadian Court that there were people there who sowed terror?

22  A.   Sewed terror -- for me, sowed terror, they are -- I -- I

23  can explain, I can explain the situation.

24         There was victims coming to the hospital looking for

25  care.  They were some paramilitary groups and militia just

1 | coming to the same hospital.

2 | So, these victims were afraid of the Interahamwe

3 | people.  That's what I was trying to say.

4 | Q.  Were you aware there was a genocide occurring at the

5 | hospital?

6 | A.  No.  Just afterward.)

7 | MR. VARGHESE:  Were you aware there was a genocide

8 | occurring at the hospital?  No.  No.  That was his testimony

9 | under oath.  He had committed that genocide at the hospital.

10:06AM 10 | He had raped Consolee Mukeshimana.  He had taken patients out

11 | to be killed.  He had committed the atrocities that he had

12 | claimed that he had never seen.

13 | All of the evidence that I outlined before, all of

14 | that evidence lets you know that these statements are not true.

15 | They are false.  All of the evidence I told you, all of the

16 | witnesses who came in and showed you, you know, you can be

17 | confident that these answers are not true, but there's more.

18 | MR. WATKINS:  Objection, your Honor.

19 | THE COURT:  Overruled.

10:06AM 20 | MR. VARGHESE:  Your common sense tells you.

21 | This is the map that Mr. Teganya used to show you the

22 | path he took.  He told you it's undisputed he was living at the

23 | Kiza dorm.  He told you that each and every day, he woke up and

24 | walked to the emergency room.  The path took you by the

25 | maternity building, the dermatology building, through the

1  hallways, up here past the tents where the refugees and Tutsis

2  were hiding and in here, to the emergency room.

3       He claimed that he never heard the screams, he never

4  heard people being killed right outside his dorm in that field

5  that had more bodies than people in this courtroom, that dogs

6  were eating the dead bodies, and he's saying he had no idea.

7       He walked right past the maternity building where

8  Esperance Mukamurenzi was hiding, where Assumpta Numukobwa was

9  hiding.  He walked right past dermatology where

10:07AM 10  Consolee Mukeshimana and Isabelle Mukankusi were.  He walked

11  past here, the tents where the nurses, Nadine, Alex,

12  Jean Marie, Sabene were killed, and he wants you to believe it

13  was just another day at work.  It was just another day at the

14  office, every single day getting up, going to the hospital.

15  Common sense tells you that can't possibly be true.

16       What about the defense?  What's their arguments?

17  Well, there's been a lot of them in this case because they want

18  you to believe that none of this happened, that all these

19  people are making up these stories.  Their first argument

10:09AM 20  seemed to be that the government of Rwanda was conspiring

21  against Mr. Teganya.

22       Well, you know that's not true.  You've heard from the

23  witnesses.  Every single one of the government witnesses said

24  they were not forced or coerced to testify.  Every single one

25  of the government witnesses came in here and told you they are

**J.A. 1988**

1    not afraid to go back to Rwanda after their testimony, but

2    there's more because the defense witnesses from Rwanda told you

3    the exact same thing.  They brought in witnesses from Rwanda

4    and told you I'm not afraid to go back.

5         You also heard from the defense's expert,

6    Dr. Noel Twagiramunga.  He was asked specifically is it your

7    thesis that people in Rwanda cannot testify truthfully against

8    genocide suspects?  He said that's not my point.  There is

9    absolutely no evidence that the government of Rwanda is

10   conspiring against Mr. Teganya.

11        What's the next theory?  Witness fees, travel costs.

12   You heard this one a lot.  Do you remember they grilled

13   Mr. Gasasira about how many chickens he owns?  You probably

14   never thought you'd learn the going price of a rooster in

15   Butare.  There is absolutely no evidence of this.

16        Special Agent Andersen told you that when the

17   investigators went to Rwanda and asked them about their

18   stories, nobody mentioned coming to the United States.  Nobody

19   mentioned witness fees.  Nobody told them you can have dinner

20   at Chipotle.  It was only after the stories were told, only

21   after the evidence was brought out that arrangements were made

22   to bring them to the United States.  There is absolutely no

23   evidence that any money affected testimony.

24        By the way, this is the exact same thing the defense

25   witnesses got.  The defense witnesses were flown here, the

**J.A. 1989**

1    defense witnesses got meals taken care of, the defense

2    witnesses were housed at the exact same hotel as the government

3    witnesses were, so what's the evidence this affected anybody's

4    testimony?

5         What about this?  The freshman year grudge theory.

6    You heard this one.  This was the theory that Dr. Kalimba and

7    Mr. Teganya didn't get along with each other because in 1991

8    they didn't like each other very much.  He was the one who

9    wanted to study, there's goes Dr. Kalimba again off to have

10:11AM 10   another beer, and so 28 years later, Dr. Kalimba gets on a

11   plane, travels across the world to testify about how he saw

12   Mr. Teganya wearing a hat and scarf.

13        Does that even seem remotely plausible to you?  Can

14   you even remember who your freshman year roommate is?  And yet

15   he would like you to believe that that grudge 28 years later is

16   why Dr. Kalimba and Mr. Arusha came to tell you their stories.

17        Think about it for a second.  If they were really

18   conspiring against Mr. Teganya, why are they talking about a

19   hat and a scarf?  Why aren't they telling you that they saw

10:11AM 20   Mr. Teganya with the ubihiri?  Why aren't they telling you that

21   Mr. Teganya actually killed somebody?  Because if you're really

22   going to try to jam somebody up, wouldn't you make it more than

23   just a hat and a scarf?  Your common sense tells you that the

24   freshman year grudge theory is nonsense.

25        Inconsistent statements.  The defense spent a lot of

**J.A. 1990**

1    time talking to you about, oh, well, what about those initial

2    reports?  Special Agent Andersen told you that witnesses were

3    talked to in Rwanda, 35, 45-minute interviews, and reports were

4    written, and they told you that these were not exhaustive

5    reports trying to document everything that happened in their

6    genocide story, it was a quick hit to determine whether or not

7    these are relevant witnesses or whether or not we want to

8    follow up with them.

9         The defense seized on it, and they said, ah-huh, the

10:12AM 10   stories are different, they must be lying.  Well, you know

11   that's not true.

12        I'll give you an example.  Mr. Gasasira with his

13   initial interview with U.S. investigators talked about how he

14   witnessed Mr. Teganya kill Dr. Karekezi and Nyangezi Protais,

15   and Mathias Gasarabwe, the same three people that he testified

16   from this stand that he saw Mr. Teganya kill, but in his

17   initial interview, either he said or the translation said that

18   he didn't actually see Mr. Gasarabwe killed.

19        When he was here, he explained what he meant.  He

10:13AM 20   actually said no, I did see Mr. Gasarabwe killed, I didn't see

21   Mr. Protais killed, Nyangezi killed, and he explained what he

22   meant.  He said Mr. Nyangezi was a family friend, "I didn't

23   want to watch him die, so I turned away."  That was his

24   testimony.  He said, "I turned away because I didn't want to

25   watch my family friend be killed."  That's the inconsistency

1   they're trying to harp on to say, oh, wait a second, he must be

2   lying.  Common sense tells you that's not true.  Mr. Gasasira's

3   testimony was entirely credible, was entirely reliable.  You

4   saw him.  You witnessed him.

5        The next theory, the defense witnesses.  They brought

6   in a parade of witnesses to talk to you.  There were a lot of

7   them.  There were witnesses who came on that stand and who

8   waved to Mr. Teganya.  There were witnesses who said they loved

9   Mr. Teganya.  There were witnesses who came in here with all

10  sorts of stories, that MRND actually got along great with the

11  Tutsis.

12       Those clothes, that's not even MRND, I think that

13  might be CDR.  There were people who just were confused.  They

14  say that they ate lunch with him every single day at the

15  cafeteria, and there were people who said I had lunch with him

16  every single day at his house.

17       The witnesses' stories were all over the place.  There

18  were witnesses who came in here and told you they got here with

19  a fake passport.  There were witnesses who came in here and

20  said, yeah, my U.S. visa application, I left out the fact that

21  I was arrested for genocide crimes.  Two witnesses actually

22  said that.

23       And then there was Eric Nshimiye.  Do you remember

24  Eric Nshimiye?  He's the defendant's best friend.

25  Eric Nshimiye lives in Ohio.  Eric Nshimiye admitted on the

**J.A. 1992**

1  stand that he lied in his asylum application to get to the

2  United States, the very same crime that Mr. Teganya is charged

3  with.  It's incredible.

4       Eric Nshimiye told you in his asylum application that

5  his father was killed in the genocide, and you learned that his

6  father, in fact, died 20 years earlier.  A lie on an asylum

7  application, exactly what this case is about.

8       The last defense theory, the defendant himself.  He

9  took the stand, and he told you his story.  What did he say?

10:15AM 10  He said he used a fake Zimbabwean passport to get to Canada,

11  that a Court in Canada ordered him to be removed, and he

12  ignored it, then he hid from Canadian authorities for two years

13  then he traveled 450 miles to a remote part of Maine to walk

14  across the border.

15       He told you he knew all of these things were wrong.

16  He told you that all of these things were illegal, but he was

17  willing to do it because in his mind, in his mind, the ends

18  justified the illegal means.

19       He was willing to do all of these things that were

10:16AM 20  illegal.  He was willing to take on a fake identity.  He was

21  willing to do all of these things, and yet now he wants you to

22  believe, oh, no, no, no, I told the truth in my asylum

23  application.

24       Why would he would have told the truth in his asylum

25  application?  He wants you to believe, oh, yeah, yeah, yeah, I

**J.A. 1993**

1    can be somebody else, I can hide from authorities for two

2    years, I can cross illegally into the country, but when

3    Judge Day gave me an oath to tell the truth, I told the truth.

4         Does that even seem remotely plausible to you?  Does

5    that sound consistent?  Is there anything that corroborates

6    that?  Your common sense tells you that that theory doesn't

7    hold any water, so there you are.  That's the defense's

8    theories.

9         And at the end of the trial, after all the witnesses

10:17AM 10   have testified, after all the exhibits have been entered and

11   admitted, you now know the truth.  You know the truth of what

12   happened at that hospital in Butare in 1994.  You know what the

13   defendant, Mr. Teganya, was doing.  He wasn't going every day

14   as a caregiver taking care of people.  He was a tormenter, he

15   was a perpetrator of the genocide, he was a murderer, he was a

16   rapist.

17        And you know this not because I say so but because the

18   evidence says so.  You've heard this.  You know this because

19   the witnesses have said so, witnesses like

10:18AM 20   Dr. Anicet Nzabonimpa, Dr. Bernard Kalimba, Jerome Arusha,

21   Jean Pierre Gasasira, Consolee Mukeshimana,

22   Esperance Mukamurenzi, Dr. Rony Zachariah, Isabelle Mukankusi,

23   Assumpta Numukobwa, Innocent Habimana, genocide survivors, a

24   Hutu killer, doctors, farmers, a Doctors Without Border hero,

25   all of these people, their stories interconnected, consistent,

1  corroborated.  They know the truth about what happened, and

2  they came and told you their stories.  Now you know, you know

3  their stories, you know the truth.

4  　　　The asylum laws in this country are meant to help

5  people.  There are people all over the world who need help, who

6  are being tortured, who are being persecuted.  People come to

7  this country from all over the world under our asylum laws

8  because they're scared, because they have no way out, people

9  like Consolee Mukeshimana, Isabelle Mukankusi.

10:19AM 10  　　　These are people that the asylum laws were made for,

11  not the defendant.  He tried to take advantage of that.  When

12  asylumees get here, we open our doors to them, we welcome them,

13  we protect them.  That's what the laws are for.

14  　　　The defendant, the tormenter, the genocidaire, he

15  tried to take advantage of those laws.  For 25 years, he has

16  been on the run from the truth of what he did, for 25 years.

17  That run stops now with you.

18  　　　You know the evidence.  You've heard it.  You've seen

19  it.  It's time that he's held accountable.  He is guilty of

10:20AM 20  each and every count in the indictment.  Thank you.

21  　　　THE COURT:  All right.  Thank you, Mr. Varghese.  I

22  think we'll take a break.  Do you want to be heard at sidebar?

23  　　　All right.  We'll take a break, and I'll see counsel

24  at sidebar.

25  　　　THE CLERK:  All rise.

**J.A. 1995**

1        (JURORS EXITED THE COURTROOM.)

2        (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

3        MR. WATKINS:  As far as the specific objection I made

4    earlier on, Mr. Varghese cited the statement that Mr. Teganya

5    only knew the genocide afterward as a lie.  That's clearly not

6    charged.  It's not one of the three very specific that those

7    two lies make him guilty of Count Five.  That's incorrect.

8        THE COURT:  Okay.  I'm going to overrule that.  I

9    think -- well, I'll overrule it.

10:22AM 10        MR. WATKINS:  Just to be clear, he asserted that the

11    jury can find his denial that the genocide was occurring wasn't

12    even a denial.  That is a statement that he only learned of the

13    genocide afterward as false was capable of satisfying

14    Count Five, and that's clearly not there.  It's not one of the

15    cited statements, and it's clearly incorrect.

16        THE COURT:  I think in context I think it is clear to

17    the jury and will be clearer after my instructions as to the

18    specific statements, including did you see atrocities

19    occurring, for example, that I think that that's fair argument,

10:22AM 20    and I'll overrule it, okay.

21        MR. WATKINS:  At the end of the argument, I did not

22    object immediately, but I will hear Mr. Varghese talked about

23    the reasons for the asylum laws.

24        THE COURT:  Yes.

25        MR. WATKINS:  I think that's inappropriate to bring up

1   as a part of a summation that we've heard nothing about that.

2   It's simply inappropriate argument, particularly where he cited

3   two of the witnesses who never applied for asylum here,

4   never -- there was absolutely no evidence that they applied for

5   asylum.

6          THE COURT:  Is there a curative instruction you want

7   ne to give?

8          MR. WATKINS:  It was improper argument, it's improper

9   to talk about the reasons for the asylum laws.  That's not

10:23AM 10  something that the jury is to consider.

11         THE COURT:  Yes, Mr. Varghese.

12         MR. VARGHESE:  Well, Meghann Boyle did testify about

13  why there's asylum laws in the United States.

14         THE COURT:  I think that's right.  I'm prepared to

15  remind the jury, I guess, you know, something to the effect

16  that just to remind them the case is not about the purpose of

17  the asylum laws, it's a very specific case against one person

18  with five very specific charges, and that should remain the

19  focus of their inquiry, and I'm prepared to do that.

10:24AM 20         Okay.  Anything else?

21         MR. WATKINS:  Just that, as the Court knows, that

22  clocked in at about an hour ten or an hour, fifteen.

23         THE COURT:  I had an hour, twelve.

24         MR. VARGHESE:  Sorry, sorry.

25         THE COURT:  Well, it's --

1          MR. WATKINS:  There's no throat clearing either.

2          THE COURT:  I was contemplating it, and I kept

3     thinking it was about to end, but Mr. Lauer can have an hour

4     and twelve minutes, and because the defense theories were

5     addressed again, rebuttal is not a second bite at the apple,

6     it's things that were raised or require a specific response.

7          You know, at least in the abstract, in my mind, it

8     ought to be on the order of about ten minutes, but we'll see

9     what the defense argument is like, okay.

10:24AM 10          (SIDEBAR CONFERENCE WAS CONCLUDED)

11          ( A recess was taken.)

12          THE CLERK:  All rise for the jury.

13          (JURORS ENTERED THE COURTROOM.)

14          THE COURT:  All right.  Mr. Lauer, before we get

15     started, just a quick reminder, ladies and gentlemen, maybe

16     this is obvious, but I'll say it anyway, what we're doing here

17     is not talking about the overall purposes of the asylum law or

18     what happens to other people, it's very specific charges

19     against a specific individual with certain requirements, and

10:38AM 20     what you're going to be asked to decide, whether the government

21     has proved its case beyond a reasonable doubt.

22          So, with that, Mr. Lauer.

23          MR. LAUER:  Thank you.

24                          CLOSING ARGUMENT

25          MR. LAUER:  They're wrong.  They're wrong about him,

1   and it's just that simple.  They're horribly, horribly wrong.

2   Mr. Teganya is not a member of MRND, never was, didn't rape

3   anyone, didn't kill anyone.  He was a medical student studying

4   to be a doctor, and his only interest in 1994 was studying as

5   hard as he could and becoming a surgeon.

6            I think it's worth noting at the outset that this case

7   involves things that happened 25 years ago, and what the

8   government has brought you in terms of evidence, yes, you have

9   some items like this.  These aren't Mr. Teganya's, these are

10:39AM 10  props.  What they brought you for evidence is the testimony of

11  witnesses, and so I agree with Mr. Varghese, this case boils

12  down to credibility.

13           And Mr. Varghese is a very gifted lawyer, and he had

14  the benefit of some witnesses who were good storytellers, and

15  he talked a lot about the emotion when they spoke, the tears

16  welling up in their eyes, the suffering that they went through.

17           You have a very specific role.  Your role is to

18  evaluate the credibility of witnesses and think critically,

19  whether what they said made sense, whether what they said is

10:40AM 20  true.

21           Now, it is true, all of these witnesses, the

22  government's witnesses, they lived through the genocide, and I

23  think it's probably fair to say that everyone, everyone in

24  Rwanda who survived the genocide suffered in one form or

25  another, and you can recognize that.

1          You can find that these people suffered, that they

2     experienced horrible things that no one should have to

3     experience, but you can do that without suspending disbelief.

4     You can think critically.  You can think whether their

5     testimony makes sense, has been consistent, and is believable.

6          On balance, we're going to ask you to find that the

7     credibility of the witnesses from the defense was more credible

8     than the testimony of witnesses from the government, and I'll

9     explain why, but first I want to talk about the government's

10:41AM 10    case and whether putting aside the testimony of the defense

11    witnesses, whether you just take the government on their

12    burden, which they have, they have a burden here to prove

13    Mr. Teganya's guilt beyond a reasonable doubt, whether they did

14    that, not even considering the defense witnesses, so let's take

15    the government's case.

16          Their case is that Mr. Teganya was an extremist, and

17    that that dated all the way back to high school, his religious

18    high school at Nyundo.  You heard from Anicet Nzabonimpa.  He

19    was a doctor.  He testified on direct examination.  He was in

10:42AM 20    private practice.  It turned out he actually worked for the

21    Rwandan government, Ministry of Health for a number of years.

22    He told you there was ethnic division and ethnic conflict in

23    that high school.  He talked about how after the RPF invasion

24    in 1990, Hutu students would speak out against Tutsis.  He

25    listed Mr. Teganya as one of those students.

1    Now, we brought a number of people who were students

2    with him.  We even brought one of his faculty members, and you

3    learned a little bit about that high school.  It was a very

4    special environment.  It was a place where Tutsi students were

5    about 50 percent of the population, and it was a place where

6    Tutsi staff dominated.

7    Mr. Kurazikubone, that's the gentleman at the bottom

8    there, an English teacher, English and American literature in

9    Rwanda, now works as a custodian at the Mozart Museum in

10   Austria.  He was one of the first Hutu teachers at this

11   seminary school.  That's the type of environment that we're

12   dealing with.

13   You heard from one of the first-year students that

14   when Mr. Teganya was in his sixth year, the last year, he was

15   the vice dean, and he was something of an authority figure.  It

16   was a mark of distinction to be the vice dean.  It meant that

17   you had been someone who had good conduct, good grades, someone

18   who could represent the students with the faculty.

19   You heard about the importance of conduct at Nyundo,

10:43AM 20   and we're fortunate to have some records from Mr. Teganya's

21   time there.  You have his report card, and you can see it's in

22   the French, it's "conduite," conduct.

23   As you heard from any number of defense witnesses, 40

24   points told you if you would be docked, if you spoke out,

25   misbehaved, cheated on a test, any student who would be

1   speaking out insulting Tutsis, that sort of thing.  It would

2   not have been tolerated because they were graded on it, and you

3   have his grades.

4        You heard a little bit more about Nyundo.  He was the

5   president of the Red Cross.  That's actually something he

6   indicated on his asylum application.  As a young man, he saw

7   people injured.  You saw the role that doctors played.  He

8   joined the Red Cross.  He trained in first aid, talked about

9   going to the leper colony at Nyundo.  That's Mr. Teganya in

10  high school.

11       But according to the government, he was so extreme in

12  his views that when he went to Butare and became a university

13  student, he turned into the leader, the leader of a group of

14  MRND members.

15       Mr. Habimana, who we've heard a lot about, the

16  gentleman who was convicted of killing people.  Mr. Habimana,

17  he described Mr. Teganya as the leader of a group of 20 to 50

18  students, medical students, university students.  He described

19  them holding the flag at rallies and meetings, shutting down

20  businesses in the town to forcibly recruit people.

21       The government's case, make no mistake about it, it's

22  not that Mr. Teganya was a member in secret or that he somehow

23  harbored sympathies that he managed to keep away from everyone

24  around him, their case is that he was out in the street holding

25  a flag, going to rallies as the leader of a group of students.

1      You heard from Mr. Habimana.  You heard about these

2   supposed trainings that occurred every Tuesday and Friday from

3   6 to 8 p.m. for going on two years.

4      There's a stipulation in this case.  I encourage you

5   to look at it.  It was the last thing that you heard before we

6   left yesterday.  Rwanda is very close to the equator.  The sun

7   sets in a very narrow window of time.  In Rwanda, the sun sets

8   at the latest during any time of the year around 6:30 p.m., so

9   this notion that Mr. Teganya was in the woods, and you have

10:46AM 10   that picture, that's in evidence, too, was in the woods

11   training with clubs, training to kill people from 6 to 8 p.m.

12   two days a week, it's ludicrous.  It's absolutely ludicrous.

13      What you did hear is that Mr. Teganya was home

14   studying, and that's borne out by everyone that you heard from.

15   He was not in the woods from 6 to 8 p.m. for two years.

16      The idea that you go in the woods from 6 to 8 p.m. for

17   two years to learn how to swing a club, does that sound

18   plausible to anyone here that for two years, for two hours a

19   night, he's learning to swing a club?  Kung Fu training.  It's

10:47AM 20   cartoonish, cartoonish.

21      The witnesses described pulling down the flap to hide

22   his neck.  You're entitled to use your common sense.  I urge to

23   do it when you consider the testimony of Mr. Habimana.

24      I urge you to think about the cross-examination, to

25   think about when I asked him, so for this two years that you

1    were going to these meetings, two years these trainings with

2    Mr. Teganya, who else was there?  Where were the other

3    students?  Could he name a single person, a single one?  No.

4         Why would that be?  How could that be?  How is that

5    possible?  The only way that is possible is because it didn't

6    happen, and he didn't know anyone else's name because he hadn't

7    been given any other names to accuse.

8         The government also called two more classmates of

9    Mr. Teganya's at the university in Butare, and we've heard a

10   lot about them, Bernard Kalimba and Jerome Arusha.

11        According to Mr. Kalimba, Mr. Teganya was a member of

12   the MRND, he had the hat, he had the flag, went to the

13   meetings, and you heard the same thing from Mr. Arusha, very

14   similar testimony.  But there were some inconsistencies there,

15   and the government didn't bring those to your attention, so I

16   want to go back to them.

17        The flag, you've heard a lot about flags.  Well, when

18   he was first interviewed, Mr. Kalimba didn't say a word about a

19   flag.  Mr. Arusha, when Mr. Arusha was first interviewed, he

20   didn't say Mr. Teganya was a member, he said he was a committee

21   member, he said he was an active Interahamwe.  That's not what

22   he told you, that's what he said in this first interview, so we

23   have this discrepancy, and we also have a discrepancy in terms

24   of what their forthcomingness with you.

25        Mr. Arusha was someone who had a reputation,

1    Mr. Arusha was someone who was loud, was very well-known, and

2    he was very well-known for drinking.  He denied that.  He said

3    he never drank to excess.  Mr. Kalimba said he never drank to

4    excess.  They might be the only two university students in the

5    world who never drank to excess.

6         You're entitled to consider their forthcomingness,

7    their forthrightness in testifying, and their testimony that

8    they did not drink tells you something.

9         Mr. Varghese said something interesting.  He said, "Do

10:49AM 10  you have a single reason to doubt their testimony?"  He said,

11   "Do you have a single reason to doubt the testimony of

12   Jerome Arusha and Bernard Kalimba?"  And in a sense, he's

13   right.

14        There's not a single reason to doubt their testimony,

15   there's around 12 reasons to doubt their testimony because you

16   don't just have to take their word for it, you can compare what

17   they said with the testimony of everybody else that the defense

18   brought in who were also there.

19        Now, it's a lot of names, a lot of photos, don't have

10:50AM 20  time to go through them individually, but what I want to stress

21   here is that some of these people were Mr. Teganya's good

22   friends.

23        You heard about Eric Nshimiye, you heard

24   Aimable Rwabukamba, a Tutsi, by the way.  Others were more

25   classmates than friends, people who knew him in passing, people

J.A. 2005

1    who were not particularly close to him.  There were people from

2    all across the etiological spectrum.

3        You heard from one person, Mr. Munyentwari, who is the

4    president of one of the opposition parties on the campus, the

5    PSD.  Mr. Munyentwari testified he knew the leaders of all the

6    other political parties because he had to deal with them.  He

7    knew Mr. Teganya was not a leader.  He knew that Mr. Teganya

8    was not a member of the MRND.

9        Another person was, Fidele Barinda, down at the bottom

10:51AM 10  there.  Mr. Barinda admitted he was a member of the MRND.  He

11   was active, he went to the meetings, he wore the hat, he wore

12   the scarf, but he testified Mr. Teganya wasn't.

13       And you heard from witness after witness, person after

14   person.  It was probably monotonous, it was probably tedious to

15   have to sit there and listen to it, and I apologize for that,

16   but the defense thought it was important that you hear from

17   people from as many different perspectives as possible, other

18   people who were there, other people who knew him.

19       These people do not all live in the same place.

10:51AM 20  They're really scattered throughout the world.  There's people

21   from United States, Canada, Europe, Africa, Rwanda, people who

22   aren't known to each other, people who are not living in the

23   same place.

24       You heard from his domestic worker, who cleaned his

25   clothes and made his food.  To a man, all of these people said

Mr. Teganya was not a member of the MRND so far as they could

see, never wore the hat, never wore the scarf, never went to

meetings.

Just the opposite, what they said was that he was a

gem, he was someone known for being studious, for doing the

right thing, for studying and doing well in school.  A number

of them scoffed openly, scoffed at the notion that he was an

MRND member.

All of these people traveled a great distance to be

here.  They took time out of their lives to come.  They were

exposed to aggressive cross-examination.  They were exposed,

some of them, to insinuations, to unsubstantiated allegations

about their backgrounds.  Why did they agree to do that?  Why

did they come?  For most, Mr. Teganya was not someone they had

seen in decades.  They came because they know the truth.  The

truth is he was not MRND.  The truth is he was just a medical

student.  Are they all mistaken?  Are they all lying?  That

seems to be what you would have to conclude to reject them.

The government pointed out that many of these

witnesses, many of these people, they weren't with him 24-7,

most of them knew him as a classmate, wouldn't necessarily know

if he went to meetings, what his political feelings were, but,

again, the case against him is not that he was a closeted

member of the MRND, the case against him is that he was an

open, notorious leader.  He was someone who had anti-Tutsi

1  views, he was someone who was ready and willing to act on those

2  views when the time came, and that takes us to the events at

3  the hospital.

4       Now, the credible evidence, we think, is that

5  Mr. Teganya was not a member of the MRND.  However, as was

6  pointed out, many of those witnesses were not in Butare.  Many

7  of the same witnesses he went to school with were not in Butare

8  at the time of the genocide, and they admitted that.  They

9  weren't there, they don't know exactly what happened in Butare

10:54AM 10  when the genocide started, so that's true in a sense that they

11  wouldn't know whether Mr. Teganya did or did not do anything.

12       But this is an instance where common sense can tell

13  you something.  Knowing what you know about Mr. Teganya's

14  background, knowing what you know about where he went to school

15  at Nyundo and that type of environment, what type of student he

16  was in medical school, his avoidance of political activity,

17  knowing all that, is it likely that when the genocide started,

18  he just threw all that out the window and became a genocidaire.

19  Does that make any sense whatsoever?

10:55AM 20       Or is it more likely that Mr. Teganya did what he told

21  you he did, that he took his studies seriously, that he was

22  supposed to be at the hospital to observe, and when the

23  hospital started to need help, he stayed because he was a

24  doctor in training, and he had been a member of the Red Cross,

25  and the hospital was overrun with people who needed help.

J.A. 2008

1    If you find that Mr. Teganya was not a zealot, that he
2    was not a member of the MRND, the idea of him taking part in
3    the violence at the hospital is fanciful, it's far-fetched, and
4    far-fetched is exactly how I would describe the evidence that
5    you heard from the government when it comes to the hospital.

6    Let's start with Mr. Habimana.  He told you about a
7    killing outside the Kiza dormitory, and the government has the
8    photograph of him standing in the field where that took place,
9    and here before you he described in great detail how that
10:56AM 10   happened.

11    He told you he didn't know their names.  He told you
12   he had no reason to know their names.  He was very clear about
13   that, they were just students who had been taken outside of the
14   Kiza dorm, but when he was interviewed before trial by
15   investigators, he supplied two names for those victims,
16   Innocent Nzeyimana and Amaible Seciyambo.  What accounts for
17   that?  There's certainly no explanation for Mr. Habimana.  It's
18   a very odd thing to recite the names of the supposed victims in
19   one breath and then not know them in the next.

10:57AM 20   Odder still is Mr. Gasasira.  Mr. Gasasira, whose
21   trial testimony bore little resemblance to any of the
22   statements that he made to investigators in his first
23   interview.

24   Mr. Gasasira, we've heard a lot about.  He's from
25   Butare, the Tumba area, I believe, from a known Tutsi family.

His father actually worked at the hospital, he said, or at the
laboratory near the hospital, said his father was known at the
hospital, he was known, his family was known in Butare.

He talked about an attack at a soccer field. That
wasn't in his first statement. He claimed to have walked to
the hospital with his wounded father on April 22nd. That was
his testimony, April 22nd, in getting to the hospital.

And he said something about what the hospital was like
when he arrived on April 22nd, and what he said was that there
were no soldiers there, no soldiers on April 22nd.

Now, Dr. Zachariah is something of an authority on the
timeline, as I think you probably all recognize. Dr. Zachariah
was very clear about the dates when things happened at the
hospital, and he told you soldiers arrived on April 19th via
helicopter, and he also said that by April 21st there were
perhaps 140 soldiers at the hospital, so you have a discrepancy
there.

But getting back to Mr. Gasasira, he claimed to have
gone from the hospital to a school, again, another attack he
survived, again, not mentioned in his original interview. He
spoke about spending up to three weeks at a government
building, a prefecture building, where he was out in the
elements, and he talked about how at a certain point, he
happened to overhear a conversation, overheard a lot of
conversations, as it turns out, and Tutsis were bussed away,

**J.A. 2010**

bussed away to be killed, and he didn't join them because he

knew what was going to happen.

        And it was at that moment, that very fortuitous

moment, that he just happened to encounter a soldier in a

wheelchair on the road, all by himself, how he got there, who

knows, who brought him there, who knows, what he was doing

outside the hospital grounds, who knows, but the soldier in the

middle of the road, he was able to ingratiate himself with, he

was able to become a caretaker to, couldn't tell us the name of

that soldier, just said he called him Boss, went back with that

soldier to the hospital grounds, stayed with that soldier

taking care of him.

        And it was back at the hospital grounds, when he was

taking care of that soldier, that he told you he came to know

Mr. Teganya.  He described him as this powerful figure, this

scary, violent figure, who was responsible for all sorts of

violence.

        He talked about his appearance, described him as

balding, described him as having a gap in his teeth, being

chubby or having a chubby face.  You'll recall he stood up and

identified Mr. Teganya in court.

        We're fortunate to have a few photographs of

Mr. Teganya during that time.  That's what he looked like in

1994.  If this is what Mr. Teganya looked in 1994, why would

Mr. Gasasira claim that he was balding?  Why would he claim

J.A. 2011

1   that he was chubby?  Why would he claim that he had a gap in
2   his teeth?
3           The government introduced a later photo of
4   Mr. Teganya, a photograph taken when Mr. Teganya was much
5   older, when he was bald, when he was chubby, like many of us,
6   as we age.
7           Is it possible Mr. Gasasira was reverse engineering
8   after having seen a photo of Mr. Teganya when he was older?
9   For someone who is so scary, for someone who is so powerful,
11:01AM 10  who is so much of a figure on the hospital campus, Mr. Gasasira
11  spent an awful lot of time around Mr. Teganya, always happened
12  to be in the right place at the right time to hear him making
13  threats, taking people, killing people.
14          For someone who is from a known Tutsi family, whose
15  father apparently worked at the hospital ground, Mr. Gasasira
16  was spending an awful lot of time hanging out, and if you
17  believe him, he was present for three killings.
18          The first one was Dr. Karekezi, who he described as
19  being killed in a very visible place behind the mortuary.  You
11:02AM 20  had that photo.  The government showed it to you where that
21  killing took place, but when he was interviewed, that's not
22  what he said.
23          When he was interviewed, he said that the killing took
24  place in the trees behind the maternity building.  What's more,
25  what's more, he said that he had gone there to witness -- well,

1  let me clarify.  At this trial, what he said was that he had

2  gone there by himself without the soldier.  The soldier was not

3  there for the killing of Dr. Karekezi, that's what he told you.

4      When he was interviewed, what he said was that he was

5  there to witness it as a kind of ceremony that the soldier

6  wanted to witness, and he said he pushed the soldier to the

7  scene of the killing.  It's not a small detail.

8      Another killing, Mathias Gasarabwe, he told you, "This

9  gentleman was killed in front of my eyes," that was his exact

11:03AM 10  words, "in front of my eyes."  But what he said when he was

11  first interviewed was he did not witness the killing, what he

12  said when he was first interviewed is he saw the body later.

13      The third killing, Protais, Protais Nyangezi.  Again,

14  he said he was there, he saw Teganya commit this murder,

15  claimed to have been present when it happened, but he looked

16  away because this was a family friend, and he couldn't bare to

17  see him killed, but when he was interviewed, that was not his

18  story.  When he was interviewed, he said he was not there when

19  the killing happened, and beyond that, he went further, he said

11:04AM 20  he was later told about the killing by a soldier.

21      Agent Andersen had a binder.  We went through it,

22  witness by witness, statement by statement, and there was some

23  talk, and you heard it again today, there was some talk, it was

24  through an interpreter, it was an initial interview.  It was a

25  short period of time.  That's not good enough.  That's not good

J.A. 2013

enough when you are talking about murder, when you're talking about rape, that's not good enough.

Agent Andersen is a good investigator, and he's perfectly capable of differentiating between seeing a murder and not seeing a murder. That's not something that got lost in translation, that's not something that was not spoken about, that is a fundamental inconsistency of whether that witness saw it or not.

So when Mr. Varghese stands here and talks about the emotion in the witness' face and he tells you, Do you have reason to doubt him? Think back to those statements he made when he said he wasn't there, when he said he didn't see it, when he said he was told about something at a later time.

There's also this bizarre moment, quite frankly, late in Mr. Gasasira's testimony where he denied having met with the prosecutors, he denied having any sort of conversation about whether there had been an interview request, he denied having been told anything about receiving money, denied, denied, denied, until Mr. Garland started asking him questions, and eventually with enough prodding from Mr. Garland, he allowed, oh, yes, there was a meeting, yes, we did discuss that.

You cannot possibly trust the testimony of a witness whose statements change from interview to interview, date to date, and, in fact, change before your very eyes in the span of

J.A. 2014

1   a few minutes.

2         We have to talk about the alleged rapes.  Mr. Teganya

3   was accused of raping Consolee Mukeshimana.  Ms. Mukeshimana

4   said she knew him, that she was able to recognize him because

5   he had treated her son in March, and she identified him at that

6   time as a student because he had some sort of tag or insignia

7   on his lab coat.

8         You heard from a variety of the medical students.  The

9   coats did not have that on them, and you heard from

11:06AM 10   Mr. Teganya.  He was not assigned to pediatrics, he had been

11   only at the hospital sporadically to do observation in the

12   internal medicine department.

13         But, be that as it may, Ms. Mukeshimana testified at

14   great length about her genocide story, about being at the

15   health center, about being attacked, about having to hide in

16   the bodies of people who were killed.

17         She talked about after fleeing that health center,

18   staying in the series of houses, and she gave the names of

19   those houses, and she gave the dates.  She said she was at the

11:07AM 20   health center from April 18th until April 23rd, and then she

21   described staying in this series of houses afterward and

22   ultimately being detained at a roadblock.

23         And it was after being detained at that roadblock that

24   she claimed she went to the hospital to check on her cousin,

25   her cousin, Veneranda.  You have to look at the details here.

1    You have to.

2         She said that when she arrived at the hospital, the

3    Doctors Without Borders were still there.  That was what she

4    said, and, again, you know from Dr. Zachariah exactly when

5    Doctors Without Borders pulled out, they pulled out on

6    April 23rd -- excuse me, April 24th.  That does not square with

7    her testimony.

8         She claimed at the hospital that both she and her

9    cousin, Veneranda, were subjected to rapes at the hands of

11:08AM 10    Mr. Teganya, at the hands of others who were there, and

11    eventually she was able to escape from the hospital, and she

12    told you the story of her escape, she told you the story of

13    being taken away by a group of armed men, and they were on the

14    verge of killing her until she throws money out.

15         Now, whether it was coins or not, in her first

16    interview, she said coins, before you, she said money, but

17    whatever it was, it's her testimony that as soon as she threw

18    the coins or the money, these Interahamwe were so dazzled by

19    the sight of money that she was able to escape while six months

11:09AM 20    pregnant.

21         Does that sound plausible?  Does that sound a little

22    off to anyone else?  Now, perhaps, more importantly, she

23    testified that she had suffered at Mr. Teganya's hands under

24    the pains and penalties of perjury, and that's an oath she was

25    very familiar with.  It just so happens she was one of the

1   government's witnesses in a case here in the United States

2   about six or seven years ago in 2012, and in that case, she was

3   asked about her genocide story, she was asked about her

4   experience.

5          She testified about being present at the health

6   center, about hiding in bodies, she testified that after, after

7   fleeing the health center, she had gone to her sister's, not a

8   word about the hospital.

9          She testified in a Rwandan prosecution in 1998.  You

11:10AM 10   might remember, I approached her, I showed her a handwritten

11   statement where she had initialed or signed every page.

12          In that case, she said, "I was at the health center, I

13   was attacked at the health center.  Afterwards, I went to my

14   sister's," not a word about being at the hospital.

15          In 1995, about a year after the genocide, she was

16   interviewed for a book.  She's quoted at great length in that

17   book, being attacked at the health center in Sovu, fleeing to

18   her sister's afterwards, not a word about the hospital, not a

19   word about Mr. Teganya.

11:11AM 20          Ms. Mukeshimana is not someone who is shy or who has

21   been shy about talking about her genocide experience.  The two

22   weeks that she claims to have spent at that hospital has never

23   surfaced until she came here.

24          There's a similar phenomenon that worked with

25   Esperance Mukamurenzi.  Ms. Esperance Mukamurenzi testified

here that Mr. Teganya was something of an infamous figure at
the hospital, that he had an army, an army of Interahamwe, and
she told you that Mr. Teganya and his army were responsible for
the rape and disappearance of her cousin, Veneranda.

She also said that Mr. Teganya and his army were
responsible or that had been involved in raping her as well.
The problem here is that Ms. Mukamurenzi testified, again,
under the pains and penalties of perjury in a different forum
in Arusha, Tanzania, and she was asked about her genocide story
there, too, and when she was giving sworn testimony in that
forum, she identified the people who took Veneranda, she
identified the people as three uniformed soldiers, three
uniformed soldiers, not a word about Mr. Teganya, not a word
about him having an army of Interahamwe.  And when she was
interviewed by agents in this case, she didn't say anything
about rapes at all.

When Mr. Varghese asks you, "Do you have reason to
doubt," the answer is yes.  If you look closely, if you're
guided by thought and not emotion, there's absolutely a reason
to doubt.

The truth, the truth is that Mr. Teganya was not
involved in these killings, he was not involved in these rapes,
he was not marauding around the hospital with an army, he was a
medical student.  He was training to help people, and during
the crisis, that's what he did.

1          There was a series of witnesses beyond Mr. Teganya.

2     He told you his story.  I mean, he testified at length, and you

3     got the chance to observe him.  You got the chance to hear his

4     voice, explain in his own words what happened, what he did, why

5     he did it.

6          You can form your own impressions about his

7     credibility.  Was he knowledgeable?  Did he seem like he was

8     telling the truth?  But you don't have to take his word for it.

9          You heard from other people who were at the hospital.

11:14AM 10  You heard from other medical students, you heard from

11    Ernest Muvunandinda, a medical student, you heard from

12    Michel Musilikare, a medical student, you heard from

13    Aimable Rwabukumba, a medical student, Tutsi, and close friend

14    of Mr. Teganya.

15         And Aimable Rwabukumba was someone who Mr. Teganya

16    spent every day with during the genocide.  And you'll recall

17    Mr. Rwabukumba.  He was a lanky gentleman with wire glasses.

18    He came here, he told you he's Tutsi.  He and Mr. Teganya moved

19    to the Kiza dormitory during the genocide because they wanted

11:14AM 20  to be close to the hospital, it was safer.  It allowed them to

21    go there and do their work.

22         You heard from Dr. Michel Musilikare.  He was at the

23    hospital, too, although did not have as frequent contact with

24    Mr. Teganya.  You heard from Dr. Muvunandinda at the hospital,

25    a more senior student.

1          What did they all say they were doing?  They were
2     treating people.  They went there.  People needed help.  This
3     was a war zone, essentially, and they helped, and when they
4     were there, they didn't see people being taken with their own
5     eyes.  They didn't see rapes, they didn't see murders.  They
6     were busy.  They had their hands full.
7          What they told you was exactly what Mr. Teganya told
8     you, it's entirely consistent between the testimony of all of
9     them.  The hospital was a place where many, many people had
11:15AM 10     come to seek refuge, where many, many people had come to seek
11     treatment.
12          You heard from two other people who were not doctors
13     who were at the hospital.  You heard from Jean Baptiste
14     Bizimana.  You heard from Tatiana Murebwayire Nahimana.
15          Mr. Bizimana was the gentleman who was caring for his
16     uncle.  He was there during the entire period of the genocide
17     as something of a caretaker.  And he told you his uncle was
18     cared for.  He told you that doctors and staff were working and
19     treating people, and he told you he didn't see killings with
11:16AM 20     his own eyes, he didn't see people being taken.
21          Tatiana Nahimana, same thing, Tutsi woman, went to the
22     hospital seeking refuge, was there for several weeks, did not
23     see killings.  She was in the pediatrics department, saw
24     doctors coming and treating people, did not see killings, did
25     not see disappearances.

**J.A. 2020**

1        The one thing that all of these people did agree on,

2   of course, people were taken, of course, people were being

3   killed.  No one denied that.  The issue is was it happening all

4   the time?  Was it happening everywhere in such a way that it

5   was inescapable?

6        What you heard from all these people is, yes, there

7   were killings, but I was there, I didn't see it, not disputing

8   that it happened, but I was not personally there to witness it,

9   and that's fundamentally what Mr. Teganya's testimony is as

11:17AM 10  well.

11        So what you see when you consider the witnesses who

12   were with the defense is that this portrait, this narrative

13   that the government is promoting where there was unspeakable

14   acts of violence taking place everywhere all the time, that's

15   not how it was, it's not how it was for everybody.

16        There were people who were trying to do the right

17   thing.  The government is promoting a view in which there's

18   victims and killers.  And that's, of course, there were

19   victims, of course, there were killers, and, of course, there

11:18AM 20  were people who were caught in the middle who were just trying

21   to get by and live.

22        I want to say a few words about Count Five, which is

23   the perjury count.  We've talked a lot about Mr. Teganya's

24   membership in the MRND, we've talked a lot about what happened

25   at the hospital.  I would like to address just briefly

Count Five, which is what was testified to at the hearing
before the Immigration Judge.

The government has alleged that Mr. Teganya committed
perjury because he denied seeing having patients taken and
killed.  He told he was aware of it.  He told you that when he
showed up in the morning, he learned about it.

Interestingly enough, there was a government witness
who said the same thing, Dr. Zachariah.  If you think back, he
testified several weeks ago now, but if you think back to his
testimony, what did he say about showing up at the hospital
from April 20th through the 23rd?

He told you he showed up in the morning, he learned
people had been taken because people were talking about it, he
showed up again two days later.  He learned people were taken.
He had to walk.  He told you he saw bodies being loaded into a
dump truck.  He had to walk to see that, and on April 23rd, he
told you that people were taken from his tent, where he was
working, the nurses for Doctors Without Borders.

You heard a lot about Nurse Sabene and a number of
others, and that was heart-wrenching to hear what his
experience was and what he saw in those tents.

But where he was was not where Mr. Teganya was, and to
generalize, to hold Mr. Teganya responsible for every killing
that may have took place on a hospital this size, that's simply
not fair.

1          Mr. Teganya told you where he was, he was in a

2     building.  He was in the emergency area going back towards the

3     surgery department.  He was busy.  There were never people that

4     didn't need to be treated.  There were always people that

5     needed to be treated.

6          He was not in the tents that were over here.  He was

7     not in the maternity ward.  He was not in the dermatology ward.

8     Did things happen in those places?  Maybe.  It's not where he

9     was.  It's a big campus.

11:21AM 10          This is a big courthouse.  We all come in here, we've

11     been coming here for the past month.  To get to this courtroom

12     from the public hallway, you walk outside other courtrooms.

13          Do any of us know what's happening in those courtrooms

14     right now?  Do we have any inkling what people are saying, what

15     people are doing?

16          Mr. Teganya told you he was there to treat people, and

17     he did.  He told you he was so busy treating people, there

18     wasn't even time to think.

19          Were people screaming?  Absolutely people were

11:21AM 20     screaming.  He was dressing wounds.  People had been cut.

21     People were screaming, but he's in a building.  The idea that

22     he is on notice of what is happening on every square inch of

23     that hospital is not realistic.

24          Now, the government's talked, they put their spin on

25     the defense theories, and the government has told you that

**J.A. 2023**

1    their witnesses denied having been pressured, and they have

2    stressed that this is an independent investigation that has

3    nothing to do with the government of Rwanda, so I'd like to

4    take a few minutes to respond to that.

5         First of all, it's not the burden of the defense to

6    show why witnesses are lying or why witnesses are mistaken,

7    that's not how it works.  The defense does not have to disprove

8    the government's case.  It's the government's burden to prove

9    their case beyond a reasonable doubt.

11:22AM 10    If you listen to the government's witnesses and you

11    have questions, if you have things that linger in your mind and

12    eat at you, you don't have to know why.  That just means the

13    government hasn't met their burden, so that's the first thing.

14         Particularly in this case, 25 years after the fact,

15    witnesses coming forward with these oddly specific memories of

16    Mr. Teganya and mainly Mr. Teganya only, there's plenty of

17    reasons to be skeptical.

18         You learned a lot about Rwanda, and you know a lot

19    more about Rwanda now than you did five weeks ago.  It's an

11:23AM 20    authoritarian state.  It has a taste for assassinations,

21    political prosecutions.  It's a place where professors have

22    been labeled enemies of the state.  They feel that they're not

23    safe to do research.  It's a place where the "president" is

24    elected with 90 some percent of the vote and has imprisoned the

25    past two presidential candidates, and interestingly, for one of

those candidates, the government also made a point to arrest
the candidate's mother and sister.

As Dr. Twagiramungu told you, it is a place where the
people are accountable to the government and not the other way
around.  Is it plausible to think that Mr. Teganya by virtue of
sharing his father's name might be the target of a political
prosecution, that he might be conceived of as a threat?  Of
course, he's not a threat.  He lived a quiet life for 15 years,
he married, he had two kids.  He's not a political person, he's
not an activist, but he has the name Teganya, and his father
was a local president in the MRND, and in Rwanda, that means
something.

Now, Agent Andersen testified at some length about the
precautions he and his team took to ensure that their
investigation was independent of the government of Rwanda, but
the fact of the matter is that very little of what goes on in
Rwanda is truly independent of the government.

He talked about Agent Andersen told you when they went
there, they met with the Rwandan prosecutor's office.  They
obtained a letter from the Rwandan prosecutors, and when he did
so, he made what I would characterize is an offhand remark that
I thought was very telling.

He said, "I don't remember like telling them
specifically, I think it was pretty clear why we were there.
Mr. Teganya's arrest in the United States generated some degree

J.A. 2025

1    of notoriety."

2           So when Agent Andersen and the prosecution team shows

3    up in Rwanda, the prosecutor's office seems to know why they're

4    there.  It makes it all the more baffling that the government

5    did no investigation outside of Rwanda, but all of the

6    witnesses -- this is impossible not to notice.  Every single

7    witness you heard from from the government who accused

8    Mr. Teganya of anything lives in Rwanda.  That's a fact.

9           You know that many Rwandans no longer live in Rwanda.

11:26AM 10    They're scattered throughout the world by virtue of this

11    terrible tragedy that befell the country.

12           One of the exhibits that Agent Andersen testified was

13    very important to his investigation was a list of university

14    students.  His team used it to help identify who they could

15    talk to so they could understand from the people who were there

16    who Mr. Teganya was.

17           There's no indication that Agent Andersen or anybody

18    else ever took it upon themselves to talk to anybody outside

19    of Rwanda.  If he had, maybe he would have located

11:27AM 20    Michele Musilikare, the gentleman who was at the hospital who

21    was a colleague of Mr. Teganya.  His name appears on the list

22    or perhaps he could have located Diogene Nsengumuremyi instead.

23    This gentleman still lives in Rwanda to this day.  Or perhaps

24    he would have located Eric Nshimiye, another name appearing on

25    the list living in Ohio today.  Or perhaps he would have

 1    located Aimable Rwabukumba, now living in France working as a

 2    doctor.

 3          If he had interviewed, if he had tried to interview

 4    people outside of Rwanda, we wouldn't have had to bring all

 5    these people here.  The government talks about the Army of

 6    Teganya.  This is the real Army of Teganya.  You heard from all

 7    these people.  They traveled here to tell you how they knew

 8    him.

 9          There's doctors, there's engineers, there's people of

11:28AM 10    all walks of life, and they came here to tell you the truth

 11    about him, so when you weigh the evidence and you decide who is

 12    credible and who is not, think about all of these people,

 13    different backgrounds living in different places, many of whom

 14    were not friendly with Mr. Teganya particularly.  Why did they

 15    come here?  Why would they do that?

 16          The government wants you to believe the worst about

 17    Mr. Teganya.  Their case takes you to some very dark places,

 18    and, admittedly, the genocide put the dark side of human nature

 19    on full display, but they want you to regard those people with

11:28AM 20    suspicion, they want you to believe only the witnesses in

 21    Rwanda at the expense of everybody else you heard from.

 22          You owe it to Mr. Teganya not to decide this case

 23    based on emotion, not to decide this case based on sympathy but

 24    to think, to think, use your common sense and evaluate who was

 25    credible and who was not.

1    When you do, you will see that the story of

2  Jean Leonard Teganya is the story of a man who was caught in

3  impossible circumstances, it is not a story of wrongdoing, it

4  is a story of resilience and perseverance.

5    Mr. Teganya told you that story truthfully.  He told

6  it truthfully in his asylum application.  He told it truthfully

7  before the Immigration Judge, and he told it truthfully here.

8  Now it's time to speak the truth of your verdict and find him

9  not guilty.

11:30AM 10    THE COURT:  All right.  Thank you.  A few minutes for

11  government rebuttal.

12                              REBUTTAL

13    MR. GARLAND:  Yes, thank you.  Ladies and gentlemen,

14  I'm not going to go through the testimony of the individual

15  witnesses or the exhibits.  You've heard a lot about that at

16  this point.

17    All I'll remind you is that when you go back to the

18  jury room and you consider all of that, search your memories,

19  think about the notes you've taken, but your memories of what

11:30AM 20  was actually said.

21    At this point, it doesn't make sense to go through

22  each thing that each of the lawyers has said and fact check it,

23  but your memories will remind you who summarized that evidence

24  correctly.

25    The defense has painted this entire case as one grand

 1  Rwandan government conspiracy against Mr. Teganya because
 2  somehow he caught the Rwandan government's attention or his
 3  father having been arrested or been a member of the MRND and a
 4  leader of the MRND a long time ago and that because of that,
 5  the Rwandan witnesses that the prosecution put on testified out
 6  of government or community pressure, but you know this was
 7  false.
 8          Why?  How do you know that?  Because all of the
 9  prosecution witnesses told you that they weren't contacted
11:31AM 10  about their testimony by the Rwandan government or anybody else
11  in Rwanda and that they felt no implicit pressure to testify
12  one way or the other.  They said they wanted to tell the truth,
13  and you, as jurors, could feel when they were on that stand
14  that they meant it.
15          Moreover, the defense witnesses from Rwanda, the
16  defense witnesses from Rwanda confirmed what the prosecution
17  witnesses told you.  Even the defense's own witnesses confirmed
18  that they faced no consequences back in Rwanda either.
19          And do you remember how Dr. Twagiramungu testified all
11:32AM 20  about how the government of Rwanda treats people and how
21  witnesses testify?  And then on cross-examination, he admitted
22  that he had no statistics, no personal research to back up his
23  opinion, and, in any event, he conceded that Mr. Teganya was
24  not the sort of political activist that the doctor had been
25  talking about during his testimony.

1    And, finally, you learned from Agent Andersen that the

2  U.S. investigation had no Rwandan government funding, no

3  personnel from the Rwandan government, no evidence from the

4  Rwandan government, not even a suggestion of who the

5  United States should interview.

6    And that letter that was shown to you on the screen,

7  the testimony was that only time that letter was used was in

8  entering Butare Hospital shown to a security guard so that the

9  team could go in and pass.

11:33AM 10    As I expect Judge Saylor to instruct you, the evidence

11  is what you heard in the courtroom from the witnesses, not what

12  you heard from any lawyer, and what you heard from the

13  witnesses, both prosecution and defense, was that this

14  investigation had nothing to do with the government of Rwanda

15  and everything to do with what the defendant did in Rwanda and

16  how he lied during his asylum proceedings.

17    Now, you heard a lot about witness credibility and the

18  argument that you should acquit the defendant because of

19  witness credibility because the prosecution witnesses

11:33AM 20  supposedly were not credible but the defense witnesses were.

21    As you evaluate the witnesses' credibility, evaluate

22  it in the context of what you know to be true about the

23  genocide and how it unfolded in Rwanda, how it unfolded in

24  Butare, how it unfolded in the hospital, how half of the Tutsis

25  in Butare were killed within the first two weeks, how, as

J.A. 2030

1    Dr. Twagiramungu testified, it was pervasive, done out in the

2    open during night and day.

3          The prosecution witnesses were consistent with those

4    facts.  They testified about their testimony and their

5    experiences with detail, dignity and raw human emotion that

6    bespoke the truth.

7          The defense witnesses.  Now, who were they and what

8    did they say?  Some of them admired him, some had been his

9    friends, the defendant's friends for years, one loved him,

11:34AM 10   one's kids currently play with Mr. Teganya's kids.

11         Some of them told you that Mr. Teganya belonged to no

12   political party and that he held no anti-Tutsi beliefs.  You

13   learned only on cross-examination that they didn't even know

14   his political views, never talked to him about politics,

15   wouldn't have seen him at political meetings because they

16   weren't there, wouldn't have seen him at places where anybody

17   would be wearing political clothes in the first place.

18         Some of them told you that they had three meals a day

19   with him in a cafeteria, others told you that Mr. Teganya never

11:35AM 20   ate at the cafeteria after his first year because he and his

21   friends had a chef.

22         Some were emphatic that the hospital closed at two,

23   whereas Mr. Teganya and his friend, Rwabukumba, claimed that it

24   was opened to 6 p.m.  One of the defense witnesses denied that

25   a genocide ever happened at the hospital at all.

1        And in a case about false statements, some defense

2    witnesses intentionally misstated their birth places on

3    passports or had immigration or visa documents that were false

4    or contradicted their own testimony.

5        And the credibility of the defendant himself, you

6    heard how his story had changed over the years and still begs

7    credulity.  He sought asylum for years and years before first

8    claiming that he had been --

9        MR. WATKINS:  Objection.

11:36AM 10        MR. GARLAND:  -- attacked with a machete.

11        MR. WATKINS:  This is not rebuttal.

12        THE COURT:  All right.  I think that's fair.  Switch

13    to a different topic.

14        MR. GARLAND:  The defendant may be smart, studious,

15    focused, a former vice dean with good conduct grades during

16    high school, a quiet gent who cares about his appearance, but

17    he also told you that he was willing to use a fake passport to

18    get to Canada, was willing to evade Canadian authorities, was

19    willing to travel hundreds of miles out of his way through

11:36AM 20    woods to avoid American authorities all to get what he wanted,

21    asylum.

22        There is no doubt about whether he would say anything

23    to American authorities to do the same thing.  Return a verdict

24    of guilty on all counts.

25        THE COURT:  All right.  Thank you.  What we're going

J.A. 2032

1   to do now, ladies and gentlemen, we're going to take a short

2   break.  We're going to get that television out of the way and

3   I'm going to instruct you on the law that you're to apply.  So

4   we'll come back as soon as we're all set up and ready to go.

5           THE CLERK:  All rise.

6           (A recess was taken.)

7           THE CLERK:  All rise for the jury.

8           (JURORS ENTERED THE COURTROOM.)

9                       <u>JURY CHARGE</u>

11:48AM 10          THE COURT:  All right.  Ladies and gentlemen, the

11   clerk is going to distribute copies of the jury instructions to

12   each of you.  You should have your own copy.  You are free to

13   write on this and to bring it with you into the jury room, and

14   I'll ask you to read along with me as I read it aloud.

15          Just a couple things.  First, I permitted the lawyers

16   to talk about the legal charges.  I don't think they misstated

17   anything, but you should take your instructions on the law from

18   me as I'm about to read it to you.

19          And you'll also recall way back when at the beginning

11:49AM 20  of the case, I also kind of gave you a thumbnail sketch of the

21   charges.  I don't think there was anything inconsistent, but

22   this is the law that you are to use to decide this case.

23          Okay.  With that, if you would please turn to page 2.

24   It is your duty to find the facts from the evidence admitted in

25   this case.  To those facts, you must apply the law as I give it

J.A. 2033

1    to you.  The determination of the law is my duty as the Judge.

2    It is your duty to apply the law exactly as I give it to you,

3    whether you agree with it or not.

4         In following my instructions, you must follow all of

5    them and not single out some and ignore others.  They are all

6    important.

7         You must not interpret these instructions or anything

8    I may have said or done as a suggestion by me as to what your

9    verdict you should return.  That is a matter entirely for you

11:50AM 10  to decide.

11        Every person accused of a crime is presumed innocent

12   unless and until his guilt is proved beyond a reasonable doubt.

13   The presumption is not a mere formality.  It is a fundamental

14   principle of our system of justice.

15        The presumption of innocence means that the burden of

16   proof is always on the government to prove that the defendant

17   is guilty of the crimes with which he is charged beyond a

18   reasonable doubt.

19        This burden never shifts to the defendant.  It is

11:50AM 20  always the government's burden to prove each of the elements of

21   the crimes charged beyond a reasonable doubt.  The defendant

22   does not have to prove that he is innocent, or even present any

23   evidence.

24        The presumption of innocence alone may be sufficient

25   to raise a reasonable doubt and to require the acquittal of the

1    defendant.  You may not convict the defendant of any crime

2    charged against him if the government fails, or is unable to

3    prove every element of that crime beyond a reasonable doubt.

4         You may not convict the defendant based on speculation

5    or conjecture.

6         You may not convict the defendant if you decide that

7    it is equally likely that he is guilty or not guilty.  If you

8    decide that the evidence would reasonably permit either of two

9    conclusions -- either that he is guilty as charged, or that he

11:51AM 10    is not guilty -- you must find the defendant not guilty.

11         You may not convict the defendant if you decide that

12    it is only probable, or even strongly probable, that he is

13    guilty.  A mere probability of guilt is not guilt beyond a

14    reasonable doubt.

15         The law does not require that the government prove

16    guilt beyond all possible doubt; proof beyond a reasonable

17    doubt is sufficient to convict.  There are very few things in

18    this world that we know with absolute certainty.  In criminal

19    cases, the law does not require proof that overcomes every

20    possible doubt.

21         Again, the defendant is presumed to be innocent, and

22    the government bears the burden of proving him guilty beyond a

23    reasonable doubt.  If, after fair and impartial consideration

24    of all the evidence, you have a reasonable doubt as to the

25    defendant's guilt, it is your duty to acquit him.  On the other

1    hand, if after fair and impartial consideration of all the

2    evidence, you are satisfied beyond a reasonable doubt as to his

3    guilt, you should vote to convict him.

4          Your verdict must be based solely upon the evidence.

5    It would be improper for you to base your verdict on anything

6    that is not evidence.  You may not base your verdict on any

7    personal feelings, prejudices, or sympathies you may have about

8    the defendant or about the nature of the crimes with which he

9    is charged.

11:52AM 10          You may not consider or be influenced by any possible

11    punishment or other consequence that may be imposed on the

12    defendant.

13          Again, your verdict must be based solely on the

14    evidence and according to the law.

15          The evidence in this case consists of the sworn

16    testimony of witnesses, both on direct and cross-examination,

17    the exhibits that have been received into evidence, and any

18    facts to which the parties have agreed or stipulated.  You

19    should consider all of the evidence, no matter what form it

11:52AM 20    takes and no matter which party introduced it.

21          Whether the government has sustained its burden of

22    proof does not depend upon the number of witnesses it has

23    called, or upon the number of exhibits it has offered, but

24    instead upon the nature and quality of the evidence presented.

25          Certain things are not evidence.  Arguments and

statements by lawyers are not evidence.  The lawyers are not

witnesses.  What they say in their opening statements, closing

arguments, and at other times is intended to help you interpret

the evidence, but it is not evidence.  If the facts as you

remember them from the evidence differ from the way the lawyers

have stated them, your memory of the facts should control.

Questions by lawyers, standing alone, are not

evidence.  Again, the lawyers are not witnesses.  The question

and the answer taken together are the evidence.

Objections by lawyers are not evidence.  Lawyers have

a duty to their clients to object when they believe a question

or an exhibit is improper under the rules of evidence.  You

should not be influenced by any objection or by my ruling on

it, and you should not speculate or guess about what the answer

might have been or what an exhibit might have said.

Anything that I have struck or instructed you to

disregard is not evidence.

The indictment is not evidence.

Anything you may have seen or heard when the court was

not in session is not evidence.  You must decide the case

solely on the evidence received at trial.

Evidence may the take the form of either "direct

evidence" or "circumstantial evidence."  "Direct evidence" is

direct proof of a fact, such as testimony from an eyewitness

that the witness saw something.  "Circumstantial evidence" is

1    indirect evidence; that is, proof of a fact (or facts) from

2    which you could draw a reasonable inference that another fact

3    exists, even though it has not been proved directly.

4         You are entitled to consider both direct and

5    circumstantial evidence.  The law permits you to give equal

6    weight to both.  It is for you to decide how much weight to

7    give to any particular piece of evidence, whether direct or

8    circumstantial.

9         Although you may consider only the evidence presented

11:54AM 10   in the case, you are not limited to the plain statements made

11   by witnesses or contained in the documents.  In other words,

12   you are not limited solely to what you saw and heard as the

13   witnesses testified.

14        You are also permitted to draw reasonable inferences

15   from the facts, if you believe those inferences are justified

16   in light of common sense and personal experience.  An inference

17   is simply a deduction or conclusion that may be drawn from the

18   facts that have been established.  Any inferences you draw must

19   be reasonable and based on the facts as you find them.

11:55AM 20   Inferences may not be based on speculation or conjecture.

21        You do not have to accept the testimony of any witness

22   if you find that the witness is not credible.  You must decide

23   which witnesses to believe, considering all of the evidence and

24   drawing upon your common sense and personal experience.  You

25   may believe all of the testimony of a witness, or some of it,

1   or none of it.  You alone are the judgments of witnesses'

2   credibility.

3          In deciding whether to believe the testimony of the

4   witnesses, you may want to take into consideration such factors

5   as their conduct and demeanor while testifying; any apparent

6   fairness or unfairness they may have displayed; any interest

7   they may have in the outcome of the case; any prejudice or bias

8   they may have shown; their opportunities for seeing and knowing

9   the things about which they have testified; the reasonableness

11:56AM 10  or unreasonableness of the events that they have related to you

11  in their testimony; and any other evidence that tends to

12  support or contradict their versions of the events.

13         The testimony of a witness may be discredited or

14  impeached by showing that he or she previously made statements

15  that are inconsistent with his or her present testimony.  If a

16  witness made inconsistent statements about any significant

17  matter, you have a right to distrust the testimony of that

18  witness in other respects.  You may reject all of the testimony

19  of that witness or give it such credibility as you may think it

11:56AM 20  deserves.

21         Sometimes, of course, people make innocent mistakes,

22  particularly as to unimportant details; not every contradiction

23  or inconsistency is necessarily important.  Again, you alone

24  are the judges of the witnesses' credibility.

25         You have heard the testimony of law enforcement agents

1    and officers.  The fact that a witness may be employed as a law

2    enforcement agent or officer does not mean that his or her

3    testimony is necessarily deserving of more or less

4    consideration or greater or less weight than that of any other

5    witness.

6         Again, if it is for you to decide whether to accept

7    the testimony of any witness and what weight, if any, to give

8    to that testimony.

9         You have heard testimony from persons who were

10   permitted to express certain opinions about certain subjects.

11   A witness who has special knowledge, skill, experience,

12   training, or education on a particular topic may testify and

13   provide an explanation or state an opinion concerning such

14   matters.

15        You may accept or reject that testimony, in whole or

16   in part.  In weighing the testimony, you should consider the

17   witness' education and experience and the soundness of the

18   reasons given for the opinion.  You should also consider the

19   credibility of the testimony, as you would with any witness.

11:57AM 20        Some of the evidence in this case consists of recorded

21   testimony.

22        The recording itself, not the transcript, is the

23   evidence.  The written transcript was prepared by the

24   government, and reflects its view as to what was said.  It is

25   for you to decide, based on all of the evidence, what the

**J.A. 2040**

1    recorded testimony was.  In other words, just because it is

2    written in a transcript does in the mean that it is necessarily

3    accurate.

4            As I indicated at the beginning of the trial, you have

5    been permitted to take notes, but some cautions apply.  You

6    should bear in mind that not everything that is written down is

7    necessarily what was said.  When you return to the jury room to

8    discuss the case, do not assume simply because something

9    appears in somebody's notes that it necessarily took place in

11:58AM 10    court.  Notes are an aid to recollection, nothing more; the

11    fact that something is written down does not mean that it is

12    necessarily accurate.

13            The numbers assigned to the exhibits are for

14    convenience and in order to ensure an orderly procedure.  You

15    should draw no inference from the fact that a particular

16    exhibit was assigned a particular number or that there be gaps

17    in the number sequence.

18            This case, like most criminal cases, began with an

19    indictment.  The indictment is not evidence or proof of guilt.

11:59AM 20    The indictment is simply an accusation -- it is the means by

21    which the defendant is charged with crimes and brought before

22    this court.

23            The defendant is charged in Counts One through Five of

24    the indictment.  You must consider each count separately, and

25    you must a separate verdict as to each count.  Your verdict as

J.A. 2041

1   to each count must be determined solely on the evidence or lack

2   of evidence presented against the defendant on that count.

3        Your verdict must be unanimous in order to convict the

4   defendant as to any count.  In other words, all of you must

5   agree that the defendant is guilty as to a particular count in

6   order to convict the defendant as to that count.

7        I am now going to give you some instructions on the

8   nature of the crimes charged in the indictment and the elements

9   of the offenses that the government must prove beyond a

11:59AM 10   reasonable doubt.

11        The indictment contains five counts.

12        Counts One and Three charge the defendant with making

13   a false statement under oath in an application required by

14   federal immigration laws.

15        Counts Two and Four charge the defendant with

16   committing perjury in a written document.

17        Counts Five charges the defendant with committing

18   perjury while testifying before the Immigration Court of the

19   United States.

12:00PM 20        Counts One and Three charge the defendant with making

21   a false statement under oath in an application required by

22   federal immigration laws.

23        For you to find the defendant guilty of that crime,

24   you must be convinced that the government has proved each of

25   the following elements beyond a reasonable doubt:

**J.A. 2042**

1    First, that the defendant made a false statement;

2    Second, that the statement concerned a material fact;

3    Third, that the statement was made under oath or under

4  penalty of perjury;

5    Fourth, that the statement was made in an application

6  required by federal immigration laws or regulations; and,

7    Fifth, that the defendant made the statement

8  knowingly -- that is, that he knew the statement was false at

9  the time he made it.

12:00PM 10    In Count One, the alleged false statement is the

11  defendant's response to a question on his asylum application,

12  Form I-589.  The question asked:

13    "Have you or your family members ever belonged to or

14  been associated with any organizations or groups in your home

15  country, such as, but not limited to, a political party,

16  student, group, labor union, religious organization, military

17  or paramilitary group, civil patrol, gorilla organization,

18  ethnic group, human rights group, or the press or media?"

19    There's a place for checking no or yes, and if "yes,"

12:01PM 20  describe for each person the level of participation, any

21  leadership or other positions held, and the length of time you

22  or your family members were involved in each organization or

23  activity.

24    To that question, the defendant answered "Yes" and

25  provided the following description.

1    The statement is italicized for clarity:

2    *My father was the local president, (formerly Kibilira*

3    *District) of MRND from 1919 to 1994.  As a student, I belonged*

4    *to the Red Cross Youth Section from 1986 to 1991.  I was*

5    *president of the Red Cross Youth Section from 1989 to 1990.*

6    In Count Three, the alleged false statement is the

7    defendant's response to a different question on his asylum

8    application, (Form I-589).  The question asked:

9    "Have you, your spouse or your children ever ordered,

12:02PM 10    incited, assisted or otherwise participated in causing harm or

11   suffering to any person because of his or her race, religion,

12   nationality, membership in a particular social group, or belief

13   in a particular political opinion:

14   To that question, the defendant answered, "No."

15   The first element the government must prove is that

16   the defendant made a false statement.  A statement is false if

17   it is untrue when made.  A statement is also false if it omits

18   information that was required to be provided under the

19   circumstances.

12:02PM 20    In deciding whether the defendant's response to a

21   question is false, the words should be given their natural

22   meaning in the context in which the words were used.

23   If a response given by the defendant was literally

24   true, then this element is not satisfied, even if the response

25   may be misleading.  However, if a question calls for a complete

1    answer, and the response is literally true but incomplete, you

2    may find that the response is false.

3         If a particular question was ambiguous or reasonably

4    capable of being understood in two different ways, and the

5    defendant truthfully answered one reasonable interpretation of

6    the question under the circumstances presented, then the answer

7    would not be false.  Similarly, if a particular question was

8    clear, but the answer was ambiguous, and one reasonable

9    interpretation of the answer would be truthful, then the answer

12:03PM 10    would not be false.

11         The second element the government must prove is that

12    the false statement concerned a "material" fact.  A false

13    statement concerns a "material" fact if it has a natural

14    tendency to influence or to be capable of influencing the

15    decision of the decision-maker to whom it was addressed.  Even

16    if the statement did not actually influence the decision-maker,

17    it is "material" if it was capable of influencing the

18    decision-maker on the issue before it.

19         A false statement on an immigration application may

12:04PM 20    concern a "material" fact if disclosure of the true facts would

21    have led the government to make an inquiry that might have

22    uncovered other facts that might lead to denial of the

23    application.

24         The third element the government must prove is that

25    the false statement was made under oath or under penalty of

**J.A. 2045**

1    perjury.

2         The "Application for Asylum and for Withholding of

3    Removal," also called the Form I-589 requires an applicant to

4    certify under the penalties of perjury under the laws of the

5    United States that the application is true and correct.

6         To satisfy this element, you must find that the

7    defendant certified under the penalty of perjury that his

8    application was true and correct.

9         The fourth element that the government must prove is

12:05PM 10   that the false statement was made in an application required by

11   federal immigration laws or regulations.

12        A Form I-589 is an application required by federal

13   immigration laws and regulations for persons applying for

14   asylum and withholding of removal in the United States.

15        To satisfy this element, you must find that the

16   defendant made a false statement in a Form I-589.

17        The fifth element the government must prove is that

18   the defendant made the false statement "knowingly," that is,

19   that he knew the statement was false at the time he made it.

12:05PM 20        To satisfy this element, you must find that the

21   defendant knew the statement was false and made the false

22   statement voluntarily and intentionally and not by accident or

23   mistake.

24        A person's knowledge cannot ordinarily be proved

25   directly for the obvious reason that there is no way of being

1  able to look inside a person's mind.  Rather, a person's

2  "knowledge" must be determined by his statements and actions,

3  that is, what he says or does and does not say or do and by the

4  surrounding facts and circumstances.

5       Counts Two and Four charge the defendant with

6  committing perjury in a written document.

7       For you to find the defendant guilty of that crime,

8  you must be convinced that the government has proved each of

9  the following elements beyond a reasonable doubt:

12:06PM 10      First, that the defendant made a false statement;

11      Second, that the statement concerned a material

12  matter;

13      Third, that the statement was made under the penalty

14  of perjury;

15      Fourth, that the defendant knew the statement was

16  false at the time he made it; and

17      Fifth, that the defendant willfully subscribed the

18  statement was true.

19      In Count Two, the statement charged is the same

12:06PM 20  statement charged in Count One.

21      In Count Four, the statement charged is the same

22  statement charged in Count Three.

23      The first element the government must prove is that

24  the defendant made a false statement.

25      I've already explained to you at page 23 how a

J.A. 2047

1   statement may be false.

2        The falsity of the statements charged in Counts Two

3   and Four must be established either by the testimony of two or

4   more independent witnesses or by the testimony of one witness

5   and independent corroborating evidence.

6        The second element the government must prove is that

7   the statement concerned a "material" matter.

8        I've already explained to you on page 24 how a matter

9   may be "material."

12:07PM 10        The third element that the government must prove was

11   that the false statement was made under the penalty of perjury.

12        I've already explained to you that the Form I-589

13   requires an applicant to certify under the penalty of perjury.

14   Therefore, to satisfy this element, you must find the defendant

15   certified under the penalty of perjury that his application was

16   true and correct.

17        The fourth element the government must prove is that

18   the defendant knew the statement was false at the time he made

19   it.

12:07PM 20        I've already explained to you at page 27 what it means

21   to act "knowingly."

22        The fifth element the government must prove is that

23   the government "willfully subscribed" the statement as true.

24        A statement is "subscribed" if the defendant signed

25   his name, or otherwise attested in writing to the content of

**J.A. 2048**

1   the statement.

2        A written statement is "willfully subscribed" as true

3   if the defendant subscribed the statement deliberately, knowing

4   the statement was false.

5        To act "deliberately" is to act voluntarily and

6   intentionally, not by accident or mistake.

7        Count Five charges the defendant with committing

8   perjury while testifying under oath before the Immigration

9   Court of the United States.

12:08PM  10        For you to find the defendant guilty of that crime,

11   you must be convinced that the government has proved each of

12   the following elements beyond a reasonable doubt:

13        First, that the defendant took an oath that he would

14   testify truthfully;

15        Second, that the oath was authorized by a law of the

16   United States;

17        Third, that the oath was taken before a competent

18   tribunal officer or person;

19        Fourth, that after taking the oath, the defendant made

12:08PM  20   a false statement;

21        Fifth, that the defendant made a false statement

22   willfully and contrary to the oath; and

23        Sixth, that the false statement concerned a material

24   matter.

25        The statements charged in Count Five are alleged to

1    have been made during sworn testimony at a hearing before the

2    Immigration Court of the United States.

3         The charge is based on three statements on that

4    testimony, which are underlined below.

5         The questions and responses are italicized for

6    clarity.

7         I'm going to go off script here.  I'm not going to

8    read the actual testimony because you heard the recording, and

9    I don't want my voice inflexion to affect the way the question

12:09PM 10    was asked or the way the answer was given, but it's here before

11    you in writing.

12         This is exactly as it appears in the indictment, and

13    I've underlined the three statements that are charged as false.

14    You see on page 1 what's underlined is, "I never belonged to

15    that political party."  The [in sic] is not something the

16    defendant said, obviously, but just to show it's not a

17    typographical error, that was the testimony, and then if you

18    turn to the next page, the two words "no" are underlined there

19    as well.

12:10PM 20         The indictment charges that the three underlined

21    statements were false and constitute perjury.

22         As to the first statement, the indictment charges that

23    it was false "in that Defendant Teganya was a member of MRND

24    before and during the Rwandan genocide."

25         As to the second and third statements, the indictment

**J.A. 2050**

1    charges that they were false "in that Defendant Teganya

2    observed atrocities at the hospital during the genocide,

3    including Tutsis being turned over to the military to be

4    killed."

5           The first element that the government must prove is

6    that the defendant took an oath that he would testify

7    truthfully.

8           To satisfy this element, you must find that the

9    defendant took an oath before giving the testimony at issue

12:10PM 10   that he would testify truthfully.

11           The second element the government must prove is that

12   the oath the defendant took was authorized by a law of the

13   United States.

14           United States law authorizes officers in United States

15   Immigration Courts to administer oaths to persons who testify

16   before the Court.

17           The third element that the government must prove is

18   that the oath was taken before a competent tribunal officer or

19   person.

12:11PM 20          A United States law provides that an officer of the

21   United States Immigration Court may administer an oath to a

22   person giving testimony at a hearing of the court.

23           The fourth element the government must prove is that

24   after taking the oath, the defendant made a false statement.

25           I've already explained to you at page 23 how a

1   statement may be false.

2        The falsity of the statement charged in Count Five

3   must be established either by the testimony of two or more

4   independent witnesses or by the testimony of one witness and

5   independent corroborating evidence.

6        The fifth element the government must prove is that

7   the defendant made the false statement willfully and contrary

8   to the oath.

9        A statement is made "willfully and contrary to the

12:11PM 10   oath" if the defendant made the statement deliberately and with

11   knowledge that the statement was false at the time he made it.

12        The sixth element the government must prove is that

13   the false statement concerned a material matter.

14        I've already explained to you at page 24 how a matter

15   may be "material."

16        Count Five charges that the defendant made three false

17   statements.  In order to convict the defendant, all of you must

18   agree that the elements of perjury are satisfied as to at least

19   one of those statements.  In other words, you may convict the

12:12PM 20   defendant if all of you agree as to the first statement, the

21   second statement, or the third statement or all of the

22   statements or any combination of the statements.

23        However, you may not convict the defendant if you all

24   agree that the defendant made a false statement but you cannot

25   agree on at least one.  Thus, for example, if six of you

1    believe that he committed perjury only as to the first

2    statement, and the other six believe he committed perjury only

3    as to the second statement, and none believe he committed

4    perjury as to the third statement, you must acquit as to the

5    perjury charge.  Again, there must be unanimous agreement as to

6    at least one of the three statements.

7         All right.  I now come to the last part of the

8    instructions, the rules for your deliberations.  When you

9    retire, you will discuss the case with the other jurors to

12:13PM 10    reach agreement if you can do so.  You shall permit your

11    foreperson to preside over your deliberations, and your

12    foreperson will speak for you here in court.  Your verdict must

13    be unanimous in order to convict the defendant.  In other

14    words, all of us must agree that the defendant is guilty in

15    order to convict the defendant.

16         Each of you must decide the case for yourself, but you

17    should do so only after considering all of the evidence,

18    discussing it fully with the other jurors, and listening to the

19    views of the other jurors.

12:13PM 20         Do not be afraid to change your opinion if you think

21    you are wrong, but do not come to a decision simply because

22    other jurors think it is right.

23         It is important that you reach a verdict if you can do

24    so conscientiously.  You should not hesitate to reconsider your

25    views from time to time and to change them if you are persuaded

J.A. 2053

 1   that this is appropriate.

 2         It is important that you attempt to return a verdict,

 3   but, of course, only if each of you can do so after having made

 4   your own conscientious determination.  Do not surrender an

 5   honest conviction as to the weight and effect of the evidence

 6   simply to reach a verdict.

 7         I want to explain to you now what's called the verdict

 8   form.  This is simply the written notice of the testimony you

 9   will reach in this case.  It's a two-page page document that

12:14PM 10   has the caption of the case.  It's called, "Verdict Form."  It

 11   says, "We, the jury, find the defendant," and there's places

 12   for all five charges and a place to check either guilty or not

 13   guilty as to each of the five counts, and on the last page,

 14   there's a place for the foreperson to sign and date the

 15   verdict.

 16         After you've reached a unanimous agreement on a

 17   verdict, your foreperson will fill in the form that has been

 18   given to you, sign and date it, and advise the jury officer

 19   outside your door that you're ready to return to the courtroom.

12:14PM 20         After you return to the courtroom, your foreperson

 21   will deliver the completed verdict form as directed in open

 22   court.

 23         If it becomes necessary during your deliberations to

 24   communicate with me, you may send through the jury officer a

 25   note signed by your foreperson or by one or more members of the

1    jury.  No member of the jury should ever attempt to communicate

2    with me concerning the case except by a signed writing, and I

3    will communicate with any member of the jury on anything

4    concerning the case only in writing or orally here in open

5    court.  If you send out a question, I will consult with the

6    parties as promptly as possible before answering it, which may

7    take some time.  You may continue with your deliberations while

8    waiting for the answer to any question.

9            When you are communicating with me, please do not tell

12:15PM 10   me or anyone else how the jury stands numerically or for which

11   decision the jury is leaning.  Let me see counsel at sidebar.

12            (THE FOLLOWING OCCURRED AT SIDEBAR:)

13            THE COURT:  Anything from the government?

14            MR. GARLAND:  No, your Honor.

15            THE COURT:  Defense, Mr. Watkins?

16            MR. WATKINS:  Yes, we reiterate our objection to the

17   Count Five description where we've asked in Entry Docket 148 to

18   break out the two statements separately.  I understand that the

19   Court has combined them as they are in the indictment, but,

12:16PM 20   nevertheless, we believe that it is clear and subject to

21   confusion if they are not broken out separately because in some

22   senses they have merged.

23            THE COURT:  That's overruled.

24            MR. WATKINS:  We also ask again that the ambiguous and

25   literal truth instruction be repeated specifically in the

J.A. 2055

1    circumstances of this case after Count Five.  I recognize that

2    the Court has referred the jury back, but, again, we would ask

3    that it be repeated rather than referred to back in the

4    instructions.

5         THE COURT:  Okay.  It's sufficient the way I've

6    handled it.

7         MR. WATKINS:  Again, we would object to the failure to

8    give a special verdict form for Count Five.

9         THE COURT:  That's overruled as well.  Thank you.

12:17PM 10    (SIDEBAR CONFERENCE WAS CONCLUDED)

11         THE COURT:  All right.  Ladies and gentlemen, first,

12    as a housekeeping detail, if you have any question or concern

13    involving your own comfort, if the room is too hot or too cold

14    or you want extra sodas or something, you don't need to do a

15    signed note, but anything else I do need a signed note from

16    you.

17         The schedule from this point is entirely up to you.

18    As I've told you, you can take as little time or as much time

19    as you think you need to make this decision.  There should be

12:17PM 20    lunch waiting for you when you get back.  It is a Friday.

21    You're under no pressure or obligation to return a verdict

22    today, but, of course, you can do it if that's what you think

23    is appropriate.

24         I'm going to check in with you if I haven't heard from

25    you otherwise at maybe ten minutes to five, if I haven't heard

1  from you otherwise, and I'll ask at that point if you think

2  you're close and you just need a little bit of time, say 15 or

3  30 minutes, I'll allow it.  The building does start to shut

4  down, and I can't keep you too late, and, of course, we're here

5  Monday, Tuesday, and, you know, every day next week.

6          I'm going to appoint a foreperson of the jury.  The

7  role of the foreperson is really a simple one.  It's to make

8  sure that the discussion is orderly, that everyone is having a

9  chance to speak, and then to make sure that the jury verdict

12:18PM 10  form accurately reflects the vote of the jury and then to sign

11  it and date it.

12          You are absolutely a jury of equals.  The foreperson

13  has no greater weight or authority than anyone else.  Again,

14  it's just to make sure a discussion is orderly and to fill out

15  the form correctly and sign it, so I'm going to appoint

16  Ms. Bowers in Seat 11 as the foreperson and instruct you to

17  permit her to preside over your deliberation.  I'm picking her

18  for the simple reason that she's an office manager and probably

19  knows something about holding meetings and filling out forms.

12:19PM 20  So it's nothing more than that.  Again, you are a jury of

21  equals.

22          Finally, and this I have to say is somewhat painful

23  for me at this point.  Only 12 of you can deliberate and vote.

24  And, as you know, we originally impaneled 16.  We lost two of

25  you, but the other 14 have been here diligently every day.

J.A. 2057

1    Some of you are making very significant sacrifices both in

2    terms of your time and in some instances your money, and,

3    again, it pains me that I cannot allow all 14 of you to

4    deliberate, but that's the way it is.

5         I'm required by law to take two people off, and we

6    have a process or a system for deciding who comes off to make

7    sure that it's neutral and fair and random and so that I'm not

8    picking favorites in any way, and so I'm sorry to report that

9    the two alternates are Ms. Buonagurio in Seat 5 and Ms. Awah in

12:20PM 10    Seat 13.

11         And to make matters worse, you're going to be

12    segregated from the other jurors, and because sometimes we lose

13    jurors during deliberation, you're not discharged.  We may need

14    to put you into the jury if something happens to one of the

15    original 12, so my apologies again.  It pains me to do that,

16    but I am required to select two people.

17         So with that, again, I instruct you to retire and to

18    begin your deliberations, and if I have not heard otherwise,

19    I'll see you at about ten minutes to five.  You can take not

12:20PM 20    only your notebooks but the instructions with you, and we will

21    get the exhibits up to you as soon as we're convinced they're

22    all in order.  Okay.

23              THE CLERK:  All rise.

24              (JURORS EXITED THE COURTROOM.)

25              THE COURT:  Are all the exhibits in order?  Are we

1    using the JERS system?

2         THE CLERK:  We are using the JERS.  We need about 15

3    minutes to confirm everybody is consenting.

4         THE COURT:  Obviously, if there's an issue, let me

5    know, and I'll try to resolve it.  Try not to be too far from

6    the courtroom while the jury is out.  You have my permission to

7    have cell phones with you and turned on while the jury is

8    deliberating.  Obviously, I'll give you a little more latitude

9    at lunch, but if you could be no more than ten minutes away,

12:22PM 10  that would be good, otherwise, again, if I haven't heard, we'll

11   reconvene at ten minutes of five and see what they want to do.

12         Anything else?

13         MR. GARLAND:  No, your Honor.

14         MR. LAUER:  No, your Honor.

15         THE COURT:  All right.  We'll stand in recess.

16         THE CLERK:  All rise.

17         (A recess was taken.)

18         (Jury deliberating)

19         THE CLERK:  All rise.

12:37PM 20        THE COURT:  Okay.  What's the issue?

21         MR. GARLAND:  The issue is that the government is

22   asking that the blow-up of 23 go back to the jury.  It has the

23   stickers on it that Agent Andersen put on during his testimony

24   and that it go back as a chalk to the jury that they can

25   consider as an aid to their memory.

## J.A. 2059

1      THE COURT:  All right.  And the defense objects?

2      MR. LAUER:  We do.

3      THE COURT:  All right.  I don't remember it being

4   admitted as an exhibit, you know, and it's a light switch

5   that's either on or off.  Either it's in or it's not.  It could

6   have been admitted.  We took a screen shot, for example, marked

7   as 23A, but I think it's too late, so I'm not going to allow it

8   back in the jury.  Okay.

9      THE CLERK:  All rise.

12:42PM 10   ( A recess was taken.)

11      THE CLERK:  Does counsel for the government consent to

12   the verdict form, hard exhibits and JERS exhibits going

13   upstairs to deliberations?

14      MR. GARLAND:  It does.

15      THE CLERK:  Does defense counsel consent to the

16   verdict form and the hard exhibits and the JERS exhibits going

17   to deliberations?

18      MR. LAUER:  Yes, we do.

19      THE CLERK:  Thank you.

03:05PM 20   ( A recess was taken.)

21      THE CLERK:  All rise for the jury.

22      (JURORS ENTERED THE COURTROOM.)

23      THE CLERK:  Thank you.  You may be seated.  Court is

24   now back in session.

25      THE COURT:  Madam foreperson, has the jury rendered a

1    unanimous verdict?

2         FOREPERSON OF THE JURY:  Yes, we have, your Honor.

3         THE COURT:  Could you please hand the form to the

4    clerk.  It appears to be in order.  I'll ask that the clerk

5    publish it, please.

6                              VERDICT

7         THE CLERK:  As to Count One, false statement under

8    oath in application required by federal immigration laws,

9    defendant is guilty.

03:23PM 10        As to Count Two, perjury and written document, guilty.

11        As to Count Three, false statement under oath in

12   application required by federal immigration law, guilty.

13        As to Count Four, perjury in written document, guilty.

14        As to Count Five, perjury and immigration court

15   testimony, guilty.  Signed by the foreperson dated 4-5-19.

16        THE COURT:  Is there a request to poll the jury?

17        MR. LAUER:  There is, your Honor.

18        THE CLERK:  Juror in Seat Number 1, do you agree with

19   the verdict?

03:24PM 20        THE JUROR:  Yes.

21        THE CLERK:  Juror in Seat Number 2, do you agree with

22   the verdict?

23        THE JUROR:  I do.

24        THE CLERK:  Juror in Seat Number 3, do you agree with

25   the verdict?

1          THE JUROR:  I do.

2          THE CLERK:  Juror in Seat Number 6, do you agree with

3     the verdict?

4          THE JUROR:  Yes, I do.

5          THE CLERK:  Juror in Seat Number 8, do you agree with

6     the verdict?

7          THE JUROR:  I do.

8          THE CLERK:  Juror in Seat Number 9, do you agree with

9     the verdict?

03:24PM 10          THE JUROR:  I do.

11          THE CLERK:  Juror in Seat Number 10, do you agree with

12     the verdict?

13          THE JUROR:  I do.

14          THE CLERK:  Juror in Seat Number 11, do you agree with

15     the verdict?

16          THE JUROR:  I do.

17          THE CLERK:  Juror in Seat Number 14, do you agree with

18     the verdict?

19          THE JUROR:  I do.

03:24PM 20          THE CLERK:  Juror in Seat Number 15, do you agree with

21     the verdict?

22          THE JUROR:  I do.

23          THE CLERK:  Juror in Seat Number 16, do you agree with

24     the verdict?

25          THE JUROR:  Yes.

1          THE COURT:  Ladies and gentlemen, thank you for your

2     service and your patience and your cooperation.  I need to

3     spend just a couple moments with the lawyers, and I know it's

4     late in the afternoon, but if you would indulge me, I'd like to

5     come up to the jury room to thank you in person for your

6     service.  Thank you, and you're hereby discharged.  Thank you.

7          THE CLERK:  All rise.

8          (JURORS EXITED THE COURTROOM.)

9          THE COURT:  All right.  Mr. Teganya, a written

03:25PM 10    pre-sentence report will be prepared by probation to assist me

11    in determining your sentence.  You'll be asked to give

12    information for that report.  Your lawyers may be present, if

13    you wish.  It's important that the report be accurate.  It will

14    not only affect what sentence you receive but what happens to

15    you after you are sentenced.

16          For example, if you are sent to prison, it will affect

17    where you are sent and what happens to you when you get there.

18    Even minor mistakes in the report should be corrected.  You'll

19    have a chance to read that report and to go over it with your

03:26PM 20    lawyers and to make objections to it before the time of

21    sentencing, and both your lawyer and you personally will have

22    the opportunity to speak at the time of your sentencing.

23          I'll therefore refer you to probation for the

24    presentence investigation and preparation of the report.  That

25    process takes typically about 12 weeks.  Does Monday July 1st

1    work at 2:00?

2            MR. GARLAND:  I believe so for the government, your

3    Honor.

4            MR. LAUER:  That's fine.

5            THE COURT:  Monday, July 1st at 2:00.  Is there

6    anything further?

7            MR. GARLAND:  Not for the government.

8            MR. LAUER:  Not at this time.

9            THE COURT:  Thank you.  We'll stand in recess.

03:27PM 10            THE CLERK:  All rise.

11            (Whereupon, the hearing was adjourned at 3:26 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Department of Homeland Security
U.S. Citizenship and Immigration Services

U.S. Department of Justice
Executive Office for Immigration Review

OMB No. 1615-0067; Expires 11/30/2014

**I-589, Application for Asylum
and for Withholding of Removal**

**START HERE**- Type or print in black ink. See the instructions for information about eligibility and how to cormplete and file this application. There is NO filing fee for this application.

**NOTE:** Check this box if you also want to apply for withholding of removal under the Convention Against Torture. ☐

## Part A.I. Information About You

**1.** Alien Registration Number(s) (A-Number) *(if any)*

**2.** U.S. Social Security Number *(if any)*

**3.** Complete Last Name
**TEGANYA**

**4.** First Name
**Jean**

**5.** Middle Name
**Leonard**

**6.** What other names have you used *(include maiden name and aliases)?*

**7.** Residence in the U.S. *(where you physically reside)*

Street Number and Name
**24 Long Pond Road**

Apt. Number

| City | State | Zip Code | Telephone Number |
|---|---|---|---|
| **Plymouth** | **MASSACHUSETTS** | **02360** | |

**8.** Mailing Address in the U.S. *(if different than the address in Item Number 7)*

In Care Of *( if applicable):*
**same as above**

Telephone Number

Street Number and Name

Apt. Number

City

State

Zip Code

**9.** Gender: ■ Male ☐ Female    **10.** Marital Status: ☐ Single ■ Married ☐ Divorced ☐ Widowed

**11.** Date of Birth *(mm/dd/yyyy)*
/1971

**12.** City and Country of Birth
**Rwanda**

| **13.** Present Nationality *(Citizenship)* | **14.** Nationality at Birth | **15.** Race, Ethnic, or Tribal Group | **16.** Religion |
|---|---|---|---|
| **Rwanda** | **Rwanda** | **Black** | **Catholic** |

**17.** Check the box, a through c, that applies: **a.** ☐ I have never been in Immigration Court proceedings.

   **b.** ☐ I am now in Immigration Court proceedings. **c.** ☐ I am **not** now in Immigration Court proceedings, but I have been in the past.

**18.** Complete 18 a through c.

   **a.** When did you last leave your country? *(mmm/dd/yyyy)* **07/17/1994** **b.** What is your current I-94 Number, if any? _____

   **c.** List each entry into the U.S. beginning with your most recent entry. List date *(mm/dd/yyyy)*, place, and your status for each entry. *(Attach additional sheets as needed.)*

| Date **08/03/2014** | Place **Houlton, ME** | Status **EWI** | Date Status Expires |
|---|---|---|---|
| Date | Place | Status | |
| Date | Place | Status | |

**19.** What country issued your last passport or travel document?
**Rwanda**

**20.** Passport Number

Travel Document Number

**21.** Expiration Date *(mm/dd/yyyy)*
**03/10/2013**

**22.** What is your native language *(include dialect, if applicable)?*
**Kinyarwanda**

**23.** Are you fluent in English?
■ Yes ☐ No

**24.** What other languages do you speak fluently?
**French, Swahili, Spanish**

EXHIBIT 001

| For EOIR use only. | For USCIS use only. | Action: Interview Date: _____ Asylum Officer ID#: _____ | Decision: _____ Approval Date: _____ Denial Date: _____ Referral Date: _____ |
|---|---|---|---|

## Part A.II. Information About Your Spouse and Children

**Your spouse** ☐ I am not married. (Skip to **Your Children** below.)

| 1. Alien RegistrationNumber (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Date of Birth (mm/dd/yyyy) ▮1975 | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name Gahamanyi | 6. First Name Nicole | 7. Middle Name | 8. Maiden Name |
| 9. Date of Marriage (mm/dd/yyyy) 10/16/2004 | 10. Place of Marriage Longuciul, Canada | 11. City and Country of Birth Gitarama, Rwanda | |
| 12. Nationality (Citizenship) Canadian | 13. Race, Ethnic, or Tribal Group Black | 14. Gender ☐ Male ▮ Female | |

| 15. Is this person in the U.S.? ☐ Yes (Complete Blocks 16 to 24.) ☐ No (Specify location): Quebec, Canada |
|---|

| 16. Place of last entry into the U.S. | 17. Date of last entry into the U.S. (mm/dd/yyyy) | 18. I-94 Number (if any) | 19. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 20. What is your spouse's current status? | 21. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 22. Is your spouse in Immigration Court proceedings? ☐ Yes ☐ No | 23. If previously in the U.S.; date of previous arrival (mm/dd/yyyy) |

24. If in the U.S., is your spouse to be included in this application? (Check the appropriate box.)

☐ Yes (Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)

☐ No

**Your Children.** List **all** of your children, regardless of age, location, or marital status.

☐ I do not have any children. (Skip to Part A.III., **Information about your background.**)

▮ I have children. Total number of children: **2**

(**NOTE:** Use Form I-589 Supplement A or attach additional sheets of paper and documentation if you have more than four children.)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) Single | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name Teganya | 6. First Name Boris | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) ▮/1997 |
| 9. City and Country of Birth Montreal, Canada | 10. Nationality (Citizenship) Canadian | 11. Race, Ethnic, or Tribal Group Black | 12. Gender ▮ Male ☐ Female |

| 13. Is this child in the U.S.? ☐ Yes (Complete Blocks 14 to 21.) ▮ No (Specify location): Quebec, Canada |
|---|

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any?(mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? (Check the appropriate box.)

☐ Yes (Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)

☐ No

USA-JLT-00002

**J.A. 2066**

| 1. Alien Registration Number (A-Number) *(if any)* | 2. Passport/ID Card Number *(if any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. U.S. Social Security Number *(if any)* |
|---|---|---|---|
| | | **Single** | |

| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(mm/dd/yyyy)* |
|---|---|---|---|
| **Teganya** | **Miguel** | **Bright** | ▮1999 |

| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic, or Tribal Group | 12. Gender |
|---|---|---|---|
| **Montreal, Canada** | **Canadian** | **Black** | ▮ Male ☐ Female |

| 13. Is this child in the U.S.? ☐ Yes *(Complete Blocks 14 to 21.)* ■ No *(Specify, location:)* **Quebec, Canada** |
|---|

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. *(mm/dd/yyyy)* | 16. I-94 Number *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| | | | |

| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any?*(mm/dd/yyyy)* | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No |
|---|---|---|

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes *(Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)*
☐ No

| 1. Alien Registration Number (A-Number) *(if any)* | 2. Passport/ID Card Number *(if any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. U.S. Social Security Number *(if any)* |
|---|---|---|---|
| | | | |

| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(mm/dd/yyyy)* |
|---|---|---|---|
| | | | |

| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic, or Tribal Group | 12. Gender |
|---|---|---|---|
| | | | ☐ Male ☐ Female |

| 13. Is this child in the U.S.? ☐ Yes *(Complete Blocks 14 to 21.)* ☐ No *(specify location):* |
|---|

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. *(mm/dd/yyyy)* | 16. I-94 Number *(If any)* | 17. Status when last admitted *(visa type, if any)* |
|---|---|---|---|
| | | | |

| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any?*(mm/dd/yyyy)* | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No |
|---|---|---|

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes *(Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person)*
☐ No

| 1. Alien Registration Number (A-Number) *(if any)* | 2. Passport/ID Card Number *(if any)* | 3. Marital Status *(Marital Single, Divorced, Widowed)* | 4. US. Social Security Number *(if any)* |
|---|---|---|---|
| | | | |

| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(mm/dd/yyyy)* |
|---|---|---|---|
| | | | |

| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic, or Tribal Group | 12. Gender |
|---|---|---|---|
| | | | ☐ Male ☐ Female |

| 13. Is this child in the U.S.? ☐ Yes *(Complete Blocks 14 to 21.)* ☐ No *(Specify location):* |
|---|

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. *(mm/dd/yyyy)* | 16. I-94 Number *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| | | | |

| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any?*(mm/dd/yyyy)* | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No |
|---|---|---|

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes *(Attach one photograph of your spouse in the upper right corner of Page 9 on the extra copy of the application submitted for this person.)*
☐ No

1. List your last address where you lived before coming to the United States. If this is not the country where you fear persecution, also list the last address in the country where you fear persecution. *(List Address, City/Town, Department, Province, or State and Country.)*
   **(NOTE:** *Use I-589 Supplement B, or additional sheets of paper, if necessary)*

| Number and Street *(Provide if available)* | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| 6213 Salvail | Laval | Quebec | Canada | 06/2007 | 08/2014 |
| | Ruhande | Butare | Rwanda | 10/1991 | 07/1994 |

2. Provide the following information about your residences during the past 5 years. List your present address first,
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary)*

| Number and Street | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| 26 Long Pond Road | Plymouth | MA | USA | 08/2014 | Present |
| 50 County Way | Portland | ME | USA | 08/2014 | 08/2014 |
| 3911 Rachel Est | Montreal | Quebec | Canada | 10/2012 | 08/2014 |
| 6213 Salvail | Laval | Quebec | Canada | 06/2007 | 10/2012 |
| | | | | | |

3. Provide the following information about your education, beginning with the most recent.
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary)*

| Name of School | Type of School | Location *(Address)* | Attended From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|
| Tilak Maharashfra Vidyaputh | Nehru Institute of Social Service | Puna, India | 10/1997 | 06/1999 |
| National University of Rwanda | Medical School | Butare, Rwanda | 10/1991 | 06/1994 |
| Petit Seminaire Saint Pie X | High School | Nyundo, Rwanda | 08/1985 | 06/1991 |
| Ecole Primaire de Muhororo | Primary School | Gatumba, Rwanda | 09/1997 | 06/1985 |

4. Provide the following information about your employment during the past 5 years. List your present employment first.
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary)*

| Name and Address of Employer | Your Occupation | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|
| Groupe MDF, Quebec Canada | Corporate Buyer | 07/2012 | 10/2012 |
| Wolseley Canada, Inc, Burlington, Ontario, Canada | Buyer/Inventory Planner | 10/2005 | 03/2012 |
| | | | |

5. Provide the following information about your parents and siblings (brothers and sisters). Check the box if the person is deceased.
   **(NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary)* (See Attachment)

| Full Name | City/Town and Country of Birth | Current Location |
|---|---|---|
| *Mother* Bernadette Mukaruhumuriza | Gatumba Ngororero, Rwanda | ☐ Deceased Rwanda |
| *Father* Innocent Teganya | Gatumba Ngororero, Rwanda | ☐ Deceased Rwanda |
| *Sibling* Marie Rose Uwamahoro | Gatumba Ngororero, Rwanda | ☐ Deceased Rwanda |
| *Sibling* Marie Chantal Uwajeneza | Gatumba Ngororero, Rwanda | ☐ Deceased Rwanda |
| *Sibling* Jean Paul Ishimwe | Gatumba Ngororero, Rwanda | ☐ Deceased missing since 1996 |
| *Sibling* Jean Pierre Rukundo | Gatumba Ngororero, Rwanda | ☐ Deceased Rwanda |

**J.A. 2068**

**Addendum to Part A. III. Item 5 - Additional Siblings**

Jean Baptiste Bosenumwe - Gatumba Ngororero, Rwanda - Rwanda
Jean Claude Uwanyirigira - Gatumba Ngororero, Rwanda - Rwanda
Marie Jeanne Niuze - Gatumba Ngororero, Rwanda - Rwanda

## Part B. Information About Your Application

(**NOTE:** *Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part B.*)

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the INA or withholding of removal under the Convention Against Torture), you must provide a detailed and specific account of the basis of your claim to asylum or other protection. To the best of your ability, provide specific dates, places, and descriptions about each event or action described. You must attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim. If this documentation is unavailable or you are not providing this documentation with your application, explain why in your responses to the following questions.

Refer to Instructions, Part 1: Filing Instructions, Section II, "Basis of Eligibility," Parts A - D, Section V, "Completing the Form," Part B, and Section VII, "Additional Evidence That You Should Submit" for more information on completing this section of the form.

1. Why are you applying for asylum or withholding of removal under section 241(b)(3) of the INA, or for withholding of removal under the Convention Against Torture? Check the appropriate box(es) below and then provide detailed answers to questions A and B below.

I am seeking asylum or withholding of removal based on:

- [■] Race
- [■] Political opinion
- [ ] Religion
- [■] Membership in a particular social group
- [ ] Nationality
- [■] Torture Convention

---

**A.** Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?

[ ] No   [■] Yes

If "Yes" explain in detail:
1. What happened;
2. When the harm or mistreatment or threats occurred;
3. Who caused the harm or mistreatment or threats; and
4. Why you believe the harm or mistreatment or threats occurred.

> My father was detained in inhuman conditions and tortured. My brother Jean Paul Ishimwe has been missing since 1996 and we do not know if he was killed or is still alive. My uncle Vedoste Bigaruka was killed. My aunt;s husband Thelesphore Riberakurora was killed. My uncle Juvenal Bagarirayose was repeatedly beaten and detained. I will submit a detailed declaration prior to my asylum hearing.

---

**B.** Do you fear harm or mistreatment if you return to your home country?

[ ] No   [■] Yes

If "Yes," explain in detail:
1. What harm or mistreatment you fear;
2. Who you believe would harm or mistreat you; and
3. Why you believe you would or could be harmed or mistreated.

> I believe if I am forced to return to Rwanda, the Rwandan authorities will see to detain, arrest and possibly kill me because of my father's political opinion, which will be imputed to me. Further, there was a lot of publicity regarding my case in Canada which has endangered my return to Rwanda. I will submit a detailed declaration prior to my asylum hearing.

---

2. Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States?

☐ No    ■ Yes

If "Yes," explain the circumstances and reasons for the action.

> My father Innocent Teganya is imprisoned in Rwanda for political reasons. He was sentenced to 22 years in 2004. I will submit a detailed declaration prior to my asylum hearing.

3.A. Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☐ No    ■ Yes

If "Yes," describe for each person the level of participation, any leadership or other positions held and the length of time you or your family members were involved in each organization or activity.

> My father was the local President (formerly Kibilira District) of MRND from 1991 to 1994. As a student, I belonged to the Red Cross Youth Section from 1986 to 1991. I was president of the Red Cross Youth Section from 1989 to 1990. I will submit a detailed declaration prior to my asylum hearing.

3.B. Do you or your family members continue to participate in any way in these organizations or groups?

■ No    ☐ Yes

If "Yes," describe for each person your or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your family members have been involved in each organization or group.

4. Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No    ■ Yes

If "Yes," explain why you are afraid and describe the nature of torture you fear, by whom, and why it would be inflicted.

> My father is in prison having been charged as a war criminal. I had no connection to him or his activities, yet I fear that the Rwandan government will seek to imprison and possibly kill me due to my father's alleged activities. I will submit a detailed declaration prior to my asylum hearing.

(NOTE: *Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.*)

1. Have you, your spouse, your child(ren), your parents or your siblings ever applied to the U.S. Government for refugee status, asylum, or withholding of removal?

   ☒ No   ☐ Yes

   If "Yes," explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision. Indicate whether or not you were included in a parent or spouse's application. If so, include your parent or spouse's A-number in your response. If you have been denied asylum by an immigration judge or the Board of Immigration Appeals, describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.

2.A. After leaving the country from which you are claiming asylum, did you or your spouse or child(ren) who are now in the United States travel through or reside in any other country before entering the United States?

   ☐ No   ☒ Yes

2.B. Have you, your spouse, your child(ren), or other family members, such as your parents or siblings, ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?

   ☐ No   ☒ Yes

   If "Yes" to either or both questions (2A and/or 2B), provide for each person the following: the name of each country and the length of stay, the person's status while there, the reasons for leaving, whether or not the person is entitled to return for lawful residence purposes, and whether the person applied for refugee status or for asylum while there, and if not, why he or she did not do so.

   I lived in Congo, Kenya, India and Canada.  My wife is a citizen of Canada.

3. Have you, your spouse or your child(ren) ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

   ☒ No   ☐ Yes

   If "Yes," describe in detail each such incident and your own, your spouse's, or your child(ren)'s involvement.

**4.** After you left the country where you were harmed or fear harm, did you return to that country?

☒ No     ☐ Yes

If "Yes," describe in detail the circumstances of your visit(s) (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s).)

**5.** Are you filing this application more than 1 year after your last arrival in the United States?

☒ No     ☐ Yes

If "Yes," explain why you did not file within the first year after you arrived. You must be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived. For guidance in answering this question, see Instructions, Part 1: Filing Instructions, Section V. "Completing the Form," Part C.

**6.** Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged convicted, or sentenced for any crimes in the United States?

☒ No     ☐ Yes

If "Yes," for each instance, specify in your response: what occurred and the circumstances, dates, length of sentence received, location, the duration of the detention or imprisonment, reason(s) for the detention or conviction, any formal charges that were lodged against you or your relatives included in your application, and the reason(s) for release. Attach documents referring to these incidents, if they are available, or an explanation of why documents are not available.

I certify, under penalty of perjury under the laws of the United States of America that this application and the evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546(a), provides in part: Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this title or imprisoned for up to 25 years. I authorize the release of any information from my immigration record that U.S. Citizenship and Immigration Services (USCIS) needs to determine eligibility for the benefit I am seeking.

> Staple your photograph here or the photograph of the family member to be included in the extra copy of the application submitted for that person.

*WARNING:* Applicants who are in the United States illegally are subject to removal if their asylum or withholding claims are not granted by an asylum officer or an immigration judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. You may not avoid a frivolous finding simply because someone advised you to provide false information in your asylum application. If filing with USCIS, unexcused failure to appear for an appointment to provide biometrics (such as fingerprints) and your biographical information within the time allowed may result in an asylum officer dismissing your asylum application or referring it to an immigration judge. Failure without good cause to provide DHS with biometrics or other biographical information while in removal proceedings may result in your application being found abandoned by the immigration judge. See sections 208(d)(5)(A) and 208(d)(6) of the INA and 8 CFR sections 208.10, 1208.10, 208.20, 1003.47(d) and 1208.20.

| Print your complete name. | Write your name in your native alphabet. |
|---|---|
| **Jean Leonard TEGANYA** | TEGANYA Jean Leonard |

Did your spouse, parent, or child(ren) assist you in completing this application? ☑ No ☐ Yes *(If "Yes," list the name and relationship.)*

| _(Name)_ | _(Relationship)_ | _(Name)_ | _(Relationship)_ |
|---|---|---|---|

Did someone other than your spouse, parent, or child(ren) prepare this application? ☐ No ☑ Yes *(If "Yes," complete Part E.)*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim? ☐ No ☑ Yes

Signature of Applicant *(The person in Part A.I.)*

[ _(signature)_ ]

Sign your name so it all appears within the brackets

Date *(mm/dd/yyyy)* 9/13/14

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant, and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324c and/or criminal penalties under 18 U.S.C. 1546(a).

| Signature of Preparer | Print Complete Name of Preparer |
|---|---|
| _(signature)_ | **David McHaffey** **Barker, Epstein, Loscocco & McHaffey** |

| Daytime Telephone Number | Address of Preparer: Street Number and Name |
|---|---|
| _(redacted)_ | **10 Winthrop Square** |

| Apt. Number | City | State | Zip Code |
|---|---|---|---|
| **2nd Floor** | **Boston** | **MASSACHUSETTS** | **02110** |

**NOTE:** *You will be asked to complete this part when you appear for examination before an asylum officer of the Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS).*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered ____ to ____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____
Signature of Applicant

_____
Date *(mm/dd/yyyy)*

_____
Write Your Name in Your Native Alphabet

_____
Signature of Asylum Officer

**NOTE:** *You will be asked to complete this Part when you appear before an immigration judge of the U.S. Department of Justice, Executive Office for Immigration Review (EOIR), for a hearing.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered ____ to ____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____
Signature of Applicant

_____
Date *(mm/dd/yyyy)*

_____
Write Your Name in Your Native Alphabet

_____
Signature of Immigration Judge

**J.A. 2075**

UNITED STATES OF AMERICA

IMMIGRATION AND NATURALIZATION SERVICE

UNITED STATES OF AMERICA,  )
                            )
-V-                         )
                            ) FILE NO.
JEAN LEONARD TEGANYA,       ) 098-301-881
                            )
            Respondent.     )

September 16, 2014

Boston, Massachusetts

<u>BEFORE:</u>   HON. STEVEN F. DAY
          United States Immigration Judge

EXHIBIT

003

PRESENT:

JENNIFER MULCAHY, ESQ.
Department of Homeland Security.

DAVID McHAFFEY, ESQ.

USA-JLT-000698

I N D E X

WITNESSES:                    DIRECT   CROSS   REDIRECT   RECROSS

Jean Leonard Teganya

EXHIBITS:                                      FOR ID    IN EVID

1        Initial Offering                                  4
2-4      Support Letters                                   4
5        Article, "When Victims Become Killers"            5
6        Wanted Poster                                     6
7        Decisions, 5/06, and 10/12                        6

USA-JLT-000699

1              P R O C E E D I N G S

2              THE COURT:  -- in a custody hearing in the case of

3    Jean Leonard Teganya, 098 301 881.  Today's date is

4    September 16th, 2014.

5              The Immigration Judge is Steven F. Day.

6              Representing the Department of Homeland Security

7    is Ms. Jennifer Mulcahy.  The respondent, is here in court,

8    DHS custody, with his attorney, David McHaffey.

9              State your name for me?

10             MR. TEGANYA:  Jean Leonard Teganya.

11             THE COURT:  Okay.  We're in a custody hearing to

12   determine if a bond should be set in your case.

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17          THE COURT:  Raise your right hand.

18  Whereupon,

19                     JEAN LEONARD TEGANYA

20  having been first duly sworn, was called as a witness

21  herein, and was examined and testified as follows:

22          THE COURT:  Okay.  Lower your hand.

23

24

25

1

2          THE COURT:  You're an ethnic Hutu?

3          THE WITNESS:  Yes, I am.

4          THE COURT:  Okay.  What did you see at the

5    hospital with respect to the genocide?

6          THE WITNESS:  At the hospital, mostly what I saw,

7    it was just people who were left for dead.  Just coming to

8    the hospital seeking for medical care.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14          THE COURT:  It sounds like your father was -- had

15   an important position in the government.

16          Did he?

17          THE WITNESS:  No.  My father was a middle-level

18   administrator in a mining company led by government.

19          THE COURT:  And what happened to him?

20          THE WITNESS:  My father was also a -- was also the

21   local head of -- local president of the MRND, which was the

22   former ruling party.

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21          THE COURT:  All right.  Why are you afraid to go

22  back to Rwanda?

23          THE WITNESS:  I'm afraid because of this political

24  past of my father.  Even though I'm not attached to him

25  politically, I was not interested in his political activity

1  or I don't -- I had no political ambition.  I was not living

2  with him.  I never belong to that political party, but still

3  in Rwanda, many times it's about family.

USA-JLT-000718

1

2

3

4

5

6

7

8

9

10

11

12                        <u>CROSS EXAMINATION</u>

13           BY MS. MULCAHY:

14      Q    So, what exactly did you see when you were an

15  intern at the Butare Hospital?

16      A    As I was telling the -- his Honor, I mostly --

17  what I saw, I saw people coming, wounded people, victims of

18  genocide coming to the hospital looking for medical care.

19      Q    Did you see anything else?

20           Anything else that -- anything else that stands

21  out in your mind?

22      A    Not specifically.

23           MS. MULCAHY:  Okay.  Well, I would draw the

24  court's attention to the respondent's -- or on Exhibit 7,

25  Page 11, which indicated that at your Canadian hearing, you

1  testified that, in addition to the military who lined the

2  corridors of the hospital, there were also individuals

3  partly dressed in military uniforms who sowed terror.

4          BY MS. MULCAHY:

5      Q   So, how come you didn't tell the Judge about that?

6      A   I have -- I have some details.  It not easy to

7  recall them because it's long time ago, but I can tell you

8  that at the first week of the month of July, that university

9  hospital was the only one hospital learning in the south

10  region of Rwanda.

11          So, they -- we are all just taking care of these

12  variant victims.  Even military and para -- paramilitary

13  group dressed in military uniform, used to come to that

14  hospital just looking for care.  So, there was a mix of

15  civilians and the soldiers and Army just coming to the

16  hospital.

17      Q   Now, you also testified today that you started at

18  the hospital in May, and you were there until July; is that

19  correct?

20      A   Yes.

21      Q   Okay.  Well, --

22      A   No, no.  Not May.  April.

23      Q   Okay.  You said, "May," earlier today.

24          So, when --

25      A   April.

1    Q    -- exactly were you at the hospital?

2    A    April.

3    Q    Until when?

4    A    'Til July.

5    Q    So, there is documentary evidence that actually

6    shows that people who came to that particular hospital --

7    and this is in Bond Exhibit --

8         THE COURT:  Five.

9         BY MS. MULCAHY:

10   Q    -- 5 -- that people were, actually, being turned

11   over to be slaughtered by the military that was waiting

12   outside.

13        Did you witness any of that?

14   A    No.

15   Q    It talks about the horror that went on in this

16   hospital where you were an intern for two months at the

17   height of the genocide and you didn't see any of this; is

18   that correct?

19   A    Only a lot of details -- according to my opinion

20   -- which are not really accurate.  I'm not the first one to

21   state that even there is a woman who participated in (u)

22   this document.  He give me -- she give me her testimony in

23   Canada.  So, that just -- all I can say is what I have seen.

24   What is written down, I -- I cannot -- cannot confirm that.

25   Q    So, you never saw any atrocities occur?

1    A    As it is written in the -- the document, most of

2  atrocity occurred nighttime.

3    Q    Did you see any atrocities occur?

4    A    No.

5    Q    Then why did you testify what you did in front of

6  the Canadian Court, that there were people there who sowed

7  terror?

8    A    Sowed terror -- for me, sowed terror be they are

9  -- I -- I can express -- I can't explain the -- the

10 situation.

11        There was victims coming to the hospital looking

12 for care.  There were some paramilitary groups and militia

13 just coming to the same hospital.

14        So, these victims were afraid of these armored

15 people.  That's what I was trying to say.

16    Q    Were you aware there was a genocide occurring at

17 the hospital?

18    A    No.  Just afterward.

19

20

21

22                    .

23

24

25

1

2

3

4

5

6

7

8          All right, sir, I granted a bond of $12,000.00,

9   but the government has reserved appeal; so, you may not be

10  released from detention until this gets resolved.

11  Typically, that takes two or three months.  So, we'll go off

12  this record, on to the removal record, and I'll appoint your

13  -- you'll start your, your removal proceedings, okay?

14

15

CERTIFICATE OF TRANSCRIBER

This is to certify that the attached proceedings

before: U.S. IMMIGRATION AND NATURALIZATION SERVICE

in the Matter of:

```
UNITED STATES OF AMERICA,          )
                                   )
-V-                                )
                                   )  FILE NO.
JEAN LEONARD TEGANYA,              )  098-301-881
                                   )
                    Respondent.    )
```

Place: Boston, Massachusetts

Date:  September 16, 2014

were held as herein appears, and that this is the true,

accurate and complete transcript prepared from the

recordings taken  of the above entitled proceeding.

```
J. Mocanu                          01/11/16
Transcriber                        Date
```



USA-JLT-000764

**J.A. 2091**





J.A. 2092





UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 17-CR-10292-FDS |
| | ) | |
| JEAN LEONARD TEGANYA | ) | |

## STIPULATIONS

Defendant, John Leonard Teganya, and the United States of America hereby stipulate and agree as follows:

1. In Butare, Rwanda during the period of 1992 through 1994, the earliest the sun set during the year was at 5:51 p.m., and the latest it set was at 6:22 p.m.

2. Civilian witnesses for the prosecution and defense who were summoned to testify at trial each received $71 per day to spend on meals and incidental expenses, and an additional $40 per day in witness fees, for each day that they were in the United States. They received $35.50 for the first and last days of travel.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

JEAN LEONARD TEGANYA
By his attorneys

/s/ George P. Varghese
SCOTT L. GARLAND
GEORGE P. VARGHESE
Assistant United States Attorneys
John J. Moakley United States Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3100

/s/ Scott Lauer
Scott Lauer
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061 (phone)
617-223-8080 (fax)



EXHIBIT

tabbies

81

**J.A. 2094**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **1:17-cr-10292-FDS** |
| | ) | |
| **JEAN LEONARD TEGANYA** | ) | |

## NOTICE OF APPEAL

Notice is hereby given that the defendant, Jean Leonard Teganya, appeals to the United States Court of Appeals for the First Circuit from the denial of all motions, the judgment of conviction, and the sentence imposed in this case. Judgment was entered July 2, 2019.

Respectfully submitted,
JEAN LEONARD TEGANYA
by his attorney
*/s/ Scott Lauer*
Scott Lauer (BBO #667807)
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061 (phone)
617-223-8080 (fax)
Scott_Lauer@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 8, 2019.

*/s/ Scott Lauer*
Scott Lauer