UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 19-1689
_____
_____

UNITED STATES
Appellee,

v.

JEAN LEONARD TEGANYA
Defendant-Appellant
_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
_____

BRIEF OF DEFENDANT-APPELLANT
JEAN LEONARD TEGANYA
_____

Christine DeMaso
Assistant Federal Public Defender
Federal Public Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No.: 1168061

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES ..................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED FOR REVIEW ...................................................1

STATEMENT OF THE CASE................................................................2

    I.    Trial ..............................................................................................2

        A.   The alleged falsehoods. ..........................................................4

        B.   The government's witnesses...................................................7

        C.   The defense witnesses.........................................................16

    II.   Sentencing ................................................................................27

SUMMARY OF ARGUMENT ..............................................................28

ARGUMENT ...............................................................................29

I.  The district court erred by admitting expert testimony that
    denigrated the defense theory and vouched for government
    witnesses ...........................................................................29

   A.  Admissibility of expert testimony and standard of review ...........30

   B.  The permissible aspects of Dr. Clark's testimony — the history of
       the Rwandan genocide. ........................................................32

   C.  Dr. Clark invaded the province of the jury by opining about the
       credibility of defense arguments and the government's
       witnesses. ........................................................................33

II. The district court erred in imposing the obstruction enhancement at
    sentencing ...........................................................................42

   A.  Standard of review. ............................................................43

   B.  Imposition of the obstruction enhancement. ...................................43

   C.  The court imposed this enhancement because Mr. Teganya
       repeated the statements that the indictment alleged were false.
       The application of the enhancement in these circumstances
       impaired his constitutional right to testify. Given the context
       of this case, his testimony was not a "significant further
       obstruction." ......................................................................46

D.   Even if the obstruction enhancement could be justified in this case, the district court did not make the findings required to do so. ....................................................................................................55

CONCLUSION .....................................................................................................58

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) .................................59

CERTIFICATE OF SERVICE .............................................................................60

# TABLE OF AUTHORITIES

**Page**

## Cases

*Rock v. Arkansas*,
    483 U.S. 44 (1987) ................................................................. 47, 48

*United States v. Agoro*,
    996 F.2d 1288 (1st Cir. 1993) ..................................................48

*United States v. Arsenault*,
    833 F.3d 24 (1st Cir. 2016) ......................................................43

*United States v. Brewer*,
    332 Fed.App. 296 (6th Cir. 2009)(unpublished) ............................. 51, 52

*United States v. Colby*,
    882 F.3d 267 (1st Cir. 2018) ....................................................55

*United States v. DeZarn*,
    157 F.3d 1042 (6th Cir. 1998)...................................................51

*United States v. Duarte*
    246 F.3d 56 (1st Cir. 2001) ......................................................31

*United States v. Dunnigan*,
    507 U.S. 87 (1993) ....................................... 47, 48, 50, 51, 52, 57

*United States v. Fernandez*,
    389 Fed.App. 194 (3d Cir. 2010) (unpublished)..................................52

*United States v. Johnson*,
    812 F.3d 757 (9th Cir. 2016)................................................ 50, 51

*United States v. Jordan*,
    813 F.3d 442 (1st Cir. 2016) ....................................................31

*United States v. Kantengwa*
    781 F.3d 545 (1st Cir. 2015) ............................................................... 33, 34

*United States v. Matiz,*
    14 F.3d 79 (1st Cir. 1994) ....................................................................55

*United States v. McCoy,*
    316 F.3d 287 (D.C. Cir. 2003) (per curiam) ...................................... 51, 52

*United States v. Mendoza-Maisonet,*
    962 F.3d 1 (1st Cir. 2020) ............................................................43, 55, 56

*United States v. Monell,*
    801 F.3d 34 (1st Cir. 2015) ....................................................................31

*United States v. Pattan,*
    931 F.2d 1035 (5th Cir. 1991) .................................................................51

*United States v. Rosales*,
    19 F.3d 763 (1st Cir. 1994) .......................................................31, 34, 40, 41

*United States v. Ruiz-Huertas,*
    792 F.3d 223 (1st Cir. 2015) ...................................................................43

*United States v. Silveira*,
    297 F.Supp.2d 349 (D. Mass. 2003) .......................................................52

*United States v. Thomas*,
    193 Fed.App. 881 (11th Cir. 2006) (per curiam) (unpublished) ........50

## Statutes

18 U.S.C. §1546.................................................................5, 52

18 U.S.C. §1621....................................................................5

18 U.S.C. §3231....................................................................1

18 U.S.C. §3481...................................................................47

28 U.S.C. §1291....................................................................1

28 U.S.C. §3742....................................................................1

## Rules

Fed. R. Evid. 403 ..................................................30, 31, 40, 41

Fed. R. Evid. 702 .............................................................30

Fed. R. Evid. 704 ......................................................30, 31, 40

## Sentencing Guidelines

U.S.S.G. §2J1.3...........................................................42, 52, 53

U.S.S.G. §2L2.2...........................................................52, 53, 54

U.S.S.G. §3C1.1. ..........................................................*passim*

U.S.S.G. §3D1.2. ...............................................................53

U.S.S.G. §3D1.3. ...............................................................53

# JURISDICTIONAL STATEMENT[1]

The district court had jurisdiction under 18 U.S.C. §3231, which grants the district courts exclusive jurisdiction over all offenses against the laws of the United States.

This Court has jurisdiction pursuant to 28 U.S.C. §1291, which confers jurisdiction to review all final decisions of the district courts, and §3742, which provides jurisdiction to review a sentence.

The district court entered final judgment on July 2, 2019. J.A.I 16. Mr. Teganya filed a timely notice of appeal on July 8, 2019. J.A.I 16, J.A.III 2095.

# ISSUES PRESENTED FOR REVIEW

1. Whether the government's expert witness gave inadmissible and prejudicial testimony that addressed the ultimate issue of witness credibility by bolstering the government witnesses and describing Mr. Teganya's defense as not credible?

2. Mr. Teganya was charged with lying during asylum proceedings, and he repeated the charged falsehoods when he testified at trial. Whether it is constitutional to apply the obstruction enhancement in these

---

[1] Add. refers to the Addendum, J.A.X to Volume X of the Joint Appendix, S.A. to the Sealed Appendix, and D.E. to a district court docket entry.

1

circumstances? Whether repeating the charged falsehoods is a "significant further obstruction" as required by the Guidelines? Whether the district court made sufficient findings to justify applying this enhancement?

## STATEMENT OF THE CASE

### I.    Trial

Mr. Teganya was charged with lying during his asylum application process in 2014, but the Rwandan genocide lies at the heart of this case. J.A.I 28-36, 82. The Rwandan genocide began in 1994 after years of strife between Rwanda's two major ethnic groups, the Hutus and the Tutsis. J.A.I 116-75. Over the course of 100 days, Hutus killed 800,000 people, mainly Tutsis. J.A.I 157-58. The genocide was led by the Hutu government, which was controlled by the MRND party (*Mouvement Révolutionaire National pour le Développement*). J.A.I 159-75. Much of the violence was perpetrated by civilians, including militias like the Interahamwe. J.A.I 169-70. It ended when the opposing party, the Tutsi-led Rwandan Patriotic Front (RPF), gained control of the country. J.A.I 180.

Jean Leonard Teganya was born to a Tutsi mother and a Hutu father in Rwanda in 1971. J.A.III 1682, S.A. 2. Ethnicity descends patrilineally, so he is considered a Hutu. J.A.I 120-21. When the genocide began, Mr.

Teganya was in his third year of medical studies at the National University of Rwanda in Butare and the affiliated University Hospital. J.A.III 1693, 1703. During the genocide he stayed at the school and helped at the hospital. J.A.III 1714-36. When the RPF approached Butare, he left Rwanda on foot. J.A.III 1748-54. He stayed in a refugee camp in Congo for two years. J.A.III 1754-57. When the Rwandan army began to attack these camps, he went to Kenya. J.A.III 1757-58. In 1997, he got a visa to study at the Tilak Maharashtra Vidyapeeth (also called the Nehru Institute of Social Sciences) in India. J.A.III 1758. Two years later, he graduated with a master's degree in economics. J.A.III 1758-59. His visa expired when he graduated, and in 1999, he used a false passport to fly to Canada, where he declared his true identity and sought protection as a refugee. J.A.III 1759-63. He lived in Canada for 15 years, worked, married a fellow refugee, and had two sons. J.A.III 1763-66.

When Canada denied his petition for refugee status in 2012, Mr. Teganya went into hiding.[2] J.A.III 1766-69. In 2014, he walked into Maine

---

[2] His application was denied because the Canadian authorities concluded "[h]e would not have survived in such an environment if he was not perceived as sharing the common intention to kill Tutsi and moderate Hutu." D.E. 97 at 4.

from Canada. J.A.III 1768-70. A border patrol agent stopped him. *Id.* He

declared his identity and began the process of applying for asylum. *Id.*

During this process he was asked about his political affiliations and actions

during the Rwandan genocide. J.A.III 2065-90. His answers formed the

basis of the charges in this case.I J.A. 28-36.

### A. The alleged falsehoods.

The Application for Asylum asked:

> Have you or your family members ever belonged to or been
> associated with any organizations or groups in your home country,
> such as, but not limited to, a political party, student group, labor
> union, religious organization, military[,] or paramilitary group, civil
> patrol, guerrilla organization, ethnic group, human rights group or
> the press or media[?]

J.A.I 28, 30. It asked him to "describe for each person the level of

participation, any leadership or other positions held and the length of time

you or your family members were involved in each organization or

activity." *Id.* Mr. Teganya responded that his father was the "local

President (formerly Kibilira District) of MRND from 1991 to 1994. As a

student, I belonged to the Red Cross Youth Section from 1986 to 1991. I was

president of the Red Cross Youth Section from 1989 to 1990." *Id.* The

government alleged that this answer was false because Mr. Teganya "was

himself a member of the MRND Party and the Interahamwe." *Id.* Counts

one and two of the indictment alleged that this answer was visa fraud in

violation of 18 U.S.C. §1546(a) and perjury in violation of 18 U.S.C.

§1621(2). J.A.I 28-31.

The Application for Asylum also asked:

Have you, your spouse or your child(ren) ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion[?]

J.A.I 32-33. Mr. Teganya responded "No." *Id.* The government alleged that

this response was false because Mr. Teganya "personally ordered, incited,

assisted and otherwise participated in causing harm and suffering to

persons because of their membership in a particular social group, to wit

Tutsis, during the genocide in Rwanda." *Id.* Counts three and four alleged

that this answer was visa fraud in violation of 18 U.S.C. §1546(a) and

perjury in violation of 18 U.S.C. §1621(2). *Id.*

Count five charged Mr. Teganya with perjury in violation of 18

U.S.C. §1621(1) based on three answers he gave during removal

proceedings. J.A.I 34-36. He was asked "Why are you afraid to go back to

Rwanda?" *Id.* He responded that he was afraid to return because his father

had been the local president of MRND, and that:

> Even though I'm not attached to him politically, I was not interested
> in his political activity or I don't—I have no political ambition. I was
> not living with him. I never belong [sic] to that political party, but
> still in Rwanda, many times it's about family.

*Id*. The government alleges that this statement was false because Mr.

Teganya "was a member of the MRND before and during the Rwandan

genocide." *Id.*

The second and third falsehood alleged in count 5 come from another

series of questions. Mr. Teganya was asked about what he saw at the

hospital during the genocide, and said he saw "victims of genocide"

coming to get medical treatment. *Id.* The government referenced

documentary evidence that people at the hospital were "being turned over

to be slaughtered by the military that was waiting outside," and asked Mr.

Teganya if he "witness[ed] any of that." *Id.* Mr. Teganya responded "No."

*Id.* He was asked to confirm that he "didn't see any" of the "horror that

went on in this hospital." *Id.* He responded that he disagreed with some of

the details in the report and that "all I can say is what I have seen." *Id.*

When he was asked "Did you see any atrocities occur?" he responded

"No." *Id.* The government alleged that these answers were false because Mr. Teganya "observed atrocities at the Hospital during the genocide, including Tutsis being turned over to the military to be killed." *Id.*

Mr. Teganya pled not guilty and went to trial. After an 18-day trial, the jury convicted him on all counts. To reach this verdict, the jury had to determine what happened during the Rwandan genocide, nearly 25 years before, across an ocean and a cultural divide. The government presented 14 witnesses. Twenty witnesses, including Mr. Teganya, testified in his defense. The pictures painted by these two groups could not have been more different. The government witnesses described Mr. Teganya as a high-ranking MRND official and Interahamwe member who committed atrocities, including raping and killing multiple Tutsis. The defense witnesses described a quiet, dedicated medical student who had no time for politics. Some explained that Mr. Teganya, like them, lived through the horror of the genocide without witnessing, let alone participating in, the individual atrocities that comprised it.

### B.    The government's witnesses.

A handful of government witnesses were not present in Rwanda during the genocide. The government began its case with expert testimony

from Phil Clark, a reader[3] in comparative and international politics at the University of London. J.A.I 106-09. He studies mass conflict in Africa, particularly in Rwanda, Uganda, and the Democratic Republic of Congo. J.A.I 108-09. He gave background on Rwanda, its ethnic groups, and the genocide.[4] J.A.I 106-251.

A U.S. Border Patrol agent described finding Mr. Teganya walking in rural Maine about five miles away from the lawful port of entry. J.A.I 558-75. Mr. Teganya said he was a Rwandan refugee who had crossed illegally from Canada. J.A.I 570-71.

An asylum agent with the U.S. Citizenship and Immigration Service (CIS) explained the asylum process. J.A.II 699-710. She explained that an applicant who harmed people in his or her own country is disqualified. J.A.II 708-09. She discussed Mr. Teganya's asylum application and immigration hearing, including how the alleged falsehoods would have impacted the asylum process. J.A.II 710-35.

---

[3] He described this position as equivalent to an assistant professor in America. J.A.I 106-09.

[4] His testimony will be discussed in greater detail in Section I, in connection with Mr. Teganya's argument that some of his testimony was inadmissible.

A Department of Homeland Security agent described his investigation of Mr. Teganya's alleged participation in the genocide. J.A.II 934-1009.

The rest of the government's witnesses were in Rwanda during the genocide. Some testified about what happened at the hospital without mentioning Mr. Teganya.

Rony Zachariah, a doctor with Doctors Without Borders, described his experience at the hospital during the genocide. J.A.I 252. He did not know or remember Mr. Teganya. J.A.I 314-15. He arrived in Rwanda in February 1994, and found Butare pleasant and seemingly untouched by the war. J.A.I 257-58, 264. The situation deteriorated when President Habyarimana's plane was shot down. J.A.I 270. He described the difficulty that his team had traveling and the horrors he observed when they did. J.A.I 284-310. He testified that he saw medical students giving patients stitches without anesthetics around April 20th or 22nd. J.A.I 312-15. Beginning on April 21st, he got reports that many of his patients, including children, had been removed from the hospital, and that some had been killed behind the hospital. J.A.I 315-18, 322. He saw bodies being carried into dump trucks and soldiers pulling patients out of the hospital. J.A.I 322,

326. Five of his nursing staff were taken away. J.A.I 327-32. He believed that 150 patients were killed on April 22nd and 23rd. J.A.I 332-33. His staff left the hospital on April 24th, and he never returned. J.A.I 333-34.

Assumpta Numukobwa, a Tutsi, was a first-year medical student at the time of the genocide. J.A.I 658-59. She described being threatened, verbally abused, and nearly raped in late 1993 when she arrived at the university. J.A.I 658-64. It was worse after Habyarimana's plane was shot down. J.A.I 664-65. She recounted students being murdered and described being taken by students, beaten, and given to soldiers. J.A.I 665-75. She escaped and hid at the hospital. J.A.I 675-83. She did not mention Mr. Teganya.

Isabelle Mukankusi was 14 at the time of the genocide. J.A.I 360. She testified that after being attacked by the Interahamwe, she spent 2.5 months in a coma at the hospital. J.A.I 373-74, 382-83. When she woke, she was taunted and hit by soldiers, and saw soldiers and civilians taking people to be killed or raped at night. J.A.I 386-90. One night, they took her. J.A.I 390-97. She saw many people dying and being killed, but the soldiers took her back to the hospital. *Id.* She recognized two of the people who took her as hospital staff. J.A.I 397-98. Once, when a soldier tried to rape her, she

10

escaped, and another patient hid her under her mattress.[5] J.A.I 399-401. She did not mention Mr. Teganya.

Three witnesses testified that Mr. Teganya was a member of MRND. Anicet Nzabonimpa, who was a year behind Mr. Teganya in secondary and medical school, testified that Mr. Teganya "was an active member" of MRND during university. J.A.I 576-82. He said that he saw Mr. Teganya "with the other students who were party members" and wearing MRND regalia. J.A.I 582-84. He was not in Butare during the genocide, and he and Mr. Teganya were not friends. J.A.I 588-89, 602.

Bernard Kalimba, Mr. Teganya's roommate during his first year of medical school, testified that he knew Mr. Teganya was a member of MRND because he wore MRND clothing and had an MRND flag. J.A.I 616-19. Although they did not live together after 1991, he said that "[e]very time [MRND] would have a rally or meetings, [Mr. Teganya] would attend. There was no day he missed." J.A.I 623. Jerome Arusha, another university classmate who was friends with Mr. Kalimba, testified that he knew Mr. Teganya was in MRND because he saw him wearing MRND clothes and

---

[5] Another witness, Ms. Mukamurenzi, described hiding Ms. Mukankusi under her bed. J.A.II 892-93.

socializing with MRND members. J.A.I 638-42. Dr. Kalimba and Mr. Arusha testified about a pre-genocide incident in which a group of MRND members harassed a Tutsi student and took his bike. J.A.I 621-22, 643-44. Dr. Kalimba testified that Mr. Teganya was there during this incident, but Mr. Arusha said that he was not. *Id*. Neither man saw Mr. Teganya during the genocide.

Other witnesses testified that Mr. Teganya committed rape and murder during the genocide. Innocent Habimana, a university maintenance worker, testified that he was in MRND with Mr. Teganya. J.A.II 749-52. He said that Mr. Teganya was the leader of the medical students in MRND and Interahamwe.[6] J.A.II 752-63. Mr. Habimana said that he was an Interahamwe advisor who helped train a group, including Mr. Teganya, in weapons and combat twice a week beginning at 6 p.m.[7] J.A.II 752-75. He described being with a group of Interahamwe when Mr. Teganya brought four Tutsi students out of a dorm. J.A.II 780-89. He said

---

[6] Mr. Habimana could not name any other students who were involved. J.AII. 810-11.

[7] He testified that these outdoor trainings lasted two hours. J.A. 807. The parties stipulated that between 1992 and 1994 in Rwanda, the sun set between 5:51 and 6:22 p.m. J.A.III 2094

that his group killed two of the students and Mr. Teganya's group killed the other two. *Id*. He spoke with Mr. Teganya once more and then did not see him again during the genocide. J.A.II 789-90.

Jean Pierre Gasasira, a Tutsi who was 17 at the time, testified that while fleeing violence, he helped a soldier who was on his way to the hospital, and spent the rest of the genocide helping him there. J.A.I 427, 446-50. Mr. Gasasira said Mr. Teganya was there caring for the soldiers. J.A.I 461-62. He described Mr. Teganya as balding with a chubby face and a gap in his teeth.[8] *Id*. He said Mr. Teganya was "very scary" and told "the soldiers to do bad things." J.A.I 466. Mr. Gasasira testified that he heard a doctor[9] named Jean Claude Karekezi tell someone that "'Dr. Teganya'" was "'hunting [him] down'" and that "'All of the medical staff here or the doctors here, there are some interns and Teganya, with Teganya, they are killing people.'" J.A.I 460. Mr. Gasasira said he saw Mr. Teganya, accompanied by a group of soldiers, chase and kill Mr. Karekezi. J.A.I 470-73. He described two other instances where he saw Mr. Teganya, joined by

---

[8] Pictures of Mr. Teganya from 1992 and 1993 contradicted this description. J.A.III 2092-93, 1712-14. The government introduced a picture taken in 2016 or 2017 that includes an ambiguous line on his teeth. J.A.III 2091, 1910-11.
[9] A defense witness said that Mr. Karekezi was not a doctor. J.A.II 1370.

soldiers, kill Tutsis he knew (Prota Nyangezia and Mathias Gasarabwe). J.A.I 484-93. Mr. Gasasira recalled hearing Mr. Teganya discuss rapes he had committed while offering to bring soldiers women they could rape. J.A.I 496-97. At the end of his cross-examination and during redirect, Mr. Gasasira repeatedly refused to acknowledge having met with the prosecutors during the two weeks prior to testifying, before finally agreeing that he did.[10] J.A.I 550-565.

Consolee Mukeshimana was a Tutsi nurse who was six months pregnant in April 1994. J.A.II 827-28. She said she met Mr. Teganya a month before the genocide, when he helped care for her son at the hospital. J.A.II 829-30. When the genocide began, she fled to the hospital, where her cousin was hiding. J.A.II 837-39. She saw Mr. Teganya there, and he asked how her son was doing. J.A.II 839-41. She said that once a day, he came with the Interahamwe and took people away. J.A.II 844. She heard the militia killing some of those people, but others, including her cousin, came back and said that Mr. Teganya raped them. J.A.II 844-49. She said Mr. Teganya took her cousin a number of times, until she did not return. J.A.II

---

[10] The prosecutors confirmed that they met with him in this period. J.A.I 552-56.

848-49. Ms. Mukeshimana testified that Mr. Teganya raped and beat her twice. J.A.II 849-50. He told a group of Interahamwe to kill her, but she escaped. J.A.II 850-53. Ms. Mukeshimana had previously testified in an American criminal case, given evidence in Rwanda, and been interviewed by researchers. J.A.II 853-55. She had never told this story before or mentioned Mr. Teganya or the hospital. J.A.II 853-55, 865-70.

Esperance Mukamurenzi, another Tutsi who hid at the hospital, said that the militia there was called "the army of Teganya." J.A.II 882-87. She did not "remember him well," but said he had a gap in his teeth. J.A.II 887; *see supra* note 8. She said his group took people to be raped and killed. J.A.II 888-91. She said that the militia, led by Mr. Teganya, took her and raped her about three times. J.A.II 891. Ms. Mukamurenzi described hiding Ms. Mukankusi under her bed, and remembered seeing Ms. Mukeshimana at the hospital. J.A.II 892-93. In her previous testimony in a genocide prosecution before the International Criminal Tribunal, Ms. Mukamurenzi did not mention Mr. Teganya. J.A.II 896-902, 911.

The government witnesses said that they were not forced, coerced, or pressured to testify. J.A.I 401-02, 499-500, 588-89, 625-26, 644, 682-83; J.A.II 792-93, 855-56, 893-94.

## C.    The defense witnesses.

The defense case began with expert testimony from Dr. Noel
Twagiramungu, a research fellow in the African Studies department at
Boston University. J.A.II 1084. His scholarship focuses on Rwanda,
particular on its post-genocide transition. J.A.II 1084-85. Dr.
Twagiramungu is Rwandan and went to the same secondary school as Mr.
Teganya. J.A.II 1083-85. Dr. Twagiramungu explained that Rwanda has a
military authoritarian government that teaches a simplified narrative of
Rwandan history. J.A.II 1086-98. This narrative positions all Tutsis as
victims, all Hutus as guilty, and all dissenters from this narrative as
genocide sympathizers or deniers. J.A.II 1091-98. Dr. Twagiramungu
described pervasive government pressure on civilians. J.A.II 1097-1104.

The other defense witnesses had personal relationships with Mr.
Teganya. Some explained that Mr. Teganya was not an MRND member.

Jean Paul Munyentwari, an agricultural student, was the university
president of a party opposing MRND (PSD, Social Democratic Party) from
1993-1994. J.A.II 1197-98. He knew the university leaders of the other
parties. J.A.II 1198-99. He recalled the MRND president was named Marcel,
and a man named Lambert was involved in the MRND. *Id.* He knew Mr.

Teganya through the university and never saw him wearing MRND clothing. J.A.II 1199-1201. Mr. Munyentwari was at the university during the genocide but did not go to the hospital. J.A.II 1202. After the genocide, he spent 11 years in prison before the Gacaca courts cleared him. J.A.II 1204. He did not report this arrest on his visa application. J.A.II 1205-06.

Fidele Barinda, a medical student, described Mr. Teganya as studious and shy. J.A.II 1218-19. Mr. Barinda was in MRND and was familiar with other members, including the president, Uruvugundi Marcel. J.A.II 1220-23. He said that Mr. Teganya was not a member. *Id*. Mr. Barinda did not know anything about the Interahamwe. J.A.II 1236-37. He was not in Butare during the genocide. J.A.II 1224-25. He spent 10 years in prison before the Gacaca courts cleared him. J.A.II 1226-27.

Between 1992 and 1994, Jean Pierre Baligira did the laundry, cleaned, and cooked at the house Mr. Teganya shared with other students. J.A.II 1259-62. He was at the house five days a week and never saw Mr. Teganya wearing MRND apparel. J.A.II 1262-63. Mr. Baligira knew Mr. Gasasira,[11]

---

[11] Mr. Gasasira was a government witness who said Mr. Teganya killed three people at the hospital. J.A.I 460-97. Mr. Gasasira said he was at the hospital throughout the genocide. J.A.I 446-50.

and believed Mr. Gasasira was never at the hospital and "made it a profession" to lie. J.A.II 1265-66, 1274-75.

Eric Nshimiye, one of Mr. Teganya's medical school classmates, shared a room with Mr. Teganya from 1992 until the genocide. J.A.III 1611-14. They went to classes together and "spent most of [their] time studying." J.A.III 1615-16. He described their daily schedule and said that Mr. Teganya did not go to trainings in the evening. *Id.* He never saw Mr. Teganya wearing MRND paraphernalia or attending MRND meetings. J.A.III 1617-18. He was not in Butare during the genocide. J.A.III 1620-21. Mr. Nshimiye lied on his application for asylum in the United States: he said that his father, who died years before it, was killed during the genocide. J.A.III 1635-44. He denied the government's insinuation that he, too, was an MRND member.III J.A.1644-46.

Jean-Claude Kabagema was a year behind Mr. Teganya in medical school. J.A.III 1671. He said that medical school was difficult and that Mr. Teganya was a hardworking model to younger students. J.A.III 1672. He never saw Mr. Teganya wearing MRND clothing, and he often saw Mr. Teganya with Tutsi friends. J.A.III 1674-75. Mr. Kabagema knew Mr.

Arusha,[12] and said he was often drunk. J.A.III 1675-76. Mr. Kabagema was not in Butare during the genocide. J.A.III 1676.

Diogene Nsengumuremyi was one of Mr. Teganya's medical school classmates. J.A.II 1152-53. He said Mr. Teganya was studious and known as a "gentleman." J.A.II 1152-53, 1172. He saw Mr. Teganya about 7 hours a day during classes and never saw him wearing MRND clothing or associating with MRND members. J.A.II 1156-57. Mr. Nsengumuremyi was not in Butare during the genocide. J.A.II 1158.

Spiridion Seminega, an agriculture student who was friends with Mr. Teganya, saw him a few times a week. J.A.II 1173-78. He never saw Mr. Teganya wearing MRND clothing or espousing MRND principles. *Id.* Mr. Seminega was in Butare during the genocide but did not go to the hospital. J.A.II 1178-79.

Jean Francouis Habimana was a year behind Mr. Teganya in medical school. J.A.III 1556-57. He never saw Mr. Teganya wearing MRND insignia.

---

[12] Mr. Arusha, one of Mr. Teganya's medical school classmates, testified for the government. He said Mr. Teganya wore MRND clothing and socialized with MRND members. J.A.I 638-42.

J.A.III 1557-59. He remembered that Mr. Arusha[13] liked to party. J.A.III 1559-60.

Jean Pierre Rukebesha was a year behind Mr. Teganya in medical school and never saw him wearing MRND insignia. J.A.III 1567-70.

Other witnesses testified that they were at the hospital during the genocide and did *not* see the atrocities charged by the government.

Aimable Rwabukumba, the head of Mr. Teganya's medical school class, was with Mr. Teganya at the hospital during the genocide. J.A.II 1289, 1295-1306. He was a Tutsi with a false Hutu identification card, and Mr. Teganya knew that. J.A.II 1289-91. He said that Mr. Arusha and Dr. Kalimba[14] were heavy drinkers. J.A.II 1311-12. He never saw Mr. Teganya wearing MRND insignia. J.A.II 1292-93. He took his lunches and dinners at Mr. Teganya's house, and he never saw Mr. Teganya go to trainings. J.A.II 1293-94. He explained that as third year medical students, they sometimes observed at the hospital wearing plain white coats. J.A.II 1298-99. He

---

[13] *See supra* note 12.

[14] Both were government witnesses and Mr. Teganya's classmates. Dr. Kalimba was his roommate during their first year, and said he saw Mr. Teganya wearing MRND clothing, going to meetings, and harassing a Tutsi man. J.A.I 616-23. Mr. Arusha is discussed in *supra* note 12.

described the hospital during the genocide as chaotic and explained that because there were no doctors, the students did their best to help. J.A.II 1300-06. Dr. Rwabukumba heard that patients were taken at night, but he did not see these removals or any killings. J.A.II 1306-08, 1332.

Ernest Muvunandinda, was in his fifth year of medical school in 1994. J.A.II 1341. He knew Mr. Teganya, but they did not have much contact. *Id.* During the genocide, he tried to help at the hospital, and he saw Mr. Teganya doing the same. J.A.II 1343-45, 1360-66. Dr. Muvunandinda was aware that people disappeared, but he never saw people being killed or taken. J.A.II 1368. He heard that a nurse named Mr. Karekezi was killed in the hospital during the day.[15] J.A.II 1370-71. He said that although he did not see Mr. Karekezi killed, Mr. Teganya was not there at the time of the murder and did not kill Mr. Karekezi. J.A.II 1380-81. He suggested that he knew who was responsible for this murder. *Id.*

Michel Musilikare was in Mr. Teganya's medical school class. J.A.II 1402. Dr. Musilikare described Mr. Teganya as smart and studious, and said that he was not known to be in MRND. J.A.II 1403-04, 1412-1413. Dr.

---

[15] Mr. Gasasira, a government witness, testified that he saw Mr. Teganya kill a Dr. Karekezi. J.A. 460-73.

Musilikare described the hospital during the genocide as chaotic and understaffed. J.A.II 1405-07. He saw Mr. Teganya a few times a week during the genocide, helping to take care of patients. J.A.II 1408-09. He did not see anyone killed or taken, but he heard about it. J.A.II 1409.

Tatiana Murebwayire Nahimana, a Tutsi who spent the genocide at the hospital, testified that although she heard that people were taken, she did not see it happening. J.A.III 1516-24. Her Burundi identity card falsely said that she was born in Burundi. J.A.III 1535-37.

When the genocide began, Jean Baptiste Bizimana was at the hospital helping his uncle, and they stayed there through the genocide. J.A.II 1382-84. Mr. Bizimana heard that people were taken from the hospital, but he did not see it happen. J.A.II 1386-87. He was jailed for 12 years before being cleared by the Gacaca courts. J.A.II 1388-89. His uncle was in MRND. J.A. 1390-92.II His passport falsely said he was born in Burundi. *Id.*

Additional witnesses testified about Mr. Teganya's life before university.

Jean Paul Mihigo was a few years behind Mr. Teganya in secondary school. J.A.III 1463-64.He explained that Mr. Teganya was the vice dean of his class, an elected position that helped to lead and organize the students.

J.A.III 1463-65. About 40 percent of the students, many teachers, and three of the five priests who ran the school were Tutsi. J.A.III 1465-67. Discipline was strict; students could be expelled for bad behavior, including for making anti-Tutsi statements. *Id.* Mr. Mihigo did not list this school as one he attended on some immigration-related documents. J.A.III 1475-83. He explained that he did not include it because he graduated from a different secondary school, which he did list.[16] *Id.*

Ignace Rukeribuga was a year ahead of Mr. Teganya in secondary school, and both men were in the Red Cross, a first-aid training organization. J.A.III 1486-88. He reiterated that discipline was strict, there was no ethnic strife at the school, and discrimination against Tutsis would have resulted in expulsion. J.A.III 1488-89. He went to university in Butare and often saw Mr. Teganya at meals and church. J.A.III 1489-90. He did not know Mr. Teganya to be a member of MRND and never saw him wearing MRND regalia. J.A.III 1491-92.

Augustin Minani, a few years behind Mr. Teganya in secondary school, remembered Mr. Teganya as vice dean. J.A.III 1504-07. He said the

---

[16] Mr. Minani, another defense witness, testified that he knew Mr. Mihigo at the school. J.A.III 1507-08.

school was evenly split between Hutus and Tutsis and did not tolerate ethnic strife. J.A.III 1508-09.

Stanislas Kurazikubone taught Mr. Teganya in secondary school and remembered him as quiet and attentive. J.A.III 1605. He said that the students were Hutus and Tutsis and the faculty was mainly Tutsis. J.A.III 1606.

Mr. Teganya testified. J.A.III 1681. He described his family and background. J.A.III 1682-84. He explained the importance of conduct at his secondary school, showed his report card and diploma, and discussed his role as vice dean. J.A.III 1684-92. He described his first year in medical school, explained that he and Dr. Kalimba did not get along, and denied Dr. Kalimba's and Mr. Arusha's allegations. J.A.III 1695-98. He detailed his schedule prior to the genocide. J.A.III 1698-1706. During his second and third years in medical school, he rented a house with a group of students, and they hired a servant to cook and clean for them. *Id.* Medical school was difficult, and he was almost always in class or studying. *Id.* He was focused on his studies, not interested in politics, and never wore any MRND insignia. J.A.III 1706-07. He never attended Interahamwe training, explaining that between 6 and 8 p.m., he was finishing dinner and

studying. J.A.III 1707-08. He discussed his Tutsi friends. J.A.III 1709-13. He introduced photos of himself from 1992 and 1993, and said that he never had a gap between his front teeth.[17] J.A.III 1713-14, 2092-93.

When the President's plane was shot down, Mr. Teganya was in Butare studying for an exam. J.A.III 1714. He moved into a student dorm and went to the hospital every day to observe and help. J.A.III 1714-18. He described an intense, chaotic situation. J.A.III 1714-32. On three occasions, he was told that patients had been taken from the hospital. J.A.III 1732-34. He never saw anyone being taken or killed. J.A.III 1735. He did not rape, kill, or hurt anyone during the genocide. J.A.III 1736.

Mr. Teganya described being attacked while trying to help two Tutsis who knew his family. J.A.III 1736-38. These individuals asked him to help them get cleaned up so they could leave Butare without arousing suspicions. J.A.III 1737-38. He let them use his room. J.A.III 1737-43. Militia members came, forced the door, and took all three behind the dorm. J.A.III

---

[17] These pictures contradicted government witnesses who described Mr. Teganya as having a gap between his teeth and a photo from 2016 or 2017 that shows an ambiguous line that could be a gap. *See* J.A.I 461-62; J.A.II 887; *supra* note 8.

1737-43. The militia hit Mr. Teganya with a machete, and he heard the other two being beaten and possibly raped. J.A.III 1742-44.

In mid-June 1994, he left Butare and walked to Congo. J.A.III 1748-54. He stayed in a refugee camp there for two years before going to Kenya. J.A.III 1754-58. He stayed in Kenya for about a year before getting a scholarship to study economics in India at the Tilak Maharashtra Vidyapeeth. J.A.III 1758-59. When he graduated in 1999 with a master's degree in economics, his student visa expired, and he bought a false Zimbabwean passport and traveled to Canada where he provided his real name and sought protection as a refugee. J.A.III 1759-63. He got a job in Canada, married a woman he met in the refugee camp, and had two children with her. J.A.III 1760-65. In 2012, Canada denied his petition for protection as a refugee, and Mr. Teganya went into hiding. J.A.III 1766-69. In 2014, desperate to avoid deportation, Mr. Teganya walked into the United States. J.A.III 1768-69. When confronted by Border Patrol, he gave his name and applied for asylum. J.A.III 1769. He said that none of the statements charged by the government were lies. J.A.III 1771-74.

After closing arguments and jury instructions, the jury convicted Mr. Teganya of all counts. J.A.III 2061.

## II.    Sentencing

The diametrically opposed views of the case carried through to sentencing. The government stated that if the court were sentencing Mr. Teganya for crimes he committed during the genocide, including "participating in at least seven murders and five rapes," it would ask for life in prison. D.E. 161 at 1. It argued that the conduct before the court—lying during the asylum application process—merited the maximum penalty on each count and an upward variance or departure to a total sentence of 20 years of incarceration. *Id.* at 1, 18.

Mr. Teganya asked for a sentence of 63 months of incarceration. D.E. 162 at 1. This request was based on a total offense level of 26 and a Criminal History Category of I, yielding a range of 63-78 months. *Id.* at 2. He explained that "the Government's evidence regarding who Jean Leonard Teganya was in 1994 bears little resemblance to the Jean Leonard Teganya known by many before and since." *Id*. at 5. It described a quiet, hardworking father who would be removed to and prosecuted in Rwanda after serving his sentence. *Id.*

The court concluded that the obstruction of justice enhancement applied, making Mr. Teganya's total offense level 28. Add. 27-29. His

criminal history category was I, making the Guidelines range 78-97

months. Add. 27-29. Mr. Teganya objected to this enhancement. D.E. 162 at

2-3; Add. 21-27; S.A. 27; *see also infra* Section II. The court imposed 97

months of incarceration.

## SUMMARY OF ARGUMENT

The government's expert witness testified immediately after Mr.

Teganya's opening statement. J.A.I 105-06. Some expert testimony was

appropriate, but Dr. Clark's testimony exceeded the permissible limits. He

made general statements rejecting the defense argument as not credible

and improperly bolstered the testimony of the government's witnesses.

Witness credibility was the critical issue, and the government and defense

witnesses gave diametrically opposed testimony. Given the importance of

witness credibility, the prejudice caused by having an expert witness

bolster one side while demeaning the other infected the entire trial and

requires reversal.

This credibility battle carried through to sentencing. The court

concluded that the jury must have found that Mr. Teganya lied when he

testified and applied the obstruction enhancement. Add. 27-29. When he

testified, Mr. Teganya simply repeated the charged falsehoods and made

explicit the denial that was implicit in his decision to go to trial. The application of this enhancement unconstitutionally burdened Mr. Teganya's right to testify. Given the extent and nature of the evidence in this case, his testimony was not a "significant further obstruction" as required by the Guidelines. Even accepting that such an enhancement could be appropriate in this type of case, the court did not make the required findings.

## ARGUMENT

### I. The district court erred by admitting expert testimony that denigrated the defense theory and vouched for government witnesses.

The central trial issue was whether Mr. Teganya lied about his experiences during the 1994 Rwandan genocide. Most of the witnesses were Rwandan and testified about the genocide. The parties each called an expert witness—academics studying Rwanda and the genocide—to help set the scene and bridge the cultural divide. J.A.I 106, 1082. The government's expert witness was Dr. Clark.

The government and defense witnesses painted starkly different pictures of Mr. Teganya. The government witnesses, many of whom did not know Mr. Teganya outside the genocide, described him as a prominent

and terrifying militia leader. The defense witnesses, many of whom had relationships with Mr. Teganya apart from the genocide, described a diligent student trying to survive a chaotic and horrifying time. The jury had to weigh the relative credibility of these two groups, and its verdict hinged on this determination.

Dr. Clark had no personal knowledge of or experience with any of the witnesses or Mr. Teganya. He improperly opined on their credibility, which was the central trial issue. These portions of his testimony invaded the province of the jury and violated Federal Rules of Evidence Rule 704. They were more prejudicial than probative and should have been excluded under Federal Rules of Evidence Rule 403.

## A. Admissibility of expert testimony and standard of review.

An expert may testify in the form of an opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony is appropriate when "the untrained layman" could not "determine intelligently and to the best possible degree

the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Id.* (1972 advisory committee notes). An expert in a criminal case may not opine "about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged." Fed. R. Evid. 704(b); *see also United States v. Monell*, 801 F.3d 34, 45 (1st Cir. 2015). Expert testimony that is more prejudicial than probative is inadmissible. Fed. R. Evid. 403.

This Court reviews "a district court's decision to admit or exclude expert testimony for abuse of discretion." *United States v. Jordan*, 813 F.3d 442, 445 (1st Cir. 2016). If the objection is not preserved, this Court reviews for plain error. *United States v. Rosales*, 19 F.3d 763, 765 (1st Cir. 1994). To satisfy plain error, a defendant must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001).

**B.    The permissible aspects of Dr. Clark's testimony—the history of the Rwandan genocide.**

Dr. Clark gave some permissible testimony. He described Rwanda's geography, demographics, and history. J.A.I 113-29. He explained that Rwandans fall into three major ethnic groups: 84-85% are Hutus, 13-14% are Tutsis, and the remaining 1% are Twa. J.A.I 117. He described the collapse of Belgian colonial rule and the rise of an oppressive Hutu-led government. J.A.I 120-28.

He detailed the events that led to the genocide. In 1973, the Hutu president, Juvenal Habyarimana, formed the MRND party. J.A. I127, 142. Adult Rwandans received automatic membership in this party until 1991. *Id.* In 1990, "a Tutsi-dominated rebel group called the Rwandan Patriotic Front, the RPF, invaded Rwanda…." J.A.I 130. A civil war ensued, and the Hutu government incited violence against Tutsis. J.A.I 130-39. The government formed "youth militias [including the Interahamwe] with the specific objective of targeting the Tutsi population." J.A.I 139-40.

The genocide began on April 6, 1994, when Habyarimana's plane was shot down. J.A.I 159-60. The killings spread across the country quickly. J.A.I 159-69. Dr. Clark explained that "Butare remained [in]credibly

peaceful and extremely tolerant in ethnic terms." J.A.I 148-50. The city

"initially did not take part in the genocide on a large scale." J.A.I 172. The

violence spread to Butare in late-April. J.A.I 172-73. Dr. Clark was not

allowed to describe events at the hospital in Butare. J.A.I 176-78.

The genocide ended in mid-July 1994, when the RPF took control of

Rwanda. J.A.I 180. Dr. Clark explained that many Hutus—regardless of

whether they had participated in the genocide—fled to the Democratic

Republic of Congo. J.A.I 182. The Tutsi government jailed "most able-

bodied Hutu men" remaining in Rwanda. J.A.I 192. The justice system was

not able to process these arrests, and in 2002, there were 130,000 genocide

suspects in prison. *Id.* Between 2002 and 2012, Rwanda prosecuted about

400,000 genocide suspects in Gacaca courts—local courts operated by lay

judges that tried suspects in their communities. J.A.I 192-94.

### C. Dr. Clark invaded the province of the jury by opining about the credibility of defense arguments and the government's witnesses.

Other portions of Dr. Clark's testimony should have been excluded.

Dr. Clark pinpointed specific parts of Mr. Teganya's defense as not

credible. He also improperly bolstered the government's witnesses. This

testimony impermissibly invaded the province of the jury by opining on

the critical credibility issues. *See United States v. Kantengwa*, 781 F.3d 545, 562-63 (1st Cir. 2015) (distinguishing between impermissible expert testimony that opines on other witnesses' credibility and permissible testimony assessing plausibility of a historical detail based on review of many witnesses' accounts); *Rosales*, 19 F.3d at 765-66 (noting that expert testimony that described young witnesses' testimony as consistent with that of abuse victims as "sen[ding] an implicit message to the jury that the children had testified truthfully, and this might have interfered with the jury's function as the sole assessor of witness credibility," but finding that its admission did not satisfy plain error).

In opening, the defense explained that Mr. Teganya's mother was Tutsi: "The woman who brought him into the world, the woman who raised him, Tutsi. The idea that he was raised to hate Tutsis is false." J.A.I 97. Counsel argued that Mr. Teganya stayed at the hospital during the genocide to help people, including Tutsis. J.A.I 101-02. Mr. Teganya recounted being attacked by the militia while trying to help two Tutsis flee. J.A.III 1736-44.

Dr. Clark testified immediately after the defense's opening statement. J.A.I 105-06. The government asked if he had "uncovered instances where

Hutus would protect some Tutsis but kill others." J.A.I 167. He said this was "quite a common phenomenon during the genocide that many Hutu perpetrators would also at some stage during the genocide have harbored or protected Tutsi friends, Tutsi neighbors, Tutsi family members." *Id.* Mr. Teganya objected, and the court instructed that this testimony was "background information" that did not "say anything about what the defendant did or did not do or what any particular witness did or did not do." J.A.I 167-68. Dr. Clark continued, saying that he had interviewed "numerous genocide perpetrators who tell a very similar story, which is that during the genocide, I protected a certain number of Tutsi." J.A.I 168. He said that "it was a common defense of many accused to say I could not have committed these genocide crimes of which I am accused because I was known to be protecting these Tutsi, but in fact, sometimes it was also possible that they were committing crimes even though they were protecting Tutsi." *Id.*

The government asked Dr. Clark if he was "familiar with the theory that individuals could not be [genocidaires] if they came from mixed ethnicities." J.A.I 208-09. Mr. Teganya's objection was overruled. *Id.* Dr. Clark responded: "This was a very common line of defense for genocide

35

suspects, not only at Gacaca but in some of the other jurisdictions that dealt with Rwandan genocide crimes." *Id*. He opined that "more often than not," this defense "had no evidentiary basis," and that, "it was very common across Rwanda for Hutu perpetrators of genocide crimes to also in many cases have a Tutsi spouse or very close Tutsi relatives." *Id*. The court "remind[ed] the jury" that this was "context and background" that did not "explain[] how any particular individual acted, whether that's the defendant or any witness, in other words, this is a broad-spread set of generalizations to help you understand things. It doesn't answer how a specific person acted or felt or what that person's motives were." J.A.I 210.

Dr. Clark's statements about people with mixed ethnicities and people whose defense was that they had protected Tutsis invaded the province of the jury. It was up to the jury to determine the credibility of the witnesses, and this decision was improperly tainted by an expert's opinion dismissing "common" defenses. These statements amount to Dr. Clark telling the jury that Mr. Teganya's defense was not credible. It was up to the jury to determine credibility, and it was improper and prejudicial for an expert to opine on it. Mr. Teganya objected to this testimony, and the district court abused its discretion by admitting it. The court's efforts to

limit this testimony were insufficient. Dr. Clark, an expert who gave lengthy testimony, targeted portions of Mr. Teganya's defense and labeled them as not credible. The court's instructions did not lessen the impact of this prejudicial and inadmissible testimony. *Cf.* J.A.II 1025-26 (government arguing that no jury instructions could cure error if defense expert was allowed to testify that Rwandan government pressured witnesses).

In addition to describing Mr. Teganya's defense as not credible, Dr. Clark improperly bolstered the government's witnesses. The government's witnesses said the Rwandan government did not pressure them to testify. J.A.I 401-02, 499-500, 588-89, 625-26, 644, 682-83; J.A.II 792-93, 855-56, 893-94. Dr. Clark said that he "found no evidence of government coercion" in the Gacaca courts. J.A.I 195, 205. Mr. Teganya did not object. The defense expert testified that Dr. Clark's opinion conflicts with the mainstream scholarly view that the Rwandan government affected "very much the proceedings of the justice." J.A.II 1097-99.

Mr. Teganya impeached some important government witnesses, particularly Ms. Mukeshimana and Ms. Mukamurenzi, both of whom said they were raped by Mr. Teganya, by showing that they had not mentioned Mr. Teganya in their previous testimony. J.A.II 853-70, 897-902. Dr. Clark

bolstered their credibility by opining on a possible explanation. He testified

that when he conducted interviews in Rwanda, he found that "[t]here are

many individuals who either have fuzzy recollections of the past or may

have reasons to not necessarily tell the truth." J.A.I 185-86. He said that it

takes him time to build trust and rapport with his subjects such that they

"will only tell me particularly sensitive things after the third or the fourth

or the fifth interview, sometimes four or five years later." *Id.*

> These individuals have never met me before. It's unlikely that they
> are going to tell me extremely sensitive or contentious things on the
> first meeting.
> It's going to take a lengthy period of building trust before
> people feel open enough to be able to speak especially about the
> genocide and its impact.

*Id.* He said that genocide survivors, particularly those who suffered sexual

violence, are difficult to interview, and that it takes time for them to "give a

full and frank interview." *Id*. Mr. Teganya did not object.

Finally, Dr. Clark injected the prejudicial and irrelevant specter of

"genocide denial." J.A.I 206-08. Dr. Clark explained that "[m]any

individuals and many groups" in Rwanda claim that the 1994 genocide did

not occur, despite "enormous" evidence that it did. *Id.* Mr. Teganya's

objection to the first question about genocide denial was sustained because

it implied that Mr. Teganya's defense was genocide denial, but he did not object to additional, rephrased questions. *Id.* Neither Mr. Teganya, his counsel, or his witnesses argued that the genocide did not happen. They argued that he was not an MRND member and did not see or commit any atrocities during the genocide. This irrelevant discussion of genocide denial was prejudicial, as it implied that the defense was ignoring, or at least minimizing, a serious and well-documented tragedy.

Witness credibility was the main issue in this case. There was no physical evidence to corroborate the government witnesses' accounts of Mr. Teganya's participation in or knowledge of the genocide. As the court noted at sentencing: "Virtually every atrocity that was described by witnesses in this trial was supported by the testimony of a single witness without much in the way of corroboration…." Add. 44. Further, "at least some of the witnesses had some credibility issues, at least as to some aspects of their testimony." *Id.* Most of the witnesses did not speak English and came from a cultural context far from the jurors' normal experience. Against this background, the jury was left to resolve difficult credibility issues.

In a pretrial discussion of the defense's expert, the court recognized the importance of limiting improper expert testimony. J.A.I 45-61. It said that experts could testify about social norms, but stated: "No one expert or otherwise can opine on the credibility of a specific witness, okay. You also can't offer expert testimony about stereotyping, you know, all Tutsi people tell the truth or all Tutsis lie or anything of that sort." J.A.I at 50. The court voiced similar concerns when discussing the defense expert's testimony. J.A.II 925-28, 1017-22, 1033-34 (noting that defense expert could not say witness testimony was necessarily affected by government coercion because that would be "expressing an opinion about the credibility of a witness"). Despite recognizing these limits, the court let the government present this type of evidence. Dr. Clark's testimony described Mr. Teganya's defenses as not credible. He bolstered the credibility of witnesses who had not previously mentioned Mr. Teganya and suggested that this was reticence borne of trauma, not a notable omission. He tainted the defense with the irrelevant specter of "genocide denial"

The highlighted portions of Dr. Clark's testimony were inadmissible under Rule 704, because they usurped the jury's "function as the sole assessor of witness credibility." *Rosales*, 19 F.3d at 765-66. They were also

more prejudicial than probative and should have been excluded under Rule 403. The impact of his testimony was compounded by the scope of this trial and the nature of the evidence. In a credibility battle of this magnitude, an expert's opinion could easily have tilted the scales.

Mr. Teganya did not object to these instances of bolstering, and they are subject to plain-error review. Standing alone, this witness bolstering might not satisfy plain-error review. *See Rosales*, 19 F.3d at 765. However, when these instances are considered in conjunction with Mr. Teganya's preserved claims about Dr. Clark's testimony, they satisfy the plain-error standard. Conversely, the unpreserved claims lend significant support to Mr. Teganya's preserved claims that Dr. Clark improperly opined on the credibility of his defense. Considering these errors together, the district court abused its discretion and committed plain error by permitting Dr. Clark to usurp the jury's role as the sole arbiter of witness credibility. These errors affected Mr. Teganya's "substantial rights" and "seriously affect[ed]the fairness, integrity or public reputation of [the] judicial proceeding[]." *Id.* (internal quotation marks and citations omitted). Particularly given the centrality of witness credibility and the cultural divide that existed in this case, Mr. Teganya was prejudiced by the

erroneous admission of this testimony. This expert testimony addressing the central issue of this case affected his substantial rights and the fairness of the trial. Even applying plain-error review to the unpreserved portion of this claim, the erroneous admission of this testimony requires reversal.

## II.     The district court erred in imposing the obstruction enhancement at sentencing.

The Guidelines prescribe a two-level increase in offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. §3C1.1. The application notes explain that the "provision is not intended to punish a defendant for the exercise of a constitutional right," but include perjury as an example of obstruction. §3C1.1, notes 2, 4. They state:

> If the defendant is convicted for an offense covered by…§2J1.3…this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense)."

§3C1.1, note 7.

The court did not find that Mr. Teganya did anything other than repeat the charged falsehoods. The application of the enhancement violated

his constitutional right to testify. Even if the application could be constitutional, Mr. Teganya's testimony was not a "significant further obstruction." Finally, even if the enhancement could be applied here, the court did not make sufficient findings.

### A. Standard of review.

This court reviews "procedural reasonableness challenges under 'a multifaceted abuse-of-discretion standard whereby "we afford de novo review to the sentencing court's interpretation and application of the sentencing guidelines, assay the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion."'" *United States v. Mendoza-Maisonet*, 962 F.3d 1, 20 (1st Cir. 2020) (quoting *United States v. Arsenault*, 833 F.3d 24, 28 (1st Cir. 2016) (quoting *United States v. Ruiz-Huertas*, 792 F.3d 223, 226 (1st Cir. 2015))).

### B. Imposition of the obstruction enhancement.

The government argued that Mr. Teganya "perjured himself and suborned the perjury of Aimable Rwabakumba." D.E. 161 at 13.

> First, Teganya took the witness stand and falsely reasserted the lies charged in the indictment, falsely denied being aware of the genocide while it happened, falsely denied having seen evidence of the genocide while it happened, falsely denied having belonged to the MRND, falsely denied having killed or participating in the killing of

seven Tutsis, falsely denied helping other soldiers to rape women and girls, falsely denied raping anybody himself, falsely claimed that he had tried to protect two Tutsi friends from Hutus himself, and falsely claimed that he had done all this because his life would be at stake if he were returned to Rwanda.

*Id*. at 12. It also argued that Mr. Rwabakumba "falsely denied Teganya's participation in the genocide and attempted to give Teganya an alibi…." *Id.* It offered no opinion as to whether Mr. Teganya obstructed justice by presenting witnesses offering conflicting testimony on details such as meal times and hospital hours. *Id.* It did not argue that he obstructed justice by calling witnesses who had lied in their own immigration documents, since it "lacks proof" that he knew about those falsehoods. *Id.* at 13.

Mr. Teganya objected to the obstruction enhancement. D.E. 162 at 2-3; S.A.26-27; Add. 26. The Presentence Report (PSR) did not include the enhancement in its calculation, deferring the decision to the court. S.A. 12-13. It noted the government's argument and Mr. Teganya's objection. S.A. 11-12, 26-27.

At sentencing, the government argued that Mr. Teganya's statement that he was not a member of MRND conflicted with testimony from Dr. Kalimba, Dr. Nzabonimpa, Mr. Arusha, and Mr. Habimana. Add. 22-23. It said that Mr. Teganya's testimony that he never participated in or saw any

"acts of genocide" was contradicted by Mr. Gasasira's testimony that he saw Mr. Teganya murder three people; Ms. Mukeshimana's testimony that Mr. Teganya raped and killed her cousin and raped her; Ms. Mukamurenzi's testimony that the militia was called Teganya's Army, that it took people to be killed, and that its members raped her; and Mr. Habimana's testimony that Mr. Teganya was an Interahamwe leader whose group once brought four Tutsi students to be killed, killing two of them themselves. Add. 23-25. Mr. Teganya countered that contradictory testimony was not enough and that the court had to make specific findings about falsity and materiality. Add. 26. He noted that his witnesses testified consistently with him. *Id*.

The court applied the enhancement, finding "by a preponderance of the evidence that the defendant made a variety of false statements during his testimony, as outlined by the government in its argument, and that those statements were, taken as a whole, material…."[18] Add. 27. Later in the sentencing, the court noted that although "[t]here was testimony that [Mr. Teganya] participated in multiple murders and rapes," "the jury did

---

[18] Neither party mentioned Mr. Rwabakumba's testimony at sentencing, and the court did not find that it was perjurious. Add. 22-27.

not specifically find that he committed or participated in any particular murder or particular rape." Add. 43. The court found "substantial ambiguity in the verdict as to what he actually did for that reason." The court concluded that it was not "comfortable" making "specific factual findings as to particular actions" because:

> Virtually every atrocity that was described by witnesses in this trial was supported by the testimony of a single witness without much in the way of corroboration, and at least some of the witnesses had some credibility issues, at least as to some aspects of their testimony.

Add 44.

**C.** **The court imposed this enhancement because Mr. Teganya repeated the statements that the indictment alleged were false. The application of the enhancement in these circumstances impaired his constitutional right to testify. Given the context of this case, his testimony was not a "significant further obstruction."**

The district court found that Mr. Teganya repeated the perjurious statements alleged in the indictment: he was not a member of MRND and did not participate in or see atrocities.[19] Add. 23-25, 27; J.A.I 28-36. The verdict revealed that the jury believed these statements were untrue. The court did not find that Mr. Teganya made additional false statements. Add.

---

[19] The court's findings were insufficient to justify applying the enhancement. *See infra* Section II.D.

27. The court concluded that it could not make factual findings about any of the atrocities described by the witnesses. Add. 43-44. It did not find that Mr. Teganya lied about any of those events. It is unconstitutional and counter to the Guidelines to apply the obstruction enhancement to a defendant charged with making false statements who exercised his right to testify and simply repeated the charged falsehoods.

A criminal defendant has the constitutional right to testify in his own defense. *Rock v. Arkansas*, 483 U.S. 44, 49 (1987); 18 U.S.C. §3481. The Guidelines say that this enhancement is not intended to punish the exercise of this right. §3C1.1, notes 2, 4. The Supreme Court has held that this enhancement is not facially unconstitutional because "a defendant's right to testify does not include a right to commit perjury." *United States v. Dunnigan*, 507 U.S. 87, 96 (1993). It wrote that:

> It is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process.

*Id.* at 97. In *Dunnigan*, the defendant was charged with conspiracy to distribute drugs. *Id.* at 89. Five witnesses testified for the government, and the defendant was the "sole witness in her own defense." *Id.* at 89-90. She

denied "all criminal acts attributed to her," as well as the government witnesses' "inculpatory statements." *Id.* at 90. The judge found that she lied at trial and applied the obstruction enhancement. *Id.* at 90-91.

Mr. Teganya's case is different because he was charged with making false statements. The Guidelines recognize this difference, stating that the enhancement does not apply in perjury cases unless there is a "significant further obstruction," such as threatening a witness. USSG §3C1.1, note 7; *see also United States v. Agoro*, 996 F.2d 1288, 1293 (1st Cir. 1993) ("The obvious purpose of this comment is to prevent double-counting…."). By pleading not guilty and going to trial, someone charged with making false statements is declaring that he did not lie. One of the rights that comes with going to trial is the ability to take the stand and say that to the jury personally. *Rock*, 483 U.S. at 49. It is difficult to imagine a plausible scenario in which a defendant is charged with making false statements, goes to trial, testifies, and does not repeat the charged falsehood.[20] Applying the enhancement based on testifying consistently with a charged falsehood

---

[20] It is possible to imagine a defense of "they did not accurately record my statement, and I did not say those things at all," or "I am not the person who said those things," or "the oath was improper," but these are not at issue in the average false statement case.

infringes on a defendant's constitutional right to testify and causes a double-counting problem.

Even accepting, arguendo, that the enhancement could be constitutionally applied in some false statement cases, Mr. Teganya's testimony was not a "significant further obstruction." Mr. Teganya exercised his right to plead not guilty. He had a 17-day trial. His lawyer argued that he did not lie, that he was not a member of MRND, and did not witness or commit atrocities during the Rwandan genocide. Mr. Teganya presented 19 witnesses, who testified consistently with the defense that he was not a member of MRND and did not witness or commit atrocities. *See supra* Section I.C. If he had done these things without testifying, the obstruction enhancement would not have applied, and his Guidelines range would have been 63-78 months instead of 78-97 months.

The only reason he was subject to the higher range is because he testified—consistent with the charges, consistent with his not guilty plea, consistent with his counsel's argument, and consistent with his witnesses. As long as he did not exercise his right to voice his own defense, he would not have been subject to a higher Guidelines range. Applying the obstruction here unfairly burdens his constitutional right. He did not

49

commit a significant further obstruction. Choosing to testify does not make him more deserving of punishment than if he had put on his entire defense without testifying. *Contrast Dunnigan*, 507 U.S. at 89-90, 96-97 (finding drug conspiracy defendant who was sole defense witness and contradicted all government witnesses committed perjury at trial more culpable).

In *United States v. Thomas*, 193 Fed.App. 881, 890 (11th Cir. 2006) (per curiam) (unpublished), the Eleventh Circuit held that note 7 "explicitly except[s]" a defendant from this enhancement where he or she repeated the charged perjury at trial. It found no "significant further obstruction" where the defendant testified "consistent with the grand jury testimony that formed the basis for her criminal conviction for perjury." *Id.* It concluded that note 7 was so clear that the district court plainly erred by applying the obstruction enhancement.[21] *Id.* at 890.

In a case where the defendant was accused of lying to a grand jury, the Ninth Circuit found that the obstruction enhancement was appropriate where he made *new* perjurious statements at trial. *United States v. Johnson*,

---

[21] The defendant in *Thomas* could not show prejudice because she received a sentence that was within the Guidelines range regardless of the application of this enhancement. 193 Fed.App. at 890-91.

812 F.3d 757, 760-62 n.2 (9th Cir. 2016). It did not "reach the issue of whether identical false testimony qualifies as a 'significant further obstruction.'" *Id.*; *see also United States v. Pattan*, 931 F.2d 1035, 1037, 1042-43 (5th Cir. 1991) (finding evidence that defendant made "further false statements" to the jury, FBI, and his attorney sufficient to support obstruction enhancement); *United States v. DeZarn*, 157 F.3d 1042, 1054 (6th Cir. 1998) (upholding obstruction enhancement based on false statements made at trial that were not "mere reiterations" of charged falsehoods).

Many cases permitting the application of the enhancement in perjury cases rely on *United States v. McCoy*, 316 F.3d 287, 289 (D.C. Cir. 2003) (per curiam). *McCoy* wrote:

> We are reluctant to hold that Note 7 gives a defendant license to perjure herself in a criminal proceeding in order to avoid enhanced punishment for, of all things, perjury. Lying under oath to protect oneself from punishment for lying under oath seems to us—and to the Supreme Court—to be precisely the sort of "significant further obstruction" to which Note 7 refers.

It did not discuss the constitutional dimensions of this issue or cite authority other than *Dunnigan*. *Id.* at 288-89.

The cases that rely on *McCoy* do not provide additional relevant analysis. *See United States v. Brewer*, 332 Fed.App. 296, 310 n.9 (6th Cir.

2009) (unpublished) (stating, in a footnote, that the obstruction enhancement is appropriate "where a defendant took the stand in a perjury trial" and citing *McCoy*); *United States v. Fernandez*, 389 Fed.App. 194, 202-04 (3d Cir. 2010) (unpublished) (citing *McCoy*, and observing that "there is no free pass for consistent perjury"); *United States v. Silveira*, 297 F.Supp.2d 349, 355-56 (D. Mass. 2003) (concluding that repeating perjury can trigger obstruction enhancement without discussing constitutional dimensions of the issue and relying on *Dunnigan* and *McCoy*).

This analysis is not changed by the fact that Mr. Teganya was convicted of two crimes not mentioned in note 7 of §3C1.1. Counts 1 and 2 charge identical conduct—lying about his MRND membership on his asylum application. J.A.I 28-31. Counts 3 and 4 charge identical conduct— lying about whether he saw atrocities on his asylum application. J.A. 32-33. Counts 1 and 3 charged Mr. Teganya with fraud and misuse of visas (18 U.S.C. §1546), which is scored under U.S.S.G. §2L2.2. Counts 2, 4, and 5, charging Mr. Teganya with perjury are scored under §2J1.3. Note 7 says that the obstruction enhancement shall not apply to an offense under §2J1.3 unless there was a "significant further obstruction." It does not make the same proclamation about crimes scored under §2L2.2.

52

First, because the conduct is identical, there is no way to apply the obstruction enhancement to one charge in isolation. Each of the charges not covered by note 7 is accompanied by an identical charge that is; there is no way to separate conduct to which note 7 does not apply, and the enhancement cannot be applied without finding a significant further obstruction.

Second, because of the way the Guidelines operate, this enhancement necessarily applies to all the counts, including the §2J1.3 counts. The district court applied the obstruction enhancement to all the counts, including some mentioned in note 7, after grouping. Add. 27. The conclusion is the same if the enhancement is applied to counts 1 and 3 before grouping. Counts 1 through 4 group together under §3D1.2(a) and (b). *See* S.A. 12; Add. 26; D.E. 161 at 15. The entire group takes the highest offense level. U.S.S.G. §3D1.3(a). The §2L2.2 offense level for visa fraud is higher than the §2J1.3 one for perjury. Even if the enhancement is applied to the §2L2.2 offenses before grouping, once the counts are grouped, it necessarily applies to the perjury counts for which note 7 demands a

finding of a significant further obstruction.[22] To impose the enhancement, the court must find that there was a significant further obstruction. As explained above, there was no such conduct here.

The enhancement should not have been applied here. Imposing the obstruction enhancement in a false statement case based on a defendant testifying consistently with the charged falsehood is unconstitutional and counter to the Guidelines. Just as pleading not guilty, going to trial, presenting a defense of truthfulness, and introducing evidence and witnesses to support that defense are not obstruction of justice, making the choice to testify consistent with that defense is not either. It was not a "significant" or "further" obstruction for Mr. Teganya to testify consistent with his prior statements and his defense.

---

[22] The government asked the court to apply the enhancement to the four-count group and to count 5. D.E. 161 at 15. The district court rejected this approach, which also yields a total offense level of 28. Add. 27; D.E. 161 at 15. If the enhancement is applied to the §2L2.2 offenses, and then to the four-count group, but not to count 5, the total offense level would be 27. Without the obstruction enhancement, the offense level is 26. S.A. 13.

**D. Even if the obstruction enhancement could be justified in this case, the district court did not make the findings required to do so.**

Even accepting, arguendo, that the obstruction enhancement could be imposed, the judge did not make the findings necessary to impose it. Before imposing the obstruction enhancement, "the sentencing court 'must make factual findings that "encompass all the elements of perjury—falsity, materiality, and willfulness."'" *Mendoza-Maisonet*, 962 F.3d at 21 (quoting *United States v. Colby*, 882 F.3d 267, 273 (1st Cir. 2018) (quoting *United States v. Matiz*, 14 F.3d 79, 84 (1st Cir. 1994))). The court does not have to discuss each element separately, but its findings must include them all. *Id.* The falsity finding does not require "directly contradictory testimony;" it can rest on circumstantial evidence. *Id.* Materiality—the ability of a statement to influence the decision being made—can be inferred from the record. *Id.* Willfulness "can be inferred from sufficient materiality." *Id.*

The court's findings on this enhancement were brief and pro forma. It stated that it found "by a preponderance of the evidence that the defendant made a variety of false statements during his testimony, as outlined by the government in its argument, and that those statements were, taken as a whole, material…." Add. 27. Part of the government's argument was that

Mr. Teganya committed perjury because his testimony that he did not see atrocities was contradicted by witnesses who testified that he committed rapes and murders. The court expressed doubts about this testimony: "[t]here was testimony that [Mr. Teganya] participated in multiple murders and rapes," but "the jury did not specifically find that he committed or participated in any particular murder or particular rape." Add. 43. It noted "substantial ambiguity in the verdict as to what he actually did for that reason." *Id.* The court concluded that it was not "comfortable" making "specific factual findings as to particular actions":

> Virtually every atrocity that was described by witnesses in this trial was supported by the testimony of a single witness without much in the way of corroboration, and at least some of the witnesses had some credibility issues, at least as to some aspects of their testimony.

Add. 44.

These statements about the evidence contradict the court's summary findings supporting the obstruction enhancement. If the court could not make factual findings about whether particular actions occurred, it could not make the required findings about whether Mr. Teganya lied about committing those actions. These statements make this case distinguishable from cases like *Mendoza-Maisonet*, where the court identified specific

portions of the defendant's testimony that it believed were perjurious and did not apparently express reservations about its ability to make findings about specific facts. 962 F.3d at 20-23.

This case was unusual in that both sides presented many witnesses, and the two sets of witnesses described completely different versions of Mr. Teganya. In this way, the case is different from *Dunnigan.* In *Dunnigan*, the Court noted that "Given the numerous witnesses who contradicted respondent regarding so many facts on which she could not have been mistaken, there is ample support for the District Court's finding." 507 U.S. at 95-96. Here, for every witness who contradicted Mr. Teganya's testimony, there was another who supported it. Although Mr. Teganya does not argue that there was insufficient evidence to support the verdict, he does argue that in this unique situation, the court was not justified in imposing the perjury enhancement. Certainly, the court did not make the findings that are required to support the enhancement here.

**CONCLUSION**

For the foregoing reasons, this Court should vacate Mr. Teganya's conviction and remand for a retrial, or vacate his sentence and remand for resentencing.

Respectfully Submitted,

*/s/ Christine DeMaso*

Christine DeMaso,
Assistant Federal Public Defender
Federal Public Defender Office
51 Sleeper Street – 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No. 1168061

Dated: July 16, 2020

# CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

>   this brief contains 11,854 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

>   this brief has been prepared in a proportionally spaced typeface using Microsoft Word and 14-point Book Antiqua font.

>   */s/ Christine DeMaso*
>   Christine DeMaso
>
>   Attorney for Appellant
>
>   Dated: July 16, 2020

# CERTIFICATE OF SERVICE

I, Christine DeMaso, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, including all counsel of record, specifically, AUSAs Alexia R. DeVincentis, Scott L. Garland, and Donald Campbell Lockhart, as identified on the Notice of Electronic Filing on July 16, 2020.

*/s/ Christine DeMaso*
Christine DeMaso

# ADDENDUM

**ADDENDUM – TABLE OF CONTENTS**

Excerpts from Jury Trial Day 2 (3/11/19)..................................................Add. 1

Excerpts from Jury Trial Day 3 (3/12/19) .............................................Add. 11

Sentencing Transcript (7/1/19) ............................................................Add. 18

Judgment ............................................................................................Add. 50

```
 1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3

 4     UNITED STATES OF AMERICA,        )
                                        )
 5     vs.                              )  Criminal Action
                                        )
 6     JEAN LEONARD TEGANYA,            )  No. 17-10292-FDS
                        Defendant       )
 7                                      )
                                        )
 8                                      )

 9

10     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11
                           JURY TRIAL DAY 2
12

13

14
                John Joseph Moakley United States Courthouse
15                        Courtroom No. 2
                          One Courthouse Way
16                        Boston, MA 02210

17
                          March 11, 2019
18                         9:01 a.m.

19

20

21

22

23                      Valerie A. O'Hara
                        Official Court Reporter
24     John Joseph Moakley United States Courthouse
                     1 Courthouse Way, Room 3204
25                        Boston, MA 02210
                     E-mail: vaohara@gmail.com
```

Add. 1

1    to enrich themselves.  If I kill my Tutsi neighbor, I will be

2    able to capture his or her head of cattle, I'll be able to

3    capture their property, I'll be able to possibly even capture

4    their land.

5         And for many communities that were economically

6    desperate at the time, taking part in the genocide provided a

7    real economic opportunity, and so my research and the research

8    of various other scholars shows that many perpetrators joined

9    the killing spree because they were motivated economically.

12:11PM 10   Q.    Throughout your research, have you uncovered instances

11   where Hutus would protect some Tutsis but kill others?

12   A.    Yes.  In my research and in the research of various other

13   commentators, this is in fact quite a common phenomenon during

14   the genocide that many Hutu perpetrators would also at some

15   stage during the genocide have harbored or protected Tutsi

16   friends, Tutsi neighbors, Tutsi family members.

17        And the reason that this takes place, the reason that

18   you have individuals who are both protectors and perpetrators

19   during the genocide is that these individuals had very complex

12:12PM 20   relations at the local level in 1994, so, for example, I have

21   interviews with numerous perpetrators who will say I

22   protected --

23        MR. LAUER:  Objection.

24        THE COURT:  I'm going to allow it.  Again, this is

25   background information, ladies and gentlemen, and I will permit

Add. 2

1    it to help you understand the context of what you're going to

2    hear, the direct evidence.  Obviously, all of this is at a high

3    level of abstract, and it doesn't say anything about what the

4    defendant did or did not do or what any particular witness did

5    or did not do, but I'll overrule the objection.  Go ahead.

6    A.    Thank you.  I have interviews with numerous genocide

7    perpetrators who tell a very similar story, which is that

8    during the genocide, I protected a certain number of Tutsi,

9    sometimes it was a close family member, sometimes it was a

12:13PM 10    close friend, but in order to thwart any suspicion about me as

11    a Hutu protecting these Tutsi, I then needed to be seen to be

12    actively joining the killings in my community, and these two

13    things were sometimes happening simultaneously.

14         The same individuals harboring Tutsis in their own

15    homes but going out by day and very actively participating in

16    the community to show to their community that they were being a

17    realty Hutu, that they were as dedicated to the eradication of

18    the Tutsi as anybody else, and so in some instances, you get

19    these two things happening simultaneously.

12:14PM 20         Especially in my research on the Gacaca Courts, it was

21    a common defense of many accused to say I could not have

22    committed these genocide crimes of which I am accused because I

23    was known to be protecting these Tutsi, but, in fact, sometimes

24    it was also possible that they were committing crimes even

25    though they were protecting Tutsi.  These two things could be

**Add. 3**

1    happening simultaneously.

2    Q.   Can you explain how the genocide progressed out from

3    Kigali and throughout the rest of the country?

4    A.   What we see after the 7th of April is the quite rapid

5    spread of the genocide from the capital city to such an extent

6    that if we think of the total death toll of Tutsi and the

7    genocide as approximately 800,000 people, about three-quarters

8    of that death toll was carried out in the first two weeks of

9    the genocide, so the vast majority of Tutsi victims of the

12:15PM 10    genocide were killed between the 7th of April and roughly the

11    21st, 22nd.

12        So this shows just how quickly the killings spread out

13    into the rural areas, and there are good reasons, I think, to

14    understand why the killing was able to spread so quickly.

15    Partly it was because, as I said before, some communities had

16    already witnessed the massacre of Tutsis as early as 1992 and

17    1993.

18        Many communities, of course, had also been listening

19    to the government propaganda for years, and furthermore, you

12:15PM 20    had the mobilization of the Interahamwe, this well-organized,

21    well-armed, absolutely dedicated militia that was also very

22    mobile across the country, and so those factors meant that

23    while the violence started in the capital, it spread with great

24    speed and great ferocity out into rural areas.

25    Q.   And you touched on this, but who all was doing the

 1   Butare Town, and then another field site in a rural area to the

 2   east of the town in a place called Ngoma, which is a sort of a

 3   small village.  There's various communities around there where

 4   I do my field work.

 5   Q.   As part of your research, have you actually visited the

 6   hospital in Butare?

 7   A.   I have visited the hospital in Butare.  I visited it on

 8   several occasions.  I've spoken to some staff who work there.

 9   I've also attended a genocide memorial service that was held in

12:42PM 10   the Butare Hospital.

11   Q.   What steps do you take to make sure that you are getting

12   accurate information during the course of your interviews?

13   A.   This is a very important feature of field work in a

14   post-conflict environment like Rwanda that as a researcher, you

15   need to spend a lot of time ensuring that the information that

16   you're gathering is as accurate as possible.  There are many

17   individuals who either have fuzzy recollections of the past or

18   may have reasons to not necessarily tell the truth, and so I

19   have various protocols in place for my field work to try to

12:42PM 20   ensure that the information is as accurate as possible.

21        This includes beginning every interview with an

22   individual by saying that I am an independent academic

23   researcher, so I'm not working for any government, I'm not a

24   journalist, and that I don't already have an idea of what I'm

25   looking for in this interview.

**Add. 5**

1          It's very important in my work to emphasize to my

2      interviewees that they need to be as free and open as possible

3      and that I'm not expecting them to tell me anything in

4      particular.

5          One of the other key features of my field work is that

6      I've been able to go back to the same locations and often to

7      interview the same individuals over this 16-year period, and so

8      what I've discovered in my field work is that this enabled me

9      to build a certain amount of trust and a certain rapport with

12:43PM 10    my interviewees, and what I find as a result is that many of my

11     interviewees will only tell me particularly sensitive things

12     after the third or the fourth or the fifth interview, sometimes

13     four or five years later, and I think that's understandable

14     that I'm a foreigner coming into Rwanda.  These individuals

15     have never met me before.  It's unlikely that they are going to

16     tell me extremely sensitive or contentious things on the first

17     meeting.

18         It's going to take a lengthy period of building trust

19     before people feel open enough to be able to speak especially

12:44PM 20    about the genocide and its impact, and so that's one of the key

21     reasons why a lot of my field work is based upon repeat visits

22     and follow-up interviews.  That's a key part of what I do.

23     Q.   Are there details about survivor stories that are

24     especially sensitive that take time to develop with the

25     witness?

**Add. 6**

A.   Yes.   Survivors, genocide survivors in Rwanda are a
particularly complex category of people to conduct interviews
with.   They are often traumatized by what they lived through.

Many of my survivor interviewees say that they
experience some degree of post-traumatic stress disorder, and
so talking about the events of the past can be very triggering
for them in many ways, and so I find particularly with
survivors that it's only after multiple interviews that certain
issues start to come out.

Now, those issues are various.   It can be things like
even identifying the perpetrator of crimes against their
family.   Many survivors simply don't want to talk about the
past because it dredges up these very, very difficulty
memories.   I've done many interviews with victims of sexual
violence, including with female victims of sexual violence.

Now, it is highly unlikely that a foreign man can come
into a Rwandan community and have an interviewee give a full
and frank interview about sexual violence at the first attempt.
That's the kind of thing that often takes many, many years of
building trust, so there's a real sensitivity around that.

And one of the other issues that has come up in some
of my survivor testimony is also about their own relatives who
were involved in killings.

There is often a sensitivity about pointing the finger
at Hutu loved ones who also perpetrated the genocide.   You have

1    to recall that a lot of my early field work was taking place

2    when the Gacaca Courts were underway between 2002 and 2012, so

3    what this meant was I was also conducting research in an

4    environment when there was a legal process underway, and so

5    many of my interviewees quite rightly wanted to know if they

6    told me certain things about the past, would that information

7    be used in Gacaca legal proceedings, and so people were

8    sometimes very reluctant to speak openly at the first attempt

9    because they were worried about the legal ramifications of

12:46PM 10    giving this testimony, and so, again, it often took multiple

11    interviews to allay their concerns, to bill rapport and to have

12    a much deeper interview than was possible at the first attempt,

13    so there are lots and lots of areas of sensitivity especially

14    in survivor interviews.

15    Q.   Do you speak Kinyarwandan?

16    A.   I do not speak it fluently, so I speak enough Kinyarwandan

17    to be able to converse on day-to-day issues, but when it comes

18    to dealing with more sensitive and more complex issues, I rely

19    entirely on Rwandan interpreters.

12:47PM 20    Q.   When you go to conduct your field work, do you coordinate

21    with the Rwandan government in any way?

22    A.   No, I don't coordinate with the government.  The only

23    formal interaction that I have with state officials is it's now

24    stipulated that all foreign researchers in Rwanda must have a

25    research permit, so you have to go through a process of

**Add. 8**

1    Q.    Did you undercover any efforts in your research by the

2    Rwanda government to force or coerce witnesses to provide

3    testimony against suspected genocidaires?

4    A.    No.  In my research, I found no evidence of government

5    coercion, either of prosecution or defense witnesses, and this

6    was something that I wrote about in my book on Gacaca and also

7    in some subsequent reports that having looked at Gacaca

8    operating in these 12 field sites over a very lengthy period,

9    this kind of thing did not manifest.

12:58PM 10   Q.    In fact, did you do any specific consulting work with

11   respect to this issue of government coercion of witnesses?

12   A.    I did, along with my wife, who is also a Rwanda

13   specialist, her name is Nicola Palmer, we did a joint project

14   four or five years ago for an NGO based in London called

15   Redress.  It's an organization that works with victims of mass

16   atrocities around the world.

17        We did a specific research report on prosecution and

18   defense witnesses in Rwanda, who were testifying in multiple

19   jurisdictions, so we interviewed prosecution and defense

12:59PM 20   witnesses who had given testimony at Gacaca and/or testimony in

21   the Rwandan National Courts or at the UN Tribunal or in foreign

22   jurisdictions, such as this one, because, obviously, many

23   Rwandan witnesses are traveling backwards and forwards to

24   testify in foreign places such as the U.S., and one of the key

25   things that we found in that report was that none of our

**Add. 9**

1   witnesses stated that they had been coerced by the Rwandan

2   government about what they were supposed to say in these

3   different jurisdictions.

4            Some individuals claimed that they had experienced the

5   coercion or the backlash of their neighbors for things that

6   they had said or even the mere fact that they had traveled was

7   sometimes a reason for backlash, but this had never been on the

8   responsibility of the Rwandan government.

9            THE COURT:  Anything else, Mr. Varghese?

01:00PM 10           MR. VARGHESE:  Just would you like me to stop, your

11  Honor?

12           THE COURT:  Well, how much more do you have?

13           MR. VARGHESE:  I only have a few minutes.  I'm

14  cognizant of the time.

15           THE COURT:  A few minutes meaning?

16           MR. VARGHESE:  Probably closer to 10 minutes.

17           THE COURT:  All right.  Why don't we break.  Let me

18  see the lawyers at sidebar about the schedule.

19           (THE FOLLOWING OCCURRED AT SIDEBAR:)

01:00PM 20           THE COURT:  All right.  With ten minutes tomorrow, how

21  long do you expect to take?  Is this the one we need the

22  tomorrow afternoon session for?

23           MR. VARGHESE:  No, it's the next witness.

24           THE COURT:  What time -- what should I tell them to

25  expect for tomorrow afternoon?  I would prefer to get them out

**Add. 10**

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

2

3

4  UNITED STATES OF AMERICA,       )
                             )

5  vs.                        )  Criminal Action
                             )

6  JEAN LEONARD TEGANYA,        )  No. 17-10292-FDS
                  Defendant   )

7                             )
                           )

8                             )

9

10  BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                    JURY TRIAL DAY 3

12

13

14

15       John Joseph Moakley United States Courthouse
                  Courtroom No. 2

16                  One Courthouse Way
                  Boston, MA 02210

17

18                  March 12, 2019
                  8:30 a.m.

19

20

21

22

23                  Valerie A. O'Hara
                Official Court Reporter

24     John Joseph Moakley United States Courthouse
            1 Courthouse Way, Room 3204

25               Boston, MA 02210
          E-mail: vaohara@gmail.com

**Add. 11**

        1    Q.    Were there any efforts, did you undercover efforts that

        2    witnesses were coerced to testify about suspected genocideers?

        3    A.    No, in my 10 years of looking at the Gacaca process, I

        4    found no evidence of witnesses either for the prosecution or

        5    for the defense being coerced to give particular forms of

        6    testimony.

        7    Q.    With respect to Gacaca -- I'm sorry, with respect to the

        8    other forms of trial, of genocideer suspects, did you find

        9    anything as well in addition to Gacaca such as the ICTR or the

09:04AM 10   Rwandan criminal courts?

       11    A.    As I mentioned in my testimony yesterday, my wife and I

       12    conducted a research report for the organization redress five

       13    or six years ago looking at exactly this issue of witnesses

       14    either for the prosecution or for the defense who were giving

       15    testimony in a wide range of jurisdictions.  That included

       16    Gacaca but also the ICTR, the UN tribunal based in Tanzania,

       17    the Rwandan national courts and proceedings held in foreign

       18    jurisdictions, such as this one.

       19          One of the key findings of that report was that there

09:05AM 20   was no direct coercion of any prosecution or defense witnesses

       21    by the Rwandan government.  There was some instances of

       22    pressure being brought to bear on witnesses by members of their

       23    own community, sometimes even by the direct family members of

       24    witnesses, especially if witnesses testified against their own

       25    family members, there would be some pushback by those family

**Add. 12**

1 members and members of the local communities, but we found no

2 evidence of coercion of witnesses conducted by the Rwandan

3 government.

4 Q. Dr. Clark, my last set of comments I want to ask you about

5 common defense argument that was made during the process.  Are

6 you familiar with the theory of genocide denial?

7 A. Yes, I'm very familiar with this idea.

8    MR. LAUER:  Objection, your Honor.

9    THE COURT:  Let me see you at sidebar.

09:06AM 10    (THE FOLLOWING OCCURRED AT SIDEBAR:)

11    MR. LAUER:  The question seems for him to opine on

12 defense strategies.

13    THE COURT:  I'm not saying I did not like the

14 introduction to that question, which did sound like it's

15 attacking a defense.  I mean, you perhaps didn't intend it, but

16 it certainly sounded that way, the kinds of things defense

17 lawyers raise, so I'm going to sustain the objection, strike

18 the question.  Why don't you rephrase it.  You can ask just are

19 you familiar with something called genocide denial.

09:07AM 20    MR. VARGHESE:  That's fine, your Honor, I apologize.

21    (SIDEBAR CONFERENCE WAS CONCLUDED)

22    THE COURT:  I'm going to sustain the objection and

23 strike the question.  Let's rephrase, Mr. Varghese.

24 Q. Dr. Clark, are you familiar with a term called "genocide

25 denial"?

Add. 13

1    A.    Yes, I'm familiar with the term, yes.

2    Q.    What is genocide denial?

3    A.    Genocide denial is in essence the idea that an individual

4    or a group would claim that a genocide that is historically

5    known to have occurred did not occur.  This is a phenomenon

6    that we've seen not just in the Rwandan context but in the

7    context of all of the other genocides that I mentioned

8    yesterday, including the holocaust.

9          There's a very well-known phenomenon of holocaust

09:07AM 10   denial.  Many individuals, many groups for various reasons

11   continue to claim that the holocaust did not occur, and

12   sometimes it is because those individuals are, in fact,

13   holocaust perpetrators, and so they prefer to try to claim that

14   the holocaust is simply a myth.

15         We've something very similar in the Rwandan context.

16   Many individuals and many groups are continuing to claim that,

17   in fact, the genocide in 1994 did not take place.

18   Q.    Is there any evidence to support that?

19   A.    There is no evidence to support that, and, in fact, as I

09:08AM 20   outlined yesterday, there is an enormous amount of evidence to

21   support the fact that the genocide did occur in Rwanda in 1994.

22         If we go back to the definition of genocide and the

23   genocide convention, we are looking at the systematic attempts

24   to eliminate in whole or in part the Tutsi minority group in

25   Rwanda in 1994.  We have an enormous amount of evidence to

## Add. 14

1    support the fact that that, in fact, exactly did take place.

2    Q.   Dr. Clark, are you familiar with the theory of the dual

3    genocide or the dual genocide theory?

4    A.   Yes, this is a very common phenomenon in many Rwandan

5    circles.  The idea behind the jewel or the double genocide

6    thesis is that there was, in essence, two genocides in 1994, a

7    view that I personally consider to be false.

8           The idea is that there was firstly the genocide of the

9    Tutsi carried out by the range of actors that I discussed

09:09AM 10   yesterday, but that during and directly after that genocide,

11   there was a second genocide of the Hutu carried out by the

12   Rwandan Patriotic Front, the Tutsi dominated rebel group, and

13   its supporters.

14          This is what the double genocide thesis, in essence,

15   says, that at first there was a genocide of the Tutsi, and this

16   was followed by a genocide of the Hutu.

17          I'm of the view that while there were killings of Hutu

18   by the RPF and by other actors that there was not the degree of

19   orchestration and systematicity that we saw in the genocide of

09:10AM 20   the Tutsi, and, so, therefore, as egregious as those crimes

21   against Hutu are, we should not describe those as a second

22   genocide.

23   Q.   Dr. Clark, are you familiar with the theory that

24   genocideers or individuals could not be genocideers if they

25   came from --

**Add. 15**

1          MR. LAUER:  Objection.

2          THE COURT:  Let me hear the question.

3    Q.   Are you familiar with the theory that individuals could

4    not be genocideers if they came from mixed ethnicities?

5          THE COURT:  Overruled.

6    A.   Yes.  This was a very common line of defense for genocide

7    suspects, not only at Gacaca but in some of the other

8    jurisdictions that dealt with Rwandan genocide crimes.  The

9    argument was often that an individual would claim they could

09:11AM 10   not have perpetrated genocide crimes because even though they

11   were a Hutu, they had a Tutsi spouse, or they had other close

12   Tutsi relatives.  This was a very common defense.

13   Q.   And was there evidence to support that?

14   A.   In the cases that I observed at Gacaca, when that kind of

15   defense was brought forward, more often than not, it had no

16   evidentiary basis, that, in fact, it was very common across

17   Rwanda for Hutu perpetrators of genocide crimes to also in many

18   cases have a Tutsi spouse or very close Tutsi relatives.

19          This is because of the nature of these very

09:11AM 20   intertwined communities, especially in rural areas in Rwanda.

21   There had been an enormous amount of intermarriage between Hutu

22   and Tutsi for generations, but when it came to 1994, one of the

23   striking features of the Rwandan genocide was that those Hutu

24   who identified very strongly with the Hutu power message and

25   wanted to eliminate Tutsi chose to do so even though they may

**Add. 16**

1   have had a Tutsi spouse or close Tutsi relatives, so this was a
2   very widespread phenomenon right across the country during the
3   genocide.
4          THE COURT:  Let me remind the jury, this is all
5   context and background, kind of viewing things at a high level.
6   None of this explains how any particular individual acted,
7   whether that's the defendant or any witness, in other words,
8   this is a broad-spread set of generalizations to help you
9   understand things.  It doesn't answer how a specific person
09:12AM 10   acted or felt or what that person's motives were.
11          Mr. Varghese.
12          MR. VARGHESE:  Thank you, your Honor, I have no
13   further questions.
14          THE COURT:  All right.  Cross.
15                      CROSS-EXAMINATION
16   BY MR. LAUER:
17   Q.   Good morning.
18   A.   Good morning.
19   Q.   So you described yesterday the concept of regionalism and
09:13AM 20   how regionalism played into the political realm during the time
21   of the genocide.  You recall that?
22   A.   Indeed.
23   Q.   And specifically you described how the MRND was strongest
24   in the north, correct?
25   A.   That's right.

**Add. 17**

```
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2


 3


 4   UNITED STATES OF AMERICA,        )
                                      )
 5   vs.                              )   Criminal Action
                                      )
 6   JEAN LEONARD TEGANYA,            )   No. 17-10292-FDS
                         Defendant    )
 7                                    )
                                      )
 8                                    )


 9


10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV


11                          SENTENCING HEARING

12


13


14
                   John Joseph Moakley United States Courthouse
15                          Courtroom No. 2
                            One Courthouse Way
16                          Boston, MA 02210

17
                              July 1, 2019
18                            8:30 a.m.

19


20


21


22
                         Kathleen Mullen Silva
23                        Official Court Reporter
                John Joseph Moakley United States Courthouse
24                      1 Courthouse Way, Room 7902
                            Boston, MA 02210
25                  E-mail: kathysilva@verizon.net
```

Add. 18

APPEARANCES:

For The United States:

    United States Attorney's Office, by GEORGE P. VARGHESE, ASSISTANT UNITED STATES ATTORNEY, and SCOTT GARLAND, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts  02110;

For the Defendant:

      Federal Public Defender Office, by SCOTT LAUER, ESQ., and TIMOTHY G. WATKINS, ESQ., 51 Sleeper Street, 5th Floor, Boston, Massachusetts 02210.

**Add. 19**

```
1                    P R O C E E D I N G S
2              THE CLERK:  All rise.
3    (Court entered.)
4              THE CLERK:  Court is now in session in the matter of
5    United States v. Jean Leonard Teganya, criminal matter number
6    17-10292.
7              Would counsel please identify themselves for the
8    record.
9              MR. VARGHESE:  Good afternoon, your Honor.  George
10   Varghese from the United States.
11             MR. GARLAND:  Good afternoon, your Honor.  Scott
12   Garland on behalf of the United States.
13             THE COURT:  Good afternoon.
14             MR. LAUER:  Good afternoon, your Honor.  Scott Lauer
15   on behalf of Mr. Teganya.
16             THE COURT:  Good afternoon.  All right.  This is the
17   sentencing of Jean Leonard Teganya.  I've received and read the
18   presentence report as revised through June 24, the defendant's
19   sentencing memorandum with letters of support attached, the
20   government's sentencing memorandum.  And I think that was it.
21             Is there anything else I should have seen that I have
22   not?
23             MR. GARLAND:  No, your Honor.
24             MR. LAUER:  No, your Honor.
25             THE COURT:  Okay.  Mr. Lauer, I know you've had a
```

**Add. 20**

1  chance to review the presentence report.  Have you gone over it

2  with Mr. Teganya?

3          MR. LAUER:  I have.

4          THE COURT:  Is that correct, Mr. Teganya?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Are there any victims present who wish to

7  participate in this process?

8          MR. GARLAND:  No, there are not.

9          THE COURT:  All right.  Let me take up the objections

10  to the presentence report.  As I see it, there are basically

11  two.  One is not really an objection, but whether the

12  obstruction of justice enhancement under Section 3C1.1 should

13  apply, and the government has said whether there should be an

14  upward departure based on the inadequacy of criminal history

15  under 4A1.3.

16          As to the upward departure issue, I think that

17  probably is best folded into the arguments generally on both

18  sides.  I don't know that it's actually a guideline objection.

19  But let's take up the obstruction of justice question.  Let me

20  hear from the government first.

21          Mr. Varghese.

22          MR. VARGHESE:  Thank you, your Honor.  I'm sorry.

23  You'd like to hear about the obstruction of justice?

24          THE COURT:  Obstruction of justice first, yes.

25          MR. VARGHESE:  That's fine, your Honor.

Add. 21

1        From presiding at this trial, the court has heard the

2    evidence in this case, and there was a lot of it.  Typically,

3    your Honor, there was -- I think there was a total of 34

4    witnesses, 14 government witnesses and 20 defense witnesses who

5    testified in this case.

6        Now, with respect to obstruction of justice, the First

7    Circuit tells us that it's not simply for conflicting evidence,

8    but where that evidence is directly contradictory of each other

9    or a wholesale denial of involvement in criminal conduct, or as

10   the First Circuit stated where it constitutes a web of lies,

11   the obstruction of justice enhancement is applicable and should

12   be applied.

13       Now, with respect to obstruction of justice, your

14   Honor, the statements at issue that the government is relying

15   on were directly contradictory, the government's witnesses and

16   then the defendant in his statements.  Putting aside the 19

17   other defense witnesses, the defendant's statements themselves

18   were directly contradictory to the government's witnesses.

19       The jury's verdict, a unanimous verdict on all five

20   counts, directly shows, your Honor, that the jury credited the

21   government's witnesses as opposed to Mr. Teganya.

22       Let me just touch briefly on a couple of those

23   statements.  Counts One and Two relate to Mr. Teganya's

24   involvement with the political party MRND.  The testimony the

25   defendant gave when he was on that stand under oath was that he

 1    was not a member of that political party, that it was his
 2    father's party, and that he was too busy studying during his
 3    time in medical school to participate in MRND activities.
 4    Those statements were directly contradicted by the testimony of
 5    government witnesses, Dr. Bernard Kalimba, Dr. Anicet
 6    Nzabonimpa, Jerome Arusha and Innocent Habimana.  All four of
 7    those witnesses testified that they saw him wearing clothing of
 8    MRND, the hat and the scarf.  They saw him wearing pins, that
 9    he attended political meetings and rallies, that he had a flag
10    in his room, and that he trained with the Interahamwe in the
11    gym and in the fields.  Again, directly contradictory to the
12    statements the defendant made on the stand under oath.
13           Counts Three and Four relate to Mr. Teganya's denial
14    of ever causing harm to anyone because of their race or social
15    group.  Similarly, Count Five was his denial of ever seeing
16    atrocities at the hospital.  Once again, the defendant took the
17    stand under oath and stated that he was at that hospital for a
18    full 100 days during the heart of the genocide -- during the
19    entire genocide, but the entire time he was there treating
20    patients, that he never participated in acts of genocide, in
21    fact, he didn't even see acts of genocide.  Once again, that
22    testimony was directly contradicted by several of the
23    government's witnesses, including Jean Pierre Gasasira.  He was
24    the 17-year-old Tutsi boy who saw the defendant hunt down and
25    murder three Tutsis at that hospital, Dr. Karekezi, Mathias

1  Gasarabwe and Protais Nyangezi.  All three of those murders,
2  Mr. Gasasira testified that the defendant not only participated
3  in but actually was involved in killing them.

4      There was the testimony of Consolee Mukeshimana.  She
5  was the Tutsi woman who was hiding in the dermatology ward.
6  She testified that she saw the defendant come and take her
7  cousin Veneranda to be raped on three separate occasions.  The
8  last time she stated that Veneranda said that she was going to
9  ask Mr. Teganya to kill her because she couldn't endure it any
10  longer, and, in fact, Mr. Teganya did that.  And then she
11  herself testified that she was taken by Mr. Teganya, was beaten
12  by Mr. Teganya, was raped by Mr. Teganya on two separate
13  occasions, all the while that she was six months pregnant.

14      There was also the testimony of Esperance Mukamurenzi.
15  She was the older Tutsi woman who was hiding in the maternity
16  ward.  She identified Mr. Teganya by describing him as the man
17  with the gap in his teeth and wearing the white lab coat, which
18  is exactly the same way Mr. Gasasira described him.  She
19  testified that she called Mr. Teganya and his militia Teganya's
20  Army, and that's how they were referred to by the patients who
21  were hiding there.  She testified that Teganya's Army came and
22  took Tutsi patients, including her aunt Venancia, to be killed
23  in the field by the maternity ward steps from the Kiza
24  dormitory where Mr. Teganya was living at the time.  Esperance
25  Mukamurenzi also testified that she too had been taken by

1    members of Teganya's Army and raped on the hospital grounds.

2         Lastly, there was Innocent Habimana.  He testified

3    about the defendant, his participation in the Interahamwe, the

4    training sessions that took place, both at the gym and in the

5    fields.  He testified that Mr. Teganya was a member -- not only

6    a member of the Interahamwe, but actually a leader of the

7    Interahamwe, about how he wore the clothing, the scarf and the

8    hat, and about how during the genocide Mr. Teganya flagged down

9    Mr. Habyarimana and his group and tried to turn over four

10   Tutsis who had been hiding in the Kiza dormitory to be killed.

11   Mr. Habyarimana testified to the jury that he told Mr. Teganya

12   you have to do the work too, and so they broke them up.  Each

13   group took two separate Tutsis.  They went behind the Kiza

14   dormitory.  Mr. Habimana and his group killed two Tutsis.

15   Mr. Teganya and his group killed the other two.

16        For all of the events that I just described

17   Mr. Teganya was asked about all of these events while he was on

18   the stand under oath, and for all of those events he denied his

19   participation in any of it.  Your Honor, we believe that those

20   constitute the web of lies that the First Circuit has stated

21   justify an obstruction of justice enhancement.  It should be

22   applied not only to the visa fraud counts or, sorry, Counts One

23   through Four but also to the perjury count in Count Five.

24   Under the guidelines, as the court knows, the perjury offense

25   level is 2J1.3.  It's a 14.  It's a level 14.  There's an

1 additional three-level enhancement if it interferes with the

2 administration of justice. So 2J1.3(b)(2). There's an

3 obstruction of justice enhancement on top of that. 3C1.1

4 applies if the defendant lied at the trial about the perjury

5 charge. So that's the additional two-level enhancement.

6 So we believe that the first four groups -- the first

7 four counts that are grouped together are a level 27. Count 5

8 stands alone at a level 19. When those are all grouped

9 together, you end up with a total offense level of 28.

10 THE COURT: Okay. Mr. Lauer.

11 MR. LAUER: Your Honor, I'd be hard-pressed to say

12 that there wasn't contradiction between the account offered by

13 Mr. Teganya and the account offered by the government

14 witnesses. That goes for many witnesses that the defense

15 presented and the jury has spoken.

16 But the obstruction of justice enhancement, the First

17 Circuit has been clear, requires more than simply contradictory

18 testimony that is not endorsed by the fact finder. It would

19 require you to make specific findings as to the nature of the

20 perjury, the materiality, et cetera. Mr. Teganya testified in

21 his defense. A number of other witnesses who knew him

22 testified in a manner consistently with him. He certainly is

23 not prepared to admit that that was perjurious or that that

24 constituted obstruction of justice. However, the jury did

25 render its verdict, and we are here today because of that. But

1    simply because the jury rejected Mr. Teganya's testimony does

2    not automatically allow for a finding of obstruction.

3            THE COURT:  All right.  As to this issue, that is,

4    whether the obstruction of justice enhancement under Section

5    3C1.1 should apply, I find that it does apply, and I will apply

6    the two-level enhancement.

7            As counsel correctly points out, this doesn't apply

8    for a mere denial of guilt or merely for exercise of one's

9    right to testify or for merely contradictory statements.

10    Something more is required, but I find by a preponderance of

11    the evidence that the defendant made a variety of false

12    statements during his testimony, as outlined by the government

13    in its argument, and that those statements were, taken as a

14    whole, material, and that, therefore, the enhancement applies.

15            I think we wind up at the same place, but I don't

16    think that the enhancement should apply twice for grouping

17    principles.  That seems to me to be perhaps double counting on

18    top of arguably double counting of the perjury offense followed

19    by the enhancement of three levels on the perjury offense, but

20    I think the two levels should be added at the end.  I think

21    that takes us to a level 28 regardless, but I think that's the

22    fair way to calculate it.

23            And, again, the objections as to upper departure I

24    think should be folded into the argument as to the appropriate

25    sentence, whether I should either upwardly depart or impose a

1 variance sentence.

2       I think the other objections were resolved, or were

3 offered to the court for information purposes. Is there

4 anything else I need to take up as a guideline matter in terms

5 of objections?

6       MR. VARGHESE: Not for the government, your Honor.

7       THE COURT: Mr. Lauer?

8       MR. LAUER: No, your Honor.

9       THE COURT: All right. Let me turn then to the

10 guideline calculation. There are two groups under 2L2.2 which

11 applies to immigration offenses. The base offense level is 8.

12 There's an increase all the way up to 25 if the defendant

13 committed the offense to conceal his participation in a serious

14 human rights offense, which I think appropriately applies.

15       The second grouping is perjury under 2J1.3. The base

16 offense level is 14. There's a three-level enhancement because

17 it resulted in a substantial interference with the

18 administration of justice. That adds up to 17. Applying

19 grouping principles, we add one level to 25 to take us to 26,

20 followed by two levels for obstruction of justice, and that

21 takes us to a level 28, which is the final adjusted offense

22 level.

23       His criminal history score is zero. His criminal

24 history category is Roman Numeral I. That produces a guideline

25 range of 78 to 97 months, a supervised release range of one to

three years.  The fine range I think is lower, because the

offense was committed before 2014, of $12,500 to $125,000.

Restitution is not applicable.  And there's a special

assessment of $100 on each count for a total of $500.

Is there any further objection to that, other than

what's already been raised?

Mr. Varghese.

MR. VARGHESE:  No, your Honor.

THE COURT:  Mr. Lauer?

MR. LAUER:  No.  Aside from the obstruction of

justice, no.

THE COURT:  All right.

With that as our starting point, let me hear from the

government.

THE COURT:  Mr. Garland.

MR. GARLAND:  Thank you, your Honor.

The government's argument for 20 years of imprisonment

begins and is underpinned largely by the enormity of the

genocide, the enormity of Mr. Teganya's part in the genocide

and the enormity of his lies about what he did then and its

effect upon the asylum system.

The enormity I think is hard to grasp, and I say that

because one of the things that we were thinking about in trying

to decide how to present this to the court and to the jury was

who should the first witness be.  And there was enormous

thought given to whether it should be, say, Mr. Gasasira, and who could identify what it was that Mr. Teganya had done at the Butare Hospital. And ultimately the thought was that what he was about to relate to the court and to the jury was so far out of the understanding of us that something that big as the Rwandan genocide, something that enormous happened during our lifetime, we were worried that people would not be able to apprehend the horror of what happened then, the worst genocide since the Holocaust.

And that's why we started out with an expert, an expert who could basically talk about the historical record, and what other people had seen and done not only throughout Rwanda but in Butare and around the hospital itself, to base that so that other people could understand the testimony -- the eyewitness testimony that they were going to hear, and to judge what Mr. Teganya had said in the immigration proceedings. And that through that they would understand that this was real and that it was horrible.

And they would also learn what type of people participated in the genocide, that it wasn't just soldiers; it wasn't just party partisans; but it was also people like neighbors and relatives and teachers and priests and seminarians. It could be done by people that you could not imagine doing these sort of things, people who were smart, educated, sometimes religious, sometimes leaders, all people

1    who had attributes that Mr. Teganya portrayed himself as

2    having, and that other witnesses identified him as having as

3    well.

4          And I emphasize this not because the court didn't sit

5    through this and understand all of it, but as we talk about the

6    technical aspects of sentencing at a remove of three months

7    from when this testimony was given, it can be difficult to keep

8    the enormity of what went on and his part in it in the mind's

9    eye.

10         And this informs, I believe, as well the understanding

11   of what Mr. Teganya's lies -- what effect they had, those lies,

12   on the asylum system itself.  And those are the crimes for

13   which he is to be sentenced.  For that -- imagine that it's May

14   of 1994.  The genocide is raging on as we speak, and imagine

15   that there are a stream of refugees coming from Rwanda lining

16   up to ask for asylum before the immigration courts.  One would

17   hope that that asylum system whose very goal is to give refuge

18   to the persecuted and to reject the persecutors, one would hope

19   that it would accurately identify the Tutsi refugees and the

20   moderate Hutu refugees who were truly fleeing the horror that

21   was going on in the genocide, that they would come here, we

22   would identify them, and that we would open our arms to them

23   and give them asylum.

24         And one would hope equally that the asylum system

25   would do exactly the same with the perpetrators of that

**Add. 31**

genocide, that it would identify them quickly and accurately
and because of the persecutor bar and just the fundamental
notions of decency that the asylum procedures and the laws
under exhibit, that we would catch them quickly and refuse them
so that they could face justice elsewhere in their home
country.

And in that regard, putting oneself back in May of
1994, playing that out as the refugees are coming in live
essentially, while the genocide goes on, I think it's much,
much easier to understand how the lies that Mr. Teganya told,
his dressing himself up in the garb of the persecuted rather
than the persecutor, how awful they were.  They weren't just
the heartland lies that might be told in immigration court for
which we still prosecute people, lies about former marriages,
lies about current marriages, lies about who they're related
to, presenting false identity documents, but these were instead
lies about the most consequential catastrophe that Rwanda has
faced.  And doing that perverts the system.  It says the
persecutor deserves some sort of refuge here, that he somehow
deserves to have some sort of freedom from prosecution
elsewhere, and at the same time it also casts suspicion on all
those other Rwandan refugees who are standing right in front of
you, because as the court heard, the whole system starts with
the candor of the applicants, and from there the inquiry goes
on, but it starts with the candor of the applicants.

1    So thinking about that, the court can understand what
2    it was that Mr. Teganya was doing in Canada when he was spewing
3    similar lies to the Canadian authorities, as well what he was
4    trying to gain here.  Because, remember, it wasn't just, well,
5    you try it, see whether it works, and if it doesn't, you go
6    out.  If Mr. Teganya had been successful, he would have been
7    granted a first step on the path to citizenship here.

8    So why the upward departure to the statutory maximum?
9    I'm going to structure this in two ways.  One is why the upward
10   departure to the statutory maximum on each of the counts, and
11   then why the 20-year sentence that the government has
12   recommended.

13   Court after court that has seen similar facts, whether
14   from Rwanda or Liberia or Ethiopia, have recognized that the
15   enormity of the genocide, the enormity of the types of acts
16   that Mr. Teganya has done is directly related to the enormity
17   of the lies, and that these are the most significant, most
18   corrosive, most morally culpable lies possible.  They deserve
19   the most serious penalty, and that is the maximum on each
20   count.

21   And each court that has considered this have asked if
22   this is not the crime that deserves the maximum penalty, then
23   what is?  And, your Honor, that is true here.

24   And it's in this light that the government suggests,
25   specifically with regard to 2L2.2 and the upward enhancement or

adjustment for genocide, that it's inadequate. It's inadequate
in light of the fact that it's just a regular offense level of
25 that it brings you only to, for criminal history category I,
57 to 71 months, which is far below the statutory maximum for
what are normally ten-year crimes. It's inadequate in light of
the defendants prosecuted, and that includes Mr. Teganya,
people who are leaders who direct other people to engage in
acts of genocide or rape, people who commit multiple genocidal
acts, as did Mr. Teganya, people whose participation in those
crimes are grotesque, as they were here with Mr. Teganya being
a medical student and having the duty of care, with Mr. Teganya
raping a woman who was pregnant six months at the time. As
well it's inadequate given the types of lies that were told as
you think about the defendant and his own characteristics.

I'll address the 4A1.3 argument at this point. You'll
recall, your Honor, that the criminal history category here, as
you said, was zero points, criminal history category I. As we
said in our papers, that does not take into count the multiple
murders and rape, incitement to murder and rape that
Mr. Teganya was responsible for. It doesn't take into account
the fact that even afterwards, throughout as many as 15
years -- 20 years, he has taken repeated step after repeated
step to renew that story in what were lies.

It starts out with the false Zimbabwean passport that
allows him to get into Canada. It continues with the many,

1    many statements that he made to Canada.  It continues with

2    Canada deciding that he must be removed and Mr. Teganya

3    becoming a fugitive for two years.  It continues with him

4    coming into the United States, clearly not intending to assert

5    an asylum claim but skirting the border and walking away from

6    that border station so that he would not be arrested.  It's

7    only because of that arrest that he came forward and he

8    continued with these lies.  And it continues again with the

9    lies that he told you and the jury inside of the trial.

10          And it's important as well because of the lies that he

11   told what effect they actually had.  Part of what he was doing

12   was denying the very reality that the government's expert, that

13   the defendant's expert, that the government's witnesses and

14   some of the defendant's witnesses as well showed to this court.

15   It denied the enormity and the reality of what happened there.

16   That the genocide was open, that it was pervasive, that it was

17   staggering in effect.  It denied as well the basic humanity of

18   those witnesses who sat on that stand and testified to the

19   court and to the jury about the unbearable suffering that they

20   saw, that they endured, that they saw others endure, and that

21   they saw others endure at Mr. Teganya's hands.

22          As you recall, Mr. Teganya didn't get up there and

23   basically say, you know, what happened during the Rwandan

24   genocide was a terrible thing.  There was a lot going on there.

25   And I feel so bad for these people who came up here and said

1   that this happened to them, but you have to understand it

2   wasn't me.  What he basically said and what he painted those

3   victims as were liars.  And if there's one small mercy it's

4   that they were not here to hear him say that when he was on the

5   stand.

6        This is the exact opposite of Gacaca.  As the court

7   will recall, the whole Gacaca process back in Rwanda was

8   intended to essentially move past this episode.  What do you do

9   with people who have participated in such large crimes and so

10  many of them?  What was the Gacaca process supposed to do?  It

11  was supposed to deal with it and move on and reconcile.  This

12  only prolonged and denied the agony that actually had happened.

13  And it showed, I think, Mr. Teganya's contempt for the whole

14  process, asylum, immigration as well.

15       The 3553(a) factors also support, as numerous courts

16  have talked about, going to the statutory max for each count,

17  promoting respect for the law, banning persecutors, recognizing

18  the seriousness of Mr. Teganya's lies which I've just

19  addressed, giving just punishment for these as well, and

20  letting, most importantly, other persecutors know that the

21  United States is no safe haven for people who are persecutors

22  or those who lie about being persecuted, and that they must

23  face justice elsewhere.

24       So once it's understood why each count must have the

25  statutory maximum penalty associated with it, whether it's five

years or ten years, the next question is how to determine how
those should run, consecutively or concurrently, to arrive at
the sentence that the government has suggested.  And for that
we look to other sentences.  Clearly at the outer limits is the
sentence for Jabbateh, who is known as Jungle Jabbah.  We are
not contending that Mr. Teganya is Jungle Jabbah.  Jungle
Jabbah got 30 years for being essentially the commander of a
battalion of some sort doing this for years upon end
essentially commanding a province and commanding other people
to do things that were unspeakable, including cannibalism, but
it gives us an outer limit to be wary of.  We noted that in
this case the statutory maximum, if you were to run everything
consecutively, would have been 35 years.  That did not appear
to be an appropriate punishment for Mr. Teganya given what he
had done in comparison to Jungle Jabbah.

       At the other end of the spectrum is Mr. Ngombwa, which
was an interesting case, because Mr. Ngombwa was a part of the
genocide.  Now, there his lies were only about, what he was
tried for, were only about who he was related to.  Whether he
was related to a former prime minister who left the country,
whether he was related to other people as well.  And there the
facts about his participation in genocide became relevant only
at sentencing.

       Now, there as well Mr. Ngombwa actually did testify at
his own trial but the lies that he said were not lies about his

participation or his lack of participation in genocide.  It was
only lies about his relations with other people, who his
relatives were, and there Mr. Ngombwa got 15 years.  The
government suggests to the court that Mr. Teganya's lies, the
very things that he was convicted upon, were far, far worse
than about who he was related to.  There were, as the court has
already identified, denials about participation in genocide.

There are other cases as well that the court can
consider.  One is U.S. v. Worku.  That was the case where the
Ethiopian prison guard had been torturing people, lied about
that, and also used a false identity.  He got 22 years.
Mr. Teganya should be sentenced above Mr. Ngombwa, below Jungle
Jabbah, right around where Mr. Worku was as well.  And that is
how we get to the 20 years.

Now, in Mr. Teganya's sentencing brief one of the
things he suggests to the court is that a 63-month sentence is
fine because after that surely he'll be deported to or removed
to Rwanda and he'll face justice there, but it's important to
note that that's unknown.  It's unknown whether Mr. Teganya
will do something such as fight removal.  If he fights removal,
what decisions will be made by the immigration courts, how long
that process will take.  Prudence Kantengwa, for example, who
was convicted years ago, her appeal was done I think in 2015,
she still sits in the United States, hasn't been removed
anywhere.

**Add. 38**

1       Moreover it's the height of the irony, and I think as

2  well continued contempt, that Mr. Teganya, who has spent his

3  entire life running from Rwandan justice, to plead that now he

4  should be able to go back to Rwanda and be sentenced there so

5  he can have a shorter sentence here.  That can't be right.

6       It's now time for him to face justice for what he did

7  in the United States, making those most consequential, most

8  serious lies that the asylum system can understand to have, and

9  it's time for the court to sentence him to 20 years in prison,

10  three years of supervised release, a fine if he's able to do

11  it, but since he is in forma pauperis I understand that there

12  would probably be no fine, and a $500 mandatory special

13  assessment.

14       THE COURT:  Okay.  Thank you.

15       Mr. Lauer.

16       MR. LAUER:  Your Honor, there's a couple principles

17  that are important to keep in mind here.  The first principle

18  is that the punishment should fit the offense.  The offense

19  here is lying.  It's lying in an asylum application.  It's

20  lying before an immigration court.  It is not the acts of

21  violence that the government has described in great detail and

22  that you yourself heard from the witnesses.  It is true that

23  this case relates to the genocide.  It is true that the subject

24  of the trial had to do with his conduct during the genocide,

25  but what he is charged with and the offenses that you must

1  sentence him for are not offenses that -- are not murders, are

2  not rapes, are not incitement to commit genocide.  You must

3  sentence him for the charged offenses, which are immigration

4  fraud and perjury.  So that's one principle to keep in mind.

5       The second principle to keep in mind is that the

6  Sentencing Guidelines exist for a reason, and that's a strange

7  thing for me to be saying because I'm often in a position of

8  explaining that the Sentencing Guidelines are inadequate for

9  one reason or another.  But the fact of the matter is is that

10 the Sentencing Guidelines, while not mandatory, are a useful

11 reference point for the court in determining what an adequate

12 punishment is.

13      This is not a case -- this is not a situation, a

14 factual situation that is completely without precedent.  In

15 fact, 2L2.2 specifically contemplates the very situation that

16 is before you today:  Someone who has lied in reference to

17 their participation in serious human rights offenses.  That is

18 the reason we are dealing with a base offense level of 25 as

19 opposed to a base offense level of 8.  This is not a situation

20 where the commission has failed to foresee someone like

21 Mr. Teganya.  In fact, that provision, 2L2.2(a) -- excuse me --

22 (b)(4)(A) was added relatively recently, and it was added to

23 ensure, essentially, that courts were mindful of the serious

24 consequences of lying about genocide, lying about serious human

25 rights abuses.  This is not a situation that was

1    uncontemplated.  Instead the provision is there, it applies,

2    and it produces a certain sentencing range.  Granted, it is not

3    mandatory, but the court should be wary of departing from it

4    certainly to the extreme of the statutory maximum without good

5    cause.  The government has cited a number of cases in other

6    districts about defendants you know nothing about.  I think

7    it's more useful to proceed with reference to the guidelines

8    than it is by anecdote.

9         This defendant was convicted of lying.  That is the

10   gravamen of the offense, and that is what the punishment should

11   fit.  To the extent that the government believes that he

12   committed murder, the government believes that he committed

13   rape, that was not the charges that he faced here.  That was

14   not the verdicts returned by this jury.

15        What will happen, undoubtedly, is the government will

16   seek to remove him to Rwanda.  You heard evidence at the trial

17   that Rwandian authorities intend to prosecute him.  There is

18   certainly no reason to think that he would not be removed to

19   Rwanda, he would not be jailed in Rwanda, and really that is

20   the court of competent jurisdiction for the charges of murder

21   and rape during the genocide.  It is not the place of this

22   court to transform itself into a tribunal to punish that

23   conduct.

24        We would ask the court, in consideration of the

25   evidence that you heard, in consideration of the guidelines, in

1    consideration about -- of what you know about Mr. Teganya and

2    how he's conducted himself over the past 25 years, to impose a

3    guideline sentence.  Twenty-five years this man has been

4    outside of Rwanda.  The government in their sentencing brief

5    takes the position that he has a criminal history that is

6    understated and that it does not adequately calculate the risk

7    of future offense that he presents.  I think the past 25 years

8    of his life suggest otherwise.  This is a man who lived a quiet

9    life, an unassuming life, working, going to school, raising a

10   family.  Really the only problems that he has had have flowed

11   from the genocide.  There's nothing else to speak of.

12           So with all that in mind, your Honor, we would ask you

13   to consider a guideline sentence because this is a case where

14   the guidelines specifically contemplate the conduct that you

15   have heard, and there is not adequate reason to depart.

16           THE COURT:  Okay.  Thank you.

17           Mr. Garland, any response?

18           MR. GARLAND:  No, your Honor.  I think that our

19   argument in our brief says it all, other than to reaffirm what

20   we said before, that if we were asking the court to sentence

21   Mr. Teganya for what he did during the genocide, we'd be asking

22   for life in prison, and we're not.

23           THE COURT:  All right.  Mr. Teganya, do you wish to

24   address the court?

25           MR. LAUER:  He would decline, your Honor.

Add. 42

1          THE COURT:  Okay.

2          THE COURT:  All right.  I find this sentencing to be

3    unusually challenging, really for the -- as is perhaps obvious

4    from the arguments of counsel.  The jury convicted him of

5    immigration offenses and perjury.  There was testimony that he

6    participated in multiple murders and rapes, and that was the

7    subject of the immigration fraud and the perjury.  He was not

8    charged in this court with murder or rape and could not be so

9    charged.  Obviously the jury did not specifically find that he

10   committed or participated in any particular murder or

11   particular rape.  They were not asked to and could not legally

12   have been asked to.

13          There is, I think, substantial ambiguity in the

14   verdict as to what he actually did for that reason, but the

15   basic question is do I sentence him as a liar or do I sentence

16   him as a murderer or rapist or genocide participant.

17          There's no question that I have the authority to

18   impose a sentence all the way up to the maximum if I make the

19   necessary findings, but I find this subject troublesome.

20          To begin, as Mr. Lauer says, the punishment should fit

21   the offense.  Of course it should also fit the offender.

22   There's a fundamental problem here that is inherent in many

23   sentencing proceedings.  Take the famous case of Al Capone, who

24   was convicted for tax evasion.  Should he be sentenced as a tax

25   cheat or should he be sentenced as Al Capone, as a murderer and

1   racketeer?  And the answer is maybe either of those things or

2   somewhere in between.  And in this case it's more complex than

3   that.

4        Of course I need to look at all the relevant conduct,

5   but that doesn't really answer the question for me.  I could

6   make specific factual findings as to particular actions.  I'm

7   not comfortable doing that.  Virtually every atrocity that was

8   described by witnesses in this trial was supported by the

9   testimony of a single witness without much in the way of

10  corroboration, and at least some of the witnesses had some

11  credibility issues, at least as to some aspects of their

12  testimony.  It's not to say I don't believe the testimony taken

13  as a whole, but my confidence level is not as high as it might

14  be in, let's say, a murder trial in a modern American court,

15  let's put it that way.

16       There's the question of the extraterritorial reach of

17  this.  There's an argument that you prosecute people where you

18  find them for human rights abuses, whether they occur in Latin

19  America or Africa or Asia or in the United States or Europe.

20  And, of course, there's a counter argument that jurisdiction

21  matters; the precise criminal charges matter; that this is not

22  an international tribunal.  There's no international sanction

23  for me to sit in judgment on the genocide in Rwanda.

24       Of course, I certainly don't want to suggest in any

25  way, shape or form that this was not a terrible tragedy, one of

1 the worst episodes in the whole degraded and unhappy history of

2 the human race.  It apparently was the fastest genocide ever in

3 terms of killings per day or per week, or whatever the right

4 metric is.  It may be the most direct genocide in the sense

5 that the murders were committed for the most part not by an

6 army or by secret police or even a political party but by

7 ordinary people killing their neighbors and in the most direct

8 way possible, with hatchets and machetes.  It's so horrifying

9 that it's hard to get your arms around it, to think about it

10 clearly.  It's so beyond the pale of our ordinary existence

11 that it's hard to understand it or to think of it as real.

12         So where does all that take me?

13         As to the record -- the argument that his criminal

14 record is inadequate, I think that doesn't really quite fit

15 what we're doing here.  This is not an issue, for example, of

16 unscored offenses or anything like that.  I think the real

17 issue is whether I should simply impose a variant non-guideline

18 sentence, if that's what I think is appropriate, or stick with

19 a guideline sentence, and if so, where within the range.

20         Again, there is no easy answer to these questions,

21 which are pointing in absolutely opposite directions, and I

22 certainly don't want to make a statement of any kind, other

23 than the actual sentence I'm pronouncing, as to how bad this

24 genocide is or how it compared with other genocides or whether

25 I'm being light on people who commit genocide or sufficiently

1  tough on people who commit genocide.

2          I think where I'm coming to rest is with the

3  Sentencing Guidelines.  There is a guideline directly on point.

4  It does, to a considerable degree, balance these factors.  It's

5  something of a fudge perhaps because all sentencing is

6  something of a fudge in the sense that you're asked to

7  reconcile things that can't be reconciled.  But I think under

8  the circumstances I'm going to sentence him within the

9  guideline range, which is 78 to 97 months.

10         The next question is where within that range.  And I

11  guess I'm convinced that under the circumstances here that the

12  high end of the range is appropriate.  So I'm going to impose a

13  sentence of 97 months.

14         I do that with misgivings, as you can tell.

15  Misgivings that maybe it ought to be higher, maybe it ought to

16  be lower, but I'm just going to impose the guideline sentence

17  at the high end of the range.  Not automatically; I've

18  certainly given it considerable thought, but because I think it

19  best balances the different factors that I'm being asked to

20  weigh here.

21         I'm not going to impose a term of supervised release.

22  I do expect that he's going to be deported or removed, and I'm

23  not going to do that, and I'm not going to impose a fine

24  because there's no evidence that he has any financial

25  resources.  So the sentence will be the sentence plus the $500

# Add. 46

1  special assessment, and that's what I'm going to impose.

2      So what I'm going to do, as is my practice, is to

3  formally state the sentence that I'm going to impose followed

4  by a statement of the reasons, to the extent I haven't done so

5  already.  Then I'll give counsel a final opportunity to impose

6  any additional corrections or additions.

7      Would the defendant please stand.

8      Pursuant to the Sentencing Reform Act of 1984 and

9  having considered the sentencing factors set forth at 18 United

10  States Code Section 3553(a), it is the judgment of the court

11  that the defendant Jean Leonard Teganya is hereby committed to

12  the custody of the Bureau of Prisons to be imprisoned for a

13  term of 97 months.  This term consists of 97 months on all five

14  counts to be served concurrently.  It is further ordered that

15  the defendant shall pay to the United States a special

16  assessment of $500 which shall be due immediately.

17      You may be seated.

18      In terms of the reasons for the sentence, it is a

19  non-guideline sentence -- I'm sorry -- a guideline sentence

20  imposed for the reasons indicated.  Again, I'm imposing no term

21  of supervised release as I expect the defendant will be

22  deported or removed.  I'm imposing no fine because he's

23  established that he is not able, and even with a reasonable

24  installment schedule, is not likely to become able to pay all

25  or part of the fine required under the guidelines.  And the

**Add. 47**

```
 1   special assessment is, of course, mandatory.
 2          Do counsel have any addition or correction or
 3   objection to that sentence not previously raised?
 4          I'm sorry?
 5          PROBATION:  Your Honor, my apologies.
 6          THE COURT:  I can't make them concurrent?  Is that --
 7          PROBATION:  I believe Counts Two, Four and Five have a
 8   statutory maximum of five years.
 9          THE COURT:  So Two, Four and Five?
10          PROBATION:  Correct.
11          THE COURT:  All right.  So it's 60 months on Two, Four
12   and Five, and 97 months on One and Three to be served
13   concurrently.
14          PROBATION:  Thank you.
15          THE COURT:  Thank you.
16          Mr. Garland.
17          MR. GARLAND:  No objections other than those already
18   raised, your Honor.
19          THE COURT:  Mr. Lauer.
20          MR. LAUER:  No, your Honor.  I would just say that we
21   request a judicial recommendation that the sentence be served
22   at Berlin in New Hampshire.
23          THE COURT:  All right.  I will make a judicial
24   recommendation that the defendant serve his term of
25   incarceration if consistent with security and other
```

Add. 48

 1  requirements of the prison system at the facility in Berlin,

 2  New Hampshire.

 3      All right.  The sentence is hereby imposed as stated.

 4  Let me give him his advice of rights.

 5      Mr. Teganya, you can appeal your conviction.  You also

 6  can appeal your sentence, particularly if you think the

 7  sentence was contrary to law.  If you're unable to pay the

 8  costs of appeal, you may ask permission to have those costs

 9  waived and appeal without paying.  You must file any notice of

10  appeal within 14 days after the entry of judgment.  And if you

11  request, the clerk will immediately prepare and file a notice

12  of appeal on your behalf.  Is there anything further?

13      MR. GARLAND:  No, your Honor.

14      MR. LAUER:  No, your Honor.  Thank you.

15      THE COURT:  All right.  Thank you.  We'll stand in

16  recess.

17      THE CLERK:  All rise.

18  (Proceedings adjourned at 2:50 p.m.

19

20

21

22

23

24

25

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

## District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| JEAN LEONARD TEGANYA | Case Number: **1: 17 CR 10292** – **001** – **FDS** |
| | USM Number:  00463-138 |
| | Scott Lauer |
| | Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1, 2, 3, 4 and 5
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1546(a) | Fraud and Misuse of Visas, Permits, and Other Documents | 09/13/14 | 1 |
| 18 U.S.C. § 1621(2) | Perjury | 09/16/14 | 2 |
| 18 U.S.C. § 1546(a) | Fraud and Misuse of Visas, Permits, and Other Documents | 09/13/14 | 3 |
| 18 U.S.C. § 1621(2) | Perjury | 09/16/14 | 4 |
| 18 U.S.C. § 1621(1) | Perjury | 09/16/14 | 5 |

    The defendant is sentenced as provided in pages 2 through _____4_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

7/1/2019
_____
Date of Imposition of Judgment

/s/ F. Dennis Saylor, IV
_____
Signature of Judge

The Honorable F. Dennis Saylor IV
Judge, U.S. District Court
_____
Name and Title of Judge

7/2/2019
_____
Date

# Add. 50

AO 245B (Rev. 11/16)   Judgment in Criminal Case
　　　　　　　　　Sheet 2 — Imprisonment

Judgment — Page   2   of   4

DEFENDANT:  JEAN LEONARD TEGANYA
CASE NUMBER:   1: 17  CR  10292   - 001 - FDS

## IMPRISONMENT

　　　　The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total
term of:      97   month(s)

This term consists of terms of 97 months on counts 1 and 3, and 60 months on counts 2, 4, and 5, to be served concurrently.

☑  The court makes the following recommendations to the Bureau of Prisons:

The defendant shall be incarcerated at FCI Berlin, if consistent with security and other requirements.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

　　☐  at _____  ☐  a.m.  ☐  p.m.   on  _____ .

　　☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

　　☐  before 2 p.m. on  _____ .

　　☐  as notified by the United States Marshal.

　　☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

# Add. 51

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___3___ of ___4___

DEFENDANT:   JEAN LEONARD TEGANYA
CASE NUMBER:   **1: 17 CR 10292   - 001 - FDS**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 500.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☐   The determination of restitution is deferred until _____.  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $                    0.00 | $                0.00 | |

☐   Restitution amount ordered pursuant to plea agreement  $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐   the interest requirement is waived for the      ☐  fine   ☐  restitution.

☐   the interest requirement for the      ☐  fine   ☐  restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

# Add. 52

Judgment — Page ___4___ of ___4___

DEFENDANT:   JEAN LEONARD TEGANYA
CASE NUMBER:   **1: 17 CR 10292  - 001 - FDS**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ ___500.00___   due immediately, balance due

      ☐  not later than _____ , or
      ☐  in accordance with ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with   ☐C,   ☐ D, or   ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

# Add. 53